IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| LERNOUT & HAUSPIE SPEECH PRODUCTS N.V., et al., | Case No. 00-04397 (JHW) Through 00-04399 (JHW) (Jointly Administered) |
| Debtor. | |
| _____/ | |
| SCOTT L. BAENA, LITIGATION TRUSTEE OF THE LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. LITIGATION TRUST, | |
| Plaintiff, | |
| | Ad. Proc. No. _____ |
| v. | |
| KPMG LLP and KLYNVELD PEAT MARWICK GOERDELER BEDRIJFSREVISOREN, | |
| Defendants. | |
| _____/ | |

## COMPLAINT

Plaintiff, Scott L. Baena, Litigation Trustee of the Lernout & Hauspie Speech Products, N.V. Litigation Trust, sues Defendants, KPMG LLP ("KPMG US") and KLYNVELD PEAT MARWICK GOERDELER BEDRIJFSREVISOREN ("KPMG Belgium"), and alleges:

## INTRODUCTION

1.     This is an action for damages arising from accounting irregularities and misstatements of revenues that, in relative terms, exceed in severity and degree the accounting problems found in much more publicized corporate failures such as Enron and WorldCom.

2.      Lernout & Hauspie Speech Products, N.V. ("L&H" or the "Company") was an international software technology enterprise whose business was centered on the burgeoning field of speech recognition systems.  Between 1995, when it completed its initial public offering and commenced trading on NASDAQ, through the summer of 2000, L&H projected the appearance of a true market leader with seemingly limitless potential.

3.      L&H's reported revenues showed more than a 100% increase between 1997 and 1998 and another 60% increase between 1998 and 1999.  Its operational and financial growth as reflected in its public filings attracted investors on both sides of the Atlantic and included such technology powerhouses as Microsoft, Dell and Intel.  By March 2000, L&H's stock price had climbed to more than $70 per share, resulting in a market capitalization in excess of $8 billion.

4.      The reality, however, was that the highly touted technological and financial accomplishments that fueled L&H's explosive growth did not exist; they were the product of a systematic and elaborate program of misstatement and overstatement of Company revenue.

5.      The discovery of these misstatements and overstatements first began in August 2000 and ultimately resulted in (i) the dramatic plunge of the price of L&H's stock to little more than $1 per share, (ii) the restatement of L&H's revenues for 1998, 1999 and the first half of 2000 by more than $360 million (almost 50% of the Company's reported revenue for these periods), and (iii) the commencement by L&H of bankruptcy proceedings in November, 2000 that ended in the Company's liquidation.

6.      The improper recognition and reporting of revenue that helped spawn the Company's growth, and ultimately led to its demise, were implemented by certain members of L&H's management with the assistance, both direct and indirect, of its long-time accountants, KPMG US and KPMG Belgium.

7.    KPMG US and KPMG Belgium's assistance in L&H's improper recognition and reporting of its revenue was critical; it prevented the independent members of L&H's Board of Directors from being able to discover and correct the misstatements and allowed L&H to complete acquisitions that caused the Company to incur hundreds of millions of dollars of debt that the Company could not possibly repay.

8.    This action is brought to hold KPMG US and KPMG Belgium accountable for the hundreds of millions of dollars of damages suffered by the Company as a consequence of their actions.

## PLAINTIFF

9.    Plaintiff, Scott L. Baena, is the Litigation Trustee of the Lernout & Hauspie Speech Products, N.V. Litigation Trust.

10.    Plaintiff's position arose out of L&H's bankruptcy, commenced on November 29, 2000 by its filing of a voluntary petition in the United States Bankruptcy Court for the District of Delaware for relief under chapter 11 of title 11 of the United States Code.

11.    On March 31, 2001, the United States Trustee appointed an official committee of unsecured creditors (the "Committee") and, on May 30, 2003, the Bankruptcy Court entered an order confirming a plan of liquidation (the "Plan").

12.    The Plan vests authority to maintain and prosecute claims after its effective date with a litigation trustee appointed by the Committee.

13.    On April 2, 2004 (the "Effective Date"), the Plan became effective and the Committee appointed Plaintiff Scott L. Baena as the litigation trustee ("Plaintiff" or "Litigation Trustee").

14.     As of the Effective Date and in accordance with the terms of the Plan, Plaintiff as the Litigation Trustee assumed responsibility for the prosecution of all claims of L&H and was vested with all right, title and interest of L&H in those claims.

### DEFENDANTS

15.     Defendant KPMG US is a public accounting firm and a limited liability partnership organized under the laws of the state of Delaware.

16.     Defendant KPMG Belgium is a Belgian public accounting firm that has conducted business in the United States through its agents and affiliates.

17.     KPMG US and KPMG Belgium are both members of KPMG International ("KPMG"), a Swiss "Verein" or association.  Each KPMG firm worldwide, including KPMG US and KPMG Belgium, is a member of KPMG, which markets itself and all of its member firms as a single entity.

18.     Since 1991, L&H was a global client of KPMG.  As part of that engagement, both KPMG US and KPMG Belgium served as L&H's accountants and, among other things, issued unqualified reports on L&H financial statements for 1998 and 1999 and ensured they were prepared in compliance with United States Generally Accepted Accounting Principles ("US GAAP") and Generally Accepted Auditing Standards ("US GAAS").

### JURISDICTION

19.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334

20.     This Court has in personam jurisdiction over KPMG Belgium because the claims asserted against it in this complaint arise out of the transaction of business in the United States

by KPMG Belgium through its agents and affiliates causing injury by acts and omissions in the United States.

21.    Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## **IMPROPER REVENUE RECOGNITION PRACTICES**

22.    Prior to the L&H bankruptcy, various members of L&H's management (the "Breaching Managers") engaged in activities and practices that falsely and artificially inflated L&H's revenues and earnings.  In so doing, they caused the Company to incur over $340 million of debt that L&H could never pay.

