**EXHIBIT C-2**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE LERNOUT & HAUSPIE | ) | CIVIL ACTION NO. |
| SECURITIES LITIGATION | ) | 00-CV-11589 (PBS) |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL ACTIONS | ) | |
| | ) | |

**FIRST CONSOLIDATED AND AMENDED
CLASS ACTION COMPLAINT**

BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO
Glen DeValerio
Jeffrey C. Block
Michael G. Lange
Michael T. Matraia
Patrick T. Egan
One Liberty Square
Boston, MA 02109
(617) 542-8300

**SHALOV STONE & BONNER**

Lee M. Shalov
James Bonner
Ralph M. Stone
276 Fifth Avenue, Suite 704
New York, New York 10001
(212) 686-8004

**CAULEY GELLAR BOWMAN &
COATES**
Steven E. Cauley
Curtis Bowman
Todd ver Weire
11311 Arcade Drive, Suite 200
Little Rock, Arkansas 72212
(501) 312-8500

**CO-LEAD COUNSEL FOR LEAD PLAINTIFFS
AND LEAD COUNSEL FOR THE CLASS**

## TABLE OF CONTENTS

I.   OVERVIEW ................................................................................ 1

II.  LEAD PLAINTIFFS' INVESTIGATION ......................................... 6

III. JURISDICTION AND VENUE ................................................... 7

IV.  THE PARTIES ......................................................................... 8

     Plaintiffs ................................................................................ 8
     The Company ........................................................................ 8
     L&H Senior Officer Defendants .............................................. 9
     L&H Director Defendants ...................................................... 10
     KPMG Defendants ................................................................ 12
     Additional Defendants .......................................................... 13

V.   SUBSTANTIVE ALLEGATIONS ................................................ 16

     A.   Background ...................................................................... 16

     B.   The Materially False and Misleading Statements ............... 18

     C.   The Massive Overstatements of Publicly Reported
          Revenues and Earnings .................................................. 41

          1.   Barter/Exchange Transactions ................................. 42
          2.   Booking Revenue Absent a Contract ....................... 45
          3.   Back-Dating Contracts ............................................ 47
          4.   Booking Revenue When Collectibility Was in Doubt   49
          5.   Booking Revenue on Contingent Contracts and/or
               Prior to Delivery .................................................... 52
          6.   Side-Agreements-Capital Union ............................... 53
          7.   Booking Revenue Where the "Customer" Had
               the Right to Return ................................................ 55
          8.   Other Examples of Fraudulent Practices of
               Revenue Recognition .............................................. 56

D.    **The Korean Fraud** ................................................    58

       1.    Side Agreements ................................................    64
       2.    Factoring Agreements ........................................    65
       3.    Recording Refundable Revenues ..........................    69
       4.    Collection is Improbable ....................................    71
       5.    The Earnout Scheme ..........................................    72

E.    **Improper Revenue Recognition Concerning Strategic Partners/Related Party Transactions** ................................................    73

       1.    Background ........................................................    74
       2.    The Undisclosed 30 ...........................................    77

F.    **The FLV Fund's Role in the Fraud** ................................................    79

G.    **FLV'S Role in Korea** ................................................    85

H.    **S.A.I.L. Trust (A.K.A FLV Foundation)** ................................................    86

I.    **Mercator's Role in the Fraud** ................................................    86

VI.    **LIABILITY OF THE KPMG DEFENDANTS** ................................................    88

A.    **Relationship Among the KPMG Defendants and Each Office Acts as One Firm With Respect to L&H** ......    88

B.    **KPMG'S Determination of Certain Amounts In Quarterly Financial Statements** ................................................    95

C.    **KPMG Had Full and Complete Access to information** ....    97

D.    **KPMG'S Actual Knowledge Of, and Participation In the Fraud** ................................................    101

       1.    Active Participation in Revenue Recognition Fraud ................................................    101

       2.    Actual Knowledge of False Revenue Recognition ................................................    103

       3.    Actual Knowledge of LDC ................................................    106

E.    RED FLAGS..................................................................    113

    1.    History of Problems With Specific Contracts .......    113
    2.    Knowledge Regarding Lack of Internal Controls.    115
    3.    Knowledge of Serial Violations of
          Company Policy ......................................................    119
    4.    KPMG's Escalation of Scope Of Procedures
          Performed .................................................................    122
    5.    Knowledge of Inactive Audit Committee..............    127

F.    Additional Allegations of Scienter ................................    129

    1.    Massive Restatement ...............................................    129

    2.    Independence Violations .........................................    131

        a.    Receipt of Substantial Non-Audit Fees ......    131

        b.    Former KPMG Auditors Given
              Lucrative Positions.........................................    133

G.    GAAS Violations ..............................................................    133

    1.    KPMG Failed to Consider Fraud...........................    143

    2.    Related Party Transactions.....................................    144

    3.    Improper Recognition of License Revenues..........    147

    4.    Inadequate Confirmation Revenues.......................    147

H.    GAAP/Company Policy/SEC Regulations Violations ......    150

    1.    Improper Revenue Recognition and Valuation
          of Accounts Receivable ...........................................    152
    2.    Related Party Transactions.....................................    157
    3.    Restrictions on Cash Balances ...............................    159
    4.    Overstatement of Inventor .....................................    160
    5.    Internal Control Weaknesses..................................    160
    6.    Additional GAAP Violations..................................    162

VIII.    THE DIRECTOR DEFENDANTS AND THE AUDIT
        COMMITTEES' KNOWLEDGE OF L&H'S SENIORS
        ACCOUNTING PROBLEMS .......................................    163

iii

|  | A. | The Audit Committee Defendants' Role | 163 |
|  | B. | The Director Defendants' Role | 165 |
| IX. | | THE FRAUD BEGINS TO COME TO LIGHT | 169 |
|  | A. | The August 8th *Wall Street Journal* Story | 171 |
|  | B. | Admission of Accounting "Irregularities" | 180 |
|  | C. | The Audit Committee Report | 182 |
|  | D. | Post-Audit Committee Report News | 184 |
|  | E. | Cancellation of Korean Revenue | 187 |
|  | F. | The Senior Officers Resign and Are Charged With Fraud | 189 |
| X. | | INSIDER TRADING | 190 |
| XI. | | CLASS ALLEGATIONS | 196 |
| XII. | | FRAUD ON THE MARKET PRESUMPTION | 198 |
| XIII. | | THE COUNTS | 200 202, 204, 205, 207, 209, 211, 212 |

## I.    OVERVIEW

1.    This securities class action concerns a massive accounting fraud at Lernout & Hauspie Speech Products, N.V. ("L&H" or the "Company"). From its first quarter of fiscal year1998 through its first two quarters of fiscal year 2000, L&H overstated all publicly reported revenues by an astounding 64% – or a total of $377 million! The Company's financial statements for 1998, 1999 and the first two quarters of 2000 have been completely restated.

2.    During the April 28, 1998 through November 8, 2000 class period (the "Class Period") L&H appeared to be the vision of a European high-tech success story. Founded in tiny Iepers, Belgium by defendants Jo Lernout ("Lernout") and Pol Hauspie ("Hauspie"), L&H appeared to have grown into an international cutting edge high-tech software powerhouse. L&H had 143 million shares of common stock outstanding as of August 2000 and its stock price hit a high of $65 per share on March 14, 2000, giving the Company a market capitalization of almost $9.3 billion at its peak.

3.    The Company's picture of financial success, however, was a sham. The chart below depicts the massive artificial inflation of L&H's publicly reported revenues and earnings during the Class Period:



| (000s) | 98 Q1 | 98 Q2 | 98 Q3 | 98 Q4 | 99 Q1 | 99 Q2 | 99 Q3 | 99 Q4 | 00 Q1 | 00 Q2 |
|---|---|---|---|---|---|---|---|---|---|---|
| □ Reported | $35,065 | $44,991 | $54,860 | $76,676 | $70,708 | $76,015 | $87,473 | $110,041 | $110,694 | $154,906 |
| ■ Restated | $33,065 | $44,191 | $44,260 | $62,176 | $46,008 | $32,315 | $46,773 | $44,441 | $52,294 | $94,206 |

(000s)

4.    The accounting irregularities at L&H "began at the top of the company with a culture that pressured individuals to prematurely recognize revenue, to engage in backdating of contracts or swapping of contracts with customers that couldn't afford to pay, in other words, creating revenues freely where none should have been recognized." That statement by L&H's outside counsel, Lanny Davis, made in a December 19, 2000 interview on *CNNfn*, is a summary of the massive, systematic, far-reaching accounting fraud that was L&H.

5.    As described in detail below, at the direction of its Senior Officers (defined below), at both its Burlington, Massachusetts and Belgium headquarters, L&H engaged in a smorgasbord of accounting irregularities ranging from back-dating contracts to prematurely recording revenue, to swapping goods with customers and recording the swap as revenue, to recording revenue even when the sales contract was not yet

negotiated or signed, to giving customers side-agreements and the right to return the product.

6.        At its Korean subsidiary, L&H engaged in egregious accounting irregularities, including the recognition of entirely fictitious revenue amounting to approximately $189 million. All of the revenue L&H publicly reported from its Korean subsidiary, from the third-quarter of 1999 through the first two quarters of 2000, has been completely reversed and eliminated.

