e.  In the fourth quarter of 1999, L&H Belgium recognized $5 million in revenue on license agreement with a company, believed to be T.I.B. A January 4, 2000 e-mail from the Beemaert to Hauspie and Jo Lernout, however, indicated that the contract was not yet signed. According to the e-mail "give me a name of the person at T.I.B. who has to read this again and who has to sign if everything is ok." Subsequently, the L&H Audit Committee reported that the contract was not signed until January 6, 2000, thus, the revenue was improperly recorded in the fourth quarter of 1999.

f.  In the fourth quarter of 1999, L&H Belgium recognized $4 million in revenue from license agreement with I-travel dated December 31, 1999. An internal L&H e-mail dated January 5, 2000 from Beemaert to Willaert and Dammekens indicated that the contract was signed after year-end. Since the contract was not signed by both parties during 1999, the revenue was improperly recorded in the fourth quarter of 1999.

g.  In the first quarter of 2000, L&H Belgium recognized $8 million of revenue based on a license agreement dated March 31, 2000 with European Language Center. According to an e-mail dated April 4, 2000 from Beemaert to Willaert, Lernout, Bastiaens and Dammekens, the customer requested information, including royalty pricing information and the list of licensed products, to finalize the agreement. Since both parties did not sign the finalized contract until the second quarter of 2000, the revenue was improperly recognized in the first quarter of 2000.

## 3.    Back-Dating Contracts

114.    On March 25, 1998 Vasco Data Security International ("Vasco"), a Burlington customer, licensed $800,000 of L&H software. At or around the same time, L&H loaned Vasco $3 million, in the form of a note convertible into Vasco shares. The loan agreement included extended payment terms providing that repayment was not due until January 4, 1999. According to L&H's financial statements, Vasco licensed additional L&H software in 1998, entering into a second licensing agreement with L&H, this one priced at $900,000 on December 31, 1998. However, according to Vasco's

47

former Chief Technology Officer, this second agreement was actually entered into in January 1999, but backdated at the demand of defendant Hauspie, who threatened to cut off L&H's funding of Vasco if Vasco's management refused to alter the date of the licensing agreement. Furthermore, the technology covered by both of the L&H licenses was useless to Vasco – L&H did not have an application that Vasco could use for any product development. L&H recorded the $900,000 for the back-dated contract in 1998.

115.    With the second licensing agreement backdated to December 1998, L&H came through with further funding, allowing Vasco to repay its $3 million loan from L&H in the second quarter of 1999. This time, Vasco was bailed out by defendant LHIC, a company formed by Lernout and Hauspie, and run by Vanderhoydonck, to invest in companies that specialize in speech and language based products. LHIC loaned Vasco $5 million and, as a result of the loan, LHIC owned 7% of Vasco and held a seat on the company's board of directors. That seat was filled by defendant Hauspie. Another top investor in Vasco is Mercator.

116.    L&H's stated policy is to defer recognition of any revenue not due within 90 days of quarter end. L&H violated this policy when it recognized revenue from the Vasco transactions in the amounts of $800,000 and $900,000 in the first and fourth quarters of 1998, respectively. Furthermore, the fact that the $3 million loan from L&H to Vasco contained "extended payment terms" beyond 90 days, and that the loan far exceeded the total license fees from both agreements, strongly indicated that the collectibility of the licensing fees was neither probable nor fixed and determinable at the signing of the agreements. The revenue from these transactions was not recognizable until at least the second quarter of 1999, when Vasco paid off the $3 million loan. Given

the circumstances of the repayment of the loan, described above, even recognition of the revenue in the second quarter of 1999 was inappropriate.

117.    In addition to forcing Vasco to backdate contracts, according to a former chief technology officer at Vasco, in early 1998, Hauspie tried unsuccessfully to "force" Vasco into acquiring Keyware Technologies ("Keyware"), a company predominately owned by FLV Fund and GIMV. Keyware was a company that developed technology to verify a person's identity by means of personal characteristic such as voice, face and fingerprints. Keyware was founded in 1996 and was one of the first companies to move into Flanders Language Valley. FLV Fund and GIMV were Keyware's largest shareholders.

118.    Like FLV Fund, GIMV had long, established ties to L&H. In 1992, GIMV had invested $5 million in return for an 18% take in L&H. At that time GIMV's investment manager was Philip Vermeulen, who was a director of L&H before the Class Period. In September 1997, Vermeulen became the chief financial officer of FLV Fund Management. In 1998, GIMV and Mercator established an investment fund in Belgium, managed by defendant Vanderhoydonck, to purportedly invest in mature companies contemplating a management buyout.

### 4.    Booking Revenues When Collectibility was in Doubt

119.    In addition to booking revenue before contract negotiations were finalized, L&H repeatedly recorded sales when it was doubtful that the customer had the ability to pay for its products or services. These instances involved, inter alia, where the customer was not invoiced for the product or services or when the customer's ability to pay

depended on an investment from L&H, thus demonstrating that collectibility was not probably as required by SOP 97-2.

120.    According to the Audit Committee report, L&H had a policy of not invoicing customers until the Company believed the customer could pay, in order to avoid triggering a value added tax obligation. Thus, a failure to invoice was indicative of doubtful collectibility.

121.    SOP 97-2, issued by the American Institute of Certified Public Accountants ("AICPA"), states that collectibility must be deemed to be probable in order for revenue to be recognized and that any extended payment terms indicate that the fee is not fixed and determinable and that revenue should be deferred until the payment becomes due. Furthermore, SOP 97-2 states: "if payment of a significant portion of the software licensing fee is not due until after expiration of the license or more than twelve months after delivery, the licensing fee is presumed not to be fixed or determinable."

122.    The Audit Committee Report revealed a number of transactions that were required to be restated because L&H recorded revenue while collectibility was in question.  For example:

    a.    As discussed above, on March 25, 1998, Vasco licensed $800,000 of L&H software.  At or around the same time, L&H loaned the customer $3 million.  This loan agreement included extended payment terms providing that the loan was not due until January 4, 1999.  The fact that the loan to Vasco contained "extended payment terms" extending beyond 90 days, and that the loan exceeded the total amount of the license fees, strongly indicates that the collectibility of the fees was neither probable nor fixed and determinable at the signing of contracts.  Thus, $800,000 and $900,000 of revenue from this customer were prematurely recognized in the first and fourth quarters of 1998, respectively.

    b.    In the first, second and third quarters of 1998, BCB Voice Systems ("BCB"), a Burlington customer, licensed a total of $1.2 million of

L&H software. In July 15, 1998, L&H and BCB entered into a stock swap valued at $1.6 million. BCB was a start-up, with little capital, and intended to use its L&H stock from the swap to pay the license fees to L&H. Under the swap arrangement, however, BCB was unable to sell the L&H stock until October 1998. Thus, the proceeds from the BCB licensing "revenues" were not available until the fourth quarter of 1998. Further, there was no assurance that the proceeds from that eventual sale would be sufficient to cover the payment. Thus, collectibility of the receivable from the customer was not probable until--at the earliest -- the fourth quarter of 1998 and L&H recognized revenue prematurely.

c.  As noted above, on December 31, 1998, Interpra Medical Imaging Network, Ltd. ("Interpra"), a Burlington customer, licensed $250,000 of L&H software. On March 31, 1999, the customer licensed an additional $250,000 of L&H software. The customer has maintained that it was verbally promised funding from the FLV Fund at the time of the license deal and would not pay the license fees with at receiving FLV funding. This promise indicated that L&H was unable to determine that the collectibility of the fees from the licensing agreements were probably at the time the revenue was recognized.

d.  On December 31, 1998, L&H recognized $250,000 of license revenue based on an agreement with a Belgium customer, believed to be Excalibur Technologies, N.V. L&H never invoiced the customer for these fees. As a general rule, L&H did not invoice customers until it believed the customer could pay. Further, the customer was a start-up that had been established only one month prior to the license agreement. L&H did not establish that the collection of the receivable was probable at the time it recognized revenue. Thus, the $250,000 in revenue should not have been recognized until the fee was collected.

e.  On March 17, 1999, L&H Belgium signed a license agreement for $900,000 with G2 Speech B.V. Of this amount, $500,000 was due within 90 days, and $400,000 was due after 90 days. The agreement called for L&H to deliver Dutch, German, French and UK English. Prior to the end of the first quarter of 1999, an amendment was signed changing the payment terms such that the entire $900,000 was due within 90 days. L&H delivered the Dutch version – almost one year later – in March 2000. As of November 2000, L&H had not delivered any of the other versions. The customer never paid any of the $900,000. Since delivery did not occur during the first quarter of 1999, the revenue related to the transaction was improperly recognized. At a minimum, only the

fraction of the license agreement fees attributable to the Dutch version could be recorded, but only in first quarter of 2000.

f.    On September 27, 1999, L&H Belgium improperly recognized $450,000 of revenue based on a license agreement where L&H never invoiced the customer. The customer was expecting an investment from an L&H related source. Thus, collectibility was not probable at the time it recognized revenue in the third quarter of 1999.

## 5.    Booking Revenues on Contingent Contracts and/or Prior to Delivery

123.    During the Class Period, L&H routinely recognized revenues from sales despite the fact that contingencies existed, such as the requirement that L&H later perform development work for the customer or where delivery had not been completed.

124.    SOP 97-2 provides, *inter alia*, that delivery of all the software must occur before the revenue can be recognized.

125.    The Audit Committee Report cited to several contracts for which revenue was improperly recorded because delivery had not occurred. For example:

a.    In the first quarter of 1999, L&H Belgium recognized $1 million of license revenue based on a license agreement from I-Merge. An August 25, 2000 letter from Eric Moons of L&H to Tony Snauwart indicates that the software was not delivered until June 1999, and was replaced two months later in August 1999. Accordingly, because delivery had not occurred, the revenue should not have been recorded in the first quarter of 1999.

b.    On June 30, 1999, L&H Belgium recognized as revenue $900,000 based on a license agreement with a customer, believed to be Cegeka Healthcare Systems N.V., that allocated the fee equally to the Dutch, German and UK English language versions of Voice Xpress, at $300,000 a piece. L&H only invoiced the customer for $600,000 of the fee. The agreement stated that L&H would deliver the Dutch language version "when and if commercially available." The Dutch version was delivered in April or May of 2000, and L&H received $300,000 in payment at that time. A beta version of UK English was delivered in March/April 2000. No final version of the UK English or German software was ever delivered. The

$900,000 was prematurely recorded in the second quarter of 1999 because the revenue attributable to the Dutch version was not earned until a year later and the remaining $600,000 is contingent on L&H performing additional development work.

c.    In the third quarter of 1999, L&H Belgium recognized $220,000 of license revenue based on a September 27, 1999 agreement. L&H never invoiced the customer for these fees and delivery did not occur until March 8, 2000 – approximately six months later. Based upon L&H's failure to invoice the customer, collection of the receivable was not probable at the time the Company recognized its revenues. Nevertheless, the $220,000 should have been recorded in the third quarter of 1999, because delivery did not occur until the first quarter of 2000.

d.    On September 30, 1999, L&H Burlington entered in a distribution agreement allowing a customer to distribute both professional and retail products. The customer agreed to pay L&H $1 million prepaid royalty on the professional product. There was no prepaid royalty on the retail products. With respect to the professional products, the agreement required L&H to deliver the American English version currently, and to deliver the Australian accent version of the software "when and if" it becomes available. On October 26, 1999, the parties signed a clarification letter removing the "when and if available" language from the earlier agreement. Accordingly, because the final terms of the agreement, with regard to the Australian accent when and if available clause, were not finalized until the fourth quarter of 1999, the revenue should not have been recorded in the third quarter of 1999.

