256.    KPMG made an identical statement regarding its consideration of L&H's internal controls and access to information in Exhibit B to the 1999 Proxy.

### D.    KPMG'S ACTUAL KNOWLEDGE OF, AND PARTICIPATION IN, THE FRAUD

257.    In a startling breach of its duty to act as the public's "watchdog", KPMG participated in, and had actual knowledge of, the fraud perpetrated at L&H during the Class Period.  In particular, KPMG advised L&H to backdate contracts to create the appearance that revenue recognition was appropriate.  Moreover, KPMG was aware of specific instances of improper revenue recognition and documented its serious concerns about the validity of the revenue recognition associated with the LDCs but nonetheless turned a blind eye to the fraud, using its false audit reports to serve as the lynchpin for the fraud.

### 1.    Active Participation in Revenue Recognition Fraud

258.    KPMG went far beyond simply turning a blind eye to the fraud, however, and went so far as to actively participate in the fraud by instructing L&H to backdate contracts for inclusion in revenues reported to the public, even though such contracts were not binding agreements at the time such revenues were recorded.

259.    In an e-mail dated January 5, 2000, five days after the end of L&H's fiscal year 1999, McLamb sent Dammekens an attached memorandum entitled "COMMENTS ON CERTAIN DRAFT AGREEMENTS."  The e-mail was copied to Glen Davison, another KPMG auditor.  According to the e-mail, McLamb had reviewed "draft" agreements in an effort to tell Dammekens how to create the appearance that the revenue on such contracts could be recognized in the fourth quarter of fiscal year 1999.  The contracts were with Digital Sei-Young Ltd, Doshin Electronics, Co., Ltd., Neo

101

Information Telecom Corp. and HI Worldwide. L&H sought to recognize $23 million in revenue under these contracts. With respect to the Digital, Doshin and Neo contracts, McLamb instructed Dammekens that the draft contracts had to be "signed and dated by each party." Thus, McLamb knew that the "draft" agreements were not final as of the end of the year, but nonetheless, in direct contravention of GAAP, permitted L&H to recognize the revenue in the fourth quarter of fiscal year 1999.

260.    In his January 5, 2000 e-mail, McLamb also discussed a number of issues with respect to the contracts, each of which should have precluded or limited substantially the amount of revenue recognized in the fourth quarter of 1999. For the Digital Sei-Young, Doshin and Neo Information contracts, McLamb noted specific items which precluded revenue recognition.

1. The contract should be signed and **dated** by each party. Having just an effective date is **unacceptable.**

2. Need to determine the financial viability of Digital to determine whether they have the financial ability to pay the $10 million.

3. Need to see clear evidence of the delivery of the deliverables under each part of the contract.

[* * *]

7. Under each part of the contract Digital is required to obtain L&H's approval for design of packaging and other artwork. *This is continuing involvement of L&H and causes a problem with revenue recognition.*

[* * *]

10. *Article A.8.1 makes it possible for Digital to get its money back. . . .*

[* * *]

I have not looked into this further as I think that VSOE [Vendor Specific Objective Evidence] will not be established for each element and the entire $10 million would need to be amortized into income over the term of the agreement.

> I also believe that the accounting is affected by the continuing involvement of L&H (see 7 above) and the royalties could be refunded under certain circumstances (see 10 above). [Bold in original, italics supplied.]

McLamb made similar comments about the Doshin and Neo Information contracts in his January, 2000 memorandum. With regard to the HI Worldwide contract, McLamb wrote that he had "previously reviewed this contract and given my comments to Carl [Dammekens]."

261.    Notwithstanding the myriad issues raised by McLamb in his January 5, 2000 e-mail, KPMG still permitted the revenue from these contracts to be fully recognized in the fourth quarter of 1999. As part of the Audit Committee Investigation, Arthur Andersen specifically identified the revenues from the Sei-Young and HI Worldwide contracts as being improperly recognized. Since that time, as alleged, L&H has reversed all of the revenue associated with all of the contracts reviewed by McLamb.

## 2.    Actual Knowledge of False Revenue Recognition

262.    KPMG's actual knowledge of accounting problems specifically with respect to revenue recognition at L&H extended directly to Korea. In an "URGENT" e-mail message dated October 10, 1999 from Oh Kwon, a partner in KPMG's Korea office and copied to Dammekens and Van Aerde just weeks before the issuance of L&H's press release announcing third quarter financial results, Kwon wrote:

> We have just completed our fieldwork for the September closing of Bumil [L&H's Korean subsidiary]. However, we have a critical revenue recognition issue as follows and, I want you to confirm this in your office as appropriate L&H responsible personnel.
>
> At 30 September 1999, L&H Korea ("Bumil") recognized the software revenue of approximately U$11 million, the largest amount Bumil ever recorded. The sales were made

to two unknown local software companies, VoiceTek (US$ 7M) and International Business Computer (US$4M), respectively, and I believe that Frederick's visit to Bumil last time was probably to review or record these transactions. Frederik [Deschodt's assistant controller at L&H] told the accountant of Bumil that this transaction was agree [sic] by KPMG at the Corporate level. I am surprised why he did not discussed [sic] with me when we met last time.

We were not informed of the details of VoiceTek. Same to ICB. We know that VoiceTek was established in July this year in the minimum paid-in capital. We are not aware of anything on IBC. <u>There are sales contracts dated 30 September 1999 with these new customers but there are no proper documents on the revenue generation schedule and condition.</u> The contracts say that the sales is final and no refund is required and the localizing expenses to be incurred will be charged to the customers additionally, etc. <u>Furthermore, the receivable was factored with a local bank with a collateral of Bumil's bank deposit and we believe the factoring is 'with recourse.'</u>

Because of this transaction at 30, September 1999, Bumil showed big profit, about, US$13M, in September while it had loss carryforward of approximately US$0.5M until the end of August.

Based on our understanding, I have several critical questions.

1.Why did Bumil recognized the whole amount in September? Per their explanation, the ultimate resolution in Korean will take about five years to complete even though Bumil is not required to refund the contract amount. Therefore, at least, the revenue should be recognized over five years or more.

2.The revenue recognition basis under USGAAP (SOP91-1 and 97-2) should be carefully complied in this transaction. Because of its sensitive nature of the first consolidation with L&H, I recommend you should consult your SEC partner on this issue. <u>My preliminary interpretation is that this revenue recognition has some problems particularly in terms of "when-and-if" available conditions, delivery of products, and collectibility.</u>

As you know this issue should be cleared promptly to complete the consolidation, please discuss at Corporate level and advise me of the discussions. If it meets the requirements of SOP's, we may conclude the September closing and consolidation package of Bumil. (emphasis added).

Thanks in advance for your immediate action.

263.    Notwithstanding the fact that the transactions referred to in Kwon's e-mail were false transactions, KPMG knowingly or recklessly permitted L&H to report such transactions as revenue in its financial results for the third quarter of 1999 and for the fiscal year ended December 31, 1999. Moreover, it is clear that KPMG was aware that the accounts receivable recorded in connection with this transaction had been factored with recourse to a Korean bank.

264.    A "factor" is essentially a sale of an account receivable. When the terms of the sale are "with recourse" the buyer of the receivable may proceed against the seller of the receivable if the third party debtor defaults. The distinction is critical because if the sale of the receivable is "with recourse" then such sale is not final and may not be recorded as a sale under GAAP, as concluded by the Audit Committee Investigation.

265.    Kwon's "preliminary interpretation" regarding the impropriety of recognizing the revenue was absolutely correct. In connection with the Audit Committee Investigation, Andersen specifically determined that the transactions with VoiceTek and ICB must be reversed and noted specifically that "KPMG was aware of transaction" at the time it was originally recorded. (emphasis added).

### 3.    Actual Knowledge of LDC Fraud

266.    KPMG knew of serious issues surrounding the recognition of revenue in connection with the LDCs as early as July 1999. In a "private & confidential" letter from Van Aerde to Bastiaens dated July 29, 1999, Van Aerde confirmed a meeting for September 1, 1999 between Bastiaens, Van Aerde, McLamb and Boyer (the KPMG Boston Audit Partner) for the purpose of discussing the "Language Companies" and, in particular, Van Aerde:

- "wanted an update on the status, review of independence;"
- "required names of investors to arrange a separate meeting;"
- "wanted to review collectibility of the LDC receivables."

267.    The July 29, 1999 letter also indicated that Van Aerde wanted an "update on the status of all issues raised in the Report to the Audit Committee," the most important among them being "revenue recognition."

268.    Foreshadowing things to come, KPMG noted in a "Prioritised list of issues to be addressed" attached to the July 29, 1999 letter that "specific proof of the collectability of individual outstanding receivables" was necessary "in order to avoid the reversal of revenue recognised in prior quarters."

269.    Also on the agenda were responses to numerous issues raised by McLamb about L&H's financial statements for the second quarter of 1999. After each issue identified by McLamb, someone from KPMG listed a response to the question raised. Instead of specifically addressing and answering each question raised by McLamb about the financial statements, however, the KPMG auditor often wrote only that response given to McLamb was that the review is only a "high level review and enquiry" so further

106

inquiry was unnecessary  Thus, instead of properly investigating the issues raised by McLamb, KPMG abrogated its responsibility by failing to take the steps necessary to investigate the serious issues raised.

270.    KPMG did not resolve the issue of the LDCs to its satisfaction in connection with the second quarter 1999 review.  Indeed, the LDC issue remained unresolved into the Fall of 1999 and at least through June 30, 2000.  For example, KPMG remained concerned about the LDCs and the issue of whether the investors in the LDCs were parties related to L&H.  In fact, a "special review" of this issue was requested by the "KPMG USA Professional Practice" group in connection with the review performed by KPMG on L&H's third quarter 1999 financial statements.

271.    Although KPMG identified the LDCs as an important audit issue, Van Aerde, in a "confidential memorandum" to McLamb dated September 30, 1999 (the "LDC Memorandum"), stated that "certain <u>scope limitations</u> were imposed on [KPMG] when performing our review." (emphasis added).  Obviously suspicious of whether the LDCs were independent, Van Aerde wanted to meet in person with the LDC investors. However, when he attempted to meet with the investors, Van Aerde was told:

> The shareholders and/or investors of the LDC's could not be met.  Contacts could be made with the managing directors of subject LDC's.  We were informed that shareholders or investors may not wish to be contacted. There are no legal grounds to enforce such a contact (at this stage).

The LDC Memorandum indicates that KPMG:

> Noted that it did not receive 4 delivery reports confirming that product had been delivered to the LDC and confirming that the LDC was independent;

Noted that the receivables due from the LDCs were
significantly overdue by six to nine months;

Noted that one of the LDCs refused to confirm in writing
that it was independent from L&H.

272.    The LDC Memorandum states:

This memorandum has been prepared on the request of
KPMG US Professional Practice. They are responsible for
the further distribution of it except for the audit
confirmation letter replies (Annex IV) which should not be
distributed outside the Firm with our prior written consent.

