E.    The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

F.    The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79);

G.    The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97).

385.    GAAP provides that previously issued financial statements which are misstated as a result of an oversight or a misuse of facts that existed at the time are to be retroactively restated. See, e.g., APB Opinion No. 20, APB Opinion No. 9 and the AICPA's Statement on Auditing Standards No. 53.

386.    L&H has now admitted that its financial statements for, at least fiscal years 1999 and 1999 and the first two quarters of fiscal year 2000 were materially false and misleading due to a misuse of facts that existed during such years.

## VIII.  THE DIRECTOR DEFENDANTS AND THE AUDIT COMMITTEES' KNOWLEDGE OF L&H'S SERIOUS ACCOUNTING PROBLEMS

### A.    THE AUDIT COMMITTEE DEFENDANTS' ROLE

387.    During the Class Period, L&H's audit committee consisted of defendants Cauwelier, DePauw, and Vandendriessche. Vandendriessche was defendant RVD's Securities designees on the board and served as Chairman of the Audit Committee.

388.    Prior to and during the Class Period, members of the Audit Committee met with defendant Paul Behets, and other auditors from KPMG, to discussed revenue recognition policies and accounts receivable at L&H.  On several occasions, the Audit Committee, KPMG and the entire Board discussed the serious need for internal controls at L&H and that in the Company's internal audit function had to be strengthened.  As early as May 1998, KPMG informed the Audit Committee that "the internal audit and internal control functions of the Company [needed to] be strengthened."  KPMG also recommended that, "with the increasing complexity of the Company, there was a need for improved reporting for the purpose of consolidation."  The Audit Committee, in turn, conveyed these warnings to the entire Board of Directors.  Nevertheless, throughout the Class Period no actions were taken to strengthen the Company's weak internal accounting controls.

389.    Also at the May 4, 1998 Board meeting, Vandendriessche reported that the Audit Committee met with Behets and Dammekens, and that KPMG "recommended that the internal audit and internal control functions of the Company be strengthened," noting "a need for improved reporting for the purpose of consolidation."

390.    At the August 30, 1999 meeting of the Board of Directors, the Audit Committee reported that it was reviewing the need for an internal auditor.

391.    On April 12, 1999, defendant Behets reported to the Director Defendants regarding various discussions with the Audit Committee, and defendant Vandendriessche, on behalf of the Audit Committee, advised the Defendant Directors that the Company "intend[ed] to establish an internal audit function due to the growing

complexity of the Company's business." But again, no action to that end was taken, and the fraud at L&H only grew.

392.    On August 30, 1999, the Audit Committee reported to the Board of Directors that KPMG had again advised of the need to increase the Company's internal control staff. The Audit Committee indicated that it was "review[ing] the need for an internal auditor." Again, no action was taken.

393.    At the January 17, 2000 Board Meeting, De Pauw reported that the Audit Committee had met to review the L&H's financial statements, had met with KPMG, and that the Audit Committee would take the same action and review each quarterly financial statement before the release of each financial statement.

394.    Despite the continued warnings during 1998 and 1999, as late as May 22, 2000, neither the Audit Committee nor the Board took steps to require L&H to hire an internal auditor. In fact, L&H did not hire an internal auditor until the summer of 2000. Nevertheless, KPMG and the Audit Committee continued to sign off on the Company's financial statements that contained and admitted inflation of revenue by $373 million or over 60%.

**B.    THE DIRECTOR DEFENDANTS' ROLE**

395.    Throughout the Class Period, the Board of Directors were informed of KPMG's and the Audit Committee's grave concerns about L&H's internal controls, as well as issues related to related party transaction, the LDC concept and L&H's activities in Korea.

396.    Early in the Class Period, the Board became aware of L&H's reliance on related party transactions, and the Company's need to monitor such transactions. At a

May 4, 1998 meeting of the Board of Directors, the Director Defendants acknowledged that there was a "potential conflict of interest" arising from the relationship between the Company and FLV "given the active involvement of Mr. Lernout and Mr. Hauspie in the management of the Company as well as in the activities of the Flanders Language Valley." The Director Defendants concluded, however, that "the benefits of the relationship clearly outweigh[ed] the potential conflicts of interest, but that procedures should be established to resolve any conflicts of interest when they arise." Hauspie and Bastiaens also discussed with the directors the need to explain "the nature of the relationship" to the investment community, "so that there is not the perception of a problem." The directors agreed that "discussions should be held with the Company's auditors, KPMG, to discuss any issues that could arise from this relationship."

397.    Also at the May 4, 1998 Board meeting, Vandendriessche reported on his meeting Behets and Dammekens, described in ¶¶ 338-89 above. Specifically, Vandendriessche conveyed KPMG's recommendation that L&H's internal audit and control functions be strengthened. Despite the fact that L&H did not hire an internal auditor until the summer of 2000, the Directors Defendants continued to sign off on L&H's 1998 and 1999 financial statements.

398.    Throughout the Class Period, Philip Vermeulen (a former director of L&H and Manger of the FLV Fund), Bastiaens or Hauspie routinely provided the Board of Directors with updates on FLV investments. Further, Hauspie would often update the Board on the actions of the S.A.I.L. Trust (a.k.a. FLV Foundation). Vanderhoydonck also provided periodic updates on the activities of LHIC, including investments in L&H customers, such as Vasco.

399.    Throughout the Class Period, the Director Defendants had numerous meetings with representatives of KPMG, primarily defendant Behets, regarding the Company's financial statements.  Additionally, the Audit Committee regularly submitted to and discussed with the Director Defendants issues relating to the Company's financial statements and the need to strengthen the internal audit and internal control functions of the Company.  As a regular agenda item at each meeting of the Board of Directors, the Audit Committee issued a report to the Director Defendants.  At some of these meetings, the Audit Committee or KPMG advised the Director Defendants as to accounting issues that had arisen and that had to be resolved by KPMG.

400.    On several occasions, the Individual Defendants discussed with the Director Defendants issues relating to the Company's operations in Korea and relating to the LDCs.  For example, on January 18, 1999, Bastiaens discussed L&H plans for expanding the Dictation Consortium concept, to allow L&H to avoid research and development costs.  Specifically, the minutes reveal:

> . . . Bastiaens indicates that the Company is taking steps to ensure the availability of long-term research and development activities, while at the same time maintaining its ongoing research and development efforts for its current and near-term projects.  Mr. Bastiaens indicates that the Company has currently been spending approximately 10%-20% of revenues for ongoing research and development.  There is also a need to spend an additional 10%-12% for long-term research and development.  However, if this were done within the context of the Company's current structure, the research and development budget would be increased to approximately 22%, which would not be feasible in the context of the Company's operations.  In order to accomplish its objective, the Company proposes to establish an independent company to conduct long-term research and development.  The Company [L&H] will own approximately 19.9% of this company.  The company will be privately funded, and the balance of the company will be owned by unaffiliated parties.  The Company will license its current technology to the research and development company, and will have a right of first refusal, on market terms, for technology developed by the long-term research and development company in the software area.

401. At the May 14, 1999 board meeting, Bastiaens expanded on the "strategic partner" plan, noting that the acquisition of BTG noting, "because [BTG] is a service company, there will be no in process write-off of research and development, and that they Company will amortize the good will over a period of 20 years."

402. On May 21, 1999, defendant Willaert reported to the Board of Directors that L&H had entered into relationships with a number of start-up LDC's for the development of twelve languages.

403. On August 30, 1999, the Director Defendants discussed the acquisition of Bumil and on September 6, 1999, the Board approved the acquisition.

404. At the August 30, 1999 Board meeting, Lernout explained the concept of the LDCs. At that meeting, the Audit Committee also advised the Director Defendants that KPMG had conducted an extensive review at the end of the second quarter of 1999 and had issued recommendations to the Company to increase its internal audit staff.

405. On December 13, 1999, defendant Willaert provided the Director Defendants with an update on L&H's LDC activities, noting that the LDCs contributed a substantial part of L&H's revenues. At that meeting, Willaert and the Board also discussed the possibility of combining LHIC and the FLV Fund into one entity. Defendant Bastiaens reported to the Director Defendants regarding the activities of the Company in Korea.

406. At a meeting of the Director Defendants on January 17, 2000, the Board of Directors voted to advance the earn-out payment to Seo based on L&H Korea's purported performance.

407.    On September 7, 2000 the Board of Directors met in the wake of the initial

The Wall Street Journal articles.  The minutes reveal "a discussion of the language

development companies, and the fact that the identity of the investors has not been

revealed.  The lack of transparency has lead to suspicions that there might be

relationships between the investors in the language development company and the

Company that could cause these transactions to be viewed as related party transactions."

At this same meeting, Cloet reigned as a director.

408.    Subsequently, each member of the Board of Directors, with the exception

of the Audit Committee Members, resigned their seats on the Board.

## IX.    THE FRAUD STARTS TO COME TO LIGHT

409.    In May of 2000, L&H acquired Dictaphone Corporation for $425 million

in cash and $510.6 million in inflated L&H common stock.  As a result of this

acquisition, L&H became subject to more stringent SEC reporting requirements.  Certain

first-time disclosures in L&H's first quarterly report filed on SEC Form 10-Q on June 30,

2000, disclosed new information about L&H's purported financial success during the

previous few quarters.

410.    For the first time, L&H publicly disclosed the geographic breakdown of its

sales – providing surprising revelations.  First, the new financial reporting revealed that a

significant portion of the Company's total revenues were from two countries in Asia:

Singapore and Korea.  In 1999, L&H's revenue totaled $344.2 million.  Of that amount,

Korea contributed $62.9 million and Singapore contributed $80.3 million in revenue,

while in 1998, those two countries only contributed less than $300,000 in sales.  While

European sales had fallen, and U.S. sales remained stagnant, Singapore sales skyrocketed

from a mere $29,000 in 1998 to $80.3 million in 1999, a jump of over <u>276,796</u> percent. During the first quarter of 2000, total sales in the United States, Europe and the rest of Asia declined by 27% to $51.8 million. At the same time, Korean sales accounted for $58.9 million, up from $97,000 a year earlier, and approximately 54% of L&H's worldwide sales of $110.7 million.

