**EXHIBIT C-3**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STONINGTON PARTNERS, INC., a Delaware corporation, STONINGTON CAPITAL APPRECIATION 1994 FUND L.P., a Delaware partnership and STONINGTON HOLDINGS, L.L.C., a Delaware limited liability company, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 01-298-SLR |
| CARL DAMMEKENS, KLYNVELD PEAT MARWICK GOERDELER BEDRIJFSREVISOVEN, KPMG LLP, ERWIN VANDENDRIESSCHE, DIRK CAUWELIER, MARC G.H. DE PAUW, FLANDERS LANGUAGE VALLEY FUND, FLANDERS LANGUAGE VALLEY FOUNDATION, L&H INVESTMENT CO. N.V., MERCATOR & NOORDSTAR N.V., LOUIS VERBEKE, HANVIT BANK, SHINHAN BANK and CHOHUNG BANK, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

## AMENDED COMPLAINT

| | |
|---|---|
| BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
| Max W. Berger<br>Douglas M. McKeige<br>Steven B. Singer<br>Steven E. Mellen<br>1285 Avenue of the Americas<br>New York, NY 10019<br>(212) 554-1400 | David C. McBride<br>John W. Shaw<br>John J. Paschetto<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>Wilmington, DE 19801<br>(302) 571-6600 |

Dated: November 2, 2001

## TABLE OF CONTENTS

                                                                            Page

I.    NATURE OF THE ACTION .................................................................  1

II.   JURISDICTION AND VENUE ...........................................................  6

III.  PARTIES AND PERTINENT NON-PARTIES ....................................  7

      *Plaintiffs* ......................................................................................  7
      *Defendants and Pertinent Non-Parties* ..........................................  8
              *The Company* ......................................................................  8
              *L&H's Senior Officers* .........................................................  8
              *The Audit Committee Defendants* ........................................  9
              *KPMG* ................................................................................  10
              *The Related-Party Defendants* ...........................................  11
              *Louis Verbeke* ...................................................................  12
              *The Korean Banks* .............................................................  13

IV.   SUBSTANTIVE ALLEGATIONS .........................................................  14

      A.    BACKGROUND ..............................................................  14

      B.    OVERVIEW OF THE FRAUD ...........................................  20

            1.    The Korean Fraud .................................................  20

                  a.    L&H Factored Korean Receivables With Recourse ....................  22
                  b.    The Underlying Contracts Were Shams .............................  24
                  c.    The Korean Banks Were Bribed by L&H .........................  25

            2.    The "Strategic Partners" Fraud ...........................  26

      C.    THE MATERIALLY FALSE AND MISLEADING STATEMENTS
            PUBLISHED BY DEFENDANTS ......................................  30

      D.    THE MATERIALLY FALSE AND MISLEADING STATEMENTS
            MADE DURING STONINGTON'S DUE DILIGENCE OF L&H IN
            CONNECTION WITH THE DICTAPHONE TRANSACTION ..............  40

            1.    L&H and KPMG Fail to Disclose the SEC's Investigation
                  of L&H ...................................................................  44

i

2.  KPMG Vouches for Each of L&H's Most Significant Contracts
    and the Collectibility of Its Receivables ............................... 47

    a.  HI Worldwide .................................................... 48
    b.  Voice Tech Korea ................................................ 53
    c.  Digital Sei-Young and Neo Information Telecom ................... 57
    d.  Four One One.Com ................................................ 60

3.  KPMG Vouches for the Independence of L&H's "Strategic Partners"
    and for the Validity of L&H's Revenue Recognition On Its Contracts
    with the Strategic Partners ......................................... 62

E.  FLV FUND'S PARTICIPATION IN THE FRAUD ................................... 76

F.  THE S.A.I.L. TRUST'S PARTICIPATION IN THE FRAUD ........................ 78

G.  LHIC'S PARTICIPATION IN THE FRAUD ..................................... 79

H.  MERCATOR AND VERBEKE'S PARTICIPATION IN THE FRAUD ..................... 80

I.  THE KOREAN BANKS' PARTICIPATION IN THE FRAUD ......................... 82

V.   THE FRAUD IS REVEALED ................................................. 83

VI.  ADDITIONAL FACTS ESTABLISHING THE LIABILITY OF KPMG
     U.S. AND KPMG BELGIUM ................................................ 89

A.  KPMG U.S. AND KPMG BELGIUM ACTED AS ONE FIRM
    WITH RESPECT TO L&H .................................................. 90

B.  KPMG WAS INTIMATELY INVOLVED IN L&H'S OPERATIONS
    AND ACCOUNTING ...................................................... 95

C.  KPMG DISREGARDED SERIOUS RED FLAGS .................................. 97

    1.  KPMG Knew L&H Lacked Sufficient Internal Controls .............. 98

    2.  KPMG Knew That L&H's Audit Committee Was Not Performing
        Its Responsibilities ......................................... 101

    3.  The Massive Nature of the Fraud and Resulting Restatement ..... 102

    4.  Independence Violations ...................................... 109

        a.  Receipt of Enormous Non-Audit Fees ...................... 109

ii

        b.    Former KPMG Auditors Received Lucrative Positions With
Entities Related to L&H Following Their Audit Engagements ..... 110

D.    VIOLATIONS OF GAAS ............................................................... 111

    1.    KPMG Failed to Consider the Risk of Fraud .......................... 119

    2.    KPMG Failed to Identify Related Party Transactions ............ 120

    3.    KPMG Permitted Improper Recognition of License Revenues ............. 122

    4.    KMPG Employed Inadequate Confirmation Procedures ........................ 123

E.    VIOLATIONS OF SEC REGULATIONS WHICH REQUIRE
CONFORMITY WITH U.S. GAAP ................................................. 124

    1.    Improper Revenue Recognition ............................................ 125

    2.    Related Party Transactions .................................................... 126

    3.    Restrictions on Cash Balances .............................................. 129

    4.    Additional Violations of U.S. GAAP .................................... 129

VII.    THE AUDIT COMMITTEE DEFENDANTS' FAILURE TO DISCHARGE
THEIR RESPONSIBILITIES ................................................................ 131

CLAIMS FOR RELIEF .............................................................................. 132

COUNT I    Against Dammekens Pursuant to Section 10(b) of the Exchange
Act and Rule 10b-5 Promulgated Thereunder ................................... 132

COUNT II    Against Dammekens Pursuant to Section 20(a) of the Exchange Act .............. 134

COUNT III    Against KPMG U.S. and KPMG Belgium Pursuant to Section 10(b)
of the Exchange Act and Rule 10b-5 Promulgated Thereunder ........................ 135

COUNT IV    Against KPMG U.S. and KPMG Belgium Pursuant To Section 20(a)
of the Exchange Act ..................................................................... 140

COUNT V    Against the Audit Committee Defendants Pursuant to Section 10(b)
of the Exchange Act and Rule 10b-5 Promulgated Thereunder ........................ 142

COUNT VI    Against the Audit Committee Defendants Pursuant to Section 20(a) of the
Exchange Act .............................................................................. 143

iii

COUNT VII    Against Dammekens for Common Law Fraud ................................. 144

COUNT VIII   Against KPMG U.S. and KPMG Belgium for Common Law Fraud ................. 145

COUNT IX     Against the Audit Committee Defendants for Common Law Fraud ................. 146

COUNT X      Against Dammekens for Negligent Misrepresentation ....................................... 146

COUNT XI     Against KPMG U.S. and KPMG Belgium for Negligent
             Misrepresentation ........................................................................................ 147

COUNT XII    Against KPMG U.S. and KPMG Belgium for Aiding and Abetting
             Common Law Fraud ..................................................................................... 148

COUNT XIII   Against the Related-Party Defendants and Verbeke For Aiding
             and Abetting Common Law Fraud ................................................................. 149

COUNT XIV    Against the Korean Banks for Aiding and Abetting Common
             Law Fraud .................................................................................................... 150

PRAYER FOR RELIEF .......................................................................................................... 150

JURY DEMAND .................................................................................................................... 151

Plaintiffs Stonington Partners, Inc., Stonington Capital Appreciation 1994 Fund, L.P., and Stonington Holdings, L.L.C. (collectively, "Stonington") allege the following:

## I.    NATURE OF THE ACTION

1.    This action concerns a massive accounting fraud perpetrated by Lernout & Hauspie Speech Products N.V. ("L&H" or the "Company"), its senior officers and directors, and its public accountants, defendants Klynveld Peat Marwick Goerdeler Bedrijfsrevisoven ("KPMG Belgium") and KPMG LLP ("KPMG U.S.") (collectively, "KPMG"), and assisted by other entities and individuals as detailed herein. Until the fall of 2000, L&H successfully convinced the investment community that it was the market leader in the field of speech recognition software and related products. In 1998 and 1999, L&H reported "record" revenues and earnings, and KPMG affirmed those results in its audit opinions on L&H's 1998 and 1999 financial statements. These "record" results were supposedly attributable to lucrative, multi-million dollar contracts L&H entered into with so-called "strategic partners" and with customers in Korea and Singapore. L&H and KPMG have now admitted that these "record" financial results were false and the result of a plethora of highly material accounting improprieties. L&H's "strategic partners" were nothing more than shell corporations funded by entities related to L&H, and the huge revenues from Asia were pure fiction. Many of L&H's customers did not even exist. The fraud was so staggering in scope that, in May 2001, L&H restated its publicly reported financial results for 1998, 1999 and the first two quarters of 2000, wiping out $373 million – nearly 70% – of the revenues the Company publicly reported from January 1998 through June 2000.

2.    One of the largest victims of this fraud was Stonington, which in May 2000 sold its ownership of a successful American company, Dictaphone Corporation ("Dictaphone"), to L&H in exchange for approximately $490 million in L&H stock (the "Dictaphone Transaction").

1

Just over six months after this transaction was completed, following L&H's restatement of its financials and a Chapter 11 bankruptcy filing by the Company, Stonington's shares of L&H were worthless.

3.    In determining to sell Dictaphone in return for L&H stock, Stonington relied particularly on KPMG's audit opinions and its direct verbal representations to Stonington. KPMG audited and certified L&H's financial statements for 1998 and 1999, placing the imprimatur of a "Big Five" accounting firm upon L&H's claims of extraordinary profitability and revenue growth. Stonington would never have agreed to the Dictaphone Transaction but for express representations made by partners of both KPMG U.S. and KPMG Belgium during the course of Stonington's due diligence that L&H's 1998 and 1999 financials were prepared in accordance with U.S. Generally Accepted Accounting Principles ("U.S. GAAP") and that its reported revenues had been appropriately recognized in each of the quarters for those years. KPMG's U.S. audit partner Robert McLamb, who was principally responsible for ensuring that L&H's financial statements conformed with U.S. GAAP, represented that he had personally reviewed each of L&H's 1999 contracts over $100,000 and that L&H's revenue recognition on each of those contracts complied with U.S. GAAP. These representations, as well as KPMG's unqualified audit opinions on the Company's 1998 and 1999 financial statements, were knowingly false.

