that L&H's development work was acceptable, KPMG nonetheless represented to Stonington that revenue had been properly recognized on this contract.

151.    In addition, the licensing fee supposedly called for by this contract was at least 50 times in excess of typical license fees in the Korean market at the time, a fact which, even if none of this other information had been known to KPMG, indicated the suspicious nature of this contract.  See ¶79 above.  Moreover, as discussed at ¶72-77 above, L&H's recognition of revenue on this contract was based entirely upon having factored the receivable from HI Worldwide "with recourse" with two Korean banks, meaning that the revenue could not have been booked under U.S. GAAP and that the cash supposedly obtained by L&H pursuant to this contract was actually being held in time-deposit bank accounts and would be taken away by the bank once HI Worldwide failed to pay.

### b.    Voice Tech Korea

152.    Another Korean contract provided to Stonington was one with Voice Tech Korea, pursuant to which L&H had recorded $7 million of revenue in the third quarter of 1999. Although KPMG represented to Stonington that this revenue had been recognized in accordance with U.S. GAAP, KPMG knew that the revenue should not have been recognized for numerous reasons.

153.    KPMG knew that there were serious concerns about this contract.  Indeed, as set forth in ¶155 below, KPMG had determined in October 1999 that there were "critical revenue recognition issues" with respect to this contract.  For one, although the agreement was dated September 30, 1999 (the last day of the third quarter), there were absolutely "no proper documents on the revenue generation schedule."  In a series of internal e-mails, copies of which were sent to Van Aerde and McLamb, KPMG determined that L&H should not have booked the

revenue from this contract in the third quarter, but should have instead recognized it over a five-year period, because that was how long it would take to develop the product.

154.     Moreover, KPMG knew that there were serious questions regarding collectibility of the $7 million.  KPMG knew that the contract with Voice Tech was highly suspicious, as Voice Tech was a brand new start-up company with virtually no financial resources and no ability to pay L&H $7 million.  In fact, KPMG knew that L&H had recognized revenue based upon factoring the receivable "with recourse" with a Korean bank.  As detailed at ¶¶72-76 above, factoring "with recourse" means that the cash ostensibly paid to L&H by the bank in exchange for the receivable could not be recognized as revenue, because L&H was obligated to return it to the bank, if and when the customer failed to pay.  In other words, the cash on L&H's balance sheet was not L&H's, but the bank's.  Accordingly, these sales of receivables were not final and could not be recorded as revenue under U.S. GAAP.

155.     KPMG's knowledge of these facts is established by an "URGENT" e-mail message dated October 18, 1999 from KPMG Korea partner Kwon to Stephan Huysman of KPMG Belgium with copies to Dammekens and Van Aerde, sent just weeks before the issuance of L&H's press release announcing third quarter 1999 financial results:

> We just completed our fieldwork for the September closing of Bumil [L&H's Korean subsidiary]. However, we have a critical revenue recognition issue as follows and, I want you to confirm this in your office as well as appropriate L&H responsible personnel.
>
> At 30 September 1999, L&H Korea ("Bumil") recognized the software revenue of approximately U$11 million, the largest amount Bumil ever recorded.  The sales were made to two unknown local software companies, VoiceTek (U$7M) and International Business Computer (U$4M), respectively, and I believe that Frederick's visit to Bumil last time was probably to review or record these transactions.  Frederik [Deschodt, L&H

assistant controller] told the accountant of Bumil that this transaction was agree by KPMG at the Corporate level. I am surprised why he did not discussed with me when we met last time.

We were not informed of the details of VoiceTek. Same to ICB. We know that VoiceTek was established in July this year in the minimum paid-in capital. We are not aware of anything on IBC. There are sales contracts dated 30 September 1999 with these new customers but there are no proper documents on the revenue generation schedule and condition. The contracts say that the sales is final and no refund is required and the localizing expenses to be incurred will be charged to the customers additionally, etc. Furthermore, the receivable was factored with a local bank with a collateral of Bumil's bank deposit and we believe the factoring is 'with recourse.'

Because of this transaction at 30, September 1999, Bumil showed big profit, about, U$13M, in September while it had loss carryforward of approximately U$0.5M until the end of August.

Based on our understanding, I have several critical questions.

1. Why did Bumil recognized the whole amount in September? Per their explanation, the ultimate resolution in Korean will take about five years to complete even though Bumil is not required to refund the contract amount. Therefore, at least, the revenue should be recognized over five years or more.

2. The revenue recognition basis under USGAAP (SOP 91-1 and 97-2) should be carefully complied in this transaction. Because of its sensitive nature of the first consolidation with L&H, I recommend you should consult your SEC partner on this issue. My preliminary interpretation is that this revenue recognition has some problems particularly in terms of "when-and-if" available conditions, delivery of products, and collectibility.

As you know this issue should be cleared promptly to complete the consolidation, please discuss at Corporate level and advise me of the discussions. If it meets the requirements of SOP's, we may conclude the September closing and consolidation package of Bumil.

Thanks in advance for your immediate action.

[Emphasis added.]

156.    After receiving the October 18, 1999 e-mail, Huysman called McLamb and told him of the issues raised by the Korean auditors.   McLamb sent Dammekens an e-mail on October 22, 1999, stating that:  "I have been discussing the two Koreans contracts [Voice Tech and IBC] with Glen Davison and we do have concerns about each."  McLamb told Dammekens that he would attempt to call him over the weekend to discuss.

157.    McLamb spoke to Dammekens that weekend, as confirmed by an October 25, 1999 e-mail from Dammekens to Bastiaens:

> Talked with Bob McLamb.  He wants to see the following matters regarding Korea:
>
> 1) the KPMG people of Korea said via email that there is "a relationship" between the president of Bumil and the man from VOICE TECH.  He wants a statement from both presidents that they are not related (family) and that there are no side agreements.
>
> 2) For both, he wants to know who is behind the companies in order to judge the collectibility.

158.    Thus, McLamb and KPMG were well aware in October 1999 of the serious issues concerning the Voice Tech and IBC contracts.   KPMG knew that there was supposedly a "relationship" between Voice Tech and the president of L&H Korea and that Voice Tech had supposedly promised to pay a $7 million licensing fee to L&H even though it was an "unknown local software company" that had been established for the minimum paid-in capital only a few months before it signed the contract with L&H.  KPMG also knew that the receivable had been factored with recourse.  In sum, KPMG failed to properly consider and respond to information known to it that demonstrated that the Voice Tech contract was nothing more than a sham.  To the contrary, KPMG permitted L&H to recognize $7 million of revenue on this contract (and another $4 million on the IBC contract).  These two contracts accounted for 13% of L&H's 1999

56

third quarter revenues. Nonetheless, KPMG and McLamb falsely represented to Stonington that McLamb had personally reviewed the contract for conformity with U.S. GAAP issues and that the revenue was recognized in accordance with U.S. GAAP.

159.    Indeed, even if none of this had been known to KPMG, the Audit Committee Report identified numerous other ways in which L&H's recognition of revenue on this contract failed to comply with U.S. GAAP:

    a.    KPMG improperly permitted L&H to account for this agreement as two separate contracts, a development agreement and a distribution agreement, and to recognize revenue separately on each element.

    b.    KPMG improperly permitted L&H to recognize the entire development fee in the fourth quarter of 2000, when under the applicable accounting provision, SOP 81-1, "the development fee should have been spread over the development period until September or October 2000."

    c.    The contract was modified on October 21, 1999 – after the third quarter had ended – by an amendment removing the right to distribute certain "when and if available" products which were the subject of the development agreement. The Audit Committee Report questioned whether this amendment was even legitimate, but assuming that it was, noted that the revenue recognized in the third quarter should have been deferred until the fourth quarter, noting "KPMG signed off on 1999 financials."

    **c.    Digital Sei-Young and Neo Information Telecom**

160.    Further, KPMG told Stonington that L&H had appropriately recognized, in the fourth quarter of 1999, $8,500,000 of revenue on a contract with Digital Sei-Young Ltd., and $8,000,000 of revenue on a contract with Neo Information Telecom ("Neo"). These were two other purported Korean customers. However, KPMG knew that the revenue on these contracts should not have recognized for several reasons, not the least of which was that the contracts were still in draft form, with key terms missing, at the end of the fourth quarter. On January 5, 2000, McLamb sent an email to Dammekens attaching McLamb's "comments on certain draft

agreements" with three Korean customers, including Digital Sei-Young and Neo. The three contracts reviewed by McLamb accounted for $23 million of revenue, or 22% of L&H's total revenues for the fourth quarter of 1999 and 5% of its total revenues for the year. McLamb noted a number of issues which precluded revenue recognition for these contracts, including the fact that the agreements had not yet been signed by the parties:

> 1. The contract should be signed and **dated** by each party. Having just an effective date is **unacceptable.**
>
> 2. Need to determine the financial viability of Digital to determine whether they have the financial ability to pay the $10 million.
>
> 3. Need to see clear evidence of the delivery of the deliverables under each part of the contract.
>
> 4. Need to confirm with Digital that there are no other written or oral agreements between itself and L&H. In addition, we need to confirm the prepayment of royalties is non-refundable and is not dependent on any future sales of Digital.
>
> &ast; &ast; &ast;
>
> 7. Under each part of the contract Digital is required to obtain L&H's approval for design of packaging and other artwork. This is continuing involvement of L&H and causes a problem with revenue recognition.
>
> 10. Article A.8.1 makes it possible for Digital to get its money back . . .

McLamb made the same comments with respect to the Neo contract.

161.    Thus, McLamb and KPMG knew that revenue should not have been recognized on these "contracts" in the fourth quarter, because as of January 5, 2000, five days after the quarter closed, they were still in "draft" form, missing signatures, dates, and other key terms.

162.    L&H's and KPMG's response to the issues identified by McLamb bordered on the absurd. L&H obtained the signatures of Digital Sei-Young and Neo on virtually identical

form letters prepared by L&H's Legal Department for the customers' signature.  Digital Sei-

Young's letter stated as follows:

> Digital Sei-Young Co., Ltd. hereby states that it has sufficient financial means and is financially viable to enter into the License, Merchandising and Broadcasting Agreement with L&H Korea for the amount of 10 Million US Dollars.  The amount of 10 Million US Dollars being non-refundable under this agreement.

> \* \* \*

> Furthermore we can declare that no other arrangements, contracts, agreements or conditions are imposed on or dependent on Digital Sei-Young to enter into this Agreement, nor that L&H Korea will have to perform any other obligation than stated under the contract.

> Digital Sei-Young hereby declares that it has received all deliverables which are needed and specified under the contract and that it accepts all such deliverables.  The deliverables were delivered on December __, 1999 as follows: _____.

