which was expecting an investment from the FLV Fund. L&H never invoiced the customer for the fee.

(b) Interpra, a customer in the Burlington office who licensed $250,000 of L&H software on December 31,1998, and another $250,000 on March 31, 1999, maintained that there was a verbal promise of funding from the FLV Fund, and that it did not want to pay the license fee until it received the funding.

(c) On March 25, 1998, Vasco licensed $800,000 of L&H software. On December 31, 1998, it licensed an additional $900,000 of L&H software. In March 1998, L&H loaned the customer $3 million, due January 4, 1999. The loan was not repaid until the second quarter of 1999, when LHIC invested $5 million in the customer.

278. L&H recognized sales revenues that were contingent on L&H later performing development work for the customer. SOP 97-2 requires that recognition of revenue be deferred until "delivery has occurred," and that delivery be determined as to each one of multiple elements, including the separate element of software delivered "on a when-and-if-available" basis:

(a) In the first quarter of 1999, L&H recognized $1 million of license revenue based on an agreement with I-Merge. An August 25, 2000 letter from Eric Moons of L&H to Tony Snauwert indicated that delivery of all software did not occur until June 1999 and that the software was later replaced in August 1999.

(b) On June 30, 1999, L&H recognized $900,000 based on a license agreement with Cegeka allocated among different language versions of Voice Xpress. One version was to be delivered "when and if commercially available." The other two versions were never delivered.

(c) On March 17, 1999, L&H recognized $900,000 from an agreement with G2 Speech allocated among four language versions of software. One version was delivered in March of 2000, the others were never delivered, and nothing was paid to L&H for any of the versions.

279. L&H also recorded revenues when the "purchasers" of the licenses were not the end users and side letters confirmed that if the licenses were sold to other parties, a finder's fee

would be paid. If the licenses were not resold, the original payments to L&H would be refunded. The fees in these arrangements should not have been recognized because they failed to meet the "fixed or determinable" and "collectibility" criteria of SOP 97-2 and the earnings process, in what was essentially a consignment sale, was not consummated:

> (a) L&H recognized $8 million of revenue in the fourth quarter of 1999 from a license agreement with Capital Union dated December 29, 1999. Side letters obligated L&H to refund a portion or all of license fee if Capital Union didn't find investors. A further letter dated November 2, 2000 indicates that Capital Union was merely an investment bank hired by L&H to find potential LDC investors. The structure of the transaction was apparently a pure sham designed to permit inappropriate recognition of revenue by L&H.

> (b) L&H signed an agreement with an LDC in the third quarter of 1998 and another in the first quarter of 1999. The investors, WH Operations, who bought the shares of the LDC from the original investors on September 23, wanted $1.3 million of free warrants from L&H. Dammekens and Willaert told WH Operations that it had to pay for the warrants "because of the P&L impact," but that L&H would make it up to them later. On August 1, 2000 L&H entered into a contract with WH Operations obligating L&H to pay $1.8 million to them over two years for "introductions" to influential politicians and business people. Dammekens told Bryan Cave and AA that this agreement was entered into to reimburse the customer for the warrants.

280. The Audit Committee Report revealed that L&H improperly recorded revenue for barter or exchange transactions with other software firms in which no cash exchanged hands. Under Statement of the Accounting Principles Board Opinion (APB) 29, *Accounting for Nonmonetary Transactions*, certain barter transactions do not culminate an earnings process and therefore do not produce recognizable revenue: "[T]he following two types of nonmonetary exchange transactions do not culminate an earnings process: a. An exchange of product or property held for sale in the ordinary course of business for a product or property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange,

and b. An exchange of a productive asset not held for sale in the ordinary course of business for a similar productive asset or an equivalent interest in the same or similar productive asset." AS § N35.108. L&H improperly recorded revenue from the following barter transactions:

> (a) L&H recognized revenue in the third quarter of 1998 from a September 30, 1998, license to Nine Rivers Technology of $950,000 of L&H software, with a net benefit to L&H (after marketing expenses) of $838,000. On January 15, 1999, L&H licensed $830,000 of the customer's software for resale. A June 17, 1999 email stated that Nine Rivers had no plans to pay L&H, as this was a reciprocal agreement.

> (b) L&H recognized revenue in the first quarter of 1999 from a license to Interpra of $250,000 of L&H software on December 31,1998, and another $250,000 on March 31, 1999. In return, L&H licensed $250,000 of Interpra's software on January 4, 1999 and another $250,000 in the third quarter of 1999.

> (c) L&H recognized revenue in the first quarter of 1998 from a March 31, 1998, license to Sequoia of $30,000 of L&H software. L&H licensed $30,000 of Sequoia's software at the same time.

> (d) On December 19, 1998, L&H recognized $800,000 of license revenue from an agreement with Educa. A second contract stated the fee as $500,000. The customer's CEO told Bryan Cave and AA that he never had any intention to pay $800,000, but understood there was an oral agreement for L&H to purchase a reciprocal amount of software. L&H never invoiced the customer, nor was anything paid.

281. These fraudulent acts of revenue recognition were intended to, and did, inflate L&H's reported revenue, income and earnings as reported in its quarterly and yearly financial statements for 1998 and 1999. While the Audit Committee Report did not make specific findings as to whether KPMG was aware of the terms of each of these transactions, except as noted, KPMG was well aware of the pervasive problems at L&H that permitted such a massive accounting fraud to take place, including the lack of sufficient internal controls and the failure of

the Audit Committee Defendants to implement important recommendations. See ¶¶262-269 above.

### 4. Independence Violations

#### a. Receipt of Enormous Non-Audit Fees

282.    KPMG was motivated to issue its clean audit opinions on L&H's materially misstated financial statements by, among other things, the tremendous compensation it received from L&H for non-audit services.

283.    According to L&H's annual Proxy Statement filed with the SEC on Form 6-K on May 24, 1999, L&H's Board of Directors recommended that KPMG Belgium be appointed the Company's "independent statutory auditor" for the following three years, noting that KPMG Belgium's fees for each such audit "will amount to BEF 1,500,000 (approximately US$41,600)."

284.    The amount which KPMG received for these audit services was dwarfed by the amounts it received from L&H for consulting and other non-audit services. These services included, for example, performing valuations and due diligence for L&H's acquisitions of Dictaphone, Dragon, and Bumil, among others. In addition, KPMG was retained to allocate the purchase price for many of the companies acquired by L&H in its ongoing acquisition spree to the individual assets acquired and the liabilities assumed.

285.    In an April 25, 2001 letter to the Board of Directors, Pol Hauspie stated that KPMG Belgium's fees as a result of the various work it performed for L&H amounted to "no less than BEF 273,445,389," or approximately US$6 million. Separately, Jo Lernout asserted that "other KPMG subsidiaries in various locations in the world billed LHS for fees amounting to more than BEF 130,000,000," or approximately US$3 million.

109

286.    The fact that KPMG derived over $9 million from its relationship with L&H, only $40,000 per year of which was attributable to audit services, meant that KPMG had a strong incentive not to exercise the requisite close scrutiny of financial statements required of an independent auditor.  In fact, by assisting L&H in portraying itself as a successful company and by helping inflate the price of the stock which L&H used as currency for its repeated acquisitions, KPMG knew that it could assure itself of millions of dollars in continuing valuation and other non-audit business from L&H.

287.    Indeed, KPMG's provision of acquisition-related services directly impaired its independent role as L&H's auditor.  During 1998 and 1999, KPMG was responsible for allocation of the purchase price on a number of acquisitions made by L&H, yet also responsible, in its capacity as auditor, for auditing the balance sheet entries resulting from that allocation process.  Thus, KPMG audited its own work, in clear violation of GAAS and of principles of auditor independence.

**b.    Former KPMG Auditors Received Lucrative Positions With Entities Related to L&H Following Their Audit Engagements**

288.    Apart from the substantial fees paid to KPMG for non-audit services, certain of the KPMG employees responsible for auditing L&H benefited directly from KPMG's relationship with the Company by accepting lucrative jobs with entities related to L&H.

