**EXHIBIT C-4**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x

GARY B. FILLER and LAWRENCE
PERLMAN, Trustees of the TRA
RIGHTS TRUST,

                Plaintiffs,

vs.

JO LERNOUT, POL HAUSPIE, GASTON
BASTIAENS, CARL DAMMEKENS,
NICO WILLAERT, KLYNVELD PEAT
MARWICK GOERDELER
BEDRIJFSREVISOREN, KPMG L.L.P.,
SAMJONG KPMG GROUP, KPMG
UNITED KINGDOM, KPMG
SINGAPORE, FLANDERS LANGUAGE
VALLEY FUND, FLANDERS
LANGUAGE VALLEY FOUNDATION,
L&H INVESTMENT CO., N.V.,
MERCATOR & NOORDSTAR, N.V., and
PAUL BEHETS,

                Defendants.

-------------------------------------------------------x

Jury Trial Demanded

CIVIL ACTION NO. 01-191 SL R



## AMENDED COMPLAINT

      Plaintiffs, by their attorneys, as and for their complaint, allege the following upon

knowledge as to themselves and their own actions, and as to Seagate Technology, Inc.

("Seagate") and the actions of Seagate and its representatives.  As to all other matters, plaintiffs'

allegations are based upon investigation of counsel, which included, among other things, review

of non-public documents created by, among others, defendants Klynveld Peat Marwick

Goerdeler Bedrijfsrevisoren ("KPMG Belgium"), KPMG LLP ("KPMG U.S."), KPMG United

Kingdom, KPMG Singapore, Samjong KPMG Group ("KPMG Korea") (collectively, with

defendant Paul Behets, "KPMG"), and by defendants Jo Lernout, Pol Hauspie, Carl Dammekens,

and Gaston Bastiaens as detailed herein, and investigation into, and review of public statements of and about Lernout & Hauspie Speech Products, NV ("L&H") and of defendants Jo Lernout, Pol Hauspie, Carl Dammekens, Gaston Bastiaens, and KPMG. Plaintiffs believe that their information-and-belief allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

## NATURE OF THE ACTION

1.    This is an action to recover damages sustained by Seagate when it sold its nearly $170 million interest in Dragon Systems, Inc. ("Dragon") for artificially inflated, and ultimately worthless, L&H stock. Seagate (prior to a merger and leveraged buyout on or about November 22, 2000) was a world leader in storage technology for Internet, business and consumer applications; it designed, manufactured and marketed products for storage, retrieval and management of data on computer systems, including disc drives, disc drive components, tape drives, and software. Dragon was and is a leading worldwide supplier of speech and language technology, including award-winning speech recognition software, Dragon NaturallySpeaking. L&H is a global speech recognition software company that offers products and services including automatic speech recognition, text-to-speech, digital speech and music compression and text-to-text translation, and was one of Dragon's chief competitors.

2.    Seagate purchased L&H stock in a merger of Dragon into a subsidiary of L&H that was consummated only months before public exposure of fraudulent transactions and accounting practices that enabled L&H to falsely inflate its revenues by at least 50% since 1997 — in 1999 alone, fully 70% of L&H's revenue was fictional and has since been reversed. These fraudulent transactions and practices were the underpinning of a material artificial inflation in the value of L&H stock.

3.    At the time Seagate agreed to sell its interest in Dragon to L&H, the price of L&H stock was at an all-time high, buoyed by reports of exponential increases in revenues. Among other things, L&H proclaimed: (a) "record" growth that was largely "organic" -- the

consequence of the maturity and success of L&H products, rather than of L&H's well-publicized acquisition spree; (b) that L&H derived substantial licensing revenues from its practice of licensing exclusive rights to technology for a specific application or language to "strategic partners" funded by outside investors who would take the risk of developing the application and split future profits with L&H; and (c) that L&H had entered early and successfully captured a fast-growing Korean market for its products. None of this was true, but the truth was intentionally concealed from Seagate.

4.       Six months after the Dragon sale was consummated, L&H was in bankruptcy, the target of investigations by the United States Securities and Exchange Commission ("SEC") and others, its stock delisted by the NASDAQ and suspended on the European EASDAQ exchange, after a stock price collapse that resulted in a loss of nearly $9 billion -- more than 95% of L&H's stock market value. L&H's long-time auditor, KPMG, has withdrawn its audit reports on the 1998 and 1999 financial statements and senior management of L&H is under arrest in Belgium and facing criminal fraud charges.

5.       This dramatic turn of events was precipitated in part by a *Wall Street Journal* reporter who, by the simple expedient of questioning eighteen of L&H's thirty claimed Korean customers, discovered that those customers actually did little or no business with L&H, yet they accounted for a stunning proportion of L&H's reported revenues. In short order, *The Wall Street Journal* also discovered that most of L&H's "strategic partner" licensees were in fact shell start-up companies created by L&H and its affiliates as a means of improperly funding research and development expenses off the books, and that $100 million was simply "missing" from the bank accounts of L&H's Korean unit. Evidently, these efforts by *The Wall Street Journal* were considerably greater than those expended by KPMG, L&H's auditor, who both orally and in writing assured Seagate that it was comfortable with L&H's financial statements and that there were no material adjustments that needed to be made relative to L&H's Korean operations, among other assurances. Indeed, there is a clear record demonstrating that KPMG deliberately ignored significant red flags indicating the precise problems leading to L&H's collapse.

