The demand for speech-enabled applications continued to grow in the Pacific Rim and L&H technologies were increasingly popular in the region. South Korea and other PacRim-based developers who plan to build applications employing L&H's RealSpeak, ASR, TTS and dialogue systems solutions include: Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities and Daewoo Securities, EPC Asia, IBCC (International Business Computer Co., Ltd.), NeoTelecom, LG Electronics, Intelligent Communications, Softech Advantage, and SofTel Telecommunications Pte. Limited.... L&H enhanced its ability to develop telephony solutions, increased its presence in Korea and continued to expand its telecommunications leadership by acquiring resources that included Bumil Information & Communications, Ltd. of Korea and others.

61.    During the fourth quarter of 1999 alone, L&H booked $46.3 million in revenue in Korea – 42% of the Company's total reported fourth quarter revenue and a significant portion of the Company's total annual revenue for 1999. More than 75% of this revenue was recorded between December 24 and December 31, 1999, and of ten contracts L&H entered into in Korea during the fourth quarter, nine were signed between December 15 and December 31. Of the $344 million in revenue that L&H recorded in 1999, approximately $63 million, or 18%, was attributed to sales in Korea. Sales in Singapore accounted for another $80 million. In total, sales from Korea and Singapore accounted for 44% of L&H's 1999 revenues.

62.    In fact, as detailed below, L&H revenues in the Far East were fictitious, and its reporting was based on an elaborate fraud involving phony customers and secret factoring agreements with Korean banks. Following exposure of L&H's fraud, all of its revenue in Korea was reversed.

### KPMG's Responsibility for L&H's False and Misleading Press Releases

63.    KPMG was intimately involved in the preparation of L&H's false and omissive financial information. KPMG's engagement by L&H involved teams of auditors from Belgium, the United States, the United Kingdom, Ireland, Korea, Singapore, Japan, Germany, France and Scandinavia. In its 1997 and 1998 Annual Reports to Shareholders, L&H listed the Ghent, Belgium and Boston, Massachusetts offices of KPMG as the Company's principal auditors. Paul

Behets was the Belgian partner with responsibility for the L&H engagement until he left in 1999 to assume his position at S.A.I.L. Trust, when he was replaced by William Van Aerde. Van Aerde, a partner, was assisted in Belgium primarily by senior manager Stephan Huysman.

64.     Robert McLamb, a senior U.S. partner, who was intimately involved in the L&H engagement from at least 1996, was specifically charged with responsibility for ensuring that L&H's financial statements complied with U.S. GAAP. McLamb became involved in the audits of L&H while in the U.S. Capital Markets Group in KPMG's London, England office and retained his responsibilities when he moved his base of operations to KPMG's Houston, Texas office in 1999. Other U.S. partners actively involved in the L&H engagement included Jim Boyer, Drew Koetcher, and Glen Davison. In Korea, the KPMG team was led by Oh Bum Kwon, and in Singapore by Philip Lee.

65.     KPMG auditors and consultants were present at L&H at the end of each quarter during 1998 and 1999 for the purpose of "signing off" on L&H's quarterly and annual financial results before they were announced to the investing public. A February 9, 2000 press release announcing L&H's financial results for the fourth quarter and year ended December 31, 1999 was sent both to Van Aerde and McLamb for review and comment before it was issued. Indeed, email among KPMG and L&H personnel makes it clear that the press release could not be issued without KPMG's express consent. For example, a January 31, 2000 email from Van Aerde to Dammekens, Bastiaens and McLamb set forth "a list of urgent items to be followed up by the company in order for us to be able to give our consent for the [February 9] press release."

66.     McLamb and Behets substantially revised L&H's 1998 financial statements and McLamb actually provided or changed certain amounts and drafted certain of the disclosures set forth in the 1998 financial statements. McLamb also revised L&H press releases disseminating unaudited quarterly results, changing or deleting entries.

67.     In an April 25, 2001 letter to the L&H Board of directors, Jo Lernout described KPMG's extensive involvement in L&H's operations and accounting:

25

In the course of the past ten years, we built up a good working relationship with KPMG, and we relied extensively on the advice from numerous KPMG divisions in various countries as well as on the KPMG audit departments, in particular in Belgium and in the United States.

As part of this relationship, all information, which we deemed relevant was always communicated to KPMG. Often, they worked side-by-side with the company in the execution of transactions. ...

[As auditor] KPMG was closely involved at the end of each quarter in processing the figures for the interim accounts – as consultants they advised and assisted the financial and bookkeeping departments of Lernout & Hauspie Speech Products. KPMG consultants came every quarter to the office to draw up the interim accounts together with the bookkeeping department of Lernout & Hauspie N.V. ...

It was also KPMG's assignment to make sure that sufficient control mechanisms were in place and that the internal procedures were such that any resorting to fraud by the local people in charge was excluded as much as possible. ...

[F]rom the day we were quoted on the stock exchange in 12/1/95, we turned to KPMG for every decision of any significance. To illustrate this I refer to the assistance which was given, for example, with about any sizable acquisition by LHS. It cannot be denied that for this reason alone, KPMG had perfect insight into the various aspects of the LHS organization, if only because of its involvement with the due diligence, audits and even the negotiations.

68.     Two emails from McLamb to Dammekens exemplify the closeness of their professional relationship. In one, dated May 2, 2000, McLamb advises Dammekens documenting L&H accounting policies:

[I]t is true that many fast growing companies do not do a good job of documenting policies and procedures. That time has come to an end. ... We need to proceed in putting these documents in place as soon as possible. ... there are certain documents that should be prepared before the submission to the SEC. Those documents primarily relate to revenue recognition.

In the second, dated August 6, 2000, McLamb advises Dammekens as to the amount of information that should be included in L&H press releases: "I would strongly recommend that we change the style of your press releases to not show a full balance sheet."

### KPMG's Unqualified Audit Reports

69.     In each of its Annual Reports for 1997, 1998 and 1999, filed with the SEC, L&H stated that its financial statements were prepared in accordance with U.S. GAAP. KPMG

bolstered the credibility of L&H's disclosures by issuing unqualified reports on its audits of
L&H's 1997, 1998 and 1999 financial statements and consenting to the inclusion of those reports
in L&H's SEC filings.

70.    An auditor is supposed to give an "unqualified opinion" or "clean opinion" only
when no significant limitations affect the performance of the auditor and when the evidence
obtained in the audit discloses no material deficiencies in the financial statement and or unusual
circumstances that affect the auditor's report.  American Institute of Certified Public Accountants
(AICPA), "Understanding Audits and the Auditor's Report — A Guide for Financial Statement
Users," 2nd ed., 1996, at 15.

71.    On April 17, 1998 KPMG, over the signature of KPMG Belgium reported on
L&H's 1997 financial statements, and on April 9, 1999, KPMG, over the signature of KPMG
Belgium reported on L&H's 1998 financial statements, each time stating:

> We have conducted our audits in accordance with generally accepted auditing standards
> in the United States.  Those standards require that we plan and perform the audit to obtain
> reasonable assurance about whether the financial statements are free of material
> misstatement.  An audit includes examining, on a test basis, evidence supporting the
> amounts and disclosures in the financial statements.  An audit also includes assessing the
> accounting principles used and significant estimates made by management, as well as
> evaluating the overall financial statement presentation.  We believe that our audits
> provide a reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present fairly, in
> all material respects, the financial position of Lernout & Hauspie Speech Products N.V.
> and subsidiaries as of [the relevant time period], and the results of their operations and
> their cash flows for each of the years in the three-year period ended [on December 31 of
> the fiscal year], in conformity with generally accepted accounting principles in the United
> States.

