136.    L&H recorded sales when the customer's ability to pay depended on an investment from L&H, which also demonstrated that collectibility was not probable as required by SOP 97-2:

(a)    On September 27, 1999, L&H recognized $450,000 of revenue based on a license agreement with Industry Productivity Group, a customer in the Belgian office that was expecting an investment from FLV Fund. L&H never invoiced the customer for the fee.

(b)    Interpra, a customer in the Burlington office who licensed $250,000 of L&H software on December 31,1998, and another $250,000 on March 31, 1999, maintained that there was a verbal promise of funding from FLV Fund, and did not want to pay the license fee until the customer received the funding.

(c)    On March 25, 1998, Vasco, a customer in the Burlington office licensed $800,000 of L&H software. On December 31, 1998, Vasco licensed an additional $900,000 of L&H software. In March 1998, L&H loaned Vasco $3 million, due January 4, 1999. The loan was not repaid until the second quarter of 1999, when LHIC invested $5 million in the customer.

137.    L&H recognized sales revenues that were contingent on L&H later performing development work for the customer. SOP 97-2 requires that recognition of revenue be deferred until "delivery has occurred," and that delivery be determined as to each one of multiple elements, including the separate element of software delivered "on a when-and-if-available" basis:

(a)    In the first quarter of 1999, L&H recognized $1 million of license revenue. An August 25, 2000 letter indicates that delivery of all software did not occur until June 1999 and then the software was replaced in August, 1999.

(b)    On June 30, 1999, L&H recognized $900,000 based on a license agreement allocated among different language versions of Voice Express. One version was to be licensed "when and if delivered." The other two versions were never delivered.

(c)    On March 17, 1999, L&H recognized $900,000 from an agreement allocated among four language versions of software. One version was delivered in March of 2000; the others never delivered; and nothing was paid.

138.    Korean contracts reviewed by the Audit Committee Advisors raised multiple

issues under SOP 97-2. The Audit Committee Report notes that KPMG was aware of the issues

raised by Korean contracts, but the record did not disclose to the Audit Committee Advisors how

KPMG was able to resolve them.

(a)    On September 30, 1999, VoiceTek and IBC, two Korean customers signed
distribution and development agreements pursuant to which L&H recognized a
total of $11 million in the third quarter of 1999 and $1.6 million in the fourth
quarter of 1999. In that quarter, L&H factored $13.7 million of receivables from
the contracts. A KPMG e-mail from October 18, 1999 "indicates that the L&H
Korea bank accounts have been held as collateral for the factoring agreements and
that the agreements may have been with recourse." On October 21, 1999, both
customers signed amendments removing their right to distribute "when and if
available" products. The Audit Committee report queries whether the license and
development agreements can be considered separate agreements, noting that
"KPMG was aware of both agreements."

(b)    Two more Korean customers, HI Worldwide Co., Ltd, and Digital Sei-Young,
Ltd., signed license agreements in December 1999, pursuant to which L&H
recognized nearly $19 million in the fourth quarter of 1999. In that quarter, L&H
factored nearly $24 million of receivables from those contracts. The Audit
Committee Report queries whether collectibility was sufficiently probable for
revenue to have been recognized under SOP 97-2 and notes that KPMG was
aware of both agreements.

139.    L&H recorded revenues when the "purchasers" of the licenses were not the end

users and side letters confirmed that if the licenses were sold to other parties, a finder's fee

would be paid. If the licenses were not resold, the original payments to L&H would be refunded.

The fees in these arrangements should not have been recognized because they were not "fixed or

determinable" as required by SOP 97-2 and the earnings process, in what was, essentially, a

consignment sale, was not consummated:

(a)    L&H recognized $4 million of revenue in the fourth quarter of 1999 from a
license agreement dated December 29, 1999. Side letters signed by Hauspie and
Willaert obligate L&H to refund a portion or all of license fee if L&H doesn't find
investors for customer.

(b)    L&H signed an agreement with an LDC in the third quarter of 1998 and another
in the first quarter of 1999. The investors who bought the shares of the LDC from

the original investors on September 23, 1999, wanted $1.3 million of free warrants from L&H. Dammekens and Willaert told investors that it had to pay for the warrants "because of the P&L impact," but that L&H would make it up to them later. On August 1, 2000 L&H entered into a contract with the investors obligating L&H to pay $1.8 million to them over two years for "introductions" to influential politicians and business people. Dammekens told the Audit Committee Advisors that this agreement was entered into to reimburse the customer for the warrants.

140.    Statement of Financial Accounting Standard SFAS No. 48, *Revenue Recognition When Right of Return Exists*, provides that revenue may be recognized only when all of the terms of the sale are fixed or determinable and the sale has become final. AS § R75.107. The Audit Committee Report confirms that L&H recorded revenues although the customer had a right to return the product, including the following:

(a)    On December 29, 1998, CCG, a customer in the Burlington office signed a distributor agreement requiring a $569,620 non refundable fee. L&H recognized $152,500. The contract gave the customer the right to return, and the customer never paid any money under the agreement.

(b)    On December 31, 1998, L&H entered into a distribution agreement with D&H Distributing, a customer in the Burlington office who was obligated to prepay $500,000 in royalties. L&H recognized $350,000 in revenue in the fourth quarter of 1998 even though the contract gave the customer the right of return, the customer never paid any fees, and the customer returned all the product.

141.    The Audit Committee Report reveals that L&H improperly recorded revenue for barter or exchange transactions with other software firms in which no cash exchanged hands. Under Statement of the Accounting Principles Board Opinion (APB) 29, *Accounting for Nonmonetary Transactions*, such transactions do not culminate an earnings process and therefore did not produce recognizable revenue: "[T]he following two types of nonmonetary exchange transactions do not culminate an earnings process: a. An exchange of product or property held for sale in the ordinary course of business for a product or property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange, and b. An exchange of productive asset not held for sale in the ordinary course of business for a similar productive asset or an equivalent interest in the same or similar productive asset." AS § N35.108. L&H improperly recorded revenue from the following barter transactions:

57

(a)    L&H recognized $375,000 of revenue in the third quarter of 1998 and $435,000 of revenue in the fourth quarter 1998 from a reseller license contract dated September 28, 1998, with Speech Machines, a customer in the Burlington office. On January 5, 1998, L&H entered into an amended reseller agreement obligating L&H to pay an upfront fee of $1.25 million to the customer for no additional consideration.

(b)    L&H recognized revenue in the third quarter of 1998 from a September 30, 1998, license to Nine Rivers Technology, a customer in the Burlington office of $950,000 of L&H software, with a net benefit to L&H (after marketing expenses) of $838,000. On January 15, 1999, L&H licensed $830,000 of the customer's software for resale.

(c)    L&H recognized revenue in the first quarter of 1999 from a license to a customer in the Burlington office of $250,000 of L&H software on December 31,1998, and another $250,000 on March 31, 1999. L&H licensed $250,000 of the customer's software on January 4, 1999 and another $250,000 in the third quarter of 1999.

(d)    In the fourth quarter of 1997, L&H agreed to pay $1.2 million to Voice Input Technologies, a customer in the Burlington office for that customer to develop PowerScribe technology. In the same quarter, that customer licensed $1.5 million of L&H software for resale. L&H recognized $1.2 million in that quarter, even though client claims it never delivered anything under the agreement.

(e)    L&H recognized revenue in the first quarter of 1998 from a March 31, 1998, license to Korteam, a customer in the Burlington office of $300,000 of L&H software. On June 29, 1998, L&H licensed $500,000 of contexts to be developed by the customer, with a $200,000 rebate if L&H obtained financing for the customer. The customer never sold any L&H product, and L&H relieved it of all obligation.

(f)    L&H recognized revenue in the first quarter of 1998 from a March 31, 1998, license to Sequoia, a customer in the Burlington office of $30,000 of L&H software. L&H licensed $30,000 of the customer's software at same time.

(g)    L&H recognized revenue in the fourth quarter of 1998 from a December 27, 1998, license to AVRI/E-docs, a customer in the Burlington office of $1,000,000 of L&H software. On January 11, 1999, L&H committed to pay $400,000 for the development of contexts by the customer.

(h)    On December 19, 1998, recognized $800,000 of license revenue from an agreement with a customer in the Belgian office. A second contract stated the fee as $500,000. The customer's CEO told the Audit Committee Advisors that he never had any intention to pay $800,000, but understood there was oral agreement

for L&H to purchase reciprocal amount of software. L&H never invoiced the customer, nor was anything paid.

142.    L&H's reported financial results also violated the following fundamental concepts underlying GAAP:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. FASB Statement of Concepts No. 1, ¶34;

(b)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources. FASB Statement of Concepts No. 1, ¶40;

(c)    The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. FASB Statement of Concepts No. 1, ¶42;

(d)    The principle that financial reporting should be reliable and that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting. FASB Statement of Concepts No. 2, ¶58;

(e)    The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. FASB Statement of Concepts No. 2, ¶79;

(f)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately

considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. FASB Statement of Concepts No. 2, ¶¶95, 97.


## Falsity of Defendant KPMG's Representation That It Conducted its Audit in Accordance With U.S. GAAS

143.    For each of the years 1997, 1998 and 1999, KPMG falsely certified that:

We have conducted our audits in accordance with generally accepted auditing standards in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

144.    U.S. GAAS imposes upon auditors "a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 110.02.

145.    As is set forth in detail below, KPMG did not follow the most basic tenets of U.S. GAAS, which require an auditor to obtain personal knowledge of sufficient, competent evidence supporting the assertions in financial statements to permit reasonable assurance that they do not contain material misstatements:

(a)    "Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements." AU § 326.02.

(b)    "The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly." AU § 326.21.

(c)    Representations from management "are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU § 333.02.

(d)    "[W]ithout adequate attention to the propriety and accuracy of the underlying accounting data, an opinion on financial statements would not be warranted." AU § 326.16.

### KPMG Internal Documents Are Replete with Red Flags

146.    Non-public documents generated by the defendants demonstrate that KPMG had specific knowledge of questionable L&H transactions involving millions of dollars in revenue, including transactions cited in the Audit Committee Report, and did not resolve critical revenue recognition issues prior to issuing unqualified reports on L&H financial statements. Nor did KPMG resolve the issues *post hoc*, as is evident from L&H's demise from precisely the issues identified but not pressed by KPMG. Partners at the highest level of the KPMG Belgium, U.S., Korea and Singapore units involved in the L&H engagement knew: (a) of indicia that Korean customers were phony and that Korean receivables had been factored without recourse; (b) of indicia that "customers" in Singapore were phony and funded by related parties; (c) of indicia that revenue in Burlington was improperly recognized, and (d) that the SEC in January 2000 commenced an inquiry into precisely the revenue recognition issues that had come to KPMG's attention independently. In each instance, KPMG'S own internal documents reflect alarming facts leading to many questions but no satisfying answers, and revenue, in each case, being recognized nonetheless.

