**EXHIBIT C-5**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
                              :

JANET BAKER, and JAMES BAKER,
JKBAKER LLC and JMBAKER LLC,       :

           Plaintiffs,             :          **JURY TRIAL DEMANDED**

                              :

v.                             :          CIVIL ACTION NO. 01-380

                              :

KPMG LLP, KLYNVELD PEAT MARWICK
GOERDELER BEDRIJFSREVISOVEN,    :
KPMG UK, PAUL BEHETS, SG COWEN
SECURITIES CORPORATION, JO LERNOUT,  :
POL HAUSPIE, CARL DAMMEKENS,
NICO WILLAERT, ROEL PIEPER,      :
GASTON BASTIAENS, FLANDERS
LANGUAGE VALLEY FUND, FLANDERS   :
LANGUAGE VALLEY FOUNDATION,
L&H INVESTMENT CO. N.V.,       :
MERCATOR & NOORDSTAR N.V.,
LOUIS VERBEKE, AND         :
CORPORATIONS A-Z, AND JOHN DOES 1 –50. :

                              :

           Defendants.           :
---------------------------------------------------------------x

## AMENDED COMPLAINT

    Plaintiffs herein, Janet Baker and James Baker, and the JKBaker LLC and JMBaker LLC

by and through their respective owners Janet Baker and James Baker, (collectively the

"Bakers"), who were owners of the majority of the shares of Dragon Systems, Inc. ("Dragon")

and are current shareholders and creditors of Lernout & Hauspie Speech Products, N.V., a

Belgian Corporation ("N.V.") and referred to sometimes along with its U.S. subsidiary L&H

Holdings USA, Inc. ("Holdings") simply as ("L&H"), by their undersigned attorneys, allege as follows:

## NATURE OF THIS ACTION

1.      This is an action to recover damages sustained by the Bakers as a result of their exchange of their 51% interest in Dragon, worth hundreds of millions of dollars, for artificially inflated and ultimately worthless L&H stock.   Dragon was a leading worldwide supplier of speech and language technology, including speech recognition software. On June 7, 2000, the Bakers purchased L&H stock in an all-stock transaction whereby Dragon was merged into a U.S. subsidiary of L&H, known as L&H Holdings USA, Inc. ("Holdings").  This transaction occurred pursuant to an Agreement and Plan of Merger Among the Bakers, Lernout & Hauspie Speech Products N.V., L&H Holdings USA, Inc., Dragon Systems, Inc., the Bakers and certain other principal shareholders of Dragon, dated March 27, 2000 (the "Merger Agreement").

2.      The Merger Agreement was entered into, and the transaction closed, before exposure of fraudulent transactions and accounting practices that falsely inflated L&H's revenues by 60% or more and induced the Bakers, and other Dragon shareholders, to enter into the Merger Agreement and go forward with the merger.  These fraudulent transactions and practices were used to materially and artificially inflate the value of L&H stock

3.      At the heart of this fraud was the repeated inflation of (false) revenue and earnings for the Company, which was accomplished, among other ways, through the improper recognition of revenues from software licensing and service contracts in violation of Generally Accepted Accounting Principles ("GAAP") and other standards of auditing and accounting.  The recognition of this improper revenue was facilitated, among other ways, through the use of numerous entities with close ties to L&H and/or its principals, as well as through the widespread

2

factoring of receivables on a recourse basis which deliberately, intentionally and/or recklessly were recorded for revenue recognition purposes on a non-recourse basis. L&H and the L&H Defendants identified herein -- with the consent and cooperation of the companies' auditor, KPMG, and S.G. Cowen Securities Corporation ("Cowen"), which acted both as an investment banker for, and a financial analyst of, L&H -- presented investors with a false and misleading picture of L&H's financial condition and apparent growth, which included reporting, certifying and circulating the reporting of up to $373 million dollars or more in improper revenue. In addition to perpetrating this massive fraud on the Bakers and the investing public, Defendants -- including KPMG and Cowen -- also made direct representations to the Bakers and other Dragon principal shareholders regarding, among other things, the accuracy of the financial statements of L&H, certified by KPMG (as well as the accuracy of certain documents which incorporated those financial statements therein), and the financial soundness of L&H and/or L&H's purported growth strategy. KPMG, and KPMG auditors, including auditors from KPMG Belgium, KPMG LLP and KPMG UK, including Paul Behets, Robert McLamb and Paul Beecy, as well as Cowen, and Cowen analyst Rob Stone and others at Cowen, who also participated with Cowen's investment banking team for the Dragon merger transaction, played an integral role in this fraudulent scheme.

4.      Specifically, although Defendants led Dragon, the Bakers and the general investing public to believe that L&H had experienced exceptional revenue growth, by early November, 2000 -- barely five months after consummation of the Dragon transaction -- L&H announced that it would have to restate its financial statements for 1998, 1999 and the first half of 2000 due to "accounting irregularities." In other words, by November 2000, L&H admitted that its financial statements contained "misstatements or omissions" constituting management

3

fraud.  Further admissions followed.  Unsurprisingly, regulators halted trading in L&H stock, thereafter delisted L&H from the NASDAQ exchange, and suspended its trading on the European Easdaq exchange.  L&H has been unable to provide audited financials for the last two and a half years, answer probing questions posed by the Securities and Exchange Commission ("SEC"), or account for the improper recording of up to $373 million or more of revenue.  The value of L&H stock has collapsed and L&H has filed for bankruptcy protection in the United States and Belgium.

5.      The fraud was exposed, in part, through the inquiry by a reporter with regard to eighteen of L&H's alleged Korean customers, who purportedly accounted collectively for a large proportion of L&H's reported revenues.  Through the simple process of questioning these customers, who KPMG clearly would have been aware of and had access to, these entities readily volunteered  that they actually did little or no business with L&H.  Shortly thereafter, it was discovered that most of L&H's "strategic partner" licensees were shell companies, created by L&H and its affiliates, with the consent and cooperation of KPMG and Cowen through their intentional, deliberate or reckless behavior, as a means of improperly funding research and development expenses by accounting for those expenses as revenue instead, and that $100 million was missing from the bank accounts of L&H's Korean unit.

6.      Arthur Andersen LLP, Brian Cave LLP and Loeffs Claeys Verbeke (collectively the "Audit Committee Advisors") were retained by L&H to investigate these allegations and within weeks issued a report on November 20, 2000 ("Audit Report") concluding that L&H's reported recorded revenues were false.  Among numerous impermissible practices that violated U.S. GAAP, and that fraudulently and materially inflated L&H's revenues, the Audit Report noted that L&H:

(a)    created sham "licensees" intended to facilitate the mischaracterization of loans or investments as revenue and enable L&H to fund its research and development without deducting the expense from operating income;

(b)    failed to disclose that its Korean unit factored receivables with recourse to L&H bank accounts and that up to $100 million or more was and is currently "missing" from those accounts;

(c)    improperly recognized revenue from barter or exchange transactions in which no cash changed hands;

(d)    improperly recognized sales revenues that were contingent on L&H later performing development work;

(e)    improperly recognized revenue prior to contracts being finalized;

(f)    improperly recognized revenue when collectibility was not reasonably assured;

(g)    improperly recognized revenue when the customer's ability to pay depended on an investment from L&H;

(h)    improperly recognized revenue when the "purchasers" of licenses were not end-users and side letters confirmed that the license fee would be reimbursed if the license were not resold; and

(i)    improperly recognized revenue when the customer had the right to return the product and did so.

7.    The L&H Audit Committee's advisors concluded that <u>at a minimum</u>, $277 million, representing <u>one third</u> of L&H's revenue over the past two and one half years, had been improperly recorded. The Audit Committee's advisors specifically tied defendants Hauspie, Lernout, Bastiaens, Willaert and Dammekens to the impermissible transactions, and recommended disciplinary action against them. Subsequently, it was revealed by L&H on April 27, 2001, at a special meeting of the shareholders that an additional approximately $96 million in reported revenue did not exist. L&H and KPMG have admitted that these revenues were overstated and, as a result, the stock of L&H was severely distorted and overstated.

8.    As set forth above, L&H's fraudulent scheme succeeded because Klynveld Peat Marwick Goerdeler Bedrijfsrevisoven, a/k/a Burgerlijke Cooperative Vennootschap Klynveld Peat Marwick Goerdeler ("KPMG Belgium"), in concert with KPMG UK and KPMG LLP

(collectively "KPMG"), the company's long-time outside auditors, through their intentional or reckless actions consented to and participated in L&H's fraudulent financial reporting. Notwithstanding the magnitude of L&H's fraud and the existence of numerous "red flags," KPMG Belgium -- working in conjunction with other KPMG entities elsewhere in the world including in particular, although not necessarily limited to, KPMG LLP in the United States and KPMG UK in Great Britain -- issued unqualified opinions on L&H's financial statements for each of the years 1997, 1998 and 1999, rendered opinions that those financial statements were presented fairly, in all material respects, in accordance with U.S. GAAP, and consented to the inclusion of those reports in filings with the SEC. The Audit Committee Advisors noted that, in many cases, the record demonstrated that KPMG Belgium, KPMG LLP and KPMG UK had knowledge of the improper or questionable nature of the transactions and that despite this knowledge the KPMG entities failed, and were unable, to resolve the issues raised by this knowledge before signing reports that contained unqualified opinions on the financial statements. Further, KPMG LLP reviewed the L&H audits and improperly found them to be in compliance with U.S. GAAP and/or GAAS principles when in fact, among other things, these issues regarding questionable transactions were not resolved and critical information regarding the relationship to L&H and/or its principals of numerous entities doing business with L&H was not disclosed. KPMG UK also participated in the audits of L&H. Moreover, according Defendant Jo Lernout, KPMG was fully aware of the improper related party transactions and revenue recognition procedures.

9.    In addition to the foregoing, representatives of KPMG, including, but not limited to, a more senior auditor from KPMG LLP and a more junior auditor from KPMG Belgium, made specific oral representations to one or more officers of Dragon conducting due diligence for the Dragon principal shareholders who were parties to the Merger Agreement, including the Bakers, in one or more meetings, affirming the propriety of L&H's financial reporting. Those statements were made by KPMG to the to Dragon shareholders, including the Bakers, or their representatives with knowledge that the Bakers, as well as other Dragon principal shareholders

6

who were parties to the Merger Agreement, would rely on those statements. Indeed, the substance of those representations was communicated to the Bakers. Without those oral representations, the Bakers would never have entered into a transaction with L&H to sell their stock of Dragon, valued at hundreds of millions of dollars, in exchange for L&H stock which, unbeknownst to the Bakers or the investing public, was worthless. Indeed, the securities received by the Bakers were only as valuable as L&H's financial reporting was legitimate. It was KPMG -- and L&H identified in one or more Annual Reports during the relevant time periods both the Belgium and U.S. offices of KPMG as its auditors -- who satisfied one of the critical conditions to closing the Dragon sale by giving an unqualified opinion on L&H's 1999 financial statements, even though KPMG Belgium had knowledge that the SEC had commenced an investigation of L&H's accounting practices and was aware of numerous other red flags signaling improprieties in L&H's accounting practices and KPMG LLP and KPMG UK either knew or were reckless in not knowing this. (Indeed, as set forth above, according to one of L&H's co-founders, KPMG was aware of L&H's improper related party transactions and revenue recognition procedures at all relevant times.) But KPMG failed to perform procedures required by U.S. Generally Accepted Auditing Standards ("GAAS") that would have revealed L&H's improper accounting practices -- or KPMG turned a blind eye to the results of those procedures.

