however, expressed a contrary view, cautioning that the Company "should talk to Fran Dissaro at KPMG . . . before calling or sending in documents."

128.    Further, in April of 2000, prior to the Closing Date, the SEC sent a follow-up letter directly to KPMG Belgium requesting additional information about L&H's accounting practices and possible related-party transactions involving L&H's "strategic partners." Nevertheless, even though their own documents show that they considered the SEC investigation to be a significant concern, L&H and KPMG failed to disclose the existence of this SEC investigation to Dragon or the Bakers.

129.    KPMG's failure to disclose the SEC investigation to Dragon and the Bakers is particularly damning because, as demonstrated below at ¶¶ 161-185, KPMG knew, contemporaneously with the due diligence, that there were serious questions regarding whether the strategic partners were independent from L&H and whether the revenues that L&H had booked from its strategic partner transactions were legitimate.

130.    Notwithstanding the L&H Defendant's and KPMG's actual knowledge of the pending SEC investigation into L&H's revenue recognition practices and the effect that an adverse finding would have on L&H's published financial results and, in turn, its stock price, L&H and KPMG failed to disclose even the existence, much less the seriousness, of the SEC investigation, or their concerted efforts to withhold information in their representations to Dragon and the Bakers.

### Reliance on KPMG's Subsequent Unqualified Opinion for 1999

131.    On April 27, 2000, KPMG Belgium issued its unqualified report on L&H's 1999 financial statements, confirming KPMG's oral representations on March 22, 2000, that its audit had uncovered no material errors or improprieties in the unaudited financial statements issued in January and making no mention of the SEC investigations:

> We have audited the accompanying consolidated balance sheets of Lernout & Hauspie Speech Products N.V. and subsidiaries (the Company) as of December 31, 1998 and December 31, 1999, and their related consolidated statements of

operations, shareholders' equity, cash flows and comprehensive income (loss) for each of the years in the three-year period ended December 31, 1999....

\*　　\*　　\*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries as of December 31, 1998 and December 31, 1999 and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1999, in conformity with generally accepted accounting principles in the United States.

132.    The Bakers would have been entitled to, and would have, terminated the Merger Agreement prior to closing if it became apparent that L&H's audited financial statements for 1999, released prior to execution of the Merger Agreement, were materially misstated. However, the Defendants continued up to and well past the date of the merger to conceal this fraud. The Merger Agreement provided in this regard as follows:

(a)    The Merger Agreement included L&H's representations and warranties that: (a) all of L&H's filings with the SEC since January, 1998, did not contain any untrue statement of material fact or any material omission;   (b) that all financial statements included in L&H's SEC filings complied in all material respects with SEC accounting requirements and published rules and regulations, and were prepared in accordance with U.S. GAAP; and (c) that L&H's unaudited consolidated financial statements for the year ended December 31, 1999 were prepared in accordance with U.S. GAAP and "fairly present in all material respects the consolidated financial position of [L&H] as of the date thereof."

(b)    Section 9.1 of the Merger Agreement allowed the Bakers to terminate the Agreement at any time prior to closing "if there has been a breach of any representation [or] warranty ... which causes the conditions set forth in section 7.3(a) ... to be incapable of being satisfied."

(c)    Section 7.3(a) of the Merger Agreement provided that "representations and warranties of [L&H] shall be true and correct in all material respects as of the closing date."

133.    Had KPMG not given an unqualified opinion stating that L&H's 1999 financial statements were prepared in accordance with U.S. GAAP -- or had it otherwise qualified its report on L&H's 1999 financial statements -- this would have communicated to the Bakers that L&H's unaudited consolidated financial statements for the year ended December 31, 1999 were not prepared in accordance with U.S. GAAP and the Merger would not have been consummated.

51

Indeed, even though the meetings that KPMG had with Dragon and its shareholders were for the purpose of satisfying the Bakers' and the other Dragon shareholders' due diligence inquiries about L&H, KPMG actively concealed material information from the Bakers or turned a blind eye as to whether accurate and complete information had been provided in reckless disregard of the truth. KPMG knew that it would jeopardize L&H's acquisition of Dragon if KPMG disclosed any information which might cause the Bakers and other Dragon shareholders to have any material concerns about L&H's financial statements or results. KPMG knew that its business relationship with L&H and its numerous related entities, at least some of whom KPMG also audited and in whose companies placed one or more former employees, would be jeopardized if KPMG endangered L&H's acquisition of Dragon. KPMG also knew that it would jeopardize KPMG's lucrative consulting work with L&H.

### KPMG's Knowledge of Certain Korean Contracts
### Where Revenue Was Not Collectible or Recognizable

#### a.  HI Worldwide

134.    KPMG's unqualified audit opinion stating that L&H's financial statements were prepared in accordance with U.S. GAAP included the recognition of revenue for contracts where no revenue was recognizable and the accounts receivable were not collectible. One such contract was with HI Worldwide, one of L&H's Korean customers. The HI Worldwide contract was the largest license agreement in L&H's history, and the $11 million of revenue booked represented 10% of L&H's total reported revenues for the fourth quarter of 1999. In fact, KPMG knew during Dragons' due diligence and prior to the date the agreement closed that revenue should not have been recognized on this contract.

135.    On March 1, 2000, KPMG's Korean audit partner, Oh Bum Kwon, sent an e-mail to Stephan Huysman of KPMG Belgium regarding a number of issues with respect to the HI Worldwide contract that precluded revenue from being recognized. Kwon told Huysman that collectibility of the substantial amounts due under this contract was far from likely because, among other things, the chairman of HI Worldwide, a Mr. Lee, was a "non-businessman" with

"no prior experience in the industry" who had started his company based upon a "lucrative future blue print" following a meeting with the president of L&H Korea. Indeed, in that e-mail, KPMG specifically noted that it was "not certain that he [Mr. Lee] has enough wealth" to pay the extraordinary amounts due to L&H. HI Worldwide had only just been established during the fourth quarter of 1999, approximately one month before it entered into the purported $11 million contract with L&H.

136.    Moreover, the products covered by the contract had not been delivered to HI Worldwide at the time revenue was recognized. This fact alone meant that revenue could not have been recognized on this contract under SOP 97-2. In the same March 1, 2000 email, Kwon reported to KPMG Belgium that Mr. Lee had "raised a question of the delivery of key product, a chip as [sic] what he said." On March 7, 2000, Huysman sent an e-mail to Dammekens and Van Aerde, among others, in which he wrote that "it appears Lee did not receive a 'key product.' Do you know anything about this or should I ask Gaston [Bastiaens] for an explanation (at least in case it is about contracts in the sales per December 31, 1999)?" [Emphasis added.]

137.    That same day, Huysman sent a separate e-mail to Kwon, with a copy to McLamb, in which he specifically noted that the failure to deliver the product meant that revenue could not be booked: "Do you have further info on what product was missing? Does this knowledge jeopardize revenue recognition of L&H at December 31 of one or other contract?" Kwon, who knew the product had not been delivered, avoided answering Huysman's question, instead writing that "I believe he [Lee] had a meeting with Gaston when the chairman visited Korea last week." After he received the e-mail, McLamb was sufficiently concerned about the situation that he himself got involved. On March 8, 2000, McLamb asked Kwon: "How does this answer the question? Was the product delivered prior to 12/31/99 or not." [Emphasis added.]

138.    The next day, Huysman forwarded Kwon's e-mail and McLamb's response to Bastiaens, stating:

> I understand from the reading of the mail that there was a discussion on delivery of a key product (a chip apparently) for a contract. Since this has been discussed with you, could you clarify what the issue was, if any, i.e.:
>
> 1. Was there a vital element missing of a license agreement that was signed with HI World prior to Dec. 31, 99?
>
> 2. If so, how come that Mr. Lee had signed a letter as token of having received the software in the contract?
>
> 3. How has this been resolved now?

139.    In fact, HI Worldwide had never received the product, which was not even an actual product but instead an idea for new technology which L&H had yet to develop.  On June 22, 2000, Lee sent an email to Bastiaens stating:

> I was led to believe that (i) your ASR 300 engines, technology and documentation in all 5 plus 4 languages were ready for deployment immediately upon execution of the agreement; (ii) that the appropriate chip set configuration, design and specifications were already completed, which in turn would enable us to produce them in mass within a period of 2 months; (iii) that L&H Korea technicians were fully trained to provide HI Worldwide all the necessary technical assistance promptly and in time; (iv) that the final chip set would not cost more than US $7.00 each; (v) and that once HI Worldwide made the chips it would capitalize on being the only company in the world to monopolize the entire toy industry in terms of supplying speech recognition chip sets.  <u>The truth is, you did not have the technology ready for deployment in a chip set format when you entered into the license agreement, your engineers had not even gone to Belgium to receive training for the ASR 300, the chip set in the format and spec given to us cost more than double your quotation, the chip set takes 6 months to develop, and you had not even tested whether ASR 300 would work as well as you claimed it would</u> . . . . My Korean attorneys inform me that the above alone are sufficient grounds for fraud charges under Korean laws.
>
> In addition, a couple of days ago your Mr. Seo explicitly admitted to me that your company did not have the technology ready, neither then nor now.
>
> [Emphasis added.]

The fact that a key product had not been delivered as of December 31, 1999 meant that, under SOP 97-2, revenue could not have been recorded in L&H's 1999 fiscal year.

140.    In this same e-mail, Lee stated that L&H had <u>guaranteed</u> a bank loan to HI Worldwide, from which the $11 million up-front payment was made to L&H in December 1999, and that L&H Korea's president had channeled his own money into HI Worldwide in order to dissuade it from suing L&H for breach of contract.  Accordingly, L&H was further precluded from recognizing revenue from HI Worldwide in 1999, because HI Worldwide lacked economic substance apart from L&H's support.  Indeed, because HI Worldwide had no real assets, the fact that L&H guaranteed the loan to HI Worldwide effectively meant that L&H was paying itself and booking that money as revenue.  As Kwon's March 1, 2000 e-mail makes clear, KPMG knew that HI Worldwide was a newly formed entity that lacked economic substance.  Accordingly, KPMG was at least reckless in allowing revenue to be recognized on this contract.

141.    As set forth above, the HI Worldwide contract was highly material to L&H's 1999 financial results.  KPMG knew, contemporaneously with the representations it made during the due diligence, that there were substantial questions regarding this contract, including whether the product had been delivered to HI Worldwide and whether HI Worldwide had economic substance (both necessary preconditions to revenue recognition).   KPMG's representations that revenue had been properly recognized on this contract were knowingly or recklessly false since it had no basis to make that claim.

142.    L&H's recognition of revenue on the HI Worldwide contract was inappropriate for still another reason:  it had recognized a prepayment of royalties from HI Worldwide as revenue when the software on which the royalties were to be paid had not even been developed yet.  Indeed, as HI Worldwide's June 22 e-mail stated, L&H had not developed the software by June 2000.  Moreover, KPMG knew that this precluded revenue from being recognized on this contract.  A March 20, 2000 e-mail from Filip Beernaert of L&H to Lernout, Hauspie, Bastiaens and Dammekens states:

55

> We just had a meeting with Bob McClamb [sic] of KPMG on the revenue recognition.
>
> Bob mentioned that the revenue under an exclusive contract can only be recognized over the term of the exclusivity. . . .
>
> Another item that he mentioned was that development or consulting agreements that are made in relation to a license agreement and which state that the development of an application or the engineering work of an application are done by L&H and for which such work is substantial to the customers application will prevent L&H from recognizing the revenue under the license agreement, until the work is accepted.

