L&H booked $3 million in license payments from each of the four companies in late 1998, according to an accounting document the maker of speech-recognition software provided to The *Wall Street Journal* in response to a request for substantiation of its revenues.

But the July central-bank filings of the four start-ups show no expenditures close to being that big, nor do their balance sheets list assets as large as the purported value of the licenses. Several Belgian accountants who reviewed the statements say they don't substantiate the $3 million expenditures. All four statements cover the period from Dec. 4, 1998, when the companies apparently were founded, to Dec. 31, 1999.

251.    On November 6, 2000, *The Wall Street Journal* provided further confirmation of L&H's fraudulent reporting of licensing revenues:

Lernout & Hauspie Speech Products NV claimed that four Belgian start-up firms paid it $12 million in 1998 for software licenses, but the original parent company of the four start-ups said they paid L&H only $6 million that year.

\*       \*       \*

The top two executives of Language Investment Co. said their closely held company, based in Poperinge, Belgium, owned the four start-ups from their inception in December 1998 until December 1999. In late 1998, they said, the four start-ups each agreed to buy licenses valued at $3 million, or a total of $12 million, entitling them to develop versions of L&H's speech-recognition and translation software in Greek, Polish, Hungarian and Czech.

However, the executives said the ventures paid L&H only $1.5 million each, or a total of $6 million, upfront in December 1998. The remaining amount, they said, was still unpaid when LIC sold the four firms to a Singapore-registered company, Velstra Pte. Ltd., in December 1999.

The LIC officials' version of events conflicts with L&H's claim that it received the $12 million license payments in full in late 1998. An internal accounting document L&H gave to the *Wall Street Journal*, in response to a request for substantiation of its revenue, shows that L&H not only booked the $12 million in revenue from the four start-ups in the fourth quarter of 1998, but also received the full $12 million payments that same quarter.

252.    On November 9, 2000, L&H "provided an update on the status of the mid-year audit of the Company that it had commissioned last August and of the ongoing audit committee inquiry" and announced that "[a]s a result of errors and irregularities identified in the audit

100

committee inquiry, the Company expects to restate its financial statements for the periods 1998, 1999 and for the first half of 2000." L&H further announced that its specially commissioned mid-year audit by KPMG, which was designed to confirm the accuracy of its financial statements, would not be completed by November 14, 2000. Upon information and belief, KPMG did not timely complete the mid-term audit because the work by the Audit Committee had made a continuation of KPMG's prior practice of auditing L&H's fraud impossible to continue.

253.    That day, the NASDAQ suspended trading in L&H shares. Just before the suspension, L&H shares were changing hands at $3.525, more than 95% below the record high of $72.50 they reached in March, when the company claimed a market capitalization of more than $10 billion. The slide wiped out more than $9 billion of the company's stock market value.

254.    On November 17, 2000, *The Wall Street Journal* reported that L&H's independent auditor, KPMG, had withdrawn its audit report of L&H:

> Lernout & Hauspie Speech Products NV's accounting firm withdrew its audit report for the company's 1998 and 1999 results, saying its prior clean opinion of the software maker's books "should no longer be relied upon."
>
> The move by KPMG International's Belgian member firm, disclosed in a regulatory filing by L&H, came after L&H announced last week that an internal probe had discovered "errors and irregularities" in its financial statements for those two years, and for the first six months of 2000.

255.    On November 17, 2000, as *The Wall Street Journal* reported (on December 7, 2000), John Duerden, who replaced Bastiaens as Chief Executive Officer of L&H, concluded that $100 million on the books of L&H's Korean unit was missing.

256.    On November 20, 2000, the L&H Audit Committee Advisors presented the Audit Committee Report, which concluded that $277 million -- or one third-- of revenue over the past 2 1/2 years may have been improperly recorded. And this was a conservative and incomplete figure. The Audit Committee Advisors reported that efforts were impeded by a lack of cooperation on the part of KPMG Belgium and members of L&H's management and board:

101

> We were unable to review the workpapers of L&H's outside auditor, KPMG, because KPMG was unwilling to make the workpapers available for review in connection with this investigation.
>
> *    *    *
>
> Management and some board members of L&H have made this process [of investigating allegations regarding related party dealings] far more difficult than it needed to be. We assume that several of these persons have full information about the investors and the structure of the transactions, and they should immediately provide that information to Audit Committee Counsel. Because they have failed to do so, Audit Committee Counsel has been forced to piece together bits and pieces of information from a variety of sources. As a result, we still do not know the identities of all of the original, and possibly all of the current investors, in these companies.

Thus, the Audit Committee Advisors cautioned that the draft schedules showing the potential impact on the financial statements of the transactions examined "do not purport to represent all changes to the financial statements that would likely be identified after a complete audit." The Advisors also warned that "[w]e did not address non-revenue issues, and the revenue transactions selected for review may not include all transactions as to which the accounting should be considered."

257. The Audit Committee Report corroborates the extensive press coverage of defendants' fraudulent scheme, and details numerous additional questionable transactions, including, among other things, the booking of revenue before contracts were signed, secret side letters providing refunds of license fees, and wrongly booked barter deals in which no money changed hands.

258. With respect to license revenues from "strategic partners," which the Audit Committee Report categorized as Cross Language Development Companies, or CLDC's, and Language Development Companies, or LDC's, the Audit Committee Advisors concluded that revenue from 24 of the 30 new companies was incorrectly booked. The report concluded that the companies were not buying software licenses, but were actually paying L&H employees to develop future products, in effect funding the company's own R&D needs. The Audit Committee Report recommended, at a minimum, reversing approximately $83 million in

licensing revenue, and stated that if the investors are related parties, as the evidence suggests, the funded amounts should be recognized as a liability:

> It appears, based on our review, that the original LDC concept involved the sale of rights and tools to an independent third party and the separate use of those tools by the third party to develop L&H compatible products in a particular language. The wording of the contracts corroborate this concept. However, it also appears that shortly after the first few LDC contracts were signed, L&H personnel realized that the LDC investors were primarily financial investors and L&H would have to provide more services to the LDC's than they originally thought. Eventually, L&H assumed responsibility for the development work for a contemplated additional fee. Although it appears to us that, by December 1998 L&H and the LDC's knew that L&H would be performing some or all of the services or development work for the LDC's, future contracts were not changed to reflect that understanding. Except for Turkish and Farsi, contracts reflecting that the LDC's would pay L&H for the services or development work were not executed until November 3, 2000. To our knowledge, except for Turkish and Farsi, the LDC's have not yet been invoiced for the development work performed to date.

> \*       \*       \*

> We believe, based on our review of certain internal documents and outside marketing material and limited discussions with the investors or their representatives, that the investors anticipated, in substance, that they were buying the future rights to a product (language) to be developed by L&H and thus were effectively funding the Company's research and development efforts to build that language.

> If the investors are not related parties, accounting for such transactions would require deferral of all the revenues and recognition over the development period.... If the investors are related parties, the relevant accounting literature presumes that the related party investors will be repaid and the funded amounts are recognized as a liability.

259.   In fact, the investors were related parties, and what L&H recognized as license revenue should not merely have been deferred, it should have been stated as a liability. Although the Audit Committee report redacted the names of the investors it did manage to discover and connect to L&H, news reports revealed those names and their affiliations with L&H.

260.    A September 22, 2000 *Wall Street Journal* article revealed that eight of the shell start-ups were funded by the FLV Fund, which is audited by KPMG Belgium. According to a November 6, *Wall Street Journal* article, another four were organized as subsidiaries of Language Investment Co., whose chief executive officer, Willem Hardeman, sits on the Board of the FLV Fund. And a December 14, 2000 *Wall Street Journal* article reveals that another sixteen were owned by Mercator, the Antwerp insurance company addressed above whose chairman is Verbeke of Loeff Claeys. As addressed above, Verbeke and Mercator separately hold stakes in L&H, and Mercator also owns interests in L&H Holding Co., LDF and indirectly owned Velstra which indirectly owned 16 of the 30 LDCs and CLDCs. L&H's financial statements and other disclosures misleadingly omitted these relationships. Indeed, as previously set forth, L&H affirmatively and falsely represented that these "licensees" were "unaffiliated customers" and that 1998 and 1999 revenues from companies funded by the FLV Fund were *de minimis*. Further, at least with respect to start-ups owned by the FLV Fund, KPMG Belgium saw both sides of the transactions.

261.    The Audit Committee Advisors did not examine the Brussels Translation Group and Dictation Consortium transactions "because of the age of the transactions and our understanding that KPMG carefully reviewed these transactions at the time." Notwithstanding KPMG Belgium's "careful review," the Audit Committee Advisors concluded that revenues from 24 of the 30 new companies, which were modeled after Dictation Consortium and Brussels Translation Group, were incorrectly booked.

262.    As for Korea, the Audit Committee Advisors recommended that L&H consider reversing the company's entire Korean revenue during 1999 and 2000, amounting to approximately $182 million, and then record the revenue if and when cash is later received from

Korea. The Audit Committee Advisors were "unable to reach any conclusions with respect to issues in Korea" because of their lack of access to information. However, the Audit Committee Advisors were able to review some Korean contracts, and suggested that the company revisit those specific contracts if and when "global issues " are resolved.

