340.    The relationship between KPMG and L&H was further exemplified by the fact that, according to Lernout, L&H employees had "direct access to KPMG, even for very practical and day-to-day problems." Recognizing that this close relationship between auditor and client was highly unusual, particularly in light of the requirement under GAAS that auditors remain independent in fact and in appearance, Lernout wrote:

> It cannot even be denied that the greater part of the learning process involving the adjustment to the US rules took place thanks to KPMG's help, which went much farther than is usual for auditors who often keep a certain difference.

341.    Lernout's statement regarding the extent of KPMG's activities are corroborated by a KPMG meeting agenda dated August 23, 1999, in which KPMG indicated that it planned to hold a U.S. GAAP training seminar for L&H employees.

342.    KPMG itself represented that it had access to all information it needed to conduct its audits, and further, that it had considered the Company's internal controls. In the Report of the Statutory Auditor on the Statutory Accounts Submitted to the General Shareholders' Meeting of [L&H], attached as Exhibit B to the L&H Proxy Statement for the Annual Meeting and the Extraordinary Meeting of Stockholders to be Held May 4, 1998 (the "1998 Proxy"), KPMG Belgium stated:

> We conducted our audit in accordance with the standards of the "Instituut der Bedrikfsrevisoren." Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, taking into account the legal and regulatory requirements applicable to financial statements in Belgium.
>
> In accordance with these standards, we have considered the Company's administrative and accounting organization as well as internal control procedures. The Company's management have

<u>provided us with all explanations and information which we required for our audit.</u>

[Emphasis added.]

KPMG made an identical statement regarding its consideration of L&H's internal controls and access to information in Exhibit B to the 1999 Proxy.

### d.    KPMG Disregarded Serious Red Flags

343.    In addition to KPMG's actual knowledge of glaring irregularities in L&H's financial statements at the time it conducted its quarterly reviews and annual audits, as set forth below, there were additional numerous red flags that alerted KPMG to the misstatements in the financial statements. If these red flags had been investigated by KPMG, as it was obligated to do under GAAS, it would not have been able to issue unqualified audit opinions. KPMG's certification of L&H's consolidated financial statements as being in conformity with U.S. GAAP, in light of these red flags, demonstrates reckless misconduct, at the very least.

### 1.    KPMG Knew L&H Lacked Sufficient Internal Controls

344.    KPMG knew that the Company did not have an adequate system of internal controls, if in fact it had any internal controls at all. Internal controls are required to ensure the integrity and reliability of a company's financial reporting. At a meeting between KPMG and the Audit Committee on May 4, 1998, KPMG in fact reported that the internal audit and internal control functions of the Company needed to be strengthened. KPMG also informed the Audit Committee that the Company must improve its financial reporting for consolidated financial statements.

345.    Further, although KPMG informed the Company that an internal audit function was necessary at L&H, it knew that the Company failed to ever implement such a function. According to the April 12, 1999 Minutes of Telephone Meeting of the Board of Directors:

> Mr. Erwin Vandendriessche, Chairman of the Audit Committee, presents a report of the Audit Committee. Mr. Vandendriessche indicates that the Audit Committee will be receiving a Management Letter from KPMG, following which it will have a further meeting with representatives of KPMG and will make an additional report to the Board of Directors. Mr. Vandendriessche also discusses the previously reported intention of the Company to establish an internal audit function, as a result of the growing complexity of the Company's business. This had originally been targeted to be done by the end of February, but because of time commitments resulting from the SEC's review of the Company's US GAAP financial statements, this has been postponed. Now that the SEC's review has been completed, a new schedule will be set to implement this function.

346.    KPMG continued to report to the Board and the Audit Committee throughout 1999 that the Company's internal controls were inadequate and that L&H still needed to implement the internal audit function. According to the Minutes of Regular Meeting of the Board of Directors, dated August 30, 1999:

> Mr. Vandendriessche reports on activities of the Audit Committee. He indicates that the Audit Committee has had two meetings within the last several weeks. He also reports that the Company's previous audit partner, Paul Behets, has left KPMG to join the Flanders Language Valley Foundation (SAIL Trust) and the Audit Committee has met with the new KPMG partner regarding the transition. Mr. Vandendriessche also reports that KPMG has done an extensive review at the end of the second quarter and has also issued recommendations to the Company regarding increases in the internal control staff. He also indicates that the Audit Committee is reviewing the need for an internal auditor, and will report back to the Board of Directors with this recommendation. He also indicates, as previously reported by Mr. Bastiaens, that the Audit Committee will have a meeting prior to each quarterly release. (emphasis added).

347.    Indeed, KPMG knew by no later than the first week of February 2000 that L&H lacked sufficient written accounting policies or manuals – a fact which became crystal clear as a result of the SEC investigation. On February 4, 2000, Van Aerde sent an e-mail to Dammekens, McLamb and Huysman, which stated that "when talking to the lawyers the other day with respect to the SEC informal investigation they asked whether L&H has an accounting manual or

143

some kind of binder where reporting and accounting policies or instructions are documented."
Van Aerde asked Dammekens if L&H had any such manuals or policies, and further requested
that he "report both to Bob [McLamb] and myself what you have."   Later that same day,
Dammekens replied to Van Aerde and McLamb that "as you know, and as discussed over the
phine [sic], we are not strongly documented, as is typical in cies [companies] with fast growth."
On February 5, 2000, McLamb sent an e-mail to Dammekens which made clear the urgent need
for documentation of L&H's accounting policies and procedures:

> Carl it is true that many fast growing companies do not do a good job of
> documenting policies and procedures.  That time has come to an end.  You are a
> $2 billion market capitalization company.  We need to proceed in putting these
> documents in place as soon as possible.  I do understand that this is not the first
> priority, but there are certain documents that should be prepared before the
> submission to the SEC.  Those documents primarily relate to revenue recognition.

   348.   Apart from the knowledge that L&H lacked written accounting policies or
procedures, KPMG had actual knowledge that L&H's accounting department was run in a
reckless manner.  In an e-mail message from Dammekens to McLamb dated May 3, 2000 – prior
to the Closing Date – Dammekens stated:

> I DO WANT TO BRING UP ANOTHER POINT – AM I
> CAPABLE OR [SIC] REMAINING CFO IN AN ORGNISATION
> LIKE THIS?  PERSONALLY I DO NOT THINK SO.
>
> I AM CONVINCED THAT IT IS TIME TO BRING IN AN
> EXPERIENCED GUY, THAT CAN BRING STABILITY AND
> DISCIPLINE AND KNOWS HOW TO RUN THE FINANCES
> OF A BIG COMPANY (BECAUSE HE GREW UP IN ONE AND
> HAS DONE IT BEFORE).
>
> THINGS ARE GETTING OVER MY HEAD – I AM STAFFING
> UP MY PEOPLE, BUT WITH ALL THE DEALS/
> ACQUISITIONS THAT GO ON, I DO NOT HAVE TIME
> ENOUGH TO EVEN THINK ABOUT INTEGRATION OR
> ORGANISATION. (caps in original).

