**EXHIBIT C-6**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| ROBERT ROTH, PAUL G. BAMBERG AND DONALD ) B. FLETCHER, JR., as Trustees of the Paul G. Bamberg ) Trust u/a dated 8/18/89, as amended 10/20/93, and ) CHERRY F. BAMBERG AND DONALD B. ) FLETCHER, JR., as Trustees of the Cherry F. Bamberg ) Trust u/a dated 8/18/89, as amended 10/20/93, ) ) | |
|         Plaintiffs, )      v. ) ) | JURY TRIAL DEMANDED C.A. No. 02-CV-10304-PBS |
| KPMG LLP, KLYNVELD PEAT MARWICK ) GOERDELER BEDRIWSREVISOVEN, KPMG UK, ) KPMG INTERNATIONAL, PAUL BEHETS, S.G. ) COWEN SECURITIES CORPORATION, JO LERNOUT, ) POL HAUSPIE, CARL DAMMEKENS, NICO ) WILLAERT, ROEL PIEPER, GASTON BASTIAENS, ) FLV FUND €.V.A., S.AI.L TRUST V.Z.W., L&H ) INVESTMENT CO. N.V., MERCATOR & ) NOORDSTAR N.V., and LOUIS VERBEKE, ) ) | |
|         Defendants. ) | CONSOLIDATED WITH |

---

| | |
|---|---|
| JANET BAKER, and JAMES BAKER, ) JKBAKER LLC and JMBAKER LLC, ) ) | |
|         Plaintiffs, )      v. ) ) | C.A. No. 02-CV-10305-PBS |
| KPMG LLP, KLYNVELD PEAT MARWICK ) GOERDELER BEDRIWSREVISOVEN, KPMG UK, ) PAUL BEHETS, SG COWEN SECURITIES ) CORPORATION, JO LERNOUT, POL HAUSPIE, CARL ) DAMMEKENS, NICO WILLAERT, ROEL PIEPER, ) GASTON BASTIAENS, FLANDERS LANGUAGE ) VALLEY FUND, FLANDERS LANGUAGE VALLEY ) FOUNDATION, L&H INVESTMENT CO. N.V., ) MERCATOR & NOORDSTAR N.V., and ) LOUIS VERBEKE, ) ) | |
|         Defendants. ) | |

---

## AMENDED COMPLAINT

Now come the plaintiffs in Civil Action No. 02-CV-10304-PBS, as set forth below, and for their Amended Complaint allege as follows:

### NATURE OF THIS ACTION

1.    This is an action to recover damages sustained by the plaintiffs as a result of their exchange of their interest in Dragon Systems, Inc. ("Dragon") for artificially inflated and ultimately worthless stock in Lernout & Hauspie Speech Products, N.V. ("LHSP"), a Belgian corporation.  Dragon was a leading worldwide supplier of speech and language technology, including speech recognition software.  On June 7, 2000, the plaintiffs, along with other shareholders of Dragon, purchased LHSP stock in an all-stock transaction whereby Dragon was merged into a U.S. subsidiary of LHSP, known as L&H Holdings USA, Inc.  This transaction occurred pursuant to an Agreement and Plan of Merger dated March 27, 2000 among LHSP, L&H Holdings USA, Inc., Dragon, the plaintiffs and certain other principal stockholders of Dragon (the "Merger Agreement").

2.    The Merger Agreement was entered into, and the transaction closed, before exposure of fraudulent transactions and accounting practices that falsely inflated LHSP's revenues by 60% or more and induced the plaintiffs, and other Dragon shareholders, to enter into the Merger Agreement and go forward with the merger.  These fraudulent transactions and practices were used to materially and artificially inflate the value of LHSP stock.

3.    At the heart of this fraud was the repeated inflation of (false) revenue and earnings for the Company, which was accomplished among other ways, through the improper recognition of revenues from software licensing and service contracts in violation of Generally Accepted Accounting Principles ("GAAP") and other standards of auditing and accounting.  The

2

recognition of this improper revenue was facilitated, among other ways, through the use of numerous entities with close ties to LHSP and/or its principals, as well as through the widespread factoring of receivables on a recourse basis which deliberately, intentionally and/or recklessly were recorded for revenue recognition purposes on a non-recourse basis. LHSP and the LHSP Defendants identified herein – with the consent and cooperation of the company's auditor, KPMG, and S.G. Cowen Securities Corporation ("Cowen"), which acted both as an investment banker for, and a financial analyst of, LHSP – presented investors with a false and misleading picture of LHSP's financial condition and apparent growth, which included reporting, certifying and circulating the reporting of $373 million dollars or more in improper revenue. In addition to perpetrating this massive fraud on the plaintiffs and the investing public, the defendants – including KPMG and Cowen – also made direct representations to the Dragon principal stockholders, including the plaintiffs, regarding, among other things, the accuracy of the financial statements of LHSP, certified by KPMG (as well as the accuracy of certain documents which incorporated those financial statements therein), and the financial soundness of LHSP and/or LHSP's purported growth strategy. KPMG, and KPMG auditors, including auditors from KPMG Belgium, KPMG LLP and KPMG UK, including Paul Behets, Robert McLamb and Paul Beecy, as well as Cowen, and Cowen analyst Rob Stone and others at Cowen, who also participated with Cowen's investment banking team for the Dragon merger transaction, played an integral role in this fraudulent scheme.

4.    Specifically, although the defendants led Dragon, the plaintiffs and the general investing public to believe that LHSP had experienced exceptional revenue growth, by early November 2000 – barely five months after consummation of the Dragon transaction – LHSP announced that it would have to restate its financial statements for 1998, 1999 and the first half

of 2000 due to "accounting irregularities." In other words, by November 2000, LHSP admitted that its financial statements contained "misstatements or omissions" constituting management fraud. Further admissions followed. Unsurprisingly, regulators halted trading in LHSP stock, thereafter delisted LHSP from the NASDAQ exchange, and suspended its trading on the European EASDAQ exchange. LHSP has been unable to provide audited financials for the last two and a half years, answer probing questions posed by the Securities and Exchange Commission ("SEC"), or account for the improper recording of up to $373 million or more of revenue. The value of LHSP stock has collapsed and LHSP has filed for bankruptcy protection in the United States and Belgium.

5.    The fraud was exposed, in part, through the inquiry by a reporter with regard to eighteen of LHSP's alleged Korean customers, who purportedly accounted collectively for a large proportion of LHSP's reported revenues. Through the simple process of questioning these customers, whom KPMG clearly would have been aware of and had access to, these entities readily volunteered that they actually did little or no business with LHSP. Shortly thereafter, it was discovered that most of LHSP's "strategic partner" licensees were shell companies, created by LHSP and its affiliates, with the consent and cooperation of KPMG and Cowen through their intentional, deliberate or reckless behavior, as a means of improperly funding research and development expenses by accounting for those expenses as revenue instead, and that $100 million was missing from the bank accounts of LHSP's Korean unit.

6.    Arthur Andersen LLP, Brian Cave LLP and Loeffs Claeys Verbeke (collectively "Audit Committee Advisors") were retained by LHSP to investigate these allegations and within weeks issued a report on November 20, 2000 ("Audit Committee Report") concluding that LHSP's reported recorded revenues were false. Among numerous impermissible practices that

violated U.S. GAAP, and that fraudulently and materially inflated LHSP's revenues, the Audit

Committee Report noted that LHSP:

    (a)    created sham "licensees" intended to facilitate the mischaracterization of loans or investments as revenue and enable LHSP to fund its research and development without deducting the expense from operating income;

    (b)    failed to disclose that its Korean unit factored receivables with recourse to LHSP bank accounts and that up to $100 million or more was and is currently "missing" from those accounts;

    (c)    improperly recognized revenue from barter or exchange transactions in which no cash changed hands;

    (d)    improperly recognized sales revenues that were contingent on LHSP later performing development work;

    (e)    improperly recognized revenue prior to contracts being finalized;

    (f)    improperly recognized revenue when collectibility was not reasonably assured;

    (g)    improperly recognized revenue when the customer's ability to pay depended on an investment from LHSP;

    (h)    improperly recognized revenue when the "purchasers" of licenses were not end-users and side letters confirmed that the license fee would be reimbursed if the license were not resold; and

    (i)    improperly recognized revenue when the customer had the right to return the product and did so.

    7.    The Audit Committee Advisors concluded that at a minimum, $277 million, representing one third of LHSP's revenue over the past two and one half years, had been improperly recorded. The Audit Committee Advisors specifically tied defendants Hauspie, Lernout, Bastiaens, Willaert and Dammekens to the impermissible transactions, and recommended disciplinary action against them. Subsequently, LHSP revealed on April 27, 2001, at a special meeting of the shareholders, that an additional approximately $96 million in reported revenue did not exist. LHSP and KPMG have admitted that these revenues were overstated, and as a result, the stock price of LHSP was severely distorted and overstated.

