revenues growing by five fold, from about $100MM in 1997 to our
2000 estimate of slightly over $550MM. However, it has not been
easy for investors to understand all the moving parts.

100.    Cowen's report also noted that LHSP's balance sheets were "strong in cash," citing $91 million in cash as of the third quarter of 1999. Cowen omitted the fact that LHSP had previously committed to spend $40 million of the $91 million to acquire three companies. Moreover, despite its knowledge that revenues were falsely inflated by LHSP's improper accounting practices — indeed as discussed elsewhere herein, senior auditors were brought to the attention of Cowen around the time of its February 2000 report regarding, among other things, LHSP's revenue recognition and strategic partners – Cowen made no mention of the accounting mechanisms that artificially inflated LHSP's revenues. The false statements in the report served to keep LHSP's stock price high.

101.    Cowen released another analyst report on February 10, 2000 again recommending LHSP stock as a "Strong Buy," citing an increase of 444% in revenues for 1999 as compared to 1998 and stating that LHSP's results in Asia were "especially strong." Again, Cowen made no public disclosure of facts it knew or was reckless in not knowing – that LHSP's convoluted corporate and related-party structure artificially inflated LHSP's revenues by improperly booking liabilities as revenue and that LHSP was involved in many related-party transactions which at a minimum were not properly disclosed.

102.    Cowen maintained and reiterated "Strong Buy" recommendations through the-fall of 2000, despite the related party transactions and accounting manipulations of LHSP. Cowen's public recommendations continued to artificially inflate the value of LHSP securities.

### The Plaintiffs and Dragon Perform Due Diligence on LHSP

103.    In October 1999, the plaintiffs and other Dragon principal stockholders began negotiations in earnest about a potential business combination between Dragon and LHSP.

These discussions resumed again in February 2000. After several weeks of negotiations, the parties entered into the Merger Agreement discussed below and the all stock-for-stock merger transaction closed on June 7, 2000.

104.    Prior to entering the Merger Agreement, the Dragon principal stockholders conducted their due diligence of the transaction, by and through the Dragon Board of Directors including Janet Baker. During the due diligence process, Janet Baker was acting, with the knowledge of the defendants, on behalf of and as an agent for all of the Dragon principal stockholders in requesting and/or receiving information from the defendants concerning LHSP, its business and its operations.

105.    Among the factors the plaintiffs considered in selling their Dragon stock to LHSP in exchange for LHSP stock and in setting the price for their Dragon stock, which LHSP paid for in LHSP stock, was the market price of LHSP stock.

106.    At all relevant times, the market for LHSP stock was efficient because LHSP common stock met the requirements for listing, and was listed and actively traded on the NASDAQ and the EASDAQ, which were automated and highly efficient markets.

107.    As a regulated issuer, LHSP filed periodic public reports with the SEC. LHSP also regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

108.    The market for LHSP stock promptly digested current information regarding LHSP from the publicly-available sources described above and reflected such information in the price of LHSP stock.

109.    Consequently, at all relevant times – including the time the plaintiffs were negotiating the price they would accept in LHSP stock, the time the plaintiffs executed the Merger Agreement, and the time the Merger was consummated – the price of LHSP stock was fraudulently inflated by defendants' misrepresentations and non-disclosures.

### False and Misleading Representations to the Dragon Principal Stockholders During the Merger Negotiations

110.    As discussed above, LHSP, and defendants Lernout, Hauspie, Willaert, Pieper, Dammekens and Bastiaens (the "LHSP Defendants"), KPMG, Behets and Cowen all disseminated false and materially misleading information to the market that artificially inflated the value of LHSP's stock.  As set forth above, in October 1999, LHSP sought, with the assistance of KPMG and Cowen, to acquire Dragon from its principal stockholders in exchange for the artificially inflated LHSP stock.  During these negotiations, the LHSP Defendants, KPMG and Cowen made numerous false and materially misleading representations to the plaintiffs, the other principal stockholders of Dragon, and their representatives.

111.    In addition to the defendants' representations in press releases and public filings, the plaintiffs relied upon specific representations by the LHSP Defendants, KPMG and Cowen regarding the value of LHSP and its securities and confirming the accuracy of LHSP's public disclosures.

112.    On several occasions during negotiation of LHSP's purchase of Dragon, through the purchase of the plaintiffs' stock and the stock of other Dragon stockholders, Bastiaens told Ellen Chamberlain, interim Chief Financial Officer of Dragon, that LHSP's projections were on target for the first and second quarters of 2000.  LHSP made those statements at meetings at the Boston, Massachusetts, offices  Cowen, LHSP's investment bankers in connection with the Merger, in February and March, 2000.  Bastiaens made these statements with knowledge that the

Dragon principal stockholders who were parties to the Merger Agreement, including the plaintiffs, would rely upon them. Ms. Chamberlain repeated the substance of these statements to the plaintiffs, who relied upon them in connection with the merger transaction.

113.    The Dragon principal stockholders and/or representatives of Dragon met with Pieper and other LHSP representatives repeatedly regarding the potential merger. Pieper, along with Ben Howe of Cowen, played significant roles on the Dragon/LHSP deal team. Indeed, Pieper traveled to the United States on numerous occasions in the fall of 1999 and winter of 1999/2000 to discuss the potential merger with Dragon stockholders. In these negotiations and meetings, Pieper repeatedly emphasized LHSP's strong financial results and growing revenues.

114.    In November 1999, the plaintiffs and other Dragon principal stockholders, as well as other members of the Dragon executive staff, met with Pieper, at that time Chairman of the Board of LHSP, as representative of the Board of Directors of LHSP.

115.    From December 13 to 15, 1999, Dragon's interim CFO met with defendants Lernout and Hauspie, where she expressed concern that FLV Fund was funding the start-up companies that were providing substantial percentages of LHSP's software licensing revenues. Both Lernout and Hauspie assured her that: (a) they had no financial interest in any of the startup companies; (b) any licensing of LHSP software by those start-up entities was the result of arms-length negotiation; and (c) even though they were both on the board of the FLV Fund, they were not active in its decision-making.

116.    In October 1999, Pieper met with Dragon shareholders and stated he had personally "checked things out" regarding the financial soundness of LHSP. On March 8, 2000, Pieper also met with certain Dragon principal stockholders and certain representatives of

Dragon. In that meeting, the parties tentatively agreed to the merger of Dragon, subject to due diligence, among other things.

117.    On or about March 22, 2000, approximately one week before the Merger Agreement was executed, defendant Dammekens participated in a conference call during which Dragon's interim CFO, in the course of conducting due diligence for the Dragon principal stockholders and Dragon, questioned him about the basis for his comfort with LHSP's revenue recognition. Dammekens stated that he was comfortable with LHSP's disclosures of revenue because he and his team reviewed all LHSP contracts before financial results were released, including the fiscal year 1999 results that had been released in January 2000. Dragon's CFO, Ellen Chamberlain, repeated the substance of the representations to the Dragon principal stockholders.

118.    During the course of due diligence prefatory to the merger, Dragon and its shareholders had repeatedly asked to speak with KPMG, but that request was rejected allegedly because their audit of LHSP's 1999 financial statements had not been completed.

119.    A representative of the Dragon principal stockholders was finally able to question representatives of KPMG Belgium during the March 22, 2000 conference call, in which a more senior audit partner from KPMG LLP and one or more auditors from KPMG Belgium, and possibly persons from other KPMG offices, participated. The senior KPMG auditor on the call stated that he was a "KPMG partner," that he was standing in for the KPMG partner with responsibility for the LHSP audit, who was on vacation, and that he was familiar with the audit. A KPMG Belgium manager who had participated in the audit was also on the call. The KPMG personnel who participated in the call knew that the purpose of the call was to provide information to the Dragon principal stockholders, as an important part of their due diligence with

respect to the Dragon Merger. Specifically, during the March 22, 2000 conference call, the above-referenced KPMG LLP partner stated:

(a) KPMG Belgium expected to sign off on its audit of LHSP's 1999 financial statements in two to three weeks.

(b) The only open audit issues were:

(i) "a couple of revenue issues" in Korea regarding one or two customers, but nothing that would cause an adjustment;

(ii) a "couple" of contract confirmations had not yet been received; and

(iii) KPMG Belgium had yet to complete minor tests of LHSP's capitalization of its R&D expense, such as checking timesheets of engineers who had billed time to certain projects.

(c) In the course of the 1999 audit, no adjustments had been booked by the auditors.

(d) KPMG would not describe "passed" adjustments – those adjustments are matters of judgment, which, if they do not add up to a material amount, will be "passed" by the auditors.

(e) KPMG did not at that time anticipate any material adjustment of LHSP's 1999 financial statement.

(f) KPMG was "comfortable" with LHSP's revenue recognition.

(g) LHSP did not record revenue from software sales until after that software left the distributor.

120. The Dragon principal stockholders were aware that, in 1999, LHSP had been previously investigated by the SEC in connection with an aggressive means of accounting for acquisitions. LHSP had used a "purchase" method of accounting for goodwill, taking it as a one-time charge against earnings for "in-process research and development." LHSP's methods, audited and approved by KPMG, impermissibly allowed LHSP to avoid the long-term depression of earnings caused by amortization of goodwill. The SEC required LHSP to restate its financial results for 1997 and the first six months of 1998. The plaintiffs were in no way

aware of the subsequent SEC investigation that had commenced as early as January 2000, or earlier, and believed that all SEC inquiries had been resolved at the time of the merger.

