to disseminate any information that furthers the 'bear case.'
Moreover, certain short-sellers believe that there are undisclosed
accounting issues outstanding. In this environment, it would be
unlikely that information about the contracts would remain out of
the public domain. Jo, Pol and Gaston could be risking the
credibility of the company and of themselves, personally. While
companies invariably reorganize and recover from earnings
shortfalls, it is far harder for managers to recover from destroyed
credibility.

209. Despite this knowledge, and Blake's participation as a member of the working

group for the Dragon/LHSP transaction on behalf of LHIC, neither Blake nor anyone else from

LHIC disclosed the LDC arrangements or LHSP's "strategic partner" during the merger

negotiations and due diligence of Dragon and the Dragon principal stockholders.

<u>Mercator And Verbeke's Participation In The Fraud</u>

210. According to *The Wall Street Journal*, Mercator was the ultimate owner of sixteen

of the thirty "start-ups" that generated a significant portion of LHSP's "licensing" revenue

during in 1998 and 1999. Mercator owned these start-ups through several intermediary entities.

First, the sixteen start-ups were directly owned by Velstra, a Singapore-based company. Velstra,

in turn, is 100% owned by Language Development Fund ("LDF"). Mercator owns 96% of LDF.

211. Tony Snauwaert is a delegate-director, or manager, of LDF, and was described as

"Pol Hauspie's right hand" in a January 24, 2001 article in *De Finacnieel-Exonomische Tijd*, a

Belgian business publication. Snauwaert was identified as the licensee representative who

signed 9 of the 23 contracts that were provided during the due diligence process. Effectively,

Mercator employed Snauwaert.

212. Mercator invested at least $2 million in LDF, and loaned LDF an additional $10

million. These funds were then used by the LDCs to pay LHSP, inflating LHSP's purported

revenues.

213.    The sixteen start-ups owned by Mercator paid a total of $53 million in licensing fees to LHSP during 1998 and 1999. On information and belief, Mercator was the ultimate owner of the following LDCs and CLDCs: Taiwanese LDC, Malay LDC, Vietnamese LDC, Urdu LDC, Thai LDC, Hindi LDC, Tamil LDC, Italian CALC, French CALC, German CALC, Slavic LDC, Bahassa LDC, Czech LDC, Greek LDC, Polish LDC and Hungarian LDC.

214.    Mercator and its chairman, defendant Verbeke, thereby provided substantial assistance to the scheme to inflate LHSP's revenue and earnings. At all relevant times, Verbeke served not only as Chairman of Mercator, but also as a named partner at L&H's chief Belgian law firm, Loeff Claeys Verbeke. In his capacity as a partner of Loeff Claeys, Verbeke provided legal services in connection with LHSP's fraudulent transactions involving the Related-Party Defendants.--In addition, Verbeke attended virtually all meetings of LHSP's Board of Directors, including those where related-party transactions or issues concerning conflicts between LHSP and FLV Fund were discussed.

215.    Mercator and Verbeke also had a direct financial interest in participating in the fraud. First, both Mercator and Verbeke had a significant ownership interest in LHSP stock. Mercator owned 6.9% of L&H Holding N.V., which in turn owned 8.9% of LHSP. Similarly, Verbeke personally owned 8.9% of L&H Holding N.V.. L&H Holding N.V. is 85% owned by defendants Hauspie and Lernout. Mercator also directly owned approximately 0.2% of LHSP's common stock. Thus, by artificially inflating the price of LHSP stock, Mercator and Verbeke increased the value of their holdings of LHSP. Further, because the majority of their holdings were indirect, they did not need to disclose the extent of any sales of L&H Holding N.V..

216.    Mercator and Verbeke also had a separate monetary incentive for participating in the fraud — a striking return on investment. Mercator only made a limited investment in the

LDCs and CLDCs that then entered into contracts with LHSP. Because LHSP would then develop the product at its own expense and then purchase the LDCs for the value of the completed product, Mercator would see a tremendous return on its initial investment for participating in the fraud.

217.    Verbeke ultimately became a target in the fraud investigation by Belgian authorities. Despite Mercator's participation in the accounting fraud at LHSP, and obvious conflict issues, Verbeke's law firm was selected to assist in investigating and drafting the Audit Committee Report in the fall of 2000. Subsequently, on July 23, 2001, *The Lawyer* reported that Verbeke and his former law firm "have been placed' under suspicion by the [Belgian] judge leading the inquiry into stock fraud" at LHSP. Belgian authorities eventually conducted two raids for documents at Verbeke's law firm.

<u>The Merger Agreement</u>

218.    On March 27, 2000, LHSP, L&H Holdings USA, Dragon, and the Dragon principal stockholders entered into the Merger Agreement pursuant to which LHSP would acquire Dragon from the plaintiffs and other stockholders in a stock-for-stock deal.

219.    The Merger Agreement provided that LHSP would acquire all of the outstanding stock of Dragon in exchange for common stock of LHSP. The deemed price of the merger was more than $600 million and on the date the terms of the transaction were agreed to, LHSP stock was trading at $53.75 per share.

220.    The terms of the merger are set forth in a series of agreements. The essential merger documents are: (1) the Agreement and Plan of Merger, dated March 27, 2000, among Lernout & Hauspie Speech Products N.V. ("Buyer"), L&H Holdings USA, Inc. ("Sub"), Dragon Systems. Inc. ("Company") and Certain Principal Stockholders of Dragon Systems, Inc. ("Principal Stockholders"); (2) an Amendment Letter to Merger Agreement, dated May 2, 2000,

among Buyer, Sub, Company and Principal Stockholders; (3) the Amendment No. 1 to Merger Agreement, dated May 25, 2000, among Buyer, Sub, Company and Principal Stockholders; (4) the Voting Agreement and Waiver, dated March 27, 2000, among Buyer, Sub and Principal Stockholders; (5) the Affiliate Agreements, each dated March 27, 2000, among Buyer and each of James K. Baker, Janet M. Baker, Ellen Chamberlain, Kim Edwards, Laurence S. Gillick, Robert Roth, Seagate Technology, Inc., Stephen J. Luczo, Donald L. Waite and John Shagoury; (6) the Exchange Agent Agreement, dated June 7, 2000, among Buyer, Sub, Company and ChaseMellon Shareholder Services, LLC as Exchange Agent ("Exchange Agent"); (7) the Indemnity Escrow Agreement, dated June 7, 2000, among Buyer, Sub, Principal Stockholders, certain Delaware limited liability companies ("LLCs"), the Stockholder Representatives (Janet M. Baker and Donald L. Waite), and State Street Bank and Trust Company as Escrow Agent ("Escrow Agent"); and (8) a series of LLC Agreements, including: an LLC Agreement, dated June 7, 2000, of the JKBaker LLC, between L&H Holding N.V. and James K. Baker; an LLC Agreement, dated June 7, 2000, of the JMBaker LLC, between L&H Holding N.V. and Janet M. Baker; an LLC Agreement, dated June 7, 2000 of the CFB Gilbert LLC, between L&H Holding N.V. and the Cherry F. Bamberg Trust; an LLC Agreement, dated June 7, 2000, of the PGB Rumpole LLC, between L&H Holding N.V. and the Paul G. Bamberg Trust; an LLC Agreement, dated June 7, 2000, of the Roth Special LLC, between L&H Holding N.V. and Robert Roth; and an LLC Agreement, dated June 7, 2000, of the Seagate LLC, between L&H Holding N.V. and Seagate Technology, Inc. (collectively referred to herein, including above, as the "Merger Agreements").

    221.    On June 7, 2000, the transaction was consummated and LHSP acquired all of the outstanding stock of Dragon through a merger of Dragon into L&H Holdings USA, a wholly

owned subsidiary of LHSP.  LHSP issued a total of 10,011,236 reflecting a 2 for 1 stock split

and an agreement arrived at between March 27, 2000 and June 7, 2000 to issue a small amount

of additional shares to acquire all outstanding shares of Dragon.

      222.    Pursuant to the Merger Agreements, the plaintiffs were permitted to sell a small

amount of LHSP stock but were required to hold, for a period of 4 months, approximately half

the shares of the LHSP common stock received (adjusted for a subsequent 2 for 1 stock split) and

the balance for 1 year.  During this period following the merger, the plaintiffs were required to

assign the voting rights to all the shares they acquired in the merger, for so long as they held

shares, to entities controlled by defendants Hauspie and Lernout.

<u>The Representations and Warranties In The Merger Agreement</u>

      223.    The Merger Agreements contained various representations and warranties

pursuant to which LHSP and L&H Holdings USA warranted the truth and accuracy of LHSP's

financial statements and SEC filings, as described below.

      224.    Article IV of the Agreement and Plan of Merger is entitled "Representations and

Warranties of Buyer and Sub" and expressly provides that both Buyer (i.e., LHSP) and Sub (i.e.,

L&H Holdings USA) "jointly and severally represent and warrant" the statements in Article IV.

      225.    In Section 4.4 of the Agreement and Plan of Merger, LHSP and L&H Holdings

USA represented that:

> (a)    Since January 1, 1998, Buyer has filed with the SEC all
> required reports, schedules, forms, statements and other documents
> (including exhibits and all other information incorporated therein)
> required under the Securities Act of 1933, as amended (the
> "Securities Act") and the Securities Exchange Act of 1934, as
> amended (the "Exchange Act"), (together with all other required
> reports, schedules, forms, statements and other such documents
> filed after the date hereof (the "Buyer SEC Reports")).  On January
> 7, 2000, Buyer filed a Registration Statement on Form F-3 (File
> No.   333-11324) (such Registration Statement including all
> documents incorporated therein by reference, as amended, is

94

hereinafter referred to as the "January Registration Statement"). As of their respective dates, the Buyer SEC Reports and the January Registration Statement complied in all material respects with the requirements of the Securities Act or the Exchange Act, as the case may be, and the rules and regulations of the SEC promulgated thereunder applicable to such Buyer SEC Reports and the January Registration Statement, and, except to the extent that information contained in any Buyer SEC Report has been revised or superseded by a later filed Buyer SEC Report, none of the Buyer SEC Reports or the January Registration Statement, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(b)    The financial statements of Buyer included in the Buyer SEC Reports and the January Registration Statement, comply as to form, as of their respective dates of filing with the SEC, in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, have been prepared in accordance with U.S. GAAP (except, in the case of unaudited statements, as permitted by Form 6-K of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly present in all material respects the consolidated financial position of Buyer and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal recurring year-end audit adjustments) and are consistent in all material respects with the books and records of Buyer.

