reporting period is a "red flag" specifically described in the AICPA Audit Risk Alert – 1999/2000 at 38: "Auditors should be alert for significant unusual or complex transactions, especially those that occur at or near the end of a reporting period, along with a variety of other circumstances that may raise concerns about improper revenue recognition."

316.    KPMG Belgium and Behets failed to follow the procedure required by the presence of this risk: confirmation, which "is the process of obtaining and evaluating a direct communication from a third party in response to a request for information about a particular item affecting financial statement assertions." AU § 330.04, *The Confirmation Process*. "If there is a risk of material misstatement due to fraud that may involve or result in improper revenue recognition" the auditor should "confirm with customers certain relevant contract terms and the absence of side agreements." AU § 316.30.

317.    KPMG Belgium and Behets improperly relied on representations of management regarding the substance of agreements and failed to obtain evidence directly from the other parties to those agreements, as required by U.S. GAAS. In so doing, KPMG failed to undertake adherence to these basic accounting precepts:

(a)    "Confirmation is undertaken to obtain evidence from third parties about 'financial statement assertions made by management. Section 325, evidential matter, states that, in general, it is presumed that 'when evidential matter can be obtained from independent sources outside an entity; it provides greater assurance of reliability for the purposes of an independent audit than that secured solely within the entity.'" AU § 330.06.

(b)    "Unusual or complex transactions may be associated with high levels of inherent risk and control risk. If the entity has entered into an unusual or complex transaction and the combined assessed level of inherent and control risk is high, the auditor should consider confirming the terms of the transaction with the other parties in addition to examining the documentation held by the entity." AU § 330.^8.

(c)    "The auditor's understanding of the client's arrangements and transactions with third parties is key to determining the information to be confirmed. The auditor should obtain an understanding of the substance of such arrangements and

transactions to determine the appropriate information to include on the confirmation request.... The auditor should also consider whether there may be oral modifications to agreements, such as unusual payment terms or liberal rights of return. When the auditor believes there is a moderate or high degree of risk that there may be significant oral modifications, he or she should inquire about the existence and details of any such modifications to written agreements. One method of doing so is to confirm both the terms of the agreements and whether any oral modifications exist." AU § 330.25.

318.    KPMG failed to heed AICPA, Audit Issues in Revenue Recognition, 1999, which

details the procedures required to obtain sufficient competent evidence of the propriety of

revenue recognition:

SAS No. 45 requires the auditor to place emphasis on testing material transactions with parties he or she knows are related to the reporting entity. It states that procedures should be directed toward obtaining and evaluating sufficient competent evidential matter and should extend beyond inquiry of management. The following are among the procedures that should be considered to obtain satisfaction concerning the purpose, nature, and extent of related-party transactions and their possible effect on revenue recognition.

• Obtain an understanding of the business purpose of the transaction.

• Examine invoices, executed copies of agreements, contracts, and other pertinent documents, such as receiving reports and shipping documents.

• Determine whether the transaction has been approved by the board of directors or other appropriate officials.

• Confirm the transaction amount and terms, including guarantees and other significant data, with the other party or parties to the transaction.

• Refer to financial publications, trade journals, credit agencies, and other information sources when there is reason to believe that unfamiliar customers, suppliers, or other business enterprises with which material amounts of business have been transacted may lack substance.

• With respect to material uncollected balances, guarantees, and other obligations, obtain information about the

137

financial capability of the other party or parties to the transactions. Such information may be obtained from audited or unaudited financial statements, tax returns, reports issued by regulatory agencies or taxing authorities, financial publications, or credit agencies.

- The auditor should consider whether he or she has obtained sufficient competent evidential matter to understand the relationship of the parties and the effects of related-party transactions on the financial statements.

AICPA, Audit Issues in Revenue Recognition, 1999, at 35.

319. KPMG and Behets failed to heed AICPA Practice Alert 95-1, which explicitly

warned auditors to search for evidence of the precise fraudulent practices that the Audit

Committee Advisors in fact discovered at LHSP and prescribed procedures that KPMG should

have followed to uncover those practices:

A substantial portion of litigation and SEC investigations involving financial reporting and cases coming before the AICPA Professional Ethics Executive and Quality Control Inquiry Committees concerns some form of revenue recognition issue.... [A]uditors need to pay particular attention to warning signals that may indicate additional audit risk and respond with appropriate professional skepticism and possible additional audit procedures.... [S]ome examples of improper and unusual revenue transactions [include]:

- Sales in which the customer's obligation to pay for the merchandise/service depends on:

  - receipt of financing from another (third) party;

  - resale to another (third) party (i.e., consignment sale);

  - fulfillment by the seller of material unsatisfied conditions;

  - final acceptance by the customer following an evaluation period

- Sales in which substantial uncertainty exists about either collectibility or the seller's ability to comply with performance guarantees.

- Sales that require substantial continuing vendor involvement after delivery of merchandise (e.g.., software sales requiring installation, debugging, extensive modifications, other significant support commitments, etc.)

- Shipments made after the end of the period (i.e., books kept open to record revenue for products shipped after the period end)

- Transactions with related parties

- Barter transactions

- Significant, unusual transactions near year-end....

Techniques used to recognize revenues improperly can be quite sophisticated. To reduce risk in this area, the audit needs to be planned and then executed with an appropriate degree of professional skepticism.... [A] company operating in [an industry] characterized by more than infrequent business failures ordinarily will present different audit considerations and, therefore, could require different or more extensive audit procedures.... A company with constantly increasing sales that 'always meets or exceeds' budget sales targets may deserve extra attention. When a substantial portion of the company's sales occur very near the year-end or quarter-end, extra caution in auditing revenue transactions may be appropriate. Also, individually significant revenue transactions, which could be designed to ease short-term profit concerns, may merit specific attention. Auditors need to examine such transactions and obtain an understanding of their business purpose to evaluate whether revenue recognition is appropriate.

The Practice Alert specifically warns auditors to design confirmations "to help the auditor solicit information from customers about payment terms, right of return privileges, or other significant risks retained by the seller" and "inquire about the existence of any oral modifications or 'side-agreements'."

320.    The details of numerous transactions described in the Audit Committee Report were readily available from other parties to the transactions. KPMG Belgium's and Behets' failure to discover fraud in transactions involving FLV Fund is particularly egregious since

KPMG Belgium was the auditor for FLV Fund and was aware of both sides of those transactions. KPMG Belgium and Behets either failed to seek confirmation of those contracts, or turned a blind eye to the results of their investigation and failed to undertake adherence to these basic accounting precepts.

321.    KPMG Belgium also failed to obtain sufficient information to support or confirm the existence and collectability of account receivables in Korea that are reported in LHSP's 1999 financial statements. The L&H Korea Preliminary Report, dated April 6, 2001 states that:

> During the course of LHK's June 30, 2000 audit, [KPMG Belgium] questioned the collectability of AR [accounts receivable] and indicated to LHK management that collections between 10% and 20% of the A/R balance would be sufficient to avoid having to record a full reserve of the A/R balance.

322.  KPMG's and Behets' permitting accounts receivable to be recorded as revenue based on receipt of 10% to 20% of the revenue violates Statement on Auditing Standards 1 that requires the audit be based on "sufficient competent evidential matter ... obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion..." Specifically, KPMG Belgium was required to obtain confirmations from third parties of the amounts of the accounts receivable pursuant to AU § 330, paras. .34-.35, and was not permitted to rely on collections of 10% to 20% as evidentiary support for the entire accounts receivable:

> Confirmation of accounts receivable is a generally accepted auditing procedure. As discussed in paragraph .06, it is generally presumed that the evidence obtained from third parties will provide the auditor with higher-quality audit evidence than is typically available from within the entity. Thus, there is a presumption that the auditor will request the confirmation of accounts receivable during an audit unless one of the following is true:
>
> •    Accounts receivable are immaterial to the financial statements.

- The use of confirmations would be ineffective.

- The auditor's combined assessed level of inherent and control risk is low, and the assessed level, in conjunction with the evidence expected to be provided by analytical procedures or other substantive tests of details, is sufficient to reduce audit risk to an acceptably low level for the applicable financial statement assertions.  In many situations, both confirmation of accounts receivable and other substantive tests of details are necessary to reduce audit risk to an acceptably low level for the applicable financial statement assertions.

An auditor who has not requested confirmations in the examination of accounts receivable should document how he or she overcame this presumption.

323.    KPMG and Behets failed to comply with or turned a blind eye to the requirements of Statement of Audit Standards 1 and AU § 330 because they permitted the showing of a 10% to 20% collection as evidence of the accounts receivable instead of obtaining confirmation from third parties.  There can be no doubt that, if sought, the confirmations would have revealed the false and misleading statements of LHSP.  *The Wall Street Journal* was able to uncover LHSP's fraud by making inquiries of LHSP's purported customers, KPMG and Behets, as auditor was required to and failed to make the same inquiries.

