Westlaw.

Slip Copy
2004 WL 1925466 (D.Del.)
(Cite as: 2004 WL 1925466 (D.Del.))

Page 1

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.

GUIDANT CORPORATION, Cardiac Pacemakers,
Inc., Guidant Sales Corporation and
Mirowski Family Ventures, L.L.C., Plaintiffs,
v.
ST. JUDE MEDICAL, INC. and Pacesetter, Inc.,
Defendants.

**No. Civ. 04-067-SLR.**

Aug. 27, 2004.

Frederick L. Cottrell, III, Richards, Layton &
Finger, Wilmington, DE, for Plaintiffs and
Counter-Defendants.

John W. Shaw, Young, Conaway, Stargatt &
Taylor, Wilmington, DE, for Defendants and
Counter-Claimants.

MEMORANDUM ORDER

ROBINSON, J.

*1 At Wilmington this 27th day of August, 2004,
having reviewed defendants' motion to transfer and
the papers submitted in connection therewith;

IT IS ORDERED that said motion to transfer
(D.I.27) is denied, for the reasons that follow:

1. Introduction. On February 2, 2004, Guidant
Corporation, Cardiac Pacemakers, Inc., Guidant
Sales Corporation and Mirowski Family Ventures,
L.L.C. (collectively, "plaintiffs"), filed this action
for declaratory judgment of patent infringement
against St. Jude Medical, Inc. and Pacesetter, Inc.
(collectively, "defendants"). (D.I.1) The
patent-in-suit is United States Patent Number

RE38,119 ("the '119 patent"). [FN1] This patent is
"directed to a new way to treat congestive heart
failure ("CHF"), which occurs when the heart
muscle is too weak to pump blood effectively
through the body." (D.I. 34 at p. 3) Plaintiffs allege
that defendants infringe the '119 patent by making
and selling congestive therapy products that provide
cardiac resynchronization therapy ("CRT") to treat
CHF. [FN2] (D.I.28)

> FN1. The '119 patent is the subject of
> litigation presently before the court in
> *Medtronic v. Guidant,* Civ. No.
> 03-848-SLR (D.Del.). Although both sides
> expend much energy arguing the relevance
> of the *Medtronic* case to the issue of
> transfer at bar, the court is unimpressed by
> these considerations.

> FN2. The accused devices are St. Jude's
> Epic0 HF implantable cardioverter
> defibrillator, Atlas0 HF implantable
> cardioverter defibrillator, and Frontier0
> pacemaker device. (D.I.28)

On February 24, 2004, Cardiac Pacemakers, Inc.
filed a second patent infringement action in the
District of Minnesota against defendants St. Jude
Medical, Inc. and Pacesetter, Inc. ("the Minnesota
Action"). (D.I. 29, Ex. 5, *Cardiac Pacemakers, Inc.
v. St. Jude Medical, Inc.,* C.A. No. 04-1016
JMR/FLN) The patent-in-suit is United States
Patent No. 5,755,766 ("the '766 patent"). [FN3] The
'766 patent is directed to cardiac leads that travel
though veins to the heart. (D.I.34)

> FN3. The accused products are St. Jude's
> QUICKSITE0 1056 K pacing lead used
> with St. Jude's Epic HF, Atlas HF and
> Frontier devices. (D .I. 28)

Defendants moved to transfer this case to the
United States District Court for the Southern
District of Indiana on March 9, 2004. (D.I.11)
Defendants argued that the interests of justice
strongly favored having all cases relating to the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 1925466 (D.Del.)
(Cite as: 2004 WL 1925466 (D.Del.))

accused products heard before the United States District Judge David F. Hamilton. Defendants argued that Judge Hamilton was "particularly well-suited to fill that role because he had recently presided over the lengthy trial of a prior suit brought by plaintiff Guidant involving four other patents issued to Dr. Morton Mower, the alleged inventor of the '119 patent in suit." [FN4] (D.I. 28 at 8)

> FN4. According to defendants:
> The judgment of invalidity as to one of the four patents is the subject of an appeal currently pending before the Federal Circuit. With respect to the other three patents, one was voluntarily dismissed before trial, Judge Hamilton's finding as to the invalidity of one has been conceded, and Judge Hamilton's summary judgment holding of invalidity of the third was affirmed by the Federal Circuit.
> (D.I.28, fn.2)

On April 7, 2004, plaintiffs filed their first amended complaint. (D.I.22) Defendants' withdrew their motion to transfer to the Southern District of Indiana on April 13, 2004. [FN5] (D.I.23) Defendants filed their answer to the amended complaint along with counterclaims on April 21, 2004. (D.I.25) Defendants filed a second motion to transfer this case to the District of Minnesota on May 6, 2004. (D.I.27, 28, 29) The matter is fully briefed. (D.I.34, 35, 36, 38, 39)

> FN5. Apparently, under the Southern District of Indiana local rules, defendants' case was not considered a related case, thereby assignment to Judge Hamilton was not possible.

2. Background. Plaintiff Guidant Corporation ("GC") is an Indiana corporation having its principal place of business in Indianapolis, Indiana. GC has an exclusive license to the '119 patent. Plaintiff Cardiac Pacemakers, Inc. ("CPI") is organized under the laws of Minnesota and has a principal place of business in St. Paul, Minnesota. Guidant Sales Corporation ("GSC") is an Indiana corporation with its principal place of business in Indianapolis, Indiana. GS and its subsidiaries CPI and GSC make and sell cardiac rhythm management

devices. (D.I.22) Mirowski Family Ventures, L.L.C. is a Maryland limited liability corporation that has been assigned title to the '119 patent. (Id.)

*2 3. Defendant St. Jude Medical, Inc. ("SJM") is a Minnesota corporation with its principal place of business in St. Paul, Minnesota. Defendant Pacesetter, Inc. ("Pacesetter") is a Delaware corporation with its principal place of business in Sylmar, California. (Id.) Pacesetter is a subsidiary of SJM.

4. Standard of Review. Under 28 U.S.C. § 1404(a), a district court may transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interests of justice. Congress intended through § 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice. Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988); Affymetrix, Inc. v. Synteni, Inc., 28 F.Supp.2d 192, 208 (D.Del.1998).

The burden of establishing the need to transfer rests with the movant "to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." Bergman v. Brainin, 512 F.Supp. 972, 973 (D.Del.1981) (citing Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir.1970). "Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail". ADE Corp. v. KLA-Tencor Corp., 138 F.Supp.2d 565, 567 (D.Del.2001); Shutte, 431 F.2d at 25.

The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. C.R. Bard, Inc. v. Guidant Corp., 997 F.Supp. 556, 562 (D.Del.1998); Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc., 2001 WL 1617186 (D.Del. Nov.28, 2001); Continental Cas. Co. v. American Home Assurance Co., 61 F.Supp.2d 128, 131 (D.Del.1999). Although transfer of an action is usually considered as less inconvenient to a plaintiff if the plaintiff has not chosen its " 'home turf' or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 1925466 (D.Del.)
(Cite as: 2004 WL 1925466 (D.Del.))

consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." *In re M.L.-Lee Acquisition Fund II, L.P.,* 816 F.Supp. 973, 976 (D.Del.1993).

The Third Circuit Court of Appeals has indicated the analysis for transfer is very broad. *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995) . Although emphasizing that "there is no definitive formula or list of factors to consider," *id.,* the Court has identified potential factors it characterized as either private or public interests. The private interests include: "(1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." *Id.* (citations omitted).

*3 The public interests include: "(1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases." *Id.* (citations omitted).

5. Discussion. Defendants assert that this case and the Minnesota Action belong together. Both actions involve cardiac rhythm management (CRM) products used to provide cardiac resynchronization therapy (CRT). According to defendants, judicial resources would be conserved by adjudicating the cases in the same forum. Since both sides have corporate headquarters in Minnesota, it would be convenient to litigate there. Defendants, also, advise that the District of Minnesota is considered to have special expertise in the technology at issue. [FN6]

> FN6. In support, defendants reference this court's 1996 memorandum order in

*Pacesetter, Inc. v. Cardiac Pacemakers,* Civ. No. 96-232-SLR (D.Del.1996). In addressing a motion to transfer in the case between some of the same litigants at bar, the court granted the motion:

> The court, however is persuaded that transfer of this case to the District of Minnesota is warranted because of Minnesota's familiarity with the technology at issue through past and pending litigation. It is the court's understanding that the District of Minnesota is in a posture to accept such a complex case without prejudice to plaintiffs' interest in a prompt resolution of the matter. Under these unusual circumstances, the court finds that transfer will conserve judicial resources and, therefore, further the interest of justice.
> (*Id.,* emphasis added)

6. Plaintiffs argue that defendants are forum shopping and clearly do not wish to be before this court. (D.I.34) Its first motion was to move this case before a particular judge and, when that was not possible, they withdrew the motion. Plaintiffs assert that defendants have failed to present legitimate reasons to transfer from its choice of forum. Plaintiffs also request that fees and costs associated with the preparation of its response to the motions be awarded.

7. Weighing the arguments against the *Jumara* balancing test, the court finds that the asserted public and public advantages of moving the case to the District of Minnesota are insufficient. Although two of the parties are headquartered in Minnesota, there is also evidence that all parties conduct business on a nationwide basis and are not restricted in any way from traveling to Delaware. Defendants argue that the public and private factors favor transfer yet offer nothing particularly burdensome or fact specific. Instead, they contend that their concern for conserving judicial resources is the most compelling factor. In the absence of any particular or unusual circumstances, the concern for judicial economy does not warrant a transfer of the case.

Moreover, defendants' concern for judicial economy actually operates against a transfer.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 1925466 (D.Del.)
(Cite as: 2004 WL 1925466 (D.Del.))

Assuming, *arguendo,* that the technology at issue in the Minnesota and the Delaware actions involve essentially the same parties and patents and involve the same legal theories, under the "first filed rule", this court, where the first case was filed, would not be compelled to transfer the case. Instead, the second filed Minnesota Action would be ripe for transfer to this court.

