# EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Alan Nisselson, Trustee of the Dictaphone
Litigation Trust, successor-in-interest to
claims of Dictaphone Corporation,

                      Plaintiff,

v.

Jo Lernout; Pol Hauspie; Nico Willaert; Gaston
Bastiaens; Carl Dammekens; Ellen Spooren;
Ju-Chul Seo; Erwin Vandendriessche; RVD
Securities N.V.; Dick Cauwelier; Marc G.H. DePauw;
Francis Vanderhoydonck; Gerard van Acker;
S.AI.L. Trust V.Z.W., Flanders Language Valley
Fund; Flanders Language Valley Fund Management;
Lessius Management Consulting, N.V.;
Gewestelijke Investeringsmaatschappij
Vlaanderen N.V.; L&H Investment Company, N.V.;
Language Investment Company; Language
Development Services: Mercator and Noordstar N.V.;
Language Development Fund; Velstra Pte Ltd.
Louis H. Verbeke; Willem Hardeman; Tony
Snauwaert; Klynveld Peat Marwick Goerdeler
Bedrijfsrevisoven; KPMG LLP; Paul Behets;
SG Cowen Securities Corporation; Chase
Securities, Inc., as successor to Hambrecht &
Quist; Deloitte & Touche; Stonington Partners, Inc.;
Stonington Capital Appreciation 1994 Fund L.P.;
Stonington Holdings, LLC; John H. Duerden;
Albert J. Fitzgibbons, III; Emil F. Jachmann;
Alexis P. Michas; Scott M. Shaw; Joseph D.
Skrzypczak; and Peter P. Tong,

                      Defendants.

03 CV 10843 (PBS)

**FIRST AMENDED
COMPLAINT**

**JURY TRIAL DEMANDED**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND SUMMARY OF FRAUDULENT SCHEME ...............................2

JURISDICTION AND VENUE ..................................................................................14

THE PARTIES AND OTHER RELEVANT INDIVIDUALS AND ENTITIES.................15

    Plaintiff and the Dictaphone Corporation...........................................................15

    Defendants and Related Individuals and Entities ..............................................16

        Lernout and Hauspie Speech Products N.V. ............................................16

        Senior Officers of L&H .............................................................................17

        L&H Audit Committee Members ................................................................18

        Other L&H Directors ................................................................................19

        The Related-Party Defendants ................................................................20

    Accountants and Investment Bankers................................................................25

    Directors, Advisors and Controlling Shareholders of Dictaphone......................28

FACTUAL BACKGROUND ....................................................................................30

    The Formation and Explosive Growth of
    Lernout & Hauspie and its Related Companies..................................................30

    Evolution of the Strategic Partners Concept .....................................................32

    Dictation Consortium and BTG:  The Prototypes for
    the Strategic Partners' Fraud ............................................................................34

    The Birth of the LDC/CLDC Project:  The 20 Languages Fund.........................39

    The LDCs/CLDCs Pay Off.................................................................................49

    The Acquisition of Bumil and the Korean Receivables Funds............................52

    The Negotiation of the Merger of Dictaphone & L&H ........................................58

    Dictaphone Performs Due Diligence on L&H .....................................................60

    Financial Condition of L&H as it Appeared to
    Dictaphone Prior to the Merger .........................................................................61

The Merger Agreement and its Representations and Warranties ..................... 65

The Representations and Warranties ................................................................. 66

Closing of the Merger .......................................................................................... 70

The Real Financial Situation of L&H at the Time of the Merger ....................... 71

*The Wall Street Journal* Raises the Possibility
of Fraud and L&H's Response .......................................................................... 73

The Report to the Audit Committee
by Bryan Cave and Arthur Andersen ............................................................... 80

Findings and Recommendations of the Audit Committee ................................. 81

Attempted Cover-up by KPMG ........................................................................... 90

The Report on Korea by PriceWaterhouseCoopers ........................................... 92

Criminal Proceedings .......................................................................................... 94

**FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS LERNOUT,
HAUSPIE, WILLAERT, BASTIAENS, DAMMEKENS, SPOOREN, SEO,
VANDENDRIESSCHE, RVD SECURITIES, CAUWELIER, DePAUW,
VANDERHOYDONCK, AND VAN ACKER FOR VIOLATION OF
SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5** ....................... 95

**SECOND CLAIM FOR RELIEF AGAINST THE L&H DEFENDANTS
AS CONTROL PERSONS OF L&H PURSUANT TO SECTION 20(a)
OF THE SECURITIES AND EXCHANGE ACT** ........................................................ 121

**THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS KPMG BELGIUM,
KPMG US, BEHETS, AND SG COWEN FOR VIOLATION OF
SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5** ....................... 122

The Falsity of Defendant KPMG Belgium's Representation
that it Conducted its Audit in Accordance with U.S. GAAS ............................. 125

KPMG's Deliberate Disregard of Overall Risk Factors ..................................... 127

KPMG's Deliberate Disregard of Risk Factors
Regarding Revenues in Korea and Singapore ................................................. 129

ii

KPMG's Deliberate Disregard of Risk Factors
Regarding Related-Party Transactions ............................................................ 133

KPMG's Deliberate Disregard of Improper
Recognition of License Revenues .................................................................. 138

KPMG's U.S.'s Role in the L&H Fraud .......................................................... 143

The Falsity of KPMG US's Representation t Dictaphone ............................... 145

SG Cowen's Role in the L&H Fraud .............................................................. 152

**FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS S.AI.L. TRUST,
MERCATOR, FLV FUND, FLV MANAGEMENT, LESSIUS, GIMV,
L&H INVESTMENT COMPANY, LANGUAGE DEVELOPMENT SERVICES,
LANGUAGE INVESTMENT COMPANY, VELSTRA PTE LTD.,
LANGUAGE DEVELOPMENT FUND, VERBEKE, HARDEMAN
AND SNAUWAERT FOR VIOLATION OF SECTION 10(B) OF
THE EXCHANGE ACT AND SEC RULE 10b-5** ....................................... 155

**FIFTH CLAIM FOR RELIEF AGAINST THE L&H DEFENDANTS,
THE RELATED-PARTY DEFENDANTS, KPMG BELGIUM, KPMG US,
BEHETS AND SG COWEN FOR COMMON LAW FRAUD** ...................... 162

**SIXTH CLAIM FOR RELIEF AGAINST THE L&H DEFENDANTS,
THE RELATED-PARTY DEFENDANTS, KPMG BELGIUM, KPMG US,
BEHETS AND SG COWEN FOR AIDING AND ABETTING
COMMON LAW FRAUD** ......................................................................... 162

**SEVENTH CLAIM FOR RELIEF AGAINST THE L&H DEFENDANTS,
THE RELATED-PARTY DEFENDANTS, KPMG BELGIUM, KPMG US
AND SG COWEN FOR UNFAIR TRADE PRACTICES G.L.c.93A** ........... 163

**EIGHTH CLAIM FOR RELIEF AGAINST DEFENDANTS KPMG US,
KPMG BELGIUM, AND SG COWEN FOR NEGLIGENT
MISREPRESENTATION** ......................................................................... 164

**NINTH CLAIM FOR RELIEF AGAINST DEFENDANTS LERNOUT,
HAUSPIE, WILLAERT, BASTIAENS, DAMMEKENS, SPOOREN,
SEO, VANDERHOYDONCK, VAN ACKER, THE AUDIT COMMITTEE
DEFENDANTS, THE RELATED-PARTY DEFENDANTS, KPMG
BELGIUM, KPMG US, BEHETS AND SG COWEN FOR CONSPIRACY** .... 165

**TENTH CLAIM FOR RELIEF AGAINST THE DICTAPHONE DIRECTORS
AND THE DICTAPHONE CONTROLLING SHAREHOLDERS FOR
BREACH OF FIDUCIARY DUTY** .............................................................. 166

**ELEVENTH CLAIM FOR RELIEF AGAINST DELOITTE & TOUCHE AND HAMBRECHT FOR BREACH OF CONTRACT**..............................167

**TWELFTH CLAIM FOR RELIEF AGAINST DELOITTE & TOUCHE AND HAMBRECHT FOR NEGLIGENCE**....................................................168

**THIRTEENTH CLAIM FOR RELIEF AGAINST THE RELATED-PARTY DEFENDANTS, KPMG BELGIUM, KPMG US, BEHETS AND SG COWEN UNDER RICO**....................................................................169

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Alan Nisselson, Trustee of the Dictaphone Litigation Trust, successor-in-interest to claims of Dictaphone Corporation, )<br>)<br>)<br>) | |
| ) | 03 CV 10843 (PBS) |
| Plaintiff, ) | |
| v. )<br>) | **JURY TRIAL DEMANDED** |
| Jo Lernout; Pol Hauspie; Nico Willaert; Gaston Bastiaens; Carl Dammekens; Ellen Spooren; Ju-Chul Seo; Erwin Vandendriessche; RVD Securities N.V.; Dick Cauwelier; Marc G.H. DePauw; Francis Vanderhoydonck; Gerard van Acker; S.AI.L. Trust V.Z.W., Flanders Language Valley Fund; Flanders Language Valley Fund Management; Lessius Management Consulting, N.V.; Gewestelijke Investeringsmaatschappij Vlaanderen N.V.; L&H Investment Company, N.V.; Language Investment Company; Language Development Services: Mercator and Noordstar N.V.; Language Development Fund; Velstra Pte Ltd. Louis H. Verbeke; Willem Hardeman; Tony Snauwaert; Klynveld Peat Marwick Goerdeler Bedrijfsrevisoven; KPMG LLP; Paul Behets; SG Cowen Securities Corporation; Chase Securities, Inc., as successor to Hambrecht & Quist; Deloitte & Touche; Stonington Partners, Inc.; Stonington Capital Appreciation 1994 Fund L.P.; Stonington Holdings, LLC; John H. Duerden; Albert J. Fitzgibbons, III; Emil F. Jachmann; Alexis P. Michas; Scott M. Shaw; Joseph D. Skrzypczak; and Peter P. Tong, )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants. ) | |

