itself was signed by Katchadurian, as the lender, and Defendant Snauwaert as "Director" of Velstra, as the borrower. Within hours after Katchadurian transferred the $36 million to a bank account held in the name of Velstra, Snauwaert instructed the bank to pay out the entire sum to four unidentified Belgian companies.

145. $5.08 million was paid by Velstra to Mercator. According to the court documents, Defendant Mercator claimed to have loaned $10 million to LDF, and "in settlement" of the loan to LDF, Velstra paid Mercator $5.08 million. Velstra's liquidators apparently do not buy that story and are attempting to recover the $5.08 million.

146. Another LDC, referred to in the Audit Committee Report as "Capital Union" (Arabic and Arabic dialects), was ostensibly owned by Capital Union, an entity from Dubai, but, in reality, Capital Union was acting as an investment banker to find a true investor (they never did), and L&H committed to repaying Capital Union if an investor could not be found.

147. Yet another group of four LDCs was ostensibly founded by LIC, apparently at the behest of L&H. LIC's CEO, Defendant Hardeman, sat on the Boards of Directors of Defendants FLV Fund and FLV Fund Management. These four Belgian-based LDCs, The Greek Development Company, The Hungarian Development Company, The Polish Development Company and The Czech Development Company, originally listed Hardeman as their contact and van Deun as one of the known shareholders. All four were also ultimately transferred to Velstra and also had LDF as their only known shareholder, Snauwaert as their only agent, and Katchadurian as their only alleged source of funding.

148.   Defendant Mercator's subsidiary, LDF, also ostensibly founded at least five LDCs of its own:  Shangra Pte Ltd. (Vietnamese), Vanesto Pte Ltd. (URDU), Vaciena Pte Ltd. (Malay), Lavenia Pte Ltd. (Armenian), and Rodeon Pte Ltd. (Taiwanese)  Defendant LDF was the only known shareholder of these LDCs and, again, Snauwaert was the registered agent.  These five LDCs also were transferred to Velstra, with the same registered address in Singapore, the same registered agent (Snauwaert), the same shareholder (LDF), and same funding source (Katchadurian) as the prior six.

149.   Three other LDCs, The Thai Development Company, The Tamil Development Company, and the Hindu Development Company, were apparently established    directly    by    Snauwaert    and    ultimately    placed    under    the Velstra/LDF/Snauwaert/Katchadurian umbrella.   The Turkish Development Company was also apparently established by Snauwaert and later transferred (like the Farsi LDC) to W.H. Operations.

150.   Defendant Velstra itself allegedly founded three Cross Language Development Companies (CLDCs), Lupeni Pte Ltd., Jelgava Pte Ltd., and Harrisca Pte Ltd., with the help of the "usual suspects" -- Snauwaert as agent, LDF as shareholder, and Katchadurian as funding source.

151.   Defendant FLV Fund established four CLDCs in September 1999, according to a contract of sale dated December 24, 1999, apparently prepared by Defendant Verbeke's firm.  The Mandarin Calc Pte Ltd., formerly known as Salfas Trading Pte Ltd., The Japanese Calc Pte Ltd., formerly known as Duranzo Trading Pte Ltd., The Russian Calc Pte Ltd., formerly known as Baleston Pte Ltd., and The Spanish

45

Calc Pte Ltd., formerly known as Senegal Pte Ltd. Each of these four CLDCs was incorporated in Singapore under the original name in early September 1999. FLV Fund purchased 100% of the shares of each on September 22, 1999, and each had its corporate name changed on October 22, 1999. Philip Vermeulen was a Director of each.

152. Apparently to disguise the transactions with these CLDCs with the intention of allowing L&H to deny that the transactions with them were related transactions, all four of these CLDCs were sold to Seoul-based Human Interface Worldwide Co. Ltd. ("HI World") on or about December 24, 1999, for $11 million. The contract of sale recites that FLV Fund had advanced $3 million each to Salfas and Duranzo, and $2 million each to Baleston and Senegal. These funds from FLV had been used by the CLDCs to pay debts they owed to L&H for the rights to license L&H software.

153. HI World was itself a start-up which, as set forth below, would also play a key role in L&H's Korea frauds. According to a report by PriceWaterhouseCoopers ("PwC"), HI World was incorporated and capitalized on December 9, 1999 – only about two weeks before it allegedly purchased the four CLDCs from FLV Fund, it was incorporated by a well-known Korean fortune teller, with no prior business experience, named C.H. Lee, who invested a mere $90,000 in the venture. Even more curious is the fact that on December 8, 1999, one day before it even existed, HI World allegedly signed a license agreement with L&H which included a prepaid license fee of $19 million and a maintenance/development fee of $2 million. The agreement was later amended on January 10, 2000 to provide that the license fee and maintenance fees

were non-refundable. An additional license agreement between HI World and L&H for $5 million was allegedly entered into on March 29, 2000. As set forth more fully below, the Audit Committee Report would later find numerous deceptive accounting misstatements with respect to HI World. HI World's entire existence depended on License Agreements with L&H Korea, which required it to make tens of millions of dollars of payments it could not afford. KPMG approved the treatment of the sale as eliminating the "related party" problems. However, FLV Fund never received _any_ of the $11 million from HI World, and in November 2000, accountants and lawyers hired by the Audit Committee characterized the sale as still "pending." In November 2000, L&H Korea acquired 80% of HI World for approximately $6.5 million, bringing formal ownership of the CLDCs back to L&H.

154.   An FLV Fund Prospectus dated from May 2000 regarding an offering of up to $150 million does not list any of these CLDCs as FLV Fund investments for 1999, even though, according to the December 24, 1999 contract of sale, they were bought by FLV Fund in September 1999 and sold in December of that year for an ostensible $1 million profit. Defendant Verbeke's firm was counsel to the FLV Fund and, on information and belief, prepared the Prospectus, the contract of sale, and the documentation of the FLV Fund September 1999 purchase.

155.   In practice, the LDCs, CLDCs and their founding companies and owners acted as clearly related, if not one company. There was little effort made to conceal the fact that these supposed independent companies were merely shells who did not and could not pay their own bills. Nor was this method of operation restricted to LDCs and CLDCs. So-called Intelligent Agent Companies ("IACs"), which took L&H technology

and developed specific products which could run using language recognition technology with various languages, followed much the same pattern of L&H domination, high "license" and "service" fees disguising what in reality were loans, and interconnected operations. At least four IACs (I-Merge, I-Mail, I-News and I-Office) were founded by Nacom, a Luxemburg company apparently owned by Johan Van der Windt of Cevennes. They were all later jointly owned by Nacom and FLV Fund. Two IACs, I-Medical and I-Travel, were apparently controlled directly by Snauwaert. At least one, 411.com, was owned by Mercator subsidiary LDF.

156. A June 30, 2000 KPMG document entitled "Lernout & Hauspie Speech Products N.V. and subsidiaries, 30 June 2000, Matters for follow-up by Management" states that 411.com, a "customer" of L&H Singapore, made payments to L&H on behalf of "customers" Bahassa and Slavic, Velstra "owned" LDCs.

157. According to an e-mail dated June 29, 2000 from Jocelyn Luo to Jacques Vanloo and LDS, KPMG Singapore had concerns about the fact that the $4.5 million in receipts that L&H received from Velstra in December 1999 was actually paying for Lupeni, Jelgava and Harrisca CLDC contracts.

158. There was little concern for maintaining corporate formalities, especially with regard to payment of obligations on L&H license agreements. According to a January 29, 2000 e-mail from McLamb of KPMG US to Van Aerde and Huysman of KPMG Belgium and Dammekens, a single payment of $25 million was paid out of a single bank account to L&H Korea for amounts owed to L&H by a number of LDCs. That payment was made from LDS to L&H Korea according to an internal L&H e-mail dated January 10, 2000 from Frederik Deschodt (a former KPMG auditor who moved to

48

L&H in August 1999) to Defendant Dammekens, and Henry Oh and Sam Cho of L&H Korea.

**The LDCs/CLDCs Pay Off**

159.    While the behind the scenes activity regarding the foundation and management of the LDCs and CLDCs was not visible to the investing public, the handsome revenues purportedly derived from these "Strategic Partners" could not be missed. The thirty or so LDCs/CLDCs together accounted for 25% of L&H revenue 1999 and 10% of L&H revenue in 1998. Indeed, in the period of 1998 to 1999, L&H reported revenue from the LDCs/CLDCs of $110.5 million, much of which, as set forth more fully below was either entirely fictitious or, as with BTG and Dictation, disguised loans and not revenues at all.

160.    According to a Oct. 26, 2000 article in *The Wall Street Journal*, although L&H booked $3 million in license payments from four LDCs in late 1998, the July Belgian Central Bank filings of the four start-ups covering the period from December 4, 1998, when these LDCS were founded, until December 31, 1999 showed no expenditures close to that number, nor any assets as large as the purported value of the licenses. Indeed, the financial statements filed by these four companies in July 2000 with the Belgian Central Bank showed total assets valued at less than $1.5 million, or half the value of the supposed license. They also showed no write-offs large enough to account for the depreciation nor any expenditures greater than $14,246.

161.    The Radial "founded" LDCs, along with four LDCs allegedly set up by LIC (all but one of which was ultimately owned by Velstra), collectively paid L&H $21 million during the course of 1998 alone. As reported in the April 24, 2001 Global News Wire

(abstracted from *L'Echo*), Artesia Bank financed L&H first LDCs such as these, and half of the $21 million "paid" to L&H was financed by credit bridges granted by Artesia to each of the seven LDCS set up in 1998.

162.   The related-party nature of many of the LDC/CLDC transactions were actively concealed form the public.  In L&H's 1998 20-F, for example, L&H represented that revenues derived from related party transactions for 1998 was approximately $34.8 million, the majority of which was attributed to Microsoft ($25.4 million).  In L&H's 1999 10–K, L&H claimed that revenues from related parties for 1999 totaled approximately $30,933,299, of which $30.9 million or 96% was attributed to Microsoft.   In fact, according to the October 2002 SEC complaint, actual related-party revenues from LDCs alone for 1998 and 1999 were at least $100 million.

