**FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS
LERNOUT, HAUSPIE, WILLAERT, BASTIAENS, DAMMEKENS,
SPOOREN, SEO, VANDENDRIESSCHE, RVD SECURITIES,
CAUWELIER, DePAUW, VANDERHOYDONCK, AND VAN ACKER
FOR VIOLATION OF SECTION 10(b)
OF THE EXCHANGE ACT AND SEC RULE 10b-5**

281.    Plaintiff repeats and realleges each and every allegation in the prior paragraphs as though fully set forth herein.

282.    Defendants Lernout, Hauspie, Willaert, Bastiaens, Dammekens, Spooren and Seo (the "Senior Management Defendants"), Vanderriessche, RVD Securities, Cauwelier and DePauw (the "Audit Committee Defendants"), Vanderhoydonck and van Acker (the "Director Defendants") (collectively, the "L&H Defendants"), individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to artificially inflate the stock price of L&H and to conceal its true financial condition.  The L&H Defendants employed devices, schemes, and artifices to defraud while in possession of material, adverse, non-public information, and they engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts, and omitting to state material facts necessary in order to make the statements made not misleading.

283.    The L&H Defendants participated, directly or indirectly, in the preparation, issuance, and dissemination of L&H's 1997, 1998 and 1999 financial results in L&H's Annual Reports and other filings with the SEC detailed herein and L&H press releases as set forth herein.  The L&H Defendants directly, or indirectly through others, specifically affirmed the truth of those financial statements in oral representations to Dictaphone in order to induce Dictaphone to purchase L&H stock.

95

284.  The L&H Defendants knew that the financial statements of L&H were materially false and omissive by, among other things, overstating revenues by a material amount, and by virtue of their participation in or knowledge of, among other schemes and devices:  (1) the creation of sham "licensees," including Dictation Consortium, Brussels Translation Group, and thirty start-up companies incorporated in Belgium and Singapore designed to facilitate the mischaracterization of loans or investments as revenue and to enable L&H to fund its research and development "off balance sheet;" (2) undisclosed "factoring" of receivables "with recourse" to bank accounts of L&H's Korean unit, which resulted in fraudulently reported fictitious revenues and fraudulently reported cash accounts; (3) transactions giving rise to improper recognition of revenue for barter or exchange transactions in which no cash changed hands; (4) transactions giving rise to improper recognition of sales revenues that were contingent on L&H later performing development work; (5) transactions giving rise to improper recognition of revenue prior to sales contracts being finalized; (6) transactions giving rise to improper recognition of revenue when collectibility was not reasonably assured; (7) transactions giving rise to improper recognition of revenue when the customer's ability to pay depended on an investment from L&H; (8) transactions giving rise to improper recognition of revenue when the "purchaser" of licenses was not the end-user and side letters confirmed that the license fee would be reimbursed if the licenses were not resold; (9) transactions giving rise to improper recognition of revenue when the customer had the right to return the product; (10) accounting practices intended to mischaracterize the foregoing transactions in order to falsely inflate L&H's revenues; and (11) the concealment of all of the foregoing.

96

285.    The massive fraud at L&H was driven by accounting considerations:  to show massive revenues when actual revenues were modest, to show revenue "growth" that did not exist, to hide large and growing expenses, and to show tens of millions of dollars of profits when there were hundreds of millions of dollars in losses.  Unlike the cruder forms of accounting fraud, the frauds committed at L&H were elaborate, complex, and expressly designed to make it appear that the L&H transactions complied with accounting standards, when, in fact, they emphatically and inarguably did not.

286.    In a letter written after the fraud was uncovered, Defendant Lernout claimed that KPMG was aware of all L&H accounting practices.  Indeed, KPMG partner Robert McLamb even boasted, in words or substance, that L&H "does not recognize revenue unless I tell them to."   But that is no defense for L&H management's or Directors' extreme and pervasive attempts to evade accounting requirements through deceit and concealment (although not concealed from the other L&H Defendants, Related-Party Defendants, accountants, investment bankers, or Belgian attorneys), acts in which all L&H Defendant officers and directors directly participated and benefited from.

287.    U.S. Generally Accepting Accounting Principles, or U.S. GAAP, are those principles recognized by the U.S. accounting profession as the conventions, rules, and procedures, either established by governing standards setting entities or generally accepted in practice, which define accepted accounting practices at a particular time.  Regulation S-X 17 C.F.R. §210.4-01(a)(1) states that financial statements filed with the SEC that are not prepared in accordance with U.S. GAAP are presumed to be misleading and inaccurate.  Here, that "presumption" is unnecessary.

288.  L&H represented to the SEC, to the investing public, and to Dictaphone that it prepared its financial statements in accordance with U.S. GAAP, and that it had a trained professional staff to ensure that they were so prepared.  The senior L&H management, however, embarked on a program to evade GAAP requirements. Dammekens, L&H's CFO, is named because evidence of the various fraudulent activity described herein had been repeatedly brought to his attention and he either ignored it or, at times, participated directly in it.  Dammekens did this while at the same time representing the exact opposite to the investing public, including Dictaphone, in signed financial statements.

289.  By acknowledging that its 1998, 1999 and 2000 financial statements needed to be corrected and restated, L&H has admitted that, contrary to its prior representations, those statements were not prepared in accordance with U.S. GAAP. Under U.S. GAAP, restatement of previously-issued financial statements is required to correct material misstatements and/or omissions in the financial statements as a result of conditions that existed at the time the financial statements were originally prepared. Financial Accounting Standards Board, *Accounting Standards, Current Text*, as published annually from June 1997 to June 2000 ("AS"), §A35.

290.  The Audit Committee Report makes it clear that L&H's financial results were not stated in accordance with U.S. GAAP, and that Defendants' representations to the contrary were false.  Moreover, the accounting principles that were disregarded were not esoteric or obscure; they were fundamental principles of revenue recognition and disclosure that were very much at the forefront of the accounting and auditing profession's concerns during the relevant period:

(a)    In a letter to the AICPA from the SEC Chief Accountant dated October 9, 1998, which was posted to the AICPA website on the Internet, the SEC addressed "inappropriate revenue recognition practices" and emphasized that auditors should be alert to the criteria for revenue recognition contained in Statement of Position (SOP) 97-2, *Software Revenue Recognition*; FASB Statement of Financial Accounting Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, and No. 6, *Elements of Financial Statements*; and SEC Accounting and Enforcement Release No. 108, all of which address the types of fraudulent practices identified by the Audit Committee Report;

(b)    AICPA Practice Alert No. 95-I, was "intended to remind auditors of conditions that can be indicative of increased audit risk with respect to improper and unusual revenue practices," and addressed specific practices identified by the Audit Committee Report;

(c)    AICPA Practice Alert No. 95-3 addressed related parties and related-party transactions, stating that "identifying related parties and material related party transactions is a key component of any audit;"

(d)    AICPA, *Audit Issues in Revenue Recognition*, 1999, at 21-26 addressed software revenue recognition and related party disclosures in financial statements, describing "indicators of improper revenue recognition" or "red flags" including "unusually rapid growth or profitability" and warned auditors to search for "side agreements," "related party transactions" and specific indicators of "the absence of agreements," "lack of delivery," or "incomplete earnings process;"

(e)    The AICPA also issued "Audit Risk Alerts" annually during the relevant period that discussed the same accounting and auditing issues highlighted in the Audit Committee Report.

291.  The Audit Committee Report demonstrates that L&H improperly recorded $83 million in licensing revenue from the licenses with "Strategic Partners," such as the LDCs and CLDCs.  The arrangements with the start-up shell companies obligated L&H to fully fund the research and development activities, either with its own money or money raised by it, and to complete software using L&H employees and facilities. L&H's accounting was improper under Statement of Financial Accounting Standard (SFAS) No. 68, *Research and Development Arrangements*, which requires that

"financial reporting of an enterprise that is party to a research and development arrangement should represent faithfully what it purports to represent and should not subordinate substance to form."

292.    At a minimum, under SFAS No. 68 and under SOP 97-2, L&H was required to account for the arrangement as a long construction-type contract and to defer recognition of revenues from the start-up shells over the development period. SFAS No. 68 provides that:

> An enterprise shall determine the nature of the obligation it incurs when it enters into an arrangement with other parties who fund its research and development.
>
> *  *  *  *
>
> To the extent that the financial risk associated with the research and development has been transferred because repayment of any of the funds provided by the other parties depends solely on the results of the research and development having future economic benefit, the enterprise shall account for its obligation as a contract to perform research and development for others.

SFAS No. 68 ¶¶4, 10. SOP 97-2, which "provides guidance on when revenue should be recognized and in what amounts for licensing, selling, leasing, or otherwise marketing computer software" states that:

> If an arrangement to deliver software or a software system, either alone or together with other products or services, requires significant production, modification, or customization of software, the entire arrangement should be accounted for in conformity with Accounting Research Bulletin (ARB) No. 45, Long Construction-Type Contracts . . .

SOP 97-2 ¶7.

293.    Since the start-up shells were related parties, the funds received by L&H should have been treated as liabilities:

If the enterprise is obligated to repay any of the funds provided by the other parties regardless of the outcome of the research and development, the enterprise shall estimate and recognize that liability. This requirement applies whether the enterprise may settle the liability by paying cash, by issuing securities or by some other means.

AS §R55.103.

294.    Among the transactions detailed in the Audit Committee Report as raising concerns about research and development funded by related parties were:

(a)    In the second quarter of 1998, L&H recognized $500,000 of license revenue from FLV Telecom, a customer in the Belgian office which indicated that it had no use for the software when it was purchased. The customer's sole funding came from Defendant S.AI.L. Trust.

(b)    In the third quarter of 1999, L&H recognized $16 million from license agreements with four Belgian "customers," CLDCs, Salfas, Senegal, Baleston and Durzano, which had been incorporated only weeks earlier. On October 22, 1999, KPMG client FLV Fund invested $10 million in those entities.

(c)    Another four customers stated that various arrangements had been proposed, including L&H's purchase of them, to ensure a return on their investment in L&H research and development.

295.    Although the Audit Committee Advisors did not examine the BTG and Dictation Consortium transactions "because of the ages of the transactions and our understanding that KPMG carefully reviewed these transactions at the time," under the Audit Committee Report analysis, revenue from those entities was also recorded improperly. According to a December 7, 2000 article in *The Wall Street Journal*, L&H stated that it had "gathered outside investors" to fund Dictation Consortium in 1996, and admitted that "L&H employees wrote its business plan and did the software work under contract." The "outside investors" who funded Dictation Consortium included KPMG client FLV Fund and FLV Management, which together owned 61% of Dictation Consortium when it was founded, and reduced that holding to 43% in 1997. Thus, the

101

$26.6 million in revenue from Dictation Consortium in 1996 and 1997, which constituted

24% of L&H's revenues in 1996 and 19% in 1997, should at least have been deferred

over the life of the project.   More likely, as noted by the SEC in its October 2002

Complaint, since FLV Fund and FLV Management were related parties, the so-called

"revenues" to L&H should have been considered loans or paid-in capital and booked as

liabilities during those years.

