revenue recognition practices of L&H, and specifically the Burlington office which KPMG US was responsible for auditing, were not in accordance with GAAP. The Audit Committee Report identified numerous instances, described in detail above, where the recognition of revenue in the Burlington office was clearly improper. Further, at a meeting held on June 23, 1999, KPMG US informed KPMG Belgium of an instance in which L&H had reclassified obsolete inventory worth $444,000 to another asset account to avoid writing it off. On July 26, 1999, in a letter from Van Aerde (a KPMG Belgium partner) to L&H's Bastiaens, KPMG's comments on the second quarter 1999 review included a request that the carry-over of obsolete inventory and other issues be resolved. Yet on November 17, 1999, the $444,000 of obsolete inventory was still carried on L&H's books, despite numerous requests that it be written off.

378.    Prior to making the representations to Dictaphone referred to above, contrary to the representations made to Dictaphone, KPMG US and KPMG Belgium were either aware of the sham nature of the LDC/CLDC revenue or, at the very least, reckless in disregarding the possibility that that those transactions were shams. This is evidenced, among other things, by Van Aerde's writing of a "confidential memorandum" to McLamb (a partner of KPMG US) on September 30, 1999, stating that "certain *scope limitations* were imposed on [KPMG] when performing our review" that prevented KPMG from investigating the independence of the LDCs, and that one of the LDCs contacted in fact refused to confirm its independence from L&H. McLamb personally was closely following this issue and was personally aware that KPMG could not establish that the LDCs were independent. Despite this knowledge, according to an e-mail from McLamb to Van Aerde dated June 26, 2000, over a month after consummation of the Merger,

reveals that KPMG had not yet performed audit procedures necessary to establish the independence of the LDCs.

379. KPMG US was aware that, in accordance with GAAP and SEC requirements, the financial statements and auditor's opinions it reviewed were required to reveal the scope limitations imposed by L&H, and that they did not.

380. Prior to making the representations to Dictaphone referred to above, and contrary to the representations that it made to Dictaphone, KPMG US was either aware of the sham nature of the Korean revenues, or at a minimum, was reckless in disregarding the possibility that those transactions were fraudulent. McLamb and Van Aerde were both informed of the Korean revenue recognition concerns identified by O.B. Kwon, a KPMG Korea partner. McLamb received a copy of the October 18, 1999 e-mail from Kwon raising the severe problems with recognition of $11 million in income from Voice Tech and IBC Korean contracts executed on September 30, 1999. Van Aerde and Huysman received copies of an e-mail from McLamb dated January 29, 2000, after he had moved to KPMG US, noting that payments from several Korean LDCs came from the same bank account and stressing the importance of finding out the identity of the corporate owners. According to Huysman, KPMG US's Professional Practice Group was directly involved in reviewing certain contracts with LDCs.

381. KPMG US was also aware that an informal inquiry into L&H's accounting practices had been commenced by the SEC in January 2000, and that the SEC specifically requested documents relevant to a review of L&H revenue recognition in April 2000, and failed to inform Dictaphone of these facts.

147

382.   All of these facts make it clear that the representations made to Dictaphone by KPMG Belgium and KPMG US referred to above were knowingly false, and were made by KPMG Belgium and KPMG US with the intent to deceive Dictaphone.  These same facts, among others pleaded in this Amended Complaint, also demonstrate the critical role KPMG US played in perpetuating the L&H frauds.

### Scienter

383.   In addition to the foregoing, evidence of knowledge of KPMG Belgium, KPMG US and Behets (collectively "the KPMG Defendants") is demonstrated by at least the following facts:

> (a)     KPMG'S failure to follow U.S. GAAS, which, as set forth above, was so egregious that KPMG's audits of L&H amounted to no audit at all.

> (b)     Internal KPMG documents and emails described above, demonstrating KPMG's specific knowledge of numerous red flags indicating each of the areas of fraud that ultimately led to L&H's demise and KPMG's decision to sign off on the 1999 audit despite the unresolved issues.

> (c)     KPMG's refusal to cooperate with the Audit Committee Advisors by denying them access to its workpapers during their investigation.

> (d)     The Audit Committee Advisors' statements that "KPMG was aware" of problematic contracts with Korean customers pursuant to which L&H improperly recognized $48 million in revenue in the last two quarters of 1999.

> (e)     KPMG's knowledge of and participation in the response to an SEC inquiry, commenced on or about January 2000, into L&H's accounting practices and transactions with related parties, and KPMG's receipt of its own letter from the SEC in April, 2000 regarding that investigation, as shown by, among other things, a February 1, 2000 e-mail from Dammekens to Van Aerde at KPMG Belgium regarding times for a meeting agenda, which included the SEC letter and other February e-mails between KPMG and the L&H Defendants in early February 2000.

(f)    KPMG's assurances to Dictaphone in pre-merger discussions, despite its knowledge that the SEC inquiry had expanded to include requests to KPMG in April 2000.

(g)    KPMG's position as auditor of the FLV Fund, which gave KPMG access to both sides of many of the fraudulent transactions giving rise to material misstatement of L&H's financial reports.

(h)    KPMG's knowledge that L&H was willing to engage in aggressive and improper accounting practices, which arose from KPMG's involvement in the restatements of L&H's financial statements for 1997 and the first nine months of 1998 ordered by the SEC.

(i)    The ease with which *The Wall Street Journal* reporters were able to discover, within weeks, that L&H's Korean sales were minimal or non-existent.

(j)    KPMG 's access to Chantal Mestdagh, a former KPMG auditor who was CFO of LHIC, and thus was aware of the other side of L&H's fraudulent transactions involving companies owned by LHIC.

(k)    KPMG's access to Frederik Deschodt, another former KPMG auditor working for L&H.

(l)    KPMG's access to Behets, who had headed the L&H audit team at KPMG through June 1999, once he was at S.AI.L. Trust, and who could provide information as to the other side of fraudulent transactions involving the FLV Fund.

(m)    KPMG's active participation in the preparation and dissemination of L&H financial information, as detailed above.

