# **EXHIBIT F**

1999 WL 1318963                                                                                       Page 1
1999 WL 1318963 (Mass.Super.), 37 UCC Rep.Serv.2d 931
(Cite as: 1999 WL 1318963 (Mass.Super.))

C

Superior Court of Massachusetts.

Austin J. DECOSTER dba Decoster Egg Farm dba
Co-Hen Egg Farm,
v.
Spiro VROUHAS, Individually and dba Spiro's Eggs
dba Spiro's Egg Farm.

No. 95958.

Jan. 25, 1999.

FINDINGS OF FACT, RULINGS OF LAW AND
ORDER FOR JUDGMENT

SPURLOCK.

*1 This case came in for trial, jury waived, on December 1, 1998 and concluded on December 2, 1998. After hearing the evidence, reviewing the exhibits, judging the credibility of the witnesses and drawing reasonable inferences, the Court makes the following findings of fact, rulings of law and order.

FINDINGS OF FACT

The plaintiff, Austin J. DeCoster, dba Decoster Egg Farm, dba Co-Hen Egg Farm ("Decoster"), is engaged in the business of processing, distributing and selling eggs. The defendant, Spiro Vrouhas, dba Spiro's Eggs, dba Spiro's Egg Farm ("Vrouhas"), purchases eggs and distributes them to various commercial customers.

From 1979 to 1988 Vrouhas purchased unprocessed eggs from Co-Hen Egg Farm. In the beginning of their business relationship, Vrouhas purchased approximately 120 cases of eggs per week. Vrouhas would clean, grade and package the unprocessed eggs and sell them to his customers.

In 1988, DeCoster acquired Co-Hen Egg farm and continued selling unprocessed eggs to Vrouhas. By 1991 Vrouhas was purchasing approximately 1,100 cases of eggs per week from DeCoster. In August of 1991 DeCoster remodeled and streamlined his egg farm. As a result, DeCoster began processing Class III (small eggs) on site. DeCoster's sales manager, Fred Hersey, informed Vrouhas of this change in operation. Hersey offered to sell processed Class III (small) eggs to Vrouhas for another two weeks and processed Class I (large) eggs thereafter. Vrouhas, however, chose to purchase Class III unprocessed eggs from other suppliers and discontinued business relations with DeCoster.

On March 16, 1992, Vrouhas resumed business relations with DeCoster by purchasing processed eggs at a price Vrouhas negotiated with Fred Hersey. In doing business, Vrouhas or his son, Dino Vrouhas, telephoned DeCoster with an order and DeCoster delivered the order to Vrouhas's place of business. After inspecting the delivered eggs, Vrouhas, Dino Vrouhas or another employee signed a delivery slip acknowledging receipt of the eggs.

If any eggs arrived damaged, or otherwise did not conform to the order, then Vrouhas could reject those eggs upon delivery. In order to reject eggs, Vrouhas or one of his employees would record the amount of eggs being rejected in a designated box on the delivery slip. The truck driver and Vrouhas or one of his employees would then sign the delivery slip and the rejected eggs would be returned to DeCoster on the delivery truck. DeCoster would then credit Vrouhas's account for the value of the rejected eggs.

Initially, DeCoster also accepted what were called store-return eggs. Store-returns were eggs that were discovered to be defective by Vrouhas's customers. Vrouhas would reject store-returns by collecting the eggs from his customers, filling out an authorized pick up form and sending the eggs back on one of DeCoster's delivery trucks. DeCoster would credit Vrouhas's account for the value of the store-returns.

By the summer of 1994, Vrouhas's orders had grown to approximately 4,000 cases of eggs per week. At this time, Vrouhas's son, Dino Vrouhas, was responsible for the day-to-day operations of the business. For some reason not made known to the Court, Vrouhas was having difficulty staying current on his account with DeCoster.

*2 In May of 1994, Fred Hersey advised Dino Vrouhas that DeCoster had changed the policy with regard to store-returns. Under the revised policy, instead of accepting store-returns for credit, DeCoster gave Vrouhas an additional one percent discount on all eggs purchased. The change in the store-return

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

policy did not alter DeCoster's practice of crediting Vrouhas's account for eggs rejected upon delivery.

During 1994, Dino Vrouhas made his own abbreviated notations on the bottom right hand corner of many delivery slips. He made these notations outside of the box designated to indicate the number of eggs that Vrouhas was rejecting. Dino Vrouhas testified that these notations indicated the amount of store-returned eggs that Vrouhas was rejecting. Neither DeCoster nor any of his employees were informed what these abbreviated notations meant.

Also during 1994, Vrouhas or one of his employees, including Dino Vrouhas, signed each and every delivery slip acknowledging receipt of eggs delivered by DeCoster. Whoever signed the delivery slip would indicate in the appropriate box the number, if any, of eggs that Vrouhas rejected upon delivery. As a result, many delivery slips had the number of eggs rejected written in the box and also had Dino Vrouhas's hand written notations on the corner of the form.

