UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____
SCOTT L. BAENA, Litigation Trustee of    :
the Lernout & Hauspie Speech Products,    :
N.V. Litigation Trust,                    :        04-CV-12606-PBS
                                          :
                 Plaintiff,               :
                                          :
        v.                                :
                                          :
KPMG LLP and                              :
KLYNVELD PEAT MARWICK                     :
GOERDELER BEDRIJFSREVISOREN,              :
                                          :
                 Defendants.              :
_____
```

## DECLARATION OF NICHOLAS W.C. CORSON
## IN SUPPORT OF DEFENDANT KLYNVELD PEAT MARWICK GOERDELER
## BEDRIJFSREVISOREN'S MOTION TO DISMISS THE COMPLAINT

NICHOLAS W.C. CORSON, declares pursuant to 28 U.S.C. § 1746 that:

1.      I am an attorney with Hogan & Hartson, LLP, which represents defendant
Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren ("KPMG-B").  My admission *pro hac vice*
in this matter is pending.  I am over the age of 18 and am fully competent to testify.  I
represented KPMG-B in connection with the decisions and transcripts of proceedings attached to
this Declaration and am personally familiar with their contents.  I submit this declaration in
support of KPMG-B's motion to dismiss the Complaint.

2.      Attached hereto as Exhibit A is a true and correct copy of the Memorandum and
Order of Judge Saris in the matter of Nisselson v. Lernout, C.A. No. 03-10843-PBS, District of
Massachusetts, dated August 9, 2004, allowing defendant SG Cowen Securities Corporation's
motion to dismiss the complaint brought by the Trustee of the Dictaphone Litigation Trust.

3.    Attached hereto as Exhibit B is a true and correct copy of the Decision and Order of Justice Donovan in the matter of Hudson Valley Partners, L.P. v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren, Index No. 20371/02, Supreme Court of the State of New York, County of Westchester, dated October 23, 2003, granting KPMG-B's motion to dismiss the complaint brought by Dictaphone bondholders for lack of personal jurisdiction over KPMG-B

4.    Attached hereto as Exhibit C is a true and correct copy of the transcript of the telephone conference call held on November 23, 2004, before the Honorable Judith H. Wizmur, United States Bankruptcy Court Judge, in the matter of In re Lernout & Hauspie Speech Products N.V., with respect to the oral argument and decision of the Court regarding KPMG LLP's motion to transfer this case to the District of Massachusetts.

5.    Attached hereto as Exhibit D is an excerpt of the first ten pages of the transcript of proceedings held on December 2, 2002 before the Honorable Judith H. Wizmur, United States Bankruptcy Court Judge, in the matter of In re Lernout & Hauspie Speech Products N.V., including the report by the L&H Litigation Trustee on his trip to Belgium.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in New York, New York this 7th day of January, 2005.

_____

Nicholas W.C. Corson

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
ALAN NISSELSON, TRUSTEE OF THE  )
DICTAPHONE LITIGATION TRUST,    )
                                )
            Plaintiff,          )
                                )
        v.                      )  CIVIL ACTION NO. 03-10843-PBS
                                )
JO LERNOUT, et al.,             )
                                )
            Defendant.          )
_____)

**MEMORANDUM AND ORDER**

August 9, 2004

Saris, U.S.D.J.

## I.  INTRODUCTION

This case arises out of the stock-for-stock merger of
Dictaphone Corporation ("Old Dictaphone") into a subsidiary of
Lernout & Hauspie N.V. ("L&H").  An alleged fraudulent scheme at
L&H rendered the L&H stock worthless, and the shareholders sued.[1]
Plaintiff Alan Nisselson, Trustee of the Dictaphone Litigation
Trust, has filed a separate action alleging that Defendant SG
Cowen Securities Corporation ("SG Cowen"), L&H's investment
banker, participated in the scheme and defrauded Dictaphone by
encouraging it to enter into the merger agreement.  Specifically,

_____

[1] See Stonington Partners, Inc. v. Dammekens, No. 02-10303-
PBS (D. Mass. filed Feb. 21., 2002).

1

plaintiff brings claims of common law fraud, unfair trade practices pursuant to Mass. Gen. Laws. ch. 93A, negligent mispresentation, conspiracy, and violations of RICO against SG Cowen.  SG Cowen moves to dismiss the Amended Complaint in its entirety on the grounds that the Trustee lacks standing because only the shareholders have been injured by the drop in stock value, and the action is barred by the doctrine of <u>in pari delecto</u>.  After hearing, the motion to dismiss is **<u>ALLOWED</u>**.

## II.   FACTUAL BACKGROUND[2]

The Amended Complaint alleges the following facts.

In early 2000, L&H and SG Cowen approached Dictaphone to discuss the possibility of acquiring Dictaphone - one of its major competitors in the speech and language applications sector. At that time, Stonington Fund was the owner of approximately 96% of the authorized and outstanding stock of Dictaphone, a Delaware corporation.  (¶ 183.)

On May 5, 2000, in what is known as a "reverse triangular merger," L&H acquired all of the outstanding stock of Dictaphone in exchange for approximately 9.4 million shares of L&H common

---

[2]   This Court has written several extensive opinions concerning the alleged fraudulent scheme at L&H.  Familiarity with the facts set out in those opinions is assumed. <u>See</u>, <u>e.g.</u>, <u>In re Lernout & Hauspie Sec. Litig.</u>, 208 F. Supp. 2d 74 (D. Mass. June 19, 2002); <u>In re Lernout & Hauspie Sec. Litig.</u>, 230 F. Supp. 2d 152 (D. Mass. Aug 19, 2002); <u>In re Lernout & Hauspie Sec. Litig.</u>, 286 B.R. 33 (D. Mass. Nov. 18, 2002); <u>Bamberg v. Cowen</u>, 236 F. Supp. 2d 79 (D. Mass. Dec. 9, 2002); <u>In re Lernout & Hauspie Sec. Litig.</u>, 236 F. Supp. 2d 161 (D. Mass. Jan. 13, 2003).

stock through the merger of Dictaphone into a wholly-owned
subsidiary of L&H.  The merger was effected pursuant to the terms
of The Agreement and Plan of Merger dated March 7, 2000 ("Merger
Agreement").  Section 2.1 of the Merger Agreement provided that
"without any action on the part of any of the holder [sic] of any
shares" of Dictaphone, (1) all shares of Dictaphone stock held as
treasury stock "shall be cancelled and retired and shall cease to
exist" and (2) every other share of Dictaphone common stock
"shall be converted into the right to receive" shares of common
stock of L&H, and "[a]ll such shares of company common stock,
when so converted, shall no longer be outstanding and shall
automatically be cancelled and retired and shall cease to exist."
The L&H subsidiary, Dark Acquisition Corp., survived the merger
and changed its name to Dictaphone Corporation ("New
Dictaphone").  (¶ 44.)

    The Merger Agreement contained representations and
warranties from L&H to Old Dictaphone, including representations
concerning the accuracy of filed financial statements.  (¶¶ 207-
215.)  Cowen made face-to-face representations to Old Dictaphone.
(¶¶ 218-220, 387.)  Old Dictaphone also hired professional
advisors, to whom Cowen made representations about the financial
condition of L&H.  (¶¶ 193-194, 388(i).)

    The consideration Old Dictaphone received for its transfer
of $900 million in assets to L&H, and the assumption of Old
Dictaphone's liabilities, were essentially worthless due to the

alleged scheme to fraudulently inflate the value of L&H stock.
Plaintiff alleges that SG Cowen had participated in this scheme
since early 1997. (¶¶ 125-126.)

On November 29, 2000, New Dictaphone filed for relief under
Chapter 11 of the United States Bankruptcy Code with the United
States Bankruptcy Court for the District of Delaware. (¶ 45.)  On
March 13, 2002, the Bankruptcy Court approved the Third Amended
Plan of Reorganization and New Dictaphone was discharged from
bankruptcy.  Pursuant to the Plan, New Dictaphone, as settler,
conveyed all its interest in certain pre-merger claims to the
Trustee on behalf of the Dictaphone Litigation Trust.  (Id.)

The Trustee seeks to recover the "damages suffered by
Dictaphone as a result of [the] fraudulent course of conduct."
(¶ 39.)  Plaintiff seeks $900 million in damages, which primarily
represents the "loss or diminution of its value as a going
concern."  (¶ 390.)

### III.  DISCUSSION

### A.  Motion to Dismiss Standard

For purposes of this motion, the Court takes as true "the
well-pleaded facts as they appear in the complaint, extending
[the] plaintiff every reasonable inference in his favor." Coyne
v. City of Somerville, 972 F.2d 440, 442-43 (1st Cir. 1992)
(citing Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 51
(1st Cir. 1990)).  A complaint should not be dismissed under Fed.
R. Civ. P. 12(b)(6) unless "'it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Roeder v. Alpha Indus., Inc., 814 F.2d 22, 25 (1st Cir. 1987) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

**B.  Standing**

    Vigorously contesting the Trustee's standing under Article III of the Constitution, defendant argues that because there was no purchase of *corporate* assets as part of the merger, there is no harm to Plaintiff apart from the harm to the shareholders. Neither party contests the shareholders' standing to bring claims arising out of the merger, which have been asserted in the separate litigation.

    To have standing, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Raines v. Byrd, 521 U.S. 811, 818 (1997) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)).  "The injury alleged must be, for example, distinct and palpable, and not abstract or conjectural or hypothetical.  The injury must be fairly traceable to the challenged action, and relief from the injury must be likely to follow from a favorable decision." Allen, 468 U.S. at 751 (internal citations omitted).

