UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SCOTT L. BAENA, LITIGATION TRUSTEE OF THE LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. LITIGATION TRUST<br><br>Plaintiff,<br><br>- v -<br><br>KPMG LLP and KLYNVELD PEAT MARWICK GOERDELER BEDRIJFSREVISOVEN,<br><br>Defendants. | Civil Action No. 04-12606 PBS |

## DECLARATION OF KRISTIN G. MCGURN IN SUPPORT OF KPMG LLP'S MOTION TO DISMISS THE COMPLAINT

Kristin G. McGurn, Esq., deposes and says:

1.     I am an attorney admitted to practice in this District and am an associate at the

law firm of Seyfarth Shaw LLP, counsel for KPMG LLP.  Based on my knowledge as counsel in

this action, I submit this declaration in support of KPMG LLP's Motion to Dismiss the

Complaint pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure.

2.     Attached are true and correct copies of the following documents:

| Document | Exhibit |
|---|---|
| Nisselson v. Lernout, Civil Action No. 03-10843 (PBS), Memorandum and Order, Dated August 9, 2004 | A |
| Nisselson v. Lernout, Civil Action No. 03-10843 (PBS), Memorandum and Order, Dated August 13, 2004 | B |

Disclosure Statement Pursuant to Section 1125
of the Bankruptcy Code with Respect to the
Official Committee of Unsecured Creditors'
Plan of Liquidation for Lernout & Hauspie
Speech Products N.V. Under Chapter 11
of the Bankruptcy Code, Dated March 11, 2003                    C

Baena v. KPMG LLP et al., Civil Action
No. 00-4397 (JHW), Litigation Trustee's
Opposition to Defendant KPMG LLP's
Motion to Transfer and Memorandum of Law,
Dated November 8, 2004                                         D

Baena v. KPMG LLP et al., Civil Action
No. 00-4397 (JHW), November 23, 2004
Transcript of Telephone Conference Call
Before The Honorable Judith H. Wizmur,
United States Bankruptcy Court Judge                           E

Agreement and Plan of Merger Among
Lernout & Hauspie Speech Products N.V.,
L&H Holdings USA, Inc., Dragon Systems, Inc.
and Certain Principal Stockholders of
Dragon Systems, Inc., Dated March 27, 2000,
Section 10.7                                                   F

Agreement and Plan of Merger Among
Lernout & Hauspie Speech Products, N.V.,
Dark Acquisition Corp. and Dictaphone Corporation,
Dated March 7, 2000, Section 9.6                               G

3.    Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the

foregoing statements are true and correct.

By: _____
Kristin G. McGurn (BBO #559687)

Dated:  Boston, Massachusetts
         January 7, 2005

**Certificate of Service**

I hereby certify that a true copy of the above document was
served upon the attorney of record for each party
electronically and by first-class mail on January 7, 2005

_____
Kristin G. McGurn

2

Exhibit A

Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
ALAN NISSELSON, TRUSTEE OF THE )
DICTAPHONE LITIGATION TRUST,    )
                                )
              Plaintiff,         )
                                )
         v.                     )  CIVIL ACTION NO. 03-10843-PBS
                                )
JO LERNOUT, et al.,             )
                                )
              Defendant.        )
_____)
```

### MEMORANDUM AND ORDER

August 9, 2004

Saris, U.S.D.J.

#### I.    INTRODUCTION

This case arises out of the stock-for-stock merger of Dictaphone Corporation ("Old Dictaphone") into a subsidiary of Lernout & Hauspie N.V. ("L&H"). An alleged fraudulent scheme at L&H rendered the L&H stock worthless, and the shareholders sued.[1] Plaintiff Alan Nisselson, Trustee of the Dictaphone Litigation Trust, has filed a separate action alleging that Defendant SG Cowen Securities Corporation ("SG Cowen"), L&H's investment banker, participated in the scheme and defrauded Dictaphone by encouraging it to enter into the merger agreement. Specifically,

---

[1] See Stonington Partners, Inc. v. Dammekens, No. 02-10303-PBS (D. Mass. filed Feb. 21., 2002).

1

plaintiff brings claims of common law fraud, unfair trade practices pursuant to Mass. Gen. Laws. ch. 93A, negligent mispresentation, conspiracy, and violations of RICO against SG Cowen. SG Cowen moves to dismiss the Amended Complaint in its entirety on the grounds that the Trustee lacks standing because only the shareholders have been injured by the drop in stock value, and the action is barred by the doctrine of <u>in pari delecto</u>. After hearing, the motion to dismiss is <u>**ALLOWED**</u>.

## II.  FACTUAL BACKGROUND[2]

The Amended Complaint alleges the following facts.

In early 2000, L&H and SG Cowen approached Dictaphone to discuss the possibility of acquiring Dictaphone – one of its major competitors in the speech and language applications sector. At that time, Stonington Fund was the owner of approximately 96% of the authorized and outstanding stock of Dictaphone, a Delaware corporation.  (¶ 183.)

On May 5, 2000, in what is known as a "reverse triangular merger," L&H acquired all of the outstanding stock of Dictaphone in exchange for approximately 9.4 million shares of L&H common

---

[2]    This Court has written several extensive opinions concerning the alleged fraudulent scheme at L&H.  Familiarity with the facts set out in those opinions is assumed.  <u>See</u>, <u>e.g.</u>, <u>In re Lernout & Hauspie Sec. Litig.</u>, 208 F. Supp. 2d 74 (D. Mass. June 19, 2002); <u>In re Lernout & Hauspie Sec. Litig.</u>, 230 F. Supp. 2d 152 (D. Mass. Aug 19, 2002); <u>In re Lernout & Hauspie Sec. Litig.</u>, 286 B.R. 33 (D. Mass. Nov. 18, 2002); <u>Bamberg v. Cowen</u>, 236 F. Supp. 2d 79 (D. Mass. Dec. 9, 2002); <u>In re Lernout & Hauspie Sec. Litig.</u>, 236 F. Supp. 2d 161 (D. Mass. Jan. 13, 2003).

2

stock through the merger of Dictaphone into a wholly-owned subsidiary of L&H.  The merger was effected pursuant to the terms of The Agreement and Plan of Merger dated March 7, 2000 ("Merger Agreement").  Section 2.1 of the Merger Agreement provided that "without any action on the part of any of the holder [sic] of any shares" of Dictaphone, (1) all shares of Dictaphone stock held as treasury stock "shall be cancelled and retired and shall cease to exist" and (2) every other share of Dictaphone common stock "shall be converted into the right to receive" shares of common stock of L&H, and "[a]ll such shares of company common stock, when so converted, shall no longer be outstanding and shall automatically be cancelled and retired and shall cease to exist." The L&H subsidiary, Dark Acquisition Corp., survived the merger and changed its name to Dictaphone Corporation ("New Dictaphone").  (¶ 44.)

The Merger Agreement contained representations and warranties from L&H to Old Dictaphone, including representations concerning the accuracy of filed financial statements.  (¶¶ 207-215.)  Cowen made face-to-face representations to Old Dictaphone. (¶¶ 218-220, 387.)  Old Dictaphone also hired professional advisors, to whom Cowen made representations about the financial condition of L&H.  (¶¶ 193-194, 388(i).)

The consideration Old Dictaphone received for its transfer of $900 million in assets to L&H, and the assumption of Old Dictaphone's liabilities, were essentially worthless due to the

3

alleged scheme to fraudulently inflate the value of L&H stock.
Plaintiff alleges that SG Cowen had participated in this scheme
since early 1997.  (¶¶ 125-126.)

On November 29, 2000, New Dictaphone filed for relief under
Chapter 11 of the United States Bankruptcy Code with the United
States Bankruptcy Court for the District of Delaware. (¶ 45.)  On
March 13, 2002, the Bankruptcy Court approved the Third Amended
Plan of Reorganization and New Dictaphone was discharged from
bankruptcy.  Pursuant to the Plan, New Dictaphone, as settler,
conveyed all its interest in certain pre-merger claims to the
Trustee on behalf of the Dictaphone Litigation Trust.  (Id.)

The Trustee seeks to recover the "damages suffered by
Dictaphone as a result of [the] fraudulent course of conduct."
(¶ 39.)  Plaintiff seeks $900 million in damages, which primarily
represents the "loss or diminution of its value as a going
concern." (¶ 390.)

### III.  DISCUSSION

### A.  Motion to Dismiss Standard

For purposes of this motion, the Court takes as true "the
well-pleaded facts as they appear in the complaint, extending
[the] plaintiff every reasonable inference in his favor." Coyne
v. City of Somerville, 972 F.2d 440, 442-43 (1st Cir. 1992)
(citing Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 51
(1st Cir. 1990)).  A complaint should not be dismissed under Fed.
R. Civ. P. 12(b)(6) unless "'it appears beyond doubt that the

4

plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" <u>Roeder v. Alpha Indus., Inc.</u>, 814 F.2d 22, 25 (1st Cir. 1987) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)).

## B. Standing

Vigorously contesting the Trustee's standing under Article III of the Constitution, defendant argues that because there was no purchase of *corporate* assets as part of the merger, there is no harm to Plaintiff apart from the harm to the shareholders. Neither party contests the shareholders' standing to bring claims arising out of the merger, which have been asserted in the separate litigation.

To have standing, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." <u>Raines v. Byrd</u>, 521 U.S. 811, 818 (1997) (quoting <u>Allen v. Wright</u>, 468 U.S. 737, 751 (1984)). "The injury alleged must be, for example, distinct and palpable, and not abstract or conjectural or hypothetical. The injury must be fairly traceable to the challenged action, and relief from the injury must be likely to follow from a favorable decision." <u>Allen</u>, 468 U.S. at 751 (internal citations omitted).

The threshold issue, then, is the Trustee's standing to pursue the fraud claims on behalf of the bankrupt corporation. "It is well settled that a bankruptcy trustee has no standing

5

generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118-19 (2d Cir. 1991) (citing Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 434 (1972)) (holding that a claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation); In re Rare Coin Galleries of Am., Inc., 862 F.2d 896, 901 (1st Cir. 1988) ("The trustee steps into the shoes of the debtor for purposes of asserting or maintaining the debtor's causes of action which become property of the estate.") See generally Caplin, 406 U.S. at 432 n.21 (rejecting argument that reorganization trustee could bring an action for fraud on behalf of individual debenture holders against indenture trustee, and noting that the trustee may well have interests that differ from those of the bondholders). Thus, to resolve whether the Trustee has standing, the Court must determine what claims the bankrupt corporation could have instituted on the date on which the bankruptcy petition was filed. Shearson, 944 F.2d at 118. Here, the bankrupt organization is New Dictaphone.

As a general matter, a bankruptcy trustee has standing to assert those claims of the pre-merger entity that were passed on to the (now bankrupt) corporation that survived the merger. See 8 Del. Code Ann. § 259(a) ("all property . . . shall be vested in the corporation surviving or resulting from such merger or

<div align="center">6</div>

consolidation"). "The right to a pending cause of action is an asset of a merged corporation which passes to the corporation surviving the merger." Lewis v. Anderson, 477 A.2d 1040, 1043 (Del. 1984) (holding that plaintiff who ceases to be a shareholder as a result of merger loses standing to prosecute derivative suit); Heit v. Tenneco, Inc., 319 F. Supp. 884, 887-88 (D. Del. 1970) (citing 8 Del. Code Ann. § 259) (holding that when successive mergers were consummated, all of the claims asserted on behalf of the pre-merger corporation were automatically transferred to the post-merger entity).

This case is much complicated by the fact that the bankrupt corporation was wholly-owned by the alleged perpetrator of the fraud. Can a Dr. Jekyll-and-Mr. Hyde corporation sue itself? Can the trustee of the New Dictaphone assert the claims of Old Dictaphone against the New Dictaphone's parent?

### 1. In Pari Delecto

First, Defendant argues that the action is barred by the doctrine of in pari delecto. See In re Mediators, Inc., 105 F.3d 822, 825-26 (2d Cir. 1997) (holding that the wrongdoing of the sole controlling shareholder must be imputed to the corporation). Courts have consistently held that claims for fraud or misrepresentation perpetrated on investors belong exclusively to those investors to the exclusion of the corporation or its successor in interest, where the corporation itself was involved in the wrongdoing. See Hirsch v. Arthur Andersen & Co., 72 F.3d

7

1085, 1094 (2d Cir. 1995) (holding that the trustee in bankruptcy of the consolidated estate of the company and its general partners lacked standing to bring claims predicated upon the distribution of misleading private placement memoranda to investors in limited partnerships because such claims "are the property of those investors, and may be asserted only by them and to the exclusion of [the trustee]."); Shearson, 944 F.2d at 118 ("[W]hen a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for damage to the creditors."); E.F. Hutton & Co., Inc. v. Hadley, 901 F.2d 979, 986-87 (11th Cir. 1990) (holding that bankruptcy trustee lacks standing to bring claims arising out of Ponzi scheme and that claims belonged only to defrauded investors, and expressing concern for "duplicative litigation"); Williams v. California 1st Bank, 859 F.2d 664, 666-67 (9th Cir. 1988) (holding that bankruptcy trustee lacked standing to bring claims against bank arising out of bank's participation in Ponzi scheme on behalf of debtor's creditors, even though creditors assigned trustee their claims, and noting that "inconsistent actions increase the chance that the Trustee will find her interests diverging from those of the investors on whose behalf she is suing").

Accordingly, the Trustee of the "New" Dictaphone (the wholly-owned subsidiary of the alleged perpetrator of the fraud) has no standing to sue a third party on behalf of the defrauded

investors.  See Shearson, 944 F.2d at 120 (holding that when the sole stockholder and decisionmaker of a corporation cooperated with a third party in defrauding the corporation, the claim accrued to creditors "not the guilty corporation."); In Re Roco Corp., 701 F.2d 978, 984 (1st Cir. 1983) ("We may impute any fraudulent intent of [the sole shareholder] to the transferor [corporation] because, as the company's president, director and sold shareholder, he was in a position to control the disposition of its property.").

Plaintiff seeks to distinguish this caselaw on the ground that "Old Dictaphone" was not involved in the fraud – indeed was the victim of the fraud -- and that its injury is distinct from the shareholders who relied on the specific misrepresentations of the parent company.  However, Old Dictaphone cannot arise Phoenix-like to assert pre-merger claims against third parties that New Dictaphone could not assert.  "Old Dictaphone" does not have independent standing under Delaware Law because its claims passed on to New Dictaphone.

### 2. Distinct Injury

Second, even if Old Dictaphone has standing independent of New Dictaphone, defendant argues the Trustee lacks standing because the corporation has asserted no injury distinct from the shareholders.  The Trustee argues that the shareholders and the corporate party to a merger may each have standing to pursue remedies for frauds committed against them.

9

In certain circumstances, courts have allowed both the shareholders and the successor-in-interest to an entity to pursue claims against third-persons who perpetrated a fraud so long as the individual shareholder has "an injury distinct from the injury to the corporation," and "double recovery is not inherent in plaintiff's theory of the case." Hayes v. Gross, 982 F.2d 104, 108-09 (3d Cir. 1992) ("Allowing [stockholders] to pursue this claim [to recover for specific misrepresentations that affected prospective purchaser differently from existing shareholders] will neither prejudice the corporation and its other stockholders nor permit a double recovery for the same injury. If [the bank] has claims against its officers and directors arising from their mismanagement, the [successor-in-interest] is free to pursue those claims for the ultimate benefit of the creditors and stockholders of [the bank].")

With respect to the pre-merger entity, the key inquiry for standing purposes is whether the corporation has suffered an injury distinct from the shareholders. See Howard v. Haddad, 916 F.2d 167, 170 (4th Cir. 1990) (holding that the purchasers of a bank stock raised direct, non-derivative claims of misrepresentation against the two directors, stating: "There is no compensable injury to the corporation . . . . The mere fact that Howard and the FDIC are pursuing the same source of assets does not transform Howard's claims into derivative ones."); In re Reliance Acceptance Group, Inc., 235 B.R. 548, 555-56 (D. Del.

10

1999) ("Debtors and Shareholders are not . . . pursuing the same cause of action" where "Debtors claim [defendants] defrauded the Company in the split-off transaction" and seek "equitable relief" while "Shareholders . . . claim the [defendants] defrauded them by publishing false and misleading statements that the shareholders relied on in connection with the purchase or sale of . . . securities" and seek "compensatory damages"); <u>Greenfield v. Shuck</u>, 867 F. Supp. 62, 67, 73 (D. Mass. 1994) (permitting the claims of plaintiff purchasers of the subordinated capital notes of a failed bank, and the RTC, the bank's successor-in-interest, to proceed on "equal footing" because the purchasers who received personal assurances had direct, non-derivative claims "sufficiently distinct from any injury to the corporation as a whole").

Delaware law provides guidance on the distinction between injury to the corporation and injury to the shareholders. "A derivative claim is one that is brought by a stockholder, on behalf of the corporation, to recover for harms done to the corporation." <u>Parnes v. Bally Entm't Corp.</u>, 722 A.2d 1243, 1245 (Del. 1999). A direct claim is one in which an individual stockholder or a class of stockholders seeks "relief for direct injuries that are independent of any injury to the corporation." <u>Id.</u> The Delaware Supreme Court recently clarified the law governing when a stockholder's claim is derivative or direct: "That issue must turn *solely* on the following questions: (1) who

11

suffered the alleged harm (the corporation or the suing
stockholders, individually); and (2) who would receive the
benefit of any recovery (the corporation or the stockholders,
individually)?" <u>Tooley v. Donaldson, Lufkin, & Jeanrette, Inc.</u>,
845 A.2d 1031, 1033 (Del. 2004). "A stockholder who is directly
injured . . . does retain the right to bring an individual action
for injuries affecting his or her legal rights as a stockholder.
Such a claim is distinct from an injury caused to the corporation
alone." <u>Id.</u> at 1036. The Delaware Supreme Court also emphasized
the nature of the duty owed and the alleged breach. "[A] court
should look to the nature of the wrong and to whom the relief
should go . . . . The stockholder must demonstrate that the duty
breached was owed to the stockholder and that he or she can
prevail without showing an injury to the corporation." <u>Id.</u> at
1039.

     The standing issue turns on whether the Trustee has asserted
an injury to the corporation caused by Cowen and whether the
corporation would receive the benefit of any recovery. The
Amended Complaint seeks $900 million in damages, which primarily
represents the loss or diminution of its value as a going
concern. The obvious problem with this damage theory is that the
"Old Dictaphone" is not a going concern, but ceased to exist
after the merger. But even if the Trustee surmounts that hurdle,
it must allege a distinct pre-merger injury to the corporation.

     The $900 million in damages alleged in the Complaint

represents approximately $450 million of shares that Old

Dictaphone shareholders exchanged for worthless shares of L&H

stock. This represents a distinct loss sustained by the

shareholders and any recovery would go to them. While defendant

may well have owed a duty to Old Dictaphone under the terms of

the Merger Agreement, which it allegedly breached by making

intentional misrepresentations, Old Dictaphone would not have the

right to recover any diminution in the value of the shares caused

by the securities fraud. Therefore, under <u>Tooley</u>, and the

Article III caselaw on standing, only the shareholders have

standing to press the claim for the loss arising from the drop in

stock value.

Plaintiff claims that the distinct harm to the corporation

is approximately $450 million, the amount that creditors had as a

claim on the old corporation which was lost as a result of the

merger. The problem with this argument is that the Trustee can

assert only the rights of the corporation, not the rights of the

creditors. Moreover, the merger was a benefit to Old Dictaphone

because New Dictaphone assumed its debts. <u>See</u> 8 Del. Code Ann. §

259(a) ("[A]ll debts, liabilities and duties of the respective

constituent corporations shall thenceforth attach to said

surviving or resulting corporation, and may be enforced against

it as if said debts, liabilities and duties had been incurred or

contracted by it."); <u>In re Enron Corp.</u>, 292 B.R. 507, 514

(S.D.N.Y. 2002) (holding that Enron Corp. sustained injuries that

13

were "distinct and separate" from injuries sustained by Enron's shareholders as a result of an unconsummated merger where the merger agreement provided that Enron would have benefitted because its debt would have been assumed by the acquirer). Any separate harm to the value of the old corporation as a going concern is speculative given the facts of this case.

<div align="center">

**ORDER**

</div>

The Court **ALLOWS** the motion to dismiss (Docket No. 9).

<div align="right">

**S/PATTI B. SARIS**
United States District Judge

</div>

14

Exhibit B

Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                )
ALAN NISSELSON, TRUSTEE OF THE )
DICTAPHONE LITIGATION TRUST,    )
                                )
            Plaintiff,          )
                                )
            v.                  )  CIVIL ACTION NO. 03-10843-PBS
                                )
JO LERNOUT, et al.,             )
                                )
            Defendant.          )
                                )
```

**MEMORANDUM AND ORDER**

August 13, 2004

Saris, U.S.D.J.

For the reasons stated in this Court's Memorandum and Order
dated August 9, 2004 (Docket No. 237), Plaintiff Alan Nisselson,
Trustee of the Dictaphone Litigation Trust, lacks standing to
bring claims under the federal securities laws, Mass. Gen. Laws
ch. 93A, RICO, common law fraud, negligent misrepresentation,
conspiracy, and breach of fiduciary duty arising out of the
alleged fraudulent scheme at Lernout & Hauspie.  Therefore, the
Court **ALLOWS** the following Motions to Dismiss: Docket No. 32
(Verbeke); Docket No. 74 (Flanders Language Valley Fund); Docket
No. 76 (Flanders Language Valley Fund Management); Docket No. 94
(KPMG LLP); Docket No. 101 (KPMG-B); Docket No. 103 (Lessius
Management Consulting); Docket No. 143 (Mercator Assurances);
Docket No. 152 (GIMV).

PATTI B. SARIS
United States District Judge

Exhibit C

Exhibit C

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY
COURT AND NO ONE MAY SOLICIT ACCEPTANCES OR REJECTIONS OF THE PLAN OF
LIQUIDATION UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE
BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION. IN ADDITION,
THIS DISCLOSURE STATEMENT WILL BE REVISED TO REFLECT EVENTS THAT
OCCUR AFTER THE DATE HEREOF, BUT PRIOR TO THE BANKRUPTCY COURT'S
APPROVAL OF THE DISCLOSURE STATEMENT.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------x
In re:                                        :        Chapter 11
                                              :        Case No. 00-4398 (JHW)
                                              :
LERNOUT & HAUSPIE SPEECH                      :
PRODUCTS N.V.,                                :
                                              :
                    Debtor.                   :
-----------------------------------------------------x

## DISCLOSURE STATEMENT PURSUANT TO
## SECTION 1125 OF BANKRUPTCY CODE WITH RESPECT TO
## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
## PLAN OF LIQUIDATION FOR LERNOUT & HAUSPIE
## SPEECH PRODUCTS N.V. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**AKIN GUMP STRAUSS HAUER & FELD LLP**
590 Madison Avenue
New York, New York  10022-2524
(212) 872-1000

– and –

**MONZACK & MONACO, P.A.**
1201 Orange Street, Ste. 400
Wilmington, DE 19801
(302) 656-8162

Attorneys for the Official Committee of Unsecured
Creditors of Lernout & Hauspie Speech Products N.V.

Dated: March 11, 2003

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

## DISCLAIMER

NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS AND EQUITY INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS) AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE EXECUTIVE SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED TO THE PLAN, AND THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  ALL CREDITORS AND EQUITY INTEREST HOLDERS SHOULD READ CAREFULLY AND CONSIDER FULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN LERNOUT & HAUSPIE SPEECH PRODUCTS N.V.'S CHAPTER 11 CASE, AND FINANCIAL INFORMATION. ALTHOUGH THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WAS ORIGINALLY CONTAINED IN THE FIRST AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF BANKRUPTCY CODE WITH RESPECT TO LERNOUT & HAUSPIE SPEECH PRODUCTS N.V.'S FIRST AMENDED PLAN OF LIQUIDATION UNDER CHAPTER 11 OF BANKRUPTCY CODE, DATED OCTOBER 16, 2002. THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS HAS NOT UNDERTAKEN AN INDEPENDENT INVESTIGATION TO VERIFY THE FACTUAL INFORMATION CONTAINED HEREIN. AS A RESULT, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS, OR RECOMMENDATIONS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO OR APPROVED BY SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS.

THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY PROCEEDING (OTHER THAN THE CHAPTER 11 CASE) INVOLVING LERNOUT & HAUSPIE SPEECH PRODUCTS N.V., OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. YOU SHOULD CONSULT YOUR OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

## EXECUTIVE SUMMARY

Lernout & Hauspie Speech Products N.V. ("L&H NV") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code") on November 29, 2000 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). On the same date, two (2) wholly owned subsidiaries of L&H NV, Dictaphone Corporation ("Dictaphone") and L&H Holdings USA, Inc. ("L&H Holdings," and, with L&H NV, the "L&H Entities," and with L&H NV and Dictaphone, the "L&H Group"), each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

An insolvency proceeding also is taking place in Belgium with respect to L&H NV. On December 27, 2000, L&H NV commenced a concordat proceeding in the Ieper, Belgium Commercial Court (the "Belgian Court"), which the Belgian Court granted on January 5, 2001 (the "Belgian Case"). On September 10, 2001, L&H NV filed its second plan of recovery (the "Second Belgian Plan") (the Belgian Court having rejected the first) which the Belgian Court conditionally approved on September 21, 2001. As a result, on October 5, 2001, however, L&H NV appealed the imposition of the conditions contained in the September 21, 2001 order to the Ghent Court of Appeals (the "Ghent Court"). As a result, on October 18, 2001, the Ghent Court issued a ruling denying the conditional approval of the Second Belgian Plan by the Belgian Court and officially dismissing the Belgian Case. On October 24, 2001, the Belgian Court declared L&H NV bankrupt and appointed five (5) curators (the "Curators"), to oversee the liquidating Belgian bankruptcy case of L&H NV. It is anticipated that the Belgian Case will continue under the supervision of the Curators for some time. *See Section IV.A.2. ("Chapter 11 Case. Commencement. Belgian Case")*

The L&H Group filed the Joint Plan Of Reorganization Of L&H Group Under Chapter 11 Of The Bankruptcy Code (the "Joint Plan") and the Disclosure Statement Relating To Joint Plan Of Reorganization Of L&H Group Under Chapter 11 Of The Bankruptcy Code (the "Joint Disclosure Statement") on August 28, 2001 with the Bankruptcy Court. The Joint Plan provided, among other things, for the reorganization of Dictaphone and the transfer of all of the assets of L&H NV and L&H Holdings into two new separate entities post-chapter 11 that will sell or otherwise dispose of assets for the benefit of the stakeholders of such estates.

Shortly after filing the Joint Disclosure Statement, and prior to the hearing scheduled to consider the adequacy of the Joint Disclosure Statement, however, a change in circumstances regarding the status of the Second Belgian Plan compelled the L&H Group to decide not to seek approval at that time of the L&H Group Disclosure Statement insofar as it relates to the L&H NV and L&H Holdings. Specifically, the Belgian Court's September 21, 2001 order imposed several conditions on L&H NV that (a) might not have been consistent with the Joint Plan and (b) might have affected L&H NV's ability to consummate the Joint Plan. Moreover, at that time, insufficient progress had been made with respect to the sale of L&H NV's and L&H Holdings' Speech And

3

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

Language Technologies Business (as defined below). *See Section IV.E.4. ("Chapter 11 Case. Significant Asset Sales. Sale Of Speech And Language Technologies Business").* Given the existence of these unresolved matters, the L&H Group determined that the most efficient course would be to adjourn final consideration of the Joint Disclosure Statement insofar as it relates to L&H Holdings and L&H NV and to proceed with seeking approval of a disclosure statement (and plan) exclusively relating to Dictaphone. On January 31, 2002, Dictaphone filed the Third Amended Plan Of Reorganization Of Dictaphone Corporation Under Chapter 11 Of The Bankruptcy Code (the "Dictaphone Plan"), relating solely to claims against and equity interests in Dictaphone. The Dictaphone Plan was confirmed on March 13, 2002 and became effective on March 28, 2002.

While L&H NV and L&H Holdings originally contemplated filing a joint plan, they subsequently determined that the more prudent course of action would be to proceed separately with (a) a plan of liquidation relating solely to claims against and equity interests in L&H Holdings and (b) a plan of liquidation relating solely to Claims against and Equity Interests in L&H NV. The pendency of the Belgian Case, and the possibility that certain restrictions imposed on L&H NV in the Belgian Case might interfere with L&H NV's ability to consummate a joint plan with L&H Holdings in the United States also led L&H NV and L&H Holdings to pursue their own separate plans.

Accordingly, on April 29, 2002, L&H Holdings filed the First Amended Plan Of Liquidation Of L&H Holdings USA, Inc. Under Chapter 11 Of Bankruptcy Code (the "L&H Holdings Plan") and the First Amended Disclosure Statement Pursuant To 1125 Of Bankruptcy Code With Respect To First Amended Plan Of Liquidation Of L&H Holdings USA, Inc. Under Chapter 11 Of Bankruptcy Code (the "L&H Holdings Disclosure Statement"). The First Amended L&H Holdings Plan relates only to claims against and equity interests in L&H Holdings. On August 13, 2002, the Bankruptcy Court entered an order confirming the L&H Holdings Plan. The L&H Holdings Plan became effective on September 23, 2002.

L&H NV has sold virtually all of its assets, including Mendez S.A. (as defined below), the Medical Transcription Business, (as defined below), and the Speech And Language Technologies Business. *See Section IV.E. ("Chapter 11 Case. Significant Asset Sales").* On October 16, 2002, L&H NV filed the First Amended Plan Of Liquidation Of Lernout & Hauspie Speech Products N.V. Under Chapter 11 Of Bankruptcy Code (the "Debtor's First Amended Plan").

On November 4, 2002, however, the Court of Appeals for the Third Circuit issued a decision with respect to Stonington Partners Inc., et al. (collectively, the "Stonington Entities"), which reversed and remanded two earlier orders by this Court and the District Court for the District of Delaware. The Stonington Entities hold a substantial claim against the Debtor's estate arising out of the purchase or sale of securities that are subordinated to general unsecured creditors in the chapter 11 case pursuant to section 510(b) of the Bankruptcy Code. The Court and District Court had enjoined the Stonington Entities from pursuing their securities fraud claims in the Belgian Case, where

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

the claims of the Stonington Entities would likely be treated as general, unsecured creditors because the insolvency laws of Belgium do not provide for the subordination of claims arising out of the purchase or sale of securities. The Stonington decision also remanded the issue to this Court for additional consideration. As a result of the Third Circuit's decision and the resulting direct conflict with respect to the priority of distribution schemes between the insolvency laws of Belgium and the United States, the Debtor decided not to pursue confirmation of the Debtor's First Amended Plan.

On January 27, 2003, the Official Committee of Unsecured Creditors of Lernout & Hauspie Speech Products N.V. (the "Committee") filed the Emergency Motion to Modify the Debtor's Exclusive Periods (the "Exclusivity Motion"). After a hearing on January 30, 2003 with respect to the Exclusivity Motion, the Court entered an order modifying the Debtor's exclusive periods to provide for L&H NV and the Committee to have co-exclusivity to file and solicit acceptances to a plan of reorganization.

The Committee filed the Official Committee of Unsecured Creditors' Plan of Liquidation for Lernout & Hauspie Speech Products N.V. Under Chapter 11 of the Bankruptcy Code (the "Plan") on March 11, 2003, along with this disclosure statement (the "Disclosure Statement"). The Plan provides for the liquidation and subsequent distribution of the Debtor's non-Belgian assets to creditors in accordance with the priority of claims outlined in the Bankruptcy Code.

The Committee has been advised that the Curators do not support the Plan.

This Executive Summary is intended solely as a summary of the Distribution provisions of the Plan and certain matters related to L&H NV's Chapter 11 Case. **FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS AND SCHEDULES THERETO IN THEIR ENTIRETY.** Capitalized terms used in this Executive Summary and not otherwise defined herein will have the meanings ascribed to them in either the Disclosure Statement or the Plan.

## A.    SOLICITATION AND ACCEPTANCE OF PLAN

## 1.    General

This Disclosure Statement and other documents described herein are being furnished by the Committee to holders of Claims against L&H NV for the purpose of soliciting votes on the Plan.

A copy of the Disclosure Statement Approval Order entered by the Bankruptcy Court on **[April 2, 2003]** and a notice of, among other things, voting procedures and the dates set for objections to and the hearing on confirmation of the Plan (the "Notice of the Confirmation Hearing") are also being transmitted with this Disclosure Statement. The Disclosure Statement Approval Order and the Notice of the Confirmation Hearing set forth in detail the deadlines, procedures, and instructions for casting votes to accept or reject the Plan, for filing objections to confirmation of the Plan,

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

the treatment for balloting purposes of certain types of Claims, and the assumptions for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot that is color-coded for each Class. Each holder of a Claim in a Class entitled to vote should read the Disclosure Statement, the Plan, the Disclosure Statement Approval Order, the Notice of Confirmation Hearing, and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning how Claims and Equity Interests are classified for voting purposes and how votes will be tabulated.

## 2.    Who Is Entitled To Vote

Under chapter 11 of the Bankruptcy Code, only holders of Claims or Equity Interests that are "impaired" and that receive distributions under the Plan are entitled to vote to accept or reject the Plan. To be confirmed, the Plan must be accepted by the holders of certain Classes of Claims and the Plan must be confirmed by the Bankruptcy Court. For a discussion of these matters, *see Sections VI. ("Voting Requirements") and VII. ("Confirmation Of Plan").*

Certain Classes of Claims and Equity Interests (Classes 5, 6, and 7) will receive no Distribution or benefits under the Plan and, therefore, are deemed to have rejected the Plan and are not entitled to vote. Certain Classes of Claims (Classes 3 and 4) are impaired under the Plan, but will receive a Distribution under the Plan and, accordingly, are entitled to vote on the Plan. The Committee is seeking acceptances of the Plan from holders of Claims in these Classes. Each of Classes 1 and 2 are unimpaired under the Plan, and the holders of such Claims are conclusively presumed under section 1126 of the Bankruptcy Code to have accepted the Plan. For a description of the Classes of Claims and Equity Interests and their treatment under the Plan, *see Section V.B. ("Summary Of Plan Of Liquidation For L&H NV. General Description Of Classification And Treatment Of Claims An**d**Interests").*

## 3.    Ballots

If you are entitled to vote to accept or reject the Plan, *see Section VI.B. ("Voting Requirements. Holders Of Claims Entitled To Vote")* A Ballot or Ballots, specific to the Claim or Equity Interest held, is enclosed for voting on the Plan. If Claims are held in more than one Class, and are entitled to vote in more than one Class, separate Ballots must be used for each Class of Claims. A separate Ballot must be used for each Claim that you hold; provided, however, that the holder of more than one Claim classified in a single Class of Claims should use a single ballot to vote to accept or reject the Plan on account of all such Claims within such single Class.

**IN ORDER TO BE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN, BALLOTS MUST BE PROPERLY FILLED OUT AND RECEIVED BY 4:00 P.M. (NEW YORK TIME) ON [MAY 19, 2003] BY THE VOTING AGENT AS SET FORTH ON THE BALLOT,** *see Section VI.D. ("Voting Requirements. Voting Procedures")* Persons wishing to change their votes can do so,

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

if they meet the requirements of Bankruptcy Rule 3018(a), by filing a motion with the Bankruptcy Court with sufficient advanced notice so that it can be heard prior to the Confirmation Hearing scheduled for **[May 29, 2003]**. **Any such application must be filed and served on or before [May 23, 2003], in accordance with the procedures set forth in detail in the Disclosure Statement Approval Order.**

## 4.    Inquiries

If you have questions about the procedures for voting your Claim or Equity Interest, or the packet of materials that you received, please contact the Voting Agent, Donlin, Recano & Co., at 419 Park Avenue South, Suite 1206, New York, New York 10016, Attention: Voting Department, or by telephone at (212) 481-1411. If you have questions about the amount of your Claim, please contact **[insert contact]** or by telephone at **[insert telephone]**. If you wish to obtain additional copies of the Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact Monzack and Monaco, P.A., 1201 Orange Street, Suite 400, Wilmington, Delaware 19801 (Attention: Heidi Sasso) or by electronic mail to hsasso@walmon.com.

## B.    PLAN OF LIQUIDATION FOR L&H NV

## 1.    Overview Of Plan

The following is a brief summary of certain material provisions of the Plan. For a more detailed description of the terms of the Plan, *see Section V. ("Summary Of Plan Of Liquidation For L&H NV")*. These descriptions are qualified in their entirety by the provisions of the Plan.

L&H NV has disposed of virtually all of its assets for cash or other consideration, including Mendez S.A., the Medical Transcription Business, and the Speech And Language Technologies Business. *See Section IV.E. ("Chapter 11 Case. Significant Asset Sales")*. As a result of L&H NV's dual plenary bankruptcy proceedings in the United States and Belgium and the difference between the insolvency laws of such jurisdictions, the Plan will distribute L&H NV's non-Belgian assets (the "Chapter 11 Assets") to creditors in accordance with the Bankruptcy Code. All assets of L&H NV other than the Chapter 11 Assets will be administered in the Belgian Case. *See Section IV.M ("L&H NV Asset Allocation") for a description of the allocation*. The Plan provides that the Chapter 11 Assets will be distributed to its creditor constituencies. The Plan also contemplates both the liquidation of any remaining Chapter 11 Assets that are non-Cash assets and the formation of a litigation trust or similar vehicle to pursue recoveries L&H NV may have against third parties arising out of the events that preceded the Chapter 11 Case. Specifically, the Litigation Trust Beneficial Interests will be distributed among holders of certain Allowed Claims as follows: (a) ninety-three percent (93%) of the Litigation Trust Beneficial Interests will be distributed to holders of general, unsecured claims against the Chapter 11 Assets and (b) seven percent (7%) will be

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

distributed to holders of claims arising out of or in connection with the PIERS and Old Convertible Subordinated Notes.

Since Distributions may require the Plan Administrator to liquidate certain of the Chapter 11 Assets that are non-cash assets, such as securities (including, but not limited to, the common stock of Dictaphone, which L&H NV received in connection with the Dictaphone Plan, additional time may be required to finalize Distributions on account of all Allowed Claims. *See Section V.C.1. ("Summary Of Plan Of Liquidation For L&H NV. Means For ImplementationOf Plan. Post Effective Date L&H. Periodic Distributions Of Available Cash and Litigation Trust Beneficial Interests")*

## 2.    Summary Of Classification And Treatment Under Plan

The following table summarizes the classification and treatment of the pre-petition Claims and Equity Interests under the Plan. The classification and treatment for all Classes are described in more detail in *section V.B. ("Summary Of Plan Of Liquidation For L&H NV. General Description Of Classification And Treatment Of Claims And Equity Interests")* Estimated Claim amounts set forth in the following table are based upon a review of the proofs of Claims filed in the Chapter 11 Case and the schedules of liabilities filed by L&H NV in the Chapter 11 Case. There can be no assurance that the estimated amounts below are correct, and actual Claim amounts may be significantly different from the estimates.

This table is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests. Accordingly, this summary is qualified in its entirety by reference to the provisions of the Plan, a copy of which is attached as Exhibit A hereto.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

## SUMMARY OF CLASSIFICATION AND TREATMENT
## OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN[1]

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired – not entitled to vote; paid Cash in full on the Effective Date or as soon as practicable thereafter, or such other treatment as agreed upon by a holder of an Allowed Priority Non-Tax Claim and Post Effective Date L&H | $[] | 100% |
| Class 2 | Secured Claims | Unimpaired – not entitled to vote; paid in full; the holder of such Secured Claim will receive the first net proceeds from the sale of any of its Collateral to the extent of the principal amount of its Claim  To the extent permitted under applicable law, the holder of such Allowed Secured Claim will receive the contractual non-default rate of interest on such Allowed Secured Claim  Until each Secured Claim is paid in full, the holder of such Allowed Secured Claim will retain the Liens securing such Allowed Secured Claim; full payment to each such secured creditor will be made on or before December 31, 2003 | $[] | 100% |
| Class 3 | Unsecured Claims | Impaired – entitled to vote; subject to certain limitations set forth in Section 5 2 3 of the Plan, on the Effective Date, and thereafter for each Distribution of Available Cash, each holder of an Allowed Class 3 Unsecured Claim will receive a Ratable Proportion of the Available Cash and ninety-three percent (93%) of the Litigation Trust Beneficial Interests  No interest will be paid on any Class 3 Unsecured Claim | $[] | [] 00% |

---

[1]   The estimated aggregate amount of allowed claims and estimated percentage recoveries are preliminary determinations that remain subject to change and amendment based upon, among other things, the completion of the claims reconciliation process and the ultimate liquidation of the Chapter 11 Assets  There can be no assurance that actual amounts will not differ significantly from these estimates  The estimated percentage recoveries ascribe no value to the Litigation Trust Beneficial Interests

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims |
|---|---|---|---|---|
| Class 4 | PIERS/Old Convertible Subordinated Notes Claims | Impaired – entitled to vote; on the Effective Date, and thereafter, after holders of Allowed Class 3 General Unsecured Claims have received Distributions equal to 100% of such Allowed Claims, for each Distribution of Excess Available Cash, subject to Section 5.2.3(b) of the Plan, each holder of a PIERS/Old Convertible Subordinated Notes Claim will receive a Ratable Proportion of Excess Available Cash and seven percent (7%) of the Litigation Trust Beneficial Interests. No interest will be paid on any Class 4 PIERS/Old Convertible Subordinated Notes Claim. | $189,360,000 | N/A |
| Class 5 | Common Stock | Impaired – deemed to have rejected the Plan. Holders of Allowed Common Stock Equity Interests will receive no Distribution under the Plan. | N/A | 0% |
| Class 6 | Securities Laws Claims | Impaired – deemed to have rejected the Plan. Holders of an Allowed Securities Laws Claim will receive no Distributions under the Plan | N/A | 0% |
| Class 7 | Other Equity Interests | Impaired – deemed to have rejected the plan and not entitled to vote. A holder of any Equity Interest in L&H NV not otherwise classified in L&H NV Classes 5 and 6 will receive no distributions under the Plan on account of such Equity Interest. | N/A | 0% |

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

## C.    CONFIRMATION HEARING

The hearing to determine whether to confirm the Plan has been scheduled for **[May 29, 2003] at [10:00 a.m.]** (New York time) before the Honorable Judith H. Wizmur, United States Bankruptcy Court, District of Delaware, Mitchell H. Cohen Courthouse, 4[h] and Cooper Streets, Room 2020, Camden, New Jersey 08101. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at or prior to the Confirmation Hearing. In addition, except as expressly provided in the Plan, the Plan may be modified pursuant to section 1127 of the Bankruptcy Code prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest. At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code have been satisfied and, if appropriate, will enter an order confirming the Plan. *See Sections VI. ("Voting Requirements") and VII. ("Confirmation Of Plan")* Both confirmation and consummation of the Plan are subject to certain conditions, which may be waived by the Committee in its discretion. *See Section VII. ("Confirmation of Plan")*

[The Remainder of This Page Intentionally Left Blank]

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

### TABLE OF CONTENTS

**Page**

I.   DISCLOSURE STATEMENT WITH RESPECT TO THE OFFICIAL
     COMMITTEE OF UNSECURED CREDITORS' PLAN OF
     LIQUIDATION FOR L&H NV .................................................................18
     A.   Introduction .................................................................................18
     B.   Definitions ..................................................................................18
     C.   Notice To Holders Of Claims ........................................................18
     D.   Solicitation Package ....................................................................20
     E.   Voting Procedures, Ballots, And Voting Deadline .........................21
          1.   General Information ...........................................................21
          2.   Voting On The Plan ............................................................21
          3.   Confirmation Hearing And Deadline For Objections To
               Confirmation .....................................................................22

II.  L&H NV'S OPERATIONS PRIOR TO CHAPTER 11 CASE ..................24
     A.   Origins & History Of L&H NV .......................................................24
          1.   Formation Of L&H NV ........................................................24
          2.   Corporate Structure ...........................................................25
          3.   Business Units And Product Offerings .................................27
               a.   Speech And Language Technologies Business ............28
               a.   Speech And Language Technologies Business ............29
                    i.    Customers .................................................29
                    ii.   Product Offerings ......................................29
               b.   Mendez S.A. ..........................................................30
               c.   Medical Transcription Services ................................30
          4.   Acquisition Program ...........................................................31
               a.   Acquisition Of Dictaphone .....................................31
               b.   Acquisition Of Dragon ...........................................32
               c.   Additional Acquisitions ..........................................32
          5.   Pre-Petition Obligations And Capital Structure ....................33
               a.   Belgian Credit Facility............................................33
               b.   Dictaphone Guaranty..............................................34
               c.   LHCCC Loan Agreement .........................................35
               d.   Indentures ............................................................35
                    i.    Old Convertible Subordinated Notes ..............35
                    ii.   Convertible Junior Subordinated Debentures
                          And "PIERS" ............................................36
     B.   Officers And Directors ................................................................37

III. EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASE.........38
     A.   Accounting Irregularities And Decline In Value Of L&H NV
          Stock .........................................................................................38
     B.   SEC Investigation .......................................................................38
     C.   Audit Committee Investigation......................................................39
     D.   Withdrawal Of KPMG Auditor Reports ..........................................40

HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION

| | | | |
|---|---|---|---|
| E. | | Lenders Accelerate Loan Obligations | 40 |
| F. | | L&H NV Besieged By Litigation | 40 |
| | 1. | Former Directors And Officers Lawsuits | 41 |
| | | a. Class Action Lawsuits | 41 |
| | | b. Rocker Management | 41 |
| | 2. | Stonington Entities' Pre-Chapter 11 Actions | 42 |
| IV. | | CHAPTER 11 CASE | 42 |
| A. | | Commencement | 42 |
| | 1. | Chapter 11 Case | 42 |
| | 2. | Belgian Case | 42 |
| B. | | Parties-In-Interest | 43 |
| | 1. | Court | 43 |
| | 2. | Advisors To L&H NV | 43 |
| | 3. | The Committee And Its Advisors | 44 |
| | 4. | Professional Fees | 44 |
| | 5. | United States Trustee | 44 |
| | 6. | Fee Auditor | 45 |
| C. | | General Electric Capital Corporation Interim Debtor-In-Possession Financing | 45 |
| D. | | Debtor In Possession-Financing | 46 |
| | 1. | Selection Of DIP Agent | 46 |
| | 2. | Court Approval Of DIP Facility | 47 |
| | 3. | Use Of And Repayment Of DIP Facility By Members Of L&H Group | 47 |
| E. | | Significant Asset Sales | 48 |
| | 1. | Sale Of Mendez S.A. | 48 |
| | 2. | Sale Of Powerscribe® To Dictaphone | 49 |
| | 3. | Sale Of Medical Transcription Business | 50 |
| | 4. | Sale Of Speech And Language Technologies Business | 51 |
| | | a. Sale Of SLT Assets To Bowne | 52 |
| | | b. Sale Of SLT Assets To Multimodal | 52 |
| | | c. Sale Of SLT Assets To ScanSoft | 52 |
| | | d. Sale Of SLT Assets To Vantage | 53 |
| | | e. Allocation Of SLT Asset Sale Proceeds | 53 |
| F. | | Summary Of Material Litigation And Related Events | 54 |
| | 1. | Settlement With ScanSoft, Inc. | 54 |
| | | a. Holdings Motion In Aid Of Consummation | 54 |
| | | b. L&H Holdings And L&H NV Settlement With ScanSoft | 55 |
| | 2. | Artesia | 57 |
| | 3. | Bakers' Claims | 58 |
| | 4. | Mutual Release Agreement | 61 |
| | 5. | Stonington Entities | 61 |
| | 6. | SEC Investigation | 64 |
| | 7. | AXA Relief Stay Motion | 64 |
| | 8. | Kemper Relief Stay Motion | 65 |

13

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

|  |  | 9. | Preference Actions | 66 |
|  | G. |  | L&H Korea -- Investigation Of Fraud | 66 |
|  | H. |  | Restatement Of Financial Statements | 66 |
|  | I. |  | Inter-Company Integration And Allocation Issues | 67 |
|  |  | 1. | PwC Allocation Project | 68 |
|  |  | 2. | Technology | 68 |
|  |  | 3. | Shared Administrative Costs | 69 |
|  | J. |  | Statements Of Financial Affairs And Schedules Of Assets And Liabilities | 69 |
|  | K. |  | Filing Deadline For Claims | 69 |
|  |  | 1. | Pre-Petition Claims -- Chapter 11 Case | 69 |
|  |  | 2. | Administrative Expense Claims | 72 |
|  | L. |  | History Of Plan Formulation | 72 |
|  | M. |  | L&H Asset Allocation | 74 |
|  |  | 1. | Asset Allocation | 74 |
|  |  | 2. | Cash Usage Allocation | 75 |
|  |  | 3. | Summary of Allocation Analysis | 75 |
| V. |  |  | SUMMARY OF PLAN OF LIQUIDATION FOR L&H NV | 75 |
|  | A. |  | Overview Of Plan | 76 |
|  | B. |  | General Description Of Classification And Treatment of Claims And Equity Interests | 76 |
|  |  | 1. | Unclassified Claims | 77 |
|  |  |  | a. Administrative Expense Claims | 77 |
|  |  |  | b. Priority Tax Chims | 77 |
|  |  | 2. | Treatment Of Classified Claims | 78 |
|  |  |  | a. Unimpaired Classes Of Claims | 78 |
|  |  |  |    i. Class 1: Priority Non-Tax Claims | 78 |
|  |  |  |    ii. Class 2: Secured Claims | 78 |
|  |  |  | b. Impaired Classes Of Claims (Entitled To Vote) | 79 |
|  |  |  |    i. Class 3: Unsecured Claims | 79 |
|  |  |  |    ii. Class 4: PIERS/Old Convertible Subordinated Notes Claims | 80 |
|  |  |  | c. Impaired Classes Of Equity Interests (Not Entitled To Vote) | 80 |
|  |  |  |    i. Class 5: Common Stock | 80 |
|  |  |  |    ii. Class 6: Securities Law Claims | 80 |
|  |  |  |    iii. Class 7: Other Equity Interests | 81 |
|  | C. |  | Means For Implementation Of Plan | 81 |
|  |  | 1. | Periodic Distributions Of Available Cash and Litigation Trust Beneficial Interests | 81 |
|  |  | 2. | Post Effective Date L&H NV's Obligations Under Plan | 81 |
|  |  | 3. | Approval Of Settlements | 83 |
|  |  | 4. | Litigation Trust | 83 |
|  |  |  | a. Establishment Of Litigation Trust | 84 |
|  |  |  | b. Acquisition Of Debtor's Assigned Causes Of Action | 84 |

14

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

|   |   |   |
|---|---|---|
| c. | Establishment Of Litigation Beneficial Interest Registers | 84 |
| d. | Litigation Membership Interests Granted On Account of Disputed Claims | 85 |
| e. | Limitations On Transferability Of Litigation Trust Beneficial Interests | 85 |
| f. | Transfer Of Causes Of Action By Holders | 85 |
| g. | Funding the Litigation Trust | 85 |
| h. | Application Of Proceeds And Expenses | 86 |
| i. | Distribution Of Litigation Proceeds | 86 |
| j. | Distribution By Litigation Trustee And Curators | 86 |
|   | i.    Timing Of Distributions | 86 |
|   | ii.   Maximum Recovery | 87 |
| k. | Litigation Trust Reserve | 87 |
| l. | Distributions After Disallowance | 87 |
| m. | Term | 87 |
| n. | Powers And Duties Of Litigation Trustee | 87 |
| o. | Authority To Settle Causes Of Action | 88 |
| p. | Compensation Of Litigation Trustee | 89 |
| q. | Indemnification And Exculpation Of Litigation Trustee And Litigation Monitoring Committee | 89 |
| r. | Monitoring Of Litigation Trust | 90 |
| s. | Discretion Afforded To Litigation Monitoring Committee To Modify Terms Of Compensation Of Litigation Trustee | 91 |
| 5. | Cancellation Of Equity Interests | 91 |
| 6. | Boards Of Directors Of Post-Effective Date L&H | 91 |
| 7. | Operations Of L&H NV Between Confirmation And Effective Date | 91 |
| 8. | Closing Of Chapter 11 Case | 91 |
| 9. | Exclusivity Period | 92 |
| 10. | Revesting Of Assets | 92 |
| 11. | The Committee | 92 |
| 12. | Effectuating Documents; Further Transactions | 92 |
| 13. | Assumptions Of Liabilities | 92 |
| 14. | Substantial Consummation | 93 |
| 15. | Preservation Of Causes Of Action | 93 |
| 16. | Cancellation Of Existing Securities | 93 |
| 17. | Appointment Of Scott L. Baena To Administer Plan | 93 |
| 18. | Distributions Under Plan | 94 |
| 19. | Plan Administrator's Obligations Under Plan | 94 |
| 20. | Securities Law Matters | 94 |
| D. | Distributions Under Plan | 95 |
| 1. | Timing Of Distributions | 95 |
| 2. | Delivery Of Distributions | 95 |
| 3. | Record Date For Distributions | 95 |

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

|  |  | a. | Record Date For Equity Interests | 95 |
|  |  | b. | Record Date For Holders of Claims | 96 |
|  | 4. | | Time Bar To Cash Payments By Check | 96 |
|  | 5. | | Disputed Claims Reserves | 96 |
|  | 6. | | Tax Requirements For Income Generated By Disputed Claims Reserves | 97 |
|  | 7. | | Untimely Claims | 97 |
|  | 8. | | Estimation Of Claims | 97 |
|  | 9. | | Distributions After Effective Date | 97 |
|  | 10. | | Fractional Shares | 98 |
|  | 11. | | Minimum Distributions | 98 |
|  | 12. | | Fractional Cents | 98 |
|  | 13. | | Interest On Claims | 98 |
|  | 14. | | No Distribution In Excess Of Allowed Amount Of Claim | 98 |
|  | 15. | | Setoffs | 98 |
|  | 16. | | Payment Of Taxes On Distributions Received Pursuant To Plan | 99 |
| E. | | | Disputed Claims Under Plan | 99 |
|  | 1. | | Objection Deadline | 99 |
|  | 2. | | Prosecution Of Objections After Effective Date | 99 |
|  | 3. | | No Distributions Pending Allowance | 99 |
|  | 4. | | Withholding Of Allocated Distributions | 99 |
|  | 5. | | Distribution When A Disputed Claim Becomes An Allowed Claim | 100 |
|  | 6. | | All Executory Contracts And Unexpired Leases Rejected If Not Listed On Assumption Schedule | 100 |
|  | 7. | | Assumed Executory Contracts And Unexpired Leases | 100 |
|  | 8. | | Payments Related To Assumption Of Executory Contracts And Unexpired Leases | 101 |
|  | 9. | | Bar Date For Rejection Damages | 101 |
|  | 10. | | Retiree Benefits | 101 |
| F. | | | Conditions Precedent To Confirmation And Occurrence Of Effective Date | 101 |
|  | 1. | | Conditions Precedent To Confirmation Of Plan | 101 |
|  | 2. | | Conditions Precedent To Effective Date Of Plan | 103 |
|  | 3. | | Waiver Of Conditions Precedent | 104 |
|  | 4. | | Effect Of Failure Or Absence Of Waiver Of Conditions Precedent To Effective Date Of Plan | 104 |
| G. | | | Effects Of Plan Confirmation | 104 |
|  | 1. | | Post Effective Date L&H's Authority | 104 |
|  | 2. | | Vesting And Liens | 104 |
|  | 3. | | Injunction | 105 |
|  | 4. | | Release Of Collateral | 105 |
|  | 5. | | Release Of Certain Intercompany Claims | 105 |
|  | 6. | | Avoidance And Recovery Actions | 106 |
|  | 7. | | Exculpation | 106 |

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

|  |  | 8. | Retention Of Jurisdiction | 107 |
|  | H. |  | Miscellaneous Provisions Of Plan | 107 |
|  |  | 1. | Modification Of Plan | 107 |
|  |  | 2. | Role Of Certain Indenture Trustees; Certain Expenses Of Indenture Trustees | 107 |
|  |  | 3. | Further Documents And Action | 108 |
|  |  | 4. | Plan Supplement | 108 |
|  |  | 5. | Plan Controls | 108 |
|  |  | 6. | Reservation Of Rights | 109 |
| VI. |  |  | VOTING REQUIREMENTS | 109 |
|  | A. |  | Voting Deadline | 110 |
|  | B. |  | Holders Of Claims Entitled To Vote | 110 |
|  | C. |  | Vote Required For Acceptance By A Class | 111 |
|  | D. |  | Voting Procedures | 112 |
|  |  | 1. | Ballots | 112 |
|  |  | 2. | Withdrawal Or Change Of Votes On Plan | 113 |
|  |  | 3. | Voting Multiple Claims | 113 |
| VII. |  |  | CONFIRMATION OF PLAN | 114 |
|  | A. |  | Confirmation Hearing | 114 |
|  | B. |  | Deadline To Object To Confirmation | 114 |
|  | C. |  | Requirements For Confirmation Of Plan | 114 |
|  |  | 1. | Requirements Of Section 1129(a) Of Bankruptcy Code | 115 |
|  |  | 2. | Acceptance By Impaired Classes | 117 |
|  |  | 3. | Best Interests Of Creditors | 117 |
|  |  | 4. | Feasibility | 118 |
|  |  | 5. | Requirements Of Section 1129(b) Of Bankruptcy Code | 118 |
|  |  |  | a.   Fair and Equitable | 118 |
|  |  |  | b.   Unfair Discrimination | 119 |
| VIII. |  |  | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 120 |
|  | A. |  | Liquidation Under Chapter 7 | 120 |
|  | B. |  | Alternative Plan Of Reorganization Or Liquidation | 120 |
|  | C. |  | Certain Risk Factors | 121 |
| IX. |  |  | CERTAIN FEDERAL INCOME TAX CONSIDERATIONS | 122 |
|  | A. |  | Consequences to Holders of Impaired Claims | 122 |
|  |  | 1. | Gain Or Loss | 123 |
|  |  | 2. | Withholding | 123 |
| X. |  |  | CONCLUSION AND RECOMMENDATION | 124 |

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

TABLE OF EXHIBITS

| | | |
|---|---|---|
| Exhibit A: | The Plan | |
| Exhibit B: | Asset Allocation Table | [to be added] |
| Exhibit C: | Cash Usage Allocation Table | [to be added] |
| Exhibit D: | Schedule of Belgian Claims | [to be added] |

## I.    DISCLOSURE STATEMENT WITH RESPECT TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' PLAN OF LIQUIDATION FOR L&H NV

### A.    Introduction

The Committee hereby submits this Disclosure Statement, pursuant to section 1125(b) of the Bankruptcy Code, for use in the solicitation of votes on the Plan. This Disclosure Statement sets forth specific information regarding L&H NV's pre-bankruptcy history, significant events that have occurred during the Chapter 11 Case, and the sale or other disposition of the assets of L&H NV. This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, and the manner in which Distributions will be made under the Plan to holders of Claims against L&H NV. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of impaired Claims must follow for their votes to be counted.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISK AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS OR EQUITY INTERESTS, PLEASE *SEE SECTIONS V. ("SUMMARY OF PLAN OF LIQUIDATION FOR L&H NV")AND VIII. ("ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN."* SECTIONS II. THROUGH IV. FOLLOWING THIS INTRODUCTION DISCUSS THE BACKGROUND OF L&H NV'S BUSINESS AND THE CHAPTER 11 CASE.

### B.    Definitions

Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan. A term used but not defined in this Disclosure Statement or the Plan has the meaning given it in the Bankruptcy Code and/or the Federal Rules of Bankruptcy Procedure. Each definition in the Disclosure Statement and in the Plan includes both the singular and the plural, and references in the Disclosure Statement include the masculine and feminine where appropriate. Headings are for convenience of reference and will not affect the meaning or interpretation of the Disclosure Statement.

### C.    Notice To Holders Of Claims

This Disclosure Statement is being transmitted to holders of impaired Claims who will receive Distributions of property under the Plan and thus are entitled to vote to accept or reject the Plan, (b) holders of Claims that are not impaired, who are

18

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

conclusively presumed to have accepted the Plan and hence are not entitled to vote thereon, and (c) holders of Claims who will receive or retain no Distribution under the Plan and, therefore, are presumed to have rejected the Plan and hence are not entitled to vote thereon. The primary purpose of this Disclosure Statement is to provide adequate information to enable you, as the holder of an impaired Claim or Equity Interest, to make a reasonably informed decision with respect to the Plan prior to exercising your right to vote to accept or reject the Plan.

On **[April 2, 2003]**, the Bankruptcy Court entered an order (the "Disclosure Statement Approval Order") approving this Disclosure Statement as containing information of a kind and in sufficient detail to enable impaired Claim holders to make an informed judgment about the Plan. **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

**IF THE BANKRUPTCY COURT CONFIRMS THE PLAN, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN L&H NV, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN WHEREVER LOCATED. THUS, IN PARTICULAR, ALL HOLDERS OF IMPAIRED CLAIMS AGAINST AND EQUITY INTERESTS IN L&H NV ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

This Disclosure Statement contains important information about the Plan, L&H NV's business and operations, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Case. **THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.** No solicitation of votes may be made except pursuant to this Disclosure Statement, and no person has been authorized to use any information concerning L&H NV other than the information contained herein. Other than as explicitly set forth in this Disclosure Statement, you should not rely on any information relating to L&H NV, its Estate, the value of its properties, the nature of its Liabilities, its creditors' Claims, or the value of any securities or instruments issued under the Plan.

**CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.**

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

Except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof. Such events may have a material impact on the information contained in this Disclosure Statement. The Committee does not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement will not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

**EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.**

**THE FACTUAL BACKGROUND INFORMATION CONTAINED HEREIN WAS PROVIDED BY L&H NV IN PREVIOUS DOCUMENTS FILED WITH THE COURT, INCLUDING, BUT NOT LIMITED TO, THE FIRST AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF BANKRUPTCY CODE WITH RESPECT TO FIRST AMENDED PLAN OF LIQUIDATION OF LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. UNDER CHAPTER 11 OF BANKRUPTCY CODE, DATED OCTOBER 16, 2002. THE COMMITTEE HAS NOT INDEPENDENTLY INVESTIGATED OR VERIFIED THE FACTUAL INFORMATION CONTAINED HEREIN.**

**D.    Solicitation Package**

Accompanying this Disclosure Statement are copies of:

1. The Disclosure Statement Approval Order approving this Disclosure Statement and, among other things, setting the voting procedures and scheduling the Confirmation Hearing and the Voting Deadline (as defined herein) for objecting to confirmation of the Plan;

2. The Notice of Confirmation Hearing; and

3. One or more Ballots and a return envelope (provided only to holders of Claims that are entitled to vote on the Plan).

If you did not receive a Ballot in your package and believe that you should have, please contact Donlin, Recano & Company, Inc. (the "Voting Agent"), at 419 Park Avenue South, Suite 1206, New York, New York 10016, Attention: Voting Department, or by telephone at (212) 481-1411.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

E.     **Voting Procedures, Ballots, And Voting Deadline**

    1.    <u>**General Information**</u>

        Under the Bankruptcy Code, certain Classes of creditors are deemed to accept or reject the Plan, and the vote of these Classes will not be solicited. Thus, if a creditor holds Claims included within a Class that is not impaired under the Plan, under Bankruptcy Code section 1126(f), the Creditor is conclusively presumed to have accepted the Plan with respect to such Claims, and its vote of such Claims will not be solicited. Pursuant to the Bankruptcy Code, a class of claims or interests is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are altered, other than by curing defaults and reinstating maturity. The Plan provides that the following Classes of Claims are unimpaired: Classes 1 and 2. Any holder of a Claim in any of these Classes may, however, object to the Plan to contest the Plan's characterization of the creditor's non-impaired status.

        A Claim to which an objection has been filed is not an Allowed Claim unless and until the Bankruptcy Court rules on the objection and allows the Claim. Consequently, although holders of Claims subject to a pending objection may receive Ballots, their votes will not be counted unless the Bankruptcy Court (a) prior to the Voting Deadline rules on the objection and allows the Claim or (b) on proper request by the claimant under Bankruptcy Rule 3018(a), temporarily allows the Claim in an amount which the Bankruptcy Court deems proper for the purpose of voting on the Plan. As set forth in the Notice of Confirmation Hearing, holders of Claims which are the subject of an objection must file motions for purposes of having their Claims temporarily allowed for voting purposes on or before [**May 5, 2003**].

    2.    <u>**Voting On The Plan**</u>

        If a holder of a Claim is classified in a voting Class of Claims under the Plan, such holder's acceptance or rejection of the Plan is important and must be in writing and filed by the Voting Deadline. If Claims are held in more than one Class and entitled to vote in more than one Class, separate Ballots must be used for each Class of Claims. A separate Ballot must be used for each Claim. The holder of more than one Claim classified in a single class of Claims will be entitled to use a single ballot to vote to accept or reject the Plan with respect to all such Claims within the single Class. Each Ballot is color-coded to reflect the Class of Claims it represents. Accordingly, when you vote, you must use only the Ballot or Ballots sent to you (or copies if necessary) with this Disclosure Statement.

        After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, please check the appropriate boxes on the enclosed Ballot to indicate your vote to accept or reject the Plan. **PLEASE COMPLETE AND SIGN YOUR BALLOT(S) (ONLY BALLOTS WITH ORIGINAL SIGNATURES WILL BE ACCEPTED; COPIES OF SIGNATURES WILL NOT BE ACCEPTED) AND RETURN IT IN THE ENCLOSED ENVELOPE SO THAT IT IS <u>RECEIVED</u> BY NO LATER THAN [MAY 19, 2003]**

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

**AT [4:00 P.M.] (NEW YORK TIME) (THE "VOTING DEADLINE").** Copies of Ballots will be accepted, provided that they contain **original** signatures.

**FOR YOUR BALLOT TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT, AND RECEIVED BEFORE THE VOTING DEADLINE BY THE VOTING AGENT.**

If you have any questions about the procedure for voting your Claim or the packet of materials that you received, please contact the Voting Agent at the address indicated above in subsection D hereof. If you have questions about the amount of your Claim, please contact [**insert contact**], or by telephone at [**insert telephone**]. If you wish to obtain additional copies of the Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact Monzack and Monaco, P.A., 1201 Orange Street, Suite 400, Wilmington, Delaware 19801 (Attention: Heidi Sasso) or by electronic mail to hsasso@walmon.com.

### 3.    Confirmation Hearing And Deadline For Objections To Confirmation

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing to commence on **[May 29, 2003 at 10:00 a.m.]** (New York Time), or as soon thereafter as counsel may be heard, before the Honorable Judith H. Wizmur, United States Bankruptcy Judge, at the Mitchell H. Cohen United States Courthouse, 4th and Cooper Streets, Room 2020, Camden, New Jersey 08101. **THE BANKRUPTCY COURT HAS DIRECTED THAT OBJECTIONS, IF ANY, TO CONFIRMATION OF THE PLAN MUST BE IN WRITING AND FILED WITH THE CLERK OF THE BANKRUPTCY COURT AND SERVED SO THAT THEY ARE RECEIVED ON OR BEFORE [May 19, 2003 at 4:00 p.m.] (NEW YORK TIME) BY:**

*Counsel for the Committee:*

> Akin Gump Strauss Hauer & Feld LLP
> 590 Madison Avenue, 20th Floor
> New York, New York 10022
> (212) 872-1000
> Attn:    Ira S. Dizengoff, Esq.
>             James R. Savin, Esq.

> – and –

22

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

Monzack and Monaco, P.A.
1201 Orange Street, Ste. 400
Wilmington, Delaware 19801
(302) 656-8162
Attn: Francis A. Monaco, Jr., Esq.
         Joseph J. Bodnar, Esq.


*Counsel for L&H NV:*

Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000
Attn: Luc A. Despins, Esq.
         Matthew S. Barr, Esq.
         James C. Tecce, Esq.

– and –

Morris, Nichols, Arsht & Tunnell
1201 North Market Street
Wilmington, Delaware 19801
(302) 658-9200
Attn: Robert J. Dehney, Esq.
         Gregory W. Werkheiser, Esq.


*Co-counsel for Artesia Banking Corp. N.V., KBC Bank N.V., Fortis Bank NV and Dresdner Bank Luxembourg S.A.:*

Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, New York 10112
Attn: Howard Seife, Esq.
         N. Theodore Zink, Esq.

- and -

Klett Rooney Lieber & Schorling
The Brandywine Building
1000 West Street, Suite 1410
P.O. Box 1397
Wilmington, Delaware 19899-1397
Attn: Adam Landis, Esq.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

*United States Trustee:*

> The Office of the United States Trustee
> J. Caleb Boggs Federal Building
> 844 King Street, Suite 2313, Lockbox 35
> Wilmington, DE 19801
> Fax:    (302) 573-6497
> Attn: Mark Kenney, Esq.

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

IN THE VIEW OF THE COMMITTEE, THE TREATMENT OF HOLDERS OF CLAIMS UNDER THE PLAN CONTEMPLATES GREATER RECOVERY FOR SUCH HOLDERS THAN WOULD BE AVAILABLE IN A CHAPTER 7 LIQUIDATION. ACCORDINGLY, THE COMMITTEE BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF HOLDERS OF CLAIMS AND, THUS, RECOMMENDS THAT ALL HOLDERS OF IMPAIRED CLAIMS AND EQUITY INTERESTS THAT ARE ENTITLED TO CAST BALLOTS VOTE TO ACCEPT THE PLAN.

## II.    L&H NV'S OPERATIONS PRIOR TO CHAPTER 11 CASE

### A.    Origins & History Of L&H NV

#### 1.    Formation Of L&H NV

L&H NV was formed in Belgium in 1987 by Jo Lernout and Pol Hauspie as a language technology company. L&H NV's mission was to become the world's leading provider of speech, artificial intelligence, and language solutions and services by creating speech user interfaces.

L&H NV Common Stock began trading on the NASDAQ exchange in or about December 1995 and on the EASDAQ in or about June 1997. After 1996, L&H NV began expanding its businesses through acquisitions and internal development. In 1999 and 2000, L&H NV undertook a bold acquisition initiative, completing various acquisitions to complement its existing technology portfolio. During this period, L&H NV acquired Dictaphone and Dragon Systems, Inc. ("Dragon") (n/k/a L&H Holdings). *See Section II.A.4. ("L&H NV's Operations Prior To Chapter 11 Case. Origins And History Of L&H NV. Aquisition Program")*

At its height during the spring of 2000, L&H NV Common Stock had a market capitalization of in excess of $8 billion. When the NASDAQ suspended trading of L&H NV Common Stock in November 2000, L&H NV had a market capitalization of approximately $890 million.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

2.    **Corporate Structure**

Prior to the Chapter 11 Case, L&H NV was affiliated with approximately seventy (70) separate corporations which conducted business in various countries, including the United States, Belgium, France, Korea, Brazil, Italy, Ireland, Portugal, Spain, Sweden, Finland, Germany, Singapore and Australia, either directly, through its subsidiaries or through enterprises in which L&H NV had an ownership interest. Generally, the corporate structure of L&H NV and its various U.S. subsidiaries could be summarized as follows (as of the Petition Date):

[A Corporate Structure Diagram Appears on the Following Page]

*Has Not Been Approved By Court/Not For Solicitation*

## L&H NV & Its Principal United States Subsidiaries



*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

3.    **Business Units And Product Offerings**

L&H NV was a leader in the development and license of advanced speech and language technologies, products and services. Specifically, L&H NV and its affiliates (including L&H Holdings):

(1)    had the largest technology portfolio of all companies active in the development of speech and language technology;

(2)    were market leaders that held a market share of 60% of the synthetic text-to-text speech and language technology sector;

(3)    were global leaders in the market of document creation systems (dictating software), having held a market share of approximately 50% in its product group (*Dragon Naturally Speaking*™); and

(4)    had a large and high-standing client portfolio of license buyers, including the leading telecommunication and information technology companies.

Shortly after the Dictaphone and Dragon acquisitions, L&H NV (and the L&H Group) were organized into three (3) primary business units: (1) Mendez S.A. ("Mendez"), a stand-alone business focusing on globalization and Internet translation; (2) healthcare solutions, consisting of Dictaphone's healthcare dictation platform group (the Dictaphone Healthcare Solutions Group), L&H NV's medical transcription business (the "Medical Transcription Business"), and L&H NV's and L&H Holdings' *Powerscribe*® medical dictation/transcription software business; and (3) speech and language technologies, consisting of the balance of the language technologies business worldwide (the "Speech And Language Technologies Business"). Dictaphone also had an additional business unit, the Dictaphone Communications Recording Systems Group.

Through 2001, each of the primary business units were sold, specifically Mendez S.A. in August 2001; Medical Transcription in September 2001; and the Speech And Language Technologies Business in December 2001 and March 2002. *See Section IV.E. ("Chapter 11 Case. Significant Asset Sales")*. These business units often straddled the various legal entities, and the following chart provides an illustration of how the business units related to the various legal entities (as of the Petition Date):

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

## Business Units By Legal Entity



*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

### a.    Speech And Language Technologies Business

The Speech And Language Technologies Business developed, licensed and provided conversational user interface technologies, systems and products. Immediately prior to its sale, a staff of approximately five hundred (500) employees worked within this business unit, including almost three hundred (300) research and development engineers. In mid-2001, the Speech And Language Technologies Business was identified by both L&H Holdings and L&H NV as a business unit to be sold. *See Section IV.E.4. ("Chapter 11 Case. Significant Asset Sales. Sale Of Speech And Language Technologies Business")*

#### i.    Customers

The Speech And Language Technologies Business' customers included enterprises aiming to increase employee efficiency and productivity with speech-enabling functions such as document creation, electronic mail and other mobile communications services. The business developed a broad customer base including: automotive original equipment manufacturers, telecommunications services providers, Internet content providers and individual consumers. Specific customers included some of the world's leading technology and telecommunications companies: Alcatel SA, AOL Time Warner, British Telecom, Cisco Systems, Delphi Automotive, Deutsche Telekom, Fujitsu Ltd., Lucent Technologies, Microsoft Corporation and Sony Corp.

#### ii.    Product Offerings

Product offerings were designed around certain core technologies, including:

(1)    Text-To-Speech:  technology which reads, analyzes and converts computer based text in a variety of languages into a natural-sounding, intelligible voice;

(2)    Automatic Speech Recognition:  a process by which the words in spoken input are identified (with multilingual capability);

(3)    Speaker Verification:  a process by which personal identity is confirmed by verifying the biometrics of a voice;

(4)    Intelligent Content Management:  technology which manages multi-lingual information and automates a sophisticated search and retrieval processes capable of conducting enhanced searches, document summarization and topic extraction;

(5)    Speech Coding And Enhancement:  a process by which speech is compressed for more efficient transmission and/or storage; and

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

(6)    Dialog: a technology which creates a conversational system using the above components capable of interacting with users with natural language in order to solve specific tasks.

Depending on a particular customer's technological capabilities and needs, product offerings ranged from the licensing of speech and language technology based software development kits ("SDKs") to the sale of comprehensive, complete voice solutions. SDKs packaged each of the technologies into individual products that could be delivered directly to developers for integration into their applications and devices. Developer support and training services were provided in conjunction with the SDKs. There were over thirty-three (33) SDK offerings with deployments covering eighteen (18) languages. Examples included *L&H™ Real Speak™* and *Dragon Naturally Speaking™*.

Solution components were built around one or more SDKs. Solution components implemented more of the functionality of the target application but still required additional development or integration with other products to become a complete solution. Examples included (1) Document Creation Systems (using *Dragon Naturally Speaking™* which enabled a user to dictate text into any Windows® based program as well as to issue commands by voice); (2) AudioMining™ Systems (using *L&H MediaIndexer* - enabled end users to both digitize their media and create searchable indexes of the spoken content of that media or to search, locate and replay indexed media), and (3) Conversational User Interface Systems (products focused on interfaces that allow automobile drivers to access information delivered by computing devices within the car). *See Section IV.E.4. ("Chapter 11 Case. Significant Asset Sales. Sale Of Speech And Language Technologies Business")*.

**b.    Mendez S.A.**

Mendez is not a debtor in the Chapter 11 Case. As of the Petition Date, Mendez (f/k/a Lernout & Hauspie Speech and Language Consulting Services N.V.) was a wholly-owned subsidiary of L&H NV. At that time, Mendez employed over nine-hundred-fifty (950) full-time employees worldwide. Mendez offered document creation, localization and translation services (both human and machine) in all of the world's most widely used languages. Products included: (i) product translation and localization; (ii) Internet and electronic commerce globalization; (iii) translation of internal/external communications, and (iv) on-line translation. Early in the Chapter 11 Case, L&H NV determined that Mendez S.A. was a non-core asset and engaged in a marketing initiative to sell Mendez S.A. *See Section IV.E.1. ("Chapter 11 Case. Significant Asset Sales. Sale of Mendez S.A.")*.

**c.    Medical Transcription Services**

L&H NV operated the Medical Transcription Business through various direct and indirect non-debtor subsidiaries, including L&H Medical Solutions Holdings, Inc., providing outsourced transcription services to customers requiring complete third-party transcription, or management of overflow work during peak periods. Customers included approximately three-hundred (300) hospitals, clinics and independent group practices primarily in the United States.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

Medical transcription is the process of converting into written form medical information, i.e., patient history, physical examination notes, procedure reports, radiology reports, hospital discharge summaries or emergency department encounter reports that have been dictated by a physician or other healthcare professional. These recordings are subsequently transcribed by medical linguistics specialists (transcriptionists) who are familiar with the terminology and procedures of one or more medical specialties. After being transcribed, the dictated medical records are delivered to the customer location to be reviewed and approved by the healthcare professional and incorporated into the patient's medical records. In mid-2001, the Medical Transcription Business also was identified by the L&H NV as a business to be sold. *See Section IV.E.3. ("Chapter 11 Case. Significant Asset Sales. Sale Of Medical Transcription Business").*

4.    **Acquisition Program**

The pursuit of its objective to become the world's leading provider of speech, artificial intelligence, and language solutions and services led the L&H NV to undertake a wave of acquisitions. By the spring of 2000, valuations for technology stocks had reached an all-time high. L&H NV Common Stock, which was listed on the NASDAQ exchange, also reached an all time high, reflecting a market capitalization of in excess of $8 billion. This capitalization allowed L&H NV to finance its acquisitions by using L&H NV Common Stock as its primary source of consideration. L&H NV was able to acquire two significant United States-based businesses, Dictaphone (May 2000) and Dragon (June 2000), by using L&H NV Common Stock as consideration.

a.    **Acquisition Of Dictaphone**

On May 5, 2000, L&H NV acquired Dictaphone from Stonington Partners, Inc., Stonington Holdings L.L.C. and Stonington Capital Appreciation Fund 1994, L.P. (the "Stonington Entities") for consideration of stock and cash and the assumption of debt pursuant to the Agreement And Plan Of Merger Among Lernout & Hauspie Speech Products N.V., Dark Acquisition Corp. And Dictaphone Corporation, dated March 7, 2000 (the "Dictaphone Merger Agreement"). As of the Petition Date, Dictaphone was a wholly-owned subsidiary of L&H NV. In connection with the merger, L&H NV issued a total of approximately 9.4 million shares of L&H NV Common Stock in exchange for all of the outstanding shares of Dictaphone Common Stock. At the time of the transaction, the market value of the L&H NV Common Stock provided for Dictaphone was approximately $465 million. L&H NV also assumed or refinanced approximately $208.6 million worth of Dictaphone debt obligations as part of the Dictaphone acquisition. *See Section II.A.5.a. ("L&H NV's Operation Prior To Chapter 11 Case. Origins And History Of L&H NV. Pre-Petition Obligations And Capital Structure. Belgian Credit Facility").*

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

**b.**   **Acquisition Of Dragon**

On June 7, 2000, L&H NV acquired Dragon through its merger into one of L&H NV's wholly-owned subsidiaries, L&H Holdings, pursuant to the terms of the Agreement And Plan Of Merger dated as of March 27, 2000, by and among L&H NV, L&H Holdings USA, Inc., Dragon Systems, Inc. and the principal stockholders of Dragon Systems, Inc. (the "Dragon Merger Agreement"). In connection with the merger, L&H NV issued approximately 10.1 million shares of L&H NV Common Stock to the Dragon stockholders in exchange for all of the outstanding shares of Dragon. At the time of the transaction, the market value of the L&H NV Common Stock provided to the Dragon selling shareholders was approximately $540 million. In addition, L&H NV converted all outstanding Dragon stock options into options to acquire approximately 1.65 million shares of L&H NV Common Stock.

**c.**   **Additional Acquisitions**

Between 1996 and 2000, L&H NV consummated additional acquisitions (including stock acquisitions and asset acquisitions) of various language development companies (or certain of their assets), including:

- Brussels Translation Group N.V., a provider of translation solutions relating to specific languages designed for Internet use, in June 1999, for approximately $42 million in cash and the assumption of $17 million of debt;

- Articulate Systems Division of Fonix Corporation (certain assets), including Fonix's continuous dictation and recording business and its *Powerscribe*® technology, in September 1999, for approximately $24 million in cash, with an additional $4 million earnout to be paid over two (2) years based on performance;

- Rodeer Systems, Inc., a medical transcription business, in November 1999, for approximately $6.4 million in cash;

- OmniMed Transcription, Inc. and Linguistic Technologies, Inc., both medical transcription companies, in January 2000, for a total of approximately $38.6 million, with a potential $4.8 million payable should certain performance criteria be met;

- Elan Informatique S.A., a text-to-speech technology provider, in February 2000, for approximately $5.1 million in cash plus an addition $8 million payout to the former shareholders if certain performance criteria are met; and

- Interactive Systems, Inc., a speech and language technology development company specializing in natural language understanding, in April 2000, for approximately $8.9 million in cash, with a $4 million earnout over two (2) years if certain performance criteria are met.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

5.    **Pre-Petition Obligations And Capital Structure**

Prior to the Petition Date, L&H NV was party to certain public debt issues and to certain credit facilities, described more fully below.

a.    **Belgian Credit Facility**

On or about May 5, 2000, in a stock-for-stock transaction, L&H NV acquired Dictaphone from the Stonington Entities through a merger of Dictaphone into one of L&H NV's wholly-owned subsidiaries, Dark Acquisition Corp. In conjunction with its acquisition of Dictaphone, L&H NV also assumed or refinanced approximately $208.6 million worth of Dictaphone debt obligations. *See Section II.A.4. ("L&H NV's Operations Prior To Chapter 11 Case. Origins And History Of L&H NV. Acquisition Program. Acquisition Of Dictaphone")* In this regard, L&H NV entered into the $430 Million Revolving Credit Facility Between Lernout & Hauspie Speech Products N.V. (Borrower) And Fortis Bank N.V. And KBC Bank NV (Lead Arrangers And Banks) And Artesia Banking Corporation N.V., Deutsche Bank N.V. And Dresdner Bank Luxembourg S.A. (Joint Arrangers And Banks) And Artesia Banking Corporation N.V. (A-Agent) And KBC Bank NV (B-Agent) (collectively, the "Lenders"), dated May 2, 2000 (the "Belgian Credit Facility"). It was a condition of the Belgian Credit Facility that L&H NV cause Dictaphone to issue, within thirty (30) days of the closing of the Belgian Credit Facility, an unsecured guarantee for the benefit of the Lenders. This condition was satisfied on May 30, 2000. *See Section II.5.b. ("L&H NV's Operations Prior To Chapter 11 Case. Origins And History Of L&H NV. Pre-Petition Obligations And Capital Structure. Dictaphone Guaranty")*.

Under the terms of the Belgian Credit Facility, the Lenders provided L&H NV with two (2) Tranches: (a) a short-term, committed revolving credit facility for an initial amount of $200 million due on March 31, 2001, which bears interest at the London Inter-Bank Offer Rate ("LIBOR") plus 100 basis points (or 1%) and (b) a long term, committed revolving credit facility for an initial amount of $230 million, with a five (5) year declining balance, which bears interest at LIBOR plus 175 basis points (or 1.75%). As of the Petition Date, the amount outstanding under the Belgian Credit Facility was approximately $340 million.

L&H NV has informed the Committee of L&H NV's belief that no collateral secures amounts due under the Belgian Credit Facility. One of the Lenders (Artesia Banking Corporation N.V. ("Artesia")) has taken the position that amounts owed to it (but not the other members) under the Belgian Credit Facility are secured by assets of L&H NV in Belgium. *See Section IV.F.2. ("Chapter 11 Case. Summary Of Material Litigation And Related Events. Artesia")*. Since the Plan only proposes to distribute the Chapter 11 Assets (assets that are not Belgian assets), the Committee does not believe that Artesia's alleged security interest impacts the amount of assets to be distributed to Creditors under the Plan.

L&H NV used a portion of the funds advanced under the Belgian Credit Facility to make a capital contribution to LHCCC (as defined below), a wholly-owned subsidiary of

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

L&H NV. LHCCC initially advanced to Dictaphone $167 million to enable Dictaphone to pay its existing bank debt and to satisfy obligations in connection with the acquisition. Thereafter, L&H NV advanced, among other sums, approximately $41.6 million to Dictaphone through LHCCC to enable Dictaphone to redeem an equivalent principal amount of the Dictaphone Corporation 11¾% Senior Subordinated Notes due 2005 (the "Dictaphone Senior Subordinated Notes") that were tendered to Dictaphone pursuant to the change of control provision of the Indenture, dated as of August 1, 1995, among State Street Bank & Trust Company (successor to Shawmut Bank Connecticut, National Association) (Trustee), Dictaphone Acquisition, Inc. (Issuer) and Dictaphone U.S. Acquisition, Inc. (Guarantor to be merged with and into Dictaphone) (the "Dictaphone Indenture"). ***See Section II.A.5.c. ("L&H NV's Operations Prior To Chapter 11 Case. Origins And History Of L&H NV. PrePetition Obligations And Capital Structure. LHCCC Loan Agreement")***

As of the Petition Date, approximately $164,527,000.00 (including accrued interest) was due on account of the Dictaphone Senior Subordinated Notes that still were outstanding, including $16 million (principal amount) held by a wholly-owned subsidiary of L&H NV, Light Acquisition Corporation. The Dictaphone Senior Subordinated Notes held by Light Acquisition Corporation were acquired in open market purchases in August 2000 at a price of 101% of par value. Light Acquisition Corporation received the same distribution as the holders of the Dictaphone Senior Subordinated Notes in connection with the Dictaphone Plan.

  **b.**   **Dictaphone Guaranty**

As a condition subsequent to the Lenders' obligations under the Belgian Credit Facility, L&H NV was required to cause Dictaphone to guarantee the performance of L&H NV's obligations under the Belgian Credit Facility. In conjunction with this obligation, on or about May 30, 2000, Dictaphone executed the Limited Guaranty (the "Dictaphone Guaranty"). The Dictaphone Guaranty provides that, among other things, Dictaphone unconditionally and absolutely guarantees all obligations of L&H NV under the Belgian Credit Facility up to an amount not to exceed:

   (i)   $167 million (plus interest accruing thereon under the Belgian Credit Facility) plus

   (ii)   the "Indenture Amount," defined as the total outstanding balance of advances received by L&H NV under the Belgian Credit Facility which L&H NV advances to Dictaphone to enable Dictaphone to satisfy its obligations ($200 million principal, plus interest and any applicable premium, charges and fees) under the following: (i) the Dictaphone Senior Subordinated Notes and (ii) the Dictaphone Indenture.

On November 8, 2000, Dictaphone executed the Amended And Restated Limited Guarantee (the "Amended Dictaphone Guaranty"), which replaced in its entirety the Dictaphone Guaranty. Under the terms of the Amended Dictaphone Guaranty, among other things, the dollar amount of Dictaphone's guarantee of L&H NV's obligations under the Belgian Credit Facility

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

increased to approximately $208.6 million to reflect additional drawings under the Belgian Credit Facility that were advanced to Dictaphone to enable it to redeem approximately $41.6 million of the Dictaphone Senior Subordinated Notes.

### c.    LHCCC Loan Agreement

The Belgian Credit Facility required L&H NV to use a portion of the first advance to satisfy, among other things, the obligations of Dictaphone under the Credit Agreement, dated as of August 7, 1995, among Dictaphone, Bankers Trust Company and certain other parties thereto (the "First Bankers Trust Credit Agreement"), and the Credit Agreement, dated as of November 14, 1997, among Dictaphone, Bankers Trust Company and certain other parties thereto (the "Second Bankers Trust Credit Agreement," and, with the First BT Credit Agreement, the "Bankers Trust Credit Agreements"). Dictaphone entered into the Loan Agreement, dated as of May 5, 2000, between Dictaphone, as borrower, and L&H Coordination Centre C.V.B.A. ("LHCCC"), a subsidiary of L&H NV, as lender, pursuant to which LHCCC advanced $173 million to Dictaphone (the "LHCCC Loan Agreement").

On or about May 8, 2000, Dictaphone satisfied its obligations under the Bankers Trust Credit Agreements which, at that time, totaled approximately $167.5 million. L&H NV advanced funds to LHCCC from the Belgian Credit Facility for this purpose, which, in turn, advanced the funds to Dictaphone.

On or about November 20, 2000, the LHCCC Loan Agreement was amended and restated in its entirety (the "Amended And Restated LHCCC Loan Agreement"). Under the Amended And Restated LHCCC Loan Agreement, payments made by Dictaphone to the Lenders under the Dictaphone Guaranty would reduce dollar-for-dollar Dictaphone's obligations to LHCCC under the Amended And Restated LHCCC Loan Agreement. The Amended And Restated LHCCC Loan Agreement also provided that at any such time as Dictaphone was required to make any payment to LHCCC thereunder, Dictaphone was only obligated to make such payment if, simultaneous with Dictaphone's payment to LHCCC, Dictaphone's obligations under the Dictaphone Guaranty were reduced by an amount equal to the payment that Dictaphone was required to make to LHCCC. The Amended And Restated LHCCC Loan Agreement also extended the date upon which the first interest payment under the LHCCC Loan was due from November 5, 2000 to May 5, 2001, a six (6) month extension.

### d.    Indentures

### i.    Old Convertible Subordinated Notes

L&H NV is party to the Indenture dated as of November 20, 1996, between L&H NV and United States Trust Company Of New York (as trustee) relating to 8% Convertible Subordinated Notes Due 2001 (the "Old Convertible Subordinated Notes"). The Old Convertible Subordinated Notes are in an aggregate principal amount not to exceed $31,050,000.00. As of the Petition Date, approximately $4 million in principal amount of the Old Convertible Subordinated Notes were outstanding. The Old Convertible Subordinated Notes are unsecured

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

and are convertible into shares of L&H NV Common Stock. L&H NV has informed the Committee that L&H NV believes that all of the Old Convertible Subordinated Notes are held by companies controlled by Mr. Jo Lernout and Mr. Pol Hauspie. Moreover, amounts outstanding under the Old Convertible Subordinated Notes are subordinated in the right of payment to all indebtedness of L&H NV, including the indebtedness owed by L&H NV to the Lenders.

<div align="center">

ii.    **Convertible Junior**
       <u>**Subordinated Debentures And "PIERS"**</u>

</div>

L&H NV is party to the Multiple Series Indenture, dated as of May 27, 1998, with Wilmington Trust Company (as trustee) (the "<u>L&H NV Multiple Series Indenture</u>"). The L&H NV Multiple Series Indenture called for the issuance of L&H NV's securities from time to time in one or more series as might be determined by L&H NV in an unlimited aggregate principal amount. On the same date, L&H NV entered into the First Supplemental Indenture between L&H NV and Wilmington Trust Company (as trustee) (the "<u>L&H NV First Supplemental Indenture</u>") which, pursuant to the terms of the L&H NV Multiple Series Indenture, L&H NV provided for the establishment of 4.75% Convertible Junior Subordinated Debentures due 2008 (the "<u>L&H NV Convertible Junior Subordinated Debentures</u>"), limited in the aggregate principal amount up to $160,824,750.00. As of the Petition Date, $115 million of the L&H NV Convertible Junior Subordinated Debentures were outstanding. Amounts due under the L&H NV Convertible Junior Subordinated Debentures are subordinated in right of payment to all indebtedness of L&H NV.

The L&H NV First Supplemental Indenture also provides that L&H Capital Trust I ("<u>L&H Capital Trust</u>") will issue up to $156 million aggregate liquidation amount of its 4.75% Preferred Income Equity Securities (the "<u>PIERS</u>") and up to $4,824,750.00 aggregate liquidation amount of its 4.75% Common Securities (the "<u>Trust Common Securities</u>," and, together with the PIERS, the "<u>Trust Securities</u>"), representing undivided beneficial ownership interests in the assets of the L&H Capital Trust. The L&H Capital Trust issued the PIERS on May 27, 1998 and June 4, 1998 in a registered offering. The L&H NV First Supplemental Indenture also provides that the L&H Capital Trust will purchase the L&H NV Convertible Junior Subordinated Debentures in an aggregate principal amount equal to the aggregate liquidation amount of the Trust Securities issued. Furthermore, L&H NV guaranteed certain payments relating to the Trust Securities pursuant to the Guarantee Agreement (the "<u>Trust Securities Guarantee</u>"), dated as of May 27, 1998, among L&H NV and Wilmington Trust Company for the benefit of Holders (as defined therein) of Trust Securities of the L&H Capital Trust.

The PIERS are convertible into shares of L&H NV Common Stock. The L&H Capital Trust was established pursuant to the Declaration of Trust dated May 20, 1998 (the "<u>Original Declaration</u>") and Certificate of Trust filed with the Secretary of State of the State of Delaware on May 20, 1998, as amended and restated by the Amended And Restated Declaration Of Trust dated as of May 27, 1998 by and among L&H NV, Carl Dammekens, Gaston Bastiaens and Patrick De Schrijver as initial Regular Trustees (as defined in the Original Declaration), Wilmington Trust Company, as the initial Property Trustee (as defined in the Original

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

Declaration), and Wilmington Trust Company, as the initial Delaware Trustee (as defined in the Original Declaration).

## B.    Officers And Directors

In August 2000, shortly after the publication of an article in The Wall Street Journal regarding accounting discrepancies, L&H NV began to make changes in its senior management. For example, on August 25, 2000, it was announced that Mr. John H. Duerden, former Chairman and Chief Executive Officer of Dictaphone, and then current President and Chief Executive Officer of the Dictaphone Health Care Solutions Group, would replace Mr. Gaston Bastiaens as Chief Executive Officer. On or about January 16, 2001, Mr. Duerden was terminated as President and Chief Executive Officer of the L&H Group and, shortly thereafter on January 25, 2001, resigned as a member of the Board of Directors.

On November 22, 2000, L&H NV announced the immediate resignations of three (3) members of its Board of Directors: Mr. Pol Hauspie, former Co-Chairman of the Board Of Directors and Managing Director, Mr. Nico Willaert, former Managing Director and Mr. Gaston Bastiaens, former Chief Executive Officer and President. On the same date, Mr. Joo Chul (John) Seo was suspended as president, general manager and a member of the Board Of Directors of L&H Korea. The resignations occurred after the Board Of Directors unanimously voted to accept the recommendations of the Audit Committee (as defined below) regarding the controversy surrounding L&H NV's financial statements. *See Section III.C. ("Events Leading To Commencement Of Chapter 11 Case. Audit Committee Investigation")*In accordance with the Audit Committee's report, the Board of Directors also requested that Mr. Jo Lernout resign as Managing Director of L&H NV on or about November 9, 2000. Mr. Lernout ultimately resigned as a director of L&H NV on January 16, 2001.

Ultimately, Mr. Lernout, Mr. Hauspie, Mr. Willaert and Mr. Bastiaens were arrested by the Belgian authorities on various charges, including, fraud, insider trading, stock manipulation and accounting violations. Mr. Lernout, Mr. Hauspie and Mr. Willaert were arrested in Belgium and taken into custody on or about April 27, 2001, but released after posting bail on or about July 4, 2001. Mr. Bastiaens was arrested in Massachusetts on or about May 26, 2001 but was extradited to Belgium and taken into custody on or about June 20, 2001, Mr. Bastiaens has since been released after posting bail.

L&H NV appointed various new officers and directors during the Chapter 11 Case, including a new Chief Executive Officer, Mr. Philippe Bodson, and a new General Counsel, Mr. Thomas Denys, on January 16, 2001, replacing Mr. Duerden and Daniel P. Hart, Esq., respectively. Mr. Bodson and Mr. Denys served as Chief Executive Officer and General Counsel, respectively, until October 2001, at which point the liquidating case of L&H NV was commenced in Belgium, which is subject to oversight by the Curators. *See Section IV.A.2 ("Chapter 11 Case. Commencement. Belgian Case")* The L&H Group also appointed a new Chief Financial Officer on April 10, 2001, Mr. Tim Ledwick.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

Numerous changes to the composition of the Board of Directors occurred during the pendency of the Chapter 11 Case: Mr. Francis Vanderhoydonck (May 10, 2001); Mr. Hubert Detremmerie (May 8, 2001), Mr. Alex Vieux (April 26, 2001); Mr. Gerard Van Acker (January 25, 2001); Mr. Roel Pieper (January 22, 2001) and Mr. Bernard Vergnes (January 9, 2001), all resigned their positions on the dates indicated next to their names. In addition, Mr. Etienne Davignon, who was appointed to the Board on May 15, 2001, resigned shortly thereafter on June 6, 2001 to avoid any appearances that his directorship of Fortis Group (the parent company of Fortis Bank N.V., one of the Lenders), could influence his decisions as a director of L&H NV.

As a result of the election of directors that took place during the annual meeting of shareholders of L&H NV on June 29, 2001, the board of directors of L&H NV was composed of Mr. Philippe Bodson, Mr. Dirk Cauwelier, Mr. Erwin Vandendriessche and Mr. Marc G.H. De Pauw. These members served until approximately October 2001, at which point the Curators were appointed to oversee the liquidating case of L&H NV in Belgium. At present, L&H NV has neither a Chief Executive Officer nor a Board of Directors. L&H NV remains under the supervision and control of the Curators.

## III.    EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASE

Until early 2000, on the heels of its bold acquisition initiatives, and with its Common Stock trading at an all-time high, L&H NV and the L&H Group continued to operate as a leader in the development and license of advance speech and language technologies, products, and services. Beginning in August 2000, however, L&H NV became mired in controversy and litigation, which ultimately compelled L&H NV (and the other members of the L&H Group) to seek chapter 11 protection.

### A.    Accounting Irregularities And Decline In Value Of L&H NV Stock

As mentioned above, on August 8, 2000, an article appeared in The Wall Street Journal raising issues regarding the integrity of L&H NV's financial statements, focusing specifically on business and accounting practices at L&H NV's Korean subsidiary, L&H Korea. The article (and various articles that followed) questioned the legitimacy of transactions recorded by L&H Korea and L&H NV's financial statements involving millions of dollars. The allegations of accounting discrepancies, among other things, caused the price of L&H NV's stock to plummet.

### B.    SEC Investigation

On August 31, 2000, the Securities And Exchange Commission (the "SEC") issued the Order Directing Private Investigation And Designating Officers To Take Testimony, signaling the commencement of a formal SEC investigation. The SEC investigation intended to examine certain accounting and other practices and, as of October 1, 2002, was still ongoing. On October 10, 2002, the SEC filed a civil injunctive action against L&H NV relating to the investigation. On November 22, 2002, the SEC and L&H NV entered into a settlement relating the SEC investigation. The settlement provides for L&H NV, without admitting or denying the

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

allegations set forth in the SEC's complaint, to consent to the entry of an order (i) enjoining L&H NV from any future violations of securities statutes, (ii) prohibiting L&H NV from making any public statements directly or indirectly denying the allegation made by the SEC in its complaint and (iii) revoking the registration of L&H NV's common stock. *See Section IV.F.6. ("Chapter 11 Case. Summary Of Material Litigation And Related Events. SEC Investigation").*

## C.    Audit Committee Investigation

On September 20, 2000, the board of directors of L&H NV authorized its audit committee (the "Audit Committee") to conduct such inquiries as it deemed appropriate into certain accounting and other practices that were the subject of both the formal SEC investigation and certain shareholder litigation commenced on account of the August 8, 2000 Wall Street Journal article, *see Sections III.A. ("Events Leading To Chapter 11 Case. Accounting Irregularities And Decline In Value Of L&H NV Common Stock") and II.B. ("L&H NV's Operations Prior To Chapter 11 Case. Officers AndDirectors").* The Audit Committee retained Bryan Cave LLP and Loeff Claeys Verbeke (collectively, "Audit Committee Counsel") to conduct an investigation, to provide legal advice in connection with these matters, and to examine L&H NV's compliance with United States securities laws. Audit Committee Counsel engaged the accounting firm of Arthur Andersen LLP ("AA" or the "Audit Committee Consultant") to provide assistance with the investigation.

On November 20, 2000, Audit Committee Counsel delivered its Findings And Recommendations to the Audit Committee (the "Audit Committee Report"). Audit Committee Counsel identified transactions and issues for review based on the issues raised by the SEC and KPMG (as defined below) and in the press, as well as from aged receivable schedules. Audit Committee Counsel focused principally on transactions generating revenue in 1998 and 1999. The investigation identified some transactions as to which revenue should never have been recorded and some transactions as to which revenue was recorded earlier than it should have been. The problems identified in Belgium included, but were not limited to: the backdating of contracts, a promise to deliver an additional language translation option at no extra charge "when and if available," and an understanding that the cost of certain options would be reimbursed through a subsequent arrangement. The problematic practices found in Burlington, Massachusetts included, but were not limited to: barter transactions, rights to return products, transactions where the customers' ability to pay depended on the receipt of an investment from L&H NV, and the separation of one agreement into two contracts – a license agreement and a development agreement – so that more revenue could be booked in an earlier quarter than might otherwise have been.

Also, in Belgium, there was an issue of concern with respect to the language development companies ("LDCs") involving the fundamental nature of the transactions and the accounting that should be applied to such transactions. Based on the evidence it reviewed, Audit Committee Counsel believed that the funded research and development approach was the most appropriate accounting treatment. Audit Committee Counsel attempted to identify the investors in the language development companies to determine whether or not they were related parties.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

At the time of the Audit Committee Report, Audit Committee Counsel was unable to reach any conclusions with respect to the issues in Korea and recommended that the entire matter be referred to the authorities for further investigation. *See Section IV.G. ("Chapter 11 Case. L&H Korea– Investigation Of Fraud")* The Audit Committee Report did conclude that L&H NV's financial statements for the periods 1998, 1999 and the first two quarters of 2000 should be restated, and that L&H NV and its auditors must determine the actual adjustments to be recorded. Audit Committee Counsel recommended many remedial measures, including disciplinary action against certain officers and directors and improved internal controls. *See Sections II.B. ("L&H NV's Operations Prior To Chapter 11 Case. Officers And Directors"); III.D. ("Events Leading To Commencement Of Chapter 11 Case. Withdrawal Of KPMG Auditor Reports") and IV.H. ("Chapter 11 Case. Restatement Of Financial Statements")*

**D.  Withdrawal Of KPMG Auditor Reports**

On or about November 15, 2000, KPMG Bedrijfsrevisoren ("KPMG"), L&H NV's independent auditor, announced that it had determined that L&H NV's auditor's reports relating to each of L&H NV's financial statements for 1998 and 1999 should no longer be relied upon. On or about April 12, 2001, KPMG issued the Report Of The Civil Co-Operative Company With Limited Liability KPMG Auditors As Ordered By The Court Of Commerce Of Ieper (B) By Judgment On January 5, 2001 -- Lernout & Hauspie Speech Products N.V. (the "KPMG Report"). The KPMG Report was prepared at the request of the Belgian Court and examines certain matters relating to L&H NV's financial statements for the fiscal years 1998, 1999 and the first half of 2000. KPMG ultimately was named as a defendant in a series of securities lawsuits relating to its certification of various financial reports filed by L&H NV. These suits were filed by, among others, the Stonington Entities and the Bakers in the United States District Court for the District of Delaware.

**E.  Lenders Accelerate Loan Obligations**

Amidst the controversy surrounding the accounting irregularities, the L&H Group commenced negotiations with the Lenders regarding potential defaults under the Belgian Credit Facility. On November 27, 2000, the Lenders declared an event of default under the Belgian Credit Facility and accelerated the amounts outstanding thereunder (approximately $350 million at that time, prior to the setoff of L&H NV funds held by the Lenders). The Lenders also accelerated Dictaphone's obligations under the Amended Dictaphone Guaranty of the Belgian Credit Facility on November 27, 2000. Simultaneously, Deutsche Bank AG New York Branch and/or Cayman Islands Branch accelerated Dictaphone's obligations under the Deutsche Bank Facility.

**F.  L&H NV Besieged By Litigation**

Shortly prior to the Petition Date, L&H NV was besieged by litigation pending in various courts within the United States.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

### 1.    Former Directors And Officers Lawsuits

#### a.    Class Action Lawsuits

Prior to the Petition Date, two groups of lawsuits were initiated against L&H NV and certain of its current and former officers and directors. In January 2000, a complaint was filed in a consolidated purported class action lawsuit in the United States District Court for the District of Massachusetts (the "Massachusetts District Court") ("Lernout Class Action I"). Through April 1999, additional complaints were filed relating to the same disputes until the cases were consolidated. In Lernout Class Action I, the consolidated, amended class action complaint alleged that L&H NV, Mr. Jo Lernout, Mr. Pol Hauspie, Mr. Gaston Bastiaens and Mr. Carl Dammekens (the Lernout I Class Action Defendants) made material, false and misleading statements, in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, concerning L&H NV's accounting for its in-process research and developments charges in connection with a certain acquisition by L&H NV.

A second consolidated purported class action also was filed in the Massachusetts District Court ("Lernout Class Action II"). Lernout Class Action II was initiated after The Wall Street Journal article appeared on August 8, 2000 questioning L&H NV's reported revenues from one of its Korean subsidiaries. The next day, various plaintiffs began filing purported class action lawsuits alleging violations of the United States securities laws in the Massachusetts District Court and in the United States District Court for the Eastern District of Pennsylvania. Ultimately, fifteen (15) virtually identical complaints were filed alleging, among other things, violations of United States' securities laws in connection with the L&H NV's reported revenues and/or financial statements. In November 2000, all of the lawsuits filed in the United States District Court for the Eastern District of Pennsylvania were transferred to the Massachusetts District Court, and the lawsuits ultimately were consolidated.

#### b.    Rocker Management

On or about December 7, 2000, Rocker Management, L.L.C., Rocker Offshore Management Company, Inc., Rocker Partners, L.P. and Compass Holdings Ltd. (collectively, "Rocker Management") filed a complaint in the United States District Court for the District of New Jersey (the "New Jersey District Court") against, among other defendants, L&H NV and various officers and directors of L&H NV, alleging, among other things, violations of United States securities laws, specifically sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5 (hereinafter, the "Rocker Management Action"). Among other things, Rocker Management claimed that L&H NV and certain other defendants made false and misleading statements regarding the financial condition of L&H NV.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

### 2.    Stonington Entities' Pre-Chapter 11 Actions

On or about November 27, 2000, the Stonington Entities initiated an action (the "Delaware Chancery Action") in the Court of Chancery of the State of Delaware against L&H NV, Mr. Jo Lernout, Mr. Pol Hauspie, Mr. Gaston Bastiaens and Mr. Nico Willaert. In the Delaware Chancery Action, the Stonington Entities sought to rescind the Dictaphone Merger Agreement and regain possession of the shares of the Dictaphone Common Stock, alleging, among other things, fraudulent inducement. On the following day (and the day before the Petition Date), November 28, 2000, the Stonington Entities sought and obtained, in the Belgian Court, certain preliminary relief in the form of an Order (the "Belgian Order") directing L&H NV to deliver possession of the share certificates relating to Dictaphone Common Stock within twenty-four (24) hours to a custodian of the Belgian Court. The Belgian Court also prohibited L&H NV from granting a security interest in the shares of Dictaphone Common Stock and ordered that L&H NV pay a financial penalty of one (1) million Euros for each day after November 30, 2000 that it did not comply with the foregoing directives.

L&H NV remained mired in litigation with the Stonington Entities throughout the course of the Chapter 11 Case. *See Section IV.F.5. ("Chapter 11 Case. Summary Of Material Litigation And Related Events. Stonington Entities").*

## IV.    CHAPTER 11 CASE

### A.    Commencement

#### 1.    Chapter 11 Case

On November 29, 2000, L&H NV filed a voluntary petition in the Bankruptcy Court for reorganization relief under chapter 11 of the Bankruptcy Code bearing Case Number 00-4398 (JHW) (the "Chapter 11 Case"). L&H Holdings and Dictaphone initiated their chapter 11 cases on the same date, bearing case numbers 00-4399 (JHW) and 00-4397 (JHW), respectively. On November 29, 2000, the L&H Group filed the Motion Of Lernout & Hauspie Speech Products N.V., Dictaphone Corporation And L&H Holdings USA, Inc., Under Fed. R. Bankr. P. 1015(b), For Entry Of Order Authorizing And Directing Joint Administration Of Above-Captioned Cases (the "Joint Administration Motion"), seeking an order directing the joint administration of the estates of the members of the L&H Group. The Bankruptcy Court granted the Joint Administration Motion by order dated December 5, 2000.

#### 2.    Belgian Case

On December 27, 2000, L&H NV commenced a concordat proceeding in the Belgian Court, which the Belgian Court granted on January 5, 2001. On September 21, 2001, the Belgian Court conditionally approved the Second Belgian Plan (having declined to approve the first) and extended concordat protection to L&H NV from creditors for an additional nine (9) months. On October 5, 2001, L&H NV appealed the imposition of certain conditions contained in the September 21, 2001 order to the Ghent Court. On October 18, 2001, the Ghent Court

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

issued a ruling denying the conditional approval of the Second Belgian Plan by the Belgian Court and officially dismissing the Belgian Case. On October 22, 2001, L&H NV filed a new concordat proceeding with the Belgian Court (the "New Concordat Proceeding"), but on October 24, 2001, the Belgian Court (i) denied the New Concordat Proceeding; (ii) declared L&H NV bankrupt and (iii) appointed the five (5) Curators, Jean-Marc Vanstaen, Stefaan De Rouck, Johan Houtman, Marnix Muylle and Frank Seys, to oversee the liquidation of L&H NV in the Belgian Case. It currently is anticipated that the liquidation of L&H NV in the Belgian Case will continue for some time. All assets of L&H NV other than the assets being distributed under the Plan (i.e., the Chapter 11 Assets) will be subject to administration in the Belgian Case.

## B.    Parties-In-Interest

### 1.    Court

The Chapter 11 Case is pending in the Bankruptcy Court before the Honorable Judith H. Wizmur, United States Bankruptcy Judge for the District of New Jersey, who is sitting by designation in the District of Delaware.

### 2.    Advisors To L&H NV

L&H NV retained Milbank, Tweed, Hadley & McCloy LLP ("Milbank Tweed") as their general bankruptcy counsel by order dated January 4, 2001. L&H NV also retained the following additional advisors: (a) PwC as restructuring consultants, by order dated January 4, 2001; (b) Brown, Rudnick, Freed & Gesmer, P.C. as special bankruptcy counsel, by order dated January 4, 2001; (c) Morris, Nichols, Arsht & Tunnell as general bankruptcy co-counsel, by order dated January 18, 2001; (d) Bryan Cave LLP as special corporate counsel in connection with the SEC investigation, by order dated January 18, 2001, *see Section III.C. (Events Leading To Commencement Of Chapter 11 Case. Audit Committee Investigation")*(e) Vergels Advocaten as special Belgian bankruptcy counsel, by order dated January 24, 2001; *see Section IV.F.5. ("Chapter 11 Case. Summary Of Material Litigation And Related Events. Stonington Entities")*; (f) Pennie & Edmonds LLP as special intellectual property counsel, by order dated February 5, 2001; (g) Bromberg & Sunstein LLP as special counsel for intellectual property matters, by order dated March 29, 2001; (h) First Law Offices of Korea as special Korean law counsel, by order dated June 12, 2001; (i) Pinsents Curtis Biddle as special English law counsel, by order dated June 12, 2001; (j) Credit Suisse First Boston (Europe) Ltd. as investment banker to sell Mendez S.A., by order dated April 6, 2001; *see Section IV.E.1. ("Chapter 11 Case. Significant Asset Sales. Sale Of Mendez S.A.")* (k) Credit Suisse First Boston Corporation as financial advisor, by order dated August 24, 2001; *see Section IV.E. ("Chapter 11 Case. Significant Asset Sales")*; and (l) Liedekerke, Wolters, Waelbroeck, Kirkpatrick & Cerfontaine S.C. as special Belgian counsel, by order dated April 3, 2001.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

### 3.    The Committee And Its Advisors

On December 13, 2000, the United States Trustee appointed an Official Committee of Unsecured Creditors in the chapter 11 cases of L&H NV, L&H Holdings and Dictaphone with respect to the three members of the L&H Group (the "Initial L&H Group Creditors' Committee").  After certain holders of Dictaphone senior subordinated notes filed a motion seeking separate, official representation with respect to the creditors of Dictaphone, however, negotiations ensued among the Initial L&H Group Creditors' Committee, these Dictaphone noteholders, and the L&H Group.  Ultimately, a separate committee consisting only of the unsecured creditors of Dictaphone (the "Dictaphone Creditors' Committee") was appointed by the United States Trustee on February 28, 2001.  Accordingly, there were two creditors' committees in the chapter 11 cases of L&H NV, L&H Holdings and Dictaphone, the Dictaphone Creditors' Committee and the Committee (the "Committee" and, with the Dictaphone Creditors' Committee, the "Creditors' Committees"). The Dictaphone Creditors' Committee remained in existence until the Dictaphone Plan became effective.

The Committee consists of KBC Bank NV, Fortis Bank N.V./S.A., Artesia Banking Corporation N.V., Wilmington Trust Company (Trustee), United States Trust Company of New York, Indenture Trustee and Studio Tognini, B.V.  It has retained the following professionals:  (a) Akin Gump Strauss Hauer & Feld LLP, co-counsel, by order dated January 18, 2001; (b) BDO Seidman, LLP, accountants, by order dated February 13, 2001; (c) Monzack & Monaco, P.A., co-counsel, by order dated March 13, 2001; and (d) Houlihan Lokey Howard & Zukin Capital, financial advisor, by order dated May 9, 2001.

### 4.    Professional Fees

As of January 9, 2003, the court-retained professionals performing services on behalf of L&H NV had sought fees of approximately of $20,867,000 million, although not all of these fees have been paid (specifically, approximately $20,133,000 million have been paid).  *See Section IV.E.4 ("Chapter 11 Case.  Significant Asset Sales.  Sale Of Speech And Language Technologies Business").*

The magnitude of the professional fees in these cases is due to a variety of factors, including:  (i) the complexity of dealing with the first ever Belgium-United States dual plenary insolvency proceedings; (ii) the marketing and sale of virtually all of the tangible and intangible assets of L&H NV and L&H Holdings; (iii) the multiplicity of professionals due to the United States Trustee's decision to appoint two (2) official committees in the Chapter 11 Case (each of the Creditors' Committees retained separate counsel, accountants and financial advisors); and (iv) professionals at PwC filing the role of accounting personnel during a transition period due to the lack of financial controls and financial personnel.

### 5.    United States Trustee

The Office of the United States Trustee assigned Mark S. Kenney, Esq. to oversee the Chapter 11 Cases.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

### 6.    Fee Auditor

On April 10, 2001, the Bankruptcy Court entered an order (the "Amended Administrative Order") amending its previous administrative order which had established procedures for the interim compensation of the professionals specifically retained pursuant to an order of the Bankruptcy Court in the Chapter 11 Case (the "Professionals"). On April 16, 2001, the Bankruptcy Court also entered another order (the "Fee Auditor Order") which supplements and modifies the Amended Administrative Order relating to the Professionals. The Fee Auditor Order also appoints Stuart, Maue, Mitchell & Jacobs, Ltd. ("Stuart Maue") as the fee auditor in the Chapter 11 Case, nunc pro tunc to April 16, 2001, to, among other things, review the Professionals' monthly and interim fee applications.

As of December 31, 2002, the Fee Auditor had issued all of its reports regarding the first, second, third, fourth and fifth interim compensation periods. The first interim compensation period extends from November 29, 2000 through and including March 31, 2001 (the "First Interim Compensation Period"). The second interim compensation period extends from April 1, 2001 through and including July 31, 2001 (the "Second Interim Compensation Period"), and the third interim compensation period extends from August 1, 2001 through November 30, 2001. The fourth interim compensation period extends from December 1, 2001 through March 31, 2002 (the "Fourth Interim Compensation Period"). The fifth interim compensation period extends from April 1, 2002 to July 31, 2002 (the "Fifth Interim Compensation Period").

On November 5, 2001, January 31, 2002, May 24, 2002, June 25, 2002 and December 20, 2002 the Bankruptcy Court held hearings with respect to the First Interim Compensation Period, the Second Interim Compensation Period, the Third Interim Compensation Period, the Fourth Interim Compensation Period and the Fifth interim Compensation Period respectively. Following each hearing, the Bankruptcy Court adopted certain recommendations made in the Fee Auditor's respective reports and ordered that certain portions of the professional fees requested by the retained professionals in these cases be reduced to reflect certain of the recommendations made in the Fee Auditor's reports relating to those periods.

### C.    General Electric Capital Corporation
### Interim Debtor-In-Possession Financing

On December 4, 2000, the L&H Group filed the Motion Of L&H Group For Order Under 11 U.S.C. §§ 105, 364 And 365 And Bankruptcy Rules 2002 And 4001, (A) Authorizing L&H Group (I) To Obtain Interim And Final Secured Postpetition Financing, And (II) To Grant Superpriority Claims To Postpetition Lender; (B) Approving Agreements Relating To Foregoing; (C) Scheduling A Final Hearing; And (D) Granting Related Relief (the "Interim Post-Petition Financing Motion"). In the Interim Post-Petition Financing Motion, the L&H Group sought authority:

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

- to borrow $35 million from General Electric Capital Corporation for a period of 90 days, secured by a first lien on substantially all of the L&H Group's assets (other than property of L&H NV located In Belgium), and with a superpriority administrative claim having priority over any and all administrative claims of the loan specified in sections 503(b) and 507(b) of the Bankruptcy Code; and

- to borrow $20 million pending a final hearing on the Interim Post-Petition Financing Motion.

The Bankruptcy Court granted the Interim Post-Petition Financing Motion by order dated December 5, 2000 (the "Interim DIP Financing Order"). The Interim DIP Financing Order approved a short-term, post-petition secured credit facility provided by the General Electric Capital Corporation ("GE Capital"), authorizing the L&H Group to borrow up to $20 million on an interim basis (the "GE Bridge Loan").

In fact, the L&H Group did not borrow more than $10 million under the GE Bridge Loan because GE Capital never agreed to advance funds over and above the initial $10 million draw. The GE Bridge Loan was repaid with proceeds of the DIP Facility, a $60 million secured loan provided by the DIP Agent, on or about February 23, 2001, with a payment in the approximate amount of $10,733,000 (which included interest, fees and expenses). *See Section IV.D. ("Chapter 11 Case. Debtor-In-Possession Financing").*

## D.    Debtor In Possession-Financing

On or about January 22, 2001, the L&H Group filed the Motion Of L&H Group For Order Under 11 U.S.C. §§ 105 And 364 And Bankruptcy Rules 2002 And 4001, (A) Authorizing L&H Group To (i) Obtain Secured Post-Petition Financing And (ii) Grant Super-Priority Claims To Post-Petition Lender; (B) Approving Agreements Relating To Foregoing; and (C) Granting Related Relief (the "DIP Motion"). The L&H Group sought to obtain Court approval to secure final, debtor-in-possession financing from Ableco Finance LLC, specifically a $60 million secured credit facility (the "DIP Facility") for which each member of the L&H Group is jointly and severally liable. Ableco Finance LLC is a special situations lending company affiliated with Cerberus Capital Management, L.P. and Gabriel Capital Group (hereinafter, the "DIP Agent").

### 1.    Selection Of DIP Agent

Because the GE Bridge Loan only satisfied short-term capital requirements, the L&H Group immediately focused its efforts on obtaining a larger and longer-term financing facility. In conjunction with that effort, the L&H Group, with its various professionals and financial advisors, undertook an extensive search for such financing from more than twelve (12) other lenders. These efforts, however, yielded only two expressions of interest, one from the DIP Agent and the other from KBC Bank NV ("KBC"), a member of the L&H Group's pre-petition bank group.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

After protracted negotiations with both the DIP Agent and KBC, the L&H Group ultimately secured long-term financing from the DIP Agent on terms and conditions it considered reasonable -- given the L&H Group's then current financial condition -- and more favorable than the terms and conditions contained in KBC's proposal.

### 2.    Court Approval Of DIP Facility

Approval of the DIP Facility was opposed by several parties, including certain of the Stonington Entities, the Bakers, and the Dictaphone Ad Hoc Committee. The Bankruptcy Court held several hearings (including evidentiary hearings commencing on February 7, 2001) concerning the proposed financing. Most objectors argued that it was inappropriate to render each member of the L&H Group jointly and severally liable for financing that would not be used equally by each debtor. Ultimately, the Bankruptcy Court agreed with the L&H Group's position that each estate was protected by the grant of a junior contribution claim/lien against the other estates securing such estate's right to be repaid if such estate repays to the DIP Agent more than it borrowed under the DIP Facility.

Specifically, under the terms of the DIP Order, to the extent that any member of the L&H Group makes repayments of DIP Facility funds in excess of the proceeds of the principal amount of DIP Facility funds that such member of the L&H Group actually received under the DIP Facility, then such member of the L&H Group will have a junior lien on all property (excluding certain avoidance actions) of each of the other members of the L&H Group's estates under section 364(c)(3) of the Bankruptcy Code (the "Junior Contribution Lien") and have a super-priority claim under section 364(c)(1) of the Bankruptcy Code against the other members of the L&H Group (subject to certain restrictions articulated in paragraph 28 of the DIP Order). Artesia has asserted an interest in the Junior Contribution Lien and super-priority claim, but both the Committee and the L&H Group dispute that Artesia has any such interests.

Ultimately, the Bankruptcy Court approved the DIP Facility by order dated February 20, 2001 (the "DIP Order"). On or about February 23, 2001, the L&H Group executed the Financing Agreement By And Among Lernout & Hauspie Speech Products N.V., Certain Of Its Subsidiaries, The Financial Institutions From Time To Time Party Hereto And Ableco Finance LLC (Agent).

### 3.    Use Of And Repayment Of DIP
###        Facility By Members Of L&H Group

Both L&H NV and L&H Holdings borrowed funds under the DIP Facility to finance the operation and management of their respective businesses, and L&H NV has made permanent repayments of such funds to the DIP Agent. L&H NV and L&H Holdings used funds from the DIP Facility to finance their operations and those of their respective non-debtor subsidiaries. The usage of the DIP Facility by L&H NV and L&H Holdings can be summarized as follows:

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

| Type Of Cost | L&H NV | | L&H Holdings | | Total | |
|---|---|---|---|---|---|---|
| Allocated Borrowings Under DIP Facility | $ | 33,213,964 | $    18,705,538 (includes DIP Facility monies loaned to L&H Holdings, which subsequently loaned monies to certain of its subsidiaries) | | $ | 51,919,502 |
| Unused Proceeds | - | | - | | $ | 80,498 |
| **Total Borrowings Under DIP Facility** | **$** | **33,213,964** | **$** | **18,705538** | **$** | **52,000,000** |
| **Summary** | | | | | | |
| Advances | $ | 25,404,174 | $ | 10,787,882 | $ | 36,192,056 |
| Insurance Payments | $ | 863,797 | $ | 666,177 | $ | 1,529,975 |
| Interest & Fees On DIP Facility | $ | 2,871,632 | $ | 1,814,935 | $ | 4,686,568 |
| Professional Fees | $ | 4,074,360 | $ | 5,436,544 | $ | 9,510,904 |

Dictaphone did not borrow any money under the DIP Facility. The DIP Facility was repaid in full on or about November 13, 2001.

### E.    Significant Asset Sales

#### 1.    Sale Of Mendez S.A.

Early in the Chapter 11 Case, the L&H NV determined that Mendez was not a core asset and engaged in a marketing initiative to sell Mendez with the assistance of an investment banker specifically retained for this purpose, Credit Suisse First Boston (Europe) Ltd. These efforts included contacting dozens of potential financial and strategic buyers. By June 1, 2001, L&H NV and Credit Suisse First Boston (Europe) Ltd. had received various indications of interest.

After a protracted marketing period, L&H NV initially decided to sell Mendez to Lionbridge Technologies, Inc. ("Lionbridge") for a purchase price of approximately $27 million, subject to higher and/or better offers. Accordingly, on July 3, 2001, L&H NV filed the Motion For Order, Pursuant To 11 U.S.C. §§ 105(a), 363 And 1146(c) And Fed. R. Bankr. P. 2002 And 6004, (A) Approving Bidding Procedures And Break-Up Fee; (B) Approving Share Purchase Agreement And Related Agreements; (C) Authorizing Sale Of All Issued Share Capital Of Mendez S.A. To Highest Or Otherwise Best Bidder; And (D) Authorizing Transfer Of Related Assets To Mendez S.A. (the "Mendez Sale Motion"). By order dated July 9, 2001, the Bankruptcy Court approved the bidding procedures provided for in the Mendez Sale Motion. The balance of the Mendez Sale Motion was scheduled to be heard on August 7, 2001.

On August 2, 2001, an auction mandated by the Bankruptcy Court was held during which Bowne submitted the highest or otherwise best offer, over and above the Lionbridge offer, on the terms and conditions set forth in the Share Purchase Agreement, dated as of August 2, 2001, between L&H NV and Bowne (the "Mendez Share Purchase Agreement"). Pursuant to the Share Purchase Agreement, among other things, Bowne agreed to acquire 100% of the capital stock of Mendez for a purchase price of $44,501,000.00 (pursuant to the Mendez Sale Motion, $1 million of the purchase price was used to pay Lionbridge a break-up fee). The

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

Bankruptcy Court approved the Mendez Share Purchase Agreement by order dated August 7, 2001. On August 16, 2001, the Commercial Court in Ieper, Belgium also approved the sale to Bowne. The Closing occurred on or about August 29, 2001. L&H NV used the net proceeds to, among other things, repay in part its obligations under the DIP facility. *See Section IV.D. ("Chapter 11 Case. Debtor In Possession Financing")*

2.    **Sale Of *Powerscribe* To Dictaphone**

As mentioned above, the Dictaphone Healthcare Solutions Group used technology developed by L&H NV and L&H Holdings. *See Section II.A.3. ("L&H NV's Operations Prior To Chapter 11 Case. Origins And History Of L&H NV. Business Units And Product Offerings").* The Dictaphone Healthcare Solutions Group provides dictation and transcription management systems for the medical market, i.e., hospitals, clinics and medical practices. The Dictaphone Healthcare Solutions Group was formed after L&H NV acquired Dictaphone on May 5, 2000, at which point Dictaphone's healthcare software and service products were combined with both L&H NV's and L&H Holdings' speech recognition products and L&H NV's transcription services.

The Healthcare Solutions Group's product offerings included *PowerScribe*[®], which consists of certain products with medical applications, such as the *PowerScribe*[®] *For Radiology* product. *PowerScribe*[®] is an integrated speech recognition system developed specifically for radiology reporting. In addition to highly accurate recognition, the software includes many "power user" features designed to facilitate the creation and editing of radiology reports. An additional technology, clinical language understanding ("CLU"), is a fact extraction software program that extracts data created through the use of certain Dictaphone products and parses text, recognizing, structuring and normalizing medical facts and terminology. CLU contains recognition-based technologies, such as natural language processing and computational linguistics.

*PowerScribe*[®] and certain related technologies, including CLU, formerly were owned in large part by L&H NV and certain of its affiliates, including L&H Holdings. Since Dictaphone contemplated becoming a standalone entity (i.e., no longer a subsidiary of L&H NV) after emerging from its chapter 11 case, however, it became apparent that some type of transaction with L&H NV (and certain of its affiliates, including L&H Holdings) would be necessary to enable Dictaphone to continue using *PowerScribe*[®] and CLU.

In late August 2001, L&H NV and certain of its affiliates agreed to (a) sell to Dictaphone certain medical transcription technology and related assets (the "*PowerScribe*[®] Assets") and (b) license to Dictaphone certain rights related to the "M-REC" intellectual property for use with the *PowerScribe*[®] Assets for approximately $19.9 million (plus additional future license fees from the licensing of the "M-REC" intellectual property by Dictaphone) (collectively, the "*Powerscribe*[®] Transaction").

The *PowerScribe*[®] Transaction was structured so that the entire consideration owed by Dictaphone to L&H NV and its affiliates would not be paid at closing, but rather in

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

installments, as follows: (a) $10.4 million was paid at closing and (b) approximately $9.5 million was payable pursuant to the terms of a promissory note issued by Dictaphone to L&H NV (the "Initial *PowerScribe*® Note"), approximately $5 million of which was payable (and paid) on or before November 15, 2001, and the balance of which was payable on the earlier of (i) December 31, 2001 and (ii) sixty-five (65) days after the entry of an order approving the disclosure statement with respect to the Third Amended Dictaphone Plan. Sums payable by Dictaphone to L&H NV under the Initial *PowerScribe*® Note were treated (as between Dictaphone and L&H NV) under the same terms as borrowings under the DIP Facility, accrued interest at the DIP Facility rate, and were secured by all of Dictaphone's assets.

On or about December 21, 2001, L&H NV agreed to extend the payment deadline from December 31, 2001 with respect to the balance owing under the Initial *PowerScribe*® Note, approximately $4.8 million (principal and interest). Dictaphone therefore issued a new promissory note (the "Second *PowerScribe*® Note") replacing the Initial *PowerScribe*® Note, pursuant to which Dictaphone agreed to pay L&H NV the amount of $4,831,751 on the earlier of (x) April 1, 2002 and (y) fifteen (15) days after the entry of an order confirming the Dictaphone Plan. The Second *PowerScribe*® Note reflects the remaining amounts owed by Dictaphone to L&H NV for the *PowerScribe*® Assets. Dictaphone satisfied the Second *Powerscribe*® Note on March 28, 2002.

### 3.  Sale Of Medical Transcription Business

On September 28, 2001, the L&H Group filed the Motion For Order, Pursuant To 11 U.S.C. §§ 105(a), 363, 365 And 1146(c) And Fed. R. Bankr. P. 2002 And 6004, (A) Approving Bidding Procedures, Break-Up Fee And Expense Reimbursement; (B) Approving Share Purchase Agreement And Related Agreements; (C) Authorizing Sale Of All Issued Shares Of Common Stock Of L&H Medical Solutions Holdings, Inc. (A Non-Debtor) To Highest Or Otherwise Best Bidder; (D) Authorizing Dictaphone Corporation To Release Intercompany Claims Against L&H Medical And Its Subsidiaries; (E) Authorizing Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases Of Non-Residential Real Property; And (F) Authorizing Transfer Of Related Assets To Lonestar Medical Transcription USA, Inc. (the "Medical Transcription Motion"). The Medical Transcription Motion sought Bankruptcy Court authorization for the sale of the Medical Transcription Business, specifically the auction and sale of all of the issued and outstanding shares of L&H Medical Solutions Holdings, Inc. ("L&H Medical"), a wholly owned, non-debtor subsidiary of L&H NV based in the United States, and certain related assets, to Transcription Acquisition LLC, subject to higher and better offers. *See Section II.A.3. ("L&H NV's Operations Prior To Chapter 11 Case. Origins And History Of L&H NV. Business Units And Product Offerings).*

Transcription Acquisition LLC served as a stalking horse. Following an auction held on October 22, 2001, however, MedQuist, Inc. ("Medquist") was the successful bidder for the Medical Transcription Business. MedQuist ultimately purchased the Medical Transcription Business for $24,875,000. The Bankruptcy Court approved the sale to MedQuist on October 29, 2001, and the sale closed on November 13, 2001.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

**4.    Sale Of Speech And Language Technologies Business**

L&H Holdings and L&H NV originally contemplated selling or otherwise disposing of the assets of the Speech And Language Technologies Business through a joint venture or similar vehicle after the filing the Joint Plan. Given the events in the Belgian Case, including the dismissal of the concordat proceeding, the appointment of the Curators, and the commencement of a liquidating case for L&H NV, however, L&H NV and L&H Holdings determined that the most appropriate course of action was to continue with the sale of their assets in the Chapter 11 Case. *See Section IV.A.2. ("Chapter 11 Case. Commencement. Belgian Case").*

Accordingly, on October 23, 2001, the L&H Entities filed the Motion For Order Pursuant To 11 U.S.C. §§ 105(a), 363, 365 And 1146(c) And Fed. R. Bankr. P. 2002 And 6004, (A) Approving Bidding Procedures, Break-Up Fee, Expense Reimbursement, And Exclusivity Provisions; (B) Approving Asset Purchase Agreement And Assigned Contracts; (C) Authorizing Sale By Lernout & Hauspie Speech Products N.V. And L&H Holdings USA, Inc. Of Substantially All Of The Assets Of Their Speech And Language Technologies Business To Highest Or Otherwise Best Bidder Or Bidders; And (D) Authorizing Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases And Non-Residential Real Property (the "SLT Asset Sale Motion"). The SLT Asset Sale Motion sought authority to establish bidding and auction procedures for the sale of certain assets (and the assumption of certain related liabilities) in connection with L&H Holdings' and L&H NV's Speech And Language Technologies Business (collectively, the "SLT Assets"). The SLT Assets were owned by L&H NV, L&H Holdings, and a number of their non-debtor subsidiaries, and constituted substantially all of L&H Holdings' core assets. *See Section II.A.3.a. ("L&H NV's Operations Prior To Chapter 11 Case. Origins And History Of L&H NV. Business Unites And Product Offerings. Speech And Language Technologies Business")* By order dated October 30, 2001, the Bankruptcy Court granted the SLT Asset Sale Motion.

With the assistance of Credit Suisse First Boston, L&H Holdings and L&H NV extensively marketed the SLT Assets. To assist in the sale process, the SLT assets were divided into eight (8) discrete asset groups (with some interdependencies):

(1)    Machine Translation (portion not already owned by Bowne & Co., Inc.)
(2)    ISI Speech Processing
(3)    Text-To-Speech
(4)    L&H Speech Processing/Dialog (And Automotive)
(5)    Dragon Speech Processing/Dialog
(6)    Intelligent Content Management
(7)    Knexys
(8)    AudioMining

After consulting with its financial advisors, Credit Suisse First Boston, and the Committee, ultimately, the L&H Entities selected SpeechWorks International, Inc. ("SpeechWorks") as the "stalking horse bidder" for two (2) of the eight (8) asset groups. L&H

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

NV, L&H Holdings, and certain of their non-debtor subsidiaries, entered into an asset purchase agreement with SpeechWorks on October 22, 2001. Pursuant to the SLT Sale Motion, an auction for the SLT Assets was held on November 26, 2001. Ultimately, after the auction, five successful bidders for the SLT Assets emerged ahead of SpeechWorks: Bowne & Co., Inc. ("Bowne"), Multimodal Technologies, Inc. ("Multimodal"), ScanSoft, Inc. ("ScanSoft"), Vantage Technology Holdings ("Vantage"), and Dragon Catalyst, LLC ("Dragon Catalyst"), all of which displaced SpeechWorks as the successful bidder for the SLT Assets.

Certain non-cash factors also placed these bidders above SpeechWorks. For example, ScanSoft agreed to employ no fewer than 150 employees of L&H Holdings and L&H NV, eliminating no less than $2.2 million in potential severance costs. ScanSoft's bid also contained fewer conditions than SpeechWorks. Moreover, L&H Holdings and L&H NV believe ScanSoft has a strong management team and has shown positive cash flow for the last year, which was considered important because a portion of the consideration for the SLT Assets were to be paid with ScanSoft common stock.

### a.    Sale Of SLT Assets To Bowne

Bowne was the successful bidder for the Machine Translation asset group, with a cash bid of $501,000. More specifically, Bowne already owned the majority of the Machine Translation asset group, but held only a fifty-percent (50%) ownership interest in certain intellectual property rights relating to those assets. The definitive agreement for the sale of the remainder of these intellectual property rights to Bowne was signed on December 11, 2001 and approved by the Bankruptcy Court on December 14, 2001. On December 20, 2001, Bowne assigned its right to purchase these SLT Assets to Mendez N.V., a Belgian company that is a wholly-owned subsidiary of Bowne. The sale of the SLT Assets to Mendez N.V. closed on December 21, 2001.

### b.    Sale Of SLT Assets To Multimodal

Multimodal, an entity controlled by former employees and managers of the Speech And Technologies Business' ISI Speech Processing Group, submitted the successful bid for L&H N.V.'s United States-based ISI Speech Processing/Dialog asset group. Multimodal's successful bid included an aggregate purchase price of $2 million in cash and the assumption by Multimodal of all earnout obligations (in the aggregate amount of $2 million) under that certain Stock Purchase Agreement, Between L&H NV And Interactive Systems, Inc., dated March 28, 2000. A definitive agreement for the sale of the ISI Speech Processing/Dialog asset group to Multimodal was signed on December 10, 2001, was approved by the Bankruptcy Court on December 11, 2001, and closed on December 21, 2001.

### c.    Sale Of SLT Assets To ScanSoft

ScanSoft submitted the successful bid for three (3) asset groups: the Text-To-Speech asset group, the L&H Speech Processing/Dialog (And Automotive) asset group, and the Dragon Speech Processing/Dialog asset group. ScanSoft's successful bid included (i) an

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

aggregate cash purchase price of $10 million, (ii) a promissory note in the amount of $3.5 million, (iii) 7.4 million shares of ScanSoft common stock (which, as of November 26, 2001, had a value of approximately $26 million), and (iv) the agreement by ScanSoft to hire or retain a sufficient number of employees of L&H Holdings and L&H NV to relieve the L&H Entities of $2.2 million in severance payments. The definitive agreement for the sale of these SLT Assets to ScanSoft was signed on December 7, 2001, was approved by the Bankruptcy Court on December 11, 2001, and closed on December 12, 2001.

At the auction of SLT Assets, Dragon Catalyst submitted the successful bid for the AudioMining asset group, with a cash bid of $751,000. By mid-December 2001, however, negotiations with Dragon Catalyst over the terms and conditions of the purchase had not reached a successful conclusion. In late December 2001, ScanSoft agreed to acquire the AudioMining asset group, with a bid consisting of (i) $500,000 in cash, (ii) a promissory note in the amount of $400,000, (iii) shares of ScanSoft common stock valued at $500,000 and (iv) an agreement by ScanSoft to hire or retain at least eight (8) employees of the L&H Entities who perform duties dedicated to the acquired business. On March 21, 2002, ScanSoft and L&H Holdings closed the sale of the Audio Mining assets.

### d.    Sale Of SLT Assets To Vantage

Vantage was the successful bidder for the Intelligent Content Management and Knexys asset groups. Vantage's successful bid included an aggregate cash purchase price of $2 million. The L&H Entities entered into a definitive agreement (the "Vantage Agreement") for the sale of these assets to Vantage on December 11, 2001, which the Bankruptcy Court approved on December 19, 2001.

On December 27, 2001, however, Vantage Technology Holdings, LLC, a newly-formed Pennsylvania limited liability company ("Vantage Holdings"), and an affiliate of Vantage, notified the L&H Entities that, among other things, it:  (i) now was the "Buyer" under the Vantage Agreement, (ii) had adopted, ratified and confirmed in all respects all of the terms, conditions, representations, warranties, covenants and agreements contained in the Vantage Agreement, (iii) had certified that each of the references to the "Buyer" in the Vantage Agreement constituted a reference to Vantage Holdings and (iv) as the "Buyer" under the Vantage Agreement, was exercising its right to have its wholly-owned Belgian subsidiary, VK SPRL ("VK") purchase these assets. VK purchased the SLT Assets on December 27, 2001.

### e.    Allocation Of SLT Asset Sale Proceeds

Immediately after the acquisition by L&H NV of Dictaphone and Dragon, the L&H Group commenced efforts to integrate the businesses of L&H NV, Dictaphone, L&H Holdings and their respective subsidiaries. Therefore, research teams were merged, executives were appointed to lead business units that straddled various legal entities, and various technologies were used by members of the L&H Group without regard to which member owned such technologies. In various instances, there were no intercompany agreements governing the

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

use of employees and technology, payment for such use and restrictions on such use. *See Section IV.I. ("Chapter 11 Case. Inter-Company Allocation And Integration Issues").*

Upon selling the [primarily United States-based] Speech And Language Technologies Business, and, more specifically, the SLT Assets, it became apparent that proceeds from the sale of those assets would have to be allocated among L&H NV and L&H Holdings and their respective subsidiaries (including non-debtor subsidiaries). An independent intellectual property valuation group of PwC was appointed to develop a proposal to allocate the proceeds derived from the sale of the SLT Assets among the L&H NV and L&H Holdings. On January 16, 2002, following an evidentiary hearing held on January 10, 2002, the Bankruptcy Court approved that allocation of the proceeds derived from the sale of the SLT Assets among L&H Holdings and L&H NV (hereinafter, the "SLT Sale Proceeds Allocation").

Generally, the SLT Sale Proceeds Application provides that the amounts received by L&H Holdings and L&H NV for the sale of the SLT Assets were allocated 57.1% to L&H NV and its subsidiaries (including non-debtor subsidiaries), and 42.9% to L&H Holdings and its subsidiaries (including non-debtor subsidiaries). *See also Section IV.I. ("Chapter 11 Case. Inter-Company Allocation And Integration Issues").*

## F.    Summary Of Material Litigation And Related Events

### 1.    Settlement With ScanSoft, Inc.

#### a.    Holdings Motion In Aid Of Consummation

Both L&H NV and L&H Holdings obtained shares of ScanSoft common stock in consideration for the SLT Assets, specifically 7.52 million shares of ScanSoft common stock, approximately 4 million shares of which were issued to L&H NV and approximately 3.5 million shares of which were issued to L&H Holdings (collectively, the "ScanSoft Stock"). The ScanSoft Stock is publicly traded on the NASDAQ exchange under the symbol "SSFT."

Because L&H NV and L&H Holdings acquired the ScanSoft Stock in a transaction that did not involve a public offering, and, as a result, the ScanSoft Stock was a restricted security within the meaning of Rule 144 promulgated under the Securities Act of 1933, 15 U.S.C. §§ 77(a)-77(aa). The ScanSoft Stock was not registered. As such, L&H NV could only resell the ScanSoft Stock by registering such securities under the 1933 Act or pursuant to an available exemption, such as section 1145 of the Bankruptcy Code, or an applicable exemption available under federal securities laws.

The L&H Holdings Plan contemplated that distributions to certain holders of allowed claims against and equity interests in L&H Holdings would consist of existing cash and the proceeds (cash and non-cash) realized from the sale of the SLT Assets, including the ScanSoft Stock. Shortly before the confirmation of the L&H Holdings Plan, however, L&H Holdings assessed its cash position and determined that it might not be able to make distributions of cash to holders of allowed administrative expense claims against L&H Holdings on the effective date of the L&H Holdings Plan (or within a reasonable time thereafter) in full satisfaction of their claims. To satisfy such claims in full, L&H Holdings decided to avail itself

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

of the exemption in section 1145 of the Bankruptcy Code with respect to holders of allowed administrative expense claims as well. Accordingly, on July 26, 2002, L&H Holdings filed the Motion Of L&H Holdings USA, Inc. For Entry Of Order, Pursuant To 11 U.S.C. §§ 105(a) And 363(b)(1), In Aid Of Consummation Of First Amended Plan Of Liquidation Of L&H Holdings USA, Inc. And Authorizing (1) Distribution Of Certain Common Stock Of Successor ScanSoft, Inc. To Holders Of Allowed Administrative Expense Claims Under First Amended Plan Of Liquidation Of L&H Holdings USA, Inc., And (2) Establishment Of Valuation Procedures With Respect To Distributions Of ScanSoft Stock To Holders Of Allowed Unsecured Claims (the "Holdings Motion In Aid Of Consummation").

Among other things, the Holdings Motion In Aid Of Consummation sought Bankruptcy Court approval to distribute ScanSoft Stock in lieu of, or in addition to cash under the L&H Holdings Plan to holders of allowed administrative expense claims pursuant to section 1145 of the Bankruptcy Code. It also sought to establish a valuation mechanism for the purposes of such distributions to holders of allowed administrative expense claims and unsecured claims against L&H Holdings. The Holdings Motion In Aid Of Consummation met several objections, including one from ScanSoft, which objected claiming that the proposed distribution and valuation procedures would result in a wave of uncontrolled sales of the ScanSoft Stock and therefore would depress the stock price.

### b.    L&H Holdings And L&H NV Settlement With ScanSoft

Ultimately, L&H Holdings (and L&H NV) reached an agreement with ScanSoft resolving the Holdings Motion In Aid Of Consummation (the "ScanSoft Settlement") and certain issues relating to distribution of the ScanSoft Stock by L&H NV and L&H Holdings and the re-purchase of the ScanSoft Stock by ScanSoft from L&H Holdings. The Bankruptcy Court approved the ScanSoft Settlement with respect to L&H Holdings in conjunction with its confirmation of the L&H Holdings Plan, pursuant to the Findings Of Fact And Conclusions Of Law Relating To, And Order Under 11 U.S.C. § 1129 Confirming, First Amended Plan Of Liquidation Of L&H Holdings USA, Inc. Under Chapter 11 Of The Bankruptcy Code, dated August 13, 2002. The Bankruptcy Court expressly approved the ScanSoft Settlement with respect to L&H NV pursuant to the Order Approving Agreement Among Lernout & Hauspie Speech Products N.V., L&H Holdings USA, Inc., And ScanSoft, Inc. Regarding Re-Purchase And Registration Of Common Stock Of ScanSoft, Inc., dated August 16, 2002.

Under the terms of the ScanSoft Settlement, among other things:

(a)    On September 16, 2002, Scansoft purchased, for cash, a number of shares of ScanSoft Stock from L&H Holdings (and the Baker Parties (as defined below)) for the aggregate purchase price of $7 million (the "Initial Purchase"). The number of shares of ScanSoft Stock purchased from L&H Holdings in the Initial Purchase was approximately 1.3 million.

(b)    Scansoft will use all commercially reasonable efforts to offer all of the remaining ScanSoft Stock (i.e., other than the ScanSoft Stock re-purchased in the Initial Purchase) in a management led public offering as soon as practicable (the "Offering"). ScanSoft also will grant an additional 300,000 shares of ScanSoft common stock (the "Additional Shares") to L&H Holdings and L&H NV, issued

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

one-half within three business days after December 15, 2002 (the "<u>December Issuance</u>") and one-half within three business days after February 15, 2003 (the "<u>Februry Issuance</u>"), subject to the following: (1) ScanSoft's obligation to issue the Additional Shares terminates if the Offering is completed by December 15, 2002; and (2) ScanSoft's obligation to issue the February Issuance terminates if the Offering is completed between December 16, 2002 and February 15, 2003. On December 18, 2002, L&H Holdings and L&H NV received the December Issuance.

(c)    If the Offering is not completed by February 15, 2003, L&H NV and L&H Holdings may exercise any right available to them to dispose of the ScanSoft Stock, including, without limitation, a disposition in accordance with section 1145 of the Bankruptcy Code or applicable securities laws.

(d)    If the Offering is not completed by January 1, 2003, that certain Promissory Note in the original principal amount of $3,500,000, dated December 12, 2001, made by ScanSoft in favor of L&H NV, L&H Holdings and certain other corporations listed on Exhibit A to such Promissory Note, will be immediately due and payable on January 1, 2003 (the "<u>Note Payment</u>"). On January 2, 2003, L&H NV and L&H Holdings received the Note Payment.

(e)    Subject to the occurrence of the Initial Purchase, the December Issuance, and the Note Payment, L&H Holdings and L&H NV will forbear from selling or distributing the remaining ScanSoft Stock until February 16, 2003.

(f)    Scansoft will use all commercially reasonable efforts to (1) register with the Securities and Exchange Commission the ScanSoft Stock held by L&H NV on or before February 15, 2003, to the extent that the ScanSoft Stock is not sold in an Offering and (2) have such registration declared effective on or before February 15, 2003 (the "<u>Registration</u>"). Following the Registration of the ScanSoft Stock by Scansoft, L&H NV and L&H Holdings have the right to sell the registered Stock (or any portion thereof).

(g)    If the Registration does not occur on or prior to February 15, 2003, Scansoft will issue to L&H NV and L&H Holdings an additional 100,000 shares of Scansoft common stock on February 16, 2003.

(h)    Scansoft will immediately pay to L&H NV and L&H Holdings any amounts due in connection with ScanSoft's purchase of SLT Assets, including $193,000 due and owing in connection with certain severance claims.

(i)    The relief granted pursuant to the Holdings Motion In Aid Of Consummation will take effect on the earlier of (i) failure of Scansoft to (a) make the Initial Purchase, (b) make the Note Payment or (c) issue the Additional Shares (collectively, the "<u>Conditions</u>") and (ii) February 16, 2003, <u>provided</u> that each of the Conditions occur.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

On February 5, 2003, ScanSoft, L&H NV and L&H Holdings filed with the Court a stipulation approving the First Amendment to the ScanSoft Settlement, which provides that all deadlines under the ScanSoft settlement of February 15, 2003 be extended to February 19, 2003 and all February 16, 2003 deadlines be extended to February 20, 2003. On February 15, 2003, the Offering was consummated and L&H NV and L&H Holdings received $14,685,693.75 respectively for the ScanSoft Stock ($3.80 per share).

## 2.    Artesia

Immediately after the Petition Date, Artesia Banking Corporation N.V. ("Artesia") commenced certain procedures in Belgium (the "Saisies Conservatoires Processes") directed at restraining L&H NV's free use of a substantial amount of L&H NV's assets that Artesia contended were collateral for L&H NV's alleged pre-petition indebtedness under the Belgian Credit Facility. *See Section II.A.5. ("L&H NV's Operations Prior To Chapter 11 Cases. Origins And History Of L&H NV. Pre-Petition Obligations And Capital Structure.")* In the Saisies Conservatoires Processes, Artesia asserted that it had a "floating lien" in L&H NV's property for any debts, present or future, that L&H NV owes or will owe to Artesia, including L&H NV's obligations under the Belgian Credit Facility. As a result of Artesia's commencement of the Saisies Conservatoires Processes, a Belgian bailiff took an inventory and restrained the use of significant assets of L&H NV, thereby barring L&H NV from selling or otherwise transferring these assets.

On March 1, 2001, after repeated requests by L&H NV that Artesia withdraw the Saisies Conservatoires Processes were denied, L&H NV initiated an adversary proceeding (the "Artesia Adversary Proceeding") by filing a Complaint For Injunctive And Declaratory Relief And Damages Under 11 U.S.C. §§ 105, 362, 541, 542, 549 And 550 And Bankruptcy Rules 7001(2), 7001(9) And 7065 (the "Artesia Complaint") in the Bankruptcy Court challenging both the Saisies Conservatoires Processes and certain setoffs that Artesia effected as to funds in L&H NV accounts (the "Artesia Setoff"). The Artesia Complaint alleges that, notwithstanding knowledge of L&H NV's chapter 11 filing, Artesia engaged in clear-cut, deliberate and repeated violations of the automatic stay.

Shortly thereafter, Artesia commenced two additional proceedings in Belgium (the "Artesia Belgian Proceedings"), arguing that Belgian law applies to the Belgian Credit Facility and that a Belgian judge should therefore decide any questions relating to Artesia's alleged "floating lien." Artesia requested, among other things, that the Belgian courts issue "anti-suit injunctions" prohibiting L&H NV from continuing to prosecute the Artesia Adversary Proceeding.

On March 15, 2001, L&H NV filed the Emergency Motion Of Lernout & Hauspie Speech Products N.V. Under 11 U.S.C. §§ 105 And 362 And Bankruptcy Rule 7065 For Temporary Restraining Order And Preliminary Injunction (the "Emergency Motion") seeking injunctive and declaratory relief with respect to Artesia's Belgian Proceedings, specifically that the Bankruptcy Court immediately cause Artesia to discontinue both the Belgian Proceedings and the Saisies Conservatoires Processes. On March 16, 2001, the Bankruptcy Court granted the

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

Emergency Motion (the "Artesia TRO Order") which, among other things, prohibits Artesia from taking any further actions with respect to the Saisies Conservatoires Processes or the Belgian Proceedings.

On April 10, 2001, Artesia filed Defendant's Motion To Dismiss Or Stay Plaintiff's Fourth Cause Of Action, To Modify The Automatic Stay And To Stay The Second And Third Causes Of Action (the "Artesia Motion To Dismiss"). Ultimately, L&H NV reached and agreement with Artesia regarding the "floating lien" issue, memorialized in the Stipulation And Order dated May 31, 2001 (the "Artesia Stipulation"), pursuant to which L&H NV and Artesia agreed that the Saisies Conservatoires Process would be voluntarily vacated by Artesia and the issue of whether Artesia's floating lien applied to sums owed to Artesia by L&H NV under the Belgian Credit Facility would be adjudicated in Belgium. As part of the settlement, Artesia agreed that L&H NV would be entitled to a range of discovery comparable to that which would be available in the United States. Under the Artesia Stipulation, the automatic stay and setoff issues remain pending in the United States in the Bankruptcy Court and ultimately will be adjudicated by that tribunal.

The issue of Artesia's alleged floating lien on L&H NV's assets in Belgium ultimately was adjudicated by the Belgian Court on June 23, 2002. The Belgian Court determined that Artesia did not have a floating lien and that Artesia therefore will not be entitled to treatment as a secured creditor. L&H NV believes that Artesia intends to appeal the Belgian Court's June 23, 2002 decision. If Artesia is determined to be a secured creditor of L&H NV, payment of its claims should not impact the ultimate recovery to holders of Allowed Unsecured Claims because the Chapter 11 Assets should not be considered part of the Belgian assets that Artesia is claiming as their collateral. While the Committee does not believe that Artesia has a secured claim against any of the Chapter 11 Assets, there can be no assurances that a Court will ultimately rule in a manner consistent with the Committee's position if Artesia pursues a secured claim against the Chapter 11 Assets.

### 3.    Bakers' Claims

On or about April 13, 2001, L&H NV and L&H Holdings initiated an adversary proceeding (the "Baker Adversary Proceeding") in the Bankruptcy Court by filing the Complaint For Declaratory Relief Under 11 U.S.C. § 510(b) And Bankruptcy Rules 7001(8) And 7001(9) (the "Baker Complaint") against the Bakers which contained a single count seeking a declaratory judgment that any claims asserted, or to be asserted, by the Bakers that arose out of the Bakers' "purchase" of L&H NV Common Stock in connection with the Dragon Merger Agreement were pre-petition claims that are subject to mandatory subordination under section 510(b) of the Bankruptcy Code. The Baker Complaint also sought a declaration that any claims arising out of the Dragon Merger Agreement would be entitled to the same priority as L&H NV Common Stock for purposes of distribution under any plan of reorganization filed in these Bankruptcy Cases, irrespective of whether such claims were asserted against L&H NV or L&H Holdings.

On February 8, 2001, the Bakers filed a claim in the Belgian Court (the "Belgian Merger Claim") that sought in excess of $206 million in damages arising out of alleged fraud by

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

L&H NV in connection with the Dragon Merger Agreement. On or about June 11, 2001, the Bakers, together with two affiliated entities (collectively, the "Baker Parties"), filed a total of four (4) proofs of claim against L&H NV and four (4) proofs of claim against L&H Holdings (collectively, the "Baker U.S. Merger Claims"), that sought in excess of $588 million in damages arising, on a variety of theories, out of alleged fraud by L&H NV in connection with the Dragon Merger Agreement. On the same date, the Baker Parties also filed a total of two (2) proofs of claim against L&H NV and two (2) proofs of claim against L&H Holdings (collectively, the "Remaining Baker U.S. Claims"), that sought in excess of $312 million in damages arising out of, among other things, L&H NV's and L&H Holdings' alleged actions in interfering with the Baker Parties' proposed sale of their Dragon common stock to Visteon Corporation in or about January 2001 (the "Visteon Transaction").

By order dated June 28, 2001 (the "Baker Subordination Order"), the Bankruptcy Court dismissed the Baker Complaint but granted certain of the relief sought therein by way of resolving what it elected to term a "contested matter." Thus, the Bankruptcy Court determined that all of the Baker U.S. Merger Claims, irrespective of whether they were asserted against L&H NV or L&H Holdings, were subject to mandatory subordination under section 510(b) of the Bankruptcy Code. The Bankruptcy Court also held that any of the Baker U.S. Merger Claims that were asserted against L&H NV would be subordinated to the level of L&H NV Common Stock, and thus payable only to the extent that other creditors had been paid in full. The Baker Subordination Order also stated that any of the Baker U.S. Merger Claims that were asserted against L&H Holdings should be subordinated to the level of L&H Holdings Common Stock, and not L&H NV Common Stock.

L&H NV and L&H Holdings, together with the Committee, appealed (the "Baker Subordination Order Appeal") to the United States District Court for the District of Delaware from that portion of the Baker Subordination Order that held that the Baker U.S. Merger Claims asserted against L&H Holdings should be subordinated to the level of L&H Holdings common stock. When the appeal was fully briefed and ready for argument, L&H NV, L&H Holdings, and the Baker Parties entered into settlement negotiations. A settlement in principle was announced to the Bankruptcy Court on August 4, 2001 (the "August Settlement").

Before a final agreement could be negotiated and executed, however, L&H NV and L&H Holdings declined to proceed with the August Settlement due to changes in L&H NV's and L&H Holdings' projections regarding anticipated proceeds of certain of their asset sales. On October 19, 2001, L&H NV and L&H Holdings, after declining to proceed with the August Baker Settlement, filed the Motion For Order Pursuant To Section 502(C) Of The Bankruptcy Code Estimating At Zero And Temporarily Disallowing Certain Claims Of James K. Baker And Janet M. Baker (the "Baker Estimation Motion"), which was directed at estimating and/or temporarily disallowing of the Remaining Baker U.S. Claims. On October 23, 2001, the Baker Parties filed a Motion to Enforce Settlement Agreement (the "August Settlement Enforcement Motion"), which sought to enforce against L&H NV and L&H Holdings the terms of the August Settlement. L&H NV and the Committee opposed the August Settlement Enforcement Motion.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

On November 5, 2001, the Bankruptcy Court preliminarily determined that the August Settlement was enforceable against L&H NV and L&H Holdings and directed L&H NV and L&H Holdings to file a motion seeking approval of the August Settlement under Bankruptcy Rule 9019. On November 16, 2001, as directed by the Bankruptcy Court, L&H NV and L&H Holdings filed the Motion Pursuant To Section 363(b) Of Bankruptcy Code And Bankruptcy Rule 9019(a) Denying Approval of Baker Settlement Agreement (the "Baker Rule 9019 Motion"). On December 31, 2001, the Baker Parties responded to the Baker Rule 9019 Motion and filed an Alternative Motion To Convert Holdings To A Chapter 7 Liquidation And Appoint A Trustee (the "Baker Conversion Motion").

L&H NV, L&H Holdings, and the Baker Parties thereafter reopened settlement negotiations in early January 2002 and were able to reach an agreement (the "January Settlement") acceptable to all parties on January 10, 2002. The terms of the January Settlement were put on the record at a hearing before the Bankruptcy Court on that date and later embodied in a Stipulation and Order (the "Baker Stipulation") that was approved by the Court on January 31, 2002.

The material terms of the January Settlement, as reflected in the Baker Stipulation, were as follows:

(a) the Baker Parties received from L&H Holdings a settlement payment in the amount of $1.75 million -- $1 million in cash and $750,000 in stock of ScanSoft (the "Baker ScanSoft Stock");

(b) the Baker Parties and their counsel, Boies Schiller & Flexner LLP (the "Boies Firm"), received, pursuant to a letter agreement dated January 31, 2001 (the "Boies Letter Agreement"), limited rights under a Registration Rights Agreement among L&H NV, L&H Holdings and ScanSoft, dated as of December 7, 2001, such that (i) the Baker Parties have the right to join in any registration demand made by L&H NV and L&H Holdings and (ii) the Baker Parties have the right to be deemed, subject to Bankruptcy Court approval, to have the rights of a transferee under section 1145 of the Bankruptcy Code if L&H NV and L&H Holdings distribute ScanSoft stock thereunder pursuant to the Plan;

(c) the Baker Parties assigned to L&H NV the Belgian Merger Claims, the Baker U.S. Merger Claims, and the Remaining Baker U.S. Claims;

(d) each of L&H NV and L&H Holdings, on the one hand, and the Baker Parties, on the other hand, provided the other with full releases; and

(e) each of the respective parties withdrew with prejudice the Baker Estimation Motion, the August Settlement Enforcement Motion, the Baker Rule 9019 Motion, the Baker Conversion Motion, and the Baker Subordination Order Appeal.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

Pursuant to the ScanSoft Settlement, the Baker ScanSoft Stock was re-purchased by ScanSoft on September 16, 2002 as part of the Initial Purchase. *See Section IV.F.1. ("Chapter 11 Case. Summary Of Material Litigation And Related EventsSettlement With ScanSoft, Inc.").* Accordingly, L&H NV's obligations to the Baker Parties under the January Settlement have been satisfied.

### 4.    Mutual Release Agreement

On June 28, 2002, L&H NV and L&H Holdings filed the Motion Of Lernout & Hauspie Speech Products N.V. And L&H Holdings USA, Inc. For Entry Of Order, Under 11 U.S.C. §§ 105(a) And 363(b)(1) And Fed. R. Bankr. P. 9019, Approving Mutual Release Agreement Among Lernout & Hauspie Speech Products N.V. And L&H Holdings USA, Inc. Entered Into In Connection With L&H Holdings First Amended Plan Of Liquidation (the "Mutual Release Motion"). The Mutual Release Motion sought approval of the Mutual Release Agreement entered into among L&H NV and L&H Holdings dated on or about June 26, 2002 pursuant to which each entity (and its affiliates) released certain potential claims against the other (and its affiliates), including potential claims arising under the Dragon Merger Agreement, but excluding certain claims relating to transactions between and among L&H Holdings and L&H NV subsequent to the Petition Date relating to certain inter-company allocations of shared costs, including, among others, management costs, corporate marketing costs, break-up fees, professional fees and expenses, DIP fees, interest and related expenses, and insurance costs. The Mutual Release Agreement also does not include the U.S. Merger Claims and the Remaining Baker Claims assigned to L&H NV pursuant to the January Settlement. The Mutual Release Agreement was approved by the Bankruptcy Court on August 13, 2002. Such releases also are provided for in section 13.3 of the Plan and in section 13.3 of the L&H Holdings Plan which was confirmed on August 13, 2002.

### 5.    Stonington Entities

On or about November 27, 2000, the Stonington Entities initiated the Delaware Chancery Action in the Court of Chancery of the State of Delaware against L&H NV, Mr. Jo Lernout, Mr. Pol Hauspie, Mr. Gaston Bastiaens and Mr. Nico Willaert, seeking to rescind the Dictaphone Merger Agreement and regain possession of the shares of Dictaphone Common Stock, alleging, among other things, fraudulent inducement. The Delaware Chancery Action has been removed to the United States District Court for the District of Delaware, where the case still is pending.

On November 28, 2000, the Stonington Entities sought and obtained, in the Belgian Court certain preliminary relief in the form of an Order (as defined above, the "Belgian Order") directing L&H NV to deliver possession of the share certificates relating to Dictaphone Common Stock within twenty-four (24) hours to a custodian of the Belgian Court. The Belgian Court also prohibited L&H NV from granting a security interest in the shares of Dictaphone Common Stock and ordered that L&H NV pay a financial penalty of one (1) million Euros for each day after November 30, 2000 that it did not comply with the foregoing directives. L&H NV has appealed the Belgian Order to the Court of Appeal of Ghent, Belgium. Vergels

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

Advocaten, special Belgian counsel to the L&H Group, is handling the appeal. As of September 30, 2002, the appeal remains pending before the Court of Appeal of Ghent, Belgium, and a hearing has not yet been set.

On or about November 30, 2000, L&H NV filed the Complaint For Declaratory And Injunctive Relief, Actual Damages, And Punitive Damages Under 11 U.S.C. §§ 105 And 362 And Bankruptcy Rule 7065 (the "Stonington Complaint") seeking entry of an order commanding the Stonington Entities to cease and desist their prosecution and enforcement of the Belgian Order. After hearings on December 1, 2000 and December 4, 2000, the Bankruptcy Court entered an order (the "Initial Stonington Order") that (a) directed the Stonington Entities to "advise, in writing" the Belgian custodian of "automatic stay pursuant to § 362 of the Bankruptcy Code and the concomitant "freezing" of assets and collection activities thereunder; (b) directed the Stonington Entities to instruct the Belgian custodian "to cease and desist all efforts to collect or obtain possession of the shares of Dictaphone Corporation as otherwise provided for under" the Belgian Order; and (c) declared that "§ 362 of Title 11 applies to all creditors, including the Stonington Entities, to proscribe collection and enforcement activity of their claims."

On February 8, 2001, and again on March 19, 2001, however, the Stonington Entities renewed their efforts to use the Belgian Order to their advantage by lodging and prosecuting a claim based on the Belgian Order's penalty provision in the Belgian Case by filing a statement of claim containing, among other things, a claim for thirty-seven (37) million Euros relating to L&H NV's alleged failure to turn over the Dictaphone shares for the 37-day period between November 28, 2000 and January 5, 2001. On March 28, 2001, L&H NV responded by filing the Motion Of L&H Group Under 11 U.S.C. §§ 105 And 362 And Bankruptcy Rule 7065 For Preliminary Injunction, which the Bankruptcy Court granted on April 10, 2001 (the "Second Stonington Order"). The Second Stonington Order directed the Stonington Entities to, among other things, withdraw their claim in the Belgian Case to the extent it sought "recovery of penalties imposed by the Belgium Order."

On or about May 2, 2001, L&H NV filed the Motion Of The L&H Group For Partial Judgment On The Pleadings Or, In The Alternative, Partial Summary Judgment (the "Stonington Partial Summary Judgment Motion"), asserting that the Stonington Entities' claims were limited in nature and priority. Specifically, the Stonington Partial Summary Judgment Motion argued that because the Stonington Entities asserted causes of action in the Delaware Chancery Court Action that arose out of the "purchase" of L&H NV common pursuant to the Dictaphone Merger Agreement's "conversion" of Dictaphone stock into L&H NV Common Stock, the Stonington Entities subordinated their claims subject to the mandatory subordination provisions of section 510(b) of the Bankruptcy Code.

The Bankruptcy Court again agreed, and by order dated May 24, 2001 (the "Stonington Section 510(b) Order"), granted partial summary judgment to L&H NV on the Stonington Complaint's Fourth Cause of Action which sought a declaratory judgment that the Stonington Entities claims relating to the Dictaphone Merger Agreement were "pre-petition claims that are subject to mandatory subordination under section 510(b) of the Bankruptcy Code, such that, should the Stonington Entities ever file a proof of claim in these Bankruptcy Cases (or

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

the debtors file a claim on behalf of the Stonington Entities' interests if the Stonington Entities fail[s] to file a claim) based upon these claims, the claims asserted therein would have the same priority as the L&H NV Common Stock."

In response to the Stonington Section 510(b) Order, the Stonington Entities claimed that they could avoid the effect of the Section 510(b) Order by seeking allowance of claims solely in Belgium. On June 28, 2001, L&H NV therefore filed the Motion Of L&H Group (A) Under Bankruptcy Rule 7015 And Federal Rule Of Civil Procedure 15(a) And 15(d) For Leave To File Second Amended And Supplemental Adversary Complaint Or, (B) In The Alternative, Under Bankruptcy Rule 9014, For Determining Forum For Adjudication Of Dictaphone Claims As Contested Matter. The Stonington Entities consented to the filing of a second amended and supplemental complaint (the "Second Amended Stonington Complaint") (the first Stonington Complaint having been amended on April 10, 2001) seeking, among other things, a declaratory judgment that the relevant relationship between the Stonington Entities and L&H NV is centered exclusively in the United States, requiring that all matters relating to the Stonington Entities' claims in conjunction with the Dictaphone Merger Agreement will be adjudicated exclusively by the Bankruptcy Court under the Bankruptcy Code.

On or about July 26, 2001, L&H NV filed the Motion Of The L&H Group For Partial Judgment On The Pleadings Or, In The Alternative, Partial Summary Judgment (the "Partial Summary Judgment Motion"). On August 23, 2001, the Bankruptcy Court granted the Partial Summary Judgment Motion on the Second Amended Stonington Complaint's Forum Selection Claim, ruling that the priority, treatment, and classification of the Dictaphone Merger Claims were to be determined exclusively by the Bankruptcy Court. The Bankruptcy Court also enjoined the Stonington Entities from further prosecuting the issue of the priority, treatment, or classification of its claims in Belgium under Belgian Court.

On August 27, 2001, the Stonington Entities appealed the Bankruptcy Court's decision with respect to the Partial Summary Judgment Motion to the United States District Court for the District of Delaware. On September 17, 2001, after full briefing, the United States District Court for the District of Delaware affirmed the Partial Summary Judgment Order in its entirety. On September 27, 2001, the Stonington Entities appealed this decision to the United States Court of Appeals for the Third Circuit, which heard oral argument in connection with the appeal on June 13, 2002. On November 4, 2002, the Court of Appeals for the Third Circuit issued a decision reversing and remanding the two earlier orders by this Court and the Delaware District Court enjoining the Stonington Entities from pursuing their securities fraud claims in the Belgian case. The United States Court of Appeals for the Third Circuit also remanded the issue to the Bankruptcy Court for additional consideration.

As a result of the United States Court of Appeals for the Third Circuit's decision, a direct conflict exists between Belgian and United States law. Pursuant to Section 510(b) of the Bankruptcy Code, the Stonington Entities' Claims are subordinated to general, unsecured creditors. Under Belgian insolvency law, the Stonington Entities' claims are treated as general unsecured creditors. This direct conflict is one of the central reasons behind L&H NV's decision not to pursue the Debtor's First Amended Plan.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

### 6.    SEC Investigation

On August 31, 2000, the SEC issued the Order Directing Private Investigation And Designating Officers To Take Testimony, signaling the commencement of a formal SEC investigation. On October 10, 2002, the SEC filed a civil injunctive action against L&H NV in the United States District Court for the District of Columbia (the "SEC Action"). Specifically, the complaint for injunctive relief filed in the SEC Action alleges, among other things, that L&H NV engaged in a variety of undisclosed and deceptive transactions to inflate L&H NV's reported income and, consequently, the price of its stock. The complaint filed in the SEC Action sought an order permanently enjoining L&H NV from future violations of certain federal securities laws. A copy of the complaint is available through the Internet on the SEC's website, www.sec.gov.

On November 22, 2002, the Bankruptcy Court entered an order approving a settlement between L&H NV and the SEC (the "Settlement"). The Settlement provides for (i) L&H NV, without admitting or denying the allegations set forth in the SEC's complaint, to consent to the entry of an order (i) enjoining L&H NV from any future violations of securities statutes, (ii) prohibiting L&H NV from making any public statements directly or indirectly denying the allegation made by the SEC in its complaint and (iii) revoking the registration of L&H NV's common stock.

### 7.    AXA Relief Stay Motion

AXA Corporate Solutions (f/k/a AXA Global Risks (UK) Limited) ("AXA") issued the Directors And Officers Liability Insurance Including Company Reimbursement Primary Policy (Number 99 X 000 602 346) (the "AXA Policy") in favor of L&H NV and its "Subsidiaries" on or about February 25, 1999, with a term aggregate limit of liability of $20 million. On or about April 3, 2001, AXA (and its co-insurers) filed the Motion By AXA Corporate Solutions, f/k/a AXA Global Risks (UK) Limited, For Relief From The Automatic Stay, To The Extent Applicable (the "AXA Stay Relief Motion"). Pursuant to the AXA Stay Relief Motion, AXA sought to modify the automatic stay to allow it to advance defense expenses to certain individuals that were insured under the AXA Policy, claiming that the AXA Policy proceeds did not constitute property of the estate. The AXA Stay Relief Motion met considerable opposition, including opposition from both L&H NV and the Committee, both of whom filed objections.

Ultimately, the Bankruptcy Court granted the AXA Stay Relief Motion by order dated May 8, 2001 (the "AXA Relief Order"). The AXA Relief Order terminates the automatic stay (to the extent applicable) to permit AXA to advance certain defense expenses under the AXA Policy to certain directors and officers in connection with various litigation in which the directors and officers are named defendants.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

### 8.   Kemper Relief Stay Motion

Kemper Indemnity Insurance Company ("Kemper") issued its SecureExcess Policy No. 3DP-00 1096 (the "Kemper Policy") to L&H NV and its directors and officers, effective for the policy period April 12, 2000 to April 2, 2001 (the "Kemper Policy Period"). The Kemper Policy provides a limit of liability of $20 million each claim and in the aggregate for the Kemper Policy Period excess of an underlying primary limit of $20 million for all claims (including all costs and expenses) and retention provided by the AXA Policy. Although the Kemper Policy is with L&H NV, the officers and directors of L&H NV's subsidiaries, including Dictaphone, qualify under the definition of "Insured Persons" under the Kemper Policy.

Since September 28, 2000, Kemper has received notice of various actions filed against L&H NV and its directors and officers seeking coverage under the Kemper Policy. Kemper believes that L&H NV may have made certain material misrepresentations in its application for coverage which, if proven, would entitle Kemper to rescind the Kemper Policy in its entirety. Additionally and/or alternatively, Kemper believes that it may be entitled to deny coverage pursuant to various exclusions contained in the Kemper Policy and the AXA Policy.

On or about January 18, 2001, Kemper filed a Motion For An Order Granting Relief From The Automatic Stay Pursuant To 11 U.S.C. § 362(d)(1), Or, In The Alternative, Restraining The Debtor From Taking Any Action Against Kemper Indemnity Insurance Company Pending A Final Determination Of The Appropriate Forum In Which A Declaratory Judgment Action May Be Filed By Kemper Indemnity Insurance Company Against The Debtors (the "Kemper Relief Stay Motion"). In the Kemper Relief Stay Motion, Kemper sought relief from the automatic stay to exercise all of its rights and remedies against L&H NV under the Kemper Policy and applicable law, including, without limitation, to file a Complaint For Declaratory Judgment against L&H NV, and certain directors and officers of L&H NV, in the Massachusetts District Court (the "Kemper Complaint"). By Order dated February 16, 2001, the Bankruptcy Court denied the Kemper Relief Stay Motion without prejudice to Kemper to refile after one-hundred-twenty (120) days.

On December 27, 2001, Kemper filed a subsequent motion seeking relief from the automatic stay (the "Second Kemper Relief Stay Motion"), asserting the same bases for such relief put forth in the original Kemper Relief Stay Motion. The L&H Group and Kemper ultimately entered into a tolling agreement (the "Kemper Tolling Agreement"), which resolved the Second Kemper Relief Stay Motion. By order dated January 31, 2002, the Bankruptcy Court approved the Kemper Tolling Agreement.

On December 20, 2002, Kemper filed a third motion seeking relief from the automatic stay (the "Third Kemper Relief Stay Motion"), asserting the same bases for such relief put forth in the two original Kemper Relief Stay Motions. The Committee objected to the Third Kemper Relief Stay Motion, and L&H NV joined the Committee's objection. On February 11, 2003, the Court granted the Third Kemper Relief Stay Motion over the objections of both the Committee and L&H NV. As a result, the Committee expects Kemper to commence an action to rescind the Kemper Policy in the Southern District of New York.

### 9. Preference Actions

To date, the members of the L&H Group have initiated a number of actions to recover amounts transferred pre-petition that constitute either preferential or fraudulent transfers under the Bankruptcy Code.

On May 11, 2001, L&H NV initiated an adversary proceeding in the Bankruptcy Court (the "SG Cowen Proceeding") against SG Cowen Securities Corporation ("SG Cowen") by filing the Complaint To Avoid Preferential Transfers And To Recover Amount Of Such Transfers (the "SG Cowen Complaint"). The SG Cowen Complaint relates to an agreement between L&H NV and SG Cowen pursuant to which L&H NV retained SG Cowen to serve as its exclusive financial advisor in connection with L&H NV's acquisition of Dictaphone. The SG Cowen Complaint alleges that a success fee in the amount of approximately $7 million that L&H NV paid to SG Cowen in September 2000 as a consequence of the Dictaphone acquisition constitutes a preferential transfer pursuant to section 547 of the Bankruptcy Code. In late July 2002, L&H NV filed a motion for summary judgment in the SG Cowen Proceeding which currently is under the court's consideration.

During this case, L&H NV has commenced 75 adversary proceedings seeking to avoid over $53 million in potentially preferential transfers. In addition, since late November 2002, L&H NV has commenced four adversary proceedings seeking to avoid over $152 million in potentially fraudulent transfers. L&H NV has executed tolling agreements with three additional parties while L&H NV investigates the merits of potential claims exceeding $9 million. There can be no assurance that any of these avoidance actions will result in the recovery by the Estate of any assets. Pursuant to the Plan, all of these avoidance actions will be transferred to the Litigation Trust for prosecution and resolution.

## G. L&H Korea -- Investigation Of Fraud

Subsequent to the Petition Date, L&H NV commenced an investigation, spearheaded by PwC, of the operational and financial condition of L&H Korea, a subsidiary of L&H NV. On March 15, 2001, L&H NV disclosed that its investigation had revealed that substantially all revenues recorded for L&H Korea (in excess of $100 million) were fictitious and that L&H NV would file criminal complaints against the former local management team of L&H Korea and possibly Korean financial institutions involved in the fraud. L&H Korea subsequently filed for bankruptcy protection under Korean law.

## H. Restatement Of Financial Statements

The Audit Committee Report concluded that the financial statements for the periods 1998, 1999 and the first two (2) quarters of 2000 should be restated. *See Section III.C. ("Events Leading To Commencement Of Chapter 11 Case. Audit Committee Investigation")* Immediately after receipt of the Audit Committee Report, the L&H Entities set out to prepare such restatements. Thousands of hours were spent on the restatement project, and the L&H

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

Entities have released their preliminary conclusions, which are not audited or necessarily in compliance with United States Generally Accepted Accounting Principles ("USGAAP").

The L&H Entities believe that the preparation by an auditing firm, which has no prior relationship with the L&H Entities of audited restated financials in accordance with the USGAAP, would cost the L&H Entities millions of dollars in accounting fees. The L&H Entities do not have sufficient resources at this time to incur an expense of this magnitude. Nonetheless, the L&H Entities have begun reviewing their historical performance and determined preliminarily that revenues for the year ending December 31, 1998 previously were overstated by approximately $64 million (the "1998 Overstatement"), revenues for the year ending December 31, 1999 previously were overstated by approximately $158 million (the "1999 Overstatement") and revenues for the six (6) months ending June 30, 2000 previously were overstated by $140.7 million (the "2000 Overstatement"):

| Applicable Revenues | Revised | Reported | Variance |
|---|---|---|---|
| Total Revenues for year ending December 31, 1998 | $147,600,000 | $211,600,000 | ($64,000,000) |
| Total Revenues for year ending December 31, 1999 | $182,600,000 | $344,200,000 | ($158,000,000) |
| Total Revenues for six (6) months ending June 20, 2000 | $124,900,000 | $265,600,000 | ($140,700,000) |
| **Total** | **$458,700,000** | **$821,400,000** | **($362,700,000)** |

At this time, it is believed that the 1998 Restatement relates primarily to adjustments concerning L&H NV. With respect to the 1999 Restatement, it is currently believed that approximately (i) $21.4 million relates L&H NV, (ii) $73 million relates to L&H Asia Pte Ltd. (a wholly-owned subsidiary of L&H NV), (iii) $61.5 million relates to L&H Korea and (iv) $2.1 million relates to Lernout & Hauspie Speech Products USA, Inc. (a wholly-owned subsidiary of L&H Holdings). Finally, it is believed that the 2000 Restatement relates primarily to adjustments concerning L&H Korea (approximately $120.9 million) and concerning L&H NV (approximately $21.9 million).

## I.    Inter-Company Integration And Allocation Issues

As previously mentioned, following the acquisition by L&H NV of Dictaphone and Dragon, the L&H Group commenced efforts to integrate the businesses of L&H NV, Dictaphone, L&H Holdings and their respective subsidiaries. Therefore, research teams were merged, executives were appointed to lead business units that straddled various legal entities, and various technologies were used by members of the L&H Group without regard to which member owned such technologies. In various instances, there were no intercompany agreements governing the use of employees and technology, payment for such use and restrictions on such use.

These issues were brought to the Bankruptcy Court's attention early on in these cases and the L&H Group mandated that PwC spearhead a task force (the "PwC Task Force") to

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

make recommendations on these issues and to examine the appropriate allocation of revenues with respect to various transactions (the "Allocation Project").

While it made imminent sense to pursue the integration effort among the members of the L&H Group at a time when it was anticipated that the L&H Group would emerge from chapter 11 as a going concern, it soon became clear that given the current market environment (the market value of the stock of most speech recognition companies declined approximately 90% from the Spring of 2000) it was unrealistic to expect the L&H Group to emerge as one stand-alone entity. Therefore, throughout the respective members of the L&H Group's chapter 11 cases, substantial efforts were made to formalize intercompany relationships and to attempt to prepare Dictaphone to emerge as a stand-alone company with the necessary tools to operate as such.

## 1.    **PwC Allocation Project**

The Allocation Project and the PwC Task Force produced a series of recommendations that have been discussed extensively with the advisors to the Committee and the Dictaphone Creditors' Committee. These recommendations focused principally on the relationship between L&H NV and its affiliates on the one hand, and Dictaphone on the other. The PwC Task Force analyzed post-petition intercompany activity through May 31, 2001 (except as where specifically noted) and proposed a settlement of intercompany activity and their respective intercompany account balances among the members of the L&H Group. The post-petition activity can be broken into four components:

(a)    Technology;
(b)    Research & Development ("R&D");
(c)    Distribution; and
(d)    Shared Administrative Costs.

In addition to interviewing various employees of the L&H Group, PwC analyzed comparable industry information and metrics to arrive at prescribed allocation rates among the members of the L&H Group with respect to these components.

## 2.    **Technology**

An agreement was reached on August 27, 2001 with respect to the purchase of the *PowerScribe*® Assets. ***See Section IV.E.2. ("Chapter 11 Case. Significant Asset Sales. Sale Of Powerscribe® To Dictaphone")***. Pursuant to the *PowerScribe*® Transaction, L&H NV and its affiliates transferred their ownership interests in certain technology contained in the *PowerScribe*® *for Radiology* product. Additionally, L&H NV and its affiliates entered into certain licenses and agreements with Dictaphone, and other assets and associated liabilities related to the *Clinical Reporter Product*.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

### 3.   Shared Administrative Costs

PwC assisted the L&H Group's management in allocating shared administrative costs. The members of the L&H Group, after reviewing PwC's recommendations, have allocated the following shared costs:

| Description of Shared Cost | Dictaphone (in US $000s) | L&H NV (in US $000s) | L&H Holdings (in US $000s) | Total (in US $000s) |
|---|---|---|---|---|
|  |  |  |  |  |
| Management Costs | $        2,118 | $        2,617 | $        2,117 | $        6,852 |
| Corporate Marketing Costs | 113 | 113 | 113 | 339 |
| Professional Fees & Expenses | 9,792 | 13,511 | 6,134 | 29,437 |
| Insurance Costs | 7,641 | 832 | 3,478 | 11,951 |
| DIP Fees, Interest & Related Expenses | --- | 3,247 | 1,996 | 5,243 |
| Other | 180 | 508 | 326 | 1,014 |
|  | $      19,844 | $      20,828 | $      14,164 | $      54,836 |

The descriptions contained herein of agreements reached among L&H NV and L&H Holdings regarding the allocation of costs and expenses were approved by the Bankruptcy Court by order dated April 26, 2002. With respect to allocations among Dictaphone and L&H NV, and Dictaphone and L&H Holdings, the allocations were approved by the Bankruptcy Court pursuant to the order confirming the Third Amended Dictaphone Plan dated March 13, 2002. *See also Section IV.E.4.e. ("Chapter 11 Case. Significant Asset Sales. Sale Of Speech And Language Technologies Business. Allocation Of SLT Asset Sale Proceeds Among L&H NV And L&H Holdings").*

### J.   Statements Of Financial Affairs And Schedules Of Assets And Liabilities

On March 10, 2001, the L&H NV filed its Statement of Financial Affairs and Schedules of Assets and Liabilities (the "Schedules"). The Schedules reflect the assets and liabilities of the L&H NV.

### K.   Filing Deadline For Claims

#### 1.   Pre-Petition Claims – Chapter 11 Case

On April 10, 2001, the Bankruptcy Court entered an order (the "Filing Deadline Order") establishing June 11, 2001 at 4:00 p.m., New York time, as the final date for filing proofs of claim in the Chapter 11 Case (the "Filing Deadline"). The Filing Deadline Order also approved the form and manner of notice of the Filing Deadline (the "Filing Deadline Notices") and the proof of claim forms to be mailed to creditors, security holders, present and former employees, historical vendors and other parties-in-interest. With the assistance of Donlin, Recano & Company, Inc., the Voting Agent, the L&H Group mailed the Filing Deadline Notices in a timely fashion in English, French and Flemish versions. The L&H Group also caused notice of the Filing Deadline to be published in various publications, both in the United States and in Belgium, on or before May 11, 2001.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

Claim amounts and classification currently are being reviewed by L&H NV and remain subject to further review and analysis, final settlement negotiations and, where appropriate, objection. The members of the L&H Group have filed fourteen (14) omnibus objections, (1) the First Omnibus Objection Of L&H Group To Claims As Duplicative, Amended And Superceded, Or Late-Filed Claims, Pursuant To 11 U.S.C. § 502(b) And Bankruptcy Rule 3007, dated October 5, 2001 (the 'First Omnibus Objection"), (2) the Second Omnibus Objection, Pursuant To 11 U.S.C. § 502(b) And Bankruptcy Rule 3007, Of (a) Dictaphone Corporation To Reclassify Claims Mistakenly Filed Against It To Claims Or Interests Potentially Against Lernout & Hauspie Speech Products N.V., (b) L&H Holdings USA, Inc. To Reclassify Claims Mistakenly Filed Against It To Claims Or Interests Potentially Against Lernout & Hauspie Speech Products N.V., (c) Dictaphone Corporation To Disallow In Their Entirety And Expunge Certain Claims As No Amount Due, (d) L&H Holdings USA, Inc. To Disallow In Their Entirety And Expunge Certain Claims As No Amount Due, (e) Dictaphone Corporation To Liquidate And Allow Certain Claims Filed As Unliquidated Claims, (f) Dictaphone Corporation To Claims As Duplicative, and (g) Dictaphone Corporation To Claims As Amended Or Superceded, dated November 13, 2001 (the 'Second Omnibus Objection"), (3) the Third Omnibus Objection, Pursuant To 11 U.S.C. § 502(b) And Bankruptcy Rule 3007, Of (a) Dictaphone Corporation To Reclassify Claims Mistakenly Filed Against It To Claims Or Interests Potentially Against Lernout & Hauspie Speech Products N.V., (b) L&H Holdings USA, Inc. To Reclassify Claims Mistakenly Filed Against It To Claims Or Interests Potentially Against Lernout & Hauspie Speech Products N.V., (c) Dictaphone Corporation To Disallow In Their Entirety And Expunge Certain Claims As No Amount Due, (d) L&H Holdings USA, Inc. To Disallow In Their Entirety And Expunge Certain Claims As No Amount Due, (e) Dictaphone Corporation To Liquidate And Allow Certain Claims Filed As Unliquidated Claims, (f) Dictaphone Corporation To Claims As Duplicative, and (g) Dictaphone Corporation To Claims As Amended Or Superceded, dated May 14, 2002 (the 'Third Omnibus Objection"), (4) the Fourth Omnibus Objection, Pursuant To 11 U.S.C. § 502(b) And Bankruptcy Rule 3007, Of L&H Holdings USA, Inc., To (A) Disallow In Their Entirety And Expunge Certain Claims As No Amount Due, Late-Filed, Duplicative Or Amended And Superseded, (B) Reclassify Certain Claims As Potential Claims Against Either Dictaphone Corporation Or Lernout & Hauspie Speech Products NV, And (C) Reclassify And/or Reduce And Allow Certain Claims, dated June 3, 2002 (the "Fourth Omnibus Objection"), (5) the Fifth Omnibus Objection of Dictaphone Corporation, Pursuant to 11 U.S.C. Sections 502(b) and 507(a) and Bankruptcy Rule 3007, to (a) Disallow in Their Entirety and Expunge Certain Claims As No Amount Due, Late-Filed, or Duplicative, (b) Reduce Certain Claims and Allow Such Claims, (c) Reclassify Certain Claims to General Unsecured Status and Allow Such Claims, (d) Reclassify Certain Claims to General Unsecured Status, Reduce Such Claims, and Allow Such Claims, or (e) Reclassify Certain Claims to General Unsecured Status, Liquidate Such Claims, and Allow Such Claims, dated July 10, 2002 (the 'Fifth Omnibus Objection"), (6) the Sixth Omnibus Objection (Non-Substantive) Of Dictaphone Corporation, Pursuant To 11 U.S.C. 502(B) And Bankruptcy Rule 3007, To Disallow In Their Entirety And Expunge Certain Claims As Late-Filed Or Amended Or Superseded, dated September 3, 2002 (the "Sixth Omnibus Objection"), (7) the Seventh Omnibus Objection (Substantive) of Dictaphone Corporation, Pursuant to 11 U.S.C. 502(B) and 507(A) and Bankruptcy Rule 3007, to (A) Disallow in Their Entirety and Expunge Certain

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

Claims as No Amount Due, (B) Reduce Certain Claims and Allow Such Claims, (C) Reclassify Certain Claims to General Unsecured Status and Allow Such Claims, or (D) Reclassify Certain Claims to General Unsecured Status, Reduce Such Claims, and Allow Such Claims, dated September 3, 2002 (the "Seventh Omnibus Objection"), (8) the Eighth Omnibus Objection (Substantive) Of Dictaphone Corporation, Pursuant To 11 U.S.C. 502(b) And 507(a) And Bankruptcy Rule 3007, To (A) Disallow In Their Entirety And Expunge Certain Claims As No Amount Due, (B) Reduce Certain Claims And Allow Such Claims, Or (C) Reclassify Certain Claims To General Unsecured Status And Allow Such Claims, dated November 8, 2002 (the "Eighth Omnibus Objection"), the Ninth Omnibus Objection (Non-Substantive) Of Lernout & Hauspie Speech Products N.V., Pursuant To 11 U.S.C. Section 502(b) And Bankruptcy Rule 3007, To (A) Reclassify Certain Claims As Equity Interests And Disallow In Their Entirety And Expunge Such Claims and (B) Disallow In Their Entirety And Expunge Certain Claims As Duplicative Or Amended And Superseded, dated November 18, 2002 (the "Ninth Omnibus Objection"), (10) the Tenth Omnibus Objection (Substantive) Of Dictaphone Corporation, Pursuant To 11 U.S.C. Sections 502(b) And 507(a) And Bankruptcy Rule 3007, To (A) Disallow In Their Entirety And Expunge Certain Claims As No Amount Due, (B) Reduce Certain Claims And Allow Such Claims, Or (C) Reclassify Certain Claims To General Unsecured Status And Allow Such Claims, dated December 20, 2002 (the "Tenth Omnibus Objection"), (11) the Eleventh Omnibus Objection (Substantive) Of L&H Holdings USA, Inc., Pursuant To 11 U.S.C. Sections 502(b) And 503(b) And Bankruptcy Rule 3007, To (A) Disallow In Their Entirety And Expunge Certain Claims As No Amount Due Or Late-Filed, (B) Reduce Certain Claims And Allow Such Claims, And (C) Reclassify Certain Claim To General Unsecured Status And Allow Such Claim, dated December 20, 2002 (the "Eleventh Omnibus Objection"), (12) the Twelfth Omnibus Objection (Substantive) Of Dictaphone Corporation, Pursuant To 11 U.S.C. Sections 502(b), 503,And 507(a) And Bankruptcy Rule 3007, To (A) Disallow In Their Entirety And Expunge Certain Claims As No Amount Due, (B) Reduce Certain Claims And Allow Such Claims, (C) Reclassify Certain Claims And Allow Such Claims, (D) Reclassify Certain Claims, Reduce Such Claims, And Allow Such Claims, Or (E) Liquidate Certain Claims And Allow Such Claims, dated January 28, 2003 (the "Twelfth Omnibus Objection"), (13) the Thirteenth Omnibus Objection (Non-Substantive) Of Dictaphone Corporation, Pursuant To 11 U.S.C. Section 502(b) And Bankruptcy Rule 3007, To Disallow In Their Entirety And Expunge Certain Claims As Being Late-Filed, Duplicative, Or Amended Or Superseded, dated January 28, 2003 (the "Thirteenth Omnibus Objection"), (14) the Fourteenth Omnibus Objection (Substantive) Of Dictaphone Corporation, Pursuant To 11 U.S.C. Section 502(b) And Bankruptcy Rule 3007, To (A) Disallow In Their Entirety And Expunge Certain Claims As No Amount Due, Or (B)Reduce Certain Claim And Allow Such Claim, dated January 28, 2003(the "Fourteenth Omnibus Objection," and, collectively with all the other omnibus objections, the "Omnibus Objections"). By orders dated November 5, 2001, December 19, 2001, June 25, 2002, July 26, 2002, August 13, 2002, October 23, 2002 and December 20, 2002 respectively, the Bankruptcy Court sustained the First Omnibus Objection, the Second Omnibus Objection, the Third Omnibus Objection, the Fourth Omnibus Objection and Fifth Omnibus Objection, the Sixth Omnibus Objection, the Seventh Omnibus Objection the Eight Omnibus Objection, and Ninth Omnibus Objection.

L&H NV estimates, based on a preliminary review and analysis of all claims conducted as of February 5, 2003, that 5,041 proofs of claim totaling approximately $3.044

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

billion have been filed in the three chapter 11 cases of L&H NV, Dictaphone and L&H Holdings. As of the same date, 2,878 claims have been filed against L&H NV totaling approximately $1.584 billion. L&H NV also estimates that, as a consequence of certain of the Omnibus Objections, and certain other actions taken by L&H NV, no claims have been allowed by L&H NV, and 2018 claims have been expunged by L&H NV, totaling approximately $149,921,281.67 million.

## 2.    **Administrative Expense Claims**

On May 24, 2002, the Bankruptcy Court entered an order (the "Administrative Claim Deadline Order") establishing June 28, 2002 at 4:00 p.m., New York time, as the final date for filing Administrative Expense Claims in the chapter 11 cases of L&H NV and L&H Holdings (the "Administrative Claim Deadline"). The Administrative Claim Deadline Order also approved the form and manner of notice of the Administrative Claim Deadline and the relevant forms to be mailed to potential claimants. L&H NV and L&H Holdings also caused notice of the Administrative Claim Deadline to be published in the Wall Street Journal on June 10, 2002. As of September 1, 2002, 389 administrative expense claims have been filed against L&H NV, totaling approximately $60.1 million.

## L.    **History Of Plan Formulation**

Shortly after the commencement of their chapter 11 cases, the members of the L&H Group, the Committee (then representing the unsecured creditors of all three (3) Estates) and the Dictaphone Creditors' Committee once it was formed, discussed with the L&H Group the potential sale of the L&H Group's businesses to maximize the value of the Estates. After a period of time during which the L&H Group began to formulate an action plan to implement a sale strategy, the Dictaphone Committee informed the L&H Group that it believed that the reorganization (and not the sale) of Dictaphone was in the best interest of its estate and creditors.

Beginning in May 2001, the members of the L&H Group and their retained professionals began negotiations with both Creditors' Committees regarding the terms of a joint plan of reorganization in the three chapter 11 cases. After extensive negotiations, the Creditors' Committees and certain creditor constituents agreed on the terms of a plan as they relate to claims and equity interests in all three members of the L&H Group.

Initially, the Joint Plan was filed embodying the terms of these negotiations on August 28, 2001 with the Bankruptcy Court. The Joint Plan provided, among other things, for the reorganization of Dictaphone and the transfer of all of the assets of the L&H Entities into two new separate entities post-chapter 11 that will sell or otherwise dispose of assets for the benefit of the stakeholders of such estates, through either a joint venture or similar vehicle. Shortly after filing the Joint Disclosure Statement, and prior to the hearing scheduled to consider the adequacy of the Joint Disclosure Statement, however, a change in circumstances compelled the L&H Group to decide not to seek approval at that time of the L&H Group Disclosure Statement insofar as it relates to the L&H NV and L&H Holdings. Specifically, the Belgian Court's September 21, 2001 order imposed several conditions on L&H NV that (a) might not be

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

consistent with the Joint Plan and (b) might affect L&H NV's ability to consummate the Joint Plan. Moreover, insufficient progress had been made with respect to the sale or other disposition of the L&H Entities' Speech And Language Technologies Business, impeding the L&H Group's ability to formulate the terms of the chapter 11 plan, a critical component of which would involve the distribution of the proceeds from the sale of these assets. *See Section IV.E.4. ("Chapter 11 Case. Significant Asset Sales. Sale Of Speech And Language Technologies Business").*

Given the existence of these unresolved matters, the L&H Group determined that the most efficient course would be to adjourn final consideration of the Joint Disclosure Statement insofar as it relates to L&H Holdings and L&H NV, and to proceed with seeking approval of a disclosure statement (and plan) exclusively relating to Dictaphone. On January 31, 2002, the Dictaphone Plan was filed relating solely to claims against and equity interests in Dictaphone. The Dictaphone Plan was confirmed on March 13, 2002 and became effective on March 28, 2002.

While L&H NV and L&H Holdings originally contemplated filing a joint plan, they decided subsequently that the more prudent course of action would be to proceed separately with (a) a plan of liquidation relating solely to claims against and equity interests in L&H Holdings and (b) a plan of liquidation relating solely to Claims against and Equity Interests in L&H NV. The pendency of the Belgian Case, and the possibility that certain restrictions imposed on L&H NV in the Belgian Case might interfere with L&H NV's ability to consummate a joint plan with L&H Holdings in the United States also led L&H Holdings to pursue its own plan of liquidation. Accordingly, on April 29, 2002, the L&H Holdings Plan was filed. The Bankruptcy Court confirmed the L&H Holdings Plan on August 13, 2002. The L&H Holdings Plan became effective on September 23, 2002. L&H NV expects to receive [$] million pursuant to the L&H Holdings Plan on account of L&H NV's 100% equity ownership interest in L&H Holdings.

On October 16, 2002, L&H NV filed the Debtor's First Amended Plan and the Debtor's First Amended Disclosure Statement. Prior to the hearing to consider the adequacy of the information contained in the Debtor's First Amended Disclosure Statement, L&H NV determined not to pursue the Debtor's First Amended Plan because of complications related to the Belgian Case, including the direct conflict between Belgium and United States law with respect to the treatment of the claims of the Stonington Entities.

The Committee believes that the Plan, by allocating L&H NV's assets between the Belgian Case and the Chapter 11 Case for the assets allocable to the Chapter 11 Case to be distributed in the Chapter 11 Case pursuant to the Bankruptcy Code, represents the only fair means of concluding the Chapter 11 Case in the near term in light of the complications resulting from the existence of the Belgian Case. In drafting the Plan, numerous issues required resolution, including the proper construction of an acceptable analytical framework within which to divide L&H NV's assets for administration between the Belgian Case and the Chapter 11 Case.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

**M.    L&H Asset Allocation**

Houlihan Lokey Howard & Zukin Capital ("Houlihan Lokey"), the Committee's financial advisors, have allocated L&H NV's assets between the Chapter 11 Case and the Belgian Case (the "L&H Asset Allocation"), taking into account the methodology and metrics of the PwC Allocation Project, with necessary adjustments as described below, Houlihan Lokey arrives at a prescribed allocation of L&H NV's assets as between the Chapter 11 Case and the Belgian Case. The L&H Asset Allocation has two parts: (i) an allocation of assets and (ii) an allocation of cash utilization.

**1.    Asset Allocation**

Attached as Exhibit B to this Disclosure Statement is a table which sets forth the asset allocation between the Chapter 11 Case and the Belgian Case. The proceeds of asset sales conducted since the Petition Date represent the majority of L&H NV's current assets. Given the fact that L&H NV's assets were integrated among multiple business units and product lines, Houlihan Lokey allocated the asset sale proceeds based on, among other metrics, the origin of the technology development and product research and development, and the location of business unit operations and sales generation. Houlihan Lokey used a list of products within each asset group and allocated each product between the Chapter 11 Case and the Belgian Case, based on the proportion of each product's research and development contribution attributable to operations based in either the United States or Belgium. After each product was allocated, the proceeds received from the sale of such assets were allocated between the Chapter 11 Case and the Belgian Case. Of note, assets attributable to entities outside of the United States or Belgium, in whole or part, were allocated evenly between the Chapter 11 Case and the Belgian Case.

The L&H Asset Allocation also includes sources of value that became available to L&H NV since the Petition Date other than asset sale proceeds (e.g., tax refunds, interest income and miscellaneous receipts). Allocation of these assets was based primarily on the location of origin of such assets because their origin was relatively clear.

The aggregate amount received from both asset sale proceeds and other sources of cash totaled $106,569,925. Of that sum, Houlihan Lokey determined that $59,182,962 is attributable to the Chapter 11 Case and the remaining $47,386,963 is attributable to the Belgian Case. The foregoing represents a percentage allocation of 55.5% for the Chapter 11 Case and 44.5% for the Belgian Case.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

## 2.    Cash Usage Allocation

Attached as Exhibit C to this Disclosure Statement is a table which sets forth the cash usage allocation between the Chapter 11 Case and the Belgian Case.  As discussed above, a component of the L&H Asset Allocation is the use of cash attributable to the assets allocated to the Chapter 11 Case or the Belgian Case since the Petition Date.  In that regard, Houlihan Lokey relied on information provided by L&H NV, including the asset(s) giving rise to the liability, nature and origin of the liability and location (i.e. United States or Belgium) of the bank account which paid the liability.  For instance, research and development costs associated with the SLT Assets were allocated between the Chapter 11 Case and the Belgian Case in accordance with the percentage allocation of proceeds derived from the SLT Assets, even though all of such liabilities were paid out of a United States bank account.  In other cases, costs were clearly paid by one business unit for the account of another business unit (e.g. insurance costs).  When certain expenses were not clearly attributable to either the Chapter 11 Case or the Belgian Case, Houlihan Lokey determined that (i) the research and development costs should reflect the percentages applied to proceeds received from the sale of such assets and (ii) professional fees should reflect, among other factors, the percentages applied to proceeds received from all the sale of such assets.

In addition to historical use of cash, the Allocation Analysis reflects liabilities of $3,200,000 that were still estimated to be outstanding.  These liabilities include remaining professional fees, an outstanding tax liability in connection with Interactive Systems, Inc. and other miscellaneous and unforeseen costs.  Houlihan Lokey allocated the expected outlays based on the above described metrics (please observe the footnotes in the analysis for more detail regarding the assumptions).

## 3.    Summary of Allocation Analysis

In conclusion, based on the L&H Asset Allocation, the allocation amounts are $34,676,979 for the Chapter 11 Case and $9,175,370 for the Belgian Case or 79.1% and 20.9% of the $43,852,348 remaining L&H NV assets, respectively.  It is Houlihan Lokey's belief that this approach is the most reasonable and accurate method for determining the fair amount allocable of the current value of L&H NV between the Chapter 11 Case and Belgian Case.

## V.    SUMMARY OF PLAN OF LIQUIDATION FOR L&H NV

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, TO THE EXHIBITS ATTACHED THERETO, AND TO THE PLAN SUPPLEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE CHAPTER 11 ASSETS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN L&H NV AND OTHER PARTIES IN INTEREST.

## A.    Overview Of Plan

The Plan seeks to effectuate an allocation of the proceeds from the sale of virtually all of the Chapter 11 Assets among the various creditor constituencies. Specifically, the Plan has been formed as a liquidating plan for the Chapter 11 Case only due to the fact that the Belgian Case is not ready for resolution at this time, and as described herein, certain direct conflicts exist between Belgian and United States insolvency laws with respect to the treatment of certain claims. The Plan contemplates the formation of a litigation vehicle to maximize the recoveries on litigation claims.

The Plan also provides for Distributions of Available Cash and Litigation Trust Beneficial Interests among holders of certain Allowed Claims as follows: (a) ninety-three percent (93%) of the Litigation Trust Beneficial Interests will be distributed to holders of general unsecured claims against the Chapter 11 Assets and (b) seven percent (7%) will be distributed to holders of claims arising out of or in connection with the PIERS and Old Convertible Subordinated Notes. Finally, as part of the settlement incorporated into the Plan regarding the allocation of Distributions, any Distributions that L&H NV obtains through the Dictaphone Plan on account of Intercompany Loan Agreement Claims will not be redistributed to the Lenders.

## B.    General Description Of Classification And Treatment of Claims And Equity Interests

The Committee has classified the Claims and Equity Interests in the Plan in accordance with the Bankruptcy Code and other applicable law. In all cases, the treatment of any Claim may be modified as agreed upon in writing between the holder of such Claim and Post-Effective Date L&H, subject, if necessary, to the approval of the Bankruptcy Court after notice and a hearing. In addition, in all cases, Post Effective Date L&H reserves the right, at its option, to prepay, without penalty or premium, any amount that the Plan provides will be paid after the Effective Date.

The treatment of any Claim or Equity Interest under the Plan will be in full satisfaction, settlement, release of and in exchange for such Claim or Equity Interest as it relates

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

to the Chapter 11 Assets. All Distributions or other transfers to be made to holders of Allowed Claims will be made by Post Effective Date L&H in accordance with the terms of the Plan.

### 1.    Unclassified Claims

#### a.    Administrative Expense Claims

Administrative Expense Claims relate to right to payment constituting a cost or expense of administration of the Chapter 11 Case Allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Chapter 11 Assets, (b) any actual and necessary costs and expenses of operating the businesses related to the Chapter 11 Assets, (c) any indebtedness or obligations incurred or assumed by the Debtor in the ordinary course of business in connection with the Chapter 11 Assets, (d) claims for reclamation of the Chapter 11 Assets Allowed in accordance with section 546(c)(2) of the Bankruptcy Code pursuant to a Final Order, (e) any Professional Fees, whether fixed before or after the Effective Date, (f) any fees or charges assessed against and payable by the Estate of the Debtor under section 1930, Chapter 123, title 28, United States Code, including post-Confirmation Date and post-Effective Date fees and charges, and (g) the Indenture Trustees' Fees.

Each holder of an Allowed Administrative Expense Claim shall be paid Cash in full by Post Effective Date L&H, (i) upon the Effective Date or as soon as practicable thereafter, (ii) as soon as practicable after such Claim becomes an Allowed Administrative Expense Claim if the date of allowance is later than the Effective Date, or (iii) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Expense Claim and Post Effective Date L&H; provided, however, that all post-Effective Date professional fees and related expenses accrued by Professionals in connection with the Plan and the Chapter 11 Assets shall be paid by Post Effective Date L&H within ten (10) Business Days of the submission by any Professional of an invoice to Post Effective Date L&H. In the event that Post Effective Date L&H objects to the payment of a Professional's post-Effective Date invoice, in whole or part, and the parties cannot resolve such objection after good faith negotiation, the Bankruptcy Court shall retain jurisdiction to review the disputed invoice and make a determination as to the extent to which the invoice shall be paid by Post Effective Date L&H.

#### b.    Priority Tax Claims

Priority Tax claims consist of any Claim of a governmental unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

On the Effective Date or as soon as practicable thereafter, or as soon as practicable after such Claim becomes an Allowed Claim if the date of allowance is later than the Effective Date, a holder of an Allowed Priority Tax Claim shall be entitled to receive in full satisfaction, settlement, and release of, and in exchange for such Allowed Priority Tax Claim (a) deferred Cash payments in an aggregate principal amount equal to the amount of such Allowed Priority Tax Claim plus interest, to the extent required under applicable law, on the unpaid

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

portion thereof at the legal rate of interest (excluding any default interest rate), or, in the absence of a legal rate of interest, at a rate of four percent (4%) per annum, from the Effective Date through the date of payment thereof, which date shall not extend beyond the sixth anniversary of the Effective Date, or (b) such other treatment as to which Post-Effective Date L&H and such holder shall have agreed upon in writing, with the approval of the Bankruptcy Court. If deferred Cash payments are made to a holder of an Allowed Priority Tax Claim, the remaining unpaid portion of such Allowed Claim shall be paid on or before the sixth anniversary of the Effective Date, together with any accrued and unpaid interest to the date of payment; provided, however, that Post Effective Date L&H reserves the right to pay any Allowed Priority Tax Claim, or any remaining balance of such Allowed Priority Tax Claim, in full at any time on or after the Effective Date without premium or penalty.

### 2. Treatment Of Classified Claims

#### a. Unimpaired Classes Of Claims

##### i. Class 1: Priority Non-Tax Claims

Class 1 consists of any Claim of a kind specified in sections 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

On the Effective Date or as soon as practicable thereafter, or as soon as practicable after such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim if the date of allowance is later than the Effective Date, a holder of an Allowed Class 1 Priority Non-Tax Claim shall receive, in full satisfaction, settlement, release of, and in exchange for such Allowed Class 1 Priority Non-Tax Claim (a) a Distribution of Cash equal to the amount of such Allowed Class 1 Priority Non-Tax Claim, or (b) such other treatment as to which Post Effective Date L&H and such holder shall have agreed upon in writing.

##### ii. Class 2: Secured Claims

Class 2 consists of all Secured Claims. A Secured Claim is a Claim secured by a Lien on Collateral to the extent of the value of the Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or as otherwise agreed upon in writing by Post-Effective Date L&H and such holder and subject to the approval of the Bankruptcy Court. To the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim is an Unsecured Deficiency Claim unless, in any such case, the Class of which such Claim is a part makes a valid and timely election under section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent Allowed.

Each holder of an Allowed Secured Claim shall be deemed to be classified in a separate Class and shall be treated as follows: to the extent that any such Claim is determined to

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

be an Allowed, valid and perfected Secured Claim, the holder of such Secured Claim shall receive the first net proceeds (*i.e.*, proceeds net of all costs and expenses related to such sale) from the sale of any of its Collateral to the extent of the principal amount of its Claim. To the extent permitted under applicable law, including the Bankruptcy Code, as determined by the Bankruptcy Court at the Confirmation Hearing, the holder of such Allowed Secured Claim shall receive the contractual non-default rate of interest on such Allowed Secured Claim semiannually in arrears based upon the amount of unpaid principal for such period and permitted costs thereon. Until each Secured Claim is paid in full, the holder of such Allowed Secured Claim shall retain the Liens securing such Allowed Secured Claim. Notwithstanding anything to the contrary herein, Post Effective Date L&H shall make full payment to each such secured creditor to the extent of its Allowed Secured Claim on or before December 31, 2004.

### b.  **Impaired Classes Of Claims (Entitled To Vote)**

#### i.  **Class 3: Unsecured Claims**

Class 3 consists of (i) any Claim against the Chapter 11 Assets that is not an Administrative Expense Claim, Secured Claim, Priority Tax Claim, Priority Non-Tax Claim, PIERS/Old Convertible Subordinated Notes Claim, or Securities Law Claim.

Subject to Section 5.2.3(b) of the Plan, on the Effective Date or as soon as practicable thereafter, or if such Unsecured Claim becomes an Allowed Unsecured Claim after the Effective Date, as soon as practicable after such Unsecured Claim becomes an Allowed Unsecured Claim, and thereafter in full satisfaction, settlement, release of, and in exchange for such Allowed Class 3 Unsecured Claim, each holder of an Allowed Class 3 Unsecured Claim shall receive a Ratable Proportion of the Available Cash and ninety-three percent (93%) of the Litigation Trust Beneficial Interests (the "Allowed Unsecured Claim Trust Interests"); provided, however, that holders of Claims under the Belgian Revolving Credit Facility (which are classified under, and constitute a portion of, Class 3 Unsecured Claims) shall not be entitled to any Distributions that are the proceeds (either directly or derivatively) of distributions made to L&H NV pursuant to the Dictaphone Plan on account of Intercompany Loan Agreement Claims assertable by L&H NV under the Dictaphone Plan; and provided, further, that as a condition to receiving the Distributions set forth in this Section 5.2.3 of the Plan, all holders of Claims under the Belgian Revolving Credit Facility shall be deemed to have waived any right to receive, and shall not receive, either directly or derivatively, any distributions that are made to L&H NV pursuant to the Dictaphone Plan on account of Intercompany Loan Agreement Claims. No interest shall be paid on any Class 3 Unsecured Claim.

Holders of Allowed Class 3 Unsecured Claims shall not receive any Distributions after they have received 100% repayment of the principal amount of their Allowed Class 3 Unsecured Claims. Any distributions by Dictaphone or Reorganized Dictaphone under the Dictaphone Plan, as the case may be, to the Lenders on account of the Dictaphone Guaranty shall be included in determining whether the Lenders have received 100% repayment of their claims relating to the Belgian Revolving Credit Facility. The Lenders, however, may assert the full amount of their Allowed Class 3 Unsecured Claims until such time as they have received 100%

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

repayment of the principal amount of their Allowed Class 3 Unsecured claims under the Belgian Revolving Credit Facility (after taking into account distributions under the Plan and the Dictaphone Plan). If Class 3 Unsecured Claims, as a class, vote to accept the Plan, all holders of Allowed Class 3 Unsecured Claims shall be deemed to have waived, and shall forever be barred from, pursuing a claim in the Belgian Case. After all holders of Allowed Class 3 Unsecured Claims have received 100% repayment of the principal amount of their Allowed Unsecured Claims, all further Distributions of Available Cash (hereinafter the "Excess Available Cash") and Litigation Trust Beneficial Interests shall be distributed to holders of Allowed Class 4 PIERS/Old Convertible Subordinated Notes Claims.

### ii.    Class 4: PIERS/Old Convertible Subordinated Notes Claims

Class 4 consists of all PIERS Claims and Old Convertible Subordinated Notes Claims. Subject to Section 5.2.3(b) of the Plan, on the Effective Date or as soon as practicable thereafter, or, as soon as practicable after such Claim becomes an Allowed PIERS/Old Convertible Subordinated Notes Claim if the date of allowance is later than the Effective Date, and thereafter, each holder of a PIERS/Old Convertible Subordinated Notes Claim shall receive, in full satisfaction, settlement, release of, and in exchange for such Allowed PIERS/Old Convertible Subordinated Notes Claim, a Ratable Proportion of both (i) the Excess Available Cash (if any) and (ii) seven-percent (7%) of the Litigation Trust Beneficial Interests. No interest shall be paid on any Class 4 PIERS/Old Convertible Subordinated Notes Claim.

### c.    Impaired Classes Of Equity Interests (Not Entitled To Vote)

### i.    Class 5: Common Stock

Class 5 consists of all interests of holders of Common Stock on account of such interests. Holders of Class 5 Common Stock Equity Interests will receive no Distributions under the Plan on account of such Class 5 Common Stock Equity Interests.

### ii.    Class 6: Securities Law Claims

Class 6 consists of all Securities Law Claims, which include any claims (1) arising from rescission of a purchase or sale of a security of the Debtor or an Affiliate of the Debtor; (2) for damages arising from the purchase or sale of such a security; (3) for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of a Claim for damages or rescission arising out of a purchase or sale of a security of the Debtor or an Affiliate of the Debtor; or (4) for similar violations of the securities laws, misrepresentations, or any similar claim, including, to the extent related to the foregoing or subject to subordination under section 510(b) of the Bankruptcy Code, but not limited to, any attorneys' fees, other charges or costs incurred in connection with the foregoing, claims for indemnification relating to the foregoing, the Securities Class Actions/Suits, and those certain Claims asserted by Stonington Capital Partners, Inc., Stonington Capital Appreciation 1994 Fund, L.P. and Stonington Holdings LLC.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

### iii.    Class 7:  Other Equity Interests

Class 7 consists of all Equity Interests in L&H NV not otherwise classified in Classes 5 and 6, including the interests of holders of Old Stock Options.  A holder of any Equity Interest not otherwise classified in Class 5 or 6 will receive no distributions under the Plan on account of such Equity Interest.

## C.    Means For Implementation Of Plan

### 1.    Periodic Distributions Of Available Cash and Litigation Trust Beneficial Interests

Post Effective Date L&H shall make Distributions as provided under the Plan from the net proceeds it has obtained or obtains from the Transfers of the Chapter 11 Assets for a period of up to five (5) years after the Effective Date.  To effect the foregoing, Post Effective Date L&H shall make Distributions of Cash, Available Cash, and Litigation Trust Beneficial Interests on account of any portion of, or in the full amount of Allowed Claims as soon as reasonably practicable after the Effective Date and, thereafter, on the first Business Day of each calendar semester (each such date, a "Semi-Annual Distribution Date"); provided, however, that except with respect to the final Distribution, Post Effective Date L&H shall not make any such Distributions unless the amount of Available Cash is in excess of $1,000,000.  Such Distributions shall continue until Post Effective Date L&H has Transferred all of its assets and there is no additional Available Cash for Distributions under the Plan.  To the extent that the Chapter 11 Assets consist of neither Cash nor Cash equivalents, Post Effective Date L&H shall endeavor to distribute such non-Cash consideration in such manner as to give effect to the distribution scheme contemplated under the Plan.  Post Effective Date L&H shall have absolute discretion to pursue or not to pursue any and all claims, rights, defenses, or Causes of Action that it retains pursuant to the Plan, as it determines in the exercise of its business judgment, and shall have no liability for the outcome of its decision.

### 2.    Post Effective Date L&H NV's Obligations Under Plan

From and after the Effective Date, as set forth herein, the Plan Administrator, Post Effective Date L&H, the Litigation Trustee, and the Litigation Trust, as the case may be, shall perform the their respective obligations under the Plan.  The Plan shall be administered and actions shall be taken in the name of the Debtor and Post Effective Date L&H through, in accordance with the terms hereof, Post Effective Date L&H, the Plan Administrator, the Litigation Trustee, and/or the Litigation Trust, irrespective of whether the Debtor is dissolved.  From and after the Effective Date, Post Effective Date L&H shall continue in existence for the purpose of:

(a)    administering the Plan and taking all steps and executing all instruments and documents necessary to effectuate the Plan;

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

(b)    selling or otherwise disposing of the Chapter 11 Assets and winding up affairs relating to the Chapter 11 Assets as expeditiously as reasonably possible;

(c)    taking any actions to liquidate, and maximize the value of, the Chapter 11 Assets;

(d)    assigning all Assigned Causes of Action, and all claims, interests, rights and privileges of each of L&H NV relating thereto to the Litigation Trust for enforcement, prosecution and settlement by the Litigation Trustee in accordance with the terms of this Plan and the Litigation Trust Agreement; provided, however, that Post Effective Date L&H shall retain an interest in the Assigned Causes of Action solely to assert a defense to a Claim or Equity Interest based upon such Assigned Causes of Action;

(e)    reconciling all Claims and resolving all Disputed Claims, and administering the Claims allowance and disallowance processes as set forth in the Plan, including objecting, prosecuting, litigating, reconciling, settling and resolving Claims and Disputed Claims in accordance with the Plan;

(f)    making decisions regarding the retention, engagement, payment and replacement of professionals, employees and consultants;

(g)    cooperating with the Litigation Trustee, the Litigation Trust, and the Litigation Monitoring Committee with regard to the pursuit of the Assigned Causes of Action;

(h)    in conjunction with Litigation Trustee, providing quarterly reports to the Litigation Monitoring Committee as to budgets, cash receipts and disbursements, asset sales or other dispositions, claims reconciliation, Litigation Proceeds and Distributions under the Plan;

(i)    administering the Distributions under the Plan, including (i) making Distributions in accordance with the terms of the Plan, (ii) establishing and maintaining the various Disputed Claims Reserves, and (iii) filing with the Bankruptcy Court semi-annual reports regarding the Distributions to be made to the holders of Allowed Claims;

(j)    exercising such other powers as necessary or prudent to carry out the provisions of the Plan;

(k)    investing any Cash in any reserves or pending distribution in accordance with reasonable business judgment for any such Entity;

(l)    filing all appropriate tax returns; and

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

(m)  taking such other action as may be necessary or appropriate to effectuate this Plan.

Each of the Plan Administrator, Post Effective Date L&H, the Litigation Trust, and the Litigation Trustee may incur and pay any reasonable and necessary expenses in performing the foregoing functions, subject to the terms of the Plan. For purposes of exercising its powers, each of the Plan Administrator, Post Effective Date L&H, the Litigation Trustee and the Litigation Trust shall be deemed to be a representative of the Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

## 3. Approval Of Settlements

The entry of the Confirmation Order shall constitute the Bankruptcy Court's finding and determination that the settlements reflecting in the Plan, including, but not limited to, (i) the settlement of the Distribution allocations between the various Classes of creditors and Equity Interests and (ii) the allocation of assets between the Belgian Case and the Chapter 11 Case, are (a) in the best interest of L&H NV and its Estate, (b) fair, equitable and reasonable, (c) made in good faith, and (d) approved by the Bankruptcy Court. Subject to obtaining the approval of the settlements reflected in this Plan by the Bankruptcy Court, on the Effective Date, Post Effective Date L&H shall take all actions necessary or reasonably required to affect the matters set forth in such settlements.

## 4. Litigation Trust

All of the Assigned Causes of Action will be assigned to the Litigation Trust. As a result of the accounting irregularities and allegations of fraud relating to L&H NV's prepetition activities, numerous potential Causes of Action exist relating to these matters and to L&H NV's acquisitions of various companies, including, but not limited to, Dictaphone and L&H Holdings. These potential Causes of Action include actions against L&H NV's former officers and directors, prepetition auditors (possibly including KPMG or any of its foreign or U.S. affiliates for, *inter alia*, accounting fraud), financial advisors and other professionals and the financial institutions involved in the alleged fraudulent activities of and involving L&H NV's investments and activities in Korea. The Litigation Trust will pursue the Assigned Causes of Action in such a manner as to maximize the recoveries to the respective Classes of creditors and interests receiving Litigation Trust Beneficial Interests under the Plan.

The Litigation Trust will not be assigned Causes of Action released in accordance with Section 13.3 of the Plan or Causes of Action settled or resolved in the Plan or pursuant to a Final Order of the Bankruptcy Court. Other excluded Causes of Action include any Causes of Action asserted against any third party who has asserted a Claim against the Chapter 11 Assets unless and until (a) Post Effective Date L&H has asserted any and all counterclaims against such third party or rights to setoff or recoupment against such third party, including rights under section 502(d) of the Bankruptcy Code, and (b) such counterclaims, rights to setoff or recoupment, or rights under section 502(d) of the Bankruptcy Code have been determined by a

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

Final Order or otherwise. Post Effective Date L&H will retain defenses, counterclaims, and setoffs to any causes of action or claims asserted against it.

THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO SET FORTH A FULL LIST, SUMMARY OR DESCRIPTION OF ALL CAUSES OF ACTION OR CLAIMS BEING ASSIGNED TO, AND THAT MAY BE PURSUED BY, THE LITIGATION TRUST. RATHER, THIS DISCLOSURE STATEMENT SETS FORTH CERTAIN SIGNIFICANT CAUSES OF ACTION AND LITIGATION MATTERS BEING ASSIGNED TO, AND THAT MAY BE PURSUED BY, THE LITIGATION TRUST. THE LITIGATION TRUST WILL RETAIN AND POSSESS ALL RIGHTS TO ASSERT ALL CAUSES OF ACTIONS AND CLAIMS AGAINST ANY PERSON OR ENTITY, REGARDLESS OF WHETHER SUCH CAUSES OF ACTION OR CLAIMS ARE DESCRIBED IN THIS DISCLOSURE STATEMENT.

The following sections set forth a description of the Litigation Trust being established pursuant to the Plan.

### a. Establishment Of Litigation Trust

The Litigation Trust will be established as of the Effective Date. The Litigation Trustee will be appointed on the Effective Date.

### b. Acquisition Of Debtor's Assigned Causes Of Action

On the Effective Date, except as otherwise provided in the Plan, Post Effective Date L&H and the Debtor shall be deemed to have, and shall have, irrevocably assigned and transferred to the Litigation Trust all of their rights, title and interest in and to any and all of the Assigned Causes of Action and any proceeds thereof received by the Debtor or Post Effective Date L&H. Each of the Assigned Causes of Action, except as otherwise provided in the Plan, shall be free and clear of all Liens, claims, encumbrances and other interests. Except as otherwise provided in the Plan, neither Post Effective Date L&H nor the Debtor shall have any further right, title or interest in any of the Assigned Causes of Action, and neither the Debtor nor Post Effective Date L&H shall be entitled to receive any portion of any amounts recovered on account of any of the Assigned Causes of Action.

### c. Establishment Of Litigation Beneficial Interest Registers

The Litigation Trust shall maintain a register of the persons or entities granted Litigation Trust Beneficial Interests therein and shall be entitled to treat as the owner of any such interest for all purposes the person or entity in whose name the Litigation Trust Beneficial Interest is registered. Litigation Trust Beneficial Interests shall be uncertified.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

### d.    Litigation Membership Interests Granted On Account of Disputed Claims

Upon a Disputed Claim becoming an Allowed Claim, Post Effective Date L&H shall notify the Litigation Trust, and the holder of such Allowed Claim shall be granted the Litigation Trust Beneficial Interests reserved for such Claim.

### e.    Limitations On Transferability Of Litigation Trust Beneficial Interests

No holder of a Litigation Trust Beneficial Interest shall be entitled to transfer such interest.

### f.    Transfer Of Causes Of Action By Holders

The irrevocable transfer of the Assigned Causes of Action to the Litigation Trust shall be treated as an irrevocable deemed transfer of such Assigned Causes of Action to the holders of Allowed Claims followed by an irrevocable deemed contribution of such Assigned Causes of Action by such holders of Allowed Claims to the Litigation Trust.

### g.    Funding the Litigation Trust

On the Effective Date, Post Effective Date L&H shall pay to the Litigation Trust the aggregate amount of $1,000,000 for the establishment of a reserve to pay the fees, expenses and costs of the Litigation Trust and the Litigation Trustee (such reserve, the "Litigation Trust Reserve"). In addition, on the Effective Date, Post Effective Date L&H shall pay to the Litigation Trust the aggregate amount of $100,000 for the establishment of a reserve to pay the fees, expenses and costs of the Litigation Monitoring Committee (such reserve, the "Litigation Monitoring Committee Reserve"). To the extent that the Litigation Trustee and the Litigation Monitoring Committee from time to time reasonably agree that the amounts of the Litigation Trust Reserve and/or the Litigation Monitoring Committee Reserve are in excess of the amounts reasonably anticipated to be incurred by the Litigation Trust and the Litigation Trustee in the pursuit of their respective duties and obligations hereunder, such excess amounts shall be returned to the Plan Administrator and shall be treated as Available Cash for Distributions to holders of Allowed Claims. To the extent that the Litigation Monitoring Committee reasonably determines that the amount of the Litigation Trust Reserve is not sufficient for the Litigation Trustee to pursue its duties and obligations hereunder, the Litigation Monitoring Committee may request from Post-Effective Date L&H additional funding for the Litigation Trust Reserve, and the consent of Post-Effective Date L&H with respect to such request for additional funding for the Litigation Trust Reserve shall not be unreasonably withheld. Except as specifically set forth in the Plan and the Litigation Trust Agreement, Post Effective Date L&H shall have no obligation to the Litigation Trust or any holder of an interest therein other than its obligations to reasonably cooperate as a party to the Assigned Causes of Action assigned to the Litigation Trust and to fund the Litigation Trust and the Litigation Monitoring Committee Reserves. In addition, the Litigation Trustee may, with the written consent of the Litigation Monitoring Committee,

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

borrow funds to finance the operations of the Litigation Trust, which borrowing(s) may include equity participation features.

**h.**     **Application Of Proceeds And Expenses**

Upon receipt of the proceeds of any Assigned Causes of Action assigned to the Litigation Trust, the Litigation Trustee shall determine whether to distribute such proceeds to holders of Litigation Trust Beneficial Interests. Prior to any Distribution, the Litigation Trustee shall apply such proceeds, net of amounts paid or deductions made by reason of set-off to the Litigation Trustee or by reason of reduction in judgment or reimbursement obligations of the Litigation Trustee, as follows: (i) first, after utilizing amounts in the Litigation Trust Reserve and the Litigation Monitoring Committee Reserve, to the payment of any associated taxes and unpaid administrative expenses of the Litigation Trust, the Litigation Trustee and the Litigation Monitoring Committee, (ii) second, pro rata to the payment of the reasonable unpaid fees and expenses incurred in employing professionals for the Litigation Trustee and the Litigation Monitoring Committee, and the compensation and expenses of the Litigation Trustee, and (iii) third, to either the Litigation Trust Reserve or the Litigation Monitoring Committee Reserve for the reasonably anticipated amount of any future expenses and obligations to the extent the amounts in such reserves are insufficient (collectively, (i)-(iii), the "Litigation Administrative Costs").

**i.**     **Distribution Of Litigation Proceeds**

Subject to the limitations set forth in Section 7.4.10(b), any proceeds from the Assigned Causes of Action distributed by the Litigation Trustee, net of amounts paid or reductions made by reason of setoff and after payment or reserve in full of the Litigation Administrative Costs of the Litigation Trust (such net proceeds, the "Litigation Proceeds"), shall be distributed in accordance with Section 7.4.10 based on each holder's Ratable Proportion as follows: (a) with respect to the holders of Litigation Trust Beneficial Interests who received such interests on account of a Belgian Claim, the Curators shall distribute the Litigation Proceeds and (b) with respect to all other holders of Litigation Trust Beneficial Interests, the Litigation Trustee shall distribute the Litigation Proceeds. Except as otherwise provided in this Section 7.4 of the Plan, Distributions of the Litigation Proceeds shall be governed by Sections V and VIII of the Plan.

**j.**     **Distribution By Litigation Trustee And Curators**

**i.**     **Timing Of Distributions**

The Curators and the Litigation Trustee, as the case may be, shall distribute the Litigation Proceeds at such times as the Curators and the Litigation Trustee deem appropriate, but only after, pursuant to this Section 7.4 of the Plan, paying all outstanding Litigation Administrative Costs and reserving for any additional reasonable Litigation Administrative Costs that may be incurred thereafter.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

### ii.    **Maximum Recovery**

Until all holders of Allowed Claims receive full payment of their Allowed Claims, the aggregate Distributions on account of any holder of an Allowed Claim shall not exceed 100% of the amount of such Allowed Claim.  Any Litigation Proceeds otherwise distributable to a holder of an Allowed Claim in excess of the Maximum Recovery Amount shall be redistributed to holders holding the same class of Claims or, if all such holders have received 100% of the amount of such Allowed Claims, to holders of Allowed Claims in proportion to the allocation of Distributions between the various Classes of Claims against the Chapter 11 Assets as set forth in Section V of the Plan.

### k.    **Litigation Trust Reserve**

The Litigation Trust shall withhold from the amounts to be distributed to holders of Litigation Trust Beneficial Interests amounts sufficient to be distributed on account of the Litigation Trust Beneficial Interests that may be granted to holders of Claims that are Disputed Claims as of the date of distribution of proceeds, and the Litigation Trust shall place such withheld proceeds in reserve.  To the extent such Disputed Claims ultimately become Allowed Claims, and Litigation Trust Beneficial Interests are granted to the holders of such Claims in accordance with Section 7.4 of the Plan, payments with respect to such interest shall be made from the Litigation Reserve.  The Litigation Trustee, in consultation with the Litigation Monitoring Committee, shall determine the amount to reserve in the Litigation Reserve based on the amount of Disputed Claims determined or estimated for the purposes of the Disputed Claims Reserve.

### l.    **Distributions After Disallowance**

If any proceeds remain in the Litigation Reserve after all objections to Disputed Claims have been resolved, such remaining amounts shall be distributed as soon as practicable in accordance with the provisions regarding the distribution of Litigation Proceeds to the holders of Litigation Trust Beneficial Interests.

### m.    **Term**

The term of the Litigation Trust shall commence on the Effective Date and shall continue until the fifth (5th) anniversary of such date, unless sooner terminated in accordance with the terms of the Litigation Trust Agreement; provided, however, that the term of the Litigation Trust may be extended for no more than five (5) successive periods of two years each in accordance with the provisions in the Litigation Trust Agreement.

### n.    **Powers And Duties Of Litigation Trustee**

With respect to the Litigation Trust, the Litigation Trustee shall at all times act solely for the benefit of the holders of Litigation Trust Beneficial Interests and shall not act for the benefit of or have any obligations to or on behalf of the Debtor or Post Effective Date L&H.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

In addition to those other powers and duties set forth in the Litigation Trust Agreement, the Litigation Trustee shall be empowered: (a) to take all steps and execute all instruments and documents necessary to effectuate the Litigation Trust, (b) to pay all Litigation Administrative Costs of the Litigation Trust, (c) to comply with the Plan and the Litigation Trust Agreement and the obligations thereunder, (d) to employ, retain or replace professionals to represent it with respect to its responsibilities, (e) to waive or enforce, to the fullest extent permitted by law, any existing client privilege of the Debtor, (f) to investigate any claims, rights, Assigned Causes of Action or other Causes of Action assigned to the Litigation Trust, (g) to prosecute, litigate, settle, adjust, retain, enforce or abandon any claims, rights, Assigned Causes of Action or other Causes of Action assigned to the Litigation Trust, including any counterclaims to the extent such counterclaims are setoff against the proceeds of any such Causes of Action, (h) to exercise such other powers as may be vested in the Litigation Trustee pursuant to an order of the Bankruptcy Court or the Litigation Trust Agreement, or as deemed by the Litigation Trustee to be necessary and proper to carry out the provisions of the Litigation Trust, and (i) to make distributions contemplated by the Litigation Trust to holders of Litigation Trust Beneficial Interests, except holders of Litigation Trust Beneficial Interests who received such Litigation Trust Beneficial Interests on account of a Belgian Claim. Subject to the terms of Section 7.4 of the Plan, and to the requirement to consult with the Litigation Monitoring Committee, the Litigation Trustee shall have sole and absolute discretion to hold, pursue, prosecute, release, settle or abandon, as the case may be, any and all claims, rights, Assigned Causes of Action or other Causes of Action assigned to the Litigation Trust pursuant to this Plan, as it determines in the exercise of its business judgment, and shall have no liability for the outcome of its decisions. For purposes of exercising its powers, each of the Litigation Trustee and the Litigation Trust shall be deemed to be a representative of the Debtor pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. To the extent that the Litigation Trustee abandons any Assigned Causes of Action, such Assigned Causes of Action shall revest and be deemed to be held by Post Effective Date L&H without any further act of the Bankruptcy Court or any other party.

### o.  **Authority To Settle Causes Of Action**

With respect to any claims, rights, Assigned Causes of Action, or other Causes of Action assigned to the Litigation Trust, (a) in which the asserted amount is equal to or less than $500,000 and (b) the settlement amount of which is equal to or less than $75,000, the Litigation Trustee shall be empowered and authorized, without approval of the Bankruptcy Court or notice to any other Person, to settle, adjust, dispose of or abandon any such claims, rights, Assigned Causes of Action or other Causes of Action assigned to the Litigation Trust, including any counterclaims to the extent such counterclaims are setoff against the proceeds of any such Causes of Action, upon written notice to the Litigation Monitoring Committee. If the Litigation Monitoring Committee disputes the reasonableness of the proposed settlement, disposition or abandonment, on or prior to the conclusion of ten (10) Business Days after the Litigation Monitoring Committee receives written notice of a proposed settlement, disposition or abandonment, or any extension thereof agreed upon between the Litigation Trustee and the Litigation Monitoring Committee, the Litigation Monitoring Committee can submit to the Bankruptcy Court for resolution the reasonableness of the Litigation Trustee's proposed settlement, disposition or abandonment. With respect to any claims, rights, Assigned Causes of

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

Action, or other Causes of Action assigned to the Litigation Trust, (x) in which the asserted amount is greater than $500,000 or (y) the settlement amount of which is greater than $75,000, the Litigation Trustee shall (i) obtain the written consent of the Litigation Monitoring Committee and (ii) obtain approval of the Bankruptcy Court to settle, adjust, dispose of or abandon any such claims, rights, Assigned Causes of Action or other Causes of Action in accordance with Bankruptcy Rule 9019.

### p.    Compensation Of Litigation Trustee

The Litigation Trustee shall receive compensation for services to the Litigation Trust as agreed upon by the (a) Litigation Trustee and (b) the Litigation Monitoring Committee, for its services and shall be entitled to reimbursement of reasonable expenses incurred in performing its duties hereunder out of the assets of the Litigation Trust, as more fully set forth in the Litigation Trust Agreement or in a separate agreement setting forth the terms and conditions of the provision of such services by the Litigation Trustee.

### q.    Indemnification And Exculpation Of Litigation Trustee And Litigation Monitoring Committee

From and after the Effective Date, the Litigation Trustee and members of the Litigation Monitoring Committee, and each of their respective post-Effective Date directors, members, officers, shall be exculpated and indemnified as provided in the Litigation Trust Agreement.

Except as may otherwise be provided in the Litigation Trust Agreement, both the Litigation Trustee and the Litigation Monitoring Committee, and each of their post-Effective Date directors, members, officers, employees, agents and attorneys, as the case may be, from and after the Effective Date, shall be exculpated by all Persons, holders of Claims and Equity Interests, Entities, and parties in interest receiving Distributions under the Plan, from any and all claims, causes of action, and other assertions of liability arising out of its discharge of the powers and duties conferred upon it by the Plan, the Litigation Trust Agreement, or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of its gross negligence, willful misconduct or breach of its fiduciary duties. No holder of a Claim or an Equity Interest, or representative thereof, shall have or pursue any claim or cause of action (a) against the Litigation Trustee or the Litigation Monitoring Committee (or their respective directors, members, officers, employees, agents and attorneys, as the case may be) for Distributions made in accordance with the Plan, or for implementing the provisions of the Plan, or (b) against any holder of a Claim for receiving or retaining payments or other Distributions as provided for by the Plan.

Both the Litigation Trustee and the Litigation Monitoring Committee shall not be liable for any action taken or omitted in good faith and reasonably believed by it to be authorized within the discretion or rights or powers conferred upon it by the Plan or the Litigation Trust Agreement. In performing its duties under the Plan and the Litigation Trust Agreement hereunder, each of the Litigation Trustee and the Litigation Monitoring Committee shall have no

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

liability for any action taken by the Litigation Trustee and the Litigation Monitoring Committee in good faith in accordance with the advice of counsel, accountants, appraisers and other professionals retained by it, Post Effective Date L&H, or the Litigation Trust. Without limiting the generality of the foregoing, the Litigation Trustee and the Litigation Monitoring Committee may rely without independent investigation on copies of orders of the Bankruptcy Court reasonably believed by it to be genuine, and shall have no liability for actions taken in good faith in reliance thereon. None of the provisions of the Plan shall require the Litigation Trustee or the Litigation Monitoring Committee to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of its rights and powers. Each of the Litigation Trustee and the Litigation Monitoring Committee may rely without inquiry upon writings delivered to it hereunder which it reasonably believes in good faith to be genuine and to have been given by a proper Person.

### r.    Monitoring Of Litigation Trust

On or prior to the Confirmation Date, the Committee shall select three (3) Persons or Entities to serve as representatives of the Litigation Trust, (collectively, the "Litigation Monitoring Committee"). A list setting forth the identities of the members of the Litigation Monitoring Committee, to the extent available, shall be filed as part of the Plan Supplement, or otherwise, in a submission to this Bankruptcy Court on or prior to the Effective Date. The Litigation Monitoring Committee shall monitor and review settlement, abandonment and other disposition proposals proposed to or agreed to by the Litigation Trustee with respect to the Assigned Causes of Action and to consult with the Litigation Trustee regarding the settlement, abandonment, disposition and prosecution of such Causes of Action. The Litigation Monitoring Committee shall, to the extent it deems necessary, retain counsel to assist it.

A quorum for the Litigation Monitoring Committee shall consist of a majority of the then existing members of the Litigation Monitoring Committee. No meeting of the Litigation Monitoring Committee shall be held unless a quorum is present at the beginning of any meeting. Any member of the Litigation Monitoring Committee may call for a meeting to be convened upon notice of such meeting being given at least two (2) Business Days prior to the proposed date of the meeting, which notice may be given by telephone, overnight mail, or facsimile transmission, to each of the other members of the Litigation Monitoring Committee. Meetings shall be held in person or by telephone conference call. Any action by the Litigation Monitoring Committee shall require the affirmative vote of a majority of those voting provided that a quorum is present at the time of the vote.

Any Entity may resign as a member of the Litigation Monitoring Committee at any time. In the event that any Entity resigns as a member of the Litigation Monitoring Committee, the remaining members of the Litigation Monitoring Committee shall select a replacement for such Entity; provided, however, that any such replacement must hold Litigation Trust Beneficial Interests.

Upon a unanimous determination by the members of the Litigation Monitoring Committee, the Litigation Trustee may be removed by the Litigation Monitoring Committee

HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION

without any necessity for any showing of cause. In addition, (a) a majority vote of the Litigation Monitoring Committee and (b) a vote among twenty-five percent (25%) of the beneficiaries of the Litigation Trust can seek to have the Litigation Trustee removed for cause. To the extent there is any dispute regarding the removal of a Litigation Trustee, the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute and may remove a Litigation Trustee for cause.

### s.    Discretion Afforded To Litigation Monitoring Committee To Modify Terms Of Compensation Of Litigation Trustee

Notwithstanding anything to the contrary in the Plan, the Litigation Monitoring Committee may, with the unanimous consent of each of the members of the Litigation Monitoring Committee, and without application to or approval by the Bankruptcy Court, subject to the consent of the Litigation Trustee, modify the Litigation Trustee's compensation and other terms regarding the retention of the Litigation Trustee.

### 5.    Cancellation Of Equity Interests

Except to the extent specifically provided otherwise in the Plan, on the Effective Date, all existing Equity Interests shall, without any further action, be cancelled, annulled and extinguished and any certificates representing such Equity Interests shall be null and void with respect to the Chapter 11 Assets.

### 6.    Boards Of Directors Of Post-Effective Date L&H

On the Effective Date, Scott Baena, as Plan Administrator, shall be appointed to serve as the sole officer and director of Post Effective Date L&H. Sufficient funds shall be retained by Post Effective Date L&H through the Final Distribution Date to fund the retention of Scott Baena as Plan Administrator and the performance of the duties of Post Effective Date L&H under the Plan. Scott Baena as Plan Administrator shall be exclusively responsible for making all Distributions of Cash and Litigation Trust Beneficial Interests under the Plan, other than Distributions of Cash and Litigation Trust Beneficial Interests to holders of the Belgian Claims, which Distributions shall be made by the Curators.

### 7.    Operations Of L&H NV Between Confirmation And Effective Date

L&H NV shall continue to operate as a Debtor In Possession during the period from the Confirmation Date through and until the Effective Date.

### 8.    Closing Of Chapter 11 Case

When all Disputed Claims filed against the Chapter 11 Assets become Allowed Claims or have become a Disallowed Claim, and all remaining assets have been liquidated and converted into Cash, and such Cash has been distributed in accordance with the terms of this Plan, or at such earlier time as the Plan Administrator deems appropriate, the Plan Administrator

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### 9.  Exclusivity Period

Subject to further order of the Bankruptcy Court, the Committee shall retain the exclusive right to amend the Plan and solicit acceptances thereof until the Effective Date (or until the earliest date on which the Effective Date can no longer occur pursuant to Section 11.4 of the Plan).

### 10.  Revesting Of Assets

The Chapter 11 Assets shall vest in Post Effective Date L&H on the Effective Date. From and after the Effective Date, Post Effective Date L&H may use, acquire, and dispose of property free of any restrictions imposed under the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all of the Chapter 11 Assets and Post Effective Date L&H shall be free and clear of all Claims, Liens and interests, except as specifically provided in the Plan or in the Confirmation Order. Without limiting the foregoing, Post Effective Date L&H may, without application to or approval by the Bankruptcy Court, pay Professional Fees and expenses that Post Effective Date L&H may incur after the Effective Date.

### 11.  The Committee

The Committee (a) shall cease to exist on the Effective Date, provided that the Committee shall retain standing to appear at any hearing regarding the allowance of Professional Fees, (b) as appropriate may interpose objections to such Professional Fees, and (c) shall be entitled to obtain reimbursement for the reasonable fees and expenses of its professionals relating to the foregoing.

### 12.  Effectuating Documents; Further Transactions

Post Effective Date L&H shall be, and hereby is, authorized to execute, deliver, file, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 13.  Assumptions Of Liabilities

The liabilities and obligations to make the Distributions as required under Sections III, IV and V of the Plan shall be assumed by Post Effective Date L&H, which shall have the liability for, and obligation to make, all Distributions of Cash, Available Cash, the Litigation Trust Beneficial Interests, or any other consideration or securities to be issued or distributed by Post Effective Date L&H under the Plan.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

### 14.    Substantial Consummation

Substantial consummation of the Plan under section 1101(2) of the Bankruptcy Code shall not be deemed to occur, the Chapter 11 Case shall remain open and not be deemed fully administered, and no final decree closing the Chapter 11 Case shall be entered pursuant to section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022, until the Effective Date.

### 15.    Preservation Of Causes Of Action

Except as otherwise provided in the Plan, including in Section 13.1 and Section 13.2 of the Plan, and in accordance with section 1123(b) of the Bankruptcy Code, Post Effective Date L&H, as successor-in-interest to the Debtor, shall retain and may enforce all of the Debtor's claims, rights, and Causes of Action that are the property of the Estate (including Avoidance Actions (except to the extent such Avoidance Actions constitute Assigned Causes of Action or except as provided under Section 13.1 and Section 13.2 of the Plan)), and Post Effective Date L&H shall retain and enforce all defenses and counterclaims to all Claims asserted against the Chapter 11 Assets, including, but not limited to, setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code. Post Effective Date L&H may pursue such claims, rights, Causes of Action, counterclaims, and defenses, as appropriate, in accordance with its best interests, as determined by Post Effective Date L&H.

### 16.    Cancellation Of Existing Securities

On the Effective Date, except as otherwise provided for herein, (i) all securities, equity interests, notes, bonds, indentures, guaranties, and other instruments or documents evidencing or creating any indebtedness, Equity Interest or obligation of L&H NV shall be as against the Estate and its respective successors extinguished and canceled, and (ii) the obligations of L&H NV under any agreements, indentures, or certificates of designation governing any securities, equity interests, notes, bonds, indentures, and other instruments or documents evidencing or creating any indebtedness, Equity Interest or obligation of the Debtor relating to the Chapter 11 Assets, as the case may be, shall be discharged.

### 17.    Appointment Of Scott L. Baena To Administer Plan

On the Effective Date, Scott L. Baena shall be appointed to serve as the sole officer and director of Post Effective Date L&H pursuant to the Plan Administration Agreement. Sufficient funds shall be retained by Post Effective Date L&H through the Final Distribution Date to fund the retention of Scott L. Baena and the performance of the duties of Scott L. Baena and Post Effective Date L&H under the Plan. Scott L. Baena shall be exclusively responsible for making all Distributions of Cash and Litigation Trust Beneficial Interests under the Plan, other than Distributions of Cash and Litigation Trust Beneficial Interests to holders of the Belgian Claims, which Distributions shall be made by the Curators.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

### 18.    Distributions Under Plan

On the Effective Date or as soon as practicable thereafter, or on such later date that Distributions are required to be made on account of Allowed Claims, Post Effective Date L&H shall make, or shall make adequate reserve for, the Distributions required to be made to all holders of Claims (whether or not Allowed) under the Plan. Cash necessary to make the Distributions required under the Plan shall be provided from all excess Cash of Post Effective Date L&H (if any), or any other source. All Distributions reserved pursuant to this Section shall be held by Post Effective Date L&H, for the benefit of the holders of Claims entitled to receive such Distributions. The Plan Administrator shall place Cash Distributions reserved under the Plan in one or more interest bearing accounts in the United States, as the Plan Administrator determines may be necessary or appropriate to effectuate the provisions of the Plan, and such Cash shall be distributed to holders of Allowed Claims under the Plan.

### 19.    Plan Administrator's Obligations Under Plan

From and after the Effective Date, the Plan shall be administered and actions shall be taken in the name of Post Effective Date L&H through, in accordance with the terms hereof and the laws of the United States, the Plan Administrator, including, but not limited to, (a) administering the Plan and taking all steps and executing all instruments and documents necessary to effectuate the Plan and (b) administering the Distributions under the Plan, including (i) making Distributions in accordance with the terms of the Plan and (ii) establishing and maintaining the various Disputed Claims Reserves.

### 20.    Securities Law Matters

It is an integral and essential element of this Plan that (a) the Distribution to holders of Allowed Claims of the Litigation Trust Beneficial Interests pursuant to this Plan, (b) the distribution of the common stock of Reorganized Dictaphone distributed previously to L&H NV pursuant to the terms of the Dictaphone Plan and transferred to Post Effective Date L&H pursuant to the terms of this Plan, and (c) the liquidation, sale, Transfer or disposition of such common stock of Reorganized Dictaphone shall be exempt from registration under the Securities Act of 1933, as amended, pursuant to section 1145 of the Bankruptcy Code. Any such securities issued to an "affiliate" of the Debtor within the meaning of the Securities Act of 1933, or any Person that Post Effective Date L&H reasonably determines to be an "underwriter," and which does not agree to resell such securities only in "ordinary trading transactions," within the meaning of section 1145(b)(1) of the Bankruptcy Code, shall be subject to such transfer restrictions and bear such legends as shall be appropriate to ensure compliance with the Securities Act of 1933. It also is an integral and essential element of the Plan that Rule 144 under the Securities Act of 1933 be available to any such "affiliate" that is not otherwise such an "underwriter" for purposes of permitting re-sales of such securities. In accordance with the Dictaphone Plan, solely for purposes of section 1145 of the Bankruptcy Code, Reorganized Dictaphone shall not be determined to be a "successor" of L&H NV.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

**D.    Distributions Under Plan**

**1.    Timing Of Distributions**

        If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**2.    Delivery Of Distributions**

        Subject to Bankruptcy Rule 9010, and except as otherwise provided herein, Distributions to holders of Allowed Claims shall be made at the address of each of such holders as set forth in the Schedules filed with the Bankruptcy Court unless superseded by the address set forth on proofs of Claim filed by such holders (or at the last known address of such holders if no proof of Claim is filed, or if Post Effective Date L&H has been notified in writing of a change of address). If any Distribution to any holder of an Allowed Unsecured Claim is returned as undeliverable, no Distribution shall be made unless and until Post Effective Date L&H has determined the then-current address of such holder, at which time such Distribution to such holder shall be made to such holder without interest. Amounts in respect of any undeliverable Distributions made through Post Effective Date L&H shall be returned to and held by Post Effective Date L&H until such Distributions are claimed. Cash and other Distributions that are not claimed before the earlier of one year from the date of the Distribution or the date that the Chapter 11 Case is closed shall (a) be deemed unclaimed property under section 347(b) of the Bankruptcy Code, (b) shall revest in Post Effective Date L&H (and, shall be subject to redistribution, as appropriate, in accordance with the provisions of Section V of the Plan) and (c) shall be forever barred. Nothing contained in the Plan shall require Post Effective Date L&H to attempt to locate any holder of an Allowed Claim.

        Amounts in respect of any undeliverable Distributions made through Post Effective Date L&H will be returned to and held by Post Effective Date L&H until such Distributions are claimed. Available Cash and other Distributions that are not claimed before the Chapter 11 Case is closed will (a) be deemed unclaimed property under section 347(b) of the Bankruptcy Code, (b) will revest in Post Effective Date L&H (and, shall be subject to redistribution, as appropriate, in accordance with the provisions of Section V of the Plan) and (c) will be forever barred. Nothing contained in the Plan will require Post Effective Date L&H to attempt to locate any holder of an Allowed Claim.

**3.    Record Date For Distributions**

**a.    Record Date For Equity Interests**

        At the close of business on the Record Date, the consolidated stockholders list or transfer ledger for the Equity Interests shall be closed, and there shall be no further changes in the record holders of the Equity Interests. Post Effective Date L&H, its agents and servicers

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

shall have no obligation to recognize any transfer of such Equity Interests occurring after the Record Date. Post Effective Date L&H, its agents and its servicers shall be entitled instead to recognize and deal for all purposes hereunder with only: (a) those record holders stated on the consolidated stockholders list or transfer ledger as of the close of business on the Record Date; and (b) holders of Equity Interests domiciled outside of the United States who do not appear on the consolidated stockholders' list or transfer ledger and who held such Equity Interests as of the Record Date.

### b.    Record Date For Holders of Claims

Except as otherwise provided in a Final Order that is not subject to any stay, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date shall be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Record Date.

### 4.    Time Bar To Cash Payments By Check

Checks issued by Post Effective Date L&H on account of Allowed Claims shall be null and void if not negotiated prior to the earlier of one year from the date of such check or the closing of the Chapter 11 Case. Requests for re-issuance of any check shall be made in writing directly to Post Effective Date L&H by the holder of the Allowed Claim with respect to which such check originally was issued on or before the closing of the Chapter 11 Case. After such dates, all Claims in respect of void checks shall be forever barred, and the proceeds of such checks shall revest in and become the property of Post Effective Date L&H and subject to redistribution, as appropriate, in accordance with the provisions of Section V of the Plan.

### 5.    Disputed Claims Reserves

On the Effective Date or such later date that Distributions are required to be made on account of Allowed Claims, and after making all Distributions required to be made on any such date under the Plan, Post Effective Date L&H shall establish a separate Disputed Claims Reserve for each of the Classes receiving Distributions under the Plan, each of which Disputed Claims Reserves shall be administered by Post Effective Date L&H. Post Effective Date L&H shall reserve the Ratable Proportion of all Cash, Available Cash, or other Distributions allocated for each Disputed Claim, or such amount as may be agreed by the holder of such Claim and Post Effective Date L&H liable on such Claim, or as may otherwise be determined by order of the Bankruptcy Court. All Cash, Available Cash, or other Distributions, as applicable, allocable to the relevant Class hereunder shall be distributed by Post Effective Date L&H to the Disputed Claims Reserve on the Effective Date or such later date that Distributions are required to be made on account of Allowed Claims. The Disputed Claims Reserve shall be closed and extinguished by Post Effective Date L&H upon its determination that all Distributions and other dispositions of Cash, Available Cash, or other Distributions required to be made under the Plan have been made in accordance with the terms of the Plan. Upon closure of a Disputed Claims Reserve, all Cash and Available Cash (including any Cash Investment Yield and any Cash

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

dividends and other Distributions held in such Disputed Claims Reserve) shall be subject to redistribution, as appropriate, in accordance with the provisions of Section V of the Plan.

6.     **Tax Requirements For Income Generated By Disputed Claims Reserves**

Post Effective Date L&H shall pay, or cause to be paid, out of the funds held in any of its Disputed Claims Reserves, any tax imposed by any federal, state or local taxing authority on the income generated by the funds or property held in such Disputed Claims Reserve. Post Effective Date L&H shall file, or cause to be filed, any tax or information return related to its Disputed Claims Reserves that is required by any federal, state or local taxing authority.

7.     **Untimely Claims**

Except as otherwise expressly provided in this Plan, any Claim not deemed filed pursuant to section 1111(a) of the Bankruptcy Code or timely filed pursuant to the Bankruptcy Code, the Bankruptcy Rules, or any applicable order of the Bankruptcy Court, shall (a) not be treated as an Allowed Claim, and (b) be expunged from the Claims register in the Chapter 11 Case without need for any further notice, motion, or order.

8.     **Estimation Of Claims**

Post Effective Date L&H may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated administrative expense claim or Claim, including any Claim for taxes, to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether L&H NV, the Committee or Post Effective Date L&H have previously objected to such claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any claim at any time during litigation concerning any objection to any claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated claim, that estimated amount shall constitute either the Allowed amount of such claim or a maximum limitation on such claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such claim, Post Effective Date L&H may elect to pursue supplemental proceedings to object to any ultimate allowance of such claim. All of the aforementioned claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

9.     **Distributions After Effective Date**

Distributions made after the Effective Date shall be deemed to have been made on the Effective Date.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

10.    **Fractional Shares**

Notwithstanding any other provision of the Plan to the contrary, no fractional shares shall be issued pursuant to the Plan. Whenever any payment of a fraction of a share under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole share (up or down), with half shares or more being rounded up and fractions less than half of a share being rounded down.

11.    **Minimum Distributions**

Notwithstanding anything herein to the contrary, if a Distribution to be made to a holder of an Allowed Claim on any date for Distributions (other than the final Distribution Date) would be $50.00 or less in the aggregate, no such Distribution will be made to that holder unless a request therefor is made in writing to Post Effective Date L&H no later than twenty (20) days after the Effective Date.

12.    **Fractional Cents**

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

13.    **Interest On Claims**

Except as specifically provided for in the Plan or the Confirmation Order, interest shall not accrue on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim. Except as expressly provided herein, no pre-petition Claim shall be Allowed to the extent that it is for post-petition interest or other similar charges.

14.    **No Distribution In Excess Of Allowed Amount Of Claim**

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any Distribution in excess of the Allowed Amount of such Claim.

15.    **Setoffs**

Except as otherwise provided in the Plan, Post Effective Date L&H may, but shall not be required to, setoff against any Claim and the Distributions to be made pursuant to the Plan in respect of such Claim, any Claims of any nature whatsoever that the Debtor may have against

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by L&H NV or Post Effective Date L&H of any right of setoff any of them may have against the holder of such Claim.

### 16.    Payment Of Taxes On Distributions Received Pursuant To Plan

All Persons and Entities that receive Distributions under the Plan shall be responsible for reporting and paying, as applicable, taxes on account of such Distributions.

### E.    Disputed Claims Under Plan

#### 1.    Objection Deadline

As soon as practicable, but in no event later than one-hundred eighty (180) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, objections to Claims and Equity Interests shall be filed with the Bankruptcy Court and served upon the holders of each such Claim or Equity Interest to which objections are made.

#### 2.    Prosecution Of Objections After Effective Date

On and after the Effective Date, except as to applications for allowances of Professional Fees or as otherwise ordered by the Bankruptcy Court, the filing, litigation, settlement, or withdrawal of all objections to Claims and Equity Interests, including pending objections, shall be the responsibility of Post Effective Date L&H. Any Claim, other than a Claim for Professional Fees, which is not an Allowed Claim shall be determined, resolved, or litigated by Post Effective Date L&H by and through the Plan Administrator. Prior to the Effective Date, the filing, litigation, settlement, or withdrawal of all objections shall be the responsibility of the Debtor.

#### 3.    No Distributions Pending Allowance

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or Distribution provided hereunder shall be made on account of the portion of such Claim that is a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim, but the payment or Distribution provided hereunder shall be made on account of the portion of such Claim that is an Allowed Claim.

#### 4.    Withholding Of Allocated Distributions

Post Effective Date L&H shall withhold from the property to be distributed under the Plan for the benefit of holders of Disputed Claims Distributions in an amount sufficient to be distributed on account of such Disputed Claims, which Distributions shall be deposited in the applicable Disputed Claims Reserve.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

5. **Distribution When A Disputed Claim Becomes An Allowed Claim**

Distributions to each holder of a Disputed Claim, to the extent that such Claim ultimately becomes an Allowed Claim (and to the extent that the holder of such Claim has not received prior Distributions on account of such Claim), shall be made in accordance with the provisions of the Plan governing the Class of Claims in which such Claim is classified.

6. **All Executory Contracts And Unexpired Leases Rejected If Not Listed On Assumption Schedule**

Except as otherwise provided herein or pursuant to a Final Order approving the assumption and assignment of any executory contract or unexpired lease, effective as of the Confirmation Date, all executory contracts and unexpired leases of the Estate not specifically listed on the Assumption And Assignment Schedule shall be deemed to be automatically rejected as of the Confirmation Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to section 365(a) of the Bankruptcy Code as of the Confirmation Date.

7. **Assumed Executory Contracts And Unexpired Leases**

All executory contracts and unexpired leases of the Estate specifically listed on the Assumption And Assignment Schedule shall be deemed automatically assumed and assigned to the party set forth in such list upon the Confirmation Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions and assignments pursuant to section 365(a) of the Bankruptcy Code. The Committee may at any time on or before the Confirmation Date (or, with respect to any executory contracts and unexpired leases for which there is a dispute regarding the nature or the amount of any Cure, at any time on or before the date of the entry of a Final Order resolving such dispute) amend the Assumption And Assignment Schedule to delete therefrom or add thereto any executory contract or unexpired lease, in which event such executory contract or unexpired lease shall be deemed to be rejected or assumed, respectively, as of the Confirmation Date. The Committee shall provide notice of any amendments to the Assumption And Assignment Schedule to the parties to the executory contracts or unexpired leases affected thereby, counsel to the Debtor, and to parties who formally have requested notice pursuant to Bankruptcy Rule 2002. The fact that any contract or lease is listed on the Assumption And Assignment Schedule shall not constitute or be construed to constitute an admission that such contract or lease is an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code or that the Debtor or any successor in interest to the Debtor has any liability thereunder. Each assumed and assigned executory contract and unexpired lease of the Debtor that relates to the use or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements, or franchises, and any other interests in real

estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order.

**8.    Payments Related To Assumption Of
Executory Contracts And Unexpired Leases**

Any monetary amounts by which each executory contract and unexpired lease to be assumed and assigned under the Plan may be in default shall be satisfied by Cure, under section 365(b)(1) of the Bankruptcy Code. In the event of a dispute regarding (a) the nature or the amount of any Cure, (b) the ability of the assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order resolving the dispute.

**9.    Bar Date For Rejection Damages**

If the rejection by the Debtor, pursuant to the Plan, of an executory contract or unexpired lease results in a Claim or Administrative Expense Claim, then such Claim or Administrative Expense Claim shall be discharged and barred forever and shall not be enforceable against L&H NV, Post Effective Date L&H or the Chapter 11 Assets, unless a proof of Claim or proof of Administrative Expense Claim is filed with the clerk of the Bankruptcy Court and served upon Post Effective Date L&H within thirty (30) days after the earlier to occur of (a) the Confirmation Date and (b) the entry of an order by the Bankruptcy Court authorizing rejection of the subject executory contract or unexpired lease.

**10.    Retiree Benefits**

L&H NV has no retiree benefit plans, fund, or programs, as defined in section 1114 of the Bankruptcy Code, for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund or program (through the purchase of insurance or otherwise). Accordingly, no payments relating to such retiree benefit plans, fund, or programs shall be made.

**F.    Conditions Precedent To Confirmation And Occurrence Of Effective Date**

**1.    Conditions Precedent To Confirmation Of Plan**

The following are conditions precedent to confirmation of the Plan that must be satisfied, unless waived in accordance with Section 11.3 of the Plan:

(a)    *Entry of the Confirmation Order.* The Confirmation Order shall be in form and substance acceptable to the Committee and shall, among other things:

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

(i)    decree that the assets of Post Effective Date L&H shall be free and clear of all Claims, Liens and encumbrances;

(ii)    decree that all transfers of the Chapter 11 Assets contemplated under the Plan shall be free and clear of all Claims, Liens and all encumbrances against such assets and equity;

(iii)    authorize the implementation of the Plan in accordance with its terms;

(iv)    provide that any transfers effected or mortgages entered into or to be effected or entered into under the Plan shall be and are exempt from any state, city or other municipality transfer taxes, mortgage recording taxes and any other stamp or similar tax under section 1146(c) of the Bankruptcy Code;

(v)    approve the other settlements, transactions and agreements to be effected pursuant to the Plan in all respects;

(vi)    provide that all executory contracts or unexpired leases assumed by L&H NV and assigned during the Chapter 11 Case or under the Plan shall remain in full force and effect notwithstanding any provision in such contract or lease (including those provisions described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables or requires termination of such contract or lease;

(vii)    provide that all executory contracts or unexpired leases assumed by L&H NV during the Chapter 11 Case or under the Plan shall remain in full force and effect for the benefit of Post Effective Date L&H;

(viii)    provide that the transfers of the Chapter 11 Assets to Post Effective Date L&H (A) are or shall be legal, valid, and effective transfers of property, (B) vest or shall vest Post Effective Date L&H with good title to such property free and clear of all Liens, Claims, encumbrances, and other interests, except as expressly provided in the Plan or Confirmation Order, (C) do not and shall not constitute avoidable transfers under the Bankruptcy Code or under applicable bankruptcy or non-bankruptcy law, and (D) except as expressly provided in the Plan, do not and shall not subject Post Effective Date L&H to any liability by reason of such transfer under the Bankruptcy Code or under applicable non-bankruptcy law, including, without limitation, any laws affecting successor or transferee liability;

102

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

(ix)   determine that any objection, not previously withdrawn or settled, to the adequacy of the information contained in the Disclosure Statement is overruled, and that the information contained in the Disclosure Statement was adequate for the purpose of soliciting votes for acceptance of the Plan;

(x)    find that the Plan complies with all applicable provisions of the Bankruptcy Code, including, without limitation, that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud;

(xi)   provide that all Equity Interests shall be extinguished and cancelled effective upon the Effective Date with respect to the Chapter 11 Assets except as expressly provided in the Plan;

(xii)  determine that the treatment of Securities Laws Claims as provided in the Plan are approved and authorized in all respects, effective as of the Effective Date, and that such resolutions are valid, appropriate and in the best interests of the Estates;

(xiii) decree that all holders of Allowed Class 3 Unsecured Claims shall be prohibited from pursuing a claim in the Belgian Case; and

(xiv)  determine that the allocation of L&H NV's assets between the Chapter 11 Case and the Belgian Case is fair, reasonable, approved, appropriate and in the best interests of the Estate.

(b)    *Entry of the Disclosure Statement Approval Order.* The Disclosure Statement Approval Order shall have been entered and be a Final Order.

2.    **Conditions Precedent To Effective Date Of Plan**

The Plan shall not become effective and the Effective Date shall not occur unless and until the following conditions shall have been satisfied or waived in accordance with Section 11.3 of the Plan:

(a)    *Confirmation Order.* The Confirmation Date shall have occurred and the Confirmation Order shall have been signed by the judge presiding over the Chapter 11 Case, and shall have become a Final Order.

(b)    *Conditions to the Confirmation Date Remain Satisfied.* All conditions precedent to the Confirmation Date shall have been satisfied and shall continue to be satisfied.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

(c)    *Execution of Documents*.  All actions, documents and agreements necessary to implement the provisions of the Plan to be effectuated on or prior to the Effective Date shall be reasonably satisfactory to the Committee and such actions, documents and agreements shall have been effected or executed and delivered.

### 3.    Waiver Of Conditions Precedent

Each of the conditions precedent in Sections 11.1 and 11.2 hereof may be waived or modified, in whole or in part by the Committee.  Any such waiver or modification of a condition precedent in Sections 11.1 and 11.2 hereof may be effectuated at any time, without notice, without leave or order of the Bankruptcy Court and without any other formal action.

### 4.    Effect Of Failure Or Absence Of Waiver Of Conditions Precedent To Effective Date Of Plan

In the event that one or more of the conditions specified in Section 11.2 of the Plan have not occurred (or been waived) on or before 120 days after the Confirmation Date, upon notification submitted by the Committee to the Bankruptcy Court and the Debtor, (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtor and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (d) the Debtor's obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtor or any other Person or Entity or to prejudice in any manner the rights of the Debtor or any Person or Entity in any further proceedings involving the Debtor.

## G.    Effects Of Plan Confirmation

### 1.    Post Effective Date L&H's Authority

Until the Effective Date, the Bankruptcy Court shall retain custody of and jurisdiction over the Debtor, including the Chapter 11 Assets.  On the Effective Date, after transferring the Chapter 11 Assets to Post Effective Date L&H and the Assigned Causes if Action to the Litigation Trust, L&H NV, its property and interests in property and operations shall be released from the custody and jurisdiction of the Bankruptcy Court, except as otherwise provided herein.

### 2.    Vesting And Liens

On the Effective Date, all of the Chapter 11 Assets shall be vested in Post Effective Date L&H free and clear of all Liens (except as expressly provided herein).

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

### 3. Injunction

Except as otherwise provided in the Plan or Confirmation Order (including any right to receive Distributions under the Plan) or a separate order of the Bankruptcy Court, as of the Effective Date, all Entities that have held, currently hold or may hold a Claim or other debt or liability that would be discharged or an Equity Interest or other right of an equity security holder that is terminated and canceled pursuant to the terms of the Plan, are permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts or liabilities or terminated and canceled Equity Interests or rights:  (1) commencing or continuing in any manner any action or other proceeding against Post Effective Date L&H, the Chapter 11 Assets or properties and interests in properties of each of the foregoing; (2) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against Post Effective Date L&H, the Estate or properties and interests in properties of each of the foregoing; (3) creating, perfecting or enforcing any lien or encumbrance against Post Effective Date L&H, the Chapter 11 Assets or properties and interests in properties of each of the foregoing; (4) asserting a setoff, right of subrogation or recoupment of any kind against any obligation due to Post Effective Date L&H, the Chapter 11 Assets or properties and interests in properties of each of the foregoing; and (5) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan and the Confirmation Order.  Such injunction shall extend to all successors of the Debtor and the Committee and its members.

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case pursuant to section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 4. Release Of Collateral

Unless a particular Secured Claim is Reinstated:  (i) each holder of: (A) a Secured Claim; and/or (B) a Claim that is purportedly secured shall on or immediately before the Effective Date: (x) turn over and release to Post Effective Date L&H any and all property of Post Effective Date L&H that secures or purportedly secures such Claim; and (y) execute such documents and instruments as Post Effective Date requires to evidence such claimant's release of such property; and (ii) on the Effective Date, all claims, right, title and interest in such property shall revert to Post Effective Date L&H (or its successor) free and clear of all Claims and Equity Interests, including, without limitation, Liens, charges, pledges, interests, encumbrances and/or security interests of any kind.

### 5. Release Of Certain Intercompany Claims

As of the Effective Date, L&H NV, Post Effective Date L&H, and each of their respective successors and successors-in-interest, hereby release any and all Claims, other claims or Causes of Action that they have, may have, or claim to have, which are property of, assertable

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

on behalf of, or derivative of the Estate against L&H Holdings or its Affiliates (other than L&H NV) in accordance with that certain Mutual Release Agreement among L&H Holdings and L&H NV dated on or about June 26, 2002, which was approved by the Bankruptcy Court on August 13, 2002 and which became effective on the effective date of the L&H Holdings Plan; provided, however, that such mutual releases among L&H NV and L&H Holdings shall not include (a) a release of certain claims relating to intercompany allocations of shared costs, including management costs, corporate marketing costs, professional fees and expenses, DIP fees, interest and related expenses, and insurance costs (which allocations have or shall be approved by the Bankruptcy Court) and (b) the U.S. Merger Claims and the Other U.S. Claims assigned to L&H NV pursuant to the Stipulation And Order Between Lernout & Hauspie Speech Products N.V. And L&H Holdings USA, Inc. And Baker Parties Compromising And Settling Claims (as such Claims are defined therein), dated January 31, 2002; and provided, further, that such releases shall include, but not be limited to, (x) other than the Claims provided for in subsection (b) above, any and all claims relating to that certain Agreement And Plan Of Merger dated as of March 27, 2000, by and among L&H NV, L&H Holdings, Dragon Systems, Inc. and the principal stockholders of Dragon Systems, Inc., any claims of breach of warranty or representations relating thereto, and (y) any remaining pre-petition and post-petition intercompany claims among L&H Holdings and L&H NV.

## 6.    Avoidance And Recovery Actions

In accordance with Section 7.4.2 of the Plan, and subject to Section 7.14 of the Plan, all of the Assigned Causes of Action that belong to or could have been raised by or on behalf of the Debtor or Debtor In Possession or its respective Estate, have been transferred and assigned to the Litigation Trust. Post Effective Date L&H and the Litigation Trust, as the case may be, as the successors to the Debtor, shall retain and may prosecute any of the foregoing as a defense or counterclaim to any Claim, Counterclaim or action, including, but not limited to, any rights under section 502(d) of the Bankruptcy Code. All other Causes of Action are being retained by Post Effective Date L&H in accordance with Section 7.14 of the Plan.

## 7.    Exculpation

Except to the extent of any willful misconduct or gross negligence, none of L&H NV, Post Effective Date L&H, or any of the L&H NV Parties (but solely in their capacities as L&H NV Parties) shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, (a) the Chapter 11 Case, (b) the pursuit of confirmation of the Plan, (c) the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, (d) the Plan, (e) the negotiation, formulation and preparation of the Plan and any of the terms, settlements and compromises reflected in the Plan, and, in all respects, the Debtor, Post Effective Date L&H, and each of the L&H NV Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided, however, that the exculpation contained in Section 13.2 of the Plan shall not apply, (x) with respect to the L&H NV Parties, to acts or omissions that occurred prior to the Petition Date, and (y) solely with respect to Post Effective Date L&H, the

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

Litigation Trust, the Plan Administrator, the Litigation Trustee or to the Curators, to acts or omissions that occur after the Effective Date.

### 8. Retention Of Jurisdiction

The Bankruptcy Court may retain jurisdiction; and if the Bankruptcy Court exercises its retained jurisdiction, shall have exclusive jurisdiction, of all matters arising out of, and relating to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the purposes more specifically described in Section 14.1 of the Plan.

### H. Miscellaneous Provisions Of Plan

#### 1. Modification Of Plan

Subject to Sections 6.5 and 15.8 of the Plan, the Committee may alter, amend, or modify the Plan or any Exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. The Committee shall provide parties-in-interest with notice of such amendments or modifications as may be required by the Bankruptcy Rules or order of the Bankruptcy Court. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or clarified, if the proposed alteration, amendment, modification or clarification does not materially and adversely change the treatment of the Claim of such holder.

After the Confirmation Date and prior to substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of the Plan, Post Effective Date L&H may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of holders of Claims under the Plan; provided, however, that to the extent required prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or an order of the Bankruptcy Court. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or clarified, if the proposed alteration, amendment, modification or clarification does not materially and adversely change the treatment of the Claim of such holder.

#### 2. Role Of Certain Indenture Trustees; Certain Expenses Of Indenture Trustees

Notwithstanding any other provision in this Plan, as soon as practicable after the Record Date, the Old Convertible Subordinated Notes Indenture Trustee and the PIERS Indenture Trustee shall provide to Post Effective Date L&H a list setting forth the identities of holders of any Class 4 PIERS/Old Convertible Subordinated Notes Claim and such other

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

information that Post Effective Date L&H may require to effect such Distributions to holders of such Claims. Subject to the Effective Date occurring, the reasonable fees and expenses of the Old Convertible Subordinated Notes Indenture Trustee and the PIERS Indenture Trustee for services rendered shall be Allowed as Administrative Expense Claims against L&H NV, pursuant to section 503(b) of the Bankruptcy Code, and shall be paid by L&H NV or Post-Effective Date L&H without the need for the Old Convertible Subordinated Notes Trustee and the PIERS Indenture Trustee to file an application for allowance with the Bankruptcy Court, subject to such fees and expenses being reasonable. The Bankruptcy Court shall retain jurisdiction over any dispute regarding the reasonableness of such fees and expenses, and any and all rights, claims, and defenses of L&H NV and Post-Effective Date L&H with respect to the reasonableness of such fees and expenses, including, but not limited to the right to object to such fees and expenses, shall be expressly reserved.

### 3. Further Documents And Action

Post Effective Date L&H shall execute, and is authorized to file with the Bankruptcy Court such agreements and other documents, take or cause to be taken such action and deliver such documents or information as may be necessary or appropriate to effect and further evidence the terms and conditions of the Plan and to consummate the transactions and transfers contemplated by the Plan. Post Effective Date L&H, and all other parties, shall execute any and all documents and instruments that must be executed under or in connection with the Plan in order to implement the terms of the Plan or to effectuate the Distributions under the Plan, provided that such documents and instruments are reasonably acceptable to such party or parties.

### 4. Plan Supplement

Except as otherwise provided in the Plan, forms of the following documents shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court at least seven (7) days prior to the Voting Deadline: the Assumption And Assignment Schedule, the Plan Administration Agreement, the Litigation Trust Agreement, the Mutual Release Agreement among L&H NV and L&H Holdings dated on or about June 26, 2002, and if available by such date, the lists of the initial members of the Litigation Monitoring Committee. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal Bankruptcy Court hours. Holders of Claims may obtain a copy of the Plan Supplement upon written request to the Committee in accordance with Section 15.4 of the Plan.

### 5. Plan Controls

In the event of any conflict or inconsistency between the terms of (a) the Plan (including all exhibits to the Plan), and (b) the Disclosure Statement, the terms of the Plan shall control.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

### 6.   Reservation Of Rights

If the Plan is not confirmed by a Final Order, or if the Plan is confirmed and does not become effective, the rights of all parties in interest in the Chapter 11 Case are and shall be reserved in full. Any concessions or settlements reflected herein, if any, are made for purposes of the Plan only, and if the Plan does not become effective no party in interest in the Chapter 11 Case shall be bound or deemed prejudiced by any such concession or settlement.

## VI.   VOTING REQUIREMENTS

On [**April 2, 2003**], the Bankruptcy Court entered the Disclosure Approval Order that, among other things, approved this Disclosure Statement, set voting procedures, and scheduled the Confirmation Hearing. A copy of the Disclosure Approval Order and the Notice of the Confirmation Hearing are enclosed with this Disclosure Statement as part of the solicitation package. The Disclosure Approval Order sets forth in detail, among other things, procedures governing voting deadlines, and objection deadlines. The Disclosure Approval Order, the Notice of the Confirmation Hearing, and the instructions attached to the Ballot should be read in connection with this Section of this Disclosure Statement.

If you have any questions about the procedure for voting your Claim or Equity Interest or the packet of materials you received, please contact:

> Donlin, Recano & Company
> 419 Park Avenue South, Suite 1206
> New York, New York 10016
> Attention: Voting Department

If you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact Monzack and Monaco, P.A., 1201 Orange Street, Suite 400, Wilmington, Delaware   19801 (Attention: Heidi Sasso) or by electronic mail to hsasso@walmon.com.

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures of the Committee concerning the Plan have been adequate and have included information concerning all Distributions made or promised to be made in connection with the Plan and the Chapter 11 Case. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law.

In particular, to confirm the Plan, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that the Plan: (i) has been accepted by the requisite votes of all Classes of impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in respect of one or more dissenting Classes, which may be the case under the Plan; (ii) is "feasible," which means that there is a reasonable probability that

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization; and (iii) is in the "best interests" of all holders of Claims or Equity Interests, which means that such holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Committee believes that the Plan satisfies all of these conditions.

### A.     Voting Deadline

This Disclosure Statement and the appropriate Ballot(s) are being distributed to all holders of Claims who are entitled to vote on the Plan. There is a separate Ballot designated for each impaired voting Class in order to facilitate vote tabulation; however, all Ballots are substantially similar in form and substance, and the term "Ballot" is used without intended reference to the Ballot of any specific Class of Claims.

**IN ACCORDANCE WITH THE DISCLOSURE STATEMENT APPROVAL ORDER, TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE RECEIVED BY THE VOTING AGENT NO LATER THAN 4:00 P.M. (NEW YORK TIME) ON [MAY 19, 2003], THE VOTING DEADLINE. ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN.**

### B.     Holders Of Claims Entitled To Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan (a) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), (b) reinstates the maturity of such claim or interest as it existed before the default, (c) compensates the holder of such claim or interest any damages resulting from such holder's reasonable reliance on such legal right to an accelerated payment, and (d) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

In general, a holder of a claim or interest may vote to accept or reject a plan if (1) the claim or interest is "allowed," which means generally that it is not disputed, contingent, or unliquidated and (2) the claim or interest is impaired by a plan. If the holder of an impaired claim or interest will not receive any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan and provides that the holder of such claim or interest is not entitled to vote. If the claim or interest is not impaired, the Bankruptcy Code conclusively presumes that the holder of such claim or interest has accepted the plan and provides that the holder is not entitled to vote.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

The holder of a Claim against L&H NV that is "impaired" under the Plan is entitled to vote to accept or reject the Plan if (1) the Plan provides a distribution in respect of such Claim and (2) (a) the Claim has been scheduled by L&H NV (and such Claim is not scheduled as disputed, contingent, or unliquidated), or (b) the holder had filed a proof of Claim on or before June 11, 2001 (the Filing Deadline), pursuant to sections 502(a) and 1126(a) of the Bankruptcy Code and Bankruptcy Rules 3003 and 3018. Any Claim as to which an objection has been timely filed and has not been withdrawn or dismissed is not entitled to vote, unless the Bankruptcy Court, pursuant to Rule 3018(a) of the Bankruptcy Rules, upon application of the holder whose Claim has been objected to, temporarily allows the Claim in the amount that the Bankruptcy Court deems proper for the purpose of accepting or rejecting the Plan. **As set forth in the Notice of Confirmation Hearing and in the Disclosure Statement Approval Order, holders of Claims which are the subject of an objection must file motions for purposes of having their Claims temporarily allowed for voting purposes on or before [May 5, 2003].**

Pursuant to the Filing Deadline Order, holders of Equity Interests (which interests are based exclusively on the ownership of common or preferred stock in L&H NV, or warrants, options, or rights to purchase, sell, or subscribe to a security interest in any L&H NV) were excused from filing proofs of interest on or before the Filing Deadline; provided, however, that holders of Equity Interests who wished to assert a Claim against L&H NV that arises out of or relates to the ownership or purchase of an Equity Interest, including Claims arising out of or relating to the sale, issuance or distribution of the Equity Interest, were required to file a proof of Claim on or before the Filing Deadline, unless another exception set forth in the Filing Deadline Order applied.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Disclosure Statement Approval Order also sets forth assumptions and procedures for tabulating Ballots that are not completed fully or correctly.

Each of Classes 3 and 4 is impaired under the Plan and the holders of Allowed Claims in such Classes are entitled to vote on the Plan. In accordance with section 1126(g) of the Bankruptcy Code, each of Classes 5, 6, and 7 is conclusively deemed to have rejected the Plan, and the holders of Allowed Claims and Equity Interests in such Classes are not entitled to vote. Each of Classes 1 and 2 and is unimpaired under the Plan and holders of Claims in each such Class are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

## C. Vote Required For Acceptance By A Class

As a condition to confirmation, the Bankruptcy Code requires that each Class of impaired Claims and Equity Interests vote to accept the Plan, except under certain circumstances. *See Section VI.B. ("Voting Requirements. Holders of Claims Entitled to Vote")* Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

of claims in that class, but for that purpose, counts only those who actually vote to accept or reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in dollar amount and a majority in number <u>actually</u> <u>voting</u> cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of interests in that class, but for that purpose, counts only those who <u>actually</u> <u>vote</u> to accept or reject the plan. Thus a class of interests will have voted to accept the plan if two-thirds of the interests actually voted are voted in favor of acceptance. Holders of Equity Interests who fail to vote are not counted as either accepting or rejecting the Plan.

**D.    Voting Procedures**

**1.    <u>Ballots</u>**

All votes to accept or reject the Plan with respect to any Class must be cast by properly submitting the duly completed and executed form of Ballot designated for such Class. Holders of impaired Claims voting on the Plan should complete and sign the Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled ["Accept the Plan"] or ["Reject the Plan."]

ANY BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL BE AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE AND REJECTION OF THE PLAN.

ANY BALLOT RECEIVED THAT IS NOT SIGNED, OR THAT CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT OR EQUITY HOLDER WILL BE AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

Ballots must be delivered to the Voting Agent, at its address set forth above, and received by the Voting Deadline. **THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE HOLDER.** If such delivery is by mail, it is recommended that holders use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to assure timely delivery. In accordance with Rule 3018(c) of the Bankruptcy Rules, the Ballots are based on Official Form No. 14, but have been modified to meet the particular needs of this case. PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

In most cases, each Ballot enclosed with this Disclosure Statement has been encoded with the amount of the Allowed Claim for voting purposes (if the Claim is a Disputed Claim, this amount may not be the amount ultimately Allowed for purposes of Distribution), and the Class to which the Claim has been attributed. For the convenience of the holders of Claims entitled to vote on the Plan, the Ballots are color-coded. The Ballots with respect to Claims in Class 3 are [green], and the Ballots with respect to Claims in Class 4 are [yellow].

## 2.    Withdrawal Or Change Of Votes On Plan

A Ballot may be withdrawn by delivering a written notice of withdrawal to the Voting Agent, so that the Voting Agent <u>receives</u> such notice prior to the Voting Deadline. Thereafter, withdrawal may be effectuated only with the approval of the Bankruptcy Court. In order to be valid, a notice of withdrawal must (i) specify the name of the holder who submitted the votes on the Plan to be withdrawn, (ii) contain the description of the Claims to which it relates, and (iii) be signed by the holder in the same manner as on the Ballot. The Committee expressly reserves the absolute right to contest the validity of any such withdrawals of votes on the Plan.

Any holder who has submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may change such vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received with respect to the same Claim or Equity Interest, the Ballot that bears the latest date will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received.

## 3.    Voting Multiple Claims

Separate forms of Ballots are provided for voting the various Classes of Claims. A separate Ballot must be used for each Claim. Ballot forms may be copied if necessary, but only Ballots containing **original** signatures will be accepted. Any person who holds Claims in more than one Class is required to vote separately with respect to each Claim. Persons holding more than one Claim within a single Class of Claims may aggregate such Claims and vote them together on a single Ballot.

Please sign, and return in accordance with the instructions in this Section D, a separate Ballot on the appropriate form to vote with respect to each such Claim of Equity Interest. Only Ballots with original signatures will be accepted (Ballots with copied signatures will not be accepted; <u>provided</u>, <u>however</u>, that photocopies of Ballots will be accepted BUT ONLY IF THEY CONTAIN ORIGINAL SIGNATURES).

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

## VII.    CONFIRMATION OF PLAN

### A.    Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing with respect to the Plan. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code described below are met. The Confirmation Hearing has been scheduled to begin on **[May 29, 2003]** at **[10:00 a.m.]** (New York time) before the Honorable Judith H. Wizmur, United States Bankruptcy Court, District of Delaware, 4th & Cooper Streets, Room 2020, Camden, New Jersey 08101. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

### B.    Deadline To Object To Confirmation

Any objection to the confirmation of the Plan must be made in writing, specify in detail (i) the name and address of the objector, (ii) all grounds for the objection and (iii) the amount of the Claim or number and class of shares of stock of L&H NV held by the objector. Any such objection must be filed with the Bankruptcy Court, with a copy to Judge Wizmur's chambers, and served so that it is received by the Bankruptcy Court, chambers, and the following parties on or before **[May 19, 2003]** at 4:00 p.m. (New York time): (i) counsel to the Committee, (a) Akin Gump Strauss Hauer & Feld, LLP, 590 Madison Avenue, 20th Floor, New York, New York 10022, Attn.: Ira S. Dizengoff, Esq. and James R. Savin, Esq. and (b) Monzack and Monaco, 1201 Orange Street, Ste. 400, Wilmington, Delaware 19801, Attn: Francis A. Monaco, Jr., Esq. and Joseph J. Bodnar, Esq.; (ii) counsel to L&H NV, (a) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005-1413, Attn.: Luc A. Despins, Esq., Matthew S. Barr, Esq. and James C. Tecce, Esq. and (b) Morris, Nichols, Arsht & Tunnell, 1201 North Market Street, Wilmington, Delaware 19801, Attn.: Robert J. Dehney, Esq. and Gregory W. Werkheiser, Esq.; (iii) Chadbourne & Parke LLP 30 Rockefeller Plaza, New York, New York 10112, Attn: Howard Seife, Esq. and N. Theodore Zink, Esq., (iv) Klett Rooney Lieber & Shorling, The Brandywine Building, 1000 West Street, Suite 1410, P.O. Box 1397, Wilmington, Delaware 19899-1397, Attn: Adam Landis, Esq. and (v) Office of the United States Trustee, 601 Walnut Street, Suite 950 West, Philadelphia, Pennsylvania 19106, Attn.: Mark Kenney, Esq.

### C.    Requirements For Confirmation Of Plan

Among the requirements for confirmation of the Plan are that the Plan (i) is accepted by all impaired Classes of Claims and Equity Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) is feasible, and (iii) is in the "best interests" of creditors and stockholders that are impaired under the Plan.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

**1.    Requirements Of Section 1129(a) Of Bankruptcy Code**

The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a reorganization plan:

*(1)*    The plan complies with the applicable provisions of the Bankruptcy Code.

*(2)*    The proponent of a plan complies with the applicable provisions of the Bankruptcy Code.

*(3)*    The plan has been proposed in good faith and not by any means forbidden by law.

*(4)*    Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

*(5)*    (A)    (i) The proponent of a plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B)    The proponent of the plan has disclosed the identity of any insider (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

*(6)*    Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

*(7)*    With respect to each impaired class of claims or interests—
(A) each holder of a claim or interest of such class—

(i)    has accepted the plan; or

(ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or

(B) if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class due to its election to retain a lien, each holder of a claim of such class will receive or retain under the plan on account of such claim

115

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

*(8)*   With respect to each class of claims or interests—
(A) such class has accepted the plan; or
(B) such class is not impaired under the plan (subject to the "cramdown" provisions discussed below,

*(9)*   Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—

    (A)   with respect to an administrative claim and certain claims arising in an involuntary case, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

    (B)   with respect to a class of priority wage, employee benefit, consumer deposit and certain other claims described in sections 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive—

        (i)   if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

        (ii)   if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

    (C)   with respect to a priority tax claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

*(10)*   If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

*(11)*   Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

*(12)*   All fees payable under 28 U.S.C. § 1930, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

*(13)*   The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the

116

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The Committee believes that the Plan meets all the applicable requirements of section 1129(a) of the Bankruptcy Code other than those pertaining to voting which has not yet taken place.

2.    **Acceptance By Impaired Classes**

Each of Classes 3 and 4 is impaired under the Plan and the holders of Allowed Claims in such Classes are entitled to vote on the Plan. In accordance with section 1126(g) of the Bankruptcy Code, each of Classes 5, 6, and 7 is conclusively deemed to have rejected the Plan. L&H NV intends to seek nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to these Classes. *See Section VI.C. ("Confirmation Of Plan)* The Committee reserves the right to seek nonconsensual confirmation of the Plan (without further notice) with respect to any Class of Claims that is entitled to vote to accept or reject the Plan if such Class rejects the Plan.

3.    **Best Interests Of Creditors**

Section 1129(a)(7) of the Bankruptcy Code requires that any holder of an impaired claim or interest voting against a proposed plan must be provided in the plan with a value, as of the effective date of the plan, at least equal to the value that the holder would receive if the debtor's operations were terminated and its assets liquidated under chapter 7 of the Bankruptcy Code. To determine what the holders of claims and interests in each impaired Class would receive if L&H NV were liquidated in a case under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from a liquidation of L&H NV's assets in the context of a hypothetical liquidation. Such determination must take into account the fact that Secured Claims, and any costs and expenses resulting from the original Chapter 11 Case and from the chapter 7 case, would have to be paid in full from the liquidation proceeds before the balance of those proceeds were made available to pay the Unsecured Claims and satisfy Equity Interests.

To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of the hypothetical liquidation of the assets (after subtracting the amount attributable to secured claims and administrative costs of the bankruptcy case) may be compared with the present value of the consideration offered to such classes under the Plan. In addition, a plan must apply the rule of absolute priority of distributions from a debtor's estate. Under that rule, no junior holder of a claim or equity interest may receive distributions under a plan until all senior classes have been paid in full or consent to some distributions being made to such junior classes. After consideration of the effect that a chapter 7 liquidation would have on the ultimate proceeds available for distribution, including (a) increased cost and expenses of liquidation under chapter 7 arising from fees payable to the chapter 7 trustee and the attorneys and other professional advisors to such trustee, (b) additional

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation, (c) the erosion of the value of L&H NV's remaining assets in the context of an expedited liquidation required under chapter 7 and the "fire sale" atmosphere that would prevail, and (d) the application of the rule of absolute priority to distributions in a chapter 7 liquidation, The Committee has determined that confirmation of the Plan will provide each holder of a Claim in an impaired Class entitled to vote with a greater recovery than such holder would have received under a chapter 7 liquidation of L&H NV.

### 4.    Feasibility

The Committee believes that Post Effective Date L&H will be able to perform its obligations under the Plan.  In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of L&H NV, unless such liquidation is proposed in the Plan.

### 5.    Requirements Of Section 1129(b) Of Bankruptcy Code

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the Plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class, and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the Plan.  These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

### a.    Fair and Equitable

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors, and equity interest holders as follows:

(1)    *Secured Creditors.*  A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides:  (a) that each of the holders of the secured claims included in the rejecting class (i) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (ii) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan, of at least equal to such holder's interest in the estate's interest in such property; (b) that each of the holders of the secured claims included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (c) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds in accordance with clause (a) or (b) of this paragraph.

(2)    *Unsecured Creditors.*    A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that:  (a) each holder of a claim included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (b) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan.

(3)    *Holders of Equity Interests.*    A plan is fair and equitable as to a class of equity interests that rejects the plan if the plan provides that:  (a) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (i) any fixed liquidation preference to which such holder is entitled, (ii) the fixed redemption price to which such holder is entitled, or (iii) the value of the interest; or (b) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan.

The Committee believes that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

**b.    Unfair Discrimination**

A plan does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated and no class receives more than it is legally entitled to receive for its claims or interests.  The Committee does not believe that the Plan discriminates unfairly against any impaired Class of Claims or Equity Interests.

CERTAIN CLASSES WILL BE DEEMED TO HAVE REJECTED THE PLAN. THEREFORE, THE BANKRUPTCY COURT WILL HAVE TO DETERMINE AT THE CONFIRMATION HEARING WHETHER THE PLAN IS FAIR AND EQUITABLE WITH RESPECT TO, AND DOES NOT DISCRIMINATE UNFAIRLY AGAINST, ANY SUCH CLASSES.  IN ADDITION, THE COMMITTEE MAY SEEK CONFIRMATION OF THE PLAN UNDER THE FOREGOING CRAMDOWN PROVISIONS IN THE EVENT THAT ANY IMPAIRED CLASS OF CLAIMS OR INTERESTS VOTES TO REJECT THE PLAN.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

## VIII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Committee believes that the Plan affords holders of Claims the greatest opportunity for realization on the Chapter 11 Assets and, therefore, is in the best interests of such holders.  If the Plan is not confirmed, however, the theoretical alternatives include:  (a) liquidation of L&H NV under chapter 7 of the Bankruptcy Code, or (b) alternative plans of reorganization or liquidation under chapter 11 of the Bankruptcy Code.  Thorough consideration of these alternatives to the Plan has led the Committee to conclude that the Plan, in comparison, provides a greater recovery to creditors on a more expeditious timetable, and in a manner that minimizes certain inherent risk in any other course of action available in the Chapter 11 Case.

### A.    Liquidation Under Chapter 7

If no plan is confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code.  In a chapter 7 case a trustee or trustees would be elected or appointed to liquidate the assets of L&H NV.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against and Equity Interests in L&H NV.

The Committee believes that in a liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustee(s) would cause a substantial diminution in the value of the Estate.  The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority.  Moreover, section 1145 of the Bankruptcy Code could not be invoked.

### B.    Alternative Plan Of Reorganization Or Liquidation

If the Plan is not confirmed, L&H NV, the Committee, or if the Bankruptcy Court were not to grant further extensions of L&H NV's and the Committee's current co-exclusive periods in which to file and solicit a plan of reorganization, any other party in interest in the cases, could propose a different plan or plans.  If the Plan is not confirmed, L&H NV's Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which a trustee or trustees would be elected or appointed to liquidate L&H NV's assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code.

The Committee has determined that confirmation of the Plan will provide each holder of an Allowed Claim in an impaired class under the Plan with a substantially greater recovery than would be received by such holder in a chapter 7 liquidation because of (a) additional administrative expenses resulting from the appointment of and services to be rendered by trustees and attorneys and other professionals to assist such trustees, (b) the relative lack of familiarity with L&H NV's assets that would inevitably hinder such professionals in the management of the estate, (c) additional expenses and claims, some of which would be entitled

to priority, that would be generated during the liquidation and (d) realization of lower value of the Chapter 11 assets than under the Plan, if such claims are ultimately successful after protracted litigation. In addition, distributions would be substantially delayed in a Chapter 7 liquidation because of the factors set forth above and the need to litigate or otherwise resolve many of the claims settled by the Plan.

## C.    Certain Risk Factors

In the event the Plan is not confirmed, or the Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code, the Committee believes that such inaction or action, as the case may be, will cause L&H NV to incur substantial expense and otherwise serve only to prolong unnecessarily the Chapter 11 Case and negatively affect creditors' recoveries on their Claims.

If the Plan, which allocates assets between the Belgian Case and the Chapter 11 Case to conclude the Chapter 11 Case in an expedited manner, is not confirmed, creditors and equity interest holders will be subject to the risks associated with the Belgian Case. For example, few non-U.S. entities and individuals have been identified who have filed Claims solely in the Belgian Case alleging fraud, deceit, or misrepresentation by L&H NV or its representatives in connection with transactions by virtue of which such claimants purchased or otherwise acquired Common Stock (the "Foreign Stock Fraud Claimants"). Similarly situated U.S. claims would be subject to mandatory subordination under section 510(b) of the Bankruptcy Code, but because the Foreign Stock Fraud Claimants have filed claims only in the Belgian Case, and are otherwise not subject to the jurisdiction of the Bankruptcy Court, such claims may not be subject to subordination under section 510(b). Moreover, there is no provision precisely analogous to section 510(b) under Belgian law, which would mandate subordination of such claims in the Belgian Case, and the Belgian Court has relied on the inclusion of a section 510(b)-type provision in the Belgian Plan to refuse to approve such plan. There also is a risk that the Foreign Stock Fraud Claimants will receive payment in full on their claims in the Belgian Case pari passu with rest of L&H NV's unsecured creditors. Such a result would have a dilutive effect on the pool of assets available to L&H NV creditors that is inconsistent with U.S. law. At this point only ten (10) Foreign Stock Fraud Claimants have been identified, and their claims are, in total, less than $2.6 million. However further similar claims could be filed in the Belgian Case of which the Committee and L&H NV are currently unaware, which could have a significant dilutive impact on recoveries to creditors with non-Foreign Stock Fraud Claims

HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN L&H NV SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

## IX.    CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

The following is a general summary of certain significant U.S. federal income tax consequences of the Plan for holders of impaired Claims against and Equity Interests in L&H NV to assist them in evaluating the effect U.S. federal income taxes may have on them if the Plan is consummated. This summary does not discuss all aspects of U.S. federal income taxation that may be relevant to the holder of a particular Claim or Equity Interest in light of its investment circumstances, or to such holders subject to special treatment under the U.S. federal income tax laws, such as banks, tax-exempt entities, foreign corporations or individuals who are not citizens or residents of the United States. Except as expressly stated below, this discussion does not address any state, local or foreign tax matters. All references to taxes are solely to U.S. federal income taxes.

This discussion is based upon information received from various sources and has not been audited or verified; any material inaccuracies in the information may affect the matters and the stated conclusions regarding the tax consequences of the Plan. The discussion is based on the provisions of the Internal Revenue Code of 1986 (as amended, the "Tax Code"), proposed, temporary and final Treasury Regulations, public and private Internal Revenue Service (the "IRS") rulings and pronouncements and relevant judicial decisions, all of which are subject to change, possibly with retroactive effect. Moreover, the tax consequences of certain aspects of the Plan are uncertain because of the lack of applicable legal precedent.

Because of the complexity of the transactions contemplated by the Plan, the differences in the nature of the claims of the various creditors, their taxpayer status and methods of accounting and prior actions taken by creditors with respect to their claims, the described tax consequences are subject to significant uncertainties and variations in their application.

The Committee has not received an opinion of counsel or a ruling from the Internal Revenue Service as to the U.S. federal income tax consequences of the Plan and does not intend to seek a ruling from the Internal Revenue Service or opinion of counsel with respect thereto. There can be no assurance the treatment discussed below will be accepted by the Internal Revenue Service. HOLDERS OF IMPAIRED CLAIMS AND EQUITY INTERESTS ARE ADVISED TO CONSULT THEIR TAX ADVISORS CONCERNING THE TAX CONSEQUENCES TO THEM, INCLUDING FOREIGN, STATE AND LOCAL TAXES.

### A.    Consequences to Holders of Impaired Claims

Pursuant to the Plan, holders of impaired Claims will receive one or more Distributions of Cash and Litigation Beneficial Interests in full satisfaction of their Claims depending upon, among other things, the liquidation of the Chapter 11 Assets, and the possible prosecution of Causes Of Action and the resolution of Disputed Claims.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

1.    **Gain Or Loss**

In connection with the implementation of the Plan, each holder of an impaired Claim generally will realize gain or loss for federal income tax purposes (other than with respect to amounts, if any, allocable to accrued but unpaid interest which will be taxable as ordinary income). The timing and amount of the recognition of that gain or loss will depend upon a number of factors, including whether the holder will receive multiple Distributions pursuant to the Plan and whether Post Effective Date L&H's obligation to make payments will be treated as a new debt obligation for federal income tax purposes. It is possible that any loss, or a portion of any gain, realized by a Claim holder may have to be deferred until all the Distributions to the holder are received (presumably, no later than on or about the date of the final distribution).

In addition, the character of any gain or loss recognized by a Claim holder as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the obligation from which its claim arose constitutes a capital asset in the hands of the holder, whether the obligation from which the claim arose has been held for more than one year, the allocation of any Distributions received between principal and unpaid accrued interest, whether and to what extent the holder has previously claimed a bad debt deduction, and the extent (if any) to which interest may be imputed where multiple distributions are received.

2.    **Withholding**

All payments to holders of Claims are subject to any applicable withholding (including employment tax withholding). Under the U.S. Tax Code, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding" at a 30% rate. Backup withholding generally applies if the holder (a) fails to furnish their social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and that he is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

*HAS NOT BEEN APPROVED BY COURT/NOT FOR SOLICITATION*

## X.    CONCLUSION AND RECOMMENDATION

The Committee believes that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims. Any alternative to confirmation of the Plan, such as a chapter 7 liquidation or attempts to confirm another plan of reorganization or liquidation, would involve significant delays, uncertainty, and substantial additional administrative costs. Moreover, as described above, the Committee believes that holders of claims against the Chapter 11 Assets will receive greater and earlier recoveries under the Plan than those that could be achieved in a Chapter 7 liquidation. FOR THESE REASONS, THE COMMITTEE URGES ALL HOLDERS OF IMPAIRED CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE ON THE PLAN TO RETURN YOUR BALLOTS ACCEPTING THE PLAN.

Dated: March 11, 2003

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LERNOUT & HAUSPIE SPEECH PRODUCTS N.V.**

By:_____
    Name:   Michael Curran on behalf of KBC Bank N.V.
    Title:   Chairman of the Official Committee of
             Unsecured Creditors of Lernout & Hauspie
             Speech Products N.V.

**WALSH, MONZACK & MONACO, P.A.**

By:_____
    Francis A. Monaco (# 2078)
    Joseph J. Bodnar (# 2512)
    1201 Orange Street, Ste. 400
    Wilmington, DE 19801
    (302) 656-8162

    AND

**AKIN GUMP STRAUSS HAUER & FELD LLP**
    Ira S. Dizengoff (ID-9980)
    James Savin (JS-9220)
    590 Madison Avenue
    New York, New York 10022
    (212) 872-1000

    Co-Counsel to the Official Committee of Unsecured Creditors

Exhibit D

Exhibit D

IN THE UNITED STATES BANKRUTPCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LERNOUT & HAUSPIE SPEECH PRODUCTS N.V., | ) ) | Case No. 00-4398 (JHW) |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| SCOTT L. BAENA, LITIGATION TRUSTEE OF THE LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. LITIGATION TRUST, | ) ) ) ) | |
| | ) | Adv. Pro. No. 04-54842 (JHW) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KPMG LLP AND KLYNFELD PEAT MARWICK GOERDELER BEDRIJFREVISOREN, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## LITIGATION TRUSTEE'S OPPOSITION TO DEFENDANT KPMG LLP'S MOTION TO TRANSFER AND MEMORANDUM OF LAW

Plaintiff, Scott L. Baena, Litigation Trustee of the Lernout & Hauspie Speech Products NV Litigation Trust (the "Trustee"), submits this response in opposition to Defendant, KPMG LLP's ("KPMG"), Motion to Transfer the Action to the District of Massachusetts ("Transfer Motion") and the Opening Brief in Support of KPMG LLP's Motion to Transfer the Action to the District of Massachusetts ("Opening Brief").

## I. PRELIMINARY STATEMENT

The Trustee has sued KPMG and Klynfeld Peat Marwick Goerdeler Bedrijfrevisoren ("KPMG Belgium") in this case for $340,000,000 in damages resulting from their failures as accountants and auditors for L&H Speech Products NV ("L&H"), their former client. The

Trustee brings these claims as successor to L&H, putting him in the position of the Defendants' former client.

KPMG asks this Court to transfer this case from this Court to the District of Massachusetts. KPMG claims that this transfer will serve the "interests of justice" and promote the "convenience of the witnesses and parties." (Opening Brief, p.6.) In fact, the transfer will do no such thing, and the Transfer Motion should be denied because it is without foundation in fact or law.

As the basis for its Transfer Motion, KPMG asserts that "virtually all of the factual and legal issues surrounding Plaintiff's claims against KPMG" are the subject of six different cases, all pending before one District Court Judge in the District of Massachusetts. KPMG argues that these "Massachusetts Actions," several of which were transferred from the District of Delaware pursuant to the "first-filed" rule, concern "the exact same issues" presented in this case and also involve the same parties, including the KPMG and KPMG Belgium. KPMG goes on to say that many of the witnesses and much of the documentary discovery relevant to the Massachusetts Actions "will be the same in this case," and that the transfer will avoid the necessity for multiple depositions of witnesses that "have been noticed to take place in Massachusetts."

KPMG cites authority for the commonly accepted proposition that it would be wasteful to allow two cases "involving precisely the same issues" to be "simultaneously pending" in different District Courts. (Opening Brief, p.7.) Indeed, the Opening Brief gives the reader the inescapable impression that if this case is not transferred to the District of Massachusetts, KPMG will be forced to defend essentially the same claims in two different jurisdictions at the same time, unfairly burdening it, the witnesses and the court system with the risk of inconsistent rulings and duplications of all kind.

There is a fundamental flaw in this presentation, however. Virtually every thing that KPMG says regarding the purported identity of this case with the Massachusetts Actions is, at best, misleading, and for the most part completely false. Indeed, as we show below, (i) both KPMG and KPMG Belgium have settled all of the claims asserted against them in the Massachusetts Actions, and, as a result, there is no identity (or even overlap) of parties between this case and the Massachusetts Actions; (ii) there is no identity or overlap of claims or legal theories between this case and the Massachusetts Actions, and (iii) discovery in the Massachusetts Actions has effectively closed and there thus cannot possibly be any benefits that will be derived by consolidating the discovery in this case with the Massachusetts Actions.

We will leave it to KPMG to explain why it has so grossly misrepresented the Massachusetts Actions. The true status of the matters, however, leaves no basis to disturb the Trustee's choice of forum and transfer this case to Massachusetts. For these reasons, KPMG's Transfer Motion should be denied in all aspects.

## II. ARGUMENT

### A. Legal Standard

The Transfer Motion is brought pursuant to both 28 U.S.C §1404(a) and §1412. Section 1404(a) is the general transfer statute, and it provides that "[f]or the convenience of the parties and the witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it may have been brought." Section 1412 regards the transfer of bankruptcy matters and similarly provides that "[a] district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties."

As KPMG correctly states, the decision to transfer under either section turns on the same

issues. *In re Emerson Radio Corp.*, 52 F.3d 50, 55 (3d Cir. 1995) ("[S]ection 1412 largely include[s] the same criteria for transfer of cases as section 1404(a), *i.e.*, 'the interest of justice' or 'the convenience of the parties' ....").  However, under both statutes, the burden of establishing the need for a transfer rests with the movant. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 878 (3d Cir. 1995).  Indeed, the party seeking the transfer bears the burden of demonstrating by a preponderance of the evidence that a transfer of venue is strongly favored under the circumstances. *Hechinger Liquidation Trust v. Fox (In re Hechinger Inv. Co. of Del., Inc.)*, 296 B.R. 323, 325 (Bankr.D.Del.2003).

KPMG also correctly sets forth the non-exclusive list of twelve factors identified by the Third Circuit as relevant to the determination of whether to transfer an action. *Jumara v. State Farm Ins. Co.*, 55 F.3d at 879-80.  However, contrary to KPMG's suggestion, these factors are not equally weighted.  The starting point in the analysis is the recognition that the plaintiff's choice of forum is deserving of paramount consideration and should not be lightly disturbed. *Schutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970).  The deference accorded plaintiff's choice of forum will apply as long as the selection is for a legitimate reason.  *Guidant Corporation v. St. Jude Medical, Inc.*, 2004 WL 1925466 (D.Del.) at *2

In this case, the Trustee has chosen to litigate this claim - the largest remaining asset of the estate - in the same forum where the bankruptcy case is proceeding – an entirely legitimate basis for Plaintiff's choice.  Indeed, with regard to transfers of bankruptcy proceedings under §§1404(a) and 1412, there is "a strong presumption of maintaining venue where the bankruptcy case is pending." *HLI Creditor Trust v. Keller Rigging Constr.(In re Hayes Lemmerz Int'l Inc.)* 312 B.R. 44, 46 (Bankr.D.Del.2004), *quoting Southwinds Assocs., Ltd. v. Reedy (In re Southwinds Assocs. Ltd.)*, 115 B.R. 857, 862 (Bankr.W.D.Pa.1990).

KPMG would have this Court believe that the confirmation of the Plan in this case somehow diminishes the presumption in favor of the Trustee's selection of this forum. Nothing could be further from the truth. To the contrary, as demonstrated by the very cases that KPMG cites in support of this proposition, the presumption will be preserved unless the party seeking the transfer can demonstrate that the transfer will significantly enhance an efficient, expeditious and cost effective resolution of the adversary proceeding.

It is precisely for this reason that KPMG has gone to the lengths that it has to portray this case as virtually identical to the Massachusetts Actions. The facts, however, speak for themselves.

## B. KPMG's Representations of The "Virtual Identity" of This Case With The Massachusetts Actions are Completely False.

As discussed above, KPMG's Transfer Motion is founded on the proposition that there is a series of cases currently pending against KPMG and KPMG Belgium in Massachusetts District Court that are "virtually identical" in every respect to this case; that unless this case is transferred to Massachusetts, discovery will be duplicated, inconsistent legal rulings may occur, judicial labor will be wasted and witnesses will be exposed to multiple depositions. Frankly, if the cases were as identical as KPMG claims, and if proposed transfer could achieve the goals that KPMG asserts, the Trustee might be receptive to KPMG's Transfer Motion. The truth, however, is that the purported benefits of the transfer are as illusory as KPMG's characterization of the "virtual identity" of the actions is false.

KPMG correctly states that when a case is pending in another District that involves the same parties and the same issues as a subsequently filed case, a court can use the "first-filed" rule to either dismiss or stay a later-filed case, or to transfer the second case to be consolidated in the court where the first-filed case is pending. *E.E.O.C. v. Univ. of Pennsylvania*, 850 F.2d 969,

971 (3d Cir. 1988); *see also*, *Liu v. Cargo Transporter, Inc.*, 2003 WL 21659254 at *1

(E.D.Pa.)(first-filed rule articulated in *E.E.O.C. v. Univ. of Penn.* does not apply when the parties

to the related actions are not the same); *Oakley, Inc. v. Dynex Sport Optics, Inc.*, 1989 WL

101550 (D.N.J.) at *8(same).

Relying on this authority, KPMG asserts that:

> • Virtually all of the factual and legal issues surrounding Plaintiff's
> claims against KPMG US and KPMG Belgium have been the subject
> of litigation pending for several years in the Massachusetts District
> Court. (Opening Brief, p.2);

> • The factual allegations and legal theories in the Complaint are
> virtually identical to those in the Massachusetts Actions. (*Id.*, p. 4);

> • These cases concern . . . third-party discovery of literally hundreds of
> persons and entities who have relevant information regarding the
> collapse of L&H, as well as scores of other factual and legal issues.
> (*Id.*, p. 2);

> • Many of the witnesses (both parties and non-parties) and document
> discovery in the Massachusetts Actions and Transaction Cases will be the
> same in this case. (*Id.*, p. 3-4);

> • Because of the ongoing litigation in Massachusetts, discovery has been
> coordinated in one forum, preventing witnesses from being subjected
> to multiple depositions in multiple jurisdictions. (*Id.*, p. 9);

> • The claims asserted here relate to the same underlying transactions that
> are the subject of the cases that have been pending in the Massachusetts
> District Court. Because that court has already delved into, and will continue
> to delve into, factual and legal issues relating to the present action, judicial
> economy weighs in favor of transfer. (*Id.*, p.9); and

> • If these cases were to proceed in separate districts, duplicative discovery
> and motion practice would ensue, wasting valuable judicial resources
> by requiring multiple judges to become familiar with the underlying facts here.
> (*Id.*, p. 9).

In point of fact, none of these statements is correct. Indeed, the statements are so

transparently lacking in any support or foundation that it is almost inexplicable that KPMG

would have the temerity to make them.

As a threshold matter, there is no identity of the parties between this case and the Massachusetts Actions. Indeed, with the conclusion of KPMG and KPMG Belgium's settlements of the Massachusetts Actions, there is not a single party - plaintiff or defendant - that is common to both this case and any of the Massachusetts Actions.

The importance of this fact cannot be overstated. The Trustee has not been able to discover a single reported decision where the first-filed rule has been relied on or even suggested as a basis, to transfer a case when the parties to the actions are completely different. Apparently, KPMG has not been able to find any support for a transfer under these circumstances either. How else can KPMG explain its failure to admit the absence of common parties to this Court or its pretense to the Court of just the opposite? More disturbingly, how can KPMG justify its representations of commonality to this Court both in its Transfer Motion and its argument in open court at the hearing on the Trustee's motion to extend the briefing schedule, when (i) both KPMG and KPMG Belgium had already negotiated the complete settlement of all claims against them in the Massachusetts Actions, and (ii) KPMG and KPMG Belgium were arguing before the Massachusetts court that these settlements should insulate them from any further litigation responsibilities in the Massachusetts Actions?

In fact, after the Transfer Motion was filed, KPMG filed a motion in the Massachusetts Actions seeking protection to *avoid* the efforts of the remaining parties from taking discovery of KPMG. As it stated in its motion: "Indeed, having settled, KPMG [LLP] is now effectively a non-party who should be protected from the overreaching and tardy discovery efforts of the Non-Settling Defendants." (KPMG LLP'S Memorandum of Law in Opposition to SG Cowen's Motion to Compel and In Support of Cross-Motion for Protective Order, dated October 12, 2004,

at p. 2, *see also*, p. 10, attached as Exhibit "1,"). KPMG's counsel reiterated that stance at the

October 19, 2004 motion when she stated to Massachusetts Magistrate Judge Robert B. Collings,

"Our position is that we are not parties in this case." (Transcript from October 12, 2004 Hearing

before Magistrate Judge Robert B. Collings, *In re Lernout & Hauspie Securities Litigation*,

consolidated Civil Action Nos. 00-11589, 02-10303, 02-10304, and 02-10305, attached as

Exhibit "2," p. 45).

KPMG Belgium took a similar position in moving for its own protective order, stating:

"KPMG [Belgium], as a result of settlement, *will no longer be defending the actions in this

Court.*" ([KPMB Belgium]'s Surreply Memo In Further Opposition To SG Cowen's Motion To

Compel And In Support Of [KPMG-Belgium]'s Motion For A Protective Order, dated October

18, 2004, *In re Lernout & Hauspie Securities Litigation*, consolidated Civil Action Nos. 00-

11589, 02-10303, 02-10304, and 02-10305, Exhibit 1).

KPMG's deception about the common parties between this case and the Massachusetts

Actions is, if anything, eclipsed by its outright misrepresentations regarding the discovery

benefits that the transfer would supposedly provide. KPMG recognizes that discovery

efficiency, particularly in terms of avoiding multiple depositions, is critical to establishing the

foundation to transfer an action away from a plaintiff's selected forum. Accordingly, KPMG

repeatedly argues how extensive the discovery in the Massachusetts Actions has been, how many

depositions have already occurred and are scheduled to occur, and how "discovery has been

coordinated in one forum, preventing witnesses from being subjected to multiple depositions in

multiple jurisdictions." (Opening Brief, p. 9).

What KPMG has conspicuously avoided telling this Court is that all discovery in the

Massachusetts Actions formally ends on November 15, 2004. In fact, when KPMG filed its

Transfer Motion, the discovery cut-off was actually October 31, 2004. What KPMG has also omitted from its representations to this Court is that, as a condition of their settlement with the plaintiffs in the Massachusetts Actions, both KPMG and KPMG Belgium expressly prohibited the settling plaintiffs from providing any cooperation to the Trustee, even in the form of translations of Belgian documents.

The import of what KPMG has avoided telling this Court cannot be overstated. Because all of the discovery in the Massachusetts Actions - including all depositions - will have been concluded before the Trustee could possibly participate, it will have precisely the same result regardless of whether this action remains in this forum or is transferred to Massachusetts. In either case, the ability of the Trustee to obtain the discovery will be the same; he will have to request production of the discovery from KPMG or KPMG Belgium, and he will have to subpoena the discovery if it is from anyone else - including the Massachusetts plaintiffs who KPMG prohibited from cooperating with the Trustee.

Moreover, to the extent that the interrogatory answers, responses to requests for admissions and deposition testimony are from KPMG or KPMG Belgium, and are useful to the Trustee's case, they will be equally admissible as admissions of party opponents, whether in this Court or in the District Court of Massachusetts. To the extent that the discovery is from other parties to the Massachusetts Actions, and is useful to the Trustee's case, it will be equally inadmissible in this Court or in Massachusetts, except as may be provided under the Fed.R.Civ.P. and Fed.R.Evid.

With specific respect to the depositions that will have been taken in the Massachusetts Actions, the inability of the Trustee to have participated will invariably require him to re-depose many of the witnesses, again regardless of whether the case remains in this Court or is

transferred to Massachusetts. The Trustee obviously cannot rely on depositions taken by other litigants with other claims and agendas (even assuming, of course, that they would be admissible at all), and he thus will have to question the witnesses on the issues that are related to his case.

Perhaps because KPMG cannot identify a single common party between this case and the Massachusetts Actions, and perhaps because KPMG cannot point to a single actual benefit that the transfer would provide in respect of the discovery in this case, KPMG devotes the better part of its Transfer Motion to what it contends are the identity of legal issues between this case and the Massachusetts Actions. KPMG's contention is nothing short of remarkable.

First and foremost, despite KPMG's claim that "[t]he factual allegations and legal issues in this case are the virtually identical to those in the Massachusetts Actions," the Trustee has not alleged a single cause of action that was asserted, let alone ruled on by Judge Saris, in any of the Massachusetts Actions. The Trustee's complaint alleges claims against KPMG and KPMG Belgium for professional malpractice, aiding and abetting breach of fiduciary duty, and violation of the provisions of the Massachusetts Consumer Protection Act applicable to professional services provided for a client. None of these claims was ever asserted in the Massachusetts Actions; nor could they possibly have been because each of the Trustee's claims could only be maintained by or on behalf of L&H.

By contrast, the vast majority of the claims alleged in the Massachusetts Actions (whether against KPMG, KPMG Belgium or the myriad of any other defendants not parties to this case) were claims for securities fraud under Sections 10(b) and 20(a) of the Securities Act. These claims were predicated on alleged misrepresentations that the plaintiffs in the L&H class action suit asserted had induced their purchase of L&H stock, and that the plaintiffs security holders in the Dragon and Dictaphone cases asserted had induced their sale of Dragon and

Dictaphone stock. Moreover, of the claims asserted by the plaintiffs in the Massachusetts Actions that did not arise under federal securities laws, they all were predicated on one or more species of fraud or misrepresentation again associated with the alleged inducement to sell or purchase securities.

The closest any of the plaintiffs in the Massachusetts Actions came to asserting any of the causes of actions alleged by the Trustee in this case was the Dictaphone Trustee in *Nisselson v. Lernout, et al.*, No. Civ. A 03-10843(PBS), who also asserted claims arising under the Massachusetts Consumer Protection Act. However, unlike the Trustee in this case, the Dictaphone Trustee's claims were based on the consumer fraud portions of the Act. Moreover, in her order dismissing the Dictaphone Trustee's action, Judge Saris never even reached this claim because of her determination that the Dictaphone Trustee lacked standing to assert any of his claims.

In short, like KPMG's pretenses about the common parties in this case and the Massachusetts Actions, and its proclamation of the discovery benefits that the transfer would produce, its contention of the "virtually identical" legal issues between this case and the Massachusetts Actions is made up out of whole cloth. For this reason as well, KPMG's reliance on the Massachusetts Actions to justify its Transfer Motion is completely unfounded.

## C. Judge Saris Familiarity With the Facts Alleged in the Massachusetts Actions is Not a Basis for Transfer.

With all of the reasons to transfer based on "pending actions" with the "same parties" involving the "same legal issues" and offering "consolidated discovery benefits" gone, nothing is left but the suggestion that Judge Saris' residual familiarity with the facts alleged in the Massachusetts Actions somehow would make her adjudication of this case more efficient. This suggestion is without merit.

In the first place, Judge Saris has never been called upon to decide any facts in the Massachusetts Actions; indeed, the furthest she proceeded "on the merits" was to rule on the motions to dismiss. Nonetheless, to the extent that KPMG is correct in its assertions that the facts of this case overlap with the facts at issue in the Massachusetts Actions, and that Judge Saris "has already delved into, and will continue to delve into" these facts, her familiarity with these facts cannot be a basis to transfer this case, and may, in and of itself, be reason not to transfer the case.

According to KPMG, Judge Saris' four year tenure with the Massachusetts Actions has allowed her to make at least preliminary determinations regarding those actions that would facilitate her ruling in this case and provide better judicial efficiency than if a different judge were to view this case anew. There is a fundamental problem with this argument, however. The Trustee has not been a party to any of the Massachusetts Actions and, as a result, has not had any say in Judge Saris' prior determinations of these issues.

Lest there be any doubt, the Trustee has nothing but the greatest respect for Judge Saris, and takes great comfort in her rulings that factual allegations, which KPMG states are virtually identical to the allegations in this case, were sufficient to state a claim for securities fraud against both KPMG and KPMG Belgium under section 10(b) of the Securities Act. The Trustee also takes great comfort in Judge Saris' determinations (i) rejecting KPMG Belgium's attempt to remove the Massachusetts Actions to Belgium on *forum non conveniens* grounds, and (ii) rejecting KPMG Belgium's attempt to shield its L&H work papers from discovery, even without consideration of L&H's consent to the disclosure of those documents. Finally, the Trustee is encouraged by the fact that Judge Saris has been asked to approve the class action plaintiffs' $115 million settlement of its claims against KPMG and KPMG Belgium, claims that the Trustee

believes are not nearly as strong as his claims in this case.

Nevertheless, the Trustee cannot countenance an argument that, in essence, uses the term "familiarity" as a code word for prejudgment. This action represents the single largest asset of a bankruptcy estate that at this point is only expected to pay its creditors pennies on the dollar. At a minimum, the Trustee should be entitled to an impartial consideration of his claims. *See, Codex Corp. v Milgo Electronic Corp.*, 553 F.2d 735, 739 (1st Cir. 1977) (Court's prior determination of facts in respect of one party would militate against transfer of case involving similar facts in respect of another party)

KPMG's misrepresentations to this Court of the "virtual identity" of this case to the Massachusetts Actions in an effort to shoehorn this action into the first-filed rule is bad enough. Its attempt to buttress this invalid argument with the contention that Judge Saris' familiarity a/k/a prejudgment of the facts will promote judicial efficiency crosses the line. The Trustee acknowledges a significant overlap of the facts of this case with the facts at issue in the Massachusetts Actions. However, this factual overlap without common parties or legal theories of recovery or prospects for consolidated discovery cannot justify the transfer of this case to Massachusetts.

**D. KPMG Has Failed To Present Any Other Basis for Requiring a Transfer to Massachusetts**

Almost as a footnote, KPMG states in paragraph 5 of its Opening Brief that the transfer of this case is warranted because the complaint alleges that L&H's former U.S. headquarters were in Massachusetts and that the center of gravity of KPMG's misconduct that forms the basis of the claims occurred in Massachusetts. KPMG also argues in the same paragraph that the Trustee "has invoked a Massachusetts consumer protection statute, namely Mass. Gen. L.C. 93A, and other claims requiring the application of Massachusetts state law." Finally KPMG claims in

the final substantive paragraph of its Opening Brief that the case should transferred because the Massachusetts District Court would be "more convenient to the parties and witnesses."

The weakness of these arguments is consistent with the half-hearted effort that KPMG has given to them. First, with respect to the convenience of the witnesses and parties that would purportedly ensue from the transfer of this case to Massachusetts, the only basis KPMG can offer to support its conclusions is its well-worn and totally inaccurate mantra regarding the virtual identity of this case and the Massachusetts Actions and the fact that "[b]ecause of the ongoing litigation in Massachusetts, discovery has been coordinated in one forum, preventing witnesses from being subjected to multiple depositions in multiple jurisdictions."

The Trustee has already demonstrated the speciousness of this argument. Suffice it to say that, as a Delaware Limited Liability Partnership, KPMG should not be heard to complain about being sued in its home state any more than it can be heard to argue the discovery benefits of joining this case with actions where discovery has been closed and with respect to which the Trustee has not had a chance to participate.

With regard to the "center of gravity" of KPMG and KPMG Belgium's conduct occurring in Massachusetts, the Trustee acknowledges that this fact should be considered for purposes of the Transfer Motion, primarily as it relates to the presence of witnesses and potential witnesses in Massachusetts. *See Affymetrix, Inc. v. Synteni, Inc.*, 28 F.Supp.2d 192, 200 (D.Del.1998). Nevertheless based on the Trustee's investigation of the facts in this case and the location of both potential party and non-party witnesses, the number of witnesses that now reside in Massachusetts appears to be relatively small. By way of example, while certain KPMG witnesses may reside in Massachusetts, critical KPMG and KPMG Belgium witnesses are resident of Houston, Atlanta, New York and Belgium respectively. Accordingly, and

particularly in the absence of any evidentiary showing by KPMG to the contrary, KPMG cannot rely on the fact that the center of gravity of KPMG and KPMG Belgium's misconduct was in Massachusetts to compel the transfer of this case.

For similar reasons, KPMG's reference to the Trustee's claims as arising under Massachusetts state law also cannot justify the transfer of this case to Massachusetts. Bankruptcy Courts routinely decide matters that require the application of state law, and KPMG has offered nothing to suggest that the Massachusetts state law issues raised by the complaint are in any way unsettled, novel or complex. To the contrary, there is a well-developed body of case law interpreting both the statutory and common law claims alleged in the complaint. For example, § 93A by its terms is interpreted in accordance with the Federal Trade Commission's construction of that Act. *Ciardi v. Hoffman-LaRoche, LTD*, 2000 WL 33162197 at *4 *citing* G.L.c. 93A § 2. This Court is thus as well equipped to review the statute and supporting case law as is the Massachusetts Court.

### E. Prospects for Expeditious Resolution of this Case Favor Denial of the Transfer Motion

Another well recognized rational basis for forum preference is the desire for a speedier resolution. *Affymetrix, Inc.*, 28 F.Supp.2d at 200(collecting cases). The Trustee has chosen this forum in part because of the pace at which such matters are adjudicated. Cases move with deliberate speed in Bankruptcy Court. The Massachusetts Actions, on the other hand, were filed over four years ago and have not yet been tried. Indeed, a KPMG motion to dismiss took almost eleven months to be decided. A review of the most recent docket information for Judge Saris available online with the United States Court Office of Administration indicates that the median time for case resolution through trial for the twelve-month period ending March 31, 2004 was thirty-one months. (*See* Table C-5, attached as Exhibit "3".) Accordingly, this factor also favors

denial of the Transfer Motion.

The foregoing demonstrates that there are no factors sufficient to support a ruling that this case should be transferred. It would be antithetical to the policies of justice and economy that underlie transfers to send this case to a jurisdiction where it is likely to take longer to get to trial based on the argument that the Defendants' activities were centered there over four years ago.

## CONCLUSION

As the Trustee has demonstrated in this memorandum, KPMG has utterly failed to carry its burden to establish that this case should be transferred from this Court to the District of Massachusetts. To the contrary, a review of the criteria the Court must consider in deciding a motion to transfer unqualifiedly supports the retention of this case in this forum. No case can be cited which justifies a transfer under even remotely similar circumstances. Accordingly, based on the arguments and authorities set forth above, the Trustee respectfully requests that this Court deny the Transfer Motion.


Dated:  Wilmington, Delaware
        November 8, 2004

**BILZIN SUMBERG BAENA PRICE
& AXELROD LLP**
David W. Trench, Esq. (admitted *pro hac vice*)
Nathan G. Mancuso, Esq. (admitted *pro hac
vice*)
2500 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2336
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

- and -

**FERRY JOSEPH & PEARCE, P.A.**

  /s/ Lisa L. Coggins
Theodore J. Tacconelli (Bar Id No. 2678)
Lisa L. Coggins (Bar Id No. 4234)
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE  19899
Telephone:  (302) 575-1555
Facsimile:  (302) 575-1714

Co-Counsel for Scott L. Baena, as Litigation
Trustee of Lernout & Hauspie Speech Products

Exhibit E

Exhibit E

UNITED STATED BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                          )
                                ) Case No. 00-4397 to 00-4399
LERNOUT & HAUSPIE SPEECH        ) Adver. No. 04-54842
                                )
                    Debtor      )
                                ) November 23, 2004

TELEPHONE CONFERENCE CALL
BEFORE THE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

Scott L. Baena,                 DAVID  W. TRENCH, ESQUIRE
Litigation Trustee of the       BILZIN, SUMBERG, BAENA, PRICE &
Lernout & Hauspie Speech          AXELROD, LLP
Products N.V. Litigation        2500 First Union Financial Center
Trust                           200 S. Biscayne Blvd.
                                Miami, FL 33131-2336

Scott L. Baena,                 LISA L. COGGINS, ESQUIRE
Litigation Trustee of the       THEODORE J. TACCONELLI, ESQUIRE
Lernout & Hauspie Speech        FERRY, JOSEPH & PEARCE, P.A.
Products N.V. Litigation        824 Market Street, Suite 904
Trust                           P.O. Box 1351
                                Wilmington, DE  19899-2306

                                BRETT FALLON, ESQUIRE
                                MORRIS, JAMES, HITCHENS & WILLIAMS
                                PNC Bank Center
                                222 Delaware Avenue, 10th Floor
                                Wilmington, DE  19899-2306


Audio Operator:                 NORMA SADER

Transcribed by:                 DIANA DOMAN TRANSCRIBING
                                P.O. Box 129
                                Gibbsboro, New Jersey  08026-129
                                (856) 435-7172
                                FAX:  (856) 435-7124
                                Email:  Dianadoman@comcast.net


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

(Appearances continued)

SUONG T. NGUYEN, ESQUIRE
MICHAEL FLYNN, ESQUIRE
DAVIS, POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017

I N D E X

PAGE

Motion                          3

ARGUMENT:

BY:  Ms. Nguyen                 3

BY:  Mr. Trench                 8

THE COURT:

Decision                       19

1      (Hearing in session)

2              THE COURT:  Hello.

3              MR. TRENCH:  Good morning, Your -- good afternoon,

4      Your Honor.

5              THE COURT:  Good afternoon. Mr. Trench?

6              MR. TRACY:  Yes, Your Honor.

7              THE COURT:  Yes, and I have Mr. Fallon, Ms. Nguyen,

8      Mr. Flynn, Mr. Tacconelli, and Ms. Coggins.

9              A FEMALE SPEAKER:  Good afternoon, Your Honor.

10             THE COURT:  Good afternoon.  Mr. Trench?

11             MR. TRENCH:  Yes.  I'm on speaker.  Can you hear me

12     clearly?

13             THE COURT:  Yes, I can.

14             MR. TRACY:  Okay.  Well, this I think is -- is KPMG's

15     motion.  I'm glad to present the argument in any fashion or

16     sequence you would like, but --

17             THE COURT:  But you're right.  I'll gladly hear from

18     a representative of KPMG first.  Who will speak for KPMG?

19             MS. NGUYEN:  Your Honor, this is Suong Nguyen from

20     Davis Polk on behalf of KPMG, LLP.

21             THE COURT:  Yes, Ms. Nguyen.

22             MS. NGUYEN:  We made the motion, and we're

23     respectively requesting a transfer of this case to the District

24     of Massachusetts.  The reason we're making this request is

25     because Massachusetts is where numerous cases that are related

Argument - Nguyen                         5

1   to Lernout & Hauspie have been pending and continue to be

2   pending for several years now, the first case filed in 2000.

3        So when the L&H litigation trust had filed their case

4   several months ago against KPMG, U.S. and KPMG Belgium, it was

5   against this back -- backdrop of litigation that had been

6   pending before Judge Saris and also before Magistrate Judge

7   Collings in Massachusetts, and it was only by virtue of the

8   fact that Lernout & Hauspie at the time was in bankruptcy that

9   L&H was not named in those cases.

10       So the basis for our transfer is that Judge Saris and

11  Magistrate Judge Collings have familiarity with the facts and

12  issues that are overlapping with this case.  All the

13  Massachusetts cases relate to L&H's demise.  It relates to its

14  1998 and 1999 financial statements and also KPMG, U.S. and

15  KPMG, Belgium's respective role in connection with L&H's

16  bankruptcy.

17       The review of the complaint in this case as compared

18  to the complaints that have been filed in Massachusetts showed

19  that they rely on the same documents at issue, the same factual

20  allegations at issue, and an example of that relates to KPMG,

21  U.S.'s role in reviewing various Korean contracts, LDC

22  (phonetic) contracts, and similar accounting issues.

23       Massachusetts is also where the cases had been

24  transferred from both the Delaware District Court and also

25  Pennsylvania.  About two years ago, Judge Robinson from the

Argument - Nguyen                                    6

1    District of Delaware had transferred four cases that dealt with

2    the Dictaphone and Dragon transaction to Massachusetts, and the

3    rational for that transfer was because the other L&H related

4    lawsuits had already been pending in Massachusetts.

5         The Dragon and Dictaphone transactions are the same

6    transactions that are issue in the L&H litigation trust's

7    action against KPMG, U.S.

8         THE COURT:  What's your reaction to the plaintiff's

9    argument that the first filed rule shouldn't apply here because

10   KPMG -- there are no common parties at this point since KPMG

11   apparently has settled all of its -- all of the claims against

12   it, asserted against it in the Massachusetts actions?

13        First, with respect to the fact that KPMG, U.S. and

14   KPMG, Belgium have settled or are in the process of finalizing

15   the settlements of the Massachusetts action, it really misses

16   the point, because our basis for transfer is because

17   Judge Saris and Magistrate Judge Collings had familiarity with

18   the issues here which the trust conceived are overlapping with

19   those in this case.

20        With respect to the first filed rule and the fact

21   that they're different parties or different theories, we cited

22   numerous cases in our reply brief which show that courts have

23   -- have transferred cases where there are different parties and

24   different legal theories at issue, and, in fact, the Filler

25   case, which is the one by Judge Robinson, the District of

1   Delaware, when Judge Robinson transferred the Dictaphone and

2   Dragon cases, they dealt with different legal theories, and the

3   Baker, Filler, all those other plaintiffs were not plaintiffs

4   in the Massachusetts action.

5              THE COURT:  Uh-huh.

6              MS. NGUYEN:  So we think that the law is very clear

7   that it -- it's -- it's of no moment that the parties or the

8   legal theories in this case are -- are not the same, because

9   Judge Collings and Saris have gone through the same issues that

10  would be relevant here.  These issues, for instance, relate to

11  KPMG, Belgium's production of documents.  There's Belgium

12  secrecy issues at stake.  We -- KPMG, U.S. has also produced

13  documents in the Massachusetts case, and we had various motions

14  about the scope of our production before

15  Judge Collings already.

16             In addition, other parties, including ourselves, have

17  produced documents in the case, and those documents are

18  governed by a confidentiality agreement that Judge Collings has

19  entered.  So that if there's any disputes about the designation

20  of certain documents as confidential or transcripts of

21  depositions that would quote from those documents as

22  confidential, Judge Collings would be the one overseeing that,

23  and we expect the same issues that, you know, were presented in

24  the Massachusetts case to be presented here.

25             The other reason why Massachusetts makes sense is

Argument - Nguyen                                    8

1    because the trustee in this case concedes that Massachusetts is

2    the center of gravity of the alleged conduct in this case, and

3    there are numerous witnesses who are present in Massachusetts.

4    L&H's U.S. offices was in Massachusetts.  There's a claim by

5    the litigation trustee for the -- violation of the

6    Massachusetts consumer protection statute.  There's allegations

7    that the auditing functions at issue here occurred in

8    Massachusetts.

9           So I -- we think that that is the reason why several

10   months ago the trustee had initially agreed to transfer, and

11   while the trustee has a right to change its mind, we submit

12   that the basis for transfer remains the same here.

13          The last thing I would add, Your Honor, is that since

14   our transfer motion had been filed, Judge Robinson of the

15   District of Delaware had withdrawn the reference with respect

16   to a core proceeding.  It was a preference complaint that the

17   trust had filed against KPMG, U.S.  And so this suggests that

18   in this particular case, which is a noncore case dealing with

19   prepetition events, that there would also be a withdraw of the

20   reference and that this case really should probably belong on

21   the district court, and we submit it should be transferred to

22   the District Court of Massachusetts.

23          THE COURT:  Uh-huh.  Understood.  Mr. Trench, will

24   you be speaking on behalf of the -- or Mr. Tacconelli?

25          MR. TRENCH:  I will, Your Honor.  This is David

1    Trench.  I'll speak on behalf of the trustee.

2           THE COURT:  All right.  What about the jury trial

3    situation?  I didn't see that taken up in the papers.

4           MR. TRENCH:  We -- we briefly took it up, Your Honor,

5    and it was to the point that the jury trial issue is not a

6    transfer motion consideration.  The question that KPMG poses is

7    should this case be tried in Delaware or Massachusetts.  If

8    there's --

9           THE COURT:  What --

10          MR. TRENCH:  -- a right to a jury trial and the

11   Bankruptcy Court in Delaware is not empowered to conduct a jury

12   trial, then the proper remedy for the one seeking the jury

13   trial is to withdraw the reference from the Bankruptcy Court to

14   the District Court in Delaware.

15          THE COURT:  Uh-huh.

16          MR. TRENCH:  It has nothing to do with whether or not

17   this case more properly belongs in Massachusetts or in

18   Delaware.  So with respect to the issue in front of the Court

19   today, which is should the case be transferred to Delaware, the

20   fact that they have a right to a jury trial, which they have

21   not yet asserted, but the fact that they have a right to one is

22   not a factor in whether or not Massachusetts should be the

23   venue or Delaware should be the venue.

24          So I think that's a red herring, if you will.  It's

25   not something which should weigh in your determination about

1    whether or not the case should be transferred to Massachusetts.

2        THE COURT:  Help me to understand your assertions

3    regarding the Delaware nexus here.  Clearly, the bankruptcy

4    proceeding has been pending here since 2000.  That -- what

5    aspect of that or anything else should compel me to honor the

6    plaintiff's choice of forum to defer to it in these

7    circumstances?

8        MR. TRACY:  The way the rules work with respect to

9    consideration of transfer is for the Court considering the

10   transfer to look at a series of well-established factors, and

11   there's some that are outside the 12 that are listed, but the

12   very first factor is the plaintiff's choice of forum.  If the

13   plaintiff -- and here, we are the plaintiff.  If the plaintiff

14   chooses a forum that has jurisdiction, which we've done, then

15   that's to remain the forum unless there's reason shown to

16   change that.

17        Now, we did choose this forum, and we chose it for

18   several reasons.  We chose it because we appear here regularly,

19   and it's a convenient forum for us in that respect.  We chose

20   it because this claim is the largest cause of -- largest asset

21   of this estate and will affect how the estate continues to be

22   administered.

23        We also chose it because one of the factors in

24   determining whether or not a transfer should occur is the speed

25   with which cases are handled in the respective jurisdictions,

1    and the cases in Bankruptcy Court move with a certain speed

2    which is not matched in District Court anywhere by my

3    experience in this court and other Bankruptcy Courts and in

4    District Courts throughout the country, and, in fact, we

5    attached I think as an amendment or an addendum or an exhibit

6    to our motion a printout with respect to Judge Saris' average

7    time of trial.  And this is not a criticism of her.  It's just

8    a measure of the time that it takes for a case to work its way

9    through District Court as opposed to Bankruptcy Court and a

10   quick resolution of something that we have an interest in.  So

11   that's another reason why we chose this -- this forum.

12        Another reason is that under the documents which

13   authorize and empower the litigation trustee to bring this

14   action, any settlement which may be reached must be approved by

15   you.  We must bring a claim before -- file a motion before this

16   Court for approval of any such settlement.  In addition, KPMG,

17   the moving party, is a -- is an entity that's organized and

18   existing under the laws of the State of Delaware.

19        So we have used those reasons, and that's why we

20   first chose this particular venue, and with all due respect, I

21   think it is up to KPMG to say that there are compelling reasons

22   to move this from where we chose to bring the action to another

23   jurisdiction.

24        THE COURT:  Well, let's take a look at those reasons

25   from your vantage point.  You've acknowledged a substantial

1    overlap at least in facts.  You've asserted differences in

2    legal theories, and indeed, there are other legal theories

3    propounded in the other actions in terms of securities fraud

4    and the like and some of the same causes as well.

5            What about those types of issues that have -- and

6    nobody is talking about res judicata or collateral estoppel

7    here.  Obviously, the trustee of L&H was not a party to, nor

8    L&H for that matter, to anything that was decided in

9    Massachusetts, and I don't think there is question that the L&H

10   trustee would have the opportunity to litigate any and all of

11   those questions.

12           But when we're talking about questions involving, for

13   instance, Belgium secrecy laws in connection with discovery

14   demands, when we're talking about other aspects of

15   international law that apparently have become familiar to

16   Judge Saris and Judge Collings, isn't that a -- the kind of use

17   of judicial resources that the first filed policy, whether or

18   not it applies specifically to this case, was intended to

19   foster?

20           MR. TRENCH:  I think it's very close to that,

21   Your Honor, but let me -- before I address those things

22   directly, let me make a comment about the -- the status and the

23   nature of the two cases.  Because KPMG has effectively settled

24   all of their claims and are only in the most nominal sense a

25   party in those cases, there is no common party between this

Argument - Trench                              13

1   action and any of the pending Massachusetts actions.

2          THE COURT:  Does that matter?

3          MR. TRENCH:  Yes, it does, Your Honor, because we've

4   looked and I think KPMG has looked, and we have never found a

5   single case in the United States in which there is no common

6   party between cases that has resulted in a transfer.

7          THE COURT:  Do you think that the basic premises of

8   the first filed rule are undercut to the extent that the

9   principal of that rule should not be applied?  In other words,

10  you acknowledge that there is the same set of facts or

11  virtually so.  You -- and, by the way, KPMG was a party to

12  those proceedings.  It's not as if there -- you know, there's

13  no connection in terms of the identification of parties by the

14  vociferous nature of your memorandum which I will tell you

15  probably crossed the line.

16          I was dismayed to read it I will tell you.  The

17  arguments are certainly sound and worthy of consideration, but

18  the tone I would ask you to tone down, if you would.

19          MR. TRENCH:  Of course.

20          THE COURT:  But the basic concept that the facts and

21  -- and some of the law are identical, doesn't that really

22  dictate that there ought not to be a division of the -- the

23  basic controversy, what happened with the collapse of L&H and

24  the preceding events to that collapse, particularly the

25  transactions involving Dragon and Dictaphone and KPMG's

Argument - Trench                                    14

1    involvement, U.S. and Belgium, in that entire debacle.  That's

2    the fundamental nature of what's still there, what was there to

3    begin with, what's still there even without KPMG and what's

4    here in this case, is it not?

5          MR. TRENCH:  Well, to some extent that's right,

6    Your Honor, but as I understand the -- the factors that are to

7    be weighed, they include judicial economy, which is what I

8    think the matters that you discussed relate to, and judicial

9    economy traditionally and often in transfer actions -- and I

10   think when Judge Robinson transferred the four cases from

11   Delaware means that there would -- if not for a transfer, there

12   would be a party defending or prosecuting the -- virtually the

13   same claim in two separate jurisdictions with the risk of

14   duplication of discovery and inconsistent rulings.

15         Now, in this particular case, there -- that won't

16   happen.  Discovery is effectively closed in Massachusetts.

17   There won't be inconsistent rulings, because there is no ruling

18   that has involved L&H or the litigation trustee in

19   Massachusetts.

20         THE COURT:  No, there isn't, but there are rulings

21   that I would probably be -- not -- perhaps not me, but perhaps

22   the District Court if this were -- if the reference were

23   withdrawn.  Should the Belgium -- KPM, Belgium matter be

24   transferred to Belgium on the ground of forum non conveniens,

25   what are the impacts of the secrecy laws of Belgium on these

1   matters, confidentiality orders apparently entered.

2          It may not be between the same parties, but there are

3   identical -- as a matter of fact, one of the parties is the

4   same.  I suspect that KPMG, Belgium was involved in the motion

5   to transfer venue to Belgium.

6          MR. TRENCH:  Yes, Your Honor.  They did move to

7   dismiss for forum non conveniens.  That motion was denied by

8   Judge Saris.  It was in connection with the motion to dismiss

9   the securities fraud claims against a number of defendants, by

10  a number of defendants, and Judge Saris did, in fact, determine

11  that the allegations were sufficiently pled to meet the

12  requirements of the securities act which are different

13  requirements that we have, and there -- there were other

14  decisions relating to securities fraud standards which do not

15  relate to us.

16         None of her decisions affected any of the causes of

17  action or touched on any of the causes of action that we bring

18  here.  The closest that any of her decisions came to that was

19  her -- her order dismissing or granting a motion to dismiss an

20  action brought by the Dictaphone trustee who did assert a

21  Massachusetts Consumer Protection Act claim.  She dismissed it,

22  however, not because she considered that claim and found that

23  it was wanting but because the Dictaphone trustee representing

24  new Dictaphone was effectively seeking damages to old

25  Dictaphone and didn't have standing to bring the action, and

1   that's an entirely different issue from the issue of the L&H

2   trustee who represents the former client of KPMG, LLP and KPMG,

3   Belgium who's bringing a malpractice action based on that

4   relationship, a breach of -- aiding and abetting breach of

5   fiduciary duty claim based on that relationship and a violation

6   of the Massachusetts Consumer Protection Act.  We have an

7   entirely different circumstance.

8           And you've mentioned the Belgium security -- secrecy

9   act, and that's interesting, because that's an act which was

10  created in Belgium to prohibit accountants and others from

11  disclosing secrets of their clients and holding them liable for

12  sanctions if they do it, and in the case in Massachusetts, the

13  court found that there were exceptions to that act which

14  allowed plaintiffs who were not in privity with either party to

15  see those records and get those records, notwithstanding the

16  fact that the Belgium secrecy act would appear to prohibit it.

17          In our case, Your Honor, there's something entirely

18  different, something none of the courts approached, and that is

19  there's an exception to the Belgium secrecy act which relates

20  to consent by the client.  Well, we're the client, and -- and

21  if we seek these records and KPMG, Belgium says you can't see

22  them because we are prohibited from the -- from the disclosure

23  of these secret records, which are effectively records of L&H's

24  representation, we will give consent to them to supply them to

25  us, and none of the judges or magistrates consider that

1    argument because those facts weren't present.  That's a

2    different circumstance.

3         So it's true that the magistrate and the court did

4    consider that act in expert affidavits on Belgium law and did

5    make rulings and, in fact, even enjoined KPMG, Belgium from

6    seeking a -- the enforcement of a writ in Belgium to prevent

7    the plaintiffs from getting those documents after the -- the

8    Court in Massachusetts said they could.

9         Those things are all true, but we have a different

10   position in this as we do in all the other claims.  We are the

11   former client, and the considerations as to whether or not that

12   applies are new considerations, whether you make them,

13   Judge Robinson makes them, Judge Saris makes them.  They're

14   going to be things that haven't been considered before.

15        THE COURT:  I understand.  Let me understand that

16   you've acknowledged that some of the witnesses remain in

17   Massachusetts.  Others are in other places, as I recall,

18   Houston, Atlanta, and the like.

19        MR. TRENCH:  Yeah.

20        THE COURT:  Who's in Delaware?

21        MR. TRENCH:  I don't think that there's -- there's a

22   witness that we -- that we're aware of right now that's in

23   Delaware, Your Honor, but the number of witnesses that are in

24   Massachusetts is few, and we frankly don't know where all of

25   the witnesses are until we do our discovery, but --

Argument - Trench                          18

1      THE COURT:  Are the books and records of KPMG, U.S.

2  in Massachusetts as well?

3      MR. TRENCH:  I -- I do not know the answer to that,

4  Your Honor.  I mean, we have not been able to do any discovery

5  yet.  So where their books and records are I don't know.  I do

6  know that one of the prominent members of KPMG, U.S. is out of

7  Dallas, and he is perhaps the most prominent of those who acted

8  in this matter, and I expect that his records are -- are in

9  Dallas.  I don't know the answer to that, but I don't know

10  whether they're in -- in Massachusetts either.

11      I have heard -- well, I don't want to talk about what

12  I've heard, because I -- I don't know the answer to that

13  question.

14      THE COURT:  Well, they've acknowledged that the --

15  the alleged conduct by KPMG, U.S. at least occurred in

16  Massachusetts.

17      MR. TRENCH:  Your Honor, one of the things we pled

18  and we assert is that the center of gravity of the conduct that

19  forms the basis of our claims is in Massachusetts.  We do plead

20  that, and that was absolutely true.

21      That, however, I must point out, was an event that

22  occurred in 1998, 1999, 2000 when L&H's U.S. headquarters were

23  present in Massachusetts.  We are now in 2004.  L&H has no

24  headquarters in Massachusetts, has no employees in

25  Massachusetts, and that connection which caused the center of

1   gravity of the cause of action to be in Massachusetts is no

2   longer a present fact.  So for considering -- for the

3   consideration of transfer purposes, I think the Court must look

4   at the way things are today on November 23, 2004, and that is

5   that L&H has no presence in Massachusetts.  It did back then,

6   and that's significant for the cause of action, but today it

7   does not.

8           In fact, L&H's presence is in the form of Scott

9   Baena, the litigation trustee who is in Miami but who does

10  travel to Delaware from time to time and, you know, that's --

11  that's the connection.  It's no longer Massachusetts.

12          THE COURT:  Understood.  Let me offer the opportunity

13  to KPMG to reply.  Any other comments?

14          MS. NGUYEN:  Your Honor, with respect to the location

15  of documents, the allegations that the plaintiffs have made is

16  that the auditing functions here occurred in Massachusetts.

17  KPMG, U.S. has a Boston, Massachusetts office, and its work

18  papers with respect to the work that it performed are, you

19  know, collected and reside in Boston, Massachusetts.

20          We have a number of witnesses who work in the office

21  who are still located in Massachusetts, and the fact that the

22  -- you know, the plaintiffs point out that discovery has closed

23  in the Massachusetts action would not be relevant with respect

24  to discovery should the Court decide that discovery could

25  proceed against the litigation trust in Massachusetts, because

1   they would be on a separate schedule, and there are other

2   parties that are on -- on a different scheduling, including the

3   Dictaphone litigation trust.  So it's not true that fact

4   discovery would apply here and preclude the litigation trust

5   from conducting discovery.

6           THE COURT:  Understood.

7           MR. TRENCH:  Your Honor, may I make a comment about

8   that?  Because I think there's a misunderstanding about what

9   our position on that is.

10          THE COURT:  Last comment.  Go ahead.

11          MR. TRENCH:  We -- we have not contended that we

12  would be precluded from discovery by virtue of a transfer to

13  Massachusetts.  What we have asserted is there would be no

14  economy of discovery by virtue of the transfer to

15  Massachusetts.  Whatever discovery we would take would be new

16  discovery, whether it's in Massachusetts or in Delaware.

17          So the economy as it relates to the parties, to the

18  Court, and to the witnesses is not present and is not a factor

19  in -- in the transfer.  That's the point that we were trying to

20  make.

21          THE COURT:  Understood.  Let me reflect that we are

22  working on a -- the defendant's motion to transfer the venue to

23  Massachusetts.  This action charges the defendants, we all

24  know, with violations of Massachusetts law, with breach of

25  fiduciary duties and with fraud in connection with serving as

The Court - Decision                                        21

1   accountants for L&H, L&H which collapsed in 2000 after

2   purchasing two other entities, Dragon and Dictaphone.

3          The -- it is asserted by the defendants that the same

4   underlying facts have been extensively litigated in

5   Massachusetts.  There are various actions, including

6   shareholder actions, pending in Massachusetts.  The defendants

7   apparently have settled their cases in Massachusetts and are no

8   longer active in the cases as of late, but the cases are still

9   pending.

10         Of course, our framework for deciding these issues

11  starts with Bankruptcy Rule 7087 which refers to 28 U.S.C.

12  Section 1412 which poses the opportunity to transfer venue,

13  "..in the interest of justice or the convenience of the

14  parties."  Seems to be that in this context, both of those

15  prongs favor the transfer of venue in this case, and the most

16  critical aspect of why that's so is the commonality of facts

17  that is actually acknowledged by the plaintiff here, the fact

18  that those cases, which have been pending for four years in

19  Massachusetts, deal with the collapse of L&H, the role of the

20  -- of, among others, KPMG, U.S. and Belgium in formulating the

21  financial statements for 1998 and 1999 and 2000, for being

22  involved in the transactions involving Dragon and Dictaphone

23  and their involvement in the collapse of L&H.  Those common

24  facts I think compel the conclusion that the convenience of the

25  parties and the interests of justice favor the transfer.

The Court - Decision                    22

1       Indeed, we have it is recognized Massachusetts State
2  law issues and Massachusetts as the center of gravity for this
3  complaint.  Of course, the plaintiff is right.  The trustee is
4  correct that a bankruptcy court or a district court let's say
5  in Delaware would, of course, be qualified and able to apply
6  the state laws of another jurisdiction.  That's not
7  fundamental, but I take note of it.
8       In passing, I note as well that there is really no
9  nexus to Delaware here, the fact that the trustee is accustomed
10 to coming to Delaware occasionally is not sufficient nexus,
11 although clearly, there is a jurisdiction by the fact that the
12 -- the bankruptcy is still pending and the -- and KPMG we note
13 is a Delaware corporation.  But basically, other than the
14 bankruptcy, there are witnesses still in Massachusetts.  The
15 exact number is unknown, certainly witnesses in other places as
16 well, but not Delaware.
17      It appears at first blush, although it's not pivotal
18 to this decision, that at least some of the books and records
19 are located in Massachusetts.  It seems to me that the import
20 of this -- the import of the first filed rule really compels
21 this case to be situated in Massachusetts, and it is a question
22 of judicial economy and the appropriate designation of judicial
23 resources.
24      There is a learning curve when we talk about Belgian
25 secrecy laws, even if we understand, as counsel for the

The Court - Decision                                    23

1   plaintiff has described, that the issues in terms of applying,

2   for instance, those Belgium secrecy laws, may be different here

3   because it is L&H, the actual client who is asserting the cause

4   of action.  Never the less, the familiarity with those matters

5   does involve a learning curve as other matters do as well,

6   matters that have been litigated for an extensive period of

7   time in Massachusetts.

8          I do not take -- I don't consider the trustee's

9   position that it is more likely that the case will be -- will

10  have a speedier result in the Bankruptcy Court in Delaware or

11  the District Court in Delaware for that matter than it would in

12  Massachusetts.  In fact, contrary speculation might be in order

13  in light of the learning curve that has already been traversed

14  by the Massachusetts District Court.

15         Plaintiff is certainly correct that some deference to

16  its choice of forum is appropriate, but it seems to me that

17  that deference is substantially outweighed here by the pendency

18  of the Massachusetts actions which overlap to such a great

19  extent in terms of factual underpinnings as well as certain

20  legal concepts that might be applicable to discovery and to

21  substance.

22         It seems to me that Judge Robinson in the Filler

23  case, that her rational for applying the first filed rule is

24  applicable here as well.  Indeed, KPMG was common to each of

25  the I think three matters that were the subject of

The Court - Decision                                24

1    Judge Robinson's review in the Filler case, but I think her

2    rational applies -- I think the first filed rule applies even

3    if there are different parties, but even if it doesn't, the

4    basic concept that the rules, quote, encourages sound judicial

5    administration and promotes comity among Federal Courts --

6    that's from the decision, and I omit the quotes -- is

7    applicable here as well, and I quote further --

8             "The decision to transfer or stay the second action

9             is within the discretion of the trial court.

10            However, invocation of the rule will usually be the

11            norm, not the exception.  Courts must be presented

12            with exceptional circumstances before exercising

13            their discretion to depart from the first filed

14            rule."

15            And Judge Robinson noted that where you have the same

16   set of facts, although not necessarily the same claims that

17   there is compelling reason for invoking the rule, for granting

18   a motion to transfer.

19            It seems to me that the other concerns expressed by

20   the trustee do not overcome this conclusion.  The fact that

21   KPMG, U.S. and Belgium have settled all their claims in

22   Massachusetts does not defeat this cause.  The basic

23   proposition is that there has been a substantial emersion in

24   the facts of this scenario by the judicial team in

25   Massachusetts, and that needs to be capped to resolve this

1    matter as expeditiously as possible.

2           So nor is it a concern that discovery has closed in

3    Massachusetts and that no consolidation of discovery is

4    possible.  It is understood that the trustee will pursue, will

5    not doubt have the chance to pursue discovery, but the

6    discovery issues which are complex and out of the norm in this

7    case, at least in some degree, I think will be better handled

8    in terms of the familiarity with -- with the underpinnings and

9    the opportunity to be in harmony with the other decisions.

10          The trustee will have every opportunity to assert its

11   own positions.  I have no, of course, as the trustee asserts in

12   his papers, he and the plaintiff are entitled to impartial

13   consideration, and I have no doubt that they will get it.  The

14   entire import of the first filed rule has no room for concern

15   about prejudgments or ideas that impressions about a case are

16   formed by the first judge who has those cases.  We all I'm sure

17   have enough faith in the system, and in particular, judges to

18   understand that they have the capacity and then some to face

19   each set of parties with the positions that they take and to

20   resolve their disputes in an impartial way.

21          So for those reasons, I will enter an order granting

22   the motion of KPMG, U.S. for transfer of venue to the District

23   of Massachusetts.  I'm not sure if a form of order has been

24   submitted.

25          MR. FALLON:  Your Honor, this is Brad Fallon.  There

The Court - Decision                                    26

1   was a form of order submitted with the motion which is at

2   docket number four. We're happy to submit that order or --

3           THE COURT: Yes. That would be helpful. Thank you.

4   I will note that I did find the stipulation and order that was

5   signed by -- between these parties on November 5th about KPMG,

6   Belgium's requirements to answer and respond and so forth, and

7   that has been entered. So I would appreciate a hard copy of

8   the order on this motion.

9           MR. FALLON: We'll do that, and we'll run it by the

10  plaintiff.

11          THE COURT: Very good. Anything else on this call?

12          MR. TRENCH: I think not, Your Honor. I think this

13  was the only matter. We're --

14          THE COURT: All right.

15          MR. TRACY: -- before --

16          A FEMALE SPEAKER: Your Honor --

17          MR. TRENCH: -- before next Thursday on other

18  matters.

19          THE COURT: Indeed, and I thank you all and wish you

20  a good holiday.

21          A FEMALE SPEAKER: You too, Your Honor. Thank you.

22          MR. TRENCH: Thank you, Your Honor.

23          A MALE SPEAKER: Thank you, Your Honor.

24          THE COURT: Bye bye.

25          MR. TRENCH: Bye bye.

The Court - Decision                                    27

1        (Hearing Adjourned)

2                           * * * * *

3                  C E R T I F I C A T I O N

4          I, Maureen Emmons, court approved transcriber,

5    certify that the foregoing is a correct transcript from the

6    official electronic sound recording of the proceedings in the

7    above-entitled matter.

8

9    _____          Date: 12/15/04

10   MAUREEN EMMONS

11   DIANA DOMAN TRANSCRIBING

12

Exhibit F

Exhibit F

AGREEMENT AND PLAN OF MERGER

AMONG

LERNOUT & HAUSPIE SPEECH PRODUCTS N.V.

L&H HOLDINGS USA, INC.

DRAGON SYSTEMS, INC.

AND CERTAIN PRINCIPAL STOCKHOLDERS OF DRAGON SYSTEMS, INC.

March 27, 2000

AGREEMENT AND PLAN OF MERGER

Section 10.3    Brokers or Finders.

Each of Buyer and Company represents, as to itself, its Subsidiaries and its affiliates, that no agent, broker, investment banker, financial advisor or other firm or person is or will be entitled to any broker's or finder's fee or any other commission or similar fee in connection with any of the transactions contemplated by this Agreement, except, in the case of Buyer, S.G. Cowen Securities, whose fees and expenses will be paid by Buyer in accordance with Buyer's agreement with such firm and, in the case of Company, Goldman Sachs & Co., whose fees and expenses shall be taken into account in calculating the Exchange Ratio in accordance with Section 2.1(c) and 2.3 hereof.

Section 10.4    Interpretation.

When a reference is made in this Agreement to Articles or Sections, such reference shall be to an Article or Section of this Agreement unless otherwise indicated. The table of contents, table of defined terms and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The phrases "the date of this Agreement, .... the date hereof," and terms of similar import, unless the context otherwise requires, shall be deemed to refer to March 27, 2000. The words "include," "includes" and "including" when used herein shall be deemed in each case to be following by the words "without limitation."

Section 10.5    Counterparts.

This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterpart.

Section 10.6    Entire Agreement; No Third Party Beneficiaries.

This Agreement (including the documents and the instruments referred to herein) (a) constitute the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof, and (b) except as expressly set forth in Sections 6.6 and 6.15 hereof, are not intended to confer upon any person other than the parties hereto any rights or remedies hereunder; provided that the Confidentiality Agreement shall remain in full force and effect until the Effective Time.

Section 10.7    Governing Law and Venue.

EXCEPT WITH RESPECT TO MATTERS RELATING TO THE ISSUANCE OF THE MERGER SHARES, WHICH ARE GOVERNED BY BELGIAN LAW, THIS AGREEMENT SHALL BE DEEMED TO BE MADE IN, AND IN ALL RESPECTS

SHALL BE INTERPRETED, CONSTRUED AND GOVERNED BY AND IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE (OTHER THAN CHOICE OF LAW PRINCIPLES THEREOF) APPLICABLE TO CONTRACTS TO BE PERFORMED WHOLLY IN SUCH STATE. The parties hereby (a) irrevocably submit to the jurisdiction of the Chancery Court of the State of Delaware and the federal courts of the United States of America located in the State of Delaware solely in respect of the interpretation and enforcement of the provisions of this Agreement and in respect of the transactions contemplated hereby and thereby and (b) waive, and agree not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement hereof, that it is not subject to such jurisdiction or that such action, suit or proceeding may not be brought or is not maintainable in said courts or that the venue thereof may not be appropriate or that this Agreement may not be enforced in or by such courts, and the parties irrevocably agree that all claims with respect to such action or proceeding shall be heard and determined in such courts. The parties hereby consent to and grant any such court's jurisdiction over the person of such parties and over the subject matter of such dispute and agree that mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 10.2, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof.

Section 10.8    Waiver of Jury Trial.

EACH OF BUYER, SUB, AND COMPANY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF BUYER, SUB, OR COMPANY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF OR THEREOF.

Section 10.9    Assignment.

Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other parties. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

Section 10.10    Severability.

In the event that any provision of this Agreement or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto. The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

Exhibit G

Exhibit G

AGREEMENT AND PLAN OF MERGER

AMONG

LERNOUT & HAUSPIE SPEECH PRODUCTS, N.V.

DARK ACQUISITION CORP.

AND

DICTAPHONE CORPORATION

March 7, 2000

AGREEMENT AND PLAN OF MERGER

This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterpart.

Section 9.5     Entire Agreement; No Third Party Beneficiaries.

This Agreement (including the documents and the instruments referred to herein) (a) constitute the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof, and (b) are not intended to confer upon any person other than the parties hereto any rights or remedies hereunder; provided that the Confidentiality Agreement shall remain in full force and effect until the Effective Time.

Section 9.6     Governing Law and Venue.

EXCEPT AS OTHERWISE REQUIRED UNDER BELGIUM LAW, THIS AGREEMENT SHALL BE DEEMED TO BE MADE IN, AND IN ALL RESPECTS SHALL BE INTERPRETED, CONSTRUED AND GOVERNED BY AND IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE (OTHER THAN CHOICE OF LAW PRINCIPLES THEREOF) APPLICABLE TO CONTRACTS TO BE PERFORMED WHOLLY IN SUCH STATE. The parties hereby (a) irrevocably submit to the jurisdiction of the Chancery Court of the State of Delaware and the federal courts of the United States of America located in the State of Delaware solely in respect of the interpretation and enforcement of the provisions of this Agreement and in respect of the transactions contemplated hereby and thereby and (b) waive, and agree not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement hereof, that it is not subject to such jurisdiction or that such action, suit or proceeding may not be brought or is not maintainable in said courts or that the venue thereof may not be appropriate or that this Agreement may not be enforced in or by such courts, and the parties irrevocably agree that all claims with respect to such action or proceeding shall be heard and determined in such courts. The parties hereby consent to and grant any such court's jurisdiction over the person of such parties and over the subject matter of such dispute and agree that mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 9.02, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof.

Section 9.7     Waiver of Jury Trial.

EACH OF BUYER, SUB, COMPANY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF BUYER, SUB, COMPANY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF OR THEREOF.