23.    The Breaching Managers routinely and improperly recorded revenues derived from, among other things, barter transactions, transactions without contracts, transactions with fictitious parties or parties whose ability perform was in doubt, transactions based on wholly contingent contracts, and loan transactions disguised as sales.

### **Barter/Exchange Transaction.**

24.    Accounting Principles Board Opinion No. 29 states that "an exchange of a product or property held for sale in the ordinary course of business for a product for property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange" does not culminate an earnings process, and that revenue may not be recognized.

25.    Notwithstanding this rule, the Breaching Managers repeatedly recorded revenue from barter or exchange transactions where no cash changed hands.

26.    The use of barter or exchange transactions was particularly common to L&H's United States operations, headquartered in Burlington Massachusetts.  Indeed, a former L&H sales manager said barter/swap transactions were widespread at L&H Burlington and "a standard practice within the whole company."

**Booking Revenue Without A Contract.**

27.    Statement of Position ("SOP") 97-2 of the American Institute of Certified Public Accountants states that there must be persuasive evidence of an existing arrangement in order to recognize revenue and that "if the vendor has a customary business practice of utilizing written contracts, evidence of the arrangement is provided only by a contract signed by both parties."

28.    L&H's internal revenue recognition policy mirrored the requirements of SOP 97 and provided that L&H only recognizes revenue, *inter alia*, "upon the signing of the license agreement . . . when no contractual terms remain unsatisfied . . ."

29.    Again, notwithstanding the applicable accounting principles and Company policy, the Breaching Managers regularly and improperly recognized revenues where no contract was signed or where the terms of the contract were not finalized.  In fact, they repeatedly booked sales even though negotiations were still ongoing, and the "customer" was under no binding obligation to purchase the product.

30.    For example, the Breaching Managers recorded $23 million in revenue for the last quarter of 1999 from purported licensing agreements between L&H and its affiliates on the one hand and Digital Sei-Young Ltd, Doshin Electronics, Co. Ltd., Neo Information Telecom Corp. and HI Worldwide, on the other hand.  In fact, none of these purported contracts was executed, let alone completed, in 1999, and all of the $23 million of recorded revenue subsequently had to be reversed.

**Booking Revenues When Collectibility was in Doubt.**

31.    SOP 97-2 also states that collectibility must be deemed to be probable in order for revenue to be recognized.

32.     In addition to booking revenue before contract negotiations were finalized, the Breaching Managers repeatedly recorded sales when it was doubtful that the customer could pay for its products or services and, in many instances, even when the customer did not exist.

33.     Indeed, the Breaching Managers became so emboldened in their ability to recognize revenue from sham transactions that they made little effort to disguise fictitious customers.  For example, the Breaching Managers recorded millions of dollars of revenue from transactions with numerous purported customers, all of which <u>coincidentally</u> were located at the same address in Singapore.  Not surprisingly, all of these customers were later discovered to be fictitious, and all of the revenue recorded from the transactions was required to be reversed.

**<u>Booking Revenues on Contingent Contracts and/or Prior to Delivery.</u>**

34.     SOP 97-2 further provides, <u>inter alia</u>, that fees under a software arrangement must be "fixed and determinable" before revenue can be recognized.

35.     Despite this rule, the Breaching Managers routinely recognized revenues from sales where delivery had not been completed or where other contingencies existed, such as the requirement that L&H later perform development work for the customer.

36.     For example, the Breaching Managers booked tens of millions of dollars of immediate revenue from license agreements with various purported language development companies ("LDC") and cross language development companies ("CLDC"), notwithstanding the fact that payments under these agreements were contingent on L&H itself doing all of the development work.

**<u>Loan Transactions Disguised As Revenue.</u>**

37.    Consistent with their practice of "manufacturing" transactions to artificially inflate revenues, the Breaching Managers also transformed loan agreements into purported sales agreements and, in the process, converted what should have been liabilities into revenues.

38.    This practice, which was common with the LDC's and CLDC's, is exemplified by L&H's contract with Capital Union, EC, an investment banker based in Bahrain, United Arab Emirates.

39.    On December 29, 1999, L&H entered into what purported to be an $8 million software license agreement with Capital Union which the Breaching Managers used to recognize the entire $8 million stated in the agreement as revenue in the fourth quarter of 1999.

40.    However, according to the terms of the "license agreement" and the supplements thereto, Capital Union was not intended to be the end-user of the licenses, but instead was to "sell" them to Belgian LDCs that L&H was to create for the purpose of purchasing the licenses.

41.    The newly created LDCs would then take the licenses and repay the $8 million Capital Union had advanced to L&H.  In addition, L&H would pay Capital Union $1.25 million of interest as well as a "success fee" of $490,000.

42.    In the event that the sale of the licenses to the not-yet-existent LDCs did not materialize, L&H promised to pay Capital Union $9.25 million (the $8 million license fee and interest of $1.25 million).

43.    Here as well, all of the $8 million of "revenue" recorded from the transaction was later required to be reversed.

### KPMG'S ROLE

44.     At all times material to this complaint, Defendants KPMG US and KPMG Belgium provided substantial assistance to the Breaching Managers in their overstatements and misstatements of Company revenues.

45.     KPMG US and KPMG Belgium served as L&H's auditors and reviewed L&H's financial results at the end of each quarter.

46.     KPMG US was primarily responsible for L&H's compliance with United States Accounting Standards, and in particular US GAAP and US GAAS.  Accordingly, whereas KPMG Belgium issued the certification of L&H's year-end financial statements, it only did so after receiving approval and authorization from KPMG US.

47.     As a result of providing audit and other services for L&H, KPMG US and KPMG Belgium personnel had continuous and unfettered access to, and knowledge of, L&H's confidential internal corporate, financial, operating and business information.  They also had ample opportunity to observe and review L&H's business and accounting practices, to test L&H's internal and publicly reported financial statements, and to review L&H's internal controls.