7.        In addition, L&H, along with defendants the Flanders Language Valley Fund ("FLV Fund") and Mercator and Noordstar NV ("Mercator"), an Antwerp insurance company, set up 30 so-called Language Development Companies ("LDCs") and Cross-Language Development Companies ("CLDCs") which supposedly licensed millions of dollars worth of software from L&H. L&H recorded all the purported revenue it received from the LDCs and CLDCs. However, this revenue recordation was entirely improper because both FLV and Mercator were related parties to L&H and major L&H stockholders. The purpose of establishing the LDCs and CLDCs was to "pump up" L&H's publicly reported revenues and benefit L&H's major shareholders – FLV, Mercator and the Senior Officers.

8.        The fraud at L&H began to unravel when investigative reporters at The Wall Street Journal, who are based in Boston, began to investigate L&H's skyrocketing sales in both Korea and Singapore. Prior to fiscal year 2000, since L&H did not file Form 10-Ks with the United States Securities and Exchange Commission (the "SEC"), it was not required to break-down its sales by geographic region. After acquiring two American companies in early 2000, however, L&H was obligated to comply with SEC

3

reporting requirements. Those filings showed an astounding surge in sales in Korea and Singapore. Through some telephone calls and knocking on some doors, The Wall Street Journal published a story questioning millions of dollars of revenues publicly reported by L&H in Korea.

9.    The Senior Officers vehemently denied The Wall Street Journal story and commissioned its regular auditors, KPMG, to audit L&H's Korean sales. Subsequently it was revealed that the SEC had commenced a formal investigation into L&H's accounting practices (unknown at the time was that the SEC had already commenced an informal investigation into L&H's accounting). L&H's Audit Committee then retained two law firms, Bryan Cave LLP and Loeff Claeys Verbeke, who retained Arthur Andersen LLP, to conduct an investigation into L&H's accounting practices.

10.    As a result of the Audit Committee investigation, on November 8, 2000 the massive accounting scandal at L&H began to emerge. The Company announced that it had uncovered accounting "errors and irregularities" and would be required to restate its 1998, 1999 and first two quarters of 2000 financial results. A few weeks later, the report of the Audit Committee (the "Audit Committee Report") was publicly released (with redactions of the identity of L&H customers and employees involved in the irregularities) which detailed numerous violations of recording revenue in violation of both generally accepted accounting principles in the United States ("GAAP") and L&H's own Company policies. In addition, the Audit Committee Report suggested that the Board consider disciplinary action against defendants Lernout, Hauspie, Gaston Bastiaens ("Bastiaens") and Nico Willaert ("Willaert").

11.    Since then, L&H has filed for bankruptcy law protection, its stock price is now virtually worthless (trading at under ten cents per share) and defendants Lernout, Hauspie, Bastiaens and Willaert have been arrested by criminal authorities in Belgium investigating the massive accounting fraud at L&H.   Both the SEC and the U.S. Attorneys' Office for the Southern District of New York are investigating L&H. Ju-Chul Seo, President of L&H's Korean subsidiary, has reportedly fled Korea and is allegedly hiding somewhere in China.

12.    As is alleged in detail below, L&H's so-called outside auditors, KPMG, had full knowledge of L&H's massive and wide-spread accounting fraud.  These three KPMG entities were fully and completely involved in auditing L&H: KPMG LLP which is the United States arm of KPMG ("KPMG US"), KPMG Bedrijsrevisoven, which is the Belgium arm of KPMG ("KPMG Belgium") and KPMG UK, the British arm of KPMG ("KPMG UK") (collectively "KPMG").  These three offices acted as one accounting firm in auditing L&H and had full knowledge of improper revenue recognition, and in some cases actually advised L&H how to record revenue in violation of GAAP.  As alleged herein, KPMG knowingly or recklessly violated generally accepted auditing standards in the United States ("GAAS").

13.    Each member of L&H's Board of Directors is named as a defendant herein.  All, except for the members of the Audit Committee and Francis Vanderhoydonck, are charged with violations of § 20(a) of the Securities Exchange Act of 1934.  The Audit Committee members and Francis Vanderhoydonck ("Vanderhoydonck") are charged with violations of both §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act").  As is alleged, the Board received

5

routine updates from KPMG with regard to significant accounting problems at L&H including the severe lack of internal accounting controls, the need for an internal auditor and the issues with regard to related party transactions. Members of the Audit Committee received even more detailed reports from KPMG about L&H's accounting deficiencies. Vanderhoydonck was involved in a number of financial arrangements with Lernout, Hauspie and Mercator in an effort to inflate L&H's publicly reported revenues.

14.    In sum, L&H was a financial house of cards propped up by accounting gimmicks and trickery to create the appearance of a financially successful company. In truth, however, L&H was nothing more than an illusion of financial prosperity, created by various individuals and entities contributing to the routine "cooking of the books" at L&H.

## II.    LEAD PLAINTIFFS' INVESTIGATION

15.    Lead Plaintiffs' allegations set forth herein are based on a thorough investigation, conducted by and through their attorneys, of all reasonably available sources of information, including, but not limited to, publicly available relevant information, in order to obtain information necessary to plead Lead Plaintiffs' claims with particularity. The nature and scope of Lead Counsel's investigation and analysis included reviewing and analyzing:

(a) L&H's filings with the SEC during the relevant time period, including, but not limited to, the Company's Annual Reports on Form 20-F and/or 10-K for fiscal years 1997 through 1999;

(b) The Company's press releases and other publicly disseminated statements made by the Company during the relevant time period;

6

(c) Reports, articles, and discussions concerning the Company and the subject

matter of this Complaint contained in the print and electronic media and

computer databases;

(d) Reports of securities analysts and investor advisory services;

(e) The November 20, 2000 Audit Committee Report of the Board of Directors;

(f) Documents produced by L&H to the SEC as part of the SEC investigation of

L&H;

(g) Interviewing former employees of L&H; and

(h) Interviewing former employees of customers of L&H.

16.    Except as alleged in this Complaint, the underlying information relating to

defendants' misconduct and the particulars thereof are not available to Lead Plaintiffs and

the public, and lie exclusively within the possession and control of defendants and

insiders of L&H, thus preventing Lead Plaintiffs from further detailing defendants'

misconduct.

## III.    JURISDICTION AND VENUE

17.    This action arises under §§ 10(b) and 20(a) of the 1934 Act, 15 U.S.C.

§§ 78j(b) and 78t, and the rules and regulations promulgated thereunder, including

Securities Exchange Commission Rule 10b-5, 17 C.F.R. 240.10b-5. Jurisdiction is based

upon Section 27 of the 1934 Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

18.    Venue is proper in this District under section 27 of the 1934 Act, 15

U.S.C. §78aa, and section 1391 (b) of the Judicial Code, 28 U.S.C. § 1391(b). L&H and

FLV Fund both maintain their United States offices in this district. KPMG LLP has an

office in this district. Further, the wrongs alleged herein occurred in substantial part in

this district, including the preparation and dissemination to the investing public of false and misleading information.

19.    In connection with the acts and conduct complained of, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the national securities exchanges.

## IV.    THE PARTIES

### Plaintiffs

20.    Lead Plaintiffs Hans A. Quaak, Attilio Po and Karl Leibinger are the Court appointed Lead Plaintiffs and purchased L&H common stock during the Class Period and were damaged thereby.  Copies of their signed certification forms pursuant to the PSLRA have previously been filed with this Court.

21.    Plaintiff MM Holdings, Inc. ("MM Holdings"), through its President Ken Sandhu, purchased L&H options during the Class Period and were damaged thereby.  A copy of MM Holdings' signed certification form pursuant to the PSLRA is attached to this complaint as Exhibit A.

### The Company

22.    L&H is a Belgian corporation with its United States executive offices located in Burlington, Massachusetts.  L&H develops and licenses speech technologies, including speech recognition software.  Throughout the Class Period, L&H was listed on the NASDAQ exchange under the symbol LHSPE.  L&H is not named as a defendant in this action because it has filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States District Court for the District of Delaware on November 29,

8

2000.

### L&H Senior Officer Defendants

23.    Defendant Lernout was a co-founder of L&H and served as its Managing Director of the Board since its organization in 1987, as President from January 1994 until October 1996, as Co-Chairman since October 1996, as a member of the Office of the Chief Executive since February 1996 and Co-Chairman in the Office of the Chief Executive since October 1996. Lernout resigned his management position with the Company on November 9, 2000. Lernout also served as a director of FLV Fund from 1996 to 1997, and after 1997 continued to "spend a portion of his time on activities relating to the FLV Fund."

24.    Defendant Hauspie was a co-founder of L&H and served as a Managing Director since its organization in 1987, Chairman from January 1994 until October 1996 and as a Co-Chairman of the Board since October 1996, as a member of the Office of the Chief Executive since February 1996 and as Co-Chairman in the Office of the Chief Executive since October 1996. Defendant Hauspie resigned from his positions on November 9, 2000. Hauspie also served as a director of FLV Fund from 1996 to 1997, and after 1997 continued to "spend a portion of his time on activities relating to the FLV Fund."

25.    Defendant Bastiaens was the President of L&H from October 1996 and Chief Executive Officer from May 1997 until his resignation on August 25, 2000.