**6.    <u>Side-Agreements – Capital Union</u>**

126.    In the fourth quarter of 1999, L&H improperly recorded $8 million in revenue stemming from a December 29, 1999 software license agreement entered into with Capital Union EC, an investment bank based in Bahrain, United Arab Emirates ("Capital Union"). Pursuant to the December 29, 1999 Transferable License Agreement (the "TL Agreement"), Capital Union purchased a license to use certain L&H systems and methodology for the development of speech software products in two languages,

Arabic and Arabic Dialects. Capital Union paid L&H $8 million, ($4 million per language), for the license.

127.    However, according to side agreements signed that same day, December 29, 1999, and the TL Agreement's own terms, Capital Union was never going to be the end-user of the license, but would "sell" the license to other entities before the agreement was a year old. In fact, according to the January 21, 2001 Affidavit of Salah Al Madusherji, the Managing Director of Capital Union, the TL Agreement contemplated that by June 2000 – six months after the agreement's inception – L&H would create two Belgian LDCs, specifically for the purpose of purchasing the license from Capital Union. The newly created LDCs, to be called the "Arabic Development Company" and the "Arabic Dialects Development Company," would refund the $8 million license fee Capital Union paid to L&H.

128.    In the event that the sale of the license to the non-existent LDCs did not materialize, one of the side agreements entered into on December 29, 1999, a letter signed by Willaert and Hauspie, provided a cushy safety net to Capital Union: L&H promised to pay to Capital Union $9.25 million (the $8 million license fee and interest of $1.25 million) on or before December 31, 2000 (one year and two days after the TL Agreement), in the event that Arabic Development Company and Arabic Dialects Development Company had not purchased Capital Union's $8 million license by June 30, 2000.

129.    This transaction was a de facto loan from Capital Union to L&H. L&H improperly recorded the $8 million paid to it by Capital Union in the fourth quarter of 1999 because the full purchase price of the license – with hefty interest – would be

refunded to Capital Union within one year.  The fees in this arrangement should not have been recognized as revenue because they were not "fixed or determinable" as required by SOP 97-2, and the earnings process, in what was, at best, a consignment sale, was not consummated.

### 7.    Booking Revenue Where the "Customer" Had the Right to Return

130.    L&H repeatedly recorded revenues despite the fact that the customer had a right to return the product.

131.    Statement of Financial Accounting Standards ("SFAS") No. 48 provides that a company may record revenue from a sales transaction where the customer has the right to return the product, in very limited circumstances that were not met under the following transactions.  Moreover, the Company must disclose that it grants its customers rights of return.  L&H never made the requisite disclosure.

132.    The Audit Committee Report cited to several contracts from which revenues were improperly recorded because L&H failed to properly account for returned products.  For example:

a.    On December 31, 1998, L&H entered into a distribution agreement with DNH Distributing ("DNH"), a Burlington, Massachusetts customer.  Under the agreement, DNH was obligated to prepay $500,000 of royalties to L&H.  During the fourth quarter of 1998, L&H recognized $350,000 of revenue under the agreement.  The contract between DNH and L&H provided DNH the right to return product, and, in fact, DNH never paid any fees, and returned the entire product.  In reviewing the transaction, the Audit Committee determined that "the evidence indicates that the [customer] never had any intent to pay the fees under the agreement until it sold through to end customers, indicating that the collectibility of the fees was not probable in the fourth quarter of 1998."  Accordingly, L&H improperly booked $350,000 in the fourth quarter of 1998.

b.    On September 30, 1998, Computer Consulting Group ("CCG"), a Burlington customer, licensed $70,000 of software from L&H.  As

55

part of the licensing agreement, L&H committed to pay CCG $145,3000 of marketing expenses. On December 29, 1998, CCG signed a distributor agreement requiring a $569,620 non-refundable fee. During the fourth quarter of 1998, L&H recognized $152,500 of this fee purportedly based on a purchase order from CCG. The contract, however, gave the customer the right to return product, and CCG never paid any money to L&H under the agreement. The Audit Committee concluded that "[t]he evidence indicates that [the customer] never had any intent to pay the fees under the agreement until it sold through to end customers, indicating that the collectibility of the fees was not probably in Q4 1998."

**8.      Other Examples of Fraudulent Practices of Revenue Recognition**

133.     In addition to the above accounting violations, defendants recorded revenue from a number of additional transactions in violation of GAAP.

134.     During the second quarter of 1998, L&H recognized $500,000 of license revenue from a Belgium customer that later admitted that the company had no use for the software when purchased. Nevertheless, the customer paid the $500,000 fee, through funding provided by an entity that was funded by defendants Lernout and Hauspie. As the Audit Committee ultimately determined, the $500,000 payment was, in reality, an additional equity infusion by defendants Lernout and Hauspie into L&H, not a revenue generating transaction. Thus, the $500,000 should not have been treated as additional paid-in-capital, not revenue.

135.     L&H signed an LDC agreement for Farsi with W.H. Operations, Ltd., in the third quarter of 1998 and another for Turkish in the first quarter of 1999. The customer purchased the shares of the LDC from the original investors on September 23, 1999 and signed amended LDC agreements with L&H. When W.H. Operations was buying the LDCs from the initial investors, the customer wanted $1.3 million of free

warrants from L&H. Dammekens and Willaert then told the customer that they had to pay for the warrants because of the impact on the Company's profit and loss statement, but that L&H would make it up to them later. On August 1, 2000, L&H entered into a contract with the customer obligating L&H to pay $1.8 million to the customer over two years for "introductions" to influential politicians and business people. According to Dammekens, this agreement was entered into to reimburse the customer for the warrants. Additionally, the customer (through its subsidiary, Langware) hired L&H to work on the development of Farsi and Turkish. Since the intent at the time of the sale of the LDCs to the customer was to reimburse it for its warrant purchase this is, in effect, a refund on a portion of the license revenue. The revenue recorded for the Farsi and Turkish transactions was required to be reduced by an amount equal to the amounts paid to the customer, i.e., $1.8 million, since GAAP requires that revenue should be recorded at the net amount received from the customer.

136.    According to a former marketing communications manager and events manager at L&H's Burlington office, L&H repeatedly shipped non-working products. For example, the former manager noted that in December 1998, Chris Force, Vice President of the Healthcare Solutions Group, authorized shipment of inoperable software (a version of L&H's Clinical Reporter) to a customer in order to make year-end numbers.

137.    The above-referenced revenue recognition schemes, together with the related-party transaction and Korean problems (discussed below), significantly contributed to L&H's overstatement of Class Period revenue by over $377 million.

138.    These improper revenue and sales tactics were well known within L&H. In fact, according to a former channel sales manager, the Burlington office held weekly

sales meetings to discuss results and forecast. Sales staff, division heads and Bastieans attended these meeting. In fact, the meetings were often held in Bastieans' office. At these weekly meeting, the participants discussed forecasts, including positive and negative trends and "bluebirds" ("what can you pull out of the sky"). After forecast numbers were provided, they generated an Excel spreadsheet given to David Kramer, the direct sales manager in charge of medical and legal software. These spreadsheets were forwarded to Bastiaens who had spreadsheet forecasts for the entire company.

### D.     THE KOREAN FRAUD

139.    Prior to September of 1999, L&H had few Korean contracts and little Korean revenue. However, on September 13, 1999, the Company orchestrated a dramatic shift in its Korean strategy, by acquiring Bumil Information & Communications, Co. Ltd. ("Bumil"), and establishing the L&H Korea subsidiary.

140.    Bumil was portrayed as "a leading systems integrator developing customized applications for the telecommunications industry" and "one of Korea's leading developers of interactive voice, call center and other telecommunications market applications." Bumil had been an L&H licensee and "joint development partner" since March 1997, involved in L&H's major Korean transactions, including a deal with ASR Stock Quote Server, Korea's largest telephone based automated stock quote and trading service, and Hanvit Bank, Korea's largest commercial banking institution. Defendant Seo was a founder and the former present of Bumil.

141.    L&H purchased Bumil for $25 million in cash, upfront. As additional consideration for the acquisition, Seo, Bumil's sole shareholder, was entitled to receive an "earn-out" of $25 million, provided that L&H Korea met certain reporting

requirements between the acquisition date and December 31, 2000. Pursuant to a Stock

Purchase Agreement, any potential "earn-out" would not be paid until 2001.

142.    On September 13, 1999, L&H issued a press release announcing that it

had expanded its Pacific Rim presence by acquiring Bumil. Specifically, the Company

announced:

> Bumil has been an L&H business partner and licensee since 1997 and, during that
> time, has deployed L&H's speech technology in several highly visible, strategic
> telecommunications applications for leading Korean companies. Most recently,
> Bumil used L&H's speech recognition to speech-enable an automated attendant
> system it developed for Hanvit Bank, Korea's largest commercial banking
> institution. Bumil also recently used L&H's speech recognition and text to
> speech technology to develop the ASR Stock Quote Server, Korea's largest
> telephone based automated stock quote and trading service.

> The acquisition of Bumil builds on L&H's already significant presence and
> resources in the Far East and helps position it for the leadership position there.
> L&H's existing Asia Pacific customer base includes Samsung, LG Semicon,
> NEC, Hitachi, Sega, Inventec, Group Sense Limited, Pioneer, Alpine and Fuji-
> Xerox, among others. It has offices in Tokyo, Beijing, Hong Kong, Taipei and
> Singapore and Sydney Australia. L&H's speech offerings for the Asian Pacific
> market include the world's first PC-based Canotnese continuous speech
> recognition product as well as ASR, TTS and machine translation support for
> Korean, Mandarin and Japanese.

> "As we pursue our long-term objectives, we continue to receive validation that
> our growth strategy is sound – particularly for the worldwide telecommunications
> industry," said Jo Lernout, L&H co-founder and co-chairman. "Our recent
> successes with Bumil, as well as industry analysts' predictions regarding the
> rapidly increasing demand for speech enabled applications, underscores the
> outstanding growth opportunities that this acquisition helps to bring to us."

The press release also quoted Bastiaens as stating:

> Bumil has leveraged its management and development expertise and business
> relationships to become a leader in the Pacific Rim in the creation and
> deployment of speech-enabled solutions for the burgeoning telecommunications
> industry . . . By combining Bumil's thriving business with L&H's vision and
> expertise, I am convinced we can continue to build a highly successful Korean
> and Asia Pacific operation.