273.    "Scope limitation" is a technical auditing term. The third standard of

auditing field work requires that the auditor's opinion be based on sufficient competent

evidential matter. If adequate evidence is not collected, a so-called "scope limitation"

occurs. With respect to scope limitations, the authoritative auditing literature states:

The auditor can determine that he is able to express and
unqualified opinion <u>only</u> if his audit has been conducted in
accordance with generally accepted auditing standards and
if he has therefore been able to apply all the procedures he
considers necessary in the circumstances. <u>Restrictions on
the scope of his audit, whether imposed by the client or by
circumstances, such as the timing of his work, the inability
to obtain sufficient competent evidential matter, or an
inadequacy in the accounting records, may require him to
qualify his opinion or disclaim an opinion.</u> (emphasis
added).

Van Aerde knew that the transactions involving the LDCs were material to the

Company's operations and, as a result, should not have accepted the scope limitation

imposed by L&H management or should have caused KPMG to later issue a qualified

audit opinion with regard to L&H's financial results. Nonetheless, and contrary to its

actual knowledge, KPMG issued an unqualified audit opinion with regard to L&H's 1999

consolidated financial statements.

274.    Further indicating that KPMG was concerned whether the LDCs were independent, KPMG informed the Audit Committee in its Report to the Audit Committee for the Fourth Quarter of 1999 that L&H management had represented that such LDCs were independent.  Placing KPMG on an even heightened awareness was the fact that the SEC had commenced an informal inquiry into the Company's accounting practices in January 2000, and further, that the SEC had specifically requested documents from KPMG relevant to the probe in April 2000.

275.    In a series of e-mails dated between January 27 and January 29, 2000, KPMG further documented the serious doubts it had concerning the validity of revenue transactions recorded by L&H in connection with the LDCs.  For example, in an e-mail message from McLamb to Van Aerde, Huysman and Dammekens, dated January 29, 2000, Mc Lamb wrote:

> It seems that a single payment of $25 million was paid to L&H Korea.  The payment was for amounts owed to LHS (the group in total) by a number of LDC's. Who made this payment?  We need to see the wire transfer or check and determine what bank account it came from.  Why did the payment for several LDC's come from a single bank account?  This makes it more important that we find out who the individual investors are for each of the LDC's  It is no longer acceptable for us to rely on an agent acting for a group of investors.  When we find out the company or person that the $25 million payment came from we need to get KPMG Korea to find out about the Company or person. If the payment was made by a Company we need to know who the owners of the company are.  This is very important.

[* * *]

McLamb correctly identified the source of the payment as "very important" but ultimately failed to ascertain the source of the payment and permitted the improper revenue recognition.

276.    Most importantly, KPMG had complete knowledge of one of the most important facts which ultimately lead to the uncovering of the fraud by The Wall Street Journal: the fact that many, if not all, of the LDCs had the exact same business addresses. Recognizing that such facts indicated strongly that the transactions were improper, Huysman, the KPMG audit manager wrote:

> 4.    Philip, some of the customers of L&H Singapore are Salfas, Duranzo, Baleston and Snegal Pte Ltd. These customers are all located on No. 5 Jalan Besar #5-01 Singapore 208785. Are you aware of any operational activity at these premises? Is R&D taking place or are people actually developing languages? For some other contracts signed between L&H Asia and Lupeni, Jelgava and Harrica Pte Ltd, the address is in always Shenton. Way 5; 12-05 UIC Building, Singapore 06888. The same question as above is asked. For all of these contracts, is there to your knowledge a local general manager (the contracts have in each case been signed by Belgian people).

> [* * *]

KPMG knew that the LDCs shared the same addresses and that the contracts were signed by Belgians, not Koreans. KPMG further recognized that these circumstances essentially precluded the possibility that such transactions were legitimate business transactions. Notwithstanding this keen awareness, KPMG turned a blind eye to the fraud and permitted L&H to recognize false revenues from the LDCs transactions.

277.    The January 27, 2000 e-mail also reiterated KPMG U.S.'s extensive involvement in the issuance of opinions on L&H's financial results, stating:

I also send this mail to the US partner who is reviewing this engagement from a US Gaap perspective (Bob McLamb, in KPMG Houston). You can send your answers to him at the same time.

278.    By June of 2000, however, KPMG had still failed to perform audit procedures sufficient to determine whether the LDCs were, in fact independent from L&H. Even though KPMG's office in Korea had prepared audited financial statements for the Korean subsidiary and issued a separate audit report on such financials on March 29, 2000 and even though KPMG Belgium had already completed its field work on the audit of the consolidated financial statements on April 27, 2000, its audit was far from complete and KPMG knew of serious and significant issues that were outstanding with respect to the accuracy of L&H's financial statements.

279.    In an e-mail message from McLamb to Van Aerde dated June 26, 2000, just days before L&H filed its Form 10-K for fiscal year 1999, which included KPMG's unqualified audit opinion concerning L&H's 1999 financial results, McLamb revealed that KPMG had not yet performed audit procedures designed to determine whether the LDC's were, in fact, independent.

280.    Undoubtedly motivated by the pressure of the SEC investigation, in the message, McLamb instructed Van Aerde to take the following steps in a last minute effort to verify both the LDC revenue and questionable revenue from Korea:

> Several procedures that we should perform, in addition to contacting investors, are as follows:
>
> We should do a two year cash flow statement, it does not need to be perfect, but we should look at where their cash outflows have gone and the timing of the cash outflows. We should compare the timing of the outflows to the timing of the payments made by the LDS/LDC's and Korean

customers and determine the date of payment, bank account number, name of the bank and name of owner of bank account. A list of information should be prepared.

We should develop a list of all acquisitions with the following information:

Date of Acquisition

Name of Company acquired

Method of payment (stock, cash or something else)

Initial payment amount, including date of payment

Earnout requirements, including date earnout must be determined by

Earnout payments, including date of payment

Reason for paying earnout early, if applicable

Description of how purchase price determined (Investment banker study, etc.) if investment banker study, we should get a copy of study specifically how was Bumil purchase price determined

Jo and Pol have also should [sic] some stock forward to GE capital, we should Compare the date of this transaction to the dates of the LDS/LDC's of Korean Customers payments

I know this is a difficult time and please feel free to call me day or night. (emphasis added).

281.    Although KPMG had already completed its audit of L&H and the Korean

subsidiary, it is clear that it was still grappling with these major accounting issues dating

back to L&H's 1998 financial results. Notwithstanding the uncertainty around the

validity of the transactions and the widening of the SEC investigation, KPMG signed off

on the 1999 financial statements and consented to the inclusion of its unqualified (yet

false) audit report on the 1998 and 1999 financial statements in the 1999 Form 10-K.

### E.    RED FLAGS

282.    Although KPMG had actual knowledge of: (1) glaring irregularities in L&H's financial statements at the time it conducted its quarterly reviews and annual audits; and (2) inadequate (or nonexistent) systems of internal controls, there were seemingly countless red flags waving at KPMG, alerting it to the misstatements in the financial statements. If these red flags had been investigated by KPMG, as it was obligated to under GAAS, it would not have issued unqualified audit opinions. Having done so in the face of these large "red flags" KPMG, in reckless disregard for the truth, certified L&H's consolidated financial statements as being in conformity with GAAP.

### 1.    History of Problems with Specific Contracts

283.    As early as 1997, KPMG noted revenue recognition as a significant audit issue at L&H and found that adjustments were required with respect to "reversal of revenue recognised in 1997 and additional doubtful debt reserves." Further, KPMG communicated certain issues to management that included issues surrounding "timeliness of availability of information on revenue contracts" and a need to "provide US GAAP training to key people in the subsidiaries." Thus, even before the Class Period began, KPMG was aware of prior instances of revenue reversal and the fact that the L&H accounting department was unable to prepare financial statements in accordance with GAAP.

284.    In connection with its audit of L&H's financial statements for the second quarter of fiscal year 1999, KPMG documented numerous problems with the Company's revenue recognition. In a Report to the Audit Committee for the Second Quarter of 1999 dated August 18, 1999, KPMG indicated that the Audit Committee had not reviewed the

113

press release announcing the second quarter financial results before it was issued to the investing public. In connection with the second quarter review, KPMG documented no less than nine transactions for which revenue recognition was suspect. These transactions were with Dialogic, Cegeka, Bumil, Group Sense, Microsoft, Samsung and the Learning Company. KPMG also raised concerns regarding the recognition of revenue from distributors and from certain "guaranteed payments."

285.    KPMG knowingly or recklessly permitted the recognition of revenue with respect to the Cegeka contract. Indeed, KPMG specifically reviewed the Cegeka contract at the time of the second quarter audit, for which L&H had recognized $900,000 in revenue for the second quarter of 1999. After reviewing the contract, KPMG proposed only that the Company record a marketing expense of $150,000 in connection with the transaction. However, the plain language of the contract required that that the Dutch language version of VoiceXpress (accounting for $300,000 of the total revenue recognized) be delivered "when and if" it is available. The contract also required L&H to deliver the UK English and German versions (accounting for $300,000 each of the total revenue recognized). Because the Dutch version was not available and the English and German versions had not been delivered, none of the revenue could be recognized under GAAP. KPMG's action in permitting revenue recognition for a product which did not yet exist was, at best, reckless.

286.    Moreover, KPMG failed to determine whether the English and German versions had actually been shipped. In fact, such versions had not been shipped and, as a result, the revenue was restated in connection with the Audit Committee investigation. It is inconceivable that KPMG could have failed to ascertain the appropriate accounting

treatment for a contract that, by its plain terms, and through simple verification, would have indicated revenue could not be recognized. KPMG either actually knew of and participated in the fraud, or was entirely reckless and simply turned a blind eye to L&H's fraudulent practices.

## 2.    Knowledge Regarding Lack of Internal Controls

287.    KPMG knew that the Company did not have an adequate (if any) system of internal controls. At a meeting between KPMG and the audit committee on May 4, 1998, KPMG reported that the internal audit and internal control functions of the Company needed to be strengthened. KPMG also informed the audit committee that the Company must improve its financial reporting for consolidated financial statements.

288.    However, although KPMG knew that the Company's internal controls were not adequate (or nonexistent), in a draft letter to the Board of Directors and the Audit Committee of L&H dated June 4, 1998 issued in connection with the audit of the Company's 1997 financial statements, KPMG stated:

> Our examination was based on substantive tests of financial information and, as you will appreciate, such an examination would not necessarily reveal all errors or irregularities that may exist. Consequently, substantial reliance must be placed on the system of internal controls as your principal safeguard against errors and irregularities. (emphasis added).

Thus, KPMG knowingly or recklessly placed reliance on a system of internal controls that it knew was inadequate (or nonexistent).

289.    Further, although KPMG informed the Company that an internal audit function was necessary at L&H, it knew that the Company failed to ever implement such

a function. The April 12, 1999 Minutes of Telephone Meeting of the Board of Directors,

L&H stated:

> Mr. Erwin Vandendriessche, Chairman of the Audit
> Committee, presents a report of the Audit Committee. Mr.
> Vandendriessche indicates that the Audit Committee will
> be receiving a Management Letter from KPMG, following
> which it will have a further meeting with representatives
> with KPMG and will make an additional report to the
> Board of Directors. Mr. Vandendriessche also discusses
> the previously reported intention of the Company to
> establish an internal audit function, as a result of the
> growing complexity of the Company's business. This had
> originally been targeted to be done by the end of February,
> but because of time commitments resulting from the SEC's
> review of the Company's US GAAP financial statements,
> this has been postponed. Now that the SEC's review has
> been completed, a new schedule will be set to implement
> this function.