411.    On July 6, 2000, <u>The Wall Street Journal</u> reported on L&H's incredible growth in Asia, noting that the Company attributed L&H's unprecedented Asian growth to a new shift in company strategy. Specifically, Bastiaens stated that rather than license its underlying technology to companies that would then develop applications for specific markets, L&H decided in 1999 to pursue a "new strategy" of building its own applications, allowing it to gain more revenue over time. Bastiaens also attributed the "strong" Asian sales to L&H's early market presence and lack of strong competition. As for Singapore, Bastiaens stated that the 1999 revenue figures were from licensing L&H technology to companies that were building local language versions of L&H's systems for languages such as Hindi and Tamil. According to Bastiaens, the licenses were sold for $2 to $4 million each, but that sales dropped off after the major language licenses were sold. As for Korea, Bastiaens attributed the surge in sales to the synergies realized from the combination of L&H technology with Bumil's large client base.

412.    In response to stock market analyst concerns and L&H denials, reporters from <u>The Wall Street Journal</u> commenced an investigation concerning certain transactions to verify the Company's sales.

170

A.    **The August 8th** *Wall Street Journal* **Story**

413.    On August 8, 2000, The Wall Street Journal began reporting the results of

its investigation. As would be revealed over the coming months, merely by asking a few

questions of purported "customers," the Journal's reporters (who were based in Boston)

were able to reveal a wide-spread fraud that had been concealed by L&H and KPMG.

The August 8, 2000 article disclosed that the revenues, and the resulting net income and

earnings per share, that L&H had reported in the fourth quarter of 1999 and first quarter

of 2000, were overstated, specifically in the Korean geographic region. The August 8,

article reported that:

> . . . [S]ome companies that L&H has identified as Korean customers say
> they do no business at all with L&H. Others say their purchases have
> been smaller than L&H says. L&H officials now acknowledge they made
> some mistaken initial representations about customers. But the company
> disputes other accounts given by some of the Korean companies, and it
> insists its Korean revenue figures are accurate.
>
> * * *
>
> In Korea, Mr. Bastiaens says L&H sells a range of products, including
> software licenses and automated phone switchboards that recognize voice
> commands. In May, while being questioned about the Asian sales by a
> reporter, he volunteered the names of about a dozen Korean customers.
> Later, the CEO provided ranges of the dollar amount of business done
> with those and some other customers. Subsequently, the company
> disclosed more names. In all, this newspaper contacted 18 of about 30
> companies claimed by L&H as customers were contacted by this
> newspaper.
>
> Three of the companies say they aren't, in fact, L&H customers. L&H
> says one of those was a former Bumil customer, and was mistakenly put
> on its list. Three more companies say their purchases from L&H over the
> past three quarters were smaller than figures provided by Mr. Bastiaens or
> Sam Cho, vice president of L&H Korea. One additional company says it
> is in a joint business with L&H that produces considerably less revenue
> than L&H claims. Officials from an eighth company initially said it had
> formed a joint venture with L&H and that the joint venture, not the
> company itself, had purchased products from L&H. Later, the company
> retracted this initial version.

171

Of the other 10 companies, three confirm they are customers but wouldn't give the size or timing of their purchases. Officials at another six confirm total purchases totaling $450,000 to $5.5 million in the period since L&H took over Bumil. One company, Artlab Co., says it signed a $10 million contract with L&H and paid in May, a figure that was within the revenue range provided by Mr. Bastiaens. Meanwhile, Hanwha Securities Co. ordered nearly $2 million of gear, says an official, adding that L&H "is highly recognized" for its technology.

All told, of the 13 companies that responded to inquiries about their purchases from L&H in the period since it acquired Bumil, the revenue tallies roughly $32 million. From all of its customers in Korea, in 1999 and the first quarter of 2000, L&H posted $121.8 million of Korea sales, and it has said that it expects second-quarter revenue from that country to exceed the first quarter's $58.9 million. The company is expected to report second-quarter results today.

Among the companies that L&H boasts as customers: Korea Securities Computer Corp., or Koscom, a government-regulated clearinghouse for stock trades. Mr. Bastiaens initially says L&H received revenue in the range of $5 million to $10 million (he wouldn't be more specific) from Koscom in the three quarters ended June 30. According to two Koscom officials, whose names were provided by L&H, Koscom and L&H are partners in an automated phone stock quote service. Korea Telecom collects the per-call payment, keeps 10% and splits the rest between Koscom and L&H.

One of the Koscom officials estimated L&H and Bumil's share of the revenue at roughly $1.5 million in 1999. Told of the discrepancy, L&H contradicts Mr. Bastiaens and puts the Koscom revenue in the range of $1 million to $5 million.

In a Dec. 28, 1999, press release, L&H said Samsung Securities, a big Korean brokerage, together with more than 14 other securities firms, had "selected L&H to develop client server solutions for online trading and automated dialogue systems." But two Samsung officials, including spokesman Shin Dong Woo, say their firm never made any purchases from L&H, although they discussed some.

Asked about the discrepancy, Mr. Bastiaens says Samsung isn't a "direct customer" but an "indirect customer." Pressed on what "indirect" means, L&H Korea's Mr. Cho says some Samsung customers also conduct trades over the Koscon-L&H phone-quotation system, and Samsung remits a portion of the trading fee to Koscom, which shares it with L&H.

> <u>L&H also claims LG Electronics as a customer. But Yu Won Uk, a senior research engineer at LG Electronics - a contact provided by L&H - says his company never bought products or licenses from L&H.</u> Instead, he says the two firms briefly worked on joint project for applying voice recognition to television, but stopped because there "was no progress." LG Electronics paid L&H only "engineer charges," he says, akin to labor costs for L&H's share of the work on the failed project.
>
> Another Korean company with which L&H says it has a significant relationship is Hung Chang Co., a maker of communications equipment. Mr. Bastiaens put revenue from Hung Chang in the range of $5 million and $10 million over the past three quarters.
>
> However, Kim Ho Kyun, a Hung Chang official whom L&H identified as its contact, says Hung Chang wasn't using L&H products internally and that L&H's $5 million bill was paid by a joint venture called Spia, "not Hung Chang." Another Hung Chang official, Choi Sang Hyun, who was reached independently of L&H says Spia Co. was founded May 2, with Hung Chang as the largest shareholder, but June 28 L&H Korea became its largest, with Hung Chang holding 27.49%. Mr. Choi says Spia makes products based on L&H's voice-recognition technology, and says Hung Chang is only a passive shareholder.
>
> * * *
>
> Mr. Bastiaens also identified Hyundai Securities and Hanvit Bank as providing revenue totaling between $5 million and $10 million. But at Hyundai Securities, two officials, including a contact provided by L&H, say their purchases amounted to just over $1 million. At Hanvit Bank, Lee Jae Bong, manager of network management, says the only contract signed by its intuition tallied $150,000.

[Emphasis added.]

414.    On this news, the Company's common stock declined dramatically by 19% from the previous day's close of $37 per share to $29 13/16 per share, trading as low as $26 3/4 per share.

415.    The Senior Officers acted quickly to strongly deny the veracity of <u>The Wall Street Journal</u> story and emphatically defended its accounting practices and the accuracy of L&H's previous financial statements. On August 8, 2000, L&H issued a press release to "categorically" deny the charges concerning discrepancies with L&H

173

Korean sales figures, stating, "L&H executives firmly believe that statements attributed to L&H Korean customers are misquoted or factually incorrect and that other information appearing in the article, including its customer roster is distorted." Bastiaens was quoted as adamantly stating: "L&H has recently had tremendous success in the Korean market based on its unique ability to bring advanced speech and language solutions to the fast growing telephony and enterprise market there. We have attained these results through strategic alliances and the development of unique, industry leading solutions. We are quite pleased with our results in Korea and intend to implement the business structure we have developed there throughout our operations worldwide."

416.    L&H's denials in the July 6, 2000 article and August 8, 2000 Press Release were false and misleading when made, because the Senior Officers knew or recklessly disregarded the fact that because of the fraudulent schemes described above, L&H had overstated its revenues for 1998 through June 30, 2000 by approximately $373 million. Further, the Senior Officers knew or recklessly disregarded the fact that all of L&H's Korean revenue was fictitious, based on sham customers and bank schemes.

417.    Despite the Company's assertion that all Korean revenues were accurate, on August 15, 2000, The Wall Street Journal reported that L&H's had commissioned a mid-year interim audit of the company by KPMG, the Company's regular auditors. The goal of the audit was to "allay concerns about the financial results of [L&H's] South Korean division." Despite inherent conflict in KPMG re-auditing its own work, L&H selected KPMG to perform this "interim audit" because L&H management was confident that KPMG would continue to cooperate in concealing or willfully and recklessly ignoring the underlying fraud.

174

418.    In announcing the "interim audit," L&H spokesman Ron Schuermans proclaimed, "We're doing this to send a positive signal to the market.  We're confident that, when the audit is completed, all our revenue figures as we have reported them will be confirmed."  Further, defendant Bastiaens stated, in an August 13, 2000 press release, "We have no doubt that the auditors will confirm that during the first two quarters of 2000 L&H Korea had strong revenues and a very solid business base, as already publicly reported. . . .  We have commissioned this audit because we're determined to remove any possible uncertainty about the integrity of our financial results."   However, Bastiaens and the Senior Officers knew of the massive underlying fraud.  Further, they knew or recklessly disregarded the fact that the only way that the audit could validate the prior inflated-figures was if KPMG continued with its complicit audit practices and KPMG, like L&H, was highly motivated to conceal the massive accounting fraud at L&H.