4.    Stonington was the owner of approximately 96% of the outstanding stock of Dictaphone, a stable and successful company with over $300 million in revenues for each of the years 1996 through 1999. The Dictaphone Transaction called for Stonington to surrender its ownership interest in Dictaphone in exchange for shares of L&H stock, half of which would be held for two years in a voting trust controlled by the principals of L&H and could not be sold

2

during that time. Under these circumstances, it was critical for Stonington to be confident that L&H's financial position was accurately reported, that its revenues had been appropriately recognized and that its explosive growth in 1998 and 1999 was genuine.

5.    Thus, before entering into the Dictaphone Transaction, Stonington conducted extensive due diligence of L&H, including detailed discussions with McLamb and KPMG Belgium partner William Van Aerde. Stonington's due diligence occurred in February and March 2000, after the end of L&H's 1999 fiscal year (which ended on December 31), and at a time when KPMG's audit of L&H's 1999 financial statements was nearing completion. As part of its due diligence of L&H, Stonington specifically requested and reviewed copies of the most significant contracts L&H entered into in 1998 and 1999, and discussed each of those contracts in detail with KPMG. KPMG repeatedly represented that it was familiar with the applicable United States accounting literature and rules governing revenue recognition on these contracts; that the contracts had been closely scrutinized by KPMG during its audits and quarterly reviews, that McLamb had personally reviewed each and every one for conformity with U.S. GAAP; and that KPMG had obtained persuasive evidence that the criteria for revenue recognition required under U.S. GAAP had been satisfied regarding each contract. Further, KPMG specifically assured Stonington that it expected no material adjustments to L&H's 1999 year-end financial results, which had been publicly announced on February 9, 2000. Stonington relied upon these representations and upon KPMG's expertise as a "Big Five" auditor in entering into the Dictaphone Transaction, and indeed, it never would have agreed to the transaction otherwise. As discussed in detail herein, however, KPMG knew that the statements it made to Stonington regarding L&H were false. In fact, KPMG knew but concealed from Stonington the fact that, during the very time due diligence discussions were taking place, L&H's financial statements

3

and revenue recognition practices were under investigation by the Securities and Exchange Commission! The failure to disclose this fact to Stonington, in and of itself, constitutes actionable fraud.

6. Following the publication of exposés of the fraud by *The Wall Street Journal* in the summer of 2000, L&H's Board of Directors authorized its Audit Committee to investigate the accounting practices of the Company. The Audit Committee commissioned the preparation of a report, which concluded that L&H's financial statements for 1998, 1999 and the first two quarters of 2000 needed to be restated, and that L&H had overstated its revenue during this period by as much as $277 million – a full *one-half* of the company's total revenues – due to accounting "errors and irregularities." (In fact, following further investigation, the ultimate restatement would be nearly $100 million higher.) "Irregularities" is a term of art in the accounting profession which refers to intentional misstatements or omissions indicating that there was fraud in the preparation of L&H's financial statements.

7. KPMG knew that L&H had engaged in numerous fraudulent practices that violated U.S. GAAP and materially inflated L&H's revenues. Specifically, L&H had:

   (a) formed sham "strategic partners" funded by entities related to L&H in order to create fictitious revenues and to enable L&H to fund its research and development without deducting the expenses from operating income;

   (b) improperly recorded over $45 million in revenue in Korea in the fourth quarter of 1999 – more than 40% of the Company's fourth quarter revenues – through fake contracts with start-up entities which had no ability to pay the multi-million dollar licensing fees recorded as revenue by L&H;

   (c) bribed Korean banks to factor its Korean receivables with recourse, creating the illusion of $100 million in cash on the Company's books which actually did not exist because L&H had to repay it to the banks; and

4

(d)    engaged in a host of other improper accounting practices, including recognition of revenue on contracts that had not yet been finalized and contracts where the customer had no obligation to pay unless it received an investment from one of L&H's related parties.

8.    Indeed, the report prepared for the Audit Committee noted that, in many cases, KPMG had direct personal knowledge of the fraudulent transactions examined and that nothing showed that, or how, KPMG was able to resolve these issues before issuing unqualified opinions on L&H's financial statements.    Indeed, the report concluded that revenue had been inappropriately recognized on many of the very same contracts that KPMG had vouched for during the course of Stonington's due diligence on the Dictaphone Transaction.

9.    Moreover, documents obtained by Stonington, including e-mails between L&H's most senior officers and the partners at KPMG with principal responsibility for the audits and quarterly reviews of L&H, establish that KPMG knew that revenue should not have been recognized on these fraudulent transactions.    Specifically, KPMG knew revenue should not have been recognized on the "strategic partner" contracts because, among other things, they were funded by entities related to L&H.    In fact, one of the most significant of these related entities, defendant Flanders Language Valley Fund ("FLV Fund"), was actually audited by KPMG Belgium – leaving no question that KPMG understood both the nature of the relationship and the details of the "strategic partner" transactions.    These same documents show that KPMG knew the "strategic partners" were mere shell corporations which performed no work, had few if any assets, often shared the same address, and transferred funds to L&H from common checking accounts.

10.    In addition, KPMG knew that L&H was unlikely to be paid on many of its Korean contracts and that L&H had recognized revenue on those contracts after factoring the receivables with Korean banks "with recourse" – meaning that revenue on these "sales" could not be booked

5

and that nearly $100 million in cash in L&H's Korean bank accounts could simply be reclaimed by the banks if L&H's customers failed to pay. Indeed, since virtually all of L&H's Korean customers were fictitious entities or small start-up companies with no ability to pay the amounts supposedly due to L&H, this is exactly what ultimately happened. L&H booked $46.3 million in revenue in Korea during the fourth quarter of 1999 – more than 40% of the Company's total fourth quarter revenue and more than 13% of its total reported revenue for the year. All of these sales were phony, and the entire $46.3 million of revenue has now been completely reversed and eliminated.

11. KPMG has since withdrawn its audit reports on the 1998 and 1999 financial statements, and even at present, L&H has been unable to provide audited financials for the last two and a half years. The senior management of L&H is under arrest in Belgium and facing criminal fraud charges. And, in November 2000, L&H drove the final nail in the coffin when it filed a Chapter 11 bankruptcy petition, officially reducing Stonington's $490 million investment in L&H to nothing.

## II.    JURISDICTION AND VENUE

12. The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78(b) and 78t(a), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, and under state law. In connection with the acts, conduct, and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of a national securities market.

13. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. §§ 1331 and 1337 and the principles of supplemental

jurisdiction under 28 U.S.C. § 1367. Furthermore, the state law claims asserted herein have an independent basis for subject matter jurisdiction pursuant to diversity of citizenship, 28 U.S.C. § 1332.

14.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

III.    **PARTIES AND PERTINENT NON-PARTIES**

**Plaintiffs**

15.     Plaintiff Stonington Partners, Inc. is a Delaware corporation with its principal place of business in New York, New York. Stonington Partners, Inc. is the management company of plaintiff Stonington Capital Appreciation 1994 Fund, L.P.

16.     Plaintiff Stonington Capital Appreciation 1994 Fund, L.P. is a Delaware limited partnership with its principal place of business in New York, New York. Prior to May 5, 2000, Stonington Capital Appreciation 1994 Fund, L.P. owned approximately 96% of the issued and outstanding capital stock of Dictaphone Corporation. Pursuant to the Merger Agreement between L&H and Dictaphone, Stonington Capital Appreciation 1994 Fund, L.P. is the beneficial holder of 9,064,329 shares of L&H common stock.

17.     Plaintiff Stonington Holdings, L.L.C. is a Delaware limited liability company with its principal place of business in New York, New York. Pursuant to the Merger Agreement between L&H and Dictaphone, Stonington Holdings, L.L.C. is the record holder of 8,478,929 shares of L&H common stock (with another 585,400 shares held in escrow for the benefit of Stonington).

7

**Defendants and Pertinent Non-Parties**

### The Company

18.    L&H was formed in 1987 by Jo Lernout and Pol Hauspie.  Its three core technologies are automatic speech recognition, text-to-speech conversions, and digital speech compression.  L&H is jointly headquartered in Ieper, Belgium, and in Burlington, Massachusetts and, until November 9, 2000, it was listed on the NASDAQ exchange under the symbol LHSP. On November 29, 2000, L&H filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware and, shortly thereafter, commenced bankruptcy proceedings in Belgium.  L&H would be named as a defendant here were it not currently the subject of bankruptcy proceedings and protected by the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362.

### L&H's Senior Officers

19.    Jo Lernout was a co-founder of L&H and served as a Managing Director of the Company since its organization in 1987, as President from January 1994 until October 1996, as Co-Chairman of the Board since October 1996, as a member of the Office of the Chief Executive since February 1996 and Co-Chairman in the Office of the Chief Executive since October 1996. Lernout resigned his management positions with the Company on November 9, 2000 and his director position on January 16, 2001.

20.    Pol Hauspie was a co-founder of L&H and served as a Managing Director of the Company since its organization in 1987, Chairman from January 1994 until October 1996 and as a Co-Chairman of the Board since October 1996, as a member of the Office of the Chief Executive since February 1996 and as Co-Chairman in the Office of the Chief Executive since

8

October 1996.  Defendant Hauspie resigned his management positions on November 9, 2000 and his director position on November 22, 2000.

21.    Gaston Bastiaens was the President of L&H from October 1996 and Chief Executive Officer from May 1997 until his resignation on August 25, 2000.  Bastiaens was a director of L&H until his resignation from that position on November 22, 2000.

22.    Nico Willaert was a Vice Chairman of L&H and a Managing Director at all relevant times until his resignation on November 9, 2000.  Willaert was a director of L&H until his resignation from that position on November 22, 2000.

23.    Lernout, Hauspie, Bastiaens and Willaert are not named as defendants here, but are named as defendants in another action filed by Stonington in the Court of Chancery of the State of Delaware (the "State Court Action"), which seeks rescission of the Dictaphone Transaction and monetary damages.  Defaults have been entered in the State Court Action against Lernout, Hauspie and Willaert.  Lernout, Hauspie, Bastiaens and Willaert would be named as defendants here were it not for the pendency of the State Court Action.

24.    Defendant Carl Dammekens joined L&H in 1990 as Corporate Controller and served as Senior Vice President of Finance from 1993 to 1996.  He was L&H's Acting Chief Financial Officer from 1996 until July 7, 1999, when he was appointed Chief Financial Officer.  He resigned his position as Chief Financial Officer on November 9, 2000.

**The Audit Committee Defendants**

25.    Defendant Erwin Vandendriessche, at all relevant times, was a director of L&H and the Chairman of the Audit Committee of L&H's Board of Directors (the "Audit Committee").  The Audit Committee is charged with, among other things, the responsibilities of providing oversight over L&H's financial reporting function, reviewing the scope of internal

9

controls and reviewing the implementation by management of recommendations made by L&H's auditors, KPMG, regarding weaknesses in L&H's internal controls and financial reporting. Presumptively, members of the Audit Committee needed to understand U.S. GAAP and the requirements thereof to exercise their oversight function over L&H's financial reporting.

26.    Defendant Dirk Cauwelier, at all relevant times, was a director of L&H and a member of the Audit Committee.

27.    Defendant Marc G.H. De Pauw, at all relevant times, was a director of L&H and a member of the Audit Committee.

28.    Defendants Vandendriessche, Cauwelier and DePauw are collectively referred to herein as the "Audit Committee Defendants."