> Sincerely yours,

> /s/

163.  Neo's letter was virtually identical and stated as follows:

> Neo Information Telecom Co., Ltd. Hereby states that it has sufficient financial means and is financially viable to enter into the License Agreement with L&H Korea for the amount of 8 Million US Dollars.  The amount of 8 Million US Dollars being non-refundable under this agreement.

> Furthermore we can declare that no other arrangements, contracts, agreements or conditions are imposed on or dependent on Neo Information Telecom to enter into this Agreement, nor that L&H Korea will have to perform any other obligation than stated under the Agreement.

> Neo Information Telecom hereby declares that it has received all deliverables which are needed and specified under the contract and that it accepts all such deliverables.   The deliverables were delivered on December 31, 1999 as follows: _____.

Sincerely yours,

/s/

164.    Thus, in both of these cases (and in the case of the third "draft" agreement commented on by McLamb as well), the customer actually left key terms of the confirmation blank, including the date the products were supposedly delivered and the description of the goods delivered. These letters were obviously insufficient to provide evidence that the revenue on the Digital Sei-Young and Neo contracts had been properly recognized, because a bare statement by the customer that "it has sufficient financial means" to pay the contract price does not constitute sufficient "competent evidential matter" to permit a conclusion that the customer's payment is reasonably assured. Indeed, these letters should have made KPMG more suspicious about the validity of these agreements, since KPMG could not confirm, as required by SOP 97-2, the customer's ability to pay, the products involved, or whether the products were satisfactorily delivered, and if so, when.

### d.    Four One One.Com

165.    Also in the course of due diligence, Stonington noted that receivables on certain contracts were outstanding for more than 90 days, including the amount of $2.6 million on a contract with Four One One.Com and $2.7 million on a contract with The Learning Kernel, and that in some cases confirmation letters sent to L&H's customers had not been returned. These issues were of high importance, because receivables outstanding for long periods of time can indicate that revenue should not have been recognized, the customer cannot pay, or even that the validity of the underlying contract is in question. However, KPMG assured Stonington that it was following up on these issues and that L&H's collection practices were improving. KPMG further told Stonington that most outstanding amounts had been collected, that all outstanding

60

confirmations had been received, and that KPMG was closely monitoring all collectibility issues. As set forth at ¶¶78-79 above, these representations were false because KPMG failed to tell Stonington that serious issues remained concerning whether many of the customers had the ability to pay and whether many of the contractual arrangements were even legitimate. Indeed, KPMG failed to inform Stonington that in some cases, when confirmations had been sent to L&H customers such as Digital Sei-Young and Neo seeking to confirm delivery of the goods, the customer had returned the confirmation with the delivery date and description of the goods blank.

166.    Specifically, with respect to the $2.6 million Four One One.com receivable, KPMG knew during due diligence and prior to the Closing Date that there were serious questions concerning collectibility.  A January 26, 2000 e-mail from KPMG Korea auditor Philip Lee to Stephen Huysman and William Van Aerde stated:

> Four One One.com – Conditions set out in SOP 97 are met <u>but we do have some doubt on the collection of the outstanding balance.</u> Of the contract sum of US$4.5 million, US$1.9 million has been collected leaving a balance of US$2.6 million which is more than 90 days overdue. Ms Cheryl Foo (our local contact at L&H Asia) is of the view that the amount is collectable but <u>we do not have further information on the debtor.</u>  Cheryl advised that Carl Dammekens has more information on the ability of the customer to pay up the balance.  In our view, the conditions for revenue recognition appears to have been met <u>except that there is now an issue of collectibility of the outstanding amount receivable.</u>

[Emphasis added.]

167.    Thus, even though KPMG knew that there were serious doubts about whether the outstanding $2.6 million would ever be paid, it failed to inform Stonington of this fact, and specifically represented to Stonington that the entire $4.5 million contract amount had been appropriately recognized as revenue in the <u>second quarter of 1999</u>.  On February 15, 2000, while

Stonington's due diligence was in progress, Stefan Huysman of KPMG Belgium sent Willaert a confirmation letter to be signed by the customer on this contract confirming an extended payment plan, under which 20% of the outstanding amount would still remain unpaid on December 31, 2000, a full year-and-a-half after the revenue had been recognized. KPMG never told Stonington that it knew a significant part of this receivable would not even be paid by the end of 2000. In addition, KPMG failed to tell Stonington that although Huysman had asked Willaert to obtain the signed confirmation by March 31, 2000, KPMG had failed to receive it as of April 21, 2000, as confirmed by an e-mail of that date from Veronique De Roose of KPMG Belgium to, among others, Dammekens, McLamb, and Van Aerde.

3.    **KPMG Vouches for the Independence of L&H's "Strategic Partners" and for the Validity of L&H's Revenue Recognition On Its Contracts with the Strategic Partners**

168.    Stonington's due diligence also focused on the nature of the "strategic partner" arrangements and on L&H's relationship with these entities, an inquiry that assumed heightened importance because almost 50% of L&H's increased revenues in the first nine months of 1999 were attributable to an increase in strategic partnership licensing revenue.

169.    Stonington specifically inquired as to whether the strategic partners were truly independent from L&H, a necessary precondition for the recognition of revenue under these circumstances. As explained above, under U.S. GAAP, if such strategic partners were not truly independent, then the amounts received from them by L&H would have to be characterized as a loan for accounting purposes, rather than revenue. Indeed, even where U.S. GAAP permits recognition of revenue on transactions with related parties, it requires specific financial statement disclosures indicating, among other things, that the revenue was derived from related parties. L&H (through Dammekens) and KPMG (through McLamb and Van Aerde) represented that the

62

strategic partners were fully independent and that the contracts were arms-length arrangements pursuant to which these start-up companies would develop software using technology licensed from L&H. Stonington was informed that the strategic partners bore all the risk under these arrangements and that L&H had no continuing obligations whatsoever, including no responsibility to support the licensed technology. In addition, because L&H could not recognize revenue on these contracts under U.S. GAAP if it retained significant continuing obligations thereunder, Stonington specifically asked if there were any circumstances whatsoever under which L&H would agree to fund development by the strategic partners, and was told that there were not.

170.    These representations were knowingly false, because KPMG and the Company knew that the "strategic partners" were funded by entities related to L&H, including the Related-Party Defendants, and that, as a consequence, any amounts collected thereunder had to be treated as loans which L&H was obligated to repay rather than as revenue.

171.    KPMG knew that there were problems with the recognition of revenue on L&H's "strategic partner" contracts as early as July 1999. In a July 29, 1999 letter from Van Aerde to Bastiaens confirming a meeting for September 1, 1999 between Bastiaens, Van Aerde, McLamb and Boyer (the KPMG Boston audit partner) for the purpose of discussing the "Language Companies," Van Aerde wrote that he:

- "wanted an update on the status, review of independence;"

- "required names of investors to arrange a separate meeting;"

- "wanted to review collectibility of the LDC receivables."

172.    The July 29, 1999 letter also indicated that Van Aerde wanted an "update on the status of all issues raised in the Report to the Audit Committee," the most important among them

63

being "revenue recognition." The letter also attached a "prioritised list of issues to be addressed" stating that "specific proof of the collectability of individual outstanding receivables" was necessary "in order to avoid the reversal of revenue recognised in prior quarters."

173. KPMG did not resolve the issue of the LDCs to its satisfaction. Subsequently, in September 1999, the "KPMG USA Professional Practice" group asked KPMG Belgium, including Van Aerde, to conduct a "special review" of "the billing and collection procedures of L&H towards the Language Development Companies." In connection with this review, KPMG performed "audit confirmation procedures" with 15 LDCs, whereby KPMG requested that each LDC confirm in writing to KPMG that it was not related to L&H, there were no side deals, and that there was "no commitments for (re)payment by LHSP, Mr. Lernout or Mr. Hauspie to the LDC's." Of the 15 LDCs that KPMG contacted, only 8 responded in writing. KPMG received a "verbal confirmation" from one individual who claimed to be a "representative" of three of the LDCs, and received no confirmation at all from the other 4 LDCs. As a result, KPMG sought to contact the shareholders and investors of the LDCs to confirm that they were truly independent. However, it was unable to do so because L&H refused to provide KPMG with the identity of the investors in the LDCs. Nevertheless, KPMG rendered a clean audit opinion on L&H's 1999 year-end financials, with no disclosure that L&H had limited the scope of its audit by refusing to provide needed information.

174. On September 30, 1999, Van Aerde sent a "confidential memorandum" to McLamb which confirmed these facts. In that memorandum, Van Aerde wrote that "certain scope limitations were imposed on [KPMG] when performing our review." (emphasis added). Specifically, Van Aerde told McLamb that when he attempted to meet with the investors:

64

> The shareholders and/or investors of the LDC's could not be met. Contacts could be made with the managing directors of subject LDC's. We were informed that shareholders or investors may not wish to be contacted. There are no legal grounds to enforce such a contact (at this stage).

[Emphasis added.]

175.    "Scope limitation" is a technical auditing term.  The third standard of auditing field work requires that the auditor's opinion be based on sufficient competent evidential matter. If adequate evidence is not collected, a so-called "scope limitation" occurs.  With respect to scope limitations, the authoritative auditing literature states:

> The auditor can determine that he is able to express an unqualified opinion <u>only</u> if his audit has been conducted in accordance with generally accepted auditing standards and if he has therefore been able to apply all the procedures he considers necessary in the circumstances.  <u>Restrictions on the scope of his audit, whether imposed by the client or by circumstances, such as the timing of his work, the inability to obtain sufficient competent evidential matter, or an inadequacy in the accounting records, may require him to qualify his opinion or disclaim an opinion.</u>

[Emphasis added.]

AICPA Professional Standards Volume 1, U.S. Auditing Standards ("AU"), section 508.24.

176.    By calling the denial of access a "scope limitation," Van Aerde admitted that KPMG had determined this to be a necessary audit procedure which could not be ignored.  Van Aerde and McLamb knew that the LDC transactions were highly material to the Company's operations and, as a result, should not have accepted the scope limitation imposed by L&H management.  In any event, the existence of a scope limitation meant that KPMG should have issued a qualified audit opinion, rather than an unqualified one.  Nonetheless, KPMG represented to Stonington that revenue had been recognized on the "strategic partner" contracts in

65

accordance with U.S. GAAP and that it expected to issue an unqualified audit opinion on L&H's published 1999 financial results.

177.    In fact, the confirmations which were returned to KPMG from the eight LDCs which did respond established that the LDCs were not independent third parties. KPMG received a single confirmation on behalf of four of the LDCs, signed by Willem Hardeman. In that confirmation, Hardeman claimed that "I confirm that I consider myself and the above mentioned companies [the LDCs] as independent third parties from LHSP." What KPMG certainly knew, however – because KPMG Belgium was the auditor of the FLV Fund – was that Hardeman was a director of the FLV Fund, which was a related party to L&H. Thus, Hardeman himself was a related party to L&H, and from his admission in the confirmation that "I am indeed the financial investor" in the LDCs, KPMG knew that those four LDCs were related parties to L&H.