289.    Indeed, one of the KPMG Belgium auditors responsible for the audits of L&H's financial statements, Chantal Mestdagh, left KPMG Belgium to become the Chief Financial Officer of LHIC upon its founding in 1998.  As set forth above, LHIC is one of the related entities through which L&H secretly funded its supposedly unaffiliated customers.

110

290.   Moreover, Behets, the audit partner with chief responsibility for L&H audits from 1991 until July 1999, left KPMG Belgium following the conclusion of KPMG's audit of L&H's 1998 financial statements to become the chief executive officer of defendant S.A.I.L. Trust, a foundation created by Lernout and Hauspie, which has control over the FLV Fund and its investments.

### D.   VIOLATIONS OF GAAS

291.   GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), defines the conduct of auditors in performing and reporting on audit engagements.  Statements on Auditing Standards ("SAS") are endorsed by the AICPA as the authoritative promulgation of GAAS.

292.   KPMG consistently represented that it performed its audits in a manner consistent with GAAS.  Such representations were materially false, misleading and without a reasonable basis.

293.   KPMG violated GAAS by, inter alia, failing to expand or otherwise properly conduct its audits with respect to revenue recognition, accounts receivable, cash and related party transactions.

294.   Indeed, as alleged herein, KPMG's so-called "audits" amounted to no audit at all, in that it violated the most fundamental requirements of GAAS, which require an auditor to obtain sufficient competent evidential matter supporting the assertions in financial statements to provide reasonable assurance that such financial statements are free from material misstatements:

(a)   "Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements."  AU § 326.02.

111

(b) "The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly." AU § 326.21.

(c) Representations from management "are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU § 333.02.

295. KPMG knowingly or recklessly failed to abstain from issuing its materially false and misleading audit opinions on L&H's 1998 and 1999 financial statements when it knew or recklessly ignored the numerous adverse facts and "red flags" set forth below. KPMG violated at least the following provisions of GAAS:

(a) General Standard No. 2, which requires an auditor to remain independent in fact and in appearance.

The absence of independence prevented KPMG from possessing the necessary professional skepticism regarding the unfounded representations of L&H's management. KPMG's independence violations are evident from, among other things: (1) its receipt of substantial non-audit fees for consulting and other services; and (2) the acceptance by certain KPMG auditors of employment offers at entities related to L&H.

(b) General Standard No. 3, which requires that due professional care is to be exercised in the performance of the audit and the preparation of the report.

As detailed above, KPMG failed to exercise due professional care in that it permitted L&H to recognize revenue on unsigned, undated contracts and otherwise permitted clear violations of U.S. GAAP.

(c) Standard of Field Work No. 1, which requires that the work is to be adequately planned.

As detailed below, KPMG failed to apply its knowledge of L&H's business to adequately plan its audit in order to take into account the events, transactions and practices that had a significant effect on its financial statements.

112

(d)    Standard of Field Work No. 2, which requires that a sufficient understanding of internal controls is to be obtained to plan the audit and to determine the nature, timing and extent of tests to be performed.

As detailed above, KPMG knew that L&H's internal controls were inadequate and that L&H lacked formal written accounting policies, including revenue recognition policies, but improperly placed reliance on such controls and otherwise failed to disclose the glaring internal control weaknesses.

(e)    Standard Of Field Work No. 3, which requires that sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

As detailed above, KPMG consistently relied principally on management's representations for critical audit evidence, failed to ascertain whether product had actually been delivered to customers and whether those customers actually existed (or who their investors were) and improperly acquiesced in L&H's imposition of scope limitations on critical procedures.  KPMG failed to adequately audit L&H's cash balances, which were materially overstated by as much as $100 million as a result of fraudulent factoring arrangements in Korea.  In particular, KPMG failed to perform procedures sufficient to determine whether disclosures were necessary for restrictions on cash.

(f)    Standard of Reporting No. 1, which requires the audit report to state whether the financial statements are presented in accordance with GAAP.

As detailed above, as a result of the Audit Committee's investigation, KPMG's audit reports were indisputably false and misleading in that they represented that L&H's 1998 and 1999 financial statements were presented in accordance with U.S. GAAP when they were anything but.  Indeed, as recently announced by L&H, more than 60% of all 1998 and 1999 revenues have been reversed and 100% of all Korean revenues have been reversed.

(g)    Standard of Reporting No. 3, which requires that informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

113

As detailed above, KPMG did not take exception to L&H's failure to disclose that material amounts of revenue were derived from transactions with parties related to L&H.

(h)    Standard of Reporting No. 4, which standard requires that, when an opinion on the financial statements taken as a whole cannot be expressed, the reasons must be stated.

As detailed above, in light of KPMG's actual knowledge that L&H's financial statements included material amounts of false revenues and that L&H had imposed scope limitations on a material portion of KPMG's audit, KPMG should have stated that no opinion could be issued by it on L&H's fiscal 1998 and 1999 financial statements or issued an adverse opinion stating that those financial statements were not fairly presented.

(i)    SAS No. 85, which requires that an auditor not substitute client representations for the application of those auditing procedures necessary to afford a reasonable basis for the opinion being given on financial statements.

As detailed above, KPMG consistently relied on representations by L&H, even in the face of contrary evidence, instead of obtaining evidential matter of its own.

296.    KPMG also violated SAS No. 82, *Consideration of Fraud in a Financial Statement Audit*, which required KPMG to specifically assess the risk of material misstatement of the financial statements due to fraud and to consider that assessment in designing the audit procedures to be performed.  AU § 316.12.  KPMG failed to consider obvious risk factors indicating the existence of fraud, including:

(a)    "an excessive interest by management in maintaining or increasing the entity's stock price or earnings trends through the use of unusually aggressive accounting practices." AU § 316.17.

KPMG Belgium was involved in L&H's 1999 response to an SEC investigation of L&H's methods of accounting for acquisitions and knew that the SEC had determined that L&H's methods were aggressive and improper.

114

(b) "significant, unusual or highly complex transactions, especially those close to year end, that pose difficult 'substance over form' questions." AU § 316.17.

Numerous contracts discussed in the Audit Committee Report were dated within three days of the end of a fiscal quarter, and ten agreements are dated within the last three days of December 1998 or December 1999. Of the ten contracts L&H recognized revenue on in Korea during the fourth quarter of 1999, nine were purportedly signed between December 15 and December 31.

(c) "unusually rapid growth or profitability, especially compared with that of other companies in the same industry." AU § 316.17.

KPMG Belgium knew of L&H's unusually rapid growth during 1998 and 1999, which was almost exclusively attributable to Korea and Singapore and to contracts with L&H's "strategic partners," yet failed to conduct a sufficient investigation as required by GAAS.

297.    AU § 411 describes "The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles in the Auditor's Report." Section AU 411.04 states in pertinent part:

The auditor's opinion that financial statements present fairly an entity's financial position, results of operations, and cash flows in conformity with generally accepted accounting principles should be based on his judgment as to whether (a) the accounting principles selected and applied have general acceptance; (b) the accounting principles are appropriate in the circumstances; (c) the financial statements, including the related notes, are informative of matters that may affect their use, understanding, and interpretation . . .; (d) the information presented in the financial statements is classified and summarized in a reasonable manner, that is, neither too detailed nor too condensed . . .; and (e) the financial statements reflect the underlying events and transactions in a manner that presents the financial position, results of operations, and cash flows within a range of acceptable limits, that is, limits that are reasonable and practicable to attain in financial statements.

298.    Had KPMG undertaken the performance of those audit procedures required by GAAS, it would have known that the fiscal 1998 and 1999 financial statements were materially

115

false and misleading because: (1) the accounting principles applied did not have general acceptance; (2) the accounting principles were not appropriate under the circumstances; (3) the financial statements failed to contain information regarding matters that affected their use, understanding and interpretation; and (4) the financial statements did not accurately reflect the underlying events and transactions within any acceptable limit. Indeed, KPMG knew that its statement that the financial statements presented L&H's financial position fairly in accordance with U.S. GAAP was false, because KPMG had actual knowledge that the financial statements did not comport with U.S. GAAP.