3

6.     A major public accounting firm and two law firms, who were subsequently retained to look into *The Wall Street Journal* allegations by L&H's Audit Committee (the "Audit Committee Advisors"), concluded within weeks that L&H's "record revenues" were fiction. Among numerous impermissible practices that were in fact, and in substance, violative of U.S. Generally Accepted Accounting Principles ("U.S. GAAP"), and that fraudulently and materially inflated L&H's revenues, L&H:

    (a)    created sham "licensees" intended to facilitate the mischaracterization of loans or investments as revenue and enable L&H to fund its research and development without deducting the expense from operating income;

    (b)    failed to disclose that its Korean unit factored receivables with recourse to L&H bank accounts and that up to $100 million or more was and is currently "missing" from those accounts;

    (c)    improperly recognized revenue from barter or exchange transactions in which no cash changed hands;

    (d)    improperly recognized sales revenues that were contingent on L&H later performing development work;

    (e)    improperly recognized revenue prior to contracts being finalized;

    (f)    improperly recognized revenue when collectibility was not reasonably assured;

    (g)    improperly recognized revenue when the customer's ability to pay depended on an investment from L&H;

    (h)    improperly recognized revenue when the "purchasers" of licenses were not end-users and side letters confirmed that the license fee would be reimbursed if the license were not resold; and

    (i)    improperly recognized revenue when the customer had the right to return the product and did so.

7.     The L&H Audit Committee's advisors concluded that <u>at a minimum</u>, $277 million, or <u>one third</u> of L&H's revenue over the past two and one half years had been improperly recorded. The Audit Committee's advisors specifically tied defendants Hauspie, Lernout,

4

Bastiaens, Willaert and Dammekens to the impermissible transactions, and recommended disciplinary action against them.

8.    L&H's fraudulent scheme succeeded because KPMG, the company's long-time outside auditor, lent credibility to L&H's fraudulent financial reporting.  Notwithstanding the magnitude of L&H's fraud and the existence of numerous "red flags," KPMG issued unqualified opinions on L&H's financial statements for each of the years 1997, 1998 and 1999, rendered opinions that those financial statements were presented fairly, in all material respects, in accordance with U.S. GAAP, and consented to the inclusion of those reports in filings with the SEC.

9.    Red flags that should unquestionably have prevented KPMG from issuing its unqualified opinions and approving the public dissemination via press release of fraudulently false financial results included, among other things:

- An alert from KPMG Korea, communicated to the highest reaches of KPMG U.S. and KPMG Belgium, that "critical revenue recognition issues" existed with respect to Korean contracts representing millions of dollars of revenue that was reversed when L&H collapsed and KPMG was required to withdraw its prior opinions.

- KPMG knowledge that numerous claimed customers in Singapore were startup ventures sharing one address where no business operations were visible, and KPMG access to information demonstrating that those customers were entities related to L&H.

- KPMG participation in L&H's response to an SEC inquiry, commenced on or about January 2000, into L&H accounting practices and transactions with related parties, and receipt in April 2000 of requests from the SEC to produce its own documents and testimony in connection with that inquiry.

5

10.   KPMG was intimately involved in the preparation of L&H's press releases, giving advice as to content and timing and making substantive editorial comments that were incorporated into L&H quarterly public announcements of financial results.

11.   Representatives of KPMG also made specific oral representations to Seagate on March 22, 2000, affirming the propriety of L&H's financial reporting.  Without those oral representations, Seagate would never have entered into a transaction with L&H, a foreign entity that was to buy Seagate's $170 million investment in Dragon not for cash but for L&H securities — securities that were only as valuable as L&H's financial reporting was legitimate.  Indeed, it was KPMG who satisfied one of the critical conditions to closing the Dragon sale by giving an unqualified opinion on L&H's 1999 financial statements, even though KPMG had knowledge that the SEC had commenced an investigation of L&H's accounting practices and was aware of numerous other red flags signaling improprieties in L&H's accounting practices.  Indeed, KPMG was participating in the production of documents to the SEC and responding to inquiries into L&H's dealings with related parties contemporaneously with KPMG's discussion with Seagate, in which all facts relating to the SEC inquiry and its subject matter were concealed.

12.   KPMG failed to perform procedures required by U.S. Generally Accepted Auditing Standards ("U.S. GAAS") that would have revealed L&H's improper accounting practices — or turned a blind eye to the results of those procedures.

## JURISDICTION AND VENUE

13.   This action arises under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, under Section 20(a) of the Exchange act, 15 U.S.C. §78t(a), and under state law.

14.   This Court has subject matter jurisdiction over this case pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa; 28 U.S.C. §1331; and principles of supplemental jurisdiction, 28 U.S.C. §1367.