72.    KPMG consented to the inclusion of its 1997 Audit Report in L&H's Annual
Report on Form 20-F filed with the SEC on July 2, 1998.  KPMG consented to the inclusion of
its 1998 Audit Report in L&H's Annual Report on Form 20-F filed with the SEC on June 30,
1999.  On January 6, 2000, KPMG also consented to the incorporation by reference of its 1998
Audit Report in Registration Statements filed by L&H with the SEC on Form F-3 on January 7,

2000. That Registration Statement was provided to Seagate as "L&H's latest public filing" in the course of Seagate's due diligence in connection with the Merger.

73.    KPMG also made false oral representations directly to Seagate, as discussed in ¶¶, below, and furnished a pivotal, unqualified report on L&H's 1999 financial statements, as discussed in ¶¶, below.

### False Oral Representations by All Defendants

74.    In addition to defendants' representations in press releases and public filings, Seagate relied upon specific oral representations by defendants Lernout, Hauspie, Bastiaens, Dammekens, and KPMG confirming the accuracy of L&H's public disclosures.

75.    On several occasions during negotiation of L&H's purchase of Dragon, defendant Bastiaens told Ellen Chamberlain, a Seagate employee acting as interim Chief Financial Officer of Dragon, that L&H's projections were on target for the first and second quarters of 2000. Bastiaens made those statements at meetings at the Boston, Mass., offices of Cowan & Co., L&H's investment bankers in connection with the Merger, in February and March 2000.

76.    From December 13 to 15, 1999, Ms. Chamberlain met with defendants Lernout and Hauspie in Belgium, where Ms. Chamberlain expressed concern that the FLV Fund was funding the start-up companies that were providing substantial percentages of L&H's software licensing revenues. Both Lernout and Hauspie assured Ms. Chamberlain that: (a) they had no financial interest in any of the start-up companies; (b) any licensing of L&H software by those start-up entities was the result of arms-length negotiation; and (c) even though they were both on the board of the FLV Fund, they were not active in its decision-making.

77.    On or about March 22, 2000, approximately one week before the Merger Agreement was executed, defendant Dammekens participated in a conference call during which Ms. Chamberlain questioned him about the basis for his comfort with L&H's revenue recognition. Dammekens stated that he was comfortable with L&H's disclosures of revenue

because he and his team reviewed all L&H contracts before financial results were released, including the fiscal year 1999 results that had been released in January 2000.

78.     During the course of due diligence prefatory to the merger, Ms. Chamberlain had repeatedly asked to speak with KPMG Belgium, and was told that she could not because their audit of L&H's 1999 financial statements had not been completed.

### March 22, 2000 Oral Misrepresentations by KPMG

79.     Ms. Chamberlain was finally able to question representatives of KPMG during the March 22, 2000 conference call, in which those representatives participated.  The senior KPMG auditor on the call stated that he was a "KPMG partner," that he was standing in for the KPMG partner with responsibility for the L&H audit, who was on vacation, and that he was familiar with the audit.  A KPMG Belgium manager who had participated in the audit was also on the call.  The KPMG personnel who participated in the call knew that the purpose of the call was to provide information to Seagate representatives as an important part of Seagate's due diligence with respect to the Merger.

80.     During the March 22, 2000 conference call, the KPMG partner told Ms. Chamberlain:

(a)     KPMG expected to sign off on its audit of L&H's 1999 financial statements in two to three weeks.

(b)     The only open audit issues were:

(i)     "a couple of revenue issues" in Korea regarding one or two customers, but nothing that would cause an adjustment;

(ii)     a "couple" of contract confirmations had not yet been received; and

(iii)     KPMG had yet to complete minor tests of L&H's capitalization of its R&D expense, such as checking timesheets of engineers who had billed time to certain projects.

(c)     In the course of the 1999 audit, no adjustments had been booked by the auditors.

29

(d)     KPMG would not describe "passed" adjustments -- those adjustments that are matters of judgment, which, if they do not add up to a material amount, will be "passed" by the auditors.

(e)     KPMG did not at that time anticipate any material adjustment of L&H's 1999 financial statements.

(f)     KPMG was "comfortable" with L&H's revenue recognition.

(g)     L&H did not record revenue from software sales until after that software left the distributor.

81.     Ms. Chamberlain was aware that, in 1999, L&H had been investigated by the SEC in connection with an aggressive means of accounting for acquisitions. L&H had used a "purchase" method of accounting for goodwill, taking it as a one-time charge against earnings for "in-process research and development." L&H's methods, audited and approved by KPMG Belgium, impermissibly allowed L&H to avoid the long-term depression of earnings caused by amortization of goodwill. The SEC required L&H to restate its financial results for 1997 and the first six months of 1998.

82.     When Ms. Chamberlain, during the March 22, 2000, conference call, inquired about the status of SEC inquiries into L&H accounting practices, the KPMG Belgium representative told her that all issues from SEC inquiries into L&H accounting practices had been resolved.

83.     KPMG's representations were false. As detailed below, KPMG was extremely uncomfortable with L&H's revenue recognition practices, as it had in hand – and was discussing internally and with L&H management – unmistakable red flags indicating that L&H's revenues were being recorded improperly. Moreover, as described below, KPMG was at that very moment heavily involved in L&H's response to an SEC inquiry into its revenue recognition practices.

**Subsequent Reliance on KPMG Belgium's Unqualified Opinion for 1999**

84.    On April 27, 2000, KPMG, over the signature of KPMG Belgium, issued its unqualified report on L&H's 1999 financial statements, confirming KPMG's oral representations, on March 22, 2000, that its audit had uncovered no material errors or improprieties in the unaudited financial statements issued in January:

> We have audited the accompanying consolidated balance sheets of Lernout & Hauspie Speech Products N.V. and subsidiaries (the Company) as of December 31, 1998 and December 31, 1999, and their related consolidated statements of operations, shareholders' equity, cash flows and comprehensive income (loss) for each of the years in the three-year period ended December 31, 1999....
>
> \*      \*      \*
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries as of December 31, 1998 and December 31, 1999 and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1999, in conformity with generally accepted accounting principles in the United States.

85.    Seagate was entitled to terminate the Merger Agreement prior to closing if it became apparent that L&H's unaudited financial statements for 1999, released prior to execution of the Merger Agreement, were materially misstated:

(a)    The Merger Agreement included L&H's representations and warranties that: (i) all of L&H's filings with the SEC since January, 1998, did not contain any untrue statement of material fact or any material omission; (ii) that all financial statements included in L&H's SEC filings complied in all material respects with SEC accounting requirements and published rules and regulations, and were prepared in accordance with U.S. GAAP; and (iii) that L&H's unaudited consolidated financial statements for the year ended December 31, 1999 were prepared in accordance with U.S. GAAP and "fairly present in all material respects the consolidated financial position of [L&H] as of the date thereof."

(b)    Section 9.1 of the Merger Agreement allowed Seagate to terminate the Agreement at any time prior to closing "if there has been a breach of any representation [or]

31

warranty ... which causes the conditions set forth in section 7.3(a) ... to be incapable of being satisfied."