147.    A series of emails, in October 1999, reveals that senior auditors at the highest levels of KPMG U.S., KPMG Korea, and KPMG Belgium were confronted with two Korean contracts, representing $11 million in revenue for the third quarter of 1999, that: (a) had been signed on the last day of the quarter, (b) that were the largest contracts in the history of the Korean unit, (c) that had been factored to a Korean bank with recourse, and (d) presented numerous indicia of insufficiency to satisfy GAAP rules regarding recognition of software

61

revenue. Notwithstanding extensive discussion of the questionable nature of these contracts among Oh Bum Kwon, a senior auditor at KPMG Korea, senior KPMG Belgium partner William Van Aerde, KPMG Belgium Senior Manager Stephan Huysman, Robert McLamb, Carl Dammekens, and Frederick Deschodt, who had recently arrived at L&H's finance department after working for several years on the L&H account at KPMG Belgium, revenue was recorded with no apparent resolution of the accounting issues, only to be reversed when L&H collapsed:

- On October 18, 1999, Kwon sent Huysman, with copies to Deschodt, Dammekens and Van Aerde, among others, an "URGENT" email regarding Bumil:

> [W]e have a critical revenue recognition issue as follows and, I want you to confirm this in your office as well as appropriate L&H responsible personnel.
>
> At 30 September 1999, L&H Korea ("Bumil") recognized the software revenue of approximate US$11M, the largest amount Bumil ever recorded. The sales were made to two unknown local software companies, VoiceTek (US$7M) and International Business Computer (US$4M), respectively, and I believe that Frederick's visit to Bumil last time was probably to review or record these transactions. Frederick told the accountant of Bumil that this transaction was agree by KPMG at the Corporate level. I am surprised why he did not discussed with me when we met last time.
>
> We were not informed of the details of VoiceTek. Same to ICB. We know that VoiceTek was established in July this year in the minimum paid-in capital. We are not aware of anything on IBC. There are sales contracts dated 30 September 1999 with these new customers but there are not proper documents on the revenue generation schedule and condition. The contracts say that the sales is final and no refund is required and the localizing expenses to be incurred will be charged to the customers additionally, etc. Furthermore, the receivable was factored with a local bank with collateral of Bumil's bank deposit and we believe the factoring is "with recourse."
>
> Because of this transaction at 30, September 1999, Bumil showed big profit, about, U$13M, in September while it had loss carryforward of approximately U$.5M until the end of August.
>
> Based on our understanding, I have several critical questions.
>
> 1. Why did Bumil recognize the whole amount in September? Per their explanation, the ultimate solution in Korean will take about five years to complete even though Bumil is not required to refund the contract amount. Therefore, at least, the revenue should be recognized over five years or more.

2.  The revenue recognition basis under USGAAP (SOP91-1 and 97-2) should be carefully complied in this transaction. Because of its sensitive nature of the first consolidation with L&H, I recommend you should consult your SEC partner on this issue. My preliminary interpretation is that this revenue recognition has some problems particularly I terms of "when-and-if" available conditions, delivery of products, and collectibility.

As you know, this issue should be cleared promptly to complete the consolidation, please discuss at Corporate level and advise me of the discussions.

- Later that same day, Kwon emailed Deschodt to report:

I had a call with Mr. Oh, new finance director, and Mr. S. Cho, and we are discussing the issue of software revenue recognition. Still I believe the one time recognition of the software revenue will not be accepted in our opinion because the distribution agreement is saying that the distributor (VoiceTek) shall have the exclusive right for the product for a period of six years after the Effective date which is 30 September, 1999. This is same for the IBC.

I think this is an accounting issue rather than business issue due to the special nature of software revenue recognition.

I will keep you informed but please discuss this issue with the appropriate KPMG professionals at the Corporate.

- Deschodt's reply was to give Kwon instructions – highly improper from a client — to include the $11 million in the reporting package and "report the issue in your Highlights Memorandum towards KPMG Headquarters here in Ghent" where "we will discuss the concerns there might be with the KPMG engagement team over here in Ghent."

- The issue was raised with KPMG U.S. partner McLamb, who stated in an October 22, 1999 email to Dammekens that "I have been discussing the two Korean contracts with Glen Davison [a KPMG U.S. partner whose area of expertise was compliance with SEC rules] and we do have concerns about each. I think we have the biggest problem with the IBC contract."

- On October 25, 1999, Dammekens emailed to Bastiaens that he:

Talked with Bob McLamb. He wants to see the following matters regarding Korea

1) the KPMG people of Korea said via email that there is "a relationship" between the president of Bumil and the man from Voice Tech. He wants a statement from both presidents that they are not related (family) and that there are not side agreements.

2) for both, he wants to know who is behind the companies in order to judge the collectibility.

- On October 27, 1999, Huysmans emailed Kwon regarding:

The status of "progress" with respect to the Korean contracts with Voice Tek and IBC. Bob McLamb and people from the US professional practise are currently investigating these agreements. There are issues, as you know. In addition, we found out that there are other contracts associated with the 2 that have been recorded in Sept. This obviously raises additional concerns.

- In a December 21, 1999 email, Van Aerde informs McLamb that "7 million USD relating to Voice Tek have been paid (factored). The remaining 4 million USD with respect to IBC are expected to be paid by January 4, 2000." There appears to be no further KPMG action on the VoiceTek and IBC contracts, representing $11 million in revenue for the third quarter of 1999 until the revenue was reversed when the fraud was revealed a year later.

148. KPMG was also aware of incurable flaws in Korean contracts with Digital Sei-Young Ltd., Neo Information Telecom, and Doshin Electronics, Ltd., upon which L&H recorded revenues of $23 million in the 4th quarter of 1999, even though in January of 2000 those contracts were still in draft form with essential terms missing. Notwithstanding the following exchange of emails putting KPMG on notice that the transactions were questionable, the $23 million was recognized, only to be eventually reversed:

- A January 5, 2000 email from Robert McLamb to Dammekens, with a copy to Glen Davison points out numerous obstacles to revenue recognition, including "the contract should be signed and dated by each party. Having just an effective date is unacceptable;" "need to determine the financial viability" of customer "to see whether they have the financial ability to pay" multi-million dollar license fees; "need see clear evidence of the

delivery of the deliverables under each part of the contract," and "need to confirm ... that there are not other written or oral agreements between [customer] and L&H."

- Although it was already too late to permit revenue to be recognized for the 4th quarter on a contract that was still in draft form five days after the quarter ended, KPMG accepted "confirmations" from the customers that themselves left key terms blank. The letter from Digital Seiyoung, for example, states:

> Digital Sei-Young Co., Ltd. hereby states that it has sufficient financial means and is financially viable to enter into the License, Merchandising and Broadcasting Agreement with L&H Korea for the amount of 10 million U.S. dollars. The amount of 10 Million US Dollars being nonrefundable under this agreement.
> ...
> Furthermore we can declare that no other arrangements, contracts, agreements or conditions are imposed on or dependent on Digital Sei-Young to enter into this Agreement, nor that L&H Korea will have to perform any other obligation than stated under the contract.
> Digital Sei-Young hereby declares that it has received all deliverables which are needed and specified under the contract and that it accepts all such deliverables. The deliverables were delivered on December ___, 1999 as follows:
> _____.

- A January 25, 2000 email from Huysman to Dammekens, with copies to Van Aerde, McLamb, and Boyer, states that for the Digital and Neo contracts, as well as for HI World, discussed below, and a contract with EPC amounting to $8 million, "We do miss the factoring agreement (asked of KPMG Korea for a translation but still to be obtained). The contracts have been signed but are not dated on the last page (together with the signature)." Huysman concludes by asking U.S. partner McLamb for guidance: "Bob, is there any action to be taken on this?"

149.    McLamb, Kwon, and Huysman also confronted – and ultimately ignored—the fact that a product had not been delivered under a Korean contract with HI Worldwide, pursuant to which $11 million had been recognized in the 4th quarter of 1999:

- On March 1, 2000, KPMG Korea partner Oh Bum Kwon emailed Huysman about his

  meeting with the chairman of HI World, CH Lee, who:

  appears non-businessman. ... Per his explanation, he met Mr. JC Suh, president of L&H
  Korea, and started the business because of the lucrative future blueprint ...

  It is not certain that he has enough wealth to pay out the promissory note issued to L&H
  Korea but he promised to pay the note at the maturity, March 27, 2000.  On L&H
  perspective, the amount received from HI World was already sold to a bank without
  recourse and it appears there is not exposure to L&H Korea.  However, for the second
  payment of 10M, which is supposed to received by end of April, it is not certain at this
  time HI World will pay or not.  Mr. Lee raised a question of the delivery of key product,
  a chip as what he said.  Per explanation of Mr. Oh of L&H Korea, CH met with the
  Chairman of L&H when he was in Korea yesterday and I believe they discussed these
  things.

- On March 7, 2000, Huysman responded, with copies to McLamb and Kaveh Varjavand

  of KPMG's Los Angeles office:

  Do you have further info on what product was missing.  Does this knowledge geopardize
  [sic] the revenue recognition of L&H at December 31 of one or other contract?  I thought
  that according to the confirmations we got from the customers, all was delivered in Q4,
  they signed for acceptance.  The letter is an important SOP 97-2 criterion.  Can you
  provide us with feedback on this?

- On March 8, 2000, Kwon replied  "I believe he had a meeting with Gaston when the

  chairman visited Korea last week."  McLamb responded "How does this answer the

  question?  Was the product delivered prior to 12/31/99 or not?"

- On March 9, 2000, Huysman emailed to Bastiaens:

  I understand from the reading of the mail that there was a discussion on delivery of a key
  product (a chip apparently) for a contract.  Since this has been discussed with you, could
  you clarify what the issue was, if any, i.e.:
  1. Was there a vital element missing of a license agreement that was signed with HI
  World prior to Dec. 31, 99?
  2.  If so, how come that Mr. Lee had signed a letter as token of having received the
  software in the contract?
  3.  How has this been resolved now?

- The issue was not resolved by KPMG and the revenue was nonetheless recognized, even though six months after the period ended, and only days before L&H's Forms 10-K and 10-Q relating to that period were released, on June 22, 2000, Lee emailed Bastiaens that the product still had not been delivered:

  > The truth is, you did not have the technology ready for deployment in a chip set format when you entered into the license agreement, your engineers had not even gone to Belgium to receive training for the ASR 300, the chip set in the format and spec given to us cost more than double your quotation, the chip set takes 6 months to develop and you had not even tested whether ASR 300 would work as well as you claimed it would. …

  > In addition, a couple of days ago your Mr. Seo explicitly admitted to met that your company did not have the technology ready, neither then nor now.

150.   Extensive emails among senior KPMG personnel and others reveal that KPMG was also aware of essential facts that should have revealed the true nature of L&H's "strategic partnerships." Among other things, KPMG knew (a) that many of the language development companies shared addresses – the fact that enabled *The Wall Street Journal* to wholly unravel the fraud, (b) that there appeared to be no business conducted at the LDC's, (c) that these allegedly Singaporean businesses were manned by Belgians; (d) that there personnel and investors were from entities related to L&H and audited by KPMG, (e) that the SEC was investigating the roles of Paul Behets, LHIC, FLV Fund, among others:

- In a September 30, 1999 "confidential memorandum" from Van Aerde to McLamb, Van Aerde "reviewed on the request of KPMG USA Professional Practice, the billing and collection procedures of L&H towards the Language Development Companies (L.D.C.'s)." Van Aerde reported that he only received eight written and four verbal confirmations from 15 LDC's, noting prominently that "certain scope limitations were imposed on ourselves when performing our review: the shareholders and/or investors of the LDC's could not be met. Contacts could be made with the managing directors of subject LDC's. We were informed that shareholders or investors may not wish to be

contacted. There are no legal grounds to enforce such a contact (at this stage.)"