10.     Cowen, L&H's long-time investment banker, who also has a securities analyst arm which analyzed and promoted L&H stock to the investing public, also participated in L&H's fraudulent scheme. One or more Cowen securities analysts, including Robert Stone, acted as part of the investment banking team for the Dragon transaction in June 2000. Other analysts or former analysts also were involved with the Dragon transaction included Dan Blake. At the time of the Dragon merger negotiations, Dan Blake had accepted a position with L&H Investment Co. ("LHIC"), a company formed by defendants Hauspie and Lernout, in which they owned a controlling interest and through which L&H secretly funded its supposedly "unaffiliated customers." After joining LHIC, Blake continued to work closely with SG Cowen and, indeed,

7

along with SG Cowen was part of the Dragon/L&H deal team.  Blake additionally continued during the relevant time period, including at least once in February, 2000 to recommend SG Cowen as an investment banker.  Moreover, Cowen representatives solicited funding for one or more "unaffiliated customer" of L&H.  Indeed, Cowen, through its representatives, including but not necessarily limited to Robert Stone who acted in a capacity as both investment banker for L&H and a financial analyst of L&H, was aware of and approved at least some of L&H's related party transactions and accounting artifices to improperly recognize revenue.  Despite this knowledge, Cowen issued public analyst reports recommending the securities of L&H as a "Strong Buy" based on L&H's strong and accelerating growth, particularly revenue growth. These recommendations artificially inflated the market price for L&H securities.  Moreover, during the negotiation of the transaction between L&H and Dragon, Cowen representatives, including but not necessarily limited to Ben Howe, in a series of meetings with Janet Baker, James Baker and others, made specific representations regarding L&H.  These representations regarding the strength and growth of L&H resulted in increasing the value of L&H's securities included, but are not necessarily limited to, the following:  (i) L&H had strong financial results; (ii) L&H was a good merger partner, and (iii) L&H is a good prospect for financial growth.  In its analyst recommendations disseminated to the public regarding the strength of L&H stock, Cowen never disclosed their knowledge of L&H's related party transactions, improper revenue recognition or the fact that, as a result, L&H's stock was dramatically over inflated even though issues regarding, among other things, L&H's software revenue recognition and its relationship with strategic partners were raised a full year prior to the L&H/Dragon transaction.  Moreover, as set forth earlier in this paragraph, Cowen in its role as the investment banker for L&H in connection with the Dragon transaction made specific representations to the Bakers and other Dragon stockholders regarding L&H.   Despite their knowledge thereof, these Cowen representatives never disclosed L&H's related party transactions, improper revenue recognition or the fact that, as a result, L&H's stock was dramatically over inflated.

8

## JURISDICTION AND VENUE

11.    This action arises under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, and under state law.  In connection with the acts, conduct and other wrongs complained of herein, defendants directly or indirectly used the means instrumentalities of interstate commerce, the United States' mails, and the facilities of a national securities market.

12.    This Court has subject matter jurisdiction over this case pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa; 28 U.S.C. §§1331 and 1337; and principles of supplemental jurisdiction, 28 U.S.C. §1367.   Furthermore, the state law claims asserted herein have an independent basis for subject matter jurisdiction pursuant to diversity of citizenship, 28 U.S.C. § 1332.

13.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1391(b) and 1391(d), because defendants Lernout, Hauspie, Dammekens, Willaert, Pieper, Bastiaens, Behets, KPMG Belgium and KPMG UK are aliens and disseminated false and misleading statements into this district.   Venue is also proper as to defendants KPMG LLP and SG Cowen Securities Corporation pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b) because KPMG LLP and SG Cowen Securities Corporation disseminated false and misleading information to the investing public in this district.

14.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## PARTIES

15.    Plaintiffs Janet and James Baker are individuals who reside in Newton, Massachusetts and Maitland, Florida and are former owners of 51% of the issued and outstanding stock of Dragon.  The JKBaker LLC is a Delaware Limited Liability Company

created to hold a portion of the L&H shares purchased by James Baker. The JMBaker LLC is also a Delaware Limited Liability Company; it was created to hold a portion of L&H shares purchased by Janet Baker. James Baker and Janet Baker hold all economic and beneficial interest in the JKBaker LLC and JMBaker LLC, respectively. Pursuant to the Merger Agreements that give rise to the claims herein, the Bakers received 4,717,564 shares of common stock of defendant L&H, plus 392,149 shares placed in escrow for a total of 5,109,713 shares.

16.     L&H is a Belgian corporation, with its principal place of business in Ieper, Belgium. Until it was delisted on December 8, 2000, L&H common stock was listed on the NASDAQ under the ticker symbol "LHSP" or "LHSEQ." L&H stock was also traded on the EASDAQ until it was "indefinitely suspended" on or about November 9, 2000. L&H is a party to the Merger Agreement. On November 29, 2000, L&H filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware, and contemporaneously commenced bankruptcy proceedings in Belgium. But for those filings, L&H would be named in this action as a defendant.[1]

17.     L&H Holdings USA, Inc. ("Holdings") is a Delaware corporation, a wholly owned subsidiary of L&H, and the corporation into which Dragon was merged. Holdings is a party to the Merger Agreement. On November 29, 2000, Holdings also filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware. But for that filing, Holdings would be named in this action as a defendant.

---

[1]     As used herein, "L&H" is intended to include the subsidiaries of L&H N.V. ("N.V."), including Holdings and L&H Korea, in any event, although in some places in this Complaint Holdings and L&H Korea may be identified separately.

18.    Defendant Jo Lernout ("Lernout") is one of the founders of L&H. Lernout was President of L&H from January, 1994 until February, 1996, Co-Chairman of the L&H Board from 1996, and a Managing Director of L&H from 1987, until he resigned those offices on November 9, 2000. Lernout served as a member of the Board of Directors of L&H until his resignation on January 16, 2001. Lernout was forced out of his remaining role as the Chief Technology Officer of L&H at the end of February, 2001. As of July 27, 2000, Lernout held, controlled or had beneficial ownership of 43,667,208 shares of L&H stock, or approximately 30% shares outstanding on that date. Lernout was arrested on April 27, 2001 in Ieper, Belgium and charged with forgery and stock price manipulation for his role in L&H's accounting fraud and currently is being held in jail. He made one or more trips to the U.S. in connection with efforts to purchase Dragon from the Bakers and other Dragon stockholders.

19.    Defendant Pol Hauspie ("Hauspie") is one of the founders of L&H. Hauspie was Chairman of L&H from January 1994 until October 1996, Co-Chairman of the L&H Board from 1996, and a Managing Director of L&H from 1987, until he resigned those offices on November 9, 2000. Hauspie resigned his board seat on November 22, 2000. As of July 27, 2000, Hauspie held, controlled or had beneficial ownership of 43,667,208 shares of L&H stock, or approximately 30% of the shares outstanding on that date. Hauspie was arrested on April 27, 2001 in Ieper, Belgium and charged with forgery and stock price manipulation for his role in L&H's accounting fraud and currently is being held in jail. He made one or more trips to the U.S. in connection with efforts to purchase Dragon from the Bakers and other Dragon stockholders.

20.    Defendant Gaston Bastiaens ("Bastiaens") joined L&H as President in September 1996, and was appointed Chief Executive Officer of L&H in May, 1997. Bastiaens also was an

11

officer of Holdings and signed the Dragon Merger Agreement on behalf of Holdings. Bastiaens resigned those offices on August 25, 2000, and his board seat on November 9, 2000. He was apprehended by U.S. Marshalls in May 2001 and has been extradited to Belgium on charges of stock manipulation and fraud. As of June 8, 2000, Bastiaens held, controlled or had beneficial ownership of 1,231,000 shares of L&H stock. Bastiaens filed for Bankruptcy in the U.S. but later sought and obtained dismissal of that bankruptcy action. The Amended Complaint adds Bastiaens as a defendant in this action.

21.    Defendant Nico Willaert ("Willaert") joined L&H as a director in 1992 and remained on the Board of Directors until November 22, 2000. Willaert was also a Managing Director of L&H from April 1993, and Co-Vice-Chairman of L&H from January 1994, until he resigned those offices on November 9, 2000. Willaert was arrested on April 27, 2001 in Ieper, Belgium and charged with forgery and stock price manipulation for his role in L&H's accounting fraud.

22.    Defendant Carl Dammekens ("Dammekens") joined L&H in 1990 as Corporate Controller, and served as a Senior Vice President of Finance from 1993 and as Acting Chief Financial Officer of L&H from 1996 until his appointment as Chief Financial Officer on July 7, 1999. On November 9, 2000, L&H announced that Dammekens would be replaced as Chief Financial Officer. Dammekens was recently terminated by L&H. In addition to holding office in N.V., Dammekens also was an officer of Holdings, a U.S. corporation

23.    Roel Pieper ("Pieper") served as vice-chairman and chairman of L&H's Board of Directors between October, 1999 and January, 2001. Pieper made one or more trips to the U.S. in connection with efforts to purchase Dragon from the Bakers and other Dragon stockholders

24.    Defendant KPMG Belgium is a Belgium public accounting firm and is a member of KPMG International.  KPMG Belgium employs over 950 partners and staff in six cities in Belgium.  KPMG Belgium, along with one or more other KPMG entities, has been L&H's outside auditor since 1991, when it absorbed the Belgian accounting firm of Behets, Boes & Co, which had been auditing L&H since the late 1980's.  KPMG Belgium issued unqualified reports on L&H's financial statements for each of the years 1997, 1998 and 1999, gave an opinion that those financial statements were prepared in accordance with U.S. GAAP, stated that its audit was conducted in accordance with U.S. GAAS, and consented to L&H's inclusion of KPMG Belgium's reports on those financial statements in filings with the SEC.  One of the KPMG Belgium auditors responsible for the L&H audits, Chantal Mestdagh, left KPMG Belgium to become Chief Financial Officer of LHIC.  Ms. Mestdagh held that position throughout KPMG Belgium's audits of L&H's 1998 and 1999 financial statements.  Another KPMG auditor, Paul Behets, left to become Chief Executive Officer of another L&H related entity, as set forth below. KPMG Belgium also audits the Flanders Language Valley Fund, N.V. ("FLV Fund"), another entity related to L&H through which L&H secretly funded its purportedly unaffiliated customers.