The major contracts we have in Korea have beside the license agreement also a development agreement in which we develop the application for the customer.

143.    Thus, even though McLamb and KPMG had informed L&H that the appropriate accounting treatment for such contracts was to defer the revenue until the customer had agreed that L&H's development work was acceptable, KPMG nonetheless included this revenue as properly recognized in L&H's 1999 financial statements.

144.    In addition, the licensing fee supposedly called for by this contract was at least 50 times in excess of typical license fees in the Korean market at the time, a fact which, even if none of this other information had been known to KPMG, indicated the suspicious nature of this contract.  Moreover, as discussed above, L&H's recognition of revenue on this contract was based entirely upon having factored the receivable from HI Worldwide "with recourse" with two Korean banks, meaning that the revenue could not have been booked under U.S. GAAP and that the cash supposedly obtained by L&H pursuant to this contract was actually being held in time-deposit bank accounts and would be taken away by the bank once HI Worldwide failed to pay.

### b.    Voice Tech Korea

145.    Another example of a Korean contract for which revenue could not be recognized was the contract with Voice Tech Korea, pursuant to which L&H had recorded $7 million of revenue in the third quarter of 1999.  Although KPMG included this revenue in L&H's 1999

financial statements as having been properly recognized in accordance with U.S. GAAP, KPMG knew that the revenue should not have been recognized for numerous reasons.

146.    KPMG knew that there were serious concerns about this contract. Indeed, as set forth in ¶ 148 below, KPMG had determined in October 1999 that there were "critical revenue recognition issues" with respect to this contract. For one, although the agreement was dated September 30, 1999 (the last day of the third quarter), there were absolutely "no proper documents on the revenue generation schedule." In a series of internal e-mails, copies of which were sent to Van Aerde and McLamb, KPMG determined that L&H should not have booked the revenue from this contract in the third quarter, but should have instead recognized it over a five-year period, because that was how long it would take to develop the product.

147.    Moreover, KPMG knew that there were serious questions regarding collectibility of the $7 million. KPMG knew that the contract with Voice Tech was highly suspicious, as Voice Tech was a brand new start-up company with virtually no financial resources and no ability to pay L&H $7 million. In fact, KPMG knew that L&H had recognized revenue based upon factoring the receivable "with recourse" with a Korean bank. Factoring "with recourse" meant, of course, that the cash ostensibly paid to L&H by the bank in exchange for the receivable could not be recognized as revenue, because L&H was obligated to return it to the bank, if and when the customer failed to pay. In other words, the cash on L&H's balance sheet was not L&H's, but the bank's. Accordingly, these sales of receivables were not final and could not be recorded as revenue under U.S. GAAP.

148.    KPMG's knowledge of these facts is established by an "URGENT" e-mail message dated October 18, 1999 from KPMG Korea partner Kwon to Stephan Huysman of KPMG Belgium with copies to Dammekens and Van Aerde, sent just weeks before the issuance of L&H's press release announcing third quarter 1999 financial results:

> We just completed our fieldwork for the September closing of Bumil [L&H's Korean subsidiary]. However, we have a critical revenue recognition issue as follows and, I want you to confirm

this in your office as well as appropriate L&H responsible personnel.

At 30 September 1999, L&H Korea ("Bumil") recognized the software revenue of approximately U$11 million, the largest amount Bumil ever recorded. The sales were made to two unknown local software companies, VoiceTek (U$7M) and International Business Computer (U$4M), respectively, and I believe that Frederick's visit to Bumil last time was probably to review or record these transactions. Frederik [Deschodt, L&H assistant controller] told the accountant of Bumil that this transaction was agree by KPMG at the Corporate level. I am surprised why he did not discussed with me when we met last time.

We were not informed of the details of VoiceTek. Same to ICB. We know that VoiceTek was established in July this year in the minimum paid-in capital. We are not aware of anything on IBC. There are sales contracts dated 30 September 1999 with these new customers but there are no proper documents on the revenue generation schedule and condition. The contracts say that the sales is final and no refund is required and the localizing expenses to be incurred will be charged to the customers additionally, etc. Furthermore, the receivable was factored with a local bank with a collateral of Bumil's bank deposit and we believe the factoring is 'with recourse.'

Because of this transaction at 30, September 1999, Bumil showed big profit, about, U$13M, in September while it had loss carryforward of approximately U$0.5M until the end of August.

Based on our understanding, I have several critical questions.

1. Why did Bumil recognized the whole amount in September? Per their explanation, the ultimate resolution in Korean will take about five years to complete even though Bumil is not required to refund the contract amount. Therefore, at least, the revenue should be recognized over five years or more.

2. The revenue recognition basis under USGAAP (SOP 91-1 and 97-2) should be carefully complied in this transaction. Because of its sensitive nature of the first consolidation with L&H, I recommend you should consult your SEC partner on this issue. My preliminary interpretation is that this revenue recognition has some problems particularly in terms of "when-and-if" available conditions, delivery of products, and collectibility.

As you know this issue should be cleared promptly to complete the consolidation, please discuss at Corporate level and advise me of the discussions. If it meets the requirements of SOP's, we may conclude the September closing and consolidation package of Bumil.

Thanks in advance for your immediate action.

[Emphasis added.]

149. After receiving the October 18, 1999 e-mail, Huysman called McLamb and told him of the issues raised by the Korean auditors. McLamb sent Dammekens an e-mail on October 22, 1999, stating that: "I have been discussing the two Koreans contracts [Voice Tech and IBC] with Glen Davison and we do have concerns about each." McLamb told Dammekens that he would attempt to call him over the weekend to discuss.

150. McLamb spoke to Dammekens that weekend, as confirmed by an October 25, 1999 e-mail from Dammekens to Bastiaens:

Talked with Bob McLamb. He wants to see the following matters regarding Korea:

1) the KPMG people of Korea said via email that there is "a relationship" between the president of Bumil and the man from VOICE TECH. He wants a statement from both presidents that they are not related (family) and that there are no side agreements.

2) For both, he wants to know who is behind the companies in order to judge the collectibility.

151. Thus, McLamb and KPMG were well aware in October 1999 of the serious issues concerning the Voice Tech and IBC contracts. KPMG knew that there was supposedly a "relationship" between Voice Tech and the president of L&H Korea and that Voice Tech had supposedly promised to pay a $7 million licensing fee to L&H even though it was an "unknown local software company" that had been established for the minimum paid-in capital only a few months before it signed the contract with L&H. KPMG also knew that the receivable had been factored with recourse. In sum, KPMG failed to properly consider and respond to information known to it that demonstrated that the Voice Tech contract was nothing more than a sham. To

59

the contrary, KPMG permitted L&H to recognize $7 million of revenue on this contract (and another $4 million on the IBC contract). These two contracts accounted for 13% of L&H's 1999 third quarter revenues. Nonetheless, KPMG falsely represented in L&H's 1999 financial statements that this revenue was recognized in accordance with U.S. GAAP.

152. Indeed, even if none of this had been known to KPMG, the Audit Committee Report identified numerous other ways in which L&H's recognition of revenue on this contract failed to comply with U.S. GAAP:

    a.     KPMG improperly permitted L&H to account for this agreement as two separate contracts, a development agreement and a distribution agreement, and to recognize revenue separately on each element.

    b.     KPMG improperly permitted L&H to recognize the entire development fee in the fourth quarter of 2000, when under the applicable accounting provision, SOP 81-1, "the development fee should have been spread over the development period until September or October 2000."

    c.     The contract was modified on October 21, 1999 – after the third quarter had ended – by an amendment removing the right to distribute certain "when and if available" products which were the subject of the development agreement. The Audit Committee Report questioned whether this amendment was even legitimate, but assuming that it was, noted that the revenue recognized in the third quarter should have been deferred until the fourth quarter, noting "KPMG signed off on 1999 financials."

### c.     Digital Sei-Young and Neo Information Telecom

153. Further, KPMG permitted L&H to recognize, in the fourth quarter of 1999, $8,500,000 of revenue on a contract with Digital Sei-Young Ltd., and $8,000,000 of revenue on a contract with Neo Information Telecom ("Neo"). These were two other purported Korean customers. However, KPMG knew that the revenue on these contracts should not have recognized for several reasons, not the least of which was that the contracts were still in draft form, with key terms missing, at the end of the fourth quarter. On January 5, 2000, McLamb sent an email to Dammekens attaching McLamb's "comments on certain draft agreements" with three Korean customers, including Digital Sei-Young and Neo. The three contracts reviewed by

McLamb accounted for $23 million of revenue, or 22% of L&H's total revenues for the fourth quarter of 1999 and 5% of its total revenues for the year. McLamb noted a number of issues which precluded revenue recognition for these contracts, including the fact that the agreements had not yet been signed by the parties:

> 1. The contract should be signed and **dated** by each party. Having just an effective date is **unacceptable.**

> 2. Need to determine the financial viability of Digital to determine whether they have the financial ability to pay the $10 million.

> 3. Need to see clear evidence of the delivery of the deliverables under each part of the contract.

> 4. Need to confirm with Digital that there are no other written or oral agreements between itself and L&H. In addition, we need to confirm the prepayment of royalties is non-refundable and is not dependent on any future sales of Digital.

> \* \* \*

> 7. Under each part of the contract Digital is required to obtain L&H's approval for design of packaging and other artwork. This is continuing involvement of L&H and causes a problem with revenue recognition.

> 10. Article A.8.1 makes it possible for Digital to get its money back . . .

McLamb made the same comments with respect to the Neo contract.

154.    Thus, McLamb and KPMG knew that revenue should not have been recognized on these "contracts" in the fourth quarter, because as of January 5, 2000, five days after the quarter closed, they were still in "draft" form, missing signatures, dates, and other key terms.

155.    L&H's and KPMG's response to the issues identified by McLamb bordered on the absurd. L&H obtained the signatures of Digital Sei-Young and Neo on virtually identical form letters prepared by L&H's Legal Department for the customers' signature. Digital Sei-Young's letter stated as follows:

> Digital Sei-Young Co., Ltd. hereby states that it has sufficient financial means and is financially viable to enter into the License, Merchandising

and Broadcasting Agreement with L&H Korea for the amount of 10 Million US Dollars. The amount of 10 Million US Dollars being non-refundable under this agreement.

* * *

Furthermore we can declare that no other arrangements, contracts, agreements or conditions are imposed on or dependent on Digital Sei-Young to enter into this Agreement, nor that L&H Korea will have to perform any other obligation than stated under the contract.

Digital Sei-Young hereby declares that it has received all deliverables which are needed and specified under the contract and that it accepts all such deliverables. The deliverables were delivered on December __, 1999 as follows: _____.

Sincerely yours,

/s/

156.   Neo's letter was virtually identical and stated as follows:

Neo Information Telecom Co., Ltd. Hereby states that it has sufficient financial means and is financially viable to enter into the License Agreement with L&H Korea for the amount of 8 Million US Dollars. The amount of 8 Million US Dollars being non-refundable under this agreement.

Furthermore we can declare that no other arrangements, contracts, agreements or conditions are imposed on or dependent on Neo Information Telecom to enter into this Agreement, nor that L&H Korea will have to perform any other obligation than stated under the Agreement.

Neo Information Telecom hereby declares that it has received all deliverables which are needed and specified under the contract and that it accepts all such deliverables. The deliverables were delivered on December 31, 1999 as follows: _____.