263. Finally, the Audit Committee Report details transactions involving tens of millions of dollars in which revenue was improperly booked for a variety of reasons.

(a) In L&H's Burlington, Massachusetts, office, "[t]he problematic practices included barter transactions, rights to return products, transactions where the customers' ability to pay depended on the receipt of an investment from L&H, and the separation of one agreement into two contracts -- a license agreement and a development agreement -- so that more revenue could be booked in an earlier quarter than might otherwise occur."

(b) In Belgium, the Audit Committee Advisors discovered many transactions where revenue was recorded earlier than it should have been, and also instances where the customer did not have the ability to pay and was not even invoiced for it. The "problematic transactions ... include the backdating of contracts, one side letter, several instances of later delivery of product, a promise to deliver an additional language at no extra charge 'when and if available' and an understanding that the cost of certain options would be reimbursed through a subsequent arrangement."

(b) In Korea, the problems included the separation of an agreement into a license agreement and a development agreement so that revenue could be recognized earlier, and also factoring of receivables and the possibility that this was done with recourse to L&H bank accounts in Korea.

264. On November 23, the public prosecutor's office in Ypres, Belgium announced an official investigation into the legal repercussions of the financial irregularities at L&H. The prosecutor stated that the investigation would determine who was responsible for the errors and irregularities and that this could include "both L&H personnel and KPMG auditors."

265. On November 29, 2000, L&H filed for protection from its creditors under Chapter 11 of the United States Bankruptcy Code.

266.    Indeed, the *Wall Street Journal* reported on December 19, 2000 that the Audit Committee Report, coupled with another audit report, "together present the broadest and deepest case to date that the rise of Lernout & Hauspie was based on artifice and deceit -- and not on dazzling advances in computerized speech recognition, as the company had purported." According to the *Wall Street Journal*, these reports make clear that statements made by L&H executives as late as December 15, 2000 to L&H investors regarding the financial status and viability of L&H were patently false.  It noted the Audit Committee Report concluded that, among other things, there were transactions with related entities "as to which revenue should never have been recorded."  In addition, the Audit Committee Report described sales practices, that resulted in recordings of improper revenue, as so "problematic" that disciplinary action was recommended against L&H employees.  According to the Audit Committee Report, "[i]n some instances it appears that the customers [for whom L&H booked revenues] did not have the ability to pay for the product, and was not even invoiced."  Strikingly, L&H refused in the investigation which culminated in the Audit Committee Report to disclose information about "the investors and the structure of the transactions" with certain customers even though the report concluded several members of L&H Management likely "have full information" regarding this.

267.    On January 5, 2001, the *Associated Press* reported that the Belgian judge presiding over L&H's Belgium bankruptcy proceeding acknowledged that there is "no doubt there was fraud" at L&H.

268.    On March 2, 2001, Philippe Bodson, L&H's third CEO since August, 2000, stated that "Korea is a real catastrophe.  The situation there is as bad as one could possibly imagine.  L&H Korea never really had any sales to speak of."

269.    On April 6, 2001, L&H held a press conference where it released certain information regarding the investigation, assisted by its outside investigators, Price Waterhouse Coopers, relating to the cancellation of $100 million of revenue of L&H Korea due to the cancellation of 47 license and maintenance agreements entered into between September 1999 and November 2000. The findings of this investigation revealed that L&H Korea had signed sales agreements and booked revenue it could not hope to collect, then created fictitious agreements with four Korean Banks and with some of its customers to create the appearance that revenue was collected from these sales.  The two reports released by L&H, L&H Korea Preliminary Report and L&H Korea Investigation reported that:

(a)    L&H Korea attempted to meet its sales forecasts by booking large sales to small and start-up business although there was "no real expectation of collecting these large royalties within a reasonable time" by the use of side agreements such as agreements not to enforce the collection of accounts receivables.  This created the problem that L&H Korea had to show some sort of collections to avoid reversals of the sales.  The appearance of collections was created by the use of factoring and transfer agreements to give the illusion that payments were received by L&H Korea, although there were little or no payments actually generated and the cash from the factoring arrangements purportedly under the control of L&H Korea was actually controlled by the Korean banks.

(b)    Beginning in September 1999, L&H Korea entered into factoring arrangements with Korean banks where the accounts receivables from the licensing agreements were sold to the banks.  These agreements were ostensibly without recourse against L&H Korea shifting the risk of non-payment to the Banks.  This mechanism permitted L&H Korea to record the receipt of income on their books. In fact, secret side agreements were entered providing that the risk of non-payment was still with L&H Korea and L&H Korea agreed not to object if L&H Korea's deposits at the Banks were used to offset the accounts receivables upon default.  In addition, L&H Korea agreed to fully collateralize the loans with the proceeds of these factoring agreements.

(c)    A second group of contracts referred to "transfers" were created to demonstrate collections.  In these transfer agreements, L&H Korea instructed its original customers to transfer its contract to third parties, and that third party obtained a loan from a Bank with the assistance and collateral of L&H Korea.  The third party would then make a payment through the original customer that would be

recorded as revenue although it was actually a loan for which L&H Korea was responsible.

(d)    L&H Korea cancelled the license agreements in November, 2000 that caused $76,840,951 in cash to revert to the Korean Banks from the factoring arrangements and transfer agreements.  In addition L&H Korea paid penalties related to these agreements and incurred other expenses in the amount of $18,369,971 as a result of the cancellation of the license agreements.  After cancellation of these license agreements, L&H Korea, which had appeared to have a cash balance of $97,501,584, in fact only had cash of $2,290,662.

270.    According to an April 25, 2001 Bloomberg news report, L&H asked Seoul, Korea prosecutors on April 25, 2001, to investigate John Chul Seo, the former head of L&H Korea, and other former employees of L&H Korea, as well as current and former officials of four Korean banks that assisted L&H Korea in the fraudulent transactions. According to Bloomberg, L&H also issued a statement that "[L&H] believes that certain actions by Mr. Seo amount to criminal fraud and breach of trust in office, among other criminal activities."  L&H also reported filing a criminal complaint with the Seoul Prosecutors Office that also named current or former officers of the Korean Banks.  Hana Bank, another Korean Bank, also was implicated in the factoring arrangements.  L&H also announced that its wholly-owned subsidiary L&H Korea filed for voluntary bankruptcy in Korea.

271.    Defendants Lernout, Hauspie and Willaert submitted letters to a Belgian financial daily printed April 26, 2001, wherein Messrs. Lernout, Hauspie and Willaert stated that they had cooperated with KPMG's audits and that KPMG was fully aware of L&H's structure, including L&H's activities in Korea.

272.    On April 27, 2001, L&H, through its CEO Philippe Bodson, announced at an extraordinary shareholders meeting in Ieper, Belgium, that in addition to the $277 million identified in the November 20, 2001 Audit Committee Report as being misreported, an additional $96 million of income had been reported which did not exist.

273.    On or about April 27, 2001, Lernout, Hauspie and Willaert were arrested in Belgium and charged with forgery and stock manipulation.

274.    On May 26, 2001, Bastiaens was arrested by United States officials in Winchester, Massachusetts, in response to a Belgian warrant.    Bastiaens was subsequently extradited to Belgium, where he has been charged with fraud, insider trading, stock market manipulation and accounting law violations.

### Falsity and Omissions of KPMG Defendants, Behets, and L&H Defendants Representations That L&H Financial Reports Were Prepared in Accordance with U.S. GAAP

275.    U.S. GAAP are those principles recognized by the U.S. accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that financial statements filed with the SEC that are not prepared in accordance with U.S. GAAP are presumed to be misleading and inaccurate.

276.    By acknowledging that its 1998, 1999 and 2000 financial statements needed to be corrected and restated, L&H has admitted that, contrary to its prior representations, those statements were not prepared in accordance with U.S. GAAP.  Under U.S. GAAP, restatement of previously issued financial statements is only permitted -- and is required -- to correct material misstatements and/or omissions in the financial statements as a result of conditions that existed at the time the financial statements were originally prepared.  Financial Accounting Standards Board, *Accounting Standards, Current Text*, as published annually from June 1997 to June 2000 ("AS"), §A35.

277.    By withdrawing its previously issued clean opinions, KPMG conceded that KPMG's prior opinions -- based on work performed by KPMG LLP and KPMG UK in addition

to KPMG Belgium -- that L&H's financial statements were prepared in accordance with U.S. GAAP were false when made. When an auditor concludes that reliable information that existed at the date of the auditor's report rendered the financial statements, as previously issued, materially misleading and erroneous, the auditor is required to take appropriate action to prevent future reliance on the financial statements and its related auditor's report. *AICPA Professional Standards*, vol. 1, *U.S. Auditing Standards*, as published annually from June 1997 through June 2000 ("AU"), §561.