Thus, KPMG was well aware that the individual in charge of preparing the Company's financial results was in "over [his] head." This was a risk factor that KPMG needed to, but did not, take into consideration in planning its audits and designing its audit procedures.

349. As of the Closing Date, June 7, 2000, it was clear that the Company's controls still remained woefully insufficient – and yet, KPMG failed to apprise the Dragon shareholders, including the Bakers, of that material fact. In a memorandum dated May 8, 2000 from McLamb to Van Aerde, McLamb identified several serious problems for inclusion in a "Management Letter" to be issued to L&H. Management letters are typically prepared by auditors at the conclusion of their audits and are used to identify internal control weaknesses in a company's accounting system. The problems identified by McLamb were:

1. KPMG noted L&H needed to create and follow formal written procedures for recording accounts receivable and adequately train personnel to record and relieve receivable balances from the general ledger.

2. KPMG noted L&H had not established written policies and procedures relating to establishing and relieving accruals for contingencies.

3. KPMG noted L&H had not established formal written policies and procedures relating to the valuation and tracking of fixed assets.

### 2. KPMG Knew That L&H's Audit Committee Was Not Performing Its Responsibilities

350. Further alerting KPMG to the accounting fraud was its knowledge that the Audit Committee was completely uninvolved with respect to the issuance of the Company's quarterly earnings reports and that it was not carrying out its assigned responsibilities. For example, on July 28, 1999, L&H issued its press release announcing second quarter 1999 financial results. However, the Audit Committee did not even meet until August 10, 1999 – thirteen days after the

press release was issued. In its Report to the Audit Committee for the Second Quarter of 1999, KPMG acknowledged that the Audit Committee had not been informed of the results of the second quarter: "the Audit Committee has requested to be informed as to the results of the quarter <u>before</u> issuing the press release." (emphasis added).

351.    KPMG continually noted issues concerning the cash collection from the LDCs and revenues recognized from Korea (and elsewhere) to the Audit Committee. For example, in a Private and Confidential letter to defendant Vandendriessche, the Chairman of the Audit Committee, dated November 17, 1999, KPMG stated with respect to these issues:

> All issues have been communicated to the management of the Company. <u>We expressed our concern that the effect of certain described issues might have an adverse effect on the profits of the quarters if they are not resolved.</u> Please be advised that KPMG does not consider this limited review to be completed until the above mentioned issues have been fully resolved.

> [Emphasis added.]

352.    However, although KPMG did not consider the review complete, L&H issued the press release announcing the 1999 third quarter financial results on October 27, 1999, despite the fact that KPMG had not yet resolved the serious issues found in the third quarter financial statements that it identified for the Audit Committee. KPMG did nothing to correct this.

### 3.    The Massive Nature of the Fraud and Resulting Restatement

353.    The magnitude of the fraud further establishes the knowing or reckless conduct on the part of KPMG. The information regarding specific contracts in the Audit Committee Report, together with the fact that L&H has reversed all revenues from Korea, makes clear that L&H reversed a stunningly high percentage of its revenues. Specifically, the Company reversed at least 13% of its reported revenues for fiscal 1998 and at least <u>70%</u> of its reported revenues for fiscal 1999. L&H reversed at least $175 million of revenues in 1999 alone.

146

354.    In its Form 8-K Current Report Pursuant to Section 13 or 15(d) of the Securities

Exchange Act of 1934, dated April 27, 2001, filed with the SEC on May 3, 2001, the Company

revealed:

> . . . the Company has prepared restated financial statements for its revenues for
> 1998, 1999 and the first two quarters of 2000.  As a result of this exercise, of $535
> million of revenues reported by the Company (excluding the Company's Mendez
> translation unit, the acquired Dragon Systems Inc. and subsidiaries business, the
> US transcription business and certain other less significant subsidiaries) during
> this period, $373 million have been reversed.  A portion of the revenue reversed
> as a result of the restatement will be recognized in later periods.  The revenues
> reversed included all revenues recorded by the Company's Korean subsidiary
> during this period, since a substantial portion of such revenues could not be
> substantiated.

[Emphasis added.]

Thus, setting aside the revenue from certain unrelated subsidiaries of L&H, it is clear that the

Company has admitted that nearly 70% of its revenues from the restated period were false and

improperly recorded.

355.    Indeed, in addition to the facts set forth at ¶¶ 134-185 above, of which KPMG had

actual knowledge, there were so many pervasive accounting violations at L&H throughout 1998

and 1999 that it is inconceivable that KPMG could not have known that L&H's financial

statements were not presented in conformity with US GAAP.

356.    The fraudulent acts of revenue recognition were intended to, and did, inflate

L&H's reported revenue, income and earnings as reported in its quarterly and yearly financial

statements for 1998 and 1999.  While the Audit Committee Report did not make specific

findings as to whether KPMG was aware of the terms of each of these transactions, except as

noted, KPMG was well aware of the pervasive problems at L&H that permitted such a massive

accounting fraud to take place, including the lack of sufficient internal controls and the failure of

the Audit Committee to implement important recommendations.  See ¶¶ 344-352 above.

4.    **Independence Violations**

(i)    **Receipt of Substantial Non-Audit Fees**

357.    KPMG was motivated to issue its clean audit opinions on L&H's materially misstated financial statements by, among other things, the tremendous compensation it received from L&H not just for auditing services but for extensive and lucrative non-audit services, performed by KPMG offices in a variety of countries, as well as the access to numerous other auditing clients and/or potential clients that L&H provided.

358.    According to L&H's annual Proxy Statement filed with the SEC on Form 6-K on May 24, 1999, L&H's Board of Directors recommended that KPMG Belgium be appointed the Company's "independent statutory auditor" for the following three years, noting that KPMG Belgium's fees for each such audit "will amount to BEF 1,500,000 (approximately US$41,600)."