8.    As set forth above, LHSP's fraudulent scheme succeeded because Klynveld Peat Marwick Goerdeler Bedrijfsrevisoven, a/k/a Burgerlijke Cooperative Vennootschap Klynveld Peat Marwick Goerdeler ("KPMG Belgium"), in concert with KPMG UK, KPMG LLP and KPMG International (collectively "KPMG"), the company's long-time outside auditors, through their intentional or reckless actions consented to and participated in LHSP's fraudulent financial reporting. Notwithstanding the magnitude of LHSP's fraud and the existence of numerous "red flags," KPMG Belgium – working in conjunction with other KPMG entities elsewhere in the world including in particular, although not necessarily limited to, KPMG International, KPMG LLP in the United States and KPMG UK in Great Britain – issued unqualified opinions on LHSP's financial statements for each of the years 1997, 1998 and 1999, rendered opinions that those financial statements were presented fairly, in all material respects, in accordance with U.S. GAAP, and consented to the inclusion of those reports in filings with the SEC. The Audit Committee Advisors noted that, in many cases, the record demonstrated that KPMG Belgium, KPMG LLP and KPMG UK, all of whom are "member firms" of KPMG International, had knowledge of the improper or questionable nature of the transactions and that despite this knowledge the KPMG entities failed, and were unable, to resolve the issues raised by this knowledge before signing reports that contained unqualified opinions on the financial statements. Further, KPMG LLP reviewed the LHSP audits and improperly found them to be in compliance with U.S. GAAP and/or Generally Accepted Accounting Standards ("GAAS") when in fact, among other things, these issues regarding questionable transactions were not resolved and critical information regarding the relationship to LHSP and/or its principals of numerous entities doing business with LHSP was not disclosed. KPMG UK also participated in the audits of

6

LHSP. Moreover, according to defendant Lernout, KPMG was fully aware of the improper related party transactions and revenue recognition procedures.

9.    In addition to the foregoing, representatives of KPMG, including, but not limited to, a more senior auditor from KPMG LLP and a more junior auditor from KPMG Belgium, made specific oral representations to one or more officers of Dragon conducting due diligence on behalf of the Dragon principal stockholders who were parties to the Merger Agreement, including the plaintiffs, in one or more meetings, affirming the propriety of LHSP's financial reporting. Those statements were made by KPMG to the Dragon shareholders, including the plaintiffs, or their representatives with knowledge that the plaintiffs and the other Dragon principal stockholders who were parties to the Merger Agreement would rely on those statements. The substance of those representations was communicated to the plaintiffs. Without those oral representations, the plaintiffs would not have entered into a transaction with LHSP to sell their stock of Dragon in exchange for LHSP stock which, unbeknownst to the plaintiffs or the investing public, was worthless. It was KPMG – and LHSP identified in one or more Annual Reports during the relevant time periods both the Belgium and U.S. offices of KPMG as its auditors – who satisfied one of the critical conditions to closing the Dragon sale by giving an unqualified opinion on LHSP's 1999 financial statements, even though KPMG Belgium had knowledge that the SEC had commenced an investigation of LHSP's accounting practices and was aware of numerous other red flags signaling improprieties in LHSP's accounting practices, and KPMG LLP and KPMG UK either knew or were reckless in not knowing this. (Indeed, as set forth above, according to one of LHSP's co-founders, KPMG was aware of LHSP's improper related party transactions and revenue recognition procedures at all relevant times.) KPMG

either failed to perform procedures required by U.S. GAAS, which would have revealed LHSP's improper accounting practices, or turned a blind eye to the results of those procedures.

10.    Cowen, LHSP's long-time investment banker, who also has a securities analyst arm which analyzed and promoted LHSP stock to the investing public, also participated in LHSP's fraudulent scheme. One or more Cowen securities analysts, including Robert Stone, acted as part of the investment banking team for the Dragon transaction in June 2000. Other analysts or former analysts also were involved with the Dragon transaction, including Dan Blake. At the time of the Dragon merger negotiations, Dan Blake had accepted a position with L&H Investment Co. ("LHIC"), a company formed by defendants Hauspie and Lernout, in which they owned a controlling interest and through which LHSP secretly funded its supposedly "unaffiliated customers." After joining LHIC, Blake continued to work closely with Cowen and, along with Cowen, was part of the Dragon/LHSP deal team. Blake additionally continued during the relevant time period, including at least once in February 2000, to recommend Cowen as an investment banker. Cowen representatives also solicited funding for one or more "unaffiliated customers" of LHSP. Indeed, Cowen, through its representatives, including but not necessarily limited to Robert Stone, who acted in a capacity as both investment banker for LHSP and a financial analyst of LHSP, was aware of and approved at least some of LHSP's related party transactions and accounting artifices to improperly recognize revenue. Despite this knowledge, Cowen issued public analyst reports recommending the securities of LHSP as a "Strong Buy" based on LHSP's strong and accelerating growth, particularly revenue growth. These recommendations artificially inflated the market price for LHSP securities. In addition, during the negotiation of the transaction between LHSP and Dragon, Cowen representatives, including but not necessarily limited to Ben Howe, in a series of meetings with certain principal

8

stockholders of Dragon, including the plaintiffs, made specific representations regarding LHSP. These representations regarding the strength and growth of LHSP resulted in increasing the value of LHSP's securities included, but are not necessarily limited to, representations that: (i) LHSP had strong financial results; (ii) LHSP was a good merger partner, and (iii) LHSP was a good prospect for financial growth.  In its analyst recommendations disseminated to the public regarding the strength of LHSP stock, Cowen never disclosed its knowledge of LHSP's related party transactions or improper revenue recognition or that, as a result, LHSP's stock was dramatically overinflated, even though issues regarding, among other things, LHSP's software revenue recognition and its relationship with strategic partners were raised a full year prior to the LHSP/Dragon transaction.  Similarly, Cowen in its role as the investment banker for LHSP in connection with the Dragon transaction made specific representations to the Dragon stockholders regarding LHSP, but never disclosed LHSP's related party transactions or improper revenue recognition or that, as a result, LHSP's stock was dramatically over inflated.

<u>JURISDICTION AND VENUE</u>

11.    This Court has subject matter jurisdiction over this case pursuant to 15 U.S.C. § 78aa; 28 U.S.C. §§ 1331 and 1337; and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b) and 1391(d), because defendants Lernout, Hauspie, Dammekens, Willaert, Pieper, Bastiaens, Behets, KPMG Belgium and KPMG UK are aliens and disseminated false and misleading statements into this district.  Venue is also proper as to defendants KPMG LLP and S.G. Cowen Securities Corporation pursuant to 15 U.S.C § 78aa and 28 U.S.C. § 1391(b) because KPMG LLP and SG Cowen Securities Corporation disseminated false and misleading information to the investing public in this district.

9

13.    In connection with the acts alleged in this complaint, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

PARTIES

14.    Plaintiff Robert Roth ("Roth") is a resident of Massachusetts. As of June 6, 2000, Roth was the owner of approximately 2.78% of the issued and outstanding stock of Dragon. Pursuant to the Merger Agreements that give rise to the claims herein, Roth received 254,683 shares of common stock of LHSP, plus 21,171 shares placed in escrow, for a total of 275,854 shares.

15.    ~ Plaintiffs Paul G. Bamberg and Donald B. Fletcher, Jr. are residents of Massachusetts and are the Trustees of the Paul G. Bamberg Trust, pursuant to an agreement dated August 18, 1989, and as amended October 20, 1993 ("PGB Trust"). As of June 6, 2000, the PGB Trust was the owner of approximately 4.39% of the issued and outstanding stock of Dragon. Pursuant to the Merger Agreements that give rise to the claims herein, the PGB Trust received 403,053 shares of common stock of LHSP, plus 33,504 shares placed in escrow, for a total of 436,557 shares.

16.    Plaintiffs Cherry F. Bamberg and Donald B. Fletcher, Jr. are residents of Massachusetts and are the Trustees of the Cherry F. Bamberg Trust, pursuant to an agreement dated August 18, 1989, and as amended October 20, 1993 ("CFB Trust"). As of June 6, 2000, the CFB Trust was the owner of approximately 1.15% of the issued and outstanding stock of Dragon. Pursuant to the Merger Agreements that give rise to the claims herein, the CFB Trust received 105,137 shares of common stock of LHSP, plus 8,739 shares placed in escrow, for a total of 113,876 shares.

17.    Lernout & Hauspie Speech Products, N.V. ("LHSP") is a Belgian corporation, with its principal place of business in Ieper, Belgium. Until it was delisted on December 8, 2000, LHSP common stock was listed on the NASDAQ under the ticker symbol "LHSP" or "LHSEQ." LHSP stock was also traded on the EASDAQ until it was "indefinitely suspended" on or about November 9, 2000. LHSP is a party to the Merger Agreement. On November 29, 2000, LHSP filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware, and contemporaneously commenced bankruptcy proceedings in Belgium. But for those filings, LHSP would be named in this action as a defendant.

18.    L&H Holdings USA, Inc. ("L&H Holdings USA") is a Delaware corporation, a wholly owned subsidiary of LHSP, and the corporation into which Dragon was merged. L&H Holdings USA is a party to the Merger Agreement. On November 29, 2000, L&H Holdings USA also filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware. But for that filing, L&H Holdings USA would be named in this action as a defendant.

19.    Defendant Jo Lernout ("Lernout") is one of the founders of LHSP. Lernout was President of LHSP from January 1994 until February 1996, Co-Chairman of the LHSP Board from 1996, and a Managing Director of LHSP from 1987, until he resigned those offices on November 9, 2000. Lernout served as a member of the Board of Directors of LHSP until his resignation on January 16, 2001. Lernout was forced out of his remaining role as the Chief Technology Officer of LHSP at the end of February 2001. As of July 27, 2000, Lernout held, controlled or had beneficial ownership of 43,667,208 shares of LHSP stock, or approximately 30% shares outstanding on that date. Lernout was arrested on April 27, 2001 in Ieper, Belgium

and charged with forgery and stock price manipulation for his role in LHSP's accounting fraud. He made one or more trips to the U.S. in connection with efforts to purchase Dragon from the plaintiffs and other Dragon stockholders.