121.   When this issue was raised during the March 22, 2000 conference call, KPMG stated that all issues from SEC inquiries into LHSP accounting practices had been resolved.  That was untrue.  KPMG Belgium knew this was untrue and the other KPMG defendants either knew this or were reckless in not knowing this.  This misinformation was presented with the knowledge and understanding that it would be presented to the plaintiffs, as principal stockholders of Dragon, as indeed it was.

122.   During the due diligence, the LHSP Defendants and KPMG represented that the SEC review had been fully resolved.  However, the LHSP Defendants and KPMG deliberately concealed from the Dragon principal stockholders, including the plaintiffs, the fact that the SEC had commenced a *new* investigation of LHSP's accounting practices in or before January 2000, which focused on LHSP's revenue recognition practices and, in particular, on the Company's contracts and relationships with its so-called "strategic partners."

123.   Indeed, internal LHSP documents show that, not only did KPMG have knowledge of this investigation contemporaneously with the representations it made to the plaintiffs during due diligence, but that KPMG took the lead in responding to the SEC's investigation on behalf of itself and LHSP.  These same documents show that LHSP was not permitted to publicly announce its 1999 results until KPMG gave its express "consent" to the February 9, 2000 press release and, further, that KPMG considered the SEC investigation to be material and a significant concern.

124.   On January 31, 2000, KPMG Belgium audit partner William Van Aerde ("Van Aerde") sent an email to defendants Dammekens and Bastiaens and to Robert McLamb

("McLamb") of KPMG, in which he set forth "a list of urgent items to be followed up by the company in order for us to be able to give our consent for the [February] press release." Van Aerde noted that the list was "long," but explained that "*in view of the nasty SEC letter, you as CFO and CEO and we as auditors cannot afford to leave open items.*" [Emphasis added.]

125.    That same day, Van Aerde sent another e-mail to defendant Willaert, requesting information concerning LHSP's "strategic partners" and their relationship with LHSP: "As you know, we are not the only ones who are interested in the related parties (cf. the SEC letter of last week)." The next day, on February 1, 2000, Van Aerde sent an e-mail to McLamb and Dammekens, as well as to defendants Willaert, Hauspie, and Bastiaens, which stated that "KPMG has asked Carl Dammekens to collect information onto the related parties transactions between LHSP, FLV (and FLV Management) and LHIC.... This information has also been requested by the SEC, as you know."

126.    In another e-mail dated February 3, 2000, Dammekens asked McLamb and Philip Flink, a partner at LHSP's outside counsel, Brown, Rudnick, Freed & Gesmer, for their comments on a suggested approach for LHSP's "initial production" to the SEC. Flink expressed the view that LHSP should be "more expansive" in its production to the SEC. McLamb, however, expressed a contrary view, cautioning that the Company "should talk to Fran Dissaro at KPMG ... before calling or sending in documents."

127.    Further, in April of 2000, prior to the closing date of the Dragon Merger, the SEC sent a follow-up letter directly to KPMG Belgium requesting additional information about LHSP's accounting practices and possible related-party transactions involving LHSP's "strategic partners." Nevertheless, even though their own documents show that they considered the SEC

investigation to be a significant concern, LHSP and KPMG failed to disclose the existence of this SEC investigation to Dragon or the Dragon principal stockholders, including the plaintiffs.

128.    KPMG's failure to disclose the SEC investigation to Dragon and the Dragon principal stockholders, including the plaintiffs, is particularly damning because, as demonstrated below at ¶¶ 160-184, KPMG knew, contemporaneously with the due diligence, that there were serious questions as to whether the strategic partners were independent from LHSP and whether the revenues that LHSP had booked from its strategic partner transactions were legitimate.

129.    Notwithstanding the LHSP Defendants' and KPMG's actual knowledge of the pending SEC investigation into LHSP's revenue recognition practices and the effect that an adverse finding would have on LHSP's published financial results and, in turn, its stock price, LHSP and KPMG failed to disclose even the existence, much less the seriousness, of the SEC investigation, or to disclose their concerted efforts to withhold information in their representations to Dragon and the Dragon principal stockholders.

### Reliance on KPMG's Subsequent Unqualified Opinion for 1999

130.    On April 27, 2000, KPMG Belgium issued its unqualified report on LHSP's 1999 financial statements, confirming KPMG's oral representations on March 22, 2000 that its audit had uncovered no material errors or improprieties in the unaudited financial statements issued in January and making no mention of the SEC investigations:

> We have audited the accompanying consolidated balance sheets of Lernout & Hauspie Speech Products N.V. and subsidiaries (the Company) as of December 31, 1998 and December 31, 1999, and their related consolidated statements of operations, shareholders' equity, cash flows and comprehensive income (loss) for each of the years in the three-year period ended December 31, 1999....
>
> * * *
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position

of Lernout & Hauspie Speech Products N.V. and subsidiaries as of
December 31, 1998 and December 31, 1999 and the results of their
operations and their cash flows for each of the years in the three-
year period ended December 31, 1999, in conformity with
generally accepted accounting principles in the United States.

131.    The Dragon principal stockholders, including the plaintiffs, would have been

entitled to, and would have, terminated the Merger Agreement prior to closing if it became

apparent that LHSP's audited financial statements for 1999, released prior to execution of the

Merger Agreement, were materially misstated. The Merger Agreement provided in this regard

as follows:

    (a)    The Merger Agreement included LHSP's representations and warranties that: (a)
all of LHSP's filings with the SEC since January, 1998, did not contain any
untrue statement of material fact or any material omission; (b) that all financial
statements included in LHSP's SEC filings complied in all material respects with
SEC accounting requirements and published rules and regulations, and were
prepared in accordance with U.S. GAAP; and (c) that LHSP's unaudited
consolidated financial statements for the year ended December 31, 1999 were
prepared in accordance with U.S. GAAP and "fairly present in all material
respects the consolidated financial position of [LHSP] as of the date thereof."

    (b)    Section 9.1 of the Merger Agreement allowed Dragon to terminate the Agreement
at any time prior to closing "if there has been a breach of any representation [or]
warranty ... which causes the conditions set forth in section 7.3(a) ... to be
incapable of being satisfied."

    (c)    Section 7.3(a) of the Merger Agreement provided that "representations and
warranties of [LHSP] shall be true and correct in all material respects as of the
closing date."

132.    Had KPMG not given an unqualified opinion stating that LHSP's 1999 financial

statements were prepared in accordance with U.S. GAAP – or had it otherwise qualified its

report on LHSP's 1999 financial statements – this would have communicated to the plaintiffs

that LHSP's unaudited consolidated financial statements for the year ended December 31, 1999

were not prepared in accordance with U.S. GAAP, and the Dragon Merger would not have been

consummated. Indeed, even though the meetings that KPMG had with Dragon and the Dragon

principal stockholders were for the purpose of satisfying the Dragon principal stockholders' due diligence inquiries about LHSP, KPMG actively concealed material information from the Dragon principal stockholders, including the plaintiff, or turned a blind eye to whether accurate and complete information had been provided in reckless disregard of the truth. KPMG knew that it would jeopardize LHSP's acquisition of Dragon if KPMG disclosed any information which might cause the plaintiffs or other Dragon shareholders to have any material concerns about LHSP's financial statements or results. KPMG knew that its business relationship with LHSP and its numerous related entities, at least some of whom KPMG also audited and in whose companies KPMG had placed one or more former employees, would be jeopardized if KPMG endangered LHSP's acquisition of Dragon. KPMG also knew that it would jeopardize KPMG's lucrative consulting work with LHSP.

KPMG's Knowledge of Certain Korean Contracts
Where Revenue Was Not Collectible or Recognizable

a. HI Worldwide

133.    KPMG's unqualified audit opinion stating that LHSP's financial statements were prepared in accordance with U.S. GAAP included the recognition of revenue for contracts where no revenue was recognizable and the accounts receivable were not collectible. One such contract was with HI Worldwide, one of LHSP's Korean customers. The HI Worldwide contract was the largest license agreement in LHSP's history, and the $11 million of revenue booked represented 10% of LHSP's total reported revenues for the fourth quarter of 1999. In fact, KPMG knew during Dragons' due diligence and prior to the date the Merger Agreement closed that revenue should not have been recognized on this contract.

134.    On March 1, 200    KPMG's Korean audit partner, Oh Bum Kwon ("Kwon"), sent an e-mail to Stephan Huysman ("Huysman") of KPMG Belgium regarding a number of issues

55

with respect to the HI Worldwide contract that precluded revenue from being recognized. In that e-mail, Kwon told Huysman that collectibility of the substantial amounts due under this contract was far from likely because, among other things, the chairman of HI Worldwide, Mr. Lee, was a "non-businessman" with "no prior experience in the industry" who had started his company based upon a "lucrative future blue print" following a meeting with the president of L&H Korea. In that e-mail, Kwon specifically noted that it was "not certain that [Mr. Lee] has enough wealth" to pay the extraordinary amounts due to LHSP. HI Worldwide had only just been established during the fourth quarter of 1999, approximately one month before it entered into the purported $11 million contract with LHSP.

135.     Moreover, the products covered by the contract had not been delivered to HI Worldwide at the time revenue was recognized. This fact alone meant that revenue could not have been recognized on this contract under U.S. GAAP. In the same March 1, 2000 email, Kwon reported to KPMG Belgium that Mr. Lee had "raised a question of the delivery of key product, a chip as [sic] what he said." On March 7, 2000, Huysman sent an e-mail to Dammekens and Van Aerde, among others, in which he wrote that "*it appears Lee did not receive key product.* Do you know anything about this or should I ask Gaston [Bastiaens] for an explanation (at least in case it is about contracts in the sales per December 31, 1999)?" Emphasis added.]