226.    These representations and warranties in the Merger Agreement were made directly to the plaintiffs as parties to the Merger Agreement and/or the plaintiffs were third party beneficiaries of any such representations made to Dragon because LHSP and L&H Holdings USA, and the LHSP Defendants herein, knew that the plaintiffs, as Dragon principal stockholders and parties to the Merger Agreement, would be relying on representations made both to the Dragon principal stockholders and to Dragon to decide whether to enter into the Merger Agreement and to effectuate the merger by selling the plaintiffs' shares of Dragon stock, and made or caused to be made such representations with the intent that the plaintiffs would rely

95

and act upon them. Further, the plaintiffs did rely on such representations and warranties in entering into the Merger Agreement and in selling their interest in Dragon in order to effectuate the merger transaction.

227.    The plaintiffs reasonably relied on these representations. Indeed, based on these representations, and the representations of the defendants described above, the plaintiffs had no reason to believe that any of the information provided by LHSP and L&H Holdings USA was false.

228.    In Section 4.6 of the Agreement and Plan of Merger, LHSP and L&H Holdings USA represented that:

> Except as expressly contemplated by this Agreement or as disclosed in the Buyer's SEC Reports filed prior to the date hereof or in Company press 'releases issued prior to the date hereof, since September 30, 1999, there has not been (i) any change in the financial condition, results of operations, business, or properties of Buyer and its Subsidiaries, taken as a whole, that has had, or is reasonably likely to have, a Buyer Material Adverse Effect; (ii) any damage, destruction or loss (whether or not covered by insurance) with respect to Buyer or any of its Subsidiaries having a Buyer Material Adverse Effect; (iii) any material change by Buyer in its accounting methods or principles not required pursuant to U.S. GAAP (except for such changes that could not reasonably be expected to have a Buyer Material Adverse Effect); (iv) except as a result of the transactions contemplated by this Agreement or in connection with the acquisition by Buyer or any of its Subsidiaries of all or substantially all the capital stock or all or substantially all the assets of another person or entity, any revaluation by Buyer of any of its assets having a Buyer Material Adverse Effect, exclusive of any revaluations (including write-downs or write-offs) of goodwill; or (v) any other action or event that would have required the consent of Company pursuant to Section 5.3 of the Agreement had such action or event occurred after the date of this Agreement.
>
> [Emphasis added.]

"Buyer Material Adverse Effect" is defined in Section 4.1 of the Agreement and Plan of Merger as "a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement."

229.    These representations and warranties in the Merger Agreement were made directly to the plaintiffs as parties to the Merger Agreement and/or the plaintiffs were third party beneficiaries of any such representations made to Dragon because LHSP and L&H Holdings USA, and the LHSP Defendants herein, knew that the plaintiffs, as Dragon principal stockholders and parties to the Merger Agreement, would be relying on representations made both to the Dragon principal stockholders and to Dragon to decide whether to enter into the Merger Agreement and to effectuate the merger by selling the plaintiffs' shares of Dragon stock and made or caused to be made such representations with the intent that the plaintiffs would rely and act upon them.. Further, the plaintiffs did rely on such representations and warranties in entering into the Merger Agreement and in selling their interest in Dragon in order to effectuate the merger transaction. The plaintiffs reasonably relied on these representations.

230.    Article VII of the Agreement and Plan of Merger is entitled "Conditions to Merger". It provides, in relevant part, several conditions to the obligation of Dragon and its shareholders to effect the merger. Two such conditions are set forth in Section 7.3:

> (i)    The representations and warranties of Buyer and Sub set forth in this Agreement that are not qualified as to materiality or Company Material Adverse Effect *shall be true and correct in all material respects as of the Closing Date and the Effective Time*, as though made at and as of the Effective Time, except that those representations and warranties that address matters only as of a particular date shall remain true and correct in all material respects as of such date;
>
> (ii)    The representations and warranties of Buyer and Sub set forth in this Agreement that are qualified as to materiality or Buyer Material Adverse Effect *shall be true and correct in all respects as of the Closing Date and the Effective Time*, as though

97

made at and as of the Effective Time, except that those representations and warranties that address matters only as of a particular date shall remain so true and correct in all material respects as of such date;

[Emphasis added.]

231. The Merger Agreements expressly provided that LHSP's and L&H Holdings USA's representations and warranties would survive for 1 year after the closing. See Agreement and Plan of Merger dated March 27, 2000, Sections 10.1 and 'Article VIII; see also Section 4.4(b), 4.4(c) and 4.7.

### False and Misleading Representations by Defendants Regarding LHSP Revenues

232. Until its acquisition of Dictaphone Corporation, another corporation by LHSP, in May, 2000, LHSP had been able to file information with the SEC as a foreign private issuer subject to less detailed disclosure requirements than those applied to U.S. entities. Shortly after the Merger was consummated, on June 30, 2000, LHSP filed a Form 10-K, which included financial statements for fiscal year 1999 audited by KPMG, and also filed a Form 10-Q, which included unaudited financial statements for the first quarter of fiscal year 2000, both of which contained, for the first time in an SEC filing by LHSP, the geographic breakdown of sales required by the SEC in filings by U.S. companies.

233. The filings purported to reveal that out of 1999 revenue of $344.2 million, Korea contributed $62.9 million and Singapore contributed $80.3 million (collectively, over 41% of total LHSP revenues), up from a combined revenue of less than $300,000 in 1998.

234. Investigation of these figures by the SEC and the financial press provided mounting evidence over the next six months of a massive and pervasive fraud that all of the defendants had concealed from the plaintiffs prior to consummation of the Merger:

(a)    Contrary to defendants' claims of LHSP's "record" growth, at least one-third of LHSP's revenues in 1998, 1999 and the first half of 2000 were improperly recorded.

(b)    Contrary to defendants' claims of hefty licensing fees from unaffiliated "strategic partners," the arrangements were sham transactions with related parties, including entities audited by KPMG Belgium, designed to permit LHSP to fund its research and development off the books.

(c)    Contrary to defendants' claims that the Far East constituted its fastest growing market, LHSP has now admitted that "Korea never really had any sales to speak of." More than $100 million recorded on the books of LHSP's Korean unit is "missing," likely as a consequence of LHSP factoring its receivables with recourse, an arrangement that was never publicly disclosed, but that was known to KPMG Belgium as early as October 1999.

(d)    Contrary to defendants' claims of record growth fueled by revenues from successful, innovative products, LHSP reported, revenue from barter transactions in which no cash changed hands, recognized revenue from sales that were contingent on LHSP later performing development work for the customer, and recorded sales before contracts were signed, when it was unclear that the customer had the ability to pay, or when the customer's ability to pay depended on an investment from LHSP.

### The LHSP Success Story Is Revealed To Be A Sham

235.    Unbeknownst to the plaintiffs, LHSP's financial statements and representations would soon be revealed to contain misstatements and omissions. Indeed, as set forth above, as a result of its acquisition of Dictaphone, LHSP became subject to more stringent SEC reporting requirements as a United States company. As explained below, certain first-time disclosures in LHSP's first quarterly reports and other SEC filings, filed on SEC Forms 10-Q, 10-K and S-3 on June 30, 2000, raised suspicions about LHSP's financial success during the previous few quarters or longer.

236.    For the first time, LHSP disclosed to the investing public and to the plaintiffs pieces of the true story behind its purported success. The new financial reporting format revealed detailed information about LHSP's huge jump in sales to Asia in 1999 and the first quarter of 2000. Specifically, out of 1999 revenue of $344.2 million, Korea contributed $62.9

million and Singapore contributed $80.3 million. The prior year, the two countries combined

had contributed less than $300,000 in sales. Although LHSP completed a significant acquisition

of Korean company Bumil Information & Communication in 1999, it made no significant

acquisition in Singapore during the period.

237.    Investigation of these figures by the SEC and the financial press provided

mounting evidence in late 2000 of a massive and pervasive fraud that all of the defendants had

concealed from the plaintiffs prior to consummation of the Merger:

(a)    Contrary to defendants' claims of LHSP's "record" growth, at least one-third of
LHSP's revenues in 1998, 1999 and the first half of 2000 were improperly
recorded.

(b)    Cntrary to defendants' claims of hefty licensing fees from unaffiliated "strategic
partners," the arrangements were sham transactions with related parties, including
entities. audited by KPMG Belgium, designed to permit LHSP to fund its
research and development off the books.

(c)    Contrary to defendants' claims that the Far East 'constituted its fastest growing
market, LHSP has now admitted that "Korea never really had any sales to speak
of." More than $100 million recorded on the books of LHSP's Korean unit is
"missing," likely as a consequence of LHSP factoring its receivables <u>with
recourse</u>, an arrangement that was never publicly disclosed but that was known to
KPMG Belgium as early as October 1999.

(d)    Contrary to defendants' claims of record growth fueled by revenues from
successful, innovative products, LHSP reported revenue from barter transactions
in which no cash changed hands; recognized revenue from sales that were
contingent on LHSP later performing development work for the customer; and
recorded sales before contracts were signed, when it was unclear that the
customer had the ability to pay, or when the customer's ability to pay depended
on an investment from LHSP.

238.    In response to analysts' concern about these new troubling disclosures, defendant

attempted to conceal LHSP's false financial reporting. Bastiaens tried to explain these

developments as mere reactions to a shift in company strategy. As reported by *The Wall Street

Journal* on July 6, 2000, Bastiaens explained that pursuant to this "new strategy," rather than

license its underlying technology to companies that would then develop applications for specific

100

markets, LHSP decided more than a year earlier to build its own applications, allowing it to gain more revenue over time.

239.   Bastiaens claimed the "strong" Asian sales were a result of LHSP's early market presence and lack of strong competition.  He explained the 1999 figures for Singapore as revenues from licensing LHSP technology to companies that are building local-language versions of its systems for languages such as Hindi and Tamil.  The licenses were sold for $2 million to $4 million each, but, according to Mr. Bastiaens, sales dropped off after the major language licenses were sold.

240.   The public revelation that LHSP's revenues were derived from unusual Asian sales promoted reporters from *The Wall Street Journal* to attempt to get behind some of the newly disclosed Asian figures that they began investigating LHSP's claimed relationships with Korean companies identified by LHSP as customers.  Nevertheless, KPMG took no action at this time to undertake any investigation to confirm its previous audits of these same revenues.