<u>Additional Facts Establishing The Liability Of The KPMG Defendants</u>

324.    As detailed above at ¶¶ 133-184, KPMG had actual knowledge of the falsity of both the representations made during the course of due diligence to Dragon, the Dragon principal stockholders and their representatives, and KPMG's unqualified audit reports on LHSP's 1998 and 1999 financial statements.  In addition to KPMG's actual knowledge, the following additional facts establish KPMG's liability for the false and misleading statements alleged herein.

a. The KPMG Entities Involved In The LHSP Audits
Acted As One Firm With Respect To LHSP

325.    KPMG LLP, KPMG Belgium and KPMG UK are members of KPMG's

worldwide enterprise, known as KPMG International.  KPMG Belgium, KPMG LLP and KPMG

UK worked with other KPMG entities worldwide in their audits of LHSP.  Through KPMG

International, these KPMG entities market themselves as a single worldwide entity.  At its

website, KPMG International states:

> Overview
>
> In a global marketplace distinguished by remarkable growth and
> consolidation, companies face a host of new challenges in today's
> economy.  *KPMG helps clients successfully respond to changing*
> *opportunities by providing professional services.  wherever and*
> *whenever they're needed.*
>
> KPMG has tailored its services - including assurance, tax and
> legal, consulting, and financial advisory services - to address the
> complex business challenges faced by global clients.  Through the
> firm's international network of industry professionals, the best
> people, products and technologies are combined to enhance
> services with industry insights and best practices.
>
> In 2000, KPMG achieved record revenues of US$13.5 billion, an Il
> percent increase driven by all of our major service lines.  *More*
> *than 100.000 KPMG professionals in member firms worldwide*
> *collaborate across industry, service and national boundaries to*
> *deliver professional services in 155 countries.  This enviable*
> *network of firms is connected through three operating regions,*
> *bringing together our local and national resources with greater*
> *flexibility, responsiveness and consistency of service delivery*
> *worldwide.*
>
> [Emphasis added.]

326.    In its Annual Report for 1999, KPMG International stated that "KPMG is acting

as 'One Firm' worldwide to consistently meet the changing needs of global clients through an

integrated array of tailored solutions.... KPMG's 100,000 professionals in 1  countries help

our clients achieve their critical business objectives through experience and personal

142

commitment to excellence." The 1999 Annual Report also praised the work of integrated teams of KPMG professionals from offices around the world to service its global clients.

### b. KPMG Belgium, KPMG LLP And KPMG UK Were All Co-Extensively Involved With LHSP

327.    KPMG LLP, KPMG Belgium and KPMG UK had co-extensive responsibility on the 1998 and 1999 audits and on the quarterly reviews for those periods, as well as authority to clear the issuance of LHSP's public announcements of unaudited financial results.  In its 1997, 1998 and 1999 Annual Reports to Shareholders, LHSP listed the Ghent, Belgium and Boston, Massachusetts offices of KPMG as the Company's principal auditors.  Robert McLamb, KPMG's SEC reviewing partner and Paul Beecy, another KPMG partner, worked extensively on each of these LHSP audits and reviews and had the final say regarding the conformity of LHSP's financial statements with U.S. GAAP.  McLamb and Beecy became involved in the audits of LHSP while in the U.S. Capital Markets Group in KPMG UK's London, England office. McLamb retained his responsibilities when he moved his base of operations to KPMG LLP's Houston, Texas office in 1999.  Beecy also continued to work with LHSP after he moved to KPMG LLP's Atlanta, Georgia office.

328.    McLamb's extensive involvement with LHSP began as early as 1997.  According to a Highlights and Summary Review Memorandum for December 31, 1997, dated April 28, 1998:

> Conversion of local to US GAAP has been reviewed by Bob McLamb and Digby Wirtz, audit partners of US Capital Markets London Office and SEC reviewing partner.  The US financial statements have been finalized after Bob's two day review visit of April 16 and 17, 1999 and subsequent review by Digby Wirtz on April 21 an ' ??. All the review comments of both Bob and Digby have been c ared.
>
> As explained earlier, KPMG Capital Markets Group London have reviewed the compliance with US GAAP reporting with both

KPMG Ghent and the client. In addition, US Capital Markets Group KPMG London reviewed the draft financial statements in February 1998 and the final financial statements (md. Footnotes) in April 1998 before release. All US reporting issues have been cleared with KPMG US Capital Markets Group London.

329. Beecy's involvement had become substantial by at least the time that LHSP's 1998 financial statements were prepared. As reflected in a billing statement from another KPMG office, Beecy with the assistance of a KPMG office in Germany drafted, in part LHSP's 1998 financial statements:

> Reporting as of December 31, 1999 - Assistance to Paul Beecy Remark: In order to match the tight time schedule several trade balance sheets and P&L's had to be drafted by ourselves as this information was not provided.

330. KPMG Belgium, KPMG LLP, and KPMG UK operated as a single auditing firm in reviewing LHSP's quarterly financial statements and auditing its annual financial statements. Each office was assigned to and worked on various aspects of the engagements. As set forth above, LHSP had dual headquarters in Burlington, Massachusetts and in Belgium. KPMG's U.S. auditors would show up at LHSP's Burlington headquarters at the end of each quarter to review LHSP's quarterly financial statements, and KPMG's Belgian auditors would do the same in Belgium. Following that, McLamb, Behets and later Van Aerde would "sign-off" on the quarterly financial results and the presentation of the quarterly financial statements. These KPMG partners also oversaw the year-end audits of LHSP's financial statements and each reviewed and provided input to the annual financial results, the completion of the audits and the presentation of LHSP's annual financial statements under U.S. GAAP.

331. KPMG auditors and consultants were present at LHSP at the end of each quarter during 1998 and 1999 for the purpose of "signing-off" on LHSP's quarterly and annual financial results before they were announced to the investing public. For example, the February 9, 2000

press release announcing LHSP's financial results for the fourth quarter and year ended December 31, 1999 was sent both to Van Aerde and to McLamb for review and comment before it was issued, and, in fact, KPMG needed to give its express "consent" before that press release could be issued. A January 31, 2000 email from Van Aerde to Dammekens, Bastiaens and McLamb set forth "a list of urgent items to be followed up by the company in order for us to be able to give our consent for the [February 9] press release."

332. Moreover, as another example of KPMG's involvement with LHSP's quarterly financial statements, according to the August 24, 1999 "Group Audit Strategy and Reporting Instructions," the number one "key review objective" for the review of LHSP's third quarter 1999 financial results was to "allow KPMG Ghent *to provide clearance* to the client on the Q3.99 consolidated financial statements of LHS prepared in accordance with group accounting policies and US GAAP." (emphasis added)

333. McLamb, Behets and Beecy provided substantial input on the presentation of the Company's 1998 financial statements. McLamb provided substantial revisions to the financial statements and disclosures therein. Moreover, McLamb actually provided or changed certain amounts and drafted certain disclosures set forth in LHSP's 1998 financial statements. In addition, as noted above, Beecy (with the assistance of another KPMG office actually drafted portions of the 1998 financial statements.

334. In KPMG's Completion Memorandum dated April 9, 1999, prepared in connection with its audit of LHSP's financial statements for fiscal year 1998, Behets stated:

> During the course of the audit, some key issues were discussed and conclusions were reach [sic] in agreement with advise from the US Capital Markets group in London [Wirtz and McLamb].
>
> *KPMG personnel from all participating offices involved reviewed the revenue recognition policies and practices followed to ensure*

compliance with group revenue recognition policy and with US
GAAP regulations.

[Emphasis added.]

335.    KPMG's involvement with LHSP's quarterly and annual financial statements was

pervasive, extending so far as to result in the actual preparation of certain parts of the financial

statements and the disclosures contained therein.

336.    Indeed, in a letter to the LHSP Board of Directors from Jo Lernout dated April 25,

2001, Lernout described LHSP's relationship with KPMG's various offices as follows:

> In the course of the past ten years, we built up a good working
> relationship with KPMG, and we relied extensively on the advice
> from numerous KPMG divisions in various countries as well as on
> the KPMG audit departments, in particular in Belgium and in the
> United States.
>
> As part of this relationship, all information which we deemed
> relevant was always communicated to KPMG. Often, they worked
> side-by-side with the company in the execution of transactions.

According to Lernout:

> From the start, KPMG played a dual role:
>
> (1)    on the one hand.  KPMG was a commissioner of
> Lernout & Hauspie Speech Products N.V., including of its
> subsidiaries, and therefore also of the Korean subsidiaries;
> and
>
> (2)    on the other hand, KPMG was also a consultant for
> the company.
>
> In that capacity, KPMG was closely involved at the end of
> each quarter *in processing the figures for the interim
> accounts – as consultants they advised and assisted the
> financial  and bookkeeping departments of Lernout &
> Hauspie Speech Products.  KPMG consultants came every
> quarter to the office to draw up the interim accounts
> together with the bookkeeping department of Lernout &
> Hauspie Speech Products N.V.*
>
> Consequently, it is impossible to believe that KPMG now
> claims that it did not notice earlier the alleged (actually,

146

disputed) "irregularities" in the Belgian bookkeeping during its auditing assignments as commissioner and when *it assisted us in drawing up the books*. In fact, KPMG helped the staff of the bookkeeping department of Lernout & Hauspie Speech Products N.V. understand and apply the US GAAP Rules (these are the accounting standards which must be observed by corporations whose shares are traded on EASDAQ and NASDAQ).