More than fifty years ago, the Third Circuit adopted the "first-filed rule" where "[i]n all cases of federal concurrent jurisdiction the court which first had possession of the subject must decide it." *Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 929 (3d Cir.1941) (quoting *Smith v. McIver,* 22 U.S. (9 Wheat.) 532, 6 L.Ed. 152 (1824)). Consequently, the second filed action should be stayed or transferred to the court where the first filed action is pending. *Peregrine Corp. Peregrine Indus., Inc.,* 769 F.Supp. 169, 171 (E.D.Pa.1991); *Genfoot, Inc. v. Payless Shoesource, Inc.,* Civ. No. 03-398-SLR, 2003 WL 22953183 (D.Del.2003). The rule "encourages sound judicial administration and promotes comity among federal courts of equal rank." *E.E.O.C. v. University of Pennsylvania,* 850 F.2d 969, 971 (3d Cir.1988). The decision to transfer or stay the second action is within the discretion of the trial court. *Id.* at 972, 977. While the issue of transfer of the Minnesota Action is obviously not before the court, the caselaw reflects the overwhelming preference toward the first-filed case.

*4 Plaintiffs, however, have not succeeded on all issues. Specifically, plaintiffs have failed to demonstrate to the court's satisfaction that an award of attorney's fees and costs is warranted at this time. Although defendants' strategic filing of motions is suspect, it does not rise to the conduct necessitating a fee award, especially when plaintiffs' own conduct, wherein the Minnesota Action was filed within weeks of this filing, suggests similar posturing.

8. Conclusion. For the reasons stated, defendants' motion to transfer (D.I.27) is denied.

2004 WL 1925466 (D.Del.)

Motions, Pleadings and Filings (Back to top)

• 1:04CV00067 (Docket)

(Feb. 02, 2004)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
2003 WL 21659254 (E.D.Pa.)
(Cite as: 2003 WL 21659254 (E.D.Pa.))

Page 1

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

Qing Ding LIU, Plaintiff,
v.
CARGO TRANSPORTERS, INC., Michael Vernon
Spangler, Greater Asian, LLC and Ming
Hui Wu, Defendants.

**No. CIV.A. 02-CV-8621.**

April 7, 2003.

*ORDER*

DAVIS.

*1 AND NOW, this day of April 2003, upon consideration of (1) Defendant Cargo Transporters, Inc.'s Motion to Transfer, (2) Plaintiff's Response in Opposition to Defendant's Motion to Transfer, and (3) Defendant's Response thereto, it is hereby ORDERED and decreed that:

1) Venue in the instant matter would be proper in the Middle District of Pennsylvania. 28 U.S.C. § 1404(a)(provides for the transfer of a case where both the original and the requested venue are proper).

2) The Court having (i) made a case-specific application of the Section 1404(a) balancing test and (ii) considered the private and public factors relevant to the determination of whether the interests of justice and the balance of convenience will be served by transferring this matter to the Middle District of Pennsylvania, finds that the balance of interests weighs in favor of keeping the matter in the Plaintiff's chosen forum. *Jumara v. State Farm Insurance Company,* 55 F.3d 873, 879 (3d. Cir.1995); *Remick v. Manfredy, et al.,* 138 F.Supp.2d 652, 655-656 (E.D.Pa.2001). 28 U.S.C.S. § 1404(a)

("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.").

3) Defendant's reliance on the "first filed" rule in support of its argument that the instant matter should be transferred because *Cargo Transporters v. Asian Food Services and Ming Hui Wu* (No. 3: CV 02-1136), filed on July 1, 2001 and currently pending in the Middle District of Pennsylvania, arises out of the same facts, transactions and occurrences as the instant matter, is inapposite. *Captain Sheriff Saudi v. Acomarit Martitimes Services,* S.A., 2003 U.S. Dist. LEXIS 1479, at n. 3 (the first filed rule as articulated in *EEOC v. University of Pennsylvania* does not apply when the parties to the two actions are not the same); *E.E.O.C. v. University of Pennsylvania,* 850 F.2d 969, 971 (3d Cir.1988) (Absent special circumstances, in the interest of justice and in accordance with the "first filed" rule, trial judges should exercise their discretion by enjoining the subsequent prosecution of cases involving the *same parties* and same issues in different federal district courts.). Defendant has failed to cite any authority to address Plaintiff's argument that Plaintiff Qing Ding Liu is not a party to the action pending in the Middle District of Pennsylvania.

4) Defendant has failed to meet its burden of establishing that the Plaintiff's choice of forum should be disturbed and this matter transferred to the Middle District of Pennsylvania. *Meisenhelder v. Sunbury Transport, Ltd.,* 2002 U.S. Dist. LEXIS, at 7 (E.D.Pa.)(("A plaintiff's choice of forum should not be disturbed unless the defendant can show that such forum would cause oppressive inconveniences. This is a heavy burden on the defendant, and the balance of interests must weigh strongly in defendant's favor.")(citing *Am. Argo v. United States Fid. & Guar. Co.,* 590 F.Supp. 1002, 1004 (E.D.Pa.1984) ).

Accordingly, Defendant's Motion to Transfer this matter to the Middle District of Pennsylvania is

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
2003 WL 21659254 (E.D.Pa.)
**(Cite as: 2003 WL 21659254 (E.D.Pa.))**

DENIED.

2003 WL 21659254 (E.D.Pa.)

Motions, Pleadings and Filings (Back to top)

• 2:02CV08621  (Docket)
                          (Nov. 25, 2002)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

1989 WL 101550
1989 WL 101550 (D.N.J.)
(Cite as: 1989 WL 101550 (D.N.J.))

Page 1

C
Only the Westlaw citation is currently available.

United States District Court, D. New Jersey.

OAKLEY, INC., etc., Plaintiff,
v.
DYNEX SPORT OPTICS, INC., et al., Defendants.

**Civ. A. No. 89-160.**

Aug. 30, 1989.

John R. Nelson, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, N.J., Darrell L. Olson, Gerard Von Hoffmann, Knobbe, Martens, Olson & Bear, Newport Beach, Cal., Gregory L. Weeks, Weeks, Willis, Rathbone & Johnson, San Diego, Cal., for plaintiff.

Edward R. Weingram, Michael E. Zall, William J. Barber, Weingram & Zall, Maywood, N.J., for defendant.

*OPINION*

WOLIN, District Judge.

*1 Plaintiff Oakley, Inc. ("Oakley") has brought this claim for patent infringement against defendants Dynex Sport Optics, Inc. and Wilson Sporting Goods, Inc. (hereinafter collectively "Dynex"). Oakley alleges that Dynex's manufacture, importation and sale of its LE BAN sunglasses violate two patents held by Oakley, U.S. Patent Nos. 4,674,851 and 4,730,915. Dynex now moves (1) for partial summary judgment of noninfringement, (2) for an award of attorney's fees under 35 U.S.C. § 285 and (3) for an injunction restraining plaintiff from initiating and prosecuting suits in other forums, specifically, an action commenced by plaintiff in the United States District Court for the Central District of California.

The Court will deny all three motions.

*BACKGROUND*

Having developed a unique design of sunglasses with both a novel appearance and functional attributes, which it markets under the name BLADES, Oakley obtained U.S. Patent No. D293,450 to protect the appearance of the BLADES design and U.S. Patent Nos. 4,674,851 and 4,730,915 to protect the unique functional aspects of the BLADES design. Dynex thereafter commenced importation of Taiwanese sunglasses, marketed under the name LE BAN, which resemble the BLADES design and share many of its functional aspects. Prior to the design and development of the LE BAN products, Dynex purchased substantial quantities of BLADES sunglasses. Dynex asserts that its motives in doing so were purely to ensure that it did not infringe Oakley's patents. Oakley, on the other hand, pointing to the fact that Dynex purchased the BLADES sunglasses under the name of the now-defunct corporation, contends that Dynex purposely purloined Oakley's patent.

The '851 patent has only one independent claim, *i.e.*, claim 1, which claims protective eyeglasses having, among other features, the following:

(a) a unitary transparent pane located to extend in a curved plane in the path of a wearer's field of vision, both frontally and sidewardly, said curved plane being everywhere substantially cylindrical, and having the same radius of curvature ...,

\* \* \*

(g) the pane being substantially cylindrical in the as-molded condition of said pane, the pane having an associated radius of curvature between 3.25 and 5.00 inches....

The claim language pertaining to the shape of the pane is explained numerous times in the patent specification:

... Basically, the improved eyeglasses comprise a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1989 WL 101550
1989 WL 101550 (D.N.J.)
(Cite as: 1989 WL 101550 (D.N.J.))

Page 2

unitary transparent lens or pane ... and the lens extends in a plane which is cylindrical, wrapping around the sides of the head to intercept peripheral vision. The result is better interception of sunlight, top to bottom and side-to-side, the lens matching closely the wearer's facial contour. No distortion is introduced because of absence of local suddenly increased curvature or breaks in shape.

[T]he protective eyeglasses or sunglasses basically comprise:

(a) a unitary transparent pane located to extend in a curved plane in the path of the wearer's field of vision, both frontally and sidewardly, that curved plane being substantially cylindrical....

* * *

*2 ... Preferably, the curved pane is cylindrical in the as-molded condition....

* * *

FIG. 3 is a section through the cylindrically normal pane of FIG. 2, on lines 3-3 of FIG. 2; ...

* * *

It is a feature of the invention that the unitary pane extends in a plane which is cylindrical in as-molded condition i.e. as indicated by FIG. 3. 'As molded condition' means that when the pane is molded, it has curvature as specified. FIG. 3 shows the cylindrical curvature of the single pane, and between opposite end wings 11a' and 11b'. FIG. 1 shows the pane in flattened condition, i.e. pressed into the flat plane of the paper. The panes 11a and 11b and bridge 13 are formed to have cylindrical conformation such that their curvatures conform very well to the natural curvature of the wearer's face.... For best result [sic ], the radius R of curvature of the panes is in the range 3.25 to 5.00 inches, and optimally within the range 3.50 and 4.00 inches.