## <u>FIRST AMENDED COMPLAINT</u>

Alan Nisselson, Trustee of the Dictaphone Litigation Trust, successor-in-interest

to the claims of Dictaphone Corporation set forth herein, ("Plaintiff"), by his attorneys,

Folkenflik & McGerity, Brauner Baron Rosenzweig & Klein LLP, and the Law Offices of

Karen D. Hurvitz, Esq., for his First Amended Complaint against Defendants, alleges:

## INTRODUCTION AND SUMMARY OF FRAUDULENT SCHEME

1.    Effective May 5, 2000, Dictaphone Corporation ("Dictaphone") was acquired by Lernout & Hauspie, N.V. ("L&H") pursuant to a merger agreement dated March 7, 2000 (the "Merger Agreement"), which required, among other things, the payment by L&H to Dictaphone of approximately 9,400,000 shares of its stock, worth at the date of closing approximately $450,000,000, and the assumption by L&H of approximately $425,000,000 of Dictaphone debt.

2.    At the time of the acquisition of Dictaphone by L&H (the "Merger"), from all that appeared publicly, Lernout & Hauspie was not merely solvent, but wildly successful. L&H's most recent financial statements, for the year ending December 31, 1999, showed that its revenues had increased from $99,371,000 in 1997 to $211,592,000 in 1998 to $344,237,000 in 1999. Its income increased from a loss of $13 million in 1997 to a profit of nearly $42 million in 1999.

3.    Less than five months later, both Dictaphone and L&H were in bankruptcy. Nearly $8 billion of market capitalization of L&H had disappeared – the result of a massive and far-reaching accounting fraud that, as of the bankruptcy filing, had only just begun to be revealed.

4.    The fraud at L&H had been ongoing for at least nearly half a decade, but it was not merely a result of rogue management or individual wrongdoing. As is shown in greater detail below, it had been engineered by L&H's attorneys, vetted and approved by L&H's accountants, and understood and effectively approved by L&H's Board and Audit Committee, at least some of whom were not merely approving the various schemes, but were themselves direct participants in the fraud. L&H's professionals

2

abandoned all professional independence as L&H directly hired, as employees, its lawyers, accountants and investment bankers. L&H's head lawyer, Louis Verbeke, participated in the fraudulent scheme through Defendant Mercator & Noordstar, N.V., where he was Chairman. KPMG Belgium's head audit partner, Paul ("Pol") Behets, even negotiated his multi-million dollar employment contract with L&H affiliate, the S.AI.L. Trust, while simultaneously serving as head KPMG Audit Partner on the 1998 L&H Audit.

5.    The earliest, ultimately most complex and far-reaching fraudulent scheme was to raise short-term capital, effectively as a loan, to pay for L&H Research and Development expenses, but through the use of the straw-man companies to fraudulently disguise those loans as license fee or service fee revenues. As individual straw-man companies exhausted their funds, or the cover story could not be stretched any further, new straw-man companies were established, so that the total amount of fraudulent revenues could be maintained.

6.    The structure was to establish a company with money either directly or indirectly contributed by L&H or its affiliates, supplemented with money loaned from private investors who were promised a guaranteed return on their investment and the right to buy long-term warrants for L&H stock at a fixed price. The company would then enter into a license agreement with L&H, allowing it to use L&H technology to develop products. Because the company had no personnel or other way to use the "license," it would enter into a separate "engineering services" agreement through which it hired L&H itself to develop a product using the "licensed" L&H technology. L&H, as part of the agreements, had an "option" to buy any technology the company developed,

3

although it was obviously always understood and, on information and belief, expressly promised, that L&H would always exercise its option. After all, L&H, not the straw-man company, identified the projects it wanted to develop, and L&H performed all the development itself with its own engineers using its own technology until L&H itself was satisfied with the results.

7.    The first of those sham companies was the Dictation Consortium, founded in September 1996, and majority-owned by and controlled by Defendant FLV Fund and FLV Management, each of which was effectively controlled by L&H and its directors, as described in greater detail below. The monies obtained from Dictation Consortium were bᵣ      by L&H as income, even though, in reality, they were loans.    Dictation       .ı accounted for 25% of L&H revenue for 1996 and 19% of L&H revenues for      ı.

8.    Although Dictation Consortium was useful in fraudulently inflating L&H revenues, the fact that it was owned by affiliates required footnote disclosure in L&H's financial statements as a "related-party transaction," which looked less impressive to investors and analysts than arms'-length transactions with real third parties.

9.    As a result, when L&H established its second straw-man company, Brussels Translation Group ("BTG") in 1997, it disguised its true relationships to BTG by using what is called in the espionage business as a "cut-out" – an entity designed to appear to the world as the true owner, but who really takes orders from L&H. To help establish the BTG cut-out, turned to experts in that activity, Frans van Deun, the Managing Director of Radial, N.V., which from time to time works with the German spy

4

agency BND (equivalent to our C.I.A.), and Stephen Bodenkamp, also a German spy, currently in jail in Germany for forgery.

10.    An entity they created which "owned" BTG, Cevennes, S.A. ("Cevennes"), was a Luxembourg corporation, whose true ownership cannot readily be traced. Cevennes was also an owner of Dictation Consortium.   Cevennes did not act as the owner of BTG – L&H did.  All technology was developed by L&H, all marketing was developed by L&H, the BTG business plan was developed by L&H.   BTG received funding from L&H's long-term bank, Artisia, on information and belief, arranged by L&H. Indeed, L&H's control of BTG was so absolute that Cevennes was not even kept "on the mailing list" with regard to the development of the technology it allegedly "owned."

11.    In a February 25th draft of minutes of the BTG/L&H "Co-ordination Committee," of February 24, 1999, sent by Johan Van der Windt to Nico Willaert of L&H, Van der Windt wrote (in Flemish, as translated below):

> According to Mr. Willaert, the technological development within the framework of the BTG-project has been successfully accomplished. Paul Linscott, the project leader within L&H, has launched an internal memo some time ago stating this and thanking all people involved.  His technical colleagues for their contribution to the project.

> Cevennes shows its joy but would have appreciated to have been on the mailing list.

12.    As phony revenues from Dictation Consortium dropped off in percentage terms, phony revenues from BTG kicked in.   Approximately $15 million of L&H 1997 "revenue" was income from BTG.  L&H and its professionals never revealed that BTG was a related party, or that the so-called revenue was really a loan.  Approximately one-

third of all L&H "revenues" for 1997 were from BTG and Dictation Consortium collectively; none of those amounts were properly treated as revenues.

13.     By 1998, L&H's business was growing explosively, as were its ambitions. L&H wanted to expand into computer translation of numerous languages, and that required enormous research and development dollars and held the possibility of equally large fraudulent revenues.   As a result, L&H developed the concept of Language Development Companies and Cross-Language Development Companies, cast in the Dictation Consortium and Brussels Translation Group molds.  Following a pattern all too frequent in recent years, L&H's professionals assisted L&H in manipulating accounting reports to intentionally paint a false picture of L&H's financial results.  From the start, L&H's professionals, including, in particular, its attorneys and accountants, were deeply involved in the creation of what the participants sometimes called "Jo and Pol, Inc," a series of interlocking companies controlled by L&H, which masqueraded as independent business, and, through that masquerade, could create enormous fraudulent revenues for L&H from what were, in reality, loans.

14.     In July 1998, Thomas Denys, then an attorney at L&H's law firm Loeff, Claeys Verbeke, wrote to Pol Hauspie to get details of what Denys called "off-balance sheet financing."   Hauspie wrote back on July 24th stating that he was raising $250 million, "of which we can potentially make use of up to $100 million USD via friendly parties."

15.     According to the e-mails, the goal was production of twenty languages at "$12.5 million USD per language."   L&H counted on Loeff Claeys to develop the structure and documentation, and the plans were reviewed and approved by KPMG

Belgium and KPMG US  In his e-mail of July 24th, Hauspie wrote "LHS can own up to 19/9% (discussed with Pol Behets of KPMG, but not level up in the US) . . . "  As part of the deal, according to the e-mails, LHS got an "option" to acquire the LDC/CLDC company, and the investors got handsomely rewarded with L&H stock options which they could pay for with "easy going" terms.