163.   As Bryan Cave LLP ("Bryan Cave") and Arthur Andersen LLP ("AA") (collectively, the Audit Committee Advisors") later noted in their November 20, 2000 report to the Audit Committee of the Board of directors of L&H ("Audit Committee Report"), even if the LDCs were not related parties -- "[t]he arrangement with the LDCs is, in substance, a funded R&D arrangement with each LDC, where the investors contribute cash to L&H to (continue to) pursue the development of the new languages."  As a result, the revenue recognition reported by L&H and approved by KPMG was wrong.  "[A]ccounting for the LDCs as a funded joint venture arrangement would result in revenue deferred and recognized as the work is performed." (*Id.*)  Critically, the Audit Committee Advisors stated that "[i]f the investors are related parties, the relevant accounting literature presumes that the related party investors will be repaid and the funded amounts are recognized a liability." (Audit Committee Report at p.10).

164. The misuse of the LDC/CLDC model was not the result of ignorance but was intentional and undertaken with knowledge of the relevant accounting and legal issues. As noted by Dan Blake (an employee of LHIC and Defendant SG Cowen) in a memo dated May 13, 1999 to Denys (an employee of LHIC and formerly with Defendant Verbeke's firm Loeff Claeys), and Defendant Vanderhoydonck (of Defendant LHIC and Director of L&H), and later forwarded to Lernout and Hauspie, "licenses in two categories are being orchestrated by Jo and Pol to fill the gap with investor expectations. These are in 'language projects' and in 'agents.'" Blake warned about the danger of the "quality of earnings" issues with these arrangements suggesting several "imperatives." Blake urged L&H to "exercise the utmost diligence to ensure that any actions and activities that are necessary to support revenue recognition be undertaken." The "investor expectations" of higher earnings were to be satisfied by "revenues" recognized from the LDCs. Blake then suggested that they seek advice from investment bankers, including his, SG Cowen.

165. The Related-Party Defendants' investments in the "start-up" companies, which licensed software from L&H, and FLV Fund's other financial dealings were, therefore, calculated to assist L&H's efforts to misleadingly inflate its revenues. In addition, the Related-Party Defendants, including FLV Fund, FLV Fund Management, Mercator, Snauwaert, Verbeke, Hardeman, Vanderhoydonck, SG Cowen, KPMG Belgium, Behets, and McLamb acted in concert with L&H and the start-up companies to facilitate improper accounting treatment for these transactions, as described in more detail below.

166.    KPMG and Verbeke and the Verbeke Firm were instrumental in the structuring of the various companies within "Jo & Pol Inc.," as well as individual deals. For example, in a series of e-mails dated between November 9 and 10, 1999 among Patrick Smets, Phillipe Hamer and David Benoit of the Verbeke Firm, for L&H, Bastiaens, Vanderhoydonck, Hauspie, Dammekens, Denys of LHIC (formerly of the Verbeke Firm) and Chantal Mestdagh of LHIC (formerly of KPMG) and Paul-Ives Bernard (formerly of KPMG), KPMG and Verbeke firm members were actively involved in debating various pros and cons of a proposed transaction between LHIC and L&H.

167.    L&H's financial statements and other disclosures misleadingly omitted the relationships between the "start-up" companies reported as customers of L&H and the FLV Fund or Mercator.  L&H affirmatively and falsely represented that these "licensees" were "unaffiliated customers" and that 1998 revenues from companies funded by FLV Fund, S.AI.L, LHIC, or other related parties, *de minimis*.  FLV Fund, Mercator, LHIC and Verbeke were aware of these inaccurate disclosures and did nothing to correct them.

**The Acquisition of Bumil and the Korean Receivables Fraud**

168.    In a June 25, 1999 press release, L&H announced that "it [wa]s the sole provider of speech recognition technology for the ASR Stock Quote Server, Korea's largest telephone based automated stock quote and trading service" through an application "developed by L&H business partner Bumil Information and Communications Co. Ltd." ("Bumil").  The press release stated that Bumil "is a leading systems integrator developing customized applications for the telecommunications industry.  The company has been an L&H licensee and joint development partner since March of 1997.  Its

customers include major Korean telecommunications providers, LG Securities and other major corporations in Korea."

169.   On August 31, 1999, L&H announced "that its technology is being used to speech-enable the automated attendant system used by Hanvit Bank, Korea's largest commercial banking institution. Deployment of the system — Korea's first commercially available auto attendant program — represents L&H's growing presence in the Korean telecommunications industry and enhances its leadership position in the market overall. The L&H based system is one of several telecommunications applications recently developed by L&H's business partner Bumil Information & Communications Co. Ltd. (BIC) and sold to leading Korean businesses."

170.   What the L&H press releases did not reveal was that Bumil apparently could not afford to pay L&H for its license fees. The initial solution proposed was to convert the receivable into L&H stock. However, a more ambitious acquisition was decided upon.

171.   On September 13, 1999, L&H announced that it had expanded its Pacific Rim presence by acquiring Bumil:

> Bumil has been an L&H business partner and licensee since 1997 and, during that time, has deployed L&H's speech technology in several highly visible, strategic telecommunications applications for leading Korean companies. Most recently, Bumil used L&H's speech recognition to speech-enable an automated attendant system it developed for Hanvit Bank, Korea's largest commercial banking institution. Bumil also recently used L&H's speech recognition and text to speech technology to develop the ASR Stock Quote Server, Koreas largest telephone based automated stock quote and trading service.
>
> The acquisition of Bumil builds on L&H's already significant presence and resources in the Asia [sic] and helps position it for the leadership position there. L&H's existing Asia Pacific customer base includes Samsung, LG

Semicon, NEC, Hitachi, Sega, Inventec, Group Sense Limited, Pioneer, Alpine and Fuji-Xerox, among others. It has offices in Tokyo, Beijing, Hong Kong, Taipei and Singapore and Sydney Australia. L&H's speech offerings for the Asian Pacific market include the world's first' PC-based Cantonese continuous speech recognition product as well as ASR, TTS and machine translation support for Korean, Mandarin and Japanese.

"As we pursue our long-term objectives, we continue to receive validation that our growth strategy is sound — particularly for the worldwide telecommunications industry," said Jo Lernout, L&H co-founder and co-chairman. "Our recent successes with Bumil, as well as industry analysts' predictions regarding the rapidly increasing demand for speech enabled applications, underscores the outstanding growth opportunities that this acquisition helps bring to us."

172.    The true value of the Bumil acquisition was as the engine for a massive amount of fraud from the third quarter of 1999 through at least June 2000. Bumil, later operating as L&H Korea, contributed $13.5 million in revenues in the fourth quarter of 1999, largely as a result of $11 million received in "revenues," although no cash changed hands, from two unknown start-up companies, Voice Tech and International Business Computers, which signed these lucrative contracts on September 30, 1999. Prior to that time, Bumil had averaged total annual revenues of only $12 million, and profits of a fraction of that. For the first eight months of 1999, their profit was only $500,000.

173.    By the year 2000, Bumil/L&H Korea revenue projections, which had grown in 1999 to an astonishingly $50 million, were further increased to a literally unbelievable $200 million, nearly 20 times the revenues immediately proceeding the Merger.

174.    As set forth in detail above, and in further detail below, in reality these revenues were fictional, resulting from an elaborate fraudulent scheme where companies with inadequate or non-existent assets signed contracts to pay millions of dollars of license fees they could not afford. L&H booked the unpaid and unpayable

54

fees as revenues.  L&H then created the appearance of receiving cash through fraudulent "factoring" agreements with several Korean banks which were, in reality, loans fully secured by the loaned funds which were kept in restricted accounts in L&H's name, but which L&H had no right to draw against.

175.    Other methods of inflating revenues were used in Korea as well.  FLV Fund purportedly identified Korea as a promising market for technology investments and established the FLV Fund Korea with a planned capitalization of $30 million.  L&H Korea supposedly assisted in the "set-up" of the FLV Fund Korea.  In fact, FLV Fund Korea was an L&H dominated affiliate, including an L&H employee as at least one director, a HI World employee as another director, and L&H employee Sang Ki Oh as its auditor.  The FLV Fund pledged $30 million of the Korean unit's money as collateral for a loan related to L&H Korea or its chief executive officer Seo, who used that money to fund other payments to L&H by allegedly "independent" start-ups who then paid L&H or L&H Korea "License Fees."

176.    All of these fraudulent practices were invisible to the outside world. Instead, L&H announcements were intended to create an appearance of an explosively growing Korean and Asian business.  In a December 28, 1999 press release, L&H "announced several deals with customers in the telecommunications, enterprise solutions and embedded technologies markets . . . The agreements, signed with industry-leading companies in Asia and several companies in Europe, follow recently announced deals in the US."

177.  In the press release, L&H cited:

strong demand for its speech and language technologies and solutions in the Asia Pacific region, especially South Korea.  Among the solutions provided are dialogue systems that provide customers with a fast, simple and convenient way to access information, as well as embedded speech engines and language technologies.  The signed contracts include:

- Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities and Daewoo Securities, along with more than 10 other securities companies, have selected L&H to develop client server solutions for on-line trading and automated dialogue systems that allow securities customers to receive stock quotes and trade.

        *  *  *  *

- LG Electronics has agreed to use L&H's TTS technologies.

    Intelligent Communications has agreed to use L&H's TTS technologies for use in e-mail reading and unified messaging applications.

- SofTech Advantage expanded their agreement with L&H to utilize L&H RealSpeak for their unified messaging platform for the Philippines.

178.  A January 10, 2000 press release repeated that "the company also recently announced more than a dozen new contracts with telecommunications developers in Korea and elsewhere in the Pacific Rim and Europe, further readying L&H's Enterprise and Telephony Solutions business group for separate legal entity status.  Contracts were signed . . . with Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities, Daewoo Securities, Delfi, GenSoft, EPC Asia and NeoTelecom, among others."

179.  In a January 31, 2000 press release, L&H announced that "Hung Chang Co., Ltd. has signed a multi-year agreement under which it will license L&H's speech

56

technologies in multiple languages to develop speaker verification and reservation applications.  The agreement with Hung Chang, a Seoul-based telecommunications technology leader, adds to a long list of worldwide telecommunications industry contracts recently signed by L&H and furthers the company's strategy to create a separate entity for Enterprise and Telephony Solutions."  In the press release, Bastiaens was quoted as stating that "[o]ur ever-increasing successes in the Korean market, particularly within the telecommunications sector, are the result of a very well developed and implemented strategy to build a worldwide enterprise and telephony solutions market presence."