296.    L&H's treatment of the start-up shells also violated SFAS No. 57, *Related

Party Disclosures*, which requires "disclosures of material related party transactions"

including:

(a)    The nature of the relationship(s) involved.

(b)    A description of the transactions, including transactions to which no
amounts or nominal amounts were ascribed, for each of the periods for
which income statements are presented, and such other information
deemed necessary to an understanding of the effects of the transactions
on the financial statements.

(c)    The dollar amounts of transactions for each of the periods for which
income statements are presented and the effects of any change in the
method of establishing the terms from that used in the preceding period.

(d)    Amounts due from or to related parties as of the date of each
balance sheet presented and, if not otherwise apparent, the terms and
manner of settlement.

AS § R36.102.

297.    Notes to L&H financial statements for 1997, 1998, and 1999 contain long

lists of "related parties," conspicuously lacking any of the detail required by SFAS No.

57.  Moreover, the connections to related parties revealed by the Audit Committee

Report demonstrate that L&H affirmatively misrepresented the amount of revenue it

recognized from the start-up shells which provided 10% of L&H's 1998 revenue and

25% of its 1999 revenue. In its 1998 Annual Report on Form 20-F, L&H stated that only 3.7% of its 1998 revenue was provided by "companies funded in part by the FLV Fund." In Notes to its 1999 financial statements, the long list of related parties identified "companies funded in part by the FLV Fund and L&H Investment Co." L&H fraudulently stated that only 0.3% of 1999 revenues (approximately one-tenth of the true amount of 25%) were provided by such companies. Schedules actually reviewed by KPMG during its audit would have revealed the true and accurate percentages.

298. L&H also flouted the provisions of SOP 97-2 relating to revenue from sales or licenses that do not require contract accounting. Under those provisions, if the arrangements do not require significant production, modification, or customization of software, L&H was not permitted to recognize revenue until *all* of the following criteria are met:

a. Persuasive evidence of an arrangement exists.

b. Delivery has occurred.

c. The vendor's fee is fixed or determinable.

d. Collectibility is probable.

SOP 97-2 ¶8 (emphasis added).

299. The Audit Committee Report lists numerous instances where L&H recognized revenue even though no contract was signed or the terms were not finalized, and thus no "persuasive evidence of an arrangement" could exist as required by SOP 97-2:

(a) In the second quarter of 1998, L&H recognized revenue from a June 30, 1998 agreement with Digital Voice, a customer in the Burlington office requiring a $150,000 prepaid royalty. An August 6, 1998 e-mail from the customer indicates that the contract was not finalized.

103

(b)    L&H recognized revenue in the third quarter of 1998 from a September 30, 1998 distribution agreement with Voicenet, a Burlington customer containing a $1,000,000 prepaid royalty.   An October letter revealed that the final terms of the agreement were not determined until the fourth quarter of 1999.

(c)    L&H recognized $4 million in the fourth quarter of 1999 based on an agreement with Lavenia (the Armenian LDC) dated December 30, 1999, when an e-mail dated January 5, 2000 to Dammekens discusses terms to be included in contract, including a $3 million fee and demonstrating that the terms had not been concluded.

(d)    L&H recognized $5 million from a license agreement with TIB, a customer in the Belgian office, in the fourth quarter of 1999, when a January 4, 2000 e-mail from the customer indicates that the contract was not final until the first quarter of 2000.

(e)    In the second quarter of 1999, L&H recognized $3 million from a license agreement with IMedical, a Belgian customer, dated June 30, 1999. A July 7, 1999 e-mail indicates the contract was not signed until the third quarter of 1999.

(f)    In the fourth quarter of 1999, L&H recognized $4 million from a license agreement with ITravel, a customer in the Belgian office, dated December 31, 1999. An e-mail dated January 5, 2000 from Beernaert to Willaert and Dammekens indicates the contract was not signed until the first quarter of 2000.

(g)    In the first quarter of 2000, L&H recognized $8 million in revenue based on agreement dated March 31, 2000 with ELC. An April 4, 2000 e-mail to Willaert, Hauspie and Dammekens shows the agreement not finalized.

(h)    L&H recognized $50,000 of revenue in the third quarter 1999, from an agreement with NEC, which told the Audit Committee Advisors that the terms of contract were never finalized, the customer was never invoiced, and the customer never paid.

(i)    L&H recognized $12 million in the third quarter of 1999 from contracts with three CLDCs, Lupeni, Jelgava and Harrisca, that each had a contract reflecting a $4 million fee and a second contract reflecting a $2 million fee, making it unclear whether there was any agreement in the quarter when the revenue was recognized.

300.   The Audit Committee Report lists numerous instances where L&H recorded sales when it was not clear that the customer had the ability to pay for its

products or services, including instances when the customer was not even invoiced, and thus collectibility was not probable, as required by SOP 97-2:

(a)    During the first three quarters of 1998, BCB, a customer in the Burlington office, licensed $1.25 million of L&H software.  In July, 1998, the customer and L&H entered into a stock swap valued at $1.6 million.  The customer was a start-up that intended to use proceeds from the sale of the L&H stock to pay the license fees, but was unable to sell the stock until October 1998.  Collectibility was not probable until the customer sold the stock and determined that the proceeds were sufficient to cover the license fees.

(b)    On September 27, 1999, the Belgian unit of L&H recognized $220,000 of license revenue but never invoiced the customer, Computer Services Solutions, for fees.  Jan Anthierens told the Audit Committee Advisors that "L&H did not invoice customers until it believed the customer could pay."

(c)    On December 31, 1998, the Belgian unit of L&H recognized $250,000 of license revenue from Advance Voice Technology, but never invoiced the customer, a start-up that had been established only one month before the license agreement.

301.    L&H recorded sales when the customer's ability to pay depended on an investment from L&H (sometimes referred to as "round tripping"), which also demonstrated that collectibility was not probable as required by SOP 97-2:

(a)    On September 27, 1999, L&H recognized $450,000 of revenue based on a license agreement with Industry Productivity Group, a customer in the Belgian office that was expecting an investment from KPMG client FLV Fund.  L&H never invoiced the customer for the fee.

(b)    A customer in the Burlington office, Interpra, who licensed $250,000 of L&H software on December 31,1998 and another $250,000 on March 31, 1999, maintained that there was a verbal promise of funding from FLV and did not want to pay the license fee until the customer received the funding.

(c)    On March 25, 1998, Vasco, a customer in the Burlington office, licensed $800,000 of L&H software.  On December 31, 1998, the customer licensed an additional $900,000 of L&H software.  In March 1998, L&H loaned the customer $3 million, due January 4, 1999.  The loan

was not repaid until the second quarter of 1999, when defendant LHIC invested $5 million in the customer.

302.    L&H recognized sales revenues that were contingent on L&H later performing development work for the customer.  SOP 97 requires that recognition of revenue be deferred until "delivery has occurred," and that delivery be determined as to each one of multiple elements, including the separate element of software delivered "on a when-and-if-available" basis:

(a)    In the first quarter of 1999, L&H recognized $1 million of license revenue from an agreement with I-Merge.  An August 25, 2000 letter indicates that delivery of all software did not occur until June 1999 and then the software was replaced in August, 1999.

(b)    On June 30, 1999, L&H recognized $900,000 based on a license agreement with Cegeka allocated among different language versions of Voice Express.  One version was to be licensed "when and if delivered." The other two versions were never delivered.

(c)    On March 17, 1999, L&H recognized $900,000 from an agreement with G2 Speech allocated among four language versions of software.  One version was delivered in March of 2000, the others never delivered, and nothing was paid.

303.    Korean contracts reviewed by the Audit Committee Advisors raised multiple issues under SOP 97-2.  The Audit Committee Report notes that KPMG Belgium was aware of the issues raised by the Korean contracts, but the record did not disclose to the Audit Committee Advisors how KPMG Belgium was able to resolve them.  In fact, KPMG Belgium never did resolve those issues; instead, it buried the problem and issued its report.  As the PwC Report later revealed, 70% of the nearly $160 million in revenue reported in Korea between September 1999 and June 2000 was entirely fictitious, an the facts set forth above demonstrate that all of the L&H officers and Director Defendants either directly participated in the Korean fraud or intentional or recklessly turned a blind eye to the fraud.

304.    On September 30, 1999, Voice Tech and International Business Computer ("IBC") signed distribution and development agreements pursuant to which L&H recognized a total of $11 million in the third quarter of 1999, which was, according to KPMG Korea, the largest amount Bumil ever recorded, and nearly equivalent to the revenues for the prior entire year, and an additional $1.6 million in the fourth quarter of 1999. In the third quarter of 1999, L&H "factored" $13.7 million of receivables from the contracts. An e-mail on October 17, 1999 from O.B. Kwon of KPMG Korea to the KPMG Audit Manager, Stephen Huysman, and Audit Partner, William Van Aerde, states that Voice Tech was established in July 1999 "with minimum paid in capital" and IBC was unknown, and that the $11 million receivable due from these companies was "factored," but "the L&H Korea bank accounts have been held as collateral for the factoring agreements" and that "we [KPMG Korea] believe the factoring is 'with recourse'." On October 21, 1999, both customers signed "amendments" removing their right to distribute "when and if available" products, giving up a valuable contract right for nothing. This amendment was apparently an effort to remove an issue regarding revenue recognition with respect to such products, but the amendment itself is unusual.

305.    Two other Korean customers, HI World and Digital Sei-Young, signed license agreements in December 1999, pursuant to which L&H recognized nearly $19 million in the fourth quarter of 1999. In that quarter, L&H "factored" nearly $24 million of receivables from those contracts. The Audit Committee Report queried whether collectibility was sufficiently probable for revenue to have been recognized under SOP 97 and noted that KPMG was aware of both agreements. In fact, HI World, which

represented the bulk of the receivable, had no ability to pay and never did pay, and L&H Korea had no ability to deliver the product it purchased at the contract price.

306.   L&H recorded revenues when the "purchasers" of the licenses were not the end users.  Side letters confirmed that if the licenses were sold to other parties, a finder's fee would be paid, but if the licenses were not resold, the original payments to L&H would be refunded.  The fees in these arrangements should not have been recognized at all because they were not "fixed or determinable" as required by SOP 97-2, and the earnings process in what was, essentially, a consignment sale, was not consummated:

>   (a)    L&H recognized $8 million of revenue in the fourth quarter of 1999 from a license agreement with Capital Union dated December 29, 1999. Side letters signed by Hauspie and Willaert obligate L&H to refund a portion or all of license fee if L&H doesn't find investors for the customer.