(n)    KPMG's knowledge that L&H lacked sufficient internal controls, as demonstrated by its advice to the Board and Audit Committee of L&H that the Company needed to implement an internal audit function reflected in minutes of the L&H Board meetings held on April 12, 1999 and August 30, 1999 and in, *e.g.,* e-mails between McLamb and Dammekens on or about May 3, 2000 discussing the need to document L&H accounting policies and procedures and replace Dammekens with a sufficiently experienced CFO.

(o)    KPMG's receipt of enormous non-audit fees for tax advice, acquisitions-related advice, and consulting gave it a strong incentive to turn a blind eye to L&H's accounting practices. According to an April *25,* 2001 letter from Jo Lernout to the L&H Board of Directors, KPMG received fees of approximately $9 million for work performed by "Belgium . . . and other KPMG subsidiaries in various locations around the world," of which only $40, 000 per year was attributable to audit work.

149

(p)     Behets' negotiation of a multi-million dollar contract for himself with S.AI.L. during the course of the 1998 audit.

(q)     As evident from a January 25, 2000 e-mail from Huysman to Dammekens, KPMG was well aware that there were problems with collections in Singapore, including the facts that outstanding receivables were over 90 days and that there was no apparent explanation of the fact that the "payment schedule of receivables of LDCs, etc. shows that these receivables are paid for a round number" before it met with Dictaphone representatives to discuss "collection" issues.  The same e-mail shows that KPMG was also well aware that all of the LDCs that FLV sold to HI World were located at the same address in Singapore.  KPMG failed to disclose those facts to Dictaphone.

(r)     KPMG partners reviewed L&H press releases disseminating unaudited quarterly results, including the February 9, 2000 press release announcing L&H's earnings for the fourth quarter of 1999, despite unresolved issues of revenue recognition.  Indeed, a January 31, 2000 e-mail from Van Aerde to Dammekens, Bastiaens and McLamb sets forth a "list of urgent items to be followed up on by the company in order for us to be able to give our consent for the [February 9] press release."  KPMG consented to the release of fourth quarter earnings despite the fact that the issues set forth in its January 31, 2000 e-mail to Dammekens were unresolved.

(s)     According to e-mails sent February 24 and February 25, 2000, Dictaphone requested that its due diligence advisor, D&T, be given access to the KPMG 1999 audit workpapers.  Dammekens, in an e-mail forwarded to KPMG US and KPMG Belgium, denied the request claiming that "is not in my hands" because KPMG refused to allow access until the audit is finalized.  KPMG later signed off on the 1999 audit in June 2000 with full knowledge of numerous accounting problems.

(t)     KPMG was plainly aware from the start, and certainly before it approved of the Q4 earnings release, signed off on the 1999 audit, and made its representations to Dictaphone and its advisors, that L&H lacked documents supporting revenue recognition.  Indeed in an e-mail dated February 5, 2000 from McLamb to Dammekens, McLamb states that "there are certain documents that should be prepared before the submission to the SEC.  Those documents primarily relate to revenue recognition."

(u)     KPMG was also involved early on in L&H's response to an earlier SEC inquiry which resulted in restatement of earnings as shown by, for example, the January 22, 1999 letter from L&H to EASDAQ.

(v)    KPMG was quite content to go along with L&H's fraudulent accounting practices prior to the Dictaphone Merger.  It is only after the SEC sent a broad document demand to KPMG, apparently in April 2000, that KPMG started to panic about the lack of supporting documentation at L&H and started (at least to give the appearance of) belatedly doing its job.  Indeed, in issuing its unqualified opinions of L&H's financials, KPMG was plainly unconcerned about receiving any supporting documentation for the claims of L&H management – at least not until after the SEC started requesting information from KPMG.  As noted in an e-mail from Frederik Deschodt to Dammekens dated June 24, 2000 regarding "LDC, LDS and Korean customers," Deschodt notes that he will be collecting the corporate registry for the customers and "[t]his would be first documentation that we submit to KPMG".

(w)    KPMG was instrumental in smoothing over any potential concerns that D&T may have had on Dictaphone's behalf.  In an e-mail dated February 28, 2000 from Huysman of KPMG Belgium to Van Aerde and Dammekens, Huysman [in translation] reports that they had concluded a meeting with D&T regarding their working papers from 1998, in which D&T asked KPMG about such issues as the L&H internal controls, what KPMG looks at, and how KPMG organizes its review of the contracts.  KPMG apparently failed to disclose the numerous issues outlined above, including the obvious lack of internal L&H controls and supporting documentation, as Huysman boasted that the meeting was "Nothing difficult, in other words.  They were impressed."  However, KPMG knew L&H's internal controls and KPMG's review of contracts were nothing to be impressed about.

(x)    KPMG was intimately involved in the structure of "Jo & Pol Inc.," including the LDCs.  For example, e-mails dated April 30, 1999 among Bastiaens, Dammekens, Behets, McLamb, Davison and Boyer of KPMG, discusses Bastiaens' desire for a meeting among himself, his financial staff and KPMG to discuss "a number of items between the Company and KPMG", including a the "Language companies, S.AI.L. Labs, other business issues" and "work organization and planning with KPMG for the future."

384.    In misrepresenting the conduct of audits for the years 1997, 1998 and 1999, and falsely representing that L&H's consolidated financial statements fairly presented its financial position and results of operations and cash flows for those years, KPMG, by the use and instrumentalities of interstate commerce and the United States mails, participated in a course of conduct that constituted a fraud and deceit,

misrepresented material facts, omitted to disclose material facts, and concealed L&H's true financial condition and results of operation.