DeCoster's Traffic Manager, Bruce Ames, was responsible for determining whether there were discrepancies between the number of eggs noted as returned on delivery slips and the amount of eggs actually returned by Vrouhas. Except for one incident, in which Vrouhas claimed more returns than were actually made, Mr. Ames *never* discovered and was not notified of any such discrepancies.

Representatives of DeCoster met with Vrouhas in the fall of 1994 because Vrouhas was falling increasingly behind on his account. As a result of this meeting, DeCoster reduced the price of eggs sold to Vrouhas by two cents per dozen and credited Vrouhas's account in the amount of $40,000. Additionally, DeCoster agreed to resume accepting store-returns for credit. Vrouhas agreed to this arrangement. Also during this period, DeCoster credited Vrouhas's account $12,000 to reflect the value of an empty egg pallet that Vrouhas sold to DeCoster. After DeCoster had given Vrouhas all these credits, Vrouhas had still failed to pay DeCoster $1,085,710.18 for eggs ordered and delivered.

Vrouhas claims that DeCoster failed to give credit for $148,454.12 worth of store-returns made between August 24, 1994 and October 14, 1994 and $175,511.50 worth of store-returns made between October 17, 1994 and January 16, 1995. Vrouhas claims that DeCoster failed to credit the account $104,751.62 to offset credits that Vrouhas was forced to give to its customers in order to replace defective eggs. Vrouhas claims that DeCoster failed to give credit for $61,134.77 worth of eggs that Vrouhas exchanged with customers who had received defective eggs. Vrouhas also contends that $3,860.00 should have been deducted from the account to reflect the cost of destroying store-returned eggs that DeCoster refused to accept.

*3 The Court, however, rules that there was no credible evidence that the eggs DeCoster delivered, which Vrouhas accepted, were defective in any way. Additionally, there was no credible evidence presented to show that Vrouhas actually rejected any store-returned eggs for which their account was not credited.

When Vrouhas could no longer fill their orders, a number of Vrouhas's customers began to purchase eggs directly from DeCoster. Dino Vrouhas told Fred Hersey that he had no objection to DeCoster selling directly to Vrouhas's customers because Vrouhas could no longer fill their orders.

Shortly after this action was commenced, DeCoster's office manager, Pearl Morse, credited Vrouhas's account by $2,285.09 to reflect store-returns made during 1994-95.

RULINGS OF LAW

1. Decoster's claims against Vrouhas

DeCoster sold and delivered $1,085,710.18 worth of eggs that Vrouhas did not pay for. Vrouhas contends that the Court should deduct $493,712.01 from this amount in order to reflect the value of store-returns and related expenses that DeCoster should have deducted from the account.

The transactions between Vrouhas and DeCoster involved the sale of goods. Accordingly, this dispute is governed by Article 2 of the Uniform Commercial Code, as codified in Mass.Gen.L.c. 106. After applying the above findings of fact to the UCC, the Court rules that Vrouhas failed to properly reject the eggs and therefore is liable to DeCoster for the full value of all of the eggs delivered.

Vrouhas's claim that its account should be offset in order to reflect the value of the store-returns fails for two reasons. First, between May of 1994 and the fall of 1994, Vrouhas and DeCoster negotiated a deal that gave Vrouhas an additional 1% discount on the eggs purchased and relieved DeCoster of the responsibility of accepting store-returns. Accordingly, this contract

modification, supported by adequate consideration, precludes Vrouhas' right to receive credit for store-returns within this period.

Second, Vrouhas' claim fails because DeCoster did not receive adequate notice of rejection for the store-returns that Vrouhas claims to have made. When the tender of goods has been accepted, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of the breach or be barred from any remedy ..." G.L.c. 106, s. 2-607. "The notice must be sufficiently definite to apprise the seller of the defects and the intention to assert legal rights." *Atlantic Pipe Corp. v. R.J. Longo Construction Co.,* 35 Mass.App.Ct. 459, 463, 622 N.E.2d 279 (1993).

DeCoster's delivery slip contained a box where Vrouhas was supposed to document any rejected eggs. Additionally, there was a separate "authorized pick up form" that Vrouhas was supposed to fill out to indicate the number of store-returns. Neither of these forms were completed for the store-returns that Vrouhas claims were not credited. Dino Vrouhas claims to have satisfied the UCC notice requirement by making annotations on the lower right hand corner of the delivery slip to indicate the amount of store returns. These annotations, however, were never brought to the attention of DeCoster and DeCoster never recognized them as representing store returns. Additionally, Vrouhas failed to convince the Court that the store-returns in question were actually returned to DeCoster. Accordingly, the Court rules that Vrouhas failed to provide DeCoster with valid notice of rejection.