    The threshold issue, then, is the Trustee's standing to pursue the fraud claims on behalf of the bankrupt corporation. "It is well settled that a bankruptcy trustee has no standing

generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." <u>Shearson Lehman Hutton, Inc. v. Wagoner</u>, 944 F.2d 114, 118-19 (2d Cir. 1991) (citing <u>Caplin v. Marine Midland Grace Trust Co.</u>, 406 U.S. 416, 434 (1972)) (holding that a claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation); <u>In re Rare Coin Galleries of Am., Inc.</u>, 862 F.2d 896, 901 (1st Cir. 1988) ("The trustee steps into the shoes of the debtor for purposes of asserting or maintaining the debtor's causes of action which become property of the estate.") <u>See generally Caplin</u>, 406 U.S. at 432 n.21 (rejecting argument that reorganization trustee could bring an action for fraud on behalf of individual debenture holders against indenture trustee, and noting that the trustee may well have interests that differ from those of the bondholders). Thus, to resolve whether the Trustee has standing, the Court must determine what claims the bankrupt corporation could have instituted on the date on which the bankruptcy petition was filed. <u>Shearson</u>, 944 F.2d at 118. Here, the bankrupt organization is New Dictaphone.

As a general matter, a bankruptcy trustee has standing to assert those claims of the pre-merger entity that were passed on to the (now bankrupt) corporation that survived the merger. <u>See</u> 8 Del. Code Ann. § 259(a) ("all property . . . shall be vested in the corporation surviving or resulting from such merger or

6

consolidation"). "The right to a pending cause of action is an asset of a merged corporation which passes to the corporation surviving the merger." Lewis v. Anderson, 477 A.2d 1040, 1043 (Del. 1984) (holding that plaintiff who ceases to be a shareholder as a result of merger loses standing to prosecute derivative suit); Heit v. Tenneco, Inc., 319 F. Supp. 884, 887-88 (D. Del. 1970) (citing 8 Del. Code Ann. § 259) (holding that when successive mergers were consummated, all of the claims asserted on behalf of the pre-merger corporation were automatically transferred to the post-merger entity).

This case is much complicated by the fact that the bankrupt corporation was wholly-owned by the alleged perpetrator of the fraud. Can a Dr. Jekyll-and-Mr. Hyde corporation sue itself? Can the trustee of the New Dictaphone assert the claims of Old Dictaphone against the New Dictaphone's parent?

### 1. In Pari Delecto

First, Defendant argues that the action is barred by the doctrine of in pari delecto. See In re Mediators, Inc., 105 F.3d 822, 825-26 (2d Cir. 1997) (holding that the wrongdoing of the sole controlling shareholder must be imputed to the corporation). Courts have consistently held that claims for fraud or misrepresentation perpetrated on investors belong exclusively to those investors to the exclusion of the corporation or its successor in interest, where the corporation itself was involved in the wrongdoing. See Hirsch v. Arthur Andersen & Co., 72 F.3d

7

1085, 1094 (2d Cir. 1995) (holding that the trustee in bankruptcy of the consolidated estate of the company and its general partners lacked standing to bring claims predicated upon the distribution of misleading private placement memoranda to investors in limited partnerships because such claims "are the property of those investors, and may be asserted only by them and to the exclusion of [the trustee]."); Shearson, 944 F.2d at 118 ("[W]hen a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for damage to the creditors."); E.F. Hutton & Co., Inc. v. Hadley, 901 F.2d 979, 986-87 (11th Cir. 1990) (holding that bankruptcy trustee lacks standing to bring claims arising out of Ponzi scheme and that claims belonged only to defrauded investors, and expressing concern for "duplicative litigation"); Williams v. California 1st Bank, 859 F.2d 664, 666-67 (9th Cir. 1988) (holding that bankruptcy trustee lacked standing to bring claims against bank arising out of bank's participation in Ponzi scheme on behalf of debtor's creditors, even though creditors assigned trustee their claims, and noting that "inconsistent actions increase the chance that the Trustee will find her interests diverging from those of the investors on whose behalf she is suing").

Accordingly, the Trustee of the "New" Dictaphone (the wholly-owned subsidiary of the alleged perpetrator of the fraud) has no standing to sue a third party on behalf of the defrauded

8

investors. <u>See</u> <u>Shearson</u>, 944 F.2d at 120 (holding that when the sole stockholder and decisionmaker of a corporation cooperated with a third party in defrauding the corporation, the claim accrued to creditors "not the guilty corporation."); <u>In Re Roco Corp.</u>, 701 F.2d 978, 984 (1st Cir. 1983) ("We may impute any fraudulent intent of [the sole shareholder] to the transferor [corporation] because, as the company's president, director and sold shareholder, he was in a position to control the disposition of its property.").

Plaintiff seeks to distinguish this caselaw on the ground that "Old Dictaphone" was not involved in the fraud - indeed was the victim of the fraud -- and that its injury is distinct from the shareholders who relied on the specific misrepresentations of the parent company. However, Old Dictaphone cannot arise Phoenix-like to assert pre-merger claims against third parties that New Dictaphone could not assert. "Old Dictaphone" does not have independent standing under Delaware Law because its claims passed on to New Dictaphone.

## 2. Distinct Injury

Second, even if Old Dictaphone has standing independent of New Dictaphone, defendant argues the Trustee lacks standing because the corporation has asserted no injury distinct from the shareholders. The Trustee argues that the shareholders and the corporate party to a merger may each have standing to pursue remedies for frauds committed against them.

9

In certain circumstances, courts have allowed both the shareholders and the successor-in-interest to an entity to pursue claims against third-persons who perpetrated a fraud so long as the individual shareholder has "an injury distinct from the injury to the corporation," and "double recovery is not inherent in plaintiff's theory of the case." <u>Hayes v. Gross</u>, 982 F.2d 104, 108-09 (3d Cir. 1992) ("Allowing [stockholders] to pursue this claim [to recover for specific misrepresentations that affected prospective purchaser differently from existing shareholders] will neither prejudice the corporation and its other stockholders nor permit a double recovery for the same injury. If [the bank] has claims against its officers and directors arising from their mismanagement, the [successor-in-interest] is free to pursue those claims for the ultimate benefit of the creditors and stockholders of [the bank].")

With respect to the pre-merger entity, the key inquiry for standing purposes is whether the corporation has suffered an injury distinct from the shareholders. <u>See</u> <u>Howard v. Haddad</u>, 916 F.2d 167, 170 (4th Cir. 1990) (holding that the purchasers of a bank stock raised direct, non-derivative claims of misrepresentation against the two directors, stating: "There is no compensable injury to the corporation . . . . The mere fact that Howard and the FDIC are pursuing the same source of assets does not transform Howard's claims into derivative ones."); <u>In re Reliance Acceptance Group, Inc.</u>, 235 B.R. 548, 555-56 (D. Del.

10

1999) ("Debtors and Shareholders are not . . . pursuing the same cause of action" where "Debtors claim [defendants] defrauded the Company in the split-off transaction" and seek "equitable relief" while "Shareholders . . . claim the [defendants] defrauded them by publishing false and misleading statements that the shareholders relied on in connection with the purchase or sale of . . . securities" and seek "compensatory damages"); <u>Greenfield v. Shuck</u>, 867 F. Supp. 62, 67, 73 (D. Mass. 1994) (permitting the claims of plaintiff purchasers of the subordinated capital notes of a failed bank, and the RTC, the bank's successor-in-interest, to proceed on "equal footing" because the purchasers who received personal assurances had direct, non-derivative claims "sufficiently distinct from any injury to the corporation as a whole").

Delaware law provides guidance on the distinction between injury to the corporation and injury to the shareholders. "A derivative claim is one that is brought by a stockholder, on behalf of the corporation, to recover for harms done to the corporation." <u>Parnes v. Bally Entm't Corp.</u>, 722 A.2d 1243, 1245 (Del. 1999). A direct claim is one in which an individual stockholder or a class of stockholders seeks "relief for direct injuries that are independent of any injury to the corporation." <u>Id.</u> The Delaware Supreme Court recently clarified the law governing when a stockholder's claim is derivative or direct: "That issue must turn *solely* on the following questions: (1) who

11

suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery (the corporation or the stockholders, individually)?" <u>Tooley v. Donaldson, Lufkin, & Jeanrette, Inc.</u>, 845 A.2d 1031, 1033 (Del. 2004). "A stockholder who is directly injured . . . does retain the right to bring an individual action for injuries affecting his or her legal rights as a stockholder. Such a claim is distinct from an injury caused to the corporation alone." <u>Id.</u> at 1036. The Delaware Supreme Court also emphasized the nature of the duty owed and the alleged breach. "[A] court should look to the nature of the wrong and to whom the relief should go . . . . The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." <u>Id.</u> at 1039.

The standing issue turns on whether the Trustee has asserted an injury to the corporation caused by Cowen and whether the corporation would receive the benefit of any recovery. The Amended Complaint seeks $900 million in damages, which primarily represents the loss or diminution of its value as a going concern. The obvious problem with this damage theory is that the "Old Dictaphone" is not a going concern, but ceased to exist after the merger. But even if the Trustee surmounts that hurdle, it must allege a distinct pre-merger injury to the corporation.

The $900 million in damages alleged in the Complaint

12

represents approximately $450 million of shares that Old Dictaphone shareholders exchanged for worthless shares of L&H stock. This represents a distinct loss sustained by the shareholders and any recovery would go to them. While defendant may well have owed a duty to Old Dictaphone under the terms of the Merger Agreement, which it allegedly breached by making intentional misrepresentations, Old Dictaphone would not have the right to recover any diminution in the value of the shares caused by the securities fraud. Therefore, under <u>Tooley</u>, and the Article III caselaw on standing, only the shareholders have standing to press the claim for the loss arising from the drop in stock value.