48.     In a letter dated April 25, 2001 to the L&H Board of Directors, Jo Lernout, one of the founders of L&H, wrote:

> In the course of the past ten years, we built up a good working relationship with KPMG, and we relied extensively on the advice from numerous KPMG divisions in various countries as well as on the KPMG audit departments, in particular in Belgium and in the United States.
>
> As part of this relationship, all information which we deemed relevant was always communicated to KPMG. Often, they worked side-by-side with the company in the execution of transactions.

49.    In his letter to the L&H Board of Directors dated April 25, 2001, Lernout indicated that, "from the day we were quoted on the stock exchange on 12/1/95, we turned to KPMG for every decision of any significance."

50.    Indeed, according to Carl Dammekens, L&H's Chief Financial Officer, L&H consulted with KPMG US personnel on revenue recognition issues "almost daily, certainly weekly," and provided KPMG US with all US contracts over $100,000 and all contracts worldwide over $1 million.  A procedure was put in place "so [KPMG US] would review [the contracts] quickly."

### Knowledge of False Revenue Recognition.

51.    KPMG US and KPMG Belgium's knowledge of L&H's misstatement of revenue is undeniable. For example, in an "URGENT" e-mail message dated October 18, 1999 from Oh Bum Kwon, a partner in KPMG's Korea office, to Stephan Huysman and William Van Arde of KPMG Belgium and Carl Dammenkens of L&H just weeks before the issuance of L&H's press release announcing third quarter financial results, Kwon wrote:

> We have just completed our fieldwork for the September closing of Bumil [L&H's Korea]. <u>However, we have a critical revenue recognition issue as follows and, I want you to confirm this in your office as appropriate L&H responsible personnel</u>.
>
> At 30 September 1999, L&H Korea ("Bumil") recognized the software revenue of approximately US$11M, the largest amount Bumil ever recorded. The sales were made to two unknown local software companies, VoiceTek (US$7M) and International Business Computer (U$4M), respectively, and I believe that Frederick's visit to Burnil last time was probably to review or record these transactions. Frederik [Deschodt's assistant controller at L&H] told the accountant of Bumil that this transaction was agree [sic] by KPMG at the Corporate level. I am surprised why he did not discussed [sic] with me when we met last time.
>
> We were not informed of the details of VoiceTek. Same to ICB. We know that VoiceTek was established in July this year in the

minimum paid-in capital. We are not aware of anything on IBC. <u>There are sales contracts dated 30 September 1999 with these new customers but there are no proper documents on the revenue generation schedule and condition</u>. The contracts say that the sales is [sic] final and no refund is required and the localising expenses to be incurred will be charged to the customers additionally, etc. <u>Furthermore, the receivable was factored with a local bank with a collateral of Bumil's bank deposit and we believe the factoring is "with recourse"</u>.

Because of this transaction at 30, September 1999, Bumil showed big profit, about, US$13M, in September while it had loss carryforward of approximately US$0.5M until the end of August.

Based on our understanding, I have several critical questions.

1. Why did Bumil recognized [sic] the whole amount in September? Per their explanation, the ultimate solution in Korean will take about five years to complete even though Bumil is not required to refund the contract amount. Therefore, at least, the revenue should be recognized over five years or more.

2. <u>The revenue recognition basis under USGAAP (SOP91-1 and 97-2) should be carefully complied in this transaction. Because of its sensitive nature of the first consolidation with L&H, I recommend you should consult your SEC partner on this issue. My preliminary interpretation is that this revenue recognition has some problems particularly in terms of "when-and-if" available conditions, delivery of products, and collectibility.</u>

As you know this issue should be cleared promptly to complete the consolidation, please discuss at Corporate level and advise me of the discussions. If it meets the requirements of SOP's, we may conclude the September closing and consolidation package of Bumil. (emphasis added).

Thanks in advance for your immediate action.

52.     Notwithstanding the fact that the transactions referred to in Kwon's e-mail were false, KPMG US and KPMG Belgium permitted L&H to report the transactions as revenue in the Company's financial results for the third quarter of 1999 and for the fiscal year ended December 31, 1999.

53.    Of course, Kwon's "preliminary interpretation" regarding the impropriety of recognizing the revenue was absolutely correct.  In fact, in connection with the subsequent investigation of L&H's revenue recognition practices following the revelation of L&H's misstatements and overstatements, the independent auditors commissioned by the Audit Committee of L&H's Board of Directors determined that the transactions with VoiceTek and ICB had to be reversed.  They also noted specifically that "KPMG was aware of the transaction" at the time it was originally recorded.

54.    KPMG US and KPMG Belgium also knew of serious issues surrounding the recognition of revenue in connection with the LDCs as early as July 1999. In a "private & confidential" letter dated July 29, 1999 from William Van Aerde of KPMG Belgium to Gaston Bastiaens, L&H's president and CEO, in Burlington Massachusetts, Van Aerde confirmed a meeting for September 1, 1999 including, among others, Robert McLamb and James Boyer, both of KPMG US, for the purposes of discussing the "Language Companies."  In particular, Van Aerde:

- wanted an update on the status, review of independence;

- required names of investors to arrange a separate meeting;

- wanted to review collectibility of the LDC receivables.

55.    The July 29, 1999 letter also indicated that Van Aerde wanted an "update on the status of all issues raised in the Report to the Audit Committee," the most important among them being "revenue recognition."

56.    Van Aerde's "questions" regarding the LDCs mirrored concerns that KPMG US also had raised, including whether the LDC investors were parties related to L&H. In fact, the "KPMG USA Professional Practice" group requested a "special review" of this issue in

connection with the review performed by KPMG Belgium on L&H's third quarter 1999 financial statements.