26.    Defendant Carl Dammekens ("Dammekens") joined L&H in 1990 as Corporate Controller and served as Senior Vice President of Finance from 1993 to 1996, and as Acting Chief Financial Officer of L&H from 1996 to July 1999. Dammekens was

9

appointed Chief Financial Officer on July 7, 1999.  Dammekens resigned his position

with the Company on November 9, 2000.

27.    Defendant Ju-Chul Seo (a.k.a. John Seo, Ju Cheol Suh, and Ju Cheol Sea)

("Seo") has served as President of L&H's Korean subsidiary from September 1999 until

his suspension on or about November 22, 2000.

28.    Defendant Willaert was, at all relevant times, Managing Director and Vice

Chairman of L&H.

29.    Defendant Ellen Spooren ("Spooren") was, at all relevant time, L&H's

Senior Vice President of Marketing and Corporate Communications.  During the Class

Period, Spooren sold 100,050 shares of L&H, reaping proceeds of over $3.94 million.

Spooren resigned her position with L&H on August 25, 2000.

30.    Defendants Lernout, Hauspie, Bastiaens, Dammekens, Seo and Willaert,

are collectively referred to as the "Senior Officers."

### L&H Director Defendants

31.    Defendant Fernand Cloet ("Cloet") served as a director of L&H from 1992

to September 2000.   At all relevant times, Cloet also served as a director of defendant

FLV Fund.

32.    Defendant Jan Coene ("Coene") served as a director of L&H from May

1997 until his resignation on November 27, 2000.

33.    Defendant Hubert Detremmerie ("Detremmerie") served as a director of

L&H from March 1995 until his resignation on May 15, 2001.

34.    Defendant Alex Vieux ("Vieux") served as a director of L&H from May

1997 until his resignation.

10

35.    Defendant Gerard van Acker ("van Acker") served as a director of L&H from May 1998 until his resignation on or about January 22, 2001.

36.    Defendant Bernard Vergnes ("Vergnes") served as a director of L&H from May 1998 until his resignation on January 9, 2001. Vergnes was nominated for election to the Board of Directors by Microsoft Corporation ("Microsoft") and served on the L&H Board as Microsoft's designee. Since July 1998, Vergnes has served as Chairman of Microsoft Europe.

37.    Defendant Francis Vanderhoydonck ("Vanderhoydonck"), was a director of L&H from May 1999 until his resignation on or about May 15, 2001. Vanderhoydonck also served as President and Managing Director of L&H Investment Co. N.V. ("LHIC"), since its inception in 1998. During the Class Period, Vanderhoydonck sold 100% of his L&H common stock for proceeds of over $3.2 million.

38.    Defendant RVD Securities N.V. ("RVD"), a financial advisory company, was, at all relevant times a Director of L&H. According to L&H's public filings, corporations may serve as directors of Belgian companies.

39.    Defendant Erwin Vandendriessche ("Vandendriessche") was a director of L&H, in his individual capacity from 1990 to 1994. Beginning in January 1994, Vandendriessche served as director as the representative of RVD, at all relevant times, RVD's appointed director. Vandendriessche was also the Chairman of L&H's Audit Committee throughout the Class Period.

40.    Defendant Dirk Cauwelier ("Cauwelier") served as a director of L&H since May 1997. Cauwelier also served as a member of the Audit Committee.

11

41.    Defendant Marc G.H. De Pauw ("De Pauw") served as a director of L&H since June 1995. At all relevant times, De Pauw was a member of the Audit Committee of the Board of Directors.

42.    Defendants Cloet, Coene, Detremmerie, Vieux, van Acker, Vergnes, RVD and Vanderhoydonck are sometimes collectively referred to herein as the "Director Defendants."

43.    Defendants Cauwelier, DePauw and Vandendriessche are sometimes collectively referred to herein as the "Audit Committee Directors."

### KPMG Defendants

44.    Defendant Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren (a.k.a. KPMG Bedrijfsrevisoren or KPMG Belgium) ("KPMG Belgium"), is a Belgian public accounting firm employing 950 partners and staff in six cities. KPMG Belgium is a member of KPMG International. KPMG Belgium has been L&H's outside auditors since 1991, when KMPG acquired the Belgian accounting firm of Behets, Boes & Co., which had been auditing L&H since the late 1980s. During the Class Period, KPMG Belgium issued unqualified reports on L&H's financial statements for 1997 through 1999; gave an opinion that those financials statements were prepared in accordance with GAAP; stated that its audit was conducted in accordance with GAAS, and consented to L&H's inclusion of KPMG Belgium's reports on those financial statements in filings with the SEC. During the Class Period, KPMG Belgium also served as outside auditor for defendant FLV Fund.

12

45.    Defendant KPMG UK is a British public accounting firm and a member of KPMG International.  During the Class Period, KPMG UK audited L&H's financial statements with KPMG Belgium and KPMG LLP.

46.    Defendant KPMG LLP ("KPMG US") is a public accounting firm based in the United States and a member of KPMG International.  During the Class Period, KPMG US audited L&H's financial statements with KPMG Belgium and KPMG UK.

47.    Defendant Paul Behets was the KPMG partner in charge of auditing L&H from 1991 until July 1999, when Behets left KPMG to become chief executive officer of defendant S.A.I.L. Trust V.Z.W.

**Additional Defendants**

48.    Defendant FLV Fund is a Belgian venture-capital fund organized by defendants Lernout and Hauspie, among others, to make various strategic investments. FLV Fund maintains its United States offices in Los Altros Hills, California and within this district in Woburn, Massachusetts.

49.    Defendant Flanders Language Valley Foundation, also known as the S.A.I.L. Trust V.Z.W. ("S.A.I.L. Trust"), purports to be a non-profit entity established in 1995 by, *inter alia*, Lernout, Hauspie and the Government of Flanders.  The S.A.I.L. Trust holds 33% of FLV Fund's management arm – FLV Management.  The S.A.I.L. Trust purports to be a non-profit organization created to support economic development and to assist in the infrastructure financing of the Flanders Language Valley.

50.    Defendant LHIC is a Belgium investment fund founded by defendants Lernout and Hauspie in 1998, through which Lernout and Hauspie control 7.6% of L&H's stock.   LHIC was purportedly established to make long-term strategic

13

investments in companies in information technology industries such as speech, language and artificial intelligence, businesses related to L&H, in order to assist L&H in their growth and success. Lernout and Hauspie capitalized LHIC with their own shares of L&H common stock and they act as advisors to the LHIC and its investments.

51.    Defendant Mercator is an insurance company located in Antwerp. At all relevant times, Mercator owned 6.9% of L&H Holding, which, in turn, owned 8.9% of L&H. Mercator also directly owned a 0.2% stake in L&H.

52.    Defendant Louis Verbeke ("Verbeke") is believed to be a Belgian citizen. During the Class Period, Verbeke served as Chairman of defendant Mercator, and as a named partner at the law firm Loeff Claeys Verbeke ("Loeff Claeys"). Loeff Claeys served as legal counsel to both L&H and FLV Fund. Verbeke attended almost all L&H Board of Directors meetings including where related party transactions were discussed and issues concerning conflicts between L&H and FLV Fund were discussed.

53.    Defendant Microsoft is a United States company that develops, manufactures, licenses and supports a wide range of software products for a multitude of computing devices. In September 1997, L&H entered into a strategic alliance with Microsoft to accelerate development of speech products in multiple language running on Microsoft Windows platforms. As part of the strategic alliance, Microsoft invested approximately $45 million in L&H. In connection with Microsoft's investment, L&H granted Microsoft the right to nominate a candidate for election to L&H's Board of Directors. That candidate was defendant Vergenes who, from May 1998 until January 9, 2001, served as Microsoft's representative on L&H's Board. Microsoft is named only in Count VIII pursuant to the common law doctrine of respondeat superior.

14

54.     By reason of their positions with the Company, each of the defendants identified as officers and directors of L&H had access to internal Company documents, reports and other information, including the adverse non-public information concerning the Company's financial condition and future prospects. These defendants, as detailed herein, attended management and/or board of directors meetings. As a result of the foregoing, they were responsible for the truthfulness and accuracy of the Company's public reports and releases described herein.

55.     These defendants, as officers and directors of a publicly traded company, had a duty to promptly disseminate truthful and accurate information with respect to L&H and to promptly correct any public statements issued by or on behalf of the Company that had become false or misleading.

56.     It is appropriate to treat the Senior Officers, the Director Defendants and Audit Committee Directors as a group for pleading purposes and to presume that the false and misleading information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of this narrowly defined group of defendants. Each of the above officers or directors of L&H, by virtue of their high-level position with the Company, directly participated in the management of the Company, was privy to confidential proprietary information concerning the Company and its business, operations and accounting practices as alleged herein. The Senior Officers, Director Defendants and Audit Committee Directors were involved or participated in the drafting, producing, reviewing and/or disseminating the false and misleading statements alleged herein. These defendants were, thus, aware that these false

15

and misleading statements and financial results were being issued regarding the Company and approved or ratified these statements, in violation of the federal securities laws.

57.    Each of the defendants knew or recklessly disregarded that the misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's stock and would cause the price of the Company's common stock to become artificially inflated. Each of the defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiffs and the other members of the Class.

58.    All Defendants are liable, jointly and severally, as direct participants in the wrongs complained of herein.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    BACKGROUND

59.    L&H was a speech recognition software manufacturer that was founded in 1987 by defendants Lernout and Hauspie. Its three core technologies are automatic speech recognition, text-to-speech conversion, and digital speech compression.