143.    Even before L&H acquired Bumil, the Senior Officers were aware of the

significant internal control issues in Korea.  On September 9, 1999, Louis Woo, President

and General Manager of L&H Asia Pacific sent an e-mail to Dammekens and Bastiaens

concerning "financial accountability of L&H Korea."  Specifically, Woo stated:

> Mr. Seo was, by all accounts, the sole owner of Bumil and he had not needed to answer
> to anyone but himself.  In Asia, not only in S. Korea, owners of family business tend to
> mix the company finances with personal finances.  We must have a clear financial
> process and procedure for them to adhere to so that no possible abuses can be made and
> tolerated. . . . It is next to impossible to expect [that] the current financial controller and
> accounting manager will behave any differently from that of the Bumil days.  It will be
> impossible for them to uphold the internationally accepted financial practices if they
> happen to be different from the current practices and it is equally impossible to expect
> them to over-rule Mr. Seo if his practice deviates from ours.
>
> It is extremely important to hire a strong controller from S. Korea to ahead up our
> financial department in L&H Korea.  If we can lay this condition down as part of the
> acquisition and integration process NOW, there will be no hard feelings.  If we delay
> making that condition clearly NOW, it will be perceived as embarrassing Mr. Seo.
> Especially if the condition is spelled out only after we have reviewed his financial
> practice.

(Emphasis in original).

144.    Despite Woo's warning, the Bumil acquisition triggered a nine-month

flurry of activity in Korea where L&H continually announced new "deals" and hyper-

record revenue.  For example, on December 28, 1999, L&H issued a press release

announcing "several deals with customers in the telecommunications, enterprise solutions

and embedded technologies markets. . . .  These agreements, signed with industry-leading

companies in Asia and several companies in Europe, follow recently announced deals in

the US."  In the December 28, 1999 Press Release, L&H cited:

> strong demand for its speech and language technologies and solutions in the Asia
> Pacific region, especially South Korea.  Among the solutions provided are
> dialogue systems that provide customers with a fast, simple and convenient way
> to access information, as well as embedded speech engines and language
> technologies.  The signed contracts include:

o Hyundia Securities, Samsung Securities, LG Securities, Daishin Securities and Daewoo Securities, along with more than 10 other securities companies, have selected L&H to develop client server solutions for on-line trading and automated dialogue systems that allow securities customers to receive stock quotes and trade

\* \* \*

o LG Electronics has agreed to use L&H's TTS technologies.

o Intelligent Communications has agreed to use L&H's TTS technologies for use in e-mail reading and unified messaging applications.

o SoftTech Advantage expanded their agreement with L&H to utilize L&H RealSpeak for their unified messaging platform for the Philippines.

145.   In early 2000, L&H continued to report incredibly strong revenue growth in Korea.  On January 10, 2000, L&H issued a press release announcing "more than a dozen new contracts with telecommunications developers in Korea and elsewhere in the Pacific Rim and Europe," and listing such customers as "Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities, Daewoo Securities, Delfi, GenSoft, EPC Asia and neoTelecom, among others."

146.   On January 31, 2000, L&H issued a press release announcing a multi-year license agreement with Hung Chang Co. Ltd. – "a Seoul-based telecommunications technology leader."  The January 31, 2000 Press Release, quoted Bastiaens as stating that "[o]ur ever-increasing successes in the Korean market, particularly within the telecommunications sector, are the result of a very well developed and implemented strategy to build a worldwide enterprise and telephony solutions market presence."

147.   Also on January 31, 2000, Asia Computer Weekly published an interview that quoted Hauspie as stating, "We are optimistic about the market here (Singapore) as we predict to make approximately half a billion this year, with a third of our revenues coming from Asia."

148.    On February 1, 2000, L&H issued a glowing press release announcing the

signing of a multi-year agreement with Hung Change Co., Ltd., a Seoul-based

telecommunications technology company.  In the February 1st Press Release, Bastiaens

was quoted as stating:

> Our ever-increasing success in the Korean market, particularly within the
> telecommunications sector, are the result of a very well developed and
> implemented strategy to build a worldwide enterprise and telephony solutions
> market presence.  These successes will help us to shortly create a separate
> business group for that industry . . .

149.    L&H again highlighted the purported positive effect of these Korean deals

in a February 9, 2000 press release, showcasing the Company's fourth quarter 1999

growth and a two-for-one stock split:

> The demand for speech-enabled applications continued to grow in the Pacific Rim
> and L&H technologies were increasingly popular in the region.  South Korea and
> other Pac Rim-based developers who plan to build applications employing L&H's
> realSpeak, ASRT, TTS and dialogue systems solutions include: Hyundai
> Securities, Samsung Securities, LG Securities, Daishin Securities and Daewoo
> Securities, EPC Asia, IBCC (International Business Computer Co., Ltd.)
> NeoTelecom, LG Electronic, Intelligent Communications, Softech Advantage,
> and SofTel Telecommunication Pte. Limited … . L&H enhanced its ability to
> develop telephony solutions, increased its presence in Korea and continued to
> expand its telecommunications leadership by acquiring resources that included
> Bumil . . . and others."

The press release quoted Bastiaens as stating:

> In 1999 we experienced a strong demand for speech and language technologies,
> applications and solution . . . .  This increase was mainly the result of internal
> growth and created a positive cash flow from operations of $68 million, reflecting
> the maturity of our operations.

150.    To investors, L&H's purported revenue generated by the so-called Korean

customers was astounding.  In 1999, L&H total sales exploded an astounding 63% to

$344 million, due, in large part, to the Asian market.  While L&H's Asian market

comprised only $10 million of 1998 sales, that number exploded to $150 million in 1999.

Moreover, for the first two quarters of 2000, Korean sales hit $127 million, up 100-fold from 1999. In Korea alone, L&H recorded nearly $160 million in licensing revenues between September 1999 and June 30, 2000.

151.    Unfortunately for L&H shareholders, all of the Korean revenues **were fictitious**! L&H had few real customers in Korea. The majority of sales were from sham transactions, well orchestrated by the Senior Officers to report increased sales, reductions of accounts receivables and increased cash.

152.    The statements contained in the September 13, 1999, December 28, 1999, January 10, 2000, January 31, 2000, February 1, 2000 and February 9, 2000 press releases, as well as Hauspie's statements in the January 31, 2000 Asia Computer Weekly interview were materially false and misleading when made, because:

   a.    a number of the companies identified as customers were not L&H customers, including Samsung Securities and LG Electronics;
   b.    All of the purported contracts, sales and revenues generated by L&H Korea were entirely fictitious, as the Company repeatedly entered side-agreements, agreeing not to seek payment from customers;
   c.    On May 3, 2001, L&H would reveal that "all revenues recorded by" L&H Korea from September 1999 to June 30, 2000 revenue would be restated "since a substantial portion of such revenues could not be substantiated."

153.    During the Class Period, to respond to sales pressure, L&H Korea misrepresented its actual revenues and cash through various schemes that included side agreements with customers and the use of factoring agreements with various banks to give the appearance that customers were making payments on outstanding agreements – when, in fact, L&H was merely paying itself through funneled sources.

1.    **Side Agreements**

154.    The root of L&H's Korean fraud was the Company's practice of repeatedly entering into large sham contacts at the close of the quarters in order to record revenues and report to investors spectacular financial growth. The purported "customers" involved in these "transactions" were typically small businesses and start-ups (often related parties to L&H and its employees) that had neither the ability nor intention of paying L&H any "revenue." To disguise this fact from the market, the Company then created "arrangements" to "give the appearance of valid license agreements being sold to existing businesses."

155.    L&H referred to these arrangements as "strategic" sales. Essentially, L&H would enter into a purported license or maintenance agreement that would enable L&H to book licensing revenue. L&H would also enter into a side agreement (either oral or written) that would materially alter the so-called contract. In fact, at sales meetings, salespersons were instructed to agree to terms outside of L&H's standard license and maintenance agreement that provided for significant changes to the standard contract, including agreements not to enforce the collection of accounts receivables from the customer and agreements to defer contract payments. L&H then recognized the full value of the sale immediately, despite the fact that the transactions were complete shams and that the Company had no expectation of collecting these large royalties within a reasonable time.

156.    Through these side agreements, L&H purported to meet its sales goals and report incredible revenue growth from September 1999 through June 2000. However, because the agreements were shams and did not involve any actual payment of licensing

64

fees, a problem arose of needing to show cash collections. In order to solve this problem, L&H merely expanded the fraudulent Korean scheme.

## 2.    Factoring Agreements

157.    The scheme to create the appearance that cash had been received by the Company involved L&H factoring unpaid receivables to Korean banks to obtain cash upfront. L&H would bring customer invoices to Korean banks in exchange for cash – allowing L&H to inflate its reported income, pay bonuses and drive up its stock price. L&H, however, would enter into side agreements with the banks that turned the sales' contracts into, de facto loans.

158.    Beginning on September 30, 1999, L&H Korea entered into a series of "factoring arrangements" by which L&H sold the accounts receivable from licensing agreements to four Korean banks: Hanvit Bank, Shinhan Bank, Hana Bank and Chohung Bank. The Korean banks involved did not have factoring arrangements with other Korean companies prior to L&H. Under the scheme, the banks would "purchase" L&H's accounts receivable and place the funds in a "restricted time deposit" at the bank that L&H agreed not to withdraw. L&H then recorded the time deposit on its own books and eliminated the accounts receivable. Therefore, through this arrangement, L&H's financial statements reflected an increase in sales, cash collections and a large amount of cash sitting in restricted time deposits in four Korean banks.

159.    A typical factoring agreement entered into between L&H and the Korean Banks read:

> I (we) [L&H] promise to adhere to the following clauses in factoring note receivable without recourse pursuant to factoring agreement dated December 31, 1999 with the Bank, and submit this confirmation letter.

1.   Although the signed factoring agreements have been without recourse, I (we) promise to take recourse responsibility under this confirmation in the event that the transferred note receivable is defaulted.

2.   Upon proceeds from factored note receivable is received, I (we) shall deposit the amount as agreed by the Bank and us, sign a separate pledge agreement and adhere to that agreement.

3.   Pursuant to the above clause, I (we) will not raise any objection when the deposit is used to offset against factored not receivable, when this notes receivable is defaulted.

160.   In reality, there was little or no payment by the sham customers and all of the cash was held by the banks. Thus, once it became apparent that the customers would not repay the loan, the banks merely foreclosed on the time deposits, leaving L&H with nothing. As a result, over $100 million of L&H's so-called Korean "revenue" and "cash" disappeared from the Company's records overnight.