    290.    KPMG continued to report to the Board and the Audit Committee

throughout the Class Period that the Company's internal controls were inadequate and

that L&H had failed to implement the necessary internal control function. According to

the Minutes of Regular Meeting of the Board of Directors, dated August 30, 1999:

> Mr. Vandendriessche reports on activities of the Audit
> Committee. He indicates that the Audit Committee has had
> two meetings within the last several weeks. He also reports
> that the Company's previous audit partner, Paul Behets, has
> left KPMG to join the Flanders Language Valley
> Foundation (SAIL Trust) and the Audit Committee has met
> with the new KPMG partner regarding the transition. <u>Mr.
> Vandendriessche also reports that KPMG has done an
> extensive review at the end of the second quarter and has
> also issued recommendations to the Company regarding
> increases in the internal control staff.</u> He also indicates that
> the Audit Committee is reviewing the need for an internal
> auditor, and will report back to the Board of Directors with
> this recommendation. He also indicates, as previously
> reported by Mr. Bastiaens, that the Audit Committee will
> have a meeting prior to each quarterly release. (emphasis
> added).

291.    Apart from the knowledge that L&H lacked internal controls, KPMG had

actual knowledge that L&H accounting department was run in a reckless manner.  In an

e-mail message from Dammekens to McLamb dated May 3, 2000, Dammekens stated:

> I DO WANT TO BRING UP ANOTHER POINT – AM I
> CAPABLE OR [SIC] REMAINING CFO IN AN
> ORGNISATION LIKE THIS?  PERSONALLY I DO NOT
> THINK SO.
>
> I AM CONVINCED THAT IT IS TIME TO BRING IN
> AN EXPERIENCED GUY, THAT CAN BRING
> STABILITY AND DISCIPLINE AND KNOWS HOW TO
> RUN THE FINANCES OF A BIG COMPANY
> (BECAUSE HE GREW UP IN ONE AND HAS DONE IT
> BEFORE).
>
> THINGS ARE GETTING OVER MY HEAD – I AM
> STAFFING UP MY PEOPLE, BUT WITH ALL THE
> DEALS/ACQUISITIONS THAT GO ON, I DO NOT
> HAVE TIME ENOUGH TO EVEN THINK ABOUT
> INTEGRATION OR ORGANISATION. (caps in original).

Thus, KPMG was well aware that there was no "discipline" in the accounting department

at L&H and that the individual in charge of preparing the Company's financial results

was "over [his] head."  It was, at a minimum, reckless for KPMG to issue unqualified

audit opinions on the financial statements of a publicly traded company reporting

hundreds of millions of dollars of revenues prepared by an individual for which the

accounting was admittedly "over [his] head."

292.    During its quarterly reviews, KPMG became aware of additional internal control

problems at L&H.  Specifically, KPMG knew the following during its mid-year review for fiscal

2000:

    a).    The inter-company balances for accounts receivable and accounts
           payable would not reconcile.

b).    The lack of a cost accounting system at L & H Mendez Portugal made the determination of work-in-process and proper cutoff for each period impossible.

c).    The belief by KPMG's Dusseldorf office that the work-in-process account was overstated in relation to L&H Deutschland Group, but no action taken to verify that belief;

d).    The belief by KPMG that the investment by L&H Mendez through the acquisition of CL Servicios Linquisticos was overstated by some $950,000, yet no corrective action was taken by KPMG to remedy the misstatement.

293.    KPMG also knew or recklessly disregarded that the data produced by L&H's computer systems was unreliable. For example, KPMG was aware of the following:

a).    The amounts stated for accounts receivable and accounts payable from an intra-company standpoint were not reconcilable based upon the information generated by the accounting systems. Yet, it is noted in the consolidated financial statements for fiscal years end 1998 and 1999 that all inter-company transactions are removed for reporting purposes.

b).    The non-existence of a cost accounting system in the German subsidiary thereby allowing for the proper allocation of funds between actual research and development costs to be expenses and amounts that are properly capitalized once a product is technologically feasible.

294.    As the end of the Class Period drew near, McLamb continued to document that the Company's controls were not sufficient. In a memorandum dated May 8, 2000 to Van Aerde, McLamb identified certain problems for inclusion in a "Management Letter" to be issued to L&H. Management letters are typically prepared by auditors at the conclusion of their consideration of a Company's internal control structure and are used to identify management weaknesses in the accounting system. The items stated by McLamb were:

1.    KPMG notes the client needs to create and follow formal written procedures for recording accounts receivable and adequately train personnel to record and relieve receivable balances from the general ledger.

2. KPMG noted the client has not established policy and procedures relating to establishing and relieving accruals for contingencies. The client needs to create and follow formal written procedures for establishing reserves for contingencies.

3. KPMG noted the client has not established policies and procedures relating to the valuation and tracking of fixed assets. The client need to create and follow formal written procedures for valuing and tracking fixed assets.

295. Consistent with KPMG's findings during the Class Period regarding the lack of internal controls, after the end of the Class Period, the Minutes of Special Meeting of the Board of Directors, dated November 7, 2000 state:

> Mr. Vandendriessche indicates that the preliminary conclusions of the Audit Committee are that the internal controls of the Company have been inadequate; that the issues and problems discovered to date in connection with the Audit Committee investigation are such that it appears likely that the financial statements for 1998, 1999 and the first two quarters or [sic] 2000 cannot be relied upon; and that there is not yet any estimate as to the range of problems and possible restatement. (emphasis added).

Terming the findings regarding inadequate internal controls as "preliminary" was pure fiction. KPMG and the Audit Committee knew throughout the Class Period that the Company did not have a system of internal controls in place and that the financial statements issued by the Company were consistently prepared with flawed or false information derived from such inherently unreliable systems.

### 3.    Knowledge of Serial Violations of Company Policy

296. Some of the problems identified by KPMG with respect to L&H's accounting practices were particularly alarming in that they constituted known violations of the Company's own stated accounting policies.

119

297.    For example, Kwon, the partner from KPMG's Korea office who discovered and documented known instances of improper revenue recognition, also documented yet another known instance of the Company's intentional violation of its own accounting policy. With respect to his review of license contracts for the second quarter Kwon stated:

> Some of the Company's license agreements are written in Korean only without English version, and accordingly, they do not contain L&H non-refundable clause on the agreements. Out of US$2.6 million of such contracts, US$ 1.6 million is recognized as revenue in Q2 and US$1 million is deferred. <u>Such treatment appears to be against the LHSP revenue recognition policy. Per discussion with H.J. Kang, the Company's financial controller, it is getting difficult to include the non-refundable policy clause due to the reluctance by customers.</u> (emphasis added).

Incredibly, KPMG failed to take appropriate steps to address these known and intentional GAAP violations and violations of L&H's own internal policies. Indeed, Kwon was essentially told that, because it is difficult to persuade customers to agree that the payments are non-refundable, the Company simply omits those contractual terms but nonetheless included the revenue in the current quarter's financial results. This blatant violation of Company accounting policy should have led to increased scrutiny by KPMG. Instead, KPMG turned a blind eye to the policy violations and continued to approve the patently false financial results.

298.    Moreover, in a USA Highlights and Completion Memorandum dated October 20, 1999 prepared by Boyer, the partner from KPMG's Boston office responsible for audits of L&H's U.S. operations, Boyer noted that the Company knowingly failed to adhere to its own stated accounting policies. In particular, Boyer found:

Upon its review of the client's A/R Aging Report as of
9/30/98, KPMG identified several customer accounts
greater than $50,000 that were aged over 90 days. One
A/R balance >90 days noted, Alpha Software Corporation
for $1,648,742, has been offset at 9/30/98 by liability
balances. See Section III: Other Audit Issues for specific
identification and review. Remaining customer A/R > 90
days amounts which are greater than $50,000 are listed
below as specifically identified problematic A/R. KPMG
notes that the Company is not in conjunction with their
corporate policy of reserving all receivables over 90 days.
[Chart omitted]. KPMG discussed the circumstances
surrounding the above individual customer A/R balances
with David Berglund, Controller. KPMG noted the client's
expectation, and relevant authoritative revenue recognition
accounting treatment, if applicable. We have discussed
revenue recognition with Tom Doherty, CFO, for all the
following items. The delays in payment appear to be based
in part on delays in L&H providing implementation
services which calls into question the appropriateness of the
Company's revenue recognition. (emphasis added).

299.    At the same time, Boyer was aware that one of the Company's U.S.

subsidiaries, Globalink, was recording entries in its accounting records at the direction of

L&H management without supporting evidence for such entries. A Globalink Q3

Highlights Memo dated October from David Milligan in KPMG's Northern Virginia

office to Boyer dated October 19, 1998, stated:

We would like to point out that local management has
stated to us that the basis for most of the accounting entries
recorded by the Company were at the direction of L&H
management. As a result, support for such entries is very
limited. (emphasis added).

Milligan further documented that Globalink did not comply with L&H policy on

receivables greater than 90 days old, stating:

Payment terms for the Company's sales are generally 60 to
90 days, and the Company does not get paid until the
distributor gets paid. As of 9/28/98, the majority of the
Company's receivables are substantially greater than 90

121

> days. <u>As a result, the reserve recorded on the sales in the
> two day stub period does not appear consistent with the
> treatment of the accounts receivable on the books at
> 9/28/98 (i.e., all A/R greater than 90 days old is reserved).</u>
> Based on the Company's collection history, it appears
> fairly probable that a majority of the sales currently
> recorded will not be collected within 90 days. Therefore,
> we question whether a larger reserve would be necessary
> on the stub period sales to be consistent with the L&H
> reserve policy applied to the A/R. (emphasis added).

As a result of Milligan's inability to review the accounting entries he concluded:

> From our limited review of the financial statements of
> Globalink, Inc. and taking into account the matters reported
> above, *at this time we are unable to state that* we are not
> aware of any matters which would cause us to believe that
> the financial statements as from September 30, 1998 do not
> represent the financial position of Globalink, Inc. and the
> results of operations for the period then ended, or are in non
> compliance with US GAAP in all material respects.
> (emphasis in original).

### 4.    KPMG's Escalation of Scope of Procedures Performed

300.    Although KPMG generally purported to only perform "review"

procedures on L&H's quarterly financial information, it decided to perform heightened

audit procedures on L&H's financial statements for the second quarter of fiscal year

1999. The occurrence of the audit procedures is also evident from a document entitled

"Group Audit Instructions" which stated:

> The purpose of this memorandum is to:
>
> •    outline the planning and reporting arrangements to
>      KPMG Ghent of the different KPMG offices
>      involved in the audits of Lernout & Hauspie Speech
>      Products and its subsidiaries, (hereafter referred to
>      as 'LHS') for the period ending June 30, 1999 (half
>      year).