419.    On August 18, 2000, The Wall Street Journal reported that on July 27, 2000, Bastiaens purchased 625,000 shares of L&H stock for $40.00 per share from an entity through which Lernout and Hauspie controlled L&H.  That price represented a premium of 34% above the stock's closing price of $29.88 per share and, according to an L&H spokesperson, reflected Bastiaens' "bullish" stance.  Bastiaens allegedly borrowed the entire $25 million from Artesia Banking Corporation to pay for the stock.  According to an L&H spokesman, Lernout and Hauspie retained the voting rights for the 625,000 shares.  This suspicious transaction was intended to give the appearance of insider confidence in the Company, to artificially inflate the price of L&H stock and to distract investors from concerns over L&H's financial condition.

175

420.    On August 25, 2000, still maintaining that the Company's accounting practices were proper and just eight days after trumpeting his "bullish" stance, L&H announced that Bastiaens resigned from his position as president and CEO of L&H. Bastiaens was replaced by John Duerden, the former CEO of Dictaphone. Bastiaens remained a director of L&H. Also, Spooren resigned from her post as Senior Vice President of Marketing and Corporate Communications without comment.

421.    On September 21, 2000, L&H issued a press release announcing an SEC investigation into the company, and purporting to fully cooperate with the SEC and also announced that its Audit Committee had initiated its own investigation of the Company's prior financial statements, on the request of L&H's Board of Directors.

422.    On September 22, 2000, The Wall Street Journal reported that L&H had confirmed that the SEC commenced a formal investigation into L&H's accounting practices. As was later revealed in October 18, 2000 and February 5, 2001 Wall Street Journal articles, the SEC originally began an informal investigation of L&H in January of 2000. In April of 2000, the SEC sent a letter to KPMG Belgium requesting information about L&H's accounting practices. This informal probe involved a number of questions concerning possible related-party transactions. The Company, however, was uncooperative and did not provide all necessary information to the SEC. As a result, the SEC began a formal investigation, with subpoena power, in late August or early September of 2000.

423.    In reaction to these announcements L&H's stock tumbled to $15.13 by the close of trading on September 21, 2000.

424.     On September 22 and 26, 2000, The Wall Street Journal also raised

significant questions about L&H's Asian revenue, specifically about 30 Singapore and

Belgian start-up companies that accounted for nearly all of L&H's Asian revenues

reported in 1998 and 1999. The articles also raised concerns that the FLV Fund had

financial connections to eight start-ups with close links to L&H, and that those start-ups

accounted for a large portion of L&H's 1998 and 1999 revenues. One of the series of

transactions questioned involved four Singapore entities (I-Merge Pte., I-Office Pte., I-

Mail Pte. And 1 News Pte.) that each became an L&H licensee in the first quarter of

1999, paying $10 million in license fees to L&H. Less than six months later, the FLV

Fund invested $8 million for a 49% stake in each of the four entities. These transactions

were never disclosed either by L&H or FLV Fund as being "related party transactions,"

despite the fact that L&H had previously conceded that FLV Fund was a related party.

The Wall Street Journal article raised similar questions about another group of four

Singapore start-ups that executed licenses with L&H in the third quarter of 1999. This

group agreed to pay $16 million to L&H for software rights. At or around the same time,

the FLV Fund invested $10 million in the group, $8 million of which was used to pay

L&H. Again, these transactions were not disclosed as a "related party transaction."

425.     In light of the ongoing disclosures and denials, on September 26, 2000,

The Wall Street Journal reported that the Brussels-based Easdaq stock exchange had

launched a formal investigation into L&H. On the same date, Bloomberg News reported

that the Easdaq would also investigation the FLV Fund.

426.     On September 26, 2000, Bloomberg News interviewed Lernout about the

accounting allegations surrounding L&H. In the interview, Lernout stated that he

"couldn't be more confident of the outlook" for L&H. Despite this fact, the next day, on September 27, 2000, L&H issued a press release warning that the Company expected to report a net loss for the third quarter of 2000, and that revenues would fall short of analyst expectations.

427.    Also on September 28, 2000, The Wall Street Journal reported that Lernout attended a news conference and issued a strongly worded denial of allegations that L&H's surge in Asian revenues was generated by related-party transactions, stating: "We have been more Catholic than the Pope."

428.    The market did not share Lernout's confidence and faith. In response to L&H's third quarter warning, and on-going disclosures through The Wall Street Journal, L&H shares plunged 30% to close at $9.75 per share – a three year low.

429.    On October 18, 2000, The Wall Street Journal reported that L&H was refusing to provide the SEC with the names of the investors behind the thirty corporate customers that were the focus of the SEC investigation, and who accounted for approximately 25% of the 1999 revenues and 10% of 1998 revenues. While L&H acknowledged that it helped start the 30 companies and initially financed their operations, the Company maintained that the firms are owned by unnamed independent investors interested in developing new applications for L&H speech software. To quell the circulating allegations, L&H released new details about the operations of the 30 companies. The new information, however, only raised further questions about their viability and independence from L&H. For example, of the 17 companies L&H agreed to discuss, none has any direct employees. Seven companies are relying on L&H employees to do work for them and have agreed to repay L&H for its services. The other

178

10 have not started developing software, though they have paid hefty licensing fees to

L&H. According to the article, the 30 companies are all registered at several addresses in

Belgium and Singapore, and many have common officers and nominee shareholders.

The article quoted Paul R. Brown, chairman of the accounting department at NYU's Stern

School of Business as sating that it appears the start-ups and L&H are "under common

management," especially in the case where L&H is paying employee salaries for the

start-ups under oral contracts. Professor Brown stated, "I'd be hard-pressed to define

those as independent revenues."

430.    On October 26, 2000, The Wall Street Journal issued a follow-up story

concerning the related, start-up companies responsible for a significant portion of L&H's

revenues. The article noted:

> [L&H's] claim that it received multimillion-dollar license payments from
> four Belgian start-up companies isn't supported by financial statements
> the ventures have filed with Belgium's central bank. L&H booked $3
> million in license payments from each of the four companies in later 1998,
> according to an accounting document the maker of speech-recognition
> software provided to The Wall Street Journal in response to a request for
> substantiation of its revenues. But the July central-bank filings of the four
> start-ups show no expenditures close to being that big, nor do their balance
> sheets list assets as large as the purported value of the licenses.

431.    Shortly after the October 26, 2000 story was published, the four

companies filed corrective financial statements with the Belgian authorities. In fact, on

November 6, 2000, The Wall Street Journal reported that the original parent company of

the four Belgian start-ups said the companies paid only $6 million to L&H during 1998-

1999, not the $12 million recorded by L&H in 1998. According to The Wall Street

Journal, this amount is consistent with the corrective filings of the four start-ups.

179

## B.    ADMISSION OF "ACCOUNTING IRREGULARITIES"

432.    After months of vehement denials, on November 9, 2000, L&H issued a

press release announcing that as a result of past accounting "errors and irregularities" the

Company would need to restate the most recent 2 ½ years of financial statements.

Specifically, the Company announced:

> "[a]s a result of certain errors and irregularities identified in the audit committee
> inquiry, the Company expects to restate its financial statements for the periods
> 1998, 1999 and for the first half of 2000. Although the audit committee is
> working diligently to determine the impact of these discrepancies on L&H's
> financial statements for these periods, L&H does not expect the audit and
> necessary restatements to be completed by November 14, 2000. Accordingly, the
> Company does not believe that its Form 10-Q for the third quarter ended
> September 30, 2000 will be filed in a timely manner.

The Company also warned that its third quarter 2000 revenues would "be at least $40

million below its previously published range of $165 to $185 million." The Company

also announced a major corporate shake-up, including: (1) that Lernout and Hauspie both

resigned their posts as executive co-chairmen, but intended to remain on L&H's Board of

Directors; (2) that John Duerden, the newly appointed CEO was appointed the sole

Managing Director; (3) that Roel Pieper was appointed Chairman of the Board; (4) that a

new CFO would be appointed by Duerden; and (5) that Willaert would step down as

managing director. The Company announced that KPMG's mid-term audit would not be

completed by November 14, 2000.

433.    L&H's announcement of "accounting irregularities" is, in accounting

terms, tantamount to an admission of fraud. Statement of Auditing Standards No. 53

issued by the American Institute of Certified Public Accountants defines "irregularities"

as "intentional misstatements or omissions" in financials statements including "fraudulent

180

financial reporting undertaken to render financial statements misleading, sometimes called management fraud."

434.    In reaction, on November 9, 2000, both NASDAQ and EASDAQ suspended trading. Prior to the suspension, the price of L&H on the NASDAQ market fell as low as $6.2188. After trading finally resumed on December 8, 2000, the stock plummeted to $1.40 per share and continued its free fall to trade below $1 per share from December 12 to December 15, 2000.

435.    On November 13, 2000, The Wall Street Journal reported that Paul Behets, a KPMG partner in charge of auditing L&H for many years, joined an L&H affiliate in 1999, shortly after KPMG issued its clean audit opinion concerning L&H's fraudulent 1998 financial statements. According to the article, Behets had been responsible for auditing L&H's books at KPMG Belgium from 1991 until July 1, 1999. In July 1999, Behets left KPMG to become CEO of defendant S.A.I.L. Trust Foundation (formerly FLV Foundation), created by Lernout and Hauspie to promote speech and language technology. L&H acknowledged the S.A.I.L. Trust as a related party in the Company's SEC filings.

436.    The November 13, 2000 The Wall Street Journal article also noted that another former senior manager at KPMG Belgium, Chantal Mestdagh, left the accounting firm in 1998 to become the CFO of defendant LHIC.

437.    On November 17, 2000, following months of allegations, investigations and admissions of irregularities, The Wall Street Journal reported that KPMG finally withdrew its audit report of the L&H 1998 and 1999 results, stating that its prior audit opinions "should no longer be relied upon."

181

## C.    THE AUDIT COMMITTEE REPORT

438.    On December 19, 2000, L&H publicly revealed the findings of the Audit

Committee Report that had previously been finalized and presented to the L&H Board of

Directors on November 20, 2000.  The Audit Committee Report contained a strong

rebuke to L&H and the Senior Officers, stating:

> The combination of the rapid growth experienced by L&H and the market
> pressure to meet expectations appear to have resulted in a loss of focus on the
> rules and regulations governing public companies, and a failure to appreciate the
> need for increasing and stronger controls.