**KPMG**

29.    Defendant Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren (a.k.a. KPMG Bedrijfsrevisoren or KPMG Belgium) ("KPMG Belgium"), is a Belgian public accounting firm and a member of the "Big Five" accounting firm known as KPMG. KPMG Belgium has audited L&H's financial statements since 1991, when KPMG acquired the Belgian accounting firm of Behets, Boes & Co., which had been auditing L&H since the late 1980s.

30.    Defendant KPMG U.S. is a public accounting firm based in the United States and, like KPMG Belgium, a member of the "Big Five" accounting firm known as KPMG. Together with KPMG Belgium, KPMG U.S. audited L&H's financial statements for 1998 and 1999 and conducted quarterly reviews of L&H's financial statements for each quarter during those years.

31.    Over the signature of KPMG Belgium, KPMG issued unqualified audit reports on L&H's financial statements for 1998 and 1999; stated that those financial statements were prepared in accordance with U.S. GAAP and that its audit was conducted in accordance with

10

United States Generally Accepted Auditing Standards ("GAAS"); and consented to the inclusion of those audit reports in L&H's filings with the United States Securities and Exchange Commission ("SEC"). In addition, KPMG had communications with Stonington or its representatives during the course of due diligence on the Dictaphone Transaction, as detailed herein.

**The Related-Party Defendants**

32. Defendant FLV Fund is a Belgian venture-capital fund organized by Hauspie and Lernout, among others, to make various strategic investments. FLV Fund is a publicly traded company which trades on the EASDAQ stock exchange under the symbol "FLVF." FLV Fund has United States offices in Los Altos Hills, California and in Woburn, Massachusetts. Both Hauspie and Lernout served as directors of FLV Fund from 1996 to 1997, and after 1997 each continued to "spend a portion of his time on activities relating to the FLV Fund." At all relevant times, the financial statements of the FLV Fund were audited by KPMG Belgium.

33. Defendant Flanders Language Valley Foundation, also known as the S.A.I.L. Trust V.Z.W. ("S.A.I.L. Trust"), purports to be a non-profit entity established in 1995 by, *inter alia*, Hauspie, Lernout and the Government of Flanders to support economic development and to assist in the infrastructure financing of the Flanders Language Valley region. S.A.I.L. Trust holds a one-third interest in FLV Management, N.V., which is the manager of the FLV Fund, and has the right to appoint five of FLV Management's directors. Since July 1999, the chief executive officer of the S.A.I.L. Trust has been Paul Behets, who until that time was the partner at KPMG Belgium with primary responsibility for the audits of L&H's financial statements.

34. Defendant L&H Investment Company N.V. ("LHIC") is a Belgium investment fund founded by Hauspie and Lernout in 1998, through which Hauspie and Lernout control 7.6%

11

of L&H's stock. LHIC was purportedly established to make long-term strategic investments in companies in information technology industries such as speech, language and artificial intelligence. Hauspie and Lernout capitalized LHIC with their own shares of L&H common stock and act as advisors to LHIC and its investments. The President and Managing Director of LHIC since its inception has been Francis Vanderhoydonck, who also served as a director of L&H from May 1999 until his resignation on or about May 15, 2001. In addition, the Chief Financial Officer of LHIC, Chantal Mestdagh, was formerly a KPMG Belgium auditor responsible for the audits of L&H's financial statements.

35.    Defendant Mercator & Noordstar, N.V. ("Mercator") is an insurance company located in Antwerp, Belgium. At all relevant times, Mercator owned 6.9% of L&H Holding, which, in turn, owned 8.9% of L&H. Mercator also directly owned a 0.2% stake in L&H.

36.    FLV Fund, S.A.I.L. Trust, LHIC, and Mercator are collectively referred to as the "Related-Party Defendants," because each is a related party to L&H. As detailed herein, each of the Related-Party Defendants provided funding for certain "strategic partners" of L&H, often referred to as Language Development Companies ("LDCs") or Cross-Language Development Companies ("CLDCs"). The LDCs and CLDCs were shell corporations which formed an integral part of the scheme to inflate L&H's revenues by means of related-party transactions.

**Louis Verbeke**

37.    Defendant Louis Verbeke is a Belgian citizen who served at all relevant times as the Chairman of Mercator and as a named partner at the Belgian law firm of Loeff Claeys Verbeke ("Loeff Claeys"). Loeff Claeys served as legal counsel to both L&H and FLV Fund. Upon information and belief, Verbeke, in his capacity as a partner of Loeff Claeys, provided legal services in connection with L&H's fraudulent transactions involving the Related-Party

Defendants.  In addition, Verbeke attended virtually all meetings of L&H's Board of Directors, including those where related-party transactions or issues concerning conflicts between L&H and FLV Fund were discussed.

### The Korean Banks

38.    Defendant Hanvit Bank is Korea's largest commercial bank and does business in countries throughout the world, including the United States.  It was reported by *The Banker*, an English financial magazine, in July 1999, to rank 113th among the world's top 200 banks in terms of equity capital, with equity of $3.22 billion.  In February 2000, Hanvit Bank issued $850 million of subordinated bonds in the United States.

39.    Defendant Shinhan Bank is one of Korea's largest banks and does business in countries throughout the world, including the United States.  Shinhan Bank was ranked 171st among the world's largest banks by *The Banker*, with equity of $1.98 billion.

40.    Defendant Chohung Bank is one of Korea's largest banks, and does business in countries throughout the world, including the United States.

41.    Hanvit Bank, Shinhan Bank, and Chohung Bank are collectively known as the "Korean Banks."  The Korean Banks, and to a lesser extent Hana Bank, which is not named as a defendant here, aided and abetted L&H's fraud by factoring receivables supposedly owed to L&H "with recourse," enabling L&H to improperly report cash on its balance sheet which was actually subject to the right of the Korean Banks to reclaim it.  In April 2001, L&H, under new management following disclosure of the fraud, filed a criminal complaint against the Korean Banks with the Seoul Prosecutor's office in connection with the fraud alleged herein.

IV.    **SUBSTANTIVE ALLEGATIONS**

A.    **BACKGROUND**

42.    In 1995, L&H completed its initial public offering and commenced trading on NASDAQ. From 1987 through 1995, the Company was never profitable and only produced a few million dollars in annual revenues.

43.    Beginning in the third quarter of 1996, L&H started rapidly expanding its business, primarily through a dizzying array of acquisitions.   As a result, L&H's sales quadrupled from 1995 to 1996, kicking off a period of unprecedented growth for L&H which made the Company an international success story and the pride of Belgium.

44.    From 1997 to June 2000, L&H reported incredible revenue growth -- which, as it turns out, was largely the consequence of undisclosed related-party transactions and fraudulent accounting.  In 1997, the Company's total revenues increased 220% to $99.4 million from $31 million in 1996.  In 1998, L&H's revenues purportedly rose 113% to $211.6 million, and by 1999, the Company reported total annual revenues of $344 million.

45.    In early 2000, Stonington was approached by L&H and SG Cowen Securities Corporation, a securities and investment banking firm, regarding a proposed acquisition of Dictaphone.   At the time, Dictaphone was one of L&H's competitors in the "speech and language applications" sector.  Unbeknownst to Stonington, which owned 96% of Dictaphone's outstanding stock, Dictaphone was about to become merely the latest in a series of acquisitions completed by L&H by means of an artificially inflated stock price.

46.    Dictaphone, headquartered in Stratford, Connecticut, is a leader in selected vertical markets in the development, manufacture, marketing, service and support of integrated voice and data management systems and software, including dictation, voice processing, voice

14

response, unified messaging, records management, call center monitoring systems and communications recording.

47.    Dictaphone is known worldwide for its medical record workflow systems and its transcription business. Indeed, Dictaphone's market penetration in this sector is noteworthy: according to industry analysts, as many as 400,000 physicians in the United States use Dictaphone to dictate 100,000 hours of dictation each day for clinical record processing.

48.    Dictaphone's healthcare market assets include its 5,000 medical industry customers worldwide, its 100 sales representatives, its strong national network of technical service representatives, its experienced executive management team, and its broad range of solutions for medical industry dictation and data management.

49.    The acquisition of Dictaphone, recognized by L&H management as "a leader in the medical dictation and patient record management market," was therefore an integral step in L&H's plans to form a powerful Healthcare Enterprise business group with immediate access to Dictaphone's large customer base and the opportunity to integrate leading technologies to create new healthcare enterprise market solutions. The acquisition of Dictaphone would also provide L&H with a wide range of assets with which to further its healthcare business strategies.

50.    In acquiring Dictaphone, L&H hoped to capitalize on Dictaphone's healthcare market revenues of $130 million in 1999, and its noteworthy market penetration in this area.

51.    L&H also recognized that access to Dictaphone's products and other resources, such as Dictaphone's document creation solutions, including its digital portable hand held voice recorders, transcription job administration and document distribution offerings, would further enable L&H to realize its plans for development of its enterprise healthcare solution.

15

52.    For its part, Stonington was intrigued by L&H's overtures because of L&H's apparent financial success in a market compatible with Dictaphone's.    Moreover, L&H's revenues and stock price were rising and continued to rise throughout the course of the discussions between Stonington and L&H.

53.    In agreeing to negotiate with and ultimately enter into an agreement with L&H, Stonington hoped to realize the potential synergies that a combination of the two companies and their technology and geographic market coverage seemed to promise.

54.    Specifically, based on what L&H represented as its extraordinarily positive results in the Asian markets, and Dictaphone's well-established United States presence, Stonington entered into the transaction with an expectation that an integration of the two companies would make the combined entity a worldwide leader in the speech recognition business.

55.    In deciding to enter into the Dictaphone Transaction, Stonington relied on L&H's publicly reported financial results for 1998 and 1999.  Indeed, on February 9, 2000, L&H issued a press release reporting its results for the fourth quarter and full year 1999.  L&H reported "record" revenues of $344 million in 1999, an increase of nearly 63% over 1998 reported revenues.

56.    The proposed transaction was a stock-for-stock swap pursuant to which Stonington would receive not cash but shares of L&H common stock.  In addition, as part of the transaction, Stonington was precluded for two years from selling approximately 4 million of the 9 million shares of L&H common stock it received.  For that two-year period, Stonington was required to assign certain voting rights to all the L&H shares it held to a voting trust controlled by Jo Lernout and Pol Hauspie.

16

57.     With these facts in mind, Stonington retained legal and financial advisors to conduct extensive due diligence of L&H.   With respect to L&H's financial statements, Stonington identified L&H's revenue recognition practices as the key issue, and discussed in detail issues relating to revenue recognition over the course of several meetings and conference calls with L&H's management and KPMG.   During the due diligence, L&H and KPMG repeatedly assured Stonington that L&H's financial statements were presented in conformity with U.S. GAAP and that L&H's revenue recognition practices were appropriate.   Moreover, both L&H and KPMG assured Stonington that they expected no material adjustments to L&H's 1999 financial statements, as announced on February 9, 2000.   See ¶¶123-127 below. Stonington relied on each of these representations.

58.     Following this due diligence process, L&H, Stonington and Dictaphone entered into a series of agreements on or about March 7, 2000 pursuant to which L&H would acquire Dictaphone from Stonington in a stock-for-stock deal.   L&H agreed to acquire all of the outstanding stock of Dictaphone, in exchange for approximately 9 million shares of L&H common stock and the assumption of approximately $400 million of Dictaphone debt and other obligations.