178.    Throughout the course of due diligence, KPMG continued to discover serious issues regarding the LDCs. On January 27, 2000, Stephan Huysman of KPMG Belgium sent an e-mail to KPMG's Korean auditors, copied to McLamb, stating that:

> I refer to both your reports that we received this week. We are still struggling with the input that we keep getting in different reports (or versions from reports) in connection with a party ('LDS') that is mentioned in both the SFM of KPMG Singapore and KPMG Seoul.
>
> We are over here [sic] that L&H sells license agreements through the Ieper company or through the Singapore affiliate to newly set up companies which purpose it is to develop a language. These entities are called Language development companies (LDC's) and are different legal entities, although some of them are on the same address in Singapore:
>
> Philip, your report mentions a party LDS (Language Development Services group of companies) and then lists them. Oh Bum, in

66

your first version of the report you mention that a customer 'LDS' had erroneously deposited 'an amount of $25 million on the accounts of L&H Korea on December 31.' Then, the explanation is confusing and, first, it was thought that this amount should have been repaid to the president of L&H Korea by LDS (collection of a personal loan that this person would have given). Then, according to later input obtained from management, the amount would be a payment of LDS that should have been paid not to L&H Korea but to L&H Singapore. However, given foreign exchange restrictions, this would now be difficult.

Then, in the version of the KPMG Korea report that was sent yesterday, this paragraph of the report has been corrected. It still states that this money should have been paid by LDS to L&H Singapore instead of on the bank account of L&H Korea. It does no longer state that [sic] the 'personal loan repayment.'

We are concerned about what happened here and need a full explanation on the whole picture; here are some questions for both of you:

1. Can either one of you confirm who is behind LDS? Is this a legal entity or not? Where did the 25 million come from? Who authorized payment? What bank account was it transferred from? What exactly does the 25 million $ cover?

2. Why didn't each of the different LDC's listed in the report not pay their own debt versus L&H instead of one party transferring a big amount of 25 million dollars (if it is intended to settle the receivables at all; we understood that it might have to do with the payment of the earnout for the acquisition of the former Bumil (now L&H Korea)). Is there, to your knowledge, a link with L&H or with other parties (the president of L&H Korea, some big new customers of L&H Korea such as HI World, Digital Seyoung, EPC NEO who all signed very big contracts in the 4th quarter of 99 with L&H Korea?

3. We understand that the report of KPMG Korea has changed for the personal loan paragraph but where did the information come from to change this text to the second version? Who was the contact for this? How has KPMG Korea validated the explanation given?

4. Philip, some of the customers of L&H Singapore are Salfas, Duranzo, Baleston and Snegal Pte Ltd. These customers are all

67

located on No. 5 Jalan Besar #5-01 Singapore 208785. Are you aware of any operational activity at these premises? Is R&D taking place or are people actually developing languages? For some other contracts signed between L&H Asia and Lupeni, Jelgava and Harrica Pte Ltd, the address is in always Shenton. Way 5; 12-05 UIC Building, Singapore 06888. The same question as above is asked. For all of these contracts, is there to your knowledge a local general manager (the contracts have in each case been signed by Belgian people).

I also send this mail to the US partner who is reviewing this engagement from a US Gaap perspective (Bob McLamb, in KPMG Houston). You can send your answers to him at the same time.

[Emphasis added.]

179.    Thus, KPMG had complete knowledge of one of the most important facts which ultimately resulted in the uncovering of the fraud by *The Wall Street Journal* – the fact that many of the LDCs had identical business addresses and common bank accounts. KPMG also knew that the contracts, although purportedly with entities located in Singapore and Korea, were signed by Belgians. KPMG further knew that a single entity called LDS – which was not even a party to any of L&H's contracts or an LDC – had supposedly paid $25 million on behalf of several of the supposedly separate and independent LDCs. KPMG knew that this payment was highly suspicious, as L&H first claimed that it was the repayment of a personal loan from the president of L&H Korea to LDS, and then later claimed that it was a payment mistakenly made by LDS to L&H Korea instead of L&H Singapore. KPMG explicitly recognized that, in light of these facts, there was likely a direct link between the LDCs and L&H, and in fact, between L&H and its Korean customers. In sum, KPMG knew that these facts precluded the possibility that the transactions at issue were legitimate business transactions. Notwithstanding these facts, based in large part on the fact that L&H had received $25 million from LDS, KPMG allowed L&H to

68

book the revenue from these sham transactions and represented to Stonington that the revenue had been recognized in accordance with U.S. GAAP.

180.    Stonington specifically raised the issue of whether the LDCs had their own identity apart from each other and apart from L&H, noting during its due diligence that the same individual, Tony Snauwert, was the licensee representative on nine of the twenty-three contracts it was provided, including strategic partner contracts, even though the names of the companies were different.    In response to its queries, Stonington was told by L&H and KPMG that Snauwert acted as an agent for the licensees.    Incredibly, L&H and KPMG failed to tell Stonington that on January 29, 2000 – only a few days before Stonington's due diligence began – McLamb had specifically informed Dammekens and KPMG's Belgian auditors, after receiving Huysman's above-quoted e-mail, that it was "no longer acceptable for us to rely on an agent acting for a group of investors" for purposes of allowing L&H to record revenue:

> It seems that a single payment of $25 million was paid to L&H Korea. The payment was for amounts owed to LHS (the group in total) by a number of LDC's. Who made this payment? We need to see the wire transfer or check and determine what bank account it came from. <u>Why did the payment for several LDC's come from a single bank account? This makes it more important that we find out who the individual investors are for each of the LDC's. It is no longer acceptable for us to rely on an agent acting for a group of investors.</u> When we find out the company or person that the $25 million payment came from we need to get KPMG Korea to find out about the Company or person. If the payment was made by a Company we need to know who the owners of the company are. <u>This is very important.</u>

> [Emphasis added.]

Despite McLamb's recognition that identifying the source of the payment was "very important," KPMG nonetheless failed to ascertain the source of the payment and permitted the improper

69

revenue recognition anyway in rendering a clean audit opinion on L&H's 1999 financial statements.

181.    KPMG knew yet another critical fact regarding the LDCs: they were corporate fictions, i.e., unstaffed shells which had performed no work whatsoever under their agreements with L&H. A January 31, 2000 e-mail from Van Aerde to Willaert stated that, although some of the LDCs had existed since the third quarter of 1998, "[a]n ill-informed reader could wonder about the fact that not a single LDC has supposedly performed any activity until now." [Emphasis added.] Even though KPMG knew that the strategic partners were doing nothing and that L&H retained all the continuing development obligations, it nonetheless permitted L&H to recognize revenue on the fraudulent LDC transactions.

182.    Tellingly, L&H was shocked that KPMG was, for the first time, apparently going to require evidence beyond mere representations from L&H management with respect to the LDCs. An internal L&H e-mail dated January 31, 2000 from L&H executive Jacques Vanloo to Dammekens, attaching several KPMG inquiries regarding the LDCs and the $25 million payment, asked: "Carl, what exactly is wrong? Has KPMG lost all its trust, are the answers from you and our management no longer sufficient?"

183.    In fact, KPMG had not lost all its trust in L&H. KPMG performed none of the audit procedures called for by Huysman and McLamb in January 2000, and did nothing to determine if the LDCs were independent third parties. On June 20, 2000, McLamb sent an e-mail to Van Aerde and Huysman in advance of L&H's SEC Form 20-F filing, which was scheduled to occur only ten days later, on June 30. The Form 20-F would contain L&H's 1999 audited financial statements and KPMG's 1999 audit report. In that e-mail, McLamb made clear

70

that, despite what he and Van Aerde had told Stonington during the due diligence, he in fact had

no idea whether the LDCs were legitimate:

> In clearing up pending items from the 1999 audit I have not received any update on the work that we performed on the $25 million that L&H Korea received as payment for receivables owed by the LDC's. What is the current status of this? Did we interview the investors of the applicable LDC's? Did we check to see who was the owner of the bank account where the funds came from? How did we ensure that the $25 million was not the same $25 million that LHS paid to the former owners of Bumil for the contingent earnout? Did we get representation from Jo and Pol and LHS that the money was in no way related to them?
>
> We need to make sure that KPMG has done adequate work on this before we sign off on the Form 20-F.

184.    On June 22, 2000, or nearly two months after it had signed its unqualified audit

opinion on L&H's 1999 financial statements, Huysman replied to McLamb, Kwon and Van

Aerde, and acknowledged that, after making unequivocal representations to Stonington regarding

the legitimacy of L&H's revenue recognition on these contracts, KPMG had done nothing to

determine whether the LDCs were legitimate:

> Oh Bum and Philip, in connection with yesterdays mail and urgent request to obtain additional information on the investors in the LDC's (customers of L&H Singapore) and the Korean customers of Bumil, can you in the mean time report to KPMG Ghent what procedures you have already performed to satisfy yourself that these are all existing (live) organisations? We made this request before in mail and fax instructions. From Korea, we got a mail back of an interview with Mr. Lee from HI World. <u>Have any others been visited or have you checked these companies registrations at an official filing system? Are there financial statements available at a central filing that allow [you] to find out if these companies are in a position to pay the large sums of the contracts to L&H? Is there a way of finding out through their articles of association who the shareholders/directors are behind them? At the request of Jo Demario, with whom you met last week, could someone of your office go to the official addresses of these customers to see if they appear proper companies/</u>

71

> organisations. It may be worthwhile taking a picture of the location.
>
> Oh Bum, I will also fax names and phone numbers of 3 Korean individuals to you. We have been informed that these would be investors. Jo has asked someone confirms that these people/phones exist. Do the addresses appear to be normal addresses considering the fact that these individuals should be relatively wealthy as investors?
>
> Philip, we obtained through your people registration of four companies (customers) of L&H Asia. Can you send someone down to the address of these companies to see if they are operational and appear proper companies and not just a post office box. Here as well, you may have some pictures taken. Can you please confirm? If any other LDC's are located in Singapore, please perform the same procedures.

185.    In that same e-mail, Huysman noted that it was his understanding that most of L&H's Korean customers were related parties. Huysman asked "Is mister Seo [Chairman of L&H Korea] not a significant shareholder or decisionmaker in some (or most) of the Korean customers? Have you asked this as part of the audit?"

186.    On June 24, 2000, Hye Jin Kang of L&H told Dammekens in an e-mail that this was the first time that KPMG had ever asked for any documentation regarding L&H's Korean customers:

> I have not replied to KPMG Seoul yet anything. We are going to collect "Corporate Registry" for the customer (Q4 FY99). This would be first documentation that we submit to KPMG (KPMG Seoul asked the documentation). Corporate Registry shows the company name, the address, PER value, number of shares, TTL capital, Business, Director Registered.
>
> [Emphasis added.]