299. From 1998 through the Closing Date, KPMG knew that the Company was in violation of SEC rules which (i) required L&H to devise and maintain a system of internal accounting controls sufficient to reasonably assure, among other things, that its transactions were recorded as necessary to permit preparation of financial statements in conformity with U.S. GAAP, and (ii) required it to make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflected all of the transactions of the Company.

300. Despite the fact that KPMG audited the Company's financial statements for approximately ten years, the planning of its work in its audits of the 1998 and 1999 financial statements was deficient in that it failed to adequately:

(a)  identify areas that needed special consideration;

(b)  assess the conditions under which accounting data was produced, processed, reviewed, and accumulated within the organization;

(c)  evaluate the reasonableness of the Company's estimates;

(d)  evaluate the reasonableness of management representations; and

116

> (e)    make judgments about the appropriateness of the accounting principles applied and the adequacy of disclosures in the Company's financial statements. (AU 311.06)

301.    GAAS further states that reportable conditions involve matters coming to the auditor's attention that should be communicated to the audit committee because they represent:

> significant deficiencies in design or operation of the internal control structure that could adversely affect the organization's ability to record, process, summarize, and report financial data consistent with the assertions of management in the financial statements. AU 325.02.

Reportable conditions must be reported by the auditor to the audit committee or to individuals with a level of authority and responsibility within a company equivalent to an audit committee, such as the board of directors. GAAS lists the following deficiencies, certain of which were present at the Company during fiscal years 1996 through 1999, among "examples of matters that may be reportable conditions":

<u>Deficiencies in Internal Control Structure Design</u>

- Inadequate overall internal control structure design.

  KPMG consistently documented that L&H had inadequate internal controls, did not have formal written accounting policies, and needed an internal audit function. KPMG was aware that L&H did not improve controls or put an internal audit function in place.

- Absence of appropriate reviews and approvals of transactions, accounting entries, or systems output.

  KPMG was aware that the Audit Committee Defendants were not fulfilling their duties in that the quarterly financial statements were issued without the Audit Committee's approval and that L&H management otherwise issued financial results

117

without first resolving the accounting issues relating to quarterly financial reports raised by KPMG.

- Inadequate procedures for appropriately assessing and applying accounting principles.

  KPMG was aware that L&H personnel were not able to record transactions in accordance with U.S. GAAP or were otherwise unqualified to execute the duties required of the accounting department of a publicly traded company.

## Failures in the Operation of Internal Controls

- Evidence of intentional override of the internal control structure by those in authority to the detriment of the overall control objectives of the system.

- Evidence of willful wrongdoing by employees or management.

- Evidence of manipulation, falsification, or alteration of accounting records or supporting documents.

- Evidence of intentional misapplication of accounting principles.

- Evidence of misrepresentation by client personnel to the auditor.

  KPMG was aware of the backdating of contracts that created the appearance that material amounts of revenue recognition was appropriate when such recognition clearly violated U.S. GAAP.

- Evidence that employees or management lack the qualifications and training to fulfill their assigned functions.

  KPMG knew that L&H's CFO was admittedly unqualified to carry out his assigned responsibilities. KPMG also knew that L&H did not maintain any formal written accounting policies or manuals.

118

302. GAAS (AU 325.15) defines a "material weakness in internal control" as:

> a reportable condition in which the design or operation of one or
> more of the internal control structure elements does not reduce to a
> relatively low level the risk that errors or irregularities in amounts
> that would be material in relation to the financial statements being
> audited may occur and not be detected within a timely period by
> employees in the normal course of performing their assigned
> functions.

303. During its audits, KPMG either recklessly failed to identify obvious reportable conditions or material weaknesses in internal control (i.e., failure of controls to prevent or detect misstatements of accounting information), or identified and intentionally ignored the existence of such conditions in violation of GAAS.

### 1.   KPMG Failed to Consider the Risk of Fraud

304. KPMG disregarded facts indicating heightened risk of fraud such as "significant pressure to obtain additional capital necessary to stay competitive, including the need for funds to finance major research and development expenditures." AU § 316.17.

305. KPMG disregarded the heightened risk of fraud as a consequence of "significant related party transactions not in the ordinary course of business or with related entities not audited or audited by another firm." AU § 316.17. These include the following:

(a)    KPMG knew that in January 2000, before it rendered an unqualified opinion on L&H's 1999 financial statements, the SEC had commenced an investigation into L&H's methods of accounting for revenue from thirty L&H customers that the SEC suspected were related parties.

(b)    KPMG Belgium was auditor for the FLV Fund, a related party whose ownership of at least eight of the entities that were the subject of the SEC inquiry and funding of four others were not disclosed and required accounting treatment materially different than that applied by L&H. KPMG Belgium saw both sides of every transaction L&H and the FLV Fund entered into.

119

(c) L&H's financial statements contain a long list of "related parties" with little or no explanation of L&H's dealings with those parties.

2. **KPMG Failed to Identify Related Party Transactions**

306. KPMG failed to take the steps prescribed in AU 334 "to identify related party relationships and transactions and to satisfy itself concerning the required financial statement accounting and disclosure." AU § 334.01. To determine the existence of related parties and to identify material transactions with related parties, the auditor should, among other things:

(a) "review filings by the reporting entity with the Securities and Exchange Commission and other regulatory agencies for the names of related parties and for other businesses in which officers and directors occupy directorship or management positions." AU 334.07(c).

KPMG knew that the investor in four of the Belgian start-ups, Willem Hardeman, was an FLV Fund director, and it knew or should have known that an additional sixteen start-ups were owned by Mercator, whose chairman, Verbeke, was a named partner in L&H's outside law firm. Verbeke and Mercator also separately owned stakes in L&H. A review of L&H's SEC filings, if it were necessary, would also have revealed two significant related parties were the subsequent employers of former KPMG Belgium auditors with responsibility for L&H audits.

(b) "review proxy and other material filed with the Securities and Exchange Commission and comparable data filed with other regulatory agencies for information about material transactions with related parties." AU § 334.08(c).

*The Wall Street Journal* was easily able to determine from "regulatory filings" that the FLV Fund owned 49% stakes in eight of the Singapore start-ups, and gave cash to four others "which they used to pay their bills to L&H." KPMG Belgium, which, as auditor of the FLV Fund, had access to both sides of the fraudulent transactions, either failed to perform these basic procedures, or turned a blind eye to their results.

(c) "[r]eview the extent and nature of business transacted with major customers, suppliers, borrowers and lenders for indications of previously undisclosed relationships." AU § 334.08 (e).

120

As auditor of the FLV Fund, KPMG Belgium had unique access to both sides of L&H's transactions with major customers who were undisclosed related parties.

307.    KPMG was reckless in relying on management assertions about transactions with related parties. "The risk associated with management's assertions about related party transactions is often assessed as higher than for many other types of transactions because of the possibility that the parties to the transaction are motivated by reasons other than those that exist for most business transactions." AU § 334.18. In fact, because L&H refused to provide KPMG with the names of the investors in the LDCs and CLDCs, KPMG admitted that this was a "denial of access to information" that "constitute[d] a limitation on the scope of the audit that ... require[d] the auditor to consider qualifying or disclaiming an opinion on the financial statements." AU § 316.25 footnote 11.

308.    KPMG failed to consider an AICPA Audit Risk Alert emphasizing that:

> Some of the more common audit issues identified in recent litigation related to fraudulent financial reporting included:
>
> A willingness by the auditor to accept management's representations without corroboration.
>
> Allowing the client to unduly influence the scope of auditing procedures.
>
> The failure to identify risky situations, or ignoring audit risks by not applying professional skepticism and revising auditing procedures appropriately.