15.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1391(b).

16.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## PARTIES AND UNNAMED ACTORS

17.    Plaintiffs Gary B. Filler and Lawrence Perlman (the "Trustees") are the former Co-Chairmen of the Board of Seagate and currently the Trustees of the TRA Rights Trust, a trust organized under the laws of the State of Delaware (the "Trust"). The Trust is the sole successor in interest to Seagate for and on behalf of the stockholders of Seagate in respect of any and all claims and causes of action possessed by Seagate arising out of, in connection with, or relating to Seagate's acquisition or ownership of shares of, or holdings in, L&H. The Trustees have the authority to bring any such claim, action, suit or proceeding against L&H and its affiliates, and/or any of L&H's officers, directors, agents, representatives, and their respective affiliates, and any other person or entity, whether at law or in equity, arising out if, in connection with, or relating to Seagate's acquisition or ownership of shares of, or holdings in, L&H. Seagate and Dragon are Delaware corporations. The former shareholders of Seagate who are the beneficiaries of the Trust are legally entitled, through the Trust, to the sole and exclusive benefit of any and all claims arising out of Seagate's ownership of L&H securities. Former Seagate shareholders who are beneficiaries of the Trust are American citizens resident in the United States, as are the Trustees.

18.    L&H is a Belgian corporation, with its principal place of business in Ieper, Belgium. Until it was delisted on December 8, 2000, L&H common stock was listed on the NASDAQ under the ticker symbol "LHSP" or "LHSEQ." L&H stock was also traded on the EASDAQ until it was "indefinitely suspended" on or about November 9, 2000. On November

7

29, 2000, L&H filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware, and contemporaneously commenced bankruptcy proceedings in Belgium. But for those filings, L&H would be named in this action as a defendant.

19.    L&H Holdings USA, Inc. ("L&H USA") is a Delaware corporation, a wholly owned subsidiary of L&H, and the successor corporation to Dragon. On November 29, 2000, L&H USA also filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware. But for that filing, L&H USA would be named in this action as a defendant.

20.    Defendant Jo Lernout ("Lernout") is one of the founders of L&H. Lernout was President of L&H from January, 1994 until February, 1996, Co-Chairman of the L&H Board from 1996, and a Managing Director of L&H from 1987, until he resigned those offices on November 9, 2000. Lernout served as a member of the Board of Directors of L&H until his resignation on January 16, 2001. Lernout was forced out of his remaining role as the Chief Technology Officer of L&H at the end of February, 2001. As of June 8, 2000, Lernout held, controlled or had beneficial ownership of 43,667,068 shares of L&H stock, or approximately 30.24% shares outstanding on that date.

21.    Defendant Pol Hauspie ("Hauspie") is one of the founders of L&H. Hauspie was Chairman of L&H from January 1994 until October 1996, Co-Chairman of the L&H Board from 1996, and a Managing Director of L&H from 1987, until he resigned those offices on November 9, 2000. Hauspie resigned his board seat on November 22, 2000. As of June 8, 2000, Hauspie held, controlled or had beneficial ownership of 43,667,208 shares of L&H stock, or approximately 30.24% of the shares outstanding on that date.

22.    Defendant Gaston Bastiaens ("Bastiaens") joined L&H as President in September 1996, and was appointed Chief Executive Officer of L&H in May, 1997. Bastiaens resigned those offices on August 25, 2000, and his board seat on November 9, 2000. As of June 8, 2000, Bastiaens held, controlled or had beneficial ownership of 1,231,000 shares of L&H stock.

8

23.     Defendant Nico Willaert ("Willaert") joined L&H as a director in 1992 and remained on the Board of Directors until November 22, 2000. Willaert was also a Managing Director of L&H from April 1993, and Co-Vice-Chairman of L&H from January 1994, until he resigned those offices on November 9, 2000.

24.     Defendant Carl Dammekens ("Dammekens") joined L&H in 1990 as Corporate Controller, and served as a Senior Vice President of Finance from 1993 and as Acting Chief Financial Officer of L&H from 1996 until his appointment as Chief Financial Officer on July 7, 1999. On November 9, 2000, L&H announced that Dammekens would be replaced as Chief Financial Officer.

25.     Defendant KPMG Belgium is a Belgian public accounting firm and a member of KPMG International, a Swiss association that describes itself on the KPMG website as an "international network of industry professionals" in which "more than 100,000 KPMG professionals in member firms worldwide collaborate across industry, service and national boundaries to deliver professional services in 155 countries."   KPMG Belgium participated in KPMG's audits of L&H from 1991, when it absorbed the Belgian accounting firm of Behets, Boes & Co, which had been auditing L&H since the late 1980's. KPMG Belgium was the signatory to KPMG's unqualified reports on L&H's financial statements for each of the years 1997, 1998 and 1999; gave an opinion that those financial statements were prepared in accordance with U.S. GAAP; stated that its audit was conducted in accordance with U.S. GAAS; and consented to L&H's inclusion of KPMG Belgium's reports on those financial statements in filings with the SEC.