(c)    Section 7.3(a) of the Merger Agreement provided that "representations and warranties of [L&H] shall be true and correct in all material respects as of the closing date."

86.    Had KPMG not given an unqualified opinion stating that L&H's 1999 financial statements were prepared in accordance with U.S. GAAP — or had it otherwise qualified its report on L&H's 1999 financial statements — this would have communicated to Seagate that L&H's unaudited consolidated financial statements for the year ended December 31, 1999 were not prepared in accordance with U.S. GAAP and the Merger would not have been consummated.

### Reliance on the Integrity of the Market for L&H Securities

87.    Among the factors Seagate considered in setting the price for its Dragon holdings, which L&H paid for in L&H stock, was the market price of L&H stock.

88.    At all relevant times, the market for L&H stock was efficient because L&H common stock met the requirements for listing, and was listed and actively traded on the NASDAQ and the EASDAQ, which were automated and highly efficient markets.

89.    As a regulated issuer, L&H filed periodic public reports with the SEC.  L&H also regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

90.    The market for L&H stock promptly digested current information regarding L&H from the publicly-available sources described above and reflected such information in the price of L&H stock.

91.    Consequently, at all relevant times — including the time Seagate was negotiating the price it would accept in L&H stock, the time Seagate executed the Merger Agreement, and

the time the Merger was consummated — the price of L&H stock was fraudulently inflated by defendants' misrepresentations and non-disclosures.

### Falsity and Omissiveness of Defendants' Representations Regarding L&H Revenues

92.    Until its acquisition of Dictaphone Corporation in May, 2000, L&H had been able to file information with the SEC as a foreign private issuer subject to less detailed disclosure requirements than those applied to U.S. entities.  Shortly after the Merger was consummated, on June 30, 2000, L&H filed a Form 10-K, which included financial statements for fiscal year 1999 audited by KPMG Belgium, and also filed a Form 10-Q, which included unaudited financial statements for the first quarter of fiscal year 2000, both of which contained, for the first time in an SEC filing by L&H, the geographic breakdown of sales required by the SEC in filings by U.S. companies.

93.    The filings purported to reveal that out of 1999 revenue of $344.2 million, Korea contributed $62.9 million and Singapore contributed $80.3 million (collectively, over 41% of total L&H revenues), up from combined revenues of less than $300,000 in 1998.

94.    Investigation of these figures by the SEC and the financial press provided mounting evidence over the next six months of a massive and pervasive fraud that all of the defendants had concealed from Seagate prior to consummation of the Merger:

    (a)    Contrary to defendants' claims of L&H's "record" growth, at least one-third of L&H's revenues in 1998, 1999 and the first half of 2000 were improperly recorded.

    (b)    Contrary to defendants' claims of hefty licensing fees from unaffiliated "strategic partners," the arrangements were sham transactions with related parties, including defendants FLV Fund, LHIC, and Mercator, designed to permit L&H to fund its research and development off the books.

    (c)    Contrary to defendants' claims that the Far East constituted its fastest growing market, L&H has admitted that "Korea never really had any sales to speak of."

33

More than $100 million recorded on the books of L&H's Korean unit evaporated as a consequence of L&H factoring its receivables with recourse, an arrangement that was never publicly disclosed but that was known to KPMG as early as October 1999.

(d)    Contrary to defendants' claims of record growth fueled by revenues from successful, innovative products, L&H reported revenue from barter transactions in which no cash changed hands; recognized revenue from sales that were contingent on L&H later performing development work for the customer; and recorded sales before contracts were signed, when it was unclear that the customer had the ability to pay, or when the customer's ability to pay depended on an investment from L&H.

95.    Suspicious of the representations made in L&H's 1999 Form 10-K, *The Wall Street Journal* investigated, and reported, on August 8, 2000, that "some companies L&H has identified as Korean customers say they do no business at all with L&H. Others say their purchases have been smaller than L&H says." *The Wall Street Journal* contacted 18 of 30 companies claimed by L&H as customers in Korea:

Three of the companies say they aren't, in fact, L&H customers.... Three more companies say their purchases from L&H over the past three quarters were smaller than figures provided by Mr. Bastiaens or Sam Cho, vice president of L&H Korea. One additional company says it is in a joint business with L&H that produces considerably less revenue than L&H claims. Officials from an eighth company initially said it had formed a joint venture with L&H and that the joint venture, not the company itself, had purchased products from L&H. Later, the company retracted this initial version.

All told, of the 13 companies that responded to inquiries about their purchases from L&H in the period since it acquired Bumil, the revenue tallies roughly $32 million. From all of its customers in Korea, in 1999 and the first quarter of 2000, L&H posted $121.8 million of Korea sales, and it has said that it expects second-quarter revenue from that country to exceed the first quarter's $58.9 million....

Among the companies that L&H boasts as customers: Korea Securities Computer Corp., or Koscom, a government-regulated clearing house for stock trades. Mr. Bastiaens initially says L&H received revenue in the range of $5 million to $10 million (he wouldn't be more specific) from Koscom in the three quarters ended June 30. According

34

to two Koscom officials, whose names were provided by L&H, Koscom and L&H are partners in an automated phone stockquote service. Korea Telecom collects the per-call payment, keeps 10% and splits the rest between Koscom and L&H.

One of the Koscom officials estimates L&H and Bumil's share of the revenue at roughly $1.5 million in 1999....

In a Dec. 28, 1999 press release, L&H said Samsung Securities, a big Korean brokerage, together with more than 14 other securities firms, had "selected L&H to develop client server solutions for online trading and automated dialogue systems." But two Samsung officials, including spokesman Shin Dong Woo, say their firm never made any purchases from L&H, although they discussed some.

*     *     *

L&H also claims LG Electronics as a customer. But Yu Won Uk, a senior research engineer at LG Electronics -- a contact provided by L&H -- says his company never bought products or licenses from L&H. Instead, he says the two firms briefly worked on a joint project for applying voice recognition to television, but stopped because there "was no progress." LG Electronics paid L&H only "engineer charges," he says, akin to labor costs for L&H's share of the work on the failed project.

*     *     *

Another Korean company with which L&H says it has a significant relationship is Hung Chang Co., a maker of communications equipment. Mr. Bastiaens put revenue from Hung Chang in the range of $5 million and $10 million over the past three quarters.

However, Kim Ho Kyun, a Hung Chang official whom L&H identified as its contact, says Hung Chang wasn't using L&H products internally and that L&H's $5 million bill was paid by a joint venture called Spia, "not Hung Chang." Another Hung Chang official, Choi Sang Hyun, who was reached independently of L&H says Spia Co. was founded May 2, with Hung Chang as the largest shareholder, but June 28 L&H Korea became the largest, with Hung Chang holding 27.49%. Mr. Choi says Spia makes products based on L&H's voice-recognition technology, and says Hung Chang is only a passive shareholder.

*     *     *

Mr. Bastiaens also identified Hyundai Securities and Hanvit Bank as providing revenue totaling between $5 million and $10 million. But at Hyundai Securities, two officials, including a contact provided by L&H, say their purchases amounted to just over $1 million. At Hanvit Bank, Lee Jae Bong, manager of network management, says the only contract signed by his institution tallied $150,000.