Startlingly, the annexed confirmations reveal:

> One response for four of the LDC's from Willem Hardeman, who confirms that "I am indeed the financial investor in the above listed companies." KPMG knew, from auditing the FLV Fund, that Hardeman was a director of the FLV Fund and therefore a related party.

> In another, verbal, response, the investor stated "that he would not confirm in written language the content of our letter to him based on advice received by his counsels." Van Aerde considered this a satisfactory confirmation.

- On January 21, 2000, Dammekens wrote to Hauspie and Bastiaens that:

> KPMG is the auditor of FLV. They have asked questions about the participation of FLV in 4 of the LDC companies. They have also seen that the investments were sold on to HI Worldwide –QUESTION is if the same company as the one with which we have a contract?

> Problems:

> 1) disclosure as related party revenue of the 4 LDC companies,

> 2) incorrect disclosure in [C/O]S!,

> 3) if this HI Worldwide is the same

>> 3a) what is the business purpose behind this

>> 3b) a major problem to show collectability – certainly for FLV – for L&H they will check the factoring carefully.

- In an email later that day, Huysman did ask Dammekens in writing about FLV and HI Worldwide:

> The Cross Language companies … which were sold on by FLV to Human Interface Worldwide Ltd concern an amount of about $10 million. Invested in October 99… The contracts were signed by Filip Vermeulen on October 24 and by Chun Hyung Lee, CEO and chairman of Human Interface Worldwide. Our question was whether this last company is the same company as HI Worldwide (the Korean company with which L&H closed a sale agreement in the 4th quarter of 99, good for revenues of $11 million.

68

- In a January 25, 2000 email to Dammekens, with copies to KPMG partners Van Aerde, McLamb, and Jim Boyer, Huysman raises numerous issues suggesting the true nature of the sham "strategic partners:"

> The LDC's that FLV sold to HI World (Mandarin, Japanese, Russian and Spanish) are the ones for which Filip Vermeulen has signed the Sept. 30, 99 license agreements on behalf of Salfas, Senegal, Baleston, Duranzo Pte ltd (all of which are companies located on the same address in Singapore: 5 Jalan Besar #5-01, Singapore 208785) and LHS.

> What's the substance of this transaction and how does this link with the other Q4, 99 revenue agreement with HI world?

> KPMG Korea note in their report that a customer, LDS, has incorrectly paid an amount of $25 million to L&H Korea instead of this being paid back to the president of L&H Korea (the latter had given LDS a personal loan of that amount). Further, the report says that LDS should have paid this balance to L&H⁻ Singapore and not to L&H Korea. Who is LDS? KPMG Singapore uses this abbreviation for all the LDC companies together (Language Development˙ Services Group of Companies). Who is paying all this money on behalf of all the different legal entities that are the LDC's? Why would the president of L&H Korea give a personal loan to the LDS (or LDC's)?

- In an "URGENT" January 27, 2000 email to KPMG Korea partner Kwon, and KPMG Singapore auditor Philip Lee, with a copy to McLamb, Huysman numerous alarming and confusing aspects of his investigation into the Language Development Companies:

> We are still struggling with the input that we keep getting in different reports (or versions from reports) in connection with a party ('LDS') that is mentioned in both the SPM of KPMG Singapore and KPMG Seoul.

> We are over here that L&H sells license agreements through the Ieper company or through the Singapore affiliate to newly set up companies which purpose it is to develop a language. These entities are called language development companies (LDC's ) and are different legal entities, although some of them are on the same address in Singapore.

> Philip, your report mentions a party LDS (Language Development Services group of companies) and then lists them. Oh Bum, in your first version of the report you mention that a customer 'LDS had erroneously deposited 'an amount of $25 million on the accounts of L&H Korea on December 31. The, the explanation is confusing and, first, it was thought that this amount should have been repaid to the president of L&H Korea by LDS (collection of a personal loan that this person

69

would have give). Then, according to later input obtained from management, the amount would be a payment of LDS that should have been paid not to L&H Korea but to L&H Singapore. However, given foreign exchange restrictions, this would now be difficult.

Then, in the version of the KPMG Korea report that was sent yesterday, this paragraph of the report has been corrected. It still states that this money should have been paid by LDS to L&H Singapore instead of on the bank account of L&H Korea. It does not longer state that the 'personal loan repayment.'

We are concerned about what happened here and need a full explanation on the whole picture; here are some questions for both of you:

1. Can either one of you confirm who is behind LDS? Is this a legal entity or not? Where did the $25 million come from? Who authorized payment? What bank account was it transferred from? What exactly does the 25 million $ cover?

2. Why didn't each of the different LDC's in the report not pay their own debt versus L&H instead of one party transferring a big amount of 25 million dollar (if it is intended to settle the receivables at all; we understood that it might have to do with the payment of the earnout for the acquisition of the former Bumil (now L&H Korea). Is there, to your knowledge, a link with L&H or with other parties (the president of L&H Korea, some big new customers of L&H Korea such as HI World, Digital Seyoung, EPC NEO who all signed very big contracts in the 4th quarter of 99 with L&H Korea?

3. We understand that the report of KPMG Korea has changed for the personal loan paragraph but where did the information come from to change this text to the second version? Who was the contact for this? How has KPMG Korea validated the explanation given?

4. Philip, some of the customers of L&H Singapore are Salfas, Duranzo, Baleston and Senegal Pte Ltd. These customers are all located on No 5 Jalan Besar #5-01 Singapore 20875. Are you aware of any operational activities at these premises? Is R&D taking place or are people actually developing languages? For some other contracts signed between L&H Asia and Lupeni, Jelgava, and Harrica Pte Ltd., the address is in Shenton Way 5, 12-05 UIC Building, Singapore 06888. The same question as above is asked, For all of these contracts, is there to your knowledge a local general manager (the contract have in each case been signed by Belgian people.) …

I also send this mail to the US partner who is reviewing this engagement from a US Gaap perspective (Bob McLamb, in KPMG Houston). You can send your answers to him at the same time.

70

- On January 29, 2000, McLamb raised further questions in an email to Van Aerde, Huysman, and Dammekens:

> It seems that a single payment of $25 million was paid to L&H Korea. The payment was for amounts owed to LHS (the group in total) by a number of LDC's. Who made this payment? We need to see the wire transfer or check and determine what bank account it came from . Why did the payment for several LDC's come from a single bank account? This makes it more important that we find out who the individual investors are for each of the LDC's It is no longer acceptable for us to rely on an agent acting for a group of investors. When we find out the company or person that the $25 million payment came from we need to get KPMG Korea to find out about the Company or person. If the payment was made by a company we need to know who the owners of the Company are. This is very important.

- On January 30, 2000, Cheryl Foo of L&H Asia responded to these queries, forwarded to her by E. Lew of KPMG Singapore. In an email to Jacques Vanloo in Dammekens' office, she stated "I only have answer to Q2 which is a common registered address. I'm surprise this comes from KPMG Ghent because I remembered you told me that KPMG has audited all the LDC contract. Can you help? What should I tell KPMG S'Pore now?" Vanloo responded on January 31, 2000, that "Jo, Pol, Nico and Gaston will handle this directly with KPMG Ghent. Give them the info you have and tell them the above for the rest."

- In a January 31, 2000 email to Dammekens with copies to McLamb and Huysman, Van Aerde includes on "a list of urgent items to be followed up by the company in order for us to be able to give our consent to the press release [of year end figures] ... [a] list of directors –officers and related transactions between LHSP, FLV, FLV Management and LHIC."

- In a February 1, 2000 email to Willaert, Hauspie, and Bastiaens, with copies to McLamb and Dammekens, Van Aerde states that:

> KPMG has asked Carl Dammekens to collect information onto the related parties transactions between L&H, FLV (and FLV Management) and LHIC. The term

71

related party refers to an affiliate; principal owners, management, and members of their immediate families; subsidiaries accounted for by the equity method, and any other party with which the Company may deal if the Company can significantly influence, or be influenced by the management or operating policies of the other. The term affiliate refers to a party that directly or indirectly controls, or is controlled by, or is under common control with, the Company.

This information has also been requested by the SEC, as you know. We would like similar information about the LDC's (Language Development Companies) (the names of the owners, officers and transaction flows). LDC's must qualify as third parties.

- In a February 4, 2000 email to Carl Dammekens with copies to McLamb and Huysman, Van Aerde states that "when talking to the lawyers the other day with respect to the SEC informal investigation … an other question that was raised concerned the director mandates of Paul Behets with FLV, Sail Ports, L&H and any other."

151.    Internal emails also reveal KPMG's knowledge of problems with collectibility at L&H:

- A January 25, 2000 email from Huysman to Dammekens, with copies to Van Aerde, McLamb, and KPMG U.S. partner Jim Boyer complaints that "Four one-one.com has been outstanding for more than 90 days with a balance of $2.6 mil. Here again, the balance would be monitored by 'holding company': who is following up on this and what is the status? …In addition, $553,000 with Pacrim, in which L&H has a minority investment, has been outstanding for more than 90 days."

- In a January 26, 2000, email, Philip Lee of KPMG Singapore expresses doubts as to the collectibility of amounts owed by Four one-one.com, but relies on the client rather than undertaking independent investigation:

    Four One One.com—conditions set out in SOP 97 are met but we do have some doubts on the collection of the outstanding balance. Of the contract sum of US$4.5 million, US$1.9 million has been collected leaving a balance of US$2.6 million which is more than 90 days overdue. Ms. Cheryl Foo (our local contact at L&H Asia) is of the view that the amount is collectable but we do not have further information on the debtor. Cheryl advised that Carl Dammekens has more information on the ability of the customer to pay up the balance. In our view, the

72

conditions for revenue recognition appears to have been met except that there is now an issue of collectibility of the outstanding amount receivable.

- On April 18, 2000, the collectibility of receivables for the fourth quarter or 1999 continued to be a problem as reflected in an email from Huysman to Bastiaens, and Willaert with copies to Van Aerde, and Philip Lee of KPMG Singapore:

> As you all know, KPMG is following closely the status of collections on receivables that were outstanding (and overdue) at December 31, 99. Today, we are 3.5 months later and would like to see the payments that L&H collected. I guess this matter is also a concern for management of L&H.
>
> We talked with yourself and the CEO of L&H Singapore (for Pacrim, Emerge, etc) to activate the collection procedures. We also asked Nico to get us a written confirmation from Four One One Com in connection with the proposed settlement plan. Today, we have not yet seen the latter, neither did we receive a copy from a bank statement on which $500,000 would be paid.

- On April 24, 2000, Cheryl Foo reported to Dammekens and Vanloo:

> We have managed to convince KPMG to recognize the major contracts in 1999 which given a choice KPMG would have classified as deferred revenue. I fear the same scenario will recur in the next quarter end as we have not seen any improvement in the a/c receivable and we will not have a very convincing story to tell this time.

152.    KPMG was aware, but hid from the plaintiffs, that the SEC had commenced an investigation into L&H revenue recognition practices, particularly with respect to related party transactions involving the FLV Fund and LHIC. In February and March 2000, the period during which plaintiffs' representative were attempting to perform a due diligence investigation of L&H, KPMG was actively involved in responding to the SEC:

- In a January 31, 2000 email to Dammekens, Bastiaens and McLamb, Van Aerde encloses "a list of urgent items to be followed up by the company in order for us to be able to give our consent to the press release [of year end figures]. ... The list is long but in view of the fact that we are talking about quarter 4 , 1999 and accumulated figures for the year, and in view of the nasty SEC letter, you as CFO and CEO and we as auditors can not afford to leave open items."