25.    KPMG UK is a British public accounting firm associated with KPMG International, KPMG Belgium and KPMG LLP.  KPMG UK participated in the audits, reporting and SEC filings of L&H and with the due diligence performed for L&H's acquisition of one ore more entities in year 2000.

26.    KPMG LLP is a United States public accounting firm associated with KPMG Belgium and KPMG UK.  KPMG LLP was integrally involved in the audits, reporting and SEC filings of L&H and served as L&H's advisor for the merger negotiations, due diligence and merger structure through its Houston, Texas office, its Atlanta, Georgia office and its Dallas,

Texas office with regard to the Dragon/L&H transaction through its accountants, Robert McLamb and Paul Beecy (both of whom worked in KPMG UK's Capital Market Group prior to joining KPMG's Houston, Texas and Atlanta, Georgia offices, respectively), Drew Koecher, and others. Indeed, in its Annual Report for years 1997, 1998 and 1999, L&H listed KPMG LLP's office in identifying its outside auditors.

27.    In its statements to the public, the above-referenced KPMG defendants ("KPMG"), in conjunction with other KPMG member firms worldwide, KPMG describes the partners and employees of the member firms as its personnel and describes the offices of its member firms as its offices. KPMG states that it has office locations throughout the world. Without differentiating which offices are the offices of which entity, KPMG describes itself as having offices across the globe including in the United States, the United Kingdom and Belgium. For example, KPMG describes itself on its website as a "global network of professional advisory firms."

28.    In KPMG's discussion of its Annual Report for 1999, which appears on the KPMG website, KPMG expressly proclaims that "KPMG is acting as 'One Firm' worldwide to consistently meet the changing needs of global clients through an integrated array of tailored solutions . . . KPMG's 100,000 professionals in 159 countries help our clients achieve their critical business objectives through experience and personal commitment to excellence." Thus, KPMG promotes all of the partners and employees of its member firms as its agents and all of the partners and employees of any member firm as the agents of every other member firm, acting collectively to form "One Firm" providing an integrated and international service. L&H was and is such a global client of KPMG receiving integrated services on a worldwide basis from KPMG.

14

29.     Each of the partners and employees of KPMG Belgium, KPMG US, and KPMG UK who participated in the audit of L&H or who communicated with the Bakers in connection with the Dragon merger was acting as the agent of KPMG Belgium, KPMG US and KPMG UK at the time of such activities.  KPMG Belgium, KPMG US and KPMG UK are jointly and severally liable for the acts of each other, for the acts of their partners and employees and for the acts of the partners and employees of such other KPMG entities named herein and each KPMG entity has acted through the acts of its partners and employees as well as through the acts of the partners and employees of such other KPMG entities named herein.

30.     Defendant Paul Behets was a principal of the Belgian accounting firm Behets, Boes & Co., where L&H was his client, until Behets, Boes & Co. was absorbed into KPMG Belgium in 1991.  At KPMG Belgium, Behets was the audit partner with chief responsibility for L&H audits from 1991 until July 1999, when he left KPMG Belgium to become the chief executive officer of Flanders Language Valley Foundation also known as SAIL Trust V.Z.W. ("SAIL Trust"), a foundation created by defendants Lernout and Hauspie.  SAIL Trust holds a one third interest in FLV Management, N.V. ("FLV Management"), and has the right to appoint five of its directors.  FLV Management is the manager of the FLV Fund.  Behets held that position throughout KPMG Belgium's audit of L&H's 1999 financial statements.  In addition, KPMG Belgium is the FLV Fund's independent auditor.  The intertwined relationships among these entities, which are discussed throughout the complaint, and provide insight into KPMG Belgium's conflicting interests and motivations are as follows:  Behets left KPMG Belgium in July 1999 to become CEO of SAIL Trust, a foundation created by defendants Messrs. Hauspie and Lernout through funds they obtained by selling some of their L&H stock.  SAIL Trust owns 1/3 of FLV Fund Management ("FLV Management").  The other owner of FLV Management is

15

Gewestelijke Investeringsmaatschappij Vlaanderen N.V. ("GIMV").  (GIMV also owns L&H stock and appoints one L&H director).  FLV Management manages and makes decisions for FLV Fund.  FLV Fund, also audited by KPMG Belgium, is one of the entities through which L&H funded its "unaffiliated customers."  L&H accomplished this through FLV's Fund's ownership of at least eight (8) sham L&H licenses and by having FLV Fund provide funds to at least four (4) bogus customers (licensees).  These and various L&H "unaffiliated customers" ultimately provided L&H $373 million or more in artificial revenues.

31.    Cowen, as stated above, is a securities and investment banking firm that was established in 1998 by the merger of Cowen & Company and Societe Generale Securities Corporation.  Cowen is incorporated in New York and is the United States investment banking arm of the French Corporation, Societe Generale Group.  Cowen maintains offices in the United States in New York, Boston, Chicago, Cleveland, San Francisco and Washington DC.  Cowen and its predecessors Cowen Societe Generale Securities Corporation acted as L&H's investment bankers since L&H's initial public offering in 1995.  Cowen also purported to offer the public unbiased research and opinions through its research analysts, including Robert Stone and Dan Blake.  Cowen also served as L&H's investment banker for the Dragon/L&H transaction.  Some time after September 1998, Dan Blake had left the employ of SG Cowen to be a partner/analyst with LHIC, which, as noted above, was one company through which L&H secretly funded its supposedly unaffiliated customers.  During the merger negotiations, Ben Howe and Robert Stone, among others, made specific representations to Dragon representatives, including the Bakers, regarding the value of L&H securities.

32.    Defendant FLV Fund is a Belgian venture-capital fund organized by Hauspie and Lernout, among others, to make various strategic investments.  FLV Fund is a publicly traded

company which trades on the EASDAQ stock exchange under the symbol "FLVF." FLV Fund has United States offices in Los Altos Hills, California and in Woburn, Massachusetts. Both Hauspie and Lernout served as directors of FLV Fund from 1996 to 1997, and after 1997 each continued to "spend a portion of his time on activities relating to the FLV Fund." At all relevant times, the financial statements of the FLV Fund were audited by KPMG Belgium.

33.    Defendant SAIL Trust purports to be a non-profit entity established in 1995 by, *inter alia*, Hauspie, Lernout and the Government of Flanders to support economic development and to assist in the infrastructure financing of the Flanders Language Valley region. S.A.I.L. Trust holds a one-third interest in FLV Management, N.V., which is the manager of the FLV Fund, and has the right to appoint five of FLV Management's directors. Since July 1999, the chief executive officer of the S.A.I.L. Trust has been Paul Behets, who until that time was the partner at KPMG Belgium with primary responsibility for the audits of L&H's financial statements.

34.    Defendant LHIC is a Belgium investment fund founded by Hauspie and Lernout in 1998, through which Hauspie and Lernout control 7.6% of L&H's stock.    LHIC was purportedly established to make long-term strategic investments in companies in information technology industries such as speech, language and artificial intelligence. Hauspie and Lernout capitalized LHIC with their own shares of L&H common stock and act as advisors to LHIC and its investments. The President and Managing Director of LHIC since its inception has been Francis Vanderhoydonck, who also served as a director of L&H from May 1999 until his resignation on or about May 15, 2001. The Chief Financial Officer of LHIC was Chantal Mestdagh, formerly a KPMG Belgium auditor responsible for the audits of L&H's financial

17

statements. In addition, as note above Dan Blake, a financial analyst at Cowen, was also employed by LHIC.

35.     Defendant Mercator & Noordstar, N.V. ("Mercator") is an insurance company located in Antwerp, Belgium. At all relevant times, Mercator owned 6.9% of L&H Holding, which, in turn, owned 8.9% of L&H. Mercator also directly owned a 0.2% stake in L&H.

36.     FLV Fund, S.A.I.L. Trust, LHIC, and Mercator are collectively referred to as the "Related-Party Defendants," because each is a related party to L&H. As detailed herein, each of the Related-Party Defendants provided funding for certain "strategic partners" of L&H, often referred to as Language Development Companies ("LDCs") or Cross-Language Development Companies ("CLDCs"). The LDCs and CLDCs were shell corporations which formed an integral part of the scheme to inflate L&H's revenues by means of related-party transactions.

37.     Defendant Louis Verbeke is a Belgian citizen who served at all relevant times as the Chairman of Mercator and as a named partner at the Belgian law firm of Loeff Claeys Verbeke ("Loeff Claeys"). Loeff Claeys served as legal counsel to both L&H and FLV Fund. Upon information and belief, Verbeke, in his capacity as a partner of Loeff Claeys, provided legal services in connection with L&H's fraudulent transactions involving the Related-Party Defendants. In addition, Verbeke attended virtually all meetings of L&H's Board of Directors, including those where related-party transactions or issues concerning conflicts between L&H and FLV Fund were discussed.

38.     John Does 1 Through 50 are, among others, the individuals and entities employed by or related to L&H that participated in, and facilitated, the fraudulent transactions and reporting of those transactions. The John Doe defendants also include presently unknown individuals presently and/or formerly employed by or present and/or former partners in KPMG

who participated in the relationships between KPMG and L&H, including, without limitation, individuals involved in auditing the books and records of L&H.

39.    Corporations A-Z are fictitious corporate defendants that upon information and belief, participated in the fraudulent scheme alleged herein.

## SUBSTANTIVE ALLEGATIONS

### Purchase of L&H Shares

40.    On March 27, 2000, L&H, Holdings, Dragon, the Bakers, and certain other principal stockholders of Dragon entered into the Merger Agreement pursuant to which L&H would purchase all the stock of Dragon from the Bakers and other Dragon stockholders in a stock-for-stock transaction (the "Merger."). On that date, L&H was valued at $53.75 per share.

41.    On June 7, 2000, the transactions contemplated by the Merger Agreement were consummated, and the Bakers acquired 5,109,713 shares of L&H common stock.