Sincerely yours,

/s/

157.   Thus, in both of these cases (and in the case of the third "draft" agreement commented on by McLamb as well), the customer actually left key terms of the confirmation blank, including the date the products were supposedly delivered and the description of the

62

goods delivered. These letters were obviously insufficient to provide evidence that the revenue on the Digital Sei-Young and Neo contracts had been properly recognized, because a bare statement by the customer that "it has sufficient financial means" to pay the contract price does not constitute sufficient "competent evidential matter" to permit a conclusion that the customer's payment is reasonably assured. Indeed, these letters should have made KPMG more suspicious about the validity of these agreements, since KPMG could not confirm, as required by SOP 97-2, the customer's ability to pay, the products involved, or whether the products were satisfactorily delivered, and if so, when.

### d.    Four One One.Com

158.    KPMG also signed off on L&H's recognition of revenue where receivables on certain contracts were outstanding for more than 90 days -- including, for example, the amount of $2.6 million on a contract with Four One One.Com and $2.7 million on a contract with The Learning Kernel -- and that in some cases confirmation letters sent to L&H's customers had not been returned. These issues were important to L&H's financial statements because receivables outstanding for long periods of time can indicate that revenue should not have been recognized, the customer cannot pay, or even that the validity of the underlying contract is in question. Nonetheless, KPMG continued to sign off on L&H's recognition of revenue in the 1999 financial statements for contracts where the collectibility of the outstanding account receivable was doubtful, the revenue should not have been recognized in the first instance and the validity of the contracts was questionable. Indeed, KPMG validated the recognition or revenue in the 1999 financial statements even where confirmations had been sent to L&H customers such as Digital Sei-Young and Neo seeking to confirm delivery of the goods, the customer had returned the confirmation with the delivery date and description of the goods blank.

159.    Specifically, with respect to the $2.6 million Four One One.com receivable, KPMG knew that there were serious questions concerning collectibility. A January 26, 2000 e-mail from KPMG Korea auditor Philip Lee to Stephen Huysman and William Van Aerde, both of KPMG Belgium, stated:

Four One One.com – Conditions set out in SOP 97 are met <u>but we do have some doubt on the collection of the outstanding balance.</u> Of the contract sum of US$4.5 million, US$1.9 million has been collected leaving a balance of US$2.6 million which is more than 90 days overdue. Ms Cheryl Foo (our local contact at L&H Asia) is of the view that the amount is collectable but <u>we do not have further information on the debtor.</u> Cheryl advised that Carl Dammekens has more information on the ability of the customer to pay up the balance. In our view, the conditions for revenue recognition appears to have been met <u>except that there is now an issue of collectibility of the outstanding amount receivable.</u>

[Emphasis added.]

160.    Thus, even though KPMG knew that there were serious doubts about whether the outstanding $2.6 million would ever be paid, it failed to inform Dragon and the Bakers of this fact. In addition, at no point during the due diligence of Dragon and the Bakers did KPMG inform Dragon or the Bakers that the $4.5 million contract amount should not have been recognized as revenue in the second quarter of 1999. On February 15, 2000, Stefan Huysman of KPMG Belgium sent Willaert a confirmation letter to be signed by the customer on this contract confirming an extended payment plan, under which 20% of the outstanding amount would still remain unpaid on December 31, 2000, a full year-and-a-half after the revenue had been recognized. KPMG never told Dragon or the Bakers that it knew a significant part of this receivable would not even be paid by the end of 2000. In addition, KPMG failed to tell Dragon of the Bakers that although Huysman had asked Willaert to obtain the signed confirmation by March 31, 2000, KPMG had failed to receive it as of April 21, 2000, as confirmed by an e-mail of that date from Veronique De Roose of KPMG Belgium to, among others, Dammekens, McLamb, and Van Aerde.

### KPMG's Knowledge of the "Strategic Partner" Agreements

161.    KPMG also signed off on L&H's "strategic partner" arrangements and on L&H's relationship with these entities, specifically that these entities were independent of L&H. This issue became increasingly important in reviewing L&H's 1999 financial statements because

almost 50% of L&H's increased revenues in the first nine months of 1999 were attributable to an increase in strategic partnership licensing revenue.

162.    As explained above, under U.S. GAAP, if such strategic partners were not truly independent, then the amounts received from them by L&H would have to be characterized as a loan for accounting purposes, rather than revenue.  Indeed, even where U.S. GAAP permits recognition of revenue on transactions with related parties, it requires specific financial statement disclosures indicating, among other things, that the revenue was derived from related parties.  In addition, L&H could not recognize revenue on these contracts under U.S. GAAP if it retained significant continuing obligations under the contracts.

163.    KPMG and L&H's representations that the agreements with the "strategic partners" were with independent entities and revenue therefrom was thus properly recorded were knowingly false because KPMG and L&H knew that the "strategic partners" were funded by entities related to L&H, including the FLV Fund and other related parties, and that, as a consequence, any amounts collected thereunder had to be treated as loans which L&H was obligated to repay rather than as revenue.

164.    KPMG knew that there were problems with the recognition of revenue on L&H's "strategic partner" contracts as early as at least July 1999.  In a July 29, 1999 letter from Van Aerde to Bastiaens confirming a meeting for September 1, 1999 between Bastiaens, Van Aerde, McLamb and Boyer (the KPMG Boston audit partner) for the purpose of discussing the "Language Companies," Van Aerde wrote that he:

·    "wanted an update on the status, review of independence;"

·    "required names of investors to arrange a separate meeting;"

·    "wanted to review collectibility of the LDC receivables."

165.    The July 29, 1999 letter also indicated that Van Aerde wanted an "update on the status of all issues raised in the Report to the Audit Committee," the most important among them being "revenue recognition."  The letter also attached a "prioritised list of issues to be addressed"

65

stating that "specific proof of the collectability of individual outstanding receivables" was necessary "in order to avoid the reversal of revenue recognised in prior quarters."

166.    KPMG did not resolve the issue of the LDCs to its satisfaction.  Subsequently, in September 1999, the "KPMG USA Professional Practice" group asked KPMG Belgium, including Van Aerde, to conduct a "special review" of "the billing and collection procedures of L&H towards the Language Development Companies."  In connection with this review, KPMG performed "audit confirmation procedures" with 15 LDCs, whereby KPMG requested that each LDC confirm in writing to KPMG that it was not related to L&H, there were no side deals, and that there was "no commitments for (re)payment by LHSP, Mr. Lernout or Mr. Hauspie to the LDC's."  Of the 15 LDCs that KPMG contacted, only 8 responded in writing.  KPMG received a "verbal confirmation" from one individual who claimed to be a "representative" of three of the LDCs, and received no confirmation at all from the other 4 LDCs.  As a result, KPMG sought to contact the shareholders and investors of the LDCs to confirm that they were truly independent. However, it was unable to do so because L&H refused to provide KPMG with the identity of the investors in the LDCs.  Nevertheless, KPMG rendered a clean audit opinion on L&H's 1999 year-end financials, with no disclosure that L&H had limited the scope of its audit by refusing to provide needed information.

167.    On September 30, 1999, Van Aerde sent a "confidential memorandum" to McLamb which confirmed these facts.  In that memorandum, Van Aerde wrote that "certain scope limitations were imposed on [KPMG] when performing our review." (emphasis added). Specifically, Van Aerde told McLamb that when he attempted to meet with the investors:

> The shareholders and/or investors of the LDC's could not be met. Contacts could be made with the managing directors of subject LDC's. We were informed that shareholders or investors may not wish to be contacted. There are no legal grounds to enforce such a contact (at this stage).

[Emphasis added.]

66

168.    "Scope limitation" is a technical auditing term.  The third standard of auditing field work requires that the auditor's opinion be based on sufficient competent evidential matter. If adequate evidence is not collected, a so-called "scope limitation" occurs.  With respect to scope limitations, the authoritative auditing literature states:

> The auditor can determine that he is able to express an unqualified opinion only if his audit has been conducted in accordance with generally accepted auditing standards and if he has therefore been able to apply all the procedures he considers necessary in the circumstances.  Restrictions on the scope of his audit, whether imposed by the client or by circumstances, such as the timing of his work, the inability to obtain sufficient competent evidential matter, or an inadequacy in the accounting records, may require him to qualify his opinion or disclaim an opinion.

[Emphasis added.]

AICPA Professional Standards Volume 1, U.S. Auditing Standards ("AU"), section 508.24.

169.    By calling the denial of access a "scope limitation," Van Aerde admitted that KPMG had determined this to be a necessary audit procedure which could not be ignored.  Van Aerde and McLamb knew that the LDC transactions were highly material to the Company's operations and, as a result, should not have accepted the scope limitation imposed by L&H management.  In any event, the existence of a scope limitation meant that KPMG should have issued a qualified audit opinion, rather than an unqualified one.  Nonetheless, KPMG represented to Dragon and its shareholders through Ellen Chamberlain, Dragon's then CFO with the understanding that it would be repeated to the Dragon shareholders, including the Bakers -- which it was -- that it expected to issue an unqualified audit opinion on L&H's published 1999 financial results and that its revenue recognition was in compliance with U.S. GAAP.

170.    In fact, the confirmations which were returned to KPMG from the eight LDCs which did respond established that the LDCs were not independent third parties.  KPMG received a single confirmation on behalf of four of the LDCs, signed by Willem Hardeman.  In that confirmation, Hardeman claimed that "I confirm that I consider myself and the above mentioned companies [the LDCs] as independent third parties from LHSP."  What KPMG

67

certainly knew, however – because KPMG Belgium was the auditor of the FLV Fund – was that Hardeman was a director of the FLV Fund, which was a related party to L&H. Thus, Hardeman himself was a related party to L&H, and from his admission in the confirmation that "I am indeed the financial investor" in the LDCs, KPMG knew that those four LDCs were related parties to L&H.

      171.   On January 27, 2000, Stephan Huysman of KPMG Belgium sent an e-mail to KPMG's Korean auditors, copied to McLamb, stating that:

> I refer to both your reports that we received this week. We are still struggling with the input that we keep getting in different reports (or versions from reports) in connection with a party ('LDS') that is mentioned in both the SFM of KPMG Singapore and KPMG Seoul.

> We are over here [sic] that L&H sells license agreements through the Ieper company or through the Singapore affiliate to newly set up companies which purpose it is to develop a language. These entities are called Language development companies (LDC's) and are different legal entities, <u>although some of them are on the same address in Singapore.</u>

> Philip, your report mentions a party LDS (Language Development Services group of companies) and then lists them. <u>Oh Bum, in your first version of the report you mention that a customer 'LDS' had erroneously deposited 'an amount of $25 million on the accounts of L&H Korea on December 31.' Then, the explanation is confusing and, first, it was thought that this amount should have been repaid to the president of L&H Korea by LDS (collection of a personal loan that this person would have given). Then, according to later input obtained from management, the amount would be a payment of LDS that should have been paid not to L&H Korea but to L&H Singapore.</u> However, given foreign exchange restrictions, this would now be difficult.

> Then, in the version of the KPMG Korea report that was sent yesterday, this paragraph of the report has been corrected. It still states that this money should have been paid by LDS to L&H Singapore instead of on the bank account of L&H Korea. It does no longer state that [sic] the 'personal loan repayment.'

We are concerned about what happened here and need a full explanation on the whole picture; here are some questions for both of you:

1.  Can either one of you confirm who is behind LDS?  Is this a legal entity or not?  Where did the 25 million come from?  Who authorized payment?  What bank account was it transferred from?  What exactly does the 25 million $ cover?