278.    The Audit Committee Report makes it clear that L&H's financial results were not stated in accordance with U.S. GAAP; and representations of the KPMG Defendants, the L&H Defendants and Behets that the financial results were stated in accordance with U.S. GAAP were false when made. Moreover, the accounting principles that were disregarded were not esoteric or obscure; they were fundamental principles of revenue recognition and disclosure that were very much at the forefront of the accounting and auditing profession's concerns during the relevant period:

(a)    In a letter to the AICPA from the SEC Chief Accountant dated October 9, 1998, which was posted to the AICPA website on the Internet, the SEC addressed "inappropriate revenue recognition practices" and emphasized that auditors should be alert to the criteria for revenue recognition contained in Statement of Position (SOP) 97-2, *Software Revenue Recognition*; FASB Statement of Financial Accounting Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, and No. 6, *Elements of Financial Statements*; and SEC Accounting and Enforcement Release No. 108, all of which address the types of fraudulent practices identified by the Audit Committee Report;

(b)    AICPA Practice Alert No. 95-1, was "intended to remind auditors of conditions that can be indicative of increased audit risk with respect to improper and unusual revenue practices," and addressed specific practices identified by the Audit Committee Report;

(b)   AICPA Practice Alert No. 95-3 addressed related parties and related party transactions, stating that "identifying related parties and material related-party transactions is a key component of any audit;"

(d)   AICPA, *Audit Issues in Revenue Recognition*, 1999, at 21-26, addressed software revenue recognition and related party disclosures in financial statements, describing "indicators of improper revenue recognition" or "red flags" including "unusually rapid growth or profitability" and warned auditors to search for "side agreements," "related party transactions" and specific indicators of "the absence of agreements," "lack of delivery," or "incomplete earnings process;"

(e)   The AICPA also issued "Audit Risk Alerts" annually during the relevant period that discussed the same accounting and auditing issues highlighted in the Audit Committee Report;

(f)   On September 28, 1998, Chairman of the SEC, Arthur Levitt, in a speech entitled "The Numbers Game," referred to inappropriate accounting that he called "Accounting Hocus-Pocus." In that speech, Chairman Levitt characterized as "merger magic," inappropriate accounting for acquired in-process research and development, stating "they classify an ever-growing portion of the acquisition price as 'in-process' research and development so -- you guessed it -- the amount can be written off in a 'one-time' charge -- removing any future earnings drag," and warned that "companies try to boost earnings by manipulating the recognition of earnings."

279.   The Audit Committee Report demonstrates that L&H improperly recorded $83 million in licensing revenue from the licenses with "strategic partners." The arrangements with the start-up shell companies obligated L&H to fully fund the research and development activities and to complete software using L&H employees and facilities. L&H's accounting was improper under Statement of Financial Accounting Standard (SFAS) No. 68, *Research and Development Arrangements*, which requires that "[t]he financial reporting of an enterprise that is party to a research and development arrangement should represent faithfully what it purports to represent and should not subordinate substance to form."

280.   At a minimum, under SFAS No. 68, and under SOP 97-2, L&H was required to account for the arrangement as a long-term construction contract and defer recognition of revenues from the start-up shells over the development period. SFAS No. 68 provides that:

> An enterprise shall determine the nature of the obligation it incurs when it enters into an arrangement with other parties who fund its research and development.
>
> *        *        *
>
> To the extent that the financial risk associated with the research and development has been transferred because repayment of any of the funds provided by the other parties depends solely on the results of the research and development having future economic benefit, the enterprise shall account for its obligation as a contract to perform research and development for others.

SFAS No. 68 ¶¶4, 10. SOP 97-2, which "provides guidance on when revenue should be recognized and in what amounts for licensing, selling, leasing, or otherwise marketing computer software" states that:

> If an arrangement to deliver software or a software system, either alone or together with other products or services, requires significant production, modification, or customization of software, the entire arrangement should be accounted for in conformity with Accounting Research Bulletin (ARB) No. 45, Long-Term Construction-Type Contracts....

SOP 97-2 ¶7.

281.    Since the start-up shells were related parties, the funds should have been treated as liabilities:

> If the enterprise is obligated to repay any of the funds provided by the other parties regardless of the outcome of the research and development, the enterprise shall estimate and recognize that liability. This requirement applies whether the enterprise may settle the liability by paying cash, by issuing securities or by some other means.

AS § R55.103.

282.    Among the transactions detailed in the Audit Committee Report as raising concerns about research and development funded by related parties were:

(a)    In the second quarter of 1998, L&H recognized $500,000 of license revenue from FLV Telecom, a customer of the Belgian office who indicated that he had no use for the software when it was purchased. The customer's sole funding came from the SAIL Trust.

112

    (b)    In the third quarter of 1999, L&H recognized $16 million from license agreements with four CLDC's (Salfas, Senegal, Baleston, Duranzo) that had been incorporated only weeks earlier. On September 22, 1999, FLV Fund purchased the shares of these four CLDC's and invested $10 million in those entities on October 22, 1999.

283.    Although the Audit Committee Advisors did not examine the BTG and Dictation Consortium transactions "because of the age of the transactions and our understanding that KPMG carefully reviewed them at the time," under the Audit Committee Report analysis, revenue from those entities was also recorded improperly.

284.    As referenced above in this Complaint, Messrs. Lernout and Hauspie and/or L&H were involved in gathering "outside" investors to fund BTG in 1997. Defendant Behets of KPMG Belgium was also involved in this activity. As reported by *De Standaard* on September 2, 2000, Behets' presence at a May 1997 conference in Boston where L&H tried to persuade an investor to infuse $15 million into BTG added credibility to the fundraising and raised additional questions about KPMG's role with regard to L&H.

285.    Further, in a December 7, 2000, interview with *The Wall Street Journal*, defendant Lernout stated that L&H gathered "outside" investors to fund Dictation Consortium in 1996, and admitted that "L&H employees wrote its business plan and did the software work under contract." The "outside investors" who funded Dictation Consortium included the FLV Fund and FLV Management, which together owned 61% of Dictation Consortium when it was founded, and reduced that holding to 43% in 1997. Thus, the $26.6 million in revenue from Dictation Consortium in 1996 and 1997, which constituted 25% of L&H's revenues in 1996 and 19% in 1997, should at least have been deferred over the life of the project. More likely, since FLV Fund and FLV Management were related parties, the fund should have been considered loans or paid-in capital and booked as liabilities during those years.

286.    L&H's treatment of the start-up shells also violated SFAS No. 57, *Related Party Disclosures*, which requires "disclosures of material related party transactions" including:

(a)    The nature of the relationship(s) involved.

(b)    A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements.

(c)    The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period.

(d)    Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

AS § R36.102.

287.    Notes to L&H financial statements for 1997, 1998, and 1999 contain long lists of "related parties" accompanied by none of the detail required by SFAS No. 57. Moreover, the connections to related parties revealed by the Audit Committee Report demonstrate that L&H affirmatively misrepresented the amount of revenue it recognized from the start-up shells who provided 10% of L&H's 1998 revenue and 25% of its 1999 revenue. In its 1998 Annual Report on Form 20-F, L&H stated that only 3.7% of its 1998 revenue was provided by "companies funded in part by the FLV Fund." In Notes to its 1999 financial statements, L&H stated that 0.3% of 1999 revenues were provided by "companies funded in part by the FLV Fund and L&H Investment Co."

288.    L&H also flouted the provisions of SOP 97-2 relating to revenue from sales or licenses that do not require contract accounting. Under those provisions, if the arrangements do not require significant production, modification, or customization of software, L&H was not permitted to recognize revenue until:

114

*all* of the following criteria are met:

- Persuasive evidence of an arrangement exists.

- Delivery has occurred.

- The vendor's fee is fixed or determinable.

- Collectibility is probable.

SOP 97-2 ¶8 (emphasis added).

289.    The Audit Committee Report lists numerous instances where L&H recognized revenue even though no contract was signed or the terms were not finalized, and, thus, no "persuasive evidence of an arrangement existed" as required by SOP 97-2:

(a)    In the second quarter of 1998, L&H recognized revenue from a June 30, 1998, agreement with Digital Voice requiring a $150,000 prepaid royalty. An August 6, 1998 internal L&H e-mail provided that the contract was not finalized until at least the third quarter.

(b)    L&H recognized revenue in the third quarter of 1999 from a September 30, 1999 distribution agreement with Voicenet containing a $1,000,000 prepaid royalty. However, it was not until the parties signed a "clarification letter" on October 26, 1999 that the final terms of the agreement were actually determined.

(c)    L&H recognized $4 million in the fourth quarter of 1999 based on an agreement with Lavenia dated December 30, 1999, when an e-mail dated January 5, 2000 from Filip Beernaert to Dammekens discussed terms to be included in the contract, including a $3 million fee, demonstrating that the revenue was recognized prior to the terms being final.

(d)    L&H recognized $5 million from a license agreement with TIB in the fourth quarter of 1999, when a January 4, 2000 e-mail from Filip Beernaert to Hauspie and Lernout demonstrated that the contract had not yet been signed.

(e)    In the second quarter of 1999, L&H recognized $3 million from a license agreement with I-Medical dated June 30, 1999. A July 7, 1999 e-mail from Lernout to Bastiaens and Hauspie established that the contract was not signed until the third quarter of 1999.