359.    In addition to receiving fees for its audit services KPMG received significant amounts from L&H for consulting and other non-audit services. These services included, for example, performing valuations and due diligence for L&H's acquisitions of Dictaphone, Dragon, and Bumil, among others. In addition, KPMG was retained to allocate the purchase price for many of the companies acquired by L&H in its ongoing acquisition spree to the individual assets acquired and the liabilities assumed.

360.    Moreover, much of the money KPMG received was for work performed by KPMG LLP, KPMG UK and other KPMG offices outside Belgium. In an April 25, 2001 letter to the Board of Directors, Defendant Hauspie stated that KPMG Belgium's fees as a result of the various work it performed for L&H amounted to "no less than BEF 273,445,389," or approximately US$6 million. Separately, Defendant Lernout asserted that "other KPMG subsidiaries in various locations in the world billed LHS for fees amounting to more than BEF 130,000,000," or approximately US$3 million.

361.    The fact that KPMG derived over $9 million from its relationship with L&H from auditing meant that KPMG had a strong incentive not to exercise the requisite close scrutiny of financial statements required of an independent auditor. In fact, by assisting L&H in portraying itself as a successful company and by helping inflate the price of the stock which L&H used as currency for its repeated acquisitions, KPMG knew that it could assure itself of millions of dollars in continuing valuation and other non-audit business from L&H.

362.    Indeed, KPMG's provision of acquisition-related services directly impaired its independent role as L&H's auditor. During 1998 and 1999, KPMG was responsible for allocation of the purchase price on a number of acquisitions made by L&H, yet also responsible, in its capacity as auditor, for auditing the balance sheet entries resulting from that allocation process. Thus, KPMG audited its own work, in clear violation of GAAS and of principles of auditor independence.

(ii)    **Former KPMG Auditors Received Lucrative Positions With Entities Related to L&H Following Their Audit Engagements**

363.    Apart from the substantial fees paid to KPMG for non-audit services, certain of the KPMG employees responsible for auditing L&H benefited directly from KPMG's relationship with the Company by accepting lucrative jobs with entities related to L&H.

364.    Indeed, one of the KPMG Belgium auditors responsible for the audits of L&H's financial statements, Chantal Mestdagh, left KPMG Belgium to become the Chief Financial Officer of LHIC upon its founding in 1998.  As set forth above, LHIC is one of the related entities through which L&H secretly funded its supposedly unaffiliated customers.  After Mestdagh left KPMG for LHIC, KPMG not only had access to her knowledge regarding the related party transactions but, in fact, consulted with her regarding L&H's finances.

365.    Moreover, Behets, the audit partner with chief responsibility for L&H audits from 1991 until July 1999, left KPMG Belgium following the conclusion of KPMG's audit of L&H's 1998 financial statements to become the chief executive officer of defendant S.A.I.L. Trust, a foundation created by Lernout and Hauspie, which has control over the FLV Fund and its investments.  KPMG also derived income, as note above, by its audits of L&H related entities.

iii.    **Falsity of Cowen's Representations That L&H's Revenues Were Growing And That L&H's Securities Were Valuable**

366.    As set forth above, Cowen has served since 1995 as L&H's investment bankers, while at the same time disseminating analyst research reports regarding L&H.  Despite having information regarding the convoluted corporate structure of L&H including (i) access to, and a continuing working relationship with, Dan Blake, a Cowen analyst, who subsequently joined LHIC an allegedly "unaffiliated customer" through whom, along with other companies, L&H effectuated its scheme, and (ii) participating in setting up and/or perpetrating this structure

150

through among other things, (a) meeting with L&H representatives to discuss related party transactions and (b) meeting with potential investors in these related entities in efforts to persuade them to invest in these entities, Cowen knew, or was reckless in not knowing, of L&H's related party transactions. Further, because Cowen issued analyst reports on, and in the course thereof studied the financial statements of, L&H, Cowen knew that L&H's related party scheme was not being disclosed. One or more L&H analysts from Cowen worked with the Cowen investment banking team in charge of the Dragon/ L&H transaction.

367.    Despite this knowledge, Cowen continued to recommend L&H stock to the public as a "Stong Buy" past the time of the Dragon merger on June 7, 2000.

368.    In addition, during the negotiations between Dragon and L&H, Cowen representatives, including Howe and Stone, met with Janet Baker and other Dragon shareholders, and represented that L&H was an attractive acquirer, based on the prospects of L&H's business predicated on its growth and in particular, its revenue growth. As part of this process, Cowen presented the Bakers with one or more of its analyst reports recommending L&H as a "Strong Buy." Cowen failed to disclose in these meetings that L&H's revenue growth was an accounting fiction and that the analyst reports were false and misleading as more fully set forth in ¶¶ 186-190 above.

iv.    **The Discovery of the Defendants' False and Omissive Representations**

369.    The defendants, working together, managed to hide falsity and omissiveness of their representations until months after the Merger with Dragon closed. When the initial news reports were issued in the *Wall Street Journal*, L&H representatives denied those reports. On August 8, 2000, after additional news reports cast doubt on L&H's Korean revenue claims, not only did Gaston Bastiaens deny those reports on behalf of L&H in an interview on CNBC, he

enlisted the assistance of Cowen's Stone to corroborate L&H's claims.  In that interview, Stone stated:

> I was in S -- Korea in the middle of July and visited with a couple of the customers -- two of the securities companies that are -- that are mentioned in the list of names provided by the company.  I not only talked to the customers but I physically saw the installations, saw the computers, saw the in bound phone lines lighting up in the call center, so I can say their real.

370.    In addition, L&H maintained throughout July, August, September and October of 2000 L&H executives, including Messrs. Lernout, Hauspie and Bastiaens maintained in the press and to the employees of L&H and its subsidiaries that L&H's revenues were proper and the press reports were a misunderstanding that would be satisfactorily resolved.

- To refute the *Wall Street Journal*'s reports regarding the Korean revenue L&H announced on August 13, 2000 that it had appointed KPMG to conduct an interim audit.  Gaston Bastiaens played up the value of the audit by stating: "We have no doubt the auditors will confirm that during the first two quarters of 1000 L&H Korea had strong revenues and a very solid business base, as already publicly reported."

- When the SEC investigation was finally announced by L&H on September 21, 2000, Messrs. Hauspie and Lernout announced that they "look[ed]" forward to working with the SEC "and they were "determined to resolve these matters.  Our innovative company will continue to be on the cutting edge of speech and language technology around the globe and on the Internet."  Indeed, one day before the SEC probe was announced, Stone is reported to have stated at an investment conference that L&H stock represented "an enormous investment opportunity."