20.    Defendant Pol Hauspie ("Hauspie") is one of the founders of LHSP. Hauspie was Chairman of LHSP from January 1994 until October 1996, Co-Chairman of the LHSP Board from 1996, and a Managing Director of LHSP from 1987, until he resigned those offices on November 9, 2000. Hauspie served as a member of the Board of Directors of LHSP until he resigned his board seat on November 22, 2000. As of July 27, 2000, Hauspie held, controlled or had beneficial ownership of 43,667,208 shares of LHSP stock, or approximately 30% of the shares outstanding on that date. Hauspie was arrested on April 27, 2001 in Ieper, Belgium and charged with forgery and stock price manipulation for his role in LHSP's accounting fraud. Hauspie made one or more trips to the U.S. in connection with efforts to purchase Dragon from the plaintiffs and other Dragon stockholders.

21.    Defendant Gaston Bastiaens ("Bastiaens") joined LHSP as President in September 1996, and was appointed Chief Executive Officer of LHSP in May 1997. Bastiaens also was an officer of L&H Holdings USA and signed the Dragon Merger Agreement on behalf of L&H Holdings USA. Bastiaens resigned those offices on August 25, 2000, and his board seat on November 9, 2000. He was apprehended by U.S. Marshals in May 2001 and has been extradited to Belgium on charges of stock manipulation and fraud. As of June 8, 2000, Bastiaens held, controlled or had beneficial ownership of 1,231,000 shares of LHSP stock. Bastiaens filed for bankruptcy in the U.S. but later sought and obtained dismissal of that bankruptcy action.

22.    Defendant Nico Willaert ("Willaert") joined LHSP as a director in 1992 and remained on the Board of Directors until November 22, 2000. Willaert was also a Managing

Director of LHSP from April 1993, and Co-Vice-Chairman of LHSP from January 1994, until he resigned those offices on November 9, 2000. Willaert was arrested on April 27, 2001 in Ieper, Belgium and charged with forgery and stock price manipulation for his role in LHSP's accounting fraud.

23.    Defendant Carl Dammekens ("Dammekens") joined LHSP in 1990 as Corporate Controller, and served as a Senior Vice President of Finance from 1993 and as Acting Chief Financial Officer of LHSP from 1996 until his appointment as Chief Financial Officer on July 7, 1999. On January 31, 2001, LHPS announced that Dammekens had "resigned" from his position as Chief Financial Officer. In addition to holding office in LHSP, Dammekens also was an officer of L&H Holdings USA.

24.    Defendant Roel Pieper ("Pieper") served as vice-chairman and chairman of LHSP's Board of Directors between October 1999 and January 2001. Pieper made one or more trips to the U.S. in connection with efforts to purchase Dragon from the plaintiffs and other Dragon stockholders.

25.    Defendant Klynveld Peat Marwick Goerdeler Bedrijfsrevisoven a/k/a Burgerlijke Cooperative Vennootschap Klynveld Peat Marwick Goerdeler ("KPMG Belgium") is a Belgian public accounting firm and is a "member firm" of KPMG International. KPMG Belgium, along with one or more other KPMG entities, has been LHSP's outside auditor since 1991, when it absorbed the Belgian accounting firm of Behets, Boes & Co., which had been auditing LHSP since the late 1980's. KPMG Belgium issued unqualified reports on LHSP's financial statements for each of the years 1997, 1998 and 1999, gave an opinion that those financial statements were prepared in accordance with U.S. GAAP, stated that its audit was conducted in accordance with U.S. GAAS, and consented to LHSP's inclusion of KPMG Belgium's reports on those financial

statements in filings with the SEC. One of the KPMG Belgium auditors responsible for the LHSP audits, Chantal Mestdagh, left KPMG Belgium to become Chief Financial Officer of LHIC. Ms. Mestdagh held that position throughout KPMG Belgium's audits of LHSP's 1998 and 1999 financial statements. Another KPMG auditor, Paul Behets, left to become Chief Executive Officer of another LHSP related entity, as set forth below. KPMG Belgium also audits the Flanders Language Valley Fund, N.V. ("FLV Fund"), another entity related to LHSP through which LHSP secretly funded its purportedly unaffiliated customers.

26. Defendant KPMG UK is a British public accounting firm associated with KPMG Belgium and KPMG LLP and is a "member firm" of KPMG International. KPMG UK participated in the audits, reporting and SEC filings of LHSP and with the due diligence performed for LHSP's acquisition of one or more entities in the year 2000.

27. Defendant KPMG LLP is a limited liability partnership with headquarters in New York, New York and is a "member firm" of KPMG International. KPMG LLP was integrally involved in the audits, reporting and SEC filings of LHSP and served as LHSP's advisor for the merger negotiations, due diligence and merger structure through its Houston, Texas office, its Atlanta, Georgia office and its Dallas, Texas office with regard to the Dragon/LHSP transaction through its accountants, Robert McLamb and Paul Beecy (both of whom worked in KPMG UK's Capital Market Group prior to joining KPMG LLP's Houston, Texas and Atlanta, Georgia offices, respectively), Drew Koecher, and others. LHSP listed KPMG LLP's offices in identifying LHSP's outside auditors in its Annual Report for 1997, 1998 and 1999.

28. Defendant KPMG International is a Swiss association with headquarters in Amsterdam, the Netherlands. KPMG International promotes itself as a "global professional services organization" whose "member firms" include KPMG Belgium, KPMG UK, and KPMG

14

LLP. In its statements to the public, KPMG International describes the partners and employees of the member firms as its personnel, describes the offices of its member firms as its offices, and states that it has office locations throughout the world. Without differentiating which offices are the offices of which entity, KPMG International describes itself as having offices across the globe including in the United States, the United Kingdom and Belgium. KPMG International, KPMG Belgium, KPMG UK and KPMG LLP are hereinafter referred to as "KPMG" and/or "KPMG Defendants."

29.    In KPMG International's discussion of its Annual Report for 1999, which appears on the KPMG International website, KPMG International expressly proclaims that "KPMG is acting as 'One Firm' worldwide to consistently meet the changing needs of global clients through an integrated array of tailored solutions ... KPMG's 100,000 professionals in 159 countries help our clients achieve their critical business objectives through experience and personal commitment to excellence." Thus, KPMG International promotes all of the partners and employees of its member firms as its agents and all of the partners and employees of any member firm as the agents of every other member firm, acting collectively to form "One Firm" providing an integrated and international service. LHSP was and is such a global client of KPMG receiving integrated services on a worldwide basis from KPMG.

30.    Each of the partners and employees of KPMG Belgium, KPMG LLP, and KPMG UK who participated in the audit of LHSP or who communicated with the plaintiffs in connection with the Dragon merger was acting as the agent of KPMG Belgium, KPMG LLP, KPMG UK and KPMG International at the time of such activities. KPMG Belgium, KPMG LLP, KPMG UK and KPMG International are jointly and severally liable for the acts of each other, for the acts of their partners and employees and for the acts of the partners and employees

15

of such other KPMG entities named herein, and each KPMG entity has acted through the acts of

its partners and employees as well as through the acts of the partners and employees of such

other KPMG entities named herein.

31.    Defendant Paul Behets ("Behets") was a principal of the Belgian accounting firm

Behets, Boes & Co., where LHSP was his client, until Behets, Boes & Co. was absorbed into

KPMG Belgium in 1991. At KPMG Belgium, Behets was the audit partner with chief

responsibility for LHSP audits from 1991 until July 1999, when he left KPMG Belgium to

become the chief executive officer of Flanders Language Valley Foundation a/k/a S.AI.L Trust

V.Z.W. ("SAIL Trust"), a position he held throughout KPMG Belgium's audit of LHSP's 1999

financial statements.

32.   ˜  Defendant S.G. Cowen Securities Corporation ("Cowen") is a securities and

investment banking firm that was established in 1998 by the merger of Cowen & Company and

Societe Generale Securities Corporation. Cowen is incorporated in New York and is the United

States investment banking arm of Societe Generale Group, a French corporation. Cowen

maintains offices in the United States in New York, Boston, Chicago, Cleveland, San Francisco

and Washington DC. Cowen and its predecessors Cowen Societe Generale Securities

Corporation acted as LHSP's investment bankers since LHSP's initial public offering in 1995.

Cowen also purported to offer the public unbiased research and opinions through its research

analysts, including Robert Stone and Dan Blake. Cowen also served as LHSP's investment

banker for the Dragon/LHSP transaction. Some time after September 1998, Dan Blake had left

the employ of Cowen to be a partner/analyst with LHIC, which was one of the companies

through which LHSP se·· ·tly funded its supposedly unaffiliated customers. During the merger

negotiations, Ben Howe and Robert Stone, among others, made specific representations to Dragon representatives regarding the value of LHSP securities.

33.    Defendant FLV Fund C.V.A. ("FLV Fund") is a Belgian venture-capital fund with headquarters in Belgium organized by Hauspie and Lernout, among others, to make various strategic investments. FLV Fund is a publicly traded company which trades on the EASDAQ stock exchange under the symbol "FLVF." FLV Fund has United States offices in Los Altos Hills, California and in Woburn, Massachusetts. Both Hauspie and Lernout served as directors of FLV Fund from 1996 to 1997, and after 1997 each continued to "spend a portion of his time on activities relating to the FLV Fund." At all relevant times, the financial statements of FLV Fund were audited by KPMG Belgium.