136.     That same day, Huysman sent a separate e-mail to Kwon, with a copy to McLamb, in which he specifically noted that the failure to deliver the product meant that revenue could not be booked: "Do you have further info on what product was missing? Does this knowledge jeopardize revenue recognition of LHSP at December 31 of one or other contract?" Kwon, who knew the product had not been delivered, avoided answering Huysman's question,

instead writing that "I believe he [Lee] had a meeting with Gaston when the chairman visited

Korea last week." After he received the e-mail, McLamb was sufficiently concerned about the

situation that he himself got involved.  On March 8, 2000, McLamb asked Kwon: "How does

this answer the question? *Was the product delivered prior to 12/31/99 or not.*" [Emphasis

added.]

      137.    The next day, Huysman forwarded Kwon's e-mail and McLamb's response to

Bastiaens, stating:

> I understand from the reading of the mail that there was a
> discussion on delivery of a key product (a chip apparently) for a
> contract.  Since this has been discussed with you, could you clarify
> what the issue was, if any, i.e.:
>
> 1.    Was there a vital element missing of a license agreement
> that was signed with HI World prior to Dec. 31, 99?
>
> 2.  If so, how come that Mr. Lee had signed a letter as token of
> having received the software in the contract?
>
> 3.    How has this been resolved now?

      138.    In fact, HI Worldwide had never received the product, which was not even an

actual product but instead an idea for new technology which LHSP had yet to develop.  On June

22, 2000, Lee sent an email to Bastiaens stating:

> I was led to believe that (i) your ASR 300 engines, technology and
> documentation in all 5 plus 4 languages were ready for deployment
> immediately upon execution of the agreement; (ii) that the
> appropriate chip set configuration, design and specifications were
> already completed, which in turn would enable us to produce them
> in mass within a period of 2 months; (iii) that L&H Korea
> technicians were fully trained to provide HI Worldwide all the
> necessary technical assistance promptly and in time; (iv) that the
> final chip set would not cost more than US $7.00 each; (v) and that
> once HI Worldwide made the chips it would capitalize on being
> the only company in the world to monopolize the entire toy
> industry in terms of supplying speech recognition chip sets. *The
> truth is you did not have the technology ready for deployment in
> a chip set format when you entered into the license agreement,*

> *your engineers had not even gone to Belgium to receive training for the ASR 300, the chip set in the format and spec given to us cost more than double your quotation, the chip set takes 6 months to develop, and you had not even tested whether ASR 300 would work as well as you claimed it would...* My Korean attorneys inform me that the above alone are sufficient grounds for fraud charges under Korean laws...
>
> In addition, a couple of days ago your Mr. Seo explicitly admitted to me that your company did not have the technology ready, neither then nor now.
>
> [Emphasis added.]

The fact that a key product had not been delivered as of December 31, 1999 meant that, under U.S. GAAP and SOP 97-2, revenue could not have been recorded in LHSP's 1999 fiscal year.

139.     In this same e-mail, Lee stated that LHSP had *guaranteed* a bank loan to HI Worldwide, from which the $11 million up-front payment was made to LHSP in December 1999, and that L&H Korea's president had channeled his own money into HI Worldwide in order to dissuade it from suing LHSP for breach of contract. Accordingly, LHSP was further precluded from recognizing revenue from HI Worldwide in 1999, because HI Worldwide lacked economic substance apart from LHSP's support. Indeed, because HI Worldwide had no real assets, the fact that LHSP guaranteed the loan to HI Worldwide effectively meant that LHSP was paying itself and booking that money as revenue. As Kwon's March 1, 2000 e-mail makes clear, KPMG knew that HI Worldwide was a newly formed entity that lacked economic substance. Accordingly, KPMG was at least reckless in allowing revenue to be recognized on this contract.

140.     As set forth above, the HI Worldwide contract was highly material to LHSP's 1999 financial results. KPMG knew, contemporaneously with the representations it made during due diligence, that there were substantial questions regarding this contract, including whether the product had been delivered to HI Worldwide and whether HI Worldwide had economic substance (both necessary preconditions to revenue recognition). KPMG's representations that

revenue had been properly recognized on this contract were knowingly or recklessly false since it had no basis to make that claim.

141.    LHSP's recognition of revenue on the HI Worldwide contract was inappropriate for still another reason: it had recognized a prepayment of royalties from HI Worldwide as revenue when the software on which the royalties were to be paid had not even been developed yet.  Indeed, as HI Worldwide's June 22 e-mail stated, LHSP had not developed the software by June 2000.  Moreover, KPMG knew that this precluded revenue from being recognized on this contract.  A March 20, 2000 e-mail from Filip Beernaert ("Beernaert") of LHSP to defendants Lernout, Hauspie, Bastiaens and Dammekens states:

> We just had a meeting with Bob McClamb [sic] of KPMG on the revenue recognition.
>
> Bob mentioned that the revenue under an exclusive contract can only be recognized over the term of the exclusivity....
>
> Another item that he mentioned was that development or consulting agreements that are made in relation to a license agreement and which state that the development of an application or the engineering work of an application are done by LHSP and for which such work is substantial to the customers application will prevent LHSP from recognizing the revenue under the license agreement, until the work is accepted.
>
> The major contracts we have in Korea have beside the license agreement also a development agreement in which we develop the application for the customer.

142.    Thus, even though McLamb and KPMG had informed LHSP that the appropriate accounting treatment for such contracts was to defer the revenue until the customer had agreed that LHSP's development work was acceptable, KPMG nonetheless included this revenue as properly recognized in LHSP's 1999 financial statements.

143    In addition, the licensing fee supposedly called for by this contract was at least 50 times in excess of typical license fees in the Korean market at the time, a fact which, even if

none of this other information had been known to KPMG, indicated the suspicious nature of this

contract. Moreover, as discussed above, LHSP's recognition of revenue on this contract was

based entirely upon having factored the receivable from HI Worldwide "with recourse" with two

Korean banks, meaning that the revenue could not have been booked under U.S. GAAP and that

the cash supposedly obtained by LHSP pursuant to this contract was actually being held in time-

deposit bank accounts and would be taken away by the bank once HI Worldwide failed to pay.

### b. Voice Tech Korea

144.    Another example of a Korean contract for which revenue could not be recognized

was the contract with Voice Tech Korea, pursuant to which LHSP had recorded $7 million of

revenue in the third quarter of 1999. Although KPMG included this revenue in LHSP's 1999

financial statements as having been properly recognized in accordance with U.S. GAAP, KPMG

knew that the revenue should not have been recognized for numerous reasons.

145.    KPMG knew that there were serious concerns about this contract. Indeed, KPMG

had determined in October 1999 that there were "critical revenue recognition issues" with

respect to this contract. For one, although the agreement was dated September 30, 1999 (the last

day of the third quarter), there were absolutely "no proper documents on the revenue generation

schedule." In a series of internal e-mails, copies of which were sent to Van Aerde and McLamb,

KPMG determined that LHSP should not have booked the revenue from this contract in the third

quarter, but should have instead recognized it over a five-year period, because that was how long

it would take to develop the product.

146.    Moreover, KPMG knew that there were serious questions regarding collectibility

of the $7 million. KPMG knew that the contract with Voice Tech was highly suspicious, as

Voice Tech was a brand new start-up company with virtually no financial resources and no

ability to pay LHSP $7 million. In fact, KPMG knew that LHSP had recognized revenue based

60

upon factoring the receivable "with recourse" with a Korean bank. Factoring "with recourse"
meant, of course, that the cash ostensibly paid to LHSP by the bank in exchange for the
receivable could not be recognized as revenue, because LHSP was obligated to return it to the
bank, if and when the customer failed to pay. In other words, the cash on LHSP's balance sheet
was not LHSP's, but the bank's. Accordingly, these sales of receivables were not final and could
not be recorded as revenue under U.S. GAAP.

147.   KPMG's knowledge of these facts is established by an "URGENT" e-mail
message dated October 18, 1999 from Kwon of KPMG Korea to Huysman of KPMG Belgium,
with copies to Dammekens and Van Aerde, sent just weeks before the issuance of LHSP's press
release announcing third quarter 1999 financial results:

> – We just completed our fieldwork for the September closing of
> Bumil [LHSP's Korean subsidiary]. *However, we have a critical
> revenue recognition issue as follows and I want you to confirm
> this in your office as well as appropriate LHSP responsible
> personnel.*
>
> At 30 September 1999, L&H Korea ("Bumil") recognized the
> software revenue of approximately U$11 million, the largest
> amount Bumil ever recorded. The sales were made to two
> unknown local software companies, VoiceTek (U$7M) and
> International Business Computer (U$4M), respectively, and I
> believe that Frederick's visit to Bumil last time was probably to
> review or record these transactions. Frederik [Deschodt, LHSP
> assistant controller] told the accountant of Bumil that this
> transaction was agree by KPMG at the Corporate level. I am
> surprised why he did not discussed with me when we met last time.
>
> We were not informed of the details of VoiceTek. Same to IBC.
> We know that VoiceTek was established in July this year in the
> minimum paid-in capital. We are not aware of anything on IBC.
> *There are sales contracts dated 30 September 1999 with these
> new customers but there are no proper documents on the revenue
> generation schedule and condition.* The contracts say that the
> sales is final and no refund is required and the localizing expenses
> to be incurred will be charged to the customers additionally, etc.
> Furthermore, the receivable was factored with a local bank with a

collateral of Bumil's bank deposit and we believe the factoring is *'with recourse.'*

Because of this transaction at 30, September 1999, Bumil showed big profit, about, US$ 1 3M, in September while it had loss carry forward of approximately U$0.5M until the end of August.

Based on our understanding, I have several critical questions.