241.   On August 8, 2000, *The Wall Street Journal* reported that "some companies LHSP has identified as Korean customers say they do no business at all with LHSP.  Others say their purchases have been smaller than LHSP says." *The Wall Street Journal* contacted 18 of 30 companies claimed by LHSP as customers in Korea:

> Three of the companies say they aren't, in fact, L&H customers....
> Three more companies say their purchases from L&H over the past
> three quarters were smaller than figures provided by Mr. Bastiaens
> or Sam Cho, vice president of L&H Korea.   One additional
> company says it is in a joint business with L&H that produces
> considerably less revenue than L&H claims.  Officials from an
> eighth company initially said it had formed a joint venture with
> L&H and that the joint venture, not the company itself, had
> purchased products from L&H.  Later, the company retracted this
> initial version.
>
> All told, of the 13 companies that responded to inquiries, about
> their purchases from L&H in the period since it acquired Bumil,

the revenue tallies roughly $32 million. From all of its customers in Korea, in 1999 and the first quarter of 2000, L&H posted $121.8 million of Korea sales, and it has said that it expects second-quarter revenue from that country to exceed the first quarter's $58.9 million....

Among the companies that L&H boasts as customers: Korea Securities Computer Corp., or Koscom, a government-regulated clearing house for stock trades... Mr. Bastiaens initially says L&H received revenue in the range of $5 million to $10 million (he wouldn't be more specific) from Koscom in the three quarters ended June 30. According to two Koscom officials, whose names were provided by L&H, Koscom and L&H are partners in an automated phone stockquote service. Korea Telecom collects the per-call payment, keeps 10% and splits the rest between Koscom and L&H.

One of the Koscom officials estimates L&H and Bumil's share of the revenue at roughly $1.5 million in 1999....

In a Dec. 28, 1999 press release, L&H said Samsung Securities, a big Korean brokerage, together with more than 14 other securities firms, had "selected L&H to develop client server solutions for online trading and automated dialogue systems." But two Samsung officials, including spokesman Shin Dong Woo, say their firm never made any purchases from L&H, although they discussed some.

* * *

L&H also claims LG Electronics as a customer. But Yu Won Uk, a senior research engineer at LG Electronics – a contact provided by L&H – says his company never bought products or licenses from L&H. Instead, he says the two firms briefly worked on a joint project for applying voice recognition to television, but stopped because there "was no progress." LG Electronics paid L&H only "engineer charges," he says, akin to labor costs for L&H's share of the work on the failed project.

* * *

Another Korean company with which L&H says it has a significant relationship is Hung Chang Co., a maker of communications equipment. Mr. Bastiaens put revenue from Hung Chang in the range of $5 million and $10 million over the past three quarters.

However, Kim Ho Kyun, a Hung Chang official whom L&H identified as its contact, says Hung Chang wasn't using L&H

102

products internally and that L&H's $5 million bill was paid by a joint venture called Spia, "not Hung Chang." Another Hung Chang official, Choi Sang Hyun, who was reached independently of L&H says Spia Co. was founded May 2, with Hung Chang as the largest shareholder, but June 28 L&H Korea became the largest, with Hung Chang holding 27.49%. Mr. Choi says Spia makes products based on L&H's voice-recognition technology, and says Hung Chang is only a passive shareholder.

\* \* \*

Mr. Bastiaens also identified Hyundai Securities and Hanvit Bank as providing revenue totaling between $5 million and $10 million. But at Hyundai Securities, two officials, including a contact provided by L&H, say their purchases amounted to just over $1 million. At Hanvit Bank, Lee Jae Bong, manager of network management, says the only contract signed by his institution tallied $150,000.

242.    Despite this report, and LHSP's acknowledgement as a result of the report, that LHSP's initial representations made about some customers were mistaken, KPMG did not withdraw its opinions with respect to LHSP's 1998 and 1999 audit.

243.    On August 13, 2000, LHSP commissioned a special mid-year audit by KPMG Belgium to examine issues raised with respect to Korea and Singapore. The ostensible purpose of this audit was to allay concerns about financial results of the South Korea division, but the real purpose was to attempt to conceal the fraud which underlie those revenues.

244.    On September 20, 2000, the LHSP Board of Directors authorized its Audit Committee to "conduct such inquiries as it deemed appropriate into certain accounting and other practices of the Company that were the subject of a formal investigation being conducted by the [SEC]," according to the Audit Committee Report, which was provided to the Audit Committee two months later, on November 20, 2000 by the Audit Committee Advisors — i.e., the U.S. law firm Bryan Cave LLP, the Belgium law firm Loeff Claeys Verbeke, and the accounting firm of Arthur Andersen LLP.

245.    On September 21, 2000, LHSP confirmed that the SEC had commenced "an investigation of its prior financial statements." As reported in *The Wall Street Journal* on February 5, 2001, that investigation had commenced as early as January 2000, in the midst of LHSP's negotiations with Dragon and the Dragon principal stockholders, including the plaintiffs, and involved KPMG Belgium prior to KPMG's reporting on LHSP's 1999 financial statements: "The SEC had sent L&H a letter in late January, 2000, notifying it of the informal probe and asking a number of questions about related-party financing issues.... And KPMG Belgium, LHSP's regular auditor, had received a letter from the SEC about LHSP's accounting in late April, 2000, according to a spokesman familiar with the letter."

246.    According to the same February 2001 *Wall Street Journal* article, certain officers and a director of LHSP sold a total of $13 million of LHSP stock in May 2000, after U.S. regulators already had notified LHSP that they were examining its accounting practices.  Before the closing of the Dragon Merger, none of the defendants disclosed to Dragon or the Dragon principal shareholders the reason for this sale of the shares in May 2000.

247.    According to a September 22, 2000 *Wall Street Journal* article, the "SEC probe ... is focusing on the once highflying company's recent dramatic sales increases in Asia and its dealings with corporate customers to which it has financial ties."  The article suggested that the SEC "may find that a key stop on the money trail is No. 5 Shenton Way in downtown Singapore" and revealed that, contrary to LHSP's representations that it received tens of millions of dollars in license revenues from "unaffiliated customers" in Singapore, nineteen start-up "licensees" in Singapore were shells manned by LHSP personnel and funded by LHSP affiliates.

248.    On October 18, 2000, *The Wall Street Journal* provided more information about the suspicious start-up licensees:

Lernout and Hauspie Speech Products NV has declined to provide the Securities and Exchange Commission with the names of investors behind 30 corporate customers that are a key focus of an SEC probe....

The 30 start-up companies, registered in Singapore and Belgium, in aggregate accounted for about 25% of 1999 revenue for the Belgian maker of speech recognition software, and about 10% of its 1998 revenue.

Among other things, the SEC is trying to determine whether the companies are in fact related parties to L&H, and should be disclosed as such. Some analysts and investors have long been concerned that L&H's revenue and growth rates have been fueled by sales to related parties, which might indicate that its competitive position and product quality are not as strong as they appear in L&H's financial statements.

* * *

Of the 17 companies L&H agreed to discuss, none has any direct employees. Seven are relying on L&H employees to do work for them, and have agreed to repay the company for the services, according to Lanny Davis, an outside L&H attorney. The other 10 have not started developing software, though they have paid hefty licensing fees to L&H.

* * *

Under accounting rules, companies must disclose many more details about related-party transactions, including a discussion of the' relationship between the parties. Despite that additional information, many investors still don't like related-party dealings, because its impossible for outsiders to tell if they were conducted at arm's length.

In addition to the related party issue, outside accounting experts wonder whether L&H created some or all of the 30 companies as off-balance-sheet vehicles to do research and development. That structure, in theory, would allow the company to pump up current revenue while limiting future R&D expenses.

249    On October 26, 2000, *The Wall Street Journal* suggested that not only was the "burst" of revenue from Belgian and Singaporean "licensees" in reality self-funded  it was also fraudulently inflated:

> Lernout & Hauspie Speech Products NV's claim that it received multimillion dollar license payments from four Belgian start-up companies isn't supported by financial statements the ventures have filed with Belgium's central bank.
>
> LHSP booked $3 million in license payments from each of the four companies in late 1998, according to an accounting document the maker of speech-recognition software provided to *The Wall Street Journal* in response to a request for substantiation of its revenues.
>
> But the July central-bank filings of the four start-ups show no expenditures close to being that big, nor do their balance sheets list assets as large as the purported value of the licenses.   Several Belgian accountants who reviewed the statements say they don't substantiate the $3 million expenditures.  All four statements cover the period from Dec. 4, 1998, when the companies apparently were founded, to Dec. 31, 1999.

250.    On November 6, 2000, *The Wall Street Journal* provided further confirmation of

LHSP's fraudulent reporting of licensing revenues:

> Lernout & Hauspie Speech Products NV claimed that four Belgian start-up firms paid it $12 million in 1998 for software licenses, but the original parent company of the four start-ups said they paid L&H only $6. million that year.
>
> * * *
>
> The top two executives of Language Investment Co. said their closely held company, based in Poperinge, Belgium, owned the four start-ups from their inception in December 1998 until December 1999.  In late 1998, they said, the four start-ups each agreed to buy licenses valued at $3 million, or a total of $12 million, entitling them to develop versions of L&H's speech-recognition and translation software in Greek, Polish, Hungarian and Czech.
>
> However, the executives said the ventures paid L&H only $1.5 million each, or a total of $6 million, upfront in December 1998. The remaining amount, they said, was still unpaid when LIC sold the four firms to a Singapore-registered company, Velstra Pte. Ltd., in December 1999.
>
> The LIC officials' version of events conflicts with L&H's claim that it received the $12 million license payments in full in late 1998.  An internal accounting document L&H gave to *The Wall*

106

*Street Journal*, in response to a request for substantiation of its revenue, shows that L&H not only booked the $12 million in revenue from the four start-ups in the fourth quarter of 1998, but also received the full $12 million payments that same quarter.