\* \* \*

It was also KPMG's assignment to make sure that sufficient control mechanisms were in place and that the internal procedures were such that any resorting to fraud by the local people in charge was excluded as much as possible.

\* \* \*

I remember pertinently that in some concrete cases the bookkeeping department of Lernout & Hauspie Speech Products N.V. decided after consulting with KPMG that there was sufficient consent between the parties to view these [licensing agreements] as actual agreements, even if the written agreements had not yet been signed in their final form.

\* \* \*

I believe that all agreements with related parties were disclosed in the proper manner. To arrive at that conclusion, I relied on the advice and support which KPMG, as an international auditing company, provided to Lernout & Hauspie Speech Products. *KPMG not only provided assistance for the processing of the quarterly figures*, but also helped the company with the disclosures required by NASDAQ and EASDAQ rules.

\* \* \*

Furthermore, KPMG was particularly well paid for this assistance, which made us assume that it used a sufficient number of specialists and collaborators to make sure that Lernout & Hauspie Speech Products followed the rules imposed by law.

[Emphasis added.]

147

c. <u>KPMG Was Intimately Involved in LHSP's Operation And Accounting</u>

337.    As a result of providing audit and other services for the Company, KPMG personnel were frequently present at LHSP's corporate headquarters in the United States and Belgium, as well as other LHSP offices throughout the world during 1998 and 1999. Indeed, KPMG had unfettered access to LHSP's confidential internal corporate, financial, operating and business information and had ample opportunity to observe and review the Company's business and accounting practices and to review the Company's internal controls.

338.    In his letter to the LHSP Board of Directors dated April 25, 2001, Lernout made LHSP's dependence on KPMG perfectly clear: "from the day we were quoted on the stock exchange on 12/1/95, we turned to KPMG for every decision of any significance." As Lernout explained:

> To illustrate this I refer to the assistance which was given, for example, with about any sizable acquisition by LHS. It cannot be denied that for this reason alone, ***KPMG had perfect insight into the various aspects of the LHS organization***, if only because of its involvement with the due diligence, audits and even the negotiations.
>
> [Emphasis added.]

339.    The relationship between KPMG and LHSP was further exemplified by the fact that, according to Lernout, LHSP employees had "direct access to KPMG, even for very practical and day-to-day problems." Recognizing that this close relationship between auditor and client was highly unusual, particularly in light of the requirement under GAAS that auditors remain independent in fact and in appearance, Lernout wrote:

> It cannot even be denied that the greater part of the learning process involving the adjustment to the US rules took place thanks to KPMG's help, which went much farther than is usual for auditors who often keep a certain difference.

340.    Lernout's statement regarding the extent of KPMG's activities are corroborated by a KPMG meeting agenda dated August 23, 1999, in which KPMG indicated that it planned to hold a U.S. GAAP training seminar for LHSP employees.

341.    KPMG itself represented that it had access to all information it needed to conduct its audits, and further, that it had considered the Company's internal controls.  In the Report of the Statutory Auditor on the Statutory Accounts Submitted to the General Shareholders' Meeting of [LHSP], attached as Exhibit B to the LHSP Proxy Statement for the Annual Meeting and the Extraordinary Meeting of Stockholders to be Held May 4, 1998 (the "1998 Proxy"), KPMG Belgium stated:

> We conducted our audit in accordance with the standards of the "Instituut der Bedrikfsrevisoren." Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, taking into account the legal and regulatory requirements applicable to financial statements in Belgium.
>
> *In accordance with these standards, we have considered the Company's administrative and accounting organization as well as internal control procedures.  The Company's management have provided us with all explanations and information which we required for our audit.*

[Emphasis added.]

KPMG made an identical statement regarding its consideration of LHSP's internal controls and access to information in Exhibit B to the 1999 Proxy.

### d.  KPMG Disregarded Serious Red Flags

342.    In addition to KPMG's actual knowledge of glaring irregularities in LHSP's financial statements at the time it conducted its quarterly reviews and annual audits, as set forth below, there were additional numerous red flags that alerted KPMG to the misstatements in the financial statements.  If these red flags had been investigated by KPMG, as it was obligated to do

under GAAS, it would not have been able to issue unqualified audit opinions. KPMG's certification of LHSP's consolidated financial statements as being in conformity with U.S. GAAP, in light of these red flags, demonstrates reckless misconduct, at the very least.

### 1. KPMG Knew LHSP Lacked Sufficient Internal Controls

343.    KPMG knew that the Company did not have an adequate system of internal controls, if in fact it had any internal controls at all. Internal controls are required to ensure the integrity and reliability of a company's financial reporting. At a meeting between KPMG and the Audit Committee on May 4, 1998, KPMG in fact reported that the internal audit and internal control functions of the Company needed to be strengthened. KPMG also informed the Audit Committee that the Company must improve its financial reporting for consolidated financial statements.

344.    Further, although KPMG informed the Company that an internal audit function was necessary at LHSP, it knew that the Company failed to ever, implement such a function. According to the April 12, 1999 Minutes of Telephone Meeting of the Board of Directors:

> Mr. Erwin Vandendriessche, Chairman of the Audit Committee, presents a report of the Audit Committee. Mr. Vandendriessche indicates that the Audit Committee will be receiving a Management Letter from KPMG, following which it will have a further meeting with representatives with KPMG and will make an additional report to the Board of Directors. Mr. Vandendriessche also discusses the previously reported intention of the Company to establish an internal audit function, as a result of the growing complexity of the Company's business. This had originally been targeted to be done by the end of February, but because of time commitments resulting from the SEC's review of the Company's US GAAP financial statements, this has been postponed. Now that the SEC's review has been completed, a new schedule will be set to implement this function.

345.    KPMG continued to report to the Board and the Audit Committee throughout that the Company's internal controls were inadequate and that LHSP still needed to implement the

internal audit function. According to the Minutes of Regular Meeting of the Board of Directors,

dated August 30, 1999:

> Mr. Vandendriessche reports on activities of the Audit Committee.
> He indicates that the Audit Committee has had two meetings
> within the last several weeks. He also reports that the Company's
> previous audit partner, Paul Behets, has left KPMG to join the
> Flanders Language Valley Foundation (SAIL Trust) and the Audit
> Committee has met with the new KPMG partner regarding the
> transition. ***Mr. Vandendriessche also reports that KPMG has
> done an extensive review at the end of the second quarter and
> has also issued recommendations to the Company regarding
> increases in the internal control staff.*** He also indicates that the
> Audit Committee is reviewing the need for an internal auditor, and
> will report back to the Board of Directors with this
> recommendation. He also indicates, as previously reported by Mr.
> Bastiaens, that the Audit Committee will have a meeting prior to
> each quarterly release. (emphasis added).

346. ͜ Indeed, KPMG knew by no later than the first week of February 2000 that LHSP

lacked sufficient written accounting policies or manuals — a fact which became crystal clear as a

result of the SEC investigation. On February 4, 2000, Van Aerde sent an e-mail to Dammekens,

McLamb and Huysman, which stated that "when talking to the lawyers the other day with

respect to the SEC informal investigation they asked whether LHSP has an accounting manual or

some kind of binder where reporting and accounting policies or instructions are documented."

Van Aerde asked Dammekens if LHSP had any such manuals or policies, and further requested

that he "report both to Bob [McLamb] and myself what you have." Later that same day,

Dammekens replied to Van Aerde and McLamb that "*as you know*, and as discussed over the

phone [sic], we are not strongly documented, as is typical in cies [companies] with fast growth."

On February 5, 2000, McLamb sent an e-mail to Dammekens which made clear the urgent need

for documentation of LHS ͿͿ accounting policies and procedures:

> Carl it is tr͜ ͜ that many fast growing companies do not do a good
> job of documenting policies and procedures. That time has come
> to an end. You are a $2 billion market capitalization company.

We need to proceed in putting these documents in place as soon as possible. I do understand that this is not the first priority, but there are certain documents that should be prepared before the submission to the SEC. Those documents primarily relate to revenue recognition.

347. Apart from the knowledge that LHSP lacked written accounting policies or procedures, KPMG had actual knowledge that LHSP's accounting department was run in a reckless manner. In an e-mail message from Dammekens to McLamb dated May 3, 2000 — prior to the Closing Date — Dammekens stated:

I DO WANT TO BRING UP ANOTHER POINT - AM I CAPABLE OR [SIC] REMAINING CFO IN AN ORGNISATION LIKE THIS? PERSONALLY I DO NOT THINK SO.