* * *

Also ... the pane has generally rearwardly extending lateral terminals 11c and 11d and a length dimension 1-1 between said terminals, 1-1 between

5 1/2 and 7 inches, that length dimension measured along the cylindrical curvature of the pane....

'851 patent, col. 1, lines 23-38, 57-58; col. 2, lines 15-16, 44-55, 65- 68; col. 3, lines 1-7.

While the '851 patent application was pending, Oakley filed a continuation-in-part application, which issued into U.S. Patent No. 4,730,915. The ' 915 patent contains two independent claims, i.e., claims 1 and 2. Both claim 1 and claim 2 contain, among others, the following identical features: "(a) a unitary transparent pane located to extend in a curved plane in the path of the wearer's field of vision, both frontally and sidewardly, said curved plane being everywhere substantially cylindrical...." The '915 patent specification is substantially identical to the '851 patent specification in explaining this claim language. In addition, the '915 patent explains as follows:

[T]he protective eyeglasses or sunglasses basically comprise:

(a) a unitary transparent pane located to extend in a curved plane in the path of the wearer's field of vision, both frontally and sidewardly, that curved plane being frustro-conical ...

* * *

... Preferably, the curved pane is cylindrical in the as-molded condition, but deformed slightly by its cooperation with a slot in the top frame to have frusto-conical curvature, and it consists of synthetic resin.

* * *

It is a feature of the invention that the unitary pane extends in a plane which is substantially and preferably precisely cylindrical in as-molded condition. FIG. 3 shows the cylindrical curvature of the single pane, and between opposite end wings 11a' and 11b'.... The panes 11a and 11b and bridge 13 are formed to have cylindrical conformation, which becomes frusto-conical when the pane is attached to top frame 20, such that their curvatures conform very well to the natural curvature of the wearer's face, i.e. his cheek bones and forehead as well as side face configuration....

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

* * *

\*3 [T]he curvature of the slot 23 may be slightly different than the cylindrical, as-molded curvature of the lens, to provide a mismatch, to grip the pane, which then resiliently coacts with the frame to slightly deform the pane to frusto-conical shape. See FIG. 13.

'915 patent, col. 1, lines 37-42, 62-66; col. 2, lines 64-68; col. 3, lines 2-8, 41-46.

Dynex has sold only two models of the LE BAN sunglasses. The only LE BAN sunglasses alleged to infringe Oakley's patents are those identified as Exhibit 1 to Dynex's deposition. *See* Plaintiff's Responses to Defendants' First Set of Interrogatories, No. 1 (Exhibit 8 to Dynex's Initial Brief in Support of Partial Summary Judgment Motion). Dynex argues, and Oakley admits, that the LE BAN sunglasses in question have lenses that are spherical in shape. Dynex contends that a spherical lens cannot possibly be deemed cylindrical or "everywhere substantially cylindrical" within the meaning of the patents. Thus, according to Dynex, the accused products do not infringe Oakley's patents as a matter of law. Dynex further contends that Oakley is precluded by file wrapper estoppel from relying on the doctrine of equivalents to establish infringement.

Oakley counters that a spherical lens can indeed fall within the description "everywhere substantially cylindrical." In support of this contention Oakley has submitted the declaration of James H. Jannard, the inventor of the patents held by Oakley, in which Jannard avers that a spherical lens can fall within the description "substantially cylindrical." Oakley thus argues that there are genuine issues of material fact as to whether there has been literal infringement of the patents. As a fallback position, Oakley argues that even if the Court determines that there has been no literal infringement as a matter of law, nothing in the prosecution history of the patents precludes Oakley from asserting the doctrine of equivalents.

Although it initially relied only on the dictionary definitions of "cylindrical" and "spherical" to support its position, Dynex has submitted along with its reply brief the declaration of Dr. J. Warren Blaker, in which Blaker contends that the phrase "everywhere substantially cylindrical"--as used in the claims of Oakley's patents, and in light of the patent specifications, prosecution history and other claims, and how one skilled in the art would interpret those claims--does not encompass a spherical lens.

Following the institution of this suit in January 1989, plaintiff filed a separate action in June 1989 in the United States District Court for the Central District of California against Performance Holdings, Inc. ("Performance") of Chapel Hill, North Carolina, alleging many of the claims alleged in the present action. Performance is one of the distributors to whom Dynex sells the LE BAN sunglasses. Contending that Oakley initiated the second action solely to harass customers of Dynex, Dynex has moved under Fed.R.Civ.P. 65 for an order enjoining Oakley from prosecuting the California action. In opposition, Oakley denies any intent to harass and strongly decries any attempt to limit its ability to pursue its legal rights. Oakley argues that the "first-to-file" doctrine, on which Dynex relies, is inapplicable because neither the parties nor the issues in the two lawsuits are identical.

## DISCUSSION

### I. *Motion for Partial Summary Judgment*

\*4 On a motion for summary judgment, the moving party bears the burden of showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53 (1986). In evaluating the merits of a summary judgment motion, the Court must view all the evidence before it in the light most favorable to the nonmovant and must draw all reasonable inferences from that evidence in favor of the nonmovant. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994 (1962).

The Court of Appeals for the Federal Circuit has confirmed the use of summary judgment in patent cases. *See, e.g., Porter v. Farmers Supply Service, Inc.,* 790 F.2d 882, 884 (Fed.Cir.1986); *Brenner v. United States,* 773 F.2d 306, 307 (Fed.Cir.1985); *Builders Concrete, Inc. v. Bremerton Concrete*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1989 WL 101550
1989 WL 101550 (D.N.J.)
(Cite as: 1989 WL 101550 (D.N.J.))

Page 4

*Products Co.,* 757 F.2d 255, 257 (Fed.Cir.1985); *Prodyne Enterprises, Inc. v. Julie Pomerantz, Inc.,* 743 F.2d 1581, 1583 (Fed.Cir.1984).

The issue of patent infringement may be resolved in two steps: (1) interpretation of the claims of the patent and (2) comparison of the claims with the accused device. *SmithKline Diagnostics v. Helena Laboratories Corp.,* 859 F.2d 878, 889 (Fed.Cir.1988); *Snellman v. Ricoh Co.,* 862 F.2d 283, 286 (Fed.Cir.1988), *cert. denied,* --- U.S. ----, 109 S.Ct. 3199 (1989); *Uniroyal, Inc. v. Rudkin-Wiley Corp.,* 837 F.2d 1044, 1054 (Fed.Cir.) , *cert. denied,* --- U.S. ----, 109 S.Ct. 75 (1988). Although claim interpretation is a question of law, *Snellman,* 862 F.2d at 287, a dispute as to the meaning of terms in a claim is a question of fact, *Perini America, Inc. v. Paper Converting Machine Co.,* 832 F.2d 581, 584 (Fed.Cir.1987). The *Perini* court held:

Like all legal conclusions, that conclusion [claim interpretation] rises out of and rests on a foundation built of established (undisputed or correctly found) facts. Interpretation of a claim, or of its scope, should not be assayed until that foundation is in place. If the meaning of terms in the claim, the specification, other claims, or prosecution history is disputed, that dispute must be resolved as a question of fact before interpretation can begin.

*Id.; see also Moeller v. Ionetics, Inc.,* 794 F.2d 653, 657 (Fed.Cir.1986) (reversing summary judgment of noninfringement). Indeed, the Court must always refer to certain extrinsic evidence--the patent specification, prosecution history and other claims--to interpret a disputed claim. *Moeller,* 794 F.2d at 656; *accord SmithKline,* 859 F.2d at 882. Also helpful is expert testimony, including evidence of how one skilled in the art would interpret the claim. *Fonar Corp. v. Johnson & Johnson,* 821 F.2d 627, 631 (Fed.Cir.1987), *cert. denied,* --- U.S. ----, 108 S.Ct. 751 (1988); *see also United States v. Telectronics, Inc.,* 857 F.2d 778, 781 (Fed.Cir.1988), *cert. denied,* --- U.S. ----, 109 S.Ct. 1954 (1989). On the other hand, an inventor is not bound by the ordinary meaning of terms but is free to be his or her own lexicographer. *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1580 (Fed.Cir.1988). "The ordinary meaning of claim language ... is not dispositive and resort must still be had to the specification and prosecution history to determine if the inventor used the disputed terms differently than their ordinary accustomed meaning." *Id.*

*5 Patent infringement may be found in either of two ways: literal infringement or infringement under the doctrine of equivalents. Literal infringement occurs when every limitation of the patent is found in the accused device literally. *SmithKline,* 859 F.2d at 889. In the absence of literal infringement, a product nevertheless infringes under the doctrine of equivalents if it performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed invention. *Graver Tank & Manufacturing Co. v. Linden Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, ---- (1950).

### (A) *Literal Infringement*

Dynex asserts that there can be no literal infringement as a matter of law because its accused products have a spherical lens or pane while the patent claims a "substantially cylindrical" lens or pane. The dictionary definition of "cylinder" cited by Dynex, from the American College Dictionary, is as follows:

1. ... a solid which may be conceived as generated by the revolution of a rectangle about one its sides (a right circular cylinder). 2. a similar solid in which the elements of the curved surface are oblique to the circular bases (oblique circular cylinder). 3. any solid bounded by two parallel planes and a curved surface generated by a moving straight line which intersects a given curve and is always parallel to its original position. 4. a curved surface generated in this manner. 5. any cylinderlike object or part, whether solid or hollow....

The adjective "cylindrical" is, not surprisingly, defined as "of, pertaining to, or of the form of a cylinder." *Id.* In contrast, a "sphere" is defined as

1. a solid geometrical figure generated by the revolution of a semicircle about its diameter; a round body whose surface is at all points equidistant from the center. 2. any rounded body approximately of this form....