16.    To accelerate "revenue" from these contracts, L&H decided to split the agreement into a "consent fee" (later termed a "license fee"), which could be recognized most quickly, and other fees for "services."  Hauspie wrote to Bastiaens on August 26th setting forth his plan to artificially manipulate revenues:

> 20 Languages Fund:
> From every 10 mil USD, I propose structuring 3 mil USD as a consent fee.  This gives us in total 60 mil USD in non refundable consent fees.  We can then spread this over 6 to 8 quarters, so that we get long-lasting enjoyment from it – without Viagra.  (translated)

17.    Bastiaens, possibly concerned about recording his thoughts, in writing, replied:

> Can we maybe have a phone call about this today?  Where can I reach you?  Otherwise call my cell phone.  (translated)

18.    Initially, the plan seemed to be to generate funding from U.S.-based venture capital funds, and elaborate term sheets were prepared by the Verbeke Firm and reviewed and approved by KPMG.  But, the American firms wanted terms which would guarantee in writing that L&H would exercise its "option."  That written agreement would make it impossible for KPMG to approve revenue recognition.  L&H then switched its plans and effectively created the twenty language companies itself.

7

19.    To effectuate this more ambitious plan required an elaborate organization. L&H created L&H Investment Company in 1998 as its nerve center, drawing together its lawyers, accountants, and investment bankers into a team capable of effectuating the plan and raising the necessary funds.  LHIC was staffed at the top by employees from its accountants, KPMG, its lawyers, Loeff Claeys, and its investment bankers, SG Cowen.

20.    It was planned that LHIC, both itself and working with FLV Fund (a publicly-owned investment company) controlled by FLV Management (which, in turn, was controlled by L&H affiliates, including Defendants Lernout, Hauspie, Verbeke and van Acker through Defendant GIMV), and the S.AI.L Trust (which L&H also controlled), would provide substantial funding the LDC/CLDC structure.  The true nature of the LDCs and CLDCs as mere instruments of L&H was disguised through the continuing use of corporate cut-outs, including van Deun's Radial, which purchased and "flipped" LDCs to yet other "friendly" purchasers. L&H also repeatedly used the services of Bodenkamp to create still further corporate disguises.

21.    Either because more money was needed than L&H could raise, or merely as an elaborate corporate cut-out to conceal L&H control of the LDCs/CLDCs, Defendant Mercator & Noordstar, N.V. ("Mercator"), a large insurance company, agreed to a primary role in the scheme.  Defendant Verbeke, L&H's chief attorney, was the Chairman of Mercator.   Ultimately, through multiple tiers of subsidiaries, Mercator "owned" a majority if the thirty start-up straw-man companies formed and operated as part of the L&H LDC scheme, an ownership which Mercator and Verbeke sought to conceal.

8

22.    Although Mercator was the ostensible owner of these LDCs and CLDCs, they were clearly an L&H operation and L&H, in fact, controlled them. Mercator set up Defendant LDF, a subsidiary run by Pol Hauspie's right-hand man Tony Snauwaert to own the LDCs. LDF created its subsidiary Velstra Pte, a Singapore entity apparently formed expressly to hold the LDC and CLDC investments. Effectively, Verbeke gave L&H control of Mercator's subsidiaries LDF and Velstra.

23.    As another mechanism to control the LDCs/CLDCs, L&H set up Defendant Language Development Services ("LDS"), also controlled by Snauwaert, to act as a "servicer" which, in reality, meant that Snauwaert established, arranged additional funding for, and controlled LDCs/CLDCs, the ostensible owner only loaned money. L&H also established Defendant Language Investment Company ("LIC") controlled by Defendant Hardeman, who had run Dictation Consortium for L&H, apparently taking direction from L&H, either directly or through FLV Fund, where Hardeman was also a Director. LIC funded multiple LDCs/CLDCs, which it promptly flipped to Mercator subsidiary Velstra.

24.    By the end of 1998, eight LDCs had been formed and had signed $24 million in licensing contracts with L&H, and all but one of them had been "sold" to Mercator's second tier subsidiary, Velstra. LDC/CLDC revenue accounted for 10% of all L&H revenues in 1998, and 25% of L&H revenues (over $85 million) in 1999, when the LDC/CLDC program really got started.

25.    As Maurice De Volder, a confidante of Hauspie, noted in an e-mail when the transactions started to come under public scrutiny:

9

So the SEC is trying to see if some of the investors in the LDC's were connected to some of L&H's earlier acquisitions. I bet they were.

If it weren't for the class action situation, it would be best if L&H could just come clean and go on down the road. But they can't, because the liability from all the class action plaintiffs would effectively bankrupt the company.

Best case for LHSP [L&H's stock market symbol], there was a failure to disclose related-party transactions, but the license sales are confirmed as U.S. GAAP.

Worse case for LHSP, there was a quid pro quo between acquisition by LHSP and the LDC investors. <u>That's cookbook fraud, plain and simple.</u> (emphasis supplied)

26.    It was "cookbook fraud, plain and simple," and even worse than De Volder had suspected. Some of the investors in the LDCs/CLDCs/IACs were, in fact, the same people connected with the earlier acquisition of Dictation Consortium and BTG (van Deun, Radial, and the people behind Cevennes in a new corporate identity), but as to the vast majority, they were completely L&H-controlled entities operating through a variety of corporate guises.

27.    Even with the LDC/CLDC frauds, L&H's business apparently was not growing as fast as management and its professionals desired. Dramatic growth was necessary to keep the pace of stock price increases, and stock price increases, in addition to making many of the Defendants substantial personal wealth, was the engine which drove the investors to make the loans which, in turn, enabled L&H to show ("fraudulent") revenue. Any slowdown in revenue growth could jeopardize the entire scheme.

28.    L&H turned to Korea for its next fraudulent scheme. L&H had been working in Korea for years, and since early 1997 had been "development partners" with

a small Korean telecommunications company Bumil. Starting in at least June of 1999,

L&H started to discuss an equity investment in Bumil, initially, on information and belief,

motivated by Bumil's inability to pay L&H a $1.5 million license fee it owed. But John

Seo, Bumil's President, apparently made clear his willingness to be a full partner in

creating fraudulent revenues for L&H, and he was recruited to do just that.

29.    In mid-September 1999, L&H acquired Bumil for $25 million, with a

potential additional $25 million if certain revenue targets were met over the next year

and a half. SG Cowen reviewed Bumil's business and gave a "fairness opinion" and

KPMG did a "due diligence" review.

30.    Immediately after the closing, Bumil, now Lernout & Hauspie Korea

("LHK"), entered into two contracts with two new, apparently unfunded, start-up

companies and booked revenue in just a few days equal to the prior full year. LHK

proceeded to book business at accelerated rates through 1999 and 2000. Ultimately

most, if not all, of these contracts proved to be fictitious.

31.    As a solution to its collection and revenue recognition issues, L&H Korea

entered into "factoring arrangements" with four local banks Hanvit, Hana, Shunhan and

Chohung. Upon "factoring" an agreement, the local banks deposited the factoring

proceeds in a "restricted time deposit" that L&H Korea agreed not to withdraw. L&H

Korea recorded the time deposit (i.e., increased cash) in its accounting records. This

created an appearance to the outside world that L&H Korea had a tremendous increase

in sales, a large amount of cash, and had collected accounts receivable. But, in reality,

there were little or no payments generated by L&H Korea's customers and the cash

from factoring was held by the bank where L&H could not touch it.

32.   The contracts themselves made no real sense:  license payments were almost ten times the going rate for such agreements; few, if any, of the customers had the resources to actually make the contractual payments, and the small amount of payments made were highly irregular in the way in which payments were made and the sources from which they came.  The total dollar value of the contracts signed were many multiples greater than the total business Bumil had ever done before.  Individual transactions were transparently fictitious on their face.

33.   For example, on December 8, 1999, a company called HI World signed a license agreement with L&H, which included a prepaid license fee of $19 million and a maintenance/development fee of $2 million.  Yet, HI World did not even exist until December 9th, when its founder, a Korean fortune-teller, started it with $90,000.  The company never had the money to pay the license fee, and never did.  The agreement was amended on January 10, 2000 to provide that the license fee and maintenance fees were "non-refundable."  The fact that the fee was not "non-refundable" until January by itself should have precluded recognition of the license fee in 1999.  L&H recognized $11 million in 1999, and KPMG approved.

34.   The factoring agreements simply made no business sense and were an obvious sham to anyone with access to L&H's books or business records.  The factored contracts required payment within 90 days, and, therefore, there was no reason to factor them to accelerate the receipt of income, and L&H Korea never withdrew the "factored" money held in restricted time deposits.

35.   Initially it was clear that the factoring arrangement was "with recourse," meaning that L&H Korea took the risk of any non-payment by the customer.  That fact,

12

combined with the start-up history and non-existent finances caused KPMG's Korean office to raise a red flag about recording any revenue from these deals, but the deals were approved at KPMG's "corporate level" apparently by KPMG accountant Robert McLamb and by KPMG US's Professional Practice Group.

36.    Large-scale frauds, such as the LDC/CLDC and Korean revenue frauds, were not the only fraudulent practices engaged in by L&H. Indeed, the business of software development and sales, in which L&H was involved, has a long history of accounting abuses, particularly in the recognition of revenues. Long before AICPA SOP 97-2 established accounting standards for the recognition of software revenues, earlier standards had been created in SOP 91-1. Software was a business in which both the accounting profession (including KPMG) and the SEC had been acutely aware of the numerous ways that revenue could be manipulated and falsely recorded. Many professional guidelines were promulgated to alert accounting professional to various fraudulent procedures. L&H seemed to have used these accounting materials as a "to do checklist," engaging in widespread fraudulent revenue recognition and fraudulent revenue acceleration in a manner that pervaded the business of the L&H Belgian headquarters and the L&H U.S. headquarters.