180.   In a February 9, 2000 press release and in its Form 6K filed with the SEC on or about February 11, 2000, L&H announced that for the fourth quarter of 1999, L&H's total revenues were $110 million, or a 43.5% increase in the reported revenue of $76.7 million for the fourth quarter of 1998."  In its February 9, 2000 press release, L&H particularly showcased fourth quarter 1999 growth in the Pacific Rim area:

> The demand for speech-enabled applications continued to grow in the Pacific Rim and L&H technologies were increasingly popular in the region. South Korea and other Pac Rim-based developers who plan to build applications employing L&H's realSpeak, ASR, TTS and dialogue systems solutions include:  Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities and Daewoo Securities, EPC Asia, IBCC (International Business Computer Co., Ltd.), NeoTelecom, LG Electronic, Intelligent Communications, Softech Advantage, and SofTel Telecommunications Pte. Limited . . . . L&H enhanced its ability to develop telephony solutions, increased its presence in Korea and continued to expand its telecommunications leadership by acquiring resources that included Bumil Information & Communications, Ltd. of Korea and others.

181.   In reality, the carefully crafted image of explosively growing Asian business was a complete sham, and all of the L&H Defendants, KPMG, SG Cowen and Verbeke participated in that sham.

**The Negotiation of the Merger of Dictaphone & L&H**

182.   L&H's public announcements made it appear as if it were moving from strength to greater strength.  Its financial statements, audited annually by KPMG and, in fact, prepared and approved by KPMG on a quarterly or more frequent basis, showed $100 million per year in annual revenue growth and a turn from losses into explosive profits.  SG Cowen's "research" reports were ecstatically enthusiastic.  L&H stock was high and moving up.  On information and belief, on the recommendation of SG Cowen, L&H decided to use the value of its fraudulently inflated stock to acquire two of its chief American competitors.

183.   In early 2000, L&H and SG Cowen approached Dictaphone to discuss the possibility of acquiring Dictaphone — one of its major competitors in the "speech and language applications" sector — as a key step toward achieving its announced growth plan.  At that time, Defendant Stonington Fund was the owner of approximately 96% of the authorized and outstanding stock of Dictaphone.

184.   At the time, Dictaphone was known worldwide for its medical record workflow systems and its transcription business.  According to industry analysts, as many as 400,000 physicians in the United States used Dictaphone to dictate 100,000 hours of dictation each day for clinical record processing.

185.   Dictaphone's healthcare market assets included its 5,000 medical industry customers worldwide, its 100 sales representatives, its strong national network of technical service representatives, its experienced executive management team, and its broad range of solutions for medical industry dictation and data management.  In 1999, Dictaphone had healthcare market revenues of $130 million.

186.   Acquisition of Dictaphone, recognized by L&H management as "a leader in the medical dictation and patient record management market," was, therefore, an integral step in L&H's plans to form a powerful Healthcare Enterprise business group with immediate access to Dictaphone's large customer base and the opportunity to integrate leading technologies to create new healthcare enterprise market solutions. Acquisition of Dictaphone would also provide L&H with a wide range of assets with which to further its healthcare business strategies.

187.   By acquiring Dictaphone, L&H hoped to capitalize on Dictaphone's healthcare market revenues of $130 million in 1999, and its noteworthy market penetration in this area.

188.   L&H executives also recognized that access to Dictaphone's products and other resources, such as Dictaphone's document creation solutions, including its digital portable hand-held voice recorders, transcription job administration and document distribution offerings would further enable L&H to realize its plans for development of its enterprise healthcare solution.

189.   For its part, Dictaphone was intrigued by L&H's overtures because of L&H's apparent financial success in a compatible market.  In agreeing to negotiate with and ultimately enter into an agreement with L&H, Dictaphone hoped to realize the potential synergies that a combination of the two companies and their technology and geographic market coverage seemed to promise.

190.   Specifically, based on what L&H, SG Cowen and KPMG represented to Dictaphone as L&H's astoundingly successful results in the Asian markets, Dictaphone entered into the merger discussions with an expectation that an integration of the two

59

companies would make the combined entity a worldwide leader in the voice recognition business.

191.   Dictaphone relied on L&H's reports of dramatic financial growth, coupled with sound technology.  Without these, Dictaphone not would have considered L&H as an appropriate merger partner for Dictaphone.

## Dictaphone Performs Due Diligence on L&H

192.   In February 2000, L&H and Dictaphone began negotiations in earnest about a potential business combination between L&H and Dictaphone.  Senior management of L&H and Dictaphone, together with their legal and financial advisors, held a series of meetings and began due diligence investigations of one another.

193.   To assist it in the merger negotiations, L&H had hired SG Cowen which, as part of its task, compiled financial and other materials delivered to Dictaphone to persuade it of the merits of L&H and the value to Dictaphone of a merger.  Pre-merger discussions involving Dictaphone involved several participants from SG Cowen's offices in Boston and New York, including Ben Howe.  As memorialized in a February 28, 2000 e-mail from Eric Chaing of SG Cowen to Defendant Bastiaens, Allan Forsey of L&H, John Duerden of Dictaphone and Scott Shaw of Stonington Partners, pre-merger discussions between Dictaphone and L&H and its outside advisors were to include, and upon information and belief, did in fact include, at least one conference call on or about February 29, 2000 to discuss "Far East due diligence".

194.   Moreover, according to a February 19, 2000 e-mail from Eric Chaing of SG Cowen to Allan Forsey and Carl Dammekens, and other SG Cowen team members, SG Cowen participated in responding to D&T's requests for information regarding such

issues as "software revenue recognition," "collection issues," and "relationships with strategic partners" [LDCs and CLDCs]. Upon information and belief, these issues were among those discussed with Dictaphone and/or its representatives during a conference call among the parties on or about February 20, 2000. For its work on the Dictaphone transaction, SG Cowen was to receive $7 million at the closing.

195. Dictaphone had its own investment bankers and financial advisors to assist it in performing its due diligence investigation into L&H. Hambrecht, currently JP Morgan Chase/Hambrecht & Quist, a division of Chase Securities, Inc., was Dictaphone's investment banker and it evaluated the fairness of the transaction to Dictaphone. Hambrecht was particularly well-suited to make a searching inquiry into L&H's business and financial representations. It had been co-underwriter with Defendant SG Cowen of L&H's 1996 public financing. D&T, Dictaphone's auditor, was engaged to perform a due diligence investigation of L&H.

196. Because of the proposed structure of the deal, as a stock-for-stock exchange and the assumption of debt, the ongoing value and corporate solidity of L&H was particularly critical to Dictaphone. L&H and its advisors clearly recognized that fact. KPMG Belgium and KPMG US, as auditors for L&H, played a particularly important role in providing financial details, descriptions of KPMG's prior audit efforts, and information and opinions with which it could provide comfort to Dictaphone and its advisors regarding the financial condition and reported results of L&H.

**Financial Condition of L&H as it Appeared to Dictaphone Prior to the Merger**

197. Even prior to its due diligence review, Dictaphone had substantial comfort in the accuracy of L&H's report financial results based upon repeated KPMG Audits,

which each resulted in KPMG's opinion that the financial statements were, in fact, accurate. In each of its Annual Reports for 1997, 1998 and 1999 filed with the SEC, L&H stated that its financial statements were prepared in accordance with U.S. GAAP. KPMG Belgium and Behets (through 1998) bolstered the credibility of L&H's disclosures by issuing unqualified reports on their audits of L&H's 1997, 1998 and 1999 financial statements and consenting to the inclusion of those reports in L&H's SEC filings.

198. An auditor may only give an "unqualified opinion" or "clean opinion" when no significant limitations affect the performance of the auditor and when the evidence obtained in the audit discloses no material deficiencies in the financial statement and/or unusual circumstances that affect the auditor's report. American Institute of Certified Public Accountants (AICPA), "Understanding Audits and the Auditor's Report: A Guide for Financial Statement Users," 2nd ed., 1996, at 15.

199. By an opinion letter dated April 17, 1998, KPMG Belgium reported on L&H's 1997 financial statements, and by an opinion letter dated April 9, 1999, KPMG Belgium reported on L&H's 1998 financial statements, each time stating:.

> We have conducted our audits in accordance with generally accepted auditing standards in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries as of [the relevant time period], and the results of their operations and their cash flows for each of

the years in the three-year period ended [on December 31 of the fiscal year], in conformity with generally accepted accounting principles in the United States.

200.   By letter dated April 27, 2000, KPMG Belgium issued its unqualified report on L&H's 1999 financial statement reporting that its audit had uncovered no material errors or improprieties in the unaudited financial statements issued in January:

> We have audited the accompanying consolidated balance sheets of Lernout & Hauspie Speech Products N.V. and subsidiaries (the Company) as of December 31, 1998 and December 31, 1999, and the related consolidated statements of operations, shareholders' equity, cash flows and comprehensive income (loss) for each of the years in the three period ended December 31, 1999.          *          *          *
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries as of December 31, 1998 and December 31, 1999 and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1999, in conformity with generally accepted accounting principles in the United States.

201.   KPMG Belgium consented to the inclusion of its 1997 Audit Report in L&H's Annual Report on Form 20-F filed with the SEC on July 2, 1998.  KPMG Belgium consented to the inclusion of its 1998 Audit Report in L&H's Annual Report on Form 20-F filed with the SEC on June 30, 1999.  On January 6, 2000, KPMG consented to the incorporation by reference of its 1998 Audit Report in Registration Statements filed by L&H with the SEC on Form F-3 on January 7, 2000.  Prior to the filing of L&H's Annual Report for that year filed with the SEC on Form 10-K, KPMG consented to the incorporation of its 1999 audit report in that Form 10-K.

202.   All of the information provided to Dictaphone prior to the signing of the Merger Agreement confirmed the rosy picture of L&H as a potential merger partner

painted in the audited L&H financial statements. Dictaphone concluded that L&H would be an attractive merger partner for Dictaphone primarily because of L&H's impressive revenue stream and impressive growth in a relatively short period of time. Unknown to Dictaphone, in order to induce Dictaphone to enter into a merger agreement with L&H, L&H and its executives and professionals, including, in particular, SG Cowen and KPMG, were deliberately hiding the fact that the reported revenue numbers were dramatically inflated through fraud.