>   (b)    L&H signed an agreement with the Farsi and Turkish LDCs in the third quarter of 1998, and another in the first quarter of 1999.  W.H. Operations, which bought the shares of the LDC from the original investors on September 23, 1999, wanted $1.3 million of free warrants from L&H.  Dammekens and Willaert told investors that it had to pay for the warrants "because of the P&L impact," but that L&H would make it up to them later.  And it did.  An agreement dated August 1, 2000, but apparently signed after September 23, between L&H and W.H. Operations obligated L&H to pay $1.8 million to them over two years for "introductions" to influential politicians and business people. Dammekens admitted to the Audit Committee Advisors that this agreement was entered into to reimburse the customer for the warrants.

307.  Statement of Financial Accounting Standard SFAS No. 48, *Revenue Recognition When Right of Return Exists*, provides that revenue may be recognized only when all of the terms of the sale are fixed or determinable and the sale has become final.  AS §R75.107.  The Audit Committee Report confirms that L&H recorded

revenues although the customer had a right to return the product, including the following:

(a)    On December 29, 1998, CCG, a customer in the Burlington office, signed a distributor agreement requiring a $569,620 non-refundable fee. L&H recognized $152,500 in the fourth quarter of 1998.  The contract gave the customer the right to return, and the customer never paid any money under the agreement.

(b)    On December 31, 1998, L&H entered into a distribution agreement with D&H Distributing, a customer in the Burlington office, who was obligated to prepay $500,000 in royalties.  L&H recognized $350,000 in revenue in the fourth quarter of 1998 even though the contract gave the customer the right of return, the customer never paid any fees, and the customer returned all the product.

308.    The Audit Committee Report reveals that L&H improperly recorded revenue for barter or exchange transactions with other software firms in which no cash ever exchanged hands.  Under Statement of the Accounting Principles Board Opinion (APB) 29, *Accounting for Nonmonetary Transactions*, such transactions do not culminate an earnings process and therefore do not produce recognizable revenue:

""[T]he following two types of nonmonetary exchange transactions do not culminate an earnings process:  a. An exchange of product or property held for sale in the ordinary course of business for a product or property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange, and b. An exchange of productive asset not held for sale in the ordinary course of business for a similar productive asset or an equivalent interest in the same or similar productive asset."

AS §N35.108.

309.    L&H improperly recorded revenue from the following barter transactions:

(a)    L&H recognized $375,000 of revenue in the third quarter of 1998 and $435,000 of revenue in the fourth quarter 1998 from a reseller license contract dated September 29, 1998 with Speech Machines, a customer in the Burlington office.  On January 15, 1999, L&H entered into an amended reseller agreement obligating L&H to pay an upfront fee of $1.25 million to the customer for no additional consideration.

(b)    L&H recognized revenue in the third quarter of 1998 from a September 30, 1998 license to Nine Rivers Technology, a customer in the Burlington office, of $950,000 of L&H software with a net benefit to L&H (after marketing expenses) of $838,000.  On January 15, 1999, L&H licensed $830,000 of the customer's software for resale.

(c)    L&H recognized revenue in the first quarter of 1999 from a license to Interpra, a customer in the Burlington office, of $250,000 of L&H software on December 31,1998, and another $250,000 on March 31, 1999. L&H licensed $250,000 of the customer's software on January 4, 1999 and another $250,000 in the third quarter of 1999.

(d)    In the fourth quarter of 1997, L&H agreed to pay $1.2 million to Voice Import Technologies, a customer in the Burlington office, to develop Power-Scribe technology.  In the same quarter, that customer licensed $1.5 million of L&H software for resale.  L&H recognized $1.2 million in that quarter, even though client never delivered anything under the agreement.

(e)    L&H recognized revenue in the first quarter of 1998 from a March 31, 1998 license to Korteam, a customer in the Burlington office of $300,000 of L&H software.  On June 29, 1998, L&H licensed $500,000 of contexts to be developed by the customer, with a $200,000 rebate if L&H obtained financing for the customer.  The customer never sold any L&H product, and L&H relieved it of all obligations.

(f)    L&H recognized revenue in the first quarter of 1998 from a March 31, 1998 license to Sequoia, a customer in the Burlington office, of $30,000 of L&H software.  L&H licensed $30,000 of the customer's software at same time.

(g)    In the fourth quarter of 1998, L&H recognized revenue from a December 27, 1998 license to AVRI/E-docs, a customer in the Burlington office, of $1,000,000 of L&H software.  On January 11, 1999, L&H committed to pay $400,000 for the development of contexts by the customer.

(h)    On December 19, 1998, L&H recognized $800,000 of license revenue from an agreement with Educa, a customer in the Belgian office. A second contract stated the fee as $500,000.  The customer's CEO told the Audit Committee Advisors that he never had any intention to pay $800,000, but understood there was an oral agreement for L&H to purchase a reciprocal amount of software.  L&H never invoiced the customer, nor was anything paid.

310.  L&H's reported financial results also violated the following fundamental concepts underlying GAAP:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. FASB Statement of Concepts No. 1, ¶34;

(b)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources.  FASB Statement of Concepts No. 1, ¶40;

(c)    The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. FASB Statement of Concepts No. 1, ¶42;

(d)    The principle that financial reporting should be reliable and that it represents what it purports to represent.  That that information should be reliable, as well as relevant, is a notion that is central to accounting. FASB Statement of Concepts No. 2, ¶58.

(e)    The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions.  FASB Statement of Concepts No. 2, ¶79;

(f)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. FASB Statement of Concepts No. 2, ¶¶95, 97.

311.  While the allegations above clearly and directly implicate senior management in L&H's fraud, they also implicate the directors generally, and, most particularly, the members of the Audit Committee.  Among the items known to the Audit Committee, which demonstrate its knowing participation or reckless disregard of the

fraud, were that L&H Directors were aware of a number of facts which indicate their participation in the fraud; in particular, the incredible growth of Bumil revenues and the bizarre agreement to accelerate the $25 million earnout. The timing of the large sale of stock by Defendant Vanderhoydonck and GIMV (of which Defendant van Acker was chairman) right after the SEC investigation expanded, is additional evidence of knowledge of fraud.

312.    Although KPMG continued to give a clean audit, the Audit Committee had a duty to oversee the auditors, that is, to guard the guardians. The Audit Committee was reckless in performing this role until at least the September/November 2000 investigation, after the horse was out of the barn.

313.    In addition to the many facts previously alleged, the Audit Committee had specific additional warnings which it either knowingly or recklessly disregarded.

314.    L&H had failed to implement a system of internal audit controls, as KPMG had been persistently recommending since May 1998.

315.    L&H failed to hire an internal auditor until June 2000, despite the Audit Committee's own commitment in August 1999 to get back to the directors with a recommendation.

316.    The Audit Committee promised the Board of Directors that it would meet prior to each quarterly financial report to review the report and continued to sign off on financial statements in 2000, despite the continuing lack of internal controls and various red flags.

317.    L&H management was issuing financial information in press releases without the advance approval of the Audit Committee.

318.    In reports to the Audit Committee, KPMG continually noted issues concerning cash collection from the LDCs and revenues recognized from Korea, and in a letter dated August 18, 1999, KPMG had reported that at least nine transactions in the second quarter of 1999 were questionable.

319.    In a confidential letter, KPMG reported on November 17, 1999 to Vandendriessche, the chair of the Audit Committee, that it did not consider its "limited review of the third quarter financial statements completed, because of outstanding revenue recognition issues in Korea and cash collection issues from the LDCs."

320.    In a separate letter from KPMG to Dammekens also dated November 17, 1999, which was communicated to Vandendriessche, KPMG advised that it could not sign the audit opinion for the December 31, 1999 audit unless issues relating to outstanding receivables, revenues and Korean contracts were resolved. They were not, but KPMG signed nonetheless.

321.    The SEC was investigating L&H accounting practices since January 2000.

322.    Despite their awareness of all of these issues, on information and belief, the Audit Committee did nothing to explore these issues or to verify the accuracy of L&H's financial reporting.

### Scienter

323.    In addition to the foregoing, knowledge of the fraud or recklessness in disseminating the fraudulent statements of the Senior Management Defendants,

Lernout, Hauspie, Willaert, Bastiaens, Dammekens, Spooren, and Seo is evidenced by,

among other things:

(a)    L&H's admission that its financial statements for 1998, 1999 and 2000 must be restated as a consequence of "errors and irregularities," "irregularities" being an accounting term of art for intentional misstatements or omissions in financial statements.

(b)    Lernout's and Hauspie's involvement, detailed above, in the FLV Fund, the FLV Fund Management, and LHIC, all entities through which L&H secretly funded its licensees.

(c)    The Audit Committee Report's specific identification of Defendants Lernout, Hauspie, Bastiaens, Willaert and Dammekens as participants in transactions, and correspondence giving rise to the fraudulent reporting of revenue, including, for example:

(i)    Bastiaens made numerous public misrepresentations through the media, as set forth in above.

(ii)    Two side letters, one signed by Willaert and the other by Hauspie, and a proxy for Willaert, obligating L&H to repay a portion, or all, of an $8 million license fee recorded as revenue in the fourth quarter of 1999 pursuant to a December 29, 1999 agreement with a Belgian customer, Capital Union.

(iii)    A January 5, 2000 e-mail to Willaert and Dammekens indicating that an agreement with a customer of L&H's Belgian office, Lavenia, pursuant to which $4 million was recognized in the fourth quarter of 1999, had not been signed in that quarter but had been backdated to December 30, 1999.

(iv)    Willaert's and Dammekens' statements to investors in the LDCs for Turkish and Farsi who wanted $1.3 million of free warrants from L&H that the investors "had to pay for the warrants because of the P&L impact, but that L&H would make it up to them later," and Willaert's and Dammekens' admissions that a later contract obligating L&H to pay those investors $1.8 million "for 'introductions' to influential politicians and business people" was "entered into to reimburse [the investors] for the warrants."

(v)    A January 4, 2000 e-mail to Hauspie and Lernout indicating that an agreement with a customer of L&H's Belgian office, TIB, pursuant to which $5 million of revenue was recognized in the fourth quarter of 1999, had not been signed in that quarter.

(vi)    Lernout and Hauspie funded an entity which provided the sole funding for a customer in the Belgian office, FLV Telecom, who signed a license agreement in the second quarter of 1998, pursuant to which $500,000 of revenue was recognized in that quarter, which customer stated that "he had no use for [the] software when purchased."