## SG Cowen's Role in the L&H Fraud

385.   As set forth above, SG Cowen has served as L&H's investment bankers since 1995, while at the same time disseminating analyst research reports regarding L&H.  SG Cowen had information regarding the convoluted corporate structure of L&H generally, by virtue of its longstanding role as its investment banker and, specifically, through, among other things (i) its access to, and a continuing working relationship with Dan Blake, a SG Cowen analyst, who subsequently joined Defendant LHIC through whom, along with other companies, L&H effectuated its scheme, and (ii) SG Cowen's participation in setting-up and/or perpetrating this structure through among other things (a) meeting with L&H representatives to discuss related-party transactions, and (b) meeting with potential investors in these related entities in efforts to persuade them to invest in these entities, and (c) performing investment banking services in connection with L&H acquisitions, including rendering a "fairness" opinion in connection with the Bumil acquisition.   These facts regarding SG Cowen's access to information about L&H's corporate structure demonstrate that SG Cowen knew, or, at a minimum, was reckless in not knowing, of L&H's related-party transactions.   Further, because SG Cowen issued analyst reports on, and in the course thereof studied, the financial statements of L&H, SG Cowen knew that L&H's related-party scheme was not being disclosed.   One or more L&H analysts from SG Cowen worked with the SG Cowen investment banking team in charge of the Dictaphone Merger.

386.    Despite its knowledge of problems in related-party transactions and in Korea, SG Cowen continued to recommend L&H stock to the public as a "Strong Buy" into the Fall of 2000, and either made investigation of the related-party problems or the Korean customers and intentionally misrepresented its findings, or made no investigation and intentionally misrepresented that it had.

387.    In addition, during the negotiations between Dictaphone and L&H, SG Cowen representatives, including Howe and Stone, met with Dictaphone and represented that L&H was an attractive acquirer, based on the prospects of L&H's business predicated on its growth and in particular, its revenue growth.  As part of this process, SG Cowen presented Dictaphone with one or more of its analyst reports recommending L&H as a "Strong Buy."  In these meetings, SG Cowen failed to disclose that L&H's revenue growth was an accounting fiction and that the analyst reports were false and misleading.

388.    In addition to the foregoing, evidence of knowledge or recklessness of SG Cowen is demonstrated by at least the following facts:

(a)    SG Cowen's extensive and lucrative relationship with L&H as its "exclusive financial advisor."  Indeed, according to its own 1999 Annual Review, SG Cowen co-managed L&H's $40 million IPO in 1995, helped L&H acquire two language translation companies, initiated three more capital-raising deals from L&H in 1996 and 1997, and had rendered opinions on other L&H deals, including the Bumil transaction in Korea on September 13, 1999.  SG Cowen handled both the Dictaphone and Dragon transactions, and billed over $800,000 in transaction fees alone for 1998, and $7 million for the Dictaphone Merger.

(b)    SG Cowen's unusually close ties to L&H through its current and former analysts Dan Blake and Barend Van den Brande as described above.

(c)    Defendant Lernout has stated that SG Cowen's Managing Director and Senior Analyst Robert Stone ("Stone") knew about, and had a direct role in, establishing the related companies, L&H's so-called "Strategic Partners," the LDCs and CLDCs, through which research and development costs would be hidden from L&H's bottom line, and that Stone allegedly told Lernout that "there's nothing wrong with working smart."

(d)    SG Cowen's efforts to assist L&H in covering up its fraudulent practices. For example, in response to, and the very day after, the August 8, 2000 *Wall Street Journal* article which reported discrepancies in L&H's representations regarding its purported Korean customers, SG Cowen analyst Stone attempted to help L&H cover-up the Korean fraud, by claiming publicly that he had personally visited and inspected L&H's Korean operations and had confirmed that they were real, even though it was later confirmed that such customers were, in fact, fictitious.

(e)    SG Cowen brokered the sales of many of the individual L&H Defendants' L&H stock during periods when L&H's accounting practices were under SEC scrutiny, including sales of stock held by Defendants Spooren and Dammekens, while simultaneously promoting L&H as a "strong buy."   As set forth above, SG Cowen apparently assisted in procuring the loan from Artesia to finance Bastiaens' highly-publicized May 2000 stock purchase.

(f)    Despite its intimate knowledge of L&H and its purported knowledge of the relevant documents, SG Cowen, on or about September 6,1999, issued a fairness opinion to L&H regarding the Bumil acquisition, even though that acquisition was not justified at the price agreed to (approximately 50 to 100 times earnings).

(g)    Despite its intimate knowledge of L&H, SG Cowen disseminated an analyst report on January 5, 2000 promoting L&H stock as a "strong buy" and downplaying L&H's restatement of results related to "write downs of acquired R&D" as a reflection of a "policy change at the SEC" and characterizing the L&H write downs as a "then common accounting treatment" that had been followed by "many other companies that had made acquisitions."

(h)    SG Cowen disseminated an analyst report on February 10, 2000 touting L&H as a "Strong Buy," citing a purported fourth quarter of 1999 "Surge in Technology and Solutions" and the "Surge in Asia Business." The report quoted 1999 revenue figures and stated as fact that the Asia division "signed a record of 80 contracts for the [fourth] quarter."   SG Cowen disseminated this report incorporating such financial information prior to KPMG signing off on the 1999 audit and with knowledge that such financial information was unreliable.

(i)    As evident from February 2000 e-mails from Eric Chiang to L&H executives as set forth above, SG Cowen was deeply involved in dissemination of information to Dictaphone and its advisors in pre-merger discussions.  On information and belief, SG Cowen did not reveal to Dictaphone or its advisors any of the negative information about L&H which it knew.

389.    By reason of the foregoing, KPMG Belgium, KPMG US, Behets and SG Cowen have violated section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

390.    Dictaphone relied on KPMG's, Behets' and SG Cowen's misrepresentations and material omissions in its purchase of L&H stock, and Plaintiff has suffered substantial damages, including, but not limited to, loss or diminution of its value as a going concern and consequential damages as a result thereof, in an amount to be proven at trial, but no less than $900,000,000.

### FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS S.AI.L. TRUST, MERCATOR, FLV FUND, FLV MANAGEMENT, LESSIUS, GIMV, L&H INVESTMENT COMPANY, LANGUAGE DEVELOPMENT SERVICES, LANGUAGE INVESTMENT COMPANY, VELSTRA PTE LTD., LANGUAGE DEVELOPMENT FUND, VERBEKE, HARDEMAN AND SNAUWAERT FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10b-5

391.    Plaintiff hereby repeats and realleges each and every allegation in the prior paragraphs as if fully set forth herein.

392.    Defendants S.AI.L. Trust, Mercator, FLV Fund, FLV Management, Lessius, GIMV, Verbeke, Hardeman, Snauwaert, L&H Investment Company, Language Development Services, Language Investment Company, Velstra Pte Ltd., and Language Development Fund (the "Related-Party Defendants"), individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate

155

commerce and of the mails, engaged and participated in a continuous course of conduct to artificially inflate the price of L&H common stock and to conceal its true financial condition.   As discussed herein, the Related-Party Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse, non-public information, and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omissions of material facts necessary in order to make the statements made not misleading.

393.    The Related-Party Defendants' fraudulent conduct was committed, directly or indirectly, "in connection with" Dictaphone's purchase of L&H shares, within the meaning of §15 U.S.C. §78j(b) and 17 C.F.R. 240.10b-5.

394.    The Related-Party Defendants participated, directly or indirectly, in L&H's scheme to fraudulently inflate L&H's revenues, assets and the price of L&H common stock, and in the fraudulent misrepresentations and omissions of L&H in its Annual Reports, press releases and other filings with the SEC by secretly funding or participating in the funding of L&H's sham "Strategic Partners," and concealing L&H's involvement with, and reliance on, the Related-Party frauds.

395.    Defendant Vanderhoydonck is liable as a control person under Section 20(a) of the Exchange Act for the violation of Defendant LHIC.   Defendants FLV Management, S.Al.L., GIMV and Lessius are liable as control persons of Defendant FLV Fund.   Defendant Verbeke is liable as a control person of Mercator.   Defendant van Acker is liable as a control person of Defendant GIMV.

156

## Scienter

396.  The Related-Party Defendants' knowledge of the fraud and intent to perpetrate it is evidenced by, among other things:

(a)    Lernout's and Hauspie's involvement in, and control over, the affairs of FLV Fund, S.AI.L. Trust, and LHIC, from which those entities' knowing participation in the fraudulent effect of their investments in LDCs and CLDCs, the concealment of which investments had no legitimate business purpose, can be inferred.

(b)    A letter written on or about November 20, 2000, from Sam Cho, Vice-President of L&H Korea, to Philip Vermeulen, CEO of FLV Management, in which Cho threatens Vermeulen with exposure of a variety of illegal activities involving the FLV Fund's investments in L&H entities, and reciprocal efforts to use L&H entities to funnel funds into the FLV Fund as part of a fraudulent scheme to ensure the success of a FLV fund Secondary Public Offering.  Among other things, Cho wrote: "it is clear that you have known from the beginning what has happened in Korea.  We all know you were involved from the beginning and during the entire transaction process, including the bank guarantee of the US $30 million . . . John Seo will help release the [$30 million] collateral on the FLV Fund as soon as possible.  However, he needs to know you will cooperate with him and to give him time to resolve this.  If you don't allow him the time, he will be forced to release the unfair and illegal involvement you were also engaged in. . . . I won't go into much details but as you may know about the HI Worldwide case of US $11 million.  You personally held the shares of the CALC Companies and you used HI Worldwide to purchase the replacement of FLV and your shares in the CALC Companies."

(c)    Apart from being outside counsel to L&H and FLV Fund, Verbeke personally and/or his firm was plainly involved in advising "Jo & Pol Inc. " on every level as illustrated by the following representative examples:

   (i)    Verbeke's Firm was Belgian counsel on the Dictaphone merger;

   (ii)    Verbeke's Firm prepared the LHIC Private Placement Memorandum April 1999;

   (iii)    Verbeke's Firm prepared the FLV Fund Prospectus;

   (iv)    Per e-mails dated Dec. 22- 23, 1999 among Paul-Yves Bernard, Bernard Bruggeman of KPMG, KBC,

157

Hauspie, Lernout, Bastiaens, Dammekens, Vanderhoydonck, Denys, Vermeulen, Mestdagh and Phillipe Hamer of the Verbeke firm and others, the planned restructuring of LHIC;

(v)     Per e-mail dated December 17, 1999 between Hauspie and Jean Van Marcke, Chairman of the Board of Directors of FLV Fund, [as translated from the original], Verbeke personally briefed Van Marcke about a "new transaction proposal" between LHIC and FLV Fund;

(vi)    Per email dated December 2, 1998 from Denys to Willaert, Hauspie, Dammekens, Lernout, Bastiaens, DeShrijver, Van Coile, Flink of L&H's U.S. counsel, Brown Rudnick, and Gherkiere and Dessers, both of the Verbeke's Firm, the preparation of information for potential LDCs investors and operational aspects of LDCs.

(d)     Verbeke was instrumental in creating the interrelated and complex corporate structuring of "Jo & Pol Inc." Indeed, as Hauspie said in a December 17, 1999 e-mail regarding a new transaction proposal for LHIC and the FLV Fund, "I lay myself down at the wisdom of Louis Verbeke." [translated]

(e)     Verbeke was certainly well aware of the wrongful nature of the conduct in which he participated. During the time period that he was Chairman of Mercator and while Mercator was the ultimate owner of certain of the "Strategic Partners" utilized by L&H in its scheme to defraud, Verbeke was a well-known authority on mergers and acquisitions, acquisition strategy, joint ventures, corporate governance and IPOs. Verbeke was also Chairman of, and a professor at, Belgium's leading business school, the Vlerick Leuven Gent Management School, a school which has ties to other L&H parties including, Jan Coene, an L&H director who co-chairs the alumni association of the school.