*4 At trial, Vrouhas advanced two other theories upon which it claims its account with DeCoster should be offset. First, Vrouhas claims that DeCoster owes $24,000.00 for pallets that Vrouhas sold to DeCoster but that DeCoster failed to pay for. (DeCoster did establish that it credited Vrouhas's account for $12,000 to reflect the sale of one pallet.) This theory, however, appears to relate to a separate breach of contract claim that was not set forth in Vrouhas's Answer, was not pleaded as a Counterclaim and was not proved at trial. Vrouhas also failed to introduce any credible evidence to support this assertion. Accordingly, the Court rules that the $24,000.00 should not be deducted from Vrouhas's account.

Second, Vrouhas claims that DeCoster failed to subtract $5,513.41 from Vrouhas's account for payments that Vrouhas made to DeCoster. Vrouhas, however, failed to prove this fact at trial. Accordingly, the court rules that the $5,513.41 should not be deducted from Vrouhas's account.

DeCoster concedes that it credited Vrouhas's account by $2,285.09 after this action commenced. This should be deducted from the balance of the account as of the date of the Complaint. Accordingly, the Court rules that Vrouhas currently owes DeCoster $1,083,524.09.

2. Vrouhas's Counterclaims against DeCoster

Vrouhas brought two counterclaims against DeCoster. First, Vrouhas claims that DeCoster violated G.L.c. 93A by distributing processed eggs instead of unprocessed eggs and also by ceasing to accept store-returns. General Laws c. 93A s. 2(a) makes unlawful any "deceptive acts or practices in the conduct of any trade or commerce." Under Section 11 of the statute, "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property ... as a result of the use or employment by another person who engages in trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by Section two" may seek damages. The interactions between Vrouhas and DeCoster concerned a commercial transaction within the scope of Section 11. *Szalla v. Locke,* 421 Mass. 448, 451, 657 N.E.2d 1267 (1995). DeCoster's conduct, however, was not unlawful.

Conduct that a reasonable business person would find reprehensible is unfair. *Schwanbeck v. Federal-Mogul Corp.,* 31 Mass.App.Ct. 390, 414, 578 N.E.2d 789 (1991). A mere breach of contract does not amount to an unfair act or practice under 93A. *Whittinsville Plaza, Inc. v. Kotseas,* 378 Mass. 85, 100-01, 390 N.E.2d 243 (1979). However, conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes. *Anthony's Pier Four Inc. v. HBC Associates,* 411 Mass. 451, 474, 583 N.E.2d 806 (1991). An act is deceptive if it could reasonably cause a person to act differently from the way he would act if he knew the truth about the matter. *Sargent v. Koulisas,* 29 Mass.App.Ct. 956, 958, 560 N.E.2d 569 (1990) (rescript). Intent to deceive is not always necessary. *Maillet v. ATF-Davidson Co.,* 407 Mass. 185, 193, 552 N.E.2d 95 (1990).

*5 In this case, DeCoster did not violate c. 93A by discontinuing its practice of selling Class 1

Case 1:04-cv-12606-PBS    Document 34-88    Filed 12/01/2004    Page 5 of 5

1999 WL 1318963                                                                                        Page 4
1999 WL 1318963 (Mass.Super.), 37 UCC Rep.Serv.2d 931
**(Cite as: 1999 WL 1318963 (Mass.Super.))**

unprocessed eggs. DeCoster ceased selling this type of eggs in August of 1991 after DeCoster remodeled and streamlined the egg farm. As a result of these improvements, DeCoster made the business decision to process all of their Class 1 eggs and to sell them pre-washed, pre-graded and pre-packaged. When DeCoster made this decision they sent their sales manager, Fred Hersey, to inform Vrouhas of the change in operations. DeCoster notified Vrouhas of the new policy two weeks before it went into effect and presented Vrouhas with several options for continuing their business relationship. DeCoster's decision to stop selling unprocessed eggs could not be determined reprehensible or unfair by a reasonable business person.

Similarly, DeCoster's decision to stop accepting store-returns does not violate c. 93A. DeCoster changed the store-return policy in May of 1994. There was nothing deceptive or unfair in connection with this decision. Decoster sent Fred Hersey to advise Dino Vrouhas of this change in policy. Under the revised policy, instead of accepting store-returns for credit, Decoster gave Vrouhas a one percent discount on all eggs purchased. Accordingly, the Court rules that the change in the store-return policy did not violate 93A.

Vrouhas's second counterclaim asserts that DeCoster violated G.L.c. 93 s. 5 by attempting to monopolize a part of trade or commerce in the Commonwealth of Massachusetts and to unlawfully lessen competition. Vrouhas failed to introduce any evidence to support this assertion. Accordingly, the Court rules that Vrouhas failed to prove that DeCoster violated G.L.c. 93 s. 5 by attempting to monopolize trade or commerce in the Commonwealth of Massachusetts.

ORDER

For the foregoing reasons, the Court ORDERS the defendant to pay the plaintiff $1,083,524.09 for goods ordered and delivered with interest. The Court further ORDERS that judgment enter for the plaintiff on the defendant's counterclaims.

1999 WL 1318963 (Mass.Super.), 37 UCC Rep.Serv.2d 931

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.