Plaintiff claims that the distinct harm to the corporation is approximately $450 million, the amount that creditors had as a claim on the old corporation which was lost as a result of the merger. The problem with this argument is that the Trustee can assert only the rights of the corporation, not the rights of the creditors. Moreover, the merger was a benefit to Old Dictaphone because New Dictaphone assumed its debts. <u>See</u> 8 Del. Code Ann. § 259(a) ("[A]ll debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to said surviving or resulting corporation, and may be enforced against it as if said debts, liabilities and duties had been incurred or contracted by it."); <u>In re Enron Corp.</u>, 292 B.R. 507, 514 (S.D.N.Y. 2002) (holding that Enron Corp. sustained injuries that

13

were "distinct and separate" from injuries sustained by Enron's
shareholders as a result of an unconsummated merger where the
merger agreement provided that Enron would have benefitted
because its debt would have been assumed by the acquirer).  Any
separate harm to the value of the old corporation as a going
concern is speculative given the facts of this case.

### ORDER

The Court **ALLOWS** the motion to dismiss (Docket No. 9).


**S/PATTI B. SARIS**
United States District Judge

14

**EXHIBIT B**



FILED & ENTERED
on 10/22/03

WESTCHESTER
COUNTY CLERK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

PRESENT:  W. DENIS DONOVAN, J.S.C.

To commence the statutory time period for appeals
as of right (CPLR 5513[a]), you are advised to serve
a copy of this order, with notice of entry, upon all
parties.
------------------------------------------------------------------X
HUDSON VALLEY PARTNERS, L.P., THE
MERGER FUND, LTD., and GREEN & SMITH
INVESTMENT MANAGEMENT, LLC,

                    Plaintiffs,

-against-

KLYNVELD PEAT MARWICK GOEDELER
BEDRIFSREVISOREN a/k/a KPMG BELGIUM,
and KPMG, LLP,

                    Defendants.
------------------------------------------------------------------X
DONOVAN, J.

**DECISION AND ORDER**

Index No. 20371/02
Motion Date: 9/5/03

    The following papers were read on these motions to dismiss:

                                PAPERS NUMBERED

| | |
|---|---|
| Notice of Motion/Affidavits/Exhibit | 1-4 |
| Affirmation in Support/Exhibits(1-3) | 5 |
| Memorandum | 5A |
| Memorandum in Opposition | 6 |
| Reply Memorandum | 7 |
| | |
| Notice of Motion/Affidavit/Exhibits | 1,2 |
| Memorandum | 2A |
| Memorandum in Opposition | 3 |
| Reply Memorandum | 4 |

Upon the foregoing papers, the motions are determined as follows:

This is an action for damages and punitive damages based on alleged fraudulent and negligent misrepresentation brought against Klynveld Peat Marwick Goerdeler Bedrifsrevisoren ("KMPG-B") and KMPG, LLP ("KMPG-US"), two members of KMPG International.

According to the complaint, plaintiffs Hudson Valley Partners, L.P., ("HVP") and The Merger Fund, Ltd., ("MF"), through their investment advisor Green & Smith Investment Management ("G&S"), purchased substantial numbers of Dictaphone Notes in April and May, 2000. In June, 2000, Dictaphone notified plaintiffs that, as part of its acquisition by the Belgian corporation, Lermont & Hauspie ("L&H"), plaintiffs had the right to redeem their Notes at 101% of principal. The offer to exercise this right was to expire on July 19, 2000. In considering this offer, G&S relied on the 1998 and 1999 financial statements of L&H and the opinion of KMPG-B relating to its audit of the financial statements. Defendant KMPG-US allegedly assisted in the audits, specifically by reviewing all United States generally accepted accounting principles (US GAAP) with respect to the audits. Based on its review, G&S advised HVP and MF to hold onto the Notes because "the apparent financial strength of L&H would result in the Notes trading at substantially higher prices than the price obtainable in the Offer."

Some time later, in the late summer or early fall of 2000, reports of improper transactions by L&H began to circulate. An audit committee retained by the L&H Board of Directors concluded in a November 20, 2000 report that the recorded revenues were false, accounting practices had violated US GAAP, and L&H's revenues had been materially inflated.

Plaintiffs allege that defendants knew or should have known about these accounting practices and inflated revenues. They claim that the financial statements, audits, and opinions on which G&S relied when it advised HVP and MF to hold onto the Notes were issued and certified despite several "red flags" that should have alerted defendants to the contrary.

By separate motions, defendants now move to dismiss the action. Defendant KMPG-B moves to dismiss on three distinct grounds. First, it contends that the court lacks personal jurisdiction over it. Second, it contends that dismissal is required under forum non conveniens. Third, it contends that the complaint fails to state a cause of action. Defendant KMPG-US moves to dismiss solely on the ground that the complaint fails to state a cause of action.

Jurisdiction

As briefed by the parties, plaintiffs' basis for asserting jurisdiction over KMPG-B is the long-arm jurisdiction provision of CPLR § 302(a)(2), which extends jurisdiction over a non-domiciliary who "commits a tortious act without the state causing injury to person or property within the state." A plaintiff seeking to assert jurisdiction under this theory must

2

also demonstrate that defendant "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." [CPLR § 302(a)(3)(ii)]

In this case, the alleged tortious acts that occurred without the state were KMPG-B's audits of L&H. The first question in analyzing the applicability of CPLR § 302(a)(3) is whether these allegedly tortious act caused injury within the state.

Case law clearly holds that New York does not become the situs of the injury merely because the plaintiff is a resident or domiciliary of New York [*McGowan v Smith*, 52 NY 2d 268 (1981)]. Moreover, where the acts complained of resulted in non-physical, commercial injury, the situs of the injury is "where the critical events associated with the dispute took place." [*United Bank of Kuwait v James M. Bridges, Ltd.*, 766 F.Supp. 113, 116 (S.D.N.Y. 1991)] The occurrence of financial consequences in New York due to the fortuitous location of plaintiffs in New York is not a sufficient basis for jurisdiction under § 302(a)(3) where the underlying events occurred outside New York [*Id.*].

Here, the facts as alleged in the complaint fall within this construct. The tortious act – the audit – occurred elsewhere, and the injured plaintiffs – three of the untold number of other investors who purchased the Dictaphone Notes – were residents or domiciliaries of New York.[1]

Even assuming that plaintiff could have established that defendant's allegedly tortious act caused injury within the state, the statute requires as an additional condition that defendant "expects or should reasonably expect the act to have consequences within the state," along with deriving substantial revenue from interstate or international commerce [CPLR § 302(a)(3)(ii)]. Plaintiffs argue three reasons why KMPG-B should have expected its audits of L&H would have injurious consequences in New York. First, they argue that a New York choice of law provision in the Dictaphone note's indenture agreement should have put KMPG-B on notice that investors in New York would be affected by its actions. Second, plaintiffs argue that L&H shares were certified for trading on the New York Stock Exchange. Third, plaintiffs argue that KMPG-B's audit opinion were filed along with L&H's financial statements with the Securities Exchange Commission.

None of plaintiffs' arguments establish the statutory requirement of expectation that defendant's act would have consequences within New York. First, there is no linkage between the audit reports prepared by defendant and the Dictaphone Notes purchased by plaintiffs. The audit reports allegedly contained misrepresentations on L&H financial statements for the years ending December 31, 1998, and December 31, 1999. Since L&H was acquired Dictaphone on May 5, 2000, defendant could not have expected, or reasonable should have expected, that reports issued with respect to L&H's financial

---

[1] Only two of the plaintiffs are alleged to maintain offices in New York, HVP and G&S. Only one of these, HVP, actually purchased the notes. G&S allegedly purchased the notes on behalf of HVP and MF, not for its own account. MF is simply alleged to be "a limited liability corporation established under the laws of the Cayman Islands."

position in 1998 and 1999 would have an effect on Dictaphone Note holders in 2000. Second, the mere fact that L&H shares were traded on stock exchanges in New York[2] does not raise any expectation with respect to these plaintiffs, who did not own L&H stock. Third, since, as defendant points out, SEC filings are made in Washington, D.C., not New York, the fact that the audit reports were included with L&H's SEC filings does not give rise to any particular expectations of consequences in New York.

In sum, it would be manifestly unfair to hold that KMPG-B should have reasonably known that its 1998 and 1999 audit reports of a Belgian client would have consequences to creditors of another corporation later acquired by the client and to subject KMPG-B to personal jurisdiction in any forum where a creditor may reside [see *United Bank of Kuwait, supra*].

Failure to State a Cause of Action

Plaintiffs assert claims for negligent misrepresentation and fraudulent misrepresentation. Each defendant argues that neither claim states a cause of action.

Although the two defendants stand in different relationships to the audits at issue (exhibits show that KMPG-B signed the audit reports; KMPG-US did not), each contend that the negligent misrepresentation claim must be dismissed for the same reason.

Under New York law, accountants conducting a traditional financial audit "undertake a duty of care in the performance of their engagement to the party which has contracted for their services." [*Security Pacific Business Credit, Inc., v Peat Marwick Main & Co.,* 79 NY 2d 695, 702 (1992)] Exceptions to this rule are "near privity" circumstances in which:

> 1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; 2) in the furtherance of which a known party or parties was intended to rely; and 3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance. [*Credit Alliance Corp. v Arthur Andersen & Co.,* 65 NY 2d 536, 551 (1985)]

The critical allegations in the negligent misrepresentation cause of action are found in paragraph 48 of the complaint. This paragraph alleges:

> Defendants knew the financial statements of L&H, and the auditor opinions thereon, would be disseminated in this state and elsewhere to the investing industry and investing

---

[2] Defendant states that L&H shares were traded on NASDAQ and EASDAQ, not the New York Stock Exchange.

public generally and that Plaintiffs and other Dictaphone Note holders would be and were specifically invited to rely and would rely on those financial statements in acting upon the Offer.