57.    In a series of e-mails dated between January 27 and January 29, 2000, KPMG US further documented the serious doubts they had concerning the validity of revenue transactions recorded by L&H in connection with the LDCs. For example, in a January 29, 2000 e-mail message from McLamb of KPMG US to Dammekens of L&H, and Van Aerde and Stephen Huysman of KPMG Belgium, McLamb wrote:

> It seems that a single payment of $25 million was paid to L&H Korea. The payment was for amounts owed to LHS (the group in total) by a number of LDC's. Who made this payment? We need to see the wire transfer or check and determine what bank account it came from. Why did the payment for several LDC's come from a single bank account? This makes it more important that we find out who the individual investors are for each of the LDC's. It is no longer acceptable for us to rely on an agent acting for a group of investors. When we find out the company or person that the $25 million payment came from we need to get KPMG Korea to find out about the Company or person. If the payment was made by a Company we need to know who the owners of the company are. This is very important.

McLamb correctly identified the source of the payment as "very important," but neither KPMG US nor KPMG Belgium ever determined the source of the payment. Nevertheless, both KPMG US and KPMG Belgium permitted the revenue to be recognized.

58.    KPMG US and KPMG Belgium also knew of one of the most important facts that ultimately led to the uncovering of the revenue misstatements by The Wall Street Journal: that many of the LDCs had the exact same business address. In fact, further to additional inquiries initiated by KPMG US's McLamb, Huysman of KPMG Belgium wrote to Oh Bum Kwon of KPMG Korea and Phillip Lee of KPMG Singapore (with a copy to McLamb) asking:

> Oh Bum and Philip, in connection with yesterdays mail and urgent request to obtain additional information on the investors in the

LDC's (customers of L&H Singapore) and the Korean customers of Bumil, can you in the meantime report to KPMG Ghent what procedures you have already performed to satisfy yourself that these are all existing (live) organisations? We made this request before in mail and fax instructions. From Korea, we got a mail back of an interview with Mr. Lee from HI world. Have any others been visited or have you checked these companies registrations at an official filing system? Are there financial statements available at a central filing that allow to find out if these companies are in a position to pay the large sums of the contracts to L&H? Is there a way of finding out through their articles of association who the shareholders/directors are behind them? At the request of Jo Demario, with whom you met last week, could someone of your office go the official addresses of these customers to see if they appear proper companies/organisations. It may be worthwhile taking a picture of the location.

Oh Bum, I will also fax the names and phone numbers of 3 Korean individuals to you. We have been informed that these would be investors. Jo has asked that someone confirms [sic] that these people/phones exist. Do the addresses appear to be normal addresses considering the fact that these individuals should be relatively wealthy as investors?

Philip, we obtained through your people registration of four companies (customers) of L&H Asia. Can you send someone down to the address of these companies to see if they are operational and appear proper companies and not just a post office box. Here as well, you may have some pictures taken. Can you please confirm? If any other LDC's are located in Singapore, please perform the same procedures.

The above request is urgent and your prompt cooperation is appreciated. As you know, the client is putting together the investors list. We expect to get this by end of this week. We may need your offices early next week to perform additional work for this (meet with investors, check out companies or individuals etc). We will keep you informed. Meanwhile, please start to update us on the above. We will keep Jo and Bob informed of the progress.

59.    KPMG US and KPMG Belgium's inquiries were warranted. As the Audit Committee of L&H's Board of Directors determined following its later investigation, seventeen of the LDC's and CLDC's with which L&H signed license agreements in 1998 and 1999, shared

the exact same address in Singapore.  These license agreements accounted for more than $50 million of the revenue recognized by L&H's during these periods

60.     Yet, despite this fact, and despite the fact that all of this revenue subsequently had to be reversed, KPMG US and KPMG Belgium sanctioned the inclusion of the full amount of LDC and CLDC revenue in L&H's 1998 and 1999 financial statements, and KPMG US authorized the publication of KPMG Belgium's certification of L&H's financial statements in L&H's public securities filings.

61.     In addition to its knowledge of L&H's improper revenue recognition, KPMG US and KPMG Belgium also had knowledge that the L&H accounting department was functionally inadequate.  In an e-mail message from Dammekens to McLamb dated May 3, 2000, Dammekens stated:

> I DO WANT TO BRING UP ANOTHER POINT - AM I CAPABLE OR [SIC] REMAINING CFO IN AN ORGNISATION LIKE THIS? PERSONALLY I DO NOT THINK SO.
>
> I AM CONVINCED THAT IT IS TIME TO BRING IN AN EXPERIENCED GUY, THAT CAN BRING STABILITY AND DISCIPLINE AND KNOWS HOW TO RUN THE FINANCES OF A BIG COMPANY (BECAUSE HE GREW UP IN ONE AND HAS DONE IT BEFORE).
>
> THINGS ARE GETTING OVER MY HEAD - I AM STAFFING UP MY PEOPLE, BUT WITH ALL THE DEALS/ACQUISITIONS THAT GO ON, I DO NOT HAVE TIME ENOUGH TO EVEN THINK ABOUT INTEGRATION OR ORGANISATION. (caps in original).

62.     Thus, KPMG US and KPMG Belgium were well aware that there was no "discipline" in the accounting department at L&H.  It was inexcusable for KPMG US and KPMG Belgium to authorize the issuance of unqualified audit opinions on the financial statements of a

*Baena v. KPMG US*

publicly traded company reporting hundreds of millions of dollars of revenues prepared by an individual who admitted to them he was "over [his] head."

**Active Participation in Improper Recognition of Revenue.**

63.     KPMG US and KPMG Belgium went far beyond simply turning a blind eye to the improper recognition of revenue; they instructed L&H how to "fix" contracts for inclusion in revenues reported to the public even though the contracts were not binding agreements at the time the revenues were recorded.

64.     In an e-mail dated January 5, 2000, five days <u>after</u> the end of L&H's 1999 fiscal year, KPMG US's McLamb sent Dammekens, the Chief Financial Officer of L&H, an attached memorandum entitled "COMMENTS ON CERTAIN DRAFT AGREEMENTS." The e-mail was copied to Glen Davison, another KPMG US auditor. According to the e-mail, McLamb had reviewed the "draft" agreements with Digital Sei-Young Ltd, Doshin Electronics, Co., Ltd., Neo Information Telecom Corp. and HI Worldwide.  He discussed a number of issues with respect to the contracts, each of which should have precluded, or limited substantially, the $23 million in revenue under these contracts which the Company wanted to recognize in the fourth quarter of 1999.