60.    In 1995, L&H completed its initial public offering and commenced trading on NASDAQ. From 1987 through 1995, the Company had never been profitable and had only produced a few million dollars in annual revenues.

61.    Beginning in the third quarter of 1996, L&H expanded its business primarily through a dizzying array of acquisitions, to reach its goal of becoming "the leading international provider of advanced speech and language technologies, products and services." In its 1997 Form 20-F, the Company stated:

Beginning in the third quarter of 1996, the Company expanded its business substantially through acquisitions, to include translations services, language

16

technologies and dictation software. The Company also expanded its core speech technologies through acquisitions. More recently the Company has acquired businesses for its translation services division and to augment the Company's language technologies division.

62. As a result of the Company's new focuses, L&H's sales quadrupled from 1995 to 1996. What proceeded was a period of unprecedented growth for L&H, making the Company an International success story and the pride of Belgium.

63. From 1997 to June 2000, L&H reported incredible revenue growth – bolstered by a number of acquisitions, related-party transactions, and fraudulent accounting. In 1997, the Company's total revenues increase 220% to $99.4 million from $31 million in 1996. In 1998, L&H's revenues purportedly rose 113% to $211.6 million, and by 1999, the total revenues were claimed to be $344 million.

64. A major focus of L&H's growth was the practice of acquiring complementary businesses and technologies as a means of supplementing its own internal development activities. Under Bastiaens' leadership, L&H acquired at least 20 companies during the Class Period, as illustrated by the following chart:

| DATE[1] | NAME OF COMPANY ACQUIRED | TOTAL CONSIDERATION | AMOUNT OF L&H SECURITIES ISSUED AS CONSIDERATION | AMOUNT OF CASH PAID AS CONSIDERATION |
|---------|--------------------------|---------------------|--------------------------------------------------|--------------------------------------|
| 03/19/98 | Applications Technology Inc. | $17.5 million | $5.2 million | $12.3 million |
| 03/31/98 | Inso Corporation's Linguistic Software Business | $19.5 million | $9.75 million | $9.75 million |
| 06/08/98 | Dictation Consortium, N.V. | $40 million | | $40 million |
| 07/20/98 | Globalink, Inc. | $70.2 million | $70.2 million | |
| 07/20/98 | AI Logic Corporation | $5.5 million | | $5.5 million |
| 07/20/98 | NeocorTech | $1.0 million | | $1.0 million |

---

[1] All information contained in the above-chart is derived from the initial L&H press releases announcing the acquisition of named companies.

17

| 08/05/98 | Heitmann Group | $35 million | $15 million | $20 million* |
| 09/30/98 | TikSoft | $12 million | $6 million | $6 million |
| 05/19/99 | Fonix Healthcare Solutions Group | $28 million | | $28 million* |
| 06/29/99 | Flanders Dialogue Company | $6.5 million | | $6.5 million |
| 06/29/99 | Brussels Translation Group | $59 million | | $42 million* $17 million* |
| 08/30/99 | Computer Aided Medical Systems | $6 million | | $6 million |
| 09/13/99 | Bumil Information & Communications, Ltd. | $50 million | | $50 million |
| 12/22/99 | Omni-Med Transcription, Inc. Linguistic Technologies, Inc. Rodeer Systems, Inc. | $49 million (aggregate) | | $49 million (aggregate) |
| 02/22/00 | Matra Nortel Communications Elan Informatique | $16 million (aggregate) | $1 million (aggregate) | $15 million (aggregate) |
| 03/7/00 | Dictaphone Corporation | $935.6 million | $510.6 million | $425 million* |
| 03/28/00 | Dragon Systems Inc. | $460 million | $460 million | |
| **Total** | | **$1.8108 billion** | **$1.077 billion** | **$.733 billion** |

\* Assumption of liabilities.

65.    As illustrated above, L&H used its own inflated stock as currency for over 40% of its Class Period acquisitions.

**B.    THE MATERIALLY FALSE AND MISLEADING STATEMENTS**

66.    On April 28, 1998, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Q1 Revenues of $35 Million; Strong Earnings of $0.13 Per Share Before One Time Charge for First Quarter" (the "April 28, 1998 Press Release"). The April 28, 1998 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

18

For the first quarter of 1998, L&H's total revenues were $35.1 million, an increase of 112% over reported revenues of $16.6 million for the first quarter of 1997.

[* * *]

Net income before one time charges and unusual items for the first quarter of 1998 reached $7 million, or $0.13 per share on 52.5 million average diluted shares outstanding which is a 62.5 % increase when compared to $2.7 million in net income, or $0.08 per share on $34.4 million average outstanding shares for the first quarter of 1997.

[* * *]

The first quarter of 1998 marked a number of important events for Lernout & Hauspie, said Gaston Bastiaens, president and CEO of Lernout & Hauspie. We shipped L&H Voice Xpress for Medicine, our continuous speech dictation product for general medical use, and we now enter the personal computer retail market today with L&H Voice Xpress and Voice Xpress Plus shipping in the market. Our ability to consistently meet product rollout milestones was augmented by our tremendous success in securing contracts and completing strategic acquisitions. All in all, it has been an outstanding quarter for L&H.

According to Bastiaens, consistent financial performance, the ability to roll out new products on schedule and making acquisitions complementing its core technologies has strengthened L&H's position as a leading speech and language technology company in the world.

[* * *]

[S]aid Jo Lernout, L&H co-founder and co-chairman "L&H is a leading contributor to this effort by developing numerous new offerings in areas ranging from continuous dictation to Internet translation. The burgeoning market acceptance for speech technology is underscored by L&H's continuing strong revenues and new contract bookings."

The April 28, 1998 Press Release also reported the following:

|  | (000s) 3 Months Ended March 31, 1998 |
| --- | --- |
| Revenues |  |
|     Core Technologies | $11,795 |
|     Dictation | $5,641 |
|     Translation Services | $11,853 |
|     Language Technology | $5,776 |
| Total Net Revenues | $35,065 |
| Loss from operations | ($8,111) |
| Net loss | ($3,982) |
|  | As of March 31, 1998 |
| Accounts Receivable | $35,655 |
| Total Assets | $246,834 |

67.     On May 1, 1998, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934 which included as "Exhibit 2" a copy of the April 28, 1998 Press Release (the "Q1 1998 6-K"). Bastiaens signed the Q1 1998 6-K.

68.     The April 28, 1998 Press Release and the Q1 1998 6-K were materially false and misleading because revenues and accounts receivable were artificially inflated by at least $2 million and earnings were materially overstated.

69.     On July 28, 1998, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Q2 Revenues of $45 Million; Record Net Profits of $9.5 Million or $0.17 EPS Before Exceptional Items" (the "July 28, 1998 Press

Release"). The July 28, 1998 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the second quarter of 1998, L&H's total revenues were $45 million, an increase of 113% over reported revenues of $21.1 million for the second quarter of 1997.
>
> [* * *]
>
> Net income before one time charges and unusual items for the second quarter of 1998 reached $9.5 million. This represents $0.17 per share on 55.1 million average diluted shares outstanding which is a 138% increase when compared to $4.0 million in net income, or $0.11 per share on 36.1 million average outstanding shares for the second quarter of 1997.
>
> [* * *]
>
> "The strong performance of our company is [sic] all our business activities proves the strength of our integrated speech and linguistic strategy and the ability of our management team to implement," said Gaston Bastiaens, president and CEO of Lernout & Hauspie.
>
> [* * *]
>
> [S]aid Jo Lernout, L&H co-founder and co-chairman "L&H has been very proactive in meeting the market demand by regularly introducing new products, diversifying our sales channels and offering competitive pricing. These efforts have been rewarded with continuing strong revenues and new contract bookings."

The July 28, 1998 Press Release also reported the following:

|  | (000s)<br>3 Months Ended<br>June 30, 1998 | (000s)<br>6 Months Ended<br>June 30, 1998 |
|---|---|---|
| Revenues |  |  |
| Core Technologies | $12,023 | $23,818 |
| Dictation | $7,323 | $12,964 |
| Translation Services | $12,288 | $18,064 |
| Language Technology | $13,357 | $25,210 |
|  |  |  |

| | | |
|---|---|---|
| Total Net Revenues | $44,991 | $80,056 |
| Loss from operations | ($31,907) | ($40,018) |
| Net loss | ($34,543) | ($38,524) |
| | As of June 30, 1998 | |
| Accounts Receivable | $42,820 | |
| Total Assets | $404,270 | |

70.    On August 7, 1998, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-1 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the July 28, 1998 Press Release (the "Q2 1998 6-K"). Bastiaens signed the Q2 1998 6-K.

71.    The July 28, 1998 Press Release and the Q2 1998 6-K were materially false and misleading because revenues and accounts receivable were artificially inflated by at least $800,000 and earnings were overstated.

72.    On October 27, 1998, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Q3 Revenues of $54.9 Million; Record Net Profits of $12.1 or $0.22 EPS Before Exceptional Items" (the "October 27, 1998 Press Release"). The October 27, 1998 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the third quarter of 1998, L&H's total revenues were $54.9 million, an increase of 97% over reported revenues of $27.9 million for the third quarter of 1997.
>
> [* * *]
>
> Net income before one-time charges and unusual items for the third quarter of 1998 reached $12.1 million. This represents $0.22 per share on 55.9 million average diluted

22

shares outstanding which is a 133% increase when compared to $5.2 million in net income, or $0.13 per share on 40.5 million average outstanding shares for the third quarter of 1997.