161.   L&H Korea's practice of factoring receivables, with recourse, was widespread and well-known by L&H management and KPMG and/or recklessly disregarded by them. It certainly was highly suspicious and should have raise huge "red flags" for L&H management and KPMG as to why tens of millions of dollars of cash was parked in four Korean banks in restricted time deposit accounts. Moreover, the terms of the so-called "sales" raised serious revenue recognition issues. For example:

a.   On September 30, 1999, Voice Tech Korea signed distribution and development agreements with L&H Korea. L&H recognized approximately $7 million in revenue from this in the third quarter of 1999 and over $1.6 million in the fourth quarter of 1999. On October 21, 1999, VoiceTek signed amendments removing its right to distribute the product "if and when the product become[s] commercially available." In the third and fourth quarter of 1999 and the first quarter of 2000, L&H factored over $8.4 million in receivables from that customer through a Korean bank. L&H management and KPMG were aware of this transaction, as evidenced in an October 18, 1999 e-mail from KPMG partner Oh Kwon to a series of persons, including: William Van Aerde, the KPMG Belgium Audit Partner for 1999, Carl Dammekens and

66

Frederick Deschodt, L&H's Assistant Controller. In the "urgent" e-mail, Kwon raises "critical revenue recognition issues" regarding VoiceTek, noting: "there are no proper documents on the revenue generation schedule and condition." Specifically, Kwon pointed out that all the revenue should not have been recorded up from for these five-year contracts and that the terms of the 'when-and-if available' condition, created problems regarding delivery and collectibility. Further, the e-mail expressly acknowledged that "the receivable was factored with a local bank with a collateral of Bumil's bank deposit and we believe the factoring is 'with recourse.'"

b.    Also on September 30, 1999, International Business Computers ("IBC") signed distribution and development agreements with L&H Korea. Pursuant to these agreements, L&H recognized over $4 million from the IBC agreement in the third quarter of 1999. On October 21, 1999, IBC signed amendments removing their right to distribute "when and if available" products. In the third quarter of 1999, L&H factored approximately $5.36 million of the ICM receivable through a Korean bank. L&H management and KPMG were aware of this transaction, as evidenced in the October 18, 1999 e-mail from Kwon to a series of persons, as discussed above. In Kwon's October 18, 1999 e-mail, KPMG indicates that the L&H Korea bank accounts have been held as collateral for the factoring agreements and that the agreements may have been factored "with recourse."

c.    On December 8, 1999, L&H Korea signed a license agreement with HI Worldwide Co. Ltd. ("HI"). This agreement included a pre-paid license fee of $19 million and a maintenance/development fee of $2 million. On January 10, 2000, after the close of fiscal year 1999, HI signed an amendment stating that the $19 million and $2 million pre-payments were non-refundable. During the fourth quarter of 1999, L&H record $10,583,270 from the license fee. In the first and second quarter of 2000, L&H recorded $1 million and $6,968,563 from the license fee, respectively. Thereafter, on March 29, 2000, L&H and HI entered a new license agreement with a $5 million pre-payment. During the fourth quarter of 1999, L&H factored $13,695,990 of HI's receivable with a Korean bank. Then, in the first quarter of 2000, L&H factored another $4 million from this contract. The Audit Committee Report questioned whether collectibility was sufficiently probable for the revenue to have been recognized and noted that KPMG was aware of the HI agreements.

d.  On December 27, 1999, L&H signed a Distributing, Merchandising and Broadcasting Agreement with Digital Sei-Young Ltd. ("Digital"), with a $10 million pre-payment. L&H recognized $8,187,374 of licensed revenue during the fourth quarter of 1999, and $1,511,430 of revenue from a PCS carve out in the first quarter of 2000. Also on December 27, 1999, L&H and Digital entered into a License and Co-Development Agreement with $2 million non-refundable engineering fees to be paid quarterly through March 31, 2002. L&H recognized $755,600 and $194,532 of engineering fees during the first and second quarters of 2000, respectively. During the fourth quarter of 1999, L&H factored approximately $11.306 million of Digital's receivables through a Korean bank. The Audit Committee Report questioned whether collectibility was sufficiently probable for the revenue to have been recognized and noted that KPMG was aware of the Digital agreements.

e.  On May 16, 2000, L&H Korea signed a license and development agreement with Evat T&C, Ltd. This agreement was written in Korean and provided for a pre-payment of approximately $917,000, to be paid quarterly through December 2001. L&H recognized revenue of $267,850 in the second quarter of 2000 (representing the amount of the payments due in the second and third quarters of 2000). L&H then factored the account receivable amount of $157,791 in the second quarter of 2000 with a Korean bank.

f.  On June 27, 2000, L&H Korea signed a license and development agreement with IMP Vision Co. ("IMP"). The agreement was written in Korean and provided for a $1 million prepayment fee payable to L&H. L&H recognized $799,264 of license revenues during the second quarter of 2000, and also factored the receivable of $750,000 with a Korean bank at the same time.

162.  While the factoring agreements allowed L&H to report on paper a reduction of accounts receivable and an influx of cash, the fact remained that no actual cash flow was being generated as the cash was all required to remain on deposit at four separate Korean banks. As a result, KPMG, voiced strong concerns about L&H receiving the outstanding "payments" before the close of the fiscal year. Specifically, during the course of L&H's June 30, 2000 audit, KPMG questioned the collectibility of accounts

receivable from Korea and indicated to L&H management that collections between 10% and 20% of the accounts receivable balance would be sufficient to avoid having to record a full reserve of the accounts receivable balance.

### 3.    Recording Refundable Revenue

163.    L&H also repeatedly booked revenue on a series of license agreements, despite the fact that the agreements did not state that the prepayment fee was non-refundable. The Senior Officers and KPMG were aware of this problem and sought to modify previously signed and recorded contracts by sending correction letters during later quarters.

164.    For example, on July 18, 2000, Frederick Deschodt, L&H's assistant controller, sent an e-mail to, inter alia, Soo Am Cho (defendant Seo's right-hand man in Korea) and Dammekens, with the subject line, "IMPORTANT ! L&H KOREA – Q2 Revenue." In the urgent e-mail, Deschodt wrote:

> We noticed that in the Q2 license agreements listed below, it is not mentioned that the license fee is non-refundable !! Moreover these license agreements are all in Korean and prepared without any involvement of the L&H corporate legal department. . . . The fact of not mentioning the non-refundability clause seriously endangers the recognition of the revenue associated with these contracts >> USD 3.792.150. KPMG Boston will not accept us recognizing the revenue without the non-refundable character !! (Emphasis in original).

The e-mail then listed nine customers where L&H had recorded $3,792,150 in revenue, despite the fact that the licensing fees, as written, were refundable. The specific "customers" involved were: HyunMin Systems, Sim's Valley, Evart T&C, Future Internet, Hyundai Securities, WelcomNet, Korea Education Media, BiTech and EuroNetism. Deschodt concluded the e-mail by stating:

> . . . we need as soon as possible for each of the customers mentioned above:
> >>>>> a letter signed by the customer mentioning that this letter is a correction to

the license agreement and that "<u>it has always been the intention of both parties that the license fee would be non-refundable.</u>" In the letter reference should be made to the original contract. The letter should be signed both by the customer and L&H Korea.

We expect your full cooperation in order to hopefully resolve this matter. It is even not sure whether KPMG will be willing to accept revenue recognition on the basis of these letters. **I hope it is clear that we can not accept such practices any longer !!**

(underlined emphasis in original; bold emphasis added).

165.    A subsequent series of e-mails, dated July 20, 2000, indicated that for five of the listed contracts, the situation was "OK" because "KPMG appears to have no problem" with each contract. However, for Evart T&C, WelcomNet and BiTech, the persons indicated: "Problem! They are still negotiating with the customer to get the letter signed." In response to this update, on July 20, 2000, Dammekens wrote to Soo Am Cho, "We NEED to get these three solved!"

166.    Regardless of whether subsequent documents were signed, L&H recorded the contingent revenue prematurely and those transactions were required to be restated under GAAP, including the following:

a.      On June 30, 2000, L&H Korea signed a licensee agreement with Midas Tech Co. Ltd. This agreement was written in Korean and did not state whether the $1.3 million prepayment to L&H was non-refundable. L&H recognized $1,293,930 of the revenue in the second quarter of 2000.

b.      On May 17, 2000, L&H Korea signed a license and development agreement with a customer. The total license and development fee pre-payment under the agreement was $604,000, but the agreement did not provide the allocation of the pre-payment. Additionally, the agreement was written in Korean and did not state whether the pre-payment to L&H was non-refundable. L&H recognized $428,560 of license revenue in the second quarter of 2000.

c.      On May 16, 2000, L&H Korea signed a license and development agreement with a customer. The total license prepayment was

70

approximately $917,000, to be paid quarterly through December 2001. The agreement was written in Korean and did not state whether the pre-payment to L&H was non-refundable. L&H recognized $267,850 of license revenue in the second quarter of 2000 (equal to the amount of the payments due in the second and third quarters of 2000).

d.    On June 27, 2000, L&H Korea signed a license and development agreement with IMP Vision Company. The agreement was written in Korean and did not state whether the $1 million pre-payment to L&H was non-refundable. At sometime prior to November 2000, IMP paid L&H $800,000 of the pre-payment. L&H recognized $799,264 of license revenue in the second quarter of 2000. L&H claimed that the customer later signed a letter indicated that the pre-payment was non-refundable.

## 4.    Collection Is Improbable

167.    L&H also continued to book sales prior to any payments from the customer – and in several cases, L&H never collected any payment.

168.    L&H Korea entered into a $6 million licensing agreement with Zen Entertainment ("Zen"). The $6 million royalty commitment was payable within 90 days and due on or before June 30, 2000. On June 7, 2000, Frederick Deschodt, a former KPMG auditor who left to become L&H's assistant controller, wrote to Soo Am Cho in Korea, as well as Dammekens and Jacques Vanloo in Belgium, indicating, "So far we did not receive payment yet, but if we do not collect the money before June 30, 2000, we might encounter problems with our auditors." On June 29, 2000, Dammekens sent a follow-up e-mail to Sam Am Cho, copying Deschodt's June 26, 2000 e-mail, inquiring "Can you update me on the status of ZEN – see below. I expect questions next week for KPMG." Then, on July 13, 2000, after the close of the second quarter of 2000, Deschodt again wrote Cho, Dammekens, and others, inquiring: "What is the status of the payment of the $6 million Zen Entertainment Korea still owes to LHSP N.V. and which was

71

payable at June 30, 2000. KPMG is enquiring (sic) why it was not paid yet. You [Soo Am Cho] told that you anticipate payment for beginning of July, once an (sic) number of small issues were resolved. Have those issues been resolved in the meanwhile? Can you keep us informed on this matter."

169.    Notwithstanding that the "issues" were not resolved, L&H is believed to have recognized the revenue in the second quarter of 2000 prior to collection in violation of GAAP.

### 5.    The Earnout Scheme

170.    Pursuant to the original Stock Purchase Agreement signed at the time of the Bumil acquisition, Seo was entitled to an "earn-out" of $25 million only if L&H Korea met certain performance requirements between September 30, 1999 and December 31, 2000. Thus, any "earn-out" payment was not required to be paid until 2001.