In a discussion memorandum attached as "Annex 1" to an agenda for a meeting held on

July 23, 1999, KPMG wrote:

> The following memorandum summarises the US GAAP
> issues that have resulted from the audit procedures
> performed on Lernout & Hauspie Speech Products Ieper
> Branch Q2 Financial Statements. The objective is to
> discuss the issues during our formal closing meeting.

In a Summary of business and audit issues attached as Annex II to the meeting agenda,

KPMG noted the following issues:

### L&H USA group

*Revenue recognition for distributors (L&H Applications)*

- **Accounts receivable balances outstanding from the largest distributors has increased significantly during the six months ended June 1999**

- **Cash collected from the largest distributors represents on average 25% of sales for the six month period, due to significant credits issued, and also slow collections**

- **We understand that payment terms for distributors can be up to 120 days**

- **However, at 30 June 1999 the outstanding receivables appears to represent almost all sales for the six month period, suggesting that payments are taking longer than the agreed upon term**

- **KPMG would like to understand if there is a concern with collectability with distributors, or if there is a concern with revenue recognition.**

The Summary further revealed that KPMG discovered an instance where L&H

management had committed accounting fraud. In particular, the Summary states:

123

*Obsolete Inventory (L&H Applications)*

- **During the 1998 year end audit, KPMG Boston proposed an adjustment to provide for obsolete inventory of USD 444,000. Subsequently, rather than making this adjustment, management reclassified the amount to "accounts receivable other"**

- **According to management, an arrangement has been reached with Iris to exchange this inventory for the most current version**

- **However, in the absence of supporting documentation for this agreement, KPMG Boston propose that the inventory should be written off.** (bold in original)

301.    It is inconceivable how KPMG was not put on a heightened level of professional skepticism upon discovering that its client had completely disregarded its mandate and reclassified the obsolete inventory to another asset account in the hopes of avoiding the write off, which would have negatively impacted earnings for the quarter. This is just another example of KPMG discovering accounting irregularities at L&H and turning a blind eye to the accounting misconduct.

302.    Each of these issues were communicated to Bastiaens and Dammekens by Van Aerde, McLamb and Boyer. In a Private & Confidential letter dated July 26, 1999 written by Van Aerde to Bastiaens, KPMG stated:

> Please find below a summary of the major findings of our review of Lernout & Hauspie for the second quarter review.
>
> These findings are the outcome of our meeting with you and your colleagues on Friday 23 June 1999, and supplemented by further input received from our colleagues, Mr. Bob McLamb and Mr. James Boyer during a conference call in the presence of Mr. Carl Dammekens.

The letter also stated:

> In all instances, we would appreciate the adjustments and further information requested, be resolved prior to the press release for the second quarter (if possible). If it is apparent that the issues described in this letter and its appendices are leading to a mismatch between recognizing revenues and their associated costs in the correct time period, then consideration should be given to the significant adjustments requested. If you do not agree with our point of view, we would like to obtain from you a written representation as to why the adjustments in appendix one should not be booked. (emphasis added).

303.    By stating that KPMG wanted the issues resolved prior to the issuance of the press release "if possible," KPMG further abrogated its responsibilities. Indeed, to the extent L&H was determined to issue the financial results without addressing issues raised by KPMG, it should have considered such actions by L&H management strong indications of problems with management's integrity.

304.    Additionally, KPMG wrote in the July 26, 1999 letter:

> In view of the high outstanding accounts receivables balances for distributors in the US, and the lack of documented history about collectability, there is uncertainty over the valuation of these receivables. Further doubts are raised by the fact that historically the provision for returns has been set at 14% of sales, whereas in recent months the returns have been in excess of this level. Therefore, it is imperative that measures are taken to demonstrate that this revenue is collectable, and was believed to be so, at the time of product shipment.

305.    Thus, KPMG consistently knew about the negative quality of the Company's accounts receivables which necessarily should have cast substantial doubt on the validity of the revenues booked by L&H. Notwithstanding the actual knowledge of serious doubts concerning the legitimacy of L&H revenue recognition practices, KPMG continually signed off on the Company's quarterly financial statements.

306.    By the end of the third quarter of fiscal year 1999, L&H had still refused

to write off the $444,000 inventory identified by KPMG at year-end 1998 as being

obsolete.  In a letter from Van Aerde to Dammekens dated November 17, 1999 (copied to

McLamb), related to "Important decisions and conclusions with respect to Lernout &

Hauspie Speech Products ('LHS') review at September 30, 1999," Van Aerde indicated

that the $444,000 of inventory was still carried on L&H's books, despite numerous

requests that it be written off.  Van Aerde also listed the revenue issues found by Kwon

as matters requiring additional attention.

307.    In a memorandum dated October 20, 1999, Boyer, documented issues

regarding the age of certain accounts receivable.  In particular, Boyer wrote:

> As of September 30, 1999, non distributor accounts
> receivable is approximately $13 million, of which $5.9 is
> either specifically or generally reserved, or deferred,
> leaving $7.1 million unreserved.  The aging at September
> 30, 1999 shows that half of this balance is greater than 90
> days past due.  See Section III below for discussion of
> specific contracts which remain unpaid as of September 30,
> 1999, well beyond the companies' policy of 90 days for the
> purposes of revenue recognition. (emphasis added).

KPMG concluded that based on the slow collections, L&H "should be on a sell through

revenue recognition model."  However, KPMG never actually required that L&H convert

to such a model.  Moreover, KPMG discovered that:

> During review of the sales registers for the current quarter
> KPMG noted several large items over $100,000 which in
> total represented $1 million in revenue recognized during
> the third quarter.  Upon review of these items we noted that
> many of them were actually quotes sent out by L&H sales
> personnel which had been returned signed by the customer.
> Each quote consisted of several elements separately stated
> with corresponding prices, including software, hardware,
> installation, interconnection, and maintenance.  It is the
> client's policy to recognize revenues for these contracts

126

> when they ship hardware and software, and to defer service
> revenues until performed. (emphasis added).

KPMG knew that the sales quotes were not contracts, as required under L&H's revenue

recognition policy and were not "persuasive evidence" that an agreement existed, as

required under GAAP. Thus, KPMG knew of clear violations of L&H accounting policy

with respect to revenue yet utterly failed to require reversal of the revenue and still issued

its unqualified audit opinions concerning L&H's financial statements.

308.    In a letter from Van Aerde to Dammekens dated November 17, 1999,

reporting "Important decisions and conclusions with respect to Lernout & Hauspie

Speech Products ('LHS') review at September 30, 1999," KPMG provided a list of

"Matters to be cleared before KPMG can sign the audit opinion on the December 31,

1999 financial statements." According to this list:

> "all outstanding receivables and the revenues of the fourth
> quarter 1999 must be paid in full before year end."
>
> "The Korean License and distribution agreements must be
> fully paid ($11 million) before year end."
>
> "Revenue contracts must exist at the quarter end, they must
> be signed and also dated together with the signature."

The information contained in the November 17, 1999 letter was communicated to Erwin

Vandendriessche, Chairman of the Audit Committee.

### 5.    Knowledge of Inactive Audit Committee

309.    Further alerting KPMG to the accounting fraud was its knowledge that the

Audit Committee was excessively lax with respect to the issuance of the Company's

quarterly earnings reports and that it was not carrying out its assigned responsibilities.

For example, the Audit Committee met on August 10, 1999, thirteen days _after_ the press

release announcing second quarter 1999 financial results had already been issued. In its

Report to the Audit Committee for the Second Quarter of 1999, KPMG indicated that

"the Audit Committee has requested to be informed as to the results of the quarter before

issuing the press release." (emphasis added).

      310.    KPMG continually noted issues concerning the cash collection from the

LDCs and revenues recognized from Korea (and elsewhere) to the Audit Committee. For

example, in a Private and Confidential letter to Erwin Vandendriessche, the Chairman of

the Audit Committee, dated November 17, 1999, KPMG stated with respect to these

issues:

> All issues have been communicated to the management of
> the Company. We expressed our concern that the effect of
> certain described issues might have an adverse effect on the
> profits of the quarters if they are not resolved. Please be
> advised that KPMG does not consider this limited review to
> be completed until the above mentioned issues have been
> fully resolved. (emphasis added).

However, although KPMG did not consider the review complete, apparently the

Company did. L&H issued the press release announcing the 1999 third quarter financial

results on October 27, 1999, even though KPMG had not yet resolved the serious issues

found in the third quarter financial statements that it identified for the Audit Committee.

L&H's issuance of the financial statements before KPMG's issues were resolved was

further evidence to KPMG concerning the integrity of L&H management and the falsity

of L&H's financial statements.

      311.    Toward the end of 1999, Dammekens requested that KPMG issue a

management letter to the Company in connection with KPMG's audit of the 1998

financial statements. In a Memorandum dated December 6, 1999 regarding "Your

request for the December 31, 1998 Lernout & Hauspie Speech Products nv and

subsidiaries management letter" Stefan Huysman stated:

> Dear Carl,
>
> I refer to our phone conversation of earlier today.
> KPMG has not issues a formal group management letter
> which is separate from the Audit Completion  .
> Memorandum.
>
> As explained to you, the Audit Completion Memorandum
> is a KPMG internal reporting document which is, in
> principal, not distributed to outside parties.
>
> However, in order to accommodate your request, we can
> summarise the main issues from our audit on the December
> 31, 1998 financial statements to be the following:
>
> • Revenue recognition and timely availability of revenue
>   contracts;
> • Cash collection of some receivables;
> • Timely availability of financial statements of some minority
> equity investees;

312.    Thus, the internal control and audit issues identified in 1999, existed

during 1998 as well.

### F.    ADDITIONAL ALLEGATIONS OF SCIENTER

#### 1.    Massive Restatement

313.    The magnitude of the overstatement of L&H's financial statements further

establishes the knowing or reckless conduct on the part of KPMG.  The following chart

depicts the striking difference between revenues as originally reported and as actually

determined in connection with the Audit Committee Investigation:

| | (000s) Reported | (000s) Restated | (000s) $ Difference | % Difference |
|---|---|---|---|---|
| **1998** | | | | |
| Q1 | $ 35,065 | $ 33,065 | $ (2,000) | 6% |
| Q2 | 44,991 | 44,191 | (800) | 2% |
| Q3 | 54,860 | 44,260 | (10,600) | 24% |
| Q4 | 76,676 | 62,176 | (14,500) | 23% |
| YTD | 211,592 | 183,692 | (27,900) | 15% |
| **1999** | | | | |
| Q1 | 70,708 | 46,008 | (24,700) | 54% |
| Q2 | 76,015 | 32,315 | (43,700) | 135% |
| Q3 | 87,473 | 46,773 | (40,700) | 87% |
| Q4 | 110,041 | 44,441 | (65,600) | 148% |
| YTD | 344,237 | 169,537 | (174,700) | 103% |
| **2000** | | | | |
| Q1 | 110,694 | 52,294 | (58,400) | 112% |
| Q2 | 154,906 | 94,206 | (60,700) | 64% |
| YTD | 265,600 | 146,500 | (119,100) | 81% |
| **Total** | $ 821,429 | $ 499,729 | $ (321,700) | 64% |

314.    The Company has not yet revealed details of the revenue restatement on a quarter-by-quarter basis. The chart above is based, in part, on an analysis prepared in connection with the Audit Committee Investigation, adjusted to account for the fact that the Company has recently revealed that all revenues recorded by the Korean subsidiary have been reversed.