The report listed a host of accounting irregularities, related to the Company's 1998 and

1999 revenues.  For example:

> (a) the Audit Committee Report concluded that sales practices in L&H's
> Burlington, Massachusetts office were "unacceptable," and included
> improper and/or premature recording of revenue on certain
> transactions, including "barter transactions, right to return products,
> transactions where the customers' ability to pay depended on the
> receipt of an investment from L&H, and the separation of one
> agreement into two contracts -- a license agreement and a development
> agreement -- so that more revenue could be booked in an earlier
> quarter than might otherwise occur."  The Audit Committee Report
> also criticized L&H's practice of "charging a 'finders fee' in the form
> of the purchase of a license from L&H in exchange for L&H arranging
> for an investment in the customer by" an undisclosed, related investor.
> Based upon information and belief, as articulated above, the
> undisclosed, related investor is the FLV Fund.

> (b) the Audit Committee Report concluded that several transactions
> stemming from L&H's Belgium office required restatement because
> "the revenue was recorded sooner than it should have been."
> Specifically, the Audit Committee Report found that "[I]n some
> instances, it appears that the customer did not have the ability to pay
> for the product, and was not even invoiced for it."  The Audit Report
> noted that problematic transaction included "backdating of contracts,
> one side letter, several instances of late delivery of product, a promise
> to deliver an additional language at no extra charge 'when and if
> available,' and an understanding that the cost of certain options would
> be reimbursed through a subsequent arrangement."

(c) the Audit Committee Report also reported the difficulty in obtain correct and/or supporting information concerning several of the LDCs, CLDCs and IACs, concluding, "[B]ased on our review of certain internal documents and outside marketing material and limited discussions with the investors or their representatives, that the investors anticipated, in substance, that they were buying the future rights to a product (language) to be developed by L&H and thus were effectively funding the Company's research and development efforts to build that language." Thus, the Audit Committee Report concluded that because these investors were funding research and development, the proper accounting would depend upon whether or not the investors were related parties. If the investors were independent, "accounting for such transactions would require deferral of all the revenue and recognition over the development period." If, however, the investors were related parties, "the relevant accounting literature presumes that the related party investors will be repaid and the funded amounts are recognized as a liability." The drafters of the Audit Committee Report, however, had insufficient information on the purported investors – the majority of whom were the FLV Fund and Mercator.

(d) The Audit Committee Report provided that it was "unable to reach any conclusions with respect to the issues in Korea," including matters related to the "difficulties or inability to obtain over $100 million in cash purportedly being held in L&H accounts at Korean banks," and payment of $25 million to Seo in early 2000. The inability to reach a conclusion on the Korean issues was due, in part, to the unavailability of information from Korean sources and KPMG. Accordingly, the Audit Committee Report recommended, "that the entire matter be referred to the authorities for further investigation."

439.    The Audit Committee Report concluded, in part, that: (a) L&H had improperly recorded as much as $277 million in revenue during 1998, 1999 and the first half of 2000; (b) that the Company should reverse all of its Korean revenues recorded during 1999 and 2000, amounting to approximately $182 million; and (c) that software license revenues from twenty-four of the thirty start-up companies were incorrectly booked because those companies were not buying software from L&H, but rather, were paying L&H employees to develop future products – in effect, funding L&H's research and development.

183

440.    As a result of the rampant and pervasive fraud across all sector of L&H, the drafters of the Audit Committee Report also recommended increased accountability and controls and disciplinary action against certain employees.  The Audit Committee Report expressly recommended that the Board consider disciplinary action against Willaert, Bastiaens, Hauspie, Lernout, and Dammekens.

441.    The Audit Committee Report did not, however, examine the Dictation Consortium and BTG transactions "because of the age of the transactions and our understanding that KPMG carefully reviewed these transactions at the time." Notwithstanding the fact that KPMG presumably "careful[ly] reviewed" all transactions as L&H's auditors, the Audit Committee Report did conclude that revenues from 24 of 30 new companies – modeled on the Dictation Consortium and BTG – were incorrectly booked.

## D.    POST-AUDIT COMMITTEE REPORT NEWS

442.    On November 21, 2000, The Wall Street Journal reported that the Easdaq had suspended trading of FLV Fund.  The article described the FLV Fund as an investment vehicle which Jo Lernout and Pol Hauspie "exercise considerable influence over its affairs," with "a history of investing in L&H customers, typically small companies that pay license fees to L&H."

443.    On November 22, 2000, L&H announced the resignation of three directors, including Hauspie.  L&H also announced, "Seo has been suspended as president and general manager of Lernout & Hauspie Korea and has been relieved of all responsibilities and access and is no longer director of Lernout & Hauspie Korea."

444.    On November 24, 2000, The Wall Street Journal reported that FLV Fund claimed that an L&H Korea executive misused $30 million of FLV Fund's money. According to the FLV Fund, Seo improperly pledged $30 million as collateral to a Korea bank "in favor of" himself.

445.    On November 29, 2000, L&H filed with for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the District of Delaware.  According to a November 30, 2000 Wall Street Journal article, the decision to file for bankruptcy protection came after L&H executives discovered about $100 million was missing from the Company's South Korean unit.

446.    A November 30, 2000 Bloomberg News article on the L&H debacle quoted Lernout.  Gone were Lernout's vehement denials of accounting improprieties and references to the Pope.  In their place, were more somber admissions:

> The audit will show where we lost control – the audit will show the nature and substance of it. . . . One of the classical errors is entrepreneurs have too strong a hold on the steering wheel – entrepreneurs are not necessarily good managers – when you go fast you make errors.  We were not the best managers for this size company.  I should have insisted earlier on a more professional level of management suited for the kind of company that we were already two years ago. I should have insisted on a less entrepreneurial style of management.

447.    On December 1, 2000, The Wall Street Journal reported on John Duerden's attempts, as L&H's new CEO, to distance himself and the Company from prior management.  According to Lanny Davis, L&H outside counsel, Duerden "came to the conclusion that the questionable financial reporting and conduct of prior management could not be accepted any longer, and the only way to save the company was by seeking protection to be able to rebuild the assets."  One day earlier, on November 30, 2000, and article in eWeek quoted Davis on the same theme: "John Duerden and [General Counsel]

185

Daniel Hart made the determination ... with the new leadership of the board that ... the company was to correct all previous problems of accounting and financial misstatements to clean house. They blew the whistle and insisted on the honesty and integrity of the company."

448.     On December 7, 2000, The Wall Street Journal issued a lengthy article on the rise and fall of L&H, entitled, "How High-Tech Dream Shattered In Scandal at Lernout & Hauspie." The article provided a detailed history of L&H, the Company's ties to the FLV Fund and the ongoing accounting scandal, noting:

> New management named in August believes it has strong evidence of a pattern of deceptive and questionable accounting practices stretching across many of L&H's operations, according to people close to the Belgian company. The company . . . appears to have improperly reported revenue from barter deals with other software firms in which no cash changed hands; immediately recognized revenue for sales that were contingent on L&H later performing development work for the customer; and sometimes reported sales before contracts were signed, when it was unclear the customer had the ability to pay or when the customer's ability to pay depended on investment from L&H.

The article also quoted L&H's new CEO as stating that certain officials at L&H Korea "had been misrepresenting the revenue and financial statements of the subsidiary," noting that certain purported customers "either didn't exist or weren't able to pay." This article also noted that that John Duerden had concluded that $100 million on the book of L&H's Korean unit was missing.

449.     On December 14, 2000, The Wall Street Journal reported on the thirty start-up companies that comprised a significant portion of L&H's revenues. The article revealed that Mercator was the ultimate owner of 16 of the 30 start-up firms that were purportedly responsible for a major amount of the Company's 1998 and 1999 revenues.

The article noted that FLV Fund had funded, at least in part, approximately 8 of the remaining 14 start-ups.

450.    On January 5, 2001, the <u>Associated Press</u> reported that the Belgian judge presiding over L&H's Belgium bankruptcy proceeding acknowledged that there is "no doubt there was fraud" at L&H.

451.    On March 2, 2001, L&H announced that co-founder Lernout was forced to step down as chief technology officer. Lernout had been the last remaining senior executive from the time the accounting scandal erupted.

E.    **CANCELLATION OF KOREAN REVENUE**

452.    As a result of the above-referenced Korean schemes, L&H was able to report incredibly strong revenue growth between September 1999 and June 2000. All of this revenue was fictitious and/or unsupportable. By the close of the Class Period, the Company admitted that over $100 million in revenue was effectively gone. Then, in April 2001, L&H revealed that 70% of the almost $160 million in Korean revenue was entirely fictitious. Finally, on May 3, 2001, the Company admitted that <u>all</u> of the Korean revenue from September 1999 through June 30, 2000 would be restated and removed.