59.     This series of agreements included several documents detailing the terms of the transaction:  (1) the Agreement and Plan of Merger among L&H, Dark Acquisition Corp. and Dictaphone Corporation, dated March 7, 2000; (2) a Stockholder Letter of Transmittal, Indemnity and General Release Pursuant to Agreement and Plan of Merger; (3) an Indemnity and Escrow Agreement by and among L&H, Stonington and other Dictaphone Stockholders and State Street Bank and Trust Company as escrow agent, dated as of May 5, 2000; (4) an Agreement of Limited Liability Company between Stonington Capital Appreciation 1994 Fund,

17

L.P. and L&H Holding N.V., dated as of May 5, 2000; (5) a Stockholders Agreement among Stonington Holdings, L.L.C., LEHA, L&H Holding N.V., L&H Holding III, Oldco N.V., L&H Investment Company N.V. and L&H, dated as of May 5, 2000; (6) a Voting Agreement and Waiver by and among L&H, Dark Acquisition Corp. and Stonington Capital Appreciation 1994 Fund, L.P., dated March 7, 2000; and (7) a Registration Rights Agreement among L&H and the Dictaphone Stockholders, dated May 5, 2000. These documents are collectively referred to herein as the "Merger Agreements."

60.    The Merger Agreements contained various representations and warranties pursuant to which L&H warranted the truth and accuracy of its financial statements and SEC filings.  In Section 4.4 of the Agreement and Plan of Merger, L&H (referred to as "Buyer") represented that:

> (a)   Buyer has filed and made available to [Dictaphone] all forms, reports and documents required to be filed with the SEC since January 1, 1997. Buyer's Registration Statement on Form F-3 (File No. 333-11324), filed with the SEC on January 7, 2000 . . . (i) was prepared in compliance in all material respects with the applicable requirements of the Securities Act and the Exchange Act, as the case may be, and the rules and regulations of the SEC thereunder applicable to such Buyer Registration Statement, and (ii) does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

> (b)   Each of the consolidated financial statements, as amended (including, in each case, any related notes or schedules), contained in the Buyer Registration Statement were prepared in accordance with US GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes to such financial statements or, in the case of unaudited statements as permitted by the SEC on Form 6-K under the Exchange Act) and fairly presented in all material respects the consolidated financial position of Buyer and its Subsidiaries as of the dates of the consolidated results of its operations for the periods indicated, consistent in all material respects with the books and records of Company and its Subsidiaries . . .

18

61.    L&H also represented in the Merger Agreements that there had been no material adverse changes in its business since the date of its most recently published quarterly financial statements, which were for the quarter ended September 30, 1999. In Section 4.6 of the Agreement and Plan of Merger, L&H represented that:

> Except as expressly contemplated by this Agreement, as disclosed in the Buyer SEC Reports or Company press releases filed or issued prior to the date hereof, or in connection with the matters disclosed at Section 4.5 of the Buyer Disclosure Schedule that Buyer has discussed with Company prior to the date hereof, since September 30, 1999, there has not been (i) any change in the financial condition, results of operations, business, or properties of Buyer and its Subsidiaries, taken as a whole, that has had, or is reasonably likely to have, a Buyer Material Adverse Effect; (ii) any damage, destruction or loss to property (whether or not covered by insurance) with respect to Buyer or any of its Subsidiaries having a Buyer Material Adverse Effect; (iii) any revaluation by Buyer of its assets having a Buyer Material Adverse Effect, exclusive of any revaluations (including write-downs or write-offs) of good will; or (iv) any other action or event that would have required the consent of Company pursuant to Section 5.3 of this Agreement had such action or event occurred after the date of this Agreement.

"Buyer Material Adverse Effect" is defined in Section 4.1 of the Agreement and Plan of Merger as "a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement."

62.    Stonington was entitled to terminate the Merger Agreements prior to closing if it learned that L&H's unaudited financial statements for 1999 were materially misstated. The Merger Agreements made the lack of a material adverse change in L&H's financial condition a precondition to the obligation of Stonington to complete the merger. Section 7.3(a) of the Agreement and Plan of Merger provides in relevant part:

> (i) The representations and warranties of Buyer and Sub set forth in this Agreement that are not qualified as to Buyer Material Adverse Effect shall be true and correct, except where failure to be true and correct would

19

not have a Buyer Material Adverse Effect, as of the Closing Date, as though made at and as of the Closing Date, except that those representations and warranties that address matters only as of a particular date shall so remain true and correct as of such date.

(ii) The representations and warranties of Buyer and Sub set forth in this Agreement that are qualified as to Buyer Material Adverse Effect shall be true and correct in all respects as of the Closing Date, as though made at and as of the Closing Date, except that those representations and warranties that address matters only as of a particular date shall remain so true and correct in all respects as of such date . . .

63.     On April 27, 2000, KPMG issued a clean and unqualified audit report on L&H's financial statements for 1999.  Ten days later, on May 5, 2000 (the "Closing Date"), the Dictaphone Transaction was consummated.  Stonington received 9,064,329 shares of L&H common stock in exchange for its interest in Dictaphone, which, based upon the trading price of L&H stock on the Closing Date ($53.97 per share), were valued at approximately $490 million. Only six months later, after the fraud was disclosed, Stonington's shares of L&H stock would be worthless.

**B.     OVERVIEW OF THE FRAUD**

64.     The most significant aspects of the fraud involved L&H's sales in Korea, where most of L&H's customers did not even exist, and contracts with "strategic partners," on which L&H recognized revenue from shell corporations which were funded by parties related to L&H.

**1.     The Korean Fraud**

65.     Prior to September of 1999, L&H had virtually no Korean revenue.  However, on September 13, 1999, the Company acquired a Korean entity, Bumil Information & Communications, Co. Ltd. ("Bumil"), and renamed it as L&H Korea.

66.     L&H purchased Bumil for $25 million in cash.  As additional consideration for the acquisition, Ju-Chul Seo, Bumil's president and sole shareholder, was entitled to receive a

20

cash "earn-out" of $25 million, provided that L&H Korea met certain revenue targets by December 31, 2000. Thus, the earliest this "earn-out" could become due was January 2001.

67.    At the time it acquired Bumil, L&H was well aware that Bumil lacked the ability "to uphold internationally accepted financial practices." On September 9, 1999, Louis Woo, President and General Manager of L&H Asia Pacific, sent an e-mail to Dammekens and Bastiaens concerning the "financial accountability of L&H Korea." Specifically, Woo stated:

> Mr. Seo was, by all accounts, the sole owner of Bumil and he had not needed to answer to anyone but himself. In Asia, not only in S. Korea, owners of family business tend to mix the company finances with personal finances. We must have a clear financial process and procedure for them to adhere to so that no possible abuses can be made and tolerated. . . . It is next to impossible to expect [that] the current financial controller and accounting manager will behave any differently from that of the Bumil days. It will be impossible for them to uphold the internationally accepted financial practices if they happen to be different from the current practices and it is equally impossible to expect them to over-rule Mr. Seo if his practice deviates from ours.
>
> It is extremely important to hire a strong controller from S. Korea to head up our financial department in L&H Korea. If we can lay this condition down as part of the acquisition and integration process NOW, there will be no hard feelings. If we delay making that condition clearly NOW, it will be perceived as embarrassing Mr. Seo. Especially if the condition is spelled out only after we have reviewed his financial practice.

68.    L&H immediately capitalized on its acquisition of Bumil by purportedly entering into a number of large contracts with a variety of Korean customers. During the fourth quarter of 1999 alone, L&H booked $46.3 million in revenue in Korea – 42% of the Company's total reported fourth quarter revenue, and a significant portion of the Company's total annual revenue for 1999. More than 75% of this revenue was recorded between December 24 and December 31, 1999, and of the ten contracts L&H entered into in Korea during the fourth quarter, nine were

21

signed between December 15 and December 31.  All of these contracts were subsequently

cancelled, and every penny of the revenue L&H recorded from these "sales" was reversed.

        69.    L&H highlighted the purported positive effect of its Korean deals in its February

9, 2000 press release announcing the Company's 1999 financial results:

> The demand for speech-enabled applications continued to grow in
> the Pacific Rim and L&H technologies were increasingly popular
> in the region.  South Korea and other Pac Rim-based developers
> who plan to build applications employing L&H's realSpeak,
> ASRT, TTS and dialogue systems solutions include: Hyundai
> Securities, Samsung Securities, LG Securities, Daishin Securities
> and Daewoo Securities, EPC Asia, IBCC (International Business
> Computer Co., Ltd.) NeoTelecom, LG Electronic, Intelligent
> Communications,    Softech    Advantage,    and    SofTel
> Telecommunication Pte. Limited . . . .  L&H enhanced its ability to
> develop telephony solutions, increased its presence in Korea and
> continued to expand its telecommunications leadership by
> acquiring resources that included Bumil . . . and others."

        70.    The purported revenue generated by L&H's so-called customers from Korea and

the Far East in 1999 was astounding.  Of the $344 million in revenue that L&H recorded in 1999,

approximately $63 million, or 18%, was attributed to sales in Korea.  Sales in Singapore

accounted for another $80 million.  In total, sales from Korea and Singapore accounted for 44%

of the Company's 1999 revenues.

        71.    In fact, the Korean revenues were entirely fictitious.  L&H had few real customers

in Korea.  The majority of sales were from sham transactions, and the cash which L&H claimed

to have on its Korean books as a result of these sales was nonexistent.

### a.  L&H Factored Korean Receivables With Recourse

        72.    Because the Korean contracts were shams, the heart of the Korean fraud involved

the systematic factoring of receivables "with recourse" by L&H in order to obtain cash upfront,

which it could then claim it had collected from its "customers."  Factoring with recourse meant

that L&H could not record the revenue from these "sales" and should have recorded it instead as a "secured borrowing," i.e., a loan which L&H was obligated to repay. The scheme was carried out with the full knowledge and cooperation of the Korean Banks.

73.    The fraud followed the same basic pattern. Beginning on September 30, 1999, L&H Korea entered into a series of "factoring arrangements" by which L&H sold the accounts receivable from licensing agreements to the three Korean Banks. L&H would generate an invoice relating to one of its fictitious contracts and deliver it to one of the Korean Banks in exchange for cash – allowing L&H to inflate its reported income, pay bonuses and drive up its stock price. L&H, however, would enter into side agreements with the banks that turned the sales contracts into de facto loans.

74.    Under the scheme, the banks would "purchase" L&H's accounts receivable and place the funds in a "restricted time deposit" account. L&H agreed not to withdraw these funds. Even though L&H had no right to withdraw the funds, it recorded the time deposit on its books as cash and eliminated the accounts receivable. Therefore, through this arrangement, L&H's financial statements reflected an increase in sales, cash collections and a large amount of cash.

75.    A typical factoring agreement entered into between L&H and the Korean Banks read:

> I (we) [L&H] promise to adhere to the following clauses in factoring note receivable without recourse pursuant to factoring agreement dated December 31, 1999 with the Bank, and submit this confirmation letter.
>
> 1. Although the signed factoring agreements have been without recourse, I (we) promise to take recourse responsibility under this confirmation in the event that the transferred note receivable is defaulted.