187.    On June 26, 2000, Kang sent another e-mail to Dammekens regarding "the questions from KPMG." In that e-mail, Kang wrote that KPMG was only at that time beginning

to collect documentation from the sales that had been booked during the fourth quarter of 1999 – including the very same contracts that KPMG had told Stonington months earlier had been appropriately booked: "[w]e are now collecting the documentation from the Q4 customer (EPC, Neo Telecom, IBCC, Voice Tech, HI World, Digital Seyoung [sic]." According to Kang, these documents included the customers' corporate registry, shareholder lists, financial statements, the articles of corporation, and a picture of the customers' offices, all of which KPMG was requesting for the first time.

188.    This e-mail also confirms that, had KPMG performed the most elementary of these steps, it would have discovered the fraudulent nature of the $25 million transaction it had first questioned in January 2000:

> Regarding LDS Korea, there is name of Sam Cho (Cho, SooAm in Korean Name) in the Business Certificate (the documentation is only evidence that shows LDS Korea is live in Korea, since LDS Korea is only Rep office, no corporate registry). And Sam is only employee of LDS Korea at this moment.
>
> Since KPMG Korea already knows who Sam is, there is a challenge how we can explain that L&H Korea is nothing to do with LDS Korea.
>
> Pls advise us if you have good comment.

Thus, had KPMG simply obtained the business certificate of LDS Korea, the entity which it knew made the $25 million payment to L&H, it would have seen that the founder and sole employee of LDS Korea was Sam Cho – who was the second-in-command of L&H Korea. Thus, the mystery of where the $25 million came from would have been solved: L&H had paid the $25 million to itself!

189.    As of June 29, 2000 – only one day before L&H filed its Form 20-F with the SEC – KPMG still had not determined whether the LDCs were real entities.  Indeed, KPMG still had

not determined whether sales that had been booked in December 1999 were real sales. On that day, Jacques Vanloo of L&H sent the following e-mail to Dammekens:

> KPMG-Singapore has come over recently to investigate the contracts signed with LDC again, and their respective receipts in 1999 & 2000. Their main concerns are:
>
> 1. Who are the investors of the LDC and where do their funds come from, since they have common directors and have only S$2 share capital?
>
> 2. The ordering party of some payments are not the contracted party. For instance, the receipts of US $4.5 million from Velstra in Dec 99 are actually paying for Lupeni, Jelgava and Harrisca contracts. They are asking us how do we know which contracts are being paid in such cases, esp. if the bank advices do not provide payment details. If it's through verbal confirmation with the LDC, they would like to know the contact person of LDC as they may want to seek confirmation with them.
>
> Understand from Cheryl Foo [another L&H employee] that these contracts are already being audited by KPMG-Ghent, but KPMG-Singapore claims that it's KPMG-Ghent who requested them to look into this again.

190. Two of the strategic partner contracts provided to Stonington during the due diligence process, Duranzo and Jelgava, related to CLDCs which were specifically identified in Huysman's January 25, 2000 e-mail as being located at the same address as several other CLDCs. Further, KPMG knew an additional fact regarding Duranzo and a company called I-Merge, another strategic partner contract provided to Stonington, which precluded revenue recognition: Both were funded by the FLV Fund, a related party to L&H, and thus the revenue from those contracts would have to be treated as a loan under U.S. GAAP. FLV Fund had invested $10 million in Duranzo and three other CLDCs on October 22, 1999. Because KPMG Belgium was the auditor of the FLV Fund, it saw both sides of these transactions.

74

191.  On December 24, 1999, FLV Fund sold its interest in these four CLDCs to HI Worldwide for $11 million.  On January 21, 2000, Stephan Huysman of KPMG Belgium sent an e-mail to Dammekens and Van Aerde regarding the FLV Fund's investments in these CLDCs. As Huysman wrote, "Carl, as discussed with you this afternoon, I received the faxed agreements from my colleague Rob Snijders.  The Cross Language companies (Russian, Mandarin, Japanese, Spanish) which were sold on by FLV to Human Interface Worldwide Ltd concern an amount of about $10 million."  [Emphasis added.]  After receiving this e-mail and speaking with Huysman, Dammekens sent an e-mail the same day to Hauspie and Bastiaens which made clear that KPMG knew that FLV Fund's investments in these CLDCs created serious "problems" with L&H's revenue recognition, including "disclosure as related party revenue of the 4 LDC companies" and "incorrect disclosure in Q3."  In fact, the HI Worldwide transaction was merely a ruse by which L&H hoped, by transferring the FLV Fund's interest in the CLDCs to another party before year-end, to evade the requirement that the transactions be reported as related-party loans rather than as revenue.  As these documents reflect, KPMG knew that this transfer was a sham and that the FLV Fund's involvement precluded recognition of revenue on these contracts, and yet collaborated with L&H to hide the fact that these were related-party transactions.  An April 17, 2000 email from Philip Vermeulen of the FLV Fund to Bastiaens, Lernout, Hauspie, and Sam Cho of L&H Korea confirmed that the $11 million "buyout" by HI Worldwide was, in fact, never paid.

192.  Thus, KPMG's representations to Stonington concerning the "strategic partners" were completely false.  KPMG knew that the LDCs and CLDCs had no real existence, that they had performed no work on their development contracts with L&H, that they shared common addresses and paid L&H from common bank accounts, and that they were funded by parties

75

related to L&H.  Moreover, at the time Stonington conducted its due diligence, KPMG had not even performed the basic audit procedures that would have informed it whether the "strategic partners" were real or not, and thus it had no basis for its representations to Stonington that the strategic partners were independent from L&H and that the revenue recognized by L&H was in conformity with U.S. GAAP.

### E.    FLV FUND'S PARTICIPATION IN THE FRAUD

193.    Hauspie and Lernout created FLV Fund in 1995, and were directors of the Fund's management arm from 1995 until 1997.  According to *The Wall Street Journal*, after 1997, Lernout and Hauspie maintained "considerable sway" over FLV Fund's affairs, as evidenced by the close relationship between the Company and the Fund since the FLV Fund's inception.

194.    In 1995, FLV took a 49% stake in the Belgian unit of Quarterdeck Corp., a California software company then headed by Bastiaens.  According to a December 7, 2000 *Wall Street Journal* article, Quarterdeck's Belgian unit then became L&H's "largest customer, accounting for 30% of revenue that year, and Quarterdeck itself contributed in 6.5% of L&H's sales."

195.    Subsequently, FLV Fund and FLV Management together owned a majority stake in Dictation Consortium, a company that provided $26.6 million in revenue to L&H from 1996 through 1998, in what was a prototype of L&H's related-party fraud involving the LDCs and CLDCs.

196.    Due to stock market and analyst sensitivity about L&H's close ties with FLV Fund, L&H took great steps to conceal its involvement with, and reliance on, the FLV Fund, and other related parties.

76

197.    In L&H's published financial statements, L&H disclosed that FLV Fund was a related party, but reported only minimal revenue from FLV Fund sources. For instance, in its 1998 Annual Report on Form 20-F, L&H stated that only 3.7% of 1998 revenue was provided by "companies funded in part by the FLV Fund." Similarly, in its 1999 Annual Report on Form 20-F, L&H claimed that only 0.3% of 1999 revenues were provided by "companies funded in party by the FLV Fund and L&H Investment Co."

198.    As revealed by *The Wall Street Journal* on December 7, 2000, the FLV Fund was the undisclosed "related party" behind eight of the thirty "start-ups" that accounted for 10% of L&H's revenues in 1998 and 25% in 1999.

199.    Specifically, FLV Fund was directly involved in owning or funding the following customers/transactions during 1999:

   a.    In the first quarter of 1999, L&H recorded $10 million in licensing fees from four Singapore start-up companies, I-Merge Pte., I-Office Pte., I-Mail Pte. and I-News Pte. I-Merge was one of the contracts which Stonington was provided during its due diligence, and KPMG represented that the revenue had been properly recorded. Approximately six months later, FLV Fund invested $8 million for 49% stake in each of the four start-ups. In violation of U.S. GAAP, the FLV Fund investment was not disclosed in L&H's 1999 financial filings.

   b.    During the third quarter of 1999, four additional LDCs, Salfas, Senegal, Baleston, and Duranzo, agreed to pay $16 million in license fees to L&H for software rights. Duranzo was one of the contracts which Stonington was provided during its due diligence, and KPMG represented that the revenue had been properly recorded. L&H recognized all of this revenue during the third quarter of 1999. On October 22, 1999, however, FLV Fund invested $10 million in the companies, who then used $8 million to pay L&H. FLV disposed of its ownership in the four start-ups prior to December 31, 1999, by selling it for $11 million to HI Worldwide. An April 17, 2000 email from Philip Vermeulen of the FLV Fund to Bastiaens, Lernout, Hauspie, and Sam Cho of L&H Korea confirms that the $11 million had never been paid. Indeed, as of September 22, 2000, HI Worldwide still had not paid FLV Fund and an HI Worldwide executive gave *The Wall Street Journal* conflicting reports on whether the

77

money was actually owed.  L&H never disclosed that the $16 million in revenue came from a related party, as required by U.S. GAAP.

Because KPMG Belgium was the auditor of the FLV Fund, it knew about all these transactions from both sides.

200.    In addition to the eight "start-ups" listed above, an additional four were organized as subsidiaries of Language Investment Co. ("LIC"), whose Chief Executive Officer, Willem Hardeman, is an FLV Fund director.  LIC owned four start-ups that each purchased licenses valued at $3 million from L&H in late 1998.  The start-ups each paid L&H $1.5 million in December of 1998; however, according to *The Wall Street Journal,* L&H recorded the full $12 million of revenue in the fourth quarter of 1998 as received.  However, LIC confirmed that the remaining $6 million was never paid by LIC.  LIC eventually sold these four start-ups to Velstra Pte. for an undisclosed sum.  As described below, Velstra is owned entirely by Mercator.

**F.    THE S.A.I.L. TRUST'S PARTICIPATION IN THE FRAUD**

201.    The S.A.I.L. Trust, while purporting to be a non-profit company, was in a position of control over the investment decisions of the FLV Fund.

202.    The S.A.I.L. Trust was created by Lernout and Hauspie in 1995 to assist young companies in the development and commercialization of products based on advanced speech and language technologies.  The S.A.I.L. Trust holds a one-third interest in FLV Management, N.V. ("FLV Management"), and has the right to appoint five of its directors.  In turn, FLV Management is the manager of the FLV Fund.  Lernout and Hauspie are also directors of the S.A.I.L. Trust.