AICPA Audit Risk Alert – 1999/2000 at 28.

309.    KPMG ignored AICPA Practice Risk Alert 95-3, which stated that "it is incumbent upon the auditor to assess the propriety of the accounting for material related-party transactions in accordance with their substance" and warned that, "[i]n the hands of the

121

unscrupulous, an undisclosed related party is a powerful tool. Using controlled entities, principal shareholders or management can execute transactions that improperly inflate earnings by masking their economic substance or distort reported results through lack of disclosure, or can even defraud the company by transferring funds to a conduit related party and ultimately to perpetrators." The Practice Risk Alert, at 2, warns auditors to look for "events that may indicate transactions with undisclosed related parties," including: "sales without substance, including funding the other party to the transaction so that the sales price is fully remitted," "sales with a commitment to repurchase that, if known, would preclude recognition of all or part of the revenue," "loans to parties that do not possess the ability to repay," and "payments for services never rendered or at inflated prices."

310.    Had KPMG performed the procedures required by AU § 334, it would have discovered, as *The Wall Street Journal* easily did, that there was no evidence of operation of fifteen firms that together paid L&H $57 million in 1999, or nearly 17% of its revenue, and that they each used the same business address. The fact that fifteen of L&H's customers had the same address in a country where revenues increased by more than 2,000% in one year was a major "red flag" for KPMG. Notwithstanding this substantial red flag, KPMG failed to perform any appropriate investigation, or ignored the results of its investigation.

### 3.    KPMG Permitted Improper Recognition of License Revenues

311.    KPMG failed to follow procedures sufficient to provide reasonable assurance that L&H recognized revenue properly in accordance with SOP 97-2. KPMG knew and disregarded the risk of material misstatement presented by the fact that material amounts of revenue were recognized at the end of each fiscal quarter. Unusual, complex or significant transactions which are recorded at or near the end of a financial reporting period are a "red flag" specifically

122

described in the AICPA Audit Risk Alert – 1999/2000 at 38:  "Auditors should be alert for significant unusual or complex transactions, especially those that occur at or near the end of a reporting period, along with a variety of other circumstances that may raise concerns about improper revenue recognition."  Notwithstanding these red flags, KPMG knowingly or reckless failed to modify its audit procedures accordingly.

### 4.    KMPG Employed Inadequate Confirmation Procedures

312.    Auditors employ a number of procedures to determine whether revenue is properly recognized during the period under audit.  One of the most important procedures is to request customers of the company under audit to confirm in writing key terms of revenue-generating agreements, amounts outstanding, and whether goods shipped have been delivered.  According to Statement on Auditing Standards No. 67, confirmation of accounts receivable is a generally accepted auditing procedure and there is a presumption that the auditor will request the confirmation of accounts receivable unless:  (1) accounts receivable are immaterial; (2) the auditor is aware from past experience that they will not be returned by customers; or (3) when the auditor's assessed level of risk is low.  None of those exceptions applied here.

313.    While requests for confirmations are generally drafted on a company's own letterhead to facilitate a customer's response, in order to be of value to an independent auditor, the requests must be sent out by the auditor, and the customer must reply directly to the auditor.  Absent the auditor's control over the process, the integrity of this audit procedure is circumvented.  In other words, it is as if the procedure was not performed at all.

314.    Here, L&H took complete control over the confirmation process, rendering it a nullity for purposes of establishing that L&H's revenues were appropriately recognized.  As set forth at ¶162 above, L&H prepared its customers' response in the affirmative, leaving to be

123

completed only the date of delivery (although the month and year were already provided) and a line for the customers' signatures. Further, the letterhead directed the customers' reply to the attention of Philip Depacker of L&H's Legal Department, rather than directly to the auditor. L&H also inserted new terms in the confirmations which were not in the contracts themselves, such as the amount under agreement being non-refundable. KPMG's failure to properly execute the confirmation process constituted a knowing violation of GAAS.

### E.    VIOLATIONS OF SEC REGULATIONS WHICH REQUIRE CONFORMITY WITH U.S. GAAP

315.    The SEC requires that publicly-traded companies present their financial statements in accordance with U.S. GAAP. 17 C.F.R. § 210.4-01(a)(1). U.S. GAAP are those principles recognized by the United States accounting profession as the conventions, rules, and procedures necessary to defined accepted accounting practice at a particular time.

316.    Financial statements filed with the SEC which are not prepared in accordance with U.S. GAAP "will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided." 17 C.F.R. § 210.4-01(a)(1).

317.    As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. FASB Statement of Concepts No. 1, ¶ 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of enterprise performance.

124

318.   The representations by KPMG and the Company that L&H's financial statements were prepared in accordance with U.S. GAAP were materially false and misleading because, as described above, L&H engaged in fraudulent revenue recognition practices, thereby materially overstating reported revenues, earnings and accounts receivable.

### 1.   Improper Revenue Recognition

319.   The realization principle requires that revenue be earned before it is recognized. Under U.S. GAAP, revenue is recognized when the earnings process is complete and an exchange has taken place (Statement of Financial Accounting Concepts ("FAC") No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, ¶¶ 83, 84). The earnings process is not complete until collection of the sales price is reasonably assured. Id. The conditions for revenue recognition under U.S. GAAP ordinarily are met when products and services are exchanged for cash or claims to cash, and the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue. Generally, a transfer of risk must occur in order to effect an "exchange" for purposes of revenue recognition under U.S. GAAP.

320.   In 1997, the Accounting Standards Executive Committee of the American Institute of Certified Public Accountants issued Statement of Position 97-2, Software Revenue Recognition ("SOP 97-2"). SOP 97-2 represents the standard on when revenue should be recognized for software transactions entered into in fiscal years beginning after December 15, 1997. SOP 97-2 states, in pertinent part:

> Revenue should be recognized when all of the following criteria are met:
>
> - Persuasive evidence of an arrangement exists.
> - Delivery has occurred.

125

- The vendor's fee is fixed or determinable.
- Collectibility is probable.

321.    As detailed herein, the Company improperly recorded hundreds of millions of dollars of revenue because:

    a.    revenue recorded by L&H was not supported by "persuasive evidence" that an agreement existed;

    b.    delivery of software had, in many instances, not occurred;

    c.    L&H's fees for software sold were not fixed because customers could return product;

    d.    collectibility was not probable; and

    e.    contract terms were not yet fixed.

322.    The recording of revenues in violation of U.S. GAAP necessarily renders the related accounts receivable also inflated in violation of U.S. GAAP.  Accounting Research Bulletin No. 43 and SFAS No. 5, Accounting for Contingencies require that entities report accounts receivable at "net realizable value."

323.    By recording false or otherwise improper transactions as sales, L&H materially overstated its reported accounts receivable.  Moreover, as detailed herein, many customers were not paying for software sold by L&H and it was more than probable that such customers would not pay amounts owed.  As a result, L&H was required to recognize the occurrence of such non-payment by consistently writing down the value of its accounts receivable each quarter, which it failed to do.

    2.    **Related Party Transactions**

324.    Article 4 of Regulation S-X and U.S. GAAP, in FASB's SFAS No. 57, required L&H to disclose in its financial statements relevant information regarding related parties and

126

related party transactions. Nonetheless, in violation of these required rules and procedures, L&H's financial statements failed to disclose all such parties and transactions.

325.    Article 1 of Regulation S-X refers to the term "related parties" as defined in SFAS 57. SFAS 57 defines "related parties" as follows:

> Related parties. Affiliates of the enterprise; entities for which investments are accounted for by the equity method by the enterprise; trusts for the benefit of employees, such as pension and profit sharing trusts that are managed by or under the trusteeship of management; principal owners of the enterprise; its management; members of the immediate families of principal owners of the enterprise and its management; and other parties with which the enterprise may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transaction parties might be prevented from fully pursuing its own separate interest. Another party also is a related party if it can significantly influence the management operating policies of the transacting parties or if it has an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests. SFAS 57 ¶24.