26.     Defendant Paul Behets was a principal of the Belgian accounting firm Behets, Boes & Co., where L&H was his client, until Behets, Boes & Co. was absorbed into KPMG Belgium in 1991. At KPMG Belgium, Behets was the audit partner with chief responsibility for L&H audits from 1991 until 1999, when he left KPMG Belgium to become the chief executive officer of defendant S.A.I.L. Trust, V.Z.W.

9

27.    Defendant KPMG U.S. is a public accounting firm based in the United States, and played a primary role in the 1997, 1998 and 1999 audits of L&H financial statements. A team of KPMG U.S. auditors performed field work at L&H's U.S. operations, and the international team as a whole was guided by Robert McLamb, a U.S. partner charged with reviewing L&H financial statements for compliance with U.S. GAAP. Another U.S. partner, Glen Davison, was responsible for reviewing L&H financial statements for compliance with SEC rules and regulations. KPMG U.S. performed extensive services for L&H in other areas as well, such as tax advice, consulting, and acquisitions advice. Robert McLamb was the "relationship partner" on L&H's engagement of KPMG in connection with the acquisition of Dragon.

28.    KPMG U.K. is the United Kingdom member of KPMG International. KPMG U.K. personnel audited the U.K. operations of L&H, and auditors in the U.S. Capital Markets Group, a department of KPMG domiciled in the U.K., reviewed L&H financial statements for compliance with U.S. GAAP.

29.    KPMG Korea is the Korean member of KPMG International. KPMG Korea performed a due diligence investigation of Bumil Information and Communications Co., Ltd. ("Bumil") a company acquired by L&H and then central to the fraud at L&H Korea, and participated in KPMG's audit of the L&H's Korean operations.

30.    KPMG Singapore is the Singapore member of KPMG International, and participated in KPMG's audit of L&H's operations in Asia.

31.    Defendant Flanders Language Valley Fund ("FLV Fund") is a Belgian venture capital fund organized by Hauspie and Lernout, among others, to make strategic investments. FLV Fund stock is traded on the EASDAQ stock exchange under the symbol "FLVF." FLV Fund has United States offices in Los Altos Hills, California and in Woburn, Massachusetts. Hauspie and Lernout served as directors of FLV Fund in 1996 and 1997, and after 1997 each continued to "spend a portion of his time on activities relating to the FLV Fund." The FLV Fund was one of the entities related to L&H through which L&H secretly funded its claimed customers. At all relevant times, the financial statements of the FLV Fund were audited by

10

KPMG. In 2001, FLV Fund dismissed KPMG as its auditors in connection with a dispute between them regarding $30 million that is missing from FLV Fund accounts in circumstances involving L&H Korea.

32.    Defendant Flanders Language Valley Foundation, also known as S.A.I.L. Trust V.Z.W. ("S.A.I.L. Trust"), purports to be a non-profit entity established in 1995 by Hauspie, Lernout, and the Government of Flanders, among others, to support economic development and assist in financing the infrastructure of the Flanders Language Valley region. S.A.I.L. Trust holds a one third interest in FLV Management, N.V. ("FLV Manager"), and has the right to appoint five of its directors. FLV Management, N.V. is the manager of the FLV Fund. The chief executive of S.A.I.L. Trust is Paul Behets, who was a principal of the Belgian accounting firm Behets, Boes & Co., where L&H was his client, until Behets, Boes & Co. was absorbed into KPMG Belgium in 1991. At KPMG Belgium, Behets was the audit partner with chief responsibility for L&H audits from 1991 until July 1999, when he left KPMG Belgium to assume his position at S.A.I.L. Trust.

33.    One of the KPMG Belgium auditors responsible for the L&H audits, Chantal Mestdagh, left KPMG Belgium to become Chief Financial Officer of Lernout and Hauspie Investment Co. ("LHIC"), a company formed by defendants Hauspie and Lernout, in which they own a controlling interest, and which was an entity through which L&H secretly funded its supposedly unaffiliated customers. Ms. Mestdagh held that position throughout KPMG Belgium's audits of L&H's 1998 and 1999 financial statements. KPMG also audits the Flanders Language Valley Fund, N.V. ("FLV Fund"), another entity related to L&H through which L&H secretly funded its purportedly unaffiliated customers.

34.    Defendant L&H Investment Company, N.V. ("LHIC") is a Belgian investment fund founded by Hauspie and Lernout in 1998, through which they control 7.6% of L&H's stock. Hauspie and Lernout capitalized LHIC with their own shares of L&H common stock and act as advisors to LHIC and its investments. LHIC was an entity through which L&H secretly funded

its claimed customers.  The chief financial officer of LHIC is Chantal Mestdagh, formerly one of the KPMG Belgium auditors responsible for the L&H audits.

35.    Defendant Mercator & Noordstar, N.V. ("Mercator") is an insurance company based in Antwerp, Belgium.  At all relevant times, Mercator owned 6.9% of L&H Holding, which, in turn, owned 8.9% of L&H.  Mercator also directly owned a 0.2% stake in L&H.