35

96. On August 13, 2000, in response to the allegations in the press, L&H commissioned a special mid-year audit by KPMG to examine issues raised with respect to Korea and Singapore.

97. On September 20, 2000, the L&H Board of Directors authorized its Audit Committee to "conduct such inquiries as it deemed appropriate into certain accounting and other practices of the Company that were the subject of a formal investigation being conducted by the [SEC]," according to a report provided to the Audit Committee two months later, on November 20, 2000 (the "Audit Committee Report"), by the advisors retained by the audit committee -- the U.S. law firm Bryan Cave LLP, the Belgian law firm Loeff Claeys Verbeke, and the accounting firm of Arthur Andersen LLP (the Audit Committee Advisors).

98. On September 21, 2000, L&H confirmed that the SEC had commenced "an investigation of its prior financial statements." As reported in *The Wall Street Journal* on February 5, 2001, that investigation had commenced as early as January, 2000, in the midst of L&H's negotiations with Seagate, and involved KPMG prior to KPMG's reporting on L&H's 1999 financial statements: "The SEC had sent L&H a letter in late January, 2000, notifying it of the informal probe and asking a number of questions about related-party financing issues.... And KPMG Belgium, L&H's regular auditor, had received a letter from the SEC about L&H's accounting in late April, 2000, according to a spokesman familiar with the letter." KPMG's involvement as early as January 2000 in L&H's response to the SEC investigation is confirmed by internal documents detailed below.

99. According to a September 22, 2000, *Wall Street Journal* article, the "SEC probe ... is focusing on the once highflying company's recent dramatic sales increases in Asia and its dealings with corporate customers to which it has financial ties." The article suggested that the SEC "may find that a key stop on the money trail is No. 5 Shenton Way in downtown Singapore" and revealed that, contrary to L&H's representations that it received tens of millions of dollars in license revenues from "unaffiliated customers" in Singapore, nineteen start-up "licensees" in Singapore were shells manned by L&H personnel and funded by L&H affiliates:

The modern highrise at No. 5 Shenton Way is the official address of 15 firms that together paid L&H $57 million last year, nearly 17% of its world-wide revenue.  L&H says these customers bought licensing rights to its speech-recognition software.

But at the Shenton Way building, there isn't any evidence of operations of the 15 L&H customers.  Their address leads to a law office, where Tan Lee Chin emerges to meet a visitor.  Ms. Chin, who is listed in Singapore government records as an officer of a number of the L&H customers, confirms that many of the companies are indeed registered at that address but declines to say more.

Across town, in a scruffy section near Singapore's red-light district, is the common address of four more customers identified by L&H.  This office, above a lamp shop, houses a notary public.  There is a list of about 30 companies outside the door.  Not one is a customer named by L&H.

*       *       *

[N]early all of L&H's revenues in the Asian city-state have come from the 19 companies. Nearly all of the companies were launched just last year, and L&H helped create all of those start-ups.  L&H also recruited and trained their initial employees.  None of the putative customers started last year has had any revenue, according to an outside L&H spokesman.  In addition to sharing addresses, many of the customers have the same officers and nominee shareholders.

*       *       *

Last year, L&H reported that its worldwide revenue rose more than 60%, fueled by huge growth in Asia.  In Singapore, sales soared to $80.3 million, from just $29,000 the prior year.  With its U.S. sales flat, Singapore became the company's largest market.

But eight of the Singapore start-ups have had financial ties to a Belgian venture-capital fund that has close links to L&H, according to regulatory filings and documents provided by L&H.  The venture outfit, Flanders Language Valley Fund, was the brainchild of L&H's two founders, Messrs. Lernout and Hauspie, who still exercise influence over the fund's affairs.

FLV Fund currently owns 49% stakes in four of the eight Singapore companies, according to documents from L&H and the fund.  The other four companies received cash from FLV Fund in late 1999, which they used to pay their bills to L&H, the outside L&H spokesman says.

FLV Fund's involvement in the Singapore companies raises the possibility that L&H's fast sales growth may not be all that it appears.  The revenue burst may have been at least partly self-funded -- that is, paid for by L&H affiliates.

37

100.    On October 18, 2000, *The Wall Street Journal* provided more information about

the suspicious start-up licensees:

> Lernout and Hauspie Speech Products NV has declined to provide the Securities and
> Exchange Commission with the names of investors behind 30 corporate customers that
> are a key focus of an SEC probe....
>
> The 30 start-up companies, registered in Singapore and Belgium, in aggregate accounted
> for about 25% of 1999 revenue for the Belgian maker of speech recognition software, and
> about 10% of its 1998 revenue.
>
> Among other things, the SEC is trying to determine whether the companies are in fact
> related parties to L&H, and should be disclosed as such.  Some analysts and investors
> have long been concerned that L&H's revenue and growth rates have been fueled by sales
> to related parties, which might indicate that its competitive position and product quality
> are not as strong as they appear in L&H's financial statements.
>
> *    *    *
>
> Of the 17 companies L&H agreed to discuss, none has any direct employees. Seven are
> relying on L&H employees to do work for them, and have agreed to repay the company
> for the services, according to Lanny Davis, an outside L&H attorney.  The other 10 have
> not started developing software, though they have paid hefty licensing fees to L&H.
>
> *    *    *
>
> Under accounting rules, companies must disclose many more details about related-party
> transactions, including a discussion of the relationship between the parties.  Despite that
> additional information, many investors still don't like related-party dealings, because its
> impossible for outsiders to tell if they were conducted at arm's length.
>
> In addition to the related party issue, outside accounting experts wonder whether L&H
> created some or all of the 30 companies as off-balance-sheet vehicles to do research and
> development.  That structure, in theory, would allow the company to pump up current
> revenue while limiting future R&D expenses.

101.    On October 26, 2000, *The Wall Street Journal* suggested that not only was the

"burst" of revenue from Belgian and Singaporean "licensees" in reality self-funded -- it was also

fraudulently inflated:

> Lernout & Hauspie Speech Products NV's claim that it received multimillion dollar
> license payments from four Belgian start-up companies isn't supported by financial
> statements the ventures have filed with Belgium's central bank.

L&H booked $3 million in license payments from each of the four companies in late 1998, according to an accounting document the maker of speech-recognition software provided to The Wall Street Journal in response to a request for substantiation of its revenues.

But the July central-bank filings of the four start-ups show no expenditures close to being that big, nor do their balance sheets list assets as large as the purported value of the licenses. Several Belgian accountants who reviewed the statements say they don't substantiate the $3 million expenditures. All four statements cover the period from Dec. 4, 1998, when the companies apparently were founded, to Dec. 31, 1999.

\*　　\*　　\*

If the four start-ups financial statements, required under Belgian law, are accurate, they suggest that at least some of the payments either came via other channels or weren't made at all.

\*　　\*　　\*

According to the accounting document that L&H provided to the Wall Street Journal, the 30 Belgian and Singapore start-ups paid L&H $3 million to $8 million apiece to license its software tools in a bid to develop fresh applications, including new versions of L&H software for a variety of languages. The document says four of the Belgian start-ups -- Greek Development Co., Polish Development Col, Czech Development Co., and Hungarian Development Co. -- each paid L&H a $3 million license fee in the fourth quarter of 1998.

But, in the financial statements filed with the Belgian central bank in July, the four start-ups each list assets valued at less than $1.5 million -- half the software licenses' purported value. They show no evidence of write-offs large enough to account for depreciation in the licenses' value. Meanwhile, all four list expenditures of just 686,815 Belgian francs ($14,246).