73

- In a Feb. 1, 2000 email to Willaert, Hauspie, and Bastiaens, with copies to McLamb and Dammekens, Van Aerde asks for "information onto the related parties transactions between L&H, FLV (and FLV Management) and LHIC," stating that "This information has also been requested by the SEC, as you know."

- In a February 12, 2000 email, to Dammekens, with copies to DiSarro and McLamb, L&H's U.S. outside counsel seeks documents from KPMG that may be responsive to the SEC request, and conveys to KPMG an SEC request to "speak directly to KPMG."

### Disregard of Overall Risk Factors

153.    KPMG failed to follow AU § 316, *Consideration of Fraud in a Financial Statement Audit*, which requires that: "[t]he auditor should specifically assess the risk of material misstatement of the financial statements due to fraud and should consider that assessment in designing the audit procedures to be performed." In addition to risk factors specific to the issues enumerated below, KPMG failed to consider overall risk factors posing a high degree of risk of error or fraud, including:

(a)    "an excessive interest by management in maintaining or increasing the entity's stock price or earnings trends through the use of unusually aggressive accounting practices." AU § 316.17. KPMG was involved in L&H's 1999 response to an SEC investigation of L&H's methods of accounting for acquisitions, and knew that the SEC had determined that L&H's methods were aggressive and improper.

(b)    "significant, unusual or highly complex transactions, especially those close to year end, that pose difficult 'substance over form' questions." AU § 316.17. Nearly every contract discussed in the Audit Committee Report is dated within three days of the end of a fiscal quarter, and ten agreements giving rise to a total of more than $27 million in revenue are dated within the last three days of December 1998 or December 1999.

74

(c) "unusually rapid growth or profitability, especially compared with that of other companies in the same industry." AU § 316.17. KPMG knew from L&H's financial statements that L&H claimed revenue increases of 213% in 1998 and 163% in 1999. KPMG knew that L&H's growth and profitability were unusual in the industry.

### Korea and Singapore

154.   KPMG failed to follow procedures sufficient to provide it with reasonable assurance that L&H's stated revenue from Korea and Singapore was free of material misstatement or turned a blind eye to the results of those procedures.

155.   KPMG was aware of facts indicating a serious risk of material misstatement of Korean and Singaporean revenues, including:

(a)   "unusually rapid growth or profitability." AU § 316.17. Korean revenues of $62.9 million in 1999 had risen from $245,000 in 1998, and constituted nearly 19% of L&H's total 1999 revenue of $344.2 million, all at a time when revenues in every other geographic market except Singapore were flat or declining. Singapore's revenues increased from only $29,000 in 1998 to $80.3 million in 1999 -- an increase of 2,769%, making Singapore the highest revenue geographic area in L&H, ahead of the United States and Europe (excluding Belgium).

(b)   "significant, unusual or highly complex transactions, especially those close to year end, that pose difficult 'substance over form' questions" AU §316.17. KPMG was aware of contracts with one Korean client representing $15 million in revenue that were signed on September 30, 1999, contracts with a second Korean client representing $21 million in revenue that were signed on December 8, 1999, and contracts with a third Korean client representing $12 million in revenue that were signed on

December 27, 1999. KPMG was aware that the form of those contracts cast doubt on the propriety of L&H's recognition of revenue from those contracts.

(d)     "other conditions [that] may be identified during fieldwork" including "unsupported or unauthorized balances or transactions" and "transactions not recorded in a complete or timely manner." AU § 316.24. The October 18, 1999 KPMG e-mail demonstrates that KPMG knew that L&H had factored its receivables from those contracts and knew that the factoring may have been "with recourse" to L&H's Korean bank accounts. The Audit Committee Advisors state that "KPMG must have resolved this issue, but we do not know how, as we have no further e-mails on the subject."

156.     Under U.S. GAAS, the risk factors in Korea and Singapore required that KPMG give heightened attention to the fundamental procedure of confirmation, "the process of obtaining and evaluating a direct communication from a third party in response to a request for information about a particular item affecting financial statement assertions." AU § 330.4, *The Confirmation Process*. "Unusual or complex transactions may be associated with high levels of risk. If the entity has entered into an unusual or complex transaction and the combined assessed level of risk is high, the auditor should consider confirming the terms of the transaction with the other parties in addition to examining documentation held by the entity." AU § 330.08. "If there is a risk of material misstatement due to fraud that may involve or result in improper revenue recognition" the auditor should "confirm with customers certain relevant contract terms and the absence of side agreements." AU § 316.30. "Standard confirmation requests (confirming only the outstanding balance) alone do not always provide sufficient evidence that only appropriate revenue transactions have been recorded. Auditors should consider the need to confirm significant terms of contracts and whether to inquire about the existence of oral or written contract modifications (side agreements)." AICPA, *Audit Risk Alert* -- 1998/99 at 38.

76

157.  Had KPMG sought confirmation of L&H contracts from Korean customers, it would have discovered, as did *The Wall Street Journal* in a matter of weeks, that nearly half of L&H's customers denied the existence or magnitude of a relationship claimed by L&H.  Had KPMG Belgium sought confirmation of L&H bank balances from Korean banks -- following audit procedures that would routinely apply where amounts of the magnitude at stake in Korea are involved -- it would have discovered, as did the Audit Committee Advisors in a matter of weeks, that $106 million was inaccessible, likely as a consequence of factoring receivables from Korean contracts with recourse to L&H's Korean bank accounts.  KPMG either failed to follow such normally applicable confirmation procedures, or turned a blind eye to the answers it received.

### Related Party Transactions

158.  KPMG failed to follow procedures sufficient to provide reasonable assurance that L&H's revenues were not inflated by transactions with related parties.

159.  KPMG disregarded facts indicating heightened risk of error or fraud categorized in U.S. GAAS as "significant pressure to obtain additional capital necessary to stay competitive, including the need for funds to finance major research and development expenditures."  AU § 316.17.

> (a)    Defendant Lernout was quoted in December 1999 describing the Dictation Consortium and BTG transactions as impelled by L&H's research and development needs: "If we didn't catch up [with competitors] we were cooked.  But we couldn't catch up because we didn't have enough R&D dollars."  KPMG was aware of all aspects of the Dictation Consortium and BTG transactions, having "carefully reviewed them at the time," according to the Audit Committee Report.  Moreover, KPMG audited the FLV Fund, and thus saw both sides of at least the Dictation Consortium transaction.

77

(b)     KPMG knew that L&H faced significant limitations on its ability to fund research and development in-house.

160.    KPMG disregarded facts indicating heightened risk of error or fraud categorized in U.S. GAAS as "significant related party transactions not in the ordinary course of business or with related entities not audited or audited by another firm." AU § 316.17. These include the following:

(a)     KPMG knew that in January, 2000, prior to KPMG's rendering a clean opinion on L&H's 1999 financial statements, the SEC had commenced an investigation into L&H's methods of accounting for revenue from thirty L&H customers that the SEC suspected were related parties.

(b)     KPMG was auditor for the FLV Fund, a related party whose ownership of at least eight of the entities that were the subject of the SEC inquiry and funding of four others was not disclosed and required accounting treatment materially different than that applied by L&H. KPMG thus saw both sides of many of the fraudulent transactions.

(c)     L&H's financial statements contain long lists of "related parties" with little or no explanation of L&H's dealings with those parties.

(d)     The internal correspondence set forth above demonstrates that KPMG was alarmed by, but failed to investigate adequately, numerous indications that "strategic partners" were related parties and transactions with them were questionable on multiple levels.

161.    KPMG failed to consider the risk factor particular to related party transactions stated in AU § 334, *Related Party Transactions*, as "large, unusual, or nonrecurring transactions or balances, ...particular[ly] ... transactions recognized at or near the end of the reporting period." The Audit Committee Report reveals that more than half of the revenue from related party transactions in 1998 and 1999 -- $13 million in 1998 and $21 million in 1999 -- was recognized in the fourth quarters of those years.

78

162.  ˙ KPMG failed to take the steps prescribed in AU 334 "to identify related party relationships and transactions and to satisfy [themselves] concerning the required financial statement accounting and disclosure." AU § 334.01.  To identify material transactions with related parties, the auditor should, among other things:

> (a)    "review filings by the reporting entity with the Securities and Exchange Commission and other regulatory agencies for the names of related parties and for other businesses in which officers and directors occupy directorship or management positions."  KPMG could easily have discovered from such sources that the CEO of Language Investment Co., the parent of four of the Belgian start-up shells, was Willem Hardeman, an FLV Fund director.  Another sixteen were owned by an Antwerp insurance company whose chairman, Louis Verbeke, is a name partner in L&H's chief Belgian law firm.  Verbeke and the insurance company also separately owned stakes in L&H.  A review of L&H's SEC filings, if it were necessary, would also have revealed <u>two significant related parties were the subsequent employers of former KPMG Belgium auditors with responsibility for L&H audits</u>.  During the 1998 and 1999 audits, the CFO of LHIC was Chantal Mestdagh, a former KPMG Belgium auditor who worked on the L&H audits.  During the 1999 audit, former KPMG auditor Behets was CEO of S.A.I.L. Trust, an entity that owned a one third interest in, and appointed five board members of, the FLV Fund Manager. KPMG was itself the auditor of the FLV Fund.  KPMG either failed to examine these sources to identify related parties, or turned a blind eye to the results of their investigation.

> (b)    "review proxy and other material filed with the Securities and Exchange Commission and comparable data filed with other regulatory agencies for information about material transactions with related parties."  AU §

334.08(c). *The Wall Street Journal* was easily able to determine from "regulatory filings" that the FLV Fund owned 49% stakes in eight of the Singapore start-ups, and gave cash to four others "which they used to pay their bills to L&H." KPMG, which, as auditor of the FLV Fund, had access to both sides of the fraudulent transactions, either failed to perform these basic procedures, or turned a blind eye to their results.

    (c)    "[r]eview accounting records for large, unusual, or non-recurring transactions or balances, paying particular attention to transactions recognized at or near the end of the reporting period." AU § 334.08(g).

    (d)    "[r]eview the extent and nature of business transacted with major customers, suppliers, borrowers and lenders for indications of previously undisclosed relationships." AU § 334.08 (e). As auditor of the FLV Fund, KPMG had unique access to both sides of L&H's transactions with major customers who were undisclosed related parties.

    163.    KPMG were not allowed to rely on management assertions about transactions with related parties. "The risk associated with management's assertions about related party transactions is often assessed as higher than for many other types of transactions because of the possibility that the parties to the transaction are motivated by reasons other than those that exist for most business transactions." AU § 334.18. If L&H was unwilling to provide the names of investors in the shell start-ups, KPMG should have considered this a "denial of access to information" that "constitute[d] a limitation on the scope of the audit that ... require[d] the auditor to consider qualifying or disclaiming an opinion on the financial statements" as set forth in AU § 508, *Reports on Financial Statements*. AU § 316.25 footnote 11. Indeed, KPMG partner Van Aerde cited a "scope limitation" in his September 1999 memo to McLamb regarding the LDC's, but this did not result in KPMG qualifying or disclaiming its opinion on L&H's 1999 financial statements.