### The Bakers' Reliance on Defendant's Material Representations

42.    In agreeing to accept L&H shares in exchange for its interest in Dragon, and in setting the price of Dragon relative to L&H's stock price, the Bakers relied on the truth and accuracy of (a) L&H's extensive public disclosures regarding its business and revenues and the propriety of its financial statements, many of which the Bakers directly examined and all of which were incorporated in the market price of L&H securities, (b) the written and oral assurances of KPMG, including KPMG Belgium, and (c) the written analysis and recommendations of Cowen regarding L&H which were incorporated in the market price of L&H securities and oral representations specifically made by Cowen representatives to the Bakers during the negotiations leading up to the signing of the merger agreement. Absent these representations to the public in general and to the Bakers specifically, the Bakers would never have entered into this transaction. These disclosures and assurances portrayed L&H as a technology company whose innovative products were propelling record global revenues. That

was untrue, and the Bakers' reliance on the defendants' disclosures and assurances proved to be sorely misplaced.

### Record Revenues Every Quarter From "Organic Growth"

43.     Every quarter in 1997, 1998, and 1999, L&H proclaimed exponential increases in revenues:

(a)     In an April 28, 1997 press release, L&H announced that "first quarter of 1997 total revenues were $16.6 million, an increase of 350% over revenues of $4.7 million in the first quarter of 1996."

(b)     A July 30, 1997 press release announced second quarter 1997 revenues of "$21.1 million, an increase of 268% over revenues of $5.7 million in the second quarter of 1996."

(c)     An October 22, 1997 press release announced third quarter 1997 revenue of "$27.9 million, an increase of 285% over revenues of $7.3 million in the third quarter of 1996."

(d)     A February 3, 1998 press release announced "results for the fourth quarter [of 1997] of $33.8 million, a 150% increase in reported revenue of $13.4 million for the fourth quarter of 1996."

(e)     In its 1997 Annual Report filed with the SEC on Form 20-F on May 26, 1998, and refiled on Form 20-F/A/2 dated April 13, 1999 signed by defendant Bastiaens, L&H announced that in 1997 "total revenues increased 220% to approximately $99.4 million in 1997 from approximately $31.0 million in 1996."

(f)     L&H announced its first quarter 1998 revenues in a press release dated April 28, 1998, attached as an exhibit to a Form 6-K/A dated May 26, 1998, and signed by defendant Bastiaens: "[f]or the first quarter of 1998, L&H's total revenues were $35.1 million, an increase of 112% over reported revenues of $16.6 million for the first quarter of 1997." Bastiaens was quoted as attributing L&H's performance to "our tremendous success in securing contracts," which the press release numbered at "a record-breaking 40 contracts."

(g)     In a July 28, 1998 press release, filed with the SEC on a Form 6-K dated August 5, 1998 and signed by Bastiaens, L&H announced total second quarter 1998 revenues of "$45 million, an increase of 113% over reported revenues of $21.1 million for the second quarter of 1997." In that press release, Lernout attributed the results to increased demand for L&H products and "new contract bookings," as did Bastiaens, who stated that "[d]uring Q2 we signed 42 new contracts."

(h)     In an October 27, 1998, press release, filed with the SEC on a Form 6-K on October 28, 1998, L&H announced that, "for the third quarter of 1998, L&H's

total revenues were $54.9 million, an increase of 97% over reported revenues of $27.9 million for the third quarter of 1997."

(i)     On April 7, 1999, L&H "announced results for the fourth quarter of 1998 of $76 million in revenue, or a 126% increase in the reported revenue of $33.8 million for the fourth quarter 1997."

(j)     In L&H's 1998 Annual Report filed with the SEC on Form 20-F and signed by defendant Bastiaens, L&H stated that "for the fiscal year 1998, the company reported total revenue of $211.6 million or an increase of 113% over the reported revenues of $99.4 million for fiscal year 1997."

(k)     An L&H 1998 Annual Report to Shareholders, filed with the SEC on a Form 6-K on June 1, 1999 and signed by defendant Dammekens, contains a letter to shareholders signed by defendants Lernout, Hauspie, and Bastiaens trumpeting "a year of major milestones.... For the fourth consecutive year, revenues grew by more than 100% over the year before. In fiscal 1998, the company reported total revenues of $211.6 million or an increase of 113 percent over the $99.4 million reported for 1997.... L&H ... signed a record 160 new contracts to license its core technologies."

(l)     On May 18, 1999, L&H announced that "for the first quarter of 1999, L&H's total revenues were $70.7 million, an increase of 102% over reported revenues of $35.1 million for the first quarter of 1998. The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications."

(m)     In a press release dated July 28, 1999, filed with the SEC on a Form 6-K dated August 2, 1999 and signed by Bastiaens, L&H announced that its second quarter 1999 "total revenues were $76.0 million, an increase of 69% over reported revenues of $45.0 million. L&H's total revenues for the six months ending June 30, 1999 were $146.7 million, an increase of 83% over reported revenues of $80.1 million for the same period in 1998. The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications." L&H reported that in the second quarter, the Technologies and Solutions division "signed 57 new contracts (45 of which were related to core speech technology)."

(n)     In a press release dated October 27, 1999, filed with the SEC on a Form 6-K dated November 3, 1999 and signed by defendant Dammekens, L&H announced that its third quarter 1999 "total revenues were $87.5 million, an increase of 59% over reported revenues of $54.9 million for the third quarter of 1998. L&H's total revenues for the nine months ended September 30, 1999 were $234.2 million, an increase of 74% over reported revenues of $134.9 million for the same period in 1998."

(o)     In a press release dated February 9, 2000, filed with the SEC on a Form 6-K/A dated February 14, 2000 and signed by defendant Dammekens, L&H announced that, "[f]or the fourth quarter of 1999, L&H's total revenues were $110 million, or a 43.5% increase in the reported revenue of $76.7 million for the fourth quarter of 1998. For the fiscal 1999 [sic], the company reported total revenues of $344 million or an increase of 62.7% over the reported revenues of $211.6 million for 1998." The company attributed growth to the "Technologies and Solutions Division sign[ing] a record of 80 contracts for the quarter." In that press release, Bastiaens stated that "[i]n 1999 we experienced a strong demand for speech and language technologies, applications and solutions, specifically in the Enterprise and Telephony area. This increase was mainly the result of internal growth and created a positive cash flow from operations of $68 million, reflecting the maturity of our operations."

44.     When questioned by critics about the extent to which L&H's revenue growth was the consequence of acquisitions, L&H insisted that the majority of its growth was "organic":

(a)     A response to "Lernout & Hauspie Frequently Asked Questions for Q3 1999," posted on its world-wide website on October 29, 1999, L&H stated that "80% of [revenue] growth was organic and the rest was based on acquisitions."

(b)     In a response to "Lernout & Hauspie Frequently Asked Questions for Q4 1999" posted on L&H's world-wide website on February 10, 2000, L&H claimed that "L&H's internal calculation [sic] show that over 70% of our growth for fiscal 1999 was organic."

(c)     In a response to "Lernout & Hauspie Frequently Asked Questions for Q1 2000," posted on its world-wide website on May 24, 2000, L&H claimed that "74% of the growth was organic."

### Non-Existent License Revenues from Unaffiliated "Strategic Partners"

45.     L&H also attributed significant revenues to what it reported as license fees from alleged unaffiliated "strategic partners" who contracted with L&H to perform research and development functions for L&H developing its software for specific applications and languages.

46.     Another scheme L&H employed to manufacture revenues involved the creation of "strategic partners" to contract with L&H. These "strategic partners" were Language Development companies ("LDCs") and Cross Language Development Companies ("CLDCs"), which were supposedly created to develop the Company's software for specific applications and/or languages. The strategic partners would pay licensing fees to L&H, which L&H would record as revenue, and then the strategic partners would purportedly "develop" the software. At

the end of the contract term, L&H would have the option – which was generally exercised – to acquire the strategic partner and the developed product. Through this scheme, L&H was able to avoid recording the expenses associated with developing the software, and to record revenue. The revenue derived from these "strategic partner" relationships was substantial, accounting for 10% of L&H's reported revenues for 1998 and 25% of its reported revenues for 1999. However, booking such revenue is only appropriate if the strategic partner is an independent third party (i.e. not related to L&H) and the strategic partner is a real entity which actually develops the software separate from L&H.

47.    In fact, the strategic partners were corporate fictions, and this revenue was entirely phony. The LDCs and CLDCs were actually funded by parties related to L&H, such as FLV Fund, Mercator, and the other Related-Party Defendants, and the entire arrangement was nothing but a sham designed to move research and development expenses off the books of L&H and to allow L&H to artificially inflate its revenues. The LDCs and CLDCs had no employees and no ability to develop software independently of L&H. All the development work under the contracts was done by L&H, and because the source of the funding for the LDCs and CLDCs was parties related to L&H, L&H was essentially paying itself to do the work and recognizing this as revenue.

48.    In 1996, shortly after Bastiaens arrived at L&H, the company announced that Dictation Consortium NV, "a private company in which the FLV Fund has an investment," had licensed L&H software in order to develop L&H's continuous automated speech recognition technology. As of December 31, 1996, FLV Fund and FLV Management together owned 61% of Dictation Consortium and defendants Lernout and Hauspie were directors of FLV Fund Management. Dictation Consortium provided L&H with $26.6 million in revenue over the next two years, approximately one quarter of its 1996 sales and 19% of 1997 sales. Since Dictation Consortium bore research and development costs, which were actually costs for L&H research and development, they did not shrink L&H's bottom line, as they should have. In May 1998, L&H announced that it had obtained the software developed by Dictation Consortium by

23

purchasing the company for $26.9 million, most of which represented goodwill and could thus be amortized over seven years.

49.    In 1997 L&H entered into a similar arrangement with a company formed in March 1997, by anonymous venture capitalists, called Brussels Translation Group ("BTG"). According to L&H's 1998 Annual Report on Form 20-F, L&H granted BTG an exclusive license to use L&H speech processing technology and associated data bases to develop an internet translation service. The agreement called for BTG to pay L&H $3.5 million in license fees, plus royalties. In May 1997, the license fee was increased by $1.5 million, and L&H also entered into an agreement to provide BTG with engineering services, which engineering services and functions would have been performed by L&H and otherwise would have a research and development cost of L&H, under which BTG paid L&H approximately $30 million.

50.    Thus, in this manner in 1998 and 1999, L&H helped create 30 start-up companies, based in Belgium and Singapore, purportedly to "develop" variants of its software for non-mainstream languages. Upon information and belief, the legal work involved in creating these start-ups was performed in whole or in part by Verbeke, in his capacity as a partner of Loeff Claeys. (In fact, Verbeke was the chairman of Mercator & Noordstar N.V. ("Mercator" an insurance company that owned 16 of the start-ups.) L&H repeatedly maintained that unaffiliated "private investors" owned the start-ups.

51.    In an April 7, 1999 press release, L&H announced among the highlights of fiscal year 1998:

> [L&H] [b]egan development of approximately 20 additional exotic languages with its financial and technological partners. During 1998 contracts were signed for the following languages: Ukraine, Polish, Czech, Slavic, Bahasa, Greek and Farsi, to support a range of speech technologies. . . . In order to develop these additional languages within certain time and financial constraints, L&H is working with partners who will undertake the localization and development of these language areas and share the financial risks and rewards. L&H will license its tools to the partners and will secure the quality of the various applications and languages.