2.  Why didn't each of the different LDC's listed in the report not pay their own debt versus L&H instead of one party transferring a big amount of 25 million dollars (if it is intended to settle the receivables at all; we understood that it might have to do with the payment of the earnout for the acquisition of the former Bumil (now L&H Korea)).  Is there, to your knowledge, a link with L&H or with other parties (the president of L&H Korea, some big new customers of L&H Korea such as HI World, Digital Seyoung, EPC NEQ who all signed very big contracts in the 4th quarter of 99 with L&H Korea?

3.  We understand that the report of KPMG Korea has changed for the personal loan paragraph but where did the information come from to change this text to the second version?  Who was the contact for this?  How has KPMG Korea validated the explanation given?

4.  Philip, some of the customers of L&H Singapore are Salfas, Duranzo, Baleston and Snegal Pte Ltd.  These customers are all located on No. 5 Jalan Besar #5-01 Singapore 208785.  Are you aware of any operational activity at these premises?  Is R&D taking place or are people actually developing languages?  For some other contracts signed between L&H Asia and Lupeni, Jelgava and Harrica Pte Ltd, the address is in always Shenton Way 5; 12-05 UIC Building, Singapore 06888.  The same question as above is asked.  For all of these contracts, is there to your knowledge a local general manager (the contracts have in each case been signed by Belgian people).

I also send this mail to the US partner who is reviewing this engagement from a US Gaap perspective (Bob McLamb, in KPMG Houston).  You can send your answers to him at the same time.

[Emphasis added.]

172.   Thus, KPMG, especially KPMG Belgium and KPMG LLP, as well as KPMG

Korea, had complete knowledge of one of the most important facts which ultimately resulted in

69

the uncovering of the fraud by *The Wall Street Journal* – the fact that many of the LDCs had identical business addresses and common bank accounts. KPMG also knew that the contracts, although purportedly with entities located in Singapore and Korea, were signed by Belgians. KPMG further knew that a single entity called LDS – which was not even a party to any of L&H's contracts or an LDC – had supposedly paid $25 million on behalf of several of the supposedly separate and independent LDCs. KPMG knew that this payment was highly suspicious, as L&H first claimed that it was the repayment of a personal loan from the president of L&H Korea to LDS, and then later claimed that it was a payment mistakenly made by LDS to L&H Korea instead of L&H Singapore. KPMG explicitly recognized that, in light of these facts, there was likely a direct link between the LDCs and L&H, and in fact, between L&H and its Korean customers. In sum, KPMG knew that these facts precluded the possibility that the transactions at issue were legitimate business transactions. Notwithstanding these facts, based in large part on the fact that L&H had received $25 million from LDS, KPMG allowed L&H to book the revenue from these sham transactions and represented in L&H's 1999 financial statements that the revenue had been recognized in accordance with U.S. GAAP.

173. Moreover, KPMG knew that the LDC revenue was not recognizable for yet another reason, namely, that the same individual, Tony Snauwert, was the licensee representative on nine of the twenty-three contracts it was provided, including strategic partner contracts, even though the names of the companies were different. On January 29, 2000, McLamb had specifically informed Dammekens and KPMG's Belgian auditors, after receiving Huysman's above-quoted e-mail, that it was "no longer acceptable for us to rely on an agent acting for a group of investors" for purposes of allowing L&H to record revenue:

> It seems that a single payment of $25 million was paid to L&H Korea. The payment was for amounts owed to LHS (the group in total) by a number of LDC's. Who made this payment? We need to see the wire transfer or check and determine what bank account it came from. <u>Why did the payment for several LDC's come from a single bank account? This makes it more important that we find out who the individual investors are for each of the LDC's. It is no</u>

70

<u>longer acceptable for us to rely on an agent acting for a group of</u>
<u>investors.</u> When we find out the company or person that the $25
million payment came from we need to get KPMG Korea to find
out about the Company or person. If the payment was made by a
Company we need to know who the owners of the company are.
<u>This is very important.</u>

[Emphasis added.]

Despite McLamb's recognition that identifying the source of the payment was "very important,"
KPMG nonetheless failed to ascertain the source of the payment and permitted the improper
revenue recognition anyway in rendering a clean audit opinion on L&H's 1999 financial
statements.

    174.    KPMG knew yet another critical fact regarding the LDCs: they were corporate
fictions, i.e., unstaffed shells which had performed no work whatsoever under their agreements
with L&H. A January 31, 2000 e-mail from Van Aerde to Willaert stated that, although some of
the LDCs had existed since the third quarter of 1998, "<u>[a]n ill-informed reader could wonder</u>
<u>about the fact that not a single LDC has supposedly performed any activity until now.</u>"
[Emphasis added.] Even though KPMG knew that the strategic partners were doing nothing and
that L&H retained all the continuing development obligations, it nonetheless permitted L&H to
recognize revenue on the fraudulent LDC transactions.

    175.    Tellingly, L&H was shocked that KPMG was, for the first time, apparently going
to require evidence beyond mere representations from L&H management with respect to the
LDCs. An internal L&H e-mail dated January 31, 2000 from L&H executive Jacques Vanloo to
Dammekens, attaching several KPMG inquiries regarding the LDCs and the $25 million
payment, asked: "Carl, what exactly is wrong? Has KPMG lost all its trust, are the answers
from you and our management no longer sufficient?"

176.   In fact, KPMG, even though it clearly knew by now, if not much earlier, that there were problems continued to fail to obtain the necessary confirmation and verification. Specifically, KPMG performed none of the audit procedures called for by Huysman and McLamb in January 2000, and did nothing to determine if the LDCs were independent third parties. On June 20, 2000, McLamb sent an e-mail to Van Aerde and Huysman in advance of L&H's SEC Form 20-F filing, which was scheduled to occur only ten days later, on June 30. The Form 20-F would contain L&H's 1999 audited financial statements and KPMG's 1999 audit report.   In that e-mail, McLamb made clear that, despite what had been told to the Dragon shareholders during the due diligence, he in fact had no idea whether the LDCs were legitimate:

> In clearing up pending items from the 1999 audit I have not received any update on the work that we performed on the $25 million that L&H Korea received as payment for receivables owed by the LDC's.   What is the current status of this?   Did we interview the investors of the applicable LDC's?   Did we check to see who was the owner of the bank account where the funds came from?   How did we ensure that the $25 million was not the same $25 million that LHS paid to the former owners of Bumil for the contingent earnout?   Did we get representation from Jo and Pol and LHS that the money was in no way related to them?
>
> We need to make sure that KPMG has done adequate work on this before we sign off on the Form 20-F.

177.   On June 22, 2000, or nearly two months after it had signed its unqualified audit opinion on L&H's 1999 financial statements, Huysman replied to McLamb, Kwon and Van Aerde, and acknowledged that, after making unequivocal representations to the Dragon shareholders regarding the legitimacy of L&H's revenue recognition on these contracts, KPMG had done nothing to determine whether the LDCs were legitimate:

> Oh Bum and Philip, in connection with yesterdays mail and urgent request to obtain additional information on the investors in the LDC's (customers of L&H Singapore) and the Korean customers of Bumil, can you in the mean time report to KPMG Ghent what procedures you have already performed to satisfy yourself that these are all existing (live) organisations?   We made this request

72

before in mail and fax instructions.  From Korea, we got a mail back of an interview with Mr. Lee from HI World.  <u>Have any others been visited or have you checked these companies registrations at an official filing system?  Are there financial statements available at a central filing that allow [you] to find out if these companies are in a position to pay the large sums of the contracts to L&H?  Is there a way of finding out through their articles of association who the shareholders/directors are behind them?  At the request of Jo Demario, with whom you met last week, could someone of your office go to the official addresses of these customers to see if they appear proper companies/ organisations.  It may be worthwhile taking a picture of the location.</u>

Oh Bum, I will also fax names and phone numbers of 3 Korean individuals to you.  We have been informed that these would be investors.  <u>Jo has asked someone confirms that these people/phones exist.  Do the addresses appear to be normal addresses considering the fact that these individuals should be relatively wealthy as investors?</u>

Philip, we obtained through your people registration of four companies (customers) of L&H Asia.  <u>Can you send someone down to the address of these companies to see if they are operational and appear proper companies and not just a post office box.</u>  Here as well, you may have some pictures taken.  Can you please confirm?  If any other LDC's are located in Singapore, please perform the same procedures.

178.    In that same e-mail, Huysman noted that it was his understanding that most of L&H's Korean customers were related parties.  Huysman asked "Is mister Seo [Chairman of L&H Korea] not a significant shareholder or decisionmaker in some (or most) of the Korean customers?  Have you asked this as part of the audit?"

179.    On June 24, 2000, Hye Jin Kang of L&H told Dammekens in an e-mail that this was the first time that KPMG had ever asked for any documentation regarding L&H's Korean customers:

I have not replied to KPMG Seoul yet anything.  We are going to collect "Corporate Registry" for the customer (Q4 FY99).  <u>This would be first documentation that we submit to KPMG</u> (KPMG Seoul asked the documentation).  Corporate Registry shows the company name, the address, PER value, number of shares, TTL capital, Business, Director Registered.

73

[Emphasis added.]

180.   On June 26, 2000, Kang sent another e-mail to Dammekens regarding "the questions from KPMG." In that e-mail, Kang wrote that KPMG was only at that time beginning to collect documentation from the sales that had been booked during the fourth quarter of 1999 – including the very same contracts that KPMG had represented months earlier had been appropriately booked: "[w]e are now collecting the documentation from the Q4 customer (EPC, Neo Telecom, IBCC, Voice Tech, HI World, Digital Seyoung [sic]." According to Kang, these documents included the customers' corporate registry, shareholder lists, financial statements, the articles of corporation, and a picture of the customers' offices, all of which KPMG was requesting for the first time.

181.   This e-mail also confirms that, had KPMG performed the most elementary of these steps, it would have discovered the fraudulent nature of the $25 million transaction it had first questioned in January 2000:

> Regarding LDS Korea, there is name of Sam Cho (Cho, SooAm in Korean Name) in the Business Certificate (the documentation is only evidence that shows LDS Korea is live in Korea, since LDS Korea is only Rep office, no corporate registry). And Sam is only employee of LDS Korea at this moment.
>
> Since KPMG Korea already knows who Sam is, there is a challenge how we can explain that L&H Korea is nothing to do with LDS Korea.
>
> Pls advise us if you have good comment.

Thus, had KPMG simply obtained the business certificate of LDS Korea, the entity which it knew made the $25 million payment to L&H, it would have seen that the founder and sole employee of LDS Korea was Sam Cho – who was the second-in-command of L&H Korea. Thus, the mystery of where the $25 million came from would have been solved: L&H had paid the $25 million to itself!

182.    As of June 29, 2000 – only one day before L&H filed its Form 20-F with the SEC – KPMG still had not determined whether the LDCs were real entities.  Indeed, KPMG still had not determined whether sales that had been booked in December 1999 were real sales.  On that day, Jacques Vanloo of L&H sent the following e-mail to Dammekens:

> KPMG-Singapore has come over recently to investigate the contracts signed with LDC again, and their respective receipts in 1999 & 2000.  Their main concerns are:
>
> 1.    Who are the investors of the LDC and where do their funds come from, since they have common directors and have only S$2 share capital?
>
> 2.    The ordering party of some payments are not the contracted party.  For instance, the receipts of US $4.5 million from Velstra in Dec 99 are actually paying for Lupeni, Jelgava and Harrisca contracts.  They are asking us how do we know which contracts are being paid in such cases, esp. if the bank advices do not provide payment details.  If it's through verbal confirmation with the LDC, they would like to know the contact person of LDC as they may want to seek confirmation with them.
>
> Understand from Cheryl Foo [another L&H employee] that these contracts are already being audited by KPMG-Ghent, but KPMG-Singapore claims that it's KPMG-Ghent who requested them to look into this again.