(f)    In the fourth quarter of 1999, L&H recognized $4 million from a license agreement with I-Travel dated December 31, 1999. An e-mail from Beernaert to

115

Willaert and Dammekens dated January 5, 2000 indicated that the contract was not signed until the first quarter of 2000.

(g)  In the first quarter of 2000, L&H recognized $8 million in revenue based on an agreement with ELC dated March 31, 2000.  On April 4, 2000, Beernaert sent an e-mail to Willaert, Lernout, Bastiaens and Dammekens stating that the customer had requested information to finalize the agreement, including royalty pricing information and the list of licensed products.  Thus, because key terms were still missing from the document as of quarter end, revenue could not be recognized.

(h)  L&H recognized $50,000 of revenue in the third quarter of 1999 from NEC, who told Bryan Cave and AA that the terms of the contract were never finalized and that it was never invoiced and had never paid.

(i)  L&H recognized $12 million in the third quarter of 1999 from contracts with three CLDC's (Lupeni, Jelgava and Harrisea) who each had two contracts, one reflecting a $4 million fee and a second contract reflecting a $2 million fee, dated the same date and signed by Tony Snauwert and Nico Willaert.  The Audit Committee Report found that the existence of two contracts for each CLDC, identical except for the amount of payment, raised questions as to whether there was an agreement in the quarter when revenue was recognized.

290.  The Audit Committee Report lists numerous instances where L&H recorded sales when it was not clear that the customer had the ability to pay for its products or services, including instances when the customer was not even invoiced, and thus, collectibility was not probable, as required by SOP 97-2:

(a)  During the first three quarters of 1998, BCB licensed $1.25 million of L&H software.  In July 1998, BCB and L&H entered into a stock swap valued at $1.6 million.  BCB was actually a start-up that intended to use proceeds from the sale of the L&H stock to pay the license fees, but was unable to sell the stock until October 1998.  Collectibility was not probable until BCB sold the stock and determined that the proceeds were sufficient to cover the license fees.

(b)  On September 27, 1999, the Belgian unit of L&H recognized $220,000 of license revenue based on an agreement with Computer Services Solutions but never invoiced the customer for fees, because "L&H did not invoice customers until it believed the customer could pay."

(c)  On December 31, 1998, the Belgian unit of L&H recognized $250,000 of license revenue from Advance Voice Technology but never invoiced the customer, a start-up that had been established only one month before the license agreement.

291.    L&H recorded sales when the customer's ability to pay depended on an investment from L&H, which also demonstrated that collectibility was not probable as required by SOP 97-2:

(a)    On September 27, 1999, L&H recognized $450,000 of revenue based on a license agreement with Industry Productivity Group, which was expecting an investment from the FLV Fund. L&H never invoiced the customer for the fee.

(b)    Interpra, a customer in the Burlington office who licensed $250,000 of L&H software on December 31,1998, and another $250,000 on March 31, 1999, maintained that there was a verbal promise of funding from the FLV Fund, and that it did not want to pay the license fee until it received the funding.

(c)    On March 25, 1998, Vasco licensed $800,000 of L&H software. On December 31, 1998, it licensed an additional $900,000 of L&H software. In March 1998, L&H loaned the customer $3 million, due January 4, 1999. The loan was not repaid until the second quarter of 1999, when LHIC invested $5 million in the customer.

292.    L&H recognized sales revenues that were contingent on L&H later performing development work for the customer. SOP 97-2 requires that recognition of revenue be deferred until "delivery has occurred," and that delivery be determined as to each one of multiple elements, including the separate element of software delivered "on a when-and-if-available" basis:

(a)    In the first quarter of 1999, L&H recognized $1 million of license revenue based on an agreement with I-Merge. An August 25, 2000 letter from Eric Moons of L&H to Tony Snauwert indicated that delivery of all software did not occur until June 1999 and that the software was later replaced in August 1999.

(b)    On June 30, 1999, L&H recognized $900,000 based on a license agreement with Cegeka allocated among different language versions of Voice Xpress. One version was to be delivered "when and if commercially available." The other two versions were never delivered.

(c)    On March 17, 1999, L&H recognized $900,000 from an agreement with G2 Speech allocated among four language versions of software. One version was delivered in March of 2000, the others were never delivered, and nothing was paid to L&H for any of the versions.

117

293. L&H recorded revenues when the "purchasers" of the licenses were not the end users and side letters confirmed that if the licenses were sold to other parties, a finder's fee would be paid. If the licenses were not resold, the original payments to L&H would be refunded. The fees in these arrangements should not have been recognized because they were not "fixed or determinable" as required by SOP 97-2 and the earnings process, in what was, essentially, a consignment sale, was not consummated:

(a)  L&H recognized $8 million of revenue in the fourth quarter of 1999 from a license agreement with Capital Union dated December 29, 1999. Side letters obligated L&H to refund a portion or all of license fee if Capital Union didn't find investors. A further letter dated November 2, 2000 indicates that Capital Union was merely an investment bank hired by L&H to find potential LDC investors. The structure of the transaction was apparently a pure sham designed to permit inappropriate recognition of revenue by L&H.

(b)  L&H signed an agreement with an LDC (Radial) in the third quarter of 1998 and another in the first quarter of 1999. The investors, WH Operations, who bought the shares of the LDC from the original investors on September 23, wanted $1.3 million of free warrants from L&H. Dammekens and Willaert told WH Operations that it had to pay for the warrants "because of the P&L impact," but that L&H would make it up to them later. On August 1, 2000 L&H entered into a contract with WH Operations obligating L&H to pay $1.8 million to them over two years for "introductions" to influential politicians and business people. Dammekens and Willaert told the Audit Committee Advisors that this agreement was entered into to reimburse the customer for the warrants.

294. Statement of Financial Accounting Standard SFAS No. 48, *Revenue Recognition When Right of Return Exists*, provides that revenue may be recognized only when all of the terms of the sale are fixed or determinable and the sale has become final. AS § R75.107. The Audit Committee Report confirms that L&H recorded revenues although the customer had a right to return the product, including the following:

(a)  On December 29, 1998, CCG signed a distributor agreement requiring a $569,620 non refundable fee. L&H recognized $152,500. The contract gave the customer the right to return; the customer never paid any money under the agreement, and never had any intention of paying until the product was sold through to end customers.

118

(b)     On December 31, 1998, L&H entered into a distribution agreement with D&H Distributing who was obligated to prepay $500,000 in royalties. L&H recognized $350,000 in revenue in the fourth quarter of 1998 even though the contract gave the customer the right of return, the customer never paid any fees, and the customer returned all the product.

295.    The Audit Committee Report reveals that L&H improperly recorded revenue for barter or exchange transactions with other software firms in which no cash exchanged hands. Under Statement of the Accounting Principles Board Opinion (APB) 29, *Accounting for Nonmonetary Transactions*, such transactions do not culminate an earnings process and therefore did not produce recognizable revenue: "[T]he following two types of nonmonetary exchange transactions do not culminate an earnings process: a. An exchange of product or property held for sale in the ordinary course of business for a product or property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange, and b. An exchange of productive asset not held for sale in the ordinary course of business for a similar productive asset or an equivalent interest in the same or similar productive asset." AS § N35.108. L&H improperly recorded revenue from the following barter transactions:

(a)     L&H recognized $375,000 of revenue in the third quarter of 1998 and $435,000 of revenue in the fourth quarter 1998 from a reseller license contract dated September 28, 1998, with Speech Machines. On January 5, 1998, L&H entered into an amended reseller agreement obligating L&H to pay an upfront fee of $1.25 million to Speech Machines for no additional consideration.

(b)     L&H recognized revenue in the third quarter of 1998 from a September 30, 1998, license to Nine Rivers Technology of $950,000 of L&H software, with a net benefit to L&H (after marketing expenses) of $838,000. On January 15, 1999, L&H licensed $830,000 of the customer's software for resale. A June 17, 1999 email stated that Nine Rivers had no plans to pay L&H, as this was a reciprocal agreement.

(c)     L&H recognized revenue in the first quarter of 1999 from a license to Interpra of $250,000 of L&H software on December 31,1998, and another $250,000 on March 31, 1999. In return, L&H licensed $250,000 of Interpra's software on January 4, 1999 and another $250,000 in the third quarter of 1999.

(d)    In the fourth quarter of 1997, L&H agreed to pay $1.2 million to Voice Inpute Technologies ("VIT") for that customer to develop PowerScribe technology. In the same quarter, that customer licensed $1.5 million of L&H software for resale. L&H recognized $1.2 million in that quarter, even though L&H stated that VIT never delivered anything under the agreement.

(e)    L&H recognized revenue in the first quarter of 1998 from a March 31, 1998, license to Korteam for $300,000 of L&H software. On June 29, 1998, L&H licensed $500,000 of contexts to be developed by the customer, with a $200,000 rebate if L&H obtained financing for Korteam. Korteam never sold any L&H product, and L&H relieved it of all obligation.

(f)    L&H recognized revenue in the first quarter of 1998 from a March 31, 1998, license to Sequoia of $30,000 of L&H software. L&H licensed $30,000 of Sequoia's software at the same time.