- In addition, Janet Baker questioned Mr. Lernout on or about October 13, 2000 regarding the allegations that had been raised by the press.  Lernout assured Janet Baker that there were no improprieties in L&H's accounting and, moreover, that Cowen and KPMG were well aware of, and approved of, the convoluted corporate structure involving numerous related party transactions.  In fact, Lernout told Janet Baker that according to Stone, "There's nothing wrong with working smart."

- On October 27, 2000, L&H again affirmed its cooperation with the SEC in seeking to release investor names of related entities to the SEC.  As part of this announcement, Messrs. Hauspie and Lernout reaffirmed their prior statements

152

"that these companies and their investors are independent of L&H and of us personally."

371.    L&H, in concert with KPMG, Behets and Cowen, not only mislead the public in general and the principal shareholders of Dragon, including the Bakers, regarding the performance of L&H and the value of its securities prior to the merger on June 7, 2000, but also acted to prevent discovery of their deception.  The Defendants were successful for months after the merger with Dragon closed.

### FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS HAUSPIE, LERNOUT, WILLAERT, DAMMEKENS, PIEPER AND BASTIAENS FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5

372.    Plaintiffs repeat and reallege paragraphs 1 through 371 as though fully set forth herein.

373.    Defendants Lernout, Hauspie, Dammekens, Willaert, Pieper and Bastiaens, individually and in concert with L&H, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to artificially inflate the stock price of L&H and to conceal its true financial condition.  Defendants Lernout, Hauspie, Dammekens, Willaert, Pieper and Bastiaens, along with others, employed devices, schemes, and artifices to defraud while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct that included the making or, or participation in the making of, untrue and misleading statements of material facts, which they knew or were reckless in not knowing, were false and omitting to state material facts which they knew or were reckless in not knowing were omitted necessary in order to make the statements made not misleading.

374.    Defendants Lernout, Hauspie, Dammekens, Willaert, Pieper and Bastiaens, along with others, participated, directly or indirectly, in the preparation, issuance, and dissemination of L&H's 1997, 1998 and/or 1999 financial results in L&H's annual reports and other filings with the SEC detailed herein and L&H press releases as set forth herein.  Defendants Lernout,

153

Hauspie, Dammekens and Bastiaens also specifically affirmed the truth of those financial statements in oral representations to the Bakers and/or to representatives of other principal shareholders of Dragon who, as defendants reasonably knew and understood would, communicate such representations to the Bakers in order to induce the Bakers to purchase L&H stock.

375.    Defendants Lernout, Hauspie, Dammekens, Willaert and Bastiaens knew, and Pieper knew or was reckless in not knowing, that the financial statements of L&H were materially false and omissive by, among other things, overstating revenues by a material amount, by virtue of their participation in or knowledge of, or with regard to Pieper participation in and knowledge of or reckless conduct with regard to, among other schemes and devices: (1) the creation of sham "licensees," including Dictation Consortium, Brussels Translation Group (BTG), and thirty start-up companies incorporated in Belgium and Singapore, designed to facilitate the mischaracterization of loans or investments as revenue and enable L&H to fund its research and development "off the books;" (2) undisclosed factoring of receivables with recourse to bank accounts of L&H's Korean unit; (3) transactions giving rise to improper recognition of revenue for barter or exchange transactions in which no cash changed hands; (4) transactions giving rise to improper recognition of sales revenues that were contingent on L&H later performing development work; (5) transactions giving rise to improper recognition of revenue prior to sales contracts being finalized; (6) transactions giving rise to improper recognition of revenue when collectibility was not reasonably assured; (7) transactions giving rise to improper recognition of revenue when the customer's ability to pay depended on an investment from L&H; (8) transactions giving rise to improper recognition of revenue when the "purchaser" of licenses were not the end-users and side letters confirmed that the license fee would be reimbursed if the license were not resold; (9) transactions giving rise to improper recognition of revenue when the customer had the right to return the product; (10) accounting practices intended to mischaracterize the foregoing transactions in order to falsely inflate L&H's revenues; and (11) the concealment of all of the foregoing.

**Scienter**

376.    The knowledge of the fraud or recklessness in disseminating the fraudulent statements of defendants Lernout, Hauspie, Dammekens, Willaert, Pieper and Bastiaens is evidenced by, among other things:

(a)    L&H's admission that its financial statements for 1998, 1999 and 2000 must be restated as a consequence of "errors and irregularities," "irregularities" being an accounting term of art for intentional misstatements or omissions in financial statements.

(b)    Lernout's and Hauspie's involvement, detailed above, in the FLV Fund, the FLV Fund Manager, and LHIC, all entities through which L&H secretly funded its licensees.

(c)    The Audit Committee Report's specific identification of defendants Lernout, Hauspie, Willaert, Dammekens and Bastiaens as participants in transactions and correspondence giving rise to the fraudulent reporting of revenue, as well as other facts demonstrating the L&H defendants direct involvement in L&H's actions, including, for example:

(i)    Two side letters, one signed by Willaert and the other by Hauspie and a proxy for Willaert, obligating L&H to repay a portion, or all, of an $8 million license fee recorded as revenue in the fourth quarter of 1999 pursuant to a December 29, 1999 agreement with a Belgian customer.

(ii)    A January 5, 2000 e-mail to Willaert and Dammekens indicating that an agreement with a customer of L&H's Belgian office, pursuant to which $4 million was recognized in the fourth quarter of 1999, had not been signed in that quarter but had been backdated to December 30, 1999.

(i)    Willaert's and Dammekens' statements to investors in the LDCs for Turkish and Farsi who wanted $1.3 million of free warrants from L&H that the investors "had to pay for the warrants because of the P&L impact, but that L&H would make it up to them later," and Willaert's and Dammekens' admission that a later contract obligating L&H to pay those investors $1.8 million "for 'introductions to influential politicians and business people" was "entered into to reimburse [the investors] for the warrants."

(iv)    A January 4, 2000, e-mail to Hauspie and Lernout indicating that an agreement with a customer of L&H's Belgian office, pursuant to which $5 million of revenue was recognized in the fourth quarter of 1999, had not been signed in that quarter.

(v)    Lernout and Hauspie funded an entity which provided the sole funding for a customer in the Belgian office who signed a license agreement in the second quarter of 1998, pursuant to which $500,000 of revenue was recognized in that quarter, which customer stated that "he had no use for [the] software when purchased."

(vi)    A July 7, 1999 e-mail to Bastiaens, with a copy to Hauspie, from Lernout indicated that a license agreement with a customer of the Belgian office, pursuant to which $3 million of revenue was recognized in the second quarter of 1999, had not been signed in that quarter and had been backdated to June 30, 1999.