34.    Defendant S.AI.L Trust V.Z.W. ("SAIL Trust") purports to be a non-profit entity established in 1995 by, inter alia, Hauspie, Lernout and the Government of Flanders to support economic development and to assist in the infrastructure financing of the Flanders Language Valley region. Since July 1999, the chief executive officer of SAIL Trust has been Paul Behets, who until that time was the partner at KPMG Belgium with primary responsibility for the audits of LHSP's financial statements. SAIL Trust holds a one-third interest in FLV Management, N.V. ("FLV Management"), which is the manager of FLV Fund, and has the right to appoint five of FLV Management's directors. Another owner of FLV Management is Gewesteliijke Investeringsmaatschappij Vlaanderen N.V. ("GIMV"), which also owns LHSP stock and appoints one LHSP director. FLV Management manages and makes decisions for FLV Fund, one of the entities through which LHSP funded its "unaffiliated customers."

35.    Defendant L&H Investment Co. N.V. ("LHIC") is a Belgium investment fund founded by Hauspie and Lernout in 1998, through which Hauspie and Lernout control 7.6% of

LHSP's stock. LHIC was purportedly established to make long-term strategic investments in companies in information technology industries such as speech, language and artificial intelligence. Hauspie and Lernout capitalized LHIC with their own shares of LHSP common stock and act as advisors to LHIC and its investments. The President and Managing Director of LHIC since its, inception has been Francis Vanderhoydonck, who also served as a director of LHSP from May 1999 until his resignation on or about May 15, 2001. The Chief Financial Officer of LHIC was Chantal Mestdagh, formerly a KPMG Belgium auditor responsible for the audits of LHSP's financial statements. In addition, as note above Dan Blake, a financial analyst at Cowen, was also employed by LHIC.

36.     Defendant Mercator & Noordstar, N.V. ("Mercator") is an insurance company located in Antwerp, Belgium. At all relevant times, Mercator owned 6.9% of LHSP Holding N.V., which, in turn, owned 8.9% of LHSP. Mercator also directly owned a 0.2% stake in LHSP.

37.     FLV Fund, SAIL Trust, LHIC, and Mercator are collectively referred to as the "Related-Party Defendants," because each is a related party to LHSP. As detailed below, each of the Related-Party Defendants provided funding for certain "strategic partners" of LHSP, often referred to as Language Development Companies ("LDCs") or Cross-Language Development Companies ("CLDCs"). The LDCs and CLDCs were essentially shell corporations which formed an integral part of the scheme to inflate LHSP's revenues by means of related-party transactions.

38.     Defendant Louis Verbeke ("Verbeke") is a Belgian citizen who served at all relevant times as the Chairman of Mercator and as a named partner at the Belgian law firm of Loeff Claeys Verbeke ("Loeff Claeys"). Loeff Claeys served as legal counsel to both LHSP and

FLV Fund.  Upon information and belief, Verbeke, in his capacity as a partner of Loeff Claeys, provided legal services in connection with LHSP's fraudulent transactions involving the Related-Party Defendants.  In addition, Verbeke attended virtually all meetings of LHSP's Board of Directors, including those at which related-party transactions or issues concerning conflicts between LHSP and FLV Fund were discussed.  At all relevant times, Verbeke owned 8.9% of L&H Holding N.V., which, in turn, owned 8.9% of LHSP.

## SUBSTANTIVE ALLEGATIONS

### Plaintiffs' Reliance on Defendants' Misrepresentations in Purchasing LHSP Shares

39.     On March 27, 2000, LHSP, L&H Holdings USA, Dragon, and certain principal stockholders of Dragon ("Dragon principal stockholders"), including the plaintiffs, entered into the Merger Agreement pursuant to which LHSP would purchase all the stock of Dragon from the plaintiffs and other Dragon stockholders in a stock-for-stock transaction ("Dragon Merger").  On that date, LHSP was valued at $53.75 per share.

40.     On June 7, 2000, the transactions contemplated by the Merger Agreement were consummated, and the plaintiffs acquired shares of LHSP common stock in the amounts stated in ¶¶ 14 –16.

41.     In agreeing to accept LHSP shares in exchange for its interest in Dragon, and in setting the price of Dragon relative to LHSP's stock price, the plaintiffs relied on the truth and accuracy of (a) LHSP's extensive public disclosures regarding its business and revenues and the propriety of its financial statements, many of which the plaintiffs directly examined and all of which were incorporated in the market price of LHSP securities, (b) the written and oral assurances of KPMG, including KPMG Belgium, and (c) the written analysis and recommendations of Cowen regarding LHSP which were incorporated in the market price of LHSP securities and oral representations specifically made by Cowen representatives to the

19

Dragon principal stockholders and/or their representatives during the negotiations leading up to

the signing of the merger agreement. Absent these representations to the public in general and to

the Dragon principal stockholders specifically, the plaintiffs would never have entered into this

transaction. These disclosures and assurances falsely portrayed LHSP as a technology company

whose innovative products were propelling record global revenues.

<u>Record Revenues Every Quarter From "Organic Growth"</u>

42.     For every quarter in 1997, 1998, and 1999, LHSP publicly announced dramatic

increases in revenues:

(a)     In an April 28, 1997 press release, LHSP announced that "first quarter of 1997 total revenues were $16.6 million, an increase of 350% over revenues of $4.7 million in the first quarter of 1996."

(b)     A July 30, 1997 press release announced second quarter 1997 revenues of "$21.1 million, an increase of 268% over revenues of $5.7 million in the second quarter of 1996."

(c)     An October 22, 1997 press release announced third quarter 1997 revenue of "$27.9 million, an increase of 285% over revenues of $7.3 million in the third quarter of 1996."

(d)     A February 3, 1998 press release announced "results for the fourth quarter [of 1997] of $33.8 million, a 150% increase in reported revenue of $13.4 million for the fourth quarter of 1996."

(e)     In its 1997 Annual Report filed with the SEC on Form 20-F on May 26, 1998, and refiled on Form 20-F/A/2 dated April 13, 1999 signed by defendant Bastiaens, LHSP announced that in 1997 "total revenues increased 220% to approximately $99.4 million in 1997 from approximately $31.0 million in 1996."

(f)     LHSP announced its first quarter 1998 revenues in a press release dated April 28, 1998, attached as an exhibit to a Form 6-K/A dated May 26, 1998, and signed by defendant Bastiaens: "[f]or the first quarter of 1998, LHSP's total revenues were $35.1 million, an increase of 112% over reported revenues of $16.6 million for the first quarter of 1997." In the same press release, Bastiaens was quoted as attributing LHSP's performance to "our tremendous success in securing contracts," and the press release made further reference to "a record-breaking 40 contracts."

(g)    In a July 28, 1998 press release, filed with the SEC on a Form 6-K dated August 5, 1998 and signed by Bastiaens, LHSP announced total second quarter 1998 revenues of "$45 million, an increase of 113% over reported revenues of $21.1 million for the second quarter of 1997." In the press release, Lernout attributed the results to increased demand for LHSP products and "new contract bookings," as did Bastiaens, who stated that LHSP "signed 42 new contracts" during the quarter.

(h)    In an October 27, 1998, press release, filed with the SEC on a Form 6-K on October 28, 1998, LHSP announced that, "for the third quarter of .1998, LHSP's total revenues were $54.9 million, an increase of 97% over reported revenues of $27.9 million for the third quarter of 1997."

(i)    On April 7, 1999, LHSP "announced results for the fourth quarter of 1998 of $76 million in revenue, or a 126% increase in the reported revenue of $33.8 million for the fourth quarter 1997."

(j)    LHSP's 1998 Annual Report, which was filed with the SEC on Form 20-F and signed by defendant Bastiaens, stated that "for the fiscal year 1998, the company reported total revenue of $211.6 million or an increase of 113% over the reported revenues of $99.4 million for fiscal year 1997."

(k)    An LHSP 1998 Annual Report to Shareholders, filed with the SEC on a Form 6-K on June 1, 1999 and signed by defendant Dammekens, contains a letter to shareholders signed by defendants Lernout, Hauspie, and Bastiaens trumpeting "a year of major milestones.... For the fourth consecutive year, revenues grew by more than 100% over the year before. In fiscal 1998, the company reported total revenues of $211.6 million or an increase of 113 percent over the $99.4 million reported for 1997.... LHSP ... signed a record 160 new contracts to license its core technologies."

(l)    On May 18, 1999, LHSP announced that "for the first quarter of 1999, LHSP's total revenues were $70.7 million, an increase of 102% over reported revenues of $35.1 million for the first quarter of 1998. The company attributes the increased revenues to LHSP's continued success in expanding the role speech and language technologies play in a broad range of markets and applications."

(m)    In a press release dated July 28, 1999, filed with the SEC on a Form 6-K dated August 2, 1999 and signed by defendant Bastiaens, LHSP announced that its second quarter 1999 "total revenues were $76.0 million, an increase of 69% over reported revenues of $45.0 million. LHSP's total revenues for the six months ending June 30, 1999 were $146.7 million, an increase of 83% over reported revenues of $80.1 million for the same period in 1998. The company attributes the increased revenues to LHSP's continued success in expanding the role speech and language technologies play in a broad range of markets and applications." LHSP reported that in the second quarter, the Technologies and Solutions division "signed 57 new contracts (45 of which were related to core speech technology)."

(n)    In a press release dated October 27, 1999, filed with the SEC on a Form 6-K dated November 3, 1999 and signed by defendant Dammekens, LHSP announced, that its third quarter 1999 "total revenues were $87.5 million, an increase of 59% over reported revenues of $54.9 million for the third quarter of 1998. LHSP's total revenues for the nine months ended September 30, 1999 were $234.2 million, an increase of 74% over reported revenues of $134.9 million for the same period in 1998."