1.    *Why did Bumil recognized the whole amount in September?* Per their explanation, the ultimate resolution in Korean will take about five years to complete even though Bumil is not required to refund the contract amount. *Therefore, at least, the revenue should be recognized over five years or more.*

2.    The revenue recognition basis under USGAAP (SOP 91-1 and 97-2) should be carefully complied in this transaction. Because of its sensitive nature of the first consolidation with LHSP, I recommend you should consult your SEC partner on this issue. *My preliminary interpretation is that this revenue recognition has some problems particularly in terms of "when-and-if" available conditions, delivery of products, and collectibility.*

As you know this issue should be cleared promptly to complete the consolidation, please discuss at Corporate level and advise me of the discussions.  If it meets the requirements of SOP's, we may conclude the September closing and consolidation package of Bumil.

Thanks in advance for your immediate action.

[Emphasis added.]

148.    After receiving the October 18, 1999 e-mail, Huysman called McLamb and told him of the issues raised by the Korean auditors.  McLamb sent Dammekens an e-mail on October 22, 1999, stating that: "I have been discussing the two Koreans contracts [Voice Tech and IBC] with Glen Davison and we do have concerns about each."  McLamb told Dammekens that he would attempt to call him over the weekend to discuss.

149.    McLamb spoke to Dammekens that weekend, as confirmed by an October 25, 1999 e-mail from Dammekens to Bastiaens:

Talked with Bob McLamb. He wants to see the following matters regarding Korea:

1) the KPMG people of Korea said via email that there is "a relationship" between the president of Bumil and the man from VOICE TECH. He wants a statement from both presidents that they are not related (family) and that there are no side agreements.

2) For both, he wants to know who is behind the companies in order to judge the collectibility.

150.    Thus, McLamb and KPMG were well aware in October 1999 of the serious issues concerning the Voice Tech and IBC contracts. KPMG knew that there was supposedly a "relationship" between Voice Tech and the president of L&H Korea and that Voice Tech had supposedly promised to pay a $7 million licensing fee to LHSP even though it was an "unknown local software company" that had been established for the minimum paid-in capital only a few months before it signed the contract with LHSP. KPMG also knew that the receivable had been factored with recourse. In sum, KPMG failed to properly consider and respond to information known to it that demonstrated that the Voice Tech contract was nothing more than a sham. To the contrary, KPMG permitted LHSP to recognize $7 million of revenue on this contract (and another $4 million on the IBC contract). These two contracts accounted for 13% of LHSP's 1999 third quarter revenues. Nonetheless, KPMG falsely represented in LHSP's 1999 financial statements that this revenue was recognized in accordance with U.S. GAAP.

151.    Indeed, even if none of this had been known to KPMG, the Audit Committee Report identified numerous other ways in which LHSP's recognition of revenue on the Voice Tech contract failed to comply with U.S. GAAP:

(a)    KPMG improperly permitted LHSP to account for this agreement as two separate contracts, a development agreement and a distribution agreement, and to recognize revenue separately on each element.

(b)    KPMG improperly permitted LHSP to recognize the entire development fee in the fourth quarter of 2000, when under the applicable accounting provision, SOP

81-1, "the development fee should have been spread over the development period until September or October 2000."

(c)     The contract was modified on October 21, 1999 — after the third quarter had ended — by an amendment removing the right to distribute certain "when and if available" products which were the subject of the development agreement. The Audit Committee Report questioned whether this amendment was even legitimate, but assuming that it was, noted that the revenue recognized in the third quarter should have been deferred until the fourth quarter, noting "KPMG signed off on 1999 financials."

c.  Digital Sei-Young and Neo Information Telecom

152.    Further, KPMG permitted LHSP to recognize, in the fourth quarter of 1999, $8,500,000 of revenue on a contract with Digital Sei-Young Ltd., and $8,000,000 of revenue on a contract with Neo Information Telecom ("Neo"). These were two other purported Korean customers. However, KPMG knew that the revenue on these contracts should not have recognized for several reasons, not the least of which was that the contracts were still in draft form, with key terms missing, at the end of the fourth quarter. On January 5, 2000, McLamb sent an email to Dammekens attaching McLamb's "comments on certain draft agreements" with three Korean customers, including Digital Sei-Young and Neo. The three contracts reviewed by McLamb accounted for $23 million of revenue, or 22% of LHSP's total revenues for the fourth quarter of 1999 and 5% of its total revenues for the year. McLamb noted a number of issues which precluded revenue recognition for these contracts, including the fact that the agreements had not yet been signed by the parties:

1. The contract should be signed and **dated** by each party. Having just an effective date is **unacceptable**.

2. Need to determine the financial viability of Digital to determine whether they have the financial ability to pay the $10 million.

3. Need to see clear evidence of the delivery of the deliverables under each part of the contract.

> 4. Need to confirm with Digital that there are no other written or oral agreements between itself and L&H. In addition, we need to confirm the prepayment of royalties is non-refundable and is not dependent on any future sales of Digital.
>
> * * *
>
> 7. Under each part of the contract Digital is required to obtain L&H's approval for design of packaging and other artwork. This is continuing involvement of L&H and causes a problem with revenue recognition.
>
> 10. Article A.8.1 makes it possible for Digital to get its money back ...

McLamb made the same comments with respect to the Neo contract.

153. Thus, McLamb and KPMG knew that revenue should not have been recognized on these "contracts" in the fourth quarter, because as of January 5, 2000, five days after the quarter closed, they were still in "draft" form, missing signatures, dates, and other key terms.

154. LHSP's and KPMG's response to the issues identified by McLamb bordered on the absurd. LHSP obtained the signatures of Digital Sei-Young and Neo on virtually identical form letters prepared by LHSP's Legal Department for the customers' signature. Digital Sei-Young's letter stated as follows:

> Digital Sei-Young Co., Ltd. hereby states that it has sufficient financial means and is financially viable to enter into the License, Merchandising and Broadcasting Agreement with L&H Korea for the amount of 10 Million US Dollars. The amount of 10 Million US Dollars being non-refundable under this agreement.
>
> * * *
>
> Furthermore we can declare that no other arrangements, contracts, agreements or conditions are imposed on or dependent on Digital Sei-Young to enter into this Agreement, nor that L&H Korea will have to perform any other obligation than stated under the contract.
>
> Digital Sei-Young hereby declares that it has received all deliverables which are needed and specified under the contract and

that it accepts all such deliverables. The deliverables were delivered on December __, 1999 as follows: _____

Sincerely yours,

/s/

155.    Neo's letter was virtually identical and stated as follows:

Neo Information Telecom Co., Ltd. Hereby states that it has sufficient financial means and is financially viable to enter into the License Agreement with L&H Korea for the amount of 8 Million US. Dollars. The amount of 8 Million US Dollars being non-refundable under this agreement.

Furthermore we can declare that no other arrangements, contracts, agreements or conditions are imposed on or dependent on Neo Information Telecom to enter into this Agreement, nor that L&H Korea will have to perform any other obligation than stated under the Agreement.

Neo Information Telecom hereby declares that it has received all deliverables which are needed and specified under the contract and that it accepts all such deliverables. The deliverables were delivered on December 31, 1999 as follows: _____

Sincerely yours,

/s/

156.    Thus, in both of these cases (and in the case of the third "draft" agreement commented on by McLamb as well), the customer actually left key terms of the confirmation blank, including the date the products were supposedly delivered and the description of the goods delivered. These letters were obviously insufficient to provide evidence that the revenue on the Digital Sei-Young and Neo contracts had been properly recognized, because a bare statement by the customer that "it has sufficient financial means" to pay the contract price does not constitute sufficient "competent evidential matter" to permit a conclusion that the customer's payment is reasonably assured. Indeed, these letters should have made KPMG more suspicious about the validity of these agreements, since KPMG could not confirm, as required by SOP 97-2,

66

the customer's ability to pay, the products involved, or whether the products were satisfactorily delivered, and if so, when.

### d. FourOneOne.Com

157.    KPMG also signed off on LHSP's recognition of revenue where receivables on certain contracts were outstanding for more than 90 days – including, for example, the amount of $2.6 million on a contract with Four One One.Com and $2.7 million on a contract with The Learning Kernel – and that in some cases confirmation letters sent to LHSP's customers had not been returned. These issues were important to LHSP's financial statements because receivables outstanding for long periods of time can indicate that revenue should not have been recognized, the customer cannot pay, or even that the validity of the underlying contract is in question. Nonetheless, KPMG continued to sign off on LHSP's recognition of revenue in the 1999 financial statements for contracts where the collectibility of the outstanding account receivable was doubtful, the revenue should not have been recognized in the first instance and the validity of the contracts was questionable. Indeed, KPMG validated the recognition of revenue in the 1999 financial statements even where confirmations which had been sent to LHSP customers such as Digital Sei-Young and Neo seeking to confirm delivery of the goods had been returned by the customer with the delivery date and description of the goods blank.

158.    Specifically, with respect to the $2.6 million Four One One.com receivable, KPMG knew that there were serious questions concerning collectibility. A January 26, 2000 e-mail from KPMG Korea auditor Philip Lee to Huysman and Van Aerde, both of KPMG Belgium, stated:

> Four One One com — Conditions set out in SOP 97 are met *but we do have some doubt on the collection of the outstanding balance.* Of the contract sum of US$4.5 million, US$1.9 million has been collected leaving a balance of US$2.6 million which is more than 90 days overdue. Ms Cheryl Foo (our local contact at L&H Asia)

> is of the view that the amount is collectable but *we do not have further information on the debtor.* Cheryl advised that Carl Dammekens has more information on the ability of the customer to pay up the balance. In our view, the conditions for revenue recognition appears to have been met *except that there is now an issue of collectibility of the outstanding amount receivable.*

[Emphasis added.]