251.    On November 9, 2000, LHSP "provided an update on the status of the mid-year audit of the Company that it had commissioned last August and of the ongoing audit committee inquiry" and announced that "[a]s a result of errors and irregularities identified in the audit committee inquiry, the Company expects to restate its financial statements for the periods 1998, 1999 and for the first half of 2000." LHSP further announced that its specially commissioned mid-year audit by KPMG, which was designed to confirm the accuracy of its financial statements, would not be completed by November 14, 2000. Upon information and belief, KPMG did not timely complete the mid-term audit because the work by the Audit Committee had made a continuation of KPMG's prior practice of auditing LHSP's fraud impossible to continue.

252.    That day, the NASDAQ suspended trading in LHSP shares. Just before the suspension, LHSP shares were changing hands at $3.525, more than 95% below the record high of $72.50 they reached in March, when the company claimed a market capitalization of more than $10 billion. The slide wiped out more than $9 billion of the company's stock market value.

253.    On November 17, 2000, The Wall Street Journal reported that LHSP's independent auditor, KPMG, had withdrawn its audit report of LHSP:

Lernout & Hauspie Speech Products NV's accounting firm withdrew its audit report for the company's 1998 and 1999 results, saying its prior clean opinion of the software maker's books "should no longer be relied upon."

The move by KPMG International's Belgian member firm, disclosed in a regulatory filing by L&H, came after L&H announced last week that an internal probe had discovered "errors and irregularities" in its financial statements for those two years, and for the first six months of 2000.

107

254.    On November 17, 2000, as *The Wall Street Journal* reported (on December 7, 2000), John Duerden, who replaced Bastiaens as Chief Executive Officer of LHSP, concluded that $100 million on the books of LHSP's Korean unit was missing.

255.    On November 20, 2000, the Audit Committee Advisors presented the Audit Committee Report, which concluded that $277 million – or one-third – of revenue over the past 2 1/2 years may have been improperly recorded. And this was a conservative and incomplete figure. The Audit Committee Advisors reported that efforts were impeded by a lack of cooperation on the part of KPMG Belgium and members of LHSP's management and board:

> We were unable to review the workpapers of L&H's outside auditor, KPMG, because KPMG was unwilling to make the workpapers available for review in connection with this investigation.

* * *

> Management and some board members of L&H have made this process [of investigating allegations regarding related party dealings] far more difficult than it needed to be. We assume that several of these persons have full information about the investors and the structure of the transactions, and they should immediately provide that information to Audit Committee Counsel. Because they have failed to do so, Audit Committee Counsel has been forced to piece together bits and pieces of information from a variety of sources. As a result, we still do not know the identities of all of the original, and possibly all of the current investors, in these companies.

Thus, the Audit Committee Advisors cautioned that the draft schedules showing the potential impact on the financial statements of the transactions examined "do not purport to represent all changes to the financial statements that would likely be identified after a complete audit." The Advisors also warned that "[w]e did not address non-revenue issues, and the revenue transactions selected for review may not include all transactions as to which the accounting should be considered."

256.    The Audit Committee Report corroborates the extensive press coverage of defendants' fraudulent scheme, and details numerous additional questionable transactions, including, among other things, the booking of revenue before contracts were signed, secret side letters providing refunds of license fees, and wrongly booked barter deals in which no money changed hands.

257.    With respect to license revenues from "strategic partners," which the Audit Committee Report categorized as Cross Language Development Companies, or CLDC's, and Language Development Companies, or LDC's, the Audit Committee Advisors concluded that revenue from 24 of the 30 new companies was incorrectly booked. The report concluded that the companies were not buying software licenses, but were actually paying LHSP employees to develop future products, in effect funding the company's own R&D needs. The Audit Committee Report recommended, at a minimum, reversing approximately $83 million in licensing revenue, and stated that if the investors are related parties, as the evidence suggests, the funded amounts should be recognized as a liability:

> It appears, based on our review, that the original LDC concept involved the sale of rights and tools to an independent third party and the separate use of those tools by the third party to develop L&H compatible products in a particular language. The wording of the contracts corroborate this concept. However, it also appears that shortly after the first few LDC contracts were signed, L&H personnel realized that the LDC investors were primarily financial investors and L&H would have to provide more services to the LDC's than they originally thought. Eventually, L&H assumed responsibility for the development work for a contemplated additional fee. Although it appears to us that, by December 1998 L&H and the LDC's knew that L&H would be performing some or all of the services or development work for the LDC's, future contracts were not changed to reflect that understanding. Except for Turkish and Farsi, contracts reflecting that the LDC's would pay L&H for the services or development work were not executed until November 3, 2000. To our knowledge, except for Turkish

and Farsi, the LDC's have not yet been invoiced for the development work performed to date.

* * *

We believe, based on our review of certain internal documents and outside marketing material and limited discussions with the investors or their representatives, that the investors anticipated, in substance, that they were buying the future rights to a product (language) to be developed by L&H and thus were effectively funding the Company's research and development efforts to build that language.

If the investors are not related parties, accounting for such transactions would require deferral of all the revenues and recognition over the development period.... If the investors are related parties, the relevant accounting literature presumes that the related party investors will be repaid and the funded amounts are recognized as a liability.

258.    In fact, the investors were related parties, and what LHSP recognized as license revenue should not merely have been deferred, it should have been stated as a liability.  Although the Audit Committee report redacted the names of the investors it did manage to discover and connect to LHSP, news reports revealed those names and their affiliations with LHSP.

259.    A September 22, 2000 *Wall Street Journal* article revealed that eight of the shell start-ups were funded by FLV Fund, which is audited by KPMG Belgium.  According to a November 6, 2000 *Wall Street Journal* article, another four were organized as subsidiaries of Language Investment Co., whose chief executive officer, Willem Hardeman, sits on the Board of the FLV Fund.  And a December 14, 2000 *Wall Street Journal* article reveals that another sixteen were owned by Mercator, the Antwerp insurance company addressed above whose chairman is Verbeke of Loeff Claeys.  As addressed above, Verbeke and Mercator separately hold stakes in LHSP, and Mercator also owns interests in L&H Holding, N.V., LDF and indirectly owned Velstra, which indirectly owned 16 of the 30 LDCs and CLDCs.  LHSP's financial statements and other disclosures misleadingly omitted these relationships  Indeed, as

110

previously set forth, LHSP affirmatively and falsely represented that these "licensees" were "unaffiliated customers" and that 1998 and 1999 revenues from companies funded by FLV Fund were *de minimis*. Further, at least with respect to start-ups owned by FLV Fund, KPMG Belgium saw both sides of the transactions.

260.    The Audit Committee Advisors did not examine the Brussels Translation Group and Dictation Consortium transactions "because of the age of the transactions and our understanding that KPMG carefully reviewed these transactions at the time." Notwithstanding KPMG Belgium's "careful review," the Audit Committee Advisors concluded that revenues from 24 of the 30 new companies, which were modeled after Dictation Consortium and Brussels Translation Group, were incorrectly booked.

261.    As for Korea, the Audit Committee Advisors recommended that LHSP consider reversing the company's entire Korean revenue during 1999 and 2000, amounting to approximately $182 million, and then record the revenue if and when cash is later received from Korea. The Audit Committee Advisors were "unable to reach any conclusions with respect to issues in Korea" because of their lack of access to information. However, the Audit Committee Advisors were able to review some Korean contracts, and suggested that the company revisit those specific contracts if and when "global issues" are resolved.

262.    Finally, the Audit Committee Report details transactions involving tens of millions of dollars in which revenue was improperly booked for a variety of reasons.

  (a)    In LHSP's Burlington, Massachusetts, office, "[t]he problematic practices included barter transactions, rights to return products, transactions where the customers' ability to pay depended on the receipt of an investment from LHSP, and the separation of one agreement into two contracts – a license agreement and a development agreement – so that more revenue could be booked in an earlier quarter than might otherwise occur."

  (b)    In Belgium the Audit Committee Advisors discovered many transactions where revenue was recorded earlier than it should have been, and also instances where

111

the customer did not have the ability to pay and was not even invoiced for it. The "problematic transactions ... include the backdating of contracts, one side letter, several instances of later delivery of product, a promise to deliver an additional language at no extra charge 'when and if available' and an understanding that the cost of certain options would be reimbursed through a subsequent arrangement."

(c)     In Korea, the problems included the separation of an agreement into, a license agreement and a development agreement so that revenue could be recognized earlier, and also factoring of receivables and the possibility that this was done with recourse to LHSP bank accounts in Korea.

263.    On November 23, 2000, the public prosecutor's office in Ieper, Belgium announced an official investigation into the legal repercussions of the financial irregularities at LHSP. The prosecutor stated that the investigation would determine who was responsible for the errors and irregularities and that this could include "both L&H personnel and KPMG auditors."

264.    On November 29, 2000, LHSP filed for protection from its creditors under Chapter 11 of the United States Bankruptcy Code.

265.    Indeed, *The Wall Street Journal* reported on December 19, 2000 that the Audit Committee Report, coupled with another audit report, "together present the broadest and deepest case to date that the rise of Lernout & Hauspie was based on artifice and deceit – and not on dazzling advances in computerized speech recognition, as the company had purported." According to *The Wall Street Journal*, these reports make clear that statements made by LHSP executives as late as December 15, 2000 to LHSP investors regarding the financial status and viability of LHSP were patently false. It noted the Audit Committee Report concluded that, among other things, there were transactions with related entities "as to which revenue should never have been recorded." In addition, the Audit Committee Report described sales practices, that resulted in recordings of improper revenue, as so "problematic" that disciplinary action was recommended against LHSP employees. According to the Audit Committee Report, "[i]n some instances it appears that the customers [for whom LHSP booked revenues] did not have the

112

ability to pay for the product, and was not even invoiced." Strikingly, LHSP refused in the investigation which culminated in the Audit Committee Report to disclose information about "the investors and the structure of the transactions" with certain customers even though the report concluded several members of LHSP management likely "have full information" regarding this.

266.    On January 5, 2001, the Associated Press reported that the Belgian judge presiding over LHSP's Belgium bankruptcy proceeding acknowledged that there is "no doubt there was fraud" at LHSP.

267.    On March 2, 2001, Philippe Bodson, LHSP's third CEO since August 2000, stated that "Korea is a real catastrophe. The situation there is as bad as one could possibly imagine. L&H Korea never really had any sales to speak of."