I AM CONVINCED THAT IT IS TIME TO BRING IN AN EXPERIENCED GUY, THAT CAN BRING STABILITY AND DISCIPLINE AND KNOWS HOW TO RUN THE FINANCES OF A BIG COMPANY (BECAUSE HE GREW UP IN ONE AND HAS DONE IT BEFORE).

THINGS ARE GETTING OVER MY HEAD - I AM STAFFING UP MY PEOPLE, BUT WITH ALL THE DEALS/ACQUISITIONS THAT GO ON, I DO NOT HAVE TIME ENOUGH TO EVEN THINK ABOUT INTEGRATION OR ORGANISATION.

[Capitalization in original.]

Thus, KPMG was well aware that the individual in charge of preparing the Company's financial results was in "over [his] head." This was a risk factor that KPMG needed to, but did not, take into consideration in planning its audits and designing its audit procedures.

348. As of the Closing Date, June 7, 2000, it was clear that the Company's controls still remained woefully insufficient — and yet, KPMG failed to apprise the Dragon principal stockholders, including the plaintiffs, of that material fact. In a memorandum dated May 8, 2000 from McLamb to n Aerde, McLamb identified several serious problems for inclusion in a "Management Letter" to be issued to LHSP. Management letters are typically prepared by

152

auditors at the conclusion of their audits and are used to identify internal control weaknesses in a

company s accounting system.  The problems identified by McLamb were:

1.    KPMG noted LHSP needed to create 'and follow formal written procedures for recording accounts receivable and adequately train personnel to record and relieve receivable balances from the general ledger.

2.    KPMG noted LHSP had not established written policies and procedures relating to establishing and relieving accruals for contingencies.

3.    KPMG noted LHSP had not established formal written policies and procedures relating to the valuation and tracking of fixed assets.

### 2.  KPMG Knew That LHSP's Audit Committee Was Not Performing Its Responsibilities

349.    Further alerting KPMG to the accounting fraud was its knowledge that the Audit

Committee was completely uninvolved with respect to the issuance of the Company's quarterly

earnings reports and that it was not carrying out its assigned responsibilities.  For example, on

July 28, 1999, LHSP issued its press release announcing second quarter 1999 financial results.

However, the Audit Committee did not even meet until August 10, 1999 — thirteen days *after*

the press release was issued.  In its Report to the Audit Committee for the Second Quarter of

1999, KPMG acknowledged that the Audit Committee had not been informed of the results of

the second quarter: "the Audit Committee has requested to be informed as to the results of the

quarter *before* issuing the press release." (Emphasis added.)

350.    KPMG continually noted issues concerning the cash collection from the LDCs

and revenues recognized from Korea (and elsewhere) to the Audit Committee.  For example, in a

Private and Confidential letter to defendant Vandendriessche, the Chairman of the Audit

Committee, dated November 17, 1999, KPMG stated with respect to these issues:

All issues have been communicated to the management of the Company. *We expressed our concern that the effect of certain described issues might have an adverse effect on the profits of the quarters if they are not resolved.* Please be advised that KPMG does not consider this limited review to be completed until the above mentioned issues have been fully resolved.

[Emphasis added.]

351.    However, although KPMG did not consider the review complete, LHSP issued the press release announcing the 1999 third quarter financial results on October 27, 1999, despite the fact that KPMG had not yet resolved the serious issues found in the third quarter financial statements that it identified for the Audit Committee.  KPMG did nothing to correct this.

### 3.  The Massive Nature of the Fraud and Resulting Restatement

352.    The magnitude of the fraud further establishes the knowing or reckless conduct on the part of KPMG.  The information regarding specific contracts in the Audit Committee Report, together with the fact that LHSP has reversed all revenues from Korea, makes clear that LHSP reversed a stunningly high percentage of its revenues.  Specifically, the Company reversed at least 13% of its reported revenues for fiscal 1998 and at least *70%* of its reported revenues for fiscal 1999.  LHSP reversed at least $175 million of revenues in 1999 alone.

353.    In its Form 8-K Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, dated April 27, 2001, filed with the SEC on May 3, 2001, the Company revealed:

the Company has prepared restated financial statements for its revenues for 1998, 1999 and the first two quarters of 2000.  As a result of this exercise, *of $535 million of revenues reported by the Company* (excluding the Company's Mendez translation unit, the acquired Dragon Systems Inc. and subsidiaries business, the US transcription business and certain other less significant subsidiaries) during this period, *$373 million have been reversed.* A portion of the revenue reversed as a result of the restatement will be recognized in later periods. *The revenues reversed included all revenues recorded by the Company's Korean subsidiary during*

154

>*this period, since a substantial portion of such revenues could not be substantiated.*

[Emphasis added.]

Thus, setting aside the revenue from certain unrelated subsidiaries of LHSP, it is clear that the Company has admitted that nearly *70%* of its revenues from the restated period were false and improperly recorded.

354.    Indeed, in addition to the facts set forth at ¶¶ 133-184 above, of which KPMG had actual knowledge, there were so many pervasive accounting violations at LHSP throughout 1998 and 1999 that it is inconceivable that KPMG could not have known that LHSP's financial statements were not presented in conformity with US GAAP.

355.    The fraudulent acts of revenue recognition were intended to, and did, inflate LHSP's reported revenue, income and earnings as reported in its quarterly and yearly financial statements for 1998 and 1999. While the Audit Committee Report did not make specific findings as to whether KPMG was aware of the terms of each of these transactions, except as noted, KPMG was well aware of the pervasive problems at LHSP that permitted such a massive accounting fraud to take place, including the lack of sufficient internal controls and the failure of the Audit Committee to implement important recommendations.

### 4. Independence Violations

#### i. Receipt of Substantial Non-Audit Fees

356.    KPMG was motivated to issue its clean audit opinions on LHSP's materially misstated financial statements by, among other things, the tremendous compensation it received from LHSP not just for auditing services but for extensive and lucrative non-audit services, performed by KPMG offices in a variety of countries, as well as the access to numerous other auditing clients and/or potential clients that LHSP provided.

357.    According to LHSP's annual Proxy Statement filed with the SEC on Form 6-K on May 24, 1999, LHSP's Board of Directors recommended that KPMG Belgium be appointed the Company's "independent statutory auditor" for the following three years, noting that KPMG Belgium's fees for each such audit "will amount to BEF 1,500,000 (approximately US$41,600)."

358.    In addition to receiving fees for its audit services KPMG received significant amounts from LHSP for consulting and other non-audit services. These services included, for example, performing valuations and due diligence for LHSP's acquisitions of Dictaphone, Dragon, and Bumil, among others. In addition, KPMG was retained to allocate the purchase price for many of the companies acquired by LHSP in its ongoing acquisition spree to the individual assets acquired and the liabilities assumed.

359.—  Moreover, much of the money KPMG received was for work performed by KPMG LLP, KPMG UK and other KPMG offices outside Belgium. In an April 25, 2001 letter to the Board of Directors, defendant Hauspie stated that KPMG Belgium's fees as a result of the various work it performed for LHSP amounted to "no less than BEF 273,445,389," or approximately US$6 million. Separately, defendant Lernout asserted that "other KPMG subsidiaries in various locations in the world billed LHS for fees amounting to more than BEF 130,000,000," or approximately US$3 million.

360.    The fact that KPMG derived over $9 million from its relationship with LHSP from auditing meant that KPMG had a strong incentive not to exercise the requisite close scrutiny of financial statements required of an independent auditor. In fact, by assisting LHSP in portraying itself as a successful company and by helping inflate the price of the stock which LHSP used as currency for its repeated acquisitions, KPMG knew that it could assure itself of millions of dollars in continuing valuation and other non-audit business from LHSP.

361.    Indeed, KPMG's provision of acquisition-related services directly impaired its independent role as LHSP's auditor. During 1998 and 1999, KPMG was responsible for allocation of the purchase price on a number of acquisitions made by LHSP, yet was also responsible, in its capacity as auditor, for auditing the balance sheet entries resulting from that allocation process. Thus, KPMG audited its own work, in clear violation of GAAS and of principles of auditor independence.

### ii. Former KPMG Auditors Received Lucrative Positions With Entities Related to LHSP Following Their Audit Engagements

362.    Apart from the substantial fees paid to KPMG for non-audit services, certain of the KPMG employees responsible for auditing LHSP benefited directly from KPMG's relationship with the Company by accepting lucrative jobs with entities related to LHSP.

363.    Indeed, one of the KPMG Belgium auditors responsible for the audits of LHSP's financial statements, Chantal Mestdagh, left KPMG Belgium to become the Chief Financial Officer of LHIC upon its founding in 1998. As set forth above, LHIC is one of the related entities through which LHSP secretly funded its supposedly unaffiliated customers. After Mestdagh left KPMG for LHIC, KPMG not only had access to her knowledge regarding the related party transactions but, in fact, consulted with her regarding LHSP's finances.