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*Id.* The adjective "spherical" is, again not surprisingly, defined as "having the form of a sphere; globular." *Id.*

Dynex argues that it strains the ordinary meaning of the terms to argue that a spherical lens or pane can be "everywhere substantially cylindrical." Paraphrasing Lewis Carroll, whose characters debated whether a raven could be like a writing desk, Dynex places Oakley in Wonderland for daring to suggest that a sphere may be a cylinder. While (*contra* Carroll) acknowledging that a patentee may be his or her own lexicographer, Dynex contends that nothing in the patent indicates that Oakley, acting as its own lexicographer, used or defined the terms "cylindrical," "substantially cylindrical" or "everywhere substantially cylindrical" to include shapes that are spherical. The shortcoming of Dynex's argument, however, is that it fails to explain the presence of the modifier "substantially." If Jannard had wanted to limit his invention to sunglasses with perfectly cylindrical lenses or panes, he would have used the word "cylindrical" with such a modifier or with no modifier at all. Indeed, the Patent Examiner recognized this in rejecting the initial claims for, among other reasons, the vagueness of the language at issue here. Jannard's use of the term "substantially cylindrical" in the independent claims of both patents necessarily means something other than perfectly cylindrical. Moreover, his use of the unmodified word "cylindrical" in dependent claim 3 of the '915 patent reinforces this conclusion; the claim differentiation rule of claim construction holds that where some claims are broad and others narrow, the narrow claim interpretation may not be read into the broad. *See Kalman v. Kimberly-Clark Corp.,* 713 F.2d 760, 770 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1284 (1984).

*6 One way of explaining the difference between a cylinder and a sphere is that a cylinder has two-dimensional perfect curvature--that is, perfect curvature about only two axes--whereas a sphere has perfect curvature about all three Euclidean axes. Arguably the phrase "substantially cylindrical" means that although the most dominant curvature of the shape is about two axes, there may be some minor curvature about the third axis. Indeed, as evidence of this interpretation, Dynex points to two drawings (Figures 5 and 6) in both the '851 and '915

patents that seem to indicate that the lenses have up-down curvature (in addition to left-right and back-forward curvature) and are thus spherical or at least ellipsoidal. In the declaration submitted by Oakley, Jannard, the inventor, claims that he measured the up-down curvature of the lens in the patent specification diagram and that it had a curvature almost identical to that of the accused products. Dynex, noting that the drawings are not to scale and are not accompanied by a description, cites cases that purportedly preclude the use of such drawings as an aid in claim construction. *Permutit Co. v. Graver Corp.,* 284 U.S. 52, 52 S.Ct. 53 (1931); *In re Wright,* 569 F.2d 1124 (C.C.P.A.1977); *Inpro Inc. v. A.W. Chesterton Co.,* 657 F.Supp. 935 (N.D.Ill.1987). Those cases, however, merely *limit* the use of unscaled and undescribed drawings. Under *Permutit,* although drawings "are of no avail where there is an *entire absence* of description of the alleged invention or a failure to claim it," drawings "may be referred to for illustration and may be used as an *aid in interpreting* the specification or claim." 284 U.S. at 60, 52 S.Ct. at 55 (emphasis added). *Wright* holds that "[a]bsent any written description in the specification of quantitative values, arguments based on *measurements* of a drawing are of little value." 569 F.2d at 1127. *Inpro* holds that a *feature* not mentioned in the claims may not be inferred from the drawings. 657 F.Supp. at 943-44. The Court agrees with Dynex that Jannard's measurement of the radius of curvature of the embodiment of the invention depicted in Figure 5 is of little value. Thus the Court will not accept Oakley's attempt to quantify that curvature. The apparent presence of some curvature in the drawings, however, is a relevant observation since it is not a "feature" in itself but merely may help to explain the explicitly claimed feature of a substantially cylindrical lens.

Of course, Dynex could still argue that although the term "substantially cylindrical" might encompass ellipsoidal shapes, which are hybrids of cylinders and spheres, it would not encompass a pure sphere, which has perfect curvature in every direction. This is certainly a sound argument, one that the trier of fact might ultimately accept. But the Court will not accept it as a matter of law at the summary judgment stage. The phrase "substantially cylindrical" is ambiguous, and the Court will be able to sort out the different possible interpretations

of the phrase only by hearing expert testimony. Summary judgment is thus precluded on the issue of literal infringement of the patents.

### (B) *Infringement Under the Doctrine of Equivalents*

*7    As noted, Oakley also alleges patent infringement under the doctrine of equivalents. In the present motion, Dynex seeks to use the principle of file wrapper estoppel to prevent Oakley from relying on the doctrine of equivalents. That principle prevents a patentee from "recaptur[ing] through equivalence ... coverage given up during prosecution" of the patent. *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 870 (Fed.Cir.1985). The Federal Circuit has rejected the "wooden application" of file wrapper estoppel to any patent that was amended during prosecution:

Amendment of claims is a common practice in prosecution of patent applications. No reason or warrant exists for limiting application of the doctrine of equivalents to those comparatively few claims allowed exactly as originally filed and never amended. Amendments may be of different types and may serve different functions. Depending on the nature and purpose of an amendment, it may have a limiting effect within a spectrum ranging from great to small to zero. The effect may or may not be fatal to application of a range of equivalents broad enough to encompass a particular accused product.

*Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362-63 (Fed.Cir.1983); *see Loctite,* 781 F.2d at 871. "Thus, whenever the doctrine of file history estoppel is invoked, a close examination must be made as to, not only what was surrendered, but also the reason for such a surrender." *Bayer Aktiengesellschaft    v.    Duphar    International Research,* 738 F.2d 1237, 1243 (Fed.Cir.1984); *see Loctite,* 781 F.2d at 871.

Dynex has engaged in precisely the "wooden application" of file wrapper estoppel decried by the Federal Circuit. *See* Dynex's Initial Brief in Support of Summary Judgment Motion, at 31-32. A reading of the prosecution history indicates that Oakley did not so limit its claims that it would be precluded under the doctrine of file wrapper estoppel from arguing that a spherical lens can

violate the patents under the doctrine of equivalents. The Examiner was initially concerned with the vagueness of the language "substantially cylindrical." In rejecting claim 1 of the '851 patent as originally filed, the Examiner, in addition to holding the claim to be "clearly anticipated" and "unpatentable" over Baratelli *et al.,* U.S. Patent No. 3,233,249, stated:

Page 5 of the specification states that the unitary pane extends in a plane which is substantially and preferably precisely cylindrical in as-molded condition. This language is indefinite as well as confusing. If the unitary pane is precisely cylindrical, then it is exactly cylindrical. If it is substantially cylindrical, it is not necessarily precisely cylindrical. Also it is not understood what 'in as-molded condition' means.

Dynex's Initial Brief in Support of Summary Judgment Motion, Exhibit 4, Tab B. In response to this rejection, Jannard amended claim 1 to read: "... said curved plane being *everywhere* substantially cylindrical, and *having the same radius of curvature* ..." *Id.* Tab C (emphasis added to additional language). This amendment does not, contrary to Dynex's contentions, narrow the scope of the claims to preclude the claiming of spherical shapes. If the original claims had been "substantially cylindrical" and the amended claim read "cylindrical," then Dynex would have a better argument for file wrapper estoppel because such an amendment would be a clear forfeiture of shapes anything other than purely cylindrical. Nothing in the actual amendment to the '851 patent, however, necessarily precludes spherical or elliptoidal surfaces any more or less than the original language. [FN1] In other words, the applicant did not give up the right to claim that spherical or elliptoidal surfaces might fall within the patent. Moreover, the amendment is largely insignificant in light of the Examiner's clear statement that the shape of the lens had nothing to do with the patentability of the invention. *Id.* Tab D, at 3.

*8    With regard to the '915 patent, the claims were never even amended; only the specifications were changed by the deletion of certain language that the Examiner had found confusing.

The Court therefore holds that the prosecution

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

history of neither the '851 nor '915 patents precludes Oakley from relying on the doctrine of equivalents. Dynex has not on this motion defended Oakley's theory of equivalence on the merits. Such a defense would clearly be unavailing on a summary judgment motion, in any event, because there are material factual questions as to whether a spherical lens could perform substantially the same function in substantially the same way to achieve substantially the same result as a "substantially cylindrical" lens (assuming a spherical lens does not fall literally within that description). Suffice it to say, however, that this seems to be the classic case for application of the doctrine of equivalents.

## II. Application for Attorney's Fees

Dynex has moved for an award of attorney's fees under 35 U.S.C. § 285, which authorizes a court to make such an award to the prevailing party in "exceptional cases." The request is obviously premature in light of the Court's denial of the partial summary judgment motion. [FN2] A few comments are nevertheless appropriate.

Dynex is correct that misconduct during litigation or the bringing of vexatious, unjustified or frivolous litigation may amount to "exceptional circumstances" for purposes of § 285. See Bayer, 738 F.2d at 1242 (citing numerous cases). The mere denial of the present summary judgment clearly indicates that Oakley's lawsuit is not vexatious, unjustified or frivolous, no matter how the matter is ultimately resolved on the merits. As for misconduct during litigation, a review of the correspondence between the parties reveals that it is Dynex's attorneys, if anyone, who have been acting unreasonably and making threats. It would behoove counsel for Dynex to put aside their inexplicable indignation and begin to take Oakley's lawsuit seriously.

The Court will deny the motion.

## III. Request for a Preliminary Injunction

Dynex also asks the Court to issue a preliminary injunction to prohibit Oakley from prosecuting its action against Performance in the United States District Court for the Central District of California.