37.    The effects of these fraudulent schemes on L&H reported financial results was dramatic. Over $100 million -- and perhaps all $160 million -- in revenue from L&H's Korean subsidiary recorded in the period of September 1999 through June 2000 was entirely fictitious. An additional $79 million or more in revenue also proved to be fictitious as part of the related-party frauds. Approximately $100 million in revenue was improperly recorded by the use of a wide range of improper accounting practices such

as side deals, money-back guarantees, treating contracts as final before they were fully negotiated or signed, and other similar activities which, in some cases, improperly accelerated the booking of earned revenue, and, in other cases, caused the booking of revenues that were, in fact, never earned at all.

38.    Ultimately, L&H determined that the improper statement of revenue amounted to approximately $373 million for the period 1998 to June 2000, which was nearly two-thirds of the total reported. L&H's income before taxes, represented by L&H to Dictaphone to be in excess of $70 million, was entirely fictitious and, in fact, L&H had incurred a loss of over $70 million. In reality, L&H, which claimed a market capitalization of nearly $8 billion at the time of the Merger, was essentially worthless. Had Dictaphone been made aware that the stock of L&H, and its promise to assume debts, were all worthless, obviously it never would have sold Dictaphone, valued at the time of the Merger at approximately $900 million, for nothing.

39.    Pursuant to the Dictaphone plan of reorganization, which was confirmed by the United States Bankruptcy Court for the District of Delaware on March 13, 2002, Dictaphone's claims arising out of the Merger transaction were assigned to the Dictaphone Litigation Trust. This action is therefore brought by Alan Nisselson, the Trustee of the Dictaphone Litigation Trust, to recover the damages suffered by Dictaphone as a result of this fraudulent course of conduct.

## JURISDICTION AND VENUE

40.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78(b), 78t(a), and Rule 10b-5, 17 C.F.R. §240.10B-5, promulgated thereunder by the SEC, and under

14

State law. In connection with the acts, conduct, and other wrongs complained of herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of a national securities market.

41.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337, and the principles of supplemental jurisdiction, 28 U.S.C. §1367.

42.    Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. §1391(b), as Defendants disseminated false and misleading statements into this District.

### THE PARTIES AND OTHER RELEVANT INDIVIDUALS AND ENTITIES

### Plaintiff and the Dictaphone Corporation

43.    Plaintiff Alan Nisselson is the Trustee (the "Trustee") of the Dictaphone Litigation Trust (the "Trust"), as successor to claims of Dictaphone Corporation ("Dictaphone"). Prior to the events described below, Dictaphone, a Delaware corporation with headquarters in Stratford, Connecticut, was a leader in the development, manufacture, marketing, service and support of integrated voice and data management systems and software, including digital dictation, voice processing, record management and communications recording, telephone call center recording systems and solutions. Dictaphone serves the healthcare and telecommunications markets.

44.    On May 5, 2000, pursuant to the terms of an Agreement and Plan of Merger dated March 7, 2000, L&H acquired all of the outstanding stock of Dictaphone in exchange for approximately 9.4 million shares of L&H common stock through the merger of Dictaphone into a wholly-owned subsidiary of L&H. The L&H subsidiary,

15

Dark Acquisition Corp., survived the merger and changed its name to Dictaphone Corporation.

45.    On November 29, 2000, Dictaphone filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") captioned *In re Lernout & Hauspie Speech Products N.V., et al.*, Case Nos. 00-4397 through 00-4399 (JHW).  Thereafter, on March 13, 2002, the United States Bankruptcy Court approved the Third Amended Plan of Reorganization (the "Plan") and Dictaphone was discharged from bankruptcy.  Pursuant to the Plan, Dictaphone, as settler, conveyed all its interest in certain claims, including all claims asserted in this Complaint, to the Trustee, acting on behalf of the Trust.

**Defendants and Related Individuals and Entities**

**Lernout and Hauspie Speech Products N.V.**

46.    L&H, a Belgian corporation with its United States corporate headquarters in Burlington, Massachusetts, was a leading international developer, licensor and provider of advanced speech and language technologies, products, solutions and services.  On November 29, 2000, L&H and certain of its U.S. subsidiaries (Dictaphone Corporation and L&H Holdings USA, Inc.) filed for Chapter 11 bankruptcy.  L&H is currently a debtor-in-possession under Chapter 11.

47.    On November 29, 2000, L&H Holdings USA, Inc. ("Holdings USA"), a subsidiary of L&H which chiefly operated the business Dragon Systems, Inc. ("Dragon"), which it acquired in June 2000, filed for Chapter 11 bankruptcy.  L&H Holdings USA, Inc. is currently a debtor-in-possession under Chapter 11.

16

**Senior Officers of L&H**

48.     Defendant Jo Lernout ("Lernout") co-founded L&H in 1987.  Lernout was Co-Managing Director of the Board and Co-Chairman in the Office of the Chief Executive of L&H.

49.     Defendant Pol Hauspie ("Hauspie") co-founded L&H in 1987.  Hauspie was Co-Managing Director of the Board and Co-Chairman in the Office of the Chief Executive of L&H.

50.     Defendant Nico Willaert ("Willaert") was the Managing Director and Vice Chairman of L&H.  He joined L&H in 1992 and had served as Managing Director since 1993 and Vice-Chairman since 1994.

51.     Defendant Gaston Bastiaens ("Bastiaens") was Chief Executive Officer of L&H from May 1997 and President from October 1996, until his resignation from both positions on August 25, 2000.  He is also a 27.7% stockholder of L&H Holding, Inc. Prior to joining L&H, Bastiaens was the Chief Executive Officer of Quarterdeck Corporation ("Quarterdeck"), where marketing hype and widespread misleading practices, he drove the stock price from single digits to over $40 per share in merely a year and a half.  Bastiaens was paid out of Quarterdeck.  Its price per share had collapsed to around 50¢ by the time that it was acquired by Symantec **[full name]** in March 1999. KPMG Peat Marwick LLP, predecessor of Defendant KPMG LLP, was the auditor for Quarterdeck.

52.     Defendant Ellen Spooren ("Spooren") was Senior Vice-President of Marketing and Corporate Communications at L&H with responsibility for four major departments at L&H:    corporate communications, investor relations, business

17

development and marketing. Prior to joining L&H in 1996, Spooren had worked with Defendant Bastiaens at Quarterdeck as part of his senior management team during the period of Quarterdeck's rise and subsequent, equally dramatic collapse.

53.    Defendant Ju-Chul Seo ("Seo") (a/k/a John Seo, Ju Cheol Suh, and Ju Cheol Sea) was President and General Manager of L&H's Korean subsidiary from September 1999, when L&H acquired his company Bumil, until his suspension on November 22, 2000.

54.    Defendant Carl Dammekens ("Dammekens") joined L&H in 1990 and became Acting Chief Financial Officer of L&H in 1996 and Chief Financial Officer in July 1999. He resigned as CFO on November 9, 2000.

### L&H Audit Committee Members

55.    Defendant Dirk Cauwelier ("Cauwelier"), an attorney and a Director of L&H since 1997, was a member of L&H's Audit Committee. Cauwelier also manually signed the original 1999 Form 10-K report.

56.    Defendant Marc G.H. DePauw ("DePauw"), a director of L&H since June 1995, was a member of L&H's Audit Committee and manually signed the original 1999 Form 10-K report.

57.    Defendant RVD Securities N.V. ("RVD") is a Belgian broker-dealer and was a member of L&H's Audit Committee. Under Belgian law, a corporation can serve on the Board of Directors.

58.    Defendant Erwin Vandendriessche ("Vandendriessche") was Chairman of the L&H Audit Committee, as well as a member of its Compensation Committee. He

had been a director of L&H in his individual capacity from 1990 until 1994, when he began his service as RVD Securities' representative on the L&H Board of Directors, which continued throughout the relevant time period.    As agent for RVD, Vandendriessche signed the Form S-3 Registration Statement filed by L&H on August 25, 2000, which publicly incorporated the fraudulent 1999 Form 10-K report, filed on June 30, 2000.

### Other L&H Directors

59.    Defendant Gerard van Acker ("van Acker") served as Chairman, President and CEO of Defendant Gewestelijke Investeringsmaatschappij Vlaanderen N.V., a member of the L&H Board and a signatory on L&H's SEC filings.  Van Acker was also GIMV's director on the Board of Directors of Defendant FLV Fund Management, N.V., which as set forth more fully below, played an integral role in the L&H scheme to defraud.

60.    Defendant Francis Vanderhoydonck ("Vanderhoydonck") served as a member of the Board of Directors of L&H and a member of its Compensation Committee since 1999.  Vanderhoydonck also served as the President and Managing Director of Defendant L&H Investment Company ("LHIC") from its inception in 1998. According to L&H's 2000 10K, Vanderhoydonck was also one of several directors and consultants of LHIC who performed financial, accounting and strategic planning services for L&H.  As a member of L&H's Board of Directors, Vanderhoydonck also signed L&H's SEC filings.  Vanderhoydonck also served as a non-executive director of several of the companies in LHIC's portfolio.