203. On March 7, 2000, L&H, Stonington and Dictaphone entered into a series of agreements pursuant to which L&H would acquire Dictaphone in a corporate merger. The terms of the transaction provided that L&H would acquire all of the outstanding stock of Dictaphone in exchange for approximately 9.4 million shares of L&H common stock (adjusted for a subsequent 2 for 1 stock split) and the assumption of approximately $429 million of Dictaphone debt and other obligations. On the date the terms of the transaction were agreed upon, L&H stock was trading at $49.50 per share (adjusted for stock split), thus valuing the equity of Dictaphone at approximately $465 million, and the enterprise at approximately $900 million.

204. On the date the agreements were signed, L&H's stock was trading at $53.75 a share (adjusted for stock split).

205. On March 7, 2000, L&H issued a press release announcing the merger agreement. In connection with the merger announcement, Bastiaens, then President and CEO of L&H, described Dictaphone as "the leader in the medical dictation and patient record management market," and further explained L&H's motive in acquiring Dictaphone: "Dictaphone Corporation gives L&H instant access to the resources to

facilitate our launch of an entity dedicated to healthcare solutions. This should enable us to create an industry leading solution utilizing speech and web technology to reduce transcription costs enterprise wide and effectively manage patient information . . . Dictaphone's call center recording and quality monitoring systems will complement L&H's existing focus on the telecommunications market and should enable us to leverage our data mining and information management technologies to create new solutions for his rapidly growing field."

### The Merger Agreement and its Representations and Warranties

206.    The terms of the merger are set forth in a series of agreements: (1) the Agreement and Plan of Merger among L&H, Dark Acquisition Corp. and Dictaphone Corporation, dated March 7, 2000 (the "Merger Agreement"); (2) a Stockholder Letter of Transmittal, Indemnity and General Release Pursuant to Agreement and Plan of Merger (the "Letter of Transmittal"); (3) an Indemnity and Escrow Agreement by and among L&H, Stonington and other Dictaphone Stockholders and State Street Bank and Trust Company as escrow agent, dated as of May 5, 2000 (the "Escrow Agreement"); (4) an Agreement of Limited Liability Company between Stonington Capital Appreciation 1994 Fund, L.P. and L&H Holding N.V., dated as of May 5, 2000; (5) a Stockholders Agreement among Stonington Holdings, L.L.C., LEHA, L&H Holding N.V., L&H Holding III, Oldco N.V., L&H Investment Company N.V. and L&H, dated as of May 5, 2000; (6) a Voting Agreement and Waiver by and among L&H, Dark Acquisition Corp. and Stonington Capital Appreciation 1994 Fund, L.P., dated March 7, 2000; and (7) a Registration Rights Agreement among L&H and the Dictaphone Stockholders, dated May 5, 2000 (collectively referred to herein as the "Merger Agreements").

## The Representations and Warranties

207.    The Merger Agreements contained various representations and warranties

pursuant to which L&H warranted the truth and accuracy of its current and historical

financial statements and SEC filings, as described below.

208.    Article IV of the Agreement and Plan of Merger is entitled

"Representations and Warranties of Buyer and Sub".  In Section 4.4 of the Agreement

and Plan of Merger, L&H (which is referred to as "Buyer") represented that:

> (a)    Buyer has filed and made available to [Dictaphone] all forms,
> reports and documents required to be filed with the SEC since January 1,
> 1997. Buyer's Registration Statement on Form F-3 (File No. 333- 11324),
> filed with the SEC on January 7, 2000, together with all documents
> incorporated therein by reference, as amended (the "Buyer Registration
> Statement"; said Buyer Registration Statement and all reports now or
> hereafter incorporated therein by reference to be referred to as the "Buyer
> SEC Reports") (i) was prepared in compliance in all material respects with
> the applicable requirements of the Securities Act and the Exchange Act,
> as the case may be, and the rules and regulations of the SEC thereunder
> applicable to such Buyer Registration Statement, and (ii) does not contain
> any untrue statement of a material fact or omit to state a material fact
> necessary in order to make the statement therein, in the light of the
> circumstances under which they were made, not misleading.
>
> (b)    Each of the consolidated financial statements, as amended
> (including, in each case, any related notes or schedules), contained in the
> Buyer Registration Statement were prepared in accordance with U.S.
> GAAP applied on a consistent basis throughout the periods involved
> (except as may be indicated in the notes to such financial statements or,
> in the case of unaudited statements as permitted by the SEC on Form 6-K
> under the Exchange Act) and fairly presented in all material respects the
> consolidated financial position of Buyer and its Subsidiaries as of the
> dates of the consolidated results of its operations for the periods indicated,
> consistent in all material respects with the books and records of Company
> and its Subsidiaries; . . .

209.    Dictaphone reasonably relied on these representations.  Based on these

representations, Dictaphone had no reason to believe that any of the information

provided by L&H was false.

210. In Section 4.6 of the Agreement a Plan of Merger, L&H represented that:

> Except as expressly contemplated by this Agreement, as disclosed in the Buyer SEC Reports or Company press releases filed or issued prior to the date hereof, or in connection with the matters disclosed at Section 4.5 of the Buyer Disclosure Schedule that Buyer has discussed with Company prior to the date hereof, since September 30, 1999, there has not been (i) any change in the financial condition, results of operations, business, or properties of Buyer and its Subsidiaries, taken as a whole, that has had, or is reasonably likely to have, a Buyer Material Adverse Effect; (ii) any damage, destruction or loss to property (whether or not covered by insurance) with respect to Buyer or any of its Subsidiaries having a Buyer Material Adverse Effect; (iii) any revaluation by Buyer of its assets having a Buyer Material Adverse Effect, exclusive of any revaluations (including write-downs or write-offs) of good will; or (iv) any other action or event that would have required the consent of Company pursuant to Section 5.3 of this Agreement had such action or event occurred after the date of this Agreement.

211. "Buyer Material Adverse Effect" is defined in Section 4.1 of the Agreement and Plan of Merger as "a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement."

212. Dictaphone reasonably relied on this representation.

213. Further, Article VI of the Agreement and Plan of Merger, Section 6.10, required L&H to immediately notify Dictaphone if any event occurred which might cause any of the representations to be untrue. Section 6.10 provides:

> Buyer will give prompt notice to Company, and Company will give prompt notice to Buyer, of the occurrence, or failure to occur, of any event, which occurrence or failure to occur would be reasonably likely to cause (a) any representation or warranty of such party contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date of this Agreement to the Effective Time, or (b) any material failure of Buyer and Sub or Company, as the case may be, or of any officer, director, employee or agent thereof, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement. Notwithstanding the above, the delivery of any notice pursuant to this section will not limit or otherwise affect the remedies

available hereunder to the party receiving such notice or the conditions to such party's obligation to consummate the Merger.

214. Dictaphone reasonably relied on the absence of notification as a representation of the continuing truth of L&H's representations and warranties.

215. Article VII of the Agreement and Plan of Merger is entitled "Conditions to Merger." It provides, in relevant part, several conditions to the obligation of Dictaphone to effect the merger. Two such conditions are set forth in Section 7.3(a):

> (i) The representations and warranties of Buyer and Sub set forth in this Agreement that are not qualified as to Material Adverse Effect shall be true and correct, except where failure to be true and correct would not have a Buyer Material Adverse Effect, as of the Closing Date, as though made at and as of the Closing Date, except that those representations and warranties that address matters only as of a particular date shall so remain true and correct as of such date;

> (ii) The representations and warranties of Buyer and Sub set forth in this Agreement that are qualified as to Buyer Material Adverse Effect shall be true and correct in all respects as of the Closing Date, as though made at and as of the Closing Date, except that those representations and warranties that address matters only as of a particular date shall remain so true and correct in all respects as of such date . . .

216. In closing the merger, Dictaphone reasonably relied on the certification of L&H that the conditions to the merger had been met.

217. Before the closing, Dictaphone or its representatives met or otherwise communicated on a number of occasions with representatives of L&H and with KPMG to conduct the due diligence of L&H. Various KPMG partners and personnel in Belgium, London, and the United States met or communicated with Dictaphone for the purpose of satisfying Dictaphone's due diligence inquiries about L&H. KPMG (Belgium and US) knew that it would jeopardize L&H's acquisition of Dictaphone if KPMG disclosed any information which might cause Dictaphone to have any material concerns

about L&H's financial statements or results.  KPMG knew that its business relationship with L&H and related entities would be jeopardized if KPMG endangered L&H's acquisition of Dictaphone.

218.    In various communications with Dictaphone or its representatives:

(a)    KPMG expressly and directly communicated to Dictaphone or its representatives that KPMG had conducted the audit of the 1998 financial statements of L&H in accordance with generally accepted accounting principles and that KPMG had conducted the audit of the 1998 financial statements for the purpose of determining whether those financial statements presented fairly, in all material respects, the financial position, results of operations, and cash flow of L&H, in conformity with generally accepted accounting principles;

(b)    KPMG expressly and directly communicated to Dictaphone or its representatives that KPMG had conducted the audit to obtain reasonable assurance that L&H's financial statements were free of material misstatement;

(c)    KPMG told Dictaphone or its representatives that KPMG was carefully monitoring L&H's ongoing practices concerning revenue recognition because of the earlier restatement L&H earnings in early 1999;

(d)    KPMG told Dictaphone and its representatives that it had reviewed all of L&H's contracts involving over $100,000 of revenue, that a U.S. GAAP review partner and a U.S. SEC review partner of KPMG were involved in auditing and monitoring L&H's accounting and that a KPMG unit in London also was involved in auditing and monitoring L&H's accounting;

(e)    KPMG reviewed with Dictaphone or its representatives the twenty largest 1999 L&H contracts involving revenue for "up-front" license payments and KPMG told Dictaphone or its representative that revenue under those contracts had been properly accounted;

(f)    KPMG reviewed with Dictaphone or its representatives the "strategic partnerships" that L&H had entered and did not suggest there was any question or issue as to the *bona fides* of those transactions;

(g)    KPMG never disclosed to Dictaphone or its representatives the enormous magnitude of transactions generating revenue for L&H were with parties related to L&H and the great magnitude of revenue which was artificial and fraudulent;

69

(h)    KPMG generally provided comfort to Dictaphone that L&H's accounting was being monitored and audited to provide reasonable assurance that L&H's financial statements were materially accurate and that their statements were not fraudulent; and

(i)    Indeed, according to e-mails between KPMG partner Robert McLamb and Defendant Dammekens during the period May 1 and May 3, 2000, McLamb was personally involved in responding to requests for information from D&T on Dictaphone's behalf. These requests from D&T on behalf of Dictaphone included inquiries about revenue recognition issues. McLamb personally met with Dictaphone representatives on at least one occasion on or about May 1, 2000 just prior to the Merger. KPMG US also performed due diligence in reviewing Dictaphone's financial condition for L&H.