(vii)    A July 7, 1999 e-mail to Bastiaens, with a copy to Hauspie, from Lernout indicating that a license agreement with a customer of the Belgian office, I-Medical, pursuant to which $3 million of revenue was recognized in the second quarter of 1999, had not been signed in that quarter and had been backdated to June 30, 1999.

(viii)    An April 4, 2000 e-mail to Willaert, Hauspie, Bastiaens and Dammekens indicating that a contract with a customer in the Belgian office, ELC, pursuant to which $8 million of revenue was recognized in the first quarter of 2000, was not finalized in that quarter and had been backdated to March 31, 2000.

(d)    As reported in an August 8, 2000 *Wall Street Journal* article, in response to questions that had been raised about the enormity of the Korean revenues, Bastiaens asserted that the surge in Korean sales was the result of L&H's "acquisition of Bumil . . . [which] provided entrée to many Korean firms that became substantial customers, and L&H benefited form its early market presence and lack of competition." Bastiaens made this assertion despite full knowledge of its falsity, indeed, knowing full well, as evidenced by a memorandum from Bumil to L&H, that there were issues with Bumil regarding the increasing customer complaints and breaches of contract "due to the low quality of [the] L&H engine," the "[e]merging extensive competitors" offering high quality and low cost and the customer's perception of the L&H product as "high cost and low quality".

(e)    The Audit Committee Advisors recommended that "disciplinary action should be taken against certain employees involved in the activities that are the subject of this report" and specifically identified Willaert, Bastiaens, Hauspie, Lernout, and Dammekens as persons who had resigned their positions and as to whom the Board of Directors [should] consider whether disciplinary action is appropriate."

(f)    John Duerden, the former CEO of Dictaphone who replaced Bastiaens as CEO of L&H when the fraud began to become public, told *The Wall Street Journal* that the Korean unit, from which $100 million was missing, was controlled by Lernout, Bastiaens and Willaert. In a December 7, 2000, article, *The Wall Street Journal* reported that: "Mr. Duerden says he repeatedly asked how and when the cash [$106 million] could be sent to headquarters, but got evasive answers from Mr. Seo, the Korean unit's chief. Despite being CEO, Mr. Duerden says, 'I never felt like I had control over the Korean operation,' which he adds was

'managed close to the chest' by Mr. Hauspie, Mr. Bastiaens and then-Vice Chairman Nico Willaert."

(g)    The L&H Senior Management Defendants were motivated by a need to maintain a high price for L&H stock so that they would be in a position to consummate the Dragon and Dictaphone acquisitions, which L&H could not otherwise afford.

(h)    The fact that Defendants Lernout, Hauspie, and Bastiaens were imprisoned in Belgium pending resolution of criminal fraud charges against them in connection with the matters detailed herein.

(i)    Defendant Spooren had responsibility for four key departments at L&H: corporate communications, investor relations, business development, and marketing.  In her "communications" function, Spooren was responsible for the content of L&H press releases referenced herein, which were disseminated to the print media and posted on the Internet, including on the L&H website.    Spooren included content in press releases and on the website knowing it was false and misleading, and intentionally manipulated the content and timing of such releases to procure the desired effect on L&H's stock price.  Indeed, in a December 28, 1999 e-mail from Spooren to Bastiaens, Spooren outlined a strategy that would "definitely KILL [the short sellers], once and for all" (emphasis in the original).  The strategy included, among other things, the continued release of "strong and positive news."   As set forth above, this was obviously without regard for the veracity of the "strong and positive news."

(j)    In the same e-mail of December 28, 1999, Spooren also states that "[t]he only thing we can do is . . . overdeliver our year end results," an apparently impossible task to complete with only three business days until year end 1999 — at least to accomplish honestly.

(k)    In an interview at a trade fair reported by AFX Europe on February 25, 2000, Spooren claimed that the company (L&H) was "undervalued" due to its consolidated structure.  Spooren claimed this knowing, by virtue of her position in the L&H and close relationship with Bastiaens, that the company was in fact over valued as a result of the accounting fraud then under SEC investigation, as well as a result of her own public relations efforts.

(l)    As referenced above, and contrary to her claims that L&H was overvalued, Spooren sold over $2 million of her L&H stock between May 15 and May 25, 2000 with knowledge of the SEC investigation.  At the same time that Spooren, along with several other insiders including Defendant Vanderhoydonck, was selling her own stock, she was responsible for the issuance of a May 24, 2000 L&H press release which trumpeted the fact that Bastiaens and Seo allegedly had bought $5 million

116

in L&H stock with plans to buy $5 million more in order to further boost investor confidence.    In fact, at approximately the same time that Bastiaens and Seo were buying, Spooren and other L&H insiders were selling far more of their own stock.

(m)    Upon information and belief, Bastiaens bought the L&H stock referenced above, with proceeds from a loan from Artesia (now under indictment in Belgium), that was procured with the assistance of Defendant SG Cowen and guaranteed by L&H.

(n)    Spooren has a history of insider trading.  According to a letter dated January 22, 1999 that was apparently sent by L&H to Anthony Preece of EASDAQ, N.V., in response to an EASDAQ inquiry about, among other things, officers and directors who had sold stock during the period November 20 through December 2, 1998 when an SEC inquiry was in progress, Spooren was among the representatives of L&H who were involved in discussions among L&H, KPMG, and L&H's U.S. counsel, Brown, Rudnick, Freed & Gesmer ("BRF&G"), regarding L&H's response to the SEC's November 30, 1998 Comment Letter regarding the accounting treatment of certain L&H acquisitions.  The SEC had initiated the inquiry by telephonic communications to BRF&G as early as the week of November 1, 1998.  Spooren, who was obviously intimately aware of the details and progress of the SEC inquiry, sold over 50,000 shares of her L&H stock for a gross sale price of over $2 million in two separate transactions on November 23, and November 30, 1998.  The fact that Spooren was included in L&H discussions regarding a response to an SEC Comment Letter regarding L&H accounting treatment of certain acquisitions demonstrates that she was a knowledgeable insider.

(o)    Spooren was an insider who was highly knowledgeable about L&H's accounting practices.    As set forth above, Spooren was a participant in L&H's responses to the SEC, and, as illustrated by a series of e-mails dated between March 3 and 7, 1999, Spooren was included by Bastiaens in management meetings which discussed, among other things, the "set-up strategy for BTG," the "current status with law suits and SEC review," "expected 99 budget," and "results so far."

(p)    Under Spooren's direction, and with the approval and authorization of the other L&H Senior Management Defendants, on February 7, 2000, L&H posted on its worldwide website, and disseminated to the print media press releases bragging about a successful test of a new and revolutionary hand-held voice recognition machine, and further announcing that L&H would demonstrate this amazing new product live on CNN.  Although widely touted, on information and belief, Spooren knew the L&H prototype did not function as described by L&H, and upon information and belief, rather than a live demonstration of the hand-held device, L&H attempted to deceive the public by performing the

117

demonstration of the product which had, in fact, been hard wired to a computer for the demonstrations. The L&H media blitz regarding this new hand-held product, however, pushed L&H's stock up by 31%.

(q)    The numerous GAAP violations detailed in herein and the sheer magnitude of the overstatement of revenue itself demonstrates a knowing intention to deceive by L&H management.

324.    The knowledge of the fraud or recklessness in disseminating the fraudulent statements of the Audit Committee, Defendants Vandendriessche, RVD Securities, Cauwelier and DePauw is evidenced by, among other things:

(a)    L&H had failed to implement a system of internal audit controls as KPMG had been recommending since May 1998.

(b)    L&H failed to hire an internal auditor until June 2000, despite the Audit Committee's own commitment in August 1999 to provide the Board of Directors with a recommendation.

(c)    The Audit Committee promised the Board of Directors that it would meet prior to each quarterly financial report to review the report and continued to sign off on financial statements despite the continuing lack of internal controls.

(d)    The Audit Committee knew the SEC was investigating L&H accounting practices in January 2000, but continued its failure to curb management misstatements of revenue which increased in the first half of 2000.

(e)    L&H management was issuing financial information in press releases without the advance approval of the Audit Committee.

(f)    In reports to the Audit Committee, KPMG continually noted issues regarding cash collection from the LDCs and the revenues recognized from Korea and, in a letter dated August 18, 1999, KPMG had reported that at least nine transactions in the second quarter of 1999 were questionable.

(g)    In a confidential letter, KPMG reported on November 17, 1999 to Vandendriessche, the chair of the Audit Committee, that it did not consider its "limited review of the third quarter financial statements completed, because of outstanding revenue recognition issues in Korea and cash collection issues from the LDCs."

(h)    In a different letter from KPMG dated November 17, 1999, which was communicated to Vandendriessche, KPMG advised that it could not sign the audit opinion for the December 31, 1999 audit unless issues relating to the outstanding receivables, revenues and Korean contracts were resolved.

(i)    Vandendriessche, RVD Securities' representative on the L&H Board, signed the Form S-3 Registration Statement filed by L&H on August 25, 2000, which publicly incorporated the fraudulent 1999 Form 10-K report filed on June 30, 2000 despite the various red flags set forth above, which were not resolved, despite the open issues raised in the SEC investigation.

(j)    Audit Committee members Vandendriessche and DePauw were present at the Board of the Directors meeting on January 17, 2000, during which the acceleration of the earnout to Bumil/L&H Korea was unanimously approved .

325.    The knowledge of the fraud or recklessness in disseminating the fraudulent statements of the Director Defendants Vanderhoydonck and van Acker is evidenced by, among other things:

(a)    Vanderhoydonck was President and Managing Director of LHIC.

(b)    Vanderhoydonck, by virtue of his education and training fully understood how L&H was fraudulently reporting revenues and LHIC's role in that fraud, was one of several directors and consultants of LHIC, who, according to the 2000 10K of L&H, had performed financial, accounting and strategic planning services for L&H.  Prior to heading LHIC in 1998, Vanderhoydonck was the head of Corporate & Investment Banking at Générale Bank and was an assistant professor at the University of Brussels.  At the time of the events alleged herein, Vanderhoydonck held degrees in Law, Economics and Tax Law from the University of Brussels, Common Law from Cambridge and an M.B.A. from New York University.

(c)    Vanderhoydonck often reported to the Board of L&H on LHIC's activities and investments.

(d)    Vanderhoydonck participated in the January 17, 2000 Board of Directors' meeting which considered, and unanimously approved, the acceleration of the earnout payment to Bumil based upon an alleged single quarterly performance of Bumil that outstripped by hundreds of percent, its prior annual performance and, at a minimum, raised serious red flags regarding the veracity of reported earnings.