(f)     Upon information and belief, Verbeke utilized his expertise described above in providing legal services to L&H in connection with L&H's fraudulent transactions involving the Related-Party Defendants and all, or virtually all, of the thirty start-up firms. Upon information and belief, Verbeke was instrumental in both L&H's lawful and unlawful mergers and acquisitions. This included providing advice regarding the structure of the LDCs and the drawing up the contracts for the LDC and CLDC transactions, including, for example, the contract of sale of certain CLDCs from FLV Fund (also Verbeke's client) to HI World to, and, per a December 2, 1998 e-mail, the preparation of information for LDC investors.

158

(g)    Verbeke attended virtually all meetings of L&H's Board of Directors, including those where related-party transactions or issues concerning conflicts between L&H and FLV Fund were discussed.

(h)    Verbeke and other L&H related parties and actors in the L&H frauds had many pre-existing ties through other connections of Verbeke. For example, among the "Foundation Partners" for Verbeke's school, Vlerick Leuvan Gent Management School, are Verbeke's firm (now Allen & Overy), Dexia Bank (successor to Artesia now under indictment for its role in the L&H frauds), Mercator and KPMG.

(i)    Verbeke, who lectures on corporate governance and accountability and whose firm, upon information and belief, drew up the relevant legal documents, as Chairman of Mercator, was surely aware of and authorized Mercator's investment as the initial shareholder for LDCs Vaciena, Rodeon, Vanesto and Shangra, and the subsequent transfer of Mercator's interest in these LDCs – on paper – though not in substance –to its subsidiary Velstra.

(j)    Verbeke, in his multiple roles as counsel to L&H and FLV Fund as well as Chairman of Mercator, likewise saw both sides to the L&H and LDC/CLDC transactions.  Upon information and belief, Verbeke, through his control of Mercator, indirectly or directly, controlled the LDCs and CLDCs used in the frauds.  Thus, while the Audit Committee Advisors may have received inconsistent information from Snauwaert, they also failed to receive a key piece of information from Defendant Verbeke, whose firm acted as co-counsel, that is, Verbeke's own personal involvement with Mercator and his personal stake in the transactions.

(k)    Verbeke is a target in the Belgian authorities' investigation of criminal fraud in connection with L&H.

(l)    As detailed above, Defendant Mercator's ownership and control, through various intermediate subsidiaries, of seventeen of the thirty start-up customers that paid a total of $53 million in licensing fees to L&H during 1998 and 1999, and Mercator's indirect payment of at least $12 million in licensing fees to L&H, the concealment of all of which had no legitimate business purpose.

(m)    As referenced above, LDF was an investment firm owned entirely by L&H related companies: by Mercator 96.7%, LDS 3.2% and LIC .1%

(n)    Mercator's, and thus Verbeke's, interest in the LDCs was not disclosed publicly.    Indeed, despite the obvious conflict of interest, Verbeke did not publicly disclose his various L&H interests, even when his firm was co-audit committee counsel.    Verbeke's chairmanship at Mercator, his other L&H personal connections, and Mercator's ownership

of most of the LDCs, were also apparently kept secret from former Dictaphone officers. According to an e-mail dated December 14, 2000 from Dan Hart to Roel Pieper, until an article in *The Wall Street Journal* revealed Verbeke's interest, Hart was unaware that Verbeke was chairman of Mercator. Moreover, Hart reportedly had ascertained from Terry Pritchard (of Bryan Cave) that this fact had not been disclosed to her either, even though Verbeke's firm, Loeff Claeys, was co-audit committee counsel.

(o)    Apart from the substantial legal fees earned for his services to L&H and its related companies, Mercator's chairman, Verbeke also stood to profit from the fraudulent acts alleged herein in that both Mercator and Verbeke personally held a minority interest in L&H through their stakes in L&H Holding. Further, had the Strategic Partners' scheme continued undetected, Mercator and Verbeke would have received a striking return on Mercator's modest investment in its LDCs and CLDCs when, after L&H had actually developed the start-up's product, L&H purchased the start-up LDC or CLDC for the value for the completed product.

(p)    The fact that Mercator, of which Verbeke was Chairman, was listed as the original known shareholder for five separate LDF–"owned" LDCs, which were later transferred to Velstra, with LDF as the only known shareholder.

(q)    Mercator effectively employed Defendant Tony Snauwaert, a manager of LDF, which is 96% owned by Mercator. A January 24, 2001 article in the Belgian business publication *De Financieel-Exonomische Tijd* described Snauwaert as "Pol Hauspie's right hand."

(r)    Snauwaert signed at least nine of the purported license contracts on behalf of sham licensees which were provided to Dictaphone during the due diligence process and misrepresented as valid license agreements.

(s)    According to the Audit Committee Report, Snauwaert gave inconsistent information about the LDCs and CLDC, even though he was, most accurately described by LDC Project Manager Leys of L&H as "a key figure in the LDC structure."

(t)    Snauwaert was listed as an officer for at least nine of the eleven start-ups registered in Belgium, six of which had their headquarters at the same address a few doors from L&H's leper headquarters. Snauwaert was also listed as an officer of at least fourteen of the bogus nineteen Singaporean customers claimed by L&H.

(u)    The President and Managing Director of LHIC at all relevant times was Francis Vanderhoydonck, who also served as a Director of L&H from May 1999 until his resignation on or about May 15, 2001, and in that

160

connection Vanderhoydonck obtained knowledge, attributable to LHIC, that L&H's failure to disclose LHIC's investments in L&H entities was illegal and was being investigated by the SEC.

(v)    Vanderhoydonck's sale of $7 million of L&H stock just after the SEC investigation expanded in April 2001, and his role in causing the firing of John Duerden.

(w)    GIMV's sale of $33 million of L&H stock in May 2001.  FLV Fund, LHIC, LIC, LDF, LDS and Velstra, Snauwaert, Hardeman, and Vanderhoydonck by acting directly in creating and/or operating the fraudulent LDCs/CLDCs and IACs as described above.    FLV Management, GIMV, Lessius, and Mercator & Noordstar as corporate management of the above Defendants by directing and/or permitting the wrongful conduct of those Defendants.