In light of the requirements of *Credit Alliance, supra,* these allegations are significant in what they do not state. There is no allegation that plaintiffs were clients of either defendant, no allegation that defendants knew about the Dictaphone Note holders when the auditor's reports were issued, and no allegation that defendants had any relationship with plaintiffs, took any action with respect to plaintiffs, or knew that plaintiffs intended to rely on the reports. The court is not persuaded by plaintiffs' argument that *AUSA Life Ins. Co. v Ernst & Young* [206 F.3d 202 (2d Cir. 2000)] applied the *Credit Alliance* test to similarly situated note holders. In *AUSA Life*, the plaintiffs held the notes of defendant/auditor's client. In the case at bar, plaintiffs did not hold note of L&H, defendant KMPG-B's client, but held Dictaphone Notes. Far from alleging conduct creating circumstances of "near privity," plaintiffs' allegations show only that their reliance on defendants' financial reports was an indirect or collateral consequence of the auditing work [see *Simon v Ernst & Young,* 223 AD 2d 506 (1st Dept. 1996)].

As to the fraud claim, defendants contend that plaintiffs have failed to plead the required elements and, to the extent they have pleaded those elements, failed to do so with requisite particularity.

The elements of a claim for fraudulent misrepresentation are: 1) that defendant made a material false representation; 2) that defendant intended to defraud plaintiff; 3) that plaintiff reasonably relied on the misrepresentation; and 4) that plaintiff suffered damages as a result of the reliance [*Swersky v Dreyer & Traub,* 219 AD 2d 321 (1st Dept. 1996)].

Defendant KMPG-US argues that, as to it, plaintiff has not alleged these elements. Specifically, KMPG-US contends that, since only KMPG-B signed the audit reports, KMPG-US itself made no representations to plaintiffs about the financial state of L&H. Without having made any representations, KMPG-US argues it necessarily did not make any knowing misrepresentations to plaintiffs. KMPG-US also contends that the complaint fails to allege justifiable reliance in that it contains no allegation that plaintiffs actually saw or heard the misrepresentation and then acted on it.

Defendant KMPG-B argues that the fraud allegations lodged against it are not pleaded with requisite particularity. It contends that the complaint does not alleges facts to support the conclusory allegations that KMPG-B had knowledge of L&H's financial improprieties or recklessly disregarded the truth of L&H's financial situation.

Both defendants argue that the complaint impermissibly, and perhaps intentionally, lumps defendants under the undefined description "KMPG" and fails to distinguish their individual activities in regard to the alleged fraud.

5

The court finds that the complaint pleads allegations of fraud against KMPG-B with the requisite particularity. For this reason, had plaintiffs been able to establish jurisdiction over KMPG-B, it would have sustained that cause of action in the complaint.

The court also finds that the complaint pleads allegations of fraudulent misrepresentation against defendant KMPG-US with the requisite particularity. Although it is clear from the record that KMPG-US did not sign the audit reports for 1998 and 1999, plaintiffs have established a sufficient nexus, for pleading purposes only, between KMPG-US and the reports by alleging that KMPG-US reviewed the reports to make sure L&H's financial statements complied with US GAAP.

Based on the foregoing, it is

**ORDERED** that the complaint is dismissed as against defendant KMPG-B for lack of jurisdiction; and it is further

**ORDERED** that the negligent misrepresentation cause of action is dismissed based on failure to state a cause of action; and it is further

**ORDERED** that the balance of the complaint is severed and continued as against defendant KMPG-US; and it is further

**ORDERED** that the motion by defendant KMPG-US, to the extent it seeks dismissal of the fraudulent misrepresentation cause of action, is denied; and it is further

**ORDERED** that defendant KMPG-US is directed to serve an answer within 20 days after service of a copy of this order with notice of entry; and it is further

**ORDERED** that counsel for the remaining parties in this action are to comply with the discovery order dated July 16, 2003, and to appear for the compliance conference on January 14, 2004, at 9:30 A.M.; and it is further

**ORDERED** that all further papers filed in this action shall reflect the change in the caption.

**E N T E R :**

**HON. W. DENIS DONOVAN**
**Justice Supreme Court**

Dated:        October 2/2003
              **White Plains, New York**

6

# EXHIBIT C

UNITED STATED BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                              )
                                    )  Case No. 00-4397 to 00-4399
LERNOUT & HAUSPIE SPEECH            )  Adver. No. 04-54842
                                    )
                    Debtor          )
                                    )  November 23, 2004


TELEPHONE CONFERENCE CALL
BEFORE THE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

Scott L. Baena,                   DAVID  W. TRENCH, ESQUIRE
Litigation Trustee of the         BILZIN, SUMBERG, BAENA, PRICE &
Lernout & Hauspie Speech            AXELROD, LLP
Products N.V. Litigation          2500 First Union Financial Center
Trust                             200 S. Biscayne Blvd.
                                  Miami, FL 33131-2336

Scott L. Baena,                   LISA L. COGGINS, ESQUIRE
Litigation Trustee of the         THEODORE J. TACCONELLI, ESQUIRE
Lernout & Hauspie Speech          FERRY, JOSEPH & PEARCE, P.A.
Products N.V. Litigation          824 Market Street, Suite 904
Trust                             P.O. Box 1351
                                  Wilmington, DE  19899-2306

                                  BRETT FALLON, ESQUIRE
                                  MORRIS, JAMES, HITCHENS & WILLIAMS
                                  PNC Bank Center
                                  222 Delaware Avenue, 10th Floor
                                  Wilmington, DE  19899-2306


Audio Operator:                   NORMA SADER

Transcribed by:                   DIANA DOMAN TRANSCRIBING
                                  P.O. Box 129
                                  Gibbsboro, New Jersey  08026-129
                                  (856) 435-7172
                                  FAX:  (856) 435-7124
                                  Email:  Dianadoman@comcast.net


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

(Appearances continued)

                              SUONG T. NGUYEN, ESQUIRE
                              MICHAEL FLYNN, ESQUIRE
                              DAVIS, POLK & WARDWELL
                              450 Lexington Avenue
                              New York, New York 10017

I N D E X

PAGE

Motion                                    3

ARGUMENT:

BY:  Ms. Nguyen                           3

BY:  Mr. Trench                           8

THE COURT:

Decision                                  19

Motion - Argument/Nguyen                                    4

1           (Hearing in session)
2                THE COURT:  Hello.
3                MR. TRENCH:  Good morning, Your -- good afternoon,
4      Your Honor.
5                THE COURT:  Good afternoon. Mr. Trench?
6                MR. TRACY:  Yes, Your Honor.
7                THE COURT:  Yes, and I have Mr. Fallon, Ms. Nguyen,
8      Mr. Flynn, Mr. Tacconelli, and Ms. Coggins.
9                A FEMALE SPEAKER:  Good afternoon, Your Honor.
10               THE COURT:  Good afternoon.  Mr. Trench?
11               MR. TRENCH:  Yes.  I'm on speaker.  Can you hear me
12     clearly?
13               THE COURT:  Yes, I can.
14               MR. TRACY:  Okay.  Well, this I think is -- is KPMG's
15     motion.  I'm glad to present the argument in any fashion or
16     sequence you would like, but --
17               THE COURT:  But you're right.  I'll gladly hear from
18     a representative of KPMG first.  Who will speak for KPMG?
19               MS. NGUYEN:  Your Honor, this is Suong Nguyen from
20     Davis Polk on behalf of KPMG, LLP.
21               THE COURT:  Yes, Ms. Nguyen.
22               MS. NGUYEN:  We made the motion, and we're
23     respectively requesting a transfer of this case to the District
24     of Massachusetts.  The reason we're making this request is
25     because Massachusetts is where numerous cases that are related

1    to Lernout & Hauspie have been pending and continue to be

2    pending for several years now, the first case filed in 2000.

3           So when the L&H litigation trust had filed their case

4    several months ago against KPMG, U.S. and KPMG Belgium, it was

5    against this back -- backdrop of litigation that had been

6    pending before Judge Saris and also before Magistrate Judge

7    Collings in Massachusetts, and it was only by virtue of the

8    fact that Lernout & Hauspie at the time was in bankruptcy that

9    L&H was not named in those cases.

10           So the basis for our transfer is that Judge Saris and

11    Magistrate Judge Collings have familiarity with the facts and

12    issues that are overlapping with this case.  All the

13    Massachusetts cases relate to L&H's demise.  It relates to its

14    1998 and 1999 financial statements and also KPMG, U.S. and

15    KPMG, Belgium's respective role in connection with L&H's

16    bankruptcy.

17           The review of the complaint in this case as compared

18    to the complaints that have been filed in Massachusetts showed

19    that they rely on the same documents at issue, the same factual

20    allegations at issue, and an example of that relates to KPMG,

21    U.S.'s role in reviewing various Korean contracts, LDC

22    (phonetic) contracts, and similar accounting issues.

23           Massachusetts is also where the cases had been

24    transferred from both the Delaware District Court and also

25    Pennsylvania.  About two years ago, Judge Robinson from the

Argument - Nguyen                                     6

1    District of Delaware had transferred four cases that dealt with

2    the Dictaphone and Dragon transaction to Massachusetts, and the

3    rational for that transfer was because the other L&H related

4    lawsuits had already been pending in Massachusetts.

5            The Dragon and Dictaphone transactions are the same

6    transactions that are issue in the L&H litigation trust's

7    action against KPMG, U.S.

8            THE COURT:  What's your reaction to the plaintiff's

9    argument that the first filed rule shouldn't apply here because

10   KPMG -- there are no common parties at this point since KPMG

11   apparently has settled all of its -- all of the claims against

12   it, asserted against it in the Massachusetts actions?

13           First, with respect to the fact that KPMG, U.S. and

14   KPMG, Belgium have settled or are in the process of finalizing

15   the settlements of the Massachusetts action, it really misses

16   the point, because our basis for transfer is because

17   Judge Saris and Magistrate Judge Collings had familiarity with

18   the issues here which the trust conceived are overlapping with

19   those in this case.