65.     With regard to the Digital Sei-Young contract, McLamb noted specific problem items including:

>    1.     The contract should be signed and dated by each party. Having just an effective date is unacceptable.
>
>    2.     Need to determine the financial viability of Digital to determine whether they have the financial ability to pay the $10 million.
>
>    3.     Need to see clear evidence of the delivery of the deliverables under each part of the contract.
>
>                            [* * *]

> 7.    Under each part of the contract Digital is required to obtain L&H's approval for design of packaging and other artwork. *This is continuing involvement of L&H and causes a problem with revenue recognition.*
>
> [* * *]
>
> 10.    *ArticleA.8.1 makes it possible for Digital to get its moneyback. . . .*
>
> [* * *]
>
> I have not looked into this further as I think that VSOE [Vendor Specific Objective Evidence] will not be established for each element and the entire $10 million would need to be amortized into income over the term of the agreement.
>
> I also believe that the accounting is affected by the continuing involvement of L&H (see 7 above) and the royalties could be refunded under certain circumstances (see 10 above).

McLamb made similar comments about the Doshin and Neo Information contracts in his January, 2000 memorandum. With regard to the HI Worldwide contract, McLamb wrote that he had "previously reviewed this contract and given my comments to Carl [Dammekens]."

66.    Notwithstanding the myriad issues raised by McLamb in his January 5, 2000 email and accompanying memorandum, KPMG US and KPMG Belgium still permitted all the revenue from these contracts to be recognized in the fourth quarter of 1999.

67.    Each of the contracts was determined to be invalid during the subsequent Audit Commitment Investigation, and all of the revenue associated with the contracts was required to be reversed.

### KPMG's Certification of L&H's Financial Statements and the Acquisitions of Dragon and Dictaphone

68.    In March 2000, L&H entered into contracts to acquire Dictaphone Corp. ("Dictaphone") and Dragon Systems, Inc. ("Dragon"), United States corporations with language recognition capability.

69.    On April 27, 2000, KPMG Belgium issued its certification of L&H's consolidated balance sheets and consolidated statements of operations for the fiscal years ending December 31, 1998 and December 31, 1999.  It stated:

> LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. AND
> SUBSIDIARIES INDEPENDENT AUDITOR'S REPORT
>
> The Board of Directors and Shareholders
>
> Lernout & Hauspie Speech Products N.V.:
>
> We have audited the accompanying consolidated balance sheets of Lernout & Hauspie Speech Products N.V. and subsidiaries (the Company as of December 31, 1998 and December 31, 1999, and the related consolidated statements of operations, shareholders' equity, cash flows and comprehensive income (loss) for each of the years in the three year period ended December 31, 1999.  These consolidated financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these consolidated financial statements based on our audits.
>
> We conducted our audits in accordance with generally accepted auditing standards in the United States.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provided a reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries of December 31, 1998 and December 31, 1999, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1999, in conformity with generally accepted accounting principles in the United States.
>
> Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren
> Brussels, Belgium
> April 27, 2000

70.    Because the audit was to be conducted in accordance with US GAAP and US GAAS, KPMG US was required to sign off and approve the certification before it could be issued and, in fact, did sign off and approve the certification.

71.    The issuance of the certification of L&H's financial statements was critical; without it L&H would not have been able to complete the acquisitions of Dictaphone and Dragon.

72.    Both of these acquisitions were funded with the currency of L&H's artificially inflated stock value that, in turn, was dependent on L&H's glowing financial statements for 1998 and 1999 – the same financial statements that were approved by KPMG US and certified by KPMG Belgium.

73.    In connection with and as a necessary consequence of the Dictaphone and Dragon acquisitions, L&H incurred more than $340 million in new debt.

74.    KPMG US and KPMG Belgium were well aware of the importance of L&H's operational results to the consummation of the Dictaphone and Dragon acquisitions; they also were well aware that the deals would not close if the overstatements and misstatements of L&H's revenue were revealed.

75.    KPMG US and KPMG Belgium also knew of the "dramatic" changes and risks that the Dictaphone and Dragon acquisitions presented to L&H.  In fact, in an e-mail that KPMG US's McLamb wrote to various members of L&H's management on August 31, 2000, he observed:

> Lernout & Hauspie Speech Products N.V. (LHS) has grown rapidly during the five years of my involvement with the Company.  Much of this growth has come through acquisitions, with each acquisition being larger than the previous one.  With these acquisitions has come change, most of it good, but some bad.

> However in the last six months we have seen the most dramatic growth and change. The acquisitions of Dictaphone and Dragon have resulted in a dramatic increase in the amount of revenues and debt of the Company, like it has never experienced in the past. In addition they have resulted in a significant increase in the number of products, employees, market expectations and skeptics. These acquisitions have brought with them opportunities and conflict. The opportunity to expand L&H's presence and penetration into a number of different markets. The conflicts include cultural issues, financial resources, personnel resources and cost reductions.

76.    Unfortunately, the ultimate discovery of L&H's revenue misstatements (representing almost half of L&H's reported revenue) that KPMG US and KPMG Belgium should have known was inevitable, never allowed L&H to realize any of the possible benefits from the Dictaphone and Dragon acquisitions.

77.    Instead, it left the Company saddled with $340 million of new debt incurred in connection with the acquisitions that it could not possibly repay. This debt together with the revelations of L&H's misstatements and overstatements of its revenue forced the Company into bankruptcy and ultimately liquidation.