The October 27, 1998 Press Release also reported the following:

|  | (000s)<br>3 Months Ended<br>September 30, 1998 | (000s)<br>9 Months Ended<br>September 30, 1998 |
|---|---|---|
| Revenues |  |  |
|     Core Technologies | $13,448 | $37,266 |
|     Dictation | $9,972 | $22,936 |
|     Linguistic Services | $18,094 | $43,304 |
|     Language Technology | $13,346 | $31,410 |
|  |  |  |
| Total Net Revenues | $54,860 | $134,916 |
|  |  |  |
| Loss from operations | ($34,153) | ($74,172) |
|  |  |  |
| Net loss | ($39,262) | ($77,787) |
|  | As of<br>September 30, 1998 |  |
|  |  |  |
| Accounts Receivable | $60,513 |  |
|  |  |  |
| Total Assets | $523,871 |  |

73.    On October 29, 1998, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the October 27, 1998 Press Release (the "Q3 1998 6-K"). Thomas B. Doherty, L&H's then-Senior Vice President of Finance and Financial Planning, signed the Q3 1998 6-K.

74.    The October 27, 1998 Press Release and the Q3 1998 6-K were materially false and misleading because revenues and accounts receivable were overstated by at least $10.6 million and earnings were overstated.

23

75.    On April 7, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues and Record Earnings Before One-Time Charges for Fourth Quarter 1998 and Fiscal Year 1998" (the "April 7, 1999 Press Release").  The April 7, 1999 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> Lernout & Hauspie (Nasdaq: LHSP) (Easdaq: LHSP) (L&H), a worldwide market leader in speech and linguistic technologies, products and services, today announced results for the fourth quarter of $76.7 million in revenue, or a 126% increase in the reported revenue of $33.8 million for the fourth quarter 1997.  For the fiscal year 1998, the company reported total revenues of $211.6 million or an increase of 113% over the reported revenues of $99.4 million for 1997.

> [* * *]

> The Company reported approximately $12.9 million in net income, before one-time charges and exceptional items, for the fourth quarter of 1998 or EPS (Earnings Per Share) of $0.22 cents per share on 58.3 million average diluted shares outstanding.  The Company's fourth quarter net income includes an increase in goodwill amortization expense of approximately $1.5 million or $0.03 per share, relating to the company's previously announced revaluation of in-process research and development acquired in prior quarters, to reflect new United States Securities and Exchange Commission (the "SEC") guidelines.  If not for this change, the Company's net income before one-time charges would have been $0.25 per share.

> [* * *]

> Net income for the full year of 1998, excluding one-time charges, totaled $37.8 million or $0.69 per share on 55.2 million average diluted shares compared to $20 million or $0.53 per share on 38.9 million average diluted shares during 1997.

> "There are a number of factors that have contributed to our successful year.  Our revenues increased significantly

24

between 1997 and 1998 not only because there was considerable growth in the market for speech and language technologies, products and services, but particularly because of L&H's ability to deliver new products, solutions and services," said Gaston Bastiaens, president and CEO of Lernout & Hauspie. "The strong growth in each of our business divisions is attributable in part to our professional, successful integration of acquired technologies and especially to our strong internal growth."

[* * *]

"During this past year, the market has gained an even greater appreciation of the vast potential for speech and language technologies. In fact, The Gartner Group recently issued a report citing speech technology, artificial intelligence, natural language technology, wearable computing, biometrics and voice over the Internet as 'technologies to watch ' for 1999," said Jo Lernout, co-founder and co-chairman of L&H. "L&H has returned record revenues for 1998 because we are expert in the full range of speech and language technologies, including artificial intelligence, Natural Language Technology (NLT) and voice over the Internet, and can combine them to create multi-lingual speech-enabled offerings. By combining these offerings we can meet a wide range of global needs."

The April 7, 1999 Press Release also reported the following:

|  | 3 Months Ended December 31, 1998 | Year Ended December 31, 1998 |
|---|---|---|
| Revenues |  |  |
| Core Technologies | $19,086 | $56,352 |
| Dictation | $14,898 | $37,834 |
| Translation Services | $24,596 | $67,900 |
| Language Technology | $18,097 | $49,507 |
| Total Net Revenues | $76,677 | $211,593 |
| Income/(Loss) from operations | $13,836 | ($43,741) |
| Net income/(loss) | $10,213 | ($48,630) |
|  | As of December 31, 1998 |  |

25

| Accounts Receivable | $81,212 | |
| --- | --- | --- |
| | | |
| Total Assets | $571,017 | |

76.    On April 19, 1999, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the April 7, 1999 Press Release (the "Q4 1998 6-K"). Bastiaens signed the Q4 1998 6-K.

77.    On June 30, 1999, L&H filed with the SEC, its Form 20-F Annual Report Pursuant to Section 13 or 15d of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 1998 ( the "1998 20-F"). The 1998 20-F included the same financial information contained in the April 7, 1999 Press Release. Bastiaens signed the 1998 20-F on June 29, 1999.

78.    The April 7, 1999 Press Release, the Q4 1998 6-K and the 1998 20-F were materially false and misleading because fourth quarter revenues and accounts receivable were overstated by at least $14.5 million and earnings were overstated. Year-end 1998 revenues were overstated by $27.9 million and earnings were overstated.

79.    The 1998 Form 20-F included the following statement by KPMG Belgium:

> LERNOUT & HAUSPIE SPEECH PRODUCTS N.V.
> AND SUBSIDIARIES  INDEPENDENT AUDITORS'
> REPORT
>
> The Board of Directors and Shareholders
> Lernout & Hauspie Speech Products N.V.:
>
> We have audited the accompanying consolidated balance
> sheets of Lernout & Hauspie Speech Products N.V. and
> subsidiaries (the Company) as of December 31, 1997 and
> December 31, 1998, and the related consolidated

26

statements of operations, shareholders' equity, cash flows and comprehensive incomes for each of the years in the three-year period ended December 31, 1998. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout &Hauspie Speech Products N.V. and subsidiaries as of December 31, 1997 and December 31, 1998, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1998, in conformity with generally accepted accounting principles in the United States.

Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren
Brussels, Belgium
April 9, 1999

80.    The above statement by KPMG Belgium was materially false and misleading for the reasons set forth in ¶ 227 to 386.

81.    On May 18, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Strong Revenues and Strong Earnings For First Quarter; Company Achieves Revenues of $70.7 Million and EPS of $0.12 Before Exceptional Items" (the "May 18, 1999

27

Press Release"). The May 18, 1999 Press Release was issued from Burlington, Massachusetts

and Ieper, Belgium and stated, in part:

> For the first quarter of 1999, L&H's total revenues were
> $70.7 million, an increase of 102% over reported revenues
> of $35.1 million for the first quarter of 1998. The company
> attributes the increased revenues to L&H's continued
> success in expanding the role speech and language
> technologies play in a broad range of markets and
> applications.

> [* * *]

> Net income before exceptional items for the first quarter of
> 1999 reached $7 million, or $0.12 per share on 58.1 million
> average diluted shares outstanding which is a 13% increase
> when compared to $6.2 million in net income, or $0.12 per
> share on 52.5 million average outstanding shares for the
> first quarter of 1998.

The May 18, 1999 Press Release also reported the following:

|  | (000s)<br>3 Months Ended<br>March 31, 1999 |
|---|---|
| Revenues |  |
|     Technologies & Solutions | $24,726 |
|     Applications | $22,568 |
|     Consulting & Services | $23,414 |
| Total Net Revenues | $70,708 |
| Income from operations | $10,939 |
| Net income | $12,304 |
|  | As of<br>March 31, 1999 |
| Accounts Receivable | $88,301 |
| Total Assets | $572,233 |

82.     On June 1, 1999, L&H filed with the SEC a Form 6-K Report of Foreign

Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934,

which included as "Exhibit 2" a copy of the May 18, 1999 Press Release (the "Q1 1999

6-K"). Dammekens signed the Q1 1999 6-K.

83.     The May 18, 1999 Press Release and the Q1 1999 6-K were materially

false and misleading because revenues and accounts receivables were overstated by at

least $24.7 million and earnings were overstated:

84.     On July 28, 1999, L&H issued a press release via Business Wire titled "Lernout &

Hauspie Reports Strong Revenues, Earnings and Cash Flow For Second Quarter; Company

Achieves Revenues of $76 million and EPS of $0.17; Reduced DSO's" (the "July 28, 1999 Press

Release"). The July 28, 1999 Press Release was issued from Burlington, Massachusetts and

Ieper, Belgium and stated, in part:

> For the second quarter of 1999, L&H's total revenues were
> $76.0 million, an increase of 69% over reported revenues
> of $45.0 million for the second quarter of 1998. L&H's
> total revenues for the six months ending June 30, 1999
> were $146.7 million, an increase of 83% over reported
> revenues of $80.1 million for the same period in 1998. The
> company attributes the increased revenues to L&H's
> continued success in expanding the role speech and
> language technologies play in a broad range of markets and
> applications.
>
> [* * *]
>
> Net income of Q2 1999 reached $10.1 million, or $0.17 per
> share on 59.4 million shares which is a 21% increase when
> compared to $8.3 million, or $0.15 per share on 55.1
> million shares for the second quarter of 1998. Net income
> for the first six months ended June 30, 1999 reached $17.1
> million, or $0.29 per share on 58.8 million average diluted
> shares outstanding, which is a 17% increase when
> compared to $14.6 million in net income, or $0.28 per

29

share on 52.5 million average outstanding shares for the six months ended June 30, 1998.