171.    Based on L&H Korea's fraudulent financial results, and Bastiaens' advice, however, L&H's Board of Directors accelerated the full $25 million earn-out and paid it almost one year early, on January 28, 2000.

172.    Bastiaens, and others, sought to present this early earnout as a reward for Seo's and L&H Korea's performance. According to a February 3, 2000 e-mail from Bastiaens to, among others, Stephen Huysman the KPMG Belgium Audit Manager, and William VanAerde the KPMG Belgium 1999 Audit Partner, and Dammekens and Hauspie at L&H:

> the Earnout of L&H Korea was related to [L&H Korea] reaching a target gross margin of $37.5 mil over 6 Quarters beginning at the signing date and ending DEC 31 2000 with a min target of $22.5 mio. L&H Korea (former Bumil) has already overachieved this target by DEC 31 '99 and as such we had a board meeting on Jan 17 2000 on this subject. The board has approved to pay out the

72

earnout because of this very positive result in line with the agreement and the payment has occurred by the end of January 2000 to the Bumil shareholders.

173.    Contrary to Bastiaens' purported reasoning, the earnout was not in response to Korea's supposed success, but rather part of the scheme to fund L&H Korea's improper relationship with Korean banks that participated in the factoring scheme described above. In fact, a February 3, 2000 e-mail from Seo to Lernout, Hauspie and Willaert, shortly after receiving the $25 million earnout, confirms the hidden basis for the accelerated payment:

> Thanks for your great assistance extended to me.  I well received the remitted amount of 25 million USD.  With your prompt action, I could keep my promise to Korean banks and those banks will rely on L&H Korea and will help us much better than before.  Thanks again for your help.
>
> I assure that I will do all my best for L&H Group and for continuous business success of L&H.
>
> Sincerely yours,
>
> Ju-Chul Seo

(emphasis added).

174.    Thus, the so-called $25 million earn-out payment was necessary to provide added funding to Korean banks and enabled L&H to more aggressively pursue its factoring scheme in the first and second quarter of 2000.  Moreover, L&H fraudulently inflated its numbers, providing defendants with a cover for pulling off this early payment to Seo without raising shareholder suspicions.

## E.    IMPROPER REVENUE RECOGNITION CONCERNING STRATEGIC-PARTNERS/REALTED-PARTY TRANSACTIONS

175.    Another scheme employed to manufacture revenues involved the creation of "strategic partners" to contract with L&H to develop the Company's software for

specific applications and/or languages. These "strategic partners" were LDCs and CLDCs. The strategic partners would pay licensing revenues to L&H, and then "develop" the software. At the end of the contract terms, L&H would have the option – which was generally exercised – to acquire the strategic partner and the developed product.

176.    To the outside world, it appeared that these strategic partners would contract for license agreements and then bear the cost and risk of developing the software. In reality, the transactions were a sham.

177.    While L&H claimed that the LDCs and CLDCs were independent, unaffiliated entities, in reality, most were owned by undisclosed related parties, such as FLV Fund and Mercator. Further, the "strategic partners" were small start-ups without the resources to perform the research and development work. Instead, L&H and its employees would perform the development work for the LDCs and CLDCs, bearing all research and development costs. When L&H purchased the LDCs or CLDCs, however, it would capitalize the majority of the purchase price as goodwill (including the amounts spent on research and development). As capitalized assets, L&H was able to amortize the cost of goodwill over an extended time period, rather than treating the research and development costs as an expense that would immediately reduce earnings.

1.    **Background**

178.    In 1996, L&H formed Dictation Consortium N.V. ("Dictation") to develop software for L&H. L&H then turned to friends as "outside" investors to fund Dictation. As a result of L&H's efforts, on December 31, 1996, FLV Fund and FLV Management invested in Dictation, for a total stake of 61% of the company. In 1997, this stake was

reduced to 43%. On December 7, 2000, The Wall Street Journal reported that the remaining unnamed private investors "were companies incorporated in the secrecy and tax havens of Luxembourg and the British Virgin Islands, their owners undisclosed."

179.    In December 1996, L&H then entered into a very profitable licensing agreement with Dictation. Pursuant to this agreement, Dictation provided L&H with $26.6 million in revenue, or 25% of L&H's 1996 sales and 19% of L&H's 1997 sales.

180.    Between December 1996 and early 1998, Dictation "developed" the software, purportedly bearing the research and development costs. However, Dictation was not actually performing any of the work to develop the software. Rather, L&H employees wrote Dictation's business plan and did the software work under contract, as defendant Lernout later acknowledged.

181.    Once the development was completed, L&H had the option to purchase Dictation. In May of 1998, at the end of the contract, L&H purchased Dictation for $40 million, resulting in a significant gain to Dictation's investors, including FLV Fund. In effect, L&H was purchasing the software it created at a significant premium. Then, L&H booked the goodwill associated with the sale as an asset and amortize the transaction over a period of years, rather than recording the research and development expenses as current expenses.

182.    Bolstered by the success of the Dictation arrangement, in May of 1997 L&H entered a similar relationship with Brussels Translation Group NV ("BTG"). On March 13, 1997, BTG was established as a limited liability company in Belgium, "primarily engaged to acquire, develop, commercialize and license machine translation software." L&H never disclosed the owners of BTG, and a December 7, 2000 Wall

75

Street Journal article was only able to trace ownership "through a Luxembourg company to two entities based in the Channel Islands, but no further."

183.    In March of 1997, BTG entered a software development and commercialization agreement with L&H, under which L&H agreed to provide engineering services for the development of machine translation services, for L&H's iTranslator services. L&H also licensed certain software to BTG.

184.    The agreement called for BTG to pay L&H $3.5 million in license fees, plus royalties, which was increased to $5 million in May 1997. L&H also entered into an agreement to provide BTG with engineering services, under which BTG paid L&H approximately $30 million.

185.    In June 1999, at the end of the contract, L&H purchased BTG for $59 million. This was comprised of an aggregate purchase price of approximately $42.3 million and the assumption of approximately $17 million of debt. The purchase price exceeded the fair value of the net assets acquired, and was allocated to goodwill or other intangible assets. As in the Dictation Consortium transaction, L&H was able to obtain the product without deducting the research and development expenses. Instead L&H was able to record nearly $35 million in revenues during 1997 through 1999 and then, when it purchased BTG, L&H capitalized the acquisition price, turning what would normally be an expense into an asset.

186.    From 1997 though 1999, L&H incurred $9 million in expenses to develop the BTG software. The net results of this transaction is that L&H paid BTG approximately $50 million over its own direct costs to acquire software which it developed.

2.     The Undisclosed 30

187.    In 1998, in an effort to further inflate L&H's revenues and share price, the defendants began a scheme that would later be described by The Wall Street Journal as a "Dictation Consortium-type structure – but on steroids."

188.    L&H helped create 30 start-up companies, based in Belgium and Singapore, purportedly to "develop" variants of its software for non-mainstream languages. L&H repeatedly maintained that unaffiliated "private investors" owned the start-ups.

189.    In an April 7, 1999 press release, L&H announced among the highlights of fiscal year 1998:

> [L&H] [b]egan development of approximately 20 additional exotic languages with its financial and technological partners. During 1998 contracts were signed for the following languages: Ukraine, Polish, Czech, Slavic, Bahasa, Greek and Farsi, to support a range of speech technologies. . . . In order to develop these additional languages within certain time and financial constraints, L&H is working with partners who will undertake the localization and development of these language areas and share the financial risks and rewards. L&H will license its tools to the partners and will secure the quality of the various applications and languages.

190.    In its 1998 Annual Report on Form 20-F, L&H expanded its description of these transactions:

> Pursuant to these agreements, we have exclusively licensed our speech and language technology development tools to strategic partners that are unaffiliated with us to develop and localize our technology for specified new languages. Our strategic partners also have exclusive rights ... to develop, market, and distribute products incorporating the development technology. In addition to one-time license fees, we have the rights to receive royalties based on our partners' net revenues from sales of products incorporating the developed technology.

(emphasis added).

77

191.    The revenue derived from these "strategic partners" was striking.  In fact, these so-called unaffiliated "strategic partners" accounted for 10% of L&H's 1998 reported revenues and 25% of its 1999-reported revenue.

192.    The above statements concerning "unaffiliated" parties was false and misleading when made because throughout the Class Period, however, L&H did not disclose that the majority of the start-ups were actually funded by parties related to L&H and that, as of December 1998, L&H was actually performing the development work for the LDCs and CLDCs.  In fact, as would later be revealed, 17 of the LDCs and 7 of the CLDCs, were owned – directly or indirectly by FLV Fund or Mercator.  Specifically, eight were backed by FLV Fund.  Another four were subsidiaries of Language Investment Co., a company run by Willem Hardeman, a director of the FLV Fund. Finally, sixteen of the thirty were predominately owned by Mercator.

193.    In fact, the Company's Audit Committee Report would later raise significant questions about these 30 start-ups, concluding:

> [T]he Company and the LDCs realized, as early as December 1998, that completion of the work by the LDCs was not practicable and the Company began to provide some level of services, if not development work.  As a result, the accounting should have been changed from up-front revenue recognition of the full license fee to deferral of the revenue and recognition of the revenue as the services or development was completed.
>
> * * *
>
> We believe, based upon our review of certain internal documents and outside marketing material and limited discussions with the investors or their representatives, that the investors anticipated, in substance, that they were buying the future rights to a product (language) to be developed by L&H and thus were effectively funding the Company's research and development efforts to build that language.

78

194.    The Audit Committee Report ultimately concluded that approximately $79 million in revenue was improperly recorded as a result of these "strategic partner" transactions. The proper treatment for each transaction, however, would depend on whether or not the LDCs or CLDCs were related parties. The Audit Committee counsel, however, lacked sufficient information concerning the investors in the LDCs, CLDCs and IACs due, in part to lack of cooperation by "[m]anagement and some board members of L&H." Nevertheless, the Report concluded:

> If the investors are not related parties, accounting for such transactions would require deferral of all the revenues and recognition over the development period . . . If the investors are related parties, the relevant accounting literature presumes that the related party investors will be repaid and the funded amount are recognized as a liability.

Either way, L&H fraudulently booked the revenue from those transactions during the Class Period.

195.    L&H, however, could not accomplish this fraud without the direct participation of the related parties. L&H's financial statements and other disclosures were false and misleading because they omitted the relationship between the "start-up" customers of L&H and FLV Fund or Mercator. L&H affirmatively and falsely represented that these "licensees" were "unaffiliated customers" and that 1998 revenues from companies funded by FLV Fund, Mercator and/or LHIC were minor.

## F.    THE FLV FUND'S ROLE IN THE FRAUD

196.    Defendants Lernout and Hauspie created FLV Fund in 1995, and were directors of the fund's management arm from 1995 until 1997. According to The Wall Street Journal, after 1997, Lernout and Hauspie maintained "considerable sway" over

FLV Fund's affairs, as evidenced by the close relationship between the Company and the Fund since the FLV Fund's inception.