315.    In its Form 8-K Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, dated April 27, 2001, filed with the SEC on May 3, 2001, however, the Company revealed:

> . . . the Company has prepared restated financial statements for its revenues for 1998, 1999 and the first two quarters of 2000. As a result of this exercise, of $535 million of revenues reported by the Company (excluding the Company's Mendez translation unit, the acquired Dragon Systems Inc. and subsidiaries business, the US transcription

130

business and certain other less significant subsidiaries) during this period, <u>$373 million have been reversed</u>. A portion of the revenue reversed as a result of the restatement will be recognized in later periods. <u>The revenues reversed included all revenues recorded by the Company's Korean subsidiary during this period, since a substantial portion of such revenues could not be substantiated.</u>

(Emphasis added).

Although the quantification of the misstatement above is not exact, and can only be determined through appropriate discovery, the Company has admitted that more than 65% of Class Period revenues were false and or improperly recorded.

### 2.     Independence Violations

#### a.     Receipt of Substantial Non-Audit Fees

316.    As alleged above, during the Class Period, KPMG served in a "dual role" to L&H; one as auditor and another as a consult to the Company on many different business issues. As a result of its dual role, it stood to earn far more than simply audit fees from L&H. Indeed, audit fees were just a fraction of the compensation it received from L&H.

317.    According to the L&H Proxy Statement for the Annual Meeting and the Extraordinary Meeting of Stockholders to be Held on May 21, 1999, filed with the SEC on Form 6-K on May 24, 1999 (the "1999 Proxy"), the Board of Directors recommended that KPMG Belgium be appointed the Company's "independent statutory auditor" for the three year period ending at the Annual Meeting of Stockholders in 2002. According to the 1999 Proxy, KPMG Belgium's fees for such audits "will amount to BEF 1,500,000 (approximately US$41,600)."

131

318.    The 1999 Proxy, however, did not disclose the extent to which KPMG was retained by L&H to perform non-audit services.  In a letter written to the Board of Directors by Hauspie dated April 25, 2001, he stated "[t]he services of KPMG were systematically hired both nationally and internationally, for auditing the accounts <u>and to consult on a wide range of topics, covering most aspects of LHS</u>." (emphasis added).

319.    For example, KPMG was hired by L&H to perform due diligence for the Company's acquisitions of Bumil, Dictaphone and Dragon Systems, among others.  Also, KPMG was retained to perform valuations for many of the companies acquired by L&H during the Class Period.  In particular, KPMG performed substantial valuation services for Dictation Consortium, Accent and Kurzweil.

320.    In his April 25 letter, Hauspie shed considerable light on the enormous amount of fees paid to KPMG, stating:

> The scope of this collaboration can be illustrated among others by the size of the fees charged to LHS by the KPMG organization.  As an example, I would like to mention that KPMG Bedrijfsrevisoren (Belgium) alone billed LHS an amount of no less than BEF 273,445,389.

Under prevailing exchange rates in August of 2001, 273 million Belgian francs is equal to approximately US$6 million.  Moreover, Lernout revealed that "[o]ther KPMG subsidiaries in various locations in the world billed LHS for fees amounting to more than BEF 130,000,000."  The fees paid to other KPMG offices amounted to approximately US$3 million under prevailing exchange rates.  Thus, although Behets had stated that the audit fees for L&H amounted only to $40,000, KPMG received approximately $9 million in fees as a result of its relationship with L&H, fees which entirely dwarfed its audit fees

and necessarily created a substantial motivated to participate in or otherwise perpetuate the fraud.

### b.    Former KPMG Auditors Given Lucrative Positions

321.    Apart from the massive fees paid to KPMG for non-audit services, certain of the KPMG employees responsible for audit L&H benefited directly from its relationship with the Company in the form of lucrative employment relationships with entities related to L&H.

322.    Indeed, one of the KPMG Belgium auditors responsible for the L&H audits, Chantal Mestdagh, left KPMG Belgium to become the Chief Financial Officer of Lernout & Hauspie Investment Co. ("LHIC"), a company formed by Hauspie and Lernout, in which they own a controlling interest, and which was an entity through which L&H secretly funded its supposedly unaffiliated customers.

323.    Moreover, Behets, the audit partner with chief responsibility for L&H audits from 1991 until July 1999, left KPMG Belgium to become the chief executive officer of defendant S.A.I.L. Trust, a foundation created by Lernout and Hauspie. S.A.I.L. Trust holds a one-third interest in FLV Management, N.V. ("FLV Management"), and has the right to appoint five of its directors. FLV Management is the manager of the FLV Fund. Behets held that position throughout KPMG Belgium's audit of L&H's 1999 financial statements. In addition, KPMG Belgium was the FLV Fund's independent auditor.

### G.    VIOLATIONS OF GAAS

324.    GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), defines the conduct of auditors in performing and

reporting on audit engagements. Statements on Auditing Standards ("SAS") are endorsed by the AICPA as the authoritative promulgation of GAAS.

325.    KPMG consistently represented that it performed its audits in a manner consistent with GAAS. Such representations were materially false, misleading and without a reasonable basis.

326.    KPMG violated GAAS by, inter alia, failing to expand or otherwise properly conduct its audits with respect to revenue recognition, accounts receivable, cash and related party transactions.

327.    Indeed, as alleged herein, KPMG's so-called "audits" amounted to no audit at all, in that it violated that most fundamental requirements of GAAS, which require an auditor to obtain personal knowledge of sufficient, competent evidence supporting the assertions in financial statements permitting reasonable assurance that such financial statements are free from material misstatements:

    (a)    "Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements." AU § 326.02.

    (b)    "The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly." AU § 326.21.

    (c)    Representations from management "are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU § 333.02.

    (d)    "[W]ithout adequate attention to the propriety and accuracy of the underlying accounting data, an opinion on financial statements would not be warranted." AU § 326.16

328.    KPMG knowingly or recklessly failed to qualify, modify or abstain from issuing its materially false and misleading audit opinions on L&H's fiscal 1998 and 1999 financial statements when it knew or recklessly turned a blind eye to the numerous adverse facts and "red flags" set forth below.  KPMG violated at least the following provisions of GAAS:

(a)    General Standard No. 3, which standard requires that due professional care is to be exercised in the performance of the examination and in the preparation of the report.

As detailed above, KPMG failed to exercise due professional care in that it participated in the fraud by permitting L&H to backdate contracts and otherwise permitted the revenue to be recognized in clear violation of GAAP.

(b)    Standard Of Field Work No. 2, which standard requires that a sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of tests to be performed.

As detailed above, KPMG knew that L&H's internal controls were inadequate or nonexistent but improperly placed reliance on such controls and otherwise failed to disclose the glaring internal control weaknesses.

(c)    Standard Of Field Work No. 3, which standard requires that sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under examination.

As detailed above, KPMG consistently relied principally on management's representation for critical audit evidence, failed to ascertain whether product had actually been delivered to customers and improperly ceded to L&H's imposition of scope limitations on its procedures.  KPMG utterly failed to audit L&H's cash balances which were materially overstated by as much as $100 million during the Class Period.  In particular, KPMG failed to perform procedures sufficient to determine whether disclosures

135

were necessary for restrictions on cash as required by
Accounting Research Bulletin No. 43 and FASB No. 5.

(d)    Standard Of Reporting No. 3, which standard requires that
informative disclosures in the financial statements are to be
regarded as reasonably adequate unless otherwise stated in
the report.

As detailed above, KPMG failed to disclose that the
Company consistently recognized material amounts of
revenue in violation of GAAP and failed to disclose that
material amounts of revenue were derived from
transactions with parties related to L&H.

(e)    Standard of Reporting No. 1 which standard requires the
audit report to state whether the financial statements are
presented in accordance with GAAP.

As detailed above, as a result of the Audit Committee
Investigation, KPMG's audit reports are admittedly false
and misleading in that they represented that L&H's 1998
and 1999 financial statements were presented in accordance
with GAAP when they were not for the reasons stated
herein. Indeed, as recently announced by L&H, more than
65% of all Class Period revenues have been reversed and
100% of all Korean revenues have been reversed.

(f)    Standard of Reporting No. 4, which standard requires that,
when a opinion on the financial statements taken as a whole
cannot be expressed, the reasons therefore must be stated.

As detailed above, in light of KPMG's actual knowledge
that L&H's financial statements included material amounts
of false revenues and the scope limitations imposed on it by
L&H, KPMG should have stated that no opinion could be
issued by it on L&H's fiscal 1998 and 1999 financial
statements or issued an adverse opinion stating that those
financial statements were not fairly presented.

(g)    SAS No.19, which standard requires that an auditor not
substitute client representations for audit procedures
necessary to form a reasonable basis as to the opinion being
given on financial statements.

(h)    General Standard No. 2 by failing to remain independent in
fact and in appearance.  The absence of independence

136

> prevented KPMG from possessing the necessary
> professional skepticism regarding the unfounded
> representations of L&H's management.  KPMG's
> independence violations are evident from:  (1) KPMG's
> audits of amounts in the financial statements prepared by it;
> (2) its receipt of substantial non-audit fees for consulting
> and other services; and (3) the acceptance of certain KPMG
> auditors of employment offers at entities related to L&H.

As detailed above, KPMG consistently relied on representations of L&H

management instead of corroborating all significant representations.

329.    KPMG also violated SAS No. 82, *Consideration of Fraud in a Financial*

*Statement Audit*, which required KPMG to "specifically assess the risk of material

misstatement of the financial statements due to fraud and should consider that assessment

in designing the audit procedures to be performed." AU § 316.  KPMG failed to consider

obvious risk factors indicating the existence of fraud, including:

> (a) "an excessive interest by management in maintaining or increasing the
> entity's stock price or earnings trends through the use of unusually
> aggressive accounting practices."  AU § 316.17.
>
> > KPMG Belgium was involved in L&H's 1999 response to
> > an SEC investigation of L&H's methods of accounting for
> > acquisitions, and knew that the SEC had determined that
> > L&H's methods were aggressive and improper.
>
> (b) "significant, unusual or highly complex transactions, especially those
> close to year end, that pose difficult 'substance over form' questions."
> AU § 316.17.
>
> > Nearly every contract discussed in the Audit Committee
> > Report is dated within three days of the end of a fiscal
> > quarter, and ten agreements are dated within the last three
> > days of December 1998 or December 1999.
>
> (c) "unusually rapid growth or profitability, especially compared with that
> of other companies in the same industry."  AU § 316.17,

KPMG Belgium knew from L&H's financial statements that L&H claimed revenue increases of 112% in 1998 and 63% in 1999. The following chart depicts the explosive growth purportedly experienced by L&H during the Class Period:

| Revenues by destination: ($000's) | 1997 | 1998 | 1999 | 2000    Q1 | 2000    Q2 |
|---|---|---|---|---|---|
| US | 26,524 | 79,695 | 79,286 | 19,939 | 48,909 |
| Belgium | 40,375 | 58,930 | 34,343 | 9,178 | 8,562 |
| Europe, other | 25,709 | 63,315 | 79,079 | 19,748 | 27,342 |
| Singapore | 0 | 29 | 80,297 | 501 | 890 |
| Korea | 1,645 | 245 | 62,874 | 58,932 | 68,059 |
| Far East, other | 5,118 | 9,378 | 8,358 | 2,396 | 1,144 |
| Total Revenue | $99,371 | $211,592 | $344,237 | $110,694 | $154,906 |

330.    GAAS, as set forth in AICPA Professional Standards Volume 1, U.S. Auditing Standards - June 1, 1997, ("AU"), in section AU 411, describes "The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles in the Auditor's Report." Section AU 411 states in pertinent part:

> The auditor's opinion that financial statements present fairly an entity's financial position, results of operations, and cash flows in conformity with generally accepted accounting principles should be based on his judgement as to whether (a) the accounting principles selected and applied have general acceptance; (b) the accounting principles are appropriate in the circumstances; (c) the financial statements, including the related notes, are informative of matters that may affect their use, understanding, and interpretation . . .; (d) the information presented in the financial statements is classified and summarized in a reasonable manner, that is, neither too detailed nor too condensed . . .; and (e) the financial statements reflect the underlying events and transactions in a manner that presents the financial position, results of operations, and cash flows within a range of acceptable limits, that is, limits that are reasonable and practicable to attain in financial statements.