453.    In November 2000, L&H cancelled 47 of the purported licensing and maintenance agreements entered into between September 30, 1999 through June 30, 2000 that generated all of the Korean "revenue," as demonstrated by the following chart:

| Sale Date | License Sales Amount in U.S. Dollars | Cancellation Date | Improper Revenue Scheme |
|---|---|---|---|
| **4Q 1999** | | | |
| 9/30/1999 | 4,000,000 | 11/16/2000 | Factored |
| 12/08/1999 | 8,000,000 | 11/16/2000 | Factored |
| 12/15/1999 | 6,329,000 | 11/14/2000 | Factored |
| 12/17/1999 | 422,000 | 11/16/2000 | No Collection |

187

| | | | |
|---|---|---|---|
| 12/21/1999 | 476,000 | 11/14/2000 | No Collection |
| 12/24/1999 | 563,000 | 11/16/2000 | No Collection |
| 12/24/1999 | 673,000 | 11/16/2000 | No Collection |
| 12/30/1999 | 8,000,000 | 11/14/2000 | Transferred |
| **1Q 2000** | | | |
| 2/29/2000 | 700,000 | 11/14/2000 | Factored |
| 2/29/2000 | 300,000 | 11/14/2000 | Factored |
| 3/23/2000 | 7,300,000 | 11/14/2000 | Factored |
| 3/23/2000 | 7,300,000 | 11/14/2000 | Factored |
| 3/29/2000 | 5,000,000 | 11/16/2000 | Factored |
| 3/30/2000 | 1,000,000 | 11/14/2000 | Transferred |
| 3/30/2000 | 1,000,000 | 11/14/2000 | Other |
| 3/31/2000 | 4,000,000 | 11/16/2000 | Factored |
| 3/31/2000 | 40,000 | 11/14/2000 | Factored |
| 3/31/2000 | 7,200,000 | 11/14/2000 | Factored |
| **2Q 2000** | | | |
| 6/22/2000 | 8,000,000 | 11/14/2000 | Factored |
| 6/26/2000 | 6,000,000 | 11/14/2000 | Factored |
| 6/27/2000 | 800,000 | 11/14/2000 | Factored |
| 6/27/2000 | 500,000 | 11/15/2000 | No Collection |
| 6/30/2000 | 2,000,000 | 11/14/2000 | Transferred |
| 6/30/2000 | 2,000,000 | 11/14/2000 | Transferred |
| 6/30/2000 | 2,000,000 | 11/14/2000 | Transferred |
| 6/30/2000 | 2,000,000 | 11/14/2000 | Transferred |
| 6/30/2000 | 6,800,000 | 11/14/2000 | Factored |
| 6/30/2000 | 1,000,000 | 11/14/2000 | Factored |
| 6/30/2000 | 1,300,000 | 11/14/2000 | No Collection |
| 6/30/2000 | 2,500,000 | 11/14/2000 | No Collection |
| 6/30/2000 | 3,000,000 | 11/14/2000 | Factored |
| 6/30/2000 | 1,000,000 | 11/14/2000 | No Collection |
| 6/30/2000 | 1,400,000 | 11/15/2000 | Transferred |
| 6/30/2000 | 1,300,000 | 11/15/2000 | Transferred |
| 6/30/2000 | 1,000,000 | 11/14/2000 | Transferred |
| 6/30/2000 | 1,000,000 | 11/14/2000 | No Collection |
| 6/30/2000 | 1,200,000 | 11/14/2000 | Transferred |
| 6/30/2000 | 3,000,000 | 11/15/2000 | Factored |
| 6/30/2000 | 2,000,000 | 11/14/2000 | Transferred |
| 6/30/2000 | 2,000,000 | 11/14/2000 | Transferred |
| 6/30/2000 | 2,000,000 | 11/14/2000 | Transferred |
| **Undated** | | | |
| | 8,000 | 11/16/2000 | No Collection |
| | 202,000 | 11/16/2000 | No Collection |
| | 44,000 | 11/16/2000 | No Collection |
| | 75,000 | 11/16/2000 | No Collection |
| | 25,000 | 11/16/2000 | No Collection |

| | 4,000,000 | 11/16/2000 | Other |
|---|---|---|---|
| **TOTAL** | $120,457,000 | | |

454.   The effect of the cancellation was staggering.  Prior to the cancellation, L&H Korea's accounting records reported available cash of $97.5 million – after, the amount was a mere $2.3 million.

455.   Finally, in a document dated April 27, 2001, and filed with the SEC on May 3, 2001, L&H reported its sales in 1998, 1999 and the first half of 2000 were overstated by $373 million, nearly $100 million more than the preliminary overstatement identified by the Audit Committee.

### F.    THE SENIOR OFFICERS RESIGN AND ARE CHARGED WITH OR ARRESTED FOR FRAUD

456.   In addition to the bankruptcy petitions and civil lawsuits, numerous criminal allegations, spanning three continents, have resulted from L&H's financial irregularities.  To date four former top executives, including the company's two founders, have been arrested.

457.   On or about April 27, 2001, Lernout and Hauspie, and Willaert were arrested in Belgium and charged with forgery and stock manipulation.

458.   In late April 2001, South Korean authorities began investigating allegations against former L&H Korea executives and employees, among them Ju Chul Seo, Sam Cho, Henry Oh, and J.H. Kim and against four South Korean banks, Chohung Bank, Hana Bank, Hanvit Bank and Shinhan Bank.

459.   On May 26, 2001, Bastiaens was arrested by United States officials in Winchester, Massachusetts, in response to a Belgian warrant.  Bastiaens was subsequently extradited to Belgium, where he is charged with fraud, insider trading, stock market manipulation and accounting law violations.

189

460.    During the fall of 2000 and early 2001, as a result of, or related to, the ongoing fraud investigation, following individuals resigned their post on L&H's Board: Pol Hauspie, Jo Lernout, Nico Willaert, Gaston Bastiaens, John Duerden, Fernand Cloet, Jan Coene, Albert J. Fitzgibbons III, Roel Pieper, Gerard van Acker, Bernard Vergnes Hubert Detremmerie and Bernard Vergnes. In addition, the following executives have resigned from L&H or one its subsidiaries: Seo, Dammekens and Spooren.

461.    On September 11, 2001, The New York Times reported on L&H's filing of new restructuring plan, largely for the benefit of L&H creditors. In discussing the plan, and future of L&H, CEO Bodson stated; "Shareholders will get nothing. They are the victims."

X.    **INSIDER SALES**

462.    Notwithstanding their duty to refrain from trading L&H stock under these circumstances, or to disclose the insider information prior to selling such stock, several Defendants and corporate insiders sold, shares of L&H stock at prices that had been artificially inflated by Defendants' materially false representations detailed above. In the aggregate, certain defendants and other insiders collectively sold more than 1.558 million share of L&H common stock for proceeds of approximately $60.96 million during the Class Period.

463.    In August and September 1998, while the price of L&H stock was artificially inflated as a result of L&H's improper accounting and other practices, Defendants Bastiaens, Dammekens and Vandendriessche and other L&H insiders sold approximately 217,850 shares of L&H common stock for gross proceeds exceeding $10.4 million as follows:

190

| Insider | Transaction Date [1] | Shares Sold | Transaction Price | Gross Sale Proceeds |
|---|---|---|---|---|
| Bastiaens, Gaston | 09/15/98 | 20,000 | $45.250 | $905,000.000 |
| Bouwers, Koen | 08/19/98 | 40,000 | $48.500 | $1,940,000.000 |
| Calabrese, Gerald S. | 08/19/98 | 29,600 | $48.500 | $1,435,600.000 |
| Dammekens, Carl | 08/18/98 | 27,000 | $48.500 | $1,309,500.000 |
| Doherty, Thomas | 08/19/98 | 40,000 | $48.500 | $1,940,000.000 |
| Kutnick, Robert | 08/19/98 | 40,000 | $48.500 | $1,940,000.000 |
| Van Compernolle, Dirk | 08/18/98 | 20,250 | $48.500 | $982,125.000 |
| Vandendriessche, Erwin | 08/14/98 | 1,000 | $42.750 | $42,750.000 |
| **Totals:** | | **217,850** | | **$10,494,975.000** |

[1] The transaction date is the approximate date of sale as reflected on Form 144.

464.    The August and September sales were suspicious, in part, because they closely followed L&H's August 11, 1998 filing of the Form 6-K with the SEC that contained that artificially inflated revenue and earnings for the second quarter of 1998.

465.    In November of 1998, Defendants and other L&H insiders sold approximately 271,826 shares of L&H common stock for gross proceeds exceeding $11 million as follows:

| Insider | Transaction Date [1] | Shares Sold | Transaction Price | Gross Sale Proceeds |
|---|---|---|---|---|
| Bouwers, Koen | 11/18/98 | 110,326 | 40.4629 | $4,464,109.905 |
| Calabrese, Gerald S. | 11/23/98 | 15,000 | 41.3125 | $619,687.500 |
| Doherty, Thomas | 11/23/98 | 20,000 | 41.3125 | $826,250.000 |
| Kutnick, Robert | 11/23/98 | 20,000 | 41.3125 | $826,250.000 |
| | 11/24/98 | 5,000 | 40.6250 | $203,125.000 |
| Mendez, Florita | 11/18/98 | 51,500 | 40.0312 | $2,061,606.800 |
| Spooren, Ellen | 11/23/98 | 33,500 | $41.3124 | $1,383,965.400 |
| | 11/30/98 | 16,550 | $40.9547 | $677,800.285 |
| | | | | |

| | | | | |
|---|---|---|---|---|
| **Totals:** | | **271,876** | | **$11,062,794.890** |
| | | | | |
| [1] The transaction date is the approximate date of sale as reflected on Form 144. | | | | |

466.   The November 1998 sales were suspicious, in part, because they closely
followed L&H's October 27, 1997 press release and October 29, 1997 filing of the Form
6-K with the SEC that contained that artificially inflated revenue and earnings for the
third quarter of 1998.

467.   November of 1999, Florita sold approximately 49,000 shares of L&H
common stock for gross proceeds exceeding $1.6 million as follows:

| *Insider* | *Transaction Date* [1] | *Shares Sold* | *Transaction Price* | *Gross Sale Proceeds* |
|---|---|---|---|---|
| Mendez, Florita | 11/02/99 | 49,000 | 32.8010 | $1,607,249.000 |
| | | | | |
| [1] The transaction date is the approximate date of sale as reflected on Form 144. | | | | |

468.   Mendez's November 1999 sales were suspicious, in part, because they
closely followed L&H's October 27, 1999 announcement of artificially inflated revenue
and earnings for the third quarter of 1999.  These sales also occurred as L&H was
beginning its fraudulent Korean scheme, following the September 1999 acquisition of
Bumil.