2. Upon proceeds from factored note receivable is received, I (we) shall deposit the amount as agreed by the Bank and us, sign a separate pledge agreement and adhere to that agreement.

3. Pursuant to the above clause, I (we) will not raise any objection when the deposit is used to offset against factored note receivable, when this notes receivable is defaulted.

76.     In reality, because there was little or no payment by the sham customers, all of the cash was held by the banks in these restricted time-deposit accounts.  Thus, after some amount of time passed and the customers had not paid the receivables, the banks merely foreclosed on the time deposits, leaving L&H with nothing.  As a result, over $100 million of L&H's so-called Korean "revenue" and "cash" disappeared from the Company's records overnight.

77.     L&H Korea's practice of factoring receivables with recourse was widespread and well-known by L&H management and KPMG.  As set forth below at ¶¶154-155, KPMG had actual knowledge in October 1999 that L&H was factoring receivables in Korea with recourse.

### b.     The Underlying Contracts Were Shams

78.     As detailed below, the Korean "customers" were typically start-ups with no ability to pay the huge license fees supposedly called for by the sham contracts.  This fact is confirmed by a report from the accounting firm of PriceWaterhouseCoopers ("PWC"), which was engaged by the L&H Audit Committee in late 2000 to uncover details of the Korean fraud.  PWC prepared a report in connection with its investigation of the Korean fraud, entitled "L&H Korea Report."  According to that report, PWC performed background checks on 10 of L&H's alleged Korean customers in order to determine what types of companies they were.  PWC was unable to locate one of these purported customers, and two of the companies sampled by PWC were still in the process of incorporating as of the date of the report in 2001.  Only two of the ten had even been incorporated prior to 1998.  Moreover, seven of the nine customers that PWC was

able to locate had fewer than 30 employees.   As PWC reported, it was inconceivable that these "customers" could have paid the huge, multi-million dollar licensing fees that L&H was booking as revenue: "[f]or these licensing agreements, there was little, if any, expectation that royalties would be collected within 90 days of the effective date of the agreement as required by the standard license agreement."

79.   L&H's licensing agreements in Korea contained purported fees of as much as $19 million.  The self-evident fact that start-up companies of this type would be unlikely to have the wherewithal to pay the multi-million dollar licensing fees called for by the sham contracts is even clearer in light of PWC's finding that licensing fees in the speech technology industry in Korea during 2000 were in the range of $100,000 to $300,000.   Indeed, PWC reported that "licensing fees in the millions of dollars were unheard of in Korea."  KPMG knew or should have known this, and it certainly knew that the "customers" were underfinanced startups and did not have economic substance apart from L&H, as demonstrated below at ¶142 and ¶155.

c.     **The Korean Banks Were Bribed by L&H**

80.   Why did the Korean Banks participate in the scheme to factor receivables with recourse?   The answer is closely tied to the "earn-out" provision in the Stock Purchase Agreement signed at the time of the Bumil acquisition, pursuant to which Seo (the president of L&H Korea) was entitled to a cash "earn-out" of $25 million only if L&H Korea met certain revenue targets between September 30, 1999 and December 31, 2000.   Even though no payment was scheduled to be made until 2001, Bastiaens persuaded L&H's Board of Directors to accelerate the full $25 million earn-out and pay it a year early, on January 28, 2000, as a so-called "reward" for L&H Korea's outstanding results in the fourth quarter of 1999.

25

81.    In fact, the earn-out was not a reward for Korea's supposed success at all, but rather a bribe for Seo to make to the Korean Banks to get them to "fund" L&H Korea's receivables. A February 3, 2000 e-mail from Seo to Lernout, Hauspie and Willaert, shortly after receiving the $25 million earn-out, confirms the basis for the accelerated payment:

> Thanks for your great assistance extended to me. I well received the remitted amount of 25 million USD. With your prompt action, I could keep my promise to Korean banks and those banks will rely on L&H Korea and will help us much better than before. Thanks again for your help.
>
> I assure that I will do all my best for L&H Group and for continuous business success of L&H.
>
> Sincerely yours,
>
> Ju-Chul Seo

### 2.    The "Strategic Partners" Fraud

82.    Another scheme L&H employed to manufacture revenues involved the creation of "strategic partners" to contract with L&H. These "strategic partners" were LDCs and CLDCs, which were supposedly created to develop the Company's software for specific applications and/or languages. The strategic partners would pay licensing fees to L&H, which L&H would record as revenue, and then the strategic partners would purportedly "develop" the software. At the end of the contract term, L&H would have the option – which was generally exercised – to acquire the strategic partner and the developed product. Through this scheme, L&H was able to avoid recording the expenses associated with developing the software, and to record revenue. The revenue derived from these "strategic partner" relationships was substantial, accounting for 10% of L&H's reported revenues for 1998 and 25% of its reported revenues for 1999. However, booking such revenue is only appropriate if the strategic partner is an independent third party

26

(i.e. not related to L&H) and the strategic partner is a real entity which actually develops the software without the involvement of L&H.

83.    In fact, the strategic partners were corporate fictions, and this revenue was entirely phony. The LDCs and CLDCs were actually funded by parties related to L&H, such as FLV Fund, Mercator, and the other Related-Party Defendants, and the entire arrangement was nothing but a sham designed to move research and development expenses off the books of L&H and to allow L&H to artificially inflate its revenues. The LDCs and CLDCs had no employees and no ability to develop software independently of L&H. All the development work under the contracts was done by L&H, and because the source of the funding for the LDCs and CLDCs was parties related to L&H, L&H was essentially paying itself to do the work and recognizing this as revenue.

84.    Thus, in 1998 and 1999, L&H helped create 30 start-up companies, based in Belgium and Singapore, purportedly to "develop" variants of its software for non-mainstream languages. Upon information and belief, the legal work involved in creating these start-ups was performed in whole or in part by Verbeke, in his capacity as a partner of Loeff Claeys. (In fact, Verbeke was the chairman of Mercator, which owned 16 of the start-ups.) L&H repeatedly maintained that unaffiliated "private investors" owned the start-ups.

85.    In an April 7, 1999 press release, L&H announced among the highlights of fiscal year 1998:

> [L&H] [b]egan development of approximately 20 additional exotic languages with its financial and technological partners. During 1998 contracts were signed for the following languages: Ukraine, Polish, Czech, Slavic, Bahasa, Greek and Farsi, to support a range of speech technologies. . . . In order to develop these additional languages within certain time and financial constraints, L&H is working with partners who will undertake the localization and

27

development of these language areas and share the financial risks and rewards.  L&H will license its tools to the partners and will secure the quality of the various applications and languages.

86.    In its 1998 Annual Report on Form 20-F, L&H expanded its description of these

transactions:

Pursuant to these agreements, we have exclusively licensed our speech and language technology development tools to strategic partners that are unaffiliated with us to develop and localize our technology for specified new languages.  Our strategic partners also have exclusive rights ... to develop, market, and distribute products incorporating the development technology.  In addition to one-time license fees, we have the rights to receive royalties based on our partners' net revenues from sales of products incorporating the developed technology.

[Emphasis added.]

87.    The above statements concerning "unaffiliated" parties were false and misleading,

because L&H did not disclose that the majority of the start-ups were funded by parties related to

L&H and that L&H was actually performing the development work that the LDCs and CLDCs

were supposed to.  In fact, as would later be revealed, 17 of the LDCs and 7 of the CLDCs were

owned, either directly or indirectly, by FLV Fund or Mercator.  Specifically, eight were owned

by FLV Fund.  Another four were subsidiaries of Language Investment Co., a company run by

Willem Hardeman, a director of the FLV Fund.  Finally, sixteen of the thirty were predominately

owned by Mercator.

88.    In fact, the investigative report presented to the Audit Committee by its advisors,

the U.S. law firm of Bryan Cave LLP ("Bryan Cave"), the accounting firm of Arthur Andersen

LLP ("AA"), and Loeff Claeys, dated November 20, 2000 (the "Audit Committee Report")

would itself raise significant questions about these 30 start-ups, concluding:

28

> [T]he Company and the LDCs realized, as early as December
> 1998, that completion of the work by the LDCs was not practicable
> and the Company began to provide some level of services, if not
> development work. As a result, the accounting should have been
> changed from up-front revenue recognition of the full license fee to
> deferral of the revenue and recognition of the revenue as the
> services or development was completed.

89.    The Audit Committee Report ultimately concluded that virtually <u>none</u> of the

revenue from the start-ups should have been booked. Approximately $79 million in revenue was

improperly recorded as a result of these "strategic partner" transactions. As the Audit

Committee Report made clear, if the LDCs or CLDCs were related parties, no revenue should

have been booked:

> If the investors are not related parties, accounting for such
> transactions would require deferral of all the revenues and
> recognition over the development period . . . If the investors are
> related parties, the relevant accounting literature presumes that the
> related party investors will be repaid and the funded amount are
> recognized as a liability.

90.    Either way, L&H fraudulently booked the revenue from those transactions. If the

LDCs and CLDCs were related parties, L&H should have recorded the payments from these

entities not as revenue but as <u>loans</u> which L&H was obligated to repay. In other words, rather

than revenue, these were <u>liabilities</u> of the Company. Even if the LDCs and CLDCs were not

related parties, the revenue could not have been booked up-front, as L&H did, but had to be

spread over a period of years, representing the time it would take L&H to perform the required

development work.

91.    L&H could not have accomplished this fraud without the direct participation of

the Related-Party Defendants and KPMG. L&H affirmatively and falsely represented that these

"licensees" were "unaffiliated customers" and that 1998 revenues from companies funded by

FLV Fund, Mercator and/or LHIC were minor. KPMG knew that the statements were false, that the licensees were actually related to L&H, and that L&H was improperly recording revenue from the transactions. In fact, KPMG Belgium was the auditor for the FLV Fund, and thus knew about every related-party transaction involving the L&H and FLV Fund from both sides.

C.    **THE MATERIALLY FALSE AND MISLEADING STATEMENTS PUBLISHED BY DEFENDANTS**

92.    On April 28, 1998, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Q1 Revenues of $35 Million; Strong Earnings of $0.13 Per Share Before One Time Charge for First Quarter." This press release stated, in relevant part:

> For the first quarter of 1998, L&H's total revenues were $35.1 million, an increase of 112% over reported revenues of $16.6 million for the first quarter of 1997.
>
> * * *
>
> Net income before one time charges and unusual items for the first quarter of 1998 reached $7 million, or $0.13 per share on 52.5 million average diluted shares outstanding which is a 62.5 % increase when compared to $2.7 million in net income, or $0.08 per share on 34.4 million average outstanding shares for the first quarter of 1997.

93.    This press release was included as Exhibit 2 to L&H's Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, filed with the SEC on May 1, 1998.

94.    These statements regarding L&H's financial results for the first quarter of 1998 were materially false and misleading because revenues and accounts receivable were artificially inflated by at least $2 million and earnings were materially overstated, as admitted by L&H's restatement of its financials for this period.

30

95.    On July 28, 1998, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Q2 Revenues of $45 Million; Record Net Profits of $9.5 Million or $0.17 EPS Before Exceptional Items." This press release stated, in relevant part:

> For the second quarter of 1998, L&H's total revenues were $45 million, an increase of 113% over reported revenues of $21.1 million for the second quarter of 1997.
>
> * * *
>
> Net income before one time charges and unusual items for the second quarter of 1998 reached $9.5 million. This represents $0.17 per share on 55.1 million average diluted shares outstanding which is a 138% increase when compared to $4.0 million in net income, or $0.11 per share on 36.1 million average outstanding shares for the second quarter of 1997.