78

203.    Paul Behets, the audit partner at KPMG Belgium in charge of L&H audits from 1991 through July 1999, left KPMG shortly after the audit report for year end 1998 was filed, to become the chief executive officer of the S.A.I.L. Trust.

204.    The S.A.I.L. Trust, directly and through its control of the FLV Fund, participated in the fraud by providing actual or purported financing to the shell corporations which L&H termed its "strategic partners."  This funding, in turn, served as the purported basis for L&H's lucrative licensing agreements with the "strategic partners."  The S.A.I.L. Trust knew that L&H was recognizing revenue on these licensing agreements even though, to the extent money changed hands at all, it was strictly through related-party transactions attributable to the S.A.I.L. Trust and thus revenue should not have been recognized on the transaction.

G.    **LHIC'S PARTICIPATION IN THE FRAUD**

205.    LHIC was founded by Hauspie and Lernout in 1998 and owned 7.6% of L&H's stock.  LHIC was purportedly established to make long-term strategic investments in companies in information technology industries such as speech, language and artificial intelligence. Hauspie and Lernout capitalized LHIC with their own shares of L&H common stock and acted as advisors to LHIC and its investments.

206.    The President and Managing Director of LHIC at all relevant times was Francis Vanderhoydonck, who also served as a director of L&H from May 1999 until his resignation on or about May 15, 2001.  Demonstrating the close relationship between L&H and LHIC, Vanderhoydonck often reported to the Board of L&H on LHIC's activities and investments.

207.    In addition, the Chief Financial Officer of LHIC, Chantal Mestdagh, was formerly a KPMG Belgium auditor responsible for the audits of L&H's financial statements.

79

208.    LHIC, which was controlled and capitalized by Hauspie and Lernout and run by a director of L&H, participated in the fraud by providing actual or purported financing to the shell corporations which L&H termed as its "strategic partners." This funding, in turn, served as the purported basis for L&H's lucrative licensing agreements with the "strategic partners." LHIC knew that L&H was recognizing revenue on these licensing agreements even though, to the extent money changed hands at all, it was strictly through related-party transactions attributable to LHIC and thus revenue should not have been recognized on the transaction.

## H.    MERCATOR AND VERBEKE'S PARTICIPATION IN THE FRAUD

209.    According to *The Wall Street Journal*, Mercator was the ultimate owner of 16 of the 30 "start-ups" that generated a significant portion of L&H's "licensing" revenue during in 1998 and 1999. Mercator owned these start-ups through several intermediary entities. First, the sixteen start-ups were directly owned by Velstra, a Singapore-based company. Velstra, in turn, is 100% owned by Language Development Fund ("LDF"). Mercator owns 96% of LDF.

210.    Tony Snauwaert is a delegate-director, or manager, of LDF, and was described as "Pol Hauspie's right hand" in a January 24, 2001 article in <u>De Finacnieel-Exonomische Tijd</u>, a Belgium business publication. <u>Snauwaert was identified as the licensee representative who signed 9 of the 23 contracts that were provided to Stonington during the due diligence process, and he obviously knew they were sham deals. Effectively, Mercator employed Snauwaert.</u>

211.    Mercator invested at least $2 million in LDF, and loaned LDF an additional $10 million. These funds were then used by the LDCs to pay L&H, inflating the Company's purported revenues.

212.    The 16 start-ups owned by Mercator paid a total of $53 million in licensing fees to L&H during 1998 and 1999. On information and belief, Mercator was the ultimate owner of

80

the following LDCs and CLDCs: Taiwanese LDC, Malay LDC, Vietnamese LDC, Urdu, LDC, Thai LDC, Hindi LDC, Tamil LDC, Italian CALC, French CALC, German CALC, Slavic LDC, Bahassa LDC, Czech LDC, Greek LDC, Polish LDC and Hungarian LDC.

213.   Mercator and its chairman, Verbeke, thereby provided substantial assistance to the scheme to inflate L&H's revenue and earnings. At all relevant times, Verbeke served not only as Chairman of Mercator, but also as a named partner at L&H's chief Belgian law firm, Loeff Claeys Verbeke. In his capacity as a partner of Loeff Claeys, Verbeke provided legal services in connection with L&H's fraudulent transactions involving the Related-Party Defendants.   In addition, Verbeke attended virtually all meetings of L&H's Board of Directors, including those where related-party transactions or issues concerning conflicts between L&H and FLV Fund were discussed.

214.   Mercator and Verbeke also had a direct financial interest in participating in the fraud. First, both Mercator and Verbeke had a significant ownership interest in L&H stock. Mercator owns 6.9% of L&H Holding, which in turn owns 8.9% of L&H. Similarly, Verbeke personally owns 8.9% of L&H Holding. L&H Holding is 85% owned by Lernout and Hauspie. Mercator also directly owns approximately 0.2% of L&H's common stock. Thus, by artificially inflating the price of L&H stock, Mercator and Verbeke increased the value of their holdings of L&H. Further, because the majority of their holdings were indirect, they did not need to disclose the extent of any sales of L&H Holdings.

215.   Mercator and Verbeke also had a separate monetary incentive for participating in the fraud – a striking return on investment. Mercator only made a limited investment in the LDCs and CLDCs that then entered into contracts with L&H. Because L&H would then develop the product at its own expense and then purchase the LDCs for the value of the completed

product, Mercator would see a tremendous return on its initial investment for participating in the fraud.

216.    Verbeke ultimately became a target in the fraud investigation by Belgian authorities.  Despite Mercator's participation in the accounting fraud at L&H, and obvious conflict issues, Verbeke's law firm was selected to assist in investigating and drafting the Audit Committee Report in the fall of 2000.  Subsequently, on July 23, 2001, The Lawyer reported that Verbeke and his former law firm "have been placed under suspicion by the [Belgian] judge leading the inquiry into stock fraud" at L&H.  Belgian authorities eventually conducted two raids for documents at Verbeke's law firm.

## I.    THE KOREAN BANKS' PARTICIPATION IN THE FRAUD

217.    As described above, the Korean Banks participated in the fraud by entering into factoring arrangements pursuant to which L&H factored "with recourse" approximately $100 million, if not more, in receivables from purported Korean customers.

218.    The Korean Banks knew that the purported contractual obligations underlying these receivables were fictitious or, at best, dubious and unlikely to be paid.  They also knew that the purpose of L&H's scheme was to create the illusion of cash on the books which would both enhance the appearance of L&H's balance sheet and provide a purported basis for L&H's recognition of revenue on these fictitious contracts.  The Korean Banks further knew that L&H was a publicly traded company and that L&H's investors would rely upon the Company's publicly reported financial statements.

219.    In reality, the cash reflected on L&H's balance sheet was held in time-deposit accounts subject to the right of the Korean Banks to reclaim the cash if the underlying receivable was not paid, which the Korean Banks knew would not be.  Thus, the Korean Banks were simply

82

permitting their own funds to be held in L&H accounts for a brief period of time in order to permit L&H to falsely claim the cash as an asset in preparing its financial statements.

220.    The Korean Banks' reward for participating in the fraud and enabling the factoring scheme to occur was a $25 million bribe from L&H, conveyed by the president of L&H Korea, Ju-Chul Seo, and disguised on L&H's books as the early payment of an "earn-out" due to Seo for L&H Korea's allegedly outstanding performance in the fourth quarter of 1999.

## V.    THE FRAUD IS REVEALED

221.    As a result of the Dictaphone Transaction, L&H became subject to additional SEC reporting requirements, including providing a geographic breakdown of revenues in its SEC filings. This information, which was disclosed for the first time in L&H's quarterly report filed on SEC Form 10-Q on June 30, 2000, revealed that a significant portion of the Company's total revenues in 1999 were from two countries in Asia: Singapore and Korea. In 1999, L&H's revenue totaled $344.2 million. Of that amount, Korea accounted for $62.9 million and Singapore accounted for $80.3 million in revenue. By comparison, in 1998, those two countries accounted for less than $300,000 in combined sales.

222.    After the June 30, 2000 Form 10-Q was filed, reporters from *The Wall Street Journal* commenced an investigation into L&H's customers in Singapore and Korea. It began reporting the results of this investigation in an article published on August 8, 2000. Merely by asking a few questions of L&H's purported "customers," the *Journal* was able to reveal a widespread fraud that had been concealed by L&H and KPMG. The article disclosed that many of the companies which L&H had identified as Korean customers had denied that they did business with L&H:

83

<u>. . . [S]ome companies that L&H has identified as Korean customers say they do no business at all with L&H. Others say their purchases have been smaller than L&H says.</u> L&H officials now acknowledge they made some mistaken initial representations about customers. But the company disputes other accounts given by some of the Korean companies, and it insists its Korean revenue figures are accurate.

. . . In all, 18 of about 30 companies claimed by L&H as customers were contacted by this newspaper.

Three of the companies say they aren't, in fact, L&H customers. L&H says one of those was a former Bumil customer, and was mistakenly put on its list. Three more companies say their purchases from L&H over the past three quarters were smaller than figures provided by Mr. Bastiaens or Sam Cho, vice president of L&H Korea. One additional company says it is in a joint business with L&H that produces considerably less revenue than L&H claims. Officials from an eighth company initially said it had formed a joint venture with L&H and that the joint venture, not the company itself, had purchased products from L&H. Later, the company retracted this initial version.

All told, of the 13 companies that responded to inquiries about their purchases from L&H in the period since it acquired Bumil, the revenue tallies roughly $32 million. From all of its customers in Korea, in 1999 and the first quarter of 2000, L&H posted $121.8 million of Korea sales, and it has said that it expects second-quarter revenue from that country to exceed the first quarter's $58.9 million. . . .

[Emphasis added.]

223.   Although L&H attempted to deny these allegations and claimed that all Korean

revenues were accurate, on August 15, 2000, *The Wall Street Journal* reported that L&H had

commissioned a mid-year interim audit of the company by KPMG. The goal of the audit was to

"allay concerns about the financial results of [L&H's] South Korean division." L&H selected

KPMG to perform this "interim audit" because L&H management was confident that KPMG

would continue to cooperate in concealing the underlying fraud in Korea.

224.    On August 25, 2000, L&H announced that Bastiaens had resigned from his position as president and CEO of L&H. Bastiaens was replaced by John Duerden, the former CEO of Dictaphone. Bastiaens remained a director of L&H.

225.    On September 22, 2000, *The Wall Street Journal* reported that L&H had finally revealed the existence of the SEC's formal investigation into its accounting practices – the same investigation that had begun in January 2000, long before the Closing Date.

226.    On September 22 and 26, 2000, *The Wall Street Journal* also raised significant questions about L&H's Asian revenue, specifically about 30 Singapore and Belgian start-up companies that accounted for nearly all of L&H's Asian revenues reported in 1998 and 1999. The articles also raised concerns that the FLV Fund had financial connections to eight start-ups with close links to L&H, and that those start-ups accounted for a large portion of L&H's 1998 and 1999 revenues. One of the transactions questioned involved the eight Singapore start-ups which, as described in ¶199 above, were initially funded by the FLV Fund without any disclosures relating to their nature as related-party transactions.