326.    SFAS 57 requires financial statements to include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business.  Specifically, these disclosures shall include:

    a.  The nature of the relationship(s) involved;

    b.  A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions of the financial statements;

    c.  The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; and

d.  Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent the terms and manner of settlement. SFAS 57 ¶2.

327.  SFAS 57 addresses why related party disclosures are relevant, specifically:

> Relationships between parties may enable one of the parties to exercise a degree of influence over the other such that the influenced party may be favored or caused to subordinate its independent interests.    Related party transactions may be controlled entirely by one of the parties so that those transactions may be affected significantly by considerations other than those in arm's length transactions with unrelated parties. Some related party transactions may be the result of the related party relationship and without the relationship may not have occurred or may have occurred on different terms.  SFAS 57 ¶13.

Likewise, SFAS 57 illustrates the necessity of related party disclosures, and in the absence of such disclosures, states that the reliability of financial information is weakened:

> Without disclosure to the contrary, there is a general presumption that transactions reflected in financial statements have been consummated on an arm's-length basis between independent parties.  However, that presumption is not justified when related party transactions exist because the requisite conditions of competitive, free-market dealings may not exist.  Because it is possible for related party transactions to be arranged to obtain certain results desired by the related parties, the resulting accounting measures may not represent what they usually would be expected to represent.  Reduced representational faithfulness and verifiability of amounts used to measure transactions with related parties weaken the reliability of those amounts.    That weakness cannot always be cured by reference to market measures because in many cases there may be no arm's-length market in the goods and services that are the subject of the related party transactions. SFAS 57 ¶15.

328.  As alleged herein, L&H recorded as revenue many transactions with parties related to L&H without disclosing the nature of the relationships and a description of the transactions.  Even if the accounting on these transactions was appropriate (which it was not), the failure to disclose the fact that these were related party transactions was material to Stonington,

128

because such disclosures would have informed Stonington about the true nature of these transactions and would have demonstrated to Stonington that L&H was unable to record significant sales absent such related party relationships.

### 3.    Restrictions on Cash Balances

329.    Accounting Research Bulletin No. 43 Ch. 3A ¶ 6 and SFAS No. 5 ¶ 18 require separate disclosure of any restrictions placed on the use of cash. Specifically, a company must include separate disclosures for any "assets pledged as security for loans."

330.    As alleged herein, L&H had significant amounts of cash held under restriction by certain Korean banks as the result of a factoring arrangement. The existence of such restrictions precluded L&H from using this cash for operations. Because this cash was pledged as security for the underlying receivables, L&H was required to disclosure the nature of the restriction.

### 4.    Additional Violations of U.S. GAAP

331.    In addition to the accounting violations noted above, KPMG permitted L&H to present its financial statements in a manner which also violated at least the following concepts underlying U.S. GAAP:

A.    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶ 34);

B.    The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶ 40);

C.     The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

D.     The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶ 42);

E.     The concept that financial reporting should be reliable and faithfully represent what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶ 58-59);

F.     The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶ 79);

G.     The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 95, 97).

130

332.    U.S. GAAP provides that previously issued financial statements which are misstated as a result of an oversight or a misuse of facts that existed at the time are to be retroactively restated.  See, e.g., FASB Statement No. 16 and APB Opinions No. 9 and 20.  Thus, L&H has now admitted that its financial statements for at least fiscal years 1998 and 1999 were materially false and misleading due to a misuse of facts that existed during such years.

## VII.    THE AUDIT COMMITTEE DEFENDANTS' FAILURE TO DISCHARGE THEIR RESPONSIBILITIES

333.    At all relevant times, L&H's audit committee consisted of defendants Cauwelier, DePauw, and Vandendriessche.  Vandendriessche served as Chairman of the Audit Committee.

334.    The responsibilities of an audit committee include oversight over the financial reporting process, review of the financial statements with management, monitoring the adequacy of internal controls and internal audit activities, and reviewing the implementation by management of recommendations made by the outside auditor.

335.    The Audit Committee Defendants regularly met with Paul Behets and other auditors from KPMG to discuss revenue recognition policies and accounts receivable at L&H. On several occasions, the Audit Committee, KPMG and the entire Board discussed the internal control weaknesses at L&H and the fact that the Company's internal audit function had to be developed.  Nevertheless, no actions were taken to improve internal controls or to develop an internal audit function.

336.    At the May 4, 1998 meeting of L&H's Board, defendant Vandendriessche reported that the Audit Committee had met with Behets and Dammekens and that KPMG "recommended that the internal audit and internal control functions of the Company be strengthened," noting "a need for improved reporting for the purpose of consolidation."

131

337.    On April 12, 1999, Vandendriessche, on behalf of the Audit Committee, advised the Board of Directors that the Company "intend[ed] to establish an internal audit function due to the growing complexity of the Company's business." But no action to that end was taken, and the fraud at L&H only grew.

338.    On August 30, 1999, the Audit Committee reported to the Board of Directors that KPMG had again advised of the need to create an internal audit function. The Audit Committee indicated that it was "review[ing] the need for an internal auditor." Again, no action was taken.

339.    Despite the continued warnings during 1998 and 1999, at no time prior to the Closing Date did the Audit Committee take steps to require L&H to hire an internal auditor. Nevertheless, KPMG and the Audit Committee continued to sign off on the Company's financial statements that contained an admitted inflation of revenue by hundreds of millions of dollars.

## CLAIMS FOR RELIEF

### COUNT I

#### Against Dammekens Pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

340.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

341.    As alleged herein, Dammekens, individually and in concert with others, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to artificially inflate the stock price of L&H, and to conceal its true financial condition. He employed devices, schemes, and artifices to defraud while in possession of material, adverse, non-public information, and he engaged in acts, practices, and a course of conduct that included the making of, or participation in the

132

making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about L&H not misleading.  Specifically, he knew or recklessly disregarded that L&H's 1998 and 1999 financial results reported in press releases, L&H's annual reports, and filings with the SEC, which were disseminated to Stonington and to the investing public, were materially overstated and were not prepared and presented in accordance with U.S. GAAP.  In addition, he made representations to Stonington during due diligence on the Dictaphone Transaction with knowledge or reckless disregard of their falsity, or omitted to state material facts necessary in order to make his statements during due diligence not misleading.

342.   Dammekens was a direct participant in the preparation of L&H's financial statements.  He was able to and did control the content of the public statements disseminated by L&H.  With knowledge of the falsity and misleading nature of the statements contained therein or in reckless disregard of the truth as pertains to those statements, he caused the heretofore complained of public statements to contain material misstatements and omissions of material facts as alleged herein.

343.   Dammekens acted with scienter, in that he either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that he failed to ascertain and disclose the true facts, when such facts were available to him.  He was directly responsible for the false and misleading statements and omissions disseminated to the public through press releases, news reports, and filings with the SEC.

344.   The misrepresentations and omissions of Dammekens were intentional or reckless and done for the purpose of enriching himself at the expense of Stonington and to conceal

L&H's true operating and financial condition.  He engaged in this scheme to inflate L&H's reported earnings and its stock price in order to create the illusion that L&H was a successful, strong, and profitable company, which would enable L&H to continue its acquisition strategy, among other things.  Further, he misrepresented L&H's true financial condition and the fact that its financial statements had not been prepared in conformity with U.S. GAAP in order to deceive Stonington into consummating the Dictaphone Transaction. The facts alleged herein indicate actual evidence, as well as a strong inference, that Dammekens acted with scienter.

345.    As a result of the deceptive practices, common schemes and artifices, and false and misleading statements and omissions alleged herein, the market price of L&H stock was artificially inflated, and Stonington was induced to exchange its shares of Dictaphone for the common stock of L&H at an artificially inflated price.

346.    By virtue of the foregoing, Dammekens has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of Dammekens' wrongful conduct, Stonington suffered damages in an amount to be proven at trial.