36.    The intertwined relationships among certain of the foregoing entities, which are discussed throughout the complaint, may be illustrated as follows, and provide an invaluable insight into KPMG Belgium's conflicting interests and motivations:

```
                                    ┌──────────────┐
                                    │     L&H      │
                                    └──────────────┘
                    owned by                              owned by

        ┌──────────────────────────┐      ┌─────────────────────────────────────┐
        │ Defendants Jo Lernout and│      │ Gewestelijke Investeringsmaatschappij│
        │      Pol Hauspie         │      │     Vlaanderen N.V. ("GIMV")         │
        │                          │      │ (owns L&H stock and nominates 1 L&H  │
        │                          │      │            director)                 │
        └──────────────────────────┘      └─────────────────────────────────────┘

   formed and sold L&H stock to provide funding for

        ┌──────────────────────────┐
        │      S.A.I.L Trust        │
        │ (defendant Behets is now  │             owns 1/3 interest  in
        │       C.E.O.)             │
        └──────────────────────────┘

   owns 1/3 interest and appoints five directors of

        ┌──────────────────────────┐
        │   FLV Fund Management     │
        └──────────────────────────┘

   manages and makes investment decisions for

        ┌──────────────────────────┐
        │        FLV Fund           │
        │ (audited by defendant KPMG│
        │         Belgium)          │
        └──────────────────────────┘
    owns                          funds

┌──────────────────────────┐      ┌──────────────────────────┐
│ at least 8 sham L&H       │      │ at least 4 sham L&H       │
│      licensees            │      │      licensees            │
└──────────────────────────┘      └──────────────────────────┘
```

## SUBSTANTIVE ALLEGATIONS

### Purchase of L&H Shares

37.    On March 27, 2000, L&H, L&H USA, Dragon, and certain of the principal

stockholders of Dragon, including Seagate, entered into an agreement (the "Merger Agreement")

pursuant to which L&H would acquire Dragon in a stock-for-stock transaction (the "Merger.")

38.    On June 7, 2000, the transactions contemplated by the Merger Agreement were

consummated, and Seagate acquired 3,871,489 shares of L&H common stock. On that date,

13

L&H was valued at $43.125 per share. Thus, Seagate purchased L&H shares for an interest in Dragon valued at approximately $166,957,963.

### Seagate's Reliance on Defendant's Material Representations

39.    In agreeing to accept L&H shares in exchange for its interest in Dragon, and in setting the price of Dragon relative to L&H's stock price, Seagate relied on the truth and accuracy of (a) L&H's extensive public disclosures regarding its business and revenues and the propriety of its financial statements, many of which Seagate directly examined and all of which were incorporated in the market price of L&H securities, and (b) the written and oral assurances of KPMG, absent which Seagate would never have entered into this transaction. These disclosures and assurances portrayed L&H as a technology company whose innovative products were propelling record global revenues. That was untrue, and Seagate's reliance on the defendants' disclosures and assurances proved to be sorely misplaced.

### False and Omissive Claims of Record Revenues
### Every Quarter From "Organic Growth"

40.    Every quarter in 1997, 1998, and 1999, L&H proclaimed exponential increases in revenues:

(a)    In an April 28, 1997 press release, L&H announced that "first quarter of 1997 total revenues were $16.6 million, an increase of 350% over revenues of $4.7 million in the first quarter of 1996."

(b)    A July 30, 1997 press release announced second quarter 1997 revenues of "$21.1 million, an increase of 268% over revenues of $5.7 million in the second quarter of 1996."

(c)    An October 22, 1997 press release announced third quarter 1997 revenue of "$27.9 million, an increase of 285% over revenues of $7.3 million in the third quarter of 1996."

14

(d)     A February 3, 1998 press release announced "results for the fourth quarter [of 1997] of $33.8 million, a 150% increase in reported revenue of $13.4 million for the fourth quarter of 1996."

(e)     In its 1997 Annual Report filed with the SEC on Form 20-F on May 26, 1998, and signed by defendant Bastiaens, L&H announced that in 1997 "total revenues increased 220% to approximately $99.4 million in 1997 from approximately $31.0 million in 1996."

(f)     L&H's announced its first quarter 1998 revenues in a press release dated April 28, 1998, attached as an exhibit to a Form 6-K/A dated May 26, 1998, and signed by defendant Bastiaens:  "[f]or the first quarter of 1998, L&H's total revenues were $35.1 million, an increase of 112% over reported revenues of $16.6 million for the first quarter of 1997."  Bastiaens was quoted as attributing L&H's performance to "our tremendous success in securing contracts," which the press release numbered at "a record-breaking 40 contracts."

(g)     In a July 28, 1998 press release, filed with the SEC on a Form 6-K dated August 5, 1998 and signed by Bastiaens, L&H announced total second quarter 1998 revenues of "$45 million, an increase of 113% over reported revenues of $21.1 million for the second quarter of 1997."  In that press release, Lernout attributed the results to increased demand for L&H products and "new contract bookings," as did Bastiaens, who stated that "[d]uring Q2 we signed 42 new contracts."