Under Belgian accounting rules, it is possible for a company not to account for software license expenditures at all in its profit-and-loss statements, Belgian accountants say. But the company must then account for the entire value of the purchased license in its balance sheet as a fixed-intangible asset, they say. The fact that the four start-ups list fixed-intangible assets of less than $1.5 million and list negligible asset depreciation and expenditures would imply that, at best, the start-ups have purchased licenses valued at $1.5 million, the accountants say.

'The most these companies could have paid Lernout & Hauspie is $1.5 million each, depending on what the exchange rate was at the time. If L&H says it received $3 million from each company, there's no trace of it anywhere in their financial statements,' says Andre Farber, an accounting professor at the Free University of Brussels' Solvay Business School.

102.    On November 6, 2000, *The Wall Street Journal* provided further confirmation of L&H's fraudulent reporting of licensing revenues:

> Lernout & Hauspie Speech Products NV claimed that four Belgian start-up firms paid it $12 million in 1998 for software licenses, but the original parent company of the four start-ups said they paid L&H only $6 million that year.

> \*    \*    \*

> The top two executives of Language Investment Co. said their closely held company, based in Poperinge, Belgium, owned the four start-ups from their inception in December 1998 until December 1999. In late 1998, they said, the four start-ups each agreed to buy licenses valued at $3 million, or a total of $12 million, entitling them to develop versions of L&H's speech-recognition and translation software in Greek, Polish, Hungarian and Czech.

> However, the executives said the ventures paid L&H only $1.5 million each, or a total of $6 million, upfront in December 1998. The remaining amount, they said, was still unpaid when LIC sold the four firms to a Singapore-registered company, Velstra Pte. Ltd., in December 1999.

> The LIC officials' version of events conflicts with L&H's claim that it received the $12 million license payments in full in late 1998. An internal accounting document L&H gave to the Wall Street Journal, in response to a request for substantiation of its revenue, shows that L&H not only booked the $12 million in revenue from the four start-ups in the fourth quarter of 1998, but also received the full $12 million payments that same quarter.

103.    On November 9, 2000, L&H "provided an update on the status of the mid-year audit of the Company that it had commissioned last August and of the ongoing audit committee inquiry" and announced that "[a]s a result of errors and irregularities identified in the audit committee inquiry, the Company expects to restate its financial statements for the periods 1998, 1999 and for the first half of 2000."

104.    That day, the NASDAQ suspended trading in L&H shares. Just before the suspension, L&H shares were changing hands at $3.525, more than 95% below the record high of $72.50 they reached in March, when the company claimed a market capitalization of more than $10 billion. The slide wiped out more than $9 billion of the company's stock market value.

105.    On November 17, 2000, *The Wall Street Journal* reported that L&H's independent auditor, KPMG Belgium, had withdrawn its audit report of L&H:

40

Lernout & Hauspie Speech Products NV's accounting firm withdrew its audit report for the company's 1998 and 1999 results, saying its prior clean opinion of the software maker's books "should no longer be relied upon."

The move by KPMG International's Belgian member firm, disclosed in a regulatory filing by L&H, came after L&H announced last week that an internal probe had discovered "errors and irregularities" in its financial statements for those two years, and for the first six months of 2000.

106.    On November 17, 2000, as *The Wall Street Journal* reported (on December 7, 2000), John Duerden, who replaced Bastiaens as Chief Executive Officer of L&H, concluded that $100 million on the books of L&H's Korean unit was missing:

[John Duerden, t]he chief executive officer of Lernout & Hauspie Speech Products NV had come to South Korea to solve a mystery: why his Korean lieutenants refused to release $100 million in cash they had on their books. Amid a deepening accounting scandal, Lernout & Hauspie, a leading maker of speech recognition software, desperately needed the funds to stave off bankruptcy.

Arriving at the Seoul office of L&H Korea on Nov. 17, he was kept waiting for an hour before being ushered into a room with a visibly nervous Joo Chul Seo, head of the subsidiary. Mr. Duerden began grilling him about the cash. "Suddenly," Mr. Duerden recalls, "the door was kicked open with a terrific crash and three guys ran into the room, shouting and gesticulating."

The CEO watched in shock as the men dragged Mr. Seo out of the room and into an adjoining office, from where loud shouts and bangs were heard. "I thought the guy was getting beaten up," Mr. Duerden says. After urging employees to call the police, he left the building and hightailed it out of the country.

The whereabouts of Mr. Seo, whom L&H has suspended, are still unknown. But Mr. Duerden soon learned the worst about the $100 million: It was gone. And with it went the company's last hope to remain solvent.

[Duerden] believes that some of L&H's $100 million may never have been fully within its control. One theory at L&H is that banks that bought its receivables had been secretly assured they would be repaid if they couldn't collect from L&H's Korean customers -- and they couldn't.

If this is correct, L&H at a minimum improperly included the cash on its balance sheets. In any case, it now appears that much of the $100 million shouldn't have been counted as revenue, throwing into doubt a majority of the Korean unit's sales since late 1999.

107.    On November 20, 2000, the L&H Audit Committee Advisors presented the Audit

Committee Report, which concluded that $277 million -- or one third-- of revenue over the past 2

1/2 years may have been improperly recorded.  And this was a conservative and incomplete

figure.  The Audit Committee Advisors reported that efforts were impeded by a lack of

cooperation on the part of KPMG and members of L&H's management and board:

> We were unable to review the workpapers of L&H's outside auditor, KPMG, because
> KPMG was unwilling to make the workpapers available for review in connection with
> this investigation.

*    *    *

> Management and some board members of L&H have made this process [of investigating
> allegations regarding related party dealings] far more difficult than it needed to be.  We
> assume that several of these persons have full information about the investors and the
> structure of the transactions, and they should immediately provide that information to
> Audit Committee Counsel.  Because they have failed to do so, Audit Committee Counsel
> has been forced to piece together bits and pieces of information from a variety of sources.
> As a result, we still do not know the identities of all of the original, and possibly all of the
> current investors, in these companies.

Thus, the Audit Committee Advisors cautioned that the draft schedules showing the potential

impact on the financial statements of the transactions examined "do not purport to represent all

changes to the financial statements that would likely be identified after a complete audit."  The

Advisors also warned that "[w]e did not address non-revenue issues, and the revenue transactions

selected for review may not include all transactions as to which the accounting should be

considered."

108.    The Audit Committee Report corroborated the extensive press coverage of

defendants' fraudulent scheme, and details numerous additional questionable transactions,

including, among other things, the booking of revenue before a contracts were signed, secret side

letters providing refunds of license fees, and wrongly booked barter deals in which no money

changed hands.