80

164.    KPMG failed to perform procedures necessary to evaluate "the purpose, nature, and extent of [related party] transactions and their effect on the financial statements. The procedures should be directed toward obtaining and evaluating sufficient competent evidential matter and should extend beyond inquiry of management." AU § 334.09.  Among other things, KPMG failed to:

      (a)    "Confirm transaction amount and terms, including guarantees and other significant data, with the other party or parties to the transaction." AU § 334.10(a).

      (b)    "Inspect evidence in possession of the other party or parties to the transaction." AU § 334.10 (b).

      (c)    "[R]efer to financial publications, trade journals, credit agencies and other information sources when there is reason to believe that unfamiliar customers ... with which material amounts of business have been transacted may lack substance." AU§ 334.10 (c).

165.    KPMG failed to heed an AICPA Audit Risk Alert emphasizing that:

Some of the more common audit issues identified in recent litigation related to fraudulent financial reporting included:

- A willingness by the auditor to accept management's representations without corroboration.

- Allowing the client to unduly influence the scope of auditing procedures.

- The failure to identify risky situations, or ignoring audit risks by not applying professional skepticism and revising auditing procedures appropriately."

AICPA Audit Risk Alert -- 1999/2000 at 28.

166.    KPMG failed to heed AICPA Practice Risk Alert 95-3, which stated that "it is incumbent upon the auditor to assess the propriety of the accounting for material related-party transactions in accordance with their substance" and warned that, "[i]n the hands of the

81

unscrupulous, an undisclosed related party is a powerful tool. Using controlled entities, principal shareholders or management can execute transactions that improperly inflate earnings by masking their economic substance or distort reported results through lack of disclosure, or can even defraud the company by transferring funds to a conduit related party and ultimately to perpetrators." The Practice Risk Alert, at 2, warns auditors to look for "events that may indicate transactions with undisclosed related parties," including: "sales without substance, including funding the other party to the transaction so that the sales price is fully remitted," "sales with a commitment to repurchase that, if known, would preclude recognition of all or part of the revenue," "loans to parties that do not possess the ability to repay," and "payments for services never rendered or at inflated prices."

167.    Had KPMG performed the procedures required by AU § 334, they would have discovered, as *The Wall Street Journal* easily did, that at the single Singapore address of fifteen firms that together paid L&H $57 million in 1999, or nearly 17% of its revenue, "there isn't any evidence of operations of the fifteen L&H customers." The simple fact that fifteen of L&H's customers in a country where revenues increased 2,769% in one year had the same address should have been a major "red flag" for the auditor. KPMG failed to perform any appropriate investigation, or turned a blind eye to the results of their search.

### Improper Recognition of License Revenues

168.    KPMG failed to follow procedures sufficient to provide reasonable assurance that L&H recognized revenue properly under SOP 97-2.

169.    KPMG knew and disregarded the risk of material misstatement presented by the fact that material amounts of revenue were recognized at the end of fiscal quarters or years. Nearly every contract discussed in the Audit Committee Report is dated within three days of the end of a fiscal quarter, and ten agreements giving rise to a total of more than $27 million in revenue are dated within the last three days of December 1998 or December 1999. The occurrence of unusual, complex or significant transactions at or near the end of a financial

82

reporting period is a "red flag" specifically described in the AICPA Audit Risk Alert --
1999/2000 at 38: "Auditors should be alert for significant unusual or complex transactions,
especially those that occur at or near the end of a reporting period, along with a variety of other
circumstances that may raise concerns about improper revenue recognition."

170.   KPMG failed to follow -- or disregarded the results of -- the procedure required
by the presence of this risk: confirmation, which "is the process of obtaining and evaluating a
direct communication from a third party in response to a request for information about a
particular item affecting financial statement assertions." AU § 330.04, *The Confirmation
Process*. "If there is a risk of material misstatement due to fraud that may involve or result in
improper revenue recognition" the auditor should "confirm with customers certain relevant
contract terms and the absence of side agreements." AU § 316.30.

171.   KPMG improperly relied on representations of management regarding the
substance of agreements and failed to obtain evidence directly from the other parties to those
agreements, as required by U.S. GAAS.

(a)     "Confirmation is undertaken to obtain evidence from third parties about
        financial statement assertions made by management. Section 325,
        evidential matter, states that, in general, it is presumed that 'when
        evidential matter can be obtained from independent sources outside an
        entity, it provides greater assurance of reliability for the purposes of an
        independent audit than that secured solely within the entity.'" AU §
        330.06.

(b)     "Unusual or complex transactions may be associated with high levels of
        inherent risk and control risk. If the entity has entered into an unusual or
        complex transaction and the combined assessed level of inherent and
        control risk is high, the auditor should consider confirming the terms of
        the transaction with the other parties in addition to examining the
        documentation held by the entity." AU§ 330.08.

83

(c)    The auditor's understanding of the client's arrangements and transactions
with third parties is key to determining the information to be confirmed.
The auditor should obtain an understanding of the substance of such
arrangements and transactions to determine the appropriate information to
include on the confirmation request.... The auditor should also consider
whether there may be oral modifications to agreements, such as unusual
payment terms or liberal rights of return.  When the auditor believes there
is a moderate or high degree of risk that there may be significant oral
modifications, he or she should inquire about the existence and details of
any such modifications to written agreements.  One method of doing so is
to confirm both the terms of the agreements and whether any oral
modifications exist."  AU § 330.25.

172.    KPMG failed to heed AICPA, Audit Issues in Revenue Recognition, 1999, which
details the procedures required to obtain sufficient competent evidence of the propriety of
revenue recognition:

SAS No. 45 requires the auditor to place emphasis on testing material transactions with
parties he or she knows are related to the reporting entity.  It states that procedures should
be directed toward obtaining and evaluating sufficient competent evidential matter and
should extend beyond inquiry of management.  The following are among the procedures
that should be considered to obtain satisfaction concerning the purpose, nature, and extent
of related-party transactions and their possible effect on revenue recognition.

- Obtain an understanding of the business purpose of the transaction.

- Examine invoices, executed copies of agreements, contracts, and other pertinent
documents, such as receiving reports and shipping documents.

- Determine whether the transaction has been approved by the board of directors or
other appropriate officials.

- Confirm the transaction amount and terms, including guarantees and other
significant data, with the other party or parties to the transaction.

84

- Refer to financial publications, trade journals, credit agencies, and other information sources when there is reason to believe that unfamiliar customers, suppliers, or other business enterprises with which material amounts of business have been transacted may lack substance.

- With respect to material uncollected balances, guarantees, and other obligations, obtain information about the financial capability of the other party or parties to the transactions. Such information may be obtained from audited or unaudited financial statements, tax returns, reports issued by regulatory agencies or taxing authorities, financial publications, or credit agencies.

- The auditor should consider whether he or she has obtained sufficient competent evidential matter to understand the relationship of the parties and the effects of related-party transactions on the financial statements.

AICPA, Audit Issues in Revenue Recognition, 1999, at 35.

173.    KPMG failed to heed AICPA Practice Alert 95-1, which explicitly warned auditors to search for evidence of the precise fraudulent practices that the Audit Committee Advisors in fact discovered at L&H and prescribed procedures that KPMG should have followed to uncover those practices:

A substantial portion of litigation and SEC investigations involving financial reporting and cases coming before the AICPA Professional Ethics Executive and Quality Control Inquiry Committees concerns some form of revenue recognition issue.... [A]uditors need to pay particular attention to warning signals that may indicate additional audit risk and respond with appropriate professional skepticism and possible additional audit procedures.... [S]ome examples of improper and unusual revenue transactions [include]:

- Sales in which the customer's obligation to pay for the merchandise/service depends on:
  - receipt of financing from another (third) party;
  - resale to another (third) party (i.e., consignment sale);
  - fulfillment by the seller of material unsatisfied conditions;
  - final acceptance by the customer following an evaluation period.

- Sales in which substantial uncertainty exists about either collectibility or the seller's ability to comply with performance guarantees.

- Sales that require substantial continuing vendor involvement after delivery of merchandise (e.g., software sales requiring installation, debugging, extensive modifications, other significant support commitments, etc.)

85

- Shipments made after the end of the period (i.e., books kept open to record revenue for products shipped after the period end).

- Transactions with related parties.

- Barter transactions.

- Significant, unusual transactions near year-end....

Techniques used to recognize revenues improperly can be quite sophisticated. To reduce risk in this area, the audit needs to be planned and then executed with an appropriate degree of professional skepticism.... [A] company operating in [an industry] characterized by more than infrequent business failures ordinarily will present different audit considerations and, therefore, could require different or more extensive audit procedures.... A company with constantly increasing sales that 'always meets or exceeds' budget sales targets may deserve extra attention. When a substantial portion of the company's sales occur very near the year-end or quarter-end, extra caution in auditing revenue transactions may be appropriate. Also, individually significant revenue transactions, which could be designed to ease short-term profit concerns, may merit specific attention. Auditors need to examine such transactions and obtain an understanding of their business purpose to evaluate whether revenue recognition is appropriate.

The Practice Alert specifically warns auditors to design confirmations "to help the auditor solicit information from customers about payment terms, right of return privileges, or other significant risks retained by the seller" and "inquire about the existence of any oral modifications or undocumented 'side-agreements'."

174.    The details of numerous transactions described in the Audit Committee Report were readily available from other parties to the transactions. KPMG's failure to detect fraud in transactions involving the FLV Fund is particularly egregious since KPMG was the auditor for the FLV Fund and was aware of both sides of those transactions. KPMG either failed to seek confirmation of those contracts, or turned a blind eye to the results of their investigation.

### Summary of False and Omissive Statements

175.    The falsity and omissiveness of defendants' statements include generally as follows:

86

| Speaker | Representation | Falsity or Omissiveness |
|---|---|---|
| L&H, Lernout, Hauspie, Bastiaens, Willaert and Dammekens | L&H's revenues for 1997 totaled $99.4 million with record increases each quarter in 1997. | 1997 revenues were falsely inflated by improper treatment of the Dictation Consortium and BTG transactions. |
| L&H, Lernout, Hauspie, Bastiaens, Willaert and Dammekens | L&H's revenues for 1998 totaled $211 million with record increases each quarter in 1998. | 1998 revenues were falsely inflated by improper treatment of funding from related parties and improper recognition of revenue from barter transactions, transactions where collectibility was not probable, where the customer had a right of return, where payment depended on funding from L&H, where revenue was contingent on L&H later performing development work, and where side letters provided for refunds, *inter alia*. |
| L&H, Lernout, Hauspie, Bastiaens, Willaert and Dammekens | L&H's revenues for 1999 totaled $344 million with record increases each quarter in 1999. | 1999 revenues were falsely inflated by $62.9 million of fictitious revenue in Korea, improper treatment of funding from related parties, and improper recognition of revenue from barter transactions, transactions where collectibility was not probable, where the customer had a right of return, where payment depended on funding from L&H, where revenue was contingent on L&H later performing development work, and where side letters provided for refunds, *inter alia*.. |
| L&H, Lernout, Hauspie, Bastiaens, Willaert and Dammekens | Increases in L&H's 1997, 1998 and 1999 revenues were primarily the consequence of "organic growth" | Increases in 1997, 1998 and 1999 revenues were primarily the consequence of fraudulent accounting practices. |
| L&H, Lernout, Hauspie, Bastiaens, Willaert | L&H's revenues from Dictation Consortium were recorded in accordance with | L&H revenues from Dictation Consortium were not recorded in accordance with GAAP |