52.     In its 1998 Annual Report on Form 20-F, L&H expanded its description of these transactions:

> Pursuant to these agreements, we have exclusively licensed our speech and language technology development tools to strategic partners that are unaffiliated with us to develop and localize our technology for specified new languages. Our strategic partners also have exclusive rights ... to develop, market, and distribute products incorporating the development technology. In addition to one-time license fees, we have the rights to receive royalties based on our partners' net revenues from sales of products incorporating the developed technology.

> [Emphasis added.]

53.     The above statements concerning "unaffiliated" parties were false and misleading, because L&H did not disclose that the majority of the start-ups were funded by parties related to L&H and that L&H was actually performing the development work that the LDCs and CLDCs were supposed to perform. In fact, as would later be revealed, 17 of the LDCs and 7 of the CLDCs were owned, either directly or indirectly, by FLV Fund or Mercator. Specifically, eight were owned by FLV Fund. Another four were subsidiaries of Language Investment Co., a company run by Willem Hardeman, a director of the FLV Fund. Finally, sixteen of the thirty were predominately owned by Mercator.

54.     In June, 1999, L&H acquired BTG for approximately $42 million in cash plus the assumption of BTG's $17 million start-up debt. As with the Dictation Consortium transaction, L&H was able to obtain a product without deducting the research and development expense. Instead L&H was able to record nearly $35 million in revenues in the form of engineering and licensing fees and then, when it purchased BTG, L&H capitalized the acquisition price, turning what would normally be an expense into an asset.

55.     Although critics charged that L&H earnings were inflated by the Dictation Consortium and BTG transactions because those companies were related to L&H, L&H falsely maintained that, except for the FLV Fund involvement in Dictation Consortium, the companies were owned by unaffiliated "private investors" whom L&H refused to identify.

56.     According to a February 9, 2001 article in the Belgium newspaper *De Standaard*, Behets (and possibly others) and SG Cowen assisted with obtaining investors for BTG. Behets attended a meeting in Boston between May 28 and 30, 1997 with a potential investor along with Messrs. Hauspie and Lernout (as well as others) to pursue the investor to invest $15 million in BTG:

> Behets helped Jo Lernout, Pol Hauspie, Gaston Bastiens (then CEO), Ellen Spooren (pr-manager) and Carl Dammekens (CFP) in giving the company more credibility. He was at the time both head of the audit committee controlling L&H's filings and chairman of the Institute of Company Auditors.

SG Cowen also assisted BTG's fund raising efforts through a dinner meeting with the potential investor during the May 28-30, 1997 meeting.

57.     Initial license fees paid by these allegedly unaffiliated "strategic partners" accounted for 10% of L&H's claimed 1998 revenue and 25% of claimed 1999 revenue, far in excess of the 3.7% of 1998 revenue that L&H stated, in its 1998 Annual Report on Form 20-F, was provided by "companies funded in part by the FLV Fund," and the 0.3% of 1999 revenues that L&H stated, in its 1999 10-K, were provided by "companies funded in part by the FLV Fund and L&H Investment Co."

58.     L&H underscored the purported legitimacy of its licensing revenues with false public descriptions of a conservative revenue recognition policy. In notes to its 1997, 1998 and 1999 financial statements, audited by KPMG Belgium, L&H stated that:

> The Company recognizes revenue from the sale of its software licenses upon satisfaction of all of the following criteria: signing of the license agreement, shipment of the products, when no contractual terms remain unsatisfied and, if applicable, when a royalty report is received from the customer. The Company generally receives, on a quarterly basis, royalty reports from each customer who has signed a license contract. The reports detail the number of units or products that the customer shipped during that period. The number of units multiplied by the applicable contractual rate per unit is the amount that the Company records as revenue. Before recording this revenue, the Company determines that all significant obligations have been satisfied and that collection of the receivable is probable.
>
> · · ·

26

The Company from time to time enters into nonrefundable minimum royalty agreements with customers. Under these arrangements the Company delivers its technologies or products to the customer contemporaneously with the execution of the agreement. Revenue from nonrefundable minimum royalty agreements is recognized upon satisfaction of all of the following criteria: signing of the licensing agreement; no additional significant production, modification or customization of the software is required; delivery has occurred; the fee is fixed and determinable, and; collection is probable. For arrangements that include multiple elements, the fee is allocated to the various elements based on vendor specific objective evidence of fair value.

In all such cases, the Company only recognizes revenue when collection of the related receivable is probable.

As discussed below, these disclosures were pervasively false.

59.    In fact, the investigative report presented to the Audit Committee by its advisors, the U.S. law firm of Bryan Cave LLP ("Bryan Cave"), the accounting firm of Arthur Andersen LLP ("AA"), and Loeff Claeys, dated November 20, 2000 (the "Audit Committee Report") would itself raise significant questions about these 30 start-ups, concluding:

> [T]he Company and the LDCs realized, as early as December 1998, that completion of the work by the LDCs was not practicable and the Company began to provide some level of services, if not development work. As a result, the accounting should have been changed from up-front revenue recognition of the full license fee to deferral of the revenue and recognition of the revenue as the services or development was completed.

60.    The Audit Committee Report ultimately concluded that virtually none of the revenue from the start-ups should have been booked. If this revenue had been reported as related-party funding of research and development, the revenue could not be recorded and approximately $79 million in revenue was improperly recorded as a result of these "strategic partner" transactions. As the Audit Committee Report made clear, if the LDCs or CLDCs were related parties, no revenue should have been booked:

> If the investors are not related parties, accounting for such transactions would require deferral of all the revenues and

27

recognition over the development period . . . If the investors are related parties, the relevant accounting literature presumes that the related party investors will be repaid and the funded amount are recognized as a liability.

61.     Either way, L&H fraudulently booked the revenue from those transactions. If the LDCs and CLDCs were related parties, L&H should have recorded the payments from these entities not as revenue but as <u>loans</u> which L&H was obligated to repay. In other words, rather than revenue, these were <u>liabilities</u> of the Company. Even if the LDCs and CLDCs were not related parties, the revenue could not have been booked up-front, as L&H did, but had to be spread over a period of years, representing the time it would take L&H to perform the required development work.

62.     L&H could not have accomplished this fraud without the direct participation of the Related-Party Defendants and KPMG. L&H affirmatively and falsely represented that these "licensees" were "unaffiliated customers" and that 1998 revenues from companies funded by FLV Fund, Mercator and/or LHIC were minor. KPMG knew that the statements were false, that the licensees were actually related to L&H, and that L&H was improperly recording revenue from the transactions. In fact, KPMG Belgium was the auditor for the FLV Fund, and thus knew about every related-party transaction involving the L&H and FLV Fund from both sides.

### Fictitious Revenue from Asia

63.     In 1999, L&H focused on what it claimed to be its early and successful penetration of a fast-growing Asian market, particularly Korea.

64.     In a June 25, 1999, press release, L&H announced that "it [wa]s the sole provider of speech recognition technology for the ASR Stock quote Server, Korea's largest telephone based automated stock quote and trading service" through an application "developed by L&H business partner Bumil Information and Communications Co. Ltd." ("Bumil"). The press release

stated that Bumil "is a leading systems integrator developing customized applications for the telecommunications industry. The company has been an L&H licensee and joint development partner since March of 1997. Its customers include major Korean telecommunications providers, LG Securities and other major corporations in Korea."

65.    On August 31, 1999, L&H announced "that its technology is being used to speech-enable the automated attendant system used by Hanvit Bank, Korea's largest commercial banking institution. Deployment of the system -- Korea's first commercially available auto attendant program -- represents L&H's growing presence in the Korean telecommunications industry and enhances its leadership position in the market overall. The L&H based system is one of several telecommunications applications recently developed by L&H's business partner Bumil Information & Communications Co. Ltd. (BIC) and sold to leading Korean businesses."

66.    On September 13, 1999, L&H announced that it had expanded its Pacific Rim presence by acquiring Bumil:

> Bumil has been an L&H business partner and licensee since 1997 and, during that time, has deployed L&H's speech technology in several highly visible, strategic telecommunications applications for leading Korean companies. Most recently, Bumil used L&H's speech recognition to speech-enable an automated attendant system it developed for Hanvit Bank, Korea's largest commercial banking institution. Bumil also recently used L&H's speech recognition and text to speech technology to develop the ASR Stock Quote Server, Korea's largest telephone based automated stock quote and trading service.
>
> The acquisition of Bumil builds on L&H's already significant presence and resources in the Asia [sic] and helps position it for the leadership position there. L&H's existing Asia Pacific customer base includes Samsung, LG Semicon, NEC, Hitachi, Sega, Inventec, Group Sense Limited, Pioneer, Alpine and Fuji-Xerox, among others. It has offices in Tokyo, Beijing, Hong Kong, Taipei and Singapore and Sydney Australia. L&H's speech offerings for the Asian Pacific market include the world's first PC-based Cantonese continuous speech recognition product as well as ASR, TTS and machine translation support for Korean, **Mandarin and Japanese**

"As we pursue our long-term objectives, we continue to receive validation that our growth strategy is sound -- particularly for the worldwide telecommunications industry," said Jo Lernout, L&H co-founder and co-chairman. "Our recent successes with Bumil, as well as industry analysts' predictions regarding the rapidly increasing demand for speech enabled applications, underscores the outstanding growth opportunities that this acquisition helps bring to us."

67.    L&H purchased Bumil for $25 million in cash. As additional consideration for the acquisition, Ju-Chul Seo, Bumil's president and sole shareholder, was entitled to receive a cash "earn-out" of $25 million, provided that L&H Korea met certain revenue targets by December 31, 2000. Thus, the earliest this "earn-out" could become due was January 2001.

68.    At the time it acquired Bumil, L&H was well aware that Bumil lacked the ability "to uphold internationally accepted financial practices." On September 9, 1999, Louis Woo, President and General Manager of L&H Asia Pacific, sent an e-mail to Dammekens and Bastiaens concerning the "financial accountability of L&H Korea." Specifically, Woo stated:

> Mr. Seo was, by all accounts, the sole owner of Bumil and he had not needed to answer to anyone but himself. In Asia, not only in S. Korea, owners of family business tend to mix the company finances with personal finances. We must have a clear financial process and procedure for them to adhere to so that no possible abuses can be made and tolerated. . . . It is next to impossible to expect [that] the current financial controller and accounting manager will behave any differently from that of the Bumil days. It will be impossible for them to uphold the internationally accepted financial practices if they happen to be different from the current practices and it is equally impossible to expect them to over-rule Mr. Seo if his practice deviates from ours.
>
> It is extremely important to hire a strong controller from S. Korea to head up our financial department in L&H Korea. If we can lay this condition down as part of the acquisition and integration process NOW, there will be no hard feelings. If we delay making that condition clearly NOW, it will be perceived as embarrassing Mr. Seo. Especially if the condition is spelled out only after we have reviewed his financial practice.