183.    In addition to knowing that several CLCDs were located at the same address, KPMG also knew an additional fact regarding Duranzo and a company called I-Merge, which precluded revenue recognition:  Both were funded by the FLV Fund, a related party to L&H, and thus the revenue from those contracts would have to be treated as a loan under U.S. GAAP.  FLV Fund had invested $10 million in Duranzo and three other CLDCs on October 22, 1999.  Because KPMG Belgium was the auditor of the FLV Fund, it saw both sides of these transactions.

184.    On December 24, 1999, FLV Fund sold its interest in these four CLDCs to HI Worldwide for $11 million.  On January 21, 2000, Stephan Huysman of KPMG Belgium sent an

e-mail to Dammekens and Van Aerde regarding the FLV Fund's investments in these CLDCs. As Huysman wrote, "Carl, as discussed with you this afternoon, I received the faxed agreements from my colleague Rob Snijders. The Cross Language companies (Russian, Mandarin, Japanese, Spanish) which were sold on by FLV to Human Interface Worldwide Ltd concern an amount of about $10 million." [Emphasis added.] After receiving this e-mail and speaking with Huysman, Dammekens sent an e-mail the same day to Hauspie and Bastiaens which made clear that KPMG knew that FLV Fund's investments in these CLDCs created serious "problems" with L&H's revenue recognition, including "disclosure as related party revenue of the 4 LDC companies" and "incorrect disclosure in Q3." In fact, the HI Worldwide transaction was merely a ruse by which L&H hoped, by transferring the FLV Fund's interest in the CLDCs to another party before year-end, to evade the requirement that the transactions be reported as related-party loans rather than as revenue. As these documents reflect, KPMG knew that this transfer was a sham and that the FLV Fund's involvement precluded recognition of revenue on these contracts, and yet collaborated with L&H to hide the fact that these were related-party transactions. An April 17, 2000 e-mail from Philip Vermeulen of the FLV Fund to Bastiaens, Lernout, Hauspie, and Sam Cho of L&H Korea confirmed that the $11 million "buyout" by HI Worldwide was, in fact, never paid.

185.    Thus, KPMG's representations to Dragon and the Bakers during the due diligence and with regard to L&H's 1999 financial statements were completely false. KPMG knew that the LDCs and CLDCs had no real existence, that they had performed no work on their development contracts with L&H, that they shared common addresses and paid L&H from common bank accounts, and that they were funded by parties related to L&H.

### False Representations or Omissions of SG Cowen

186.    During the merger negotiations between Dragon and its principal shareholders, including the Bakers, and L&H, Ben Howe ("Howe") of Cowen served as one of the primary contacts and negotiators of the Merger Agreement. Dan Blake, previously with Cowen and now with LHIC, worked closely with Cowen as evidenced by the fact, among other things, that Blake,

along with Cowen, was part of the deal team for the Dragon/L&H transaction. During the course of these negotiations, Howe made repeated representations to Janet Baker and others at Dragon specifically regarding the financial strength and soundness of L&H and the benefits to Dragon and the Bakers that would result from the Merger. Janet Baker repeated this information to Jim Baker.

187.    Robert Stone, who was a research analyst at Cowen, who participated with Cowen's investment banking team in connection with the Dragon merger transaction, attended numerous meetings with Dragon's principal shareholders, including the Bakers, in February and/or March 2000, including on March 3 and 8, 2000. At these meetings, Stone repeatedly advocated L&H's securities, specifically citing L&H's strong revenue growth and stating that L&H securities would increase in value over both the long and short term. In addition, Stone gave a presentation to the Bakers and other Dragon representatives and principal shareholders regarding L&H's strong past performance, including revenue growth and the value of L&H securities.

188.    As a further part of the merger negotiations process, Cowen provided its September 15, 1998, January 5, 2000 and February 10, 2000 analyst reports of L&H, and possibly other analyst reports, to the Bakers. The Bakers reviewed and relied on Cowen's oral representations and its written reports in determining whether to complete the merger transaction and accept L&H stock in exchange for their majority interest in Dragon. The February 2000 analyst report was issued in the same month that questions were raised with Cowen regarding L&H's software revenue and strategic partners. Moreover, the February 2000 Cowen report contained financial information for 1999. Since the KPMG audit was not finalized until April 27, 1999, Cowen could not have relied upon this information in preparing its report. Moreover, additionally, as Cowen was made aware from having been a recipient on an e-mail in February 2000, "Standard Procedures," was for the KPMG working papers to not be provided "as long as they have not signed of [sic] on the financial statements." The February 2000 report does not attribute a source outside of Cowen as the basis for this financial information. The February

2000 Cowen report identifies a stock target price of $95-100, up approximately 12% from just one month prior.

189.    In addition to the oral representations to the Bakers, Cowen also prepared a "Deal Book," that was given to the Bakers at a March 2000 merger meeting at SG Cowen's offices in Boston, to support Cowen's contention that L&H securities were valuable. The "Deal Book" contained extensive financial reporting and projections regarding L&H's revenue and financial status. All of the information provided to the Bakers, including the information in the February 10, 2000 analyst report and the information in the Deal Book was untrue and Cowen either knew or was reckless in not knowing this information was false. Among the materials in this "Deal Book" were:

- Consolidated Balance Sheets from 12/31/98 to 12/31/99 that stated, among other false statements, that L&H had over $130 million cash and marketable securities as of 12/31/99 and total assets of over $693 million as of 12/31/99 which had increased by over $122 million since 12/31/98 and increased by over $53 million in the last quarter of 1999 alone.

- A Consolidated Statement of Income reflecting 1999 revenue as over $344 million, which represented a 43.5% increase from 1998. This statement also reflected gross profit as over $249 million representing a 72% increase over 1998 and positive net income of over $68 million before taxes and $41 million after taxes. This represented a tremendous alleged growth for L&H that had negative income in 1998.

- This Deal Book also contained the January 5, 2000 analyst report recommending L&H securities as a strong buy.

- At this same meeting, Cowen personnel gave Janet Baker the February 10, 2000 Cowen analyst report also recommending L&H securities as a strong buy.

- Revenue Analysis by Market stating that L&H had total revenue of $211.6 million in 1998 and $344.2 million in 1999.

- A ranking of L&H's customers by revenue for the fourth quarter of 1999 listing Korean customers as four of the top 8 customers.

- A quarterly profit and loss statement and estimate listing net income for each quarter of 1998 and 1999 between $6.3 million and $13.6 million and earning per share (exclusive of goodwill) at between .16 and .39 cents a share.

190.    Neither Howe nor Stone, nor any other Cowen representative, ever disclosed the fact, which Cowen knew or was reckless in not knowing, that L&H's revenues had been artificially inflated by treating research and development liabilities (costs) as revenues through having this research and development performed by related parties in order to obtain license fees from these related parties, which the related parties either were unable to pay, had no formal obligation to pay, or were somehow financed by L&H, and, thus, that many of L&H's alleged customers were in fact related entities, often funded by L&H, from which revenue should not be recognized. To be sure, issues had been raised to Cowen prior to the Dragon/L&H transaction regarding, among other things, questions and concerns regarding Software revenue recognition and L&H's relationship with strategic partners. However, even though the meetings that Cowen had with Dragon and its shareholders were for the purpose of satisfying the Bakers' and other Dragon shareholders' due diligence inquiries about L&H, Cowen actively concealed material information from the Bakers or turned a blind eye in reckless disregard as to whether accurate and complete information had been provided. Cowen knew that it would jeopardize L&H's acquisition of Dragon if Cowen disclosed any information that might cause the Bakers and other Dragon shareholders to have any material concerns about L&H's financial statement or results. Cowen knew that its business relationship with L&H and its numerous related entities and "customers," for one or more of whom Cowen also performed services and delivered revenue, would be jeopardized if Cowen endangered L&H's acquisition of Dragon.

### FLV Fund's Participation In The Fraud

191.    Hauspie and Lernout created FLV Fund in 1995, and were directors of the Fund's management arm from 1995 until 1997. According to *The Wall Street Journal,* after 1997, Lernout and Hauspie maintained "considerable sway" over FLV Fund's affairs, as evidenced by the close relationship between the Company and the Fund since the FLV Fund's inception.

192.    In 1995, FLV took a 49% stake in the Belgian unit of Quarterdeck Corp., a California software company then headed by Bastiaens. According to a December 7, 2000 *Wall Street Journal* article, Quarterdeck's Belgian unit then became L&H's "largest customer,

accounting for 30% of revenue that year, and Quarterdeck itself contributed in 6.5% of L&H's sales."

193.    Subsequently, FLV Fund and FLV Management together owned a majority stake in Dictation Consortium, a company that provided $26.6 million in revenue to L&H from 1996 through 1998, in what was a prototype of L&H's related-party fraud involving the LDCs and CLDCs.

194.    Due to stock market and analyst sensitivity about L&H's close ties with FLV Fund, L&H took great steps to conceal its involvement with, and reliance on, the FLV Fund, and other related parties.

195.    In L&H's published financial statements, L&H disclosed that FLV Fund was a related party, but reported only minimal revenue from FLV Fund sources.  For instance, in its 1998 Annual Report on Form 20-F, L&H stated that only 3.7% of 1998 revenue was provided by "companies funded in part by the FLV Fund."  Similarly, in its 1999 Annual Report on Form 20-F, L&H claimed that only 0.3% of 1999 revenues were provided by "companies funded in part by the FLV Fund and L&H Investment Co."

196.    As revealed by *The Wall Street Journal* on December 7, 2000, the FLV Fund was the undisclosed "related party" behind eight of the thirty "start-ups" that accounted for 10% of L&H's revenues in 1998 and 25% in 1999.

197.    Specifically, FLV Fund was directly involved in owning or funding the following customers/transactions during 1999:

    a.    In the first quarter of 1999, L&H recorded $10 million in licensing fees from four Singapore start-up companies, I-Merge Pte., I-Office Pte., I-Mail Pte. and I-News Pte.  Approximately six months later, FLV Fund invested $8 million for 49% stake in each of the four start-ups.  In violation of U.S. GAAP, the FLV Fund investment was not disclosed in L&H's 1999 financial filings.

    b.    During the third quarter of 1999, four additional LDCs, Salfas, Senegal, Baleston, and Duranzo, agreed to pay $16 million in license fees to L&H for software rights.  L&H recognized all of this revenue during the third

quarter of 1999. On October 22, 1999, however, FLV Fund invested $10 million in the companies, who then used $8 million to pay L&H. FLV disposed of its ownership in the four start-ups prior to December 31, 1999, by selling it for $11 million to HI Worldwide. An April 17, 2000 email from Philip Vermeulen of the FLV Fund to Bastiaens, Lernout, Hauspie, and Sam Cho of L&H Korea confirms that the $11 million had never been paid. Indeed, as of September 22, 2000, HI Worldwide still had not paid FLV Fund and an HI Worldwide executive gave *The Wall Street Journal* conflicting reports on whether the money was actually owed. L&H never disclosed that the $16 million in revenue came from a related party, as required by U.S. GAAP.