(g)    L&H recognized revenue in the fourth quarter of 1998 from a December 27, 1998, license to AVRI/E-Docs for $1,000,000 of L&H software. On January 11, 1999, L&H committed to pay $400,000 for the development of contexts by AVRI/E-Docs.

(h)    On December 19, 1998, L&H recognized $800,000 of license revenue from an agreement with Educa. A second contract stated the fee as $500,000. The Audit Committee Advisors reported that Educa's CEO had stated that he never had any intention to pay $800,000, but understood there was an oral agreement for L&H to purchase a reciprocal amount of software. L&H never invoiced the customer, nor was anything paid.

296.    L&H's reported financial results also violated the following fundamental concepts underlying GAAP:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. FASB Statement of Concepts No. 1, ¶34;

(b)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources. FASB Statement of Concepts No. 1, ¶40;

(c)    The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations

about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. FASB Statement of Concepts No. 1, ¶42;

(d)    The principle that financial reporting should be reliable and that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting. FASB Statement of Concepts No. 2, ¶58;

(e)    The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. FASB Statement of Concepts No.2, ¶79;

(f)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. FASB Statement of Concepts No. 2, ¶¶95, 97.

### Falsity of KPMG And Behets' Representation That
### L&H Audits Were Conducted in Accordance With U.S. GAAS

297.    For each of the years 1997, 1998 and 1999, KPMG Belgium and Behets falsely certified that:

We have conducted our audits in accordance with generally accepted auditing standards in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

298.    U.S. GAAS imposes upon auditors "a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 110.02.

299.    As is set forth in detail below, L&H audits did not follow the most basic tenets of U.S. GAAS, which require an auditor to obtain personal knowledge of sufficient, competent evidence supporting the assertions in financial statements to permit reasonable assurance that they do not contain material misstatements:

121

(a)     "Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements." AU § 326.02.

(b)     "The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly." AU § 326.21.

(c)     Representations from management "are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU § 333.02.

(d)     "[W]ithout adequate attention to the propriety and accuracy of the underlying accounting data, an opinion on financial statements would not be warranted." AU § 326.16.

### Disregard of Overall Risk Factors by KPMG Defendants and Behets

300.    As an initial matter, the L&H audits failed to follow AU § 316, *Consideration of Fraud in a Financial Statement Audit*, which requires that: "[t]he auditor should specifically assess the risk of material misstatement of the financial statements due to fraud and should consider that assessment in designing the audit procedures to be performed." In addition to risk factors specific to the issues enumerated below, KPMG and Behets failed to consider overall risk factors posing a high degree of risk of error or fraud, including:

(a)     "an excessive interest by management in maintaining or increasing the entity's stock price or earnings trends through the use of unusually aggressive accounting practices." AU § 316.17. KPMG Belgium was involved in L&H's 1999 response to an SEC investigation of L&H's methods of accounting for acquisitions, and, thus KPMG Belgium knew and, KPMG LLP, KPMG UK and Behets, also new or were reckless in not knowing, that the SEC had determined that L&H's methods were aggressive and improper.

(b)     "significant, unusual or highly complex transactions, especially those close to year end, that pose difficult 'substance over form' questions." AU § 316.17. Nearly every contract discussed in the Audit Committee Report is dated within three days of the end of a fiscal quarter, and ten agreements giving rise to a total of more than $27 million in revenue are dated within the last three days of December 1998 or December 1999.

(c)     "unusually rapid growth or profitability, especially compared with that of other companies in the same industry." AU § 316.17. Behets, KPMG Belgium and KPMG LLP knew from L&H's financial statements that L&H claimed revenue

increases of 213% in 1998 and 163% in 1999. KPMG Belgium and KPMG LLP knew that L&H's growth and profitability were unusual in the industry.

### a.    Korea and Singapore

301.    KPMG and Behets failed to follow procedures sufficient to provide it with reasonable assurance that L&H's stated revenue from Korea and Singapore was free of material misstatement or turned a blind eye to the results of those procedures.

302.    KPMG was aware of facts indicating a serious risk of material misstatement of Korean and Singaporean revenues, including:

(a)    "unusually rapid growth or profitability." AU § 316.17. Korean revenues of $62.9 million in 1999 had risen from $245,000 in 1998, and constituted nearly 19% of L&H's total 1999 revenue of $344.2 million, all at a time when revenues in every other geographic market except Singapore were flat or declining. Singapore's revenues increased from only $29,000 in 1998 to $80.3 million in 1999 -- an increase of 2,769%, making Singapore the highest revenue geographic area in L&H, ahead of the United States and Europe (excluding Belgium).

(b)    "significant, unusual or highly complex transactions, especially those close to year end, that pose difficult 'substance over form' questions" AU §316.17. According to the Audit Committee Report, KPMG was aware of contracts with one Korean client representing $15 million in revenue that were signed on September 30, 1999, contracts with a second Korean client representing $21 million in revenue that were signed on December 8, 1999, and contracts with a third Korean client representing $12 million in revenue that were signed on December 27, 1999. KPMG was aware that the form of those contracts cast doubt on the propriety of L&H's recognition of revenue from those contracts.

(c)    "other conditions [that] may be identified during fieldwork" including "unsupported or unauthorized balances or transactions" and "transactions not recorded in a complete or timely manner." AU § 316.24. According to the Audit Committee Report, an October 18, 1999 e-mail from KPMG indicates that KPMG knew that L&H had factored its receivables from those contracts and knew that the factoring may have been "with recourse" to L&H's Korean bank accounts. The Audit Committee Advisors state that "KPMG must have resolved this issue, but we do not know how, as we have no further e-mails on the subject."

303.    Under U.S. GAAS, the risk factors in Korea and Singapore required that KPMG and Behets give heightened attention to the fundamental procedure of confirmation, "the process of obtaining and evaluating a direct communication from a third party in response to a request for information about a particular item affecting financial statement assertions." AU § 330.4,

*The Confirmation Process.* "Unusual or complex transactions may be associated with high levels of risk. If the entity has entered into an unusual or complex transaction and the combined assessed level of risk is high, the auditor should consider confirming the terms of the transaction with the other parties in addition to examining documentation held by the entity." AU § 330.08. "If there is a risk of material misstatement due to fraud that may involve or result in improper revenue recognition" the auditor should "confirm with customers certain relevant contract terms and the absence of side agreements." AU § 316.30. "Standard confirmation requests (confirming only the outstanding balance) alone do not always provide sufficient evidence that only appropriate revenue transactions have been recorded. Auditors should consider the need to confirm significant terms of contracts and whether to inquire about the existence of oral or written contract modifications (side agreements)." AICPA, *Audit Risk Alert* -- 1998/99 at 38.

304.    Had KPMG and Behets sought confirmation of L&H contracts from Korean customers, KPMG and Behets would have discovered, as did *The Wall Street Journal* in a matter of weeks, that nearly half of L&H's customers denied the existence or magnitude of a relationship claimed by L&H. Had KPMG Belgium and Behets sought confirmation of L&H bank balances from Korean banks -- following audit procedures that would routinely apply where amounts of the magnitude at stake in Korea are involved -- KPMG and Behets would have discovered, as did the Audit Committee Advisors in a matter of weeks, that $106 million was inaccessible, likely as a consequence of factoring receivables from Korean contracts with recourse to L&H's Korean bank accounts. KPMG and Behets either failed to follow such normally applicable confirmation procedures, or turned a blind eye to the answers they received.

### b.    Related Party Transactions

305.    KPMG and Behets failed to follow procedures sufficient to provide reasonable assurance that L&H's revenues were not inflated by transactions with related parties.

306.    KPMG and Behets disregarded facts indicating heightened risk of error or fraud categorized in U.S. GAAS as "significant pressure to obtain additional capital necessary to stay

competitive, including the need for funds to finance major research and development expenditures." AU § 316.17.

(a)    Defendant Lernout was quoted in December 1999 describing the Dictation Consortium and BTG transactions as impelled by L&H's research and development needs: "If we didn't catch up [with competitors] we were cooked. But we couldn't catch up because we didn't have enough R&D dollars." KPMG Belgium was aware of all aspects of the Dictation Consortium and BTG transactions, having "carefully reviewed them at the time," according to the Audit Committee Report. Moreover, KPMG Belgium audited the FLV Fund, and thus saw <u>both sides</u> of at least the Dictation Consortium transaction.

(b)    KPMG and Behets knew that L&H faced significant limitations on its ability to fund research and development in-house.

307.    KPMG and Behets disregarded facts indicating heightened risk of error or fraud categorized in U.S. GAAS as "significant related party transactions not in the ordinary course of business or with related entities not audited or audited by another firm." AU § 316.17. These include the following:

(a)    KPMG knew or was reckless in not knowing that in January, 2000, prior to KPMG Belgium's rendering a clean opinion on L&H's 1999 financial statements, the SEC had commenced an investigation into L&H's methods of accounting for revenue from thirty L&H customers that the SEC suspected were related parties.

(b)    KPMG Belgium was auditor for the FLV Fund, a related party whose ownership of at least eight of the entities that were the subject of the SEC inquiry and funding of four others was not disclosed and required accounting treatment materially different than that applied by L&H. KPMG Belgium thus saw both sides of many of the fraudulent transactions.