(vii)    A January 5, 2000, e-mail to Willaert and Dammekens indicating that a license agreement with a customer in the Belgian office, pursuant to which $4 million of revenue was recognized in the fourth quarter of 1999, had not been signed in that quarter and was backdated to December 31, 1999.

(viii)    An April 4, 2000 e-mail to Willaert, Hauspie, Bastiaens and Dammekens indicating that a contract with a customer in the Belgian office, pursuant to which $8 million of revenue was recognized in the first quarter of 2000, was not finalized in that quarter and had been backdated to March 31, 2000.

(ix)    Pieper's statements to Janet Baker to the effect, among other things, that he had in October 1999 verified the financial soundness of L&H.

(d)    The Audit Committee Advisors recommendation that "disciplinary action should be taken against certain employees involved in the activities that are the subject of this report" and specifically identified Willaert, Hauspie, Lernout and Dammekens as persons who had resigned their positions and as to whom "the Board of Directors [should] consider whether disciplinary action is appropriate." The Audit Committee Advisors also recommended that the Board of Directors Consider "whether disciplinary action is appropriate" as to Gaston Bastiaens.

(e)    John Duerden, the former CEO of Dictaphone, who replaced Bastiaens as CEO of L&H when the fraud began to become public, reported to the *Wall Street Journal* that the Korean unit, from which $100 million was missing, was controlled by Lernout, Bastiaens and Willaert. In a December 7, 2000, article, the *Wall Street Journal* reported that: "Mr. Duerden says he repeatedly asked how and when the cash [$106 million] could be sent to headquarters, but got evasive answers from Mr. Seo, the Korean unit's chief. Despite being CEO, Mr. Duerden says, 'I never felt like I had control over the Korean operation,' which he adds was 'managed close to the chest' by Mr. Hauspie, Mr. Bastiaens and then-Vice Chairman Nico Willaert."

156

(f)    The defendants' motivation to maintain a high price for L&H stock was so that, among other things, they would be in a position to consummate the Dragon and Dictaphone acquisitions, which L&H could not otherwise afford.

(g)    The criminal charges pending against defendants Lernout, Hauspie, Willeart and Bastiaens in Belgium for forgery and stock manipulation.

(h)    L&H Korea's use of factoring agreements and transferring licensing agreements to attempt to create the appearance that its contracts were real and revenues had been collected.

377.    The Bakers relied, which reliance was reasonable, on the materially false and misleading misrepresentations and omissions in purchasing L&H stock.    Had defendants Lernout, Hauspie, Willaert, Dammekens, Pieper and Bastiaens, along with L&H, accurately presented L&H's true financial condition and financial results, the Bakers would not have entered into the Merger Agreement.    As a result of L&H's and defendants' fraudulent conduct, the Bakers have sustained damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS HAUSPIE, LERNOUT, WILLAERT, DAMMEKENS, PIEPER AND BASTIAENS FOR VIOLATION OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT

378.    Plaintiffs hereby repeat and reallege paragraphs 1 through 377 as though fully set forth herein.Each of the defendants Lernout, Hauspie, Willaert, Dammekens, Pieper and Bastiaens was a controlling person of L&H within the meaning of Section 20(a) of the Exchange Act at all times during the period he served as an officer and/or director of L&H. Those defendants, by virtue of their positions as officers and directors of L&H, had the power to influence and control, and did so influence and control, the acts and conduct of L&H, including, but not limited to, L&H's subsidiaries including L&H Korea. In particular, those defendants had the power and influence, at all times relevant to this claim, to direct L&H to disclose its transactions with related parties, to direct L&H to record revenues and otherwise state its financial results and condition in accordance with U.S. GAAP, and to direct L&H or L&H Korea in the preparation and issuance of its annual reports and other filings with the SEC, its press releases and other statements and representations. By virtue of their positions, those defendants had unique and extensive access to and control over L&H's financial records.

379.    The Bakers reasonably relied on the materially false and misleading representations and omissions in purchasing L&H stock. By reason of, and as a direct and proximate result of the wrongful conduct of the L&H Defendants Lernout, Hauspie, Willaert, Dammekens, Pieper and Bastiaens are liable for the wrongful conduct of L&H and liable to the Bakers for the substantial damages they suffered in connection with their exchange of their interest in Dragon for L&H stock.

380.    By reason of the foregoing, Defendants Lernout, Hauspie, Willaert, Dammekens, Pieper and Bastiaens are jointly and severally liable to the Bakers for the aforesaid damages, in an amount to be proven at trial.

158

### THIRD CLAIM FOR RELIEF AGAINST
### KPMG DEFENDANTS AND BEHETS FOR VIOLATION OF
### SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5

381.    Plaintiffs hereby repeat and reallege paragraphs 1 through 380 as though fully set forth herein.

382.    In each of their reports on L&H's 1997, 1998, and 1999 financial statements, KPMG Belgium, and for years 1997 and 1998 also Behets, represented that KPMG conducted its "audits in accordance with generally accepted auditing standards" and that the consolidated financial statements of the Company and its subsidiaries for the fiscal year audited "present[ed] fairly, in all material respects, the consolidated financial position" of L&H and its subsidiaries "and the results of their operations and their cash flow" in accordance with U.S. GAAP. KPMG LLP and KPMG UK were integrally involved in the audits of L&H for one or more of those years. Among other things, they purported to ensure that the audits were conducted in accordance with US GAAP, GAAS and/or the rules and regulations of the SEC. KPMG Belgium, KPMG LLP, as well as others, also made specific oral representations to and for the benefit of the Dragon shareholders, including the Bakers, affirming the propriety of L&H's financial reporting in general, and of the unaudited financial results for 1999 and subsequently the audited 1999 financial statements, as detailed above. These representations were false, and the certified financial statements, as described above, were materially false and misleading.

383.    KPMG and Behets knew the audit reports would be attached to financial statements filed with the SEC that would be used to attract investors and form the basis on which shareholders would purchase shares of L&H. KPMG Belgium and Behets explicitly consented to the inclusion of the KPMG reports in, among other filings, L&H's 1997 Annual Report on Form 20-F filed with the SEC on July 2, 1998; 1998 Annual Report on Form 20-F filed with the SEC on June 30, 1999; 1999 Annual Report on Form 10-K filed with the SEC on June 30, 2000; and Registration Statement filed on Form S-3 on January 7, 2000. KPMG Belgium and KPMG LLP knew that the Bakers had reviewed its certification reports as part of the due diligence prefatory to the Merger Agreement and knew that the Bakers would rely on those reports -- and

on the direct oral responses of KPMG Belgium, KPMG LLP, and possibly KPMG UK, to Dragon's inquiries about the propriety of L&H's financial reporting -- in making a decision to exchange the Bakers' interest in Dragon for L&H shares and in setting the rate of exchange for that transaction.