(o)    In a press release dated February 9, 2000, filed with the SEC on a Form 6-K/A dated February 14, 2000 and signed by defendant Dammekens, LHSP announced that, "[f]or the fourth quarter of 1999, LHSP's total revenues were $110 million, or a 43.5% increase in the reported revenue of $76.7 million for the fourth quarter of 1998. For the fiscal 1999 [sic], the company reported total revenues of $344 million or an increase of 62.7% over the reported revenues of $211.6 million for 1998." The company attributed growth to the "Technologies and Solutions Division, sign[ing] a record of 80 contracts for the quarter." In that press release, Bastiaens stated that "[i]n 1999 we experienced a strong demand for speech and language technologies, applications and solutions, specifically in the Enterprise and Telephony area. This increase was mainly the result of internal growth and created a positive cash flow from operations of $68 million, reflecting the maturity of our operations."

43.    Throughout this period, LHSP also stated that the majority of its growth was "organic":

(a)    LHSP represented in a document entitled "Lernout & Hauspie Frequently Asked Questions for Q3 1999," posted on its world-wide website on October 29, 1999, that "80% of [revenue] growth was organic and the rest was based on acquisitions."

(b)    LHSP represented in a document entitled "Lernout & Hauspie Frequently Asked Questions for Q4 1999," posted on LHSP's world-wide website on February 10, 2000, that "LHSP's internal calculation [sic] show that over 70% of our growth for fiscal 1999 was organic."

(c)    LHSP represented in a document entitled "Lernout & Hauspie Frequently Asked Questions for Q1 2000," posted on its world-wide website on May 24, 2000, that "74% of the growth was organic."

Non-Existent License Revenues from Unaffiliated "Strategic Partners"

44.    LHSP also attributed significant revenues to what it reported as license ˉ ˍˍ from alleged unaffiliated "strategic partners" who contracted with LHSP to perform researcʰ and development functions for LHSP developing its software for specific applications and languages.

These "strategic partners" were so-called Language Development Companies ("LDCs") and

Cross-Language Development Companies ("CLDCs"), which were supposedly created to

develop the Company's software for specific applications and/or languages. The strategic

partners would pay licensing fees to LHSP, which LHSP would record as revenue, and then the

strategic partners would purportedly "develop" the software. At the end of the contract term,

LHSP would have the option — which was generally exercised — to acquire the strategic

partner and the developed product. Through this scheme, LHSP was able to avoid recording the

expenses associated with developing the software, and to record revenue. The revenue derived

from these "strategic partner" relationships was substantial, accounting for 10% of LHSP's

reported revenues for 1998 and 25% of its reported revenues for 1999. However, under the

applicable U.S. GAAP principles, booking such revenue is only appropriate if the strategic

partner is an independent third party (i.e., not related to LHSP) and the strategic partner is a real

entity which actually develops the software separate from LHSP.

45. In fact, the strategic partners were corporate fictions, and the license revenue from

the strategic partners was entirely phony. The LDCs and CLDCs were actually funded by parties

related to LHSP, such as FLV Fund, SAIL Trust, Mercator, and LHIC, and were used by LHSP

to move research and development expenses off its books and to allow LHSP to artificially

inflate its revenues. The LDCs and CLDCs had no employees and no ability to develop software

independently of LHSP, and all the development work under the contracts was done by LHSP.

Because the source of the funding for the LDCs and CLDCs was parties related to LHSP, LHSP

was essentially paying itself to do the work and recognizing these "payments" as revenue.

46. In 1996, shortly after Bastiaens arrived at LHSP, the company announced that

Dictation Consortium N.V., "a private company in which the FLV Fund has an investment," had

licensed LHSP software in order to develop LHSP's continuous automated speech recognition technology. As of December 31, 1996, FLV Fund and FLV Management together owned 61% of Dictation Consortium, and defendants Lernout and Hauspie were directors of FLV Management. Dictation Consortium provided LHSP with $26.6 million in revenue over the next two years, approximately one quarter of its 1996 sales and 19% of 1997 sales. Since Dictation Consortium bore research and development costs, which were actually costs for LHSP research and development, they did not shrink LHSP's bottom line, as they should have. In May 1998, LHSP announced that it had obtained the software developed by Dictation Consortium by purchasing the company for $26.9 million, most of which represented goodwill and could thus be amortized over seven years.

47.-  -  In 1997, LHSP entered into a similar arrangement with a company formed in March 1997, by anonymous venture capitalists, called Brussels Translation Group ("BTG"). According to LHSP's 1998 Annual Report on Form 20-F, LHSP granted BTG an exclusive license to use LHSP speech processing technology and associated data bases to develop an internet translation service. The agreement called for BTG to pay LHSP $3.5 million in license fees, plus royalties. In May 1997, the license fee was increased by $1.5 million, and LHSP also entered into an agreement to provide BTG with engineering services, which engineering services and functions would have been performed by LHSP and otherwise would have a research and development cost of LHSP, under which BTG paid LHSP approximately $30 million.

48.    Similarly, in 1998 and 1999, LHSP helped create thirty start-up companies, based in Belgium and Singapore, purportedly to "develop" variants of its software for non-mainstream languages. Upon infor ation and belief, the legal work involved in creating these start-ups was performed in whole or in part by defendant Verbeke, in his capacity as a partner of Loeff Claeys

24

Verbeke was also the chairman of defendant Mercator, an insurance company that owned 16 of the start-ups. LHSP repeatedly maintained that unaffiliated "private investors" owned the start-ups.

49.    In an April 7, 1999 press release, LHSP announced among the highlights of fiscal year 1998:

> [L&H] [b]egan development of approximately 20 additional exotic languages with its financial and technological partners. During 1998 contracts were signed for the following languages: Ukraine, Polish, Czech, Slavic, Bahasa, Greek and Farsi, to support a range of speech technologies.... In order to develop these additional languages within certain time and financial constraints, L&H is working with partners who will undertake the localization and development of these language areas and share the financial risks and rewards. L&H will license its tools to the partners and will secure the quality of the various applications and languages.

50.    In its 1998 Annual Report on Form 20-F, LHSP expanded its description of these transactions:

> Pursuant to these agreements, we have exclusively licensed our speech and language technology development tools to strategic partners *that are unaffiliated with us* to develop and localize our technology for specified new languages. Our strategic partners also have exclusive rights ... to develop, market, and distribute products incorporating the development technology. In addition to one-time license fees, we have the rights to receive royalties based on our partners' net revenues from sales of products incorporating the developed technology.
>
> [Emphasis added.]

51.    The above statements concerning "unaffiliated" parties were false and misleading, because LHSP did not disclose that the majority of the start-ups were funded by parties related to LHSP and that LHSP was actually performing the development work that the LDCs and CLDCs were supposed to perform. In fact, as would later be revealed, seventeen of the LDCs and seven of the CLDCs were owned, either directly or indirectly, by FLV Fund or Mercator. Specifically,

eight were owned by FLV Fund. Another four were subsidiaries of Language Investment Co., a company run by Willem Hardeman, a director of the FLV Fund. Finally, sixteen were predominately owned by Mercator.

52.    In June 1999, LHSP acquired BTG for approximately $42 million in cash plus the assumption of BTG's $17 million start-up debt. As with the Dictation Consortium transaction, LHSP was able to obtain a product without deducting the research and development expense. Instead, LHSP was able to record nearly $35 million in revenues in the form of engineering and licensing fees and then, when it purchased BTG, LHSP capitalized the acquisition price, turning what would normally be an expense into an asset.

53.    Although critics charged that LHSP earnings were inflated by the Dictation Consortium and BTG transactions because those companies were related to LHSP, LHSP falsely maintained that, except for the FLV Fund involvement in Dictation Consortium, the companies were owned by unaffiliated "private investors" whom LHSP refused to identify.

54.    According to a February 9, 2001 article in the Belgium newspaper *De Standaard*, defendants Behets and Cowen (and possibly others) assisted with obtaining investors for BTG. Behets attended a meeting in Boston between May 28 and 30, 1997 with a potential investor along with defendants Hauspie and Lernout (as well as others) to pursue the investor to invest $15 million in BTG:

> Behets helped Jo Lernout, Pol Hauspie, Gaston Bastiens (then CEO), Ellen Spooren (pr-manager) and Carl Dammekens (CFP) in giving the company more credibility. He was at the time both head of the audit committee controlling L&H's filings and chairman of the Institute of Company Auditors.

SG Cowen also assisted BTG's fund raising efforts through a dinner meeting with the potential investor during the May 28-30, 1997 meeting.

55.    Initial license fees paid by these allegedly unaffiliated "strategic partners"

accounted for 10% of LHSP's claimed 1998 revenue and 25% of claimed 1999 revenue, far in

excess of the 3.7% of 1998 revenue that LHSP stated, in its 1998 Annual Report on Form 20-F,

was provided by "companies funded in part by the FLV Fund," and the 0.3% of 1999 revenues

that LHSP stated, in its 1999 10-K, were provided by "companies funded, in part by the FLV

Fund and LHSP Investment Co."