159.    Thus, even though KPMG knew that there were serious doubts about whether the outstanding $2.6 million would ever be paid, it failed to inform the Dragon principal stockholders, including the plaintiffs, of this fact. In addition, at no point during the due diligence by Dragon and the Dragon principal stockholders did KPMG inform Dragon or the Dragon principal stockholders that the $4.5 million contract amount should not have been recognized as revenue in the second quarter of 1999. On February 15, 2000, Huysman of KPMG Belgium sent defendant Willaert a confirmation letter to be signed by the customer confirming an extended payment plan, under which 20% of the outstanding amount would still remain unpaid on December 31, 2000, a full year-and-a-half after the revenue had been recognized. KPMG never told the Dragon principal stockholders that it knew a significant part of this receivable would not even be paid by the end of 2000. In addition, KPMG failed to tell the Dragon principal stockholders that although Huysman had asked Willaert to obtain the signed confirmation by March 31, 2000, KPMG had failed to receive it as of April 21, 2000, as confirmed by an e-mail of that date from Veronique De Roose of KPMG Belgium to, among others, Dammekens, McLamb, and Van Aerde.

### KPMG's Knowledge of the "Strategic Partner" Agreements

160.    KPMG also signed off on LHSP's "strategic partner" arrangements and on LHSP's relationship with these entities, and endorsed LHSP's representation that these entities were independent of LHSP. This issue became increasingly important in reviewing LHSP's

1999 financial statements because almost 50% of LHSP's increased revenues in the first nine months of 1999 were attributable to an increase in strategic partnership licensing revenue.

161.    As explained above, under U.S. GAAP, if such strategic partners were not truly independent, then the amounts received from them by LHSP would have to be characterized as a loan for accounting purposes, rather than revenue.  Indeed, even where U.S. GAAP permits recognition of revenue on transactions with related parties, it requires specific financial statement disclosures indicating, among other things, that the revenue was derived from related parties.  In addition, LHSP could not recognize revenue on these contracts under U.S. GAAP if it retained significant continuing obligations under the contracts.

162.    KPMG and LHSP's representations that the agreements with the "strategic partners" were with independent entities and revenue therefrom was thus properly recorded were knowingly false because KPMG and LHSP knew that the "strategic partners" were funded by entities related to LHSP, including defendant FLV Fund and other related parties, and that, as a consequence, any amounts collected thereunder had to be treated as loans which LHSP was obligated to repay rather than as revenue.

163.    KPMG knew that there were problems with the recognition of revenue on LHSP's "strategic partner" contracts as early as July 1999.  In a July 29, 1999 letter from Van Aerde to Bastiaens confirming a meeting for September 1, 1999 between Bastiaens, Van Aerde, McLamb and Boyer (the KPMG LLP audit partner in Boston) for the purpose of discussing the "Language Companies," Van Aerde wrote that he:

- "wanted an update on the status, review of independence;"

- "required names of investors to arrange a separate meeting;"

- "wanted to review collectibility of the LDC receivables."

164.    The July 29, 1999 letter also indicated that Van Aerde wanted an "update on the status of all issues raised in the Report to the Audit Committee," the most important among them being "revenue recognition." The letter also attached a "prioritised list of issues to be addressed" stating that "specific proof of the collectability of individual outstanding receivables" was necessary "in order to avoid the reversal of revenue recognised in prior quarters."

165.    KPMG did not resolve the issue of the LDCs to its satisfaction. Subsequently, in September 1999, the "KPMG USA Professional Practice" group asked KPMG Belgium, including Van Aerde, to conduct a "special review" of "the billing and collection procedures of LHSP towards the Language Development Companies." In connection with this review, KPMG performed "audit confirmation procedures" with 15 LDCs, whereby KPMG requested that each LDC confirm in writing to KPMG that it was not related to LHSP, there were no side deals, and that there was "no commitments for (re)payment by LHSP, Mr. Lernout or Mr. Hauspie to the LDC's." Of the 15 LDCs that KPMG contacted, only 8 responded in writing. KPMG received a "verbal confirmation" from one individual who claimed to be a "representative" of three of the LDCs, and received no confirmation at all from the other 4 LDCs. As a result, KPMG sought to contact the shareholders and investors of the LDCs to confirm that they were truly independent. However, it was unable to do so because LHSP refused to provide KPMG with the identity of the investors in the LDCs. Nevertheless, KPMG rendered a clean audit opinion on LHSP's 1999 year-end financials, with no disclosure that LHSP had limited the scope of its audit by refusing to provide needed information.

166.    On September 30, 1999, Van Aerde sent a "confidential memorandum" to McLamb which confirmed these facts. In that memorandum, Van Aerde wrote that "certain

*scope limitations* were imposed on [KPMG] when performing our review." [Emphasis added ]

Specifically, Van Aerde told McLamb that when he attempted to meet with the investors:

> *The shareholders and/or investors of the LDC's could not be met.* Contacts could be made with the managing directors of subject LDC's. We were informed that shareholders or investors may not wish to be contacted. There are no legal grounds to enforce such a contact (at this stage).
>
> [Emphasis added.]

167.  "Scope limitation" is a technical auditing term.  The third standard of auditing field work requires that the auditor's opinion be based on sufficient competent evidential matter. If adequate evidence is not collected, a so-called "scope limitation" occurs.  With respect to scope limitations, the authoritative auditing literature states:

> The auditor can determine that he is able to express an unqualified opinion *only* if his audit has been conducted in accordance with generally accepted auditing standards and if he has therefore been able to apply all the procedures he considers necessary in the circumstances.  *Restrictions on the scope of his audit, whether imposed by the client or by circumstances, such as the timing of his work, the inability to obtain sufficient competent evidential matter, or an inadequacy in the accounting records, may require him to qualify his opinion or disclaim an opinion.*
>
> [Emphasis added.]

AICPA Professional Standards, Volume 1, U.S. Auditing Standards ("AU"), § 508.24.

168.  By calling the denial of access a "scope limitation," Van Aerde admitted that KPMG had determined this to be a necessary audit procedure which could not be ignored.  Van Aerde and McLamb knew that the LDC transactions were highly material to the Company's operations and, as a result, should not have accepted the scope limitation imposed by LHSP management.  In any event, the existence of a scope limitation meant that KPMG should have issued a qualified audit opinion, rather than an unqualified one.  Nonetheless, KPMG represented to Ellen Chamberlain, Dragon's interim CFO – with the understanding that this respresentation

71

would be repeated to the Dragon principal stockholders, as it was – that it expected to issue an

unqualified audit opinion on LHSP's published 1999 financial results and that its revenue

recognition was in compliance with U.S. GAAP.

169.    In fact, the confirmations which were returned to KPMG from the eight LDCs

which did respond established that the LDCs were not independent third parties.  KPMG

received a single confirmation on behalf of four of the LDCs, signed by Willem Hardeman.  In

that confirmation, Hardeman claimed that "I confirm that I consider myself and the above

mentioned companies [the LDCs] as independent third parties from LHSP."  What KPMG

certainly knew, however – because KPMG Belgium was the auditor of FLV Fund – was that

Hardeman was a director of FLV Fund, which was a related party to LHSP.  Thus, Hardeman

himself was a related party to LHSP, and from his admission in the confirmation that "I am

indeed the financial investor" in the LDCs, KPMG knew that those four LDCs were related

parties to LHSP.

170.    On January 27, 2000, Huysman of KPMG Belgium sent an e-mail to KPMG's

Korean auditors, copied to McLamb, stating that:

> I refer to both your reports that we received this week.  We are still
> struggling with the input that we keep getting in different reports
> (or versions from reports) in connection with a party ('LDS') that
> is mentioned in both the SFM of KPMG Singapore and KPMG
> Seoul.
>
> We are over here [sic] that LHSP sells license agreements through
> the Ieper company or through the Singapore affiliate to newly set
> up companies which purpose it is to develop a language.  These
> entities are called Language development companies (LDC's) and
> are different legal entities, *although some of them are on the same
> address in Singapore.*
>
> Philip, your report mentions a party LDS (Language Development
> Services group of companies) and then lists them.  *Oh Bum, in
> your first version of the report you mention that a customer
> 'LDS' had erroneously deposited 'an amount of $25 million on*

the accounts of L&H Korea on December 31.' Then, the explanation is confusing and, first, it was thought that this amount should have been repaid to the president of L&H Korea by LDS (collection of a personal loan that this person would have given). Then, according to later input obtained from management, the amount would be a payment of LDS that should have been paid not to L&H Korea but to L&H Singapore. However, given foreign exchange restrictions, this would now be difficult.

Then, in the version of the KPMG Korea report that was sent yesterday, this paragraph of the report has been corrected. It still states that this money should have been paid by LDS to L&H Singapore instead of on the bank account of L&H Korea. It does no longer state that [sic] the 'personal loan repayment.'

We are concerned about what happened here and need a full explanation on the whole picture; here are some questions for both of you:

1.      Can either one of you confirm who is behind LDS? Is this a legal entity or not? Where did the 25 million come from? Who authorized payment? What bank account was it transferred from? What exactly does the 25 million $ cover?

2. Why didn't each of the different LDC's listed in the report not pay their own debt versus L&H instead of one party transferring a big amount of 25 million dollars (if it is intended to settle the receivables at all; we understood that it might have to do with the payment of the earnout for the acquisition of the former Bumil (now L&H Korea)). Is there, to your knowledge, a link with L&H or with other parties (the president of L&H Korea, some big new customers of L&H Korea such as HI World, Digital Seyoung, EPC NEO who all signed very big contracts in the 4th quarter of 99 with L&H Korea?