268.    On April 6, 2001, LHSP held a press conference where it released certain information regarding the investigation, assisted by its outside investigators, Price Waterhouse Coopers, relating to the cancellation of $100 million of revenue of L&H Korea due to the cancellation of 47 license and maintenance agreements entered into between September 1999 and November 2000. The findings of this investigation revealed that L&H Korea had signed sales agreements and booked revenue it could not hope to collect, then created fictitious agreements with four Korean Banks and with some of its customers to create the appearance that revenue was collected from these sales. The two reports released by LHSP, L&H Korea Preliminary Report and L&H Korea Investigation reported that:

(a)    L&H Korea attempted to meet its sales forecasts by booking large sales to small and start-up business although there was "no real expectation of collecting these large royalties within a reasonable time" by the use of side agreements such as agreements not to enforce the collection of accounts receivables. This created the problem that L&H Korea had to show some sort of collections to avoid reversals of the sales. The appearance of collections was created by the use of factoring

113

and transfer agreements to give the illusion that payments were received by L&H Korea, although there were little or no payments actually generated and the cash from the factoring arrangements purportedly under the control of L&H Korea was actually controlled by the Korean banks.

(b)    Beginning in September 1999, L&H Korea entered into factoring arrangements with Korean banks where the accounts receivables from the licensing agreements were sold to the banks.  These agreements were ostensibly without recourse against L&H Korea shifting the risk of non-payment to the Banks.  This mechanism permitted L&H Korea to record the receipt of income on their books. In fact, secret side agreements were entered providing that the risk of nonpayment was still with L&H Korea and L&H Korea agreed not to object if L&H Korea's deposits at the Banks were used to offset the accounts receivables upon default. In addition, L&H Korea agreed to fully collateralize the loans with the proceeds of these factoring agreements.

(c)    A second group of contracts referred to "transfers" were created to demonstrate collections.  In these transfer agreements, L&H Korea instructed its original customers to transfer its contract to third parties, and that third party obtained a loan from a Bank with the assistance and collateral of L&H Korea.  The third party would then make a payment through the original customer that would be recorded as revenue although it was actually a loan for which L&H Korea was responsible.

(d)    L&H Korea cancelled the license agreements in November 2000, which caused $76,840,951 in cash to revert to the Korean Banks from the factoring arrangements and transfer agreements.  In addition L&H Korea paid penalties related to these agreements and incurred other expenses in the amount of $18,369,971 as a result of the cancellation of the license agreements.  After cancellation of these license agreements, L&H Korea, which had appeared to have a cash balance of $97,501,584, in fact only had cash of $2,290,662.

269.    According to an April 25, 2001 Bloomberg news report, LHSP asked Seoul, Korea prosecutors on April 25, 2001, to investigate John Chul Seo, the former head of L&H Korea, and other former employees of L&H Korea, as well as current and former officials of four Korean banks that assisted L&H Korea in the fraudulent transactions.  According to Bloomberg, LHSP also issued a statement that "[LHSP] believes that certain actions by Mr. Seo amount to criminal fraud and breach of trust in office, among other criminal activities."  LHSP also reported filing a criminal complaint with the Seo  Prosecutors Office that also named current or former officers of the Korean Banks.  Hana Bank, another Korean Bank, also was implicated in

114

the factoring arrangements. LHSP also announced that its wholly-owned subsidiary L&H Korea filed for voluntary bankruptcy in Korea.

270.    Defendants Lernout, Hauspie and Willaert submitted letters to a Belgian financial daily printed April 26, 2001, in which Lernout, Hauspie and Willaert stated that they had cooperated with KPMG's audits and that KPMG was fully aware of LHSP's structure, including LHSP's activities in Korea.

271.    On April 27, 2001, LHSP, through its CEO Philippe Bodson, announced at an extraordinary shareholders meeting in Ieper, Belgium, that in addition to the $277 million identified in the Audit Committee Report as being misreported, an additional $96 million of income had been reported which did not exist.

272. _ On or about April 27, 2001, Lernout, Hauspie and Willaert were arrested in Belgium and charged with forgery and stock manipulation.

273.    On May 26, 2001, Bastiaens was arrested by United States officials in Winchester, Massachusetts, in response to a Belgian warrant. Bastiaens was subsequently extradited to Belgium, where he has been charged with fraud, insider trading, stock market manipulation and accounting law violations.

**False and Misleading Representations and Omissions by
KPMG Defendants, Behets, and LHSP Defendants That LHSP
Financial Reports Were Prepared in Accordance with U.S. GAAP**

274.    U.S. GAAP are those principles recognized by the U.S. accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Regulation S-X, 17 C.F.R. 210.4-01(a)(1), states that financial statements filed with the SEC that are not prepared in accordance with U.S. GAAP are presumed to be misleading and inaccurate.

275.    By acknowledging that its 1998, 1999 and 2000 financial statements needed to be corrected and restated, LHSP has admitted that, contrary to its prior representations, those statements were not prepared in accordance with U.S. GAAP.  Under U.S. GAAP, restatement of previously issued financial statements is only permitted – and is required – to correct material misstatements and/or omissions in the financial statements as a result of conditions that existed at the time the financial statements were originally prepared.  Financial Accounting Standards Board, Accounting Standards ("AS"), § A35.

276.    By withdrawing its previously issued clean opinions, KPMG conceded that KPMG's prior opinions – based on work performed by KPMG LLP and KPMG UK in addition to KPMG Belgium – that LHSP's financial statements were prepared in accordance with U.S. GAAP were false when made.  When an auditor concludes that reliable information that existed at the date of the auditor's report rendered the financial statements, as previously issued, materially misleading and erroneous, the auditor is required to take appropriate action to prevent future reliance on the financial statements and its related auditor's report.  AU § 561.

277.    The Audit Committee Report makes it clear that LHSP's financial results were not stated in accordance with U.S. GAAP; and representations of the KPMG Defendants, the LHSP Defendants and Behets that the financial results were stated in accordance with U.S. GAAP were false when made.  Moreover, the accounting principles that were disregarded were not esoteric or obscure; they were fundamental principles of revenue recognition and disclosure that were very much at the forefront of the accounting and auditing profession's concerns during the relevant period:

(a)    In a letter to the AICPA from the SEC Chief Accountant dated October 9, 1998, which was posted to the AICPA website on the Internet, the SEC addressed "inappropriate revenue recognition practices" and emphasized that auditors should be alert to the criteria for revenue recognition contained in Statement of

116

Position ("SOP") 97-2, *Software Revenue Recognition*; FASB Statements of
Financial Accounting Concepts Statement No. 5, *Recognition and Measurement
in Financial Statements of Business Enterprises*, and No. 6, *Elements of Financial
Statements*; and SEC Accounting and Enforcement Release No. 108, all of which
address the types of fraudulent practices identified by the Audit Committee
Report;

(b)     AICPA Practice Alert No. 95-1 was "intended to remind auditors of conditions
that can be indicative of increased audit risk with respect to improper and unusual
revenue practices," and addressed specific practices identified by the Audit
Committee Report;

(c)     AICPA Practice Alert No. 95-3 addressed related parties and related party
transactions, stating that "identifying related parties and material related-party
transactions is a key component of any audit;"

(d)     AICPA, *Audit Issues in Revenue Recognition*, 1999, at 21-26, addressed software
revenue recognition and related party disclosures in financial statements,
describing "indicators of improper revenue recognition" or "red flags" including
"unusually rapid growth or profitability" and warned auditors to search for "side
agreements," "related party transactions" and specific indicators of "the absence
of agreements," "lack of delivery," or "incomplete earnings process;"

(e)     The AICPA also issued "Audit Risk Alerts" annually during the relevant period
that discussed the same accounting and auditing issues highlighted in the Audit
Committee Report;

(f)     On September 28, 1998, Chairman of the SEC, Arthur Levitt, in a speech entitled
"The Numbers Game," referred to inappropriate accounting that he called
"Accounting Hocus-Pocus."  In that speech, Chairman Levitt characterized as
"merger magic," inappropriate accounting for acquired in-process research and
development, stating "they classify an ever-growing portion of the acquisition
price as 'in-process' research and development so – you guessed it – the amount
can be written off in a 'one-time' charge – removing any future earnings drag,"
and warned that "companies try to boost earnings by manipulating the recognition
of earnings."

278.    The Audit Committee Report demonstrates that LHSP improperly recorded $83

million in licensing revenue from the licenses with "strategic partners." The arrangements with

the start-up shell companies obligated LHSP to fully fund the research and development

activities and to complete software using LHSP employees and facilities.  LHSP's accounting

was improper under Statement of Financial Accounting Standard ("SFAS") No. 68, *Research*

*and Development Arrangements*, which requires that "[t]he financial reporting of an enterprise that is party to a research and development arrangement should represent faithfully what it purports to represent and should not subordinate substance to form."

279.    At a minimum, under SFAS No. 68, and under SOP 97-2, LHSP was required to account for the arrangement as a long-term construction contract and defer recognition of revenues from the start-up shells over the development period.  SFAS No. 68 provides that:

> An enterprise shall determine the nature of the obligation it incurs when it enters into an arrangement with other parties who fund its research and development.
>
> * * *
>
> To the extent that the financial risk associated with the research and development has been transferred because repayment of any of the funds provided by the other parties depends solely on the results of the research and development having future economic benefit, the enterprise shall account for its obligation as a contract to perform research and development for others.

SFAS No. 68, ¶¶ 4, 10.  SOP 97-2, which "provides guidance on when revenue should be recognized and in what amounts for licensing, selling, leasing, or otherwise marketing computer software," states that:

> If an arrangement to deliver software or a software system, either alone or together with other products or services, requires significant production, modification, or customization of software, the entire arrangement should be accounted for in conformity with Accounting Research Bulletin (ARB) No. 45, Long-Term Construction-Type Contracts....

SOP 97-2, ¶ 7.

280.    Since the start-up shells were related parties, the funds should have been treated as liabilities:

> If the enterprise is obligated to repay any of the funds provided the other parties regardless of the outcome of the research and development, the enterprise shall estimate and recognize that

118

liability.  This requirement applies whether the enterprise may
settle the liability by paying cash, by issuing securities or by some
other means.

AS § R55.103.

281.    Among the transactions detailed in the Audit Committee Report as raising

concerns about research and development funded by related parties were:

(a)    In the second quarter of 1998, LHSP recognized $500,000 of license revenue
from FLV Telecom, a customer of the Belgian office who indicated that it had no
use for the software when it was purchased.  The customer's sole funding came
from SAIL Trust.