364.    Moreover, Behets, the audit partner with chief responsibility for LHSP audits from 1991 until July 1999, left KPMG Belgium following the conclusion of KPMG's audit of LHSP's 1998 financial statements to become the chief executive officer of defendant S.A.I.L. Trust, a foundation created by Lernout and Hauspie, which has control over the FLV Fund and its investments. KPMG also derived income, as note above, by its audits of LHSP related entities.

157

<u>Falsity of Cowen's Representations That LHSP's Revenues Were
Growing And That LHSP's Securities Were Valuable</u>

365.    As set forth above, Cowen has served since 1995 as LHSP's investment bankers,

while at the same time disseminating analyst research reports regarding LHSP.  Despite having

information regarding the convoluted corporate structure of LHSP including (i) access to, and a

continuing working relationship with, Dan Blake, a Cowen analyst, who subsequently joined

LHTC, an allegedly "unaffiliated customer" through whom, along with other companies, LHSP

effectuated its scheme, and (ii) participating in setting up and/or perpetrating this, structure

through among other things, (a) meeting with LHSP representatives to discuss related party

transactions and (b) meeting with potential investors in these related entities in efforts to

persuade them to invest in these entities, Cowen knew, or was reckless in not knowing, of

LHSP's related party transactions.  Further, because Cowen issued analyst reports on, and in the

course thereof studied the financial statements of, LHSP, Cowen knew that LHSP's related party

scheme was not being disclosed.  One or more LHSP analysts from Cowen worked with the

Cowen investment banking team in charge of the Dragon/LHSP transaction.

366.    Despite this knowledge, Cowen continued to recommend LHSP stock to the

public as a "Strong Buy" past the time of the Dragon merger on June 7, 2000.

367.    In addition, during the negotiations between Dragon and LHSP, Cowen

representatives, including Howe and Stone, met with Dragon shareholders, and represented that

LHSP was an attractive acquirer, based on the prospects of LHSP's business predicated on its

growth and in particular, its revenue growth.  As part of this process, Cowen presented the

plaintiffs with one or more of its analyst reports recommending LHSP as a "Strong Buy." Cowen

failed to disclose in these meetings that LHSP's revenue growth was an accounting fiction and

that the analyst reports were false and misleading as more fully set forth in ¶¶ 18 -189 above.

158

The Discovery of the Defendants' False and Misleading Representations

368.    The defendants, working together, managed to hide falsity and omissiveness of their representations until months after the Merger with Dragon closed.  When the initial news reports were issued in the Wall Street Journal, LHSP representatives denied those reports.  On August 8, 2000, after additional news reports cast doubt on LHSP's Korean revenue claims, not only did Gaston Bastiaens deny those reports on behalf of LHSP in an interview on CNBC, he enlisted the assistance of Cowen's Stone to corroborate LHSP's claims.  In that interview, Stone stated:

> I was in S – Korea in the middle of July and visited with a couple of the customers – two of the securities companies that are – that are mentioned in the list of names provided by the company.  I not only talked to the customers but I physically saw the installations, saw the computers, saw the in bound phone lines lighting up in the call center, so I can say their real.

369.    In addition, throughout July, August, September and October of 2000, LHSP executives, including defendants Lernout, Hauspie and Bastiaens maintained in the press and to the employees of LHSP and its subsidiaries that LHSP's revenues were proper and the press reports were a misunderstanding that would be satisfactorily resolved.

- To refute the reports by *The Wall Street Journal* regarding the Korean revenue, LHSP announced on August 13, 2000 that it had appointed KPMG to conduct an interim audit. Gaston Bastiaens played up the value of the audit by stating: "We have no doubt the auditors will confirm that during the first two quarters of 2000 L&H Korea had strong revenues and a very solid business base, as already publicly reported."

- When the SEC investigation was finally announced by LHSP on September 21, 2000, Hauspie and Lernout announced that they "look[ed] forward to working with the SEC" and they were "determined to resolve these matters. C. innovative company will continue to be on the cutting edge of speech and language technology around the globe and on the Internet." Indeed, one day before the SEC probe

was announced, Stone is reported to have stated at an investment conference that LHSP stock represented "an enormous investment opportunity."

- In addition, former Dragon principal stockholder Janet Baker questioned Lernout on or about October 13, 2000 regarding the allegations that had been raised by the press. Lernout assured Janet Baker that there were no improprieties in LHSP's accounting and, moreover, that Cowen and KPMG were well aware of, and approved of, the convoluted corporate structure involving numerous related party transactions. In fact, Lernout told Dragon stockholder Janet Baker that according to Stone, "There's nothing wrong with working smart."

- On October 27, 2000, LHSP again affirmed its cooperation with the SEC in seeking to release investor names of related entities to the SEC. As part of this announcement, Messrs. Hauspie and Lernout reaffirmed their prior statements "that these companies and their investors are independent of LHSP and of us personally."

370. The LHSP Defendants, in concert with the KPMG Defendants, Behets and Cowen, not only misled the public in general and the Dragon principal stockholders, including the plaintiffs, regarding the performance of LHSP and the value of its securities prior to the merger on June 7, 2000, but also acted to prevent discovery of their deception. The defendants were successful for months after the Dragon Merger.

## FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS HAUSPIE, LERNOUT, WILLAERT. DAMMEKENS, PIEPER AND BASTIAENS FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5

371. Plaintiffs repeat and reallege paragraphs 1 through 370 as though fully set forth herein.

372. Defendants Lernout, Hauspie, Dammekens, Willaert, Pieper and Bastiaens, individually and in concert with LHSP and L&H Holdings USA, directly and indirectly, by the use and means of inς ‑mentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to artificially' inflate the stock price of LHSP and

to conceal its true financial condition. Defendants Lernout, Hauspie, Dammekens, Willaert, Pieper and Bastiaens, along with others including LHSP and L&H Holdings USA, employed devices, schemes, and artifices to defraud while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct that included the making or, or participation in the making of, untrue and misleading statements of material facts, which they knew, or were reckless in not knowing, were false and omitted material facts which they knew, or were reckless in not knowing, were necessary in order to make the statements made not misleading.

373.    Defendants Lernout, Hauspie, Dammekens, Willaert, Pieper and Bastiaens, along with others including LHSP and L&H Holdings USA, participated, directly or indirectly, in the preparation, issuance, and dissemination of LHSP's 1997, 1998 and/or 1999 financial results in LHSP's annual reports and other filings with the SEC detailed herein and LHSP press releases as set forth herein. Defendants Lernout, Hauspie, Dammekens and Bastiaens also specifically affirmed the truth of those financial statements in oral representations to the Dragon principal stockholders and/or their representatives who, as defendants reasonably knew and understood would, communicate such representations to the plaintiffs in order to induce the plaintiffs to purchase LHSP stock.

374.    Defendants Lernout, Hauspie, Dammekens, Willaert and Bastiaens knew, and Pieper knew or was reckless in not knowing, that the financial statements of LHSP were materially false or misleading by, among other things, overstating revenues by a material amount, by virtue of their participation in or knowledge of, or with regard to Pieper, participation in and knowledge of or reckless conduct with regard to, among other schemes and devices: (1) the creation of sham "licensees," including Dictation Consortium, Brussels Translation Group,

and thirty start-up companies incorporated in Belgium and Singapore, designed to facilitate the mischaracterization of loans or investments as revenue and enable LHSP to fund its research and development "off the books;" (2) undisclosed factoring of receivables with recourse to bank accounts of LHSP's Korean unit; (3) transactions giving rise to improper recognition of revenue for barter or exchange transactions in which no cash changed hands; (4) transactions giving rise to improper recognition of sales revenues that were contingent on LHSP later performing development work; (5) transactions giving rise to improper recognition of revenue prior to sales contracts being finalized; (6) transactions giving rise to improper recognition of revenue when collectibility was not reasonably assured; (7) transactions giving rise to improper recognition of revenue when the customer's ability to pay depended on an investment from LHSP; (8) transactions giving rise to improper recognition of revenue when the "purchaser" of licenses were not the end-users and side letters confirmed that the license fee would be reimbursed if the license were not resold; (9) transactions giving rise to improper recognition of revenue when the customer had the right to return the product; (10) accounting practices intended to mischaracterize the foregoing transactions in order to falsely inflate LHSP's revenues; and (11) the concealment of all of the foregoing.

Scienter

375.   The knowledge of the fraud or recklessness in disseminating the fraudulent statements of defendants Lernout, Hauspie, Dammekens, Willaert, Pieper and Bastiaens is evidenced by, among other things:

(a)   LHSP's admission that its financial statements for 1998, 1999 and 2000 must be restated as a consequence of "errors and irregularities," "irregularities" being an accounting term of art for intentior ! misstatements or omissions in financial statements.

(b) Lernout's and Hauspie's involvement, detailed above, in FLV Fund, FLV Management, SAIL Trust and LHIC, all entities through which LHSP secretly funded its licensees.