In cases of concurrent jurisdiction the court that first has jurisdiction over the subject matter of the litigation may issue an injunction under Fed.R.Civ.P. 65 to restrain the prosecution of the later-filed action and thus prevent an unnecessary multiplicity of lawsuits. Crosley Corp. v. Hazeltine Corp., 122 F.2d 925, 928 (3d Cir.1941), cert. denied, 315 U.S. 813, 62 S.Ct. 798 (1942). Application of the "first-filed" rule is only appropriate, however, where the two suits involve the same parties and the same issues. EEOC v. University of Pennsylvania, 850 F.2d 969, 971 (3d Cir.), cert. granted in part, --- U.S. ----, 109 S.Ct. 554 (1988), cert. order amended, --- U.S. ----, 109 S.Ct. 1660 (1989); Triangle Conduit & Cable Co. v. National Electric Products Corp., 138 F.2d 46, 47 (3d Cir.1942), cert. denied, 320 U.S. 784, 64 S.Ct. 191 (1943). Oakley argues that the two lawsuits at the very least do not involve the same parties and that the request should be denied on this basis alone. The Court agrees. Oakley has a right, distinct from its rights against Dynex, to sue Performance for its distribution of an allegedly infringing product. See 35 U.S.C. § 271(a). This is not the classic "customer suit," since Performance is not an exclusive distributor of Dynex, and the LE BAN products at issue here differ from the ELITE products at issue in California. Cf. Kerotest Manufacturing Co. v. C-O-Two Fire Equipment Co., 342 U.S. 180, 186, 72 S.Ct. 219, 222 (1952). Moreover, Oakley has a prior business relationship with Performance and the two companies operate in the same region. The Court finds that Oakley has brought the second action for legitimate reasons and not to harass Dynex or Performance. Accordingly, the Court will deny the motion. Of course, to the extent that there is some overlap of issues, the dual litigation could be streamlined if, for example, Performance stipulated in the California litigation to be bound by the present litigation. The Court leaves such arrangements to the parties and the Central District.

## CONCLUSION

*9 The Court will deny all three of Dynex's motions. An appropriate order is attached.

## ORDER
For the reasons expressed in the Court's opinion filed herewith,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1989 WL 101550
1989 WL 101550 (D.N.J.)
(Cite as: 1989 WL 101550 (D.N.J.))

It is on this 30th day of August, 1989

ORDERED that defendants' motions for partial summary judgment, an award of attorney's fees, and a preliminary injunction are denied.

> FN1. For example, the addition of the word "everywhere" to precede "substantially cylindrical" does not, at least as a matter of law, preclude spherical shapes any more than "substantially cylindrical" alone.

> FN2. Oakley makes a good point in that even a grant of the partial summary judgment motion would not establish Dynex as the "prevailing party."

1989 WL 101550 (D.N.J.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2000 WL 33162197                                                    Page 1
2000 WL 33162197 (Mass.Super.)
(Cite as: 2000 WL 33162197 (Mass.Super.))

**H**
Only the Westlaw citation is currently available.


Superior Court of Massachusetts.

Valerie CIARDI et al, [FN1]

FN1. A class of others similarly situated.

v.
HOFFMANN-LaROCHE, LTD et al. [FN2]

FN2. Hoffman-La Roche, Inc., Roche
Vitamins, Inc., BASF A.G., BASF
Corporation, Rhone-Poulenc S.A.,
Rhone-Poulenc Animal Nutrition, Inc .,
Rhone-Poulenc Inc., Lonza A.G., Lonza
Inc., Chinook Group, Ltd., Chinook
Group, Inc., DCV, Inc., and Ducoa L.P.


No. 993244.


Sept. 29, 2000.


MEMORANDUM OF DECISION AND ORDER
ON DEFENDANTS' MOTION TO DISMISS

BOTSFORD.

*1 The plaintiff, Valerie Ciardi (Ciardi), has filed a
two-count complaint alleging coercive civil
conspiracy (count I) and violation of G.L. c. 93A
(count II), against the defendant corporations, all of
which are engaged in the manufacture, production,
distribution and sale of vitamins and vitamin
products. Ciardi has filed the claims on behalf of
herself and others similarly situated as a class action
suit pursuant to Mass.R.Civ.P. 23. Each defendant
corporation has filed a motion to dismiss pursuant
to Mass.R.Civ.P. 12(b)(6), as well as Mass.R.Civ.P.
9(b) and 8(a)(1), and each relies on substantially the
same arguments. [FN3] For the following reasons,
the defendants' motions to dismiss the civil
conspiracy count will be allowed, and the motions

to dismiss the count under G.L. c. 93A will be
denied, as will the defendants' motions under
Mass.R.Civ.P. 8(a)(1) and 9(b).

> FN3. Several defendants have also filed
> motions to dismiss for lack of personal
> jurisdiction pursuant to Mass.R.Civ.P.
> 12(b)(2). The parties have agreed,
> however, to have the Rule motions
> described in the text resolved first, and
> therefore they are the only motions
> addressed in this memorandum of decision.

BACKGROUND

For purposes of this motion, I accept the facts
alleged in Ciardi's first amended complaint as true.
These facts are as follows.

The defendants manufacture, produce, distribute,
and sell vitamins, vitamin premixes, and other
vitamin products for human and animal
consumption. The defendants are dominant in the
vitamin market. F. Hoffmann-La Roche, Ltd.,
Hoffman-La Roche, Inc., and Roche Vitamins, Inc.,
control approximately 40% of the relevant world
vitamin market; BASF, A.G. and BASF
Corporation account for approximately 20%; and
Rhone-Poulenc, S.A., Rhone-Poulenc Animal
Nutrition, Inc., and Rhone-Poulenc, Inc. account for
approximately 15% of the market. The products
involved include vitamins A, B2, B3, B4, B5, C, E,
Beta Carotene, vitamin premixes, and products
containing one or more of certain vitamins or
vitamin premixes (collectively, the vitamin
products). The vitamin products are manufactured
and sold in the United States, including
Massachusetts.

Beginning in or about January 1990, the defendants
conspired together to suppress and eliminate
competition by fixing the prices and allocating the
volume of the vitamin products. The conspiracy
consisted of collusive agreements, formal and
informal, among defendants to: fix, increase, and
maintain prices for the vitamin products and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2000 WL 33162197
2000 WL 33162197 (Mass.Super.)
(Cite as: 2000 WL 33162197 (Mass.Super.))

Page 2

coordinate price increases among themselves in the United States, including Massachusetts; allocate the volume of sales and market shares of the vitamin products, and allocate all or part of certain contracts to supply to various customers; and refrain from submitting bids, or submit collusive, non-competitive and rigged bids. In furtherance of these agreements, the defendants engaged in a number of activities, including: participation in meetings and conversations to discuss the prices and volumes of the vitamin products, the exchange of sales and customer information for the purpose of monitoring and enforcing adherence to the above-described price-fixing and other agreements; issuing price announcements and price quotations; selling the vitamin products at agreed-upon prices and volume allocations; participation in meetings and conversations to discuss the submission of prospective bids for contracts including agreeing upon the low bidder and prices to be submitted; and selling the vitamin products at the rigged and non-competitive prices.

*2 As a result of the agreements between and conduct of the defendants, competition in the sale of the vitamin products in Massachusetts has been restrained; prices paid by consumers in Massachusetts have been artificially fixed at supra-competitive levels; purchasers of vitamin products in Massachusetts, including the plaintiff, have been overcharged for the products and such purchasers have also been deprived of the benefits of free and open competition.

By acting in unison to control the prices of the vitamin products, the defendants exercised a peculiar coercive power over the plaintiff. Throughout the period described in the complaint (i.e., beginning in 1990 and extending almost to the time of filing), the defendants fraudulently concealed their conspiracy from the plaintiff and putative class members. In particular, the defendants engaged in a horizontal price-fixing conspiracy that was inherently self-concealing, and to further the concealment, they met secretly together in the United States and Europe; exchanged information about prices and volumes of sales of vitamin products; instructed the members of their conspiracy at their meetings not to divulge the existence of the conspiracy; and took other steps, including manipulating bidding practices, to

disguise and cover up the existence of the agreement.

The plaintiff has served a demand letter pursuant to G.L. c. 93A, § 9, on each of the defendants. The plaintiff defines the class she seeks to represent as including all persons or entities in Massachusetts who or which purchased vitamin products supplied by any of the defendants at any time from January 1, 1990 to the present.

DISCUSSION

I. Rule 12(b)(6) Motions

Under Mass.R.Civ.P. 12(b)(6), the sufficiency of a complaint is examined by accepting the allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor. See *Eyal v. Helen Broadcasting Corp.,* 411 Mass. 426, 429 (1991). "The plaintiffs need only surmount a minimal hurdle to survive a motion to dismiss for failure to state a claim." *Bell v. Mazza,* 394 Mass. 176, 184 (1985). "[D]ismissals on the basis of pleadings, before facts have been found, are discouraged." *Gennari v. Revere,* 23 Mass.App.Ct. 979, 980 (1987) (citations omitted). A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Nader v. Citron,* 372 Mass. 96, 98 (1977) (citation omitted). "Doubt or misgivings whether the present claim can be ranked as provable (or even credible), ... is not a proper basis for dismissal ..." *Wrighton v. Spaulding,* 20 Mass.App.Ct. 70, 72, rev. denied, 395 Mass. 1103 (1985). "If a complaint lacks merit, the defendant should take the appropriate steps to cause the matter to be brought within the purview of rule 56(b) ..." *Id.*

A. Coercive Civil Conspiracy

*3 The first count of the complaint sets out a common law claim of civil conspiracy in restraint of trade. The defendants contend that this count is preempted by the Massachusetts Antitrust Act, G.L. c. 93, §§ 1-14A (referred to generally hereafter as the Antitrust Act), and must therefore be dismissed.

Section 4 of c. 93 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the

2000 WL 33162197
2000 WL 33162197 (Mass.Super.)
(Cite as: 2000 WL 33162197 (Mass.Super.))

Page 3

commonwealth shall be unlawful." As the defendants point out, the plaintiff's claims--that the defendants conspired together to suppress and eliminate competition by fixing the prices for the vitamin products, coordinating price increases, allocating volume and market shares of the vitamin products as well as contracts, and rigging bids, all for the purpose of restraining trade and commerce [FN4]--fall squarely within the scope of this statutory language. The parties agree, however, that the plaintiff does not and cannot raise a claim under the Antitrust Act because the challenged course of conduct of the defendants did not "occur and have their predominant impact primarily within the commonwealth and at most, only incidentally outside New England ... [,]" G.L. c. 93, § 3, and because the plaintiff is an indirect purchaser of the vitamin products. [FN5] The question raised is whether a common law cause of action for civil conspiracy in restraint of trade may be maintained independently of the Antitrust Act.