19

**The Related-Party Defendants**

61.    The Related-Party Defendants created, invested in, purchased and sold approximately thirty small start-up companies referred to as Language Development Companies ("LDCs") and Cross-Language Development Companies ("CLDCs").  LDCs and CLDCs, which were also sometimes referred to as L&H's "Strategic Partners," were generally used to accomplish the fraud described below.

62.    Defendant Flanders Language Valley Fund ("FLV Fund") is a Belgian venture-capital fund, with United States offices in Los Altros Hills, California, and Woburn, Massachusetts, and was publicly traded on EASDAQ, the pan-European stock market.    FLV Fund was managed by Defendant FLV Fund Management ("FLV Management"), a "working shareholder" of FLV Fund, which, in turn, was run by a Board comprised of three corporate directors:  Defendants Lessius Management Consulting, N.V., S.AI.L Trust V.Z.W., Gewestelijke Investeringsmaatschappij Vlaanderen N.V. Lernout and Hauspie created FLV Fund in 1995, and were Directors of FLV Management arm from 1995 until 1997.  After 1997, Lernout and Hauspie continued to be active in FLV Fund's operations and to have considerable influence.  Defendant FLV Fund owned or funded at least seven of the thirty start-up LDC and CLDC companies through which L&H accomplished a portion of its fraudulent scheme.  Loeff Claeys Verbeke, L&H's chief Belgian law firm and Defendant Verbeke's firm, also served as legal counsel to Defendants FLV Fund.  Defendant KPMG Belgium, L&H's auditors, were also auditors for the FLV Fund.

63.    Defendant Flanders Language Valley Fund Management, N.V. ("FLV Fund Management") is the manager of FLV Fund and controls its investment practices.

20

Defendants Lessius, GIMV and S.AI.L. each hold a one-third interest in FLV Fund Management. Fernand Cloet and Philip Vermeulen, former L&H Directors, served as Vice-Chairman of the Board of Directors and Director of the FLV Fund Management, respectively. Defendant van Acker, who has served as President, CEO and Chairman of Defendant GIMV, and as a Director of L&H, also served as GIMV's Director on the FLV Fund Management Board.

64.     Defendant Language Investment Company ("LIC") is an entity in Poperinge, Belgium which, as set forth below, was instrumental in the creation of various start-up companies, which were promptly re-sold to other Defendants. Defendant Hardeman controlled LIC. LIC founded at least four start-up companies as its subsidiaries at the behest of L&H, and then sold the companies to Velstra, an indirectly-owned subsidiary of Defendant Mercator and Noordstar N.V.

65.     Defendant Gewestelijke Investeringsmaatschappij Vlaanderen N.V. ("GIMV") is a shareholder of L&H with the right to nominate one director to L&H's Board. GIMV's Chairman, President and CEO, Defendant Gerard van Acker, also served as an L&H Director.    GIMV also owns a one-third interest in Defendant FLV Fund Management.    GIMV used Defendant SG Cowen Securities Corporation as its investment banker. GIMV has long-established ties to L&H. In 1992, when it invested $5 million in return for an 18% interest in L&H, its investment manager was Philip Vermeulen, who later became chief financial officer of Defendant FLV Management. In 1998, GIMV established an investment fund with Defendant Mercator, managed by Defendant Vanderhoydonck to purportedly invest in mature companies contemplating a management buy-out.

66.    Defendant Willem Hardeman ("Hardeman") was a director of FLV Fund and also the Chief Executive Officer of Defendant Language Investment Company.  He also served as Director of FLV Fund Management and as a member of its Audit and Compensation Committees.  On information and belief, Hardeman had been President of the Board of Directors of Dictation Consortium prior to its acquisition by L&H. Hardeman was also listed as the "contact" for Language Investment Company.

67.    Defendant L&H Investment Company, N.V. ("LHIC") was an investment fund established by Lernout and Hauspie in October 1998 for the stated purpose of making "strategic" investments in high technology-based companies specializing in speech and language based products.  Defendants Lernout and Hauspie beneficially owned a controlling interest in LHIC and were its Co-Chairmen while Defendant Vanderhoydonck was its President and Managing Director.  Defendant Verbeke's firm served as counsel to LHIC.  Initially, a different company of the same name held Lernout and Hauspie's interest in L&H as well as additional investments in start-up companies.  In 1999, the start-up companies were spun out to a new firm.  The principal purpose of LHIC was to invest in high-technology start-up companies, including, as described more fully below, a substantial number of the "Strategic Partners" that were used to accomplish the fraud.  LHIC, which operated similarly to the FLV Fund, was similarly involved in the related-party start-up company frauds.  LHIC served as the nerve-center for the direct involvement of L&H professionals in the L&H related-party frauds as set forth more fully herein.

68.    Defendant Language Development Fund, N.V. ("LDF") is an investment firm owned almost entirely by Defendant Mercator (96.7%) with the remaining 3.3%

22

interest shared by L&H-related companies, Language Development Service ("LDS"), of which Defendant Snauwaert was CEO (3.2%), and LIC (.1%). LDF founded or funded at least eleven of the thirty start-up LDCs and CLDCs.

69.    Defendant Language Development Services ("LDS"), of which Defendant Snauwaert was CEO, was, according to an internal L&H memorandum dated March 23, 1999 from Steven Leys, L&H Project Manager, a service company that provided "supporting services to the LDC enterprises."

70.    Defendant Lessius Management Consulting, N.V. ("Lessius") is a subsidiary of a Belgian-based investment bank, Lessius N.V. Lessius holds a one-third interest in Defendant FLV Management and was also financial advisor to FLV Fund. Lessius has close ties to, and took direction from, Defendant Mercator & Noordstar, N.V.

71.    Defendant Mercator and Noordstar N.V. ("Mercator") is an insurance company located in Antwerp, Belgium. Mercator was the ultimate owner of at least seventeen of the thirty start-up LDCs and CLDCs. Mercator also held an equity interest in L&H Holdings.

72.    Defendant S.AI.L. Trust V.Z.W. ("S.AI.L."), a purportedly not-for-profit foundation, was formed in May 1998 by Lernout, Hauspie, and Fernand Cloet, an L&H Director and Vice-Chairman of Defendant FLV Management, and originally was known as the Flanders Language Valley Foundation and Stichtling Flanders Language Valley V.Z.W. The ostensible purpose of the S.AI.L. Trust was to support the economic development and to assist in the financing of the infrastructure and the enhancement of the educational system of the Flanders Language Valley, a campus-like technology

business park in Leper, Belgium.  S.AI.L. holds a one-third interest in the FLV Fund Management.

73.    Defendant Tony Snauwaert ("Snauwaert"), CEO of LDS and a delegate-Director/Manager of LDF, and has been described as "Hauspie's right hand."  As set forth more fully below, Snauwaert was also listed as an officer and/or agent for many of the start-up companies known as LDCs and CLDCs.  Snauwaert was also the "fundraiser" and "fund manager" for many or all the LDCs and CLDCs, and other L&H "customers," and was described by L&H personnel as "a key figure within the LDC structure."

74.    Defendant Vanderhoydonck was President and Managing Director of LHIC.  LHIC's partners and officers included individuals from L&H's chief Belgian law firm (Thomas Denys of the Verbeke Firm was a Managing Director, Partner and a member of its Strategic Committee), from L&H's investment banker (Daniel Blake of Defendant SG Cowen Securities Corporation was a Partner and Chief Analyst), from L&H's auditors (Chantal Mestdagh, CFO, formerly the account manager at Defendant KPMG Bedrijsreviseven (KPMG Belgium) for the L&H account).

75.    Defendant Velstra Pte Ltd. ("Velstra"), a Singapore-based company, is 100% owned by Language Development Fund.  Velstra directly owned at least seventeen of the thirty start-ups companies or "Strategic Partners."

76.    Defendant Louis H. Verbeke ("Verbeke") is Chairman of Mercator and a named partner at Loeff Claeys Verbeke ("the Verbeke Firm"), the Belgian law firm serving as counsel to L&H, FLV Fund, and L&H Investment Company ("LHIC"), and to all, or virtually all, of the thirty start-up companies.  Verbeke personally served as

24

counsel to L&H and counsel to the FLV Fund.  One of Verbeke's former senior associates at the Verbeke Firm, Thomas Denys, was a Managing Director and Partner at Defendant LHIC and a Director of several of its investee corporations.  Verbeke personally owned an interest in L&H through an 8.9% interest in L&H Holdings. Verbeke personally attended L&H board meetings where related-party transactions were discussed, and, upon information and belief, was instrumental in advising Defendants Lernout and Hauspie regarding the structure of the various L&H corporate entities, as well as the structure of individual transactions.  Verbeke's firm also served as Belgian counsel with regard to the Dictaphone Merger.

**Accountants and Investment Bankers**

77.    Defendant Klynveld Peat Marwick Goerdeler Bedrijfsrevisoven ("KPMG Belgium") is a Belgian public accounting firm.  It employs over 750 partners and staff in six cities in Belgium.  KPMG Belgium has been L&H's outside auditor since 1991 when it absorbed the Belgian accounting firm of Behets, Boes & Co. ("Behets Boes"), which had been auditing L&H since the late 1980's.