219.    Similarly, the SG Cowen "deal book" and SG Cowen represented the *bona fides* of L&H's business, growth and revenues.

220.    When communicating the above information to Dictaphone and its advisors, KPMG and SG Cowen knew that Dictaphone was relying upon information and representations from KPMG and SG Cowen to determine whether to agree to the Merger and that Dictaphone was relying upon KPMG's ongoing monitoring of L&H's accounting practices, particularly with respect to revenue recognition issues.

**Closing of the Merger**

221.    On May 5, 2000 the merger was consummated and Dictaphone obtained for its shareholders approximately 9.4 million shares of L&H common stock in exchange for cancellation of Dictaphone common stock. At the time of closing, the L&H common stock was trading at $53.97 per share (adjusted for stock split), putting the price of the Merger at over $930 million.

**The Real Financial Situation of L&H at the Time of the Merger**

222.    Subsequent investigation by the SEC, the financial press, and a variety of professionals hired by L&H who conducted special investigations, provided mounting evidence of a massive and pervasive fraud that all of the Defendants had concealed from Dictaphone prior to consummation of the Merger:

(a)    Contrary to Defendants' claims of L&H's "record" growth, at least one-third of L&H's revenues in 1998, 1999 and the first half of 2000 were improperly recorded, and most of that was fictitious.

(b)    Contrary to Defendants' claims of hefty licensing fees from unaffiliated "strategic partners," the arrangements were sham transactions with related parties, some of whom were entities audited by KPMG Belgium, designed to permit L&H to report fictitious revenues which either never existed or were effectively reporting L&H's own money as revenue to L&H.

(c)    Contrary to Defendants' claims that the Far East constituted its fastest growing market, L&H has admitted that "Korea never really had any sales to speak of." More than $100 million recorded on the books of L&H's Korean unit never really existed, but, instead, was the fraudulent use of money borrowed by L&H and held in banks under sham "factoring" arrangements purportedly "without recourse" but in reality, under written agreements which were "with recourse" time deposits securing phony "receivables", which the purported customer could not pay and never intended to pay. These arrangements were never publicly disclosed, but the critical components were known to KPMG Belgium as early as October 1999.

(d)    Contrary to Defendants' claims of record growth fueled by revenues from successful, innovative products, L&H reported revenue from barter transactions in which no cash changed hands, recognized revenue from sales that were contingent and never earned, and recorded sales before contracts were signed, when the customer had no ability to pay, or when the customer's ability to pay depended on an investment from L&H or its affiliates.

223.    Indeed, to L&H insiders, KPMG and L&H's other professionals, just before the Merger was concluded, it seemed clear that the fraudulent scheme was about to unravel.    The SEC investigation, which began in January, had led to increased

71

attention.  A broad and alarming document request was received in April 2000, and at about the same time, KPMG was notified that the SEC wanted to speak to KPMG about L&H.

224.  Certain officers and a Director of L&H rushed to sell a total of $46 million of L&H stock in May, 2000.  These officers and directors included:

(a)    Ellen Spooren, who had broad responsibilities at L&H with four departments reporting to her and who was a close confidante and longtime business partner of Bastiaens.  She left L&H in late August on the same day Bastiaens was removed as CEO and three weeks before L&H publicly disclosed the SEC investigation.  Mrs. Spooren sold more than $2 million of L&H shares between May 15 and May 25, 2000, for a profit of $1.9 million.  Mrs. Spooren apparently advised *The Wall Street Journal* that she was not aware of the informal SEC inquiry until after she sold the L&H shares.  However, earlier, when the SEC commenced a "review" of L&H in November 1998, Spooren immediately sold nearly $1.5 million in stock.

(b)    Francis Vanderhoydonck, a Director of L&H sold more than $7 million of L&H shares between May 16 and May 30, 2000, realizing a gain of $3.2 million.  Mr. Vanderhoydonck was directly involved in the "strategic partner" fraud as President and Managing Director of LHIC and of certain of the LHIC "start-ups".  Mr. Vanderhoydonck reportedly played an active role in the firing of John Duerden (the Dictaphone CEO who replaced Bastiaens as CEO of L&H in August, 2000), apparently in an attempt to cover up the fraud.

(c)    Florita Mendez, who headed L&H's translation unit, realized a gain of $1.8 million on sales of $1.9 million of L&H stock during May 2000.  She had similarly sold over $2 million in stock at the time of the earlier SEC review.

(d)    Bert Van Coile, who headed L&H's research and development, realized a gain of $2 million on sales of $2.1 million of L&H stock during May, 2000.

(e)    Most significantly of all, GIMV, headed by L&H Director van Acker, and as a Director of FLV Management, a principal player in the LDC/CLDC schemes, filed a Form 144 indicating an intention to sell over $33 million of its investment in L&H on May 15th.  SG Cowen was listed as GIMV's broker on the deal.

72

**_The Wall Street Journal_ Raises the Possibility of Fraud and L&H's Response**

225.   As a result of its acquisition of Dictaphone, L&H became subject to more stringent SEC reporting requirements as a United States company.   As explained below, certain first-time disclosures in L&H's first quarterly report filed on SEC Form 10K on June 30, 2000, revealed new information about L&H's financial success during the previous few quarters.

226.   For the first time, L&H publicly disclosed the geographic breakdown of sales.   The new financial reporting format revealed detailed information about L&H's huge jump in sales to Asia in 1999 and the first quarter of 2000. Specifically, out of 1999 revenue of $344.2 million, Korea contributed $62.9 million and Singapore contributed $80.3 million.   The prior year, the two countries combined had contributed less than $300,000 in sales.   Although L&H completed an acquisition of the Korean company Bumil in 1999, nothing in Bumil's history or financial results up to the date of closing could help to explain the extraordinary jump in revenue in Korea.   L&H made no significant acquisition in Singapore during that same period.

227.   Similarly, according to L&H's 10Q for first quarter 2000, Korean sales accounted for $58.9 million in revenue, up from $97,000 a year earlier, and approximately 53% of L&H's worldwide sales of $110.7 million.   During the same quarter, total sales in the United States, Europe and the rest of Asia declined 27%, to $51.8 million.   Sales in Singapore plummeted during this quarter to $501,000, down from the previous year's $10.4 million for the same quarter.

228.   In response to analysts' concern about these new disclosures, Bastiaens, on information and belief, tried to cover up by explaining these developments as mere

reactions to a shift in company strategy. As reported by *The Wall Street Journal* on July

6, 2000, Bastiaens explained that pursuant to this "new strategy," rather than license its

underlying technology to companies that would then develop applications for specific

markets, L&H decided more than a year earlier to build its own applications, allowing it

to gain more revenue over time.

229.    Bastiaens explained the "strong" Asian sales as a result of L&H's early

market presence and lack of strong competition.  He explained the 1999 figures for

Singapore as revenues from licensing L&H technology to companies that were building

local language versions of its systems for languages such as Hindi and Tamil.  The

licenses were sold for $2 million to $4 million each but, according to Bastiaens, sales

dropped off after the major language licenses were sold.

230.    As to Korea, Bastiaens explained the surge in sales as the result of

synergies realized from the combination of L&H technology with Bumil's large client

base.  Virtually everything Bastiaens said was either known by him and Spooren to be

false, or the transactions he referred to were themselves fraudulent.

231.    The public revelation that L&H's revenues were derived from unusual

Asian sales prompted reporters from *The Wall Street Journal* to attempt to verify these

revenues by contacting certain of the Asian customers to verify the accuracy of the

reported revenues.  Despite the public skepticism generated by these revenues, KPMG

did not undertake any investigation to confirm its previous audit of these same

revenues.    SG Cowen did not question or modify its prior research reports or

recommendations.    Rather, SG Cowen and KPMG worked with the management of

L&H to attempt to reassure everyone that the previously audited revenues were accurate.

232.    Contrary information began to emerge. *The Wall Street Journal* reported on August 8, 2000 that "some companies L&H has identified as Korean customers say they do no business at all with L&H. Others say their purchases have been smaller than L&H says." *The Wall Street Journal* contacted eighteen of about thirty companies claimed by L&H as customers in Korea:

> Three of the companies say they aren't, in fact, L&H customers . . . Three more companies say their purchases from L&H over the past three quarters were smaller than figures provided by Mr. Bastiaens or Sam Cho, vice president of L&H Korea. One additional company says it is in a joint business with L&H that produces considerably less revenue than L&H claims. Officials from an eighth company initially said it had formed a joint venture with L&H and that the joint venture, not the company itself, had purchased products from L&H. Later, the company retracted this initial version.

>                      * * *

> All told, of the 13 [sic] companies that responded to inquiries about their purchases from L&H in the period since it acquired Bumil, the revenue tallies roughly $32 million. From all of its customers in Korea, in 1999 and the first quarter of 2000, L&H posted $121.8 million of Korea sales, and it has said that it expects second quarter revenue from that country to exceed the first quarter's $58.9 million . . .

> Among the companies that L&H boasts as customers: Korea Securities Computer Corp., or Koscom, a government clearing house for stock trades. Mr. Bastiaens initially says L&H received revenue in the range of $5 million to $10 million (he wouldn't be more specific) from Koscom in the three quarters ended June 30. According to two Koscom officials, whose names were provided by L&H, Koscom and L&H are partners in an automated phone stock quote service. Korea Telecom collects the per-call payment, keeps 10% and splits the rest between Koscom and L&H.

> One of the Koscom officials estimates L&H and Bumil's share of the revenue at roughly $1.5 million in 1999. . . .

> In a Dec. 28, 1999 press release, L&H said Samsung Securities, a big Korean brokerage, together with more than 14 other securities firms, had "selected L&H to develop client server solutions for online trading and

automated dialogue systems." But two Samsung officials, including spokesman Shin Dong Woo, say their firm never made any purchases from L&H, although they discussed some.