(e)    Vanderhoydonck was the recipient of many internal e-mails regarding such sensitive subjects as the LDCs and their accounting treatment, for example, the May 14, 1999 e-mail from Denys commenting on the May 13, 1999 memo from Dan Blake regarding the "L&H project" or LDCs described above, as well as a May 11, 1999 memo from Denys and Blake regarding L&H's "strategic alternatives."

(f)    Vanderhoydonck, although officially occupying the positions of Director of L&H and President and Managing Director of LHIC, was deeply involved in the activities of all the Related-Party Defendants.  Thus, for example, in an e-mail dated April 10, 1999 to Hauspie and Lemout, Vanderhoydonck discusses suggested action involving not only LHIC, but also S.AI.L. Labs and the FLV Fund.

(g)    Vanderhoydonck was deeply involved in decisions regarding the structure and staffing of many of the component parts of "Jo & Pol Inc.," as illustrated by e-mails between Vanderhoydonck and Hauspie over the period of April 10 to 12, 1999, in which they discuss the structure and staffing decisions for LHIC, S.AI.L. Labs, and FLV.

(h)    Vanderhoydonck was aware of the SEC investigation into L&H accounting practices which had commenced in January 2000 and expanded in April 2000, and sold 163,000 shares of L&H common stock, the entirety of his personal holdings, for a profit of $3.2 million in May 2000, shortly after the SEC expanded its investigation into L&H by seeking information and documents from KPMG.

(i)    van Acker, who was an L&H Director at the same time as he was Chairman of GIMV, which held a one-third interest in FLV Fund Management, as noted herein, caused GIMV to file a Form 144 indicating an intention to sell over $33 million of its investment in L&H on May 15, 2000, shortly after the SEC expanded its investigation.

( j)    van Acker, as a control person of GIMV, effectively also controlled FLV Fund through GIMV's one-third interest in FLV Fund's statutory manager, FLV Fund Management.

326.    Dictaphone relied on the materially false and misleading financial statements misrepresentations and omissions set forth above in purchasing L&H stock. Had the L&H Defendants accurately presented L&H's true financial condition and financial results, Dictaphone would not have entered into the Merger Agreement. As a result of the L&H Defendants' fraudulent conduct, Plaintiff has sustained damages,

including, but not limited to, loss or diminution of its value as a going concern and consequential damages in an amount to be proven at trial, but no less than $900,000,000.

## SECOND CLAIM FOR RELIEF AGAINST THE L&H DEFENDANTS AS CONTROL PERSONS OF L&H PURSUANT TO SECTION 20(a) OF THE SECURITIES & EXCHANGE ACT

327.    Plaintiff hereby repeats and realleges each and every allegation in the prior paragraphs as though fully set forth herein.

328.    Each of the L&H Defendants was a controlling person of L&H within the meaning of Section 20(a) of the Exchange Act at all times during the period he served as an officer and/or director of L&H.  The L&H Defendants, by virtue of their positions as officers and directors of L&H, had the power to influence and control, and did so influence and control, the acts and conduct of L&H.  In particular, each of the L&H Defendants had the power and influence at all times relevant to this claim to direct L&H to disclose its transactions with related parties, to direct L&H to record revenues and otherwise state its financial results and condition in accordance with U.S. GAAP, and to direct L&H in the preparation and issuance of its Annual Reports and other filings with the SEC, its press releases and other statements and representations.  By virtue of their positions, each of the L&H Defendants had unique and extensive access to and control over L&H's financial records.

329.    As a direct and proximate result of the wrongful conduct of the L&H Defendants, Dictaphone suffered substantial damages including, but not limited to, loss or diminution of its value as a going concern and consequential damages in an amount to be proven at trial as a consequence of its merger with L&H.

121

330.   By reason of the foregoing, L&H Defendants are jointly and severally liable to Plaintiff for the aforesaid damages, in an amount to be proven at trial, but no less than $900,000,000.

### THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS KPMG BELGIUM, KPMG US, BEHETS, AND SG COWEN FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5

331.   Plaintiff hereby repeats and realleges each and every allegation in the prior paragraphs as though fully set forth herein.

332.   In each of its reports on L&H's 1997 and 1998 financial statements, KPMG represented that it conducted its "audits in accordance with generally accepted auditing standards" and that the consolidated financial statements of the Company and its subsidiaries for the fiscal year audited "present[ed] fairly, in all material respects, the consolidated financial position" of L&H and its subsidiaries "and the results of their operations and their cash flow" in accordance with U.S. GAAP.  KPMG Defendants also made specific oral representations to Dictaphone affirming the propriety of L&H's financial reporting in general, and of the unaudited financial results for 1999 publicly disseminated in January 2000, as detailed above.  KPMG's representations were false, and the certified financial statements, as described above, were materially false and misleading.

333.   Implicit in all of KPMG's representations was the fact that KPMG was properly acting as an independent auditor and was free of conflicts of interest with respect to its work for L&H, concepts which are fundamental under accounting standards for any auditor.  Unknown to Dictaphone, KPMG had completely abandoned

122

its independence.   It was not merely that KPMG auditors working on the L&H engagements had been hired by L&H (Deschodt) and its affiliate LHIC (Mesdatg), but Defendant Behets was actively negotiating with L&H for a multi-million dollar contract -- during the very period he was evaluating whether to sign-off on the 1998 audit.

334.   KPMG's audit opinion on L&H's 1998 financial statements was dated April 8, 1999.   In accordance with accounting standards and conventions, the date on the opinion is the date of the last day of field work on the audit.   The evaluation of the field work and decision to issue the opinion occurs thereafter, in this case apparently on or about June 29, 1999.

335.   On Saturday, April 10th, Vanderhoydonck e-mailed to Hauspie and Lernout about his negotiations with Behets to work for the S.AI.L. Trust.   He wrote (translated from Flemish):

> In the past week, I had a good chat with Pol Behets, who's apparently quite interested in leading S.AI.L. PORT.   I have the impression that his decision could come quickly.
>
> In financial matters, he has only now gained rights to a maximal share as a partner at KPMG and will hand them 13 mil. BEF all-inclusive for this.   Naturally, this result is dependent on how the shop does (it's a partnership . . . ) and it's thus by no means guaranteed.   For the above-mentioned, a 'respectable' steady salary (600 to 700,000 per month) with an option plan should be acceptable to Pol.   I've spoken with him about possible options from the FLV Fund that are still available in trust.   Even though he'd much rather have L&H options, this appeared acceptable to him.
>
> Made an appointment with him to have a concrete proposal ready for him towards the end of next week.   I'll check this with you all first.   If you all have suggestions, please feel free
> . . .

336.   To conduct such negotiations during the course of a pending audit was a blatant violation of accounting standards, which was never disclosed to Dictaphone.

337.   KPMG knew its reports would be attached to financial statements filed with the SEC that would be used to attract investors and form the basis on which shareholders would purchase shares of L&H.   KPMG explicitly consented to the inclusion of its reports in, among other filings, L&H's 1997 Annual Report on Form 20-F filed with the SEC on July 2, 1998, L&H's 1998 Annual Report on Form 20-F filed with the SEC on June 30,1999, L&H's 1999 Annual Report on Form 10-K filed with the SEC on June 30, 2000, and Registration Statement filed on Form S-3 on January 7, 2000.  KPMG knew that Dictaphone had reviewed its certified reports as part of its due diligence in connection with the Merger Agreement and knew that Dictaphone would rely on those reports -- and on KPMG's direct oral responses to Dictaphone's inquiries about the propriety of L&H's financial reporting -- in making a decision to merge Dictaphone into L&H and in setting the rate of exchange for that transaction.

338.   KPMG US's oral and KPMG Belgium's written representations were material to Dictaphone's decision to agree to the Merger.   In making its investment decision, Dictaphone relied upon KPMG Belgium's and Behets' written representations and KPMG US's oral representations as to the accuracy and reliability of the information contained in L&H's financial statements and the procedures used to audit the financial statements.

339.   KPMG knew that L&H's financial statements were not prepared in accordance with U.S. GAAP, as falsely represented to Dictaphone, because, among other material misstatements in L&H's financial reports, L&H's financial statements

concealed the facts that:  (1) $373 million, or nearly two-thirds of L&H's revenue in 1998, 1999 and 2000, was improperly recognized; (2) thirty start-up companies who provided 10% of L&H's 1998 revenue and 25% of its 1999 revenue were funded by parties related to L&H; (3) at least 18 of 30 Korean customers named by Bastiaens as providing more than 20% of 1999 revenues did little or no business with L&H; (4) more than $100 million in the bank accounts of L&H's Korean unit was, in fact, not available to L&H, likely as a consequence of a secured lending arrangement that was designed to fraudulently inflate revenues and cash.

**The Falsity of Defendant KPMG Belgium's Representation**
**that it Conducted its Audit in Accordance with U.S. GAAS**

340.  For each of the years 1997, 1998 and 1999, KPMG Belgium falsely certified that:

> We have conducted our audits in accordance with generally accepted auditing standards in the United States.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

341.  When an auditor concludes that reliable information that existed at the date of the auditor's report rendered the financial statements, as previously issued, materially misleading and erroneous, the auditor is required to take appropriate action to prevent future reliance on the financial statements and its related auditor's report. *AICPA Professional Standards,* vol. 1, *U.S. Auditing Standards,* as published annually from June 1997 through June 2000 ("AU"), §561.  By withdrawing its previously issued

clean opinion, KPMG Belgium has conceded that its prior opinion that L&H's financial statements were prepared in accordance with U.S. GAAP was false when made.

342.   U.S. Generally Accepted Auditing Standards (U.S. GAAS) imposes upon auditors "a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU §110.02.

343.   The case against KPMG is not based on a failure of professional skill or due care.   Rather, numerous facts set forth in this Amended Complaint show KPMG making intentionally fraudulent misrepresentations, both in their audit opinions and in face-to-face meetings with Dictaphone.   Time after time, KPMG disregarded, and even effectively buried, evidence of fraudulent transactions.   It is not simply that it did not find the fraud, or even that it did not look for it, but that in numerous cases KPMG had the fraud directly revealed to it (as for one example, the Korean "factoring" fraud), and still did nothing, and directed others, most particularly KPMG Korea, to do nothing.   Even more egregious, KPMG as set forth above, signed the December 31, 1999 audit opinion with full knowledge that it was misleading and contrary to applicable professional standards to do so.   By so doing, it turned a $40,000 audit into $9 million in revenues from L&H.

344.   Were it not true that KPMG directly participated in the fraud, then it would be indisputably true that it was reckless in its work and made its misrepresentations knowing it had no basis for them.   As is set forth in detail below, the L&H audits did not follow the most basic tenets of U.S. GAAS, which require an auditor to obtain personal knowledge of sufficient, competent evidence supporting the assertions in financial

statements to permit reasonable assurance that they do not contain material misstatements:

(a)    "Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements." AU §326.02.