(x)    Willem Hardeman had been President of the Board of Directors of Dictation Consortium, the "prototype" for the Strategic Partners scheme, and later became LIC's chief executive, and a director of FLV Fund. Hardeman has admitted that LIC founded four of the start-ups, Greek Development Co., Polish Development Co., Hungarian Development Co., and Czech Development Co., at the behest of L&H in late 1998.

(y)    Hardeman is also a target of a criminal investigation arising out of his L&H connections.

(z)    According to the Audit Committee Report, Hardeman was listed as the "contact" person for four LDC start-ups which were later sold to Velstra.

397.    As a direct and proximate result of the wrongful conduct of the Related-Party Defendants, Dictaphone suffered substantial damage in connection with the Merger, including but not limited to, the loss or diminution of its value as a going concern as well as consequential damages.

398.    By reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for the aforesaid damages, in an amount to be proven at trial, but no less than $900,000,000.

**FIFTH CLAIM FOR RELIEF AGAINST THE L&H DEFENDANTS,
THE RELATED-PARTY DEFENDANTS, KPMG BELGIUM, KPMG US,
BEHETS AND SG COWEN FOR COMMON LAW FRAUD**

399.    Plaintiff hereby repeats and realleges each and every allegation in the prior paragraphs as though fully set forth herein.

400.    In an effort to induce Dictaphone to enter into the Merger Agreement, all Defendants knowingly and willfully made misrepresentations of material facts to Dictaphone and knowingly and willfully failed to disclose or fraudulently concealed the true facts from Dictaphone.

401.    In reliance on those misrepresentations, and as a result of Defendants' failure to disclose and fraudulently conceal the true facts, Dictaphone entered into the Merger Agreement to its detriment.

402.    As a result of Defendants' fraudulent conduct, Plaintiff has sustained damages, including but not limited to, the loss or diminution of its value as a going concern and consequential damages in an amount to be proven at trial, but no less than $900,000,000.

**SIXTH CLAIM FOR RELIEF AGAINST THE L&H DEFENDANTS,
THE RELATED-PARTY DEFENDANTS, KPMG BELGIUM, KPMG US,
BEHETS AND SG COWEN FOR AIDING AND ABETTING COMMON LAW FRAUD**

403.    Plaintiff hereby repeats and realleges each and every allegation in the prior paragraphs as though fully set forth herein.

404.    As set forth above, L&H intentionally defrauded Dictaphone by misrepresenting its revenues, income and assets by material amounts in its financial statements, press releases and public statements, including, among other things, its

162

filings with the SEC. Those misrepresentations were intended to, and did, have the effect of fraudulently inflating L&H's financial statements and common stock price, including the price of the L&H common stock that L&H exchanged for Dictaphone's stock.

405.   Each of the L&H Defendants, the Related-Party Defendants, KPMG US, KPMG Belgium, Behets and SG Cowen knew of the misrepresentations and fraud committed by L&H and knowingly, recklessly and/or intentionally rendered substantial assistance to L&H in its perpetration of the fraudulent scheme alleged herein.

406.   Plaintiff has been harmed by the Defendants' aiding and abetting the fraud perpetrated by L&H, and has sustained damages, including but not limited to, loss or diminution of its value as a going concern and consequential damages in an amount to be proven at trial, but no less than $900,000,000.

### SEVENTH CLAIM FOR RELIEF AGAINST THE L&H DEFENDANTS, THE RELATED-PARTY DEFENDANTS, KPMG BELGIUM, KPMG US AND SG COWEN FOR UNFAIR TRADE PRACTICES G.L.c 93A

407.   Plaintiff hereby repeats and realleges the prior paragraphs as though fully set forth herein.

408.   The above-described conduct was engaged in substantial part with the intent of inducing Dictaphone to agree to a merger with L&H. As to Dictaphone, that conduct was engaged in substantially and primarily in Massachusetts, where L&H maintained its U.S. corporate headquarters in Burlington, Massachusetts. Indeed, many of the unfair and deceptive trade practices emanated from L&H's Massachusetts headquarters including, but not limited to, the deceptive press releases and unfair and deceptive acts referenced above and came from KPMG's Boston office, including

misrepresentations to Dictaphone and its advisors referred to above, and constitute violations of G.L.c 93A §11.

409. The conduct of Defendants were knowing and intentional violations of G.L.c 93A, §11, and, therefore, in addition to actual damages, Plaintiff demands at least double and up to treble damages and its reasonable costs and attorneys' fees.

### EIGHTH CLAIM FOR RELIEF AGAINST DEFENDANTS KPMG US, KPMG BELGIUM, AND SG COWEN FOR NEGLIGENT MISREPRESENTATION

410. Plaintiff hereby repeats and realleges each and every allegation in the prior paragraphs as though fully set forth herein.

411. In the alternative, in the course of its engagement as L&H's independent auditors and investment bankers, in which it had a pecuniary interest, Defendant KPMG and SG Cowen supplied false oral and written information for the guidance of Dictaphone in its decision to enter into the Merger Agreement and its determination of the price to be paid for L&H stock.

412. In supplying the false oral and written information, KPMG and SG Cowen knew that Dictaphone intended to rely on that information in deciding whether to enter into the Merger Agreement and in determining the price to be paid for L&H stock. KPMG intended to influence Dictaphone's decision in that transaction and the determination of the price to be paid for L&H stock in that transaction.

413. Dictaphone relied upon the oral and written false information supplied by KPMG and SG Cowen in deciding to enter into the Merger Agreement and in determining the price to be paid for L&H stock in that transaction, to its detriment.

414.   As a result of KPMG's and SG Cowen's negligent misrepresentations, Plaintiff has suffered substantial damages, including but not limited to, the loss or diminution of its value as a going concern and consequential damages in an amount to be determined at trial, but no less than $900,000,000.