20           With respect to the first filed rule and the fact

21   that they're different parties or different theories, we cited

22   numerous cases in our reply brief which show that courts have

23   -- have transferred cases where there are different parties and

24   different legal theories at issue, and, in fact, the Filler

25   case, which is the one by Judge Robinson, the District of

Argument - Nguyen                                    7

1     Delaware, when Judge Robinson transferred the Dictaphone and

2     Dragon cases, they dealt with different legal theories, and the

3     Baker, Filler, all those other plaintiffs were not plaintiffs

4     in the Massachusetts action.

5              THE COURT:  Uh-huh.

6              MS. NGUYEN:  So we think that the law is very clear

7     that it -- it's -- it's of no moment that the parties or the

8     legal theories in this case are -- are not the same, because

9     Judge Collings and Saris have gone through the same issues that

10    would be relevant here.  These issues, for instance, relate to

11    KPMG, Belgium's production of documents.  There's Belgium

12    secrecy issues at stake.  We -- KPMG, U.S. has also produced

13    documents in the Massachusetts case, and we had various motions

14    about the scope of our production before

15    Judge Collings already.

16              In addition, other parties, including ourselves, have

17    produced documents in the case, and those documents are

18    governed by a confidentiality agreement that Judge Collings has

19    entered.  So that if there's any disputes about the designation

20    of certain documents as confidential or transcripts of

21    depositions that would quote from those documents as

22    confidential, Judge Collings would be the one overseeing that,

23    and we expect the same issues that, you know, were presented in

24    the Massachusetts case to be presented here.

25              The other reason why Massachusetts makes sense is

Argument - Nguyen                                    8

1    because the trustee in this case concedes that Massachusetts is

2    the center of gravity of the alleged conduct in this case, and

3    there are numerous witnesses who are present in Massachusetts.

4    L&H's U.S. offices was in Massachusetts.  There's a claim by

5    the litigation trustee for the -- violation of the

6    Massachusetts consumer protection statute.  There's allegations

7    that the auditing functions at issue here occurred in

8    Massachusetts.

9            So I -- we think that that is the reason why several

10   months ago the trustee had initially agreed to transfer, and

11   while the trustee has a right to change its mind, we submit

12   that the basis for transfer remains the same here.

13           The last thing I would add, Your Honor, is that since

14   our transfer motion had been filed, Judge Robinson of the

15   District of Delaware had withdrawn the reference with respect

16   to a core proceeding.  It was a preference complaint that the

17   trust had filed against KPMG, U.S.  And so this suggests that

18   in this particular case, which is a noncore case dealing with

19   prepetition events, that there would also be a withdraw of the

20   reference and that this case really should probably belong on

21   the district court, and we submit it should be transferred to

22   the District Court of Massachusetts.

23           THE COURT:  Uh-huh.  Understood.  Mr. Trench, will

24   you be speaking on behalf of the -- or Mr. Tacconelli?

25           MR. TRENCH:  I will, Your Honor.  This is David

Argument - Trench                                        9

1    Trench.  I'll speak on behalf of the trustee.

2              THE COURT:  All right.  What about the jury trial

3    situation?  I didn't see that taken up in the papers.

4              MR. TRENCH:  We -- we briefly took it up, Your Honor,

5    and it was to the point that the jury trial issue is not a

6    transfer motion consideration.  The question that KPMG poses is

7    should this case be tried in Delaware or Massachusetts.  If

8    there's --

9              THE COURT:  What --

10             MR. TRENCH:  -- a right to a jury trial and the

11   Bankruptcy Court in Delaware is not empowered to conduct a jury

12   trial, then the proper remedy for the one seeking the jury

13   trial is to withdraw the reference from the Bankruptcy Court to

14   the District Court in Delaware.

15             THE COURT:  Uh-huh.

16             MR. TRENCH:  It has nothing to do with whether or not

17   this case more properly belongs in Massachusetts or in

18   Delaware.  So with respect to the issue in front of the Court

19   today, which is should the case be transferred to Delaware, the

20   fact that they have a right to a jury trial, which they have

21   not yet asserted, but the fact that they have a right to one is

22   not a factor in whether or not Massachusetts should be the

23   venue or Delaware should be the venue.

24             So I think that's a red herring, if you will.  It's

25   not something which should weigh in your determination about

Argument - Trench                                    10

1    whether or not the case should be transferred to Massachusetts.

2                THE COURT:  Help me to understand your assertions

3    regarding the Delaware nexus here.  Clearly, the bankruptcy

4    proceeding has been pending here since 2000.  That -- what

5    aspect of that or anything else should compel me to honor the

6    plaintiff's choice of forum to defer to it in these

7    circumstances?

8                MR. TRACY:  The way the rules work with respect to

9    consideration of transfer is for the Court considering the

10   transfer to look at a series of well-established factors, and

11   there's some that are outside the 12 that are listed, but the

12   very first factor is the plaintiff's choice of forum.  If the

13   plaintiff -- and here, we are the plaintiff.  If the plaintiff

14   chooses a forum that has jurisdiction, which we've done, then

15   that's to remain the forum unless there's reason shown to

16   change that.

17               Now, we did choose this forum, and we chose it for

18   several reasons.  We chose it because we appear here regularly,

19   and it's a convenient forum for us in that respect.  We chose

20   it because this claim is the largest cause of -- largest asset

21   of this estate and will affect how the estate continues to be

22   administered.

23               We also chose it because one of the factors in

24   determining whether or not a transfer should occur is the speed

25   with which cases are handled in the respective jurisdictions,

Argument - Trench                                      11

1    and the cases in Bankruptcy Court move with a certain speed

2    which is not matched in District Court anywhere by my

3    experience in this court and other Bankruptcy Courts and in

4    District Courts throughout the country, and, in fact, we

5    attached I think as an amendment or an addendum or an exhibit

6    to our motion a printout with respect to Judge Saris' average

7    time of trial.  And this is not a criticism of her.  It's just

8    a measure of the time that it takes for a case to work its way

9    through District Court as opposed to Bankruptcy Court and a

10   quick resolution of something that we have an interest in.  So

11   that's another reason why we chose this -- this forum.

12         Another reason is that under the documents which

13   authorize and empower the litigation trustee to bring this

14   action, any settlement which may be reached must be approved by

15   you.  We must bring a claim before -- file a motion before this

16   Court for approval of any such settlement.  In addition, KPMG,

17   the moving party, is a -- is an entity that's organized and

18   existing under the laws of the State of Delaware.

19         So we have used those reasons, and that's why we

20   first chose this particular venue, and with all due respect, I

21   think it is up to KPMG to say that there are compelling reasons

22   to move this from where we chose to bring the action to another

23   jurisdiction.

24         THE COURT:  Well, let's take a look at those reasons

25   from your vantage point.  You've acknowledged a substantial

1    overlap at least in facts.  You've asserted differences in

2    legal theories, and indeed, there are other legal theories

3    propounded in the other actions in terms of securities fraud

4    and the like and some of the same causes as well.

5          What about those types of issues that have -- and

6    nobody is talking about res judicata or collateral estoppel

7    here.  Obviously, the trustee of L&H was not a party to, nor

8    L&H for that matter, to anything that was decided in

9    Massachusetts, and I don't think there is question that the L&H

10   trustee would have the opportunity to litigate any and all of

11   those questions.

12         But when we're talking about questions involving, for

13   instance, Belgium secrecy laws in connection with discovery

14   demands, when we're talking about other aspects of

15   international law that apparently have become familiar to

16   Judge Saris and Judge Collings, isn't that a -- the kind of use

17   of judicial resources that the first filed policy, whether or

18   not it applies specifically to this case, was intended to

19   foster?

20         MR. TRENCH:  I think it's very close to that,

21   Your Honor, but let me -- before I address those things

22   directly, let me make a comment about the -- the status and the

23   nature of the two cases.  Because KPMG has effectively settled

24   all of their claims and are only in the most nominal sense a

25   party in those cases, there is no common party between this

Argument - Trench                                    13

1     action and any of the pending Massachusetts actions.

2              THE COURT:  Does that matter?

3              MR. TRENCH:  Yes, it does, Your Honor, because we've

4     looked and I think KPMG has looked, and we have never found a

5     single case in the United States in which there is no common

6     party between cases that has resulted in a transfer.

7              THE COURT:  Do you think that the basic premises of

8     the first filed rule are undercut to the extent that the

9     principal of that rule should not be applied?  In other words,

10    you acknowledge that there is the same set of facts or

11    virtually so.  You -- and, by the way, KPMG was a party to

12    those proceedings.  It's not as if there -- you know, there's

13    no connection in terms of the identification of parties by the

14    vociferous nature of your memorandum which I will tell you

15    probably crossed the line.

16             I was dismayed to read it I will tell you.  The

17    arguments are certainly sound and worthy of consideration, but

18    the tone I would ask you to tone down, if you would.

19             MR. TRENCH:  Of course.

20             THE COURT:  But the basic concept that the facts and

21    -- and some of the law are identical, doesn't that really

22    dictate that there ought not to be a division of the -- the

23    basic controversy, what happened with the collapse of L&H and

24    the preceding events to that collapse, particularly the

25    transactions involving Dragon and Dictaphone and KPMG's

Argument - Trench                                          14

1    involvement, U.S. and Belgium, in that entire debacle.  That's

2    the fundamental nature of what's still there, what was there to

3    begin with, what's still there even without KPMG and what's

4    here in this case, is it not?