### DISCOVERY OF THE MISSTATEMENTS OF REVENUE

### The August 8th *Wall Street Journal* Story.

78.    On August 8, 2000, The Wall Street Journal began reporting the results of inquiries it had initiated into L&H and its explosive growth. As would be revealed over the coming months, merely by asking a few questions of purported "customers," the Journal's reporters (based in Boston) were able to uncover the widespread overstatement of revenue that had been concealed by the Breaching Managers with the assistance of KPMG US and KPMG Belgium. The first Journal article on August 8, 2000 focused on L&H's Korean operations and reported that:

...[S]ome companies that L&H has identified as Korean customers say they do no business at all with L&H. Others say their purchases have been smaller than L&H says. L&H officials now acknowledge they made some mistaken initial representations about customers. But the company disputes other accounts given by some of the Korean companies, and it insists its Korean revenue figures are accurate.

[* * *]

In Korea, Mr. Bastiaens says L&H sells a range of products, including software licenses and automated phone switchboards that recognize voice commands. In May, while being questioned about the Asian sales by a reporter, he volunteered the names of about a dozen Korean customers. Later, the CEO provided ranges of the dollar amount of business done with those and some other customers. Subsequently, the company disclosed more names. In all, 18 of about 30 companies claimed by L&H as customers were contacted by this newspaper.

Three of the companies say they aren't, in fact, L&H customers. L&H says one of those was a former Bumil customer, and was mistakenly put on its list. Three more companies say their purchases from L&H over the past three quarters were smaller than figures provided by Mr. Bastiaens or Sam Cho, vice president of L&H Korea. One additional company says it is in a joint business with L&H that produces considerably less revenue than L&H claims. Officials from an eighth company initially said it had formed a joint venture with L&H and that the joint venture, not the company itself, had purchased products from L&H. Later, the company retracted this initial version.

[***]

Among the companies that L&H boasts as customers: Korea Securities Computer Corp., or Koscom, a government-regulated clearinghouse for stock trades. Mr. Bastiaens initially says L&H received revenue in the range of $5 million to $10 million (he wouldn't be more specific) from Koscorn in the three quarters ended June 30. According to two Koscorn officials, whose names were provided by L&H, Koscom and L&H are partners in an automated phone stock quote service. Korea Telecom collects the per call payment, keeps 10% and splits the rest between Koscom and L&H.

One of the Koscorn officials estimated L&H and Burnil's share of the revenue at roughly $1.5 million in 1999. Told of the

discrepancy, L&H contradicts Mr. Bastiaens and puts the Koscorn revenue in the range of $1 million to $5 million.

In a Dec. 28, 1999, press release, L&H said Samsung Securities, a big Korean brokerage, together with more than 14 other securities firms, had "selected L&H to develop client server solutions for online trading and automated dialogue systems." But two Samsung officials, including spokesman Shin Dong Woo, say their firm never made any purchases from L&H, although they discussed some.

[***]

L&H also claims LG Electronics as a customer. But Yu Won Uk, a senior research engineer at LG Electronics - a contact provided by L&H - says his company never bought products or licenses from L&H. Instead, he says the two firms briefly worked on joint project for applying voice recognition to television, but stopped because there "was no progress." LG Electronics paid L&H only "engineer charges," he says, akin to labor costs for L&H's share of the work on the failed project.

[***]

Another Korean company with which L&H says it has a significant relationship is Hung Chang Co., a maker of communications equipment. Mr. Bastiaens put revenue from Hung Chang in the range of $5 million and $10 million over the past three quarters.

However, Kim Ho Kyun, a Hung Chang official whom L&H identified as its contact, says Hung Chang wasn't using L&H products internally and that L&H's $5 million bill was paid by a joint venture called Spia, "not Hung Chang." Another Hung Chang official, Choi Sang Hyun, who was reached independently of L&H says Spia Co. was founded May 2, with Hung Chang as the largest shareholder, but June 28 L&H Korea became the largest, with Hung Chang holding 27.49%. Mr. Choi says Spia makes products based on L&H's voice recognition technology, and says Hung Chang is only a passive shareholder.

[***]

Mr. Bastiaens also identified Hyundai Securities and Hanvit Bank as providing revenue totaling between $5 million and $10 million. But at Hyundai Securities, two officials, including a contact provided by L&H, say their purchases amounted to just over $1

> million. At Hanvit Bank, Lee Jae Bong, manager of network management, says the only contract signed by its intuition tallied $150,000.

[Emphasis added.]

79.    Despite L&H's assertion that all Korean revenues were accurate, L&H then commissioned a mid-year interim audit of the company by KPMG, even though KPMG Belgium had certified L&H's financial statements less than four months earlier and KPMG US had authorized the inclusion of the certification in L&H's Form 10K less than two months earlier.

80.    On September 21, 2000, L&H issued a press release announcing an SEC investigation into L&H and reporting that its Audit Committee had initiated its own investigation of L&H's prior financial statements at the request of L&H's Board of Directors.

81.    On September 22 and 26, 2000, The Wall Street Journal published new articles that raised significant questions about L&H's Asian revenue.  Specifically, the articles focused on the Singapore and Belgian startup LDC's that accounted for nearly all of L&H's Asian revenue reported in 1998 and 1999. The articles also raised concerns about the connection between the startup LDC's and an investment capital fund that was closely related to L&H.

82.    Significantly, the Belgian and Singapore LDC's that were the subject of the articles included the same LDC's that that shared the same address in Singapore that KPMG US and KPMG Belgium had scrutinized only a few months before.  These, of course, were the LDC's whose investors and operations neither KPMG US nor KPMG Belgium ever verified, but whose $50 million plus of contract revenue KPMG US and KPMG Belgium nevertheless allowed to be in included in L&H's certified financial results.

**Admission of "Accounting Irregularities".**

83.     On November 9, 2000, in the course of the L&H Audit Committee's investigation into the misstatements of revenue, L&H issued a press release announcing that as a result of past accounting "errors and irregularities" L&H would need to restate the most recent 2½ years of financial statements. Specifically, L&H announced:

> "[a]s a result of certain errors and irregularities identified in the audit committee inquiry, the Company expects to restate its financial statements for the periods 1998, 1999 and for the first half of 2000. Although the audit committee is working diligently to determine the impact of these discrepancies on L&H's financial statements for these periods, L&H does not expect the audit and necessary restatements to be completed by November 14, 2000. Accordingly, the Company does not believe that its Form 10-Q for the third quarter ended September 30, 2000 will be filed in a timely manner.