[* * *]

"L&H has steadfastly pursued its long-term strategy to be the leading provider of speech and language technologies, products and services, particularly as it relates to opportunities in Natural Language Understanding," said Jo Lernout, L&H co-founder and co-chairman. "We are especially pleased with our Q2 successes because they affirm that our strategy is sound and successful. Our continued ability to attract interest from industry leaders, as evidenced by the Intel agreement announced this quarter, reinforces this long term strategy as well."

The July 28, 1999 Press Release also reported the following:

| | (000s) 3 Months Ended June 30, 1999 | (000s) 6 Months Ended June 30, 1999 |
|---|---|---|
| Revenues | | |
| Technologies & Solutions | $26,485 | $51,211 |
| Applications | $28,984 | $51,552 |
| Consulting & Services | $20,546 | $43,960 |
| Total Net Revenues | $76,015 | $146,723 |
| Income from operations | $15,532 | $26,471 |
| Net income | $10,114 | $22,418 |
| | As of June 30, 1999 | |
| Accounts Receivable | $87,145 | |
| Total Assets | $606,303 | |

85.    On August 6, 1999, L&H filed with the SEC a Form 6-K Report of

Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act

30

of 1934, which included as "Exhibit 2" a copy of the July 28, 1999 Press Release (the "Q2 1999 6-K"). Bastiaens signed the Q2 1999 6-K.

86.    The July 28, 1999 Press Release and the Q2 1999 6-K were materially false and misleading because revenues and accounts receivables were overstated by at least $43.7 million and earnings were overstated.

87.    On October 27, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues of $87.5 Million and Strong Earnings of $0.16 for Third Quarter; Record Earnings Before Goodwill Amortization of $18.5 Million or $0.31 per Share" (the "October 27, 1999 Press Release"). The October 27, 1999 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the third quarter of 1999, L&H's total revenues were $87.5 million, an increase of 59% over reported revenues of $54.9 million for the third quarter of 1998. L&H's total revenues for the nine months ended September 30, 1999 were $234.2 million, an increase of 74% over reported revenues of $134.9 million for the same period in 1998.
>
> [* * *]
>
> Net income for Q3 1999, before goodwill amortization, reached $18.5 million, or $0.31 per share on 60.5 million shares. This is a 25% increase compared to $14.7 million before goodwill amortization and one-time charges, or $0.26 per share on 55.8 million fully diluted shares, for the third quarter of 1998. Net income for the first nine months ended September 30, 1999 reached $50 million before goodwill amortization and one-time charges, or $0.85 per share on 59.1 million fully diluted shares which is a 43% increase when compared to $34.7 million in net income, or $0.64 per share on 54.1 million fully diluted shares for the nine months ended September 30, 1998. Net income for the third quarter of 1999 was $9.8 million or $.16 per share on a fully-diluted basis versus a net loss of $35.6 million or $.70 per share net loss for the third quarter of 1998.

The October 27, 1999 Press Release also reported the following:

|  | (000s) 3 Months Ended September 30, 1999 | (000s) 9 Months Ended September 30, 1999 |
|---|---|---|
| Revenues |  |  |
| Technologies & Solutions | $31,033 | $82,244 |
| Applications | $32,107 | $83,659 |
| Consulting & Services | $24,333 | $68,293 |
| Total Net Revenues | $87,473 | $234,196 |
| Income from operations | $16,827 | $43,296 |
| Net income | $10,446 | $31,096 |
|  | As of September 30, 1999 |  |
| Accounts Receivable | $122,871 |  |
| Total Assets | $640,333 |  |

88.    On November 4, 1999, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the October 27, 1999 Press Release (the "Q3 1999 6-K"). Dammekens signed the Q3 1999 6-K.

89.    On June 30, 2000, L&H filed with the SEC its form 10-Q Quarterly Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Quarterly Period Ended September 30, 1999 (the "Q3 1999 10-Q"). The Q3 1999 10-Q included substantially the same financial information contained in the October 27, 1999 Press Release. Bastiaens and Dammekens signed the Q3 1999 10-Q.

90.     The October 27, 1999 Press Release, the Q3 1999 6-K and the Q3 1999 10-Q were materially false and misleading because revenues and accounts receivables were overstated by at least $40.7 million and earnings were overstated.

91.     On February 9, 2000, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues of $110 Million and Earnings Per Share of $0.22 for Fourth Quarter (Before Exceptional Items); Strong Fiscal Year 1999; Announces 2-For-1 Stock Split; Record Earnings of $22.6 Million or $0.37 Earnings Per Share Before Goodwill Amortization and Exceptional Items; Cash Flow of $68 Million from 1999 Operations and DSO's reduced to 86 Days" (the "February 9, 2000 Press Release").  The February 9, 2000 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the fourth quarter of 1999, L&H's total revenues were $110 million, or a 43.5% increase in the reported revenue of $76.7 million for the fourth quarter 1998. For the fiscal 1999, the company reported total revenues of $344 million or an increase of 62.7% over the reported revenues of $211.6 million for 1998.
>
> The company reported approximately $13.4 million in net income for the fourth quarter of 1999, before exceptional items, or EPS (Earnings Per Share) of $0.22 cents per share on 60.7 million average diluted shares outstanding.  Net income for fiscal 1999, excluding exceptional items, totaled $40.2 million or $0.67 per share on 59.6 million average diluted shares compared to $38.2 million or $0.69 per share on 55.2 million average diluted shares during 1998.  The exceptional items for the fourth quarter of 1999 resulted in a $2.7 million net loss (unrealized currency exchange loss). For fiscal 1999 the exceptional items resulted in a $2.5 million net benefit (mainly unrealized currency exchange gain).
>
> [* * *]
>
> "In 1999 we experienced a strong demand for speech and language technologies, applications and solutions, specifically in the Enterprise and Telephony arena. This

increase was mainly the result of internal growth and created a positive cash flow from operations of $68 million, reflecting the maturity of our operations," said Gaston Bastiaens, president and CEO of L&H. "During 2000 I believe we will reap the benefits of these changes as we plan to launch separate entities for Healthcare, Internet Translation and Globalization, Enterprise and Telephony Solutions. We foresee L&H's technologies will provide an intuitive speech user interface for the ever growing number of wireless, portable and handheld devices."

The February 9, 2000 Press Release also reported the following:

|  | (000s) 3 Months Ended December 31, 1999 | (000s) Year Ended December 31, 1999 |
|---|---|---|
| Revenues |  |  |
| Technologies & Solutions | $56,416 | $138,660 |
| Applications | $30,034 | $113,693 |
| Consulting & Services | $23,591 | $91,884 |
| Total Net Revenues | $110,041 | $344,237 |
| Income from operations | $22,984 | $66,280 |
| Net income | $10,645 | $41,741 |
|  |  |  |
| Cash and Marketable Securities | $130,630 |  |
| Accounts Receivable | $104,989 |  |
|  |  |  |
| Total Assets | $693,738 |  |

92.    One June 30, 2000, L&H filed its Form 10-K Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 1999 with the SEC (the "1999 Form 10-K"). The 1999 Form 10-K included substantially the same financial information contained in the February 9, 2000 Press Release. Bastiaens, Dammekens, Lernout, Hauspie, Willaert, Cauwelier and Cloet signed the 1999 Form 10-K.

93.    The February 9, 2000 Press Release and the 1999 Form 10-K were materially false and misleading because fourth quarter revenues and accounts receivables were overstated by at least $65.6 million and earnings were overstated.  Year end 1999 revenues and accounts receivables were overstated by $174.7 million and earnings were overstated.

94.    The 1999 Form 10-K contained the following statement by KPMG Belgium:

LERNOUT & HAUSPIE SPEECH PRODUCTS N.V.
AND SUBSIDIARIES  INDEPENDENT AUDITORS'
REPORT

The Board of Directors and Shareholders
Lernout & Hauspie Speech Products N.V.:

We have audited the accompanying consolidated balance
sheets of Lernout & Hauspie Speech Products N.V. and
subsidiaries (the Company) as of December 31, 1998 and
December 31, 1999, and the related consolidated
statements of operations, shareholders' equity, cash flows
and comprehensive income (loss) for each of the years in
the three-year period ended December 31, 1999. These
consolidated financial statements are the responsibility of
the Company's management. Our responsibility is to
express an opinion on these consolidated
financial statements based on our audits.

We conducted our audits in accordance with generally
accepted auditing standards in the United States. Those
standards require that we plan and perform the audit to
obtain reasonable assurance about whether the financial
statements are free of material misstatement. An audit
includes examining, on a test basis, evidence supporting the
amounts and disclosures in the financial statements. An
audit also includes assessing the accounting principles used
and significant estimates made by management, as well as
evaluating the overall financial statement presentation. We
believe that our audits provide a reasonable basis for our
opinion.