197.    In 1995, FLV took a 49% stake in the Belgian unit of Quarterdeck Corp., the California software company then headed by Bastiaens.  According to a December 7, 2000 Wall Street Journal article, Quarterdeck's Belgian unit then became L&H's "largest customer, accounting for 30% of revenue that year, and Quarterdeck itself contributed in 6.5% of L&H's sales."

198.    Then, as noted above, FLV Fund and FLV Management together owned a majority stake in Dictation Consortium, a company that provided $26.6 million in revenue to L&H from 1996 through 1998.

199.    Due to stock market and analyst sensitivity about L&H's close ties with FLV Fund, L&H took great steps to conceal its involvement with, and reliance on, the FLV Fund, and other related parties.

200.    During the Class Period, L&H disclosed that FLV Fund was a related party, but only reported minimal revenue from FLV Fund sources.  For instance, in its 1998 Annual Report on Form 20-F, L&H stated that only 3.7% of 1998 revenue was provided by "companies funded in part by the FLV Fund."  Similarly, in its 1999 Annual Report on Form 20-F, L&H revealed that only 0.3% of 1999 revenues were provided by "companies funded in party by the FLV Fund and L&H Investment Co."

201.    FLV Fund's so-called diminishing role in L&H's revenues is belied by the actions of L&H sales persons, as well as FLV's role in 12 of the 30 LDCs and CLDCs.

202.    According to a former channel sales manager from the Burlington office, L&H sales representatives routinely told customers that if they acquired or licensed L&H

80

products, FLV Fund would make an investment in the customer, noting there was no real separation between L&H and FLV Fund. "I always thought they were the same thing, because of the attitude we had, the positioning," said the former Channel Sales Manager In fact, during presentations to potential customers, sales and marketing representatives would describe the FLV Fund as a potential investor, and even devoted a portion of a PowerPoint slide presentation to describe the FLV Fund and how it worked.

203.    On December 7, 2000, The Wall Street Journal quoted Michael Faherty, a former L&H salesman in the United States, as stating that he and other L&H salespersons were encouraged to refer potential, cash-poor customers to FLV Fund. The article quoted Mr. Faherty as stating, "If FLV invests $1 million [in the customer] . . . it was understood that we'd get about $300,000" in the form of license fees paid by that customer to L&H. In internal L&H sales forecasts provided by Mr. Faherty to The Wall Street Journal, an entire category was developed for prospects that had been referred to FLV Fund. A description of one potential $25,000 L&H customer noted that its business plan was "in to FLV."

204.    As revealed by The Wall Street Journal, the FLV Fund was the undisclosed "related-party" behind eight of the thirty "start-ups" that accounted for 10% of L&H's revenues in 1998 and 25% in 1999.

205.    Specifically, FLV Fund was directly involved in owning or funding the following customers/transactions during the Class Period:

     a.    In the first quarter of 1999, L&H recorded $10 million in licensing fees from four Singapore start-up companies, I-Merge Pte., I-Office Pte., I-Mail Pte. and I-News Pte. Approximately six months later, FLV Fund invested $8 million for 49% stake in each of the four start-ups. In violation of GAAP, the FLV Fund investment was not disclosed in L&H's 1999 financial filings.

81

b.   During the third quarter of 1999, four additional Singapore start-ups agreed to pay $16 million in license fees to L&H for software rights. L&H recognized all of this revenue during the third quarter of 1999. On October 22, 1999, however, FLV Fund invested $10 million in the companies, who then used $8 million to pay L&H. FLV disposed of its ownership in the four start-ups prior to December 31, 1999, by selling it for $11 million to HI World. As of September 22, 2000, however, HI World had not paid FLV Fund and a HI World executive gave The Wall Street Journal conflicting reports on whether the money was owed. L&H never disclosed that the $16 million in revenue came from a related-party, as required by GAAP.

206.   In addition to the eight "start-ups" listed above, an additional four were organized as subsidiaries of Language Investment Co. ("LIC"), whose Chief Executive Officer, Willem Hardeman, is an FLV Fund director. LIC owned four start-ups that each purchased licenses valued at $3 million in late 1998. The start-ups each paid L&H $1.5 million in December of 1998, however, according to The Wall Street Journal, L&H recorded the full $12 million of revenue in the fourth quarter of 1998 as received. However, LIC confirmed that the remaining $6 million was never paid by LIC.

207.   According to a November 6, 2000 Wall Street Journal article, LIC founded four start-ups, the Greek Development Co., the Polish Development Co., the Hungarian Development Co. and Czech Development Co., in late 1998 "at the behest of L&H," especially Nico Willaert who made a presentation about L&H's "new franchising system." The article reported:

Under the [new franchising] system, Mr. Willaert explains, L&H proposed to give investors the opportunity to develop potentially profitable new versions of L&H software for nonmainstream languages, in exchange for license payments and a share of future revenue generated by start-up firms the investors would create to do the development work. . . . Under the deal LIC eventually signed with L&H on behalf of its four start-ups, each of the firms was to pay $1.5 million upfront, but didn't have to pay the remaining $1.5 million they owed L&H until a later date. . . . "The point for us was to have these companies begin to develop software

for these lesser-used languages and then sell the companies for a profit," Mr. Hardeman said. "For us, it was a purely financial investment."

The article notes that LIC eventually sold the four firms in December 1999 to Velstra for an undisclosed sum. As described below, Velstra is almost exclusively owned by Mercator.

208.    Investors were unaware that a related-party, FLV Fund, was behind such a large number of transactions. In fact, the above referenced transactions alone far exceed L&H's disclosure that only 3.7 % of the Company 1998 revenues and 0.3% of the 1999 revenues where from related parties.

209.    In addition to the above-referenced actions, the Audit Committee Report also raised several concerns about FLV Fund's involvement in related party transactions where "a more fulsome disclosure may [have been] appropriate, including, *inter alia*:

> a.    L&H purportedly offered its customers investments by FLV for a "finder's fee."
> b.    Philip Vermuelen, CEO of the statutory manager for the FLV Fund, wrote e-mails to senior management at L&H "summarizing FLV Fund's investments and the ways in which those investments would help L&H"
> c.    FLV Fund's investment in four CLDCs for a short period, before selling its interest to HI World, a newly formed Korean company with close ties to L&H; and
> d.    FLV Korea's action of providing $30 million in collateral for a loan to Seo, President of L&H Korea, described herein.

210.    L&H's "finders fee" practice of coercing "customers" into contracting with L&H in order to obtain FLV Fund funding was particularly severe in the Burlington office. For example, an e-mail dated February 3, 2000 e-mail from John Soloninka from Interpra, to Peter Durlach, Vice President, Marketing & Business Development at L&H Burlington's Healthcare Solutions Group, summarizes the aggressive tactics practices by L&H Burlington:

Summary of selected key events in the L&H/Interpra/Merge history as related by J P Soloninka variously to Michael Benol, Peter Durlach and in part to Rick Oldach of L&H on different occasions:

- L&H brought FLV financing opportunity to Interpra in Feb/March 99; we were in need of major financing to remain in business.
- FLV appeared to show sincere interest in us.
- Although FLV stated that they were independent of L&H, Chris Force and Mark Santosuosso stated that FLV funding was in fact conditional on a large presale of non-existent product (essentially of 20% commission on $2.5m financing).
- L&H used extortionist tactics. The following is an excerpt, paraphrased as accurately as I can from March 99 telephone conversation ... it sounds like a B movie, and would be pathetically funny if it weren't real. I have 4 witnesses who will attest that this is an accurate representation of the tone of the conversation and key statements made. Mark Santosuosso was in Interpra's office with our senior management team. Chris Force was off-site on the telephone.

* * *

Interpra:  You want a 20% commission (on the $2.5m FLV financing) in the form of presale licenses? We can't do 20%. Firstly, we don't need more than year's worth of licenses... how could we justify to our shareholders that we would take several years' worth of inventory which would go stale? Our auditors would never accept this. We can't pay such a level. Besides, how do we know that you can deliver on the FLV money? FLV . . . said they were independent of you.

Mark:  In the 22 deals of this type we've done, they've all paid 20% and they've all got their money.

Interpra:  Are you saying if we say no to the 20%, you will quash the deal with FLV?

Mark:  We're just saying that in the past when people have agreed to the 20% they got the money, when they didn't . . .

Interpa:  We just can't do the 20%, We won't. . . .

* * *

Interpra:  ... We can try and justify $250,000 in licenses, (10% commission), but not more. If we can't do it at 10% we can't do the deal. ... after some discussion Mark and Chris very begrudgingly agree to 10%.

Interpra:  . . .But we are going to need written assurance that if the FLV financing fails to go through, we are not on the hook to pay L&H for those licenses.

Chris:  No! No documented side deals. I can't recognize revenue if there are any side deals.

84

Interpra: But we can't do the deals without assurance. We would be irresponsible and as Directors, even personally liable.

Chris: Look guys, I want this to go through. We've done 22 deals, it's virtually a sure thing. Besides, if the deal doesn't go through, what good would it do me to chase a company with no money and going bankrupt. Trust me, we will not be looking for our money if the deal doesn't go through.

Interpra: If you are so sure . . . put it in writing.

Chris: I can't. I won't.

Interpra: ... (after much deliberation) ... We will doe the deal at 105 ($250,000) under the understanding that this liability is contingent on us getting the FLV funding.

Chris/Mark accept the deal.


## G.    FLV'S ROLE IN KOREA

211.    In yet another example of striking symmetry between the two companies, in 1999, FLV Fund, like L&H, identified Korea as a promising market for technology investments.

212.    FLV Fund established the FLV Fund Korea, with the assistance of L&H Korea. In established its Korean arm, FLV deposited $30 million in a Korean bank account and appointed interim directors in Korea.

213.    Soon thereafter, based on the instruction of FLV Fund's interim directors, FLV Fund Korea then pledge the $30 million as collateral to Hanvit Bank related to a loan to Seo related to L&H's Korean operations.

214.    Eventually, the entire $30 million was seized by Hanvit Bank, by which time public scrutiny of the relationship between L&H and FLV Fund was at an all time high. As a result, FLV Fund booked a loss of $28.7 million stemming from its brief foray into Korea.

**H.    S.A.I.L. TRUST (A.K.A. FLV FOUNDATION) ROLE**

215.    The S.A.I.L. Trust, while purporting to be a non-profit company, was in a position of control over the investment decisions of the FLV Fund.

216.    The S.A.I.L. Trust was created by Lernout and Hauspie in 1995, to assist young companies in the development and commercialization of products based on advanced speech and language technologies. The S.A.I.L. Trust holds a one-third interest in FLV Management, N.V. ("FLV Management"), and has the right to appoint five of its directors. In turn, FLV Management is the manager of the FLV Fund. Lernout and Hauspie are also directors of the S.A.I.L. Trust.