331.    Had KPMG undertaken the performance of those audit procedures required by GAAS, it would have known that the fiscal 1998 and 1999 financial

138

statements were materially false and misleading because these financial statements were: (1) not presented in accordance with GAAP; (2) that the accounting principles applied did not have general acceptance; (3) the accounting principles were not appropriate under the circumstances; and (4) the financial statements did not accurately reflect the underlying events and transactions within any acceptable limit.

332. Throughout the Class Period, KPMG knew that the Company was in violation of SEC rules which (i) required L&H to devise and maintain a system of internal accounting controls sufficient to reasonably assure, among other things, that its transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP, and (ii) required it to make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflected all of the transactions of the Company.

333. Given the fact that KPMG audited the Company's financial statements for approximately ten years and had a thorough knowledge of the Company's financial history, accounting practices, internal controls, and business operations, KPMG either failed to:

      a.      identify areas that needed special consideration or identified such areas and audited them in a manner that was so deficient it amounted to no audit at all;

      b.      assess the conditions under which accounting data was produced, processed, reviewed, and accumulated within the organization;

      c.      evaluate the reasonableness of management's representations and the Company's estimates or evaluated them in a manner which was so deficient that it amounted to no evaluation at all; or

139

d.    judge the appropriateness of the accounting principles applied and the adequacy of disclosures in the Company's financial statements. In this regard, KPMG failed to "recognize that management's selection and application of significant accounting policies, particularly those related to revenue recognition . . . may be misused." (AU 316A.19)

334.    GAAS (AU 325.21) states that reportable conditions involve matters that relate to:

significant deficiencies in design or operation of the internal control structure that could adversely affect the organization's ability to record, process, summarize, and report financial data consistent with the assertions of management in the financial statements.

Reportable conditions must be reported by the auditor to the audit committee or to individuals with a level of authority and responsibility within a company equivalent to an audit committee, such as the board of directors.

335.    Further, GAAS lists the following deficiencies, certain of which were present at the Company during fiscal years 1996 through 1999, among "examples of matters that may be reportable conditions":

Deficiencies In Internal Structure Design

- Inadequate overall internal control structure design.

  KPMG consistently documented that L&H had inadequate internal controls and needed an internal audit function. KPMG was aware throughout the Class Period that L&H did not improve controls or put an internal audit function in place.

140

- Absence of appropriate reviews and approvals of transactions, accounting entries, or systems output.

  KPMG was aware that the Audit Committee of L&H's Board of Directors was not fulfilling its duties in that the quarterly financial statements were issued without the Audit Committee's approval and that L&H management otherwise issued financial results without first resolving the accounting issues relating to quarterly financial reports raised by KPMG.

- Inadequate procedures for appropriately assessing and applying accounting principles.

  KPMG was consistently aware that L&H personnel were not able to record transactions in accordance with GAAP or were otherwise unqualified to execute the duties required of the accounting department of a publicly traded company.

## Failures In The Operation Of Internal Control

- Evidence of intentional override of the internal control structure by those in authority to the detriment of the overall control objectives of the system.

- Evidence of willful wrongdoing by employees or management.

- Evidence of manipulation, falsification, or alteration of accounting records or supporting documents.

- Evidence of intentional misapplication of accounting principles.

- Evidence of misrepresentation by client personnel to the auditor.

141

KPMG was aware that L&H falsely classified obsolete inventory as accounts receivable to avoid writing off such inventory as required by KPMG. KPMG was aware of, and participated in, the backdating of contracts that created the appearance that material amounts of revenue recognition was appropriate when such recognition clearly violated GAAP. KPMG was also aware of many instances where L&H intentionally violated its own stated accounting policies.

- Evidence that employees or management lack the qualifications and training to fulfill their assigned functions.

KPMG knew that L&H's CFO was woefully unqualified to carry out his assigned responsibilities.

336. GAAS (AU 325.15) states that "material weaknesses in internal control" is defined as:

a reportable condition in which the design or operation of one or more of the internal control structure elements does not reduce to a relatively low level the risk that errors or irregularities in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions.

337. During its audits, KPMG either recklessly failed to identify obvious reportable conditions or material weaknesses in internal control (i.e., failure of controls to prevent or detect misstatements of accounting information), or identified and intentionally ignored the existence of such conditions in violation of GAAS. All such material weaknesses should have been disclosed to investors by KPMG and/or L&H during the Class Period.

1.    **KPMG Failed to Consider Fraud**

338.    KPMG disregarded facts indicating heightened risk of fraud such as

"significant pressure to obtain additional capital necessary to stay competitive, including

the need for funds to finance major research and development expenditures." AU §

316.17.

(a)    Lernout was quoted in December 1999 describing the Dictation
Consortium and BTG transactions as impelled by L&H's research
and development needs. "If we didn't catch up [with competitors]
we were cooked. But we couldn't catch up because we didn't have
enough R&D dollars." KPMG was aware of all aspects of the
Dictation Consortium and BTG transactions, having "carefully
reviewed them at the time," according to the Audit Committee
Report. Moreover, KPMG Belgium audited the FLV Fund, and
thus saw both sides of at least the Dictation Consortium
transaction.

(b)    KPMG knew that L&H faced significant limitations on its ability
to fund research and development in-house.

339.    KPMG disregarded facts indicating heightened risk of fraud categorized in

GAAS as "significant related party transaction not in the ordinary course of business or

with related entities not audited or audited by another firm." AU § 316.17. These

include the following:

(a)    KPMG knew that in January, 2000, before it rendered an
unqualified opinion on L&H's 1999 financial statements,
the SEC had commenced an investigation into L&H's
methods of accounting for revenue from thirty L&H
customers that the SEC suspected were related parties.

(b)    KPMG Belgium was auditor for the FLV Fund, a related
party whose ownership of at lease eight of the entities was
the subject of the SEC inquiry and funding of four others
were not disclosed and required accounting treatment
materially different that that applied by L&H. KPMG
Belgium thus saw both sides of many of the fraudulent
transactions.

143

(c)    L&H's financial statements contain a long list of "related parties" with little or no explanation of L&H's dealings with those parties.

## 2.    Related Party Transactions

340.    KPMG failed to consider the risk factor particular to related party transactions stated AU § 334, Related Party Transactions, "large, unusual, or nonrecurring transactions or balances, ... particular[ly] . . . transaction recognized at or near the end of the reporting period." The Audit Committee Report reveals that more than half of the revenue from related party transactions in 1998 and 1999 - $13 million in 1998 and $21 million in 1999 – was recognized in the fourth quarters of those years.

341.    KPMG failed to take the steps prescribed in AU 334 "to identify related party relationships and transactions and to satisfy [themselves] concerning the required financial statement accounting and disclosure." AU § 334.01. To identify material transactions with related parties, the auditor should, among other things:

(a)    "review filings by the reporting entity with the Securities and Exchange Commission and other regulatory agencies for the names of related parties and for other businesses in which officers and directors occupy directorship or management positions."

KPMG could have learned that the CEO of Language Investment Co., the parent of four of the Belgian start-ups, was Willem Hardeman, an FLV Fund director and that an additional sixteen companies were owned by Mercator. Mercator's chairman, Louis Verbeke, was a name partner in L&H's outside law firm. Verbeke and the insurance company also separately owned stakes in L&H. A review of L&H's SEC filings, if it were necessary, would also have revealed two significant related parties were the subsequent employers of former KPMG Belgium auditors with responsibility for L&H audits.

(b)    "review proxy and other material filed with the Securities and Exchange Commission and comparable data filed with other regulatory agencies for information about material transactions with related parties." AU § 334.08(c).

The Wall Street Journal was easily able to determine from
"regulatory filings" that the FLV Fund owned 49% stakes in eight
of the Singapore start-ups, and gave cash to four others "which
they used to pay their bills to L&H." KPMG Belgium, which, as
auditor of the FLV Fund, had access to both sides of the fraudulent
transactions, either failed to perform these basic procedures, or
turned a blind eye to their results.

(c)    "[r]eview the extend and nature of business transacted with major
customers, suppliers, borrowers and lenders for indications of
previously undisclosed relationships." AU § 334.08 (e).

As auditor of the FLV Fund, KPMG Belgium had unique access to
both sides of L&H's transactions with major customers who were
undisclosed related parties.

342.    KPMG was reckless in relying on management assertions about transactions with

related parties. "The risk associated with management's assertions about related party

transactions is often assessed as higher than for many other types of transactions because of the

possibility that the parties to the transaction are motivated by reasons other than those that exist

for most business transactions." AU § 334.18. Because L&H refused to permit KPMG to meet

with the investors in the LDCs and CLDCs, KPMG should have considered this a "denial of

access to information" that "constitute[d] a limitation on the scope of the audit that ... require[d]

the auditor to consider qualifying or disclaiming an opinion on the financial statements" as set

forth in AU § 508, Reports on Financial Statements. AU § 316.25 footnote 11.

343.    KPMG failed to consider an AICPA Audit Risk Alert emphasizing that:

Some of the more common audit issues identified in recent
litigation related to fraudulent financial reporting included:

A willingness by the auditor to accept management's
representations without corroboration.

Allowing the client to unduly influence the scope of
auditing procedures.

> The failure to identify risky situations, or ignoring audit
> risks by not applying professional skepticism and revising
> auditing procedures appropriately.

AICPA Audit Risk Alert – 1999/2000 at 28.

344.    KPMG ignored AICPA Practice Risk Alert 95-3, which stated that "it is

incumbent upon the auditor to assess the propriety of the accounting for material related-party

transactions in accordance with their substance" and warned that, "[i]n the hands of the

unscrupulous, an undisclosed related party is a powerful tool.  Using controlled entities, principal

shareholders or management can execute transactions that improperly inflate earnings by

masking their economic substance or distort reported results through lack of disclosure, or can

even defraud the company by transferring funds to a conduit related party and ultimately to

perpetrators."  The Practice Risk Alert, at 2, warns auditors to look for "events that may indicate

transactions with undisclosed related parties," including: "sales without substance, including

funding the other party to the transaction so that the sales price is fully remitted," "sales with a

commitment to repurchase that, if known, would preclude recognition of all or part of the

revenue," "loans to parties that do not possess the ability to repay," and "payments for services

never rendered or at inflated prices."