469.   Between May 15 and May 31, 2000, the Defendants Spooren and
Vanderhoydonck, and other L&H insiders, sold approximately 394,394 shares of L&H
common stock for gross proceeds of exceeding $12.7 million as follows:

| Insider | Transaction Date | Shares Sold | Transaction Price | Gross Sale Proceeds [1] | Shares Remaining (at Month End) [2] | % of Holdings Sold |
|---|---|---|---|---|---|---|
| Calabrese, Gerald S. [3] | 05/16/00 | 80,000 | $46.5218 | $3,721,744.000 | | |
| **Calabrese Totals:** | | **80,000** | | **$3,721,744.000** | | |
| | | | | | | |
| Mendez, Florita | 05/16/00 | 10,000 | $46.9100 | $440,000.000 | | |
| | 05/18/00 | 2,000 | $45.2700 | $84,720.000 | | |
| | 05/22/00 | 15,000 | $39.3600 | $546,750.000 | | |
| | 05/25/00 | 10,620 | $41.1900 | $406,533.600 | | |
| | 05/26/00 | 5,000 | $38.5000 | $177,950.000 | | |
| | 05/30/00 | 8,000 | $40.3900 | $299,840.000 | 175,530 | |
| **Mendez Totals:** | | **50,620** | | **$1,955,793.600** | **175,530** | **22.383%** |
| | | | | | | |
| Spooren, Ellen | 05/15/00 | 4,000 | $46.9100 | $176,000.000 | | |
| | 05/22/00 | 15,000 | $39.3600 | $546,750.000 | | |
| | 05/23/00 | 20,000 | $39.7500 | $736,800.000 | | |
| | 05/25/00 | 11,000 | $41.1900 | $421,080.000 | 0 | |
| **Spooren Totals:** | | **50,000** | | **$1,880,630.000** | | **100.000%** |
| | | | | | | |
| Van Coile, Bert | 05/15/00 | 1,460 | $46.0000 | $65,437.200 | | |
| | 05/16/00 | 4,028 | $46.9100 | $184,200.440 | | |
| | 05/22/00 | 15,000 | $39.3600 | $572,700.000 | | |
| | 05/31/00 | 29,512 | $41.6200 | $1,193,465.280 | 30,020 | |
| **Van Coile Totals:** | | **50,000** | | **$2,015,802.920** | **30,020** | **62.484%** |
| | | | | | | |
| Vanderhoydonck, Francis | 05/16/00 | 41,000 | $46.9100 | $954,480.000 | | |
| | 05/18/00 | 32,000 | $45.2700 | $692,480.000 | | |
| | 05/18/00 | 9,000 | $45.0000 | $192,330.000 | | |
| | 05/23/00 | 20,000 | $40.6200 | $339,800.000 | | |
| | 05/25/00 | 5,000 | $42.5000 | $94,350.000 | | |
| | 05/30/00 | 56,774 | $40.3900 | $951,532.240 | 0 | |
| **Vanderhoydonck Totals:** | | **163,774** | | **$3,224,972.240** | | **100.000%** |
| **Totals:** | | **394,394** | | **$12,798,942.760** | | |

[1] Gross proceeds for Mendez, Spooren, Van Coile and Vanderhoydonck are calculated by the number of shares sold multiplied by the sales price minus the number of shares multiplied by the option price per share.
[2] For defendant Mendez and Van Coile, the number of shares held at month end take reflect the 2:1 stock split of 5/12/2000.

| Insider | Transaction Date | Shares Sold | Transaction Price | Gross Sale Proceeds [1] | Shares Remaining (at Month End) [2] | % of Holdings Sold |
|---------|------------------|-------------|-------------------|-------------------------|-------------------------------------|--------------------|
| [3] This is a proposed sale pursuant to Form 144 and the transaction date is the approximate date of sale as reflected on the Form 144. | | | | | | |

470.    Defendant Spooren and Vanderhoydonck's and other insiders' stock sales during the Class Period were unusual and suspicious in timing and amount. The majority of the above insiders did not sell any stock in 1999 or any prior period in 2000. Moreover, the stock sales represented substantial portions or all of their total holdings. For example, in May 2000, Van Coile sold almost two-thirds of his total holdings, or 62%, and, defendants Spooren and Vanderhoydonck each sold 100% of their total holdings.

471.    Moreover, the timing of the May 2000 sales was highly suspicious because, as alleged above, defendants Spooren and Vanderhoydonck, and the insiders were aware of the fraudulent practices as L&H to improperly record revenue, as well that lack of proper internal controls over the company. Further, the sales occurred while the defendants and senior officers were fully aware of the SEC investigation into L&H's fraudulent practices that began in January 2000. In fact, in April 2000, the SEC had expanded its investigation, requesting documents from KPMG. Despite this knowledge, the above-referenced individuals took advantage of the share price of L&H in the wake of the Company's May 9, 2000 press release announcing record results for the first quarter of 2000 (due largely to the recording of fictitious revenue from Korean). Further, the insiders were aware or reckless in not knowing that L&H's acquisition of Dictaphone, also in May 2000, would necessitate the filing of Forms 10-Q and 10-K with the SEC. The insiders sought to dump their shares prior to the release of those SEC forms that would – for the first time – detail L&H's finances and raise suspicions among analysts and commentators.

472.    In addition to the defendant and insider sales, on May 15, 2000, GIMV, an investment firm with close ties to L&H, FLV Fund, S.A.I.L. Trust, Mercator and Vanderhoydonck sold 750,000 of L&H stock reaping proceeds of over $34.9 million.

473.    Finally, in July 2000, defendant Lernout sold 625,000 shares of L&H stock reaping proceeds of $25 million as follows:

| Insider | Transaction Date | Shares Sold [1] | Transaction Price | Gross Sale Proceeds | Shares Remaining (at Month End) | % Holdings Sold |
|---------|------------------|-----------------|-------------------|---------------------|----------------------------------|-----------------|
| Lernout, Jo | 07/27/00 | 625,000 | 40.0000 | $25,000,000.000 | 12,119,000 | 4.904% |

[1] These securities are beneficially owned by L&H Holdings N.V.

474.    Lernout was not the only defendant to profit from the July 27, 2000 sales. L&H Holdings N.V. was owned, in large part, by Lernout and Hauspie.  However, Mercator owned 6.9% of L&H Holding and Verbeke personally owned an 8.9% interest in L&H Holding.

475.    Defendant Lernout's L&H Holding sale was unusual and suspicious for several reasons:

    a.    The sale occurred after Lernout had knowledge of the SEC's investigation into L&H's accounting practices and document request to KPMG, but before that investigation was disclosed to the market;

    b.    The sale occurred after analysts and reporters began investigating L&H's suspicious sales, but before the Company's admission of "accounting irregularities."  In fact, at the time Lernout dumped

195

the above referenced shares, journalists were requesting information on L&H's purported Korean and Singapore customers. For example, on June 6, 2000, Spooren sent and urgent e-mail to Bastiaens and Soo Am Cho noting that The Wall Street Journal was inquiring about L&H's Korean practices, noting "[t]hey want to write a article and it DOES NO[T] LOOK good." Spooren also referenced a May 1999 Wall Street Journal article and investigation, stating, "this situation is as serious as the Matthew Rose situation. (Rose is another Wall Street Journal reporter). We controlled it as we sat on top of him. This is new and we desperately need the active help of Asia Pacific and Korea." Further, on July 6, 2000, The Wall Street Journal published its first article noting the "unusual surge in orders from Korea and Singapore." The preliminarily results of the Journal's investigations, however, would begin to hit light on August 9, 2000; only two weeks after Lernout sold his shares reaping $25 million in proceeds.

## XI.    CLASS ACTION ALLEGATIONS

476.    Lead Plaintiffs bring this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of Lead Plaintiffs and all other persons or entities who purchased the common stock and call options or sold put options only on NASDAQ, of L&H during the period April 28, 1998 through November 9, 2000, inclusive (the "Class"). Excluded from the Class are the

196

defendants herein, and the officers and directors of L&H and the members of their immediate families, any entity in which any defendant has a controlling interest or is a parent or subsidiary or is controlled by the any defendant, and the officers, directors, affiliates, legal representatives, heirs, predecessors, successors and assigns of any of the excluded persons or entities.

477.    The Class is so numerous that joinder of all members is impracticable.  As of June 27, 2000, approximately 143 million shares of L&H common stock were outstanding in an actively traded and efficient market, the Nasdaq National Market Systems.  Thus, there are believed to be thousands of persons who purchased L&H securities during the Class Period.  During the Class Period, L&H stock was listed and traded on the NASDAQ under the symbol "LHSP."

478.    Lead Plaintiffs' and MM Holdings' claims are typical of the claims of the other members of the Class, as Lead Plaintiffs and all members of the Class sustained damages arising out of defendants' conduct in violation of federal law and state law as complained of herein.

479.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

480.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for

197

the members of the Class individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

481. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements disseminated by defendants to the investing public and to Class members during the Class Period omitted and/or misrepresented material facts about the business, operations, prospects and financial condition of the Company;

(c)     whether defendants acted willfully, knowingly, or recklessly in omitting and/or misrepresenting such material facts;

(d)     whether defendants' non-disclosures and/or misrepresentations constituted a fraud on the market by artificially inflating the market prices of L&H common stock during the Class Period; and

(e)     whether the members of the Class have sustained damages and, if so, what is the proper measure of such damages.

## XII.    <u>FRAUD ON THE MARKET PRESUMPTION</u>

482. Lead Plaintiffs, and Plaintiff MM Holdings, will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts regarding L&H financial results during the Class

Period;

(b)    The omissions and misrepresentations were material;

(c)    The common stock of the Company traded on the NASDAQ, an

efficient and open market;

(d)    The misrepresentations and omissions alleged would tend to

induce a reasonable investor to misjudge the value of the

Company's common stock;

(e)    Lead Plaintiffs and the members of the Class purchased their L&H

stock between the time defendants failed to disclose or

misrepresented material facts and the time the true facts were

disclosed, without knowledge of the misrepresented facts; and

(f)    L&H traded on the NASDAQ and was followed by analysts,

including, inter alia, Auerbach Grayson, Branch Cabell & Co.,

Ladenburg, Thalmann & Co., SG Cowen Sec. Corp. and Deutsche

Bank.  The price of L&H's stock reflected the effect of news

disseminated in the market.