96.    This press release was included as Exhibit 2 to L&H's Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, filed with the SEC on August 7, 1998.

97.    These statements regarding L&H's financial results for the second quarter of 1998 were materially false and misleading because revenues and accounts receivable were artificially inflated by at least $800,000 and earnings were materially overstated, as admitted by L&H's restatement of its financials for this period.

98.    On October 27, 1998, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Q3 Revenues of $54.9 Million; Record Net Profits of $12.1 or $0.22 EPS Before Exceptional Items." This press release stated, in relevant part:

> For the third quarter of 1998, L&H's total revenues were $54.9 million, an increase of 97% over reported revenues of $27.9 million for the third quarter of 1997.
>
> * * *

31

> Net income before one-time charges and unusual items for the
> third quarter of 1998 reached $12.1 million.  This represents $0.22
> per share on 55.9 million average diluted shares outstanding which
> is a 133% increase when compared to $5.2 million in net income,
> or $0.13 per share on 40.5 million average outstanding shares for
> the third quarter of 1997.

99.     This press release was included as Exhibit 2 to L&H's Form 6-K Report of

Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of

1934, filed with the SEC on October 29, 1998.

100.     These statements regarding L&H's financial results for the third quarter of 1998

were materially false and misleading because revenues and accounts receivable were artificially

inflated by at least $10.6 million and earnings were materially overstated, as admitted by L&H's

restatement of its financials for this period.

101.     On April 7, 1999, L&H issued a press release via Business Wire titled "Lernout &

Hauspie Reports Record Revenues and Record Earnings Before One-Time Charges for Fourth

Quarter 1998 and Fiscal Year 1998." This press release stated, in relevant part:

> Lernout & Hauspie (Nasdaq: LHSP) (Easdaq: LHSP) (L&H), a
> worldwide market leader in speech and linguistic technologies,
> products and services, today announced results for the fourth
> quarter of $76.7 million in revenue, or a 126% increase in the
> reported revenue of $33.8 million for the fourth quarter 1997.  For
> the fiscal year 1998, the company reported total revenues of $211.6
> million or an increase of 113% over the reported revenues of $99.4
> million for 1997.
>
> * * *
>
> The Company reported approximately $12.9 million in net income,
> before one-time charges and exceptional items, for the fourth
> quarter of 1998 or EPS (Earnings Per Share) of $0.22 cents per
> share on 58.3 million average diluted shares outstanding.  The
> Company's fourth quarter net income includes an increase in
> goodwill amortization expense of approximately $1.5 million or
> $0.03 per share, relating to the company's previously announced

32

revaluation of in-process research and development acquired in prior quarters, to reflect new United States Securities and Exchange Commission (the "SEC") guidelines. If not for this change, the Company's net income before one-time charges would have been $0.25 per share.

\* \* \*

Net income for the full year of 1998, excluding one-time charges, totaled $37.8 million or $0.69 per share on 55.2 million average diluted shares compared to $20 million or $0.53 per share on 38.9 million average diluted shares during 1997.

102.    This press release was included as Exhibit 2 to L&H's Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, filed with the SEC on April 19, 1999.

103.    On June 30, 1999, L&H filed with the SEC its Form 20-F Annual Report Pursuant to Section 13 or 15d of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 1998 (the "1998 20-F"). The 1998 20-F included the same financial information contained in L&H's April 7, 1999 press release.

104.    These statements regarding L&H's financial results for the fourth quarter of 1998 and for the 1998 fiscal year were materially false and misleading because fourth quarter revenues and accounts receivable were artificially inflated by at least $14.5 million, year-end revenues were artificially inflated by at least $27.9 million, and earnings were materially overstated, as admitted by L&H's restatement of its financials for this period.

105.    The 1998 20-F also included KPMG's unqualified audit opinion on L&H's financial statements for 1998:

33

LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. AND
SUBSIDIARIES INDEPENDENT AUDITORS' REPORT

The Board of Directors and Shareholders
Lernout & Hauspie Speech Products N.V.:

We have audited the accompanying consolidated balance sheets of
Lernout & Hauspie Speech Products N.V. and subsidiaries (the
Company) as of December 31, 1997 and December 31, 1998, and
the related consolidated statements of operations, shareholders'
equity, cash flows and comprehensive income for each of the years
in the three-year period ended December 31, 1998. These
consolidated financial statements are the responsibility of the
Company's management. Our responsibility is to express an
opinion on these consolidated financial statements based on our
audits.

We conducted our audits in accordance with generally accepted
auditing standards in the United States. Those standards require
that we plan and perform the audit to obtain reasonable assurance
about whether the financial statements are free of material
misstatement. An audit includes examining, on a test basis,
evidence supporting the amounts and disclosures in the financial
statements. An audit also includes assessing the accounting
principles used and significant estimates made by management, as
well as evaluating the overall financial statement presentation. We
believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to
above present fairly, in all material respects, the financial position
of Lernout & Hauspie Speech Products N.V. and subsidiaries as of
December 31, 1997 and December 31, 1998, and the results of
their operations and their cash flows for each of the years in the
three-year period ended December 31, 1998, in conformity with
generally accepted accounting principles in the United States.

Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren
Brussels, Belgium
April 9, 1999

[Emphasis added.]

106.    KPMG's unqualified audit report was materially false and misleading.

Specifically, contrary to what KPMG represented in its audit report, as set forth in ¶¶291-332

34

below, KPMG did not conduct its audit in accordance with generally accepted auditing standards in the United States, and L&H's 1998 financial statements did not present fairly, in all material respects, the financial position of L&H as of December 31, 1998, and the results of its operations for the year then ended, in conformity with generally accepted accounting principles in the United States.

107.    On May 18, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Strong Revenues and Strong Earnings For First Quarter; Company Achieves Revenues of $70.7 Million and EPS of $0.12 Before Exceptional Items." This press release stated, in relevant part:

> For the first quarter of 1999, L&H's total revenues were $70.7 million, an increase of 102% over reported revenues of $35.1 million for the first quarter of 1998. The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications.
>
> * * *
>
> Net income before exceptional items for the first quarter of 1999 reached $7 million, or $0.12 per share on 58.1 million average diluted shares outstanding which is a 13% increase when compared to $6.2 million in net income, or $0.12 per share on 52.5 million average outstanding shares for the first quarter of 1998.

108.    This press release was included as Exhibit 2 to L&H's Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, filed with the SEC on June 1, 1999.

109.    These statements regarding L&H's financial results for the first quarter of 1999 were materially false and misleading because revenues and accounts receivable were artificially

inflated by at least $24.7 million and earnings were materially overstated, as admitted by L&H's restatement of its financials for this period.

110.    On July 28, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Strong Revenues, Earnings and Cash Flow For Second Quarter; Company Achieves Revenues of $76 million and EPS of $0.17; Reduced DSO's."  This press release stated, in relevant part:

> For the second quarter of 1999, L&H's total revenues were $76.0 million, an increase of 69% over reported revenues of $45.0 million for the second quarter of 1998.  L&H's total revenues for the six months ending June 30, 1999 were $146.7 million, an increase of 83% over reported revenues of $80.1 million for the same period in 1998.  The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications.
>
> * * *
>
> Net income for Q2 1999 reached $10.1 million, or $0.17 per share on 59.4 million shares which is a 21% increase when compared to $8.3 million, or $0.15 per share on 55.1 million shares for the second quarter of 1998.  Net income for the first six months ended June 30, 1999 reached $17.1 million, or $0.29 per share on 58.8 million average diluted shares outstanding, which is a 17% increase when compared to $14.6 million in net income, or $0.28 per share on 52.5 million average outstanding shares for the six months ended June 30, 1998.

111.    This press release was included as Exhibit 2 to L&H's Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, filed with the SEC on August 6, 1999.

112.    These statements regarding L&H's financial results for the second quarter of 1999 were materially false and misleading because revenues and accounts receivable were artificially

inflated by at least $43.7 million and earnings were materially overstated, as admitted by L&H's restatement of its financials for this period.

113.   On October 27, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues of $87.5 Million and Strong Earnings of $0.16 for Third Quarter; Record Earnings Before Goodwill Amortization of $18.5 Million or $0.31 per Share." This press release stated, in relevant part:

> For the third quarter of 1999, L&H's total revenues were $87.5 million, an increase of 59% over reported revenues of $54.9 million for the third quarter of 1998. L&H's total revenues for the nine months ended September 30, 1999 were $234.2 million, an increase of 74% over reported revenues of $134.9 million for the same period in 1998.
>
> * * *
>
> Net income for Q3 1999, before goodwill amortization, reached $18.5 million, or $0.31 per share on 60.5 million shares. This is a 25% increase compared to $14.7 million before goodwill amortization and one-time charges, or $0.26 per share on 55.8 million fully diluted shares, for the third quarter of 1998. Net income for the nine months ended September 30, 1999 reached $50 million before goodwill amortization and one-time charges, or $0.85 per share on 59.1 million fully diluted shares which is a 43% increase when compared to $34.7 million in net income, or $0.64 per share on 54.1 million fully diluted shares for the nine months ended September 30, 1998. Net income for the third quarter of 1999 was $9.8 million or $.16 per share on a fully-diluted basis versus a net loss of $35.6 million or $.70 per share net loss for the third quarter of 1998.

114.   This press release was included as Exhibit 2 to L&H's Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, filed with the SEC on November 4, 1999.

115.   These statements regarding L&H's financial results for the third quarter of 1999 were materially false and misleading because revenues and accounts receivable were artificially

37

inflated by at least $40.7 million and earnings were materially overstated, as admitted by L&H's restatement of its financials for this period.

116.    On February 9, 2000, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues of $110 Million and Earnings Per Share of $0.22 for Fourth Quarter (Before Exceptional Items); Strong Fiscal Year 1999; Announces 2-For-1 Stock Split; Record Earnings of $22.6 Million or $0.37 Earnings Per Share Before Goodwill Amortization and Exceptional Items; Cash Flow of $68 Million from 1999 Operations and DSO's Reduced to 86 Days." This press release stated, in relevant part:

> For the fourth quarter of 1999, L&H's total revenues were $110 million, or a 43.5% increase in the reported revenue of $76.7 million for the fourth quarter 1998. For fiscal 1999, the company reported total revenues of $344 million or an increase of 62.7% over the reported revenues of $211.6 million for 1998.
>
> The company reported approximately $13.4 million in net income for the fourth quarter of 1999, before exceptional items, or EPS (Earnings Per Share) of $0.22 cents per share on 60.7 million average diluted shares outstanding. Net income for fiscal 1999, excluding exceptional items, totaled $40.2 million or $0.67 per share on 59.6 million average diluted shares compared to $38.2 million or $0.69 per share on 55.2 million average diluted shares during 1998. The exceptional items for the fourth quarter of 1999 resulted in a $2.7 million net loss (unrealized currency exchange loss). For fiscal 1999 the exceptional items resulted in a $2.5 million net benefit (mainly unrealized currency exchange gain).