227.    On September 26, 2000, *The Wall Street Journal* reported that the Brussels-based EASDAQ stock exchange had launched a formal investigation into L&H. On the same date, Bloomberg News reported that the EASDAQ would also investigate the FLV Fund.

228.    On October 18, 2000, *The Wall Street Journal* reported that L&H was refusing to provide the SEC with the names of the investors behind the thirty corporate customers that were the focus of the SEC investigation, and who accounted for approximately 25% of the Company's 1999 revenues and 10% of its 1998 revenues. While L&H acknowledged that it helped start the 30 companies and initially financed their operations, the Company maintained that the firms were owned by independent investors interested in developing new applications for L&H speech

software. L&H released new details about the operations of 17 of the 30 companies, which revealed that these companies had no real corporate existence whatsoever, and certainly no corporate existence apart from L&H. Of these 17 companies, none had any direct employees. Seven companies were relying on L&H employees to do work for them and had agreed to repay L&H for its services. The other 10 had not started developing software, though they had paid hefty licensing fees to L&H. According to *The Wall Street Journal*, the 30 companies were all registered at just a few common addresses in Belgium and Singapore, and many had common officers and nominee shareholders.

229.   On November 9, 2000, L&H issued a press release announcing that as a result of accounting "errors and irregularities," the Company would need to restate its previously issued financial statements for 1998, 1999 and the first two quarters of 2000:

> [a]s a result of certain errors and irregularities identified in the audit committee inquiry, the Company expects to restate its financial statements for the periods 1998, 1999 and for the first half of 2000. Although the audit committee is working diligently to determine the impact of these discrepancies on L&H's financial statements for these periods, L&H does not expect the audit and necessary restatements to be completed by November 14, 2000. Accordingly, the Company does not believe that its Form 10-Q for the third quarter ended September 30, 2000 will be filed in a timely manner.

The Company also warned that its third quarter 2000 revenues would "be at least $40 million below its previously published range of $165 to $185 million." The Company also announced that: (1) Lernout and Hauspie had both resigned their posts as executive co-chairmen, but intended to remain on L&H's Board of Directors; (2) John Duerden, the newly appointed CEO, had been appointed the sole Managing Director; (3) Roel Pieper had been appointed Chairman of

86

the Board; (4) a new CFO would be appointed by Duerden; and (5) Willaert would step down as managing director.

230.    L&H's announcement of "accounting irregularities" was, in accounting terms, tantamount to an admission of fraud.  Statement of Auditing Standards No. 53 issued by the American Institute of Certified Public Accountants defines "irregularities" as "intentional misstatements or omissions" in financial statements, meaning that there was fraud in their preparation.

231.    In response to these revelations, on November 9, 2000, both NASDAQ and EASDAQ suspended trading in L&H stock.  Prior to the suspension, the price of L&H on the NASDAQ market fell as low as $6.2188.  After trading finally resumed on December 8, 2000, the stock fell to $1.40 per share and, by December 12, 2000, the stock was trading at less than $1.00 per share.

232.    On November 17, 2000, following months of allegations, investigations and admissions of irregularities, *The Wall Street Journal* reported that KPMG had finally withdrawn its audit report on L&H's 1998 and 1999 financial statements, stating that its prior audit opinions "should no longer be relied upon."  KPMG did so even though it was in possession of no material information beyond that which it knew or should have known in connection with its audits of L&H's 1998 and 1999 financial statements.

233.    On December 19, 2000, L&H publicly revealed the findings of the Audit Committee Report, which had previously been presented to the L&H Board of Directors on November 20, 2000.  The Audit Committee Report concluded, in part, that:  (a) L&H had improperly recorded as much as $277 million in revenue during 1998, 1999 and the first half of 2000; (b) the Company should reverse all of its Korean revenues recorded during 1999 and 2000,

87

amounting to approximately $182 million; and (c) software license revenues from twenty-four of the thirty "strategic partners" were doing nothing more than funding L&H's research and development through related-party transactions.

234.    On November 21, 2000, *The Wall Street Journal* reported that the EASDAQ had suspended trading in the FLV Fund. The article described the FLV Fund as an investment vehicle as to which Jo Lernout and Pol Hauspie "exercise considerable influence over its affairs," with "a history of investing in L&H customers, typically small companies that pay license fees to L&H."

235.    On November 24, 2000, *The Wall Street Journal* reported that the FLV Fund claimed that Seo, L&H Korea's president, misused $30 million of FLV Fund's money by pledging it as collateral to a Korea bank "in favor of" himself.

236.    On November 29, 2000, L&H filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the District of Delaware. According to a November 30, 2000 *Wall Street Journal* article, the decision to file for bankruptcy protection came after L&H executives discovered that $100 million in cash was missing from the Company's South Korean unit.

237.    On December 14, 2000, *The Wall Street Journal* reported on the thirty "strategic partners" that comprised a significant portion of L&H's revenues, revealing that Mercator was the ultimate owner of 16 of the 30 start-ups and that the FLV Fund had funded, at least in part, approximately 8 of the remaining 14.

238.    On January 5, 2001, the Associated Press reported that the Belgian judge presiding over L&H's Belgium bankruptcy proceeding acknowledged that there is "no doubt there was fraud" at L&H.

88

239. On March 2, 2001, L&H announced that co-founder Lernout had been forced to step down as chief technology officer. Lernout had been the last remaining senior executive from the time the accounting scandal erupted.

240. In late April of 2001, South Korean authorities began investigating allegations against the Korean Banks, as well as certain former L&H Korea employees.

241. On or about April 27, 2001, Lernout, Hauspie and Willaert were arrested in Belgium and charged with forgery and stock manipulation.

242. On May 26, 2001, Bastiaens was arrested by United States officials in Winchester, Massachusetts, in response to a Belgian warrant. Bastiaens was subsequently extradited to Belgium, where he has been charged with fraud, insider trading, stock market manipulation and accounting law violations.

## VI.    ADDITIONAL FACTS ESTABLISHING THE LIABILITY OF KPMG U.S. AND KPMG BELGIUM

243. As detailed above at ¶¶130-192, KPMG had actual knowledge of the falsity of both the representations made to Stonington during the course of due diligence and its unqualified audit reports on L&H's 1998 and 1999 financial statements. In addition to KPMG's actual knowledge, the following additional facts establish KPMG's liability for the false and misleading statements alleged herein.

89

A.    **KPMG U.S. AND KPMG BELGIUM ACTED
      <u>AS ONE FIRM WITH RESPECT TO L&H</u>**

244.    KPMG International ("KPMG Int'l") is a Swiss "Verein" or association.  KPMG

U.S. and KPMG Belgium are members of KPMG Int'l, KPMG's worldwide enterprise.  KPMG

Int'l markets KPMG as a single entity.  At its website, KPMG Int'l states:

> **Overview**
>
> In a global marketplace distinguished by remarkable growth and
> consolidation, companies face a host of new challenges in today's
> economy.  <u>KPMG helps clients successfully respond to changing
> opportunities by providing professional services, wherever and
> whenever they're needed.</u>
>
> KPMG has tailored its services - including assurance, tax and
> legal, consulting, and financial advisory services - to address the
> complex business challenges faced by global clients.  Through the
> firm's international network of industry professionals, the best
> people, products and technologies are combined to enhance
> services with industry insights and best practices.
>
> In 2000, KPMG achieved record revenues of US$13.5 billion, an
> 11 percent increase driven by all of our major service lines.  <u>More
> than 100,000 KPMG professionals in member firms worldwide
> collaborate across industry, service and national boundaries to
> deliver professional services in 155 countries.  This enviable
> network of firms is connected through three operating regions,
> bringing together our local and national resources with greater
> flexibility, responsiveness and consistency of service delivery
> worldwide.</u> (emphasis added).

245.    In its Annual Report for 1999, KPMG Int'l stated that "KPMG is acting as 'One

Firm' worldwide to consistently meet the changing needs of global clients through an integrated

array of tailored solutions . . . KPMG's 100,000 professionals in 159 countries help our clients

achieve their critical business objectives through experience and personal commitment to

excellence."  The 1999 Annual Report also praised the work of integrated teams of KPMG

professionals from offices around the world to service its global clients.

246.    KPMG U.S. and KPMG Belgium had co-extensive responsibility on the 1998 and 1999 audits and on the quarterly reviews for those periods, as well as authority to clear the issuance of L&H's public announcements of unaudited financial results. In its 1997 and 1998 Annual Reports to Shareholders, L&H listed the Ghent, Belgium and Boston, Massachusetts offices of KPMG as the Company's principal auditors.   Robert McLamb, KPMG's SEC reviewing partner, worked extensively on each of these L&H audits and reviews and had the final say regarding the conformity of L&H's financial statements with U.S. GAAP.  McLamb became involved in the audits of L&H while in the U.S. Capital Markets Group in KPMG's London, England office and retained his responsibilities when he moved his base of operations to KPMG's Houston, Texas office in 1999.

247.    McLamb's extensive involvement with L&H began as early as 1997.  According to a Highlights and Summary Review Memorandum for December 31, 1997, dated April 28, 1998:

> Conversion of local to US GAAP has been reviewed by Bob McLamb and Digby Wirtz, audit partners of US Capital Markets London Office and SEC reviewing partner.  The US financial statements have been finalized after Bob's two day review visit of April 16 and 17, 1999 and subsequent review by Digby Wirtz on April 21 and 23.  All the review comments of both Bob and Digby have been cleared.

> * * *

> As explained earlier, KPMG Capital Markets Group London have reviewed the compliance with US GAAP reporting with both KPMG Ghent and the client.  In addition, US Capital Markets Group KPMG London reviewed the draft financial statements in February 1998 and the final financial statements (incl. Footnotes) in April 1998 before release.  All US reporting issues have been cleared with KPMG US Capital Markets Group London.

91

248.    KPMG Belgium and KPMG U.S. operated as a single auditing firm in reviewing L&H's quarterly financial statements and auditing its annual financial statements. Each office was assigned to and worked on various aspects of the engagements. As set forth above, L&H had dual headquarters in Burlington, Massachusetts and in Belgium. KPMG's U.S. auditors would show up at L&H's Burlington headquarters at the end of each quarter to review L&H's quarterly financial statements, and KPMG's Belgian auditors would do the same in Belgium. Following that, McLamb, Behets and later Van Aerde would "sign-off" on the quarterly financial results and the presentation of the quarterly financial statements. These KPMG partners also oversaw the year-end audits of L&H's financial statements and each reviewed and provided input to the annual financial results, the completion of the audits, and the presentation of L&H's annual financial statements under U.S. GAAP.