## COUNT II

### Against Dammekens Pursuant to Section 20(a) of the Exchange Act

347.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

348.    Dammekens, by virtue of his position within L&H and his specific acts was, at the time of the wrongs alleged herein, a controlling person of L&H within the meaning of Section 20(a) of the Exchange Act.  He had the power and influence and exercised same to cause L&H to engage in the illegal conduct and practices complained of herein.

134

349. By reason of the conduct of L&H as alleged in this Complaint, Dammekens is liable for the aforesaid wrongful conduct of L&H and liable to Stonington for the substantial damages which it suffered in connection with its acquisition of L&H stock as a result of L&H's violations of the Exchange Act.

## COUNT III

### Against KPMG U.S. and KPMG Belgium Pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

350. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

351. As detailed herein, KPMG Belgium and KPMG U.S. operated as one firm in connection with the audits of L&H and the Dictaphone Transaction. In each of KPMG's reports on L&H's 1998 and 1999 financial statements, it represented that it conducted its "audits in accordance with generally accepted auditing standards" and that the consolidated financial statements of the Company and its subsidiaries for the fiscal year audited "present[ed] fairly, in all material respects, the consolidated financial position" of L&H and its subsidiaries "and the results of their operations and their cash flow" in accordance with U.S. GAAP. KPMG Belgium and KPMG U.S. also made specific oral representations to Stonington in the course of Stonington's due diligence of L&H affirming the propriety of L&H's financial reporting as detailed above. These representations were false, and KPMG's audit opinions on the 1998 and 1999 financial statements were materially false and misleading, for the reasons set forth herein.

352. KPMG knew its audit reports would be attached to financial statements filed with the SEC that would be used to attract investors and form the basis on which Stonington and other investors would purchase shares of L&H. KPMG consented to the

inclusion of those reports in, among other filings, L&H's 1998 Annual Report on Form 20-F filed with the SEC on June 30, 1999; L&H's 1999 Annual Report on Form 10-K filed with the SEC on June 30, 2000; and the Registration Statement filed on Form F-3 on January 7, 2000. KPMG knew that Stonington had relied upon its audit reports as part of its due diligence prefatory to the Merger and knew that Stonington would rely on KPMG's assurances that there would be no material adjustments to L&H's published 1999 financial statements, as well as on KPMG's other responses to Stonington's inquiries regarding the propriety of L&H's financial reporting, in making a decision to exchange Stonington's interest in Dictaphone for L&H shares and in setting the rate of exchange for that transaction. Stonington justifiably relied upon those representations in making its investment decision.

353.    KPMG knew, or was reckless in not knowing, that L&H's financial statements were not prepared in accordance with U.S. GAAP, as falsely represented in KPMG's audit reports and directly to Stonington, because, among other material misstatements, L&H's financial statements concealed the facts that: (1) $373 million, or more than one-third of L&H's revenue in 1998, 1999 and the first half of 2000 was improperly recognized; (2) thirty start-up companies which provided 10% of L&H's 1998 revenue and 28% of its 1999 revenue were funded by parties related to L&H; (3) 100% of the revenue recognized on L&H's Korean contracts was improperly recognized and had to be reversed; and (4) more than $100 million in the bank accounts of L&H's Korean unit was inaccessible, as a consequence of a factoring arrangement that was not publicly disclosed. A fraud of this magnitude and pervasiveness could not have gone undetected without knowledge or the highest degree of recklessness on the part of

KPMG because of the overwhelming size and nature of the items in value and their centrality to the results of operations and financial condition of L&H.

354.    The facts set forth herein give rise to a strong inference that KPMG U.S. and KPMG Belgium acted with actual knowledge, or at the least, recklessness, in making the false statements alleged herein to Stonington during due diligence and in rendering the 1998 and 1999 audit reports on L&H's financial statements, as shown by at least the following facts:

(a) KPMG knowingly failed to disclose to Stonington the existence of the SEC investigation of L&H that began in January 2000 and continued throughout Stonington's due diligence, notwithstanding the fact that the investigation focused on L&H's revenue recognition practices and on L&H's contracts with and lack of independence from its strategic partners, areas in which Stonington had particular interest. ¶¶130-137.

(b) KPMG falsely represented to Stonington that L&H's recognition of revenue on its contract with HI Worldwide was in accordance with US GAAP, when KPMG knew that HI Worldwide lacked the ability to pay the amounts recognized by L&H (¶142); that revenue could not be recognized because a key product had not been delivered (¶¶143-146); that L&H had recognized a prepayment of royalties as revenue even though the software on which the royalties were to be paid had not even been developed (¶149); that the purported licensing fee was far in excess of typical license fees in the Korean market at the time (¶151); and that L&H was recognizing revenue in Korea by means of receivables factored with recourse (¶155).

(c) KPMG falsely represented to Stonington that L&H's recognition of revenue on its contract with Voice Tech was in accordance with US GAAP, when KPMG knew that L&H had factored the receivable on this contract (and others) with recourse (¶155); that Voice Tech was a brand new start-up company with no ability to pay the amounts recognized by L&H (id.); that the purported licensing fee was far in excess of typical license fees in the Korean market at the time (¶151); and that there was apparently a "relationship" between Voice Tech and the president of L&H Korea (¶157). KPMG knew that L&H was factoring receivables with recourse in Korea and that the factoring was collateralized by L&H's bank accounts in Korea.

(d) KPMG falsely represented to Stonington that L&H's recognition of revenue on its contracts with Digital Sei-Young and Neo was in accordance with US GAAP, when KPMG knew that the contracts were still in draft form, with key terms missing, at the time revenue was recognized (¶160); that the customers had returned "confirmations" to L&H which left key terms blank, including the date the products were supposedly delivered and the description of the products (¶¶162-163); that the purported licensing fees were far in excess of typical license fees in the Korean market at the time (¶151); and that L&H was recognizing revenue in Korea by means of receivables factored with recourse (¶155).  As demonstrated by McLamb's January 5, 2000 e-mail, KPMG knew that L&H had improperly recognized at least $23 million in revenue during the 1999 fourth quarter from the three "draft" contracts discussed therein (¶160).

(e) KPMG falsely represented to Stonington that L&H's recognition of revenue on its contract with Four One One.Com was in accordance with GAAP, when KPMG knew that it was unlikely that the $2.6 million outstanding receivable on this contract would be collected (¶166); that an extended payment plan had been proposed to the customer under which a substantial portion of the receivable would have remained unpaid even at the end of 2000 (¶167); and that although KPMG had requested that the confirmation letter reflecting the extended payment plan be returned by March 31, 2000, it had failed to receive it as of several weeks later (id.).

(f) KPMG falsely represented to Stonington that L&H's strategic partners were independent from L&H, when KPMG had direct evidence to the contrary.  KPMG knew that the confirmation letters sent to several of the strategic partners had been returned by a director of the FLV Fund, a related party to L&H, who admitted to being the investor in the strategic partners (¶177).  KPMG also knew that FLV Fund had funded four CLDCs in October 1999 and that L&H had transferred the FLV Fund's interest in those CLDCs to HI Worldwide in the last week of 1999 solely in an attempt to avoid reporting the contracts with the CLDCs as related-party transactions. (¶191) Although KPMG knew the purpose of this transaction, it collaborated with L&H and failed to disclose that these were related-party transactions on which revenue could not be recognized.

(g) In addition, KPMG knew that the strategic partners were corporate fictions which had performed no work independent of L&H (¶181); that at least eight of the strategic partners, including two whose contracts were provided to Stonington, were funded by the FLV Fund, which was audited by KPMG Belgium (¶190); that many of the

strategic partners shared common addresses, providing strong evidence that they were not operational companies capable of performing the development work supposedly required by their contracts with L&H (¶178); that the contracts with these purported Korean and Singaporean entities had actually been signed by Belgians, providing even more evidence that the contracts were phony (¶178); that a single entity which was not a party to any of L&H's contracts had supposedly made a $25 million payment on behalf of several of the strategic partners (id.); that L&H had refused to permit access to the investors in the strategic partners in order for KPMG to confirm their independence, and in fact, had refused to even give KPMG the names of the investors (¶174); and that, although KPMG had identified numerous audit procedures which were necessary in order for KPMG to conclude that the strategic partners were independent, it had performed none of those procedures by the time it issued its 1999 audit report or by the Closing Date (¶¶183-189).