(h)     In an October 27, 1998, press release, filed with the SEC on a Form 6-K on October 28, 1998, L&H announced that, "for the third quarter of 1998, L&H's total revenues were $54.9 million, an increase of 97% over reported revenues of $27.9 million for the third quarter of 1997."

(i)     On April 7, 1999, L&H "announced results for the fourth quarter of 1998 of $76 million in revenue, or a 126% increase in the reported revenue of $33.8 million for the fourth quarter 1997."

15

(j)    In L&H's 1998 Annual Report filed with the SEC on Form 20-F and signed by defendant Bastiaens, L&H stated that "for the fiscal year 1998, the company reported total revenue of $211.6 million or an increase of 113% over the reported revenues of $99.4 million for fiscal year 1997."

(k)    An L&H 1998 Annual Report to Shareholders, filed with the SEC on a Form 6-K on June 1, 1999 and signed by defendant Dammekens, contains a letter to shareholders signed by defendants Lernout, Hauspie, and Bastiaens trumpeting "a year of major milestones.... For the fourth consecutive year, revenues grew by more than 100% over the year before. In fiscal 1998, the company reported total revenues of $211.6 million or an increase of 113 percent over the $99.4 million reported for 1997.... L&H ... signed a record 160 new contracts to license its core technologies."

(l)    On May 18, 1999, L&H announced that "for the first quarter of 1999, L&H's total revenues were $70.7 million, an increase of 102% over reported revenues of $35.1 million for the first quarter of 1998. The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications."

(m)    In a press release dated July 28, 1999, filed with the SEC on a Form 6-K dated August 2, 1999 and signed by Bastiaens, L&H announced that its second quarter 1999 "total revenues were $76.0 million, an increase of 69% over reported revenues of $45.0 million. L&H's total revenues for the six months ending June 30, 1999 were $146.7 million, an increase of 83% over reported revenues of $80.1 million for the same period in 1998. The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications." L&H reported that in the second quarter, the Technologies and Solutions division "signed 57 new contracts (45 of which were related to core speech technology)."

16

(n)     In a press release dated October 27, 1999, filed with the SEC on a Form 6-K dated November 3, 1999 and signed by defendant Dammekens, L&H announced that its third quarter 1999 "total revenues were $87.5 million, an increase of 59% over reported revenues of $54.9 million for the third quarter of 1998. L&H's total revenues for the nine months ended September 30, 1999 were $234.2 million, an increase of 74% over reported revenues of $134.9 million for the same period in 1998."

(o)     In a press release dated February 9, 2000, filed with the SEC on a Form 6-K/A dated February 14, 2000 and signed by defendant Dammekens, L&H announced that, "[f]or the fourth quarter of 1999, L&H's total revenues were $110 million, or a 43.5% increase in the reported revenue of $76.7 million for the fourth quarter of 1998. For the fiscal 1999 [sic], the company reported total revenues of $344 million or an increase of 62.7% over the reported revenues of $211.6 million for 1998." The company attributed growth to the "Technologies and Solutions Division sign[ing] a record of 80 contracts for the quarter." In that press release, Bastiaens stated that "[i]n 1999 we experienced a strong demand for speech and language technologies, applications and solutions, specifically in the Enterprise and Telophony area. This increase was mainly the result of internal growth and created a positive cash flow from operations of $68 million, reflecting the maturity of our operations."

41.     When questioned by critics about the extent to which L&H's revenue growth was the consequence of acquisitions, L&H insisted that the majority of its growth was "organic":

(a)     A response to "Lernout & Hauspie Frequently Asked Questions for Q3 1999," posted on its world-wide website on October 29, 1999, L&H stated that "80% of [revenue] growth was organic and the rest was based on acquisitions."

(b)     In a response to "Lernout & Hauspie Frequently Asked Questions for Q4 1999" posted on L&H's world-wide website on February 10, 2000, L&H claimed that

17

"L&H's internal calculation [sic] show that over 70% of our growth for fiscal 1999 was organic."

42.     In a response to "Lernout & Hauspie Frequently Asked Questions for Q1 2000," posted on its world-wide website on May 24, 2000, L&H claimed that "74% of the growth was organic." For reasons detailed below, these claims were false. As L&H subsequently admitted, nearly 70% of its revenue reported in 1998, 1999 and 2000 was wholly fictional.

### Non-Existent License Revenues from Unaffiliated "Strategic Partners"

43.     L&H also attributed significant revenues to what it reported as license fees from unaffiliated "strategic partners" who contracted with L&H to develop its software for specific applications and languages.

44.     In 1996, shortly after Bastiaens arrived at L&H, the company announced that Dictation Consortium NV, "a private company in which the FLV Fund has an investment," had licensed L&H software in order to develop L&H's continuous automated speech recognition technology. As of December 31, 1996, FLV Fund and FLV Management together owned 61% of Dictation Consortium and defendants Lernout and Hauspie were directors of FLV Fund Management. Dictation Consortium provided L&H with $26.6 million in revenue over the next two years, approximately one quarter of its 1996 sales and 19% of 1997 sales. Since Dictation Consortium bore the research and development costs, they did not shrink L&H's bottom line, as they should have. In May 1998, L&H announced that it had obtained the software developed by Dictation Consortium by purchasing the company for $26.9 million, most of which represented goodwill and could thus be amortized over seven years.