109.    With respect to license revenues from "strategic partners," which the Audit

Committee Report categorized as Cross Language Development Companies, or CLDC's, and

42

Language Development Companies, or LDC's, the Audit Committee Advisors concluded that

revenue from 24 of the 30 new companies was incorrectly booked. The report concluded that the

companies were not buying software licenses, but were actually paying L&H employees to

develop future products, in effect funding the company's own R&D needs. The Audit

Committee Report recommended, at a minimum, reversing approximately $83 million in

licensing revenue, and stated that if the investors are related parties, as the evidence suggests, the

funded amounts should be recognized as a liability:

> It appears, based on our review, that the original LDC concept involved the sale of rights and tools to an independent third party and the separate use of those tools by the third party to develop L&H compatible products in a particular language. The wording of the contracts corroborate this concept. However, it also appears that shortly after the first few LDC contracts were signed, L&H personnel realized that the LDC investors were primarily financial investors and L&H would have to provide more services to the LDC's than they originally thought. Eventually, L&H assumed responsibility for the development work for a contemplated additional fee. Although it appears to us that, by December 1998 L&H and the LDC's knew that L&H would be performing some or all of the services or development work for the LDC's, future contracts were not changed to reflect that understanding. Except for Turkish and Farsi, contracts reflecting that the LDC's would pay L&H for the services or development work were not executed until November 3, 2000. To our knowledge, except for Turkish and Farsi, the LDC's have not yet been invoiced for the development work performed to date.

> \*      \*      \*

> We believe, based on our review of certain internal documents and outside marketing material and limited discussions with the investors or their representatives, that the investors anticipated, in substance, that they were buying the future rights to a product (language) to be developed by L&H and thus were effectively funding the Company's research and development efforts to build that language.

> If the investors are not related parties, accounting for such transactions would require deferral of all the revenues and recognition over the development period.... If the investors are related parties, the relevant accounting literature presumes that the related party investors will be repaid and the funded amounts are recognized as a liability.

110.    In fact, the investors were related parties, and what L&H recognized as license

revenue should not merely have been deferred, it should have been stated as a liability. Although

43

the Audit Committee report redacted the names of the investors it did manage to discover and connect to L&H, news reports revealed those names and their affiliations with L&H.

111.    A September 22, 2000 *Wall Street Journal* article revealed that eight of the shell start-ups were funded by defendant FLV Fund, which is audited by KPMG.  According to a November 6, *Wall Street Journal* article, another four were organized as subsidiaries of Language Investment Co., whose chief executive officer, Willem Hardeman, sits on the Board of the FLV Fund.  And a December 14, 2000 *Wall Street Journal* article reveals that another sixteen were owned by defendant Mercator , whose chairman, Louis Verbeke is a name partner in the law firm that acted as L&H's main counsel and as an Audit Committee Advisor -- Loeff, Claeys, Verbeke.  Mr. Verbeke and Mercator separately hold stakes in L&H.  Mercator also owns 6.9% of L&H Holding Co., a vehicle through which defendants Lernout and Hauspie control L&H. L&H's financial statements and other disclosures misleadingly omitted these relationships. Indeed, as previously set forth, L&H affirmatively and falsely represented that these "licensees" were "unaffiliated customers" and that 1998 and 1999 revenues from companies funded by the FLV Fund were *de minimis*.  Further, at least with respect to start-ups owned by the FLV Fund, KPMG saw both sides of the transactions.

112.    The Audit Committee Advisors did not examine the Brussels Translation Group and Dictation Consortium transactions "because of the age of the transactions and our understanding that KPMG carefully reviewed these transactions at the time."  Notwithstanding KPMG's "careful review," the Audit Committee Advisors concluded that revenues from 24 of the 30 new companies, which were modeled after Dictation Consortium and Brussels Translation Group, were incorrectly booked.

113.    As for Korea, the Audit Committee Advisors recommended that L&H consider reversing the company's entire Korean revenue during 1999 and 2000, amounting to approximately $182 million, and then record the revenue if and when cash is later received from Korea.  The Audit Committee Advisors were "unable to reach any conclusions with respect to issues in Korea" because of their lack of access to information.  However, the Audit Committee

Advisors were able to review some Korean contracts, and suggested that the company revisit those specific contracts if and when "global issues " are resolved.

114.    Finally, the Audit Committee Report details transactions involving tens of millions of dollars in which revenue was improperly booked for a variety of reasons.

(a)    In L&H's Burlington, Massachusetts, office, "[t]he problematic practices included barter transactions, rights to return products, transactions where the customers' ability to pay depended on the receipt of an investment from L&H, and the separation of one agreement into two contracts -- a license agreement and a development agreement -- so that more revenue could be booked in an earlier quarter than might otherwise occur."

(b)    In Belgium, the Audit Committee Advisors discovered many transactions where revenue was recorded earlier than it should have been, and also instances where the customer did not have the ability to pay and was not even invoiced for it.  The "problematic transactions … include the backdating of contracts, one side letter, several instances of later delivery of product, a promise to deliver an additional language at no extra charge 'when and if available' and an understanding that the cost of certain options would be reimbursed through a subsequent arrangement."

(c)    In Korea, the problems included the separation of an agreement into a license agreement and a development agreement so that revenue could be recognized earlier, and also factoring of receivables and the possibility that this was done with recourse to L&H bank accounts in Korea.

115.    On November 23, the public prosecutor's office in Ypres, Belgium announced an official investigation into the legal repercussions of the financial irregularities at L&H.  The prosecutor stated that the investigation would determine who was responsible for the errors and irregularities and that this could include "both L&H personnel and KPMG auditors."  To date, defendants Lernout, Hauspie, Bastiaens, and Willaert have been arrested in connection with an inquiry into fraud charges against them and the investigation continues.

116.    On November 29, 2000, L&H filed for protection from its creditors under Chapter 11 of the United States Bankruptcy Code.

117.    On March 2, 2001, Philippe Bodson, L&H's third CEO since August, 2000, stated that "Korea is a real catastrophe.  The situation there is as bad as one could possibly imagine. L&H Korea never really had any sales to speak of."

118.    At a press conference on April 6, 2001, L&H released an abridged version of a report that had been prepared by PricewaterhouseCoopers on its investigation of the situation in Korea ("Abridged Report").  The Abridged Report revealed that more than half of the missing $100 million was in the hands of Korean banks, who had schemed with L&H Korea management to give the appearance that small start-up customers, who had never intended to fulfill exorbitant contracts, were in fact making payments on those agreements.  Much of the rest went to erstwhile "customers," cronies of John Seo.  At the end of November, as the fraud was unraveling, L&H had cancelled the contracts in order to prevent foreign creditors of L&H from enforcing them, and also to protect the Korean Banks.

119.    The Abridged Report revealed that the $100 million had been recorded as income from 47 bogus agreements that were later cancelled, in November, 2000, leaving L&H Korea with available cash of $2.3 million, rather than the $97.5 million that had been supporting L&H's stock price:

> LHNV's [Lernout & Hauspie] findings indicate that LHK [L&H Korea] recognized over $100 million in revenue from September 30, 1999 through June 30, 2000 related to 47 license and maintenance agreements.   In November 2000 these 47 license and maintenance agreements were cancelled. Prior to the cancellation, LHK's accounting records showed available cash of $97.5 million. In fact, LHK's actual available cash after cancellation was only approximately $2.3 million. LHK misrepresented its actual revenues and available cash position through various schemes that included side agreements with customers, the use of factoring agreements with various banks and transactions termed "transfers" that were designed to give the appearance that customers were making payments on outstanding agreements.

\*\*\*

46

LHK originally forecasted gross margins of $50 million for the year 2000. The original forecast was subsequently increased by LHK management to $200 million. The company now understands that LHK employees believe that the pressure to meet these unrealistic budget targets led to the recognition of questionable license revenues during 2000. This situation appears to have been compounded by pressure from LHNV to improve collections of accounts receivable ("A/R") once the sales were recorded.