| | | |
|---|---|---|
| Dammekens, and KPMG | U.S. GAAP. | because in reality the transaction was development funded by a related party.. |
| L&H, Lernout, Hauspie, Bastiaens, Willaert Dammekens, and KPMG | L&H's revenues from Brussels Translation Group were recorded in accordance with U.S. GAAP. | L&H revenues from BTG were not recorded in accordance with GAAP because they should have been recorded in accordance with long-term construction contract accounting. |
| L&H, Lernout, Hauspie, Bastiaens, Willaert and Dammekens | In 1998, L&H entered into "strategic partnerships" with unaffiliated parties who provided 10% of 1998 revenue | L&H's "strategic partners" were undisclosed related parties who were funding research and development with funds that should have been recognized as liabilities.. |
| L&H, Lernout, Hauspie, Bastiaens, Willaert and Dammekens | In 1999 L&H entered into "strategic partnerships" with unaffiliated parties who provided 25% of 1999 revenue. . | L&H's "strategic partners" were undisclosed related parties who were funding research and development with funds that should have been recognized as liabilities.. |
| . L&H, Lernout, Hauspie, Bastiaens, Willaert Dammekens, and KPMG | L&H's revenues from "strategic partnerships" were recorded in accordance with U.S. GAAP | L&H revenues from "strategic partnerships" were not presented in accordance with U.S. GAAP because the entities were related parties who were funding research and development.. |
| L&H, Lernout, Hauspie, Bastiaens, Willaert and Dammekens | Revenue from transactions with companies owned or partly owned by the FLV Fund constituted 3.7% of 1998 revenues. . | Revenues from transactions with companies owned or partly owned by the FLV Fund constituted at least 10% of 1998 revenues. |
| L&H, Lernout, Hauspie, Bastiaens, Willaert and Dammekens | Revenues from transactions with companies owned or partly owned by the FLV Fund or LHIC constituted 0.3% of 1999 revenues.. | Revenues from transactions with companies owned or partly owned by the FLV Fund and LHIC constituted at least 25% of 1999 revenues.. |
| KPMG | KPMG Belgium was "comfortable" with L&H revenue recognition. . | KPMG Belgium knew or was reckless in not knowing that L&H revenues for 1997, 1998 and 1999 were overstated as a consequence of fraudulent accounting practices. |
| L&H, Lernout, | L&H's revenue recognition | L&H did not follow its stated |

| Dammekens, and KPMG | U.S. GAAP. | because in reality the transaction was development funded by a related party.. |
|---|---|---|
| L&H, Lernout, Hauspie, Bastiaens, Willaert Dammekens, and KPMG | L&H's revenues from Brussels Translation Group were recorded in accordance with U.S. GAAP. | L&H revenues from BTG were not recorded in accordance with GAAP because they should have been recorded in accordance with long-term construction contract accounting. |
| L&H, Lernout, Hauspie, Bastiaens, Willaert and Dammekens | In 1998, L&H entered into "strategic partnerships" with unaffiliated parties who provided 10% of 1998 revenue | L&H's "strategic partners" were undisclosed related parties who were funding research and development with funds that should have been recognized as liabilities.. |
| L&H, Lernout, Hauspie, Bastiaens, Willaert and Dammekens | In 1999 L&H entered into "strategic partnerships" with unaffiliated parties who provided 25% of 1999 revenue. . | L&H's "strategic partners" were undisclosed related parties who were funding research and development with funds that should have been recognized as liabilities.. |
| . L&H, Lernout, Hauspie, Bastiaens, Willaert Dammekens, and KPMG | L&H's revenues from "strategic partnerships" were recorded in accordance with U.S. GAAP | L&H revenues from "strategic partnerships" were not presented in accordance with U.S. GAAP because the entities were related parties who were funding research and development.. |
| L&H, Lernout, Hauspie, Bastiaens, Willaert and Dammekens | Revenue from transactions with companies owned or partly owned by the FLV Fund constituted 3.7% of 1998 revenues. . | Revenues from transactions with companies owned or partly owned by the FLV Fund constituted at least 10% of 1998 revenues. |
| L&H, Lernout, Hauspie, Bastiaens, Willaert and Dammekens | Revenues from transactions with companies owned or partly owned by the FLV Fund or LHIC constituted 0.3% of 1999 revenues.. | Revenues from transactions with companies owned or partly owned by the FLV Fund and LHIC constituted at least 25% of 1999 revenues.. |
| KPMG | KPMG Belgium was "comfortable" with L&H revenue recognition. . | KPMG Belgium knew or was reckless in not knowing that L&H revenues for 1997, 1998 and 1999 were overstated as a consequence of fraudulent accounting practices. |
| L&H, Lernout, | L&H's revenue recognition | L&H did not follow its stated |

| | | |
|---|---|---|
| Hauspie, Bastiaens, Willaert Dammekens, and KPMG | practices conform to U.S. GAAP. | revenue recognition policy. L&H's actual revenue recognition practices did not conform to U.S. GAAP. |
| L&H, Lernout, Hauspie, Bastiaens, Willaert and Dammekens | In 1999, L&H signed contracts with numerous Korean customers who provided $62.9 million in revenue in 1999. . | Many Korean customers claimed they did little or no business with L&H and L&H has admitted that "L&H Korea never really had any sales to speak of." |
| KPMG | L&H's financial statements for 1997 and 1998 fairly presented its financial condition and its results of operations and its cash flows in accordance with U.S. GAAP. . | L&H's financial statements for 1997 and 1998 overstated revenues, improperly capitalized research and development, failed to disclose or affirmatively misrepresented transactions with related parties, and affirmatively misrepresented the policy it actually followed to record its revenues, *inter alia.*. |
| KPMG | KPMG conducted its audits of L&H's 1997 and 1998 financial statements in accordance with U.S. GAAS. . | Despite the presence of red flags and pervasive indicia of fraud, KPMG failed to perform procedures required by U.S. GAAS that would have revealed L&H's improper accounting practices, or turned a blind eye to the results of those procedures. |
| Bastiaens | L&H's projections were on target for the first and second quarters of 2000. . | L&H projections for the first and second quarters of 2000 were not on target because revenues in those quarters included fictitious income from Korean customers, revenue from the sale or lease of software that was not recognizable under U.S. GAAP, and revenue from undisclosed related parties, *inter alia.*, 106-113. |
| Dammekens | Dammekens was comfortable with all L&H disclosures about | Dammekens knew that L&H disclosures about revenue |

89

| | revenue because he reviewed all contracts before revenue figures were publicly released. . | were false because he was a party to the fraudulent accounting treatment applied to L&H contracts. |
|---|---|---|
| Lernout, Hauspie | Lernout and Hauspie had no financial interest in the start-up licensees. . | Lernout and Hauspie formed and funded S.A.I.L. Trust, which indirectly controlled the FLV Fund, an undisclosed investor in at least eight of the licensees, and the provider of funds to four others. |
| Lernout, Hauspie | All license agreements with start-up companies were negotiated at arms-length. | The start-up companies were shells funded by L&H and its affiliates and agreements with them were not negotiated at arms-length but rather dictated by Lernout and Hauspie.. |
| KPMG | One month prior to KPMG's signing its clean opinion on L&H's financial statements there were no open audit issues other than awaited confirmation of "a couple" of contracts" and minor testing of capitalization of R&D. . | L&H had factored its receivables in Korea with recourse to L&H bank accounts or otherwise acted improperly such that $100 million was missing from those accounts. The L&H financial statements, including the notes thereto, were materially misleading. |
| KPMG | In 1999 there were no revenue issues in Korea that would cause an adjustment. | L&H did not account for its revenues in Korea in accordance with U.S. GAAP or its own stated policy. |
| KPMG | KPMG had conducted a process of confirming L&H contracts and was "comfortable" with revenue recognition. | KPMG either failed to confirm L&H contracts or knew that L&H did not recognize revenue in accordance with U.S. GAAP or its own stated policy.. |
| KPMG | L&H did not record revenue from software sales until after that software left the distributor. | L&H recorded revenue from software sales before contracts were finalized, from barter transactions, transactions where collectibility was not probable, where the customer had a right of return, where payment depended on funding |

| | | from L&H, where revenue was contingent on L&H later performing development work, and where side letters provided for refunds, *inter alia.*. |
|---|---|---|
| KPMG | All issues raised by the SEC regarding L&H accounting practices had been resolved.  . | KPMG knew that the SEC had just commenced an inquiry into L&H's methods of accounting for revenue from related parties.  . |
| KPMG, L&H, Lernout, Hauspie, Bastiaens, Willaert and Dammekens | L&H's financial statements for 1999 fairly presented its financial condition, and its results of operations and cashflows, in accordance with U.S. GAAP. | L&H's financial statements for 1999 did not fairly present its financial condition, results of operations, and cash flow in accordance with U.S. GAAP because, *inter alia*, they included fictitious revenue from Korea, overstated revenues, improperly capitalized research and development expenses, and failed to disclose and affirmatively misrepresented its accounting policies and transactions with related parties.. |
| KPMG | KPMG conducted its audits of L&H's 1999 financial statements in accordance with U.S. GAAS.  . | Despite the presence of red flags and pervasive indicia of fraud, KPMG failed to perform procedures required by U.S. GAAS that would have revealed L&H's fraudulent accounting practices, or turned a blind eye to the results of those procedures.  , |

**FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS HAUSPIE, LERNOUT, BASTIAENS, WILLAERT AND DAMMEKENS FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5**

91

176.   ·Plaintiffs repeat and reallege paragraphs 1 through 175 as though fully set forth herein.

177.   L&H and defendants Lernout, Hauspie, Bastiaens, Dammekens and Willaert, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to artificially inflate the stock price of L&H and to conceal its true financial condition.  L&H and defendants Lernout, Hauspie, Bastiaens, Dammekens and Willaert employed devices, schemes, and artifices to defraud while in possession of material, adverse, non-public information and they engaged in acts, practices, and a course of conduct that included the making or, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made not misleading.

178.   L&H and defendants Lernout, Hauspie, Bastiaens, Dammekens, and Willaert participated, directly or indirectly, in the preparation, issuance, and dissemination of L&H's 1997, 1998 and 1999 financial results in L&H's annual reports and other filings with the SEC detailed herein and L&H press releases as set forth herein.  Defendants Lernout, Hauspie, Bastiaens and Dammekens also specifically affirmed the truth of those financial statements in oral representations to Seagate in order to induce Seagate to purchase L&H stock.

179.   Defendants Lernout, Hauspie, Bastiaens, Dammekens, and Willaert knew that the financial statements of L&H were materially false and omissive by, among other things, overstating revenues by a material amount, by virtue of their participation in or knowledge of, among other schemes and devices: (1) the creation of sham "licensees," including Dictation Consortium, Brussels Translation Group, and thirty start-up companies incorporated in Belgium and Singapore, designed to facilitate the mischaracterization of loans or investments as revenue and enable L&H to fund its research and development "off the books;" (2) undisclosed factoring of receivables with recourse to bank accounts of L&H's Korean unit; (3) transactions giving rise to improper recognition of revenue for barter or exchange transactions in which no cash changed hands;  (4)  transactions giving rise improper recognition of sales revenues that were contingent

92

on L&H later performing development work; (5) transactions giving rise to improper recognition of revenue prior to sales contracts being finalized; (6) transactions giving rise to improper recognition of revenue when collectibility was not reasonably assured; (7) transactions giving rise to improper recognition of revenue when the customer's ability to pay depended on an investment from L&H; (8) transactions giving rise to improper recognition of revenue when the "purchaser" of licenses were not the end-users and side letters confirmed that the license fee would be reimbursed if the license were not resold; (9) transactions giving rise to improper recognition of revenue when the customer had the right to return the product; (10) accounting practices intended to mischaracterize the foregoing transactions in order to falsely inflate L&H's revenues;  and (11) the concealment of all of the foregoing.