69.    L&H immediately capitalized on its acquisition of Bumil by purportedly entering into a number of large contracts with a variety of Korean customers. During the fourth quarter of 1999 alone, L&H booked $46.3 million in revenue in Korea – 42% of the Company's total

reported fourth quarter revenue, and a significant portion of the Company's total annual revenue for 1999. More than 75% of this revenue was recorded between December 24 and December 31, 1999, and of the ten contracts L&H entered into in Korea during the fourth quarter, nine were signed between December 15 and December 31. All of these contracts were subsequently cancelled, and every penny of the revenue L&H recorded from these "sales" was reversed.

70.    In a December 28, 1999 press release, L&H "announced several deals with customers in the telecommunications, enterprise solutions and embedded technologies markets.... The agreements, signed with industry-leading companies in Asia and several companies in Europe, follow recently announced deals in the US." In the press release, L&H cited:

> strong demand for its speech and language technologies and solutions in the Asia Pacific region, especially South Korea. Among the solutions provided are dialogue systems that provide customers with a fast, simple and convenient way to access information, as well as embedded speech engines and language technologies. The signed contracts include:

> - Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities and Daewoo Securities, along with more than 10 other securities companies, have selected L&H to develop client server solutions for on-line trading and automated dialogue systems that allow securities customers to receive stock quotes and trade.

> * * *

> - LG Electronics has agreed to use L&H's TTS technologies.

> - Intelligent Communications has agreed to use L&H's TTS technologies for use in e-mail reading and unified messaging applications

> - SofTech Advantage expanded their agreement with L&H to utilize L&H RealSpeak for their unified messaging platform for the Philippines.

71.    A January 10, 2000 press release repeated that "the company also recently announced more than a dozen new contracts with telecommunications developers in Korea and elsewhere in the Pacific Rim and Europe, further readying L&H's Enterprise and Telephony Solutions business group for separate legal entity status. Contracts were signed ... with Hyundai

Securities, Samsung Securities, LG Securities, Daishin Securities, Daewoo Securities, Delfi,

GenSoft, EPC Asia and NeoTelecom, among others."

72.    In a January 31, 2000 press release, L&H announced that "Hung Chang Co., Ltd.

has signed a multi-year agreement under which it will license L&H's speech technologies in

multiple languages to develop speaker verification and reservation applications.  The agreement

with Hung Chang, a Seoul-based telecommunications technology leader, adds to a long list of

worldwide telecommunications industry contracts recently signed by L&H and furthers the

company's strategy to create a separate entity for Enterprise and Telephony Solutions."  In the

press release, Defendant Bastiaens was quoted as stating that "[o]ur ever-increasing successes in

the Korean market, particularly within the telecommunications sector, are the result of a very

well developed and implemented strategy to build a worldwide enterprise and telephony

solutions market presence."

73.    L&H highlighted the purported positive effect of its Korean deals in its February

9, 2000 press release announcing the Company's 1999 financial results:

> The demand for speech-enabled applications continued to grow in
> the Pacific Rim and L&H technologies were increasingly popular
> in the region.  South Korea and other Pac Rim-based developers
> who plan to build applications employing L&H's realSpeak,
> ASRT, TTS and dialogue systems solutions include: Hyundai
> Securities, Samsung Securities, LG Securities, Daishin Securities
> and Daewoo Securities, EPC Asia, IBCC (International Business
> Computer Co., Ltd.) NeoTelecom, LG Electronic, Intelligent
> Communications,      Softech     Advantage,      and      SofTel
> Telecommunication Pte. Limited . . . . L&H enhanced its ability to
> develop telephony solutions, increased its presence in Korea and
> continued to expand its telecommunications leadership by
> acquiring resources that included Bumil . . . and others."

74.    The purported revenue generated by L&H's so-called customers from Korea and

the Far East in 1999 was astounding.  Of the $344 million in revenue that L&H recorded in 1999,

approximately $63 million, or 18%, was attributed to sales in Korea.  Sales in Singapore

accounted for another $80 million. In total, sales from Korea and Singapore accounted for 44% of the Company's 1999 revenues.

75.    In fact, the Korean revenues were entirely fictitious. L&H had few real customers in Korea. The majority of sales were from sham transactions, and the cash which L&H claimed to have on its Korean books as a result of these sales was nonexistent.

76.    Because the Korean contracts were shams, the heart of the Korean fraud involved the systematic factoring of receivables "with recourse" by L&H in order to obtain cash upfront, which it could then claim it had collected from its "customers." Factoring with recourse meant that L&H could not record the revenue from these "sales" and should have recorded it instead as a "secured borrowing," i.e., a loan which L&H was obligated to repay. The scheme was carried out with the full knowledge and cooperation of Hanvit Bank, Shinan Bank and Chohung Bank (collectively referred to as the "Korean Banks").

77.    The fraud followed the same basic pattern. Beginning on September 30, 1999, L&H Korea entered into a series of "factoring arrangements" by which L&H sold the accounts receivable from licensing agreements to the three Korean Banks. L&H would generate an invoice relating to one of its fictitious contracts and deliver it to one of the Korean Banks in exchange for cash – allowing L&H to inflate its reported income, pay bonuses and drive up its stock price. L&H, however, would enter into side agreements with the banks that turned the sales contracts into de facto loans.

78.    Under the scheme, the banks would "purchase" L&H's accounts receivable and place the funds in a "restricted time deposit" account. L&H agreed not to withdraw these funds. Even though L&H had no right to withdraw the funds, it recorded the time deposit on its books as cash and eliminated the accounts receivable. Therefore, through this arrangement, L&H's financial statements reflected an increase in sales, cash collections and a large amount of cash.

79.    A typical factoring agreement entered into between L&H and the Korean Banks read:

I (we) [L&H] promise to adhere to the following clauses in factoring note receivable without recourse pursuant to factoring agreement dated December 31, 1999 with the Bank, and submit this confirmation letter.

1. Although the signed factoring agreements have been without recourse, I (we) promise to take recourse responsibility under this confirmation in the event that the transferred note receivable is defaulted.

2. Upon proceeds from factored note receivable is received, I (we) shall deposit the amount as agreed by the Bank and us, sign a separate pledge agreement and adhere to that agreement.

3. Pursuant to the above clause, I (we) will not raise any objection when the deposit is used to offset against factored note receivable, when this notes receivable is defaulted.

80.    In reality, because there was little or no payment by the sham customers, all of the cash was held by the banks in these restricted time-deposit accounts. Thus, after some amount of time passed and the customers had not paid the receivables, the banks merely foreclosed on the time deposits, leaving L&H with nothing. As a result, over $100 million of L&H's so-called Korean "revenue" and "cash" disappeared from the Company's records overnight.

81.    L&H Korea's practice of factoring receivables with recourse was widespread and well-known by L&H management and KPMG. As set forth below at ¶¶154-155, KPMG had actual knowledge in October 1999 that L&H was factoring receivables in Korea with recourse.

### The Underlying Contracts Were Shams

82.    As detailed below, the Korean "customers" were typically start-ups with no ability to pay the huge license fees supposedly called for by the sham contracts. This fact is confirmed by a report from the accounting firm of PriceWaterhouseCoopers ("PWC"), which was engaged by the L&H Audit Committee in late 2000 to uncover details of the Korean fraud. PWC prepared a report in connection with its investigation of the Korean fraud, entitled "L&H Korea Report." According to that report, PWC performed background checks on 10 of L&H's alleged Korean customers in order to determine what types of companies they were. PWC was unable to locate one of these purported customers, and two of the companies sampled by PWC

34

were still in the process of incorporating as of the date of the report in 2001. Only two of the ten had even been incorporated prior to 1998. Moreover, seven of the nine customers that PWC was able to locate had fewer than 30 employees. As PWC reported, it was inconceivable that these "customers" could have paid the huge, multi-million dollar licensing fees that L&H was booking as revenue: "[f]or these licensing agreements, there was little, if any, expectation that royalties would be collected within 90 days of the effective date of the agreement as required by the standard license agreement."

83.    L&H's licensing agreements in Korea contained purported fees of as much as $19 million. The self-evident fact that start-up companies of this type would be unlikely to have the wherewithal to pay the multi-million dollar licensing fees called for by the sham contracts is even clearer in light of PWC's finding that licensing fees in the speech technology industry in Korea during 2000 were in the range of $100,000 to $300,000. Indeed, PWC reported that "licensing fees in the millions of dollars were unheard of in Korea." KPMG knew or should have known this, and it certainly knew that the "customers" were underfinanced startups and did not have economic substance apart from L&H, as demonstrated below at ¶142 and ¶155.

84.    Why did the Korean Banks participate in the scheme to factor receivables with recourse? The answer is closely tied to the "earn-out" provision in the Stock Purchase Agreement signed at the time of the Bumil acquisition, pursuant to which Seo (the president of L&H Korea) was entitled to a cash "earn-out" of $25 million only if L&H Korea met certain revenue targets between September 30, 1999 and December 31, 2000. Even though no payment was scheduled to be made until 2001, Bastiaens persuaded L&H's Board of Directors to accelerate the full $25 million earn-out and pay it a year early, on January 28, 2000, as a so-called "reward" for L&H Korea's outstanding results in the fourth quarter of 1999.

85.    In fact, the earn-out was not a reward for Korea's supposed success at all, but rather a bribe for Seo to make to the Korean Banks to get them to "fund" L&H Korea's receivables. A February 3, 2000 e-mail from Seo to Lernout, Hauspie and Willaert, shortly after receiving the $25 million earn-out, confirms the basis for the accelerated payment:

35

Thanks for your great assistance extended to me. I well received the remitted amount of 25 million USD. With your prompt action, I could keep my promise to Korean banks and those banks will rely on L&H Korea and will help us much better than before. Thanks again for your help.

I assure that I will do all my best for L&H Group and for continuous business success of L&H.

Sincerely yours,

Ju-Chul Seo

### KPMG's Unqualified Audit Reports

86.    In each of its Annual Reports for 1997, 1998 and 1999, filed with the SEC, L&H stated that its financial statements were prepared in accordance with U.S. GAAP. KPMG and Behets bolstered the credibility of L&H's disclosures by issuing unqualified reports on their audits of L&H's 1997, 1998 and 1999 financial statements and consenting to the inclusion of those reports in L&H's SEC filings.