198.    Because KPMG Belgium was the auditor of the FLV Fund, it knew about all these transactions from both sides.

199.    In addition to the eight "start-ups" listed above, an additional four were organized as subsidiaries of Language Investment Co. ("LIC"), whose Chief Executive Officer, Willem Hardeman, is an FLV Fund director. LIC owned four start-ups that each purchased licenses valued at $3 million from L&H in late 1998. The start-ups each paid L&H $1.5 million in December of 1998; however, according to *The Wall Street Journal,* L&H recorded the full $12 million of revenue in the fourth quarter of 1998 as received. However, LIC confirmed that the remaining $6 million was never paid by LIC. LIC eventually sold these four start-ups to Velstra Pte. for an undisclosed sum. As described below, Velstra is owned entirely by Mercator.

### The S.A.I.L. Trust's Participation In the Fraud

200.    The S.A.I.L. Trust, while purporting to be a non-profit company, was in a position of control over the investment decisions of the FLV Fund.

201.    The S.A.I.L. Trust was created by Lernout and Hauspie in 1995 to assist young companies in the development and commercialization of products based on advanced speech and language technologies. The S.A.I.L. Trust holds a one-third interest in FLV Management, N.V. ("FLV Management"), and has the right to appoint five of its directors. In turn, FLV

81

Management is the manager of the FLV Fund. Lernout and Hauspie are also directors of the S.A.I.L. Trust.

202.    Paul Behets, the audit partner at KPMG Belgium in charge of L&H audits from 1991 through July 1999, left KPMG shortly after the audit report for year end 1998 was filed, to become the chief executive officer of the S.A.I.L. Trust.

203.    The S.A.I.L. Trust, directly and through its control of the FLV Fund, participated in the fraud by providing actual or purported financing to the shell corporations which L&H termed its "strategic partners." This funding, in turn, served as the purported basis for L&H's lucrative licensing agreements with the "strategic partners." The S.A.I.L. Trust knew that L&H was recognizing revenue on these licensing agreements even though, to the extent money changed hands at all, it was strictly through related-party transactions attributable to the S.A.I.L. Trust and thus revenue should not have been recognized on the transaction.

### LHIC's Participation In the Fraud

204.    LHIC was founded by Hauspie and Lernout in 1998 and owned 7.6% of L&H's stock. LHIC was purportedly established to make long-term strategic investments in companies in information technology industries such as speech, language and artificial intelligence. Hauspie and Lernout capitalized LHIC with their own shares of L&H common stock and acted as advisors to LHIC and its investments.

205.    The President and Managing Director of LHIC at all relevant times was Francis Vanderhoydonck, who also served as a director of L&H from May 1999 until his resignation on or about May 15, 2001. Demonstrating the close relationship between L&H and LHIC, Vanderhoydonck often reported to the Board of L&H on LHIC's activities and investments.

206. In addition, the Chief Financial Officer of LHIC, Chantal Mestdagh, was formerly a KPMG Belgium auditor responsible for the audits of L&H's financial statements. KPMG not only knew LHIC was a related party to L&H, but relied on Mestdagh for information regarding L&H's financials.

207. LHIC, which was controlled and capitalized by Hauspie and Lernout and run by a director of L&H, participated in the fraud by providing actual or purported financing to the shell corporations which L&H termed as its "strategic partners." This funding, in turn, served as the purported basis for L&H's lucrative licensing agreements with the "strategic partners." LHIC knew that L&H was recognizing revenue on these licensing agreements even though, to the extent money changed hands at all, it was strictly through related-party transactions attributable to LHIC and thus revenue should not have been recognized on the transaction.

208. By at least May of 1999, Dan Blake, formerly of Cowen and now at LHIC, knew that L&H could not continue to meet the expectations of its investors. A May 11, 1999 memo from Blake and Thomas Denys of Loeff Claeys to Lernout, Hauspie and Francis Vanderhooydonck not only stated that "earnings expectations [are] currently too high" but also advocated lowering those expectations to a more sustainable level by stating "shortfall is opportunity to recalibrate investor expectations for the long term."

209. By May 13, 1999, Blake knew that L&H was not going to lower investor expectations, but would instead raise them through the LDCs and strategic partners. On May 13, 1999, Blake sent an e-mail to Thomas Denys of Loeff Claeys that were forwarded by Denys to Hauspie and Lernout:

> [L]icenses in two categories are being orchestrated by Jo and Pol to fill the gap with investor expectations. These are in 'language projects' and in 'agents.' Because of the nature of the contracts and the licensees, investors may view with

skepticism the revenues recognized from the up-front license payments – in other words, the contracts may create a 'quality of earnings" issue.

As presented, these licenses account for a significant portion of planned revenues for Q1 and Q2. Specifically, in Q1, language projects account for $12MM ($6MM in the Technology & Solutions Division (T&S) and $6MM in the Applications Division (APPS)) plus agents agents account for $10MM ($6MM in T&S and $4MM in Apps). In Q2, language projects account for $9MM ($4.5MM in T&S and $4.5MM in Apps) and agents account for $3MM (inT&S).

Because of the magnitude of these revenues -- $22MM or 32% of total L&H revenues in Q1 and $12MM or 15% of total revenues in Q2 – we should ensure that Jo and Pol understand fully the risks and be directly involved in this issue. There are three imperatives:

(1) To the extent outside auditors are asked to review the transactions, they must receive sufficient detail about the contracts and licensees to properly ascertain the appropriate accounting treatment for revenue recognition.

(2) In communications with investors, the nature of the contracts and the licensees must be disclosed so that the investors can make an informed judgment about the quality of earnings.

(3) L&H must exercise the utmost diligence to ensure any actions and activities that are necessary to support revenue recognition be undertaken.

Because of the magnitude of the revenues involved, failure to follow these imperatives could have consequences for the corporation far worse than any announcement of an earnings shortfall. Short-sellers are active in the stock and actively seeking to disseminate any information that furthers the 'bear case.' Moreover, certain short-sellers believe that there are undisclosed accounting issues outstanding. In this environment, it would be unlikely that information about the contracts would remain out of the public domain. Jo, Pol and Gaston could be risking the credibility of the company and of themselves, personally. While companies invariably reorganize and recover from earnings shortfalls, it is far harder for managers to recover from destroyed credibility.

210.   Despite this knowledge, and Blake's participation as a member of the working group for the Dragon/L&H transaction on behalf of LHIC, neither Blake nor anyone else from LHIC disclosed the LDC arrangements or L&H's "strategic partner" during the merger negotiations and due diligence of Dragon and the Bakers.

84

### Mercator And Verbeke's Participation In The Fraud

211.    According to *The Wall Street Journal*, Mercator was the ultimate owner of 16 of the 30 "start-ups" that generated a significant portion of L&H's "licensing" revenue during in 1998 and 1999. Mercator owned these start-ups through several intermediary entities. First, the sixteen start-ups were directly owned by Velstra, a Singapore-based company. Velstra, in turn, is 100% owned by Language Development Fund ("LDF"). Mercator owns 96% of LDF.

212.    Tony Snauwaert is a delegate-director, or manager, of LDF, and was described as "Pol Hauspie's right hand" in a January 24, 2001 article in De Finacnieel-Exonomische Tijd, a Belgium business publication. Snauwaert was identified as the licensee representative who signed 9 of the 23 contracts that were provided to Stonington during the due diligence process, and he obviously knew they were sham deals. Effectively, Mercator employed Snauwaert.

213.    Mercator invested at least $2 million in LDF, and loaned LDF an additional $10 million. These funds were then used by the LDCs to pay L&H, inflating the Company's purported revenues.

214.    The 16 start-ups owned by Mercator paid a total of $53 million in licensing fees to L&H during 1998 and 1999. On information and belief, Mercator was the ultimate owner of the following LDCs and CLDCs: Taiwanese LDC, Malay LDC, Vietnamese LDC, Urdu, LDC, Thai LDC, Hindi LDC, Tamil LDC, Italian CALC, French CALC, German CALC, Slavic LDC, Bahassa LDC, Czech LDC, Greek LDC, Polish LDC and Hungarian LDC.

215.    Mercator and its chairman, Verbeke, thereby provided substantial assistance to the scheme to inflate L&H's revenue and earnings. At all relevant times, Verbeke served not only as Chairman of Mercator, but also as a named partner at L&H's chief Belgian law firm, Loeff Claeys Verbeke. In his capacity as a partner of Loeff Claeys, Verbeke provided legal services in

85

connection with L&H's fraudulent transactions involving the Related-Party Defendants. In addition, Verbeke attended virtually all meetings of L&H's Board of Directors, including those where related-party transactions or issues concerning conflicts between L&H and FLV Fund were discussed.

216.    Mercator and Verbeke also had a direct financial interest in participating in the fraud. First, both Mercator and Verbeke had a significant ownership interest in L&H stock. Mercator owns 6.9% of L&H Holdings, which in turn owns 8.9% of L&H. Similarly, Verbeke personally owns 8.9% of L&H Holdings. L&H Holdings is 85% owned by Lernout and Hauspie. Mercator also directly owns approximately 0.2% of L&H's common stock. Thus, by artificially inflating the price of L&H stock, Mercator and Verbeke increased the value of their holdings of L&H. Further, because the majority of their holdings were indirect, they did not need to disclose the extent of any sales of L&H Holdings.

217.    Mercator and Verbeke also had a separate monetary incentive for participating in the fraud -- a striking return on investment. Mercator only made a limited investment in the LDCs and CLDCs that then entered into contracts with L&H. Because L&H would then develop the product at its own expense and then purchase the LDCs for the value of the completed product, Mercator would see a tremendous return on its initial investment for participating in the fraud.

218.    Verbeke ultimately became a target in the fraud investigation by Belgian authorities. Despite Mercator's participation in the accounting fraud at L&H, and obvious conflict issues, Verbeke's law firm was selected to assist in investigating and drafting the Audit Committee Report in the fall of 2000. Subsequently, on July 23, 2001, The Lawyer reported that Verbeke and his former law firm "have been placed under suspicion by the [Belgian] judge

leading the inquiry into stock fraud" at L&H. Belgian authorities eventually conducted two raids for documents at Verbeke's law firm.

### The Merger Agreement

219.    On March 27, 2000, L&H, Holdings, Dragon, the Bakers and certain other Stockholders of Dragon entered into the above-referenced Merger Agreement pursuant to which L&H would acquire Dragon from the Bakers and other stockholders in a stock-for-stock deal.

220.    The transaction provided that L&H would acquire all of the outstanding stock of Dragon in exchange for common stock of defendant L&H. The deemed price of the merger was more than $600 million and on the date the terms of the transaction were agreed to, L&H stock was trading at $53.75 per share.