(c)    L&H's financial statements contain long lists of "related parties" with little or no explanation of L&H's dealings with those parties.

308.    KPMG and Behets (for 1988) failed to consider the risk factors particular to related party transactions stated in AU § 334, *Related Party Transactions*, as "large, unusual, or nonrecurring transactions or balances, ...particular[ly] ... transactions recognized at or near the end of the reporting period." The Audit Committee Report reveals that more than half of the revenue from related party transactions in 1998 and 1999 -- $13 million in 1998 and $21 million in 1999 -- was recognized in the fourth quarters of those years.

309.   KPMG and Behets failed to take the steps prescribed in AU 334 "to identify related party relationships and transactions and to satisfy [themselves] concerning the required financial statement accounting and disclosure." AU § 334.01.  To identify material transactions with related parties, the auditor should, among other things:

(a)   "review filings by the reporting entity with the Securities and Exchange Commission and other regulatory agencies for the names of related parties and for other businesses in which officers and directors occupy directorship or management positions."   KPMG Belgium and Behets could easily have discovered from such sources that the CEO of Language Investment Co., the parent of four of the Belgian start-up shells, was Willem Hardeman, an FLV Fund director.  Another sixteen were owned by Mercator whose chairman, Verbeke, is a name partner in L&H's chief Belgian law firm.  Verbeke and the insurance company also separately owned stakes in L&H.  A review of L&H's SEC filings which could have been undertaken by KPMG, if it were necessary, would also have revealed <u>two significant related parties were the subsequent employers of former KPMG Belgium auditors with responsibility for L&H audits</u>.  During the 1998 and 1999 audits, the CFO of LHIC was Chantal Mestdagh, a former KPMG Belgium auditor who worked on the L&H audits and financial statements and who continued to provide KPMG information regarding L&H after she became CFO of LHIC. During the 1999 audit, defendant Behets was CEO of SAIL Trust. KMPG Belgium was itself the auditor of the FLV Fund.  KPMG and Behets either failed to examine these sources to identify related parties, or turned a blind eye to the results of the audit investigation.

(b)   "review proxy and other material filed with the Securities and Exchange Commission and comparable data filed with other regulatory agencies for information about material transactions with related parties." AU § 334.08(c). *The Wall Street Journal* was easily able to determine from "regulatory filings" that the FLV Fund owned 49% stakes in eight of the Singapore start-ups, and gave cash to four others "which they used to pay their bills to L&H." KPMG Belgium, which, as auditor of the FLV Fund, had access to both sides of the fraudulent transactions, either failed to perform these basic procedures, or turned a blind eye to their results.

(c)   "[r]eview accounting records for large, unusual, or non-recurring transactions or balances, paying particular attention to transactions recognized at or near the end of the reporting period." AU § 334.08(g).

(d)   "[r]eview the extent and nature of business transacted with major customers, suppliers, borrowers and lenders for indications of previously undisclosed relationships." AU § 334.08 (e).  As auditor of the FLV Fund, KPMG Belgium had unique access to both sides of L&H's transactions with major customers who were undisclosed related parties.

126

310.   KPMG and Behets were not allowed to rely on management assertions about transactions with related parties.  "The risk associated with management's assertions about related party transactions is often assessed as higher than for many other types of transactions because of the possibility that the parties to the transaction are motivated by reasons other than those that exist for most business transactions." AU § 334.18.  If L&H was unwilling to provide the names of investors in the shell start-ups, KPMG and Behets should have considered this a "denial of access to information" that "constitute[d] a limitation on the scope of the audit that ... require[d] the auditor to consider qualifying or disclaiming an opinion on the financial statements" as set forth in AU § 508, *Reports on Financial Statements*.  AU § 316.25 footnote 11.

311.   KPMG and Behets failed to devise, ensure the undertaking of and/or perform, procedures necessary to evaluate "the purpose, nature, and extent of [related party] transactions and their effect on the financial statements.  The procedures should be directed toward obtaining and evaluating sufficient competent evidential matter and should extend beyond inquiry of management."  AU § 334.09.  Among other things, KPMG and Behets failed to:

   (a)   "Confirm transaction amount and terms, including guarantees and other significant data, with the other party or parties to the transaction." AU § 334.10(a).

   (b)   "Inspect evidence in possession of the other party or parties to the transaction." AU § 334.10 (b).

   (c)   "[R]efer to financial publications, trade journals, credit agencies and other information sources when there is reason to believe that unfamiliar customers ... with which material amounts of business have been transacted may lack substance." AU§ 334.10 (c).

312.   KPMG and Behets failed to heed an AICPA Audit Risk Alert emphasizing that:

Some of the more common audit issues identified in recent litigation related to fraudulent financial reporting included:

     •   A willingness by the auditor to accept management's representations without corroboration.

> - Allowing the client to unduly influence the scope of auditing procedures.
>
> - The failure to identify risky situations, or ignoring audit risks by not applying professional skepticism and revising auditing procedures appropriately."

AICPA Audit Risk Alert -- 1999/2000 at 28.

313.   KPMG and Behets failed to heed AICPA Practice Risk Alert 95-3, which stated that "it is incumbent upon the auditor to assess the propriety of the accounting for material related-party transactions in accordance with their substance" and warned that, "[i]n the hands of the unscrupulous, an undisclosed related party is a powerful tool.  Using controlled entities, principal shareholders or management can execute transactions that improperly inflate earnings by masking their economic substance or distort reported results through lack of disclosure, or can even defraud the company by transferring funds to a conduit related party and ultimately to perpetrators."  The Practice Risk Alert, at 2, warns auditors to look for "events that may indicate transactions with undisclosed related parties," including: "sales without substance, including funding the other party to the transaction so that the sales price is fully remitted," "sales with a commitment to repurchase that, if known, would preclude recognition of all or part of the revenue," "loans to parties that do not possess the ability to repay," and "payments for services never rendered or at inflated prices."

314.   Had KPMG Belgium, KPMG LLP and KPMG UK performed the procedures required by AU § 334, and KPMG LLP, they would have discovered, as *The Wall Street Journal* easily did, that at the single Singapore address of fifteen firms that together paid L&H $57 million in 1999, or nearly 17% of its revenue, "there isn't any evidence of operations of the fifteen L&H customers."  The simple fact that fifteen of L&H's customers in a country where revenues increased 2,769% in one year had the same address should have been a major "red flag" for the auditor.  KPMG failed to perform any appropriate investigation, or turned a blind eye to the results of their search, and failed to ensure that adequate investigative steps had been undertaken to comply with GAAP.

c.    **Improper Recognition of License Revenues**

315.    KPMG and Behets failed to follow procedures sufficient to provide reasonable assurance that L&H recognized revenue properly under SOP 97-2.

316.    KPMG and Behets knew and disregarded the risk of material misstatement presented by the fact that material amounts of revenue were recognized at the end of fiscal quarters or years. Nearly every contract discussed in the Audit Committee Report is dated within three days of the end of a fiscal quarter, and ten agreements giving rise to a total of more than $27 million in revenue are dated within the last three days of December 1998 or December 1999. The occurrence of unusual, complex or significant transactions at or near the end of a financial reporting period is a "red flag" specifically described in the AICPA Audit Risk Alert -- 1999/2000 at 38: "Auditors should be alert for significant unusual or complex transactions, especially those that occur at or near the end of a reporting period, along with a variety of other circumstances that may raise concerns about improper revenue recognition."

317.    KPMG Belgium and Behets failed to follow the procedure required by the presence of this risk: confirmation, which "is the process of obtaining and evaluating a direct communication from a third party in response to a request for information about a particular item affecting financial statement assertions." AU § 330.04, *The Confirmation Process*. "If there is a risk of material misstatement due to fraud that may involve or result in improper revenue recognition" the auditor should "confirm with customers certain relevant contract terms and the absence of side agreements." AU § 316.30.

318.    KPMG Belgium and Behets improperly relied on representations of management regarding the substance of agreements and failed to obtain evidence directly from the other parties to those agreements, as required by U.S. GAAS. In so doing, KPMG failed to undertake adherence to these basic accounting precepts.

    (a)    "Confirmation is undertaken to obtain evidence from third parties about financial statement assertions made by management. Section 325, evidential matter, states that, in general, it is presumed that 'when evidential matter can be obtained from independent sources outside an entity, it provides greater assurance of reliability

for the purposes of an independent audit than that secured solely within the entity.'" AU § 330.06.

(b)     "Unusual or complex transactions may be associated with high levels of inherent risk and control risk. If the entity has entered into an unusual or complex transaction and the combined assessed level of inherent and control risk is high, the auditor should consider confirming the terms of the transaction with the other parties in addition to examining the documentation held by the entity." AU § 330.08.

(c)     The auditor's understanding of the client's arrangements and transactions with third parties is key to determining the information to be confirmed. The auditor should obtain an understanding of the substance of such arrangements and transactions to determine the appropriate information to include on the confirmation request.... The auditor should also consider whether there may be oral modifications to agreements, such as unusual payment terms or liberal rights of return. When the auditor believes there is a moderate or high degree of risk that there may be significant oral modifications, he or she should inquire about the existence and details of any such modifications to written agreements. One method of doing so is to confirm both the terms of the agreements and whether any oral modifications exist." AU § 330.25.