384.    The oral and written representations of KPMG and the written representations of Behets were material to the Bakers' decision to exchange its interest in Dragon for L&H shares and determination of the rate of exchange for that transaction. In making its investment decision, the Bakers relied upon KMPG's oral and written representations and Behets' written representations as to the accuracy and reliability of the information contained in L&H's financial statements and the procedures used to audit the financial statements.

385.    KPMG Belgium, KPMG LLP, KPMG UK, and Behets knew, or were reckless in not knowing, that L&H's financial statements were not prepared in accordance with U.S. GAAP, as falsely represented to the Bakers, because, among other material misstatements in L&H's financial reports, L&H's financial statements concealed the facts that: (1) $373 million, or about 44% of L&H's revenue in 1998, 1999 and 2000 was improperly recognized; (2) thirty start-up companies who provided at least 10% of L&H's 1998 revenue and 28% of its 1999 revenue were funded by parties related to L&H; (3) 100% of the revenue recognized on L&H's Korean contracts was improperly recognized; (4) more than $100 million in the bank accounts of L&H's Korean unit was inaccessible, likely as a consequence of a factoring arrangement that was not publicly disclosed. A fraud of this magnitude and pervasiveness could not have gone undetected without knowledge or the highest degree of recklessness on the part of KPMG and Behets because of the overwhelming size and nature of the items in value and their centrality to the results of operations and financial condition of L&H.

### Scienter

386.    Evidence of KPMG's and Behets' knowledge or recklessness is demonstrated by at least the following facts:

(a)  KPMG's and Behets' failure to follow U.S. GAAS, which was so egregious that audits of L&H amounted to no audit at all, as detailed above.

(b)  An October 18, 1999 e-mail written by KPMG personnel demonstrating KPMG's knowledge that L&H was factoring receivables from contracts with Korean customers and that the factoring was collateralized by L&H's Korean bank accounts, from which $100 million is currently "missing."

(c)  The Audit Committee Advisor's statements that "KMPG was aware" of problematic contracts with Korean customers pursuant to which L&H improperly recognized $48 million in revenue in the last two quarters of 1999.

(d)  KPMG's knowledge of the SEC investigation of L&H's dealings with related parties, and failure to disclose that information to Dragon and the Bakers.

(e)  KPMG Belgium's position as auditor of the FLV Fund, which gave KPMG Belgium access to both sides of many of the fraudulent transactions giving rise to material misstatement of L&H's financial reports.

(f)  KMPG's knowledge that the FLV Fund was an investor in the LDCs rendering revenue under contracts between the LDCs and L&H not recognizable under US GAAP.

(g)  KPMG's and Behets' knowledge that L&H was willing to engage in aggressive and improper accounting practices, which arose from the restatements of L&H's financial statements for 1997 and the first nine months of 1998 ordered by the SEC.

(h)  KPMG's knowledge that revenue under contracts with HI Worldwide, Vice Tech, Digital Sei-Young, Neo and FourOneOne.com was not recognizable in accordance with US GAAP.

(i)  The ease with which *Wall Street Journal* reporters were able to discover, within weeks, that L&H's Korean sales were minimal or non-existent.

(j)  KPMG's access to and communications with Chantal Mestdagh, a former KPMG auditor who was CFO of LHIC, and thus was aware of the other side of L&H's fraudulent transactions involving companies owned by LHIC.

(k)  KPMG's access to Behets once he was at SAILTrust, and could provide information as to the other side of fraudulent transactions involving the FLV Fund.

     (l)     KPMG's knowledge that L&H lacked adequate internal controls and that its CFO was unable to perform his responsibilities and the Audit Committee was not performing its responsibilities.

     (m)    Behets, while a KPMG Belgium partner, was motivated by a desire to obtain lucrative employment at an entity controlled by defendants Lernout and Hauspie, and he did obtain such employment, as chief executive officer of SAIL Trust, a foundation created by defendants Lernout and Hauspie, through which they exercise indirect control over the FLV Fund, and commenced his employment there shortly after KPMG Belgium, with assistance from KPMG LLP and KPMG UK, rendered a clean opinion on L&H's materially false and misleading 1998 financial statements.

     (n)     Behets' participation, as early as May 1997 or earlier, in one or more meetings on behalf of L&H to try to attract investors for the Belgium Translation Group ("BTG").

     (o)     Lernout's statement to Janet Baker, and later Lernout, Hauspie and Willaerts's letters stating that KPMG was fully aware of and supported L&H's convoluted corporate structure and L&H's Korean activities.

     387.   In misrepresenting the conduct of audits for the years 1997, 1998 and 1999, and falsely representing that L&H's consolidated financial statements fairly presented its financial position and results of operations and cash flows for those years, KPMG and Behets, by the use and instrumentalities of interstate commerce and the United States mail, participated in a course of conduct that constituted a fraud and deceit, misrepresented material facts and omitted to disclose material facts and concealed L&H's true financial condition and results of operation.

     388.   By reason of the foregoing, KPMG and Behets have violated section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

     389.   The Bakers relied, which reliance was reasonable, on KPMG's and Behets' misrepresentations and material omissions in its purchase of L&H stock, and have suffered substantial damages as a result thereof, in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF AGAINST KPMG DEFENDANTS
## PURSUANT TO SECTION 20(a) OF THE EXCHANGE ACT

     390.   Plaintiffs hereby repeat and reallege paragraphs 1 through 389 as though fully set forth herein.

391.    The partners, employees and agents of KPMG Belgium, KPMG LLP and KPMG UK who conducted the audits of L&H and who communicated with the Bakers and Dragon in connection with the Dragon merger were at all relevant times, directly or indirectly, controlled by KPMG LLP, KPMG UK and KPMG Belgium, acting individually or collectively as "KPMG," a single firm.

392.    The collective control of all of the partners, employees and agents of KPMG by the collective of KPMG is evidenced by the following:

(a)    KPMG presents itself as a single firm providing integrated services on a worldwide basis. To provide such worldwide, "one-firm" services it is necessary to and the KPMG entities do exercise actual and implied control over the various partners, agents and employees of the KPMG entities so that these partners, agents and employees can and do provide integrated services. Absent such control, KPMG's entire marketing program would be a fraud because KPMG would be incapable of providing services as "one firm."