56.    LHSP underscored the purported legitimacy of its licensing revenues with false

public descriptions of a conservative revenue recognition policy.  In notes to its 1997, 1998 and

1999 financial statements, audited by KPMG Belgium, LHSP stated that:

> The Company recognizes revenue from the sale of its software
> licenses upon satisfaction of all of the following criteria: signing of
> the license agreement, shipment of the products, when no
> contractual terms remain unsatisfied, and, if applicable, when a
> royalty report is received from the customer.  The Company
> generally receives, on a quarterly basis, royalty reports from each
> customer who has signed a license contract.  The reports detail the
> number of units or products that the customer shipped during that
> period.    The number of units multiplied by the applicable
> contractual rate per unit is the amount that the Company records as
> revenue.  Before recording this revenue, the Company determines
> that all significant obligations have been satisfied and that
> collection of the receivable is probable.
>
> * * *
>
> The Company from time to time enters into nonrefundable
> minimum royalty agreements with customers.   Under these
> arrangements the Company delivers its technologies or products to
> the customer contemporaneously with the execution of the
> agreement.    Revenue from nonrefundable minimum royalty
> agreements is recognized upon satisfaction of all of the following
> criteria: signing of the licensing agreement; no additional
> significant production, modification or customization of the
> software is required; delivery has occurred; the fee is fixed and
> determinable; and collection is probable.  For arrangements that
> include multiple elements, the fee is allocated to the various
> elements based on vendor specific objective evidence of fair value.

> In all such cases, the Company only recognizes revenue when
> collection of the related receivable is probable.

As discussed below, these disclosures were pervasively false.

57.    In fact, the Audit Committee Report dated November 20, 2000, presented to the

Audit Committee by the Audit Committee Advisors, would itself raise significant questions

about these 30 start-ups, concluding:

> [T]he Company and the LDCs realized, as early as December
> 1998, that completion of the work by the LDCs was not practicable
> and the Company began to provide some level of services, if not
> development work.  As a result, the accounting should have been
> changed from up-front revenue recognition of the full license fee to
> deferral of the revenue and recognition of the revenue as the
> services or development was completed.

58.    The Audit Committee Report ultimately concluded that virtually none of the

revenue from the start-ups should have been booked.  If this revenue had been reported as

related-party funding of research and development, the revenue could not be recorded and

approximately $79 million in revenue was improperly recorded as a result of these "strategic

partner" transactions.  As the Audit Committee Report made clear, if the LDCs or CLDCs were

related parties, no revenue should have been booked:

> If the investors are not related parties, accounting for such
> transactions would require deferral of all the revenues and
> recognition over the development period .  .  .  If the investors are
> related parties, the relevant accounting literature presumes that the
> related party investors will be repaid and the funded amount are
> recognized as a liability.

59.    Either way, LHSP fraudulently booked the revenue from those transactions.  If the

LDCs and CLDCs were related parties, LHSP should have recorded the payments from these

entities not as revenue but as loans which LHSP was obligated to repay.  In other words, rather

than revenue, these were liabilities of LHSP.  Even if the LDCs and CLDCs were not related

parties, the revenue could not have be booked up-front, as LHSP did, but had to be spread over a

period of years, representing the time it would take LHSP to perform the required development work.

60.    LHSP could not have accomplished this fraud without the direct participation of the Related-Party Defendants and KPMG. LHSP affirmatively and falsely represented that these "licensees" were "unaffiliated customers" and that 1998 revenues from companies funded by FLV Fund, Mercator and/or LHIC were minor. KPMG knew that the statements were false, that the licensees were actually related to LHSP, and that LHSP was improperly recording revenue from the transactions. In fact, KPMG Belgium was the auditor for FLV Fund, and thus knew about every related-party transaction involving LHSP and FLV Fund from both sides.

<u>Fictitious Revenue from Asia</u>

61.    ⌐ In 1999, LHSP made several public statements regarding its supposed early and successful penetration of a fast-growing Asian market, particularly Korea.

62.    In a June 25, 1999 press release, LHSP announced that "it [wa]s the sole provider of speech recognition technology for the ASR Stock Quote Server, Korea's largest telephone based automated stock quote and trading service" through an application "developed by LHSP business partner Bumil Information and Communications Co. Ltd." ("Bumil"). The press release stated that Bumil "is a leading systems integrator developing customized applications for the telecommunications industry. The company has been an LHSP licensee and joint development partner since March of 1997. Its customers include major Korean telecommunications providers, LG Securities and other major corporations in Korea."

63.    On August 31, 1999, LHSP announced "that its technology is being used to speech-enable the automated attendant system used by Hanvit Bank, Korea's largest commercial banking institution. Deployment of the system – Korea's first commercially available automated attendant program – represents L&H's growing presence in the Korean telecommunications

industry and enhances its leadership position in the market overall. The L&H based system is one of several telecommunications applications recently developed by L&H's business partner Bumil Information & Communications Co. Ltd. (BIC) and sold to leading Korean businesses."

64.    On September 13, 1999, LHSP announced that it had expanded its Pacific Rim presence by acquiring Bumil:

> Bumil has been an L&H business partner and licensee since 1997 and, during that time, has deployed L&H's speech technology in several highly visible, strategic telecommunications applications for leading Korean companies. Most recently, Bumil used L&H's speech recognition to speech-enable an automated attendant system it developed for Hanvit Bank, Korea's largest commercial banking institution. Bumil also recently used L&H's speech recognition and text to speech technology to develop the ASR Stock Quote Server, Korea's largest telephone based automated stock quote and trading service.
>
> The acquisition of Bumil builds on L&H's already significant presence and resources in the Asia [sic] and helps position it for the leadership position there. L&H's existing Asia Pacific customer base includes Samsung, LG Semicon, NEC, Hitachi, Sega, Inventec, Group Sense Limited, Pioneer, Alpine and Fuji-Xerox, among others. It has offices in Tokyo, Beijing, Hong Kong, Taipei and Singapore and Sydney Australia. L&H's speech offerings for the Asian Pacific market include the world's first PC-based Cantonese continuous speech recognition product as well as ASR, TTS and machine translation support for Korean, Mandarin and Japanese.
>
> "As we pursue our long-term objectives, we continue to receive validation that our growth strategy is sound – particularly for the worldwide telecommunications industry," said Jo Lernout, L&H co-founder and co-chairman. "Our recent successes with Bumil, as well as industry analysts' predictions regarding the rapidly increasing demand for speech enabled applications, underscores the outstanding growth opportunities that this acquisition helps bring to us."

65.    LHSP purchased Bumil for $25 million in cash. As additional consideration for the acquisition, Ju-Chul Seo, Bumil's president and sole shareholder, was entitled to receive a cash "earn-out" of $25 million, provided that L&H Korea (as Bumil was now called) met certain

revenue targets by December 31, 2000. Thus, the earliest this "earn-out" could become due was January 2001.

66.     At the time it acquired Bumil, LHSP was well aware that Bumil lacked the ability "to uphold internationally accepted financial practices." On September 9, 1999, Louis Woo, President and General Manager of L&H Asia Pacific, sent an e-mail to Dammekens and Bastiaens concerning the "financial accountability of L&H Korea." Specifically, Woo stated:

> Mr. Seo was, by all accounts, the sole owner of Bumil and he had not needed to answer to anyone but himself. In Asia, not only in S. Korea, owners of family business tend to mix the company finances with personal finances. We must have a clear financial process and procedure for them to adhere to so that no possible abuses can be made and tolerated…. It is next to impossible to expect [that] the current financial controller and accounting manager will behave any differently from that of the Bumil days. It will be impossible for them to uphold the internationally accepted financial practices if they happen to be different from the current practices and it is equally impossible to expect them to over-rule Mr. Seo if his practice deviates from ours.
>
> It is extremely important to hire a strong controller from S. Korea to head up our financial department in L&H Korea. If we can lay this condition down as part of the acquisition and integration process NOW, there will be no hard feelings. If we delay making that condition clearly NOW, it will be perceived as embarrassing Mr. Seo. Especially if the condition is spelled out only after we have reviewed his financial practice.

67.     LHSP immediately capitalized on its acquisition of Bumil by purportedly entering into a number of large contracts with a variety of Korean customers. During the fourth quarter of 1999 alone, LHSP booked $46.3 million in revenue in Korea – 42% of the Company's total reported fourth quarter revenue, and a significant portion of the Company's total annual revenue for 1999. More than 75% of this revenue was recorded between December 24 and December 31, 1999, and of the ten contracts LSP entered into in Korea during the fourth quarter, nine were

signed between December 15 and December 31. All of these contracts were subsequently
cancelled, and every penny of the revenue LHSP recorded from these "sales" was reversed.

    68.   In a December 28, 1999 press release, LHSP "announced several deals with
customers in the telecommunications, enterprise solutions and embedded technologies markets....
The agreements, signed with industry-leading companies in Asia and several companies in
Europe, follow recently announced deals in the US." In the press release, LHSP cited:

> strong demand for its speech and language technologies and
> solutions in the Asia Pacific region, especially South Korea.
> Among the solutions provided are dialogue systems that provide
> customers with a fast, simple and convenient way to access
> information, as well as embedded speech engines and language
> technologies. The signed contracts include:

> - Hyundai Securities, Samsung Securities, LG Securities,
>   Daishin Securities and Daewoo Securities, along with more
>   than 10 other securities companies, have selected L&H to
>   develop client server solutions for online trading and
>   automated dialogue systems that allow securities customers
>   to receive stock quotes and trade.

>                   * * *

> - LG Electronics has agreed to use L&H's TTS technologies.

> - Intelligent Communications has agreed to use L&H's TTS
>   technologies for use in e-mail reading and unified
>   messaging applications

> - SofTech Advantage expanded their agreement with L&H to
>   utilize L&H RealSpeak for their unified messaging
>   platform for the Philippines.