3. We understand that the report of KPMG Korea has changed for the personal loan paragraph but where did the information come from to change this text to the second version? Who was the contact for this? How has KPMG Korea validated the explanation given?

4. Philip, some of the customers of L&H Singapore are Salfas, Duranzo, Baleston and Snegal Pte Ltd. These customers are all located on No. 5 Jalan Besar #5-01 Singapore 208785. Are you aware of any operational activity at these premises? Is R&D taking place or are people actually developing languages? For

73

some other contracts signed between L&H Asia and Lupeni, Jelgava and Harrica Pte Ltd, *the address is in always Shenton Way 5; 12-05 UIC Building, Singapore 06888. The same question as above is asked.* For all of these contracts, is there to your knowledge a local general manager (the contracts have in each case been signed by Belgian people).

*I also send this mail to the US partner who is reviewing this engagement from a US Gaap perspective (Bob McLamb, in KPMG Houston).* You can send your answers to him at the same time.

[Emphasis added.]

171.    Thus, KPMG, especially KPMG Belgium and KPMG LLP, as well as KPMG Korea, had complete knowledge of one of the most important facts which ultimately resulted in the uncovering of the fraud by *The Wall Street Journal* – the fact that many of the LDCs had identical business addresses and common bank accounts. KPMG also knew that the contracts, although purportedly with entities located in Singapore and Korea, were signed by *Belgians*. KPMG further knew that a single entity called LDS – which was not even a party to any of LHSP's contracts or an LDC – had supposedly paid $25 million on behalf of several of the supposedly separate and independent LDCs. KPMG knew that this payment was highly suspicious, as LHSP first claimed that it was the repayment of a personal loan from the president of L&H Korea to LDS, and then later claimed that it was a payment mistakenly made by LDS to L&H Korea instead of L&H Singapore. KPMG explicitly recognized that, in light of these facts, there was likely a direct link between the LDCs and LHSP, and in fact, between LHSP and its Korean customers. In sum, KPMG knew that these facts precluded the possibility that the transactions at issue were legitimate business transactions. Notwithstanding these facts, based in large part on the fact that LHSP had received $25 mill.n from LDS, KPMG allowed LHSP to book the revenue from these sham transactions and represented in LHSP's 1999 financial statements that the revenue had been recognized in accordance with U.S. GAAP.

74

172.    Moreover, KPMG knew that the LDC revenue was not recognizable for yet another reason, namely, that the same individual, Tony Snauwert, was the licensee representative on nine of the twenty-three contracts it was provided, including strategic partner contracts, even though the names of the companies were different.  On January 29, 2000, McLamb had specifically informed Dammekens and KPMG's Belgian auditors, after receiving Huysman's above-quoted e-mail, that it was "no longer acceptable for us to rely on an agent acting for a group of investors" for purposes of allowing LHSP to record revenue:

> It seems that a single payment of $25 million was paid to L&H Korea.  The payment was for amounts owed to LHS (the group in total) by a number of LDC's.  Who made this payment? We need to see the wire transfer or check and determine what bank account it came from.  *Why did the payment for several LDC's come from a single bank account?  This makes it more important that we find out who the individual investors are for each of the LDC's. It is no longer acceptable for us to rely on an agent acting for a group of investors.*  When we find out the company or person that the $25 million payment came from we need to get KPMG Korea to find out about the Company or person.  If the payment was made by a Company we need to know who the owners of the company are.  *This is very important.*

> [Emphasis added.]

Despite McLamb's recognition that identifying the source of the payment was "very important," KPMG nonetheless failed to ascertain the source of the payment and permitted the improper revenue recognition anyway in rendering a clean audit opinion on LHSP's 1999 financial statements.

173.    KPMG knew yet another critical fact regarding the LDCs:  they were corporate fictions, i.e., unstaffed shells which had performed no work whatsoever under their agreements with LHSP.  A January 31, 2000 e-mail from Van Aerde to Willaert stated that, although some of the LDCs had existed since the third quarter of 1998, "*[a]n ill-informed reader could wonder about the fact that not a single LDC has supposedly performed any activity until now.*"

[Emphasis added.] Even though KPMG knew that the strategic partners were doing nothing and that LHSP retained all the continuing development obligations, it nonetheless permitted LHSP to recognize revenue on the fraudulent LDC transactions.

174.   Tellingly, LHSP was shocked that KPMG was, for the first time, apparently going to require evidence beyond mere representations from LHSP management with respect to the LDCs.  An internal LHSP e-mail dated January 31, 2000 from LHSP executive Jacques Vanloo to Dammekens, attaching several KPMG inquiries regarding the LDCs and the $25 million payment, asked: "Carl, what exactly is wrong?  Has KPMG lost all its trust, are the answers from you and our management no longer sufficient?"

175.   In fact, KPMG, even though it clearly knew by now that there were problems continued to fail to obtain the necessary confirmation and verification, *performed none of the audit procedures called for by Huysman and McLamb in January 2000 and did nothing to determine if the LDCs were independent third parties*.  On June 20, 2000, McLamb sent an e-mail to Van Aerde and Huysman in advance of LHSP's SEC Form 20-F filing, which was scheduled to occur only ten days later on June 30.  The Form 20-F would contain LHSP's 1999 audited financial statements and KPMG's 1999 audit report.  In that e-mail, McLamb made clear that, despite what had been told to the Dragon principal stockholders during the due diligence, he in fact had no idea whether the LDCs were legitimate:

> In clearing up pending items from the 1999 audit I have not received any update on the work that we performed on the $25 million that L&H Korea received as payment for receivables owed by the LDC's.  What is the current status of this? Did we interview the investors of the applicable LDC's? Did we check to see who was the owner of the bank account where the funds came from? How did we ensure that the $25 million was not the same $25 million that LHS paid to the former owners of Bumil for the contingent earnout? Did we get representation from Jo and Pol and LHS that the money was in no way related to them?

We need to make sure that KPMG has done adequate work on this
before we sign off on the Form 20-F.

176.    On June 22, 2000, or nearly two months after it had signed its unqualified audit

opinion on LHSP's 1999 financial statements, Huysman replied to McLamb, Kwon and Van

Aerde, and acknowledged that, after making unequivocal representations to the Dragon principal

stockholders regarding the legitimacy of LHSP's revenue recognition on these contracts, KPMG

had done nothing to determine whether the LDCs were legitimate:

> Oh Bum and Philip, in connection with yesterdays mail and urgent
> request to obtain additional information on the investors in the
> LDC's (customers of L&H Singapore) and the Korean customers
> of Bumil, can you in the mean time report to KPMG Ghent what
> procedures you have already performed to satisfy yourself that
> these are all existing (live) organisations? We made this request
> before in mail and fax instructions.  From Korea, we got a mail
> back of an interview with Mr. Lee from HI World.  *Have any
> others been visited or have you checked these companies
> registrations at an official filing system?  Are there financial
> statements available at a central filing that allow [you] to find out
> if these companies are in a position to pay the large sums of the
> contracts to L&H?  Is there a way of finding out through their
> articles of association who the shareholders/directors are behind
> them?  At the request of Jo Demario with whom you met last
> week could someone of your office go to the official addresses of
> these    customers    to    see    if    they    appear    proper
> companies/organisations.  It may be worthwhile taking a picture
> of the location.*
>
> Oh Bum, I will also fax names and phone numbers of 3 Korean
> individuals to you.  We have been informed that these would be
> investors.    *Jo has asked someone confirms that these
> people/phones exist.  Do the addresses appear to be normal
> addresses considering the fact that these individuals should be
> relatively wealthy as investors?*
>
> Philip, we obtained through your people registration of four
> companies (customers), of L&H Asia.  *Can you send someone
> down to the address of these companies to see if they are
> operational and appear proper companies and not just a post
> office box.*  Here as well, you may have some pictures taken.  Can
> you please confirm? If any other LDC's are located in Singapore,
> please perform the same procedures.

77

177.    In that same e-mail, Huysman noted that it was his understanding that most of L&H's Korean customers were related parties. Huysman asked "Is mister Seo [Chairman of L&H Korea] not a significant shareholder or decisionmaker in some (or most) of the Korean customers? Have you asked this as part of the audit?"

178.    On June 24, 2000, Hye Jin Kang of LHSP told Dammekens in an e-mail that this was the first time that KPMG had ever asked for any documentation regarding LHSP's Korean customers:

> I have not replied to KPMG Seoul yet anything. We are going to collect "Corporate Registry" for the customer (Q4 FY99). *This would be first documentation that we submit to KPMG* (KPMG Seoul asked the documentation). Corporate Registry shows the company name, the address, PER value, number of shares, TTL capital, Business, Director Registered.
>
> [Emphasis added.]

179.    On June 26, 2000, Kang sent another e-mail to Dammekens regarding "the questions from KPMG." In that e-mail, Kang wrote that KPMG was only at that time beginning to collect documentation from the sales that had been booked during the fourth quarter of 1999 – including the very same contracts that KPMG had represented months earlier had been appropriately booked: "[w]e are now collecting the documentation from the Q4 customer (EPC, Neo Telecom, IBCC, Voice Tech, HI World, Digital Seyoung [sic]." According to Kang, these documents included the customers' corporate registry, shareholder lists, financial statements, the articles of corporation, and a picture of the customers' offices, all of which KPMG was requesting for the first time.