(b)    In the third quarter of 1999, LHSP recognized $16 million from license
agreements with four CLDC's (Salfas, Senegal, Baleston, Duranzo) that had been
incorporated only weeks earlier.  On September 22, 1999, FLV Fund purchased
the shares of these four CLDC's and invested $10 million in those entities on
October 22, 1999.

282. ˉ  Although the Audit Committee Advisors did not examine the BTG and Dictation

Consortium transactions "because of the age of the transactions and our understanding that

KPMG carefully reviewed them at the time," under the Audit Committee Report analysis,

revenue from those entities was also recorded improperly.

283.    As previously referenced, defendants Lernout and Hauspie and/or LHSP were

involved in gathering "outside" investors to fund BTG in 1997.  Defendant Behets of KPMG

Belgium was also involved in this activity.  As reported by *De Standaard* on September 2, 2000,

Behets' presence at a May 1997 conference in Boston where LHSP tried to persuade an investor

to infuse $15 million into BTG added credibility to the fundraising and raised additional

questions about KPMG's role with regard to LHSP.

284.    Further, in a December 7, 2000, interview with The Wall Street Journal,

defendant Lernout stated that LHSP gathered "outside" investors to fund Dictation Consortium

in 1996, and admitted that  LSP employees wrote its business plan and did the software work

119

under contract." The "outside investors" who funded Dictation Consortium included FLV Fund

and FLV Management, which together owned 61% of Dictation Consortium when it was

founded, and reduced that holding to 43% in 1997. Thus, the $26.6 million in revenue from

Dictation Consortium in 1996 and 1997, which constituted 25% of LHSP's revenues in 1996 and

19% in 1997, should at least have been deferred over the life of the project. More likely, since

FLV Fund and FLV Management were related parties, the fund should have been considered

loans or paid-in capital and booked as liabilities during those years.

285.    LHSP's treatment of the start-up shells also violated SFAS No. 57, *Related Party*

*Disclosures*, which requires "disclosures of material related party transactions" including:

    (a)    The nature of the relationship(s) involved.

    (b)    A description of the transactions, including transactions to which no amounts or
nominal amounts were ascribed, for each of the periods for which income
statements are presented, and such other information deemed necessary to an
understanding of the effects of the transactions on the financial statements.

    (c)    The dollar amounts of transactions for each of the periods for which income
statements are presented and the effects of any change in the method of
establishing the terms from that used in the preceding period.

    (d)    Amounts due from or to related parties as of the date of each balance sheet
presented and, if not otherwise apparent, the terms and manner of settlement.

AS § R36.102.

286.    Notes to LHSP financial statements for 1997, 1998, and 1999 contain long lists of

"related parties" accompanied by none of the detail required by SFAS No. 57. Moreover, the

connections to related parties revealed by the Audit Committee Report demonstrate that LHSP

affirmatively misrepresented the amount of revenue it recognized from the start-up shells who

provided 10% of LHSP's 1998 revenue and 25% of its 1999 revenue. In its 1998 Annual Report

on Form 20-F, LHS  stated that only 3.7% of its 1998 revenue was provided by "companies

funded in part by the FLV Fund." In Notes to its 1999 financial statements, LHSP stated that

0.3% of 1999 revenues were provided by "companies funded in part by the FLV Fund and L&H Investment Co."

287.    LHSP also flouted the provisions of SOP 97-2 relating to revenue from sales or licenses that do not require contract accounting.  Under those provisions, if the arrangements do not require significant production, modification, or customization of software, LHSP was not permitted to recognize revenue until *all* of the following criteria are met:.

- Persuasive evidence of an arrangement exists.

- Delivery has occurred.

- The vendor's fee is fixed or determinable.

- Collectibility is probable.

SOP 97-2, ¶ 8.

288.    The Audit Committee Report lists numerous instances where LHSP recognized revenue even though no contract was signed or the terms were not finalized, and, thus, no "persuasive evidence of an arrangement existed" as required by SOP 97-2:

(a)    In the second quarter of 1998, LHSP recognized revenue from a June 30, 1998, agreement with Digital Voice requiring a $150,000 prepaid royalty.  An August 6, 1998 internal LHSP e-mail provided that the contract was not finalized until at least the third quarter.

(b)    LHSP recognized revenue in the third quarter of 1999 from a September 30, 1999 distribution agreement with Voicenet containing a $1,000,000 prepaid royalty. However, it was not until the parties signed a "clarification letter" on October 26, 1999 that the final terms of the agreement were actually determined.

(c)    LHSP recognized $4 million in the fourth quarter of 1999 based on an agreement with Lavenia dated December 30, 1999, when an e-mail dated January 5, 2000 from Filip Beernaert to Dammekens discussed terms to be included in the contract, including a $3 million fee, demonstrating that the revenue was recognized prior to the terms being final.

(d)    LHSP recognized $5 million from a license agreement with TIB in the fourth quarter of 1999, when a January 4, 2000 e-mail from Filip Beernaert to Hauspie and Lernout demonstrated that the contract had not yet been signed.

121

(e)     In the second quarter of 1999, LHSP recognized $3 million from a license agreement with I-Medical dated June 30, 1999. A July 7, 1999 e-mail from Lernout to Bastiaens and Hauspie established that the contract was not signed until the third quarter of 1999.

(f)     In the fourth quarter of 1999, LHSP recognized $4 million from a license agreement with I-Travel dated December 31, 1999. An e-mail from Beernaert to Willaert and Dammekens dated January 5, 2000 indicated that the contract was not signed until the first quarter of 2000.

(g)     In the first quarter of 2000, LHSP recognized $8 million in revenue based on an agreement with EEC dated March 31, 2000. On April 4, 2000, Beernaert sent an e-mail to Willaert, Lernout, Bastiaens and Dammekens stating that the customer had requested information to finalize the agreement, including royalty pricing information and the list of licensed products. Thus, because key terms were still missing from the document as of quarter end, revenue could not be recognized.

(h)     LHSP recognized $50,000 of revenue in the third quarter of 1999 from NEC, who told Bryan Cave and Arthur Andersen that the terms of the contract were never finalized and that it was never invoiced and had never paid.

(i)     LHSP recognized $12 million in the third quarter of 1999 from contracts with three CLDC's (Lupeni, Jelgava and Harrisea) who each had two contracts, one reflecting a $4 million fee and a second contract reflecting a $2 million fee, dated the same date and signed by Tony Snauwert and Nico Willaert. The Audit Committee Report found that the existence of two contracts for each CLDC, identical except for the amount of payment, raised questions as to whether there was an agreement in the quarter when revenue was recognized.

289.    The Audit Committee Report lists numerous instances where LHSP recorded sales when it was not clear that the customer had the ability to pay for its products or services, including instances when the customer was not even invoiced, and thus, collectibility was not probable, as required by SOP 97-2:

(a)     During the first three quarters of 1998, BCB licensed $1.25 million of LHSP software. In July 1998, BCB and LHSP entered into a stock swap valued at $1.6 million. BCB was actually a start-up that intended to use proceeds from the sale of the LHSP stock to pay the license fees, but was unable to sell the stock until October 1998. Collectibility was not probable until BCB sold the stock and determined that the proceeds were sufficient to cover the license fees.

(b)     On September 27, 1999, the Belgian unit of LHSP recognized $220,000 of license revenue based on an agreement with Computer Services Solutions but never

122

invoiced the customer for fees, because "LHSP did not invoice customers until it believed the customer could pay."

    (c)    On December 31, 1998, the Belgian unit of LHSP recognized $250,000 of license revenue from Advance Voice Technology but never invoiced the customer, a start-up that had been established only one month before the license agreement.

290.    LHSP recorded sales when the customers ability to pay depended on an

Investment from LHSP, which also demonstrated that collectibility was not probable as required

by SOP 97-2:

    (a)    On September 27, 1999, LHSP recognized $450,000 of revenue based on a license agreement with Industry Productivity Group, which was expecting an investment from FLV Fund. LHSP never invoiced the customer for the fee.

    (b)    Interpra, a customer in the Burlington office who licensed $250,000 of LHSP software on December 31,1998, and another $250,000 on March 31, 1999, maintained that there was a verbal promise of funding from FLV Fund, and that it did not want to pay the license fee until it received the funding.

    (c)    On March 25, 1998, Vasco licensed $800,000 of LHSP software. On December 31, 1998, it licensed an additional $900,000 of LHSP software. In March 1998, LHSP loaned the customer $3 million, due January 4, 1999. The loan was not repaid until the second quarter of 1999, when LHIC invested $5 million in the customer.

291.    LHSP recognized sales revenues that were contingent on LHSP later performing

development work for the customer. SOP 97-2 requires that recognition of revenue be deferred

until "delivery has occurred," and that delivery be determined as to each one of multiple

elements, including the separate element of software delivered "on a when-and-if-available"

basis:

    (a)    In the first quarter of 1999, LHSP recognized $1 million of license revenue based on an agreement with I-Merge. An August 25, 2000 letter from Eric Moons of LHSP to Tony Snauwert indicated that delivery of all software did not occur until June 1999 and that the software was later replaced in August 1999.

    (b)    On June 30, 1999, LHSP recognized $900,000 based on a license agreement with Cegeka allocated among different language versions of Voice Xpress. One version was to be delivered "when and if commercially available." The other two versions were never delivered.

(c)     On March 17, 1999, LHSP recognized $900,000 from an agreement with G2 Speech allocated among four language versions of software. One version was delivered in March of 2000, the others were never delivered, and nothing was paid to LHSP for any of the versions.

292.    LHSP recorded revenues when the "purchasers" of the licenses were not the end users and side letters confirmed that if the licenses were sold to other parties, a finder's fee would be paid. If the licenses were not resold, the original payments to LHSP would be refunded. The fees in these arrangements should not have been recognized because they were not "fixed or determinable" as required by SOP 97-2 and the earnings process, in what was, essentially, a consignment sale, was not consummated:

(a)     LHSP recognized $8 million of revenue in the fourth quarter of 1999 from a license agreement with Capital Union dated December 29, 1999. Side letters obligated LHSP to refund a portion or all of license fee if Capital Union didn't find investors. A further letter dated November 2, 2000 indicates that Capital Union was merely an investment bank hired by LHSP to find potential LDC investors. The structure of the transaction was apparently a pure sham designed to permit inappropriate recognition of revenue by LHSP.