(c) The Audit Committee Report's specific identification of defendants Lernout, Hauspie, Willaert, Dammekens and Bastiaens as participants in transactions and correspondence giving rise to the fraudulent reporting of revenue, as well as other facts demonstrating the LHSP defendants direct involvement in LHSP's actions, including, for example:

(i) Two side letters, one signed by Willaert and the other by Hauspie and a proxy for Willaert, obligating LHSP to repay a portion, or all, of an $8 million license fee recorded as revenue in the fourth quarter of 1999 pursuant to a December 29, 1999 agreement with a Belgian customer.

(ii) A January 5, 2000 e-mail to Willaert and Dammekens indicating that an agreement with a customer of LHSP's Belgian office, pursuant to which $4 million was recognized in the fourth quarter of 1999, had not been signed in that quarter but had been backdated to December 30, 1999.

(iii) Willaert's and Dammekens' statements to investors in the LDCs for Turkish and Farsi who wanted $1.3 million of free warrants from LHSP that the investors "had to pay for the warrants because of the P&L impact, but that LHSP would make it up to them later," and Willaert's and Dammekens' admission that a later contract obligating LHSP to pay those investors $1.8 million "for introductions to influential politicians and business people" was "entered into to reimburse [the investors] for the warrants."

(iv) A January 4, 2000, e-mail to Hauspie and Lernout indicating that an agreement with a customer of LHSP's Belgian office, pursuant to which $5 million of revenue was recognized in the fourth quarter of 1999, had not been signed in that quarter.

(v) Lernout and Hauspie funded an entity which provided the sole funding for a customer in the Belgian office who signed a license agreement in the second quarter of 1998, pursuant to which $500,000 of revenue was recognized in that quarter, which customer stated that "he had no use for [the] software when purchased."

163

(vi)    A July 7, 1999 e-mail to Bastiaens, with a copy to Hauspie, from Lernout indicated that a license agreement with a customer of the Belgian office, pursuant to which $3 million of revenue was recognized in the second quarter of 1999, had not been signed in that quarter and had been backdated to June 30, 1999.

(vii)   A January 5, 2000, e-mail to Willaert and Dammekens indicating that a license agreement with a customer in the Belgian office, pursuant to which $4 million of revenue was recognized in the fourth quarter of 1999, had not been signed in that quarter and was backdated to December 31, 1999.

(viii)  An April 4, 2000 e-mail to Willaert, Hauspie, Bastiaens and Dammekens indicating that a contract with a customer in the Belgian office, pursuant to which $8. million of revenue- was recognized in the first quarter of 2000, was not finalized in that quarter and had been backdated to March 31, 2000.

(ix)    Pieper's statements to Janet Baker, as a representative of the Dragon principal stockholders, to the effect, among other things, that he had in October 1999 verified the financial soundness of LHSP.

(d)     The Audit Committee Advisors recommendation that "disciplinary action should be taken against certain employees involved in the activities that are the subject of this report" and specifically identified Willaert, Hauspie, Lernout and Dammekens as persons who had resigned their positions and as to whom "the Board of Directors [should] consider whether disciplinary action is appropriate." The Audit Committee Advisors also recommended that the Board of Directors Consider "whether disciplinary action is appropriate" as to Gaston Bastiaens.

(e)     John Duerden, the former CEO of Dictaphone, who replaced Bastiaens as CEO of LHSP when the fraud began to become public, reported to the Wall Street Journal that the Korean unit, from which $100 million was missing, was controlled by Lernout, Bastiaens and Willaert. In a December 7, 2000, article, the Wall Street Journal reported that: "Mr. Duerden says he repeatedly asked how and when the cash [$106 million] could be sent to headquarters, but got evasive answers from Mr Seo, the Korean unit's chief. Despite being CEO, Mr. Duerden says, 'I never felt like I had control over the Korean operation,' which he adds was 'managed close to the chest' by Mr. Hauspie, Mr. Bastiaens and then-Vice Chairman Nico Willaert."

(f)    The defendants' motivation to maintain a high price for LHSP stock was so that, among other things, they would be in a position to consummate the Dragon and Dictaphone acquisitions, which LHSP could not otherwise afford.

(g)    The criminal charges pending against defendants Lernout, Hauspie, Willaert and Bastiaens in Belgium for forgery and stock manipulation.

(h)    L&H Korea's use of factoring agreements and transferring licensing agreements to attempt to create the appearance that its contracts were real and revenues had been collected.

376.    The plaintiffs relied, which reliance was reasonable, on the materially false and misleading misrepresentations and omissions in purchasing LHSP stock. Had defendants Lernout, Hauspie, Willaert, Dammekens, Pieper and Bastiaens, along with LHSP, accurately presented LHSP's true financial condition and financial results, the plaintiffs would not have entered into the Merger Agreement. As a result of LHSP's and defendants' fraudulent conduct, the plaintiffs have sustained damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS HAUSPIE, LERNOUT, WILLAERT, DAMMEKENS, PIEPER AND BASTIAENS FOR VIOLATION OF SECTION 20(A) OF THE SECURITIES EXCHANGE ACT

377.    Plaintiffs hereby repeat and reallege paragraphs 1 through 376 as though fully set forth herein.

378.    Each of the defendants Lernout, Hauspie, Willaert, Dammekens, Pieper and Bastiaens was a controlling person of LHSP within the meaning of Section 20(a) of the Exchange Act at all times during the period he served as an officer and/or director of LHSP. Those defendants, by virtue of their positions as officers and directors of LHSP, had the power to influence and control, and did so influence and control, the acts and conduct of LHSP, including, but not limited to, LHSP's subsidiaries including L&H Korea. In particular, those defendants had the power and influence, at all times relevant to this claim, to direct LHSP to disclose its transactions with related parties, to direct LHSP to record revenues and otherwise state its

financial results and condition in accordance with U.S. GAAP, and to direct LHSP or L&H

Korea in the preparation and issuance of its annual reports and other filings with the SEC, its

press releases and other statements and representations. By virtue of their positions, those

defendants had unique and extensive access to and control over LHSP's financial records.

379.    The plaintiffs reasonably relied in purchasing LHSP stock on the materially false

and misleading representations and omissions by LHSP in purchasing LHSP stock. By reason

of, and as a direct and proximate result of the wrongful conduct of LHSP, defendants Lernout,

Hauspie, Willaert, Dammekens, Pieper and Bastiaens are liable for the wrongful conduct of

LHSP and liable to the plaintiffs for the substantial damages they suffered in connection with

their exchange of their interest in Dragon for LHSP stock.

380.    By reason of the foregoing, Defendants Lernout, Hauspie, Willaert, Dammekens,

Pieper and Bastiaens are jointly and severally liable to the plaintiffs for the aforesaid damages, in

an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF AGAINST KPMG LLP, KPMG UK, KPMG BELGIUM AND BEHETS FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5

381.    Plaintiffs hereby repeat and reallege paragraphs 1 through 380 as though fully set

forth herein.

382.    In each of their reports on LHSP's 1997, 1998, and 1999 financial statements,

KPMG Belgium, and for years 1997 and 1998 also Behets, represented that KPMG conducted its

"audits in accordance with generally accepted auditing standards" and that the consolidated

financial statements of the Company and its subsidiaries for the fiscal year audited "present[ed]

fairly, in all material respects, the consolidated financial position" of LHSP and i׳ ׃ubsidiaries

"and the results of their operations and their cash flow" in accordance with U S ׳ ׃AP. KPMG

LLP and KPMG UK were integrally involved in the audits of LHSP for one or more of those

years. Among other things, they purported to ensure that the audits were conducted in accordance with US GAAP, GAAS and/or the rules and regulations of the SEC. KPMG Belgium, KPMG LLP, as well as others, also made specific oral representations to and for the benefit of the Dragon shareholders, including the plaintiffs, affirming the propriety of LHSP's financial reporting in general, and of the unaudited financial results for 1999 and subsequently the audited 1999 financial statements, as detailed above. These representations were false, and the certified financial statements, as described above, were materially false and misleading.

383.    KPMG and Behets knew the audit reports would be attached to financial statements filed with the SEC that would be used to attract investors and form the basis on which shareholders would purchase shares of LHSP. KPMG Belgium and Behets explicitly consented to the inclusion of the KPMG reports in, among other filings, LHSP's 1997 Annual Report on Form 20-F filed with the SEC on July 2, 1998; 1998 Annual Report on Form 20-F filed with the SEC on June 30, 1999; 1999 Annual Report on Form 10-K filed with the SEC on June 30, 2000; and Registration Statement flied on Form S-3 on January 7, 2000. KPMG Belgium and KPMG LLP knew that the plaintiffs had reviewed its certification reports as part of the due diligence prefatory to the Merger Agreement and knew that the plaintiffs would rely on those reports – and on the direct oral responses of KPMG Belgium, KPMG LLP, and possibly KPMG UK to Dragon's inquiries about the propriety of LHSP's financial reporting – in making a decision to exchange the plaintiffs' interest in Dragon for LHSP shares and in setting the rate of exchange for that transaction.