FN4. First amended complaint, ¶¶ 8, 11.

FN5. The plaintiff's status as an indirect purchaser precludes her from bringing a claim under the Antitrust Act because the Act is to "to be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable[,]" G.L. c. 93, § 1, and indirect purchasers are foreclosed from bringing claims under the Federal antitrust statutes. See *Illinois Brick v. Illinois,* 431 U.S. 720, 736- 45 (1977) (Illinois Brick). See also *Boos v. Abbott Labs.,* 925 F.Supp. 49, 50-51 (1996). The plaintiff concedes this point. (Plaintiff's opposition, p. 7.)

The answer is no. The common law proscribed conspiracies to create monopolies and regulate prices in restraint of trade. See, e.g., *Commonwealth v. Dyer,* 243 Mass. 472, 481, 486 (1922), cert. denied, 262 U.S. 751 (1923) (defendants charged, *inter alia,* with common law crime of "conspiracy to create a monopoly in fresh fish, to fix, regulate, control, and to enhance ... unreasonably the price of fresh fish, and thus to cheat and defraud the public"). The proscription could have criminal consequences, see *id.,* and also civil. See, e.g., *United Shoe Machinery Corp. v.*

*LaChapelle,* 212 Mass. 467 (1912). Cf., e.g., *Foster v. Shubert Holding Co.,* 316 Mass. 470 (1944). However, as the Supreme Judicial Court has noted, since Massachusetts adopted an antitrust statute in the early 1900s, there do not appear to be any cases in which a common law cause of action for conspiracy to create a monopoly or to restrain trade has been advanced separately from the statute. See *SDK Medical Computer Serv. Corp. v. Professional Operating Mgt. Group, Inc.,* 371 Mass. 117, 129 (1976).

In *Boos v. Abbott Labs.,* 925 F.Supp. 49, 51 (D.Mass.1996), the court considered the same question raised here, that is, whether a common law claim of illegal restraint of trade was superseded by the Massachusetts Antitrust Act. [FN6] After a thorough review of the common law governing monopolies and agreements in restraint of trade in Massachusetts, the history of antitrust legislation in the Commonwealth and the relationship between the two, the court concluded that the legislation was intended to replace any common law cause of action for monopolistic agreements or conspiracies in restraint of trade. [FN7] As the court in Boos pointed out, antitrust laws in Massachusetts from the start proscribed monopolistic agreements and agreements in restraint of trade in violation of the "common law," and thus appeared always "to have encompassed the claim which plaintiff[ ] now assert[s]." *Id.* at 53. Moreover, historically, the remedy offered by the common law did not include damages, but rather looked to injunctive relief or a judicial determination that an agreement or conspiracy restraining trade in violation of the common law could not be enforced. See *Foster v. Shubert Holding Co., supra,* 316 Mass. 470. See also *United Shoe Machinery Corp. v. LaChapelle, supra,* 212 Mass. 467; *Central Shade Roller Co. v. Cushman,* 143 Mass. 153 (1887). By contrast, the Massachusetts Antitrust Act expressly establishes a private cause of action for damages, see G.L. c. 93, § 12, which is of course the remedy the plaintiff seeks in this case.

FN6. The plaintiff in *Boos* brought a class action in which she alleged that the defendant companies had conspired to fix prices for infant formula throughout the United States. She asserted a violation of G.L. c. 93A as well as a common law

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2000 WL 33162197
2000 WL 33162197 (Mass.Super.)
(Cite as: 2000 WL 33162197 (Mass.Super.))

Page 4

claim of illegal restraint of trade in "necessities." *Boos v. Abbott Labs., supra,* 925 F.Supp. at 51.

FN7. "To the extent that Massachusetts courts would have recognized plaintiff's claims prior to statutory enactments, I find that the legislature intended, by its passage of comprehensive antitrust legislation, to replace the common law regime and to specify fully, by statute, the remedies available for acts which would have violated the common law." *Boos v. Abbott Labs.,* 925 F.Supp. at 54.

*4 In sum, I find the *Boos* decision persuasive, and based on its reasoning, I conclude that a common law cause of action based on a claim of civil conspiracy in restraint of trade does not survive the passage of the Antitrust Act. See also *SDK Medical Computer Serv. Corp. v. Professional Operating Mgt. Group, Inc., supra,* 371 Mass. at 129 (where the court observed that "... the statutory [antitrust] provisions have largely if not altogether supplanted the common law ..."). The defendants' motions to dismiss Count I of the plaintiff's first amended complaint should be allowed.

B. Chapter 93A

In the second count of the plaintiff's amended complaint she alleges that the price-fixing conspiracy in which the defendants have engaged constitutes an unfair or deceptive act or practice that violates G.L. c. 93A, § 9. The defendants assert dismissal of the count is required. In substance, their argument is this: the plaintiff raises one substantive claim in this case, viz., the defendants have engaged in a concerted plan of price-fixing and related anti-competitive conduct in connection with the sale of the vitamin products; such conduct is the direct focus of the Antitrust Act; the plaintiff has no claim under the Antitrust Act because she is an indirect purchaser of the vitamin products; [FN8] and policy concerns as well as a governing principle of statutory construction--that related statutes should be construed "harmoniously so as to give rise to a consistent body of law," *Marco v. Green,* 415 Mass. 732, 736 (1993)--require that Chapter 93A be interpreted to bar claims of anti-competitive conduct by indirect purchasers.

FN8. See note 5 above.

The question whether Chapter 93A permits indirect purchasers to bring a claim for price-fixing or other forms of unfair competition is one that has not yet been addressed by the Massachusetts appellate courts. [FN9] While the defendants advance strong legal and policy arguments to the contrary, I nonetheless conclude--particularly in the context of a motion to dismiss under Rule 12(b)(6), see *Nader v. Citron, supra,* 372 Mass. at 98--that Chapter 93A should not be interpreted to bar the plaintiff as an indirect purchaser from bringing such a claim. [FN10]

FN9. In *Boos v. Abbott Labs., supra,* 925 F.Supp. at 57, the Federal District judge certified to the Supreme Judicial Court the question whether an individual consumer may bring an action under G.L. c. 93A, § 9, alleging a price-fixing conspiracy, where that individual is barred from bringing such a claim under the Federal or Massachusetts antitrust statutes because of her status as an indirect purchaser within the meaning of the *Illinois Brick* decision. For unexplained reasons the Court appears never to have answered the question.

FN10. Some of the defendants may be arguing that Chapter 93A must be construed to bar indirect purchasers from bringing a claim of price-fixing conspiracy because it would be inconsistent with *Illinois Brick.* Such a contention must fail. The Supreme Court held in *California v. ARC America Corp.,* 490 U.S. 93, 103-04 (1989), that States may permit indirect purchasers to recover under their own antitrust or related laws. Accordingly, the question here is not whether the Commonwealth may authorize indirect purchaser suits, but whether Chapter 93A is intended to do so, at least where consumers are concerned.

It goes without saying that the Antitrust Act and chapter 93A are separate enactments, although obviously related to each other in some respects. [FN11] Chapter 93A is a broad remedial statute, creating new substantive rights. See, e.g., *Linthicum*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*v. Archambault,* 379 Mass. 381, 383 (1979); *Dodd v. Commercial Union Ins. Co.,* 373 Mass. 72, 78 (1977); *Slaney v. Westwood Auto, Inc.,* 366 Mass ... 688, 693 (1975). By its terms, c. 93A proscribes unfair or deceptive conduct as well as "[u]nfair methods of competition"; both are "declared unlawful." G.L. c. 93A, § 2(a). Moreover, the statute expressly states that it is to be construed in accordance with the interpretations of the Federal Trade Commission Act (FTC Act) by the Federal Courts and FTC. *Id.,* § 2(b). The FTC Act has long been read to offer an additional prohibit anti-competitive conduct that is also covered by the Federal antitrust statutes, and to offer a separate and cumulative avenue of relief against such conduct. See *FTC v. Cement Institute,* 333 U.S. 683, 693- 95 (1948). Accordingly, it is clear that G.L. c. 93A, § 2 , reaches the merits of price-fixing agreements in restraint of trade that the plaintiff alleges in this case, and the defendants do not suggest otherwise.

> FN11. The defendants' reliance on cases such as *GTE Products Corp. v. Broadway Elec. Supply Co., Inc.,* 42 Mass.App.Ct. 293, 302 (1997); and *J.H Westerbeke Corp. v. Onan Corp.,* 580 F.Sup. 1173, 1192 (D.Mass.1984), to prove their argument is misplaced; the plaintiff is correct that the defendants have conflated lack of standing with lack of proof. In GTE Products, the defendant's counterclaim alleging violations of the Antitrust Act, G.L. c. 93, were dismissed on summary judgment because there was no evidence of any conduct in restraint of competition or trade. Since the defendants' counterclaim alleging a violation of Chapter 93A was wholly premised on the antitrust claims, dismissal of the Chapter 93A count was also proper. In the J H. Westerbeke Corp. case, the situation was essentially the same. In both cases, however, the plaintiffs had standing to raise their Chapter 93A claims as well as their antitrust claims. Here, whatever the merits of an antitrust claim may be, the plaintiff lacks standing to bring it. What must be determined is whether she also lacks standing to bring her Chapter 93A claim.

*5 As the defendants also recognize, insofar as

consumers are concerned, since 1979, Chapter 93A has not required plaintiffs to be in privity with the persons or businesses against whom or which they have a claim. See G.L. c. 93A, § 9(1), as amended by St.1979, c. 406, § 1. [FN12] While there is no specific reference to consumers as indirect purchasers in the amended version of § 9(1), they unquestionably are covered by the section's terms: "[a]ny person, other than a person entitled to bring an action under section eleven of this chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two ..." *Id.* More significantly, the Antitrust Act, G.L. c. 93, § 14A, expressly provides that it is to "have no effect upon the provisions of [Chapter 93A], except as explicitly provided in said [Chapter 93A]," and the only reference to the Antitrust Act in Chapter 93A occurs in the business section, § 11, [FN13] not in § 9. What the reference to the Antitrust Act in § 11 demonstrates is that if the Legislature intended to limit consumer actions under § 9 of chapter 93A by restrictions that may apply to actions brought under the Antitrust Act, it knew how to effectuate such a purpose. See *Boos v. Abbott Labs., supra,* 925 F.Sup. at 56.