78.    Defendant KPMG Belgium issued unqualified reports on L&H's financial statements for each of the years 1997, 1998 and 1999; gave an opinion that those financial statements were prepared in accordance with U.S. GAAP, stated that its audit was conducted in accordance with U.S. GAAS, and consented to L&H's inclusion of KPMG Belgium's reports on those financial statements in filings with the SEC.

79.    One of the KPMG Belgium auditors responsible for the L&H audits, Chantal Mestdagh, left KPMG Belgium to become Chief Financial Officer of Defendant LHIC.  Ms. Mestdagh held that position throughout KPMG Belgium's audits of L&H's

1998 and 1999 financial statements. KPMG Belgium also audits the FLV Fund and may also be the auditor of the other L&H-related entities.. In the summer of 1999, Frederik Deschodt, who had been employed by KPMG Belgium until August 1999, became assistant controller of L&H and played a key role in reviewing and obtaining approval for KPMG Korea's fraudulent accounting practices.

80.    Defendant Pol or Paul Behets ("Behets") was the Partner-in-Charge of the audit of L&H at Behets Boes and at KPMG Belgium and, on information and belief, was personally familiar with and responsible for all of the misrepresentations, omissions and audit failures of KPMG Belgium during his time as Partner-in-Charge of the L&H Audit. After Behets signed off on L&H's 1998 audit, he left KPMG to become the head of Defendant S.AI.L. Trust, a position he negotiated for during the course of the 1998 Audit.

81.    Defendant KPMG LLP ("KPMG US" or "KPMG LLP") is a Big Five public accounting firm associated with KPMG Belgium.  KPMG US not only provided assistance to KPMG Belgium in connection with the audits of L&H's financial statements, but also actively participated in the conduct of the L&H audits and the drafting of L&H financial statements.  In addition, certain partners or employees of KPMG US had communications with Dictaphone and its representatives during the due diligence preceding the Dictaphone merger.  (KPMG Belgium and KPMG US are hereinafter referred to collectively as "KPMG").

82.    Defendant SG Cowen Securities Corporation ("SG Cowen") is a U.S. broker-dealer subsidiary of Société Générale Group.  It provides securities and investment banking services to corporate clients and institutional investors worldwide.

26

SG Cowen was established in 1998 when Cowen & Company was acquired by the Société Générale Group. As a result of that transaction, SG Cowen was merged with Société Générale Securities Corporation, the U.S. investment banking arm of the Société Générale Group.

83. Defendant SG Cowen has offices in New York, Boston, Chicago, Cleveland, Dallas, Denver, San Francisco, Geneva, Paris, Toronto, Zurich, and an affiliate in London. Through Société Générale, it has access offices in 75 countries around the world, including South Korea and Belgium.

84. Defendant SG Cowen was deeply involved in L&H as its investment banker, co-underwriting L&H's public financing in 1996, and providing investment banking advice, fairness opinions and due diligence assistance in L&H's acquisitions, including the acquisition of Bumil in Korea in September 1999 and of Dictaphone and Dragon in the United States in January through June 2000. SG Cowen also served as investment banker for Defendant GIMV.

85. In addition, certain of SG Cowen's present and former analysts and investment bankers have held positions in both SG Cowen and L&H-related companies, in some instances simultaneously occupying dual positions. For example, one of SG Cowen's former research analysts and investment bankers, Daniel Blake, joined Defendant LHIC as a partner in the spring of 1999, but still continued to work as an investment banker with SG Cowen and as a member of the Dictaphone and Dragon Systems investment banking teams.

86. Yet another SG Cowen investment banker and analyst, Barend Van den Brande, also worked as Director of Business Development at Defendant FLV Fund,

which presumably put him in the middle of the development and financing of the LDCs and CLDCs which were at the center of the fraud. Van den Brande then founded Big Bang Ventures, an investment fund which invested together with Defendant FLV Fund and Defendant LHIC in L&H customers.

87.    Despite SG Cowen's knowledge of L&H's fraudulent practices, SG Cowen investment banker and analyst, Robert Stone, who worked on both the Dictaphone and Dragon Systems mergers and possibly worked on L&H investment banking projects as well, continued to issue supposedly objective research reports rating L&H as a "strong buy." Indeed, even after many public revelations of fraud had already emerged in August and September 2000, as late as at the end of September, SG Cowen analyst Stone continued to tout L&H as a "buying opportunity."

## Directors, Advisors and Controlling Shareholders of Dictaphone

88.    Defendants John H. Duerden, Albert J. Fitzgibbons, III, Emil F. Jachmann, Alexis P. Michas, Scott M. Shaw, Joseph D. Skryzpczak and Peter P. Tong were each active Directors of Dictaphone, and, in the case of Duerden, Chairman of Dictaphone's Board of Directors, throughout the period November 29, 1999 through May 5, 2000, the date of the Merger, and voted to approve the Merger on February 17, 2000 and March 1, 2000. Defendants Duerden, Fitzgibbons and Michas constituted a Special Executive Committee which negotiated and executed the final Merger documents.

89.    Defendant Stonington Partners L.P. ("Stonington") is a New York private investment fund that managed Defendant Stonington Capital Appreciation 1994 Fund, L.P. (the "Stonington Fund"), the holder of approximately 96% of the outstanding voting capital stock of Dictaphone at the time of the Merger.  Defendant Stonington is a

general partner of Defendant Stonington Fund, and Defendant Stonington Partners, Inc. is the management company of Stonington Fund (collectively, the "Stonington Defendants"). The Stonington Defendants exercised their control over Dictaphone to cause approval of the merger with L&H.

90.    Defendant Deloitte & Touche ("D&T"), the American branch of the worldwide accounting firm Deloitte Touche Tohmatsu, is the second largest of the Big Four accounting firms (in terms of U.S. revenue). Based in New York, D&T offers auditing, tax and management consulting services through its offices in more than 100 U.S. cities. Deloitte Touche Tohmatsu has offices in numerous countries worldwide, including South Korea and Belgium. D&T was hired by Dictaphone to assist it in due diligence on the L&H Merger.

91.    Defendant Hambrecht & Quist ("Hambrecht") was founded in 1968 in San Francisco, California as an investment banking firm that focused on high-growth companies in the technology, health care, information services, and branded consumer products industries. On December 9, 1999, JPMorgan Chase acquired Hambrecht & Quist for $1.46 billion dollars and renamed it Chase Hambrecht & Quist. As of January 2, 2001, Chase Hambrecht & Quist became JPMorgan Hambrecht & Quist, a division of Chase Securities, Inc.

92.    Hambrecht was co-underwriter with SG Cowen on the 1996 financing for L&H. Hambrecht was hired by Dictaphone to assist it in due diligence on the L&H Merger.

29

## FACTUAL BACKGROUND

**The Formation and Explosive Growth of**
**Lernout & Hauspie and its Related Companies**

93.    L&H was formed in 1987 and quickly became a leading developer, licensor and provider of advanced speech recognition and language technologies, products, solutions and services, including technologies which enable computers to recognize and respond to naturally spoken speech, create speech from text and/or text from speech data, respond to commands with speech, and store, transmit and replay speech, translation services, and a wide-range of other end-user applications. L&H offered dictation products for the healthcare, law enforcement and legal industries.

94.    In the decade after L&H's founding, the combined forces of improvements in speech recognition technology, increased computer power and decreased costs of computers caused the speech recognition industry to start to experience rapid growth.

95.    In 1995, L&H formed Flanders Language Valley Foundation ("FLVF") as a not-for-profit entity promoted by the co-founders of L&H and designed to foster the establishment and growth of enterprises near L&H headquarters in Flanders that sought to develop and commercialize products based upon advanced speech and language technology. In reality, FLVF, along with other affiliates, was used to conduct an elaborate financial fraud.

96.    Beginning in the third quarter of 1996, L&H began expanding its business primarily through a series of acquisitions intended to further its stated goal of becoming "the leading international provider of advanced speech and language technologies, products and services."

30

97.   In its 1997 Annual Report filed with the SEC on Form 20-F on May 26, 1998, L&H announced that in 1997 "total revenues increased 220% to approximately $99.4 million in 1997 from approximately $31.0 million in 1996."

98.   In its annual report for the year ended December 1998, L&H defined the key elements of its growth strategy as involving substantial emphasis on multilingual and translation technologies through collaboration with enterprises in the FLVF.

99.   L&H's reported year-end results for 1998 showed remarkably increased revenues and dramatic growth.  For the fiscal year ended December 31, 1998, L&H reported total revenues of $211.6 million, up 113% from the $99.4 million reported for the previous year.

100.   During 1999, L&H continued on its path to expansion, primarily through a series of small acquisitions.   Throughout 1999, L&H's quarterly earnings announcements reported continuing growth and sharply increasing revenues.

101.   On February 9, 2000, L&H announced year-end results for the fiscal year ended December 31, 1999.  In its press release, L&H announced that "for fiscal 1999, the company reported total revenues of $344 million or an increase of 62.7% over the reported revenues of $211.6 million for 1998."

102.   Bastiaens, then President and CEO of L&H, attributed this success to an increase in demand for speech and language technologies, applications and solutions, primarily in the Enterprise and Telephony arena.  "This increase was mainly the result of internal growth and created positive cash flow from operations of $68 million, reflecting the maturity of our operations."