\*    \*    \*

L&H also claims LG Electronics as a customer. But Yu Won Uk, a senior research engineer at LG Electronics — a contact provided by L&H — says his company never bought products or licenses from L&H. Instead, he says the two firms briefly worked on a joint project for applying voice recognition to television, but stopped because there "was no progress." LG Electronics paid L&H only "engineer charges," he says, akin to labor costs for L&H's share of the work on the failed project.

\*    \*    \*

Another Korean company with which L&H says it has a significant relationship is Hung Chang Co., a maker of communications equipment. Mr. Bastiaens put revenue from Hung Chang in the range of $5 million and $10 million over the past three quarters.

However, Kim Ho Kin, a Hung Chang official whom L&H identified as its contact, says Hung Chang wasn't using L&H products internally and that L&H's $5 million bill was paid by a joint venture called Spia, "not Hung Chang." Another Hung Chang official, Choy Sang Hyun, who was reached independently of L&H says Spia Co. was founded May 2, with Hung Chang as the largest shareholder, but June 28 L&H Korea became the largest, with Hung Chang holding 27.49%. Mr. Choy says Spia makes products based on L&H's voice-recognition technology, and says Hung Chang is only a passive shareholder.

\*    \*    \*

Mr. Bastiaens also identified Hyundai Securities and Hanvit Bank as providing revenue totaling between $5 million and $10 million. But at Hyundai Securities, two officials, including a contact provided by L&H, say their purchases amounted to just over $1 million. At Hanvit Bank, Lee Jae Bong, manager of network management, says the only contract signed by his institution tallied $150,000. . . .

233. L&H officials responded by acknowledging that some of L&H's initial representations made about customers were mistaken, but they disputed other accounts given to *The Wall Street Journal* by some of the Korean companies and continued to insist that the company's Korean revenue figures were accurate.

234.   To provide support for L&H's insistence that its Korea revenue figures were accurate, on August 15, 2000, L&H announced that it would commission a mid-year "interim audit" to be conducted by KPMG.  The ostensible purpose of this audit was to allay concerns about the financial results of the South Korean division, but the real purpose of this audit was to conceal the fraud that underlie L&H's revenue.  To that end, KPMG was selected to perform this "interim audit" because L&H management was confident that KPMG would cooperate, as it had in the past, in concealing or overlooking the underlying fraud.  Indeed, L&H spokesman Ron Schuermans was so confident that KPMG's audit practices would simply approve L&H's fraudulent practice that he proclaimed:  "We're doing this to send a positive signal to the market.  We're confident that, when the audit is completed, all our revenue figures as we have reported them will be confirmed."  However, the senior L&H officers knew of the underlying fraud and could not have held out any hope that the "interim audit" would not reveal the fraud unless they expected that KPMG would cover up or approve L&H's improper practices.

235.   On August 25, 2000, L&H announced that Defendant Bastiaens would be resigning from his position as president and CEO of L&H.  L&H co-chairman and founder Lernout insisted that Bastiaens' departure had nothing to do with the questionable Korean situation.  John Duerden, former CEO of Dictaphone, was named as Bastiaens' replacement.  Defendant SG Cowen continued to tout L&H stock and referred to the depressed prices as a "buying opportunity" at a meeting on or about September 20, 2000.

236.   On September 21, 2000, *The Wall Street Journal* reported the commencement of a Securities and Exchange Commission ("SEC") formal investigation

of L&H's accounting practices. According to an article in *The Wall Street Journal* on October 18, 2000, this formal investigation was prompted by L&H's unwillingness to cooperate with the SEC in an informal investigation. That investigation was commenced in January 2000, and had led to an extensive request for the production of documents in April, prior to consummation of the Dictaphone transaction. The informal investigation focused in significant part on the related-party issues. *The Wall Street Journal* also reported that KPMG Belgium received a letter from the SEC about L&H's accounting in late April 2000.

237. On September 22, 2000, *The Wall Street Journal* raised questions about thirty Singapore and Belgian start-up companies that accounted for nearly all of L&H's Asian revenues reported in 1998 and 1999. *The Wall Street Journal* also raised questions about these companies' ties to L&H and the FLV Fund, and questioned whether the reported revenue figures were accurate. The article suggested that L&H's contractual arrangements with some of these companies were used by L&H as a vehicle for overstating revenues and understating research and development expenses.

238. One of the series of transactions questioned by *The Wall Street Journal* involved four Singapore entities identified as I-Merge Pte, I-Office Pte, I-Mail Pte and I-News Pte (all four of which were founded by Nacom, which apparently was owned by the same individuals as Cevennes, the investor in Dictation Consortium and BTG). Each became an L&H licensee in the first quarter of 1999 by entering into contracts, but not actually paying, $10 million in license fees to L&H. Not more than six months later, the FLV Fund, an entity that L&H conceded was a related party to L&H, invested $8 million for 49% stakes in each of the four entities. As discussed above, L&H and KPMG

attempted to conceal these "related-party transactions" by having FLV Fund sell its stock in these companies to HI World for the promise to pay $11 million, which HI World never paid, never had the ability to pay, and never intended to pay. L&H Korea purchased 80% of HI World for $6.5 million on or about November 16, 2000.

239.    When L&H was confronted by *The Wall Street Journal* article regarding its failure to disclose that these licensing transactions were "related-party transactions," L&H publicly stated that the transactions did not need to be disclosed as related-party transactions because the FLV Fund's investments in the four companies occurred after the licensing transactions. This public explanation by L&H was not consistent with Generally Accepted Accounting Principles, but apparently was the cover-up story KPMG had intended to use if the true facts ever came out.

240.    Another series of transactions questioned in *The Wall Street Journal's* September 22nd article involved four other Singapore "start-ups" that executed licenses with L&H in the third quarter of 1999. This quartet of "start-ups" had agreed to pay $16 million to L&H for software rights. FLV Fund invested $10 million in the quartet, which was used to pay $8 million owed by the quartet to L&H. Again, neither L&H nor KPMG disclosed these transactions as "related party transactions."

241.    On October 18, 2000, *The Wall Street Journal* reported that L&H was refusing to provide the SEC with the names of the investors behind the 30 start-up companies registered in Singapore and Belgium that, in aggregate, accounted for about 25% of L&H's 1999 revenues and 10% of its 1998 revenues.

242.    On October 26, 2000, *The Wall Street Journal* reported that financial statements filed by each of the four Belgian start-ups in July 2000 showed no evidence

of the $3 million in purported license payments from each of the four companies booked

by L&H in late 1998. Shortly after *The Wall Street Journal* inquired about this anomaly,

the four companies filed corrective financial statements with the Belgian authorities.

243. *The Wall Street Journal* reported on November 6, 2000 that the original

parent company of the four Belgian start-ups said that the companies paid only $6

million to L&H in 1998-1999, not the $12 million recorded by L&H in 1998. As reported

by *The Wall Street Journal*, this account is consistent with the corrective filings of the

four start-ups.

## The Report to the Audit Committee by Bryan Cave and Arthur Andersen

244. On September 20, 2000, the L&H Board of Directors authorized its Audit

Committee to "conduct such inquiries as it deemed appropriate into certain accounting

and other practices of the Company that were the subject of a formal investigation being

conducted by the [SEC]," according to a report provided to the Audit Committee two

months later, on November 20, 2000 (the "Audit Committee Report"), by the advisors

retained by the Audit Committee — the U.S. law firm Bryan Cave LLP ("Bryan Cave"),

the Verbeke Firm, and the accounting firm of Arthur Andersen LLP ("AA") (collectively,

the "Audit Committee Advisors").

245. The Audit Committee investigation appeared superficially to be a

responsible investigation of the increasingly disturbing public allegations, but, in fact, it

was not. The most likely chain of events is that Bryan Cave, who originally had been

retained to respond to the SEC's investigation, in the course of collecting documents for

the SEC discovered numerous documents and e-mails maintained openly in the L&H

corporate records, which strongly indicated the possibility of financial reporting

80

irregularities and possibly fraud, and that when the Audit Committee was presented with this evidence, it felt compelled to commence an investigation. The Audit Committee assigned the Verbeke Firm (the Verbeke Firm and Louis Verbeke himself were principal actors in the LDC frauds) to work with Bryan Cave. Bryan Cave took only six weeks to conclude the entire process.

246. Arthur Andersen was retained to provide independent accounting expertise. KPMG refused to cooperate with the Audit Committee Advisors in that KPMG denied Bryan Cave or AA access to any KPMG workpapers during the Audit Committee review.

247. Given the magnitude, complexity, and international character of L&H's business, and the lack of cooperation by KPMG, the Audit Committee may have hoped that the time period would be too short to reach any clear conclusion. Nevertheless, despite the time pressure and the lack of cooperation from KPMG, the financial fraud was so pervasive and so obvious from the records of the company, that the Audit Committee Advisors were able to uncover nearly $277 million of overstated revenues in the thirty months between January 1998 and June 2000.

**Findings and Recommendations of the Audit Committee**

248. On November 20, 2000, the Audit Committee Advisors provided a report to the Audit Committee and Board of Directors of L&H that described the inquiry undertaken by Bryan Cave and AA, summarized the facts gathered and set forth the conclusions reached by Bryan Cave and AA ("Audit Committee Report"). That report stated the following:

81

(a)    Bryan Cave and AA had requested that KPMG provide its audit work papers to the Audit Committee to assist that Committee in its investigation. The provision of these work papers would have facilitated the work of the 'Audit Committee. However, despite the fact that KPMG was arguably conducting an "interim audit" which supposedly would address the same accounting issues the Audit Committee was investigating, KPMG refused to provide its audit work papers to Bryan Cave, AA or the Audit Committee. On information and belief, KPMG refused to make these papers available because these work papers would show the inadequacy of the audits KPMG had performed.

(b)    Bryan Cave and AA focused their investigation principally on transactions generating revenue in 1998 and 1999. However, they did not re-audit L&H's financial statements, nor did they investigate the roles of KPMG or L&H's legal counsel in the transactions which were investigated.

(c)    Bryan Cave and AA identified transactions as to which revenue should never have been recorded and transactions as to which revenue was prematurely recorded (and for which revenue may or may not be recorded in future periods). The report identified transactions generated in Burlington, Massachusetts, Belgium, and Korea.