(b)    "The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly." AU §326.21.

(c)    Representations from management "are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU §333.02.

(d)    "[W]ithout adequate attention to the propriety and accuracy of the underlying accounting data, an opinion on financial statements would not be warranted." AU §326.16.

## KPMG'S Deliberate Disregard of Overall Risk Factors

345.    As an initial matter, if KPMG did not have actual knowledge of the fraud, and the facts show it did, then KPMG's L&H audits recklessly failed to follow AU§316, *Consideration of Fraud in a Financial Statement Audit*, which requires that: "[t]he auditor should specifically assess the risk of material misstatement of the financial statements due to fraud and should consider that assessment in designing the audit procedures to be performed."  In addition to risk factors specific to the issues enumerated below, the L&H audits failed to consider overall risk factors posing a high degree of risk of error or fraud, including:

(a)    "an excessive interest by management in maintaining or increasing the entity's stock price or earnings trends through the use of unusually . . . aggressive accounting practices." AU §316.17. KPMG Belgium and US were involved in L&H's 1999 response to an SEC investigation of L&H's methods of accounting for acquisitions, and knew that the SEC had determined that L&H's methods were aggressive and improper.

(b)    "significant, unusual or highly complex transactions, especially those close to year end, that pose difficult 'substance over form' questions." AU §316.17.   Nearly every contract discussed in the Audit Committee Report is dated within three days of the end of a fiscal quarter, and ten agreements giving rise to a total of more than $27 million in revenue are dated within the last three days of December 1998 or December 1999.

(c)    "unusually rapid growth or profitability, especially compared with that of other companies in the same industry." AU §316.17.   KPMG Belgium and KPMG US knew from L&H's financial statements that L&H claimed revenue increases of 213% in 1998 and 163% in 1999.   KPMG Belgium and KPMG US knew that L&H's growth and profitability were unusual in the industry, and that the engine for that growth was the improperly booked revenues from the LDC/CLDCs and, for 1999, the Korean operation of Bumil, which had only months earlier been unable to pay L&H its license fees and was doing business at merely a fraction of the reported new contracts.

346.   KPMG's disregard of overall risk factors regarding L&H's financial statements was plainly intentional.   KPMG's disregard of the numerous risk factors was contrary to the advice and standards of practice which KPMG proffered to its clients on its website, and KPMG's own audit process, which KPMG was then touting to existing and potential clients worldwide.   KPMG's Audit Committee Institute for example, a resource provided by KPMG to its clients, stressed the importance of recognizing and being attentive to the factors in a company's "risk profile."   Indeed, KPMG (US and International) boasted that KPMG utilized a "Business Measurement Process," a "risk based audit process focusing on a company's strategy, core business processes, supporting resource processes, business risks, controls and their impact on financial reporting".   Shaping the Audit Committee Agenda (1999), p.27.   Incredibly, as detailed herein, some of the very risk factors identified by KPMG to its existing and potential clients, notably, "ongoing or prior investigations by regulators," "overly complex organizational structures or transactions," "unusually rapid growth," and "unusual results

128

or trends," *id.* at p. 3, were all present at L&H and blatantly ignored by KPMG.  The only reasonable inference is that KPMG's "failures" were not the product of ignorance or ineptitude, but rather of conscious choice,

**KPMG'S Deliberate Disregard of Risk Factors**
**Regarding Revenues in Korea and Singapore**

347.   If KPMG Belgium did not have actual knowledge of the frauds in Korea and Singapore, and the facts show that it did, then KPMG Belgium consciously failed to follow procedures sufficient to provide it with reasonable assurance that L&H's stated revenue from Korea and Singapore was free of material misstatement or intentionally turned a blind eye to the results of those procedures.

348.   KPMG Belgium and KPMG US were aware of facts indicating a serious risk of material misstatement of Korean and Singaporean revenues, including:

(a)   "unusually rapid growth or profitability" AU §316.17.   Korean revenues of $62.9 million in 1999 had risen from $245,000 in 1998 (about $12 million including Bumil on a pro forma basis), and constituted nearly 19% of L&H's total 1999 revenue of $344.2 million, all at a time when revenues in every other geographic market, except Singapore, were flat or declining.  Singapore's revenues increased from only $29,000 in 1998 to $80.3 million in 1999 — an increase of 2,769%, making Singapore the highest revenue geographic area in L&H, ahead of the United States and Europe (excluding Belgium).

(b)   "significant, unusual or highly complex transactions, especially those close to year end, that pose difficult 'substance over form' questions" AU §316.17.  According to the Audit Committee Report, KPMG Belgium was aware of contracts with one Korean client Voice Tech representing $11 million in revenue that were signed on September 30, 1999, contracts with a second Korean client, HI World, representing $21 million in revenue that were signed on December 8, 1999, and contracts with a third Korean client, Digital Sei Young, representing $12 million in revenue that were signed on December 27, 1999.  KPMG Belgium was aware that the form of those contracts was unusual and complex and cast doubt on the propriety of L&H's recognition of revenue from those contracts.  According to an e-mail from KPMG auditor Huysman, KPMG

US Professional Practice Group, who examined the Voice Tech and IBC transactions, and Robert McLamb personally reviewed and approved each of those transactions.

(c)    "other conditions [that] may be identified during fieldwork" including "unsupported or unauthorized balances or transactions" and "transactions not recorded in a complete or timely manner." AU §316.24.  An October 17, 1999 e-mail from KPMG Korea to KPMG Belgium states that L&H had factored its receivables from those contracts and knew that the factoring may have been "with recourse" to L&H's Korean bank accounts.  The Audit Committee Advisors state that "KPMG must have resolved this issue, but we do not know how, as we have no further e-mails on the subject."  In fact, former KPMG Auditor, Frederik Deschodt, then working at L&H, told KPMG Korea that this revenue was "agree[d] by KPMG at the corporate level" which "surprised" Kwon.  Deschodt effectively told KPMG Korea to stay out of this issue, and KPMG Belgium buried the issue, despite its materiality.  IBC never paid anything at all to L&H.  Both Voice Tech and IBC had contracts which were ultimately cancelled.

349.    Under U.S. GAAS, the risk factors in Korea and Singapore required that KPMG Belgium give heightened attention to the fundamental procedure of confirmation, "the process of obtaining and evaluating a direct communication from a third party in response to a request for information about a particular item affecting financial statement assertions."  AU §330.4, *The Confirmation Process*.  "Unusual or complex transactions may be associated with high levels of risk.  If the entity has entered into an unusual or complex transaction and the combined assessed level of risk is high, the auditor should consider confirming the terms of the transaction with the other parties in addition to examining documentation held by the entity."  AU §330.08.  "If there is a risk of material misstatement due to fraud that may involve or result in improper revenue recognition" the auditor should "confirm with customers certain relevant contract terms and the absence of side agreements." AU §316.30.  "Standard confirmation requests (confirming only the outstanding balance) alone do not always provide sufficient evidence that only appropriate revenue transactions have been recorded.  Auditors

should consider the need to confirm significant terms of contracts and whether to inquire about the existence of oral or written contract modifications (side agreements)." AICPA, *Audit Risk Alert* — 1998/99 at 38.

350.    The factoring arrangements were highly unusual.  KPMG knew all along that there was "no precedent of factoring to bank in Korea."  A September 21, 2000 e-mail from Hye-Jin Kang (of KPMG Korea) to Dammekens and Frederik Deschodt, among others, admits that.  Since the "factored" contracts had 90-day payment terms — and L&H never took the money within the 90 days, if the customer had the ability to pay, what business purpose was served by the "factoring" loans?  Why did little or none of the factored money leave the banks, where KPMG knew it was being held in restricted accounts?  Why would the banks assume credit risk for millions of dollars on these start-up companies, and why did they keep "factoring" when original invoices were not paid?  Why did they make no effort to collect?  The underlying contracts themselves were highly unusual.  The PwC Report stated the usual license fee was $400,000.  The contracts in question had license fees typically in the $4 million range and as high as $19 million (HI World).

351.    If KPMG Belgium did seek confirmation of L&H contracts from Korean customers, it would have undoubtedly discovered, as did *The Wall Street Journal* in a matter of weeks, that nearly half of L&H's customers denied the existence or magnitude of the relationship claimed by L&H.  If KPMG Belgium did seek confirmation of L&H bank balances from Korean banks — following audit procedures that would routinely apply where amounts of the magnitude at stake in Korea were involved — it would have undoubtedly discovered, as did the Audit Committee Advisors in a matter of weeks, that

$106 million was inaccessible, as a consequence of the factoring loan balances being held as collateral for the factored receivables from Korean contracts.

352.    Plainly, KPMG Belgium either knew the true substance of the "factoring" arrangements in Korea well before *The Wall Street Journal* article, or intentionally turned a blind eye to the facts in its possession which established that these factoring arrangements were a sham.

353.    Further, as evident from KPMG e-mails, KPMG either knew or was guilty of willful blindness with respect to the lack of reality in the Korean contracts.  For example, as early as October 17, 1999, in an e-mail from Oh Bum Kwon of KPMG Korea to Huysman of KPMG Belgium regarding the September closing of Bumil (later L&H Korea) and the "sale" to Voice Tech, Kwon notes, among other things, that "there are no proper documents on the revenue generation schedule and condition" and that "the receivable was factored with a local bank with a collateral of Bumil's bank deposit and we believe the factoring is 'with recourse.'"  According to a reply written by Huysman to Kwon on October 27, 1999, "Bob McLamb and the people from the U.S. Professional Practice are currently investigating these arrangements."    That investigation seems to have been chiefly concerned with creating a "paper record" that the agreements were valid, even if an examination of the facts cast doubt, or even proved a lack of validity.  Thus, according to the same e-mail, McLamb and KPMG appear to have been willing to accept as sufficient a representation from Voice Tech or IBC that even if the company could not pay the contractually required amount by the contractually required date, if they claimed that they "disposed [sic] over adequate financial resources to pay the high cost of the contracts," KPMG would approve revenue

recognition.  On information and belief, KPMG US and KPMG Belgium did approve revenue recognition. IBC could not pay and gave L&H a worthless promissory note instead of payment on December 29.

### KPMG's Deliberate Disregard of Risk Factors
### Regarding Related-Party Transactions

354.  If KPMG did not have actual knowledge of the "related party" frauds, and the facts show that it did, then the audit of L&H consciously failed to follow procedures sufficient to provide reasonable assurance that L&H's revenues were not inflated by transactions with related parties.  This failure was particularly egregious in light of KPMG's pivotal role in creating the LDC/CLDC structure and its experience with Dictation Consortium and BTG.