**NINTH CLAIM FOR RELIEF AGAINST DEFENDANTS LERNOUT, HAUSPIE, WILLAERT, BASTIAENS, DAMMEKENS, SPOOREN, SEO, VANDERHOYDONCK, VAN ACKER, THE AUDIT COMMITTEE DEFENDANTS, THE RELATED-PARTY DEFENDANTS, KPMG BELGIUM, KPMG US, BEHETS AND SG COWEN FOR CONSPIRACY**

415.   Plaintiff hereby repeats and realleges each and every allegation in the prior paragraphs as though fully set forth herein.

416.   Defendants Lernout, Hauspie, Willaert, Bastiaens, Dammekens, Spooren, Seo, the Audit Committee Defendants, Vanderhoydonck, van Acker, the Related-Party Defendants, KPMG Belgium, KPMG US, Behets and SG Cowen, and others presently unknown to Plaintiff, engaged in a common conspiracy to defraud.  These Defendants entered into a contract, combination or conspiracy with the intent and purpose of committing the unlawful acts described above and for the purpose of inflicting injury upon numerous persons.  Each and every one of these Defendants committed at least one overt act in furtherance of this conspiracy.

417.   As a consequence of this conspiracy, each and every one of these Defendants is jointly and severally liable for the acts and omissions of the others.

418.   As a result of the foregoing, Plaintiff has suffered substantial damages including, but not limited to, the loss or diminution of its value as a going concern and consequential damages in an amount to be determined at trial, but no less than $900,000,000.

165

## TENTH CLAIM FOR RELIEF AGAINST THE DICTAPHONE DIRECTORS AND THE DICTAPHONE CONTROLLING SHAREHOLDERS FOR BREACH OF FIDUCIARY DUTY

419.    Plaintiff hereby repeats and realleges each and every allegation in the prior paragraphs as though fully set forth herein.

420.    By virtue of their status as Directors of Dictaphone, Defendants John H. Duerden, Albert J. Fitzgibbons, III, Emil F. Jachmann, Alexis P. Michas, Scott M. Shaw, Joseph D. Skryzpczak and Peter P. Tong (the "Dictaphone Director Defendants"), and Defendants Stonington Partners L.P. and Stonington Capital Appreciation 1994 Fund, L.P. (the "Stonington Defendants"), by virtue of their status as Controlling Shareholders of Dictaphone, had fiduciary duties to Dictaphone, including the duty to exercise due care in causing or approving the Merger.

421.    The Stonington Defendants, as controlling shareholders, caused the Merger to be approved.  The Dictaphone Director Defendants voted to approve and effectuate the Merger.

422.    In the alternative, should it be determined that the Dictaphone Director Defendants or the Stonington Defendants knew or should have known facts which could have revealed the fraud at L&H, then in that event, the Dictaphone Director Defendants and the Stonington Defendants have breached their fiduciary duties to Dictaphone.

423.    As a result of the foregoing, Plaintiff has suffered substantial damages, including, but not limited to, the loss or diminution of its value as a going concern and consequential damages in an amount to be determined at trial, but no less than $900,000,000.

## ELEVENTH CLAIM FOR RELIEF AGAINST DELOITTE & TOUCHE
## AND HAMBRECHT FOR BREACH OF CONTRACT

424.    Plaintiff hereby repeats and realleges each and every allegation in the prior paragraphs as though fully set forth herein.

425.    In or about February 2000, in connection with its consideration of a proposed merger with L&H, Dictaphone entered into a contract with Defendant D&T pursuant to which D&T would render its professional services to Dictaphone in assisting with Dictaphone's due diligence on the L&H Merger.

426.    In or about February 2000, in connection with its consideration of a proposed merger with L&H, Dictaphone entered into a contract with Defendant Hambrecht, an investment banking firm, pursuant to which Hambrecht would render its professional services to Dictaphone in assisting with Dictaphone's due diligence on the L&H Merger.

427.    Dictaphone fully performed its obligations under its contracts with D&T and Hambrecht.

428.    In the alternative, should it be determined that Dictaphone should have known facts which could have revealed the fraud at L&H, then in that event, D&T breached its contractual duties to Dictaphone by not learning or revealing those facts to Dictaphone.

429.    In the alternative, should it be determined that Dictaphone should have known facts which could have revealed the fraud at L&H, then in that event, Hambrecht breached its contractual duties to Dictaphone by not learning and/or revealing those facts to Dictaphone.

430.   As a result of the foregoing, Plaintiff has suffered substantial damages, including but not limited to, the loss or diminution of its value as a going concern and consequential damages in an amount to be determined at trial, but no less than $900,000,000.

## TWELFTH CLAIM FOR RELIEF AGAINST
## DELOITTE &TOUCHE AND HAMBRECHT FOR NEGLIGENCE

431.   Plaintiff hereby repeats and realleges each and every allegation in the prior paragraphs as though fully set forth herein.

432.   D&T and Hambrecht owed Dictaphone a duty to exercise due care in the performance of their professional services and a duty to perform those services in conformance with the accepted professional practices and standards.

433.   In rendering their professional services, D&T and Hambrecht knew that Dictaphone intended to rely on the information and advice offered by D&T and Hambrecht in deciding whether to enter into the Merger Agreement and in determining the price to be paid for Dictaphone stock.  D&T and Hambrecht knew that their advice to Dictaphone would influence Dictaphone's decision to enter into that transaction, as well as the determination of the price to be paid for Dictaphone stock in that transaction.

434.   Dictaphone reasonably relied upon the oral and written information and advice supplied to it by D&T and Hambrecht in deciding to enter into the Merger Agreement and in determining the price to be paid for Dictaphone stock in that transaction, to its detriment.

435.   In the alternative, should it be determined that the Dictaphone should have known facts which could have revealed the fraud at L&H, then in that event, D&T and

Hambrecht have breached their duty of due care to Dictaphone by not learning and/or reporting those facts.

436.    As a result of the foregoing, Plaintiff has suffered substantial damages, including but not limited to, the loss or diminution of its value as a going concern and consequential damages in an amount to be determined at trial, but no less than $900,000,000.