5            MR. TRENCH:  Well, to some extent that's right,

6    Your Honor, but as I understand the -- the factors that are to

7    be weighed, they include judicial economy, which is what I

8    think the matters that you discussed relate to, and judicial

9    economy traditionally and often in transfer actions -- and I

10   think when Judge Robinson transferred the four cases from

11   Delaware means that there would -- if not for a transfer, there

12   would be a party defending or prosecuting the -- virtually the

13   same claim in two separate jurisdictions with the risk of

14   duplication of discovery and inconsistent rulings.

15           Now, in this particular case, there -- that won't

16   happen.  Discovery is effectively closed in Massachusetts.

17   There won't be inconsistent rulings, because there is no ruling

18   that has involved L&H or the litigation trustee in

19   Massachusetts.

20           THE COURT:  No, there isn't, but there are rulings

21   that I would probably be -- not -- perhaps not me, but perhaps

22   the District Court if this were -- if the reference were

23   withdrawn.  Should the Belgium -- KPM, Belgium matter be

24   transferred to Belgium on the ground of forum non conveniens,

25   what are the impacts of the secrecy laws of Belgium on these

1   matters, confidentiality orders apparently entered.

2          It may not be between the same parties, but there are

3   identical -- as a matter of fact, one of the parties is the

4   same.  I suspect that KPMG, Belgium was involved in the motion

5   to transfer venue to Belgium.

6          MR. TRENCH:  Yes, Your Honor.  They did move to

7   dismiss for forum non conveniens.  That motion was denied by

8   Judge Saris.  It was in connection with the motion to dismiss

9   the securities fraud claims against a number of defendants, by

10  a number of defendants, and Judge Saris did, in fact, determine

11  that the allegations were sufficiently pled to meet the

12  requirements of the securities act which are different

13  requirements that we have, and there -- there were other

14  decisions relating to securities fraud standards which do not

15  relate to us.

16         None of her decisions affected any of the causes of

17  action or touched on any of the causes of action that we bring

18  here.  The closest that any of her decisions came to that was

19  her -- her order dismissing or granting a motion to dismiss an

20  action brought by the Dictaphone trustee who did assert a

21  Massachusetts Consumer Protection Act claim.  She dismissed it,

22  however, not because she considered that claim and found that

23  it was wanting but because the Dictaphone trustee representing

24  new Dictaphone was effectively seeking damages to old

25  Dictaphone and didn't have standing to bring the action, and

Argument - Trench                                    16

1    that's an entirely different issue from the issue of the L&H

2    trustee who represents the former client of KPMG, LLP and KPMG,

3    Belgium who's bringing a malpractice action based on that

4    relationship, a breach of -- aiding and abetting breach of

5    fiduciary duty claim based on that relationship and a violation

6    of the Massachusetts Consumer Protection Act.  We have an

7    entirely different circumstance.

8            And you've mentioned the Belgium security -- secrecy

9    act, and that's interesting, because that's an act which was

10   created in Belgium to prohibit accountants and others from

11   disclosing secrets of their clients and holding them liable for

12   sanctions if they do it, and in the case in Massachusetts, the

13   court found that there were exceptions to that act which

14   allowed plaintiffs who were not in privity with either party to

15   see those records and get those records, notwithstanding the

16   fact that the Belgium secrecy act would appear to prohibit it.

17           In our case, Your Honor, there's something entirely

18   different, something none of the courts approached, and that is

19   there's an exception to the Belgium secrecy act which relates

20   to consent by the client.  Well, we're the client, and -- and

21   if we seek these records and KPMG, Belgium says you can't see

22   them because we are prohibited from the -- from the disclosure

23   of these secret records, which are effectively records of L&H's

24   representation, we will give consent to them to supply them to

25   us, and none of the judges or magistrates consider that

Argument - Trench                                         17

1   argument because those facts weren't present.  That's a

2   different circumstance.

3            So it's true that the magistrate and the court did

4   consider that act in expert affidavits on Belgium law and did

5   make rulings and, in fact, even enjoined KPMG, Belgium from

6   seeking a -- the enforcement of a writ in Belgium to prevent

7   the plaintiffs from getting those documents after the -- the

8   Court in Massachusetts said they could.

9            Those things are all true, but we have a different

10  position in this as we do in all the other claims.  We are the

11  former client, and the considerations as to whether or not that

12  applies are new considerations, whether you make them,

13  Judge Robinson makes them, Judge Saris makes them.  They're

14  going to be things that haven't been considered before.

15           THE COURT:  I understand.  Let me understand that

16  you've acknowledged that some of the witnesses remain in

17  Massachusetts.  Others are in other places, as I recall,

18  Houston, Atlanta, and the like.

19           MR. TRENCH:  Yeah.

20           THE COURT:  Who's in Delaware?

21           MR. TRENCH:  I don't think that there's -- there's a

22  witness that we -- that we're aware of right now that's in

23  Delaware, Your Honor, but the number of witnesses that are in

24  Massachusetts is few, and we frankly don't know where all of

25  the witnesses are until we do our discovery, but --

Argument - Trench                                    18

1          THE COURT:  Are the books and records of KPMG, U.S.

2     in Massachusetts as well?

3          MR. TRENCH:  I -- I do not know the answer to that,

4     Your Honor.  I mean, we have not been able to do any discovery

5     yet.  So where their books and records are I don't know.  I do

6     know that one of the prominent members of KPMG, U.S. is out of

7     Dallas, and he is perhaps the most prominent of those who acted

8     in this matter, and I expect that his records are -- are in

9     Dallas.  I don't know the answer to that, but I don't know

10    whether they're in -- in Massachusetts either.

11         I have heard -- well, I don't want to talk about what

12    I've heard, because I -- I don't know the answer to that

13    question.

14         THE COURT:  Well, they've acknowledged that the --

15    the alleged conduct by KPMG, U.S. at least occurred in

16    Massachusetts.

17         MR. TRENCH:  Your Honor, one of the things we pled

18    and we assert is that the center of gravity of the conduct that

19    forms the basis of our claims is in Massachusetts.  We do plead

20    that, and that was absolutely true.

21         That, however, I must point out, was an event that

22    occurred in 1998, 1999, 2000 when L&H's U.S. headquarters were

23    present in Massachusetts.  We are now in 2004.  L&H has no

24    headquarters in Massachusetts, has no employees in

25    Massachusetts, and that connection which caused the center of

Argument - Trench                                    19

1    gravity of the cause of action to be in Massachusetts is no

2    longer a present fact.  So for considering -- for the

3    consideration of transfer purposes, I think the Court must look

4    at the way things are today on November 23, 2004, and that is

5    that L&H has no presence in Massachusetts.  It did back then,

6    and that's significant for the cause of action, but today it

7    does not.

8            In fact, L&H's presence is in the form of Scott

9    Baena, the litigation trustee who is in Miami but who does

10   travel to Delaware from time to time and, you know, that's --

11   that's the connection.  It's no longer Massachusetts.

12           THE COURT:  Understood.  Let me offer the opportunity

13   to KPMG to reply.  Any other comments?

14           MS. NGUYEN:  Your Honor, with respect to the location

15   of documents, the allegations that the plaintiffs have made is

16   that the auditing functions here occurred in Massachusetts.

17   KPMG, U.S. has a Boston, Massachusetts office, and its work

18   papers with respect to the work that it performed are, you

19   know, collected and reside in Boston, Massachusetts.

20           We have a number of witnesses who work in the office

21   who are still located in Massachusetts, and the fact that the

22   -- you know, the plaintiffs point out that discovery has closed

23   in the Massachusetts action would not be relevant with respect

24   to discovery should the Court decide that discovery could

25   proceed against the litigation trust in Massachusetts, because

The Court - Decision                                    20

1    they would be on a separate schedule, and there are other

2    parties that are on -- on a different scheduling, including the

3    Dictaphone litigation trust.  So it's not true that fact

4    discovery would apply here and preclude the litigation trust

5    from conducting discovery.

6              THE COURT:  Understood.

7              MR. TRENCH:  Your Honor, may I make a comment about

8    that?  Because I think there's a misunderstanding about what

9    our position on that is.

10             THE COURT:  Last comment.  Go ahead.

11             MR. TRENCH:  We -- we have not contended that we

12   would be precluded from discovery by virtue of a transfer to

13   Massachusetts.  What we have asserted is there would be no

14   economy of discovery by virtue of the transfer to

15   Massachusetts.  Whatever discovery we would take would be new

16   discovery, whether it's in Massachusetts or in Delaware.

17             So the economy as it relates to the parties, to the

18   Court, and to the witnesses is not present and is not a factor

19   in -- in the transfer.  That's the point that we were trying to

20   make.

21             THE COURT:  Understood.  Let me reflect that we are

22   working on a -- the defendant's motion to transfer the venue to

23   Massachusetts.  This action charges the defendants, we all

24   know, with violations of Massachusetts law, with breach of

25   fiduciary duties and with fraud in connection with serving as

The Court - Decision                                      21

1    accountants for L&H, L&H which collapsed in 2000 after

2    purchasing two other entities, Dragon and Dictaphone.

3              The -- it is asserted by the defendants that the same

4    underlying facts have been extensively litigated in

5    Massachusetts.  There are various actions, including

6    shareholder actions, pending in Massachusetts.  The defendants

7    apparently have settled their cases in Massachusetts and are no

8    longer active in the cases as of late, but the cases are still

9    pending.