84.     In reaction, on November 9, 2000, both NASDAQ and EASDAQ suspended trading of L&H stock. Prior to the suspension, the price of L&H on the NASDAQ market fell as low as $6.2188. After trading finally resumed on December 8, 2000, the stock plummeted to $1.40 per share and continued its free fall to trade below $1 per share from December 12 to December 15, 2000.

85.     On November 15, 2000, KPMG withdrew its audit report of L&H's 1998 and 1999 financial results, stating that its prior audit opinions "should no longer be relied upon." This decision was based on the same information that was available to, and in many instances actually considered by, KPMG US and KPMG Belgium when the certification of L&H's financial statements was issued and then filed with the SEC less than six months earlier.

**The Audit Committee Report.**

86.     On November 20, 2000, the Audit Committee of L&H was presented with the report of the investigation that it had commissioned regarding L&H's revenue recognition practices.  The report listed a host of accounting irregularities, related to the Company's 1998 and

1999 revenues, and concluded, in part, that L&H had improperly recorded as much as $277 million in revenue during 1998, 1999 and the first half of 2000.

87.     The initial calculation of L&H's misstatement of revenues in connection with the Audit Committee investigation was subsequently increased to $362,700,000, and was performed without any assistance of KPMG.  In fact, notwithstanding that KPMG had served as the Company's auditors for ten years and had certified the Company's financial statements for 1998 and 1999, it refused to cooperate with the Audit Committee investigation and was not even willing to make its work papers available for the investigators to review.

**L&H's Bankruptcy**

88.     On November 29, 2000, nine days after the Audit Committee report, L&H was forced to file for Chapter 11 Bankruptcy protection in the United States Bankruptcy Court for the District of Delaware

89.     It soon became evident that L&H could not be reorganized and, as a result, a Plan of Liquidation of the Company was proposed to, and confirmed by, the Bankruptcy Court. Based on projections included in the Plan Disclosure Statement, distributions to unsecured creditors of L&H were estimated to be approximately 4½ cents on the dollar.

## COUNT I

### (Violation of Mss. Gen. L.C. 93A by KPMG US)

90.     The Liquidating Trustee realleges paragraphs 1 through 89, above as it set forth herein at length.

91.     KPMG US undertook to provide L&H accounting services for which KPMG US received compensation.

92.     The conduct of KPMG US that culminated in its approval and authorization of the certification of L&H's financial statements allowed the acquisitions of Dictaphone and Dragon to be completed by enabling the Breaching Managers to conceal their overstatements and misstatements of L&H's revenue from the independent directors on the Audit Committee as well as from Dictaphone and Dragon until well after the closings of these transactions.

93.     As demonstrated by the prompt actions the Audit Committee undertook to investigate and correct the misstatements and overstatements of revenue after they were revealed by The Wall Street Journal reports, the independent directors could, and would, have prevented the dissemination of the false financial information that was necessary to close the Dictaphone and Dragon acquisitions.

94.     If the true financial condition of L&H had been revealed, either by corrected financial statements or by the refusal of KPMG US to approve and authorize KPMG Belgium to certify the false financial statements, neither acquisition would have closed.

95.     The conduct of KPMG US described in this complaint constituted unfair and/or deceptive acts or practices in violation of Mass. Gen L.C. 93A § 2.

96.     As a result of KPMG US's use or employment of the aforementioned unfair and/or deceptive act or practice, L&H has suffered substantial damages, including but not limited to, the incurrence of over $340 million of debts that L&H could not possibly repay.

97.     The facts alleged in this complaint, including specifically the fact that KPMG US authorized KPMG Belgium to certify L&H's financial statements as complying with US GAAP and US GAAS, the fact that L&H's United States headquarters were located in Burlington, Massachusetts, and the fact that KPMG US performed its audit functions primarily out of its

Boston office, establishes Massachusetts as the "center of gravity" of the conduct of KPMG US giving rise to this action.

98.    WHEREFORE, Plaintiff demands judgment against KPMG US for damages in excess of 340 million, plus interest, cost and all other relief that the Court deems just and proper.

## COUNT II

### (Violation of Mss. Gen. L.C. 93A by KPMG Belgium)

99.    The Liquidating Trustee realleges paragraphs 1 through 89, above as it set forth herein at length.

100.    KPMG Belgium undertook to provide L&H accounting services for which KPMG Belgium received compensation.

101.    The conduct of KPMG Belgium, culminating in its certification of L&H's financial statements, allowed the acquisitions of Dictaphone and Dragon to be completed by enabling the Breaching Managers to conceal their overstatements and misstatements of L&H's revenue from the independent directors on the Audit Committee as well as from Dictaphone and Dragon until well after the closings of these transactions.

102.    As demonstrated by the prompt actions that the Audit Committee undertook to investigate and correct the misstatements and overstatements of revenue after they were revealed by The Wall Street Journal reports, the independent directors could, and would, have prevented the dissemination of the false financial information that were integral to the Dictaphone and Dragon acquisitions.

103.    If the true financial condition of L&H had been revealed, either by corrected financial statements or by the refusal of KPMG Belgium to certify the false financial statements, neither acquisition would have closed.

104.    The conduct of KPMG Belgium described in this complaint constituted unfair and/or deceptive acts or practices in violation of Mass. Gen L.C. 93A § 2.

105.    As a result of KPMG Belgium's use or employment of the aforementioned unfair and/or deceptive act or practice, L&H has suffered substantial damages, including but not limited to, the incurrence of over $340 million of debts that L&H could not possibly repay.

106.    The combination of the facts alleged above, including specifically the fact that KPMG Belgium certified L&H's financial statements as complying with US GAAP and US GAAS, the fact that L&H's United States headquarters were located in Burlington, Massachusetts, and the fact that KPMG Belgium utilized the services and expertise of KPMG US and its Boston audit team, establishes Massachusetts as the "center of gravity" of the acts and omissions of KPMG Belgium giving rise to this action.