In our opinion, the consolidated financial statements
referred to above present fairly, in all material respects, the
financial position of Lernout &Hauspie Speech Products
N.V. and subsidiaries as of December 31, 1998 and

35

December 31, 1999, and the results of their operations and
their cash flows for each of the years in the three-year
period ended December 31, 1999, in
conformity with generally accepted accounting principles
in the United States.

Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren
Brussels, Belgium
April 27, 2000

95.    The above statement by KPMG Belgium was materially false and misleading for

the reasons set forth in ¶ 227 to ¶ 386.

96.    On May 9, 2000, L&H issued a press release via Business Wire titled "Lernout &

Hauspie Reports Record Revenues and Strong Earnings for First Quarter 2000; Company

Achieves Revenues of $110.7 million and EPS of $0.37 Before Goodwill Amortization and

Exceptional Items" (the "May 9, 2000 Press Release").  The May 9, 2000 Press Release was

issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

For the first quarter of 2000, L&H's total revenues were
$110.7 million, an increase of 57% over reported revenues
of $70.7 million for the first quarter of 1999. The company
attributes the increased revenues to continued growth in
telephony, enterprise solutions and embedded market
strengths. Approximately 74% of the revenue increase was
attributed to organic growth.

Net income before exceptional items for the first quarter of
2000 reached $12.2 million, or $.19 per share on 63.9
million average diluted shares outstanding which is a 75%
increase when compared to $7.0 million in net income, or
$0.12 per share on 58.1 million average diluted shares
outstanding for the first quarter of 1999. The excluded
exceptional amount in Q1 2000 was a $4.2 million net
benefit (mainly unrealized currency exchange gain).
Earnings per share, EPS before goodwill amortization,
were $0.37 compared to $0.24 during the first quarter of
1999.

The May 9, 2000 Press Release also reported the following:

|  | (000s)<br>3 Months Ended<br>March 31, 2000 |
|---|---|
| Revenues | |
|   Technologies & Solutions | $58.886 |
|   Applications | $27.993 |
|   Consulting & Services | $23.815 |
| Total Net Revenues | $110.694 |
| Income from operations | $26,722 |
| Net income | $16,447 |
|  | As of<br>March 31, 2000 |
| Cash and Marketable Securities | $179,139 |
| Accounts Receivable | $128,741 |
| Total Assets | $828,141 |

   97.  On May 12, 2000, L&H filed with the SEC a Form 6-K Report of Foreign Private

Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which

included as "Exhibit 2" a copy of the May 9, 2000 Press Release (the "Q1 2000 6-K").

Dammekens signed the Q1 2000 6-K.

   98.  On June 30, 2000, L&H filed its Form 10-Q Quarterly Report Pursuant to

Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Quarterly Period

ended March 31, 2000 ( the "Q1 2000 10-Q"). The Q1 2000 10-Q included substantially

the same financial information contained in the May 9, 2000 Press Release. Bastiaens

and Dammekens signed the Q1 2000 10-Q.

37

99.    The May 9, 2000 Press Release, the Q1 2000 6-K and the Q1 2000 10-Q were materially false and misleading because revenues and accounts receivables were overstated by at least $58.4 million and earnings were overstated.

100.    On August 8, 2000, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues of Approximately $155 Million for Q2, 2000 and Earnings of $0.05 Before Goodwill Amortization and Exceptional Items" (the "August 8, 2000 Press Release"). The August 8, 2000 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> L&H's total revenues were approximately $155 million, an increase of 104% over reported revenues of $76 million for the second quarter of 1999. Thirty-one million dollars of the company's second quarter 2000 revenues came from Dictaphone and Dragon. Excluding Dictaphone and Dragon, L&H's second quarter revenues were $124 million, a 63% increase from revenues of $76 million in the second quarter of 1999. The company attributes 72% of this increase to organic growth.
>
> Net income before goodwill and exceptional items for the second quarter of 2000 were $7.1 million, or $0.05 per share on approximately 140 million average diluted shares outstanding as compared to $17.3 million, or $0.15 per share during the second quarter of 1999 on approximately 119 million average diluted shares outstanding.
>
> [* * *]
>
> **Geographical Analysis of Revenues in the Second Quarter**
>
> European revenues were approximately $36.4 million or 23% of total revenues compared to $29.3 million or 39% in the second quarter of 1999.
>
> Revenues for North America were approximately $48.2 million or 31% of total revenues compared to $18.7 million or 25% of total revenues for the second quarter 1999. The increase in U.S. revenue is largely attributable to the Dictaphone and Dragon acquisitions.

Korea contributed approximately $68 million or 44% of total company revenues.

Currently, L&H has over 150 corporate customers in Korea including Art Lab, Digital Life, Digital Sei Young Ltd, EPC, Hanvit Bank, Hanvit Securities, Hung Chang, Hyundai Securities, Koscom, LG Electronics, Samsung Electronics, and Terrasoft. Its second quarter 2000 revenues continued to be strong in Korea.

[* * *]

**The increase in U.S. revenue is largely attributable to the Dictaphone and Dragon acquisitions.**
"The combination of Dragon and Dictaphone with L&H and the retention of the talented executive management from both companies provide us with an organization and resources that are unquestionably the strongest and finest in this industry," said Gaston Bastiaens, president and CEO of L&H. "We are very excited to apply these resources to tackle the ever growing opportunities in healthcare, enterprise and telephony, applications, globalization and the Internet. There has never been a more exciting or promising period in the speech and language technology industry."

"The second quarter of 2000 was filled with successes that we believe we can replicate in other areas of our business," said Jo Lernout, co-founder and chairman of L&H. "During the second quarter we continued to move toward a solutions oriented approach, as evidenced by the introduction of our healthcare solutions, our consumer applications and our NAK prototype solution. We also had numerous solutions sales in Asia. We believe these achievements can serve as a model for additional growth in the U.S. and Europe."

[* * *]

**Balance Sheet & Cash Flow Highlights, June 30, 2000**

Cash and Marketable Securities increased to approximately $200 million from $179 million at the end of the previous quarter.

Accounts Receivable increased to $238 million from $129 million at the end of the second quarter. The increase was due primarily to the inclusion of Dictaphone and Dragon.

Short-term debt was $252 million primarily as a result of the assumption of the debt associated with the acquisition of Dictaphone.

Net working capital was approximately $48 million, down primarily as a result of the assumption of the short-term debt associated with the acquisition of Dictaphone.

Net goodwill was approximately $1,701 million, an increase of approximately $1,283 versus the first quarter as a result of the acquisition of Dictaphone and Dragon.

Long-term debt was approximately $234 million as a result of the assumption of $200 million of Dictaphone senior subordinated notes.

Shareholders' equity was ($1,531) million.

Operating cash flow for the quarter was approximately $12 million and $32 million year-to-date.

Net cash used from investing activities was approximately $71 million and $145 million year-to-date.

Net cash provided by investing activities was approximately $83 million and $191 million year-to-date.

The August 8, 2000 Press Release also reported the following:

| | 3 Months Ended June 30, 2000 | 6 Months Ended June 30, 2000 |
|---|---|---|
| Revenues | | |
| Technologies & Solutions | $78,904 | $137,790 |
| Applications | $50,440 | $78,433 |
| Consulting & Services | $25,562 | $49,378 |
| Total Net Revenues | $154,906 | $265,601 |
| Income(Loss) from operations | ($15,936) | $10,787 |
| Net loss | ($33,667) | ($17,219) |

101.    On or about August 14, 2000, L&H filed its Form 10-Q Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Quarterly Period ended June 30, 2000 (the "Q2 2000 10-Q"). The Q2 2000 10-Q included the same financial

information included in the August 8, 2000 Press Release. Bastiaens and Dammekens signed the Q2 2000 Quarterly 10-Q.

102.    The August 8, 2000 Press Release and the Q2 2000 10-Q were materially false and misleading because revenues and accounts receivables were overstated by at least $60.7 million and earnings were overstated.

### C.    THE MASSIVE OVERSTATEMENT OF PUBLICLY REPORTED REVENUES AND EARNINGS

103.    Throughout the Class Period, L&H engaged in numerous schemes that were intended to, and did, artificially inflate the Company's revenues, earnings and the value of L&H's common stock. As a result of defendants' far-reaching fraud, L&H would eventual admit that over $377 million of revenue from 1998 through June of 2000 was improperly recorded – including the reversal of all revenue recorded in Korea from September 1999 through June 30, 2000.

104.    In Burlington, defendants' fraudulent accounting practices were concentrated in L&H's Medical Division and included:  barter transactions, undisclosed rights to return product, transactions where the customers' ability to pay depended on the receipt of an investment from L&H, and the artificial division of agreements into separate contracts to book revenue in an earlier quarter.

105.    The improper revenue practices were not confined to Burlington.  In Belgium, L&H routinely recorded revenue prematurely by:  backdating of contracts, booking revenue prior to delivery of products, promising to deliver additional products at no extra charge "when and if available," and booking a large loan from Capital Union as revenue.

41

1.    **Barter/Exchange Transaction**

106.    L&H repeatedly recorded revenue from barter or exchange transactions where no cash changed hands. Essentially, L&H and a "customer" would agree to exchange products held for sale to a separate end-user customer. L&H would nonetheless record the transaction as a straight sale and record revenue immediately.