217.    Paul Behets, the audit partner at KPMG Belgium in charge of L&H audits from 1991 through July 1999, left KPMG, shortly after the audit report for year end 1998 was filed, to become the chief executive officer of the S.A.I.L. Trust.

218.    On November 11, 2000, Dow Jones International News reported that FLV Fund, and its shareholders, GIMV N.V. and Lessius, intended to buy out S.A.I.L. Trust's 33.3% stake in FLV Management. "The sale aims to ensure that FLV Fund and L&H's affairs are kept separate."

**I.    MERCATOR'S ROLE IN THE FRAUD**

219.    According to The Wall Street Journal, Mercator was the ultimate owner of 16 of the 30 "start-ups" that generated a significant portion of L&H's "licensing" revenue during in 1998 and 1999. Mercator owned these start-ups through several intermediary entities. First, the sixteen start-ups were directly owned by Velstra, a Singapore-based company. Velstra, in turn, is 100% owned by Language Development Fund ("LDF"). Mercator owns 96% of LDF.

220.    Tony Snauwaert is a delegate-director, or manager, of LDF, and was described as "Pol Hauspie's right hand" in a January 24, 2001 article in De Finacnieel-Exonomische Tijd, a Belgium business publication.

221.    During the Class Period, Mercator invested $2 million in LDF, and loaned LDF an additional $10 million to be repaid by September of 1999; as of December 2000, only half of the loan had been repaid. These funds were then used by the LDCs to pay L&H, inflating the Company's purported revenues.

222.    The 16 start-ups owned by Mercator paid a total of $53 million in licensing fees to L&H during 1998 and 1999. Mercator is believed to be the ultimate owner of the following LDCs and CLDCs: Taiwanese LDC, Malay LDC, Vietnamese LDC, Urdu, LDC, Thai LDC, Hindi LDC, Tamil LDC, Italian CALC, French CALC, German CALC, Slavic LDC, Bahassa LDC, Czech LDC, Greek LDC, Polish LDC and Hungarian LDC.

223.    Mercator participated in this scheme to inflate L&H's revenue and earnings with knowledge or reckless disregard of the details of L&H's "strategic partner" scheme by virtue of the actions and knowledge of Mercator's chairman, Louis Verbeke ("Verbeke"). During the Class Period, Verbeke served not only as Chairman of Mercator, but also as a named partner at L&H's chief Belgian law firm – Loeff Claeys Verbeke. Verbeke was present at L&H Board meetings where related party transactions were discussed.

224.    Mercator also had a direct financial interest in participating in the fraud. First, both Mercator and Verbeke had a significant ownership interest in L&H stock. Mercator owns 6.9% of L&H Holdings, which in turn owns 8.9% of L&H. L&H

Holding is 85% owned by Lernout and Hauspie. Mercator also directly owns approximately 0.2% of L&H's common stock. In total, Mercator owns approximately 0.82% of L&H. Similarly, Verbeke personally owns 8.9% of L&H Holding. Thus, by artificially inflating the price of L&H stock, Mercator and Verbeke increased the value of their holdings. Further, because the majority of their holdings are indirect, they need not disclose the extent of any sales of L&H Holdings.

225.    Mercator also had a separate monetary incentive for participating in the fraud – a striking return on investment. Mercator only made a limited investment in the LDCs and CLDCs that then entered into contracts with L&H. However, because L&H would then develop the product at their own expense and then purchase the LDCs for the value of the completed product, Mercator would see a tremendous return on its initial investment for participating in the fraud.

226.    Eventually, Mercator and Verbeke's luck ran out. Despite Mercator's participation in the accounting fraud at L&H, and obvious conflict issues, Verbeke's law firm was selected to assist in investigating and drafting the Audit Committee Report in the fall of 2000. Subsequently, on July 23, 2001, The Lawyer reported that Verbeke his former law firm "have been placed under suspicion by the [Belgian] judge leading the inquiry into stock fraud" at L&H. Belgian authority eventually conducted two raids for documents at Verbeke's law firm.

## VI.    LIABILITY OF THE KPMG DEFENDANTS

### A.    RELATIONSHIP AMONG THE KPMG DEFENDANTS AND EACH OFFICE ACTS AS ONE FIRM WITH RESPECT TO L&H

227.    KPMG International ("KPMG Int'l") is a Swiss "Verein" or association. Each KPMG firm worldwide is a member of KPMG Int'l. KPMG Belgium, KPMG LLP

SEP.24.2001    4:27PM    BERMAN DEVALERIO PERS 542 TT94              NO.136   P.2/2

and KPMG UK are all members of KPMG Int'l.  KPMG Int'l markets itself and all of its

member firms as a single entity.  At its website, KPMG Int'l states:

> **Overview**
>
> In a global marketplace distinguished by remarkable
> growth and consolidation, companies face a host of new
> challenges in today's economy. KPMG helps clients
> successfully respond to changing opportunities by
> providing professional services, wherever and whenever
> they're needed.
>
> KPMG has tailored its services - including assurance, tax
> and legal, consulting, and financial advisory services - to
> address the complex business challenges faced by global
> clients. Through the firm's international network of
> industry professionals, the best people, products and
> technologies are combined to enhance services with
> industry insights and best practices.
>
> In 2000, KPMG achieved record revenues of US$13.5
> billion, an 11 percent increase driven by all of our major
> service lines. More than 100,000 KPMG professionals in
> member firms worldwide collaborate across industry,
> service and national boundaries to deliver professional
> services in 155 countries. This enviable network of firms is
> connected through three operating regions, bringing
> together our local and national resources with greater
> flexibility, responsiveness and consistency of service
> delivery worldwide. (emphasis added).

228.    In its Annual Report for 1999, KPMG Int'l stated that "KPMG is acting as

'One Firm' worldwide to consistently meet the changing needs of global clients through

an integrated array of tailored solutions . . . KPMG's 100,000 professionals in 159

countries help our clients achieve their critical business objectives through experience

and personal commitment to excellence." The 1999 Annual Report also stated that

KPMG expects its "global lead partners to marshal KPMG's finest resources, wherever

they reside." The 1999 Annual Report also praised the work of integrated teams of

KPMG professionals from offices around the world to service its global clients.

229.    Because L&H was one of KPMG's global clients, many KPMG offices –
located in the United States, Belgium, the United Kingdom and elsewhere – actively
participated in the reviews and audits of L&H's financial statements during the Class
Period.  In its 1997 and 1998 Annual Reports to Shareholders, L&H listed the Ghent,
Belgium and Boston, Massachusetts offices of KPMG as the Company's principal
auditors.

230.    KPMG Belgium, a member of KPMG Int'l, is a public accounting firm,
employing 950 partners and staff in six cities in Belgium.  L&H became an audit client of
KPMG Belgium after it acquired the accounting firm of Behets, Boes & Co., which had
been auditing L&H since the late 1980s.

231.    According to the Report by the Statutory Auditor for the Fiscal Year
December 31, 1998, filed as Exhibit B to the L&H Proxy Statement for the Annual
Meeting and the Extraordinary Meeting of Stockholders to be Held on May 21, 1999,
filed with the SEC on Form 6-K on May 24, 1999 (the "1999 Proxy"), Paul P. Behets was
the partner of KPMG Belgium responsible for the audit of L&H's 1998 financial
statements and certain quarterly reviews in 1999.  Stefan Huysman was the Engagement
Senior Manager of KPMG Belgium responsible for the audits of L&H's financial
statements.

232.    However, many other KPMG offices were involved in the L&H audits or
otherwise responsible for providing professional services to L&H.  In the United States,
KPMG's offices in Atlanta, Boston, Northern Virginia, and Houston, among others, were
actively involved in the audit, particularly with respect to L&H's U.S. operations in
Burlington and other subsidiaries based in the U.S.  James Boyer was the KPMG partner

90

in KPMG's Boston office responsible for the services rendered by KPMG to L&H in the U.S.

233.   Abroad, Robert McLamb, KPMG's SEC reviewing partner based in KPMG's US Capital Markets Group, worked extensively on the L&H audits and reviews and was, for most of the Class Period, based in KPMG UK's London, England office. At some point during 2000, McLamb was based in KPMG's Houston, Texas office.

234.   McLamb's involvement with L&H was extensive and began as early as 1997. According to a Highlights and Summary Review Memorandum for December 31, 1997, dated April 28, 1998:

> Conversion of local to US GAAP has been reviewed by Bob McLamb and Digby Wirtz, audit partners of US Capital Markets London Office and SEC reviewing partner. The US financial statements have been finalized after Bob's two day review visit of April 16 and 17, 1999 and subsequent review by Digby Wirtz on April 21 and 23. All the review comments of both Bob and Digby have been cleared.

> [* * *]

> As explained earlier, KPMG Capital Markets Group London have reviewed the compliance with US GAAP reporting with both KPMG Ghent and the client. In addition, US Capital Markets Group KPMG London reviewed the draft financial statements in February 1998 and the final financial statements (incl. Footnotes) in April 1998 before release. All US reporting issues have been cleared with KPMG US Capital Markets Group London.

235.   KPMG's constituent partnerships in the U.S., U.K., Belgium and Korea effectively operated as a single auditing firm with regard to L&H and the preparation of its quarterly financial results. Each office was assigned to and worked on various aspects of the engagements. The U.S. auditors would show up at L&H's Burlington headquarters at the end of each quarter to prepare L&H's financial statements; the Belgian auditors

would do the same in Belgium and the Korean auditors would do the same in Korea. McLamb, Wirtz, Behets and then Van Aerde oversaw the year-end audits of L&H and each reviewed and provided input into the completion of the audits.

236.    KPMG was actively involved in the preparation and dissemination of L&H's quarterly, as well as its year-end financial statements, before and during the Class Period. KPMG auditors and consultants were present at L&H at the end of each quarter during the Class Period for the purpose of reviewing (and, in some instances described below, auditing) L&H's quarterly financial results before they were issued to the investing public.

237.    For example, the press release announcing financial results for the first quarter of fiscal year 1999 issued by L&H was sent to Behets and McLamb for review and comment before it was issued.

238.    Moreover, as another example of KPMG's involvement with the issuance of quarterly financial statements, according the "Group Audit Strategy and Reporting Instructions," dated August 24, 1999, the number one "key review objective" for the review of L&H's third quarter 1999 financial results was to "allow KPMG Ghent to provide clearance to the client on the Q3.99 consolidated financial statements of LHS prepared in accordance with group accounting policies and US GAAP." (emphasis added).

239.    McLamb and Behets provided substantial input on the preparation of the Company's 1998 financial results and audit report. McLamb provided edits to the language of the audit report issued by KPMG Belgium as well as substantial revisions to

92

the financial statements and disclosures. Moreover, McLamb actually prepared and provided certain amounts and disclosures to L&H's 1998 financial statements.