345.    Had KPMG performed the procedures required by AU § 334, it would have

discovered, as The Wall Street Journal easily did, of the fifteen firms that together paid L&H $57

million in 1999, or nearly 17% of its revenue, "there isn't any evidence of operation of the

fifteen L&H customers" and they each operate from offices at the same address.  The fact that

fifteen of L&H's customers had the same address in a country where revenues increased by more

than 2,000% in one year was a major "red flag" for KPMG.  Notwithstanding this substantial red

146

flag, KPMG failed to perform any appropriate investigation, or tuned a blind eye to the results of their investigation.

### 3.    Improper Recognition of License Revenues

346.    KPMG failed to follow procedures sufficient to provide reasonable assurance that L&H recognized revenue properly in accordance with Statement of Position 97-2. KPMG knew and disregarded the risk of material misstatement presented by the fact that material amounts of revenue were recognized at the end of each fiscal quarter. Indeed, almost all of the contracts discussed in the Audit Committee Report are dated just a few days before the end of the quarter, and ten agreements giving rise to a total of more than $27 million in revenue are dated within the last three days of December 1998 or December 1999. Unusual, complex or significant transactions which are recorded at or near the end of a financial reporting period is a "red flag" specifically described in the AICPA Audit Risk Alert – 1999/2000 at 38: "Auditors should be alert for significant unusual or complex transactions, especially those that occur at or near the end of a reporting period, along with a variety of other circumstances that may raise concerns about improper revenue recognition." Notwithstanding these red flags, KPMG knowingly or reckless failed to modify its audit procedures accordingly and turned a blind eye to the fraud.

### 4.    Inadequate Confirmation

347.    Auditors employ a number of procedures to determine whether revenue is properly recognized during the period under audit. The most important procedure is to request customers of the company under audit to confirm in writing key terms of revenue-generating agreements, amounts outstanding, and whether goods shipped have

been delivered.  In short, confirmations are utilized to ensure a company's financial statements are presented in accordance with GAAP.  According to Statement on Auditing Standards No. 67, the use of confirmations is a generally accepted auditing procedure and must be used unless:  (1) accounts receivable are immaterial; (2) the auditor is aware from past experience that they will not be returned by customers; or (3) when the audit assess the risk of misstatement as low.

348.    KPMG was required to confirm L&H's accounts receivable because such amounts were material, KPMG was not aware from past experience that they would not be returned and KPMG had assessed the risk of misstatement in L&H's revenues and receivables as high.

349.    While requests for confirmations are generally drafted on a company's own letterhead to facilitate a customer's response, in order to be of value to an independent auditor, the requests must be sent out by the auditor, and the customer must reply directly to the auditor.  Absent the auditor's control over the process, the integrity of this audit procedure is circumvented.  In other words, it is as if the procedure was not performed at all.

350.    Shortly after the end of fiscal year 1999, L&H prepared letters seeking confirmation of the following items:

a.  That the customer had sufficient financial means and was financially viable to enter into their recent license agreements;

b.  That amounts owed under such agreements were non-refundable;

c.  That no other arrangements, contracts, agreements or conditions were imposed on or dependent on the customer to enter in the agreement;

d. That L&H Korea was under no other obligation to perform, except as stated in the license agreement;

e. That the customer received all deliverables needed and specified under the contract;

f. That the customer accepts all such deliverables;

g. The date that the deliverables were delivered to the customer.

351.    While the customers' responses would ordinarily be useful in an audit, L&H took complete control over this confirmation process, thus defeating any benefit or assurance provided by the customer's response. Specifically, the Company prepared its customers' response in the affirmative, leaving to be completed only the date of delivery (although December and 1999 were already provided) and a line for the customers' signatures. Further, the letterhead directed the customers' reply to the attention of Philip Depacker of L&H's Legal Department.

352.    The Company's recording of revenue and then its control over the confirmation process on the license agreements that purportedly generated the revenue, served as a scope limitation to the KPMG. Further, L&H prepared affirmative responses, such as the amount under agreement being non-refundable, served to insert terms not included in the license agreement itself. As such, the Company's prepared responses and control over the confirmation process sought to give the appearance that it had satisfied revenue recognition requirements under GAAP when in fact they had not. The following are examples of confirmations that were returned directly to the Company:

a. On January 11, 2000, a Mr. Park from Neo Information System faxed directly to Bastiaens his company's response to the Company's request. The attached response was signed by the customer and "31" was added to "December ____ 1999." No other modifications were made to L&H's prepared response.

b. The Company also received a confirmation directly from a H.Y. Son, President of EPC Corp. The response was dated as of January 9, 2000, the date which was selected by the Company. The response was signed by Mr. Son and "31" was added to "December ___ 1999." Similarly, no other modifications were made to L&H's prepared response

c. On January 10, 2000, Jung Jin Cho and An Hee Choi from Zen Entertainment faxed directly to Bastiaens Digital Sei-Young Co., Ltd.'s response to the Company's request. The attached response included the customer's signature, but no additional information or modifications were added to the response, not even the date that the deliverables were delivered. Thus, not only was the confirmation inappropriately sent back to the Company, it was not even complete.

KPMG's failure to properly execute the confirmation process constituted a knowing violation of GAAS.

## H.    GAAP/COMPANY POLICY/SEC REGULATIONS VIOLATIONS

353.    Despite the fact that L&H's financial statements included hundreds of millions of dollars in false or otherwise improper revenues and ultimately required massive restatement, at all relevant times during the Class Period, KPMG and the Company falsely represented that L&H's financial statements were fairly presented in accordance with GAAP.

354.    The SEC requires that publicly-traded companies present their financial statements in accordance with GAAP. 17 C.F.R. § 210.4-01(a)(1). GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to defined accepted accounting practice at a particular time.

355.    Financial statements filed with the SEC which are not prepared in accordance with GAAP "will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided." 17 C.F.R. § 210.4-01(a)(1).

150

356.    As set forth in Financial Accounting Standards Board ("FASB")
Statement of Concepts No. 1, one of the fundamental objectives of financial reporting is
that it provide accurate and reliable information concerning an entity's financial
performance during the period being presented.  Concepts Statement No. 1, ¶ 42, states:

> Financial reporting should provide information about an
> enterprises financial performance during a period.
> Investors and creditors often use information about the past
> to help in assessing the prospects of an enterprise.  Thus,
> although investment and credit decisions reflect investors'
> and creditors' expectations about future enterprise
> performance, those expectations are commonly based at
> least partly on evaluations of enterprise performance.

357.    The representations by KPMG and the Company that L&H's financial
statements were prepared in accordance with GAAP were materially false and misleading
because L&H:  (1) engaged in fraudulent revenue recognition practices, thereby
materially overstating reported revenues and accounts receivable; (2) improperly
recorded revenue from, and failed to disclose, barter transactions; (3) failed to disclose
the existence of material related party transactions; (4) failed to disclose material
restrictions on cash balances reported as assets of the Company; (5) failed to write off
obsolete inventory; and (6) failed to fully disclose the significant risks and uncertainties
caused by the Company's lack of internal controls.  Each of these accounting practices,
misrepresentations and omissions, standing alone, was a material breach of GAAP,
Company policy, and/or SEC regulations.  In the aggregate, they amounted to a complete
distortion of L&H's actual financial performance — a distortion that KPMG knowingly or
recklessly perpetuated throughout the Class Period.

151

### 1. Improper Revenue Recognition and Valuation of Accounts Receivable

358.    The realization principle requires that revenue be earned before it is recognized. Under GAAP, revenue is recognized when the earnings process is complete and an exchange has taken place (Statement of Financial Accounting Concepts ("FAC") No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, ¶¶ 83, 84). The earnings process is not complete until collection of the sales price is reasonably assured. Id. The conditions for revenue recognition under GAAP ordinarily are met when products and services are exchanged for cash or claims to cash, and the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue. Generally, a transfer of risk must occur in order to effect an "exchange" for purposes of revenue recognition under GAAP.

359.    In 1997, the Accounting Standards Executive Committee of the American Institute of Certified Public Accountants issued Statement of Position 97-2, Software Revenue Recognition ("SOP 97-2"). SOP 97-2 represents the standard on when revenue should be recognized for software transactions entered into in fiscal years beginning after December 15, 1997. SOP 97-2 states, in pertinent part:

> Revenue should be recognized when all of the following criteria are met:
>
> - Persuasive evidence of an arrangement exists.
> - Delivery has occurred
> - The vendor's fee is fixed or determinable.
> - Collectibility is probable.

360.    L&H's Annual Report on Form 20-F for the fiscal year ended December 31, 1998 and Annual Report on Form 10-K for the fiscal year ended December 31, 1999 represented that:

The Company recognizes revenue from the sale of its software licenses upon satisfaction of all of the following criteria: signing of the license agreement, shipment of the products, when no contractual terms remain unsatisfied and, if applicable, when a royalty report is received from the customer. The Company generally receives, on a quarterly basis, royalty reports from each customer who has signed a license contract. The reports detail the number of units or products that the customer shipped during that period. The number of units multiplied by the applicable contractual rate per unit is the amount that the Company records as revenue. Before recording this revenue, the Company determines that all significant obligations have been satisfied and that collection of the receivable is probable. Generally, invoices under these arrangements are payable within 90 days. Under certain contracts the Company allows distributors to return products subject to their replacement by the same amount of merchandise for stock balancing purposes. Certain returns are allowed through distributors selling to the retail consumer markets, by their end users. With respect to each distributor of the Company with return privileges, the Company's price to the distributor is fixed at the date of sale, the distributor is obligated to pay the Company within 90 days, the payment obligation is not contingent on resale of the product, title has passed to the distributor, the distributor has economic substance, the Company does not have significant obligations for future performance, and the amount of returns can be reasonably estimated. End user returns are monitored monthly and a historic return rate is determined and applied as a reserve against revenues derived from end users at the time of revenue recognition.

The Company from time to time enters into nonrefundable minimum royalty agreements with customers. Under these arrangements the Company delivers its technologies or products to the customer contemporaneously with the execution of the agreement. Revenue from nonrefundable minimum royalty agreements is recognized upon satisfaction of all of the following criteria: signing of the license agreement; no additional significant production, modification or customization of the software is required; delivery has occurred; the fee is fixed and determinable and; collection is probable. For arrangements that

include multiple elements, the fee is allocated to the various elements based on vendor specific objective evidence of fair value.

Revenues from engineering fees and maintenance and support services are recognized as the services are performed.

Revenue derived from translation services is recognized as the work is performed.

Revenues related to software development contracts is recognized based on the percentage of completion method.

In all such cases, the Company only recognizes revenue when collection of the related receivable is probable.