483.    Based on the foregoing, Lead Plaintiffs and Plaintiff MM Holdings and

the members of the Class are entitled to the presumption of reliance upon the integrity of

the market.

## THE SAFE HARBOR PROVISION IS INAPPLICABLE

484.    The statutory safe harbor provided for forward-looking statements under

certain circumstances does not apply to any of the allegedly false statements pleaded in

this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

## COUNT I

**Violation of § 10(b) of the 1934 Act and
Rule 10b-5 as Promulgated by the SEC
Against Defendants Lernout, Hauspie,
Dammekens, Bastiaens Willaert and Seo**

485.    Lead Plaintiffs repeat and re-allege each and every proceeding allegation as if fully set forth herein.

486.    This Count is asserted against defendants Lernout, Hauspie, Dammekens, Bastiaens, Willaert and Seo for violations of § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5, as promulgated thereunder.

487.    During the Class Period, Lernout, Hauspie, Dammekens, Bastiaens, Willaert and Seo, singly and in concert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon lead plaintiffs and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce plaintiff and the other members of the Class to purchase L&H common stock during the Class Period at artificially inflated prices.

200

488.    During the Class Period, these defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of each of the deceptive and materially false and misleading statements to the investing public as identified in ¶¶ 66, 67, 69, 70, 72, 73, 75, 76, 77, 78, 81, 82, 84, 85, 87, 88, 89, 91, 92, 96, 97, 98, 100, 101, 142, 144-149, 189 and 190.

489.    As a result of the dissemination of the false and misleading statements set forth above, the market price of L&H common stock was artificially inflated during the Class Period.  In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, lead plaintiffs and the other members of the Class relied, to their detriment, on the integrity of the market price of the stock in purchasing L&H common stock.  Had lead plaintiffs and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

490.    Lead Plaintiffs and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

491.    By reason of the foregoing, defendants Lernout, Hauspie, Dammekens, Bastiaens, Willaert and Seo directly violated § 10(b) of the 1934 Act and Rule 10b-5, as promulgated thereunder in that they:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were

201

made, not misleading; and/or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiff and the other members of the Class in connection with their purchases of L&H common stock during the Class Period.

## COUNT II

### Violation of § 10(b) of the 1934 Act and Rule 10b-5 as Promulgated by the SEC Against Defendants Vandendriessche, De Pauw and Cauwelier

492.    Lead Plaintiffs repeat and re-allege each and every proceeding allegation as if fully set forth herein.

493.    This Count is asserted against defendants Vandendriessche, De Pauw and Cauwelier for violations of §10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5, as promulgated thereunder.

494.    During the Class Period, Vandendriessche, De Pauw and Cauwelier, singly and in concert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon lead plaintiffs and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce plaintiff and the other members of the Class to purchase L&H common stock during the Class Period at artificially inflated prices.

495.    During the Class Period, these defendants, as member of the L&H Audit Committee, either knew of, or in reckless disregard for the truth, the issuance of materially false and misleading financial statements issued by L&H for the reasons set forth in ¶¶ 288, 289, 290, 295 and 388-394.  These defendants, pursuant to a scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of each of the deceptive and materially false and misleading statements to the investing public as identified in ¶¶ 66, 67, 69, 70, 72, 73, 75, 76, 77, 78, 81, 82, 84, 85, 87, 88. 89, 91, 92, 96, 97, 98, 100, 101, 142, 144-49, 189 and 190.

496.    As a result of the dissemination of the false and misleading statements set forth above, the market price of L&H common stock was artificially inflated during the Class Period.  In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, lead plaintiffs and the other members of the Class relied, to their detriment, on the integrity of the market price of the stock in purchasing L&H common stock.  Had lead plaintiffs and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

497.    Lead Plaintiffs and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

498.    By reason of the foregoing, defendants Vandendriessche, De Pauw and Cauwelier, directly violated § 10(b) of the 1934 Act and Rule 10b-5, as  promulgated

203

thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiff and the other members of the Class in connection with their purchases of L&H common stock during the Class Period.

## COUNT III

### Violation of § 20(a) of the 1934 Act
### Against the Senior Officers,
### Director Defendants and the Audit Committee Defendants

499.    Lead Plaintiff repeat and re-allege each and every proceeding allegation as if set forth fully herein.

500.    During the Class Period, defendants Lernout, Hauspie, Dammekens, Bastiaens, Willaert, Seo, Cauwelier, Cloet, Ceone, De Pauw, Detremmerie, Vieux, van Acker, Vergnes, Vandendriessche, Vanderhoydonck and RVD by virtue of their positions, stock ownership and/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons of L&H within the meaning of § 20(a) of the 1934 Act.

501.    The Individual Defendants had the power to control and influence the conduct, acts and practices of L&H.

502.    By reason of the conduct alleged in the Complaint, each of the defendants named in this Count III are liable for the violations of the federal securities laws by L&H and are liable to lead plaintiffs and the members of the Class for the substantial damages

which they suffered in connection with their purchases of L&H common stock during the Class Period at artificially inflated prices.

## COUNT IV

### Violation of § 10(b) of the 1934 Act and
### Rule 10b-5 as Promulgated by the SEC
### Against Defendants Vanderhoydonck, LHIC and Spooren

503.    Lead Plaintiffs repeat and re-allege each and every proceeding allegation as if fully set forth herein.

504.    This Count is asserted against defendants Vanderhoydonck and Spooren for violations of §10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5, as promulgated thereunder.

505.    During the Class Period, Vanderehoydonck, LHIC and Spooren singly and in concert with defendants Lernout, Hauspie, Dammekens, Bastiaens, Willaert and Seo, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon lead plaintiffs and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce plaintiff and the other members of the Class to purchase L&H common stock during the Class Period at artificially inflated prices.

506.  During the Class Period, Vanderhoydonck, LHIC and Spooren sold millions of dollars of L&H common stock for their own personal benefit while in possession of material non-public information concerning L&H as alleged in ¶¶ 470 to 472.  In addition, Vanderhoydonck and LHIC engaged in acts, practices, and a course of business and employed devices, schemes, and artifices to defraud which operated as a fraud on lead plaintiffs and the Class by investing funds in companies for the purpose of those companies purchasing product from L&H for the sole  purpose of L&H publicly reporting artificially inflated revenues and earnings.  Vanderhoydonck and LHIC knew, or in reckless disregard for the truth, engaged in these acts, practices, and a course of business and employed devices, schemes, and artifices to defraud.

507.  As a result of the dissemination of the false and misleading statements set forth above, the market price of L&H common stock was artificially inflated during the Class Period.  In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by these defendants, lead plaintiffs and the other members of the Class relied, to their detriment, on the integrity of the market price of the stock in purchasing L&H common stock.  Had lead plaintiffs and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

508.  Lead Plaintiffs and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

509.    By reason of the foregoing, defendants Vanderhoydonck, LHIC and Spooren directly violated § 10(b) of the 1934 Act and Rule 10b-5, as promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiff and the other members of the Class in connection with their purchases of L&H common stock during the Class Period.  In addition, Spooren made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading.

## COUNT V

### Violation of § 10(b) of the 1934 Act and Rule 10b-5 as Promulgated by the SEC
### Against Defendants Mercator, Verbeke, S.A.I.L. Trust and FLV Fund

510.    Lead Plaintiffs repeat and re-allege each and every proceeding allegation as if fully set forth herein.

511.    This Count is asserted against defendants Mercator, Verbeke, S.A.I.L. Trust and FLV for violations of §10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5, as promulgated thereunder.

512.    During the Class Period, Mercator, Verbeke, S.A.I.L. Trust and FLV singly and in concert with defendants Lernout, Hauspie, Dammekens, Bastiaens, Willaert, Vanderhoydonck and Seo, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon lead plaintiffs and the other members of the Class.   The purpose and effect of said

207

scheme, plan, and unlawful course of conduct was, among other things, to induce

plaintiff and the other members of the Class to purchase L&H common stock during the

Class Period at artificially inflated prices.

513.    During the Class Period, Mercator, Verbeke, S.A.I.L. Trust and FLV

engaged in acts, practices, and a course of business and employed devices, schemes, and

artifices to defraud which operated as a fraud on lead plaintiffs and the Class by investing

funds in companies for the purpose of those companies purchasing product from L&H for

the sole  purpose of L&H publicly reporting artificially inflated revenues and earnings.

Mercator, Verbeke, S.A.I.L. Trust and FLV knew, or in reckless disregard for the truth,

engaged in these acts, practices, and a course of business and employed devices,

schemes, and artifices to defraud.

514.    As a result of the dissemination of the false and misleading statements set

forth above, the market price of L&H common stock was artificially inflated during the

Class Period.  In ignorance of the false and misleading nature of the statements described

above and the deceptive and manipulative devices and contrivances employed by these

defendants, lead plaintiffs and the other members of the Class relied, to their detriment,

on the integrity of the market price of the stock in purchasing L&H common stock.  Had

lead plaintiffs and the other members of the Class known the truth, they would not have

purchased said shares or would not have purchased them at the inflated prices that were

paid.

515.    Lead Plaintiffs and the other members of the Class have suffered

substantial damages as a result of the wrongs herein alleged in an amount to be proved at

trial.

208

516.   By reason of the foregoing, defendants Mercator, Verbeke, S.A.I.L. Trust and FLV directly violated § 10(b) of the 1934 Act and Rule 10b-5, as promulgated thereunder in that they:  (a) employed devices, schemes, and artifices to defraud; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiff and the other members of the Class in connection with their purchases of L&H common stock during the Class Period.

## COUNT VI

### Violation of § 10(b) of the 1934 Act and Rule 10b-5 as Promulgated by the SEC Against Defendants KPMG US, KPMG UK, KPMG Belgium and Behets

517.   Lead Plaintiffs repeat and re-allege each and every proceeding allegation as if fully set forth herein.

518.   This Count is asserted against defendants KPMG US, KPMG UK, KPMG Belgium and Behets for violations of §10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5, as promulgated thereunder.