117.    These statements regarding L&H's financial results for the fourth quarter of 1999 and for the 1999 fiscal year were materially false and misleading because fourth quarter revenues and accounts receivable were artificially inflated by at least $65.6 million, year-end revenues were artificially inflated by at least $174.7 million, and earnings were materially overstated, as admitted by L&H's restatement of its financials for this period.

38

118.    On April 27, 2000, KPMG issued its unqualified audit opinion on L&H's financial statements for 1999. The 1999 audit report appeared to confirm what Stonington had been told during due diligence on the Dictaphone Transaction, namely, that L&H's 1999 financials were prepared in accordance with U.S. GAAP, that KPMG's audit was conducted in accordance with GAAS, and that there were no material changes to L&H's 1999 financial results announced on February 9, 2000:

> LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. AND SUBSIDIARIES INDEPENDENT AUDITORS' REPORT
>
> The Board of Directors and Shareholders
> Lernout & Hauspie Speech Products N.V.:
>
> We have audited the accompanying consolidated balance sheets of Lernout & Hauspie Speech Products N.V. and subsidiaries (the Company) as of December 31, 1998 and December 31, 1999, and the related consolidated statements of operations, shareholders' equity, cash flows and comprehensive income (loss) for each of the years in the three-year period ended December 31, 1999. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.
>
> <u>We conducted our audits in accordance with generally accepted auditing standards in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.</u>
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries as of December 31, 1998 and December 31, 1999, and the results of their operations and their cash flows for each of the years in the

three-year period ended December 31, 1999, in conformity with
generally accepted accounting principles in the United States.

Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren
Brussels, Belgium
April 27, 2000

119.    KPMG's unqualified audit report was materially false and misleading.
Specifically, contrary to what KPMG represented in its audit report, as set forth in ¶¶291-332
below, KPMG did not conduct its audit in accordance with generally accepted auditing standards
in the United States, and L&H's 1999 financial statements did not present fairly, in all material
respects, the financial position of L&H as of December 31, 1999, and the results of its operations
for the year then ended, in conformity with generally accepted accounting principles in the
United States.

**D.    THE MATERIALLY FALSE AND MISLEADING
STATEMENTS MADE DURING STONINGTON'S
DUE DILIGENCE OF L&H IN CONNECTION
WITH THE DICTAPHONE TRANSACTION**

120.    When merger discussions between L&H and Stonington began in February 2000,
several facts made it particularly important for Stonington to be comfortable with the state of
L&H's business and its financial reporting.  First, because the proposed transaction would be a
stock-for-stock swap in which Stonington would receive not cash but shares of L&H stock,
Stonington knew that the consideration for the transaction would be only as valuable as L&H's
business itself.  Indeed, as described in ¶56 above, the transaction required nearly half of the
L&H shares received by Stonington to be held in a voting trust for two years, during which time
Pol Hauspie and Jo Lernout would have the right to vote the shares as they saw fit.  The fact that
Stonington would be unable to dispose of these shares for at least two years made it even more
imperative that Stonington receive adequate assurances regarding L&H's financials.

40

121.  In addition, Stonington required adequate assurances concerning the propriety of L&H's financial reporting because it knew that the SEC had required a restatement of some of L&H's historical financial statements in 1999 as a result of issues relating to acquisition accounting.  Stonington was, of course, concerned about any ongoing SEC investigations into L&H's financial statements.

122.  The importance of these issues to Stonington was further heightened on February 9, 2000, when L&H announced its unaudited financial results for the fourth quarter of 1999 and for the full year, as set forth in ¶116 above.  L&H's claims of spectacular growth, including a 62% increase in revenues as compared to 1998, caused L&H's stock price to skyrocket.  The dramatic increase in L&H's stock price based upon its claims of outstanding 1999 results made it that much more critical for Stonington to be assured that those results had been appropriately confirmed.

123.  Motivated by these critical issues, Stonington and its legal, financial, and accounting advisors conducted extensive due diligence of L&H throughout February and March 2000.  Stonington was assisted in its accounting due diligence of L&H by the accounting firm of Deloitte & Touche LLP.  From an accounting standpoint, Stonington identified L&H's revenue recognition practices as the key risk area and focused on them throughout the due diligence process.  In a series of meetings and conference calls, including an all-day on-site session at L&H's Burlington, Massachusetts offices on February 4, 2000, and conference calls with KPMG Belgium, KPMG U.S., and Dammekens on February 14, 2000 and February 19, 2000, Stonington asked a series of detailed questions concerning revenue recognition issues and was assured at every turn by both KPMG and the Company that L&H's revenue recognition practices were appropriate.

41

124.    Speaking for KPMG throughout this process were audit partners Robert McLamb of KPMG U.S. and William Van Aerde of KPMG Belgium. Stonington was informed that McLamb was the KPMG partner with primary responsibility for the conformity of L&H's financial statements with U.S. GAAP. In fact, McLamb's approval was necessary before KPMG could sign off on its audit and issue its audit reports on L&H. McLamb specifically represented to Stonington that he had reviewed all of L&H's 1999 contracts over $100,000 for conformity with U.S. GAAP issues.

125.    It was made clear to Stonington throughout the course of due diligence that KPMG U.S. had a central role in the audits and quarterly reviews of L&H. In fact, Stonington was told that KPMG U.S. reviewed L&H contracts on a quarterly basis, and that adjustments to revenue recognized were made as indicated from the results of those reviews. Stonington was also told that McLamb had been responsible for reviewing L&H's financial statements for U.S. GAAP issues for several years. Specifically, Stonington was told that McLamb had spent four years in a London-based practice unit of KPMG devoted to addressing U.S. GAAP issues faced by foreign registrants, including L&H. In addition, Stonington was informed that Glen Davison, a highly-regarded SEC review partner at KPMG U.S., played an important role in the review of L&H's financial statements, and that even KPMG's local Belgian audit team involved auditors from KPMG U.S. on assignment to the KPMG Belgium practice for purposes of, among other things, providing auditing and other services to L&H.

126.    Because of the importance of L&H's 1999 financial statements and the fact that KPMG was nearing completion of its audit, Stonington asked KPMG and L&H if there would be any material adjustments to these financial statements. Both KPMG and L&H assured

Stonington that there would be no material adjustments to the 1999 financial results published in the February 9, 2000 press release.

127.    Stonington asked many additional questions relating to revenue recognition and the Company's licensing arrangements, including a request for L&H's revenue recognition policies for all significant revenue streams within its business segments; the nature of L&H's significant contracts, including royalty agreements, licensing agreements, and contracts with strategic partners; billing practices, including the nature of unbilled receivables; the nature of all of L&H's related-party arrangements; and accounting for contract revenues on various consulting and services contracts.    Stonington specifically asked if the Company's revenue recognition practices were consistent at all L&H locations, especially the Far East, and was told that they were.    Indeed, KPMG and L&H provided specific assurances in response to each of Stonington's inquiries, repeatedly confirming, among other things, that L&H's revenue recognition was appropriate.    KPMG confirmed during these discussions that its audits of the 1998 and 1999 financial statements of L&H had determined that those financial statements were presented in accordance with U.S. GAAP; that KPMG had conducted its 1998 and 1999 audits to obtain reasonable assurance that L&H's financial statements were free of material misstatement; and that KPMG was continuing to carefully monitor L&H's practices concerning revenue recognition.

128.    In communicating the above information to Stonington, KPMG knew that, in deciding whether to enter into the Dictaphone Transaction, Stonington was relying upon KPMG's audits of L&H's 1998 and 1999 financial statements and upon KPMG's representations that it was monitoring L&H's accounting practices on an ongoing basis, particularly with respect to revenue recognition issues. KPMG knew that it was under a continuing obligation to disclose

43

to Stonington any material information it obtained concerning L&H's revenue recognition prior to the closing of the Dictaphone Transaction. KPMG also knew that it would jeopardize L&H's acquisition of Dictaphone if KPMG disclosed any information which might cause Stonington to have material concerns about L&H's financial statements or results, and that KPMG's business relationship with L&H and related entities would be jeopardized if it endangered L&H's acquisition of Dictaphone. In particular, KPMG knew that, had it not represented that there would be no material changes to L&H's financial results for 1999 that were announced in February 2000, Stonington would not have executed the Merger Agreements and would have withdrawn from the transaction.

129.    Without the assurances of a "Big Five" accounting firm such as KPMG that, among other things, L&H's financial statements were presented in conformity with U.S. GAAP and that McLamb, as an expert in U.S. GAAP issues, had personally reviewed all of L&H's significant contracts and determined that the revenue had been appropriately recognized, Stonington would not have agreed to exchange its Dictaphone shares for L&H stock.

### 1.    L&H and KPMG Fail to Disclose the SEC's Investigation of L&H

130.    A particularly important area of inquiry for Stonington involved L&H's recent restatement of its 1997 and 1998 financials, which had been required by the SEC following its review of certain L&H registration statements. During the due diligence, L&H and KPMG represented that the SEC review had been fully resolved. However, L&H and KPMG deliberately concealed from Stonington the fact that the SEC had commenced a new investigation of L&H's accounting practices in January 2000, which focused on L&H's revenue recognition practices and, in particular, on the Company's contracts and relationships with its so-called "strategic partners."

44

131. Indeed, internal L&H documents show that, not only did KPMG have knowledge of this investigation contemporaneously with the representations it made to Stonington during due diligence, but that KPMG took the lead in responding to the SEC's investigation on behalf of itself and L&H. These same documents show that L&H was not permitted to publicly announce its 1999 results until KPMG gave its express "consent" to the February 9, 2000 press release and, further, that KPMG considered the SEC investigation to be material and a significant concern.

132. Thus, on January 31, 2000, KPMG Belgium audit partner Van Aerde sent an e-mail to Dammekens, Bastiaens and McLamb, in which he set forth "a list of urgent items to be followed up by the company in order for us to be able to give our consent for the [February 9] press release." Van Aerde noted that the list was "long," but explained that "in view of the nasty SEC letter, you as CFO and CEO and we as auditors cannot afford to leave open items." [Emphasis added.]

133. That same day, Van Aerde sent another e-mail to Willaert, requesting information concerning L&H's "strategic partners" and their relationship with L&H: "As you know, we are not the only ones who are interested in the related parties (cf. the SEC letter of last week)." The next day, on February 1, 2000, Van Aerde sent an e-mail to McLamb and Dammekens, as well as to Willaert, Hauspie, and Bastiaens, which stated that "KPMG has asked Carl Dammekens to collect information onto the related parties transactions between L&H, FLV (and FLV Management) and LHIC. . . . This information has also been requested by the SEC, as you know."

134. In another e-mail dated February 3, 2000, Dammekens asked McLamb and Philip Flink, a partner at L&H's outside counsel, Brown, Rudnick, Freed & Gesmer, for their comments on a suggested approach for L&H's "initial production" to the SEC. Flink expressed

45

the view that L&H should be "more expansive" in its production to the SEC. McLamb, however, expressed a contrary view, cautioning that the Company "should talk to Fran Dissaro at KPMG . . . before calling or sending in documents."

135.    Further, in April of 2000, prior to the Closing Date, the SEC sent a follow-up letter directly to KPMG Belgium requesting additional information about L&H's accounting practices and possible related-party transactions involving L&H's "strategic partners." Nevertheless, even though their own documents show that they considered the SEC investigation to be a significant concern, L&H and KPMG failed to disclose the existence of this SEC investigation to Stonington.