249.    KPMG auditors and consultants were present at L&H at the end of each quarter during 1998 and 1999 for the purpose of "signing-off" on L&H's quarterly and annual financial results before they were announced to the investing public. For example, the February 9, 2000 press release announcing L&H's financial results for the fourth quarter and year ended December 31, 1999 was sent both to Van Aerde of KPMG Belgium and to McLamb of KPMG U.S. for review and comment before it was issued, and, in fact, KPMG needed to give its express "consent" before that press release could be issued. A January 31, 2000 email from Van Aerde to Dammekens, Bastiaens and McLamb set forth "a list of urgent items to be followed up by the company in order for us to be able to give our consent for the [February 9] press release."

250.    Moreover, as another example of KPMG's involvement with L&H's quarterly financial statements, according to the August 24, 1999 "Group Audit Strategy and Reporting Instructions," the number one "key review objective" for the review of L&H's third quarter 1999

92

financial results was to "allow KPMG Ghent to provide clearance to the client on the Q3.99

consolidated financial statements of LHS prepared in accordance with group accounting policies

and US GAAP." (emphasis added).

251.   McLamb and Behets provided substantial input on the presentation of the

Company's 1998 financial statements.   McLamb provided substantial revisions to the financial

statements and disclosures therein.   Moreover, McLamb actually provided or changed certain

amounts and drafted certain disclosures set forth in L&H's 1998 financial statements.

252.   In KPMG's Completion Memorandum dated April 9, 1999, prepared in

connection with its audit of L&H's financial statements for fiscal year 1998, Behets stated:

> During the course of the audit, some key issues were discussed and
> conclusions were reach [sic] in agreement with advise from the US
> Capital Markets group in London [Wirtz and McLamb].
>
> * * *
>
> KPMG personnel from all participating offices involved reviewed
> the revenue recognition policies and practices followed to ensure
> compliance with group revenue recognition policy and with US
> GAAP regulations.
>
> [Emphasis added.]

253.   KPMG's involvement with L&H's quarterly and annual financial statements was

pervasive, extending so far as to result in the actual preparation of certain parts of the financial

statements and the disclosures contained therein.

254.   Indeed, in a letter to the L&H Board of Directors from Jo Lernout dated April 25,

2001, Lernout described L&H's relationship with KPMG and its various offices as follows:

> In the course of the past ten years, we built up a good working
> relationship with KPMG, and we relied extensively on the advice
> from numerous KPMG divisions in various countries as well as on

93

the KPMG audit departments, in particular in Belgium and in the United States.

As part of this relationship, all information which we deemed relevant was always communicated to KPMG. Often, they worked side-by-side with the company in the execution of transactions.

According to Lernout:

From the start, KPMG played a dual role:

(1) on the one hand, KPMG was a commissioner of Lernout & Hauspie Speech Products N.V., including of its subsidiaries, and therefore also of the Korean subsidiaries; and

(2) on the other hand, KPMG was also a consultant for the company.

In that capacity, KPMG was closely involved at the end of each quarter in processing the figures for the interim accounts – as consultants they advised and assisted the financial and bookkeeping departments of Lernout & Hauspie Speech Products. KPMG consultants came every quarter to the office to draw up the interim accounts together with the bookkeeping department of Lernout & Hauspie Speech Products N.V.

Consequently, it is impossible to believe that KPMG now claims that it did not notice earlier the alleged (actually, disputed) "irregularities" in the Belgian bookkeeping during its auditing assignments as commissioner and when it assisted us in drawing up the books. In fact, KPMG helped the staff of the bookkeeping department of Lernout & Hauspie Speech Products N.V. understand and apply the US GAAP Rules (these are the accounting standards which must be observed by corporations whose shares are traded on EASDAQ and NASDAQ).

* * *

It was also KPMG's assignment to make sure that sufficient control mechanisms were in place and that the internal procedures were such that any resorting to fraud by the local people in charge was excluded as much as possible.

* * *

94

I remember pertinently that in some concrete cases the bookkeeping department of Lernout & Hauspie Speech Products N.V. decided after consulting with KPMG that there was sufficient consent between the parties to view these [licensing agreements] as actual agreements, even if the written agreements had not yet been signed in their final form.

\* \* \*

I believe that all agreements with related parties were disclosed in the proper manner. To arrive at that conclusion, I relied on the advice and support which KPMG, as an international auditing company, provided to Lernout & Hauspie Speech Products. KPMG not only provided assistance for the processing of the quarterly figures, but also helped the company with the disclosures required by NASDAQ and EASDAQ rules.

\* \* \*

Furthermore, KPMG was particularly well paid for this assistance, which made us assume that it used a sufficient number of specialists and collaborators to make sure that Lernout & Hauspie Speech Products followed the rules imposed by law.

[Emphasis added.]

**B.    KPMG WAS INTIMATELY INVOLVED IN L&H'S OPERATIONS AND ACCOUNTING**

255.    As a result of providing audit and other services for the Company, KPMG personnel were frequently present at L&H's corporate headquarters in the United States and Belgium, as well as other L&H offices throughout the world during 1998 and 1999. Indeed, KPMG had unfettered access to L&H's confidential internal corporate, financial operating and business information and had ample opportunity to observe and review the Company's business and accounting practices and to review the Company's internal controls.

256.    In his letter to the L&H Board of Directors dated April 25, 2001, Lernout made L&H's dependence on KPMG perfectly clear: "from the day we were quoted on the stock

95

exchange on 12/1/95, we turned to KPMG for every decision of any significance." As Lernout explained:

> To illustrate this I refer to the assistance which was given, for example, with about any sizable acquisition by LHS. It cannot be denied that for this reason alone, <u>KPMG had perfect insight into the various aspects of the LHS organization,</u> if only because of its involvement with the due diligence, audits and even the negotiations.

> [Emphasis added.]

257. The relationship between KPMG and L&H was further exemplified by the fact that, according to Lernout, L&H employees had "direct access to KPMG, even for very practical and day-to-day problems." Recognizing that this close relationship between auditor and client was highly unusual, particularly in light of the requirement under GAAS that auditors remain independent in fact and in appearance, Lernout wrote:

> It cannot even be denied that the greater part of the learning process involving the adjustment to the US rules took place thanks to KPMG's help, which went much farther than is usual for auditors who often keep a certain difference.

258. Lernout's statement regarding the extent of KPMG's activities are corroborated by a KPMG meeting agenda dated August 23, 1999, in which KPMG indicated that it planned to hold a U.S. GAAP training seminar for L&H employees.

259. KPMG itself represented that it had access to all information it needed to conduct its audits, and further, that it had considered the Company's internal controls. In the Report of the Statutory Auditor on the Statutory Accounts Submitted to the General Shareholders' Meeting of [L&H], attached as Exhibit B to the L&H Proxy Statement for the Annual Meeting and the Extraordinary Meeting of Stockholders to be Held May 4, 1998 (the "1998 Proxy"), KPMG Belgium stated:

96

We conducted our audit in accordance with the standards of the "Instituut der Bedrikfsrevisoren." Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, taking into account the legal and regulatory requirements applicable to financial statements in Belgium.

In accordance with these standards, we have considered the Company's administrative and accounting organization as well as internal control procedures. The Company's management have provided us with all explanations and information which we required for our audit.

[Emphasis added.]

260.    KPMG made an identical statement regarding its consideration of L&H's internal controls and access to information in Exhibit B to the 1999 Proxy.

## C.    KPMG DISREGARDED SERIOUS RED FLAGS

261.    In addition to KPMG's actual knowledge of glaring irregularities in L&H's financial statements at the time it conducted its quarterly reviews and annual audits, as set forth below, there were additional numerous red flags that alerted KPMG to the misstatements in the financial statements. If these red flags had been investigated by KPMG, as it was obligated to do under GAAS, it would not have been able to issue unqualified audit opinions. KPMG's certification of L&H's consolidated financial statements as being in conformity with U.S. GAAP, in light of these red flags, demonstrates reckless misconduct, at the very least.

97

1.    **KPMG Knew L&H Lacked Sufficient Internal Controls**

262.    KPMG knew that the Company did not have an adequate system of internal controls, if in fact it had any internal controls at all. Internal controls are required to ensure the integrity and reliability of a company's financial reporting. At a meeting between KPMG and the Audit Committee on May 4, 1998, KPMG reported that the internal audit and internal control functions of the Company needed to be strengthened. KPMG also informed the Audit Committee that the Company must improve its financial reporting for consolidated financial statements.

263.    Further, although KPMG informed the Company that an internal audit function was necessary at L&H, it knew that the Company failed to ever implement such a function. According to the April 12, 1999 Minutes of Telephone Meeting of the Board of Directors:

> Mr. Erwin Vandendriessche, Chairman of the Audit Committee, presents a report of the Audit Committee. Mr. Vandendriessche indicates that the Audit Committee will be receiving a Management Letter from KPMG, following which it will have a further meeting with representatives with KPMG and will make an additional report to the Board of Directors. Mr. Vandendriessche also discusses the previously reported intention of the Company to establish an internal audit function, as a result of the growing complexity of the Company's business. This had originally been targeted to be done by the end of February, but because of time commitments resulting from the SEC's review of the Company's US GAAP financial statements, this has been postponed. Now that the SEC's review has been completed, a new schedule will be set to implement this function.

264.    KPMG continued to report to the Board and the Audit Committee throughout 1999 that the Company's internal controls were inadequate and that L&H still needed to implement the internal audit function. According to the Minutes of Regular Meeting of the Board of Directors, dated August 30, 1999:

98

> Mr. Vandendriessche reports on activities of the Audit Committee. He indicates that the Audit Committee has had two meetings within the last several weeks. He also reports that the Company's previous audit partner, Paul Behets, has left KPMG to join the Flanders Language Valley Foundation (SAIL Trust) and the Audit Committee has met with the new KPMG partner regarding the transition. Mr. Vandendriessche also reports that KPMG has done an extensive review at the end of the second quarter and has also issued recommendations to the Company regarding increases in the internal control staff. He also indicates that the Audit Committee is reviewing the need for an internal auditor, and will report back to the Board of Directors with this recommendation. He also indicates, as previously reported by Mr. Bastiaens, that the Audit Committee will have a meeting prior to each quarterly release. (emphasis added).