(h) In response to Stonington's inquiries, KPMG represented to Stonington that Tony Snauwert (who had signed 9 of the 23 contracts provided to Stonington in due diligence) was an agent for several L&H licensees, when KPMG knew that just a few days previously, on January 29, 1999, McLamb had informed L&H and KPMG's Belgian auditors that it was "no longer acceptable for us to rely on an agent acting for a group of investors" for purposes of allowing L&H to record revenue (¶180).

(i) KPMG issued clean and unqualified audit opinions on L&H's financial statements, when KPMG knew all of the foregoing facts, and knew that a "scope limitation" had been placed upon KPMG when L&H refused to provide information concerning the investors in the strategic partners (¶174).

(j) As set forth above, KPMG knew that L&H lacked adequate internal controls, that the Company's accounting personnel, including its CFO, were not capable of ensuring the integrity of L&H's financial statements, and that its Audit Committee was not performing its responsibilities.

355.    In misrepresenting the conduct of its audits for the years 1998 and 1999, and falsely representing that L&H's consolidated financial statements fairly presented its financial position and results of operations and cash flows for those years, KPMG, by the use and instrumentalities of interstate commerce and the United States mails, participated

in a course of conduct that constituted a fraud and deceit, misrepresented material facts and omitted to disclose material facts and concealed L&H's true financial condition and results of operation.

356.    By reason of the foregoing, KPMG U.S. and KPMG Belgium have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. As a direct and proximate result of the wrongful conduct of KPMG U.S. and KPMG Belgium, Stonington suffered substantial damages in an amount to be proven at trial.

## COUNT IV

### Against KPMG U.S. and KPMG Belgium Pursuant
### To Section 20(a) of the Exchange Act

357.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

358.    KPMG U.S. and KPMG Belgium were controlling persons of L&H and its senior officers, including Dammekens, within the meaning of Section 20(a) of the Exchange Act, with respect to the false public statements made by L&H and its officers. At all relevant times, KPMG U.S. and KPMG Belgium had the power to control the actions of L&H and its officers in making those false public statements.

359.    KPMG U.S. and KPMG Belgium exercised actual power or control over L&H and its officers and the transactions alleged herein which give rise to L&H's and its officers' liability under the securities laws. This control is evidenced by the fact that KPMG U.S. and KPMG Belgium had authority to clear the issuance of L&H's 1998 and 1999 financial statements and L&H's public announcements of unaudited financial results and had the right to approve or disapprove the financial statements or any part thereof prior to their release to the public. Notwithstanding their knowledge or reckless

disregard of the fact that these public statements were false, KPMG U.S. and KPMG Belgium permitted issuance of these false and misleading public statements.

360.   In addition, KPMG U.S. was a controlling person of KPMG Belgium within the meaning of Section 20(a) of the Exchange Act with respect to the false 1998 and 1999 audit opinions signed by KPMG Belgium.   At all relevant times, KPMG U.S. had the power to control KPMG Belgium's actions in preparing and issuing the false audit opinions.

361.   KPMG U.S., through its partner Robert McLamb, exercised actual power or control over KPMG Belgium and the transactions alleged herein which give rise to KPMG Belgium's liability under the securities laws.   This control is evidenced by the fact that the approval of KPMG U.S., through McLamb, was necessary before KPMG Belgium could issue KPMG's audit reports on L&H's 1998 and 1999 financial statements over the signature of KPMG Belgium.   Notwithstanding its knowledge that the 1998 and 1999 financial statements of L&H were not prepared in conformity with U.S. GAAP, or reckless disregard of that fact, KPMG U.S. permitted the issuance of the false 1998 and 1999 audit opinions which stated the contrary.

362.   By reason of the foregoing, KPMG U.S. is liable under Section 20(a) of the Exchange Act jointly and severally with, and to the same extent as, KPMG Belgium for its violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

363.   As a direct and proximate result of the wrongful conduct of KPMG U.S. and KPMG Belgium, Stonington suffered damages in an amount to be proven at trial.

## COUNT V

### Against the Audit Committee Defendants Pursuant to Section 10(b)
### of the Exchange Act and Rule 10b-5 Promulgated Thereunder

364.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

365.    As alleged herein, the Audit Committee Defendants, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to artificially inflate the stock price of L&H, and to conceal its true financial condition. They employed devices, schemes, and artifices to defraud while in possession of material, adverse, non-public information, and they engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about L&H not misleading.  Specifically, they knew or recklessly disregarded that L&H's 1998 and 1999 financial results reported in press releases, L&H's annual reports, and filings with the SEC, which were disseminated to Stonington and to the investing public, were materially overstated and were not prepared and presented in accordance with U.S. GAAP.

366.    The Audit Committee Defendants acted with scienter, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, when such facts were available to them.  They were directly responsible for the false and misleading statements and omissions disseminated to the public through press releases, news reports, and filings with the SEC.

142

367.    The misrepresentations and omissions of the Audit Committee Defendants were intentional or reckless and done for the purpose of enriching themselves at the expense of Stonington and other investors in L&H and to conceal L&H's true operating and financial condition.  They engaged in this scheme to inflate L&H's reported earnings and its stock price in order to create the illusion that L&H was a successful, strong, and profitable company, which would enable L&H to continue its acquisition strategy, among other things. The facts alleged herein indicate actual evidence, as well as a strong inference, that the Audit Committee Defendants acted with scienter.

368.    As a result of the deceptive practices, common schemes and artifices, and false and misleading statements and omissions alleged herein, the market price of L&H stock was artificially inflated, and Stonington was induced to exchange its shares of Dictaphone for the common stock of L&H at an artificially inflated price.

369.    By virtue of the foregoing, the Audit Committee Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of the Audit Committee Defendants' wrongful conduct, Stonington suffered damages in an amount to be proven at trial.

## COUNT VI

### Against the Audit Committee Defendants Pursuant
### to Section 20(a) of the Exchange Act

370.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

143

371. The Audit Committee Defendants, by virtue of their positions within L&H and their specific acts were, at the time of the wrongs alleged herein, controlling persons of L&H within the meaning of Section 20(a) of the Exchange Act. They had the power and influence and exercised same to cause L&H to engage in the illegal conduct and practices complained of herein, including the publishing of false statements of L&H's financial results.

372. By reason of the conduct of L&H as alleged in this Complaint, the Audit Committee Defendants are liable for the aforesaid wrongful conduct of L&H and liable to Stonington for the substantial damages which it suffered in connection with its acquisition of L&H stock as a result of L&H's violations of the Exchange Act.

## COUNT VII

### Against Dammekens for Common Law Fraud

373. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

374. In an effort to induce Stonington to enter into the Merger Agreements, Dammekens knowingly and willfully made misrepresentations of material facts to Stonington and knowingly and willfully failed to disclose or fraudulently concealed the true facts from Stonington.

375. In addition, Dammekens knowingly and willfully made and participated in the making of public misrepresentations of material facts concerning L&H's published financial results and knowingly and willfully failed to disclose or fraudulently concealed the true facts relating thereto.

376.    In reliance on those misrepresentations, and as a result of Dammekens' failure to disclose and fraudulent concealment of the true facts, Stonington exchanged its shares of Dictaphone for the common stock of L&H.

377.    As a direct and proximate result of Dammekens' fraudulent conduct, Stonington suffered damages in an amount to be proven at trial.

**COUNT VIII**

**Against KPMG U.S. and KPMG Belgium for Common Law Fraud**

378.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

379.    In an effort to induce Stonington to enter into the Merger Agreements, KPMG U.S. and KPMG Belgium knowingly and willfully made misrepresentations of material facts to Stonington and knowingly and willfully failed to disclose or fraudulently concealed the true facts from Stonington.