45.     In 1997, L&H entered into a similar arrangement with a company formed in March 1997, by anonymous venture capitalists, called Brussels Translation Group ("BTG"). According to L&H's 1998 Annual Report on Form 20-F, L&H granted BTG an exclusive license to use L&H speech processing technology and associated data bases to develop an internet translation service. The agreement called for BTG to pay L&H $3.5 million in license fees, plus

royalties. In May 1997, the license fee was increased by $1.5 million, and L&H also entered into an agreement to provide BTG with engineering services, under which BTG paid L&H approximately $30 million.

46.    In June, 1999, L&H acquired BTG for approximately $42 million in cash plus the assumption of BTG's $17 million start-up debt. As in the Dictation Consortium transaction, L&H was able to obtain a product without deducting the research and development expense. Instead L&H was able to record nearly $35 million in revenues and then, when it purchased BTG, L&H capitalized the acquisition price, turning what would normally be an expense into an asset.

47.    Although critics charged that L&H earnings were inflated by the Dictation Consortium and BTG transactions because those companies were related to L&H, L&H falsely maintained that, except for the FLV Fund involvement in Dictation Consortium, the companies were owned by unaffiliated "private investors" whom L&H refused to identify.

48.    In late 1998 L&H expanded its reliance on customers modeled on Dictation Consortium, helping to create 30 start-up companies incorporated in Belgium and Singapore. Those companies were funded by unidentified private investors whom L&H insisted were "unaffiliated with us." In an April 7, 1999 press release, L&H announced among the highlights of fiscal year 1998:

> [L&H began] development of approximately 20 additional exotic languages with its financial and technological partners. During 1998, contracts were signed for the following languages: Ukraine, Polish, Czech, Slavic, Bahasa, Greek and Farsi, to support a range of speech technologies.... In order to develop these additional languages within certain time and financial constraints, L&H is working with partners who will undertake the localization and development of these language areas and share the financial rewards. L&H will license its tools to the partners and will secure the quality of the various applications and languages.

49.    In its 1998 Annual Report on Form 20-F, L&H expanded its description of these transactions:

> Pursuant to these agreements, we have exclusively licensed our speech and language technology development tools to strategic partners that are unaffiliated with us to develop

19

and localize our technology for specified new languages. Our strategic partners also have exclusive rights ... to develop, market, and distribute products incorporating the developed technology. In addition to one-time license fees, we have rights to receive royalties based on our partners' net revenues from sales of products incorporating the developed technology.

(emphasis added.)

50.     Initial license fees paid by these assertedly unaffiliated "strategic partners" accounted for 10% of L&H's claimed 1998 revenue and 25% of claimed 1999 revenue, far in excess of the 3.7% of 1998 revenue that L&H stated, in its 1998 Annual Report on Form 20-F, was provided by "companies funded in part by the FLV Fund," and the 0.3% of 1999 revenues that L&H stated, in its 1999 10-K, were provided by "companies funded in part by the FLV Fund and L&H Investment Co."

51.     L&H underscored the purported legitimacy of its licensing revenues with false public descriptions of a conservative revenue recognition policy. In notes to its 1997, 1998 and 1999 financial statements, audited by KPMG, L&H stated that:

> The Company recognizes revenue from the sale of its software licenses upon satisfaction of all of the following criteria: signing of the license agreement, shipment of the products, when no contractual terms remain unsatisfied and, if applicable, when a royalty report is received from the customer. The Company generally receives, on a quarterly basis, royalty reports from each customer who has signed a license contract. The reports detail the number of units or products that the customer shipped during that period. The number of units multiplied by the applicable contractual rate per unit is the amount that the Company records as revenue. Before recording this revenue, the Company determines that all significant obligations have been satisfied and that collection of the receivable is probable. ...

> The Company from time to time enters into nonrefundable minimum royalty agreements with customers. Under these arrangements the Company delivers its technologies or products to the customer contemporaneously with the execution of the agreement. Revenue from nonrefundable minimum royalty agreements is recognized upon satisfaction of all of the following criteria: signing of the licensing agreement; no additional significant production, modification or customization of the software is required; delivery has occurred; the fee is fixed and determinable, and; collection is probable. For arrangements that include multiple elements, the fee is allocated to the various elements based on vendor specific objective evidence of fair value.

In all such cases, the Company only recognizes revenue when collection of the related receivable is probable.

52.    These disclosures were also false. As detailed below, investigators have discovered, and L&H has confirmed, that its "strategic partners" were in fact shell start-up ventures established by parties related to L&H (and audited by KPMG), including defendants FLV Fund, S.A.I.L. Trust, and LHIC, as a means of funding research and development off the books, and the hefty "license fees" from those "customers" recorded by L&H were a sham.