The company also understands that in response to sales pressure, an "arrangement" was created to give the appearance of valid license agreements being sold to existing businesses. These arrangements were called "strategic" sales by LHK. During sales meetings, the company understands that salesmen were told to agree to terms outside of LHNV's standard agreement, including side agreements not to enforce the collection of A/R. It appears that additional oral and written side agreements were entered into by which LHK agreed to significant changes to the standard LHNV license agreement including deferral of contract payments. LHK recognized the full value of the sale immediately. The size of these contracts was very large in comparison to the customers who were mostly small businesses, often start-ups. It appears that LHK had no real expectation of collecting these large royalties within a reasonable time. These side agreements appear to have allowed LHK to meet their sales goal, but also created a problem of needing to show cash collections to avoid reversal of the sale.

Abridged Report at 2-3 (emphasis added).

120.     The false revenue reports also entitled John Seo, the head of L&H Korea, to a $25 million bonus in addition to the $25 million he had received for his interest in Bumil. That performance bonus was paid in January 2000, according to L&H's 1999 Form 10-K.

121.     The Abridged Report reveals that Seo and other L&H Korea executives colluded with the Korean bank defendants in schemes designed to conceal the fact that L&H Korea customers, many of whom apparently were friends and relatives of defendant Seo, were unable to meet their commitments to provide revenue that had already been booked.

### Falsity and Omissiveness of Defendants' Representations that L&H Financial Reports Were Prepared in Accordance with U.S. GAAP

122.     U.S. GAAP are those principles recognized by the U.S. accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that financial statements filed

with the SEC that are not prepared in accordance with U.S. GAAP are presumed to be misleading and inaccurate.

123. By acknowledging that its 1998, 1999 and 2000 financial statements needed to be corrected and restated, L&H has admitted that, contrary to its prior representations, those statements were not prepared in accordance with U.S. GAAP. Under U.S. GAAP, restatement of previously issued financial statements is only permitted — and is required — to correct material misstatements and/or omissions in the financial statements as a result of conditions that existed at the time the financial statements were originally prepared. Financial Accounting Standards Board, *Accounting Standards, Current Text*, as published annually from June 1997 to June 2000 ("AS"), §A35.

124. By withdrawing its previously issued clean opinion, KPMG has conceded that its prior opinion that L&H's financial statements were prepared in accordance with U.S. GAAP was false when made. When an auditor concludes that reliable information that existed at the date of the auditor's report rendered the financial statements, as previously issued, materially misleading and erroneous, the auditor is required to take appropriate action to prevent future reliance on the financial statements and its related auditor's report. *AICPA Professional Standards*, vol. 1, *U.S. Auditing Standards*, as published annually from June 1997 through June 2000 ("AU"), §561.

125. The Audit Committee Report makes it clear that L&H's financial results were not stated in accordance with U.S. GAAP, and that defendants' representations to the contrary were false. Moreover, the accounting principles that were disregarded were not esoteric or obscure; they were fundamental principles of revenue recognition and disclosure that were very much at the forefront of the accounting and auditing profession's concerns during the relevant period:

    (a)    In a letter to the AICPA from the SEC Chief Accountant dated October 9, 1998, which was posted to the AICPA website on the Internet, the SEC addressed "inappropriate revenue recognition practices" and emphasized that auditors should be alert to the criteria for revenue recognition contained in Statement of Position (SOP) 97-2, *Software Revenue Recognition*; FASB Statement of Financial

48

Accounting Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, and No. 6, *Elements of Financial Statements*; and SEC Accounting and Enforcement Release No. 108, all of which address the types of fraudulent practices identified by the Audit Committee Report;

(b)     AICPA Practice Alert No. 95-1, was "intended to remind auditors of conditions that can be indicative of increased audit risk with respect to improper and unusual revenue practices," and addressed specific practices identified by the Audit Committee Report;

(c)     AICPA Practice Alert No. 95-3 addressed related parties and related party transactions, stating that "identifying related parties and material related-party transactions is a key component of any audit;"

(d)     AICPA, *Audit Issues in Revenue Recognition*, 1999, at 21-26, addressed software revenue recognition and related party disclosures in financial statements, describing "indicators of improper revenue recognition" or "red flags" including "unusually rapid growth or profitability" and warned auditors to search for "side agreements," "related party transactions" and specific indicators of "the absence of agreements," "lack of delivery," or "incomplete earnings process;"

(e)     The AICPA also issued "Audit Risk Alerts" annually during the relevant period that discussed the same accounting and auditing issues highlighted in the Audit Committee Report;

(f)     On September 28, 1998, Chairman of the SEC, Arthur Levitt, in a speech entitled "The Numbers Game," referred to inappropriate accounting that he called "Accounting Hocus-Pocus."  In that speech, Chairman Levitt characterized as "merger magic," inappropriate accounting for acquired in-process research and development, stating "they classify an ever-growing portion of the acquisition price as 'in-process' research and development so -- you guessed it -- the amount

49

can be written off in a 'one-time' charge -- removing any future earnings drag,"
and warned that "companies try to boost earnings by manipulating the recognition
of earnings."

126.    The Audit Committee Report demonstrates that L&H improperly recorded $83
million in licensing revenue from the licenses with "strategic partners." The arrangements with
the start-up shell companies obligated L&H to fully fund the research and development activities
and to complete software using L&H employees and facilities. L&H's accounting was improper
under Statement of Financial Accounting Standard (SFAS) No. 68, *Research and Development
Arrangements,* which requires that "[t]he financial reporting of an enterprise that is party to a
research and development arrangement should represent faithfully what it purports to represent
and should not subordinate substance to form."

127.    At a minimum, under SFAS No. 68, and under SOP 97-2, L&H was required to
account for the arrangement as a long-term construction contract and defer recognition of
revenues from the start-up shells over the development period. SFAS No. 68 provides that:

> An enterprise shall determine the nature of the obligation it incurs when it enters into an
> arrangement with other parties who fund its research and development.
>
> *            *            *
>
> To the extent that the financial risk associated with the research and development has
> been transferred because repayment of any of the funds provided by the other parties
> depends solely on the results of the research and development having future economic
> benefit, the enterprise shall account for its obligation as a contract to perform research
> and development for others.

SFAS No. 68 ¶¶4, 10.  SOP 97-2, which "provides guidance on when revenue should be
recognized and in what amounts for licensing, selling, leasing, or otherwise marketing computer
software" states that:

> If an arrangement to deliver software or a software system, either alone or together with
> other products or services, requires significant production, modification, or customization
> of software, the entire arrangement should be accounted for in conformity with
> Accounting Research Bulletin (ARB) No. 45, Long-Term Construction-Type
> Contracts....

50

SOP 97-2 ¶7.

128.    Since the start-up shells were related parties, the funds should have been treated

as liabilities:

> If the enterprise is obligated to repay any of the funds provided by the other parties
> regardless of the outcome of the research and development, the enterprise shall estimate
> and recognize that liability. This requirement applies whether the enterprise may settle
> the liability by paying cash, by issuing securities or by some other means.

AS § R55.103.

129.    Among the transactions detailed in the Audit Committee Report as raising

concerns about research and development funded by related parties were:

(a)    In the second quarter of 1998, L&H recognized $500,000 of license revenue from
FLV telecom, which indicated that he had no use for the software when it was
purchased. The customer's sole funding came from the FLV Foundation.