<div align="center">

**Scienter**

</div>

180.    The knowledge of the fraud or recklessness in disseminating the fraudulent statements of defendants Lernout, Hauspie, Bastiaens, Dammekens and Willaert is evidenced by, among other things:

(a)    L&H's admission that its financial statements for 1998, 1999 and 2000 must be restated as a consequence of "errors and irregularities," "irregularities" being an accounting term of art for intentional misstatements or omissions in financial statements.

(b)    Lernout's and Hauspie's involvement, detailed above, in the FLV Fund, the FLV Fund Manager, and LHIC, all entities through which L&H secretly funded its licensees.

(c)    The Audit Committee Report's specific identification of defendants Lernout, Hauspie, Bastiaens, Willaert and Dammekens as participants in transactions and correspondence giving rise to the fraudulent reporting of revenue, including, for example:

(i)    Two side letters, one signed by Willaert and the other by Hauspie and a proxy for Willaert, obligating L&H to repay a portion, or all, of an $8

<div align="center">93</div>

· · ·    million license fee recorded as revenue in the fourth quarter of 1999

pursuant to a December 29, 1999 agreement with a Belgian customer.

(ii)    A January 5, 2000 e-mail to Willaert and Dammekens indicating that an

agreement with a customer of L&H's Belgian office, pursuant to which $4

million was recognized in the fourth quarter of 1999, had not been signed

in that quarter but had been backdated to December 30, 1999.

(iii)    Willaert's and Dammekens' statements to investors in the LDCs for

Turkish and Farsi who wanted $1.3 million of free warrants from L&H

that the investors "had to pay for the warrants because of the P&L impact,

but that L&H would make it up to them later," and Willaert's and

Dammekens' admission that a later contract obligating L&H to pay those    ·

investors $1.8 million "for 'introductions to influential politicians and

business people" was "entered into to reimburse [the investors] for the

warrants."

(iv)    A January 4, 2000, e-mail to Hauspie and Lernout indicating that an

agreement with a customer of L&H's Belgian office, pursuant to which $5

million of revenue was recognized in the fourth quarter of 1999, had not

been signed in that quarter.

(v)    Lernout and Hauspie funded an entity which provided the sole funding for

a customer in the Belgian office who signed a license agreement in the

second quarter of 1998, pursuant to which $500,000 of revenue was

recognized in that quarter, which customer stated that "he had no use for

[the] software when purchased."

(vi)    A July 7, 1999 e-mail to Bastiaens, with a copy to Hauspie, from Lernout

indicated that a license agreement with a customer of the Belgian office,

pursuant to which $3 million of revenue was recognized in the second

94

quarter of 1999, had not been signed in that quarter and had been backdated to June 30, 1999.

(vii)    A January 5, 2000, e-mail to Willaert and Dammekens indicating that a license agreement with a customer in the Belgian office, pursuant to which $4 million of revenue was recognized in the fourth quarter of 1999, had not been signed in that quarter and was backdated to December 31, 1999.

(viii)    An April 4, 2000 e-mail to Willaert, Hauspie, Bastiaens and Dammekens indicating that a contract with a customer in the Belgian office, pursuant to which $8 million of revenue was recognized in the first quarter of 2000, was not finalized in that quarter and had been backdated to March 31, 2000.

(d)    The Audit Committee Advisors recommended that "disciplinary action should be taken against certain employees involved in the activities that are the subject of this report" and specifically identified Willaert, Bastiaens, Hauspie and Lernout and Dammekens as persons who had resigned their positions and as to whom "the Board of Directors [should] consider whether disciplinary action is appropriate."

(e)    John Duerden, the former CEO of Dictaphone, who replaced Bastiaens as CEO of L&H when the fraud began to become public, told the Wall Street Journal that the Korean unit, from which $100 million was missing, was controlled by Lernout, Bastiaens and Willaert. In a December 7, 2000, article, the Wall street Journal reported that: "Mr. Duerden says he repeatedly asked how and when the cash [$106 million] could be sent to headquarters, but got evasive answers from Mr. Seo, the Korean unit's chief. Despite being CEO, Mr. Duerden says, 'I never felt like I had control over the Korean operation,' which he adds was 'managed close to the chest' by Mr. Hauspie, Mr. Bastiaens and then-Vice Chairman Nico Willaert."

95

(f)    The defendants were motivated by a need to maintain a high price for L&H stock so that they would be in a position to consummate the Dragon and Dictaphone acquisitions, which L&H could not otherwise afford.

(g)    The fact that defendants Lernout, Hauspie, and Bastiaens are currently imprisoned in Belgium pending resolution of criminal fraud charges against them in connection with the matters detailed herein.

181.    Seagate relied on the materially false and misleading misrepresentations and omissions in purchasing L&H stock. Had L&H and defendants Lernout, Hauspie, Bastiaens, Willaert and Dammekens accurately presented L&H's true financial condition and financial results, Seagate would not have entered into the Merger Agreement. As a result of L&H's and defendants' fraudulent conduct, Seagate has sustained damages in an amount to be proven at trial - but no less than $166,957,963.

### SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS HAUSPIE, LERNOUT, BASTIAENS, WILLAERT AND DAMMEKENS FOR VIOLATION OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT

182.    Plaintiffs hereby repeat and reallege paragraphs 1 through 181 as though fully set forth herein.

183.    Each of defendants Lernout, Hauspie, Willaert and Dammekens was a controlling person of L&H within the meaning of Section 20(a) of the Exchange Act at all times during the period he served as an officer and/or director of L&H. Those defendants, by virtue of their positions as officers and directors of L&H, had the power to influence and control, and did so influence and control, the acts and conduct of L&H. In particular, those defendants had the power and influence, at all times relevant to this claim, to direct L&H to disclose its transactions with related parties, to direct L&H to record revenues and otherwise state its financial results and condition in accordance with U.S. GAAP, and to direct L&H in the preparation and issuance of its annual reports and other filings with the SEC, its press releases and other statements and

96

representations. By virtue of their positions, those defendants had unique and extensive access to and control over L&H's financial records.

184.    As a direct and proximate result of the wrongful conduct of defendants Lernout, Hauspie, Bastiaens, Willaert and Dammekens, plaintiffs suffered substantial damage in connection with their exchange of their interest in Dragon for L&H stock.

185.    By reason of the foregoing, defendants Lernout, Hauspie, Bastiaens, Willaert and Dammekens are jointly and severally liable to plaintiffs for the aforesaid damages, in an amount to be proven at trial but no less than $166,957,963.

### THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS KPMG BELGIUM, KPMG US, KPMG KOREA, KPMG UK, AND KPMG SINGAPORE AND BEHETS FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5

186.    Plaintiffs hereby repeat and reallege paragraphs 1 through 185 as though fully set forth herein.

187.    In each of its reports on L&H's 1997 and 1998 financial statements, KPMG represented that it conducted its "audits in accordance with generally accepted auditing standards" and that the consolidated financial statements of the Company and its subsidiaries for the fiscal year audited "present[ed] fairly, in all material respects, the consolidated financial position" of L&H and its subsidiaries "and the results of their operations and their cash flow" in accordance with U.S. GAAP.  KPMG also made specific oral representations to Seagate affirming the propriety of L&H's financial reporting in general, and of the unaudited financial results for 1999 publicly disseminated in January 2000, as detailed above.  KPMG's representations were false, and the certified financial statements, as described above, were materially false and misleading.

188.    KPMG knew its reports would be attached to financial statements filed with the SEC that would be used to attract investors and form the basis on which shareholders would purchase shares of L&H.  KPMG explicitly consented to the inclusion of its reports in, among other filings, L&H's 1997 Annual Report on Form 20-F filed with the SEC on July 2, 1998; 1998

97

Annual Report on Form 20-F filed with the SEC on June 30, 1999; 1999 Annual Report on Form 10-K filed with the SEC on June 30, 2000; and Registration Statement filed on Form S-3 on January 7, 2000. KPMG knew that Seagate had reviewed its certification reports as part of its due diligence prefatory to the Merger Agreement and knew that Seagate would rely on those reports — and on KPMG's direct oral responses to Seagate's inquiries about the propriety of L&H's financial reporting — in making a decision to exchange Seagate's interest in Dragon for L&H shares and in setting the rate of exchange for that transaction.

189.    KPMG's oral and written representations were material to Seagate's decision to exchange its interest in Dragon for L&H shares and determination of the rate of exchange for that transaction. In making its investment decision, Seagate relied upon KPMG Belgium's and Behets' oral and written representations as to the accuracy and reliability of the information contained in L&H's financial statements and the procedures used to audit the financial statements.

190.    KPMG knew, or were reckless in not knowing, that L&H's financial statements were not prepared in accordance with U.S. GAAP, as falsely represented to Seagate, because, among other material misstatements in L&H's financial reports, L&H's financial statements concealed the facts that: (1) $277 million, or one-third of L&H's revenue in 1998, 1999 and 2000 was improperly recognized; (2) thirty start-up companies who provided 10% of L&H's 1998 revenue and 28% of its 1999 revenue were funded by parties related to L&H; (3) at least 18 of 30 Korean customers named by Bastiaens as providing more than 20% of 1999 revenues claimed to do little or no business with L&H; (4) more than $100 million in the bank accounts of L&H's Korean unit was inaccessible, likely as a consequence of a factoring arrangement that was not publicly disclosed. A fraud of this magnitude and pervasiveness could not have gone undetected without knowledge or the highest degree of recklessness on the part of KPMG because of the overwhelming size and nature of the items in value and their centrality to the results of operations and financial condition of L&H.

98

**Scienter**

191.    Evidence of KPMG's knowledge or recklessness is demonstrated by at least the following facts:

(a)    KPMG'S failure to follow U.S. GAAS, which was so egregious that KPMG's audits of L&H amounted to no audit at all, as detailed above.

(b)    Internal KPMG documents and emails described above, demonstrating KPMG's specific knowledge of numerous red flags indicating each of the areas of fraud that ultimately led to L&H's demise.

(c)    The Audit Committee Advisor's statements that "KPMG was aware" of problematic contracts with Korean customers pursuant to which L&H improperly recognized $48 million in revenue in the last two quarters of 1999.

(d)    KPMG's knowledge of and participation in the response to an SEC inquiry, commenced on or about January 2000, into L&H's accounting practices and transactions with related parties, and KPMG's. receipt of its own letter from the SEC in April, 2000, regarding that investigation.

(e)    KPMG's position as auditor of the FLV Fund, which gave KPMG access to both sides of many of the fraudulent transactions giving rise to material misstatement of L&H's financial reports.

(f)    KPMG's knowledge that L&H was willing to engage in aggressive and improper accounting practices, which arose from KPMG involvement in the restatements of L&H's financial statements for 1997 and the first nine months of 1998 ordered by the SEC.

(g)    The ease with which *Wall Street Journal* reporters were able to discover, within weeks, that L&H's Korean sales were minimal or non-existent.

(h)    KPMG 's access to Chantal Mestdagh, a former KPMG auditor who was CFO of LHIC, and thus was aware of the other side of L&H's fraudulent transactions involving companies owned by LHIC.