87.    An auditor is supposed to give an "unqualified opinion" or "clean opinion" only when no significant limitations affect the performance of the auditor and when the evidence obtained in the audit discloses no material deficiencies in the financial statement and/or unusual circumstances that affect the auditor's report. American Institute of Certified Public Accountants (AICPA), "Understanding Audits and the Auditor's Report — A Guide for Financial Statement Users," 2nd ed., 1996, at 15.

88.    On April 17, 1998 KPMG Belgium reported on L&H's 1997 financial statements, and on April 9, 1999, KPMG Belgium reported on L&H's 1998 financial statements, each time stating:

We have conducted our audits in accordance with generally accepted auditing standards in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant

36

estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries as of [the relevant time period], and the results of their operations and their cash flows for each of the years in the three-year period ended [on December 31 of the fiscal year], in conformity with generally accepted accounting principles in the United States.

89.    Prior to issuing an unqualified report for one or all of the above years, KPMG LLP, KPMG UK and KPMG Belgium participated in the audit and viewed the audit reports and related materials allegedly to, among other things, ensure their compliance with U.S. GAAP. Both KPMG LLP and KPMG UK worked with KPMG Belgium and Behets in one or more of the above audits and/or in connection with certain SEC filings made by L&H and/or in connection with the due diligence relating to the Dragon merger.

90.    Further, KPMG consented to the inclusion of its 1997 Audit Report in L&H's Annual Report on Form 20-F filed with the SEC on July 2, 1998. KPMG consented to the inclusion of its 1998 Audit Report in L&H's Annual Report on Form 20-F filed with the SEC on June 30, 1999. On January 6, 2000, KPMG also consented to the incorporation by reference of its 1998 Audit Report in Registration Statements filed by L&H with the SEC on Form F-3 on January 7, 2000. That Registration Statement was provided to the Bakers as "L&H's latest public filing" in the course of their due diligence in connection with the Dragon transactions. KPMG also made false oral representations directly to the Bakers and furnished a pivotal, unqualified report on L&H's 1999 financial statements, as discussed in the sections below.

91.    The 1998 20-F also included KPMG's unqualified audit opinion on L&H's financial statements for 1998:

LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. AND SUBSIDIARIES
INDEPENDENT AUDITORS' REPORT

The Board of Directors and Shareholders
Lernout & Hauspie Speech Products N.V.:

We have audited the accompanying consolidated balance sheets of Lernout & Hauspie Speech Products N.V. and subsidiaries (the Company) as of December 31, 1997 and December 31, 1998, and the related consolidated statements of operations, shareholders' equity, cash flows and comprehensive income for each of the years in the three-year period ended December 31, 1998. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

_We conducted our audits in accordance with generally accepted auditing standards in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion._

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries as of December 31, 1997 and December 31, 1998, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1998, in conformity with generally accepted accounting principles in the United States.

Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren
Brussels, Belgium
April 9, 1999

[Emphasis added.]

92.    KPMG's unqualified audit report was materially false and misleading. Specifically, contrary to what KPMG represented in its audit report, as set forth in ¶¶ 275-296 below, KPMG did not conduct its audit in accordance with generally accepted auditing standards in the United States, and L&H's 1998 financial statements did not present fairly, in all material

respects, the financial position of L&H as of December 31, 1998, and the results of its operations for the year then ended, in conformity with generally accepted accounting principles in the United States.

93.    On April 27, 2000, KPMG issued its unqualified audit opinion on L&H's financial statements for 1999. The 1999 audit report confirmed that L&H's 1999 financials were prepared in accordance with U.S. GAAP, that KPMG's audit was conducted in accordance with GAAS, and that there were no material changes to L&H's 1999 financial results announced on February 9, 2000:

> LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. AND SUBSIDIARIES INDEPENDENT AUDITORS' REPORT
>
> The Board of Directors and Shareholders
> Lernout & Hauspie Speech Products N.V.:
>
> We have audited the accompanying consolidated balance sheets of Lernout & Hauspie Speech Products N.V. and subsidiaries (the Company) as of December 31, 1998 and December 31, 1999, and the related consolidated statements of operations, shareholders' equity, cash flows and comprehensive income (loss) for each of the years in the three-year period ended December 31, 1999. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.
>
> We conducted our audits in accordance with generally accepted auditing standards in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries as of December 31, 1998 and December 31, 1999, and the results of

their operations and their cash flows for each of the years in the three-year period ended December 31, 1999, in conformity with generally accepted accounting principles in the United States.

Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren
Brussels, Belgium
April 27, 2000

94.    KPMG's unqualified audit report was materially false and misleading. Specifically, contrary to what KPMG represented in its audit report, as set forth in ¶¶ 297-324 below, KPMG did not conduct its audit in accordance with generally accepted auditing standards in the United States, and L&H's 1999 financial statements did not present fairly, in all material respects, the financial position of L&H as of December 31, 1999, and the results of its operations for the year then ended, in conformity with generally accepted accounting principles in the United States.

95.    According to specific representations made by Jo Lernout to Janet Baker during a meeting on October 13, 2000, KPMG was aware of and supportive of the structure of L&H's related party transactions and had "approved" of those transactions.  Jo Lernout later repeated these statements in a meeting on October 17, 2000 with the management group at Dragon. Specifically in that October 17, 2000 meeting, Lernout stated that KPMG was aware of the third-party transaction structure of L&H and had audited that structure specifically to verify the recognizability of revenue.  Despite KPMG's knowledge of this convoluted structure, KPMG issued unqualified audit reports for L&H's financial statements for the years 1997, 1998 and 1999.

### Cowens' Involvement In Affiliated Transactions And In Promotion of L&H Stock

96.    Cowen served as L&H's investment banker and financial advisors since 1995. Cowen also provided research coverage of L&H that promoted the stock, rating it as a "Strong Buy," thus, artificially inflating the market value of L&H's securities.  Indeed, defendant Lernout is quoted in Cowen's 1999 Annual Review speaking about L&H as follows:

Our relationship with SG Cowen dated back to its 1995 Global Technology Conference in Europe. Since then, they have been an invaluable partner to us through every phase of our growth, helping us to acquire several companies and raise more than $390 million.

97.    As described by Cowen in its 1999 Annual Review:

For more than five years, SG Cowen has helped L&H become one of Europe's fastest growing companies through a number of financing solutions, including co-managing its successful $40 million initial public offering in 1995. After a follow-on offering in May of 1996, SG Cowen supported L&H's expansion into new markets by helping the company research, evaluate and negotiate the acquisition of two language translation companies. The following year, we initiated three more capital-raising deals, including taking the lead position in a $108 million follow-on offering. Most recently as L&H's exclusive financial advisor in the translation market, we represented the company in two acquisitions in 2000—the $1billion acquisition of Dictaphone Corporation, a privately held leader in dictation and call-center recording solutions, and the $600 million pending acquisition of Dragon Systems, Inc., a privately held leader in speech and language technology.

98.    Cowen's activities as investment banker for L&H gave it access to information regarding the structure and accounting practices of L&H. For example, as L&H's investment banker, Cowen investigated proposed transactions and drafted fairness opinions for the acquisition of Bumil and other entities, giving Cowen access to material information regarding the value of the Bumil and other entities before they were acquired by L&H. This transactional work constituted a major source of revenue for SG Cowen, permitting it to bill over $800,000 in transaction fees in 1998 alone. In fact, Defendant Lernout told Janet Baker on October 13, 2000, that Cowen was not only aware of and supportive of, but suggested they had a direct role in devising, L&H's use of third-party companies to improperly shift research and developments expenses to these affiliated companies. Indeed, Lernout quoted Cowen's Robert Stone as specifically approving of this structure. Despite this knowledge, Cowen never disclosed prior to the L&H/Dragon transaction in communications with the Bakers and other shareholders of Dragon (which are discussed below) that these transactions were designed specifically to create

41

the illusion of revenue growth for L&H.  Further, as discussed below, Cowen actively disseminated false information in promoting L&H securities.

99.    As noted above, in addition to serving as L&H's investment bankers since 1995, Cowen also issued analyst reports recommending L&H as a sound investment which served to artificially inflate the value of L&H's stock.  In its role as research analyst, Cowen issued recommendations stating that L&H's stock was undervalued and had growing revenues despite Cowen's knowledge of L&H's use of affiliated companies to fund research and development activities and L&H's booking those costs, not as liabilities, but as revenues.

100.    On September 15, 1998, Cowen issued an analyst report recommending L&H securities as a "Strong Buy," citing "an increasing number of new licenses each quarter since its late 1995 IPO, for a total of 349 at the end of Q2."  Cowen also promoted L&H securities, specifically citing its "strong internal growth."  Although Cowen knew these facts were not true, it disseminated this report in the market, thus artificially inflating the value of L&H's securities.

101.    On January 5, 2000 Cowen issued another analyst report again recommending L&H as a "Strong Buy" and raising its price target for the stock.  In that report Cowen stated:

> **After Endless Short Yammering In 1999, Shares Testing New Highs On Strong 2000 Prospects** - In late 1998 and early 1999 a policy change at the SEC prompted LHSP to restate results related to write-downs of acquired R&D in process.  The SEC apparently raised no other issues with LHSP's accounting practices, and many other companies that had made acquisitions and followed then-common accounting treatment were in the same situation.  However, some short sellers took advantage of the resulting period of uncertainty, and the shares were mostly range-bound throughout 1999 (although those with the conviction to buy on dips did quite well).  Against the tide of a very weak market yesterday, LHSP reached a new 52 week high.  We believe that sufficient time has passed for investors to begin regaining confidence and recognizing that the stock is significantly undervalued compared to its leadership position and huge market potential.
>
> **More Disclosure Should Boost Confidence In Estimates; Higher R&D May Trim EPS 10-12 Cents** – LHSP is a complex company, with many products,

business units and end markets, and it has augmented its growth and consolidated its market position via numerous acquisitions. The results have been impressive, with revenues growing by five fold, from about $100MM in 1997 to our 2000 estimate of slightly over $550MM. However, it has not been easy for investors to understand all the moving parts.

102.   Cowen's report also noted that L&H's balance sheets were "strong in cash," citing $91 million in cash as of the third quarter of 1999. Cowen omitted the fact that L&H had previously committed to spend $40 million of the $91 million to acquire three companies. Moreover, despite its knowledge that revenues were falsely inflated by L&H's improper accounting practices – indeed as discussed elsewhere herein, senior auditors were brought to the attention of Cowen around the time of its February 2000 report regarding, among other things, L&H's revenue recognition and strategic partners -- Cowen made no mention of the accounting mechanisms that artificially inflated L&H's revenues. The false statements in the report served to keep L&H's stock price high.