221.    The terms of the merger are set forth in a series of agreements. The essential merger documents are: (1) the Agreement and Plan of Merger (the "Merger Agreement"), dated March 27, 2000, among Lernout & Hauspie Speech Products N.V. ("Buyer"), L&H Holdings USA, Inc. ("Sub"), Dragon Systems, Inc. ("Company") and Certain Principal Stockholders of Dragon Systems, Inc. ("Principal Stockholders"); (2) an Amendment Letter to Merger Agreement, dated May 2, 2000, among Buyer, Sub, Company and Principal Stockholders; (3) the Amendment No. 1 to Merger Agreement, dated May 25, 2000, among Buyer, Sub, Company and Principal Stockholders; (4) the Voting Agreement and Waiver, dated March 27, 2000, among Buyer, Sub and Principal Stockholders; (5) the Affiliate Agreements, each dated March 27, 2000, among Buyer and each of James K. Baker, Janet M. Baker, Ellen Chamberlain, Kim Edwards, Laurence S. Gillick, Robert Roth, Seagate Technology, Inc., Stephen J. Luczo, Donald L. Waite and John Shagoury; (6) the Exchange Agent Agreement, dated June 7, 2000, among Buyer, Sub, Company and ChaseMellon Shareholder Services, LLC as Exchange Agent

("Exchange Agent"); (7) the Indemnity Escrow Agreement, dated June 7, 2000, among Buyer,

Sub, Principal Stockholders, certain Delaware limited liability companies ("LLCs"), the

Stockholder Representatives (Janet M. Baker and Donald L. Waite), and State Street Bank and

Trust Company as Escrow Agent ("Escrow Agent"); (8) a LLC Agreement, dated June 7, 2000,

of the JK Baker LLC, between L&H Holding N.V. and James K. Baker; a LLC Agreement,

dated June 7, 2000, of the JM Baker LLC, between L&H Holding N.V. and Janet M. Baker; a

LLC Agreement, dated June 7, 2000 of the CFB Gilbert LLC, between L&H Holding N.V. and

the Cherry F. Bamberg Trust; a LLC Agreement, dated June 7, 2000, of the PGB Rumpole LLC,

between L&H Holding N.V. and the Paul G. Bamberg Trust; a LLC Agreement, dated June 7,

2000, of the Roth Special LLC, between L&H Holding N.V. and Robert Roth; and a LLC

Agreement, dated June 7, 2000, of the Seagate LLC, between L&H Holding N.V. and Seagate

Technology, Inc. (collectively referred to herein, including above, as the "Merger Agreements").

    222.    On June 7, 2000, the transaction was consummated and L&H acquired all of the

outstanding stock of Dragon through a merger of Dragon into Holdings, a wholly owned

subsidiary of L&H.    L&H issued a total of 10,011,236 reflecting a 2 for 1 stock split and an

agreement arrived at between March 27, 2000 and June 7, 2000 to issue a small amount of

additional shares to acquire all outstanding shares of Dragon. The Bakers were issued 5,109,713

shares for their 51% ownership interest in Dragon.

    223.    Pursuant to the Merger Agreements, the Bakers were permitted to sell a small

amount of L&H stock but were required to hold, for a period of 4 months, approximately half the

shares of the L&H common stock received (adjusted for a subsequent 2 for 1 stock split) and the

balance for 1 year.  During this period following the merger, plaintiffs were required to assign

the voting rights to all the shares they acquired in the merger, for so long as they held shares, to an entity controlled by the co-founders and co-chairmen of L&H, Jo Lernout and Pol Hauspie.

### The Representations and Warranties In The Merger Agreement

224.    The Merger Agreements contained various representations and warranties pursuant to which L&H and Holdings warranted the truth and accuracy of L&H's financial statements and SEC filings, as described below.

225.    Article IV of the Agreement and Plan of Merger is entitled "Representations and Warranties of Buyer and Sub" and expressly provides that both Buyer (i.e., L&H) and Sub (i.e., Holdings) "jointly and severally represent and warrant" the statements in Article IV.

226.    In Section 4.4 of the Agreement and Plan of Merger, L&H and Holdings represented that:

> (a)    Since January 1, 1998, Buyer has filed with the SEC all required reports, schedules, forms, statements and other documents (including exhibits and all other information incorporated therein) required under the Securities Act of 1933, as amended (the "Securities Act") and the Securities Exchange Act of 1934, as amended (the "Exchange Act"), (together with all other required reports, schedules, forms, statements and other such documents filed after the date hereof (the "Buyer SEC Reports")). On January 7, 2000, Buyer filed a Registration Statement on Form F-3 (File No. 333-11324) (such Registration Statement including all documents incorporated therein by reference, as amended, is hereinafter referred to as the "January Registration Statement"). As of their respective dates, the Buyer SEC Reports and the January Registration Statement complied in all material respects with the requirements of the Securities Act or the Exchange Act, as the case may be, and the rules and regulations of the SEC promulgated thereunder applicable to such Buyer SEC Reports and the January Registration Statement, and, except to the extent that information contained in any Buyer SEC Report has been revised or superseded by a later filed Buyer SEC Report, none of the Buyer SEC Reports or the January Registration Statement, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

> (b)    The financial statements of Buyer included in the Buyer SEC Reports and the January Registration Statement, comply as to form, as of their

respective dates of filing with the SEC, in all material respects with applicable
accounting requirements and the published rules and regulations of the SEC with
respect thereto, have been prepared in accordance with U.S. GAAP (except, in the
case of unaudited statements, as permitted by Form 6-K of the SEC) applied on a
consistent basis during the periods involved (except as may be indicated in the
notes thereto) and fairly present in all material respects the consolidated financial
position of Buyer and its consolidated Subsidiaries as of the dates thereof and the
consolidated results of their operations and cash flows for the periods then ended
(subject, in the case of unaudited statements, to normal recurring year-end audit
adjustments) and are consistent in all material respects with the books and records
of Buyer.

227.   These representations and warranties in the Merger Agreement were made
directly to the Bakers as parties to the Merger Agreement and/or the Bakers were third party
beneficiaries of any such representations made to Dragon because N.V. and Holdings, and the
officers and director defendants herein, knew that the Bakers, as shareholders of Dragon and
parties to the Merger Agreement, would be relying on representations made both to the Bakers
and to Dragon to decide whether to enter into the Merger Agreement and to effectuate the merger
by selling the Bakers' shares of Dragon stock and made or caused to be made such
representations with the intent that the Bakers would rely and act upon them.  Further, the Bakers
did rely on such representations and warranties in entering into the Merger Agreement and in
selling their 51% interest in Dragon in order to effectuate the merger transaction.

228.   The Bakers reasonably relied on these representations.  Indeed, based on these
representations, and the representations of the defendants described above, the Bakers had no
reason to believe that any of the information provided by L&H and Holdings was false.

229.   In Section 4.6 of the Agreement and Plan of Merger, L&H and Holdings
represented that:

Except as expressly contemplated by this Agreement or as disclosed in the Buyer
SEC Reports filed prior to the date hereof or in Company press releases issued
prior to the date hereof, since September 30, 1999, there has not been (i) any
change in the financial condition, results of operations, business, or properties of

Buyer and its Subsidiaries, taken as a whole, that has had, or is reasonably likely to have, a Buyer Material Adverse Effect; (ii) any damage, destruction or loss (whether or not covered by insurance) with respect to Buyer or any of its Subsidiaries having a Buyer Material Adverse Effect; (iii) any material change by Buyer in its accounting methods or principles not required pursuant to U.S. GAAP (except for such changes that could not reasonably be expected to have a Buyer Material Adverse Effect); (iv) except as a result of the transactions contemplated by this Agreement or in connection with the acquisition by Buyer or any of its Subsidiaries of all or substantially all the capital stock or all or substantially all the assets of another person or entity, any revaluation by Buyer of any of its assets having a Buyer Material Adverse Effect, exclusive of any revaluations (including write-downs or write-offs) of goodwill; or (v) any other action or event that would have required the consent of Company pursuant to Section 5.3 of the Agreement had such action or event occurred after the date of this Agreement.

(Emphasis added.) "Buyer Material Adverse Effect" is defined in Section 4.1 of the Agreement and Plan of Merger as "a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement."

230. These representations and warranties in the Merger Agreement were made directly to the Bakers as parties to the Merger Agreement and/or the Bakers were third party beneficiaries of any such representations made to Dragon because N.V. and Holdings, and the officers and director defendants herein, knew that the Bakers, as shareholders of Dragon and parties to the Merger Agreement, would be relying on representations made both to the Bakers and to and/or to Dragon to decide whether to enter into the Merger Agreement and to effectuate the merger by selling the Bakers' shares of Dragon stock and made or caused to be made such representations with the intent that the Bakers would rely and act upon them. Further, the Bakers did rely on such representations and warranties in entering into the Merger Agreement and in selling their 51% interest in Dragon in order to effectuate the merger transaction. The Bakers reasonably relied on these representations.

91

231.    Article VII of the Agreement and Plan of Merger is entitled "Conditions to

Merger".  It provides, in relevant part, several conditions to the obligation of Dragon and its

shareholders to effect the merger.  Two such conditions are set forth in Section 7.3:

> (i)    The representations and warranties of Buyer and Sub set
> forth in this Agreement that are not qualified as to materiality or Company
> Material Adverse Effect *shall be true and correct* in all material respects
> as of the Closing Date and the Effective Time, as though made at and as of
> the Effective Time, except that those representations and warranties that
> address matters only as of a particular date shall remain true and correct in
> all material respects as of such date;

> (ii)    The representations and warranties of Buyer and Sub set
> forth in this Agreement that are qualified as to materiality or Buyer
> Material Adverse Effect *shall be true and correct in all respects as of the
> Closing Date and the Effective Time*, as though made at and as of the
> Effective Time, except that those representations and warranties that
> address matters only as of a particular date shall remain so true and correct
> in all material respects as of such date; .....

(Emphasis added.)

232.    The Merger Agreements expressly provided that L&H's and Holdings'

representations and warranties would survive for 1 year after the closing.  See Agreement and

Plan of Merger dated March 27, 2000, Sections 10.1 and Article VIII; see also Section 4.4(b),

4.4(c) and 4.7.

**Falsity and Omissiveness of Defendants' Representations Regarding L&H Revenues**

233.    Until its acquisition of Dictaphone Corporation, another corporation by L&H, in

May, 2000, L&H had been able to file information with the SEC as a foreign private issuer

subject to less detailed disclosure requirements than those applied to U.S. entities.  Shortly after

the Merger was consummated, on June 30, 2000, L&H filed a Form 10-K, which included

financial statements for fiscal year 1999 audited by KPMG, and also filed a Form 10-Q, which

included unaudited financial statements for the first quarter of fiscal year 2000, both of which

contained, for the first time in an SEC filing by L&H, the geographic breakdown of sales required by the SEC in filings by U.S. companies.

234. The filings purported to reveal that out of 1999 revenue of $344.2 million, Korea contributed $62.9 million and Singapore contributed $80.3 million (collectively, over 41% of total L&H revenues), up from a combined revenue of less than $300,000 in 1998.

235. Investigation of these figures by the SEC and the financial press provided mounting evidence over the next six months of a massive and pervasive fraud that all of the defendants had concealed from the Bakers prior to consummation of the Merger:

    (a)    Contrary to defendants' claims of L&H's "record" growth, at least one-third of L&H's revenues in 1998, 1999 and the first half of 2000 were improperly recorded.

    (b)    Contrary to defendants' claims of hefty licensing fees from unaffiliated "strategic partners," the arrangements were sham transactions with related parties, including entities audited by KPMG Belgium, designed to permit L&H to fund its research and development off the books.

    (c)    Contrary to defendants' claims that the Far East constituted its fastest growing market, L&H has now admitted that "Korea never really had any sales to speak of." More than $100 million recorded on the books of L&H's Korean unit is "missing," likely as a consequence of L&H factoring its receivables with recourse, an arrangement that was never publicly disclosed, but that was known to KPMG Belgium as early as October 1999.

    (d)    Contrary to defendants' claims of record growth fueled by revenues from successful, innovative products, L&H reported revenue from barter transactions in which no cash changed hands, recognized revenue from sales that were contingent on L&H later performing development work for the customer, and recorded sales before contracts were signed, when it was unclear that the customer had the ability to pay, or when the customer's ability to pay depended on an investment from L&H.