319.     KPMG failed to heed AICPA, Audit Issues in Revenue Recognition, 1999, which details the procedures required to obtain sufficient competent evidence of the propriety of revenue recognition:

SAS No. 45 requires the auditor to place emphasis on testing material transactions with parties he or she knows are related to the reporting entity. It states that procedures should be directed toward obtaining and evaluating sufficient competent evidential matter and should extend beyond inquiry of management. The following are among the procedures that should be considered to obtain satisfaction concerning the purpose, nature, and extent of related-party transactions and their possible effect on revenue recognition.

- Obtain an understanding of the business purpose of the transaction.

- Examine invoices, executed copies of agreements, contracts, and other pertinent documents, such as receiving reports and shipping documents.

- Determine whether the transaction has been approved by the board of directors or other appropriate officials.

- Confirm the transaction amount and terms, including guarantees and other significant data, with the other party or parties to the transaction.

130

- Refer to financial publications, trade journals, credit agencies, and other information sources when there is reason to believe that unfamiliar customers, suppliers, or other business enterprises with which material amounts of business have been transacted may lack substance.

- With respect to material uncollected balances, guarantees, and other obligations, obtain information about the financial capability of the other party or parties to the transactions. Such information may be obtained from audited or unaudited financial statements, tax returns, reports issued by regulatory agencies or taxing authorities, financial publications, or credit agencies.

- The auditor should consider whether he or she has obtained sufficient competent evidential matter to understand the relationship of the parties and the effects of related-party transactions on the financial statements.

AICPA, Audit Issues in Revenue Recognition, 1999, at 35.

320. KPMG and Behets failed to heed AICPA Practice Alert 95-1, which explicitly warned auditors to search for evidence of the precise fraudulent practices that the Audit Committee Advisors in fact discovered at L&H and prescribed procedures that KPMG should have followed to uncover those practices:

A substantial portion of litigation and SEC investigations involving financial reporting and cases coming before the AICPA Professional Ethics Executive and Quality Control Inquiry Committees concerns some form of revenue recognition issue.... [A]uditors need to pay particular attention to warning signals that may indicate additional audit risk and respond with appropriate professional skepticism and possible additional audit procedures.... [S]ome examples of improper and unusual revenue transactions [include]:

- Sales in which the customer's obligation to pay for the merchandise/service depends on:
  - receipt of financing from another (third) party;
  - resale to another (third) party (i.e., consignment sale);
  - fulfillment by the seller of material unsatisfied conditions;
  - final acceptance by the customer following an evaluation period.

- Sales in which substantial uncertainty exists about either collectibility or the seller's ability to comply with performance guarantees.

- Sales that require substantial continuing vendor involvement after delivery of merchandise (e.g., software sales requiring installation, debugging, extensive modifications, other significant support commitments, etc.)

- Shipments made after the end of the period (i.e., books kept open to record revenue for products shipped after the period end)

- Transactions with related parties.

- Barter transactions.

- Significant, unusual transactions near year-end....

Techniques used to recognize revenues improperly can be quite sophisticated. To reduce risk in this area, the audit needs to be planned and then executed with an appropriate degree of professional skepticism.... [A] company operating in [an industry] characterized by more than infrequent business failures ordinarily will present different audit considerations and, therefore, could require different or more extensive audit procedures.... A company with constantly increasing sales that 'always meets or exceeds' budget sales targets may deserve extra attention. When a substantial portion of the company's sales occur very near the year-end or quarter-end, extra caution in auditing revenue transactions may be appropriate. Also, individually significant revenue transactions, which could be designed to ease short-term profit concerns, may merit specific attention. Auditors need to examine such transactions and obtain an understanding of their business purpose to evaluate whether revenue recognition is appropriate.

The Practice Alert specifically warns auditors to design confirmations "to help the auditor solicit information from customers about payment terms, right of return privileges, or other significant risks retained by the seller" and "inquire about the existence of any oral modifications or undocumented 'side-agreements'."

321.    The details of numerous transactions described in the Audit Committee Report were readily available from other parties to the transactions. KPMG Belgium's and Behets' failure to discover fraud in transactions involving the FLV Fund is particularly egregious since KPMG Belgium was the auditor for the FLV Fund and was aware of both sides of those transactions. KPMG Belgium and Behets either failed to seek confirmation of those contracts, or turned a blind eye to the results of their investigation and failed to undertake adherence to these basic accounting precepts.

322.    KPMG Belgium also failed to obtain sufficient information to support or confirm the existence and collectability of account receivables in Korea that are reported in L&H's 1999 financial statements. The L&H Korea Preliminary Report, dated April 6, 2001 states that:

132

During the course of LHK's June 30, 2000 audit, [KPMG Belgium] questioned the collectability of AR [accounts receivable] and indicated to LHK management that collections between 10% and 20% of the A/R balance would be sufficient to avoid having to record a full reserve of the A/R balance.

323.    KPMG's and Behets' permitting accounts receivable to be recorded as revenue based on receipt of 10% to 20% of the revenue violates Statement on Auditing Standards 1 that requires the audit be based on "sufficient competent evidential matter . . . obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion. . . ." Specifically, KPMG Belgium was required to obtain confirmations from third parties of the amounts of the accounts receivable pursuant to AU § 330, paras. .34-.35, and was not permitted to rely on collections of 10% to 20% as evidentiary support for the entire accounts receivable:

Confirmation of accounts receivable is a generally accepted auditing procedure. As discussed in paragraph .06, it is generally presumed that the evidence obtained from third parties will provide the auditor with higher-quality audit evidence than is typically available from within the entity. Thus, there is a presumption that the auditor will request the confirmation of accounts receivable during an audit unless one of the following is true:

- Accounts receivable are immaterial to the financial statements.
- The use of confirmations would be ineffective.
- The auditor's combined assessed level of inherent and control risk is low, and the assessed level, in conjunction with the evidence expected to be provided by analytical procedures or other substantive tests of details, is sufficient to reduce audit risk to an acceptably low level for the applicable financial statement assertions. In many situations, both confirmation of accounts receivable and other substantive tests of details are necessary to reduce audit risk to an acceptably low level for the applicable financial statement assertions.

An auditor who has not requested confirmations in the examination of accounts receivable should document how he or she overcame this presumption."

324.    KPMG and Behets failed to comply with or turned a blind eye to the requirements of Statement of Audit Standards 1 and AU § 330 because it permitted the showing of a 10% to 20% collection as evidence of the accounts receivable instead of obtaining confirmation from third parties. There can be no doubt that, if sought, the confirmations would have revealed the

133

false and misleading statements of L&H. *The Wall Street Journal* was able to uncover L&H's fraud by making inquiries of L&H's purported customers, KPMG and Behets, as auditor was required to and failed to make the same inquiries.

## Additional Facts Establishing The Liability Of KPMG U.S. And KPMG Belgium

325.    As detailed above at ¶¶ 134-185, KPMG had actual knowledge of the falsity of both the representations made during the course of due diligence to Dragon, its principal shareholders and its representatives and its unqualified audit reports on L&H's 1998 and 1999 financial statements.  In addition to KPMG's actual knowledge, the following additional facts establish KPMG's liability for the false and misleading statements alleged herein.

### a    The KPMG Entities Involved In The L&H Audits Acted As One Firm With Respect To L&H

326.    KPMG LLP, KPMG Belgium and KPMG UK are members of KPMG's worldwide enterprise, known as KPMG International.  KPMG Belgium, KPMG LLP and KPMG UK worked with other KPMG entities worldwide in their audits of L&H.  Through KPMG International, these KPMG entities market themselves as a single worldwide entity.  At its website, KPMG International states:

> **Overview**
> In a global marketplace distinguished by remarkable growth and consolidation, companies face a host of new challenges in today's economy. KPMG helps clients successfully respond to changing opportunities by providing professional services, wherever and whenever they're needed.
>
> KPMG has tailored its services - including assurance, tax and legal, consulting, and financial advisory services - to address the complex business challenges faced by global clients. Through the firm's international network of industry professionals, the best people, products and technologies are combined to enhance services with industry insights and best practices.
>
> In 2000, KPMG achieved record revenues of US$13.5 billion, an 11 percent increase driven by all of our major service lines. More

than 100,000 KPMG professionals in member firms worldwide collaborate across industry, service and national boundaries to deliver professional services in 155 countries. This enviable network of firms is connected through three operating regions, bringing together our local and national resources with greater flexibility, responsiveness and consistency of service delivery worldwide. (emphasis added).

327.    In its Annual Report for 1999, KPMG International stated that "KPMG is acting as 'One Firm' worldwide to consistently meet the changing needs of global clients through an integrated array of tailored solutions . . . KPMG's 100,000 professionals in 159 countries help our clients achieve their critical business objectives through experience and personal commitment to excellence." The 1999 Annual Report also praised the work of integrated teams of KPMG professionals from offices around the world to service its global clients.