(b)    With respect to the particular audits and communications alleged in this complaint, KPMG Belgium, KPMG US and/or KPMG UK exercised, either individually or collectively, control over the performance of the audits in question, the communications in question and the persons who performed such audits and made such communications. Specifically, the KPMG partner who was considered by L&H to be the "lead" partner on the account, and the KPMG partner who exercised final decisionmaking authority with respect to the account were partners located at various times in Belgium, the United States and the United Kingdom.

393.    KPMG LLP through its partners, especially Robert McLamb, KPMG UK through its partners, especially Paul Beecy, and KPMG Belgium through its partners, especially William Van Aerde and Paul Behets, exercised actual control over the KPMG entities worldwide and the transactions alleged herein that give rise to KPMG's liability under the securities laws. Notwithstanding knowledge that the 1998 and 1999 financial statements of L&H were not prepared in accordance with US GAAP or reckless disregard of that fact, KPMG LLP, KPMG

Belgium and KPMG UK permitted the issuance of the false 1998 and 1999 audit opinions that stated the contrary.

394.    By reason of the foregoing, each of the KPMG Defendants are liable under Section 20(a) of the Exchange Act jointly and severally with the other KPMG Defendants for the wrongful conduct alleged in this Complaint.

395.    As a direct and proximate result of the wrongful conduct of KPMG LLP. KPMG UK and KPMG Belgium, the Bakers suffered damages in connection with their purchase of L&H securities in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF AGAINST THE KPMG DEFENDANTS, PURSUANT TO SECTION 10(b) OF THE EXCHANGE ACT BASED UPON AGENCY

396.    Plaintiffs hereby repeat and reallege paragraphs 1 through 395 as though fully set forth herein.

397.    Each of the persons who conducted the audits of L&H, who issued the audit opinions and who communicated on behalf of KPMG with the Bakers or their representatives in connection with the Dragon merger were presented as and were agents of "KPMG", including each of KPMG LLP, KPMG UK and KPMG Belgium, either individually and/or collectively.

398.    Each of the acts performed by such persons in the conduct of the audits of L&H the issuance of the audit opinions and the communications to the Bakers and Dragon in connection with the Dragon merger were authorized by, apparently authorized by or within the power of those persons to make for KPMG LLP, KPMG UK and KPMG Belgium.

399.    KPMG's presentation of the various partners, employees and agents of KPMG Belgium, KPMG LLP and KPMG UK as being part of one, worldwide and integrated firm known as and marketed as "KPMG" is intended to communicate that such persons, by reason of being agents of KPMG, have a special level of skill, care and professionalism, as advertised by KPMG for the "one firm" it purports to be.  Moreover, auditors from these three KPMG offices worked together in connection with performing auditing and other accounting services for L&H.

Further, there were high level individuals from each of these three offices included in the L&H audits. The Bakers relied upon the representations of care, skill and professionalism by KPMG in connection with their consideration of the financial statements of L&H and the communications made by the various KPMG personnel. KPMG intended to enhance the credibility of its audit and of its opinion letter by causing investors to believe that the audit performed and the opinion rendered were those of a worldwide, sophisticated and prominent accounting firm, not a local or limited firm.

400. As a consequence of the foregoing, each of KPMG LLP, KPMG UK and KPMG Belgium are liable for some or all of the wrongful conduct alleged in this Complaint, including the acts of one another, and are liable to the Bakers for the damages which they suffered in connection with their purchase of L&H securities in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF AGAINST
DEFENDANT COWEN FOR VIOLATION OF
SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5**

401. Plaintiffs hereby repeat and reallege paragraphs 1 through 400 as though fully set forth herein.

402. In its analyst reports dated September 15, 1998, January 5, 2000, and February 10, 2000, Cowen purported to give their analyst report of L&H's securities. These reports recommended L&H's securities as a "Strong Buy" based on L&H's growth, and particularly revenue growth. Cowen's recommendations contained facts that were materially false and misleading.

403. Indeed, as set forth above, Cowen was involved in obtaining funding for and/or helping to create the related party transactions which were characterized publicly as "unaffiliated" transactions, and which Cowen took no steps to correct.

404. Cowen knew that its reports influenced investors and formed the basis on which shareholders would purchase L&H securities.

165

405.    Cowen also served as L&H's investment bankers and made oral and written presentations to the Bakers during the negotiation of the Merger between L&H and Dragon. Cowen knew that the Bakers would rely on Cowen's analyst reports and written and oral representations regarding the value of L&H's securities in deciding to exchange the Bakers' interest in Dragon for L&H shares and in setting the rate of exchange for that transaction.

406.    Cowen knew or was reckless in not knowing that L&H's alleged financial reports, growing revenue and expansion in Asia were fraudulent and that (1) companies who provided a substantial percentage of L&H's revenue to L&H in 1998 and 1999 were funded by parties related to L&H for the purpose of making research and development costs appear to be revenues and (2) that L&H's revenues accordingly were overstated.

**Scienter**

407.    Evidence of Cowen's knowledge or recklessness is demonstrated by at least the following facts:

(a)    Cowen served as L&H's investment banker since 1995, was the underwriter of L&H's initial public offering in 1995 and two follow-up offerings, as well as lead advisor for L&H in the acquisitions of Dictaphone and Dragon, giving them access to L&H's financial information.

(b)    Lernout's statement to Janet Baker that Cowen was well aware of and supported L&H's use of "third party" corporations fund research and development expenses, as evidenced specifically Stone's statements to Lernout.

(c)    Cowen's efforts to recruit investors for BTG.

(d)    Cowen's motivation to issue materially false and misleading analyst reports and make direct representations to the Bakers to continue to earn investment banker fees from L&H and/or from companies related to L&H and to place Cowen personnel as employees at these companies.

(e)    Cowen's access to Blake, a former Cowen analyst who was employed by LHIC and thus had access to, if not direct knowledge, of L&H's fraudulent transactions including companies owned by LHIC.

(f)    The ease with which *Wall Street Journal* reports were able to discover, within weeks, that L&H Korea's sales were minimal or non-existent.

(g)     Cowen's continued close relationship and work on the Dragon/L&H deal team with former Cowen analyst Dan Blake who went to LHIC.

(h)     Cowen's knowledge prior to the Dragon/L&H transaction of concerns and issues raised regarding L&H's revenue recognition practices and Strategic Partners.