    69.   A January 10, 2000 press release repeated that "the company also recently
announced more than a dozen new contracts with telecommunications developers in Korea and
elsewhere in the Pacific Rim and Europe, further readying L&H's Enterprise and Telephony
Solutions business group for separate legal entity status. Contracts were signed ... with Hyundai

Securities, Samsung Securities, LG Securities, Daishin Securities, Daewoo Securities. Delfi

GenSoft, EPC Asia and NeoTelecom, among others."

70.    In a January 31, 2000 press release, LHSP announced that "Hung Chang Co., Ltd.

has signed a multi-year agreement under which it will license L&H's speech technologies in

multiple languages to develop speaker verification and reservation applications. The agreement

with Hung Chang, a Seoul-based telecommunications technology leader, adds to a long list of

worldwide telecommunications industry contracts recently signed by L&H and furthers the

company's strategy to create a separate entity for Enterprise and Telephony Solutions." In the

press release, defendant Bastiaens was quoted as stating that "[o]ur ever-increasing successes in

the Korean market, particularly within the telecommunications sector, are the result of a very

well developed and implemented strategy to build a worldwide enterprise and telephony

solutions market presence."

71.    LHSP highlighted the purported positive effect of its Korean deals in its February

9, 2000 press release announcing the Company's 1999 financial results:

> The demand for speech-enabled applications continued to grow in
> the Pacific Rim and L&H technologies were increasingly popular
> in the region. South Korea and other Pac Rim-based developers
> who plan to build applications employing L&H's realSpeak,
> ASRT, ITS and dialogue systems solutions include: Hyundai
> Securities, Samsung Securities, LG Securities, Daishin Securities
> and Daewoo Securities, EPC Asia, IBCC (International Business
> Computer Co., Ltd.) NeoTeledom, LG Electronic, Intelligent
> Communications, Softech Advantage, and SofTel
> Telecommunication Pte. Limited.... L&H enhanced its ability to
> develop telephony solutions, increased its presence in Korea and
> continued to expand its telecommunications leadership, by
> acquiring resources that included Bumil ... and others.

72.    The purported revenue generated by LHSP's so-called customers from Korea and

the Far East in 1999 was astounding. Of the $344 million in revenue that LHSP recorded in

1999, approximately $63 million, or 18%, was attributed to sales in Korea. Sales in Singapore

accounted for another $80 million.  In total, sales from Korea and Singapore accounted for 44%

of the Company's 1999 revenues.

73.    In fact, the Korean revenues were entirely fictitious.  LHSP had few real

customers in Korea.  The majority of sales were from sham transactions, and the cash which

LHSP claimed to have on its Korean books as a result of these sales was nonexistent.

74.    Because the Korean contracts were shams, the heart of the Korean fraud involved

the systematic factoring of receivables "with recourse" by LHSP in order to obtain cash upfront,

which it could then claim it had collected from its "customers."  Factoring with recourse meant

that LHSP could not record the revenue from these "sales" and should have recorded it instead as

a "secured borrowing," i.e., a loan which LHSP was obligated to repay.  The scheme was carried

out with the full knowledge and cooperation of Hanvit Bank, Shinan Bank and Chohung Bank

(collectively, "Korean Banks").

75.    The fraud followed the same basic pattern.  Beginning on September 30, 1999,

L&H Korea entered into a series of "factoring arrangements" by which LHSP sold the accounts

receivable from licensing agreements to the three Korean Banks.  LHSP would generate an

invoice relating to one of its fictitious contracts and deliver it to one of the Korean Banks in

exchange for cash — allowing LHSP to inflate its reported income, pay bonuses and drive up its

stock price.  LHSP, however, would enter into side agreements with the banks that turned the

sales contracts into de facto loans.

76.    Under the scheme, the banks would "purchase" LHSP's accounts receivable and

place the funds in a "restricted time deposit" account.  LHSP agreed not to withdraw these funds.

Even though LHSP had no right to withdraw the funds, it recorded the time deposit on its books

as cash and eliminated the accounts receivable. Therefore, through this arrangement, LHSP's financial statements reflected an increase in sales, cash collections and a large amount of cash.

77.     A typical factoring agreement entered into between LHSP and the Korean Banks read:

> I (we) [LHSP] promise to adhere to the following clauses in factoring note receivable without recourse pursuant to factoring agreement dated December 31, 1999 with the Bank, and submit this confirmation letter.
>
> 1.     Although the signed factoring agreements have been without recourse, I (we) promise to take recourse responsibility under this confirmation in the event that the transferred note receivable is defaulted.
>
> 2.     Upon proceeds from factored note receivable is received, I (we) shall deposit the amount as agreed by the Bank and us, sign a separate pledge agreement and adhere to that agreement.
>
> 3.     Pursuant to the above clause, I (we) will not raise any objection when the deposit is used to offset against factored note receivable, when this notes receivable is defaulted.

78.     In reality, because there was little or no payment by the sham customers, all of the cash was held by the banks in these restricted time deposit accounts. Thus, after some amount of time passed and the customers had not paid the receivables, the banks merely foreclosed on the time deposits, leaving LHSP with nothing. As a result, over $100 million of LHSP's so-called Korean "revenue" and "cash" disappeared from the Company's records overnight.

79.     L&H Korea's practice of factoring receivables with recourse was widespread and well-known by LHSP management and KPMG. As set forth below at ¶¶ 146-147, KPMG had actual knowledge in October 1999 that LHSP was factoring receivables in Korea with recourse.

<u>The Underlying Contracts Were Shams</u>

80.     As detailed below, the Korean "customers" were typically start-ups with no ability to pay the huge license fees supposedly called for by the sham contracts. This fact is

confirmed by a report from the accounting firm of PriceWaterhouseCoopers ("PWC"), which

was engaged by the LHSP Audit Committee in late 2000 to uncover details of the Korean fraud.

PWC prepared a report in connection with its investigation of the Korean fraud, entitled "L&H

Korea Report." According to that report, PWC performed background checks on ten of LHSP's

alleged Korean customers in order to determine what types of companies they were. PWC was

unable to locate one of these purported customers, and two of the companies sampled by PWC

were still in the process of incorporating as of the date of the report in 2001. Only two of the ten

had even been incorporated prior to 1998. Moreover, seven of the nine customers that PWC was

able to locate had fewer than 30 employees. As PWC reported, it was inconceivable that these

"customers" could have paid the huge, multi-million dollar licensing fees that LHSP was

booking as revenue: "[f]or these licensing agreements, there was little, if any, expectation that

royalties would be collected within 90 days of the effective date of the agreement as required by

the standard license agreement."

81.    LHSP's licensing agreements in Korea contained purported fees of as much as

$19 million. The self-evident fact that start-up companies of this type would be unlikely to have

the wherewithal to pay the multi-million dollar licensing fees called for by the sham contracts is

even clearer in light of PWC's finding that licensing fees in the speech technology industry in

Korea during 2000 were in the range of $100,000 to $300,000, and, as PWC reported, "licensing

fees in the millions of dollars were unheard of in Korea." KPMG knew or should have known

this, and it certainly knew that the "customers" were underfinanced startups and did not have

economic substance apart from LHSP, as demonstrated below at ¶ 135 and ¶ 147.

82.    Why did the Korean Banks participate in the scheme to factor receivables with

recourse? The answer is closely tied to the "earn-out" provision in the Stock Purchase

Agreement signed at the time of the Bumil acquisition, pursuant to which Seo (the president of L&H Korea) was entitled to a cash "earn-out" of $25 million only if L&H Korea met certain revenue targets between September 30, 1999 and December 31, 2000. Even though no payment was scheduled to be made until 2001, Bastiaens persuaded LHSP's Board of Directors to accelerate the full $25 million earn-out and pay it a year early, on January 28, 2000, as a so-called "reward" for L&H Korea's outstanding results in the fourth quarter of 1999.

83.    In fact, the earn-out was not a reward for Korea's supposed success at all, but rather a bribe for Seo to make to the Korean Banks to get them to "fund" L&H Korea's receivables. A February 3, 2000 e-mail from Seo to Lernout, Hauspie and Willaert, shortly after receiving the $25 million earn-out, confirms the basis for the accelerated payment:

> Thanks for your great assistance extended to me. I well received the remitted amount of 25 million USD. With your prompt action, I could keep my promise to Korean banks and those banks will rely on L&H Korea and will help us much better than before. Thanks again for your help.
>
> I assure that I will do all my best for L&H Group and for continuous business success of L&H.
>
> Sincerely yours,
>
> Ju-Chul Seo

### KPMG's Unqualified Audit Reports

84.    In each of its Annual Reports for 1997, 1998 and 1999, filed with the SEC, LHSP stated that its financial statements were prepared in accordance with U.S. GAAP. KPMG and Behets bolstered the credibility of LHSP's disclosures by issuing unqualified reports on their audits of LHSP's 1997, 1998 and 1999 financial statements and consenting to the inclusion of those reports in LHSP's SEC filings.

85.    An auditor is supposed to give an "unqualified opinion" or "clean opinion" only when no significant limitations affect the performance of the auditor and when the evidence obtained in the audit discloses no material deficiencies in the financial statement and/or unusual circumstances that affect the auditor's report.  American Institute of Certified Public Accountants (AICPA), "Understanding Audits and the Auditor's Report — A Guide for Financial Statement Users," 2nd ed., 1996, at 15.