180.    This e-mail also confirms that, had KPMG performed the most elementary of these steps, it would have discovered the fraudulent nature of the $25 million transaction it had first questioned in January 2000:

> Regarding LDS Korea, there is name of Sam Cho (Cho, SooAm in Korean Name) in the Business Certificate (the documentation is only evidence that shows LDS Korea is live in Korea, since LDS Korea is only Rep office, no corporate registry). And Sam is only employee of LDS Korea at this moment.
>
> Since KPMG Korea already knows who Sam is, there is a challenge how we can explain that L&H Korea is nothing to do with LDS Korea.
>
> Pls advise us if you have good comment.

Thus, had KPMG simply obtained the business certificate of LDS Korea, the entity which it knew made the $25 million payment to L&H, it would have seen that the founder and sole employee of LDS Korea was Sam Cho — *who was the second-in-command of L&H Korea*. Thus, the mystery of where the $25 million came from would have been solved: LHSP had paid the $25 million to itself.

181.    As of June 29, 2000 – the day before LHSP filed its Form 20-F with the SEC – KPMG still had not determined whether the LDCs were real entities. Indeed, KPMG still had not determined whether sales that had been booked in December 1999 were real sales. On that day, Jacques Vanloo of LHSP sent the following e-mail to Dammekens:

> KPMG-Singapore has come over recently to investigate the contracts signed with LDC again, and their respective receipts in 1999 & 2000. Their main concerns are:
>
> 1.    Who are the investors of the LDC and where do their funds come from, since they have common directors and have only S$2 share capital?
>
> 2.    The ordering party of some payments are not the contracted party. For instance, the receipts of US $4.5 million from Velstra in Dec 99 are actually paying for Lupeni, Jelgava and Harrisca contracts. They are asking us how do we know which contracts are being paid in such cases, esp. if the bank advices do not provide payment details. If it's through verbal confirmation with the LDC, they would like to know the contact person of LDC as they may want to seek confirmation with them.

> Understand from Cheryl Foo [another LHSP employee] that these
> contracts are already being audited by KPMG-Ghent, but KPMG-
> Singapore claims that it's KPMG-Ghent who requested them to
> look into this again.

182.    In addition to knowing that several CLCDs were located at the same address,

KPMG also knew an additional fact regarding Duranzo and a company called I-Merge, which

precluded revenue recognition: both were funded by defendant FLV Fund, a related party to

LHSP, and thus the revenue from those contracts would have to be treated as a loan under U.S.

GAAP.  FLV Fund had invested $10 million in Duranzo and three other CLDCs on October 22,

1999.  Because KPMG Belgium was the auditor of FLV Fund, it saw both sides of these

transactions.

183.    On December 24, 1999, FLV Fund sold its interest in these four CLDCs to HI

Worldwide for $11 million.  On January 21, 2000, Huysman of KPMG Belgium sent an e-mail

to Dammekens and Van Aerde regarding FLV Fund's investments in these CLDCs.  As

Huysman wrote, "Carl, as discussed with you this afternoon, I received the faxed agreements

from my colleague Rob Snijders.  The Cross Language companies (Russian, Mandarin, Japanese,

Spanish) *which were sold on by FLV* to Human Interface Worldwide Ltd concern an amount of

about $10 million."  [Emphasis added.]  After receiving this e-mail and speaking with Huysman,

Dammekens sent an e-mail the same day to Hauspie and Bastiaens which made clear that KPMG

knew that FLV Fund's investments in these CLDCs created serious "problems" with LHSP's

revenue recognition, including "disclosure as related party revenue of the 4 LDC companies" and

"incorrect disclosure in Q3."  In fact, the HI Worldwide transaction was merely a ruse by which

LHSP hoped, by transferring the FLV Fund's interest in the CLDCs to another party before year-

end, to evade the requirement that the transactions be reported as related-party loans rather than

as revenue.  As these documents reflect, KPMG knew that this transfer was a sham and that the

FLV Fund's involvement precluded recognition of revenue on these contracts, and yet collaborated with LHSP to hide the fact that these were related-party transactions. An April 17, 2000 e-mail from Philip Vermeulen of FLV Fund to Bastiaens, Lernout, Hauspie, and Sam Cho of L&H Korea confirmed that the $11 million "buyout" by HI Worldwide was, in fact, never paid.

184.    Thus, KPMG's representations to Dragon and the Dragon principal stockholders during the due diligence and with regard to LHSP's 1999 financial statements were completely false. KPMG knew that the LDCs and CLDCs had no real existence, that they had performed no work on their development contracts with LHSP, that they shared common addresses and paid LHSP from common bank accounts, and that they were funded by parties related to LHSP.

<u>False and Misleading Representations of SG Cowen</u>

185.    During the merger negotiations between the Dragon principal stockholders, including the plaintiffs, and LHSP, Ben Howe ("Howe") of Cowen served as one of the primary contacts and negotiators of the Merger Agreement. Dan Blake, previously with Cowen and now with LHIC, worked closely with Cowen as evidenced by the fact, among other things, that Blake, along with Cowen, was part of the deal team for the Dragon/LHSP transaction. During the course of these negotiations, Howe made repeated representations to Dragon and the Dragon principal stockholders, including stockholder Janet Baker, specifically regarding the financial strength and soundness of LHSP and the benefits to Dragon and the Dragon principal stockholders that would result from the Dragon Merger. Janet Baker obtained this information, as the defendants knew, on behalf of the other Dragon principal stockholders and repeated this information to the other Dragon principal stockholders.

186.    Robert Stone, a research analyst at Cowen who participated with Cowen's investment banking team in connection with the Dragon merger transaction, attended numerous

meetings with the Dragon principal stockholders, including the plaintiffs, in February and/or March 2000, including on March 3 and 8, 2000. At these meetings, Stone repeatedly advocated LHSP's securities, specifically citing. LHSP's strong revenue growth and stating that LHSP securities would increase in value over both the long and short term. In addition, Stone gave a presentation to Dragon representatives and principal stockholders regarding LHSP's strong past performance, including revenue growth and the value of LHSP securities.

187.    As a further part of the merger negotiations process, Cowen provided its September 15, 1998, January 5, 2000 and February 10, 2000 analyst reports of LHSP, and possibly other analyst reports, to Dragon principal stockholders, including the plaintiffs. The plaintiffs reviewed and relied on Cowen's oral representations and its written reports in determining whether to complete the merger transaction and accept LHSP stock in exchange for their interest in Dragon. The February 2000 analyst report was issued in the same month that questions were raised with Cowen regarding LHSP's software revenue and strategic partners. Moreover, while the February 2000 Cowen report purported to contain financial information for 1999, the KPMG audit for that year was not finalized until April 27, 1999. Cowen therefore could not have relied upon this information in preparing its report. Moreover, additionally, as Cowen was made aware from received an e-mail in February 2000, KPMG's "Standard Procedures" was for KPMG working papers to not be provided "as long as they have not signed of [sic] on the financial statements." The February 2000 Cowen report does not attribute a source outside of Cowen as the basis for the 1999 financial information, and yet identifies a stock target price of $95-100, up approximately 12% from just one month prior.

188.    In addition to the oral representation. to the Dragon principal stockholders, Cowen also prepared a "Deal Book" that was given  certain of the Dragon principal

stockholders at a March 2000 merger meeting at Cowen's offices in Boston, in order to support Cowen's contention that LHSP securities were valuable. The "Deal Book" contained extensive financial reporting and projections regarding LHSP's revenue and financial status. All of the information provided to the plaintiffs, including the information in the February 10, 2000 analyst report and the information in the Deal Book was untrue and Cowen either knew or was reckless in not knowing this information was false. Among the materials in this "Deal Book" were:

- Consolidated Balance Sheets from 12/31/98 to 12/31/99 that stated, among other false statements, that LHSP had over $130 million cash and marketable securities as of 12/31/99 and total assets of over $693 million as of 12/31/99 which had increased by over $122 million since 12/31/98 and increased by over $53 million in the last quarter of 1999 alone.

- A Consolidated Statement of Income reflecting 1999 revenue as over $344 million, which represented a 43.5% increase from 1998. This statement also reflected gross profit as over $249 million representing a 72% increase over 1998 and positive net income of over $68 million before taxes and $41 million after taxes. This represented a tremendous alleged growth for LHSP that had negative income in 1998.

- The January 5, 2000 analyst report recommending LHSP securities as a strong buy.

- At this same meeting, Cowen personnel gave Dragon principal stockholders the February 10, 2000 Cowen analyst report also recommending LHSP securities as a strong buy.

- Revenue Analysis by Market stating that LHSP had total revenue of $211.6 million in 1998 and $344.2 million In 1999.

- A ranking of LHSP's customers by revenue for the fourth quarter of 1999 listing Korean customers as four of the top eight customers.

- A quarterly profit and loss statement and estimate listing net income for each quarter of 1998 and 1999 between $6.3

million and $13.6 million and earning per share (exclusive
of goodwill) at between .16 and .39 cents a share.

189.    Neither Howe nor Stone, nor any other Cowen representative, ever disclosed the

fact, which Cowen knew or was reckless in not knowing, that LHSP's revenues had been

artificially inflated by treating research and development liabilities (costs) as revenues through

having this research and development performed by related parties in order to obtain license fees

from these related parties, which the related parties either were unable to pay, had no formal

obligation to pay, or were somehow financed by LHSP, and, thus, that many of LHSP's alleged

customers were in fact related entities, often funded by LHSP, from which revenue should not be

recognized.  Issues had been raised to Cowen prior to the Dragon/LHSP transaction regarding,

among other things, questions and concerns regarding software revenue recognition and LHSP's

relationship with strategic partners.  However, even though the meetings that Cowen had with

Dragon and the Dragon principal stockholders were for the purpose of satisfying the Dragon

stockholders' due diligence inquiries about LHSP, Cowen actively concealed material

information from the plaintiffs or turned a blind eye in reckless disregard as to whether accurate

and complete information had been provided.  Cowen knew that it would jeopardize LHSP's

acquisition of Dragon if Cowen disclosed any information that might cause the Dragon principal

shareholders to have any material concerns about LHSP's financial statement or results.  Cowen

knew that its business relationship with LHSP and its numerous related entities and "customers,"

for one or more of whom Cowen also performed services and delivered revenue, would be

jeopardized if Cowen endangered LHSP's acquisition of Dragon.