(b)     LHSP signed an agreement with an LDC (Radial) in the third quarter of 1998 and another in the first quarter of 1999. The investors, WH Operations, who bought the shares of the LDC from the original investors on September 23, wanted $1.3 million of free warrants from LHSP. Dammekens and Willaert told WH Operations that it had to pay for the warrants "because of the P&L impact," but that LHSP would make it up to them later. On August 1, 2000 LHSP entered into a contract with WH Operations obligating LHSP to pay $1.8 million to them over two years for "introductions" to influential politicians and business people. Dammekens and Willaert told the Audit Committee Advisors that this agreement was entered into to reimburse the customer for the warrants.

293.    SFAS No. 48, *Revenue Recognition When Right of Return Exists*, provides that revenue may be recognized only when all of the terms of the sale are fixed or determinable and the sale has become final. AS § R75.107. The Audit Committee Report confirms that LHSP recorded revenues although the customer had a right to return the product, including the following:

124

(a)    On December 29, 1998, CCG signed a distributor agreement requiring a $569,620 non refundable fee. LHSP recognized $152,500. The contract gave the customer the right to return; the customer never paid any money under the agreement, and never had any intention of paying until the product was sold through to end customers.

(b)    On December 31, 1998, LHSP entered into a distribution agreement with D&H Distributing who was obligated to prepay 5500,000 in royalties. LHSP recognized 5350,00() in revenue in the fourth quarter of 1998 even though the contract gave the customer the right of return, the customer never paid any fees, and the customer returned all the product.

294.    The Audit Committee Report reveals that LHSP improperly recorded revenue for barter or exchange transactions with other software firms in which no cash exchanged hands. Under Statement of the Accounting Principles Board Opinion (APB) 29, Accounting for Nonmonetary Transactions, such transactions do not culminate an earnings process and therefore did not produce recognizable revenue: "[T]he following two types of nonmonetary exchange transactions do not culminate an earnings process: a. An exchange of product or property held for sale in the ordinary course of business for a product or property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange, and b. An exchange of productive asset not held for sale in the ordinary course of business for a similar productive asset or an equivalent interest in the same or similar productive asset." AS §N35.108. LHSP improperly recorded revenue from the following barter transactions:

(a)    LHSP recognized $375,000 of revenue in the third quarter of 1998 and $435,000 of revenue in the fourth quarter 1998 from a reseller license contract dated September 28, 1998, with Speech Machines. On January 5, 1998, LHSP entered into an amended reseller agreement obligating LHSP to pay an up front fee of $1.25 million to Speech Machines for no additional consideration.

(b)    LHSP recognized revenue in the third quarter of 1998 from a September 30, 1998, license to Nine Rivers Technology of $950,000 of LHSP software, with a net benefit to LHSP (after marketing expenses) of $838,000. On January 15, 1999, LHSP licensed $830,000 of the customer's software for resale. A June 17, 1999 email stated that Nine Rivers had no plans to pay LHSP, as this was a reciprocal agreement.

(c)     LHSP recognized revenue in the first quarter of 1999 from a license to Interpra of $250,000 of LHSP software on December 31, 1998, and another $250,000 on March 31, 1999. In return, LHSP licensed $250,000 of Interpra's software on January 4, 1999 and another $250,000 in the third quarter of 1999.

(d)     In the fourth quarter of 1997, LHSP agreed to pay $1.2 million to Voice Inpute Technologies ("VIT") for that customer to develop PowerScribe technology. In the same quarter, that customer licensed $1.5 million of LHSP software for resale. LHSP recognized $1.2 million in that quarter, even though LHSP stated that VIT never delivered anything under the agreement.

(e)     LHSP recognized revenue in the first quarter of 1998 from a March 31, 1998, license to Korteam for $300,000 of LHSP software. On June 29, 1998, LHSP licensed $500,000 of contexts to be developed by the customer, with a $200,000 rebate if LHSP obtained financing for Korteam. Korteam never sold any LHSP product, and LHSP relieved it of all obligation.

(f)     LHSP recognized revenue in the first quarter of 1998 from a March 31, 1998, license to Sequoia of $30,000 of LHSP software. LHSP licensed $30,000 of Sequoia's software at the same time.

(g)     LHSP recognized revenue in the fourth quarter of 1998 from a December 27, 1998, license to AVRI/E-Docs for $1,000,000 of LHSP software. On January 11, 1999, LHSP committed to pay $400,000 for the development of contexts by AVRI/E-Docs.

(h)     On December 19, 1998, LHSP recognized $800,000 of license revenue from an agreement with Educa. A second contract stated the fee as $500,000. The Audit Committee Advisors reported that Educa's CEO had stated that he never had any intention to pay $800,000, but understood there was an oral agreement for LHSP to purchase a reciprocal amount of software. LHSP never invoiced the customer, nor was anything paid.

295.     LHSP's reported financial results also violated the following fundamental concepts underlying GAAP:

(a)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. FASB Statement of Concepts No. 1, ¶ 34;

(b)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources and the effects of transactions, events and circumstances that change resources and claims to those resources. FASB Statement of Concepts No. 1, ¶ 40;

126

    (c)    The principle that financial reporting should provide information, about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. FASB Statement of Concepts No. 1, ¶ 42;

    (d)    The principle that financial reporting should be reliable and that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting. FASB Statement of Concepts No. 2, ¶ 58;

    (e)    The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. FASB Statement of Concepts No. 2, ¶ 79;

    (f)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. FASB Statement of Concepts No. 2, ¶¶ 95, 97.

Falsity of KPMG And Behets' Representation That LHSP Audits
Were Conducted in Accordance With U.S. GAAS

296.    For each of the years 1997, 1998 and 1999, KPMG Belgium and Behets falsely certified that:

> We have conducted our audits in accordance with generally accepted auditing standards in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

297.    U.S. GAAS imposes upon auditors "a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 110.02.

127

298.    As is set forth in detail below, LHSP audits did not follow the most basic tenets of U.S. GAAS, which require an auditor to obtain personal knowledge of sufficient, competent evidence supporting the assertions in financial statements to permit reasonable assurance that they do not contain material misstatements:

(a)    "Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements." AU § 326.02.

(b)    "The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly." AU § 326.21.

(c)    Representations from management "are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU § 333.02.

(d)    "[W]ithout adequate attention to the propriety and accuracy of the underlying accounting data, an opinion on financial statements would not be warranted." AU § 326.16.

### Disregard of Overall Risk Factors by KPMG Defendants and Behets

299.    As an initial matter, the LHSP audits failed to follow AU § 316, *Consideration of Fraud in a Financial Statement Audit*, which requires that: "[t]he auditor should specifically assess the risk of material misstatement of the financial statements due to fraud and should consider that assessment in designing the audit procedures to be performed." In addition to risk factors specific to the issues enumerated below, KPMG and Behets failed to consider overall risk factors posing a high degree of risk of error or fraud, including:

(a)    "an excessive interest by management in maintaining or increasing the entity's stock price or earnings trends through the use of unusually aggressive accounting practices." AU § 316.17. KPMG Belgium was involved in LHSP's 1999 response to an SEC investigation of LHSP's methods of accounting for acquisitions, and thus, KPMG Belgium knew, and KPMG LLP, KPMG UK and Behets also knew or were reckless in not knowing, that the SEC had determined that LHSP's methods were aggressive and improper.

(b)    "significant, unusual or highly complex transactions, especially those close to
year end, that pose difficult 'substance over form' questions." AU § 316.17.
Nearly every contract discussed in the Audit Committee Report is dated within
three days of the end of a fiscal quarter, and ten agreements giving rise to a total
of more than $27 million in revenue are dated within the last three days of
December 1998 or December 1999.

(c)    "unusually rapid growth or profitability, especially compared with that of other
companies in the same industry." AU § 316.17. Behets, KPMG Belgium and
KPMG LLP knew from LHSP's financial statements that LHSP claimed revenue
increases of 213% in 1998 and 163% in 1999. KPMG Belgium and KPMG LLP
knew that LHSP's growth and profitability were unusual in the industry.

a. <u>Korea and Singapore</u>

300.    KPMG and Behets failed to follow procedures sufficient to provide it with

reasonable assurance that LHSP's stated revenue from Korea and Singapore was free of material

misstatement or turned a blind eye to the results of those procedures.

301.    KPMG was aware of facts indicating a serious risk of material misstatement of

Korean and Singaporean revenues, including:

(a)    "unusually rapid growth or profitability." AU § 316.17. Korean revenues of
$62.9 million in 1999 had risen from $245,000 in 1998, and constituted nearly
19% of LHSP's total 1999 revenue of $344.2 million, all at a time when revenues
in every other geographic market except Singapore were flat or declining.
Singapore's revenues increased from only $29,000 in 1998 to $80.3 million in
1999 – an increase of 2,769%, making Singapore the highest revenue geographic
area in LHSP, ahead of the United States and Europe (excluding Belgium).

(b)    "significant, unusual or highly complex transactions, especially those close to
year end, that pose difficult 'substance over form' questions" AU §316.17.
According to the Audit Committee Report, KPMG was aware of contracts with
one Korean client representing $1.5 million in revenue that were signed on
September 30, 1999, contracts with a second Korean client representing $21
million in revenue that were signed on December 8, 199.9, and contracts with a
third Korean client representing $12 million in revenue that were signed on
December 27, 1999. KPMG was aware that the form of those contracts cast doubt
on the propriety of LHSP's recognition of revenue from those contracts.

(c)    "other conditions [that] may be identified during fieldwork" including
"unsupported or unauthorized balances or transactions" and "transactions not
recorded in a complete or timely manner." AU § 316.24. According to the Audit
Committee Report, an October 18, 1999 e-mail from KPMG indicates that KPMG

129

knew that LHSP had factored its receivables from those contracts and knew that the factoring may have been "with recourse" to LHSP's Korean bank accounts. The Audit Committee Advisors state that "KPMG must have resolved this issue, but we do not know how, as we have no further e-mails on the subject."