384.    The oral and written representations of KPMG and the written representations of Behets were material to the plaintiffs' decision to exchange their interest in Dragon for LHSP shares and determination of the rate of exchange for that transaction. In making their investment

decision, the plaintiffs relied upon KPMG's oral and written representations and Behets' written representations as to the accuracy and reliability of the information contained in LHSP's financial statements and the procedures used to audit the financial statements.

385.    KPMG Belgium, KPMG LLP, KPMG UK, and Behets knew, or were reckless in not knowing, that LHSP's financial statements were not prepared in accordance with U.S. GAAP, as falsely represented to the plaintiffs, because, among other material misstatements in LHSP's financial reports, LHSP's financial statements concealed the facts that: (1) $373 million, or about 44% of LHSP's revenue in 1998, 1999 and 2000 was improperly recognized; (2) thirty start-up companies who provided at least 10% of LHSP's 1998-revenue and 28% of its 1999 revenue were funded by parties related to LHSP; (3) 100% of the revenue recognized on LHSP's Korean contracts was improperly recognized; (4) more than $100 million in the bank accounts of LHSP's Korean unit was inaccessible, likely as a consequence of a factoring arrangement that was not publicly disclosed.  A fraud of this magnitude and pervasiveness could not have gone undetected without knowledge or the highest degree of recklessness on the part of KPMG and Behets because of the overwhelming size and nature of the items in value and their centrality to the results of operations and financial condition of LHSP.

<u>Scienter</u>

386.    Evidence of KPMG's and Behets' knowledge or recklessness is demonstrated by at least the following facts:

(a)    KPMG's and Behets' failure to follow US. GAAS, which was so egregious that audits of LHSP amounted to no audit at all, as detailed above.

(b)    An October 18. 1999 e-mail written by KPMG personnel demonstrating KPMG's knowle ge that LHSP was factoring receivables from contracts with Korean custom s and that the factoring was collateralized by LHSP's Korean bank accou..: from which $100 million is currently "missing."

(c)  The Audit Committee Advisors' statements that "KPMG was aware" of problematic contracts with Korean customers pursuant to which LHSP improperly recognized $48 million in revenue in the last two quarters of 1999.

(d)  KPMG's knowledge of the SEC investigation of LHSP's dealings with related parties, and failure to disclose that information to Dragon and the plaintiffs.

(e)  KPMG Belgium's position as auditor of FLV Fund, which gave KPMG Belgium access to both sides of many of the fraudulent transactions giving rise to material misstatement of LHSP's financial reports.

(f)  KPMG's knowledge that FLV Fund was an investor in the LDCs, rendering revenue under contracts between the LDCs and LHSP not recognizable under US GAAP.

(g)  KPMG's and Behets' knowledge that LHSP was willing to engage in aggressive and improper accounting practices, which arose from the restatements of LHSP's financial statements for 1997 and the first nine months of 1998 ordered by the SEC.

(h)  KPMG's knowledge that revenue under contracts with HI Worldwide, Vice Tech, Digital Sei-Young, Neo and FourOneOne.com was not recognizable in accordance with US GAAP.

(i)  The ease with which Wall Street Journal reporters were able to discover, within weeks, that LHSP's Korean sales were minimal or non-existent.

(j)  KPMG's access to and communications with Chantal Mestdagh, a former KPMG auditor who was CFO of LHIC, and thus was aware of the other side of LHSP's fraudulent transactions involving companies owned by LHIC.

(k)  KPMG's access to Behets once he was at SAIL Trust and could provide information as to the other side of fraudulent transactions involving the FLV Fund.

(l)  KPMG's knowledge that LHSP lacked adequate internal controls and that its CFO was unable to perform his responsibilities and the Audit Committee was not performing its responsibilities.

(m)  Behets, while a KPMG Belgium partner, was motivated by a desire to obtain lucrative employment at an entity controlled by defendants Lernout and Hauspie, and he did obtain such employment, as chief executive officer of SAIL Trust, a foundation created by defendants Lernout and Hauspie, through which they exercise indirect control over the FLV Fund, and commenced his employment there shortly after KPMG Belgium, with assistance from KPMG LLP and KPMG UK, rendered a clean opinion on LHSP's materially false and misleading 1998 financial statements.

(n)     Behets' participation, as early as May 1997 or earlier, in one or more meetings on behalf of LHSP to try to attract investors for the Belgium Translation Group.

(o)     Lernout's statement to Janet Baker, and later Lernout, Hauspie and Willaerts's letters stating that KPMG was fully aware of and supported LHSP's convoluted corporate structure and LHSP's Korean activities.

387.    In misrepresenting the conduct of audits for the years 1997, 1998 and 1999, and falsely representing that LHSP's consolidated financial statements fairly presented its financial position and results of operations and cash flows for those years, KPMG and Behets, by the use and instrumentalities of interstate commerce and the United States mail, participated in a course of conduct that constituted a fraud and deceit, misrepresented material facts and omitted to disclose material facts and concealed LHSP's true financial condition and results of operation.

388.    By reason of the foregoing, KPMG and Behets have violated section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

389.    The plaintiffs relied, which reliance was reasonable, on KPMG's and Behets' misrepresentations and material omissions in - its purchase of LHSP stock, and have suffered substantial damages as a result thereof, in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF AGAINST THE KPMG DEFENDANTS PURSUANT TO SECTION 20(A) OF THE EXCHANGE ACT

390.    Plaintiffs hereby repeat and reallege paragraphs 1 through 389 as though fully set forth herein.

391.    The partners, employees and agents of KPMG Belgium, KPMG LLP, KPMG UK and KPMG International who conducted the audits of LHSP and who communicated with the plaintiffs and Dragon in connection with the Dragon merger were at all relevant times, directly or indirectly, controlled by KPMG LLP, KPMG UK  KPMG Belgium and KPMG International, acting individually or collectively as "KPMG," a single firm.

392.    The collective control of all of the partners, employees and agents of KPMG by the collective of KPMG is evidenced by the following:

(a)    KPMG presents itself as a single firm providing integrated services on worldwide basis. To provide such worldwide, "one-firm" services it is necessary to and the KPMG entities do exercise actual and implied control over the various partners, agents and employees of the KPMG entities so that these partners, agents and employees can and do provide integrated services. Absent such control, KPMG's entire marketing program would be a fraud because KPMG would be incapable of providing services as "one firm."

(b)    With respect to the particular audits and communications alleged in this complaint, KPMG Belgium, KPMG US, KPMG UK and/or KPMG International exercised, either individually or collectively, control over the performance of the audits in question, the communications in question and the persons who performed such audits and made such communications. Specifically, the KPMG partner who was considered by LHSP to be the "lead" partner on the account, and the KPMG partner who exercised final decisionmaking authority with respect to the account were partners located at various times in Belgium, the United States and the United Kingdom.

393.    KPMG LLP through its partners, especially Robert McLamb, KPMG UK through its partners, especially Paul Beecy, KPMG Belgium through its partners, especially William Van Aerde and Paul Behets, and KPMG International exercised actual control over the KPMG entities worldwide and the transactions alleged herein that give rise to KPMG's liability under the securities laws. Notwithstanding knowledge that the 1998 and 1999 financial statements of LHSP were not prepared in accordance with US GAAP or reckless disregard of that fact, KPMG LLP, KPMG Belgium, KPMG UK and KPMG International permitted the issuance of the false 1998 and 1999 audit opinions that stated the contrary.

394.    By reason of the foregoing, each of the KPMG Defendants are liable under Section 20(a) of the Exchange Act jointly and severally with the other KPMG Defendants for the wrongful conduct alleged in this Complaint.

395.    As a direct and proximate result of the wrongful conduct of KPMG LLP, KPMG UK, KPMG Belgium and KPMG International, the plaintiffs suffered damages in connection with their purchase of LHSP securities in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF AGAINST THE KPMG DEFENDANTS PURSUANT TO SECTION 10(B) OF THE EXCHANGE ACT BASED UPON AGENCY

396.    Plaintiffs hereby repeat and reallege paragraphs 1 through 395 as though fully set forth herein.

397.    Each of the persons who conducted the audits of LHSP, who issued the audit opinions and who communicated on behalf of KPMG with the plaintiffs or their representatives in connection with the Dragon merger were presented as and were agents of "KPMG", including each of KPMG LLP, KPMG UK, KPMG Belgium, and KPMG International, either individually and/or collectively.

398.    Each of the acts performed by such persons in the conduct of the audits of LHSP the issuance of the audit opinions and the communications to the plaintiffs and Dragon in connection with the Dragon merger were authorized by, apparently authorized by or within the power of those persons to make for KPMG LLP, KPMG UK, KPMG Belgium and KPMG International.