> FN12. The defendants suggest that the amendment to G.L. c. 93A, § 9(1) is not to be read as intending anything other than to reverse the Supreme Judicial Court's decision in *Dodd v. Commercial Union Ins. Co.,* 373 Mass. 72 (1977), which held that only an insurance company's policy holder could bring a claim for unfair claims settlement practices. (See BASF memorandum, p. 10, n. 5.) While the 1979 amendment to § 9(1) may have in part been focused on the *Dodd* decision, see *VanDyke v. St. Paul Fire & Marine Ins. Co.,* 388 Mass. 671, 675 (1983), the language of the amendment is broader and more general, and plainly reaches beyond unfair claims settlement practices of insurance companies. See, e.g., *Maillet v.. ATF-Davidson Co.,* 407 Mass. 185, 190-91 (1990); *Burnham v. Mark IV Homes, Inc.,* 387 Mass. 575, 581 (1982). The defendants also point to *Nei Boston Survey Consultants, Inc.* 388 Mass. 320, 324 (1983), as showing that a direct

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2000 WL 33162197
2000 WL 33162197 (Mass.Super.)
(Cite as: 2000 WL 33162197 (Mass.Super.))

Page 6

connection between plaintiff and defendant is required under Chapter 93A. I disagree. The court expressly recognized in *Nei* that no privity of contract is required under Chapter 93A. Its statement that "it is somewhat significant" the defendant land surveying company had no contractual or business relationship with the plaintiff must be considered in context. In the *Nei* case the plaintiff buyers of real property sued the land surveying company which had conducted high water and percolation tests on the property for the sellers. The plaintiffs sought to hold the company liable for not disclosing to them the significance of the tests it had performed. The Court concluded that the company had not committed an unfair or deceptive act or practice in violation of Chapter 93A simply by failing to explain to the buyers the significance of test results that it had performed for the sellers and had accurately reported. The Court does not suggest in *Nei*, contrary to the defendants' claim here, that a "substantial nexus" between plaintiff and defendant is generally "a necessary perquisite for a Chapter 93A claim." (BASF memorandum, p. 9.)

FN13. The penultimate paragraph of G.L. c. 93A, § 11, reads:
In any action brought under this section, in addition to the provisions of paragraph (b) of section two, the court shall also be guided in its interpretation of unfair methods of competition by those provisions of chapter ninety-three known as the Massachusetts Antitrust Act. (Emphasis supplied.)

The legislative history of the Antitrust Act supports the conclusion that it was not intended to circumscribe the scope of consumers' actions under Chapter 93A. The Massachusetts Antitrust Act in essentially its current form was enacted in 1978 with an emergency declaration. St.1978, c. 459. The passage of the statute followed several attempts by the Attorney General and others to replace the existing antitrust legislation which had been enacted at various points over the years since the early

1900s. [FN14] Thus, in January 1977, a bill was filed in the House of Representatives on the petition of the Attorney General that proposed a new antitrust act containing most of the terms that were ultimately enacted in the 1978 legislation, including proscriptions against contracts and agreements in restraint of trade and monopolies, provisions for civil investigations and suits by the Attorney General as well as a private right of action with the potential for treble damages. 1977 House Bill No. 1251. [FN15] The bill had a provision calling for the act to be construed "in harmony" with judicial interpretations of the Federal antitrust statutes. (1977 House Bill No. 1251, Section 1, proposing G.L. c. 93F, § 20.) On the question of relationship between the proposed antitrust act and Chapter 93A, the bill provided: "This chapter shall not be interpreted to repeal any statute modeled after the Federal Trade Commission Act." (*Id.*, Section 1, proposing G.L. c. 93F, § 21.) The bill was referred to the Committee of Ways and Means, and in October 1977, a substitute bill was reported out, Senate Bill No.1925.

FN14. See *Boos v. Abbott Labs. supra,* 925 F.Supp. at 52-53, for a description of the early antitrust statutes. See also Letter from Attorney General Francis X. Bellotti to Governor Michael S. Dukakis, dated July 7, 1978, included in the Governor's legislative file for St.1978, c. 459, located in the State Archives.

FN15. The private right of action appears in the proposed G.L. c. 93F, § 12(a), included in Section 1 of Bill No. 1251.

The bill was similar in most respects to the earlier House Bill, but contained one major change. It contained a provision repealing G.L. c. 93A, § 11, in its entirety, while expressly stating that the remaining provisions of Chapter 93A were to be unaffected:
*6 SECTION 1. Chapter 93A of the General Laws is hereby amended by repealing section eleven. The preceding sentence shall not affect any action brought under section eleven of Chapter 93A of the General Laws prior to the effective date of this act. Except as explicitly provided herein, this act shall have no impact upon the provisions of Chapter 93A of the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2000 WL 33162197
2000 WL 33162197 (Mass.Super.)
(Cite as: 2000 WL 33162197 (Mass.Super.))

Page 7

General Laws.
1977 Senate Bill No.1925, Section 1 (emphasis supplied).

Senate Bill No.1925 passed the Senate on October 31, 1977. It appears that its proposed repeal of § 11 caused great consternation in some business circles, because unlike consumers, the consumer protection remedies available to businesses were being completely eliminated. [FN16] The result was another round of negotiations between the Attorney General and others, with a compromise about the fate of Chapter 93A, § 11, being reached and memorialized in amendments to Senate Bill No.1925. (See 1977 Journal of the House of Representatives, vol. II, Jan. 3, 1978, p. 2700.) (See also letter of Attorney General Francis X. Bellotti to Governor Michael S. Dukakis dated July 7, 1978, page 1; the letter is included in the Governor's legislative file for St.1978, c. 459.) Compromise, however, came too late for the amended version of the proposed antitrust legislation to be enacted during the 1977 session. (See *id.*)

> FN16. The Governor's legislative file for St.1978, c. 459, contains letters from Harold Brown, Esquire, to then Governor Michael Dukakis and to then Attorney General Francis Bellotti which vigorously oppose the repeal of G.L. c. 93A, §§ 11. For example, Mr. Brown writes: "Although the consumer will still retain a private remedy under § 9 and 10 [of c. 93A], the small businessman would be foreclosed. On the technical side, this means that in return for obtaining a limited private remedy under the new Chapter 93 [the proposed Antitrust Act], such businessmen would have to surrender their cause of action for 'unfair or deceptive acts or practices.' This is contrary to all logic ..." (Letter from Harold Brown to Attorney General Francis X. Bellotti dated December 1, 1977, page 2.)

In 1978, a new bill was filed, 1978 House Bill No. 2222; according to the Attorney General, this bill was essentially the same as the compromise bill that had died the year before. (See *id.*) On the general relationship between the Antitrust Act and Chapter

93A, the bill provided: "Except as explicitly provided therein, the said Massachusetts Antitrust Act shall have no effect upon the provisions of chapter ninety-three A of the General Laws." 1978 House Bill No. 2222, Section 2. The bill then went on to provide for an amendment to c. 93A, § 11, to deal with the Antitrust Act: "In any action brought under this section [viz., c. 93A, § 11], the court shall be guided in its interpretation of unfair methods of competition in particular by those provisions of chapter ninety-three known as the Massachusetts Antitrust Act and cases decided thereunder." 1978 House Bill No. 2222, Section 4. [FN17] Both of these provisions were incorporated into the Antitrust Act legislation as it was enacted during the 1978 legislative session. See G.L. c. 93, § 14A, as enacted by St.1978, c. 459, § 1; and G.L. c. 93A, § 11, as amended by St.1978, c. 459 § 3. [FN18] And of course these provisions remain in the Antitrust Act and c. 93A, § 11 today.

> FN17. House Bill No. 2222 was referred to the Committee on the Judiciary and reported out as a new bill, 1978 Senate Bill No. 1499. The exact substance of House Bill No. 2222's provisions relating to G.L. c. 93A are present in the Senate Bill. See 1978 Senate Bill No. 1499, Section 1, proposing G.L. c. 93, § 15 and Section 4.

> FN18. The 1978 amendment to G.L. c. 93A, § 11, also contained a sentence providing that a particular portion of c. 93A, § 3, was not to apply to actions brought under § 11. This sentence was repealed in 1986, at the same time that § 3 of c. 93A was amended. The sentence has no bearing on the issue in this case.

This history indicates that the connection between the Antitrust Act and Chapter 93A was a special point of focus for the Legislature when the Antitrust Act was enacted. The history also shows, however, that with respect to the interrelation of the two statutes, there was consistently drawn a distinction between consumers and businesses. All the bills leading up to St.1978, c. 459, provided in substance that the Antitrust Act was to be construed in harmony with interpretations of the Federal antitrust statutes, and Chapter 93A was not generally to be affected by the Antitrust Act. But (with the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2000 WL 33162197
2000 WL 33162197 (Mass.Super.)
(Cite as: 2000 WL 33162197 (Mass.Super.))

Page 8

exception of 1977 House Bill No. 1251) these bills also had sections that dealt specifically with § 11 of Chapter 93A. This same distinction obviously appears in St.1978, c. 459. Read against this background, the language generally separating Chapter 93A from the Antitrust Act is reasonably understood to reflect a legislative determination that in contrast to its effect on businesses, the new antitrust legislation was not to have any impact on individual consumers'(or the Attorney General's) available causes of actions and remedies under Chapter 93A.