103.   When questioned by critics about the extent to which L&H's revenue growth was the consequence of acquisitions, L&H insisted that the majority of its growth was "organic."

(a)    In a response to "Lernout & Hauspie Frequently Asked Questions for Q3 1999," posted on its world-wide website on October 29, 1999, L&H stated that "80% of [revenue] growth was organic and the rest was based on acquisitions."

(b)    In a response to "Lernout & Hauspie Frequently Asked Questions for Q4 1999" posted on L&H's world-wide website on February 10, 2000, L&H claimed that "L&H's internal calculation [sic] show that over 70% of our growth for fiscal 1999 was organic."

(c)    In a response to "Lernout & Hauspie Frequently Asked Questions for Q1 2000," posted on its world-wide website on May 24, 2000, L&H claimed that "74% of the growth was organic."

104.   L&H also reported rapid fourth quarter 1999 growth in the Pacific Rim area, and explained that it had signed numerous contracts with "high-profile Pac Rim-based developers."

**Evolution of the Strategic Partners Concept**

105.   As L&H grew and the language recognition industry started to blossom, L&H began to promote the development of start-up high-tech companies, primarily focused on voice recognition or complementary technologies.  L&H developed the Flanders Language Valley, a college campus-like setting in Ieper (sometimes written "Leper" or "Yeper"), Belgium, where L&H was located, to provide a place for companies pursuing what L&H referred to as "SAIL" (sometimes written as "S.AI.L.") technologies (speech("S"), artificial intelligence("AI"), language("L")) to work closely with each other and to receive from L&H-related entities various education, infrastructure and other support.  Using the sailing imagery evoked by the acronym S.AI.L., Flanders Language

Valley later became known as S.AI.L. Port Flanders Language Valley.  L&H envisioned developing similar S.AI.L. Ports around the world.

106.   This concept, a high-tech "incubator" used to get fledging companies off the ground, was neither invented by, nor unique to L&H, but L&H pursued the concept with Messianic zeal.   Through a series of related and interrelated entities with confusingly similar and often-changing names, L&H proceeded to invest tens of millions of dollars in these start-up companies, the money initially coming directly from Lernout and Hauspie personally (using their interest in L&H), and their affiliates, but later it was supplemented by borrowings, private placements and public issuance of stock.  In many cases, the investments were made in what L&H referred to as their "Strategic Partners," companies developing specific applications using L&H technology, some of which were also LDCs or CLDCs.

107.   This collection of incubator investment companies and their affiliates were a chief method used to perpetuate L&H's massive fraud.  L&H had a powerful motive. L&H was trailing competitors in developing voice recognition software and, as Lernout was once quoted starting in a 1999 interview with *The Wall Street Journal*, "If we didn't catch up, we were cooked.  But we couldn't catch up, because we didn't have enough R&D dollars."  As set forth below, fraudulent accounting methods however, provided those needed dollars.

108.   But, as L&H and its officers, directors, and professionals knew, the key to raising R&D dollars lay in the performance of L&H stock, but raising and spending R&D dollars would do nothing to help L&H's stock.  What L&H needed was revenues. Accordingly, a scheme was developed and refined to transform R&D expenditures into

fictional "revenues" and the growth in "revenues" could inflate L&H stock. That inflated stock could then be used to raise more money.

### Dictation Consortium and BTG: The Prototypes for the Strategic Partners' Fraud

109.   The "template" for using the "Strategic Partners" as a vehicle for fraud appears in L&H's earlier transactions with two entities, the Dictation Consortium N.V. ("Dictation") and the Brussels Translation Group ("BTG"). Dictation was first, and its formation shortly preceded the arrivals of Defendants Bastiaens as L&H's President.

110.   In 1995, Defendant FLV Fund held a 49% stake in the Belgian unit of Defendant Bastiaens' former company, Quarterdeck, which also became L&H's largest customer that year, accounting for 30% of revenue. In 1996, when Quarterdeck imploded due to a series of disastrous acquisitions and Bastiaens was out of a job, he quickly found a new home at L&H. Almost immediately after Bastiaens arrived at L&H, L&H announced that Dictation, "a private company in which the FLV Fund has an investment," had licensed L&H software in order to develop L&H's continuous automated speech recognition technology.

111.   In fact, FLV Fund, however, had more than a mere "investment" in Dictation. It had a controlling interest. According to a December 7, 2000 article in *The Wall Street Journal*, as of December 31, 1996, FLV Fund and FLV Management owned 61% of Dictation Consortium. On information and belief, L&H employees created Dictation's business plan and found all investors. In effect, L&H created and totally controlled Dictation, which was merely a vehicle to disguise loans to L&H from FLV Fund, FLV Fund Management, and others, as L&H "revenues." Significantly, these revenues were frequently created at the end of a final quarter or financial year.

Nonetheless, the revenue produced by the Agreement was reflected on Dictaphone's financial statement.  Dictation, like L&H and the FLV Fund, also retained KPMG Belgium as its outside auditors.  Prior to its acquisition by L&H in May 1998, Dictation was headed by Defendant Hardeman as Chairman of its Board of Directors.

112.   The other "owners" of Dictation (in effect, lenders to L&H) were private Luxembourg-based entities, Syllabus, S.A., Cevennes, S.A., and its apparent successor-in-interest, Mont Regal Industries S.A.  Cevennes' Directors, Frans van Deun and Johan Van der Windt would later resurface in connection with other LDCs and CLDCs.

113.   Within one day after its creation in September 1996, Dictation entered into a $5 million agreement with L&H to license certain speech to text technology, including the right to develop applications from the technology.  The revenues generated by that license were reflected in L&H's third quarter 1996 results.

114.   Within three months of the initial license, Dictation entered into a second agreement with L&H whereby Dictation agreed to pay L&H $25 million to develop software using the technology licensed to Dictation.  The agreement gave L&H the "option" to buy back the rights to the license and any software developed.

115.   In effect, Lernout and Hauspie had, through their affiliates, raised $25-$30 million to invest in L&H, and L&H itself would develop software and ultimately own the software it developed, after repaying the investment.  Had the transaction been treated as the loans that they were, there would certainly have been nothing improper about it.  But, instead of recording the transaction honestly, L&H, FLV Fund, FLV Management, Dictation and KPMG created sham transactions, treating the license fee and the

software development payments as "revenues" instead of the loans they actually were. Loans would have had no impact on L&H's profits and losses, but revenues certainly did.

116.    The arrangement had an enormous impact on L&H's financial statements. Dictation provided L&H with $26.6 million in revenue over the next two years, approximately one-quarter of its 1996 sales and 19% of 1997 sales. Dictation was L&H's largest customer in 1996 and 1997.

117.    In May 1998, L&H announced that it had obtained the software developed by Dictation by purchasing the company for $26.9 million (although a subsequent SEC Complaint stated the purchase price was actually $43.3 million), most of which was 's "goodwill" and could thus be amortized over seven years. Through this ne, L&H effectively used its own money to pay itself, thereby creating fictitious revenues, and took R&D expenses that should all have been expensed in 1996 and 1997 completely out of those years and, instead, spread those expenses over the seven-year period starting in 1998.

118.    In 1997, L&H entered into a similar arrangement with a company called Brussels Translation Group ("BTG"). BTG allegedly was formed on March 13, 1997 by "anonymous venture capitalists." According to a December 7, 2000 article in *The Wall Street Journal*, in public filings BTG's ownership can only be traced as far as a Luxembourg company through to two entities based in the Channel Islands. Upon information and belief, BTG was founded with the assistance of a $17 million credit line extended by Artesia Bank, which was L&H's primary bank in its early years. The very day of its formation, BTG entered into a $3.5 million licensing agreement with L&H

36

under which, according to L&H's 1998 Annual Report on Form 20-F, L&H granted BTG an exclusive license to use L&H speed processing technology and associated databases to develop an internet translation service. That license agreement was amended in May 1997 to increase the license fee to $5 million, and, at the same time, BTG contracted to pay L&H $30 million for "engineering services." The services ostensibly provided to BTG were engineering services and functions that ordinarily would have been performed by L&H and otherwise would have been expensed as research and development costs of L&H.

119.    BTG also had a significant impact on L&H's financial statements. L&H recognized $15 million in revenue in 1997 from its BTG transactions (or 15% of its reported revenue), and $18 million in 1998 (8.5% of reported revenue). L&H reported another $2 million in revenue from BTG in 1999. Thus, in 1997, revenue from Dictation and BTG combined represented 36% of L&H's total reported revenue.

120.    In June 1999, L&H acquired BTG for approximately $42 million in cash plus the assumption of BTG's $17 million start-up debt.

121.    Although critics charged that L&H earnings were inflated by the Dictation and BTG transactions because those companies were related to L&H, L&H falsely maintained that, except for the FLV Fund involvement in Dictation, the companies were owned by unaffiliated "private investors" whom L&H refused to identify.

122.    As noted in the SEC's October 2002 Complaint, however, the so-called revenues derived from Dictation and BTG were disguised loans and not sales or service contracts. Thus, revenue derived from these transactions should not have been recognized under GAAP. This resulted in a misstatement of revenues from Dictation in

1996 ($7.5 million or 31% overstatement) and in 1997 ($18.9 million or 23% overstatement) and a misstatement of revenues from BTG in 1997 ($15 million or 18%), in 1998 ($18 million or 9%) and in 1999 ($2 million or 1%).