249. Bryan Cave and AA concluded that revenues for 1998 had been overstated by as much as $28 million, that revenues in 1999 had been overstated by as much as $137 million, and that revenues in the first and second quarters of 2000 had been overstated by as much as $112 million.

250. Much of the revenue overstatements identified by the Audit Committee were attributable to transactions in Belgium between L&H, the LDCs, CLDCs and IACs. With respect to many of these transactions, AA concluded that the accounting treatment was improper, even if it assumed that the transactions in question were "arms-length" transactions with unrelated parties, which all, or almost all, were not. While the Audit Committee Report did not analyze KPMG's responsibility for the improper accounting treatment, the Report initially mandated a conclusion that KPMG audits were improper: the factual basis for AA's conclusion that the accounting treatment of these transactions

was not proper was as available to KPMG during its audits as it was to AA during the Audit Committee's investigation.

251. The Audit Committee Advisors had not been able to identify with certainty the investors in the LDCs and CLDCs, and whether they were related to L&H or its Managing Directors, other then the FLV Fund and possibly HI World. However, the Audit Committee Report also commented that management and some board members of L&H "made this [the process of identifying investors] far more difficult than it needed to be . . . [a]s a result [the Audit Committee advisors] still do not know the identities of all of the original, and possibly all of the current investors, in these companies." They particularly noted that with respect to the LDCs and CLDCs, they "received inconsistent information from Tony Snauwaert, an agent for most of the LDCs, CLDCs, and IACs. . ."

252. An attempt was made to conceal the ownership of the LDCs/CLDCs in general, and Mercator's ownership interest in particular. This deception continued into the fall of 2000. It was only in response to substantial pressure from John Duerden, who insisted that the Audit Committee be informed, that Lernout finally revealed that the owner of certain LDCs was Mercator. The Audit Committee Report makes no reference to, and apparently was unaware of, Verbeke's role at Mercator in connection with the LDCs.

253. In addition, the Audit Committee Report also noted various accounting issues with respect to specific LDC/CLDC transactions. These included :

> (a)    Despite the purported nature of the services rendered, "[e]xcept for Turkish and Farsi, contracts reflecting that the LDCs would pay L&H for the services or development work were not executed until November 3, 2000." Further, with the exception of Turkish and Farsi, the LDCs had never even been invoiced for the development work.

(b)     L&H recognized $4 million in revenue as of 9/30/99 for each of the 7 CLDCs — the four sold by FLV Fund to HI World and Lupeni, Jelgava and Harrisca, each of which had two separate license agreements, one for the $4 million, and another for $3 million each signed by Willaert (for L&H) and Snauwaert (for the LDC) on the same day.  L&H recognized $4 million for each of the contracts with Lupeni, Jelgava and Harrisca for a total of $12 million for the Q3 1999.  While the Bryan Cave report notes that each of these CLDCs paid $4 million, apparently, they did not make the payments themselves.  According to a 6/29/00 e-mail from Luo of L&H to Vanloo states that the $4.5 million received by L&H in December 1999 from Velstra was actually for contracts for these three CLDCs.

(c)     Vermeulen of FLV Fund signed a $4 million license agreement with L&H on behalf of each of four CLDCs, Salfas [Mandarin CLDC], Senegal [Japanese CLDC], Baleston [Russian CLDC], and Duranzo [Spanish CLDC] on Sept. 30, 1999, making clear that each LDC was a "related party."  L&H recognized the $4 million each for Q3 1999, and never disclosed these transactions are related party transactions.  FLV Fund sold its interest in these CLDCs soon thereafter to HI World.  As the Audit Committee Advisors noted, the fact that FLV Fund sold its interest so soon after its investment "suggests" that FLV Fund never intended to be the ultimate investor or the end-user of the license.

(d)     On December 29, 1999 L&H entered into a license agreement with Capital Union regarding Farsi and Turkish LDCs resulting in $8 million recognized in Q 4 1999.  However, it was clear that the Capital Union transaction was an investment banking arrangement and not a true license agreement.  A December 29, 1999 side letter signed by Willaert promised a $490,000 success fee to Capital Union if funding of the LDC was successful by June 30, 2000 and interest would be paid at closing to Capital Union at 25% on $5 million up to closing of funding, but not later than June 2000.  A second December 29, 1999 side letter signed by Hauspie and Filip Beernaert for Willaert reiterated the above terms and further promised that if Capital Union failed to complete the funding by June 30, 2000, L&H would repay the license fee.  A confirmation reply letter from Capital Union dated 11/2/00 indicated that Capital Union was merely an investment bank hired by L&H on a best efforts basis to find potential LDC investors.  Revenue recognition for Q4 1999 of $8 million was, therefore, fraudulent.

(e)     L&H recognized $4 million in revenue in Q4 1999 based upon an agreement with the Lavenia LDC dated 12/30/99.  However, an e-mail dated Jan. 5, 2000 from Fillip Beernaert to Willaert and Dammekens discusses the terms to be included in the agreement, including a license fee of $3 million. As the Audit Committee Advisors noted in their report, it appeared from the e-mail that the terms of the agreement were not

finalized until Q1 2000. Thus, the revenue could not be recognized under SOP 97-2.

(f)    For each of three CLDCs, Lupeni, Jelgava and Harrisca, there were two contracts dated September 30, 1999, one reflecting a $2 million fee and the other a separate contract for a $4 million fee. In each case, both contracts were signed by Willaert (for L&H) and Snauwaert (for each LDC).

254.    While the accounting for the transactions with the LDCs and CLDCs in Belgium (even assuming they were "arms-length") was improper, the Audit Committee Report also noted serious questions as to whether the transactions were, in fact, "arms-length." The Audit Committee Advisors indicated that their investigation of the potential relationship between L&H and the LDCs, CLDCs and IACs was thwarted by management and certain directors of L&H. In fact, however, on information and belief, KPMG knew that each of these companies were "related parties," and, in fact, each had been created to disguise loans as revenues.

255.    Verbeke also knew of the relatedness of the various parties. Apart from his role as legal advisor and architect of the L&H structure, Verbeke, as Chairman of Mercator, plainly knew of his Mercator's ultimate ownership of many of the LDCs and CLDCs. Verbeke's firm, on information and belief, did the legal work for most, if not all, of the LDCs and CLDCs. Tellingly, despite the obvious conflict of interest generated by, among other things, the fact of the Verbeke Firm's role in performing legal work for the LDCs and CLDCs and Verbeke's role as Chairman of Mercator in creating Velstra, and LDF, a vehicle for allowing L&H, via Snauwaert, to control the purportedly "independent" LDCs, versus his firm's role as co-Audit Committee counsel with Bryan Cave, on information and belief, Verbeke never informed the Audit Committee Advisors of the conflict.

256.  In addition to the unresolved issues with respect to the Belgium transactions, Bryan Cave and AA identified "unresolved" issues with respect to the Asian transactions that contributed so substantially to L&H's revenues in 1999 and early 2000.  These issues were, on information and belief, well-known to KPMG during the audit.  Indeed, in the report of the Audit Committee, AA and Bryan Cave specifically identified certain issues, indicated that KPMG must have been aware of the same issues (from the information known to KPMG), and further indicated that "KPMG must have resolved this issue" [to render its clean audit opinion], but stated that Bryan Cave and AA were unable to determine how KPMG resolved the issue because KPMG refused to provide its audit work papers to AA.  On information and belief, KPMG never properly resolved those issues and issued its opinions nonetheless.

257.  The Audit Committee Report identified many millions of dollars of revenues improperly recorded in the Burlington and Belgium offices of L&H.  The improper practices in Burlington included "barter transactions, rights to return products, transactions where the customers' ability to pay depended on the receipt of an investment from L&H, and the separation of one agreement into two contracts – a license agreement and a development agreement – so that more revenue could be booked in an earlier quarter than might otherwise occur."  The improper practices in Belgium included "backdating of contracts, one side letter, several instances of late delivery of product, a promise to deliver an additional language at no extra charge 'when and if available," and an understanding that the cost of certain options would be reimbursed through a subsequent arrangement."

258. Finally, the Audit Committee was "unable to reach any conclusion with respect to the issues in Korea." However, it identified significant issues regarding the difficulties or inability to obtain over $100 million in cash purportedly being held in L&H accounts at Korea bank," the $25 million earnout paid to John Seo in early 2000, the relationship between L&H and HI-World. The Report also stated: "We did not examine collectibility issues that we understand have been examined by KPMG. We understand that KPMG believes that a significant amount of revenue recorded in the first and second quarters of fiscal 2000 will need to be restated because of questions about whether collection was probable that that time." In addition, the Report noted specific problems with specific Korean contractors. It suggested reversing all Korean revenues and recording revenues only as cash is withdrawn from the banks.

259. The report by Bryan Cave and AA also contained a variety of recommendations for L&H to implement. These recommendations were for the purpose of "prospective compliance with U.S. GAAP, principles of corporate governance and the U.S. federal securities laws." Some of the recommendations evidence the inadequacy of the prior financial reporting by L&H and the prior audit by KPMG. For example:

> (a)    The Report recommended that the directors of L&H should require management to establish "a control environment that includes integrity and ethical values." Quoting from the SEC, the Report noted that the "corporate environment or culture within which financial reporting occurs — is the most important factor contributing to the integrity of the financial reporting process." In fact, the directors and officers of L&H failed to perform their role of establishing the appropriate tone and mechanisms for promoting the "integrity of financial reporting."

> (b)    The Report recommended that the directors of L&H, and the Audit Committee in particular, "should receive assurances from the independent auditors that they have conducted the required pre-filing reviews" and the independent auditors should provide the Audit Committee with "a full and frank discussion of the quality of the financial results, particularly

revenues, and of management's approach to financial reporting." In fact, KPMG did not provide "full and frank" information to the Audit Committee, nor did the Audit Committee require it.

(c)    The Report recommended that L&H adopt a "'know your customer rule and should refuse to enter into any contracts where the identities of the parties cannot be revealed." The Audit Committee's Report makes clear that L&H management and KPMG, at best, embarked on a policy of calculated ignorance, closing their eyes to countless "red flags" and actual evidence concerning the identity and *bona fides* of these "customers" which were creating the revenue growth being reported by L&H. In reality, both L&H and their professionals collectively created the LDC/CLDC structure to allow L&H to have total control of the supposed "unrelated" entities.