355.  At best, KPMG Belgium and Behets intentionally chose to ignore facts indicating heightened risk of error or fraud from "significant pressure to obtain additional capital necessary to stay competitive, including the need for funds to finance major research and development expenditures."  AU §316.17.

> (a)    Lernout was quoted in *The Wall Street Journal* in December 1999 describing the Dictation Consortium and BTG transactions as impelled by L&H's research and development needs:  "If we didn't catch up [with competitors] we were cooked.  But we couldn't catch up because we didn't have enough R&D dollars."  KPMG Belgium was aware of all aspects of the Dictation Consortium and BTG transactions, having "carefully reviewed them at the time," according to the Audit Committee Report. Moreover, KPMG Belgium audited the FLV Fund, and thus was privy to both sides of the Dictation Consortium transaction; Behets was personally involved in raising funds for BTG.

> (b)    KPMG Belgium knew that L&H faced significant limitations on its ability to fund research and development in-house.

356.  At best, KPMG Belgium and Behets deliberately disregarded facts indicating heightened risk of error or fraud from "significant related party transactions

not in the ordinary course of business or with related entities not audited or audited by another firm." AU §316.17. These include the following:

(a)    KPMG Belgium knew that in January, 2000, prior to KPMG Belgium's rendering a clean opinion on L&H's 1999 financial statements, the SEC had commenced an investigation into L&H's methods of accounting for revenue from thirty L&H customers that the SEC suspected were related parties.

(b)    KPMG Belgium was auditor for the FLV Fund, a related party whose ownership of at least eight of the entities that were the subject of the SEC inquiry and funding of four others was not disclosed and required accounting treatment materially different than that applied by L&H. KPMG had close contact with LHIC through LHIC's CFO, the former KPMG account manager for the L&H account, and possibly as auditor for LHIC. KPMG Belgium thus saw both sides of many of the fraudulent transactions.

(c)    KPMG Belgium and KPMG US knew, according to a confidential memorandum from Van Aerde to McLamb that as of September 30, 1999, scope limitations had been imposed by L&H on KPMG's investigation of the independence of the LDCs and at least one of the LDCs had refused to confirm its independence.

(d)    As shown by a May 8, 2000 memo from McLamb to Van Aerde, KPMG Belgium and KPMG US were aware that L&H had failed in several respects to establish and follow formal written accounting procedures.

357.   At best, KPMG Belgium, KPMG US and Behets consciously failed to consider the risk factor particular to related party transactions stated in AU §334, *Related Party Transactions*, as "large, unusual, or nonrecurring transactions or balances . . . particular[ly] . . . transactions recognized at or near the end of the reporting period." The Audit Committee Report reveals that more than half of the revenue from related party transactions in 1998 and 1999 — $13 million in 1998 and $21 million in 1999 — was recognized in the fourth quarters of those years.

358.   At best, KPMG Belgium and KPMG US consciously failed to take the steps prescribed in AU §334 "to identify related party relationships and transactions and

to satisfy [themselves] concerning the required financial statement accounting and disclosure." AU §334.01. To identify material transactions with related parties, the auditor should, among other things:

(a)    "review filings by the reporting entity with the Securities and Exchange Commission and other regulatory agencies for the names of related parties and for other businesses in which officers and directors occupy directorship or management positions." KPMG Belgium and Behets could easily have discovered from such sources that the CEO of Language Investment Co., the parent of four of the Belgian start-up shells, was Willem Hardeman, an FLV Fund director. Another seventeen were ultimately owned by Mercator, whose chairman, Louis Verbeke, is a name partner in L&H's chief Belgian law firm. Verbeke and the insurance company each also separately owned stakes in L&H. KPMG Belgium knew what a review of L&H's SEC or other public filings, if it were necessary, would also have revealed that two significant related parties were the subsequent employers of former KPMG Belgium auditors with responsibility for L&H audits. During the 1998 and 1999 audits, the CFO of LHIC was Chantal Mestdagh, a former KPMG Belgium auditor who worked on the L&H audits. During the 1998 audit, Defendant Behets was involved in negotiations to become CEO of S.AI.L. Trust, an entity that owned a one-third interest in, and appointed five board members of, the FLV Fund Management. KPMG Belgium was itself the auditor of the FLV Fund. KPMG Belgium and Behets either failed to examine these sources to identify related parties, or turned a blind eye to the results of their investigation.

(b)    "review proxy and other material filed with the Securities and Exchange Commission and comparable data filed with other regulatory agencies for information about material transactions with related parties." AU §334.08(c). *The Wall Street Journal* was easily able to determine from "regulatory filings" that the FLV Fund owned 49% stakes in eight of the Singapore start-ups, and gave cash to four others "which they used to pay their bills to L&H." KPMG Belgium which, as auditor of the FLV Fund, had access to both sides of the fraudulent transactions, either failed to perform these basic procedures, or turned a blind eye to their results.

(c)    review "accounting records for large, unusual, or non-recurring transactions or balances, paying particular attention to transactions recognized at or near the end of the reporting period." AU §334.08(g).

(d)    review "the extent and nature of business transacted with major customers, suppliers, borrowers and lenders for indications of previously undisclosed relationships." AU §334.08(e). Again, as auditor of the FLV

135

Fund, KPMG Belgium had unique access to both sides of L&H's transactions with major customers who were undisclosed related parties.

359.  KPMG Belgium, KPMG US and Behets impermissibly relied upon questionable or known false management assertions about transactions with related parties.  "The risk associated with management's assertions about related party transactions is often assessed as higher than for many other types of transactions because of the possibility that the parties to the transaction are motivated by reasons other than those that exist for most business transactions."  AU §334.18.  When L&H was unwilling to provide the names of investors in a shell start-up, KPMG Belgium, KPMG US and Behets knew that they were professionally obligated to consider this a "denial of access to information" that "constitute[d] a limitation on the scope of the audit that . . . require[d] the auditor to consider qualifying or disclaiming an opinion on the financial statements" as set forth in AU §508, *Reports on Financial Statements*.  AU §316.25, footnote 11.

360.  At best, KPMG Belgium, KPMG US and Behets consciously failed to perform procedures necessary to evaluate "the purpose, nature, and extent of [related party] transactions and their effect on the financial statements.  The procedures should be directed toward obtaining and evaluating sufficient competent evidential matter and should extend beyond inquiry of management."  AU §334.09.  Among other things, KPMG Belgium, KPMG US and Behets failed to:

(a)    "Confirm transaction amount and terms, including guarantees and other significant data, with the other party or parties to the transaction." AU §334.10(a).

(b)    "Inspect evidence in possession of the other party or parties to the transaction."  AU §334.10 (b).

(c)    review "financial publications, trade journals, credit agencies and other information sources when there is reason to believe that unfamiliar customers . . . with which material amounts of business have been transacted may lack substance."  AU §334.10 (c).

361.    At best, KPMG Belgium, KPMG US and Behets chose to ignore an AICPA

Audit Risk Alert emphasizing that:

> Some of the more common audit issues identified in recent litigation related to fraudulent financial reporting included:
>
> • willingness by the auditor to accept management's representations without corroboration.
>
> • Allowing the client to unduly influence the scope of auditing procedures.
>
> • The failure to identify risky situations, or ignoring audit risks by not applying professional skepticism and revising auditing procedures appropriately."

AICPA Audit Risk Alert — 1999/2000 at 28.

362.    At best, in at least a significant number of instances, KPMG Belgium and

KPMG US chose to ignore AICPA Practice Risk Alert 95-3 which states that "it is

incumbent upon the auditor to assess the propriety of the accounting for material related

transactions in accordance with their substance" and warned that "[i]n the hands of the

unscrupulous, an undisclosed related party is a powerful tool.  Using controlled entities,

principal shareholders or management can execute transactions that improperly inflate

earnings by masking their economic substance or distort reported results through lack

of disclosure, or can even defraud the company by transferring funds to a conduit

related party and ultimately to perpetrators."  The Practice Risk Alert, at 2, warns

auditors to look for "events that may indicate transactions with undisclosed related

parties," such as "sales without substance, including funding the other party to the

transaction so that the sales price is fully remitted," "sales with a commitment to

137

repurchase that, if known, would preclude recognition of all or part of the revenue," "loans to parties that do not possess the ability to repay," and "payments for services never rendered or at inflated prices."

363. If KPMG Belgium, KPMG US and Behets performed the procedures required by AU §334, they would have had to discover, as *The Wall Street Journal* easily did, that at the single Singapore address of fifteen firms that together paid L&H $57 million in 1999, or nearly 17% of its revenue, "there isn't any evidence of operations of the fifteen L&H customers." The simple fact that fifteen of L&H's customers in a country where revenues increased 2,769% in one year had the same address was undoubtedly a major "red flag" for the auditor. If KPMG ignored such "red flags," it was because it already knew what they signaled. At best, KPMG Belgium, KPMG US and Behets consciously chose not to perform any appropriate investigation because they anticipated the results, or turned a blind eye to the results of their search.

## KPMG'S Deliberate Disregard of Improper Recognition of License Revenues

364. KPMG Belgium and Behets chose not to follow procedures sufficient to provide reasonable assurance that L&H recognized revenue properly under SOP 97-2. KPMG Belgium and Behets knew and disregarded the risk of material misstatement presented by the fact that material amounts of revenue were recognized at the end of fiscal quarters or years. As pointed out above, nearly every contract discussed in the Audit Committee Report is dated within three days of the end of a fiscal quarter, and ten agreements giving rise to a total of more than $27 million in revenue are dated within the last three days of December 1998 or December 1999. The occurrence of unusual, complex or significant transactions at or near the end of a financial reporting period is a

"red flag" specifically described in the AICPA Audit Risk Alert — 1999/2000 at 38:
"Auditors should be alert for significant unusual or complex transactions, especially
those that occur at or near the end of a reporting period, along with a variety of other
circumstances that may raise concerns about improper revenue recognition."

365.    At best, KPMG Belgium consciously chose not to follow — or disregarded
the results of — the procedure required by the presence of this risk: confirmation, which
"is the process of obtaining and evaluating a direct communication from a third party in
response to a request for information about a particular item affecting financial
statement assertions." AU §330.04, *The Confirmation Process* (emphasis supplied). "If
there is a risk of material misstatement due to fraud that may involve or result in
improper revenue recognition" the auditor should "confirm with customers certain
relevant contract terms and the absence of side agreements." AU §316.30.

366.    In many or most instances, KPMG Belgium and Behets chose to rely on
representations of management regarding the substance of agreements and decided
not to obtain evidence directly from the other parties to those agreements, as required
by U.S. GAAS.