## THIRTEENTH CLAIM FOR RELIEF AGAINST THE RELATED-PARTY DEFENDANTS, KPMG BELGIUM, KPMG US, BEHETS AND SG COWEN UNDER RICO

437.    Plaintiff hereby repeats and realleges each and every allegation in the prior paragraphs as though fully set forth herein.

438.    The Private Securities Litigation Reform Act of 1995 ("PSLRA") amended the Federal Racketeer Influenced and Corrupt Organizations ("RICO") statute (18 U.S.C.§1960 *et. seq.*) to remove general civil liability under the RICO statute for "any conduct that would have been actionable as fraud in the purchase or sale of securities . . . " 18 U.S.C. §1964 (c).

439.    If this Court finds that any or all of these Defendants' conduct is actionable as securities fraud as alleged herein, no RICO liability will lie under 18 U.S.C. §1964(c). Alternatively, however, if this Court finds that the conduct of these Defendants is not actionable as securities fraud, then the predicate acts alleged below do not fall within the proscription of "conduct that would have been actionable as fraud in the purchase or sale of securities" in 18 U.S.C. §1964(c), and these Defendants, as alleged below, are liable to Plaintiff under RICO.

440.   The Related-Party Defendants, KPMG Belgium, KPMG US, Behets and SG Cowen each, individually, and acting for one another and in concert with each other and with the L&H Defendants, have committed the following predicate acts of "racketeering activity" within the meaning of 18 U.S.C. §1961(1):

(a)  mail fraud, as outlined below, in violation of 18 U.S.C. §1343; and

(b)  wire fraud, as outlined below, in violation of 18 U.S.C. §1343.

441.   The Related-Party Defendants, KPMG Defendants, Behets and SG Cowen each have engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5) by numerous acts of racketeering activity over a several year period, at least in part as follows:

(a)    Numerous acts for the purpose of aiding and abetting the L&H Defendants in defrauding, Dictaphone and others in making, causing or assisting the making of, numerous separate false and fraudulent statements and fraudulent material omissions in connection with the Dictaphone Merger, including, but not limited to, entering into, facilitating or concealing, the numerous fraudulent transactions set forth above involving the LDCs and CLDCs, or L&H's "Strategic Partners" and other Related-Party Transactions and concealing the fraudulent factoring agreements and facilitating, making or concealing the existence of false statements or material omissions regarding L&H's financial condition .

(b)    Numerous acts of mail fraud for the purpose of defrauding, or aiding and abetting the L&H Defendants in defrauding, Dictaphone and others, by causing or facilitating the dissemination of false information by mail, including, but not limited to, the dissemination of the fraudulent L&H financial statements and L&H press releases set forth above.

(c)    Numerous acts of wire fraud in the use of wire communications in interstate and foreign commerce for the purpose of defrauding Dictaphone and others, including, but not limited to, disseminating or facilitating the dissemination of false information regarding L&H's financial condition to Dictaphone and its advisors via telephonic conferences as set forth above.

170

442.    All of the acts alleged constitute a pattern of racketeering activity occurred after April 25, 1991 and within a ten-year period prescribed by 18 U.S.C. §1961(5).

443.    Throughout the relevant period , the Related-Party Defendants, the KPMG Defendants, Behets, SG Cowen and the L&H Defendants were an association-in-fact and, thus, an "enterprise" within the meaning of 18 U.S.C. §1961(4), and L&H was an "enterprise."

444.    The Related-Party Defendants, KPMG Belgium and KPMG US, Behets and SG Cowen have conducted and participated in, directly or indirectly, the affairs of the enterprises described above through the pattern of racketeering activity described above in violation of 18 U.S.C. §1962(c).  Each of these Defendants exercised control over the above-mentioned enterprise through his or its own acts and acting in conspiracy and concert with others as part of the fraudulent scheme.

445.    Acting in express agreement with each other, the Related-Party Defendants, KPMG Belgium, KPMG US, Behets and SG Cowen have conspired to violate 18 U.S.C. §§1962(c) through a pattern of racketeering activities in violation of 18 U.S.C. §1962(d).

446.    As a direct and proximate result of the aforesaid violations of RICO, Plaintiff has suffered substantial damages including, but not limited to, the loss or diminution of its value as a going concern in an amount to be determined at trial, but no less than $900,000,000.

447.    By reason of such violations, the Related-Party Defendants, KPMG Belgium, KPMG US, Behets and SG Cowen are jointly and severally liable to Plaintiff for

threefold the damages sustained by Plaintiff, plus the costs of suit and reasonable attorneys' fees pursuant to RICO §1962(c), in a total amount to be proven at trial.

**WHEREFORE**, Plaintiff demands judgment as follows:

(a)    Awarding Plaintiff all damages, including consequential damages in an amount to be determined at trial, against all Defendants, jointly and severally, for Dictaphone's Merger with L&H, as well as reimbursement for any liabilities and expenses incurred as a result of the impact of the fraud on Dictaphone;

(b)    Awarding Plaintiff its reasonable costs and expenses incurred in this action, and interest;

(c)    On the Seventh Cause of Action, awarding Plaintiff triple the amount of damages and attorneys' fees;

(d)    Alternatively, on the Thirteenth Cause of Action, awarding Plaintiff triple the amount of damages, costs and attorneys' fees.

(e)    Awarding such other, further or different relief as the Court may deem just and proper.

Dated:  August _____, 2003

> **FOLKENFLIK & MCGERITY**
> Max Folkenflik, Esq.
> Margaret McGerity, Esq.
> 1500 Broadway, 21st Floor
> New York, New York 10036
> (212) 757-0400
>
> **BRAUNER BARON ROSENZWEIG & KLEIN LLP**
> Jon D. Kaplon, Esq.
> Regina Griffin, Esq.
> 61 Broadway
> New York, New York  10006
> (212) 797-9100

LAW OFFICES OF KAREN D. HURVITZ

By: _Karen J Hurvitz_
Karen D. Hurvitz, Esq.
331A Perkins Street
Jamaica Plain, MA 02130
(617) 983-3218
Attorneys for Plaintiff

173