10             Of course, our framework for deciding these issues

11   starts with Bankruptcy Rule 7087 which refers to 28 U.S.C.

12   Section 1412 which poses the opportunity to transfer venue,

13   "..in the interest of justice or the convenience of the

14   parties."  Seems to be that in this context, both of those

15   prongs favor the transfer of venue in this case, and the most

16   critical aspect of why that's so is the commonality of facts

17   that is actually acknowledged by the plaintiff here, the fact

18   that those cases, which have been pending for four years in

19   Massachusetts, deal with the collapse of L&H, the role of the

20   -- of, among others, KPMG, U.S. and Belgium in formulating the

21   financial statements for 1998 and 1999 and 2000, for being

22   involved in the transactions involving Dragon and Dictaphone

23   and their involvement in the collapse of L&H.  Those common

24   facts I think compel the conclusion that the convenience of the

25   parties and the interests of justice favor the transfer.

The Court - Decision                                    22

1          Indeed, we have it is recognized Massachusetts State
2     law issues and Massachusetts as the center of gravity for this
3     complaint.  Of course, the plaintiff is right.  The trustee is
4     correct that a bankruptcy court or a district court let's say
5     in Delaware would, of course, be qualified and able to apply
6     the state laws of another jurisdiction.  That's not
7     fundamental, but I take note of it.
8          In passing, I note as well that there is really no
9     nexus to Delaware here, the fact that the trustee is accustomed
10    to coming to Delaware occasionally is not sufficient nexus,
11    although clearly, there is a jurisdiction by the fact that the
12    -- the bankruptcy is still pending and the -- and KPMG we note
13    is a Delaware corporation.  But basically, other than the
14    bankruptcy, there are witnesses still in Massachusetts.  The
15    exact number is unknown, certainly witnesses in other places as
16    well, but not Delaware.
17         It appears at first blush, although it's not pivotal
18    to this decision, that at least some of the books and records
19    are located in Massachusetts.  It seems to me that the import
20    of this -- the import of the first filed rule really compels
21    this case to be situated in Massachusetts, and it is a question
22    of judicial economy and the appropriate designation of judicial
23    resources.
24         There is a learning curve when we talk about Belgian
25    secrecy laws, even if we understand, as counsel for the

The Court - Decision                                          23

1   plaintiff has described, that the issues in terms of applying,

2   for instance, those Belgium secrecy laws, may be different here

3   because it is L&H, the actual client who is asserting the cause

4   of action.  Never the less, the familiarity with those matters

5   does involve a learning curve as other matters do as well,

6   matters that have been litigated for an extensive period of

7   time in Massachusetts.

8          I do not take -- I don't consider the trustee's

9   position that it is more likely that the case will be -- will

10  have a speedier result in the Bankruptcy Court in Delaware or

11  the District Court in Delaware for that matter than it would in

12  Massachusetts.  In fact, contrary speculation might be in order

13  in light of the learning curve that has already been traversed

14  by the Massachusetts District Court.

15         Plaintiff is certainly correct that some deference to

16  its choice of forum is appropriate, but it seems to me that

17  that deference is substantially outweighed here by the pendency

18  of the Massachusetts actions which overlap to such a great

19  extent in terms of factual underpinnings as well as certain

20  legal concepts that might be applicable to discovery and to

21  substance.

22         It seems to me that Judge Robinson in the Filler

23  case, that her rational for applying the first filed rule is

24  applicable here as well.  Indeed, KPMG was common to each of

25  the I think three matters that were the subject of

The Court - Decision                                    24

1    Judge Robinson's review in the Filler case, but I think her

2    rational applies -- I think the first filed rule applies even

3    if there are different parties, but even if it doesn't, the

4    basic concept that the rules, quote, encourages sound judicial

5    administration and promotes comity among Federal Courts --

6    that's from the decision, and I omit the quotes -- is

7    applicable here as well, and I quote further --

8                  "The decision to transfer or stay the second action

9                  is within the discretion of the trial court.

10                 However, invocation of the rule will usually be the

11                 norm, not the exception.  Courts must be presented

12                 with exceptional circumstances before exercising

13                 their discretion to depart from the first filed

14                 rule."

15                 And Judge Robinson noted that where you have the same

16    set of facts, although not necessarily the same claims that

17    there is compelling reason for invoking the rule, for granting

18    a motion to transfer.

19                 It seems to me that the other concerns expressed by

20    the trustee do not overcome this conclusion.  The fact that

21    KPMG, U.S. and Belgium have settled all their claims in

22    Massachusetts does not defeat this cause.  The basic

23    proposition is that there has been a substantial emersion in

24    the facts of this scenario by the judicial team in

25    Massachusetts, and that needs to be capped to resolve this

The Court - Decision                                      25

1   matter as expeditiously as possible.

2           So nor is it a concern that discovery has closed in

3   Massachusetts and that no consolidation of discovery is

4   possible.  It is understood that the trustee will pursue, will

5   not doubt have the chance to pursue discovery, but the

6   discovery issues which are complex and out of the norm in this

7   case, at least in some degree, I think will be better handled

8   in terms of the familiarity with -- with the underpinnings and

9   the opportunity to be in harmony with the other decisions.

10          The trustee will have every opportunity to assert its

11  own positions.  I have no, of course, as the trustee asserts in

12  his papers, he and the plaintiff are entitled to impartial

13  consideration, and I have no doubt that they will get it.  The

14  entire import of the first filed rule has no room for concern

15  about prejudgments or ideas that impressions about a case are

16  formed by the first judge who has those cases.  We all I'm sure

17  have enough faith in the system, and in particular, judges to

18  understand that they have the capacity and then some to face

19  each set of parties with the positions that they take and to

20  resolve their disputes in an impartial way.

21          So for those reasons, I will enter an order granting

22  the motion of KPMG, U.S. for transfer of venue to the District

23  of Massachusetts.  I'm not sure if a form of order has been

24  submitted.

25          MR. FALLON:  Your Honor, this is Brad Fallon.  There

The Court - Decision                                    26

1    was a form of order submitted with the motion which is at

2    docket number four.  We're happy to submit that order or --

3              THE COURT:  Yes.  That would be helpful.  Thank you.

4    I will note that I did find the stipulation and order that was

5    signed by -- between these parties on November 5th about KPMG,

6    Belgium's requirements to answer and respond and so forth, and

7    that has been entered.  So I would appreciate a hard copy of

8    the order on this motion.

9              MR. FALLON:  We'll do that, and we'll run it by the

10   plaintiff.

11             THE COURT:  Very good.  Anything else on this call?

12             MR. TRENCH:  I think not, Your Honor.  I think this

13   was the only matter.  We're --

14             THE COURT:  All right.

15             MR. TRACY:  -- before --

16             A FEMALE SPEAKER:  Your Honor --

17             MR. TRENCH:  -- before next Thursday on other

18   matters.

19             THE COURT:  Indeed, and I thank you all and wish you

20   a good holiday.

21             A FEMALE SPEAKER:  You too, Your Honor.  Thank you.

22             MR. TRENCH:  Thank you, Your Honor.

23             A MALE SPEAKER:  Thank you, Your Honor.

24             THE COURT:  Bye bye.

25             MR. TRENCH:  Bye bye.

The Court - Decision                                    27

1          (Hearing Adjourned)

2                          * * * * *

3                  C E R T I F I C A T I O N

4          I, Maureen Emmons, court approved transcriber,

5    certify that the foregoing is a correct transcript from the

6    official electronic sound recording of the proceedings in the

7    above-entitled matter.

8

9    _____        Date: 12/15/04

10   MAUREEN EMMONS

11   DIANA DOMAN TRANSCRIBING

12

**EXHIBIT D**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Chapter 11
                                    .
LERNOUT & HAUSPIE SPEECH            .    Case No. 00-4398(JHW)
PRODUCTS N.V.,                      .
                                    .    Dec. 2, 2004 (10:21 a.m.)
            Debtor.                 .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY COURT JUDGE



Proceedings recorded by electronic sound recording;
transcript produced by transcription service.



THE COURT:  All set?

MR. TRENCH:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. TRENCH:  David Trench of Bilzin Sumberg Baena Price & Axelrod representing the Plan Administrator and Litigation Trustee on this matter.  We have a number of items on this agenda and with your permission I'm going to slightly rearrange them at the request of some of the participants.  The first item, which I think will be very short, is a supplemental application of Aiken Gump for fees in connection with services performed prior to the effective date.  There was an omission of some sort, and I believe someone from Aiken Gump is on the phone to make that application.

MR. SAVIN (TELEPHONIC):  Good morning, Your Honor.  It's James Savin for Aiken Gump.

THE COURT:  Good morning.

MR. SAVIN (TELEPHONIC):  Your Honor, as you'll recall at the time of the final fee hearing there was a discussion about some roughly $11,000 of fee expenses that were inadvertently excluded from our final fee application.  Following the Court's direction, we filed the short supplement for our final fee application, and that is what Your Honor has before you today.

THE COURT:  That's fine, I have no problem with it.  I reviewed it.  An order may be entered.

MR. SAVIN (TELEPHONIC):  Thank you very much, Your Honor.

3

1          THE COURT:  Thank you.

2          MR. SAVIN (TELEPHONIC):  Your Honor, can I be

3   excused at this point?