WHEREFORE, Plaintiff demands judgment against KPMG Belgium for damages in excess of $340 million, plus interest, cost and all other relief that the Court deems just and proper.

## **COUNT III**

### **(Aiding and Abetting Breach of Fiduciary Duty against KPMG US)**

107.    The Liquidating Trustee realleges paragraphs 1 through 89 as through fully set forth herein.

108.    By virtue of their position with the Company, all of the Breaching Managers owed fiduciary duties to L&H to fairly and faithfully manage the operations and financial affairs of L&H.

109.    The Breaching Managers breached their fiduciary duties to L&H by overstating and misstating the Company's revenue as set forth above.

110.    As further set forth above, KPMG US knowingly participated in and gave substantial assistance to the Breaching Manager's aforementioned breaches of their fiduciary duties.

111.    In fact, the aiding and abetting of the Breaching Managers violations of their fiduciary duties by KPMG US allowed the Breaching Managers to conceal their overstatements and misstatements of L&H's revenue from the independent directors on the Audit Committee until well after the acquisitions of Dictaphone and Dragon had been completed.

112.    As demonstrated by the prompt actions that the Audit Committee undertook to investigate and correct the misstatements and overstatements of revenue after they were revealed by The Wall Street Journal reports, the independent directors could, and would, have prevented the dissemination of the false financial information that were integral to the Dictaphone and Dragon acquisitions.

113.    If the true financial condition of L&H had been revealed, either by corrected financial statements or by the refusal of KPMG US to approve and authorize KPMG Belgium to certify the false financial statements, neither acquisition would have closed.

114.    As a result of the above-described conduct of KPMG US, L&H has suffered substantial damages including, but not limited to, the incurrence of over $340 million of debts that L&H could not possibly repay.

WHEREFORE, Plaintiff demands judgment against KPMG US for damages in excess of $340 million, plus interest, cost and all other relief that the Court deems just and proper.

## COUNT IV

**(Aiding and Abetting Breach of Fiduciary Duty against KPMG Belgium)**

115.    The Liquidating Trustee realleges paragraphs 1 through 89 as through fully set forth herein.

116.    By virtue of their position with the Company, all of the Breaching Managers owed fiduciary duties to L&H to fairly and faithfully manage the operations and financial affairs of L&H.

117.    The Breaching Managers breached their fiduciary duties to L&H by overstating and misstating the Company's revenue as set forth above.

118.    As further set forth above, KPMG Belgium knowingly participated in and gave substantial assistance to the Breaching Manager's aforementioned breaches of their fiduciary duties.

119.    In fact, the aiding and abetting of the Breaching Managers violations of their fiduciary duties by KPMG Belgium allowed the Breaching Managers to conceal their overstatements and misstatements of L&H's revenue from the independent directors on the Audit Committee until well after the acquisitions of Dictaphone and Dragon had been completed.

120.    As demonstrated by the prompt actions that the Audit Committee undertook to investigate and correct the misstatements and overstatements of revenue after they were revealed by The Wall Street Journal reports, the independent directors could, and would, have prevented the dissemination of the false financial information that were integral to the Dictaphone and Dragon acquisitions.

121.    If the true financial condition of L&H had been revealed, either by corrected financial statements or by the refusal of KPMG Belgium to certify the false financial statements, neither acquisition would have closed.

122.    As a result of the above-described conduct of KPMG Belgium, L&H has suffered substantial damages including, but not limited to, the incurrence of over $340 million of debts that L&H could not possibly repay.

WHEREFORE, Plaintiff demands judgment against KPMG Belgium for damages in excess of $340 million, plus interest, cost and all other relief that the Court deems just and proper.

## COUNT V
### (Malpractice against KPMG US)

123.    The Liquidating Trustee realleges paragraphs 1 through 89, 111 through 113 as though fully set forth herein.

124.    KPMG US owed L&H a duty to exercise care in the performance of its professional services and a duty to perform those services in accordance with the accepted professional practices and standards.

125.    KPMG US breached those duties for the reasons set forth above.

126.    As a result of KPMG US's breach of its duties to L&H, L&H has suffered damages including, but not limited to, the incurrence of over $340 million of debt that L&H could not possibly repay.

WHEREFORE, Plaintiff demands judgment against KPMG US for damages in excess of 340 million, plus interest, cost and all other relief that the Court deems just and proper.

## COUNT VI
### (Malpractice against KPMG Belgium)

127.    The Liquidating Trustee realleges paragraphs 1 through 89, 119 through 121 as though fully set forth herein.

*Baena v. KPMG US*

128.    KPMG Belgium owed L&H a duty to exercise care in the performance of its professional services and a duty to perform those services in accordance with the accepted professional practices and standards.

129.    KPMG Belgium breached those duties for the reasons set forth above.

130.    As a result of KPMG Belgium's breach of its duties to L&H, L&H has suffered damages including, but not limited to, the incurrence of over $340 million of debt that L&H could not possibly repay.

WHEREFORE, Plaintiff demands judgment against KPMG Belgium for damages in excess of $340 million, plus interest, cost and all other relief that the Court deems just and proper.

Dated: August 2, 2004

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE
& AXELROD LLP**
David W. Trench, Esq.
2500 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2336
Telephone: (305) 374-7580
Facsimile:  (305) 374-7593

Counsel for Scott L. Baena, Litigation Trustee of the Lernout & Hauspie Speech Products, N.V. Litigation Trust

  -and-

**FERRY, JOSEPH & PEARCE, P.A.**

/s/ Theodore J. Tacconelli
Theodore J. Tacconelli (No. 2678)
Lisa L. Coggins (No. 4234)
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899
Telephone: (302) 575-1555

Local Counsel for Scott L. Baena, Litigation
Trustee of the Lernout & Hauspie Speech
Products, N.V. Litigation Trust