107.    The recognition of revenue from such barter transactions violated Accounting Principles Board Opinion No. 29, which states that "an exchange of a product or property held for sale in the ordinary course of business for a product for property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange" does not culminate an earnings process and that revenue may not be recognized on an exchange of non-monetary assets if fair values are not determinable.

108.    A former channel sales manager from the Burlington office of L&H said barter/swap transactions were widespread at L&H Burlington and "a standard practice within the whole company, absolutely from the top down . . . . It was expected. It was the way things were done." "Everybody knew about it. Nobody hid it. Everybody acted like it was some kind of genius scheme to book revenue." The former channel sales manager understood that Bastiaens was responsible for implementing the cross-quarter deals and barter transactions.

109.    For example, in the first quarter of 1998, L&H entered into an $18,000 license agreement with Xybernaut, with the intent that Xybernaut would resell L&H's Voice Express for Medicine software. In return, Xybernaut sent hardware (portable, "wearable" computers) valued at $18,000 to L&H. According to a former channel sales

manager in L&H's Burlington office, "it was absolutely a swap," and L&H paid a sales commission on the deal.

110.     The Audit Committee Report determined that a number of barter-transactions would have to be restated and the revenue reversed. For example:

a.      On March 31, 1998, a customer, believed to be Kortean, licensed L&H software for $300,000 from the Burlington office. In return, on June 29, 1998, L&H licensed $500,000 of contexts to be developed by Kortean, with a $200,000 rebate if L&H obtained financing for the customer. Kortean never sold any L&H product, and L&H relieved the customer of its obligations. Kortean intended to develop technology to facilitate sales to its own customers, so the earnings process was not culminated in the first quarter of 1998 when it was booked by L&H. Further, the fair value of the context development work could not be determined because the customer never developed anything. Thus, the Audit Committee concluded that the entire $300,000 recognized as revenue by L&H in the first quarter of 1998 had to be reversed.

b.      On March 31, 1998, Sequoia Software Corporation licensed $30,000 of L&H software for resale from the Burlington office. In the same quarter, L&H licensed $30,000 of the customer's product. With the two license arrangements, L&H and the customer exchanged products to be held for sale to end customers, and thus the earnings process had not been completed. Thus, the Audit Committee concluded that the entire $30,000 recognized as revenue by L&H in the first quarter of 1998 had to be reversed.

c.      On September 29, 1998, L&H's Burlington office entered into a reseller agreement with Speech Machines. Pursuant to that agreement, L&H recognized $375,000 in revenue during the third quarter of 1998, and $435,000 in revenue during the fourth quarter of 1998. On January 15, 1999, L&H entered into an amended reseller agreement with Speech Machines that obligated L&H to pay an upfront fee of $1.25 million to Speech Machines for no additional consideration. Bastiaens signed the January 15, 1999 Agreement on behalf of L&H. L&H and Speech Machines exchanged products to be held for sale to end customers, thus, the earnings process had not been culminated in the third and fourth quarters of 1998 when L&H recognized the revenue. Thus, the Audit Committee concluded that all revenue recorded from this transaction in the later half of 1998 had to be reversed.

43

d.  On September 30, 1998, Nine Rivers Technology ("NRT") entered a value added reseller agreement with L&H Burlington, agreeing to license $950,000 of L&H's software for resale. L&H recorded $950,000 in revenue from the sale in the third quarter of 1998. As part of the September 30, 1998 agreement, L&H committed to pay almost $112,000 of marketing expenditures, reducing L&H's net benefit to approximately $838,000. On January 15, 1999, L&H licensed $838,000 of the NRT's software for resale. Dammekens signed both the September 30, 1998 and January 15, 1999 agreements. A May 18, 1999 internal L&H e-mail from William Neeb to David Berglund [both L&H employees] referenced the September 30, 1998 agreement, and concluded: "According to Dave Miller [Director of Operations at NRT], they have no plans to pay us. They claim this was a reciprocal agreement, and that L&H was to place orders of equal value." Thus, L&H and the customer exchanged products to be held for sale to end customers and the earnings process had not been completed in the third quarter of 1998 when L&H recognized $950,000 in revenue from this transaction. Further, since the customer never paid the receivable, but instead delivered product to L&H, the earning process was never culminated. Thus, the Audit Committee concluded that the entire revenue recorded from this transaction in the third quarter 1998 had to be reversed.

e.  On December 31, 1998, Interpra Medical Imaging Network, Ltd. ("Interpra"), licensed $250,000 of L&H software from L&H's Burlington office. On the next business day, January 4, 1999, L&H, in return, licensed $250,000 of Interpra's software (plus additional engineering fees). Later, on March 31, 1999, Interpra licensed an additional $250,000 of L&H software, and in the third quarter of 1999, L&H licensed an additional $250,000 of software. Since L&H and Interpra exchanged products to be held for sale to end customers, the earnings process was not complete at the time revenue was booked. Further, since the customer never paid the receivables, but instead delivered product to L&H, the earnings process was never culminated. Thus, the Audit Committee concluded that the entire revenue recorded from this transaction in the fourth quarter of 1998 had to be reversed.

f.  On December 19, 1998, L&H Belgium recognized $800,000 of license fee revenue based on an agreement with Educa N.V. The parties entered a second agreement, also dated December 19, 1998, which was identical in all respects except that the fee was only $500,000. The customer, however, never had any intention to pay the $800,000 and, in fact, believed there was an oral agreement for L&H to purchase $800,000 of software from the customer for

44

resale. L&H never invoiced the customer for either the $500,000 or $800,000 license fees. Further, L&H was never paid any amount under these agreements. To the extent this transaction was a swap with the parties intending to exchange products to be held for sale to end customers, the earnings process was not complete at the time L&H recorded the revenue. Further, as discussed below, because the Company did not invoice Interpra, collectibility would be at issue. Thus, the Audit Committee concluded that the entire revenue recorded from this transaction in the fourth quarter of 1998 had to be reversed.

g.     On December 27, 1998, Applied Voice Recognition ("Applied Voice") licensed $1 million of L&H software under a value added reseller agreement ("VAR") from the Burlington office. Soon thereafter, on January 11, 1999, L&H committed to pay $400,000 of the development of contexts by Applied Voice. The customer intended to develop technology to be used by L&H to facilitate sales to third party customers; therefore, the earning process was not culminated in the fourth quarter of 1998. Further, the Audit Committee concluded, "it appears unlikely that the parties were able to determine the fair value of that context development work." Thus, the Audit Committee concluded that the entire revenue recorded from this transaction in the fourth quarter of 1998 had to be reversed.

**2.     Booking Revenue Absent A Contract**

111.    L&H also inflated earnings by prematurely recognizing revenues where no contract was signed or where the terms of the contract were not finalized. Throughout the Class Period, defendants repeatedly booked sales, even though negotiations were still ongoing and the "customer" was under no binding obligation to purchase the product.

112.    Statement of Position ("SOP") 97-2 provides that there must be persuasive evidence of an existing arrangement in order to recognize revenue and that "if the vendor has a customary business practice of utilizing written contracts, evidence of the arrangement is provided only by a contract signed by both parties." L&H's own revenue recognition policy provides that L&H only recognizes revenue, *inter alia*, "upon the signing of the license agreement . . . when no contractual terms remain unsatisfied . . .".

113.   The Audit Committee report revealed a number of transactions where revenues were booked prior to the completion of a contract that were required to be restated.  For example:

a.   On June 30, 1998, L&H Burlington entered into a VAR agreement with Digital Voice, Inc., requiring a $150,000 prepaid royalty. L&H booked $150,000 in revenue from this agreement in the second quarter of 1998.  An August 6, 1998 internal L&H e-mail referred to the need to finalize the contract "that was signed in June."  The August 6, 1998 e-mail discussed specific terms of the contract to be modified and shows that the terms of the agreement were not finalized in the second quarter of 1998, when the revenue was prematurely recognized.  Since the final, modified contract was not signed, or even agreed upon, by both parties until after June 30, 1998, no revenue should have been recognized in the second quarter 1998.

b.   In the second quarter 1999, L&H Belgium recognized $3 million in licensing revenue under a June 30, 1999 agreement with I-Medical.  On July 7, 1999, however, Lernout sent an e-mail to Bastiaens and Hauspie, indicating that the contract had not yet been signed.  Since the contract had not yet been signed, the $3 million in revenue should not have been recognized in the second quarter of 1999.

c.   In the third quarter of 1999, L&H Belgium recognized $50,000 of revenue from a purported customer, despite the fact that L&H had never invoiced the customer and that, according to an unidentified source in the Audit Committee report, the terms of the contract were never finalized and there was never any final agreement. Accordingly, the $50,000 was improperly recognized during the third quarter of 1999.

d.   In the fourth quarter of 1999, L&H recognized $4 million of revenue based on a December 30, 1999 agreement between L&H Belgium and an Armenian LDC customer.  An internal L&H e-mail dated January 5, 2000 from Filip Beemaert ("Beemaert"), L&H legal counsel, to defendant Willaert and Dammekens, however, discussed the terms to be included in the contract, including fees of $3 million.  The e-mail makes it clear that the terms of the agreement were not finalized during 1999, and, thus, L&H had not met the criteria for "persuasive evidence of an arrangement" until the first quarter of 2000.  Accordingly, this $4 million was improperly recorded as revenue in 1999.

46