240. In KPMG's Completion Memorandum dated April 9, 1999, prepared in connection with its audit of L&H for fiscal year 1998, Behets stated:

> During the course of the audit, some key issues were discussed and conclusions were reach [sic] in agreement with advise from the US Capital Markets group in London [Wirtz and McLamb].
>
> [* * *]
>
> KPMG personnel from all participating offices involved reviewed the revenue recognition policies and practices followed to ensure compliance with group revenue recognition policy and with US GAAP regulations. (emphasis added).

241. KPMG's involvement in the preparation of the Company's quarterly and annual financial results was pervasive, extending so far as to result in the actual preparation of certain reported financial results and disclosures contained in such financial statements.

242. Indeed, in a letter to the L&H Board of Directors from Lernout dated April 25, 2001 Lernout wrote:

> In the course of the past ten years, we built up a good working relationship with KPMG, and we relied extensively on the advice from numerous KPMG divisions in various countries as well as on the KPMG audit departments, in particular in Belgium and in the United States.
>
> As part of this relationship, all information which we deemed relevant was always communicated to KPMG. Often, they worked side-by-side with the company in the execution of transactions.

According to Lernout:

93

From the start, KPMG played a dual role:

(1) on the one hand, KPMG was a commissioner of Lernout & Hauspie Speech Products N.V., including of its subsidiaries, and therefore also of the Korean subsidiaries; and

(2) on the other hand, KPMG was also a consultant for the company.

In that capacity, KPMG was closely involved at the end of each quarter in processing the figures for the interim accounts – as consultants they advised and assisted the financial and bookkeeping departments of Lernout & Hauspie Speech Products. KPMG consultants came every quarter to the office to draw up the interim accounts together with the bookkeeping department of Lernout & Hauspie Speech Products N.V.

Consequently, it is impossible to believe that KPMG now claims that it did not notice earlier the alleged (actually, disputed) "irregularities" in the Belgian bookkeeping during its auditing assignments as commissioner and when it assisted us in drawing up the books. In fact, KPMG helped the staff of the bookkeeping department of Lernout & Hauspie Speech Products N.V. understand and apply the US GAAP Rules (these are the accounting standards which must be observed by corporations whose shares are traded on EASDAQ and NASDAQ).

[* * *]

It was also KPMG's assignment to make sure that sufficient control mechanisms were in place and that the internal procedures were such that any resorting to fraud by the local people in charge was excluded as much as possible.

[* * *]

I remember pertinently that in some concrete cases the bookkeeping department of Lernout & Hauspie Speech Products N.V. decided after consulting with KPMG that there was sufficient consent between the parties to view these [licensing agreements] as actual agreements, even if

94

the written agreements had not yet been signed in their final
form.

[* * *]

I believe that all agreements with related parties were
disclosed in the proper manner.  To arrive at that
conclusion, I relied on the advice and support which
KPMG, as an international auditing company, provided to
Lernout & Hauspie Speech Products.  KPMG not only
provided assistance for the processing of the quarterly
figures, but also helped the company with the disclosures
required by NASDAQ and EASDAQ rules.

[* * *]

Furthermore, KPMG was particularly well paid for this
assistance, which made us assume that it used a sufficient
number of specialists and collaborators to make sure that
Lernout & Hauspie Speech Products followed the rules
imposed by law. (emphasis added)

## B.   KPMG'S DETERMINATION OF CERTAIN AMOUNTS IN QUARTERLY FINANCIAL STATEMENTS

243.   KPMG effectively served as an adjunct to L&H's accounting department during

fiscal years 1998 and 1999.  As alleged above, KPMG auditors and consultants were present at

L&H at the end of every quarter during the Class Period and worked closely with L&H on the

preparation of the quarterly financial statements.  As an example of KPMG's involvement in the

preparation of the financial statements, KPMG, through KPMG Consulting, a division of the

same Swiss association as KPMG Belgium, KPMG LLP and KPMG UK, performed valuation

services for acquisitions made during that time by L&H.  In particular, KPMG was hired to

determine the allocation of the purchase price among the various assets acquired.  KPMG

provided allocation of the purchase price for at least the following acquisitions:

a)   The allocation for the Application Technology, Inc. acquisition in
April of 1998.

b) The allocation for the Accent Software International acquisition in June of 1998.

c) The allocation for the Bumil acquisition in September 1999.

d) The allocation for the Dragon acquisition in 2001.

244. The work performed by KPMG resulted in millions of dollars being allocated into "goodwill and other business acquisitions intangibles" and recorded as assets on L&H's quarterly balance sheets. For example, KPMG and L&H included the following amounts in the financial statements with respect to the acquisitions of Bumil and Dragon:

**Allocation of Dragon per: Q2 2000 10-Q**

|  | (in 000s) |
|---|---|
| Assets acquired: | |
| Working capital | $(18,282) |
| Property and equipment | 2,320 |
| Goodwill | 461,240 |
|  | ----------- |
|  | $445,278 |

**Allocation of Bumil per: Q3 1999 10-Q**

|  | (in 000s) |
|---|---|
| Assets acquired: | |
| Working capital | $   (108) |
| Property and equipment | 927 |
| Goodwill | 25,988 |
|  | ------------ |
| Liabilities assumed | (1,083) |
|  | $25,724 |

KPMG was directly responsible for the amounts entered on L&H's financial statements for these particular assets. Aside from making KPMG complicit in the preparation of L&H's financial statements, such conduct violated GAAS in that KPMG audited L&H's consolidated financial statements. In essence, KPMG audited its own valuation work and therefore was not independent.

245.    Moreover, in performing reviews and audits of L&H, KPMG assigned various values to represent materiality, or the amount which KPMG determined would influence persons reading L&H's financial statements.  To justify misstatements in L&H's financial statements, KPMG netted known (or "hard") overstatements of revenues or assets with certain possible understatements thereby allowing individually material items be overstated, yet included in L&H's financial statements.  For example, during KPMG's six-month review for June 30, 2000, over $2.8-million in known, net misstatements were discovered by KPMG, yet no corrective action was required by, or undertaken by, KPMG.  In the memoranda dealing with the meeting concerning the six-month review, KPMG documented its improper acquiescence by stating "KPMG is willing to let some adjustments flow through."  KPMG's statement demonstrates a complete disregard for the function of an independent auditor in ensuring that the financial statements are free from material misstatement.  Moreover, given the fact that KPMG was making the final decision regarding which entries would and would not be recorded, its conduct made KPMG complicit in the preparation of the false quarterly financial statements.  Such action violates SEC Staff Accounting Bulletin No. 99 that was issued on August 12, 1999.

## C.    KPMG HAD FULL AND COMPLETE ACCESS TO INFORMATION

246.    As a result of providing audit and other services for the Company, KPMG personnel were frequently present at L&H's corporate headquarters in the United States and Belgium, as well as other L&H offices throughout the world during 1998, 1999 and the first two quarters of fiscal year 2000.  Indeed, KPMG had continual and unfettered access to, and knowledge of, L&H's confidential internal corporate, financial operating

97

and business information and had ample opportunity to observe and review the

Company's business and accounting practices, and to test the Company's internal and

publicly reported financial statements, as well as review the Company's internal controls.

247.    KPMG's intimate knowledge of L&H was based on almost ten years as

the Company's auditor.  Indeed, KPMG has served as the Company's auditor since 1991

and purports to be a  "leading provider" of audit services.  In particular, at its website,

KPMG Int'l claims that:

> Assurance practice helps manage client risk so they can
> focus on their core business.  By intimately understanding
> each client's business, we convert information into insights
> to uncover hidden opportunities to improve client
> efficiency and performance.
>
> [* * *]
>
> We also know that intimately understanding each client's
> business – its challenges and objectives – builds close
> relationships.  It's how KPMG adds exceptional value.
> (emphasis added.)

248.    By virtue of its position as the independent accountant and auditor for

L&H, KPMG therefore had unlimited access to the Company's key personnel, accounting

books and records and transactional documents at all relevant times.

249.    Indeed, the KPMG Int'l website states the following, inter alia, with

respect to the auditor's close involvement with the Company at all times during the fiscal

year:

> **Year Round**
>
> [KPMG's Business Measurement Process] provides a
> continuous audit process.  Your auditor stays in touch with
> you year-round – keeping current with your business and
> changing market conditions, and providing you with

98

ongoing feedback on how your business decisions could
affect your financial results.

250.    Moreover, <u>The Financial Statement Audit: Why A New Age Requires An</u>

<u>Evolving Methodology</u>, a publication prepared by KPMG and available at its website,

states: "'Few are privy to as much information as an auditor.'" <u>Id.</u> at 15 (quoting Frank O.

Marrs, "Using Your Audit As A Management Tool," <u>Leaders</u>, Vol. 19, No. 3,

July/Aug./Sept. 1996).

251.    In his letter to the L&H Board of Directors dated April 25, 2001, Lernout

indicated that, "from the day we were quoted on the stock exchange on 12/1/95, we

turned to KPMG for every decision of any significance." Indeed, as early as 1996, L&H

involved KPMG in the accounting for specific contracts at the time they were

contemplated.  For example, in the Minutes of Regular Meeting of the Board of

Directors, dated January 11, 1996, the directors discussed two new contracts which

generated $1,800,00 and $1,000,000 of revenue for the Company.  The meeting minutes

indicate "there is a discussion of the need to involve the Company's accountants, KPMG,

in review of these agreements for the purposes of determining revenue recognition

policies."

252.    To elaborate, Lernout explained in his April 25, 2000 letter to the Board of

Directors:

> To illustrate this I refer to the assistance which was given,
> for example, with about any sizable acquisition by LHS.  It
> cannot be denied that for this reason alone, <u>KPMG had
> perfect insight into the various aspects of the LHS
> organization</u>, if only because of its involvement with the
> due diligence, audits and even the negotiations. (emphasis
> added).

253.    The symbiotic relationship between KPMG and L&H is further exemplified by the fact that, according to Lernout, L&H employees had "direct access to KPMG, even for very practical and day-to-day problems." Recognizing that this close relationship between auditor and client was unusual in light of the requirement under GAAS that auditors remain independent in fact and in appearance, Lernout wrote:

> It cannot even be denied that the greater part of the learning process involving the adjustment to the US rules took place thanks to KPMG's help, which went much farther than is usual for auditors who often keep a certain difference.

254.    Lernout's statement regarding the extent of KPMG's activities are corroborated by a KPMG meeting agenda dated August 23, 1999, in which KPMG indicated that it planned to hold a US GAAP training seminar for L&H employees.

255.    In the Report of the Statutory Auditor on the Statutory Accounts Submitted to the General Shareholders' Meeting of [L&H], attached as Exhibit B to the L&H Proxy Statement for the Annual Meeting and the Extraordinary Meeting of Stockholders to be Held May 4, 1998 (the "1998 Proxy"), KPMG Belgium stated:

> We conducted our audit in accordance with the standards of the "Instituut der Bedrikfsrevisoren." Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, taking into account the legal and regulatory requirements applicable to financial statements in Belgium.
>
> In accordance with these standards, we have considered the Company's administrative and accounting organization as well as internal control procedures. The Company's management have provided us with all explanations and information which we required for our audit.

[* * *]

100