361.    FASB's Statement of Financial Accounting Standards ("SFAS") No. 48 requires that where the right of return is granted to customers, either implicitly or explicitly, revenue should be deferred unless certain conditions exist, including:

a.    the buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product;

b.    the seller does not have significant obligations for future performance to directly bring about resale of the product to the buyer; and

c.    the amount of future returns can be reasonably estimated.

Even where the above conditions of SFAS No. 48 are met, an entity is required to accrue adequately and timely reserves for returns and allowances for bad debts.  SFAS No. 5, Accounting for Contingencies, ¶¶22-23.

362.    As detailed herein, the Company improperly recorded hundreds of millions of dollars of revenue because:

154

    a.   revenue recorded by L&H was not supported by

        "persuasive evidence" that an agreement existed;

    b.   delivery of software had, in many instances, not

        occurred;

    c.   L&H's fees for software sold were not fixed because

        customers could return product; and

    d.   collectibility was not probable; and

    e.   contract terms were not yet fixed.

363.    As noted above, L&H granted certain of its customers undisclosed "side letters" permitting customers to return product which had previously been recorded as final and complete sales. The existence of such side letters dictated that the earnings process was not complete with respect to such transactions and, therefore, revenue recognition was not permitted under GAAP.

364.    The Company's revenue recognition practices also violated its own stated revenue recognition policy.

365.    The recording of revenues in violation of GAAP necessarily renders the related accounts receivable also inflated in violation of GAAP. Accounting Research Bulletin No. 43 and SFAS No. 5, Accounting for Contingencies require that entities report accounts receivable at "net realizable value."

366.    SFAS No. 5 "Accounting for Contingencies" requires that an estimated loss from a loss contingency shall be recognized by a charge to income if both of the following conditions are met:

    a.   Information available prior to issuance of the
        financial statements indicated that it is probable that

an asset had been impaired or a liability had been
incurred at the date of the financial statements; and

b.    The amount of the loss can be reasonably estimated.

367.    Under SFAS No. 5 ¶ 3a "probable" means that the "future event or events
are likely to occur."

368.    By recording false or otherwise improper transactions as <u>bona fide</u> sales,
L&H materially overstated its reported accounts receivable during the Class Period.
Moreover, as detailed herein, many customers were not paying for software sold by L&H
and it was more than probable that such customers would not pay amounts owed.  As a
result, L&H was required to recognize the occurrence of such non-payment by
consistently writing down the value of its accounts receivable each quarter, which it
failed to do.

369.    The Company also violated GAAP in that it recorded as revenue certain
so-called "barter transactions" which are essentially nothing more than a "swap" of
L&H's product or service for that of another company.  According to Accounting
Principles Board Opinion ("APB") No. 29, Accounting for Non-Monetary Transactions,
"an exchange of product or property held for sale in the ordinary course of business for a
product or property to be sold in the same line of business to facilitate sales to customers
other than the parties to the exchange" does not culminate in an earnings process.

370.    As alleged herein, in several transactions in 1998 and 1999, L&H
exchanged products or services with other companies and recognized material amounts of
revenue in violation of APB No. 29.

## 2.    Related Party Transactions

371.    Article 4 of Regulation S-X and GAAP, in FASB's SFAS No. 57, required

L&H to disclose in its financial statements during the Class Period relevant information

regarding related parties and related party transactions. Nonetheless, in violation of these

required rules and procedures, L&H's financial statements failed to disclose all such

parties and transactions.

372.    Article 1 of Regulation S-X refers to the term "related parties" as defined

in SFAS 57. SFAS 57 defines "related parties" as follows:

> Related parties. Affiliates of the enterprise; entities for
> which investments are accounted for by the equity method
> by the enterprise; trusts for the benefit of employees, such
> as pension and profit sharing trusts that are managed by or
> under the trusteeship of management; principal owners of
> the enterprise; its management; members of the immediate
> families of principal owners of the enterprise and its
> management; and other parties with which the enterprise
> may deal if one party controls or can significantly influence
> the management or operating policies of the other to an
> extent that one of the transaction parties might be prevented
> from fully pursuing its own separate interest. Another party
> also is a related party if it can significantly influence the
> management operating policies of the transacting parties or
> if it has an ownership interest in one of the transacting
> parties and can significantly influence the other to an extent
> that one or more of the transacting parties might be
> prevented from fully pursuing its own separate interests.
> SFAS 57 ¶24.

373. SFAS 57 requires financial statements to include disclosures of material

related party transactions, other than compensation arrangements, expense allowances,

and other similar items in the ordinary course of business. (¶2) Specifically, these

disclosures shall include:

a.  The nature of the relationship(s) involved;

157

b.  A description of the transactions, including transactions to

which no amounts or nominal amounts were ascribed, for each

of the periods for which income statements are presented, and

such other information deemed necessary to an understanding

of the effects of the transactions of the financial statements;

c.  The dollar amounts of transactions for each of the periods for

which income statements are presented and the effects of any

change in the method of establishing the terms from that used

in the preceding period; and

d.  Amounts due from or to related parties as of the date of each

balance sheet presented and, if not otherwise apparent the

terms and manner of settlement. SFAS 57 ¶2.

374.  SFAS 57 addresses why related party disclosures are relevant, specifically:

> Relationships between parties may enable one of the parties
> to exercise a degree of influence over the other such that
> the influenced party may be favored or caused to
> subordinate its independent interests.  Related party
> transactions may be controlled entirely by one of the parties
> so that those transactions may be affected significantly by
> considerations other than those in arm's length transactions
> with unrelated parties. Some related party transactions may
> be the result of the related party relationship and without
> the relationship may not have occurred or may have
> occurred on different terms.  SFAS 57 ¶13.

Likewise, SFAS 57 illustrates the necessity of related party disclosures, and in absence of

such disclosures, states that the reliability of financial information is weakened:

> Without disclosure to the contrary, there is a general
> presumption that transactions reflected in financial
> statements have been consummated on an arm's-length
> basis between independent parties.  However, that

presumption is not justified when related party transactions exist because the requisite conditions of competitive, free-market dealings may not exist. Because it is possible for related party transactions to be arranged to obtain certain results desired by the related parties, the resulting accounting measures may not represent what they usually would be expected to represent. Reduced representational faithfulness and verifiability of amounts used to measure transactions with related parties weaken the reliability of those amounts. That weakness cannot always be cured by reference to market measures because in many cases there may be no arm's-length market in the goods and services that are the subject of the related party transactions. SFAS 57 ¶15.

375.    As alleged herein, during the Class Period, L&H recorded as revenue many transactions with parties related to L&H without disclosing the nature of the relationships and a description of the transactions. Such disclosures would have informed investors regarding the improper transactions and would have influenced investors significantly in making investment decisions regarding L&H, which was unable to record significant sales absent such related party relationships.

### 3.    Restrictions on Cash Balances

376.    Accounting Research Bulletin No. 43 Ch. 3A ¶ 6 and SFAS No. 5 ¶ 18 require separate disclose of any restrictions placed on the use of cash.

377.    As alleged herein, L&H had significant amounts of cash held under restriction by certain Korean banks during the Class Period. The existence of such restrictions precluded L&H from using this cash for operations. This failure to disclose caused the investing public to believe that all cash received and held by L&H was in the ordinary course of business and fully available to fund the Company's operations.

### 4.    Overstatement of Inventory

378.    GAAP, as stated in Accounting Research Bulletin No. 43, Chapter 4, ¶ ¶

7-8, provides that:

> Where there is evidence that the utility of goods, in their
> disposal in the ordinary course of business, will be less than
> cost, whether due to physical deterioration, obsolescence,
> changes in price levels, or other causes, the difference
> should be recognized as a loss of the current period.  This is
> generally accomplished by stating such goods at a lower
> level commonly designated as market.

379.    By failing to require timely write down of the value of L&H's inventory,

KPMG and the Company knew or recklessly disregarded that L&H's financial statements

violated the dictates of GAAP and, consequently, materially overstated, inter alia, its total

assets, net income, and earnings per share.  Moreover, KPMG and the Company knew or

recklessly disregarded that L&H also violated, and thereby misrepresented, its stated

policy of accounting for its inventory at the lower of cost or market as disclosed in its

1998 and 1999 audited financial statements.

### 5.    Internal Control Weaknesses

380.    Article 11 of Regulation S-X and GAAP, in FASB's SFAS No. 5, required

L&H to disclose in the footnotes of its financial statements during the Class Period that

the aforementioned internal control weaknesses could reasonably cause the Company's

financial statements to be materially misstated.  Nonetheless, in violation of GAAP,

L&H's financial statements failed to disclose that such internal control weaknesses were

reasonably likely to have a material adverse effect on L&H's operating results.

381.    In addition, Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's

Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"),

require the issuer to furnish information required by Item 303 of Regulation S-K [17

C.F.R. 229.303]. In discussing results of operations, Item 303 of Regulation S-K requires

the registrant to:

> Describe any known trends or uncertainties that have had
> or that the registrant reasonably expects will have a
> material favorable or unfavorable impact on net sales or
> revenues or income from continuing operations.

The Instructions to Paragraph 303(a) further state:

> The discussion and analysis shall focus specifically on
> material events and uncertainties known to management
> that would cause reported financial information not to be
> necessarily indicative of future operating results.

382. In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-

26831, has indicated that registrants should employ the following two-step analysis in

determining when a known trend or uncertainty is required to be included in the MD&A

disclosure pursuant to Item 303 of Regulation S-K:

> A disclosure duty exists where a trend, demand,
> commitment, event or uncertainty is both presently known
> to management and is reasonably likely to have a material
> effect on the Registrant's results of operations.

383. KPMG and the Company knew or recklessly disregarded that Item 303 of

Regulation S-K required L&H to disclose that the weaknesses in (or absence of) its

internal control system were reasonably likely to have a material adverse effect on L&H's

operating results. Nonetheless, L&H's Form 10-Ks, Form 6-Ks and Form 10-Qs issued

during the Class Period failed to disclose such information, which was necessary for a

proper understanding and evaluation of the Company's operating performance and an

informed investment decision.

**6.**    <u>Additional Violations of GAAP</u>

384.    In addition to the accounting violations noted above, KPMG permitted

L&H to present its financial statements in a manner which also violated at least the

following provisions of GAAP:

A.    The concept that financial reporting should provide information

that is useful to present and potential investors and creditors and other users in making

rational investment, credit and similar decisions (Concepts Statement No. 1, ¶ 34);

B.    The concept that financial reporting should provide information

about the economic resources of an enterprise, the claims to those resources, and the

effects of transactions, events and circumstances that change resources and claims to

those resources (Concepts Statement No. 1, ¶ 40);

C.    The concept that financial reporting should provide information

about how management of an enterprise has discharged its stewardship responsibility to

owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent

that management offers securities of the enterprise to the public, it voluntarily accepts

wider responsibilities for accountability to prospective investors and to the public in

general (Concepts Statement No. 1, ¶ 50);

D.    The concept that financial reporting should provide information

about an enterprise's financial performance during a period.  Investors and creditors often

use information about the past to help in assessing the prospects of an enterprise.  Thus,

although investment and credit decisions reflect investors' expectations about future

enterprise performance, those expectations are commonly based at least partly on

evaluations of past enterprise performance (Concepts  Statement No. 1, ¶ 42);

162