519.   During the Class Period, KPMG US, KPMG UK, KPMG Belgium and Behets singly and in concert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon lead plaintiffs and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class.  The purpose and effect of

said scheme, plan, and unlawful course of conduct was, among other things, to induce

plaintiff and the other members of the Class to purchase L&H common stock during the

Class Period at artificially inflated prices.

520.   During the Class Period, these defendants, pursuant to said scheme, plan,

and unlawful course of conduct, knowingly and recklessly issued, caused to be issued,

participated in the issuance of, the preparation and issuance of each of the deceptive and

materially false and misleading statements to the investing public as identified in ¶¶ 66,

67, 69, 70, 72, 73, 75, 76, 77, 78, 79, 81, 82, 84, 85, 87, 88, 89, 91, 92, 94, 96, 97, 98, 100

and 101.

521.   As a result of the dissemination of the false and misleading statements set

forth above, the market price of L&H common stock was artificially inflated during the

Class Period.  In ignorance of the false and misleading nature of the statements described

above and the deceptive and manipulative devices and contrivances employed by said

defendants, lead plaintiffs and the other members of the Class relied, to their detriment,

on the integrity of the market price of the stock in purchasing L&H common stock.  Had

lead plaintiffs and the other members of the Class known the truth, they would not have

purchased said shares or would not have purchased them at the inflated prices that were

paid.

522.   Lead Plaintiffs and the other members of the Class have suffered

substantial damages as a result of the wrongs herein alleged in an amount to be proved at

trial.

523.   By reason of the foregoing, defendants KPMG US, KPMG UK, KPMG B

and Behets directly violated § 10(b) of the 1934 Act and Rule 10b-5, as  promulgated

210

thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiff and the other members of the Class in connection with their purchases of L&H common stock during the Class Period.

## COUNT VII

### Violation of § 20(a)
### of the 1934 act Against KPMG US and KPMG UK

524.    Lead Plaintiff repeat and re-allege each and every proceeding allegation as if set forth fully herein.

525.    During the Class Period, defendants KPMG US and KPMG UK by virtue of KPMG Belgium's reliance on them to review L&H's financial statements for compliance with U.S. GAAP, had the power to control and influence KPMG Belgium with regard to KPMG Belgium's audits of L&H and KPMG Belgium's issuance of its materially false and misleading audit opinions concerning L&H. As such, KPMG US and KPMG UK were, at the time of the wrongs alleged herein, controlling persons of KPMG Belgium within the meaning of § 20(a) of the 1934 Act.

526.    By reason of the conduct alleged in Count VI of the Complaint, KPMG US and KPMG UK are liable for the violations of the federal securities laws by KPMG Belgium and are liable to lead plaintiffs and the members of the Class for the substantial damages which they suffered in connection with their purchases of L&H common stock during the Class Period at artificially inflated prices.

211

## COUNT VIII

### Respondeat Superior Liability
### Against Microsoft and RVD

527.    Lead Plaintiff repeat and re-allege each and every proceeding allegation as if set forth fully herein.

528.    As alleged in ¶ 36 and ¶ 53, Microsoft had the power to appoint an individual of its choice to the L&H Board of Directors and Microsoft exercised its right to appoint defendant Vergnes to the L&H Board.  Vergnes, the President of Microsoft Europe, served as a director on the L&H Board within the scope of his employment at Microsoft.  Accordingly, to the full extent Vergnes is liable to lead plaintiffs and the Class for the violations set forth in Count III herein, Microsoft is jointly and severally liable to the Class for the acts of its employee, who was acting within the scope of his employment.

529.    As alleged in ¶ 39, RVD had the power to appoint an individual of its choice to the L&H Board of Directors and RVD exercised its right to appoint defendant Vandendriessche to the L&H Board.  Vandendriessche served as a director on the L&H Board and Chairman of the Audit Committee of the L&H Board of Directors within the scope of his employment at RVD.  Accordingly, to the full extent Vandendriessche is liable to lead plaintiffs and the Class for the violations set forth in Count III herein, RVD is jointly and severally liable to the Class for the acts of its employee, who was acting within the scope of his employment.

WHEREFORE, plaintiffs, on their own behalf and on behalf of the Class, pray for judgment as follows:

A.   Declaring this action to be a proper class action and certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding compensatory damages in favor of plaintiffs and the other members of the Class against the defendants for the damages sustained as a result of the wrongdoings of the defendants, together with interest thereon;

C.   Awarding plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiffs' attorneys, and experts;

D.   Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder, including attaching, impounding, imposing a constructive trust upon or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs have an effective remedy; and

E.   Granting such other and further relief as the Court may deem just and proper.

## PLAINTIFFS DEMAND A TRIAL BY JURY

Dated: September 21, 2001                    Respectfully submitted,

**BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO**

Glen DeValerio, BBO #122010
Jeffrey C. Block, BBO #600747
Michael G. Lange, BBO #559372
Michael T. Matraia, BBO #633049
Patrick T. Egan, BBO #637477
One Liberty Square
Boston, MA 02109
(617) 542-8300

CERTIFICATE OF SERVICE
I hereby certify that on 9/31/2001
a true copy of the above document was
served by mail by hand upon the attorney
of record for each other party per the
attached service list.

213

**CAULEY GELLER BOWMAN & COATES, LLP**
Steven E. Cauley
Curtis L. Bowman
W. Tod ver Weire
11311 Arcade Drive, Suite 200
Little Rock, Arkansas 72212
(501) 312-8500

**SHALOV STONE & BONNER**
Lee S. Shalov
Ralph M. Stone
James Bonner
276 Fifth Avenue, Suite 704
New York, New York 10001
(212) 686-8004

**CO-LEAD COUNSEL FOR LEAD PLAINTIFFS AND THE CLASS**

Lenrout2/amendcomp_jcb

IN RE LERNOUT & HAUSPIE SEC. LITIG.
SERVICE LIST

Glen DeValerio
Jeffrey C. Block
Michael G. Lange
Michael T. Matraia
Patrick T. Egan
**BERMAN, DEVALERIO PEASE TABACCO BURT & PUCILLO**
One Liberty Square
Boston, MA 02109
(617) 542-8300

Curtis L. Bowman
**CAULEY GELLER BOWMAN & COATES, LLP**
11311 Arcade Drive, Suite 200
Little Rock, Arkansas 72212
(501) 312-8500

Lee S. Shalov
**SHALOV STONE & BONNER**
276 Fifth Avenue, Suite 704
New York, New York 10001
(212) 686-8004

**Co-Lead Counsel for the Lead
Plaintiffs**

Arnold P. Messing
Kevin J. Lesinski
**CHOATE HALL & STEWART**
Exchange Place
Boston, MA 02109
(617) 227-5020

William J. Fenrich
**DAVIS POLK & WARDELL**
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

**Counsel for KPMG LLP**

Robert J. Kaler
**Gadsby Hannah LLP**
225 Franklin Street
Boston, MA 02110
(617) 345-7000

John C. Millian
Jacqueline E. Coleman
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500

**Counsel for Flanders Language Valley Fund b.v.a.**

Thomas E. Peisch
**CONN, KAVANAUGH, ROSENTHAL
PEISCH & FORD, LLP**
Ten Post Office Square
Boston, MA 02109
(617) 482-8200

Bruce Merritt, Esq.
**DEBEVOISE & PLIMPTON**
875 Third Avenue
New York, N.Y. 10022
(212) 909-6000

**Counsel for Dirk Cauwelier, Fernand Cloet, Marc De Pauw,
Gerard Van Acker, Jan Coene and Hubert Detremmerie**

William R. Moorman, Jr., Esq.
Stephen Wald, Esq.
**CRAIG AND MACCAULEY**
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA 02210
(617) 367-9500

**Attorney for Gaston Bastiaens**

Brian E. Pastuszenski, Esq.
**TESTA, HURWITZ & THIBEAULT, LLP**
125 High Street
Boston, MA 02110
(617) 248-7000

**Attorneys for Francis Vanderhoydonck**

Michael A. Collora
**DWYER & COLLORA**
600 Atlantic Avenue
Boston, MA  02110
(617) 371-1000

Donald Chase
**MORRISON, COHEN, SIGNER & WEINSTEIN LLP**
750 Lexington Avenue
New York, NY 10022
(212) 735-8708

**Attorneys for Pol Hauspie, Nico Willaert**
**and L&H Investment Company, N.V.**

Gus P. Coldebella
**GOODWIN PROCTER LLP**
Exchange Place
Boston, MA 02109
(617) 570-1000

**Attorney for Jo Lernout**

Louis M. Solomon
David N. Ellenhorn
Teresa A. Gonsalves
**SOLOMON, ZAUDERER, ELLENHORN, FRISCHER & SHARP**
45 Rockefeller Plaza
New York, NY 10111
(212) 956-3700

**Counsel for Defendant Paul Behets**

George A. Salter
John A. Redmon
Nicholas W.C.Corson
**HOGAN & HARTSON LLP**
100 Park Avenue
New York, NY 10017
(212) 685-8000

**Counsel for Defendant KPMG Bedrijfsrevisoren**

Robert Cohen, Esq.
Thomas Evans, Esq.
**COHEN & FIERMAN LLP**
4 Faneuil Hall Marketplace
Boston, MA 02109
(617) 523-0505

Mary C. Bennett
Daniel Goelzer
John W. Polk
**BAKER & McKENZIE**
815 Connecticut Avenue, N.W.
Washington, D.C. 20006
(202) 452-7000

**Attorneys For Mercator &
Noordstar N.V.**

Theodore Edelman
Sullivan & Cromwell
St. Olave's House
9a Ironmonger Lane
London EC2V 8EY, England
011-44-207-710-6355

Stephanie G. Wheeler, Esq.
Sullivan & Cromwell
125 Broad Street
New York, NY 10004-2498
(212) 558-4000

**Counsel for KPMG UK**

Lernout2/p/servicelist-main