136.    KPMG's failure to disclose the SEC investigation to Stonington is particularly damning because, as demonstrated below at ¶¶170-192, KPMG knew, contemporaneously with the representations it made to Stonington during due diligence, that there were serious questions regarding whether the strategic partners were independent from L&H and whether the revenues that L&H had booked from its strategic partner transactions were legitimate.

137.    Notwithstanding their actual knowledge of the pending SEC investigation into L&H's revenue recognition practices and the effect that an adverse finding would have on L&H's published financial results and, in turn, its stock price; and notwithstanding Stonington's specific inquiries into revenue recognition, "strategic partner" issues, and any SEC proceedings, Dammekens and KPMG failed to disclose the existence of the SEC investigation in their representations to Stonington. Given Stonington's focus on revenue recognition issues at L&H throughout the course of due diligence, and in light of Stonington's concerns regarding L&H's earlier restatement, the omission of this fact was highly material to Stonington. Stonington would not have agreed to the Dictaphone Transaction had it known of the SEC's investigation.

46

2. **KPMG Vouches for Each of L&H's Most Significant**
**Contracts and the Collectibility of Its Receivables**

138.    In order to obtain adequate assurances concerning L&H's revenue recognition procedures, Stonington requested copies of L&H's most significant contracts, including the 1999 contracts with the largest nonrefundable upfront license fees and contracts with the Company's "strategic partners." In response, Stonington was provided with copies of twenty-three of L&H's most important contracts with various entities in Belgium, the United States, and the Far East. These contracts accounted for approximately $95 million in revenue recognized by L&H in 1998 and 1999, and 40% of the total revenue recognized by L&H in the fourth quarter of 1999. Stonington was also shown copies of KPMG's reports to L&H's Audit Committee, including KPMG's 1999 fourth quarter Report to the Audit Committee. Stonington was also given access to KPMG's workpapers for its audit of L&H's 1998 financial statements. Stonington was unable to review KPMG's workpapers for the 1999 audit because, according to KPMG, they were currently being prepared. KPMG represented that it could respond orally to all questions because its audit was nearing completion.

139.    Stonington discussed each of the twenty-three contracts in detail with McLamb and KPMG. McLamb represented that he had personally reviewed each of these contracts and that the revenue recognized on them by L&H fully complied with U.S. GAAP, including SOP 97-2, the principal U.S. GAAP pronouncement relating to recognition of revenue on software contracts. Thus, KPMG represented that, with respect to each of the twenty-three contracts, KPMG had obtained sufficient competent evidential matter indicating that the contracts met each of the criteria of SOP 97-2: (1) persuasive evidence of an arrangement existed at the time revenue was recognized; (2) delivery of the goods had occurred at that time; (3) the fee was fixed

47

or determinable at that time; and (4) no material contingencies affected the likelihood of payment under these contracts and collectibility was probable.

140.    KPMG's representations were knowingly false.  In fact, L&H's recognition of revenue was improper as to virtually all of these contracts.  Indeed, among the contracts provided to Stonington were contracts with Human Interface Worldwide ("HI Worldwide"), Digital Sei-Young, Neo Information Telecom, Voice Tech Korea, Four One One.Com, Jelgava Pte., Duranzo Pte, and I-Merge.  Contracts with these customers alone accounted for $49 million in revenue recognized by L&H during 1999 – or one-seventh of L&H's total revenue for the year.  <u>L&H's revenue recognition on each and every one of these contracts was subsequently reversed.</u>

### a.    HI Worldwide

141.    KPMG represented that L&H had appropriately recognized $11 million of revenue in the fourth quarter of 1999 on a contract with HI Worldwide.  HI Worldwide was one of L&H's Korean customers.  The HI Worldwide contract was the largest license agreement in L&H's history, and the $11 million of revenue booked represented 10% of L&H's total reported revenues for the fourth quarter of 1999.  Based upon these facts and upon KPMG's express representations that it had closely scrutinized this contract for conformity with U.S. GAAP, Stonington relied upon KPMG's statement that the revenue had been properly recognized.  In fact, KPMG knew during Stonington's due diligence and prior to the Closing Date that revenue should not have been recognized on this contract.

142.    On March 1, 2000, KPMG's Korean audit partner, Oh Bum Kwon, sent an e-mail to Stephan Huysman of KPMG Belgium regarding a number of issues with respect to the HI Worldwide contract that precluded revenue from being recognized.  Kwon told Huysman that collectibility of the substantial amounts due under this contract was far from likely because,

48

among other things, the chairman of HI Worldwide, a Mr. Lee, was a "non-businessman" with "no prior experience in the industry" who had started his company based upon a "lucrative future blue print" following a meeting with the president of L&H Korea. Indeed, in that e-mail, KPMG specifically noted that it was "not certain that he [Mr. Lee] has enough wealth" to pay the extraordinary amounts due to L&H. HI Worldwide had only just been established during the fourth quarter of 1999, approximately one month before it entered into the purported $11 million contract with L&H.

143. Moreover, the products covered by the contract had not been delivered to HI Worldwide at the time revenue was recognized. This fact alone meant that, contrary to what McLamb and KPMG represented, revenue could not have been recognized on this contract under SOP 97-2. In the same March 1, 2000 email, Kwon reported to KPMG Belgium that Mr. Lee had "raised a question of the delivery of key product, a chip as [sic] what he said." On March 7, 2000, Huysman sent an e-mail to Dammekens and Van Aerde, among others, in which he wrote that "it appears Lee did not receive a 'key product.' Do you know anything about this or should I ask Gaston [Bastiaens] for an explanation (at least in case it is about contracts in the sales per December 31, 1999)?" [Emphasis added.]

144. That same day, Huysman sent a separate e-mail to Kwon, with a copy to McLamb, in which he specifically noted that the failure to deliver the product meant that revenue could not be booked: "Do you have further info on what product was missing? Does this knowledge jeopardize revenue recognition of L&H at December 31 of one or other contract?" Kwon, who knew the product had not been delivered, avoided answering Huysman's question, instead writing that "I believe he [Lee] had a meeting with Gaston when the chairman visited Korea last week." After he received the e-mail, McLamb was sufficiently concerned about the

situation that he himself got involved.  On March 8, 2000, McLamb asked Kwon:  "How does

this answer the question?  <u>Was the product delivered prior to 12/31/99 or not.</u>"  [Emphasis

added.]

      145.  The next day, Huysman forwarded Kwon's e-mail and McLamb's response to

Bastiaens, stating:

> I understand from the reading of the mail that there was a
> discussion on delivery of a key product (a chip apparently) for a
> contract.  Since this has been discussed with you, could you clarify
> what the issue was, if any, i.e.:
>
> 1.  Was there a vital element missing of a license agreement that
> was signed with HI World prior to Dec. 31, 99?
>
> 2.  If so, how come that Mr. Lee had signed a letter as token of
> having received the software in the contract?
>
> 3.  How has this been resolved now?

      146.  In fact, HI Worldwide had never received the product, which was not even an

actual product but instead an idea for new technology which L&H had yet to develop.  On June

22, 2000, Lee sent an email to Bastiaens stating:

> I was led to believe that (i) your ASR 300 engines, technology and
> documentation in all 5 plus 4 languages were ready for deployment
> immediately upon execution of the agreement; (ii) that the
> appropriate chip set configuration, design and specifications were
> already completed, which in turn would enable us to produce them
> in mass within a period of 2 months; (iii) that L&H Korea
> technicians were fully trained to provide HI Worldwide all the
> necessary technical assistance promptly and in time; (iv) that the
> final chip set would not cost more than US $7.00 each; (v) and that
> once HI Worldwide made the chips it would capitalize on being
> the only company in the world to monopolize the entire toy
> industry in terms of supplying speech recognition chip sets.  <u>The
> truth is, you did not have the technology ready for deployment in a
> chip set format when you entered into the license agreement, your
> engineers had not even gone to Belgium to receive training for the
> ASR 300, the chip set in the format and spec given to us cost more</u>

50

> than double your quotation, the chip set takes 6 months to develop, and you had not even tested whether ASR 300 would work as well as you claimed it would . . . .  My Korean attorneys inform me that the above alone are sufficient grounds for fraud charges under Korean laws.
>
> In addition, a couple of days ago your Mr. Seo explicitly admitted to me that your company did not have the technology ready, neither then nor now.
>
> [Emphasis added.]

The fact that a key product had not been delivered as of December 31, 1999 meant that, under SOP 97-2, revenue could not have been recorded in L&H's 1999 fiscal year.

147.    In this same e-mail, Lee stated that L&H had guaranteed a bank loan to HI Worldwide, from which the $11 million up-front payment was made to L&H in December 1999, and that L&H Korea's president had channeled his own money into HI Worldwide in order to dissuade it from suing L&H for breach of contract.  Accordingly, L&H was further precluded from recognizing revenue from HI Worldwide in 1999, because HI Worldwide lacked economic substance apart from L&H's support.  Indeed, because HI Worldwide had no real assets, the fact that L&H guaranteed the loan to HI Worldwide effectively meant that L&H was paying itself and booking that money as revenue.  As Kwon's March 1, 2000 e-mail makes clear, KPMG knew that HI Worldwide was a newly formed entity that lacked economic substance. Accordingly, KPMG was at least reckless in allowing revenue to be recognized on this contract.

148.    As set forth above, the HI Worldwide contract was highly material to L&H's 1999 financial results.  KPMG knew, contemporaneously with the representations it made to Stonington during the due diligence, that there were substantial questions regarding this contract, including whether the product had been delivered to HI Worldwide and whether HI Worldwide had economic substance (both necessary preconditions to revenue recognition).  Nonetheless,

51

neither McLamb nor Van Aerde disclosed these facts to Stonington. Instead, they told Stonington that revenue from this agreement had been recognized in accordance with U.S. GAAP. Since this issue was unresolved at the time Stonington conducted its due diligence, KPMG's representations that revenue had been properly recognized on this contract were knowingly or recklessly false since it had no basis to make that claim.

149.    L&H's recognition of revenue on the HI Worldwide contract was inappropriate for still another reason: it had recognized a prepayment of royalties from HI Worldwide as revenue when the software on which the royalties were to be paid had not even been developed yet. Indeed, as HI Worldwide's June 22 e-mail stated, L&H had not developed the software by June 2000. Moreover, KPMG knew that this precluded revenue from being recognized on this contract. A March 20, 2000 e-mail from Filip Beernaert of L&H to Lernout, Hauspie, Bastiaens, Dammekens states:

> We just had a meeting with Bob McClamb [sic] of KPMG on the revenue recognition.
>
> Bob mentioned that the revenue under an exclusive contract can only be recognized over the term of the exclusivity. . . .
>
> Another item that he mentioned was that development or consulting agreements that are made in relation to a license agreement and which state that the development of an application or the engineering work of an application are done by L&H and for which such work is substantial to the customers application will prevent L&H from recognizing the revenue under the license agreement, until the work is accepted.
>
> The major contracts we have in Korea have beside the license agreement also a development agreement in which we develop the application for the customer.

150.    Thus, even though McLamb and KPMG had informed L&H that the appropriate accounting treatment for such contracts was to defer the revenue until the customer had agreed

52