265.    Indeed, KPMG knew by no later than the first week of February 2000 that L&H lacked sufficient written accounting policies or manuals – a fact which became crystal clear as a result of the SEC investigation.  On February 4, 2000, Van Aerde sent an e-mail to Dammekens, McLamb and Huysman, which stated that "when talking to the lawyers the other day with respect to the SEC informal investigation they asked whether L&H has an accounting manual or some kind of binder where reporting and accounting policies or instructions are documented." Van Aerde asked Dammekens if L&H had any such manuals or policies, and further requested that he "report both to Bob [McLamb] and myself what you have."  Later that same day, Dammekens replied to Van Aerde and McLamb that "as you know, and as discussed over the phine [sic], we are not strongly documented, as is typical in cies [companies] with fast growth." On February 5, 2000, McLamb sent an e-mail to Dammekens which made clear the urgent need for documentation of L&H's accounting policies and procedures:

> Carl it is true that many fast growing companies do not do a good job of documenting policies and procedures.  That time has come to an end.  You are a $2 billion market capitalization company. We need to proceed in putting these documents in place as soon as possible.  I do understand that this is not the first priority, but there

99

are certain documents that should be prepared before the
submission to the SEC.   Those documents primarily relate to
revenue recognition.

266.   Apart from the knowledge that L&H lacked written accounting policies or

procedures, KPMG had actual knowledge that L&H's accounting department was run in a

reckless manner.  In an e-mail message from Dammekens to McLamb dated May 3, 2000 – only

4 days before the Closing Date – Dammekens stated:

> I DO WANT TO BRING UP ANOTHER POINT – AM I
> CAPABLE OR [SIC] REMAINING CFO IN AN ORGNISATION
> LIKE THIS?  PERSONALLY I DO NOT THINK SO.
>
> I AM CONVINCED THAT IT IS TIME TO BRING IN AN
> EXPERIENCED GUY, THAT CAN BRING STABILITY AND
> DISCIPLINE AND KNOWS HOW TO RUN THE FINANCES
> OF A BIG COMPANY (BECAUSE HE GREW UP IN ONE AND
> HAS DONE IT BEFORE).
>
> THINGS ARE GETTING OVER MY HEAD – I AM STAFFING
> UP  MY  PEOPLE,  BUT  WITH  ALL  THE  DEALS/
> ACQUISITIONS THAT GO ON, I DO NOT HAVE TIME
> ENOUGH TO EVEN THINK ABOUT INTEGRATION OR
> ORGANISATION. (caps in original).

Thus, KPMG was well aware that the individual in charge of preparing the Company's financial

results was in "over [his] head."  This was a risk factor that KPMG needed to, but did not, take

into consideration in planning its audits and designing its audit procedures.

267.   As of the Closing Date, May 5, 2000, it was clear that the Company's controls

still remained woefully insufficient – and yet, KPMG failed to apprise Stonington of that

material fact.  In a memorandum dated May 8, 2000 from McLamb to Van Aerde, McLamb

identified several serious problems for inclusion in a "Management Letter" to be issued to L&H.

Management letters are typically prepared by auditors at the conclusion of their audits and are

100

used to identify internal control weaknesses in a company's accounting system. The problems identified by McLamb were:

1. KPMG noted L&H needed to create and follow formal written procedures for recording accounts receivable and adequately train personnel to record and relieve receivable balances from the general ledger.

2. KPMG noted L&H had not established written policies and procedures relating to establishing and relieving accruals for contingencies.

3. KPMG noted L&H had not established formal written policies and procedures relating to the valuation and tracking of fixed assets.

### 2.    KPMG Knew That L&H's Audit Committee Was Not Performing Its Responsibilities

268.    Further alerting KPMG to the accounting fraud was its knowledge that the Audit Committee was completely uninvolved with respect to the issuance of the Company's quarterly earnings reports and that it was not carrying out its assigned responsibilities. For example, on July 28, 1999, L&H issued its press release announcing second quarter 1999 financial results. However, the Audit Committee did not even meet until August 10, 1999 – thirteen days after the press release was issued. In its Report to the Audit Committee for the Second Quarter of 1999, KPMG acknowledged that the Audit Committee had not been informed of the results of the second quarter: "the Audit Committee has requested to be informed as to the results of the quarter before issuing the press release." (emphasis added).

269.    KPMG continually noted issues concerning the cash collection from the LDCs and revenues recognized from Korea (and elsewhere) to the Audit Committee. For example, in a Private and Confidential letter to defendant Vandendriessche, the Chairman of the Audit Committee, dated November 17, 1999, KPMG stated with respect to these issues:

101

> All issues have been communicated to the management of the Company. <u>We expressed our concern that the effect of certain described issues might have an adverse effect on the profits of the quarters if they are not resolved.</u> Please be advised that KPMG does not consider this limited review to be completed until the above mentioned issues have been fully resolved.

> [Emphasis added.]

However, although KPMG did not consider the review complete, apparently the Company did. L&H issued the press release announcing the 1999 third quarter financial results on October 27, 1999, even though KPMG had not yet resolved the serious issues found in the third quarter financial statements that it identified for the Audit Committee. L&H's issuance of the financial statements before KPMG's issues were resolved was further evidence that the Audit Committee was ignoring the important issues identified by KPMG.

### 3.    The Massive Nature of the Fraud and Resulting Restatement

270.    The magnitude of the fraud further establishes the knowing or reckless conduct on the part of KPMG. Although L&H has yet to issue restated financial statements for fiscal 1998 and 1999, the information regarding specific contracts in the Audit Committee Report, together with the fact that L&H has reversed all revenues from Korea, makes clear that L&H reversed a stunningly high percentage of its revenues. Specifically, the Company reversed at least 13% of its reported revenues for fiscal 1998 and at least <u>70%</u> of its reported revenues for fiscal 1999. L&H reversed at least $175 million of revenues in 1999 alone.

271.    In its Form 8-K Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, dated April 27, 2001, filed with the SEC on May 3, 2001, the Company revealed:

> . . . the Company has prepared restated financial statements for its revenues for 1998, 1999 and the first two quarters of 2000. As a

result of this exercise, of $535 million of revenues reported by the Company (excluding the Company's Mendez translation unit, the acquired Dragon Systems Inc. and subsidiaries business, the US transcription business and certain other less significant subsidiaries) during this period, $373 million have been reversed. A portion of the revenue reversed as a result of the restatement will be recognized in later periods. The revenues reversed included all revenues recorded by the Company's Korean subsidiary during this period, since a substantial portion of such revenues could not be substantiated.

[Emphasis added.]

Thus, setting aside the revenue from certain unrelated subsidiaries of L&H, it is clear that the Company has admitted that nearly 70% of its revenues from the restated period were false and improperly recorded.

272.    Indeed, in addition to the facts set forth at ¶¶130-192 above, of which KPMG had actual knowledge, there were so many pervasive accounting violations at L&H throughout 1998 and 1999 that it is inconceivable that KPMG could not have known that L&H's financial statements were not presented in conformity with US GAAP.

273.    As documented in the Audit Committee Report, at L&H's U.S. headquarters in Burlington, defendants' fraudulent accounting practices were concentrated in L&H's Medical Division and included:  barter transactions, transactions where the customers' ability to pay depended on the receipt of an investment from L&H, and the artificial division of agreements into separate contracts to book revenue in an earlier quarter.

274.    The improper revenue practices were not confined to Burlington.  In Belgium, as also set forth in the Audit Committee Report, L&H routinely recorded revenue prematurely by: backdating contracts, booking revenue prior to delivery of products, promising to deliver

103

additional products at no extra charge "when and if available," and mischaracterizing a large loan in order to treat it as revenue.

275. The Audit Committee Report listed numerous instances where L&H recognized revenue even though no contract was signed or the terms were not finalized, and thus no "persuasive evidence of an arrangement existed":

(a) In the second quarter of 1998, L&H recognized revenue from a June 30, 1998, agreement with Digital Voice requiring a $150,000 prepaid royalty. An August 6, 1998 internal L&H e-mail provided that the contract was not finalized until at least the third quarter.

(b) L&H recognized revenue in the third quarter of 1999 from a September 30, 1999 distribution agreement with Voicenet containing a $1,000,000 prepaid royalty. However, it was not until the parties signed a "clarification letter" on October 26, 1999 that the final terms of the agreement were actually determined.

(c) L&H recognized $4 million in the fourth quarter of 1999 based on an agreement with Lavenia dated December 30, 1999, when an e-mail dated January 5, 2000 from Filip Beernaert to Dammekens discussed terms to be included in the contract, including a $3 million fee, demonstrating that the revenue was recognized prior to the terms being final.

(d) L&H recognized $5 million from a license agreement with TIB in the fourth quarter of 1999, when a January 4, 2000 e-mail from Filip Beernaert to Hauspie and Lernout demonstrated that the contract had not yet been signed.

(e) In the second quarter of 1999, L&H recognized $3 million from a license agreement with I-Medical dated June 30, 1999. A July 7, 1999 e-mail from Lernout to Bastiaens and Hauspie established that the contract was not signed until the third quarter of 1999.

(f) In the fourth quarter of 1999, L&H recognized $4 million from a license agreement with I-Travel dated December 31, 1999. An e-mail from Beernaert to Willaert and Dammekens dated January 5, 2000 indicated that the contract was not signed until the first quarter of 2000.

104

(g) In the first quarter of 2000, L&H recognized $8 million in revenue based on an agreement with ELC dated March 31, 2000. On April 4, 2000, Beernaert sent an e-mail to Willaert, Lernout, Bastiaens and Dammekens stating that the customer had requested information to finalize the agreement, including royalty pricing information and the list of licensed products. Thus, because key terms were still missing from the document as of quarter end, revenue could not be recognized.

(h) L&H recognized $50,000 of revenue in the third quarter of 1999 from NEC, who told Bryan Cave and AA that the terms of the contract were never finalized and that it was never invoiced and had never paid.

276.    The Audit Committee Report also listed numerous instances where L&H recorded sales when it was not clear that the customer had the ability to pay for its products or services, including instances when the customer was not even invoiced, and thus collectibility was not probable, as required by SOP 97-2:

(a) During the first three quarters of 1998, BCB licensed $1.25 million of L&H software. In July 1998, BCB and L&H entered into a stock swap valued at $1.6 million. BCB was actually a start-up that intended to use proceeds from the sale of the L&H stock to pay the license fees, but was unable to sell the stock until October 1998. Collectibility was not probable until BCB sold the stock and determined that the proceeds were sufficient to cover the license fees.

(b) On September 27, 1999, the Belgian unit of L&H recognized $220,000 of license revenue based on an agreement with Computer Services Solutions but never invoiced the customer for fees, because "L&H did not invoice customers until it believed the customer could pay."

(c) On December 31, 1998, the Belgian unit of L&H recognized $250,000 of license revenue from Advance Voice Technology but never invoiced the customer, a start-up that had been established only one month before the license agreement.

277.    L&H recorded sales when the customer's ability to pay depended on an investment from L&H, which also demonstrated that collectibility was not probable as required by SOP 97-2:

(a)    On September 27, 1999, L&H recognized $450,000 of revenue based on a license agreement with Industry Productivity Group,

105