380.    In addition, KPMG U.S. and KPMG Belgium knowingly and willfully made and participated in the making of public misrepresentations of material facts concerning L&H's published financial results and knowingly and willfully failed to disclose or fraudulently concealed the true facts relating thereto.

381.    In reliance on those misrepresentations, and as a result of KPMG U.S.'s and KPMG Belgium's failure to disclose and fraudulent concealment of the true facts, Stonington exchanged its shares of Dictaphone for the common stock of L&H.

382.    As a direct and proximate result of the fraudulent conduct of KPMG U.S. and KPMG Belgium, Stonington suffered damages in an amount to be proven at trial.

## COUNT IX

### Against the Audit Committee Defendants for Common Law Fraud

383.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

384.    The Audit Committee Defendants knowingly and willfully made and participated in the making of public misrepresentations of material facts concerning L&H's published financial results and knowingly and willfully failed to disclose or fraudulently concealed the true facts relating thereto.

385.    In reliance on those misrepresentations, and as a result of the Audit Committee Defendants' failure to disclose and fraudulent concealment of the true facts, Stonington exchanged its shares of Dictaphone for the common stock of L&H.

386.    As a direct and proximate result of the fraudulent conduct of the Audit Committee Defendants, Stonington suffered damages in an amount to be proven at trial.

## COUNT X

### Against Dammekens for Negligent Misrepresentation

387.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

388.    In the course of his engagements as an officer of L&H, in which he had a pecuniary interest, Dammekens supplied false information for the guidance of Stonington in its decision to exchange its Dictaphone shares for L&H common stock and its determination of the price to be paid for L&H stock.

389.    In supplying the false information, Dammekens knew that Stonington intended to rely on that information in deciding whether to enter into the Merger

146

Agreement and in determining the price to be paid for L&H stock. Dammekens intended to influence Stonington's decision in that transaction and determination of the price to be paid for L&H stock in that transaction.

390.    Dammekens breached his duty to provide accurate information to Stonington by failing to exercise reasonable care in communicating information regarding L&H, as detailed herein.

391.    Stonington justifiably relied to its detriment upon the false information supplied by Dammekens in deciding to exchange its Dictaphone shares for shares of L&H and in determining the price to be paid for L&H stock in that exchange.

392.    As a direct and proximate result of Dammekens' negligent misrepresentations, Stonington suffered damages in an amount to be determined at trial.

## COUNT XI

### Against KPMG U.S. and KPMG Belgium
### for Negligent Misrepresentation

393.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

394.    In the course of their engagement as auditor of L&H, in which they had a pecuniary interest, KPMG U.S. and KPMG Belgium supplied false information for the guidance of Stonington in its decision to exchange its Dictaphone shares for L&H common stock and its determination of the price to be paid for L&H stock.

395.    In supplying the false information, KPMG U.S. and KPMG Belgium knew that Stonington intended to rely on that information for the particular purpose of deciding whether to enter into the Merger Agreement and in determining the price to be paid for Stonington's interest in Dictaphone. KPMG U.S. and KPMG Belgium intended to

147

influence Stonington's decision in that transaction and determination of the price to be paid for L&H stock in that transaction.  KPMG U.S. and KPMG Belgium affirmatively confirmed the importance of the information they supplied to Stonington's investment decision by, among other things, engaging in detailed discussions with Stonington concerning revenue recognition issues on each of L&H's most significant contracts and by providing Stonington with copies of its workpapers for the 1998 audit.

396.    KPMG U.S. and KPMG Belgium breached their duty to provide accurate information to Stonington by failing to exercise reasonable care in communicating information regarding L&H, as detailed herein.

397.    Stonington justifiably relied to its detriment upon the false information supplied by KPMG U.S. and KPMG Belgium in deciding to exchange its Dictaphone shares for shares of L&H and in determining the price to be paid for L&H stock in that exchange.

398.    As a direct and proximate result of the negligent misrepresentations of KPMG U.S. and KPMG Belgium, Stonington suffered damages in an amount to be determined at trial.

## COUNT XII

### Against KPMG U.S. and KPMG Belgium for
### Aiding and Abetting Common Law Fraud

399.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

400.    As set forth herein, KPMG U.S. and KPMG Belgium knew of the fraud committed by L&H and its officers and senior management, including Dammekens.

401.    KPMG U.S. and KPMG Belgium provided substantial assistance to L&H and its officers and senior management in that they affirmatively assisted in the publishing of false financial statements and the making of false statements to Stonington in the course of due diligence.

402.    In addition, although KPMG U.S. and KPMG Belgium had a duty to disclose to Stonington the true facts known to them, including that the financial statements of L&H were not prepared in conformity with U.S. GAAP and were materially misstated and that L&H's recognition of revenue on the contracts provided to Stonington in the course of due diligence was improper, KPMG U.S. and KPMG Belgium provided substantial assistance in the commission of the fraud by failing to advise of these known facts.

403.    As a consequence of the foregoing, Stonington suffered damages in an amount to be proven at trial.

## COUNT XIII

### Against the Related-Party Defendants and Verbeke
### For Aiding and Abetting Common Law Fraud

404.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

405.    As set forth herein, the Related-Party Defendants and Verbeke knew of the fraud committed by L&H and its officers and senior management, including Dammekens.

406.    The Related-Party Defendants and Verbeke provided substantial assistance to L&H and its officers and senior management in that they affirmatively assisted in the purported funding of L&H's "strategic partners" in order to enable L&H to falsely report revenue derived from contracts with the "strategic partners."

149

407.    In addition, Verbeke, in his capacity as a partner of Loeff Claeys, provided substantial assistance to L&H and its officers and senior management in that he provided legal services in connection with the establishment of the "strategic partners" and L&H's dealings with the "strategic partners."

408.    As a consequence of the foregoing, Stonington suffered damages in an amount to be proven at trial.

### COUNT XIV

**Against the Korean Banks for**
**Aiding and Abetting Common Law Fraud**

409.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

410.    As set forth herein, the Korean Banks knew of the fraud committed by L&H and its officers and senior management, including Dammekens.

411.    The Korean Banks provided substantial assistance to L&H and its officers and senior management in that they affirmatively assisted L&H's publishing of false financial results by factoring L&H's receivables with recourse.

412.    As a consequence of the foregoing, Stonington suffered damages in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs seek a judgment:

A.    Awarding plaintiffs all compensatory damages they suffered, including lost profits, consequential and incidental damages, as a result of the wrongful conduct of the defendants, in an amount to be determined at trial;

B.    Awarding plaintiffs punitive damages in an amount to be determined at trial;

150

C.      Awarding plaintiffs prejudgment and post-judgment interest;

D.      Awarding plaintiffs their costs, expenses and attorneys' fees incurred in connection with this action; and

E.      Awarding plaintiffs such other and further relief as the Court finds just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury.

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

Max W. Berger
Douglas M. McKeige
Steven B. Singer
Steven E. Mellen
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

David C. McBride
John W. Shaw
John J. Paschetto
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Attorneys for Plaintiffs Stonington Partners, Inc.,
Stonington Capital Appreciation 1994 Fund L.P.
and Stonington Holdings, L.L.C.

Dated: November 2, 2001

151

<u>CERTIFICATE OF SERVICE</u>

I, John W. Shaw, Esquire, hereby certify that I caused copies of the foregoing

document to be served on November 2, 2001 upon the following counsel of record:

BY HAND

Andre G. Bouchard, Esquire
Bouchard Margules & Friedlander
222 Delaware Avenue, Suite 1102
Wilmington, DE  19801

Robert K. Payson, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza
1313 N. Market Street
Wilmington, DE  19801

Lewis H. Lazarus, Esquire
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue
Wilmington, DE  19801

Stephen E. Jenkins, Esquire
Ashby & Geddes
222 Delaware Avenue, 17th Floor
Wilmington, DE  19801

John W. Shaw