### Fictitious Revenue from the Far East

53.    In 1999, as critics asserted that L&H's U.S. and European revenues were languishing, L&H focused on what it claimed to be its early and successful penetration of a fast-growing Korean market.

54.    In a June 25, 1999, press release, L&H announced that "it [wa]s the sole provider of speech recognition technology for the ASR Stock quote Server, Korea's largest telephone based automated stock quote and trading service" through an application "developed by L&H business partner Bumil Information and Communications Co. Ltd." The press release stated that Bumil "is a leading systems integrator developing customized applications for the telecommunications industry. The company has been an L&H licensee and joint development partner since March of 1997. Its customers include major Korean telecommunications providers, LG Securities and other major corporations in Korea."

55.    On August 31, 1999, L&H announced "that its technology is being used to speech-enable the automated attendant system used by Hanvit Bank, Korea's largest commercial banking institution. Deployment of the system -- Korea's first commercially available auto attendant program -- represents L&H's growing presence in the Korean telecommunications industry and enhances its leadership position in the market overall. The L&H based system is one of several telecommunications applications recently developed by L&H's business partner Bumil Information & Communications Co. Ltd. (BIC) and sold to leading Korean businesses."

56.    On September 13, 1999, L&H announced that it had expanded its Pacific Rim

presence by acquiring Bumil:

> Bumil has been an L&H business partner and licensee since 1997 and, during that
> time, has deployed L&H's speech technology in several highly visible, strategic
> telecommunications applications for leading Korean companies. Most recently,
> Bumil used L&H's speech recognition to speech-enable an automated attendant
> system it developed for Hanvit Bank, Korea's largest commercial banking
> institution. Bumil also recently used L&H's speech recognition and text to speech
> technology to develop the ASR Stock Quote Server, Korea's largest telephone
> based automated stock quote and trading service.
>
> The acquisition of Bumil builds on L&H's already significant presence and
> resources in the Asia and helps position it for the leadership position there.
> L&H's existing Asia Pacific customer base includes Samsung, LG Semicon, NEC,
> Hitachi, Sega, Inventec, Group Sense Limited, Pioneer, Alpine and Fuji-Xerox,
> among others. It has offices in Tokyo, Beijing, Hong Kong, Taipei and Singapore
> and Sydney Australia. L&H's speech offerings for the Asian Pacific market
> include the world's first PC-based Cantonese continuous speech recognition
> product as well as ASR, TTS and machine translation support for Korean,
> Mandarin and Japanese.
>
> "As we pursue our long-term objectives, we continue to receive validation that
> our growth strategy is sound -- particularly for the worldwide telecommunications
> industry," said Jo Lernout, L&H co-founder and co-chairman. "Our recent
> successes with Bumil, as well as industry analysts' predictions regarding the
> rapidly increasing demand for speech enabled applications, underscores the
> outstanding growth opportunities that this acquisition helps bring to us."

57.    In a December 28, 1999 press release, L&H "announced several deals with

customers in the telecommunications, enterprise solutions and embedded technologies

markets.... The agreements, signed with industry-leading companies in Asia and several

companies in Europe, follow recently announced deals in the US." In the press release, L&H

cited

> strong demand for its speech and language technologies and solutions in the Asia
> Pacific region, especially South Korea. Among the solutions provided are
> dialogue systems that provide customers with a fast, simple and convenient way
> to access information, as well as embedded speech engines and language
> technologies. The signed contracts include:

22

- Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities and Daewoo Securities, along with more than 10 other securities companies, have selected L&H to develop client server solutions for on-line trading and automated dialogue systems that allow securities customers to receive stock quotes and trade.

*          *          *

- LG Electronics has agreed to use L&H's TTS technologies.

- Intelligent Communications has agreed to use L&H's TTS technologies for use in e-mail reading and unified messaging applications.

- SofTech Advantage expanded their agreement with L&H to utilize L&H RealSpeak for their unified messaging platform for the Philippines.

58.     A January 10, 2000 press release repeated that "the company also recently announced more than a dozen new contracts with telecommunications developers in Korea and elsewhere in the Pacific Rim and Europe, further readying L&H's Enterprise and Telephony Solutions business group for separate legal entity status.  Contracts were signed … with Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities, Daewoo Securities, Delfi, GenSoft, EPC Asia and NeoTelecom, among others."

59.     In a January 31, 2000 press release, L&H announced that "Hung Chang Co., Ltd. has signed a multi-year agreement under which it will license L&H's speech technologies in multiple languages to develop speaker verification and reservation applications.  The agreement with Hung Chang, a Seoul-based telecommunications technology leader, adds to a long list of worldwide telecommunications industry contracts recently signed by L&H and furthers the company's strategy to create a separate entity for Enterprise and Telephony Solutions."  In the press release, Defendant Bastiaens was quoted as stating that "[o]ur ever-increasing successes in the Korean market, particularly within the telecommunications sector, are the result of a very well developed and implemented strategy to build a worldwide enterprise and telephony solutions market presence."

60.     In a February 9, 2000 press release, L&H showcased fourth quarter 1999 growth in the Pacific Rim area:

23