(b)    In the third quarter of 1999, L&H recognized $16 million from license
agreements with Salfas (Mandarin CLDC), Senegal (Japanese CLDC), Baleston
(Russian CLDC) and Duranzo (Spanish CLDC), which had been incorporated
only weeks earlier. On October 22, 1999, the FLV Fund, invested $10 million in
those entities, and sold its interest to HI World, a customer of L&H Korea, for
$11 million on Dec. 24, 1999.

(c)    In 1998 and 1999, Cellport Labs, EHQ, Sequoia, and TIB received investments
totaling $16 million from FLV Fund, each time within one month after revenue
was recognized from agreements with a given customer.

(d)    Another four customers stated that various arrangements had been proposed,
including L&H's purchase of them, to ensure a return on their investment in L&H
research and development.

130.    Although the Audit Committee Advisors did not examine the BTG and Dictation

Consortium transactions "because of the age of the transactions and our understanding that

KPMG carefully reviewed them at the time," under the Audit Committee Report analysis,

revenue from those entities was also recorded improperly. In a December 7, 2000, interview

with *The Wall Street Journal*, defendant Lernout stated that it was L&H who gathered "outside"

investors to fund Dictation Consortium in 1996, and admitted that "L&H employees wrote its

business plan and did the software work under contract." The "outside investors" who funded

Dictation Consortium included the FLV Fund and FLV Management, which together owned
61% of Dictation Consortium when it was founded, and reduced that holding to 43% in 1997.
Thus, the $26.6 million in revenue from Dictation Consortium in 1996 and 1997, which
constituted 25% of L&H's revenues in 1996 and 19% in 1997, should at least have been deferred
over the life of the project.  More likely, since FLV Fund and FLV Management were related
parties, the fund should have been considered loans or paid-in capital and booked as liabilities
during those years.

      131.    L&H's treatment of the start-up shells also violated SFAS No. 57, *Related Party
Disclosures*, which requires "disclosures of material related party transactions" including:

      a.      The nature of the relationship(s) involved.

      b.      A description of the transactions, including transactions to which no amounts or
nominal amounts were ascribed, for each of the periods for which income
statements are presented, and such other information deemed necessary to an
understanding of the effects of the transactions on the financial statements.

      c.      The dollar amounts of transactions for each of the periods for which income
statements are presented and the effects of any change in the method of
establishing the terms from that used in the preceding period.

      d.      Amounts due from or to related parties as of the date of each balance sheet
presented and, if not otherwise apparent, the terms and manner of settlement.

AS § R36.102.

      132.    Notes to L&H financial statements for 1997, 1998, and 1999 contain long lists of
"related parties" accompanied by none of the detail required by SFAS No. 57.  Moreover, the
connections to related parties revealed by the Audit Committee Report demonstrate that L&H
affirmatively misrepresented the amount of revenue it recognized from the start-up shells who
provided 10% of L&H's 1998 revenue and 25% of its 1999 revenue.  In its 1998 Annual Report
on Form 20-F, L&H stated that only 3.7% of its 1998 revenue was provided by "companies
funded in part by the FLV Fund."  In Notes to its 1999 financial statements, L&H stated that

0.3% of 1999 revenues were provided by "companies funded in part by the FLV Fund and L&H Investment Co."

133.    L&H also flouted the provisions of SOP 97-2 relating to revenue from sales or licenses that do not require contract accounting.  Under those provisions, if the arrangements do not require significant production, modification, or customization of software, L&H was not permitted to recognize revenue until:

> ***all*** of the following criteria are met:
> - Persuasive evidence of an arrangement exists.
> - Delivery has occurred.
> - The vendor's fee is fixed or determinable.
> o Collectibility is probable.

SOP 97-2 ¶8 (emphasis added).

134.    The Audit Committee Report lists numerous instances where L&H recognized revenue even though no contract was signed or the terms were not finalized, and thus no "persuasive evidence of an arrangement existed" as required by SOP 97-2:

(a)    In the second quarter of 1998, L&H recognized revenue from a June 30, 1998, agreement with Digital Voice requiring a $150,000 prepaid royalty.  An August 6, 1998 e-mail from the customer indicates that contract was not finalized.

(b)    L&H recognized revenue in the third quarter of 1999 from a September 30, 1998 distribution agreement with Voicenet containing a $1,000,000 prepaid royalty. An October letter revealed that the final terms of the agreement were not determined until the fourth quarter of 1999.

(c)    L&H recognized $4 million in the fourth quarter of 1999 based on agreement with Lavenia (Armenian LDC) dated December 30, 1999, when an e-mail dated January 5, 2000 to Willaert and Dammekens discusses terms to be included in contract, including a $3 million fee and demonstrates that the terms had not been concluded.

(d)    L&H recognized $5 million from a license agreement with TIB in the fourth quarter of 1999, when a January 4, 2000 e-mail from the customer to Lernout and Hauspie indicates that the contract was not final until the first quarter of 2000.

(e)    In the second quarter of 1999, L&H recognized $3 million from a license agreement with I-Medical, a Belgian customer, dated June 30, 1999.  A July 7,

53

1999 email to Bastiaens, with copy to Hauspie, from Lernout, indicates the contract was not signed until the third quarter of 1999.

(f)     In the fourth quarter of 1999, L&H recognized $4 million from a license agreement with I Travel, a customer in the Belgian office dated December 31, 1999. An email to Willaert and Dammekens indicates the contract not signed until the first quarter of 2000.

(g)     In the first quarter of 2000, L&H recognized $8 million in revenue based on agreement with ELC, a Belgian customer, dated March 31, 2000. An April 4, 2000, email to Willaert, Hauspie, Bastiaens, and Dammekens shows the agreement not finalized.

(h)     L&H recognized $50,000 of revenue in the third quarter 1999, from an agreement with NEC, who told the Audit Committee Advisors that the terms of contract were never finalized, the customer was never invoiced and the customer never paid.

(i)     L&H recognized $12 million in the third quarter of 1999 from contracts with three CLDC's, Lupeni, Jelgava, and Harrisca, who each had a contract reflecting $4 million fee and a second contract reflecting $2 million fee, making it unclear whether there was an agreement in quarter when revenue recognized.

135.    The Audit Committee Report lists numerous instances where L&H recorded sales when it was not clear that the customer had the ability to pay for its products or services, including instances when the customer was not even invoiced, and thus collectibility was not probable, as required by SOP 97-2:

(a)     During the first three quarters of 1998, BCB, a customer in the Burlington office licensed $1.25 million of L&H software. In July, 1998, BCB and L&H entered into a stock swap valued at $1.6 million. BCB was a start-up that intended to use proceeds from the sale of the L&H stock to pay the license fees, but was unable to sell the stock until October 1998. Collectibility was not probable until the customer sold the stock and determined that the proceeds were sufficient to cover the license fees.

(b)     On September 27, 1999, the Belgian unit of L&H recognized $220,000 of license revenue but never invoiced the customer, Computer Services Solutions, for fees. The customer told the Audit Committee Advisors that "L&H did not invoice customers until it believed the customer could pay."

(c)     On December 31, 1998, the Belgian unit of L&H recognized $250,000 of license revenue but never invoiced the customer, a start-up that had been established only one month before the license agreement.

54