99

(i) KPMG 's access to Behets once he was at S.A.I.L. Trust, and could provide information as to the other side of fraudulent transactions involving the FLV Fund.

(j) KPMG's active participation in the preparation and dissemination of L&H financial information, detailed above.

(k) KPMG's knowledge that L&H lacked sufficient internal control, as is demonstrated by advice to the Board and Audit Committee of L&H that the Company needed to implement an internal audit function reflected in minutes of the L&H Board meetings held on April 12, 1999, and August 30, 1999, and in, e.g., emails between McLamb and Dammekens on February 5, 2000 and May 3, 2000 discussing the need to document L&H accounting policies and procedures and replace Dammekens with a sufficiently experienced CFO.

(l) KPMG's receipt of enormous non-audit fees for tax advice, acquisitions-related advice, and consulting gave it a strong incentive to turn a blind eye to L&H's accounting practices. According to an April 25, 2001 letter from Jo Lernout to the L&H Board of Directors, KPMG received fees of approximately $9 million for work performed by "Belgium ...and other KPMG subsidiaries in various locations around the world," of which only $40, 000 per year was attributable to audit work.

In misrepresenting the conduct of audits for the years 1997, 1998 and 1999, and falsely representing that L&H's consolidated financial statements fairly presented its financial position and results of operations and cash flows for those years, KPMG, by the use and instrumentalities of interstate commerce and the United States mails, participated in a course of conduct that constituted a fraud and deceit, misrepresented material facts and omitted to disclose material facts and concealed L&H's true financial condition and results of operation.

192.   By reason of the foregoing, KPMG has violated section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

193.   Seagate relied on KPMG's misrepresentations and material omissions in its purchase of L&H stock, and has suffered substantial damages as a result thereof, in an amount to be proven at trial but no less than $166,957,963.

## FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS FLV FUND, S.A.I.L. TRUST, LHIC, AND MERCATOR FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10b-5

194.   Plaintiffs hereby repeat and reallege paragraphs 1-193 as though fully set forth herein.

195.   Defendants FLV Fund, S.A.I.L. Trust, LHIC and Mercator (the "Related-Party Defendants"), individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct artificially inflate the price of L&H common stock and to conceal its true financial condition. As discussed herein, the Related-Party Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse, non-public information and they engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material fact and omissions of material facts necessary in order to make the statements made not misleading.

196.   The Related-Party Defendants' fraudulent conduct was committed, directly or indirectly, "in connection with" Seagate's purchase of L&H shares, within the meaning of § 10(b) and SEC Rule 10b-5.

197.   The Related-Party Defendants participated, directly or indirectly, in L&H's scheme to fraudulently inflate L&H's revenues, assets and the price of L&H common stock, and in the fraudulent misrepresentations and omissions of L&H in its annual reports, press releases and other filings with the SEC by secretly funding or participating in the funding of L&H's sham "strategic partners" and concealing L&H's involvement with, and reliance on, the Related-Party

101

Defendants in furtherance of this scheme to artificially inflate L&H's revenues and defraud its investors.

<div align="center">Scienter</div>

198.    The Related-Party Defendants' knowledge of the fraud and intent to perpetrate it is evidenced by, among other things:

- Lernout and Hauspie's involvement in and control over the affairs of FLV Fund, S.A.I.L. Trust, and LHIC, from which those entities' knowing participation in the fraudulent effect of their investments in LDC's and CLDC's, the concealment of which investments had not legitimate business purpose, can be inferred.

- A letter written on or about November, 2000, from Sam Cho, vice-president of L&H Korea, to Philip Vermeulen, CEO of FLV Management, in which Cho threatens Vermeulen with exposure of a variety of illegal activities involving the FLV Fund's investments in L&H entities, and reciprocal efforts to use L&H entities to funnel funds into the FLV Fund as part of a fraudulent scheme to ensure the success of a FLV fund Secondary Public offering.  Among other things, Cho wrote: "[I]t is clear that you have known from the beginning what has happened in Korea.  We all know you were involved from the beginning and during the entire transaction process, including the bank guarantee of the US$30 million. ...  John Seo will help release the [$30 million] collateral on the FLV Fund as soon as possible.  However, he needs to know you will cooperate with him and to give him time to resolve this.  If you don't allow him the time, he will be forced to release the unfair and illegal involvement you were also engaged in. ... I won't go into much details but as you may  know about the HiWorldwide case of US$11 million.  You personally held the shares of the CALC Companies and you used Hi Worldwide to purchase the replacement of FLV and your shares in the CALC Companies."

<div align="center">102</div>

- Defendant Mercator's ownership and control, through various intermediate subsidiaries, of 16 of the 30 start-up customers that paid a total of $53 million in licensing fees to L&H during 1998 and 1999 and Mercator's indirect payment of at least $12 million in licensing fees to L&H, the concealment of all of which had no legitimate business purpose.

- The fact that Mercator's chairman, Louis Verbeke, is a name partner at L&H's chief Belgian law firm, Loeff Claeys Verbeke. Verbeke provided legal services to L&H in connection with L&H's fraudulent transactions involving the Related-Party Defendants and attended virtually all meetings of L&H's Board of Directors, including those where related party transactions or issues concerning conflicts between L&H and FLV Fund were discussed.

- The fact that Mercator effectively employees Tony Snauwaert, reported who was a manager of LDF, which is 96% owned by Mercator. A January 24, 2001 article in the Belgian business publication *De Finacnieel-Exonomische Tijd* described Snauwaert as "Pol Hauspie's right hand." Snauwaert signed contracts on behalf of 9 sham licensees.

- The fact that the President and Managing Director of LHIC at all relevant times was Francis Vanderhoydonck, who also served as a director of L&H from May 1999 until his resignation on or about May 15, 2001, and in that connection obtained knowledge, attributable to LHIC, that L&H's failure to disclose LHIC's investments in L&H entities was illegal and was being investigated by the SEC.

- Mercator's chairman, Verbeke, is a target in the Belgian authorities' investigation of criminal fraud in connection with L&H, and The Lawyer, on July 23, 2001, that Verbeke and his former law firm "have been placed under suspicion by the [Belgian] judge leading the inquiry into stock fraud" at L&H.

103

199.    As a direct and proximate result of the wrongful conduct of Related Party defendants, plaintiffs suffered substantial damage in connection with their exchange of their interest in Dragon for L&H stock.

200.    By reason of the foregoing, defendants are jointly and severally liable to plaintiffs for the aforesaid damages, in an amount to be proven at trial, but no less than $166,957,963.

## FIFTH CLAIM FOR RELIEF AGAINST DEFENDANTS LERNOUT, HAUSPIE, WILLAERT, DAMMEKENS AND KPMG FOR COMMON LAW FRAUD

201.    Plaintiffs hereby repeat and reallege paragraphs 1 through 200 as though fully set forth herein.

202.    In an effort to induce Seagate to enter into the Merger Agreement, all defendants knowingly and willfully made misrepresentations of material facts to Seagate and knowingly and willfully failed to disclose or fraudulently concealed the true facts from Seagate.

203.    In reliance on those misrepresentations, and as a result of defendants' failure to disclose and fraudulently conceal the true facts, Seagate entered into the Merger Agreement, to its detriment.

204.    As a result of defendants' fraudulent conduct, Seagate has sustained damages in an amount to be proven at trial but no less than $166,957,963.

## SIXTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS FOR AIDING AND ABETTING COMMON LAW FRAUD

205.    Plaintiffs hereby repeat and reallege paragraphs 1 through 204 as though fully set forth herein.

206.    As set forth above, L&H intentionally defrauded Seagate by misrepresenting its revenues, income and assets, by material amounts, in its financial statements, press releases and public statements, including, among other things, its filings with the SEC. Those misrepresentations were intended to and did have the effect of fraudulently inflating L&H's

104

financial statements and common stock price, including the price of the L&H common stock that L&H exchanged for Seagate's interest in Dragon.

207.    Each of the Defendants knew of the misrepresentations and fraud committed by L&H and knowingly, recklessly or intentionally rendered substantial assistance to L&H in its perpetration of the fraudulent scheme alleged herein.

208.    Seagate has been harmed by the defendants' aiding and abetting the fraud perpetrated by L&H, and have sustained damages in an amount to be proven at trial but no less than $166,957,963.

### SEVENTH CLAIM FOR RELIEF AGAINST DEFENDANTS KPMG U.S., KPMG BELGIUM, KPMG U.K., KPMG KOREA, AND KPMG SINGAPORE FOR NEGLIGENT MISREPRESENTATION

209.    Plaintiffs hereby repeat and reallege paragraphs 1 through 208 as though fully set forth herein.

210.    In the course of its engagement as L&H's independent auditors, in which it had a pecuniary interest, defendant KPMG supplied false oral and written information for the guidance of Seagate in its decision to enter into the Merger Agreement and its determination of the price to be paid for L&H stock.

211.    In supplying the false oral and written information, KPMG knew that Seagate intended to rely on that information in deciding whether to enter into the Merger Agreement and in determining the price to be paid for L&H stock.  KPMG intended to influence Seagate's decision in that transaction and determination of the price to be paid for L&H stock in that transaction.

212.    Seagate relied upon the oral and written false information supplied by KPMG in deciding to enter into the Merger Agreement and in determining the price to be paid for L&H stock in that transaction, to its detriment.

213.    As a result of KPMG's negligent misrepresentations, Seagate has been damaged in an amount to be determined at trial but no less than $166,957,963.

105

**WHEREFORE**, plaintiffs demand judgment as follows:

(a)    Awarding plaintiffs damages in an amount to be determined at trial against all defendants, jointly and severally, for Seagate's purchases of L&H shares, as well as reimbursement for any liabilities and expenses incurred as a result of the impact of the fraud on Seagate's sales of L&H shares or otherwise;

(b)    Awarding plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(c)    Awarding such other, further or different relief as the Court may deem just and proper.


Dated:  December 14, 2001

                    PRICKETT, JONES & ELLIOTT


                    By: _____
                    Elizabeth M. McGeever  (Del. Bar No. 2057)
                          1310 King Street
                          P.O. Box 1328
                          Wilmington, Delaware 19899-1328
                          Tel. (302) 888-6500


                    GREGORY P. JOSEPH LAW OFFICES LLC
                    Gregory P. Joseph
                    Pamela Jarvis
                    Sandra M. Lipsman
                    Honey L. Kober
                    Douglas J. Pepe
                          805 Third Avenue
                          New York, New York 10022
                          Tel. (212) 407-1200

                    Attorneys for Plaintiffs


                          106

## CERTIFICATE OF SERVICE

I, Elizabeth M. McGeever, hereby certify that on this 14th day of December, 2001, I caused two copies of the foregoing AMENDED COMPLAINT to be hand delivered to counsel for the parties at the following address:

Susan E. Kaufman, Esquire
Heiman, Aber, Goldlust & Baker
702 King Street, Suite 600
Wilmington, DE 19801

Robert K. Payson, Esquire
Kevin R. Shannon, Esquire
Potter Anderson & Corroon
1313 N. Market Street
Wilmington, DE 19801

Brian A. Sullivan, Esquire
Werb & Sullivan
300 Delaware Avenue
Wilmington, DE 19801

Neal J. Levitsky, Esquire
Agostini Levitsky Isaacs & Kuleska
824 N. Market Street, Suite 810
Wilmington, DE 19801

_____
Elizabeth M. McGeever