103.   Cowen released another analyst report on February 10, 2000 again recommending L&H stock as a "Strong Buy," citing an increase of 444% in revenues for 1999 as compared to 1998 and stating that L&H's results in Asia were "especially strong." Again, Cowen made no public disclosure of facts it knew or was reckless in not knowing -- that L&H's convoluted corporate and related party structure permitted artificially inflated L&H's revenues by improperly booking liabilities as revenue and that L&H was involved in many related party transactions which at a minimum were not properly disclosed.

104.   Cowen maintained and reiterated "Strong Buy" recommendations through the fall of 2000, despite the related party transactions and accounting manipulations of L&H. Cowen's public recommendations continued to artificially inflate the value of L&H securities.

43

### The Bakers and Dragon Perform Due Diligence on L&H

105.    In October 1999, the Bakers and other Dragon stockholders began negotiations in earnest about a potential business combination between Dragon and L&H.  These discussions resumed again in February 2000.  After several weeks of negotiations, the parties entered into the Merger Agreement discussed below and the all stock-for-stock merger transaction closed on June 7, 2000.

106.    Among the factors the Bakers considered in selling their Dragon stock to L&H in exchange for L&H stock and in setting the price for their Dragon stock, which L&H paid for in L&H stock, was the market price of L&H stock.

107.    At all relevant times, the market for L&H stock was efficient because L&H common stock met the requirements for listing, and was listed and actively traded on the NASDAQ and the EASDAQ, which were automated and highly efficient markets.

108.    As a regulated issuer, L&H filed periodic public reports with the SEC.  L&H also regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

109.    The market for L&H stock promptly digested current information regarding L&H from the publicly-available sources described above and reflected such information in the price of L&H stock.

110.    Consequently, at all relevant times -- including the time the Bakers were negotiating the price they would accept in L&H stock, the time the Bakers executed the Merger

44

Agreement, and the time the Merger was consummated -- the price of L&H stock was fraudulently inflated by defendants' misrepresentations and non-disclosures.

### False Representations or Omissions
### to the Bakers During the Merger Negotiations

111.    As discussed above, L&H, and Defendants Lernout, Hauspie, Willaert, Pieper, Dammekens and Bastiaens (the "L&H Defendants"), KPMG, Behets and Cowen all disseminated false and omissive information to the market that artificially inflated the value of L&H's stock. As set forth above, in October 1999, L&H sought, with the assistance of KPMG and Cowen, to acquire Dragon from its principal shareholders in exchange for the artificially inflated L&H stock. During these negotiations, the L&H Defendants, KPMG and Cowen made numerous false and omissive representations to the Bakers, representatives of the Bakers, and other principal shareholders of Dragon

112.    In addition to defendants' representations in press releases and public filings, the Bakers relied upon specific representations by the L&H Defendants, KPMG and Cowen regarding the value of L&H and its securities and confirming the accuracy of L&H's public disclosures.

113.    On several occasions during negotiation of L&H's purchase of Dragon, through the purchase of the Bakers' stock and the stock of other Dragon stockholders, Bastiaens told Ellen Chamberlain, interim Chief Financial Officer of Dragon that L&H's projections were on target for the first and second quarters of 2000. L&H made those statements at meetings at the Boston, Massachusetts, offices of Cowen, L&H's investment bankers in connection with the Merger, in February and March, 2000. Bastiaens made these statements with knowledge that Dragon and the Dragon principal shareholders who were parties to the Merger Agreement would rely upon them. Ms. Chamberlain repeated the substance of these statements to the Bakers, who relied upon them in connection with the merger transaction.

114.    The Bakers and other Dragon stockholders and/or representatives of Dragon met with Pieper and other L&H representatives repeatedly regarding the potential merger. Pieper,

45

along with Ben Howe of Cowen, played significant roles on the Dragon/L&H deal team.  Indeed, Pieper traveled to the United States on numerous occasions in the fall of 1999 and winter of 1999/2000 to discuss the potential merger with the Bakers and others.  In these negotiations and meetings, Pieper repeatedly emphasized L&H's strong financial results and growing revenues.

115.    In November, 1999, the Bakers and other Dragon principal shareholders, as well as other members of the Dragon executive staff, met with Pieper, at that time Chairman of the Board of L&H, as representative of the Board of Directors of L&H.

116.    From December 13 to 15, 1999, Dragon's interim CFO met with Messrs. Lernout and Hauspie, where she expressed concern that the FLV Fund was funding the start-up companies that were providing substantial percentages of L&H's software licensing revenues.  Both Lernout and Hauspie assured her that:  (a) they had no financial interest in any of the start-up companies;  (b) any licensing of L&H software by those start-up entities was the result of arms-length negotiation;  and (c) even though they were both on the board of the FLV Fund, they were not active in its decision-making.

117.    In October 1999, Pieper met with Dragon shareholders and stated he had personally "checked things out" regarding the financial soundness of L&H.  On March 8, 2000, Pieper also met with the Bakers, other Dragon principal shareholders, and certain representatives of Dragon.  In that meeting the parties tentatively agreed to the merger of Dragon, subject of course to due diligence, among other things.

118.    On or about March 22, 2000, approximately one week before the Merger Agreement was executed, defendant Dammekens participated in a conference call during which Dragon's interim CFO, in the course of conducting due diligence for the Dragon principal shareholders and Dragon, questioned him about the basis for his comfort with L&H's revenue recognition.  Dammekens stated that he was comfortable with L&H's disclosures of revenue because he and his team reviewed all L&H contracts before financial results were released, including the fiscal year 1999 results that had been released in January 2000.  Dragon's CFO, Ellen Chamberlain, repeated the substance of the representations to the Bakers.

119.    During the course of due diligence prefatory to the merger, Dragon and its shareholders had repeatedly asked to speak with KPMG, but that request was rejected allegedly because their audit of L&H's 1999 financial statements had not been completed.

120.    A representative of the Dragon shareholders who were signatories to the Merger Agreement, including the Bakers, was finally able to question representatives of KPMG Belgium during the March 22, 2000 conference call, in which a more senior audit partner from KPMG LLP and one or more auditors from KPMG Belgium, and possibly persons from other KPMG offices also, participated. The senior KPMG auditor on the call stated that he was a "KPMG partner," that he was standing in for the KPMG partner with responsibility for the L&H audit, who was on vacation, and that he was familiar with the audit. A KPMG Belgium manager who had participated in the audit was also on the call. The KPMG personnel who participated in the call knew that the purpose of the call was to provide information to the principal Dragon shareholders who were signatories to the Merger Agreement, as an important part of their due diligence with respect to the Merger. Indeed, the substance of this information was provided to the Bakers. Specifically, during the March 22, 2000 conference call, the above-referenced KPMG LLP partner stated:

(a)    KPMG Belgium expected to sign off on its audit of L&H's 1999 financial statements in two to three weeks.

(b)    The only open audit issues were:

(i)    "a couple of revenue issues" in Korea regarding one or two customers, but nothing that would cause an adjustment;

(ii)    a "couple" of contract confirmations had not yet been received; and

(iii)    KPMG Belgium had yet to complete minor tests of L&H's capitalization of its R&D expense, such as checking timesheets of engineers who had billed time to certain projects.

(c)    In the course of the 1999 audit, no adjustments had been booked by the auditors.

(d)    KPMG would not describe "passed" adjustments -- those adjustments are matters of judgment, which, if they do not add up to a material amount, will be "passed" by the auditors.

(e)    KPMG did not at that time anticipate any material adjustment of L&H's 1999 financial statement.

(f)    KPMG was "comfortable" with L&H's revenue recognition.

(g)    L&H did not record revenue from software sales until after that software left the distributor.

121.    Dragon was aware that, in 1999, L&H had been previously investigated by the SEC in connection with an aggressive means of accounting for acquisitions. L&H had used a "purchase" method of accounting for goodwill, taking it as a one-time charge against earnings for "in-process research and development." L&H's methods, audited and approved by KPMG, impermissibly allowed L&H to avoid the long-term depression of earnings caused by amortization of goodwill. The SEC required L&H to restate its financial results for 1997 and the first six months of 1998. The Bakers were in no way aware of the subsequent SEC investigation that had commenced as early as January 2000, or earlier, and believed that all SEC inquiries had been resolved at the time of the merger.

122.    When this issue was raised during the March 22, 2000 conference call, KPMG stated that all issues from SEC inquiries into L&H accounting practices had been resolved. That was untrue. KPMG Belgium knew this was untrue and the other KPMG defendants either knew this or were reckless in not knowing this. This misinformation was presented with the knowledge and understanding that it would be presented to the Bakers, as majority shareholders of Dragon, and indeed it was.

123.    During the due diligence, the L&H Defendants and KPMG represented that the SEC review had been fully resolved. However, the L&H Defendants and KPMG deliberately concealed from the Dragon shareholders, including the Bakers, the fact that the SEC had commenced a new investigation of L&H's accounting practices in January 2000, which focused

48

on L&H's revenue recognition practices and, in particular, on the Company's contracts and relationships with its so-called "strategic partners."

124.    Indeed, internal L&H documents show that, not only did KPMG have knowledge of this investigation contemporaneously with the representations it made to the Bakers during due diligence, but that KPMG took the lead in responding to the SEC's investigation on behalf of itself and L&H.  These same documents show that L&H was not permitted to publicly announce its 1999 results until KPMG gave its express "consent" to the February 9, 2000 press release and, further, that KPMG considered the SEC investigation to be material and a significant concern.

125.    Thus, on January 31, 2000, KPMG Belgium audit partner Van Aerde sent an e-mail to Dammekens, Bastiaens and Robert McLamb, in which he set forth "a list of urgent items to be followed up by the company in order for us to be able to give our consent for the [February 9] press release."  Van Aerde noted that the list was "long," but explained that "in view of the nasty SEC letter, you as CFO and CEO and we as auditors cannot afford to leave open items." [Emphasis added.]

126.    That same day, Van Aerde sent another e-mail to Willaert, requesting information concerning L&H's "strategic partners" and their relationship with L&H:  "As you know, we are not the only ones who are interested in the related parties (cf. the SEC letter of last week)."  The next day, on February 1, 2000, Van Aerde sent an e-mail to McLamb and Dammekens, as well as to Willaert, Hauspie, and Bastiaens, which stated that "KPMG has asked Carl Dammekens to collect information onto the related parties transactions between L&H, FLV (and FLV Management) and LHIC. . . .  This information has also been requested by the SEC, as you know."

127.    In another e-mail dated February 3, 2000, Dammekens asked McLamb and Philip Flink, a partner at L&H's outside counsel, Brown, Rudnick, Freed & Gesmer, for their comments on a suggested approach for L&H's "initial production" to the SEC.  Flink expressed the view that L&H should be "more expansive" in its production to the SEC.  McLamb,