## The L&H Success Story Is Revealed To Be A Sham

236. Unbeknownst to the Bakers, L&H's financial statements and representations would soon be revealed to contain misstatements and omissions. Indeed, as set forth above, as a

result of its acquisition of Dictaphone, L&H became subject to more stringent SEC reporting requirements as a United States company.  As explained below, certain first-time disclosures in L&H's first quarterly reports and other SEC filings, filed on SEC Forms 10-Q, 10-K and S-3 on June 30, 2000, raised suspicions about L&H's financial success during the previous few quarters or longer.

237.    For the first time, L&H disclosed to the investing public and to the Bakers pieces of the true story behind its purported success.  The new financial reporting format revealed detailed information about L&H's huge jump in sales to Asia in 1999 and the first quarter of 2000.  Specifically, out of 1999 revenue of $344.2 million, Korea contributed $62.9 million and Singapore contributed $80.3 million.   The prior year, the two countries combined had contributed less than $300,000 in sales.  Although L&H completed a significant acquisition of Korean company Bumil Information & Communication in 1999, it made no significant acquisition in Singapore during the period.

238.    Investigation of these figures by the SEC and the financial press provided mounting evidence in late 2000 of a massive and pervasive fraud that all of the defendants had concealed from the Bakers prior to consummation of the Merger:

(a)     Contrary to defendants' claims of L&H's "record" growth, at least one-third of L&H's revenues in 1998, 1999 and the first half of 2000 were improperly recorded.

(b)     Contrary to defendants' claims of hefty licensing fees from unaffiliated "strategic partners," the arrangements were sham transactions with related parties, including entities audited by KPMG Belgium, designed to permit L&H to fund its research and development off the books.

(c)     Contrary to defendants' claims that the Far East constituted its fastest growing market, L&H has now admitted that "Korea never really had any sales to speak of."  More than $100 million recorded on the books of L&H's Korean unit is "missing," likely as a consequence of L&H factoring its receivables with

94

<u>recourse</u>, an arrangement that was never publicly disclosed but that was known to KPMG Belgium as early as October 1999.

(d)  Contrary to defendants' claims of record growth fueled by revenues from successful, innovative products, L&H reported revenue from barter transactions in which no cash changed hands; recognized revenue from sales that were contingent on L&H later performing development work for the customer; and recorded sales before contracts were signed, when it was unclear that the customer had the ability to pay, or when the customer's ability to pay depended on an investment from L&H.

239.    In response to analysts' concern about these new troubling disclosures, L&H CEO Gaston Bastiaens attempted to conceal L&H's false financial reporting.  Mr. Bastiaens tried to explain these developments as mere reactions to a shift in company strategy.  As reported by *The Wall Street Journal* on July 6, 2000, Mr. Bastiaens explained that pursuant to this "new strategy," rather than license its underlying technology to companies that would then develop applications for specific markets, L&H decided more than a year earlier to build its own applications, allowing it to gain more revenue over time.

240.    Mr. Bastiaens claimed the "strong" Asian sales were a result of L&H's early market presence and lack of strong competition.  He explained the 1999 figures for Singapore as revenues from licensing L&H technology to companies that are building local-language versions of its systems for languages such as Hindi and Tamil.  The licenses were sold for $2 million to $4 million each, but, according to Mr. Bastiaens, sales dropped off after the major language licenses were sold.

241.    The public revelation that L&H's revenues were derived from unusual Asian sales promoted reporters from *The Wall Street Journal* to attempt to get behind some of the newly disclosed Asian figures that they began investigating L&H's claimed relationships with Korean companies identified by L&H as customers.  Nevertheless, KPMG took no action at this time to undertake any investigation to confirm its previous audits of these same revenues.

95

242.    On August 8, 2000, *The Wall Street Journal* reported that "some companies L&H has identified as Korean customers say they do no business at all with L&H. Others say their purchases have been smaller than L&H says." *The Wall Street Journal* contacted 18 of 30 companies claimed by L&H as customers in Korea:

> Three of the companies say they aren't, in fact, L&H customers.... Three more companies say their purchases from L&H over the past three quarters were smaller than figures provided by Mr. Bastiaens or Sam Cho, vice president of L&H Korea. One additional company says it is in a joint business with L&H that produces considerably less revenue than L&H claims. Officials from an eighth company initially said it had formed a joint venture with L&H and that the joint venture, not the company itself, had purchased products from L&H. Later, the company retracted this initial version.

> All told, of the 13 companies that responded to inquiries about their purchases from L&H in the period since it acquired Bumil, the revenue tallies roughly $32 million. From all of its customers in Korea, in 1999 and the first quarter of 2000, L&H posted $121.8 million of Korea sales, and it has said that it expects second-quarter revenue from that country to exceed the first quarter's $58.9 million....

> Among the companies that L&H boasts as customers: Korea Securities Computer Corp., or Koscom, a government-regulated clearing house for stock trades. Mr. Bastiaens initially says L&H received revenue in the range of $5 million to $10 million (he wouldn't be more specific) from Koscom in the three quarters ended June 30. According to two Koscom officials, whose names were provided by L&H, Koscom and L&H are partners in an automated phone stockquote service. Korea Telecom collects the per-call payment, keeps 10% and splits the rest between Koscom and L&H

> One of the Koscom officials estimates L&H and Bumil's share of the revenue at roughly $1.5 million in 1999....

> In a Dec. 28, 1999 press release, L&H said Samsung Securities, a big Korean brokerage, together with more than 14 other securities firms, had "selected L&H to develop client server solutions for online trading and automated dialogue systems." But two Samsung officials, including spokesman Shin Dong Woo, say their firm never made any purchases from L&H, although they discussed some.

> \*    \*    \*

> L&H also claims LG Electronics as a customer. But Yu Won Uk, a senior research engineer at LG Electronics -- a contact provided by L&H -- says his company never bought products or licenses from L&H. Instead, he says the two

firms briefly worked on a joint project for applying voice recognition to television, but stopped because there "was no progress." LG Electronics paid L&H only "engineer charges," he says, akin to labor costs for L&H's share of the work on the failed project.

*    *    *

Another Korean company with which L&H says it has a significant relationship is Hung Chang Co., a maker of communications equipment. Mr. Bastiaens put revenue from Hung Chang in the range of $5 million and $10 million over the past three quarters.

However, Kim Ho Kyun, a Hung Chang official whom L&H identified as its contact, says Hung Chang wasn't using L&H products internally and that L&H's $5 million bill was paid by a joint venture called Spia, "not Hung Chang." Another Hung Chang official, Choi Sang Hyun, who was reached independently of L&H says Spia Co. was founded May 2, with Hung Chang as the largest shareholder, but June 28 L&H Korea became the largest, with Hung Chang holding 27.49%. Mr. Choi says Spia makes products based on L&H's voice-recognition technology, and says Hung Chang is only a passive shareholder.

*    *    *

Mr. Bastiaens also identified Hyundai Securities and Hanvit Bank as providing revenue totaling between $5 million and $10 million. But at Hyundai Securities, two officials, including a contact provided by L&H, say their purchases amounted to just over $1 million. At Hanvit Bank, Lee Jae Bong, manager of network management, says the only contract signed by his institution tallied $150,000.

243.    Despite this report, and L&H's acknowledgement as a result of the report, that L&H's initial representations made about some customers were mistaken, KPMG did not withdraw its opinions with respect to L&H's 1998 and 1999 audit.

244.    On August 13, 2000, L&H commissioned a special mid-year audit by KPMG Belgium to examine issues raised with respect to Korea and Singapore. The ostensible purpose of this audit was to allay concerns about financial results of the South Korea division, but the real purpose was to attempt to conceal the fraud which underlie those revenues.

245.    On September 20, 2000, the L&H Board of Directors authorized its Audit Committee to "conduct such inquiries as it deemed appropriate into certain accounting and other practices of the Company that were the subject of a formal investigation being conducted by the [SEC]," according to a report provided to the Audit Committee two months later, on November

97

20, 2000 (the "Audit Committee Report"), by the Audit Committee Advisors – *i.e.*, the U.S. law firm Bryan Cave LLP, the Belgian law firm Loeff Claeys Verbeke, and the accounting firm of Arthur Andersen LLP.

246. On September 21, 2000, L&H confirmed that the SEC had commenced "an investigation of its prior financial statements." As reported in *The Wall Street Journal* on February 5, 2001, that investigation had commenced as early as January, 2000, in the midst of L&H's negotiations with Dragon and its principal shareholders, including the Bakers, and involved KPMG Belgium prior to KPMG's reporting on L&H's 1999 financial statements: "The SEC had sent L&H a letter in late January, 2000, notifying it of the informal probe and asking a number of questions about related-party financing issues.... And KPMG Belgium, L&H's regular auditor, had received a letter from the SEC about L&H's accounting in late April, 2000, according to a spokesman familiar with the letter."

247. According to the same February 2001 *Wall Street Journal* article, certain officers and a director of L&H sold a total of $13 million of L&H stock in May, 2000 after U.S. regulators already had notified L&H that they were examining its accounting practices. Before the closing of the Dragon merger, none of the Defendants disclosed to the Bakers or Dragon the reason for this sale of the shares in May 2000.

248. According to a September 22, 2000, *Wall Street Journal* article, the "SEC probe ... is focusing on the once highflying company's recent dramatic sales increases in Asia and its dealings with corporate customers to which it has financial ties." The article suggested that the SEC "may find that a key stop on the money trail is No. 5 Shenton Way in downtown Singapore" and revealed that, contrary to L&H's representations that it received tens of millions of dollars in license revenues from "unaffiliated customers" in Singapore, nineteen start-up "licensees" in Singapore were shells manned by L&H personnel and funded by L&H affiliates.

249. On October 18, 2000, *The Wall Street Journal* provided more information about the suspicious start-up licensees:

98

Lernout and Hauspie Speech Products NV has declined to provide the Securities and Exchange Commission with the names of investors behind 30 corporate customers that are a key focus of an SEC probe....

The 30 start-up companies, registered in Singapore and Belgium, in aggregate accounted for about 25% of 1999 revenue for the Belgian maker of speech recognition software, and about 10% of its 1998 revenue.

Among other things, the SEC is trying to determine whether the companies are in fact related parties to L&H, and should be disclosed as such. Some analysts and investors have long been concerned that L&H's revenue and growth rates have been fueled by sales to related parties, which might indicate that its competitive position and product quality are not as strong as they appear in L&H's financial statements.

*     *     *

Of the 17 companies L&H agreed to discuss, none has any direct employees. Seven are relying on L&H employees to do work for them, and have agreed to repay the company for the services, according to Lanny Davis, an outside L&H attorney. The other 10 have not started developing software, though they have paid hefty licensing fees to L&H.

*     *     *

Under accounting rules, companies must disclose many more details about related-party transactions, including a discussion of the relationship between the parties. Despite that additional information, many investors still don't like related-party dealings, because its impossible for outsiders to tell if they were conducted at arm's length.

In addition to the related party issue, outside accounting experts wonder whether L&H created some or all of the 30 companies as off-balance-sheet vehicles to do research and development. That structure, in theory, would allow the company to pump up current revenue while limiting future R&D expenses.

250.    On October 26, 2000, *The Wall Street Journal* suggested that not only was the "burst" of revenue from Belgian and Singaporean "licensees" in reality self-funded -- it was also fraudulently inflated:

Lernout & Hauspie Speech Products NV's claim that it received multimillion dollar license payments from four Belgian start-up companies isn't supported by financial statements the ventures have filed with Belgium's central bank.

99