### b.  KPMG Belgium, KPMG LLP And KPMG UK Were All Co-Extensively Involved With L&H

328.    KPMG LLP, KPMG Belgium and KPMG UK had co-extensive responsibility on the 1998 and 1999 audits and on the quarterly reviews for those periods, as well as authority to clear the issuance of L&H's public announcements of unaudited financial results. In its 1997, 1998 and 1999 Annual Reports to Shareholders, L&H listed the Ghent, Belgium and Boston, Massachusetts offices of KPMG as the Company's principal auditors.  Robert McLamb, KPMG's SEC reviewing partner and Paul Beecy, another KPMG partner, worked extensively on each of these L&H audits and reviews and had the final say regarding the conformity of L&H's financial statements with U.S. GAAP.  McLamb and Beecy became involved in the audits of L&H while in the U.S. Capital Markets Group in KPMG UK's London, England office. McLamb retained his responsibilities when he moved his base of operations to KPMG LLP's Houston, Texas office in 1999.  Beecy also continued to work with L&H after he moved to LLP's Atlanta Georgia office.

329.    McLamb's extensive involvement with L&H began as early as 1997.  According to a Highlights and Summary Review Memorandum for December 31, 1997, dated April 28, 1998:

> Conversion of local to US GAAP has been reviewed by Bob McLamb and Digby Wirtz, audit partners of US Capital Markets' London Office and SEC reviewing partner.  The US financial statements have been finalized after Bob's two day review visit of April 16 and 17, 1999 and subsequent review by Digby Wirtz on April 21 and 23.  All the review comments of both Bob and Digby have been cleared.

* * *

> As explained earlier, KPMG Capital Markets Group London have reviewed the compliance with US GAAP reporting with both KPMG Ghent and the client.  In addition, US Capital Markets Group KPMG London reviewed the draft financial statements in February 1998 and the final financial statements (incl. Footnotes) in April 1998 before release.  All US reporting issues have been cleared with KPMG US Capital Markets Group London.

330.    Beecy's involvement had become substantial by at least the time that L&H's 1998 financial statements were prepared.  As reflected in a billing statement from another KPMG office, Beecy with the assistance of a KPMG office in Germany drafted, in part L&H's 1998 financial statements:

> Reporting as of December 31, 1999 -  Assistance to Paul Beecy  Remark: In order to match the tight time schedule several trade balance sheets and P&L's had to be drafted by ourselves as this information was not provided.

331.    KPMG Belgium, KPMG LLP, and KPMG UK operated as a single auditing firm in reviewing L&H's quarterly financial statements and auditing its annual financial statements.  Each office was assigned to and worked on various aspects of the engagements.  As set forth above, L&H had dual headquarters in Burlington, Massachusetts and in Belgium.  KPMG's U.S. auditors would show up at L&H's Burlington headquarters at the end of each quarter to review

L&H's quarterly financial statements, and KPMG's Belgian auditors would do the same in Belgium. Following that, McLamb, Behets and later Van Aerde would "sign-off" on the quarterly financial results and the presentation of the quarterly financial statements. These KPMG partners also oversaw the year-end audits of L&H's financial statements and each reviewed and provided input to the annual financial results, the completion of the audits, and the presentation of L&H's annual financial statements under U.S. GAAP.

332. KPMG auditors and consultants were present at L&H at the end of each quarter during 1998 and 1999 for the purpose of "signing-off" on L&H's quarterly and annual financial results before they were announced to the investing public. For example, the February 9, 2000 press release announcing L&H's financial results for the fourth quarter and year ended December 31, 1999 was sent both to Van Aerde and to McLamb for review and comment before it was issued, and, in fact, KPMG needed to give its express "consent" before that press release could be issued. A January 31, 2000 email from Van Aerde to Dammekens, Bastiaens and McLamb set forth "a list of urgent items to be followed up by the company in order for us to be able to give our consent for the [February 9] press release."

333. Moreover, as another example of KPMG's involvement with L&H's quarterly financial statements, according to the August 24, 1999 "Group Audit Strategy and Reporting Instructions," the number one "key review objective" for the review of L&H's third quarter 1999 financial results was to "allow KPMG Ghent to provide clearance to the client on the Q3.99 consolidated financial statements of LHS prepared in accordance with group accounting policies and US GAAP." (emphasis added).

334. McLamb, Behets and Beecy provided substantial input on the presentation of the Company's 1998 financial statements. McLamb provided substantial revisions to the financial

statements and disclosures therein.  Moreover, McLamb actually provided or changed certain

amounts and drafted certain disclosures set forth in L&H's 1998 financial statements.  In

addition, as noted above, Beecy (with the assistance of another KPMG office) actually drafted

portions of the 1998 financial statements.

335.    In KPMG's Completion Memorandum dated April 9, 1999, prepared in

connection with its audit of L&H's financial statements for fiscal year 1998, Behets stated:

> During the course of the audit, some key issues were discussed and conclusions
> were reach [sic] in agreement with advise from the US Capital Markets group in
> London [Wirtz and McLamb].

* * *

> <u>KPMG personnel from all participating offices involved reviewed
> the revenue recognition policies</u> and practices followed to ensure
> compliance with group revenue recognition policy and with US
> GAAP regulations.

> [Emphasis added.]

336.    KPMG's involvement with L&H's quarterly and annual financial statements was

pervasive, extending so far as to result in the actual preparation of certain parts of the financial

statements and the disclosures contained therein.

337.    Indeed, in a letter to the L&H Board of Directors from Jo Lernout dated April 25,

2001, Lernout described L&H's relationship with KPMG's various offices as follows:

> In the course of the past ten years, we built up a good working relationship with
> KPMG, and we relied extensively on the advice from numerous KPMG divisions
> in various countries as well as on the KPMG audit departments, in particular in
> Belgium and in the United States.

> > As part of this relationship, all information which we deemed
> > relevant was always communicated to KPMG.  Often, they worked
> > side-by-side with the company in the execution of transactions.

According to Lernout:

138

From the start, KPMG played a dual role:

> (1) on the one hand, KPMG was a commissioner of Lernout & Hauspie Speech Products N.V., including of its subsidiaries, and therefore also of the Korean subsidiaries; and

> (2) on the other hand, KPMG was also a consultant for the company.

> In that capacity, KPMG was closely involved at the end of each quarter <u>in processing the figures for the interim accounts – as consultants they advised and assisted the financial and bookkeeping departments of Lernout & Hauspie Speech Products. KPMG consultants came every quarter to the office to draw up the interim accounts together with the bookkeeping department of Lernout & Hauspie Speech Products N.V.</u>

> Consequently, it is impossible to believe that KPMG now claims that it did not notice earlier the alleged (actually, disputed) "irregularities" in the Belgian bookkeeping during its auditing assignments as commissioner and when <u>it assisted us in drawing up the books</u>. In fact, KPMG helped the staff of the bookkeeping department of Lernout & Hauspie Speech Products N.V. understand and apply the US GAAP Rules (these are the accounting standards which must be observed by corporations whose shares are traded on EASDAQ and NASDAQ).

* * *

> It was also KPMG's assignment to make sure that sufficient control mechanisms were in place and that the internal procedures were such that any resorting to fraud by the local people in charge was excluded as much as possible.

* * *

> I remember pertinently that in some concrete cases the bookkeeping department of Lernout & Hauspie Speech Products N.V. decided after consulting with KPMG that there was sufficient consent between the parties to view these [licensing agreements] as actual agreements, even if the written agreements had not yet been signed in their final form.

* * *

> I believe that all agreements with related parties were disclosed in the proper manner. To arrive at that conclusion, I relied on the

139

advice and support which KPMG, as an international auditing
company, provided to Lernout & Hauspie Speech Products.
KPMG not only provided assistance for the processing of the
quarterly figures, but also helped the company with the disclosures
required by NASDAQ and EASDAQ rules.

* * *

Furthermore, KPMG was particularly well paid for this assistance,
which made us assume that it used a sufficient number of
specialists and collaborators to make sure that Lernout & Hauspie
Speech Products followed the rules imposed by law.

[Emphasis added.]

### c.    KPMG Was Intimately Involved in L&H's Operation And Accounting

338.    As a result of providing audit and other services for the Company, KPMG

personnel were frequently present at L&H=s corporate headquarters in the United States and

Belgium, as well as other L&H offices throughout the world during 1998 and 1999. Indeed,

KPMG had unfettered access to L&H=s confidential internal corporate, financial, operating and

business information and had ample opportunity to observe and review the Company=s business

and accounting practices and to review the Company=s internal controls.

339.    In his letter to the L&H Board of Directors dated April 25, 2001, Lernout made

L&H's dependence on KPMG perfectly clear: "from the day we were quoted on the stock

exchange on 12/1/95, we turned to KPMG for every decision of any significance." As Lernout

explained:

To illustrate this I refer to the assistance which was given, for
example, with about any sizable acquisition by LHS. It cannot be
denied that for this reason alone, KPMG had perfect insight into
the various aspects of the LHS organization, if only because of its
involvement with the due diligence, audits and even the
negotiations.

[Emphasis added.]

140