(i)     Cowen's own financial analysis in connection with the February 2000 Cowen report of the financial results of L&H for 1999, which report(s) issued prior to the conclusion of the 1999 KPMG audit.

408.    In issuing its analyst reports, Cowen by the use and instrumentalities of interstate commerce and United States Mail, participated in a course of conduct that constituted fraud and deceit, misrepresented material facts and omitted to disclose material facts and concealed L&H's true financial condition and results of operation.

409.    By reason of the foregoing, Cowen has violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

410.    The Bakers relied, which reliance was reasonable, on Cowen's misrepresentations and material omissions in its purchase of L&H stock, and have suffered substantial damages as a result thereof, in an amount to be proven at trial.

### SEVENTH CLAIM FOR RELIEF AGAINST KPMG DEFENDANTS, BEHETS, DAMMEKENS, LERNOUT, HAUSPIE, BASTIAENS, WILLAERT, PIEPER AND COWEN FOR COMMON LAW FRAUD

411.    Plaintiffs hereby repeat and reallege paragraphs 1 through 410 as though fully set forth herein.

412.    In an effort to induce the Bakers to enter into the Merger Agreement, all defendants knowingly and willfully made misrepresentations of material facts to Bakers and knowingly and willfully failed to disclose or fraudulently concealed the true facts from the Bakers.

413.    In reasonable reliance on those misrepresentations, and as a result of defendants' failure to disclose and fraudulently conceal the true facts, the Bakers entered into the Merger Agreement, to its detriment.

167

414.    As a result of the above defendants' fraudulent conduct, the Bakers have sustained damages in an amount to be proven at trial.

### EIGHTH CLAIM FOR RELIEF AGAINST KPMG DEFENDANTS, BEHETS, DAMMEKENS, LERNOUT, HAUSPIE, BASTIENS, WILLAERT, PIEPER AND COWEN FOR NEGLIGENT MISREPRESENTATION

415.    Plaintiffs hereby repeat and reallege paragraphs 1 through 414 as though fully set forth herein.

416.    In the course of their engagement as L&H's officers, L&H's independent auditors, and L&H's investment bankers, in which they had a pecuniary interest, the L&H Defendants, KPMG, Behets and Cowen supplied false oral and written information for the guidance of the Bakers in its decision to enter into the Merger Agreement and its determination of the price to be paid for L&H stock.

417.    In supplying the false oral and written information, and failing to disclose material information, Defendants knew that the Bakers intended to rely on that information or omissions in deciding whether to enter into the Merger Agreement and in determining the price to be paid for L&H stock. Defendants intended to influence the Bakers' decision in that transaction and determination of the price to be paid for L&H stock in that transaction.

418.    The Bakers reasonably relied upon the oral and written false information supplied by KPMG Belgium, KPMG LLP, Behets and Cowen in deciding to enter into the Merger Agreement and in determining the price to be paid for L&H stock in that transaction, to its detriment.

419.    As a result of the above Defendants' negligent misrepresentations, the Bakers have been damaged in an amount to be determined at trial.

### NINTH CLAIM FOR RELIEF AIDING AND ABETTING COMMON LAW FRAUD AGAINST THE RELATED-PARTY DEFENDANTS AND VERBEKE

420.    Plaintiffs hereby repeat and reallege paragraphs 1 through 419 as though fully set forth herein.

421.    As set forth herein, the Related-Party Defendants and Verbeke knew of the fraud committed by L&H and its officers and senior management, including Dammekens.

422.    The Related-Party Defendants and Verbeke provided substantial assistance to L&H and its officers and senior management in that they affirmatively assisted in the purported funding of L&H's "strategic partners" in order to enable L&H to falsely report revenue derived from contracts with the "strategic partners."

423.    In addition, Verbeke, in his capacity as a partner of Loeff Claeys, provided substantial assistance to L&H and its officers and senior management in that he provided legal services in connection with the establishment of the "strategic partners" and L&H's dealings with the "strategic partners."

424.    As a consequence of the foregoing, the Bakers suffered damages in an amount to be proven at trial.

**WHEREFORE**, plaintiffs demand judgment as follows:

(a)    Awarding plaintiffs damages in an amount to be determined at trial against all defendants, jointly and severally, for the Bakers' purchases of L&H shares, as well as reimbursement for any liabilities and expenses incurred as a result of the impact of the fraud on Bakers' sales of L&H shares or otherwise;

(b)    Awarding plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(c)    Awarding such other, further or different relief as the Court may deem just and proper.

169

REED SMITH LLP

By: _____
John G. Harris, Esquire
I.D. No. 4017
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 778-7524
Attorneys for Plaintiffs

OF COUNSEL:

Karen C. Dyer, Esquire
Florida Bar No. 716324
George R. Coe, Esquire
Florida Bar No. 0298440
BOIES, SCHILLER & FLEXNER LLP
255 South Orange Avenue, Suite 905
Orlando, FL  32801-3456
Telephone:  (407) 425-7118
Facsimile:   (407) 425-7047

David Boies, Esq.
BOIES, SCHILLER & FLEXNER LLP
80 Business Park Drive, #110
Armonk, NY  10504
Telephone:  (914) 273-9800
Facsimile:  (914) 273-9810


Dated:  December 14, 2001

170

## CERTIFICATE OF SERVICE

I, John G. Harris, Esquire, hereby certify that on the 14th day of December, 2001, two true and correct copies of the foregoing **Amended Complaint** were served in the manner indicated, on the attached Service List.

_____
John G. Harris

## SERVICE LIST

## BAKER, ET AL. V. KPMG LLP, ET AL.

## C.A. No. 01-380

**BY HAND**

Andre G. Bouchard, Esquire
Bouchard Margules & Friedlander P.A.
222 Delaware Avenue
Suite 1102
Wilmington, DE 19801

Henry A. Heiman, Esquire
Heiman Aber Goldlust & Baker
First Federal Plaza, Suite 600
Wilmington, DE 19899-1675

Lewis H. Lazarus, Esquire
Morris, Hitchens & Williams LLP
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899

M. Duncan Grant, Esquire
Andrea B. Unterberger, Esquire
Joseph S. Naylor
Pepper Hamilton LLP
1201 Market Street
Wilmington, DE 19801-1709

**BY HAND**

John G. Harris, Esquire
Kurt F. Gwynne, Esquire
Reed Smith LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801

Stephen E. Jenkins, Esquire
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

Kevin R. Shannon, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899

Paul J. Lockwood, Esquire
Skadden, Arps, Slate, Meagher & Flom
One Rodney Square
Wilmington, DE 19899