86.    On April 17, 1998, KPMG Belgium reported on LHSP's 1997 financial statements, and on April 9, 1999, KPMG Belgium reported on LHSP's 1998 financial statements, each time stating:

> We have conducted our audits in accordance with generally accepted auditing standards in the United States.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries as of [the relevant time period], and the results of their operations and their cash flows for each of the years in the three-year period ended [on December 31 of the fiscal year], in conformity with generally accepted accounting principles in the United States.

87.    Prior to issuing an unqualified report for one or all of the above years, KPMG LLP, KPMG UK and KPMG Belgium participated in the audit and viewed the audit reports and related materials allegedly to, among other things, ensure their compliance with U.S. GAAP. Both KPMG LLP and KPMG UK worked with KPMG Belgium and Behets in one or more of

the above audits, in connection with certain SEC filings made by LHSP, and/or in connection with the due diligence relating to the Dragon merger.

88.    Further, KPMG consented to the inclusion of its 1997 Audit Report in LHSP's Annual Report on Form 20-F filed with the SEC on July 2, 1998 and to the inclusion of its 1998 Audit Report in LHSP's Annual Report on Form 20-F filed with the SEC on June 30, 1999. On January 6, 2000, KPMG also consented to the incorporation by reference of its 1998 Audit Report in Registration Statements filed by LHSP with the SEC on Form F-3 on January 7, 2000. That Registration Statement was provided to the Dragon principal stockholders, including the plaintiffs, as LHSP's "latest public filing" in the course of their due diligence in connection with the Dragon transactions. KPMG also made false oral representations directly to the Dragon principal stockholders and furnished a pivotal, unqualified report on LHSP's 1999 financial statements, as discussed below.

89.    The 1998 Form 20-F also included KPMG's unqualified audit opinion on LHSP's financial statements for 1998:

> LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. AND SUBSIDIARIES
> INDEPENDENT AUDITORS' REPORT
>
> The Board of Directors and Shareholders
> Lernout & Hauspie Speech Products N.V.:
>
> We have audited the accompanying consolidated balance sheets of Lernout & Hauspie Speech Products N.V. and subsidiaries (the Company) as of December 31, 1997 and December 31, 1998, and the related consolidated statements of operations, shareholders' equity, cash flows and comprehensive income for each of the years in the three-year period ended December 31, 1998. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.
>
> *We conducted our audits in accordance with generally accepted auditing standards in the United States. Those standards require*

*that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries as of December 31, 1997 and December 31, 1998, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1998, in conformity with generally accepted accounting principles in the United States.

Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren
Brussels, Belgium
April 9, 1999

[Emphasis added.]

90.    KPMG's unqualified audit report was materially false and misleading.

Specifically, contrary to what KPMG represented in its audit report, as set forth in ¶¶ 274-323

below, KPMG did not conduct its audit in accordance with generally accepted auditing standards

in the United States, and LHSP's 1998 financial statements did not present fairly, in all material

respects, the financial position of LHSP as of December 31, 1998, and the results of its

operations for the year then ended, in conformity with generally accepted accounting principles

in the United States.

91.    On April 27, 2000, KPMG issued its unqualified audit opinion on LHSP's

financial statements for 1999. The 1999 audit opinion stated that LHSP's 1999 financials were

prepared in accordance with U.S. GAAP, that KPMG's audit was conducted in accordance with

GAAS, and that there were no material changes to LHSP's 1999 financial results announced on

February 9, 2000.

LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. AND SUBSIDIARIES
INDEPENDENT AUDITORS' REPORT

The Board of Directors and Shareholders
Lernout & Hauspie Speech Products N.V.:

We have audited the accompanying consolidated balance sheets of Lernout & Hauspie Speech Products N.V. and subsidiaries (the Company) as of December 31, 1998 and December 31, 1999, and the related consolidated statements of operations, shareholders' equity, cash flows and comprehensive income (loss) for each of the years in the three-year period ended December 31, 1999. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

*We conducted our audits in accordance with generally accepted auditing standards in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries as of December 31, 1998 and December 31, 1999, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1999, in conformity with generally accepted accounting principles in the United States.

Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren
Brussels, Belgium
April 27, 2000

[Emphasis added.]

92.     KPMG's unqualified audit report was materially false and misleading.

Specifically, contrary to what KPMG represented in its audit report, as set forth in ¶¶ 274-323

below, KPMG did not conduct its audit in accordance with generally accepted auditing standards in the United States, and LHSP's 1999 financial statements did not present fairly, in all material respects, the financial position of LHSP as of December 31, 1999, and the results of its operations for the year then ended, in conformity with generally accepted accounting principles in the United States.

93.    According to specific representations made by defendant Lernout to Janet Baker, one of the Dragon principal stockholders, during a meeting on October 13, 2000, KPMG was aware of and supportive of the structure of LHSP's related party transactions and had "approved" of those transactions. Lernout later repeated these statements in a meeting on October 17, 2000 with the management group at Dragon. Specifically in that October 17, 2000 meeting, Lernout stated that KPMG was aware of the third-party transaction structure of LHSP and had audited that structure specifically to verify the recognizability of revenue. Despite KPMG's knowledge of this convoluted structure, KPMG issued unqualified audit reports for LHSP's financial statements for the years 1997, 1998 and 1999.

Cowen's Involvement In Affiliated Transactions And In Promotion of LHSP Stock

94.    Cowen served as LHSP's investment banker and financial advisors since 1995. Cowen also provided research coverage of LHSP that promoted the stock, rating it as a "Strong Buy," thus, artificially inflating the market value of LHSP's securities, Indeed, defendant Lernout is quoted in Cowen's 1999 Annual Review speaking about LHSP as follows:

> Our relationship with SG Cowen dated back to its 1995 Global Technology Conference in Europe. Since then, they have been an invaluable partner to us through every phase of our growth, helping us to acquire several companies and raise more than $390 million.

95.    As described by Cowen in its 1999 Annual Review:

For more than five years, SG Cowen has helped L&H become one of Europe's fastest growing companies through a number of financing solutions, including managing its successful $40 million initial public offering in 1995. After a follow-on offering in May of 1996, SG Cowen supported L&H's expansion into new markets by helping the company research, evaluate and negotiate the acquisition of two language translation companies. The following year, we initiated three more capital-raising deals, including taking the lead position in a $108 million follow-on offering. Most recently as L&H's exclusive financial advisor in the translation market, we represented the company in two acquisitions in 2000 – the $1 billion acquisition of Dictaphone Corporation, a privately held leader in dictation and call-center recording solutions, and the $600 million pending acquisition of Dragon Systems, Inc., a privately held leader in speech and language technology.

96.     Cowen's activities as investment banker for LHSP gave it access to information regarding the structure and accounting practices of LHSP. For example, as LHSP's investment banker, Cowen investigated proposed transactions and drafted fairness opinions for the acquisition of Bumil and other entities, giving Cowen access to material information regarding the value of the Bumil and other entities before they were acquired by LHSP. This transactional work constituted a major source of revenue for Cowen, permitting it to bill over $800,000 in transaction fees in 1998 alone. In fact, defendant Lernout told Janet Baker on October 13, 2000, that Cowen was not only aware of and supportive of, but suggested they had a direct rote in devising, LHSP's use of third-party companies to improperly shift research and developments expenses to these affiliated companies. Indeed, Lernout quoted Cowen's Robert Stone as specifically approving of this structure. Despite this knowledge, Cowen never disclosed prior to the LHSP/Dragon transaction in communications with the Dragon principal stockholders (which are discussed below) that these transactions were designed specifically to create the illusion of revenue growth for LHSP. Further, as discussed below, Cowen actively disseminated false information in promoting LHSP securities.

97.    As noted above, in addition to serving as LHSP's investment bankers since 1995, Cowen also issued analyst reports recommending LHSP as a sound investment which served to artificially inflate the value of LHSP's stock.  In its role as research analyst, Cowen issued recommendations stating that LHSP's stock was undervalued and had growing revenues despite Cowen's knowledge of LHSP's use of affiliated companies to fund research and development activities and LHSP's booking those costs, not as liabilities, but as revenues.

98.    On September 15, 1998, Cowen issued an analyst report recommending LHSP securities as a "Strong Buy," citing "an increasing number of new licenses each quarter since its late 1995 IPO, for a total of 349 at the end of Q2."  Cowen also promoted LHSP securities, specifically citing its "strong internal growth."  Although Cowen knew these facts were not true, it disseminated this report in the market, thus artificially inflating the value of LHSP's securities.

99.    On January 5, 2000 Cowen issued another analyst report again recommending LHSP as a "Strong Buy" and raising its price target for the stock.  In that report Cowen stated:

> **After Endless Short Yammering In 1999, Shares Testing New Highs On Strong 2000 Prospects** - In late 1998 and early 1999 a policy change at the SEC prompted LHSP to restate results related to write-downs of acquired R&D in process.  The SEC apparently raised no other issues with LHSP's accounting practices, and many other companies that had made acquisitions and followed then-common accounting treatment were in the same situation.  However, some short sellers took advantage of the resulting period of uncertainty, and the shares were mostly range-bound throughout 1999 (although those with the conviction to buy on dips did quite well).  Against the tide of a very weak market yesterday, LHSP reached a new 52 week high.  We believe that sufficient time has passed for investors to begin regaining confidence and recognizing that the stock is significantly undervalued compared to its leadership position and huge market potential.
>
> **More Disclosure Should Boost Confidence In Estimates; Higher R&D May Trim EPS 10-12 Cents** – LHSP is a complex company, with many products, business units and end markets, and it has augmented its growth and consolidated its market position via numerous acquisitions.  The results have been impressive, with

44