### FLV Fund's Participation In The Fraud

190.    Defendants Hauspie and Lernout created FLV Fund in 1995, and were directors

of FLV Fund's management arm from 1995 until 1997.  According to *The Wall Street Journal*,

after 1997, Lernout and Hauspie maintained "considerable sway" over FLV Fund's affairs, as evidenced by the close relationship between LHSP and the Fund since FLV Fund's inception.

191.    In 1995, FLV took a 49% stake in the Belgian unit of Quarterdeck Corp., a California software company then headed by Bastiaens.  According to a December 7, 2000 *Wall Street Journal* article, Quarterdeck's Belgian unit then became LHSP's "largest customer, accounting for 30% of revenue that year, and Quarterdeck itself contributed in 6.5% of LHSP's sales."

192.    Subsequently, FLV Fund and FLV Management together owned a majority stake in Dictation Consortium, a company that provided $26.6 million in revenue to LHSP from 1996 through 1998, in what was a prototype of LHSP's related-party fraud involving the LDCs and CLDCs.   —

193.    Due to stock market and analyst sensitivity about LHSP's close ties with FLV Fund, LHSP took great steps to conceal its involvement with, and reliance on, the FLV Fund, and other related parties.

194.    In LHSP's published financial statements, LHSP disclosed that FLV Fund was a related party, but reported only minimal revenue from FLV Fund sources.  For instance, in its 1998 Annual Report on Form 20-F, LHSP stated that only 3.7% of 1998 revenue was provided by companies funded in part by the FLV Fund."  Similarly, in its 1999 Annual Report on Form 20-F, LHSP claimed that only 0.3% of 1999 revenues were provided by "companies funded in part by the FLV Fund and L&H Investment Co."

195.    As revealed by *The Wall Street Journal* on December 7, 2000, FLV Fund was the undisclosed "related party" behind eight of the thirty "start-ups" that accounted for 10% of LHSP's revenues in 1998 and 25% in 1999.

196.    Specifically, FLV Fund was directly involved in owning or funding the following customers/transactions during 1999:

(a)    In the first quarter of 1999, LHSP recorded $10 million in licensing fees from four Singapore start-up companies, I-Merge Pte., I-Office Pte., I-Mail Pte. and I-News Pte. Approximately six months later, FLV Fund invested $8 million for 49% stake in each of the four start-ups. In violation of U.S. GAAP, the FLV Fund investment was not disclosed in LHSP's 1999 financial filings.

(b)    During the third quarter of 1999, four additional LDCs, Salfas, Senegal, Baleston, and Duranzo, agreed to pay $16 million in license fees to LHSP for software rights. LHSP recognized all of this revenue during the third quarter of 1999. On October 22, 1999, however, FLV Fund invested $10 million in the companies, who then used $8 million to pay LHSP. FLV Fund disposed of its ownership in the four start-ups prior to December 31, 1999, by selling it for $11 million to HI Worldwide. An April 17, 2000 email from Philip Vermeulen of the FLV Fund to Bastiaens, Lernout, Hauspie, and Sam Cho of L&H Korea confirms that the $11 million had never been paid. Indeed, as of September 22, 2000, HI Worldwide still had not paid FLV Fund and an HI Worldwide executive gave *The Wall Street Journal* conflicting reports on whether the money was actually owed. LHSP never disclosed that the $16 million in revenue came from a related party, as required by U.S. GAAP.

197.    Because KPMG Belgium was the auditor of the FLV Fund, it knew about all these transactions from both sides.

198.    In addition to the eight "start-ups" listed above, an additional four were organized as subsidiaries of Language Investment Co. ("LIC"), whose Chief Executive Officer, Willem Hardeman, is an FLV Fund director. LIC owned four start-ups that each purchased licenses valued at $3 million from LHSP in late 1998. The start-ups each paid LHSP $1.5 million in December of 1998; however, according to *The Wall Street Journal*, LHSP recorded the full $12 million of revenue in the fourth quarter of 1998 as received. LIC confirmed that the remaining $6 million was never paid by LIC. LIC eventually sold these four start-ups to Velstra Pte. for an undisclosed sum. As described below, Velstra is owned entirely by Mercator.

86

### SAIL Trust's Participation In the Fraud

199.    SAIL Trust, while purporting to be a non-profit company, was in a position of control over the investment decisions of FLV Fund.

200.    SAIL Trust was created by Lernout and Hauspie in 1995 to assist young companies in the development and commercialization of products based on advanced speech and language technologies. SAIL Trust holds a one-third interest in FLV Management, N.V. ("FLV Management"), and has the right to appoint five of its directors. In turn, FLV Management is the manager of FLV Fund. Lernout and Hauspie were also directors of the SAIL Trust at all times relevant to these claims.

201.    Defendant Behets, the audit partner at KPMG Belgium in charge of LHSP audits from 1991 through July 1999, left KPMG shortly after the audit report for year end 1998 was filed, to become the chief executive officer of SAIL Trust.

202.    SAIL Trust, directly and through its control of the FLV Fund, participated in the fraud by providing actual or purported financing to the shell corporations which LHSP termed its "strategic partners." This funding, in turn, served as the purported basis for LHSP's lucrative licensing agreements with the "strategic partners." SAIL Trust knew that LHSP was recognizing revenue on these licensing agreements even though, to the extent money changed hands at all, it was strictly through related-party transactions attributable to SAIL Trust and thus revenue should not have been recognized on the transaction.

### LHIC's Participation In the Fraud

203.    LHIC was founded by Hauspie and Lernout in 1998 and owned 7.6% of LHSP's stock. LHIC was purportedly established to make long-term strategic investments in companies in information technology industries such as speech, language and artificial intelligence.

Hauspie and Lernout capitalized LHIC with their own shares of LHSP common stock and acted as advisors to LHIC and its investments.

204.    The President and Managing Director of LHIC at all relevant times was Francis Vanderhoydonck, who also served as a director of LHSP from May 1999 until his resignation on or about May 15, 2001. Demonstrating the close relationship between LHSP and LHIC, Vanderhoydonck often reported to the Board of LHSP on LHIC's activities and investments.

205.    In addition, the Chief Financial Officer of LHIC, Chantal Mestdagh, was formerly a KPMG Belgium auditor responsible for the audits of LHSP's financial statements. KPMG not only knew LHIC was a related party to LHSP, but relied on Mestdagh for information regarding LHSP's financials.

206. — LHIC, which was controlled and capitalized by Hauspie and Lernout and run by a director of LHSP, participated in the fraud by providing actual or purported financing to the shell corporations which LHSP termed as its "strategic partners." This funding, in turn, served as the purported basis for LHSP's lucrative licensing agreements with the "strategic partners." LHIC knew that LHSP was recognizing revenue on these licensing agreements even though, to the extent money changed hands at all, it was strictly through related-party transactions attributable to LHIC and thus revenue should not have been recognized on the transaction.

207.    By at least May of 1999, Dan Blake of LHIC, formerly employed by Cowen, knew that LHSP could not continue to meet the expectations of its investors. A May 11, 1999 memo from Blake and Thomas Denys of Loeff Claeys to Lernout, Hauspie and Francis Vanderhooydonck not only stated that "earnings expectations [are] currently too high" but also advocated lowering the expectations to a more sustainable level by stating "shortfall is opportunity to recalibre investor expectations for the long term."

208.    By May 13, 1999, Blake knew that LHSP was not going to lower investor expectations, but would instead raise them through the LDCs and strategic partners  On May 13, 1999, Blake sent an e-mail to Thomas Denys of Loeff Claeys that were forwarded by Denys to Hauspie and Lernout:

> [L]icenses in two categories are being orchestrated by Jo and Pol to fill the gap with investor expectations.  These are in 'language projects' and in 'agents.'  Because of the nature of the contracts and the licensees, investors may view with skepticism the revenues recognized from the up-front license payments — in other words, the contracts may create a 'quality of earnings" issue.
>
> As presented, these licenses account for a significant portion of planned revenues for Q1 and Q2.  Specifically, in Q1, language projects account for $12MM ($6MM in the Technology & Solutions Division (T&S) and $6MM in the Applications Division (APPS)) plus agents account for $10MM ($6MM in T&S and $4MM in Apps).  In Q2, language projects account for $9MM ($4.5MM in T&S and $4.5MM in Apps) and agents account for $3MM (inT&S).
>
> Because of the magnitude of these revenues – $22MM or 32% of total LHSP revenues in Q1 and $ 12MM or 15% of total revenues in Q2 — we should ensure that Jo and Pol understand fully the risks and be directly involved in this issue.  There are three imperatives:
>
> (1)    To the extent outside auditors are asked to review the transactions, they must receive sufficient detail about the contracts and licensees to properly ascertain the appropriate accounting treatment for revenue recognition.
>
> (2)    In communications with investors, the nature of the contracts and the licensees must be disclosed so that the investors can make an informed judgment about the quality of earnings.
>
> (3)    LHSP must exercise the utmost diligence to ensure any actions and activities that are necessary to support revenue recognition be undertaken.
>
> Because of the magnitude of the revenues involved, failure to follow these imperatives could have consequences for the corporation far worse than any announcement of an earnings shortfall.  Short-sellers are active in the stock and actively seeking