302.    Under U.S. GAAS, the risk factors in Korea and Singapore required that KPMG and Behets give heightened attention to the fundamental procedure of confirmation, "the process of obtaining and evaluating a direct communication from a third party in response to a request for information about a particular item affecting financial statement assertions." AU § 330.4, *The Confirmation Process.* "Unusual or complex transactions may be associated with high levels of risk. If the entity has entered into an unusual or complex transaction and the combined assessed level of risk is high, the auditor should consider confirming the terms of the transaction with the other parties in addition to examining documentation held by the entity." AU § 330.08. "If there is a risk of material misstatement due to fraud that may involve or result in improper revenue recognition" the auditor should "confirm with customers certain relevant contract terms and the absence of side agreements." AU § 316.30. "Standard confirmation requests (confirming only the outstanding balance) alone do not always provide sufficient evidence that only appropriate revenue transactions have been recorded. Auditors should consider the need to confirm significant terms of contracts and whether to inquire about the existence of oral or written contract modifications (side agreements)." AICPA, Audit Risk Alert – 1998/99 at 38.

303.    Had KPMG and Behets sought confirmation of LHSP contracts from Korean customers, KPMG and Behets would have discovered, as did *The Wall Street Journal* in a matter of weeks, that nearly half of LHSP's customers denied the existence or magnitude of a relationship claimed by LHSP. Had KPMG Belgium and Behets sought confirmation of LHSP bank balances from Korean banks – following audit procedures that would routinely apply where amounts of the magnitude at stake in Korea are involved – KPMG and Behets would have

discovered, as did the Audit Committee Advisors in a matter of weeks, that $106 million was

inaccessible, likely as a consequence of factoring receivables from Korean contracts with

recourse to LHSP's Korean bank accounts. KPMG and Behets either failed to follow such

normally applicable confirmation procedures, or turned a blind eye to the answers they received.

b.  Related Party Transactions

304.    KPMG and Behets failed to follow procedures sufficient to provide reasonable

assurance that LHSP's revenues were not inflated by transactions with related parties.

305.    KPMG and Behets disregarded facts indicating heightened risk of error or fraud

categorized in U.S. GAAS as "significant pressure to obtain additional capital necessary to stay

competitive, including the need for funds to finance major research and development

expenditures." AU § 316.17.

(a)    Defendant Lernout was quoted in December 1999 describing the Dictation
       Consortium and BTG transactions as impelled by LHSP's research and
       development needs: "If we didn't catch up [with competitors] we were cooked.
       But we couldn't catch up because we didn't have enough R&D dollars." KPMG
       Belgium was aware of all aspects of the Dictation Consortium and BTG
       transactions, having "carefully reviewed them at the time," according to the Audit
       Committee Report. Moreover, KPMG Belgium audited the FLV Fund, and thus
       saw *both sides* of at least the Dictation Consortium transaction.

(b)    KPMG and Behets knew that LHSP faced significant limitations on its ability to
       fund research and development in-house.

306.    KPMG and Behets disregarded facts indicating heightened risk of error or fraud

categorized in U.S. GAAS as "significant related party transactions not in the ordinary course of

business or with related entities not audited or audited by another firm." AU § 316.17. These

include the following:

(a)    KPMG knew or was reckless in not knowing that in January 2000, prior to KPMG
       Belgium's rendering a clean opinion on LHSP's 1999 financial statements, the
       SEC had commenced an investigation into LHSP's methods of accounting for
       revenue from thirty LHSP customers that the SEC suspected were related parties.

131

(b)    KPMG Belgium was auditor for FLV Fund, a related party whose ownership of at least eight of the entities that were the subject of the SEC inquiry and funding of four others was not disclosed and required accounting treatment materially different than that applied by LHSP.  KPMG Belgium thus saw both sides of many of the fraudulent transactions.

(c)    LHSP's financial statements contain long lists of "related parties" with little or no explanation of LHSP's dealings with those parties.

307.    KPMG and Behets (for 1988) failed to consider the risk factors particular to related party transactions stated in AU § 334, *Related Party Transactions*, as "large, unusual, or nonrecurring transactions or balances, ...  particular[ly] ... transactions recognized at or near the end of the reporting period." The Audit Committee Report reveals that more than half of the revenue from related party transactions in 1998 and 1999 – $13 million in 1998 and $21 million in 1999 – was recognized in the fourth quarters of those years.

308.    KPMG and Behets failed to take the steps prescribed in AU 334 "to identify related party relationships and transactions and to satisfy [themselves] concerning the required financial statement accounting and disclosure." AU § 334.01.  To identify material transactions with related parties, the auditor should, among other things:

(a)    "review filings by the reporting entity with the Securities and Exchange Commission and other regulatory agencies for the names of related parties and for other businesses in which officers and directors occupy directorship or management positions." KPMG Belgium and Behets could easily have discovered from such sources that the CEO of Language Investment Co., the parent of four of the Belgian start-up shells, was Willem Hardeman, an FLV Fund director.  Another sixteen were owned by Mercator whose chairman, Verbeke, is a name partner in LHSP's chief Belgian law firm. Verbeke and the insurance company also separately owned stakes in LHSP.  A review of LHSP's SEC filings which could have been undertaken by KPMG, if it were necessary, would also have revealed *two significant related parties were the subsequent employers of former KPMG Belgium auditors with responsibility for LHSP audits*. During the 1998 and 1999 audits, the CFO of LHIC was Chantal Mestdagh, a former KPMG Belgium auditor who worked on the LHSP audits and financial statements and who continued to provide KPMG information regarding LHSP after she became CFO of LHIC.  During the 1999 audit, defendant Behets was CEO of SAIL Trust.  KPMG Belgium was itself the auditor of the FLV Fund.  KPMG

132

and Behets either failed to examine these sources to identify related parties, or turned a blind eye to the results of the audit investigation.

(b)   "review proxy and other material filed with the Securities and' Exchange Commission and comparable data filed with other regulatory agencies for information about material transactions with related parties." AU § 334.08(c). *The Wall Street Journal* was easily able to determine from "regulatory filings" that FLV Fund owned 49% stakes in eight of the Singapore start-ups, and gave cash to four others "which they used to pay their bills to LHSP." KPMG Belgium, which, as auditor of FLV Fund, had access to both sides of the fraudulent transactions, either failed to perform these basic procedures, or turned a blind eye to their results.

(c)   "[r]eview accounting records for large, unusual, or non-recurring transactions or balances, paying particular attention to transactions recognized at or near the end of the reporting period." AU § 334.08(g).

(d)   "[r]eview the extent and nature of business transacted with major customers, suppliers, borrowers and lenders for indications of previously undisclosed relationships." AU § 334.08 (e). As auditor of FLV Fund, KPMG Belgium had unique access to both sides of LHSP's transactions with major customers who were undisclosed related parties.

309.   KPMG and Behets were not allowed to rely on management assertions about transactions with related parties. "The risk associated with management's assertions about related party transactions is often assessed as higher than for many other types of transactions because of the possibility that the parties to the transaction are motivated by reasons other than those that exist for most business transactions." AU § 334.18. If LHSP was unwilling to provide the names of investors in the shell start-ups, KPMG and Behets should have considered this a "denial of access to information" that "constitute[d] a limitation on the scope of the audit that ... require[d] the auditor to consider qualifying or disclaiming an opinion on the financial statements" as set forth in AU § 508, *Reports on Financial Statements*. AU § 316.25 footnote 11.

310.   KPMG and Behets failed to devise, ensure the undertaking of and/or perform, procedures necessary to evaluate "the purpose, nature, and extent of [related party] transactions

133

and their effect on the financial statements.  The procedures should be directed toward obtaining and evaluating sufficient competent evidential matter and should extend beyond inquiry of management." AU § 334.09.  Among other things, KPMG and Behets failed to:

(a)  "Confirm transaction amount and terms, including guarantees and other significant data, with the other party or parties to the transaction." AU § 334.10(a).

(b)  "Inspect evidence in possession of the other party or parties to the transaction." AU § 334.10(b).

(c)  "[R]efer to financial publications, trade journals, credit agencies and other information sources when there is reason to believe that unfamiliar customers ... with which material amounts of business have been transacted may lack substance." AU § 334.10(c).

311.  KPMG and Behets failed to heed an AICPA Audit Risk Alert emphasizing that:

−  Some of the more common audit issues identified in recent litigation related 'to fraudulent financial reporting included:

•  A willingness by the auditor to accept management's representations without corroboration.

•  Allowing the client to unduly influence the scope of auditing procedures.

•  The failure to identify risky situations, or ignoring audit risks by not applying professional skepticism and revising auditing procedures appropriately."

AICPA, Audit Risk Alert – 1999/2000 at 28.

312.  KPMG and Behets failed to heed AICPA Practice Risk Alert 95-3, which stated that "it is incumbent upon the auditor to assess the propriety of the accounting for material related-party transactions in accordance with their substance" and warned that, "[i]n the hands of the unscrupulous, an undisclosed related party is a powerful tool.  Using controlled entities, principal stockholders or management can execute transactions that improperly inflate earnings by masking their economic substance or distort reported results through lack of  disclosure, or can even defraud the company by transferring funds to a conduit related party and ultimately to

134

perpetrators." The Practice Risk Alert, at 2, warns auditors to look for "events that may indicate transactions with undisclosed related' parties," including: "sales without substance, including funding the other party to the transaction so that the sales price is fully remitted," "sales with a commitment to repurchase that, if known, would preclude recognition of all or part of the revenue," "loans to parties that do not possess the ability to repay," and "payments for services never rendered or at inflated prices."

313.    Had KPMG Belgium, KPMG LLP and KPMG UK performed the procedures required by AU § 334, they would have discovered, as *The Wall Street Journal* easily did, that at the single Singapore address of fifteen firms that together paid LHSP $57 million in 1999, or nearly 17% of its revenue, "there isn't any evidence of operations of the fifteen LHSP customers." The simple fact that fifteen of LHSP's customers in a country where revenues increased 2,769% in one year had the same address should have been a major "red flag" for the auditor.  KPMG failed to perform any appropriate investigation, or turned a blind eye to the results of their search, and failed to ensure that adequate investigative steps had been undertaken to comply with GAAP.

### c.  Improper Recognition of License Revenues

314.    KPMG and Behets failed to follow procedures sufficient to provide reasonable assurance that LHSP recognized revenue properly under SOP 97-2.

315.    KPMG and Behets knew and disregarded the risk of material misstatement presented by the fact that material amounts of revenue were recognized at the end of fiscal quarters or years.  Nearly every contract discussed in the Audit Committee Report is dated within three days of the end of a fiscal quarter, and ten agreements giving rise to a total of more than $27 million in revenue are dated within the last three days of December 1998 or December 1999. The occurrence of unusual, complex or significant transactions at or near the end of a financial