399.    KPMG's presentation of the various partners, employees and agents of KPMG Belgium, KPMG LLP and KPMG UK as being part of one, worldwide and integrated firm known as and marketed as "KPMG" is intended to communicate that such persons, by reason of being agents of KPMG, have a special level of skill, care and professionalism, as advertised KPMG for the "one firm" it purports to be. Moreover, auditors from these three KPMG offices worked together in connection with performing auditing and other accounting services for LHSP. Further, there were high level individuals from each of these three offices included in the LHSP

audits. The plaintiffs relied upon the representations of care, skill and professionalism by KPMG in connection with their consideration of the financial statements of LHSP and the communications made by the various KPMG personnel. KPMG intended to enhance the credibility of its audit and of its opinion letter by causing investors to believe that the audit performed and the opinion rendered were those of a worldwide, sophisticated and prominent accounting firm, not a local or limited firm.

400.    As a consequence of the foregoing, each of KPMG LLP, KPMG UK, KPMG Belgium and KPMG International are liable for some or all of the wrongful conduct alleged in this Complaint, including the acts of one another, and are liable to the plaintiffs for the damages which they suffered in connection with their purchase of LHSP securities in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF AGAINST DEFENDANT COWEN FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5

401.    Plaintiffs hereby repeat and reallege paragraphs 1 through 400 as though fully set forth herein.

402.    In its analyst reports dated September 15, 1998, January 5, 2000, and February 10, 2000, Cowen purported to give their analyst report of LHSP's securities. These reports recommended LHSP's securities as a "Strong Buy" based on LHSP's growth, and particularly revenue growth. Cowen's recommendations contained facts that were materially false and misleading.

403.    Indeed, as set forth above, Cowen was involved in obtaining funding for and/or helping to create the related party transactions which were characterized publicly as "unaffiliated" transactions, and which Cowen took no steps to correct.

404.   Cowen knew that its reports influenced investors and formed the basis on which shareholders would purchase LHSP securities.

405.   Cowen also served as LHSP's investment bankers and made oral and written presentations to the Dragon principal stockholders, including the plaintiffs, during the negotiation of the Merger between LHSP and Dragon.  Cowen knew that the Dragon principal stockholders, including the plaintiffs, would rely on Cowen's analyst reports and written and oral representations regarding the value of LHSP's securities in deciding to exchange the plaintiffs' interest in Dragon for LHSP shares and in setting the rate of exchange for that transaction.

406.   Cowen knew or was reckless in not knowing that LHSP's alleged financial reports, growing revenue and expansion in Asia were fraudulent and that (1) companies who provided a substantial percentage of LHSP's revenue to LHSP in 1998 and 1999 were funded by parties related to LHSP for the purpose of making research and development costs appear to be revenues and (2) that LHSP's revenues accordingly were overstated.

<u>Scienter</u>

407.   Evidence of Cowen's knowledge or recklessness is demonstrated by at least the following facts:

(a)   Cowen served as LHSP's investment banker since 1995, was the underwriter of LHSP's initial public offering in 1995 and two follow-up offerings, and acted as lead advisor for LHSP in the acquisitions of Dictaphone and Dragon, giving them access to LHSP's financial information.

(b)   Lernout's statement to Janet Baker, as a representative of the Dragon principal shareholders, that Cowen was well aware of and supported LHSP's use of "third party" corporations fund research and development expenses, as evidenced specifically Stone's statements to Lernout.

(c)   Cowen's efforts to recruit investors for BTG.

(d)   Cowen's motivation to issue materially false and misleading analy . reports and make direct representations to the Bakers to continue to earn invesi.nent banker

174

fees from LHSP and/or from companies related to LHSP and to place Cowen
personnel and employees at these companies.

(e)    Cowen's access to Blake, a former Cowen analyst who was employed by LHIC
and thus had access to, if not direct knowledge of, LHSP's fraudulent transactions
including companies owned by LHIC.

(f)    The ease with which Wall Street Journal reports were able to discover, within
weeks, that L&H Korea's sales were minimal or non-existent.

(g)    Cowen's continued close relationship and work on the Dragon/LHSP deal team
with former Cowen analyst Dan Blake who went to LHIC.

(h)    Cowen's knowledge prior to the Dragon/LHSP transaction of concerns and issues
raised regarding LHSP's revenue recognition practices and strategic partners.

(i)    Cowen's own financial analysis in connection with the February 2000 Cowen
report of the financial results of LHSP for 1999, which report(s) issued prior to
the conclusion of the 1999 KPMG audit.

408.    In issuing its analyst reports, Cowen by the use and instrumentalities of interstate
commerce and United States Mail, participated in a course of conduct that constituted fraud and
deceit, misrepresented material facts and omitted to disclose material facts and concealed
LHSP's true financial condition and results of operation.

409.    By reason of the foregoing, Cowen has violated Section 10(b) of the Exchange
Act and Rule 10b-S thereunder.

410.    The plaintiffs relied, which reliance was reasonable, on Cowen's
misrepresentations and material omissions in its purchase of LHSP stock, and have suffered
substantial damages as a result thereof, in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF AGAINST THE KPMG DEFENDANTS, BEHETS, DAMMEKENS, LERNOUT, HAUSPIE, BASTIAENS, WILLAERT, PIEPER AND COWEN FOR COMMON LAW FRAUD

411.    Plaintiffs hereby repeat and reallege paragraphs 1 through 410 as though fully set
forth herein.

412.    In an effort to induce the plaintiffs to enter into the Merger Agreement, all defendants knowingly and willfully made misrepresentations of material facts to the Dragon principal stockholders, including the plaintiffs, and knowingly and willfully failed to disclose or fraudulently concealed the true facts from the Dragon principal stockholders, including the plaintiffs.

413.    In reasonable reliance on those misrepresentations, and as a result of defendants' failure to disclose and fraudulently conceal the true facts, the plaintiffs entered into the Merger Agreement, to their detriment.

414.    As a result of the above defendants' fraudulent conduct, the plaintiffs have sustained damages in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF AGAINST THE KPMG DEFENDANTS, BEHETS, DAMMEKENS, LERNOUT, HAUSPIE, BASTIENS, WILLAERT, PIEPER AND COWEN FOR NEGLIGENT MISREPRESENTATION

415.    Plaintiffs hereby repeat and reallege paragraphs 1 through 414 as though fully set forth herein.

416.    In the course of their engagement as LHSP's officers, LHSP's independent auditors, and LHSP's investment bankers, in which they had a pecuniary interest, the LHSP Defendants, the KPMG Defendants, Behets and Cowen supplied false oral and written information for the guidance of the plaintiffs in its decision to enter into the Merger Agreement and its determination of the price to be paid for LHSP stock.

417.    In supplying the false oral and written information, and failing to disclose material information, the defendants knew that the Dragon principal stockholders, including the plaintiffs, intended to rely on that information in deciding whether to enter into the Merger Agreement and in detecmining the price to be paid for LHSP stock. Defendants intended to

influence the decision of the Dragon principal stockholders, including the plaintiffs, in that transaction and in the determination of the price to be paid for LHSP stock in that transaction.

418.    The plaintiffs reasonably relied upon the oral and written false information supplied by KPMG Belgium, KPMG LLP, Behets and Cowen in deciding to enter into the Merger Agreement and in determining the price to be paid for LHSP stock in that transaction, to their detriment.

419.    As a result of the above defendants' negligent misrepresentations, the plaintiffs have been damaged in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF AGAINST THE RELATED-PARTY DEFENDANTS AND VERBEKE FOR AIDING AND ABETTING COMMON LAW FRAUD

420.    Plaintiffs hereby repeat and reallege paragraphs 1 through 419 as though fully set forth herein.

421.    As set forth herein, the Related-Party Defendants and Verbeke knew of the fraud committed by LHSP and its officers and senior management, including Dammekens.

422.    The Related-Party Defendants and Verbeke provided substantial assistance to LHSP and its officers and senior management in that they affirmatively assisted in the purported funding of LHSP's "strategic partners" in order to enable LHSP to falsely report revenue derived from contracts with the "strategic partners."

423.    In addition, Verbeke, in his capacity as a partner of Loeff Claeys, provided substantial assistance to LHSP and its officers and senior management in that he provided legal services in connection with the establishment of the "strategic partners" and LHSP's dealings with the "strategic partners."

424.    As a consequence of the foregoing, the plaintiffs suffered damages in an amount to be proven at trial.

WHEREFORE, plaintiffs demand judgment as follows:

(a)    Awarding plaintiffs damages in an amount to be determined at trial against all

defendants, jointly and severally, for, the plaintiffs' purchases of LHSP shares, as

well as reimbursement for any liabilities and expenses incurred as a result of the

impact of the fraud on plaintiffs' sales of LHSP shares or otherwise;

(b)    Awarding plaintiffs their reasonable costs and expenses incurred in this action;

and

(c)    Awarding such other, further or different relief as the Court may deem just and

proper.

JURY DEMAND

Plaintiffs demand trial by jury.

By their attorneys,

Jack R. Pirozzolo, BBO# 400400
Richard E. Bennett, BBO# 037740
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Counsel for plaintiffs