*7 It may be argued that the lack of attention paid to consumers in 1977 and 1978 is not significant, because at that time, G.L. c. 93A, § 9, did not authorize a consumer to bring suit against a defendant if there was no privity in the relationship. See G.L. c. 93A, § 9, as amended through St.1973, c. 939. The argument would be that the Legislature had no reason to be concerned in 1978 about the possibility that consumers as indirect purchasers might make an "end run" around the restriction on their standing to sue under the Antitrust Act which the *Illinois Brick* decision imposed, because consumers as indirect purchasers had no standing under Chapter 93A in any event. This argument should fail. Section 9(1) of Chapter 93A was amended in 1979 to remove the requirement of privity with respect to consumer suits, only one year after the passage of the Antitrust Act. See St.1979, c. 406, § 1. The *Illinois Brick* case had been decided two years earlier, in 1977. The Legislature had demonstrated it was very aware of the connection between the Antitrust Act and Chapter 93A when it enacted the former statute in 1978, but nothing in the legislative history of St.1979, c. 406, suggests any concern about the possibility that consumers, freed of the privity requirements originally incorporated into Chapter 93A, § 9(1), might have available to them through § 9 an avenue of relief against anti-competitive conduct that was foreclosed by the Antitrust Act. Again, the history of the Legislature's handling of Chapter 93A, § 11, in relation to the Antitrust Act indicates that if the Legislature were uneasy about consumers' potentially inconsistent causes of action under the Antitrust Act and Chapter 93A, it would have addressed the issue specifically when it amended Chapter 93A, § 9(1), in 1979.

The defendants point to decisions in other States in which courts have concluded that consumers who are indirect purchasers do not have standing to sue for alleged price-fixing or other anti-competitive conduct under consumer protection statutes when state antitrust statutes bar suits by indirect purchasers. See *Abbott Labs., Inc. v. Segura,* 907 S.W.2d 503, 505-06 (Tex.1995). See also *Blewett v. Abbott Labs.,* 86 Wash.App. 782, 785, 786-89 (1997). Cf. *Laughlin v. Evanston Hosp.,* 133 Ill.2d 374, 550 N.E .2d 986, 993 (1990) (where State's antitrust act is interpreted to preclude recovery for claims of non-predatory price discrimination, State's consumer fraud statute will be similarly construed not to include such price discrimination as an unfair or deceptive act or practice; to do otherwise would be inconsistent and incongruous). But see *Mack v. Bristol-Myers Squibb Co.,* 673 So.2d 100, 104- 05, 106  10  (Fla.App.1996),  review  dismissed, *Bristol-Myers v. Mack,* 689 So.2d 1068 (Fla.1997) (although plaintiff, an indirect purchaser, had no standing under Florida antitrust statute to sue manufacturers of infant formula for alleged price-fixing conduct, she stated a claim for relief under the separate Florida deceptive and unfair trade practices [consumer protection] statute, and the two statutes could operate harmoniously with different standing rules); [FN19] *Blake v. Abbott Labs., Inc.,* 1996 WL 134947 (Tenn .Ct.App.1996) (Tennessee antitrust act should be interpreted to permit suits by indirect purchasers; the same should be true of Tennessee consumer protection statute). These decisions, which come down on both sides of the question presented here, are of limited value in helping to decide the meaning of the Massachusetts consumer protection and antitrust statutes. There are distinctions to be drawn between the statutes involved in each of these cases and the two relevant Massachusetts statutes in terms of language and history. In the end the question is one of discerning the intent of the Massachusetts Legislature, and other States' statutes and decisions do not speak to this issue.

> FN19. Although the court in the *Mack* case concluded that the Florida consumer protection statute should be interpreted to afford standing to consumers suing as indirect purchasers for alleged price-fixing by manufacturers, it nonetheless certified this question to the Florida Supreme Court.

2000 WL 33162197
2000 WL 33162197 (Mass.Super.)
(Cite as: 2000 WL 33162197 (Mass.Super.))

Page 9

*Mack v. Bristol-Myers Squibb Co.,* 673 So.2d 100, 110-11 (Fla.App.1996). The Florida Supreme Court, however, dismissed the certification as moot. *Bristol-Myers Squibb Co. v. Mack,* 689 So.2d 1068 (Fla.1997).

**\*8** The defendants also contend that strong policy considerations counsel against interpreting G.L. c. 93A, § 9, to authorize the plaintiff as an indirect purchaser to bring a price-fixing claim when she may not do so under the Antitrust Act. One of those considerations is the incongruity of permitting a consumer to bring a cause of action under Chapter 93A for what might be deemed an antitrust violation when she cannot do so under the Antitrust Act. In addition, the defendants point to the practical problems of duplicative recovery and of proving damages. These were problems discussed in the *Illinois Brick* decision, and one of the reasons the Court interpreted the Federal antitrust statutes to preclude suits by indirect purchasers. *Illinois Brick,* 431 U.S. at 730-43. These are all matters as serious concern. But in *California v. ARC America Corp., supra,* the Supreme Court plainly stated that States were free to allow indirect purchasers to recover under State laws, see 490 U.S. at 103, and for the reasons discussed above, there is no evidence that the Legislature intended to limit the broad scope of Chapter 93A in relation to actions by indirect purchaser-consumers who seek to challenge alleged price-fixing or other forms of anti-competitive conduct.

In sum, despite the policy issues raised by the defendants, the language and history of the Antitrust Act and of Chapter 93A persuade me at this stage of the case that the plaintiff has stated a claim under c. 93A, § 9, upon which relief may be granted. The defendants' motion to dismiss in its entirety Count II of the amended complaint should be denied.

II. Notice of Claims

The defendants argue that they were not put on fair notice of the claims against them. They point to a lack of any specifics in the complaint regarding dates, meetings, or products affected in claiming that they were not fairly appraised of the claims against them. Under Mass.R.Civ.P. 8(a)(1), a complaint is required to contain "a short and plain statement of the claim showing that the pleader is entitled to relief ..." Further, Mass.R.Civ.P. 8(e)(l) states that "[e]ach averment of a pleading shall be simple, concise, and direct. No technical forms of pleading or motions are required." "Under this rule, if a plaintiff fairly notifies the defendant of the nature of the plaintiff's claim and the grounds on which he relies, the action should not be dismissed because it does so through what might be termed 'conclusions of law.' " Mass.R.Civ .P. 8, Reporter's Notes. "Nevertheless the Rules are not designed to encourage a plaintiff to put in a grievously murky complaint, without sufficient attention to its basis in the substantive law, in hopes of somehow finding something helpful to his case in the course of the discovery procedure." *Charbonnier v. Amico,* 367 Mass. 146, 153 (1975).

The complaint here is sufficient to put the defendants on notice of the allegations made against them. See *Jessie v. Boynton,* 372 Mass. 293, 304 (1977). The face of the complaint indicates the plaintiff has alleged that through various discussions and meetings the defendants agreed to inflate artificially the prices of the various vitamin products. It is not necessary for the plaintiff to set forth the specifics at this point. See, e.g., *New England Data Servs., Inc. v. Becher,* 829 F.2d 286, 291 (1st Cir.1987); *Julius Nasso Concrete Corp. v. DIC Concrete Corp.,* 467 F.Supp. 1016, 1025 (S.D.N.Y.1979). The plaintiff is entitled to discovery in this case. For now, it is enough that the defendants have been warned of the claims against them so that they may prepare their defense. See *Friedman v. Jablonski,* 371 Mass. 482, 488 (1976). The complaint has fairly warned the defendants of the allegations against them involving a large scale, world-wide conspiracy to fix the prices of vitamin products and fix the bidding on certain contracts. If, after discovery, no facts have been developed to support these allegations with respect to one or more, or all, of the defendants, summary judgment motions are available. The defendants' motions to dismiss under Rule 8(a)(l) must be denied.

V. Fraudulent Concealment

**\*9** The complaint in this case was filed on June 29, 1999. The statute of limitations for violations of G.L. c. 93A claims is four years. See G.L. c. 260, § 5A. In anticipation of the defendants' statute of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2000 WL 33162197
2000 WL 33162197 (Mass.Super.)
(Cite as: 2000 WL 33162197 (Mass.Super.))

limitations defense, the plaintiff alleges fraudulent concealment in the complaint in an attempt to toll the limitations period. See G.L. c. 260, § 12, which permits the statute of limitations to be tolled where a person potentially liable to another "fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it ... Absent the tolling statute, the plaintiff's consumer protection claims would be limited to damages arising after June 29, 1995.

Under Mass.R.Civ.P. 9(b), a plaintiff must plead fraud with particularity. This requirement also applies to a claim of fraudulent concealment of the cause of action. See *Maloney v. Brackett*, 275 Mass. 479, 484 (1931). Cf. *In re Vitamins Antitrust Litigation*, Misc. No. 99-197 (D.D.C.), Memorandum Opinion Re: Motions to Dismiss dated May 9, 2000, slip op. at 3-5 (pleading requirements of claim for fraudulent concealment under Federal antitrust statutes). In the last-cited decision, the court rejected motions to dismiss the fraudulent concealment allegations of complaints similarly alleging a conspiracy by the manufacturers as vitamin products to fix prices and take other concerted action in restraint of trade. *Id.,* slip op. at 5-15. It appears that the allegations of those complaints were very similar to the plaintiff's allegations of fraudulent concealment, and I similarly conclude that while they are hardly a model of specificity, in the context of the complaint, the allegations are sufficient to satisfy the requirements of Rule 9(b). There will be time enough after discovery for the defendants to proceed with a summary judgment motion concerning their statute of limitations claim.

### ORDER

For the foregoing reasons, the defendants' motions to dismiss the plaintiff's claim of coercive civil conspiracy (Count I of the first amended class action complaint) under Mass.R.Civ.P. 12(b)(6) are allowed, and their Rule 12(b)(6) motions to dismiss the claim of violation of G.L. c. 93A are denied. The defendants' motions to dismiss the plaintiff's claims under Mass.R.Civ.P. 9(b) and 8(a)(1) are also denied. Counsel are requested to contact the clerk of the "E" Session in Boston to schedule a brief conference on this case, and in particular the question of whether or not this decision on the

Chapter 93A claim should be reported pursuant to Mass.R.Civ.P. 64.

2000 WL 33162197 (Mass.Super.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.