123.    As with the Dictation transaction, L&H was able to obtain a product without deducting the research and development expense. Instead, L&H was able to record nearly $35 million in revenues in the form of engineering and licensing fees and then, when it purchased BTG, L&H capitalized the acquisition price, turning what would normally be an expense into an asset.

124.    The actual investors in BTG were never disclosed by L&H. Indeed, it was once reported that when questioned about the BTG investors by Lehman Brothers, Lernout blurted out (rather prophetically): "I will go to jail before I say anything." Although public filings did not reveal much about BTG's origins, according to an internal L&H e-mail from Christophe Lammar to Bastiaens, Hauspie, Lernout, Willaert, Dammekens and in-house lawyer, De Schrijver dated June 23, 1999, the investors in BTG were a Luxembourg registered holding company, Cevennes S.A., which was also an owner of Dictation Consortium. L&H e-mails regarding "management" meetings prior to its acquisition by L&H also show that Stephan Bodenkamp and Johan Van der Windt (later to be shareholders and/or officers of certain other LDCs) were also involved in BTG, apparently acting for Cevennes. Frans van Deun (possibly through his company van Deun Consult) appears to have a minor ownership position, possibly as his "fee" for services in setting up BTG. On information and belief, however, the original BTG investors were really effectively lending money to L&H for a guaranteed return and not investing at all.

125.   Defendants KPMG Belgium, SG Cowen and Behets were directly involved in the BTG scheme.  According to a February 9, 2001 article in the Belgium newspaper *De Standard,* Defendant Behets, then a partner at Defendant KPMG Belgium and L&H's chief auditor, and Defendant SG Cowen assisted with obtaining investors for BTG. Behets attended a meeting in Boston between May 28 and 30, 1997 with a potential investor along with Messrs. Hauspie and Lernout (as well as others) to persuade the investor to invest $15 million in BTG:

> Behets helped Jo Lernout, Pol Hauspie, Gaston Bastiaens (then CEO), Ellen Spooren (pr-manager) and Carl Dammekens (CFP) in giving the company more credibility.  He was at the time both head of the audit committee controlling L&H's filing and chairman of the Institute of Company Auditors.

126.   SG Cowen also assisted BTG's fund raising efforts through a dinner meeting with the potential investor during the May 28-30, 1997 meeting.

**The Birth of the LDC/CLDC Project:  The 20 Languages Fund**

127.   Having milked all the fraudulent revenue it could from Dictation and BTG, and inspired by the apparent success of the Dictation and BTG schemes, L&H decided to "create" a whole stable of new "customers" in the Dictation/BTG mold, the so-called "Strategic Partners" or LDCs and CLDCs.

128.   Thus, starting in 1998, L&H, acting through its various related companies, FLV Fund, FLV Fund Management, Mercator, GIMV, and through individual Defendants Verbeke. Hardeman, Snauwaert and van Acker, among others, embarked upon a plan to create a number of start-up language development companies to generate phony licensing revenues and absorb R&D costs.  L&H publicly touted its allegedly purely contractual relationships with the LDCs and CLDCs as a means of creating new

39

markets for L&H technology as the LDCS and CLDCs were supposedly developing speech recognition and translation software applicable to a variety of languages.

129.  The L&H Defendants affirmatively misrepresented that such strategic partners were "unaffiliated with us [L&H]" (1998 20-F at p.22.).  Moreover, the L&H Defendants also misrepresented that "we [L&H] generally have limited or no control over the operations of our strategic ventures, including with respect to the amount and timing of resources that our strategic partners devote to these ventures."  *Id.* at 68.  The reality was quite the opposite.

130.  In reality, the LDCs and CLDCs were shell companies with few, if any, employees, thoroughly dependent on L&H personnel, and with no significant product of their own.  The LDCS and CLDCs were structured as private companies in such a fashion as to mask their L&H affiliation and true purpose.

131.  All or most of the LDCs/CLDCs were actually centrally controlled from Belgium.  An L&H internal memorandum dated April 19, 1999 from Steven Leys, L&H LDC Project Manager to Marc De Deygere with a copy to Andre Schenk regarding training facilities for LDCs, notes that a "number of LDCs are being founded. . . . L&H will play an important role in setting up and supervising the developments.  Apart from the managerial level, there will also be direct participation in the technical developments. . ."

132.  According to another internal L&H memorandum dated March 23, 1999 from Steven Leys (as translated), Defendant Snauwaert was the "fundraiser and fund manager" with respect to the LDCs.  Snauwaert was also "CEO of the service company LDS (Language Development Service) that will grant supporting services to the LDC

40

enterprises.  He will be substantially involved in the organizational realisation and additionally the technical follow-through of most LDC enterprises."

133.  Another document entitled "Minutes Meeting March 20, 2000 in Ostend," L&H participants discussing the LDC "franchise" program stated that "[o]rganizing activities in the LDCs, CLDCs has been given top priority.  We need to be able to show activities in the LDC-CLDC before the end of Q2.  One possible indication to show activities would be to hire have [sic] 3 persons available per LDC before the end of Q2.  These persons will be recruited on L&H payroll . . ."

134.  Yet another e-mail dated May 22, 2000 from Steven Leys to a distribution list at L&H speaks of hiring people for the listed languages "on the payroll of L&H Belgium".  The plan was apparently to have the employees live and work in Belgium for approximately two years and then move to Singapore.

135.  Each of the Related-Party Defendants played an integral part to play in the scheme.  Defendants FLV Fund, FLV Fund Management, Mercator, and their related companies, LDF, LIC and Velstra among others, directly and indirectly invested in numerous start-up companies that licensed software from L&H.  Defendants GIMV, Verbeke and van Acker were directly involved in the scheme through their control of FLV Fund, Mercator, and the related companies.

136.  One of the first groups of LDCs formed pursuant to this scheme was that ostensibly founded by a company called Radial N.V., allegedly managed by a former banker, Frans van Deun, who not so coincidentally had been a Director of one of the investors in Dictation, Cevennes, and through Cevennes and his own company, as investor in BTG.  Radial, a company located at Arendonk, Belgium, was the alleged

41

initial owner of three LDCs, The Bahassa Development Company, The Slavic Development Company, and The Farsi Development Company, all of which shared a common address and common officers (van Deun and Stephan Bodenkamp). Upon information and belief, Radial set these three companies up in late 1998.

137. According to an L&H document, apparently the minutes of an "LDC Project Meeting at Wemmel on Dec. 18, 1998", van Deun was the Managing Director of Radial Belgium and Stephan Bodenkamp was its Director and Chief Technology Officer. Bodenkamp later claimed that, in fact, he occupied only an "honorary post."

138. According to investigative journalism by Belgian newspaper *De Standaard*, Bodenkamp, whose real name was Christop Kionowski, was an agent of the German intelligence service, BND, and was "technical director "of the language technology department within the agency. Bodenkamp, who was later suspended from the BND, has been sentenced by a German Court for forgery of a contract with the German company Polygenesys, another technology company.

139. According to the December 18, 1998 LDC Project Meeting minutes, Radial, the ostensible owner of the Bahassa, Slavic, and Farsi LDCs, was to act as "coordinator" and "report directly to the L&H management." The minutes further noted that Radial would prepare a financial report "for the investors" and, at a subsequent meeting in Prag[Prague], "LDC and Radial will be acting as one company."

140. The Farsi LDC was transferred at some point in 1999 from Radial to W.H. Operations, a company whose address was listed as "c/o" a management service in the Channel Islands.

141.   In December 1999, "ownership" of the Bahassa and Slavic LDCs was transferred from Radial to Velstra.  Velstra, which was to become the ostensible "owner" of the Bahassa and Slavic LDCs and, as set forth below, numerous other LDCs and CLDCs, was a shell company with no staff that was registered in Singapore.  As set forth below, Velstra has multiple connections to the L&H Defendants and the Related-Party Defendants.

142.   Velstra was wholly owned by LDF, which was itself an investment firm virtually wholly-owned by Defendant Mercator (96.7%).  Velstra listed Defendant Snauwaert, manager of Mercator-owned LDF, as its agent.  Snauwaert, according to a March 23, 1999 internal L&H memorandum from Steven Leys, L&H Project Manager for the LDCs, a "key figure within the LDC structure," Snauwaert was apparently also a Director of Velstra, and Defendant LDF was Velstra's only known shareholder.  On information and belief, Snauwaert reported directly to Pol Hauspie and also to Verbeke, as Chair of LDF's controlling shareholder.

143.   Lebanese multi-millionaire Harout Katchadurian ("Katchadurian") was the alleged source of funding for the LDCs while under Velstra "control."  As reported in a March 13, 2003 article in *The Straits Times* (Singapore), court documents filed by Katchadurian in proceedings relating to the liquidation of Velstra state that Katchadurian was introduced to Defendants Lernout, Hauspie and Willaert in 1999 by a "third party" for the purpose of discussing a $30 million loan.  Ultimately, the loan was increased to $36 million, with total interest of $5.99 million.

144.   Although the discussions regarding the loan took place between Katchadurian and L&H Defendants Hauspie, Lernout and Willaert, the loan agreement

43