(d)    The Report recommended a variety of corrections that needed to be made to L&H's accounting and financial systems.

260.    Even before the Audit Committee Report was finalized, as a result of the findings of Bryan Cave and AA, L&H issued two press releases on November 9, 2000, both of which were disclosed in an SEC Form 8-K material change report. In the first press release, L&H announced that "errors and irregularities" had been identified in the company's financial statements for 1998, 1999 and the first half of 2000 as a result of the on-going Audit Committee inquiry. As a result of these errors and irregularities, L&H announced that it expected to restate its financials for the periods at issue. L&H further announced that its specially-commissioned mid-year audit by KPMG, which was designed to confirm the accuracy of its financial statements, would not be completed by November 14, 2000. Upon information and belief, KPMG did not complete the mid-term audit because the discoveries by the Audit Committee had made it impossible to control KPMG's prior practice of aiding L&H's fraud.

261.    L&H's announcement of "accounting irregularities" is, in accounting terms, tantamount to an admission of fraud. Statement of Auditing Standards No. 53 issued by

the American Institute of Certified Public Accountants defines "irregularities" as "intentional misstatements or omissions" in financial statements (emphasis supplied), including "fraudulent financial reporting undertaken to render financial statements misleading, sometimes called management fraud."

262.    In its second November 9, 2000 press release, L&H announced various management changes:  (1) that the company's two founders and co-chairmen of the Board of Directors, Messrs. Lernout and Hauspie, would be resigning as co-chairmen and Managing Directors, (2) that John Duerden, the newly appointed CEO and the former CEO of Dictaphone, was appointed the sole Managing Director, (3) that Roel Pieper was appointed Chairman of the Board, and (4) that a new CFO would be appointed by Mr. Duerden.   Despite these changes, Messrs. Lernout and Hauspie retained their seats on the Board of Directors, continued to control 30% of the company's voting rights, and continued to have the power to elect a majority of the company's Board of Directors.

263.    In response to L&H's announcement about accounting irregularities, on November 9, 2000 the NASDAQ and EASDAQ suspended trading indefinitely in L&H. Before suspension of trading on NASDAQ, the stock price dropped to $6.2188 a share. Trading continued for a short while on EASDAQ, falling to $3.525 before suspension.

264.    On November 20, the EASDAQ suspended trading in the FLV Fund because of risks linked to its close association with L&H.

265.    On November 22, 2000, L&H announced the resignations of three directors — including Hauspie — and yet another management realignment.

89

266.  On November 29, L&H and certain of its U.S. subsidiaries, including Dictaphone, filed for bankruptcy.

267.  On April 25, 2001, L&H announced that L&H Korea, its wholly-owned subsidiary, voluntarily filed for bankruptcy in Korea.

**Attempted Cover-up by KPMG**

268.  Once it became aware of the conclusions reached by Bryan Cave and AA, KPMG next undid what it never should have done in the first instance.  On November 17, 2000, KPMG announced that its prior audit letters for 1998 and 1999 "should no longer be relied upon."  This correction occurred only after L&H publicly announced that it would restate its financial statements for the last 2½ years.

269.  KPMG then purportedly began a belated effort to conduct its own investigation.  On December 7, 2000, KPMG advised the L&H Board of Directors of irregularities and questions that had arisen in KPMG's "interim audit" of L&H.  In fact, KPMG was now finally performing the audit procedures it recklessly or intentionally failed to perform in its initial audits.  The only reason KPMG's "interim audit" was able to identify these "irregularities" and "questions" that it purportedly failed to detect earlier was a change in KPMG's motivation.

270.  KPMG tried damage control.  On December 7, 2000, KPMG advised the L&H directors of "serious" issues related to transactions with LDCs, including issues relating to revenue recognition, agreements that did not reflect the true economic reality, and the disclosure of related-party transactions.  Yet these issues belatedly raised by KPMG could have and should, in fact, have been examined, or had been examined but were intentionally not revealed by KPMG in its earlier audits.

271.  By judgment dated January 5, 2001, the Court of Commerce of Ieper, Belgium ordered KPMG and the Verbeke firm to report to the general assembly of L&H on whether the financial statements of L&H for the years 1998 and 1999 and the first half of 2000 were drafted in accordance with the appropriate provisions of law and administrative provisions, and whether in the opinion of KPMG such statements give a true and fair value of the assets, financial situation, and profits of the company.

272.  Despite these extraordinary events, KPMG continued for a time to try to keep the show going.  It had been forced to withdraw its opinions on L&H financial statements, but it continued to support FLV Fund, one of its other clients who was a party to the fraud.  In February, it announced that support to the FLV Fund Board.

273.  In late March, its approach changed.   Previously, KPMG had been motivated not to "rock the boat" of L&H's incredible revenue growth.  KPMG knew that this revenue growth was key to L&H's acquisition strategy, particularly its important acquisition of Dictaphone.  Thus, KPMG was either a willing participant in covering up the L&H fraudulent schemes or, at best, remained intentionally indifferent to suspicious facts, including facts that caused third parties, such as the reporters for *The Wall Street Journal*, to investigate L&H's finances.

274. After L&H's overstatement of revenues were publicly revealed and confirmed by the Audit Committee Report and after the Court of Commerce was breathing down its neck, KPMG's motivation and approach changed.  Now it attempted to portray itself as the "victim" of a fraud by L&H's management by highlighting all of the accounting irregularities that previously "escaped" its notice.

91

275. On April 6, 2001, KPMG Belgium filed suit against L&H for allegedly obstructing its efforts to audit L&H. In addition, KPMG alleged that certain officers and directors of L&H gave it "false, inaccurate or incomplete information." KPMG Belgium alleged that several persons tried to obstruct its audit "by pressing third parties to make false statements to KPMG."

276. On April 12, 2001, KPMG and the Verbeke Firm rendered their report finding that "important irregularities were committed" and that treating the LDCs and CLDCs as separate and unrelated companies "did not correspond to the reality." However, KPMG repeatedly sought, throughout the entire report, to make it appear to the greatest extent possible that KPMG had been the "victim" of a fraud perpetrated on it by management, and that there had been changes in operating practices after December 31, 1999, the last date for which KPMG had rendered an opinion as auditors. In connection with the LDCs in particular, KPMG tried to portray a meeting on March 20, 2000, as the "determining moment at which one deviated from the 'original' . . . concept [of management of the LDCs as separate entities.]" Yet, as the facts set forth in this Amended Complaint clearly demonstrate, KPMG not only could have known, but, in fact, did know, of the fraudulent practices engaged in from inception long before the close of the December 1999 year and willingly assisted L&H in its fraudulent schemes.

**The Report on Korea by PriceWaterhouseCoopers**

277. Because of the problems with Korean revenues identified on the Audit Committee Report, and the inability of the Audit Committee Advisers, L&H hired PriceWaterhouseCoopers ("PwC") to investigate L&H's accounting practices. This investigation was concluded in April 2001, and found that 70% of the nearly $160 million

92

in sales reported by the Korean unit of L&H between September 1999 and June 2000 were fictitious. The investigation uncovered two schemes that were used to create fictitious revenues:

> (a)    The first method involved factoring unpaid receivables to banks to obtain cash. Side letters gave the banks the right to be repaid the money advanced if the banks were unable to collect from L&H's customers, and the funds "advanced" to L&H under the "factoring" arrangements were held by the banks in restricted accounts as collateral. This "factoring" amounted at best to little more than a loan, not revenue for L&H.

> (b)    The second method involved L&H providing collateral for third parties to whom L&H customers transferred their contracts with L&H. The proceeds of the bank loans collateralized by L&H were used by the third parties to pay L&H. The essence was that L&H was paying itself.

> (c)    The investigation also reported that the bulk of L&H's sales in Korea came from contracts signed at the end of quarters, so L&H managers could meet ambitious quarterly sales targets. Thirty deals signed in the final 9 days of the second quarter of 2000 accounted for 90% of the revenue recorded by L&H Korea in that quarter. Of these 30 contracts, 21 subsequently were canceled for non-payment.

278.    The revelations in the PwC report indirectly revealed a collateral $25 million fraud by L&H management. The Bumil acquisition in September 1999 was for $25 million, but provided for an additional $25 million earnout if Bumil recorded $27 million in revenues over the next six quarters, certainly an ambitious goal since Bumil at the time was averaging only $12 million in revenues per year. The earnout required Bumil to increase its business by 150% over the next eighteen months. Instead, by the end of the year (only one quarter and two weeks), Bumil reported a startling and unbelievable $62.9 in revenues, $11 million on September 30th alone, and $19 million from two customers alone in December. Instead of questioning these revenues, which, in fact, were entirely fictitious, and were highly dubious on their face, the L&H Management and its Board voted to modify the acquisition agreement and pay the $25

million earnout one year early.  In an e-mail dated February 3, 2000, Defendant John Seo thanked L&H and said the money would be a help with the banks. He then used the funds to funnel money into effectively insolvent "customers" via an entity called LDS Korea.  LDS Korea's incorporation papers show that it was owned by Seo's right-hand man. The "customer" then used this money to make payments to L&H Korea.  L&H was effectively paying itself and recording those payments as revenues.  Seo recorded a loan due to him from L&H Korea of in excess of $25 million.

## Criminal Proceedings

279.    On November 23, 2000, the public prosecutor's office in Ipres, Belgium announced an official investigation into the legal repercussions of the financial irregularities at L&H.  The prosecutor stated that the investigation would determine who was responsible for the errors and irregularities and that this could include "both L&H personnel and KPMG auditors."  To date, Defendants Lernout, Hauspie, Bastiaens (who were extradited from the U.S.) and Willaert have been arrested in connection with an inquiry into fraud charges against them.  Verbeke, the Verbeke Firm, KPMG Belgium are subject to criminal proceedings.  Hardeman is the subject of a criminal investigation. As reported in *The New York Times* on June 25, 2003, Dexia, Artesia's successor, has now been indicted in Belgium for Artesia's role in the L&H frauds.

280.    On April 25, 2001, L&H reported filing a criminal complaint with the Seoul Prosecutors Office.  Among the defendants named in the complaint are current or former officers of Chottung Bank, Flana Bank, Hanvit Bank and Shinhare Bank.  John Seo is apparently a fugitive possibly living in China.