> (a)    "Confirmation is undertaken to obtain evidence from third parties
> about financial statement assertions made by management." Section 325,
> evidential matter, states that, in general, it is presumed that "when
> evidential matter can be obtained from independent sources outside an
> entity, it provides greater assurance of reliability for the purposes of an
> independent audit than that secured solely within the entity." AU §330.06.
>
> (b)    "Unusual or complex transactions may be associated with high
> levels of inherent risk and control risk.  If the entity has entered into an
> unusual or complex transaction and the combined assessed level of
> inherent and control risk is high, the auditor should consider confirming the
> terms of the transaction with the other parties in addition to examining the
> documentation held by the entity." AU §330.08.

(c)    "The auditor's understanding of the client's arrangements and transactions with third parties is key to determining the information to be confirmed.  The auditor should obtain an understanding of the substance 'of such arrangements and transactions to determine the appropriate information to include on the confirmation request . . .  The auditor should also consider whether there may be oral modifications to agreements, such as unusual payment terms or liberal rights of return.  When the auditor believes there is a moderate or high degree of risk that there may be significant oral modifications, he or she should inquire about the existence and details of any such modifications to written agreements.  One method of doing so is to confirm both the terms of the agreements and whether any oral modifications exist." AU §330.25.

367.    At best, even if confirmation was obtained, KPMG Belgium and Behets consciously chose to ignore their obligations under AICPA, Audit Issues in Revenue Recognition, 1999, which details the procedures required to obtain sufficient competent evidence of the propriety of revenue recognition:

SAS No. 45 requires the auditor to place emphasis on testing material transactions with parties he or she knows are related to the reporting entity.  It states that procedures should be directed toward obtaining and evaluating sufficient competent evidential matter and should extend beyond inquiry of management.  The following are among the procedures that should be considered to obtain satisfaction concerning the purpose, nature, and extent of related-party transactions and their possible effect on revenue recognition.

- Obtain an understanding of the business purpose of the transaction.

- Examine invoices, executed copies of agreements, contracts, and other pertinent documents, such as receiving reports and shipping documents.

- Determine whether the transaction has been approved by the board of directors or other appropriate officials.

- Confirm the transaction amount and terms, including guarantees and other significant data, with the other party or parties to the transaction.

- Refer to financial publications, trade journals, credit agencies, and other information sources when there is reason to believe that unfamiliar customers, suppliers, or other business enterprises with which material amounts of business have been transacted may lack substance.

140

- With respect to material uncollected balances, guarantees, and other obligations, obtain information about the financial capability of the other party or parties to the transactions. Such information may be obtained from audited or unaudited financial statements, tax returns, reports issued by regulatory agencies or taxing authorities, financial publications, or credit agencies.

- The auditor should consider whether he or she has obtained sufficient competent evidential matter to understand the relationship of the parties and the effects of related-party transactions on the financial statements.

AICPA, Audit Issues in Revenue Recognition, 1999, at 35.

368. At best, KPMG Belgium and Behets consciously chose to ignore AICPA Practice Alert 95.4, which explicitly warned auditors to search for evidence of the precise fraudulent practices that the Audit Committee Advisors in fact discovered at L&H and prescribed procedures that KPMG should have followed to uncover those practices:

A substantial portion of litigation and SEC investigations involving financial reporting and cases coming before the AICPA Professional Ethics Executive and Quality Control Inquiry Committees concerns some form of revenue recognition issue. . . . [A]uditors need to pay particular attention to warning signals that may indicate additional audit risk and respond with appropriate professional skepticism and possible additional audit procedures. . . . [S]ome examples of improper and unusual revenue transactions [include]:

- Sales in which the customer's obligation to pay for the merchandise/service depends on:

  - receipt of financing from another (third) party;

  - resale to another (third) party (i.e., consignment sale);

  - fulfillment by the seller of material unsatisfied conditions;

  - final acceptance by the customer following an evaluation period.

- Sales in which substantial uncertainty exists about either collectibility or the seller's ability to comply with performance guarantees.

- Sales that require substantial continuing vendor involvement after delivery of merchandise (e.g., software sales requiring installation, debugging, extensive modifications, other significant support commitments, etc.)

- Shipments made after the end of the period (i.e., books kept open to record revenue for products shipped after the period end)

- Transactions with related parties.

- Barter transactions.

- Significant, unusual transactions near year-end . . .

Techniques used to recognize revenues improperly can be quite sophisticated. To reduce risk in this area, the audit needs to be planned and then executed with an appropriate degree of professional skepticism . . . [A] company operating in [an industry] characterized by more than infrequent business failures ordinarily will present different audit considerations and, therefore, could require different or more extensive audit procedures . . . A company with constantly increasing sales that 'always meets or exceeds' budget sales targets may deserve extra attention. When a substantial portion of the company's sales occur very near the year-end or quarter extra caution in auditing revenue transactions may be appropriate. Also, individually significant revenue transactions, which could be designed to ease short-term profit concerns, may merit specific attention. Auditors need to examine such transactions and obtain an understanding of their business purpose to evaluate whether revenue recognition is appropriate.

The Practice Alert specifically warns auditors to design confirmations "to help the auditor solicit information from customers about payment terms, right of return privileges, or other significant risks retained by the seller" and "inquire about the existence of any oral modifications or undocumented 'side-agreements'."

369.  To the extent that KPMG engaged in the required audit procedures, it did so without the "appropriate degree of professional skepticism" required by the standards.  The details of numerous transactions described in the Audit Committee Report were readily available to KPMG from the other parties to the transactions. Moreover, the Audit Committee, as set forth above, noted many instances where KPMG

was plainly aware of the issues raised by the transactions but signed off on them nonetheless without resolution. KPMG Belgium's and Behets' purported "failure" to detect fraud in transactions involving the FLV Fund is particularly egregious and, in fact, incredible, since KPMG Belgium was the auditor for the FLV Fund and was aware of both sides of those transactions. KPMG Belgium and Behets either already knew the economic reality of these transactions, or deliberately chose to turn a blind eye to the results of their investigation which showed the fraudulent nature of these transactions.

### KPMG's U.S.'s Role in the L&H Fraud

370. KPMG US was intimately involved in the audits of L&H. The Boston, Massachusetts office of KPMG US was listed as one of L&H's "principal auditors" (in addition to KPMG Belgium) in Annual Reports to Shareholders in 1997, 1998 and 1999. KPMG US had the primary responsibility of auditing the financial reporting of the L&H U.S. operations run out of the Burlington, Massachusetts office.

371. KPMG US Partner Robert McLamb played a pivotal role in the L&H audits and reviews. Initially, as a partner of the U.S. Capital Markets Group, McLamb was based in KPMG's London office for the period prior to late 1999 or January 2000, when he moved to the Houston, Texas office of KPMG US, where he continued to perform services at a senior level on the L&H engagement. McLamb was KPMG's audit partner responsible for ensuring that L&H's financial statements complied with U.S. GAAP. He worked extensively on L&H audits and reviews, as well as helping to prepare, review, and comment on L&H's financial disclosures. Paul Beecy, another KPMG partner, also worked on the L&H engagement initially from the KPMG UK office, and later from the KPMG office in Atlanta. Glenn L. Davidson, a KPMG US partner, was assigned as the

143

SEC reviewing partner and, on information and belief, in that capacity he reviewed all financial statements filed wit the SEC.

372.   As demonstrated in the Huysman October 1999 e-mail to Oh Bum Kwon of KPMG Korea, from the very outset KPMG US and McLamb were deeply involved in review of revenues recognized by LHK.  KPMG US Partners, including McLamb after he transferred from KPMG UK in January 2000, actively participated in the reviews and audits of L&H's financial statements, oversaw the year-end audits of L&H, and reviewed and provided input into the completion of the audits.

373.   As a result of this work, KPMG US knew that L&H's own internal audit controls in the US were inadequate or nonexistent, as exemplified by its documented awareness, prior to August 30, 1999, of the need for "increases in the internal control staff" at L&H.

374.   On February 4, 2000, Van Aerde sent an e-mail to Dammekens, McLamb and Huysman, which stated that "when talking to the lawyers the other day with respect to the SEC informal investigation they asked whether L&H has an accounting manual or some kind of binder where reporting and accounting policies or instructions are documented."  Van Aerde asked Dammekens if L&H had any such manuals or policies, and further requested that he "report both to Bob [McLamb] and myself what you have." Later that same day, Dammekens replied to Van Aerde and McLamb that "As you know, and as discussed over the phine [sic], we are not strongly documented, as is typical in [companies] with fast growth [I hear]."  (emphasis added)  On February 5, 2000, McLamb sent an e-mail to Dammekens which made clear the urgent need for documentation of L&H's accounting policies and procedures:

144

Carl it is true that many fast growing companies do not do a good job of documenting policies and procedures. That time has come to an end. You are a $2 billion market capitalization company. We need to proceed in putting these documents in place as soon as possible. I do understand that this is not the first priority, but there are certain documents that should be prepared before the submission to the SEC. Those documents primarily relate to revenue recognition.

375.    KPMG US had actual knowledge that L&H's accounting department was run in a reckless manner. In an e-mail message from Dammekens to McLamb dated May 3, 2000 – prior to the Closing Date – Dammekens stated:

I DO WANT TO BRING UP ANOTHER POINT – AM I CAPABLE OR [SIC] REMAINING CFO IN AN ORGANISATION LIKE THIS? PERSONALLY I DO NOT THINK SO.

I AM CONVINCED THAT IT IS TIME TO BRING IN AN EXPERIENCED GUY, THAT CAN BRING STABILITY AND DISCIPLINE AND KNOWS HOW TO RUN THE FINANCES OF A BIG COMPANY (BECAUSE HE GREW IN ONE AND HAS DONE IT BEFORE).

THINGS ARE GETTING OVER MY HEAD – I AM STAFFING UP MY PEOPLE, BUT WITH ALL THE DEALS/ACQUISITIONS THAT GO ON, I DO NOT HAVE TIME ENOUGH TO EVEN THINK ABOUT INTEGRATION OR ORGANIZATION. (caps in original)

376.    Thus, KPMG was well aware that the individual in charge of preparing the Company's financial results was in "over [his] head." This was a risk factor that KPMG needed to, but did not, take into consideration in planning its audits and designing its audit procedures. McLamb wrote a memorandum to Van Aerde, dated May 8, 2000, noting that L&H had continued to fail to establish formal written procedures for recording accounts receivable, relieving accruals for contingencies, and valuing fixed assets.

**The Falsity of KPMG US's Representation to Dictaphone**

377.    Prior to making the representations to Dictaphone referred to above, and contrary to the representations made to Dictaphone, KPMG US was aware that the

145