4          THE COURT:  Indeed.

5          MR. SAVIN (TELEPHONIC):  Thank you very much.

6          MR. TRENCH:  Your Honor, for the second matter,

7   what I'd like to do is move to what are agenda items 7 and 8,

8   and those are status reports with respect to the motion for

9   clarification that we filed regarding tax returns and Belgian

10  claims.  Scott Baena, the Plan Administrator and Litigation

11  Trustee planned to be here today to deliver that report in

12  person and found Monday that he had to be on a conference

13  call this afternoon while we were flying back, and so he is

14  attending by telephone, and I would like to turn this over to

15  him so he can report on our trip to Belgium and the

16  agreements and matters that we dealt with in that trip.

17         THE COURT:  Very good.  Mr. Baena?

18         MR. BAENA (TELEPHONIC):  May it please the Court.

19  Good morning, Your Honor.

20         THE COURT:  Good morning.

21         MR. BAENA (TELEPHONIC):  Scott Baena, Plan

22  Administrator and Litigation Trustee.  Your Honor, indeed, as

23  we indicated at the last hearing, we went to Belgium about

24  two weeks ago with three principal objectives in mind.  The

25  first was to attempt to reach a protocol for the transfer and

4

1  administration of Belgian claims filed in the Concordat

2  (phonetical) proceedings that are pending in Belgium.  As the

3  Court may recall, claimants could file claims in either the

4  United States or Belgium, and under the plan, after the

5  Belgium claims are deemed accepted in Belgium, they're

6  supposed to be transferred to the United States for

7  administration under the U.S. Bankruptcy Code.  As odd and

8  awkward as that seems, that's what the plan provided for.

9  Except in respect of what are referred to in Belgium as

10  privilege claims, which are akin to priority claims under the

11  U.S. bankruptcy laws, those claims were to be paid in Belgium

12  and indeed on the effective date we gave the curators some

13  $14 million with which to make payments in respect to the

14  privilege claims.  The urgency of having those Belgian

15  claims, the non-privilege Belgian claims transferred is that

16  until we had an opportunity to examine and object and

17  conclude objections to those claims, we wouldn't be able to

18  make a distribution here in the United States.  The second

19  objective that we had was to reach an agreement on the

20  preparation and filing of federal as well as Belgian income

21  tax returns, which have not been filed since the year 2000.

22  This was a matter that Your Honor has heard on at least one

23  occasion.  And then finally, we sought to obtain access to

24  books and records and documents of Lernout & Hauspie Speech

25  Products N.V., which we needed to complete our claims

5

1  analysis, to prosecute the litigations that had been

2  commenced or are being contemplated, and to complete the

3  preparation and filing of income tax returns.  I'm pleased to

4  report that we were very successful in the undertaking.  As

5  to the Belgian claims, we had an opportunity to review those

6  claims with the curators on a claim-by-claim basis, and there

7  are several hundred of them.  We had an opportunity to

8  actually inspect the claims which were filed in the Ieper

9  Bankruptcy Court in Belgium, and we also reached an agreement

10  for the immediate transfer of the accepted Belgian claims to

11  the Plan Administrator so that we may determine whether

12  further objections are required to be made in respect to

13  those claims under the U.S. bankruptcy laws.  And, it is our

14  expectation, to file notices of those transfers imminently

15  both here and in the Ieper Court with the consent of the

16  curators.  We likewise reached agreement on the preparation

17  of U.S. and Belgian tax returns, which is a matter that has

18  caused many sleepless nights for us.  We did agree to

19  undertake the payment of the expense incidental to the

20  preparation of those claims, and the curators graciously

21  assisted us in locating the company's former tax accountants

22  who you recall were not returning our communications and

23  assisting us in arranging with them to coordinate the

24  preparation of federal and Belgian tax returns in concert

25  with the trust's tax accountants.  That process should be

6

1  underway relatively soon.  As for access to the company's
2  documents, there were two aspects really of our undertaking.
3  First, and of no insignificant importance, I might add, we
4  finally located the company's last general ledgers which are
5  obviously critical, Your Honor, to the preparation of claims
6  objections and the preparation of tax returns.  It turns out
7  that the company's general ledgers were transferred to Scan
8  Soft when Scan Soft bought assets from the debtor, and they
9  apparently needed aspects of those ledgers which contained
10  sales activity in order to promote and develop their own
11  sales activities in respect to the assets which they acquired
12  from the debtor.  We were able to persuade Scan Soft to
13  develop an internet link which would permit us direct access
14  and the ability to download the general ledgers from the
15  United States.  While we had hoped that that link would be
16  operational by now, as luck would have it, there are some
17  mechanical issues that we tried to sort out, but we hope to
18  have that access very shortly.  The second aspect of our
19  location and inspection of documents concerned the company's
20  records which had been seized by the federal police as part
21  of the Belgian Attorney General's ongoing criminal
22  investigations of Lernout & Hauspie.  To this end, Your
23  Honor, through our local Belgian counsel, whose services were
24  invaluable to us throughout our visit, we obtained permission
25  to review documents located in storage facilities in Ieper

7

1    and also in the national archives in Bavarin (phonetical).

2    The unfortunate problem we encountered, however, was that

3    because of the seizure by the federal police, we were only

4    allowed to review the documents, and we were denied any right

5    to copy those documents.  In Ieper, the federal police did

6    allow us to segregate and box certain documents which we

7    wished to copy, and they said that they would hold them aside

8    in the Ieper jail until we sort out our rights to further

9    access.  In Bavarin we were allowed to have documents, but we

10   weren't allowed to segregate them.  And, Judge, we're talking

11   about enormous amounts of documents.  In Ieper -- and it was

12   very cold in this outside storage shed, there were eight

13   pallets, six feet high each, of boxes of documents which had

14   previously been described to us as inconsequential,

15   miscellaneous papers.  In fact, though, we found amongst

16   those papers documents which are critical to our claims

17   against KPMG.  We found documents which were critical to the

18   establishment of the basis that the company had, the assets

19   it acquired in the year 2000, and other materials that we

20   likewise deemed to be critical.  We also learned that the

21   federal police had imaged numerous of the documents which

22   were seized on DVDs, and obviously, we'd like to get a copy

23   of those DVDs, as the curators have already done.  However,

24   the curators are unable to share those DVDs with us because

25   of Belgian secrecy laws.  To this end, Judge, we have filed a

8

petition with the Attorney General in Belgium and the
investigating Judge in Belgium seeking copying rights and
copies of the DVDs.  That petition is under consideration.
Parenthetically, with note of interest, the investigating
Judge was not in Belgium at the time because he's in Korea
investigating the Korean bank claims that might exist on a
criminal level.  Upon the advice of local counsel, Your
Honor, we're led to believe that there is some
misapprehension about who I am and what my role is.  Our
petition does seek to allay those misapprehensions, however,
it's far from clear yet whether we'll be successful.  Again,
based on the advice of local Belgian counsel, we think it
would be extremely helpful if the Court would allow us to
impose upon it to informally communicate the fact of my
appointment and status and the need for our access to the
Attorney General and to that end, Your Honor, Mr. Trench has
with him and can now pass up to the Court, if you'll allow
him to do so --

      THE COURT:  Indeed.

      MR. BAENA (TELEPHONIC):  -- a letter which is
relatively benign, which we drafted in concert with local
counsel, which we would respectfully ask the Court to
consider issuing on its own official letterhead to the
Attorney General.  It merely is intended to introduce you as
the presiding bankruptcy Judge and to confirm, through you,

9

1  my appointment as Plan Administrator, the nature of my

2  duties, and the importance of me having access to those

3  materials.

4      THE COURT:  Thank you, Mr. Baena.  I'm extremely

5  impressed by the significant progress that's been made that

6  you've described on all of those fronts.  I'm reviewing this

7  letter and find it very appropriate with no problem on my

8  part particularly in light of the Third Circuit's

9  encouragement to reach out, not only, I would suggest, to

10 what they described as my counterpart, but perhaps in this

11 way to facilitate the process.  So, I will be happy to do

12 exactly what you propose, put this on my letterhead and to

13 send it off.

14     MR. BAENA (TELEPHONIC):  Thank you very much,

15 Judge.  And if it will facilitate that, Mr. Trench also has a

16 CD rom or a diskette of that letter in Word, if that will be

17 helpful to you.

18     THE COURT:  I appreciate it.  I'll take it.  It

19 doesn't much matter.  We can work with it easily either way.

20     MR. BAENA (TELEPHONIC):  Thank you so much, Your

21 Honor, for the opportunity to address you.

22     THE COURT:  Thank you, sir.

23     MR. TRENCH:  Your Honor, having covered those

24 matters, I would next like to turn to the agenda as it's

25 organized.  Do you have the diskette in there?

10

THE COURT: Yes, actually I did, yes.

MR. TRENCH: What has been placed at the top of the amended notice is a continued settled matter which is now listed as item number 11, and this is the 26th omnibus objection -- substantive omnibus objection to claims, and the agenda item lists a series of responses, and what we have done is reached agreement with those who have filed responses and some who have yet to file responses with respect to deadlines for that and would ask that those claims which are listed with responses that the objection be moved to the January 13th calendar, and that an order be entered with respect to all claims for which -- all of the claims objections for which no response has been filed. And --

THE COURT: That's fine.

MR. TRENCH: -- with your permission, we will at the end of this proceeding give you that order which will dispose of those claims and then on January 13th address the ones who have responded and who will respond.

THE COURT: All right.

MR. TRENCH: The next item, Your Honor, is three settlements which I'd like to announce to the Court. They are settlements of adversary proceedings. They are agenda items 1, 3, and 4. The first of which is an adversary proceeding, a preference recovery action against Bromberg & Sunstein who was a counsel for L&H. We had a claim of