# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SCOTT L. BAENA, Litigation Trustee   :   04-CV-12606-PBS
of the Lernout & Hauspie Speech Products, :
N.V. Litigation Trust,                  :
                            :
           Plaintiff,           :
                            :
v.                                  :
                            :
KPMG LLP and KLYNVELD PEAT    :
MARWICK GOERDELER          :
BEDRIJFSREVISOREN,          :
                            :
           Defendants.       :
                            :

## DECLARATION OF DAVID W. TRENCH IN SUPPORT OF PLAINTIFF'S OPPOSITION TO KPMG BELGIUM'S MOTION TO DISMISS THE COMPLAINT

David W. Trench, Esq. deposes and says:

1.       I am an attorney admitted to practice in this District *pro hac vice* and am a partner at the law firm of Bilzin Sumberg Baena Price & Axelrod, LLP, counsel for Plaintiff. Based on my knowledge as counsel in this action, I submit this declaration in support of Plaintiff's Opposition to KPMG Belgium's Motion to Dismiss the Complaint.

2.       Attached are true and correct copies of the following documents:

| **Document** | **Exhibit** |
|---|---|
| Excerpts from October 7, 2003 Deposition of James Boyer by Officials of the Belgian Government | A |
| Excerpts from October 6, 2003 Deposition of Glen Davison by Officials of the Belgian Government | B |
| Excerpts from January 19, 2001 Testimony of Robert P. McLamb before the United States Securities and Exchange Commission | C |

Excerpts from February 28, 2001 Testimony of Glen Davison          D
before the United States Securities and Exchange Commission

Excerpts from March 1, 2001 Testimony of Glen Davison             E
before the United States Securities and Exchange Commission

KPMG Belgium's Invoices to L&H                                    F

Excerpts from January 18, 2001 Testimony of Robert P. McLamb       G
before the United States Securities and Exchange Commission

KPMG Letter dated February 2, 2001                                H

      3.      Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that

the foregoing statements are true and correct.

                                           DAVID W. TRENCH, ESQ.

Dated:  February 11, 2005.

MIAMI 857494.1 7554321648

**COMPOSITE EXHIBIT "A"**

**REQUEST FROM BELGIUM FOR ASSISTANCE
IN THE MATTER OF LERNOT & HAUSPIE
SPEECH PRODUCTION/KPMG**

**DEPOSITION OF:
<u>JAMES BOYER</u>**

**OCTOBER 7, 2003 @ 11:00 AM**

8

2          A.    Um, I would consider that a normal --

3    a normal procedure for an engagement.

4          Q.    And did you ever have discussions with

5    people from L&H about the fees?

6          A.    Yes.

7          Q.    Can you explain with who and why

8    and --

9          A.    I recall discussions with Carl

10   Dammekens about our fees particularly in 1999

11   and early 2000.  Because the fee estimates that

12   we were providing to KPMG Belgium were

13   increasing significantly.  Because the -- the

14   scope of the work that we were asked to perform

15   by KPMG Belgium had increased.  And Carl was

16   concerned about the size of the fees.  And like

17   most of our clients, was interested in trying to

18   keep the fees to a minimum.

19   BY MR. HEIMANS:

20         Q.    Were separate fees arranged for

21   different L&H entities such as the FLV Fund, FLV

22   Foundation, LHIC, Mercator, and different

23   individuals such as Jo Lernout, Pol Hauspie,

24   Gaston Bastiaens, Carl Dammekens, and Nico

25   Willaert; what was the fee structure for that?

2          A.    No, I don't.  I don't recall the total

3     amount of the fees.

4          Q.    Can you give us an estimate, a

5     ballpark figure of the annual fees?

6          A.    Well, a rough ballpark of the fees I

7     would say for, for, for fiscal year 1998, the

8     fees for the work that I was responsible for

9     would have been I would say less than $200,000.

10    Somewhere between 100, 100,000, less than 200.

11              The fees for 1999, I would put a

12    ballpark of somewhere around 200,000.  Could

13    have been, could have been 200, 250,000,

14    somewhere in those, those are rough, rough

15    ballpark figures.

16         Q.    I would now like to talk about the

17    contacts and communications between KPMG U.S.

18    and KPMG Belgium.

19              Could you name the people from KPMG

20    U.S. who were on the L&H account?

21         A.    Yes.  And would you like a specific

22    time period?

23         Q.    Yeah, 1998, '99 and 2000.

24         A.    Okay.  The members of the team that I

25    was responsible for in Boston would have

2  included several different managers.  Those

3  people included Katie Warren and Craig Campbell,

4  Mike Maschio, Jason Neelan, Megan Upham.  Those

5  were managers and staff who were involved in the

6  work that I was responsible for.  That's for the

7  period 1998, 1999.  Those were not all the

8  people.  Those were key people who were on the

9  engagement.

10      Q.    And who were the KPMG Belgium people

11  that were on the -- that were working on the L&H

12  account?

13      A.    Our primary contacts were Paul Behets,

14  Stefan Huysman, Chantal Neste, and William van

15  Aerde.  Those were the principal people.

16      Q.    And do you remember where these people

17  were actually working, the Belgian people?

18      A.    The Belgian --

19            MR. DE SMET:  At what office?

20      A.    My understanding was that they were in

21  the Ghent office.

22      Q.    Did you meet these people either in

23  Belgium or in the U.S.?

24      A.    Yes.  In both, in both countries.  I

25  had traveled to Belgium for meetings and they

12

2    came to the U.S. for meetings as well.

3        Q.    Could you specify some of these

4    meetings or maybe we'll be talking about it

5    later also, but maybe you could mention some

6    specific occasions?

7        A.    I recall a meeting in Belgium at the

8    Lernout and Hauspie offices in Wemmel, recall

9    having a meeting there with the KPMG Belgium

10   team, and some of the individuals from Lernout

11   and Hauspie.  And then the timing of that, I

12   don't, I don't recall exactly when that was, but

13   it was -- it was in the 1998, 1999 time frame.

14       Q.    Was there anything special on the

15   agenda there?

16       A.    My recollection is that was a planning

17   meeting.  It was an effort to bring KPMG people

18   together to talk about the audit services, to

19   get an update on the developments within the

20   company.

21       Q.    Do you remember any other meetings

22   specifically?

23       A.    There were meetings in the U.S. in

24   Burlington.  There was a meeting at the end of

25   the -- toward the end of the 1999 audit which

2      was in January of 2000.   I also recall a meeting

3      in late 1999 in Burlington as well.

4          Q.    Do you remember what these meetings

5      were, about any specific topics?

6          A.    The -- the meetings were either

7      planning or what I would call sort of

8      educational, and then the third was the report

9      of our audit procedures and sort of a status

10     update.

11              So if I sort of go in order,

12     educational meetings, we would periodically have

13     meetings with the company personnel and with

14     KPMG Belgium to talk about technical accounting

15     rules, specifically SOP 97-2 for revenue

16     recognition.   That would be an opportunity for

17     us to present recent developments in technical

18     accounting, and make sure that the company

19     personnel were up to date in the latest

20     developments.

21              Second was audit planning.   That was

22     an effort to sit down, understand what the

23     developments were within the company, and then

24     for KPMG Belgium to talk about the -- the

25     anticipated audit plan.

2          Then, the third, in January of 2000,

3    was to talk about the audit procedures and audit

4    issues for the 1999 audit.

5          Q.   Did you also have direct contacts with

6    L&H by e-mail, video conferencing, conversation,

7    calls, etc.?

8          A.   Yes.  I recall numerous conference

9    calls and e-mails.  I would say usually, KPMG

10   Belgium was involved.  If there were issues KPMG

11   Belgium was involved, they weren't necessarily

12   involved in every call, but they were involved

13   in the issues.

14         Q.   Who were your contacts at L&H then

15   that you communicated with?

16         A.   Our contacts could be Carl Dammekens,

17   Jacques van Loo, we also dealt at times with

18   Patrick de Schrijver, and Gaston Bastiaens,

19   those were -- I would say that, that group was

20   probably our primary contacts.  I would also

21   periodically have contacts with others.

22   Including Jo Lernout and Pol Hauspie.

23         Q.   These contacts with the L&H people,

24   were these on what frequency did you have

25   contact with them; was that a monthly situation

2    or weekly or even daily?

3        A.    Well, it would vary.  It was certainly

4    not a weekly, that frequently.  It would be, I

5    would say, I would say it was periodic during

6    the course of the year, focused mostly at the

7    time of our procedures that we were performing

8    for KPMG Belgium.

9        Q.    How much of your time did you spend on

10   LHSP as part of your total activities?

11       A.    Well, that would -- that would vary.

12   To give you an idea, during the '98 and 1999, I,

13   I had probably maybe 15 clients that were --

14   that I was dealing with.  Technology clients.

15   So, I would split my time among those companies.

16   At certain times I would be focused on the work

17   for Lernout and Hauspie.  At other times I

18   was -- I would be focused on my other clients.

19       Q.    Did they become more intensive; did

20   you spend more time toward the end of '99 and

21   the beginning of 2000?

22       A.    Yes, that's correct.

23       Q.    Could you say how much more or how

24   much, what percentage of your time did you spend

25   on L&H?

2       A.    Well, it's -- it's difficult for me to

3    say what percentage of my time I spent.  Having

4    a number of clients, and I would say, that, that

5    in December and January of December of 1999,

6    January of 2000, I was very focused on L&H.

7    Because of issues that we had come across during

8    the course of the audit.  So I did spend a

9    considerable amount of time during that time

10    period working on resolving the issues.

11       Q.   And that intensive work on L & H

12    continued into the spring of 2000?

13       A.    Yes.  We, in the spring of 2000, we

14    were asked to perform quarterly reviews.  So

15    that work continued.  And we continued to

16    identify some issues.

17       Q.    Could you at this point in time

18    specify your work that you and your team

19    performed for L&H?

20       A.    For what period?

21       Q.    1998 through 2000.

22       A.    Okay.  We, we would receive

23    instructions from KPMG Belgium to perform

24    limited reviews for quarterly results of L&H

25    U.S.  So we would on a quarterly basis perform

2      these review procedures.  Then on an annual

3      basis, we would be asked to perform audit

4      procedures on the L&H U.S. financial

5      information.

6          Q.    Did the contents of your activities

7      for L&H U.S.A. stay the same or did it change,

8      was it different?  Was there a different focus?

9          A.    The activities stayed consistent.

10     There were additional procedures to be

11     performed.  L&H had acquired a number of

12     companies in the U.S., so the scope of the work

13     that KPMG Belgium asked us to perform increased

14     because of some of these new entities that were

15     being acquired.  And as a result of some of the

16     acquisitions, there were additional audit

17     procedures for auditing the opening balance

18     sheets.  So over time that did, that did

19     increase.

20         Q.    Did you also provide advice to L&H and

21     its entities?  In addition to the audit work?

22         A.    Well, first of all, as part of the

24     on accounting issues, on, on required

25     documentation and whatnot.  That was a, that was

2    a continual, continual process.  As I had

3    mentioned previously, we would periodically hold

4    meetings to discuss technical guidance with,

5    with L&H.

6          So that was my -- that was in my view

7    all part of the audit.  As far as advice outside

8    of the audit, I don't recall, I don't recall

9    really providing advice outside of the audit for

10   the U.S. segment that I was involved in.

11       Q.    Did you bill those consulting

12   activities separately or was it part of your

13   complete integral part of the audit fees that

14   you billed?

15       A.    Those were -- those were typically

16   part of the audit fees that we billed.

17          MR. DE SMET:  Mr. Chairman, may I ask

18   one question.  There's no doubt about it that

19   you were acting on behalf of the audit

20   engagement of KPMG Belgium and you had to give

21   any feedback to KPMG U.S. or not?

22          MR. CARROLL:  You mean was he

23   reporting to anyone at KPMG U.S.?

24          MR. DE SMET:  Yes.  Because the

25   engagement partner was his -- was KPMG, eh, who

2     gave you, KPMG Belgium who gave you

3     instructions, eh?

4           A.     That's correct.  That's correct.

5           MR. DE SMET:  And the second part of

6     my question that is did you report to KPMG U.S.

7     in any way?

8           A.     Yes, yes.  For instance, for the 1999

9     audit, that Bob McLamb was responsible for

10    reviewing the work that I had performed in the

11    U.S. segment.

12          MR. DE SMET:  Okay, I see.

13          Q.     Did you or your team ever resorted to

14    or consult to the U.K. office, the KPMG office

15    in U.K.?

16          A.     We had interaction with the KPMG

17    office in the U.K.  And that was primarily in I

18    think in two areas.  One is that at one point

19    Bob McLamb was, was located in KPMG London

20    offices.  And we had interaction with him and

21    with Digby Wirtz as a partner who was located in

22    London at the time.

23          My recollection is that there were

24    also some tax issues that had -- that our --

25    that KPMG London was involved in.  Those were

21

2   organizations.

3       Q.    And more specifically, with regard to

4   the L&H audit, what was your understanding of

5   the inter-relationships of the various entities?

6       A.    My understanding was that KPMG Belgium

7   had an engagement, an engagement letter

8   particular with Lernout and Hauspie.  Under that

9   engagement letter, the terms of the letter, KPMG

10  Belgium would provide audit and tax services.

11          KPMG Belgium then requested assistance

12  from our KPMG member firms, to assist in

13  carrying out audit procedures.  That would

14  enable KPMG Belgium to opine on consolidated

15  financial statements of Lernout and Hauspie.

16          MR. SMET:  Have you any idea of the

17  statutes of the KPMG international -- I am

18  asking everyone, but no one seems to know, but

19  you talked about the loose association of

20  separate entities who were members of KPMG.  Do

21  you know that statute?

22      A.    No, I don't, I don't know the

23  specifics.

24          (Pause)

25          MR. CARROLL:  Do you want to know if

24

2    customer, now you had a second transaction where

3    the customer would license their technology to

4    L&H.  And in each case, the, the value of each

5    of those transactions was the same.

6          So, let's say it was a million

7    dollars, that the customer licensed technology

8    for a million, subsequently L&H licensed the

9    customers technology for a million.  So there

10   was no need to have any cash in the transaction.

11   Because the two -- the two offset each other;

12   the customer didn't owe L&H anything, L&H didn't

13   owe the customer anything.

14         MS. DE BRAEKELEER:  Which customers

15   were that?

16         A.    My recollection is there were five of

17   them.  There was a company called Interpra,

18   another one I believe was Speech Machines, then

19   there was another company AVRI or AVRS,

20   something similar to that, and I think there

21   were a couple health care companies, HCOS, HSS

22   or something like that.  I may have the names, I

23   may have the lettering mixed up.  But there were

24   a group of transactions, they were all similar.

25         MS. DE BRAEKELEER:  With L&H U.S.A.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2    then; these were contracts with L&H U.S.A.?

3       A.   Yes, these were all recorded by L&H

4    U.S.A.

5          Now, these are very difficult

6    transactions to try and understand, particularly

7    because there are two pieces to it.  And I spent

8    and my team spent an enormous amount of time

9    first of all trying to understand these

10   transactions.  And then, we spent a lot of time

11   discussing these with the company.  So that was

12   one of the issues that came up and it was very

13   very time consuming and very frustrating because

14   it took us so long to, number one, gain an

15   understanding of the transactions, and number

16   two, come to, come to an agreement on what the

17   proper accounting should be.

18         MS. BEECKMAN:  What was that

19   agreement?

20      A.   Well, the agreement was that they

21   should not be recognizing any revenue on these

22   transactions.

23         MS. BEECKMAN:  So that was the

24   first --

25      A.   That was an issue that went right to

27

significant amount of time analyzing that

information, making sure we understood the

arrangements and that the revenue recognition

was appropriate.

        As part of all that, they had various

rebate programs, where they would offer rebates

to customers.  That if you buy the product, you

can get a $10 rebate, you can mail back to the

company.  We spent a lot of time making sure we

understood the rebate programs, and looking at

the accounting that the company had put in

place.

BY MR. HEIMANS:

    Q.    And who did you communicate with about

these issues?  Who at L&H and KPMG Belgium?

    A.    Everyone.  We discussed the issues at

length with the KPMG Belgium team.  We discussed

the issues with Carl Dammekens, we discussed the

issues with Gaston Bastiaens and others.  And

once again, once again, the part of the

frustration here was that -- was that during

1999 as we were doing our quarterly reviews, we

were very clear in making recommendations to the

company as to the documentation that needed to

2    company, but this was something we worked out

3    with the company, we wanted to make sure it was

4    resolved on a timely basis.  And then on top of

5    that, we come across these non-monetary

6    transactions which we had not been told about

7    previously.  So, a lot of issues.

8    BY MS. BEECKMAN:

9        Q.    How was communication with the rule of

10    KPMG Belgium with your second issue about the

11    sell through issue?

12        A.    I'm sorry, could you repeat the

13    question?

14        Q.    What did they do to make things better

15    on that part of the audit?

16        A.    Well, part of my understanding was

17    that they were, they were discussing this with

18    Carl as well, making sure that the issue was

19    addressed on a timely basis.

20    BY MR. HEIMANS:

21        Q.    Did you insist with KPMG Belgium that

22    a problem or a solution had to be found for this

23    problem?  Did you use KPMG Belgium as your

24    intermediary to talk to L&H and insist on a

25    solution to this particular problem?

30

A.    Yes.  Any problems that we had, we
would address through KPMG Belgium.  So they
weren't so much an intermediary, we were
reporting into them, we would tell them what the
issues were, and then we would then make sure
that they understood what we were saying, and if
we had recommendations, for instance, with the
distributers, we needed to make sure that the --
that the company had adequate documentation.
And they would then work with the company to
make sure that the company was addressing the
documentation issue.

BY MS. BEECKMAN:

Q.    So that was the second issue.  Is
there a third?

A.    Well, the third issue was just the --
the timely receipt of information on our part so
we could perform our audit procedures.  And meet
the -- meet the time line that the company, the
company wanted us to meet.

Q.    Was it just a question about timely or
was it also a question about having all the
information?

A.    Well, it was both.  It was both.  We

2   took proper action in order to address your

3   comments; did they ask L&H Belgium to do the

4   necessary things?  Necessary measures, to take

5   the necessary measures?

6       A.    Yes, it was my understanding that they

7   had communicated the issues that we helped

8   identify.

9           MR. DE SMET:  Communicated or

10  insisted?

11      A.    Well --

12          MR. DE SMET:  There's a difference.

13      A.    I know they had communicated the

14  issues and that they had told me they

15  communicated them in a way these were issues

16  that needed to be resolved.

17  BY MS. DE BRAEKELEER:

18      Q.    I was just trying to make clear, do I

19  understand correctly that you were responsible

20  for performing the audit procedures concerning

21  L&H U.S.A. and then that you were reporting your

22  conclusions to KPMG Belgium as the consolidating

23  audit partner; is that right or not?

24      A.    Yes, that's correct.

25      Q.    Okay.  But you were responsible for

33

2  performing the audit procedures for L&H U.S.A.

3  or not?

4      A.    Only L&H U.S.A.  Those would be the

5  instructions that I would receive from KPMG

6  Belgium, I would report back to them on my

7  findings.  And then would combine those findings

8  with the findings from other participating

9  offices.

10         MR. DE SMET:  Who was ultimately

11  responsible, KPMG Belgium or KPMG U.S.A. and was

12  KPMG Belgium not responsible for the global

13  audit?

14         MS. DE BRAEKELEER:  Of course.

15  BY MR. HEIMANS:

16     Q.    In your activities, did you also have

17  contact with the SEC?

18     A.    In my activities for Lernout and

19  Hauspie, I don't recall having contact with the

20  SEC.

21         MR. CARROLL:  Except for testimony.

22  Did you mean to include any testimony?  If he

23  was asked questions about the SEC?

24         MR. HEIMANS:  No.

25         MR. CARROLL:  No, okay.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

39

2    several times or --

3        A.    Yes, it is fair to say we had to

4    revisit that issue and that was one the issues

5    that --

6        Q.    Recurred?

7        A.    Recurred, yes, yes.

8        Q.    Are there other issues?  Perhaps we

9    can try then to have a definition of end of '99.

10   More exactly precision of the time period.

11       A.    Okay.  I've gone through the

12   significant issues with you.  There were some

13   other issues which we had highlighted to KPMG

14   Belgium in our memo to them, so I think we

15   haven't covered everything.  But I think we've

16   covered what I would consider to be the more

17   significant issues.

18       Q.    So can you try now to precise the time

19   that those issues arose?

20       A.    If I -- let me sort of start from

21   December of 1999 and go forward.

22            My recollection is that, is that in,

23   in early December of 1999 we had, we had a call

24   with KPMG Belgium and with Lernout and Hauspie

25   and that was Carl Dammekens.  And I believe it

2    was also Jacques van Loo where we had discussed

3    the issues as we saw them at that point in time.

4    These were the audit issues for the U.S.

5    operations.  That included the distributer

6    issue, the medical sales, and the status of

7    acquisitions that the company was making.

8            And the intent was to make sure that

9    we all had agreed on what we thought the issues

10    would be for the audit.  Because we wanted to

11    make sure we could meet the deadline.  My

12    recollection is that the deadline for reporting

13    to KPMG Belgium was the end of January.  It

14    wasn't a late day in January, but I think it was

15    within a week of the end of January.

16            So, in December the effort was to make

17    sure we had identified all the issues, many of

18    which we had spoken about previously, and some

19    we'd spoken about numerous times.  That was the

20    game plan and we were performing some work in

21    December and our final work during January.

22            As far as the issues coming up, the

23    non-monetary transaction issue came up in

24    January, the Langware contract came up in

25    January, so those were what I would consider

41

2    late surprises that we didn't have previous

3    knowledge about.  The distributers and the

4    medical sales, we had known about, and those --

5    that was a process that we had to work through,

6    and analyze the company's information.

7            So the intent was to be done before

8    the end of January.  And the plan was that KPMG

9    Belgium would come over to Burlington for a wrap

10   up meeting in late January.  I don't recall the

11   day that the meeting took place, but it was in

12   late January, I do recall that we were not

13   finished at that time.  That there were -- we

14   were still performing our audit procedures and

15   that in certain cases, such as the non-monetary

16   transactions, we had not really gained a

17   thorough understanding of those issues.  So I

18   wasn't in a position at that time to be able to

19   make any recommendations on what the proper

20   accounting was.

21           We continued to do our work subsequent

22   to that meeting.  And my recollection is that we

23   finished our work, finished the bulk of the work

24   in early February.

25           Just to add one point.  There were

61

2          MR. HEIMANS:  Okay.

3          MS. BEECKMAN:  Let's have lunch.

4          MR. CARROLL:  Ten after two?  Okay.

5          (Luncheon recess taken)

6                    AFTERNOON SESSION

7                      2:10 p.m.

8    BY MS. BEECKMAN:

9          Q.    So we start again.  I have here a copy

10   of your diary.  And it is, it stipulates a

11   meeting on the 6th -- on the, sorry.  Here.  6th

12   of May, yes.

13         A.    Okay.

14         Q.    So the question is, do you remember

15   that meeting and can you elaborate things that

16   were discussed during that meeting?  And of

17   course we are primarily interested in the topic

18   about language companies.

19         MR. DE SMET:  Language development

20   companies.

21              (Pause)

22         A.    I don't have a specific recollection

23   of this meeting.  I do recall that we had

24   several meetings with Gaston Bastiaens and other

25   members of the L&H management team along with

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

2   KPMG Belgium to discuss issues.

3           Here it looks like we were discussing

4   new issues for that year.  And that would

5   include issues that Gaston might bring up if the

6   meeting included KPMG Belgium, which my

7   recollection is these meetings it always did.

8   So there was issues that didn't relate to the

9   U.S., that might be talked about at that time.

10          I don't have any specific recollection

11  of the language companies or the sale labs

12  discussion.  Or whether we actually discussed

13  those at the time.

14      Q.    At that meeting?

15      A.    This would have been a summary of what

16  I would've received typically from KPMG Belgium,

17  as to the topics of the meeting.  And I would've

18  put those topics they had told me were to be

19  discussed in my diary.

20      Q.    So, the initiative of such a meeting

21  would go out from KPMG Belgium?

22      A.    Yes, that's correct.

23      Q.    And you would participate in it?

24      A.    I would participate.  My understanding

25  was there were many meetings with management and

63

2    certain meetings I would participate that those

3    meetings would be relevant to some of the issues

4    in the United States.

5        Q.    But you were not responsible for the

6    agenda?

7        A.    No, I was not responsible for the

8    agenda.  This would have been from the agenda

9    from KPMG Belgium.

10       Q.  .  Okay.  But you don't remember exactly

11   that meeting?  I think that's acceptable, that

12   you don't remember exactly what was discussed on

13   that meeting, but can you tell us then in global

14   what you know about the language development

15   companies and at what time periods, not exact

16   date, but what you knew in certain -- the

17   evolution in your knowledge over time.

18       A.    Okay.  I had a general knowledge of

19   the language development companies.  I was aware

20   they existed.  I was aware that, that there were

21   research and development arrangements that may

22   have been part of these, part of these

23   transactions. · When I became aware of them, I

24   don't recall.  I was -- it was during the course

25   of time.  And I was not involved in the details

74

2    company, to be able to understand the

3    transactions fully and come to a conclusion.    I

4    was doing a limited review.  So, it was a

5    combination of discussion and documents.

6         The point here is, is that if I'm

7    expected to meet the time lines, I need to have

8    cooperation from the company, so that I can

9    obtain the documents and review them in a timely

10   basis.

11        MS. DE BRAEKELEER:  You said a lot of

12   people were upset with that.  Who was upset with

13   that?

14   A.    Well, I recall that are William van

15   Aerde was, that he had just come on the account

16   as the lead partner.  And that my understanding

17   was that he got -- he heard a mouthful from Carl

18   Dammekens and others.  And they were concerned

19   that I wasn't in a position to sign off.

20        MS. DE BRAEKELEER:  To sign off before

21   press release or what?

22   A.    No, to sign off by the pre-determined

23   sign off date.  Sign off date we had received in

24   our instructions from KPMG Belgium.

25   Q.    So, the sentence before relates to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**COMPOSITE EXHIBIT "B"**

**REQUEST FROM BELGIUM FOR ASSISTANCE
IN THE MATTER OF LERNOT & HAUSPIE
SPEECH PRODUCTION/KPMG**

**DEPOSITION OF:
GLEN DAVISON**

**OCTOBER 6, 2003 @ 10:00 AM**

26

3A6HLETD                    Davison

1      1998, but I will be happy to share with you my

2      understanding of the structure of the engagement

3      which I believe was in place during those prior

4      periods as well.

5              My understanding is KPMG Belgium led

6      the Lernout & Hauspie audit engagement at all

7      times, there was a Belgian audit engagement

8      partner, and that they involved other KPMG firms

9      around the world in the audit.

10             There was a segment of the audit that

11     was done by the KPMG, LLP in the U.S.   The

12     Boston office was involved.   I believe the

13     company's U.S. headquarters were in Burlington,

14     Massachusetts.   So the U.S. firm was involved in

15     auditing the U.S. segment.

16             I believe that other affiliated firms

17     did work for the Belgian firm in other parts of

18     the world.   In particular, I knew that work was

19     being done by the Korean KPMG firm and that the

20     general structure of the engagement would have

21     been that the work was being done under the

22     supervision of KPMG Belgium.   They would have

23     requested that work be done by the various

24     affiliates in the countries where Lernout &

25     Hauspie had significant operations.

27

3A6HLETD                        Davison

1          The foreign affiliates would have

2     performed the procedures and reported the

3     results to KPMG Belgium.  KPMG Belgium would

4     have been responsible for evaluating that work

5     and reaching final conclusions about the audit,

6     and that is the structure that is in place on

7     all of the international engagements that I am

8     involved with.  So it is by practice.  I am not

9     sure that it is in the audit manual

10    specifically, that particular structure.

11          MR. DE SMET:  That is why I ask.

12          THE WITNESS:  Yes.

13    BY MR. HEIMANS:

14    Q.    I know you already stated generally,

15    but could you tell us specifically to which

16    degree KPMG U.S. was involved in certifying the

17    consolidated annual statements according to U.S.

18    GAAP for 1998 through 2000?

19    A.    In 1998 and 1999, the two years that

20    audit reports were issued that I was associated

21    with, the Boston office performed the U.S.

22    segment audit and reported to the Belgian firm

23    what the results of that were.  And I performed

24    the filing review, assisted by another partner,

25    Mr. Bob McLamb, and I believe that was the

3A6HLETD                      Davison

1      revenue recognition policies that were applied

2      by Lernout & Hauspie everywhere in the world

3      were designed to comply with U.S. GAAP.  So I

4      never had any discussions about what the Belgian

5      GAAP differences might have been.

6                     MS. DE BRAEKELEER:  (through the

7      interpreter) So the internal Lernout & Hauspie

8      rules for revenue recognition are the same as

9      U.S. GAAP rules?

10                    THE WITNESS:  That was my

11     understanding.

12                    I would comment that the U.S. GAAP

13     rules on software revenue recognition are very

14     detailed, and I am confident that there is not

15     an equivalent anywhere else in the world in

16     terms of their complexity and their detailed

17     nature.  So to answer your original question, I

18     would doubt that there is present in Belgian

19     GAAP an equivalent standard, but to my

20     knowledge, Lernout & Hauspie applied U.S. rules

21     everywhere in the world.

22     BY MR. HEIMANS:

23          Q.    So this would also be the case for

24     research and development issues?

25          A.    With respect to research and

3A6HLETD                    Davison

1    was never discussed with the SEC especially?

2                THE WITNESS:  No, not to my knowledge.

3    Now, the SEC did ask questions about the LDC

4    concept, I believe, in some of their comment

5    letters.

6                MS. BEECKMAN:  Did you want --

7                MR. CARROLL:  The only thing I was

8    going to ask is, when you say discussions with

9    the SEC, Mr. Davison used to work at the SEC.

10   Were you meaning to include activities by him at

11   the SEC?

12               MS. DE BRAEKELEER:  No.

13               MR. CARROLL:  I took that you were

14   not.

15               MS. DE BRAEKELEER:  No.

16               MR. CARROLL:  Good.

17   BY MS. BEECKMAN:

18       Q.    So when was the first time that you

19   hear about problems with the LDCs?

20       A.    In the summer of 1999, I believe KPMG

21   received a communication from an employee of the

22   company that raised questions about the

23   appropriateness of the revenue recognition

24   transactions with the language development

25   companies.

3A6HLETD                      Davison

1    Q.    And do you remember the name of that

2  employee?

3    A.    I do not.

4    Q.    What was done with that information?

5    A.    I had an initial discussion with Bob

6  McLamb about the allegations and he and I talked

7  about what types of procedures might be

8  performed to try to evaluate whether or not the

9  allegations were true or not true, whether or

10  not they would have impact on the revenue

11  recognition.

12         Mr. McLamb, I believe, had a trip

13  scheduled to Belgium in, I believe it was August

14  of 1999, at which a variety of issues were to be

15  discussed.  So we concluded that in connection

16  with Bob's August 1999 trip that he would talk

17  to the engagement team about what their plans

18  were for dealing with the allegations and to

19  share with the engagement team our ideas about

20  audit procedures that could be performed to get

21  comfort with the transactions or to reveal that

22  the transactions were not appropriate.

23    Q.    Before that meeting, was there any

24  communication on that allegation between KPMG

25  U.S. and KPMG Belgium?

3A6HLETD                        Davison

1    recognition issues, that they were communicated

2    by KPMG U.S. to KPMG Belgium, or any way?  Are

3    you aware of those issues?

4              THE WITNESS:  I would have expected

5    that they would have been aware of the issues,

6    although I personally did not speak to the

7    engagement team about them.

8              MR. CARROLL:  Are you referring to

9    this particular document or more generally?

10              MS. DE BRAEKELEER:  More generally.

11              THE WITNESS:  Yes.  More generally,

12    from time to time I spoke with Mr. McLamb and

13    Mr. McLamb conveyed to me discussions he had had

14    with the engagement team and I believe that

15    there was a regular dialogue between Mr. McLamb

16    and the engagement team on key issues.  So that

17    was my understanding.

18    BY MS. BEECKMAN:

19         Q.    So do you know about the confidential

20    memorandum that Mr. van Aerde wrote dated 30         bijlage 3

21    September '99.  I will show you a copy of it.

22              MR. BATTLAU:  E-mail of 4/2/99 is

23    Exhibit 2.

24              (Pause)

25         A.    Can you repeat your question?

144

3A6HLETD                    Davison

1           MR. HEIMANS:  We cannot expect you to

2    know what has been going on and everything

3    because for us it is a learning curve as well.

4    We are learning more and more how things took

5    place as we delve into it.

6           MR. DE SMET:  If I understood you

7    quite right, you had a purely advisory role.

8           THE WITNESS:  Yes.

9           MR. HEIMANS:  Yes.  We spoke about

10   that with other witnesses.  The limitation or

11   the borders between the KPMG USA and KPMG

12   Belgium, what was the division of

13   responsibilities?

14           I can only tell you about the Belgian

15   side of that, but I would like to hear your

16   version on how these tasks were divided.

17           From the various statements of all

18   partners and managers of KPMG Belgium who were

19   involved with the LHSP file, it turns out that

20   there were -- they contacted Bob McLamb almost

21   on a day-to-day basis in connection with all

22   possible audit issues in the file.  It has been

23   stated that KPMG Belgium always blindly followed

24   McLamb's suggestions.

25           Also, Mr. Paul Behets, who was until

3A6HLETD                        Davison

1    the third quarter of 1999 the worldwide

2    responsible KPMG partner for this file,

3    repeatedly states that he never made a decision

4    without the advice and approval of Bob McLamb as

5    the specialist in the matter or the expert.

6           This is also clear from the statements

7    by LHSP managers in which Joe Lernout stated

8    that McLamb was above or in the hierarchy was

9    above KPMG Belgium.

10          Paul Hauspie stated that McLamb at

11   KPMG USA gave the final approval and KPMG

12   Belgium didn't really have anything to say,

13   while Nico Willaert states that McLamb was the

14   decision maker inside or within KPMG.

15          Do you agree with these statements?

16          THE WITNESS:  I do not agree with

17   those statements, and let me take a moment to

18   try to comment on it.

19          From the perspective of someone who

20   does audits every day, and I am an audit

21   engagement partner on a small group of accounts,

22   and on any engagement the engagement partner

23   will from time to time seek the advice of

24   experts and specialists, perhaps an actuary in

25   connection with actuarial data, a tax partner in

146

3A6HLETD                   Davison

1    connection with tax matters, a partner

2    knowledgeable about valuation issues on

3    valuations, and from time to time the department

4    of professional practice on technical matters.

5    But in all the matters that an engagement

6    partner seeks advice on, the engagement partner,

7    to the extent that he accepts that advice, is

8    ultimately responsible for the decisions that

9    are made on the engagement.

10          KPMG Belgium signing the engagement

11   letter with Lernout & Hauspie, they issued all

12   of the audit reports that were issued on the

13   engagement, and to the extent that they employed

14   other KPMG member firms or to the extent that

15   they sought the advice of experts, were

16   responsible to consider those views in terms of

17   their decision making about the rendering of

18   their report.

19          Mr. McLamb nor anyone in the U.S. was

20   responsible for rendering the report of Lernout

21   & Hauspie.  And so I find the tenor of those

22   comments that somehow someone else was

23   responsible other than the engagement partner

24   that signs a report to be inconsistent with the

25   way our firm is run and not appropriate.

3A6HLETD                    Davison

1    explain in more practical terms what that

2    difference is and what it means to say that the

3    auditor, the engagement partner is in charge of

4    the auditing and the reviewer is someone who is

5    giving advice and consulting.  Could you either

6    through examples or through some more specific

7    discussion illustrate why that is and what it

8    means.  I think it might be useful for you.

9          THE WITNESS:  Well, I think I made an

10   attempt to describe this a couple of times, but

11   I will try again.

12         It is that the audit engagement

13   partner is the one who is contracted with the

14   client to perform the service.  He has

15   participated in the planning.  The people who

16   work on the engagement are under his

17   supervision.  And he is responsible to review

18   all the working papers and to review the report

19   and approve the issuance of the opinion.

20         First the concurring review is done by

21   someone not otherwise involved in the engagement

22   and is a quality control measure at the end by

23   someone not responsible for performing the work,

24   but simply to look at the work papers to see if

25   they seem to comply with the general accepted

**COMPOSITE EXHIBIT "C"**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:               )
                                )    File No. H0-7341
LERNOUT & HAUSPIE               )
SPEECH PRODUCTS, N.V.           )

WITNESS:  Robert P. McLamb

PAGES:    208 through 413

PLACE:    450 Fifth Street, N.W.
          Room 9314
          Washington, D.C. 20549

DATE:     Friday, January 19, 2001


    The above-entitled matter came on for hearing, pursuant to notice, at 9:10 a.m.


APPEARANCES:

On behalf of the Securities and Exchange Commission:

    DEBORAH HEILIZER, ESQ.
    KAM H. LEE, CPA
    CHARLES DAVIS, ESQ.
    DAVID WITHERSPOON, ESQ.
    Securities and Exchange Commission
    450 Fifth Street, N.W.
    Washington, D.C.  20549
    (202) 942-4150

On behalf of the Witness:

    MICHAEL P. CARROLL, ESQ.
    WILLIAM J. FENRICH, ESQ.
    Davis Polk & Wardwell
    450 Lexington Avenue
    New York, New York  10017
    (212) 450-4000

    SUSAN C. COCKFIELD, ESQ.
    WILLIAM J. BARRY, ESQ.
    KPMG LLP
    280 Park Avenue
    New York, New York  10017
    (212) 909-5685

1        BY MR. LEE:

2        Q    What is your view about the involvement of KPMG LLP

3    in the Lernout audit?

4        A    It's my -- my understanding that KPMG Belgium

5    requested KPMG LLP, the Boston office, to perform procedures

6    on Lernout & Hauspie's U.S. subsidiary.

7        Q    So you -- do you consider KPMG LLP to be the

8    auditors?

9        A    No, sir.

10       Q    Why not?

11       A    Because the engagement is with KPMG Belgium and

12   they are the -- the firm signing the audit opinion.

13       Q    Do you consider KPMG LLP to be participating in the

14   audit?

15       A    KPMG performed audit procedures on Lernout &

16   Hauspie's U.S. operations under the directions and at the

17   request of KPMG Belgium.

18       Q    My question is do you consider KPMG LLP to be

19   participating in the Lernout audit?

20            MR. CARROLL:  Do you mean other than in that way

21   or --

22            MR. DAVIS:  Including that.

23            MR. LEE:  Including -- including performing audit

24   procedures pursuant to instruction from KPMG Belgium.

25            THE WITNESS:  They -- they participate in the audit

310

1   by auditing, performing work of that subsidiary that KPMG

2   Belgium had requested.

3           BY MR. LEE:

4       Q    So I -- do I take it your answer is yes, they

5   participated in the audit?

6           MR. CARROLL:  In the sense he's explaining.

7           THE WITNESS:  KPMG Belgium -- KPMG LLP performed

8   procedures on Lernout & Hauspie's operations, U.S.

9   operations, at the request and under instructions received

10  from KPMG Belgium.

11          BY MR. LEE:

12      Q    I -- KPMG LLP's involvement in the Lernout audit,

13  do you consider or you said in your opinion -- let me

14  rephrase the question.  By KPMG LLP's participation in the

15  Lernout audit, what is your view whether KPMG LLP is subject

16  to auditor independence requirement?

17      A    My view is that they are subject to the auditor

18  independence requirement.

19      Q    Do you know if the -- do you know if KPMG LLP has

20  performed any procedure in connection with the confines with

21  auditor independence on the Lernout engagement?

22      A    Any specific procedures -- specifically related to

23  auditor independence as it relates to Lernout & Hauspie, is

24  that -- if that's your --

25      Q    Either specifically related to Lernout or general.

                    Diversified Reporting Services, Inc.
                            (202) 296-9626

399

1    partners of KPMG Belgium?

2        A    I've always thought that it did contain a listing

3    of all the partners of each of the member -- each of the

4    foreign -- each of the firms.

5        Q    So under headings are those individual member

6    firms?

7        A    To my recollection, yes, sir.

8        Q    Is there also a compilation of partners of any and

9    all under the firms in alphabetical order?

10       A    I believe in the back of the International

11   Directory there's an alphabetical listing, yes, sir.

12       Q    Are there any indications or designations or

13   symbols or footnotes or whatever within the body of that

14   directory that indicates title or position or what member

15   firms the people are members of when they're listed in

16   alphabetical order?

17       A    Not to my recollection.

18            BY MR. LEE:

19       Q    So have you met Mr. Erauw?

20       A    Yes, sir.

21       Q    Was he in any of these meetings concerning the

22   LDCs?

23       A    I don't recall him being in any of the meetings

24   that were held in the fall -- the summer and fall of 1999

25   related to the LDCs.  In June of 2000, from the period that

1  -- that I found out that the procedures that I had suggested

2  were not performed, there were daily telephone conversations

3  with Mr. VanAerde and in some of those Mr. Erauw participated

4  in. Erauw.

5      Q    How did -- I'm sorry.

6           MS. HEILIZER:  I'm sorry.

7           BY MR. LEE:

8      Q    How did this document come to your attention?

9           MR. CARROLL:  Exhibit 53.

10          THE WITNESS:  In -- I don't know why --

11          MS. HEILIZER:  That's okay.

12          THE WITNESS:  It was faxed to me in June of 2000.

13          BY MR. LEE:

14     Q    Was it because of a conversation you had with KPMG

15  Belgium?

16     A    Yes, sir.  When --

17     Q    I'm sorry.

18     A    -- in the conversation they implied that they had

19  sent me a document outlining the procedures that they had

20  performed and I said, "Well I want to see that document," and

21  they faxed this to me.

22     Q    What triggered that conversation?

23     A    A phone call I had received the day before.

24     Q    A phone call from who?

25     A    A gentleman named Joe DiMario.

**COMPOSITE EXHIBIT "D"**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                              )
                                               )        File No. HO-7341
                                               )
LERNOUT & HAUSPIE SPEECH PRODUCTS, N.V.        )

WITNESS:   Glen Davison

PAGES:     1 through 188

PLACE:     Securities and Exchange Commission
           450 Fifth St., N.W., Room 9314
           Washington, D.C.  20549

DATE:      Wednesday, February 28, 2001

     The above-entitled matter came on for hearing, pursuant
to notice, at 9:40 a.m.


APPEARANCES:

On behalf of the Securities and Exchange Commission:

     CHARLES DAVIS, Esq.
     DEBRAH HEILIZER, Esq.
     DAVID WITHERSPOON, Esq.
     KAM H. LEE, CPA
     Division of Enforcement
     Securities and Exchange Commission
     450 Fifth St., N.W., Room 9314
     Washington, D.C. 20549
     (202) 942-4846


On behalf of the Witness:

     MICHAEL P. CARROLL, Esq.
     SUSAN C. COCKFIELD, Associate General Counsel
     KATHLEEN A. SAVALTY, Esq.
     WILLIAM J. BARRY, Partner
     DAVIS POLK & WARDWELL
     450 Lexington Avenue
     New York, N.Y. 10017
     (212) 450-4000


                Diversified Reporting Services, Inc.
                       (202) 296-9626

94

1    Lernout & Hauspie?

2        A    Yes, I did.

3        Q    And when -- what services did you provide Lernout &

4    Hauspie when you succeeded Mr. Wirtz?

5        A    The initial service I recall being involved in

6    related to an SEC comment letter that the company had

7    received late in 1998.  There was a meeting in Boston that I

8    attended to discuss the -- how the company might respond to

9    the SEC comment letter.

10       Q    Is that meeting reflected on your 1998 calendar?

11       A    I believe it is.

12            BY MS. HEILIZER:

13       Q    Counsel has opened your calendar to December, 1998.

14    Does the entries on that page refresh your recollection?

15       A    Yes.  It's the entry on December 22, 1998.  Oh, I'm

16    sorry.  There's an entry on December 15, 1998 that is, I

17    believe, that meeting.

18            BY MR. DAVIS:

19       Q    And there was a meeting in Boston?

20       A    Yes, or outside of Boston at the company's

21    location.

22       Q    You mean on the company's premises?

23       A    Yes.

24       Q    With whom did you meet?

25       A    There were a lot of people in that meeting and I

Diversified Reporting Services, Inc.
(202) 296-9626

95

1    may not remember everyone's name.

2        Q    I want to hear the ones that you do.

3        A    Okay.  I remember that Gaston Bastians was there.

4    Carl Dammekens, the company's Chief Financial Officer was

5    there.  Paul Behets, the KPMG Belgium engagement partner.

6    Bob McLamb.  There was a representative of KPMG's evaluation

7    practice who was at that meeting.

8        Q    And you don't recall who that was?

9        A    I don't recall his name.

10       Q    Connected with KPMG LLP?

11       A    Yes.

12            BY MS. HEILIZER:

13       Q    Was it a man or a woman, sir?

14       A    It was a man.  Lernout & Hauspie's outside Counsel,

15   Phil Blink, I believe his name is from Brown and Rudnick, was

16   present at the meeting.  Jim Boyer from KPMG's Boston office

17   was there.  And there were a number of other Lernout &

18   Hauspie staff members in attendance for parts of the meeting.

19       Q    Prior to the time of that meeting, sir, did you

20   develop an understanding as to whether Mr. Wirtz was leaving

21   as --

22       A    Oh, I'm sorry.  Digby Wirtz was present at that

23   meeting as well.

24       Q    Oh, Mr. Wirtz was?  Okay.

25       A    Thank you for reminding me of that.

134

1    question was originally raised.  So, it's routine that those
2    draft documents are not kept.

3        Q    When you started working on the Lernout engagement
4    in 1998, how did you come up to speed; find out about the
5    company?

6        A    The meeting that we had in outside of Boston on
7    December 15 of 1998 was a full day meeting.  Officers of the
8    company made presentations about what the company's business
9    was.  There was a demonstration of some of the technology to
10   the group that was there that day.  And I had a copy of the
11   prior year 20-F as well as the SEC comment letter, and also
12   had discussions with the engagement partner and with Digby
13   Wirtz who had been file reviewer, and Mr. McLamb who had been
14   assisting Mr. Wirtz on the file review previously.

15       Q    So you reviewed the company's prior 20-F --
16       A    Yes.

17       Q    -- as part of your getting up to speed?

18       A    And as part of advising them on the -- how best to
19   respond to the SEC comment letter.

20       Q    At the time you first became involved in Lernout &
21   Hauspie or doing work for Lernout & Hauspie, what was your
22   understanding as to the level of audit or other risk
23   associated with that client?

24       A    I considered it to be a high risk engagement.

25       Q    Why?

**<u>COMPOSITE EXHIBIT "E"</u>**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                          )
                                           )
LERNOUT & HAUSPIE SPEECH PRODUCTS N.V.  )   File No. HO-7341

WITNESS:  Glen Davison

PAGES:    189 through 337

PLACE:    Securities and Exchange Commission Headquarters
          450 Fifth Street, NW - Room 11602
          Washington, DC

DATE:     Thursday, March 1, 2001


        The above-entitled matter came on for hearing at
9:35 a.m., pursuant to notice.


APPEARANCES:

On behalf of the Securities and Exchange Commission:

        CHARLES DAVIS, ESQ.
        DEBORAH HEILIZER, ESQ.
        DAVID WITHERSPOON, ESQ.
        KAM H. LEE, ACCOUNTANT
        Securities and Exchange Commission
        450 Fifth Street, NW
        Washington, DC   20549
        (202) 942-4643


On behalf of the Witness:

        MICHAEL P. CARROLL, ESQ.
        KATHLEEN A. SAVALTY, ESQ.
        Davis, Polk and Wardwell
        450 Lexington Avenue
        New York, NY   10017
        (212) 450-4000

        WILLIAM J. BARRY, ESQ.
        SUSAN C. COCKFIELD, ESQ.
        KPMG
        280 Park Avenue
        New York, NY   10017
        (212) 909-5685

                Diversified Reporting Services, Inc.
                      (202) 296-9626

273

1    10-Q with respect to 1999, and the first two quarters of

2    2000.

3        Q    Okay, sir, have you described the universe of

4    documents that you received to review as file reviewer in

5    relation to 12-31-99 20-F?

6        A    From time to time, I received e-mail messages from

7    Mr. McLamb and others that also would have been relevant to

8    the file review.

9        Q    From what others beside Mr. McLamb did you receive

10   e-mail messages relevant to the file review?

11       A    I believe that there were e-mails that were

12   directly from KPMG Belgium personnel that I was copied on, or

13   was an addressee on that also would have been part of the

14   communications during the engagement.

15       Q    Do you recall what personnel from KPMG Belgium?

16       A    I don't have a specific recollection of individual

17   e-mails.  I would expect the engagement partner and manager,

18   but I don't have any specific recollection.

19       Q    And who were those individuals?

20       A    The partner's name is William Van Aerde, and I

21   don't recall the manager's name.

22       Q    With respect to the 12-31-99 20-F, how much time

23   did you spend in your file review?

24       A    Well, I think you have the time records, and they

25   reflect roughly forty hours in additional time, perhaps

Diversified Reporting Services, Inc.
(202) 296-9626

320

1          A    Yes, I'm was reading it.  Is that what you were

2    asking --

3          Q    That's fine, sir.

4          A    Okay.

5          Q    We will wait for you to conclude.

6          A    Uh-huh.

7                          (Pause.)

8                BY MS. HEILIZER:

9          Q    I'm sorry, have you had an opportunity to look at

10   Exhibit 91, sir?

11         A    Yes.

12         Q    What do you understand it to be?

13         A    It's a letter that was written to me and Mr. McLamb

14   from Mr. Van Aerde, and Mr. Eural of KPMG Belgium regarding

15   the additional procedures they performed in response to our

16   request.

17         Q    Is this the, I think before you broke, you used the

18   word memo, is this the memo that you were describing before

19   we took our latest break?

20         A    Yes.

21         Q    The one at the end of June?

22         A    Yes.

23         Q    When did you first see this memo, or see this

24   letter?

25         A    I don't recall.

**COMPOSITE EXHIBIT "F"**

xuuw3x68



Bedrijfsrevisoren - Reviseurs d'Entreprises

27 JUNI 2000

Burgerlijke vennootschap die de rechtsvorm heeft
aangenomen van een coöperatieve vennootschap met
beperkte aansprakelijkheid.
Société civile ayant emprunté la forme d'une société
coopérative à responsabilité limitée.

Lernout & Hauspie Speech Products
Attn. Mr. C. Dammekens
Flanders Language Valley 50
8900 Ieper

V.A.T. n° : BE 432.834.685 √

2 2 -06- 2000

INVOICE        9 9 0 1 1 1 3 2 3 6

Fees of Klynveld Peat Marwick Goerdeler Reviseurs d'Entreprises,
represented by Mr. W. Van Aerde, for the recharge of invoice
40295561 of KPMG Houston (as attached)

| | | |
|---|---|---|
| 29.800 $ or | BEF | 1.256.800 |
| V.A.T. 21 % | Q1 eDos, Rodeon, CT1 2 | 263.928 |
| | omni red | |
| Total | | 1.520.728 |

| Conversion in Euro for information purposes only | Base | VAT 21 % | Total |
|---|---|---|---|
| EUR | 31.155,26 | 6.542,60 | 37.697,86 |

| Please pay this invoice to our account : | BBL : 310-0929850-94 |
|---|---|
| Veuillez payer cette facture à notre compte : | CCB : 068-2328001-28 |
| Gelieve deze factuur te betalen op onze rekening : | KB : 409-8511731-25 |

| NR | |
|---|---|
| APD | 911 |
| PO | |
| COBR | |
| ACC | 6140210 |
| | 00+9100 |

CONFIDENTIAL TREATMENT
REQUESTED
LHSP 007532

Member of KPMG International, a Swiss association

900  10:21        KPMG LLP                    7133192214    P.02/84



Date: May 31, 2000
Invoice: 40295561

MR. WILLIAM VAN AERDE, PARTNER
KPMG
KORTRIJKSESTEENWEG 22-28
B-9000 GENT, BELGIUM

PLEASE REMIT TO:
KPMG, LLP
Dept. 0691
P. O. Box 120001
Dallas, TX 75312-0691

TIN: 13-5565207

| Business Unit: | US115 | Client Number: | 60026065 | Project Number(s): 10302047 |
|---|---|---|---|---|

For services rendered in the review of significant customer contracts, purchase
contracts including opening balance sheet reviews and First Quarter 2000
information for the following Lernout & Hauspie NV subsidiaries: eDocs, Rodeer,
LTI, and Omnimed.

Total Due                                   $29,800.00

KPMG LLP.  KPMG LLP, a U.S. limited liability partnership,        Please Pay By Invoice and        Payment Due
is a member of KPMG International, a Swiss association.           Enclose Remittance Copy          Upon Receipt

CONFIDENTIAL TREATMENT
REQUESTED
LHSP 007533



Bedrijfsrevisoren - Reviseurs d'Entreprises

Burgerlijke vennootschap die de rechtsvorm heeft
aangenomen van een coöperatieve vennootschap met
beperkte aansprakelijkheid.
Société civile ayant emprunté la forme d'une société
coopérative à responsabilité limitée.

Lernout & Hauspie Speech Products NV
Ter attentie van de Heer Carl Dammekens
Flanders Language Valley 50
8900 Ieper

B.T.W. nr. : BE 432.834.685

3 0 -06- 2000

**FAKTUUR**                 **9 9 0 1 1 1 3 7 0 9**

Ereloon van Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren,
commissaris-revisor, vertegenwoordigd door de Heer W. Van Aerde,
bedrijfsrevisor, voor bijkomende prestaties met betrekking tot
Lernout & Hauspie Speechproduct NV en haar recente overnames en
filings in de Verenigde staten.

Prestaties werden uitgevoerd door Ellen Vermeersch, Barbara Himpens,
Sofie Lauwaert, Veronique De Roose, Stefan Huysman, William Van Aerde
(totaal aantal uren: 170)

- Conference Call op 22 maart met Arthur Anderssen in het kader
  van de overname van Dragon
- Bijkomende coördinatie met betrekking tot Dictaphone (rapporterings-
  instructies, vragen met betrekking tot openingsbalans etc.)
- Form S8 nazicht in mei en juni 2000; opstellen representation letters en
  consent letters.
- Coördinatie met betrekking tot bijkomende "medical" entiteiten in de
  Verenigde Staten
- Nazicht verschillende versies van de 10 Q, 10 K, S3 ons overgemaakt
  via Brown Rudnick tussen half mei en 26 juni 2000:
      Form 10 Q op 31 maart 2000
      Form 10 Q op 30 september 1999
      Form 10 Q op 30 juni 1999
      Form 10 K
      Form S 3

CONFIDENTIAL TREATMENT
REQUESTED
LHSP 007543

1/2

 Member of KPMG International, a Swiss association

Bourgetlaan -
Avenue du Bourget 40
1130 Brussel - Bruxelles
België - Belgique
Tel - 32 2 708 43 00
Fax - 32 2 708 43 99

Spoorwegelaan 3
2610 Antwerpen (Wilrijk)
België - Belgique
Tel - 32 3 821 17 00
Fax - 32 3 825 20 25

Bollebergen 2B - bus 13
9052 Gent
België - Belgique
Tel - 32 9 241 68 00
Fax - 32 9 241 68 99

Egelantier 7
3500 Hasselt
België - Belgique
Tel - 32 11 29 66 10
Fax - 32 11 29 66 19

rue Van Opré 76
5100 Jambes
Belgique
Tel - 32 81 32 69 80
Fax - 32 81 32 69 98

De lijst van de vennoten
kan in de zetels persoon-
gelegd worden. La liste
des associés peut être
consultée aux sièges.

RPR/RSC
Antwerpen 94
BTW-TVA
BE 419 122 548



ƒ 200003ૡ.

Bedrijfsrevisoren - Reviseurs d'Entreprises

Burgerlijke vennootschap die de rechtsvorm heeft
aangenomen van een coöperatieve vennootschap met
beperkte aansprakelijkheid.
Société civile ayant emprunté la forme d'une société
coopérative à responsabilité limitée.

| NR | |
|---|---|
| APD | |
| PO | 48 |
| CORR | 640220 |
| ACC | 0015400 |

| | BEF | 1.051.250 |
|---|---|---|
| B.T.W. 21 % | | 220.763 |
| Totaal | BEF | 1.272.013 |

| Omrekening in Euro louter ter informatie | Basis | BTW 21 % | Totaal |
|---|---|---|---|
| EUR | 26.059,81 | 5.472,57 | 31.532,38 |

| Please pay this invoice to our account : | BBL : 310-0929850-94 |
|---|---|
| Veuillez payer cette facture à notre compte : | CCB : 068-2328001-28 |
| Gelieve deze factuur te betalen op onze rekening : | KB : 409-8511731-25 |

CONFIDENTIAL TREATMENT
REQUESTED
LHSP 007542

2/2



Bourgetlaan -
Avenue du Bourget 40
1130 Brussel - Bruxelles
België - Belgique
Tel - 32 2 708 43 00
Fax - 32 2 708 43 99

Sacconvegtiaan 3
2610 Antwerpen (Wilrijk)
België - Belgique
Tel - 32 3 821 17 00
Fax - 32 3 825 20 25

Bollebergen 2B - bus 13
9052 Gent
België - Belgique
Tel - 32 9 241 88 00
Fax - 32 9 241 88 99

Ilgatlaan 1
3500 Hasselt
België - Belgique
Tel - 32 11 28 66 10
Fax - 32 11 28 66 19

rue Van Opré 76
5100 Jambes
Belgique
Tel - 32 81 32 88 80
Fax - 32 81 32 88 98

De tijt van de vennoten
kan in de zetels gestadt
ofwegd worden. Lu siste
des associés peut être
consultee aux siègen

RBV-RSC
Antwerpen 94
BTW-Tva
BE 419 122 548



**04 OCT. 2000**

Bedrijfsrevisoren - Reviseurs d'Entreprises

Burgerlijke vennootschap die de rechtsvorm heeft
aangenomen van een coöperatieve vennootschap met
beperkte aansprakelijkheid.
Société civile ayant emprunté la forme d'une société
coopérative à responsabilité limitée.

Lernout & Hauspie Speech Products
Ter attentie van de Heer C. Dammekens
Senior Vice President and Acting CFO
Flanders Language Valley 50
8900 Ieper

**2 9 -09- 2000**

B.T.W. nr. : BE 432.834.685 √

**FACTUUR**         **2 0 0 1 1 1 0 2 7 4**

Ereloon van Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren,
commissaris-revisor, vertegenwoordigd door de Heer W. Van Aerde,
bedrijfsrevisor, voor de doorfacturatie van kosten met betrekking tot
Dragon (zie kopie van factuur in bijlage)

|  |  |  |
|---|---|---|
| 58.700 $ of | BEF | 2.777.330 |
| B.T.W. 21 % |  | 583.239 |
| Totaal | BEF | 3.360.569 |

| L.R | 340 |
|---|---|
| AFD | MV |
| FO |  |
| OORR |  |
| ACC | 614150 |
|  | 004510 |

| Omrekening in Euro louter ter informatie | Basis | BTW 21 % | Totaal |
|---|---|---|---|
|  | EUR    68.848,21 | 14.458,12 | 83.306,33 |

| Please pay this invoice to our account : | BBL : 310-0929850-94 |
|---|---|
| Veuillez payer cette facture à notre compte : | DEXIA : 068-2328001-28 |
| Gelieve deze factuur te betalen op onze rekening : | KBC : 409-8511731-25 |

Bourgetlaan ·
Avenue du Bourget 40
1130 Brussel - Bruxelles
Belgie - Belgique
Tel. + 32 2 708 43 00

Bollebergen 2B - bus 13
9052 Gent
Belgë - Belgique
Tel. + 32 9 241 88 00

rue Van Opré 76
5100 Jambes
Belgique
Tel. + 32 81 32 69 86

12-08-00   10:15    Van-KPMG REGIO WEST          +32-9-2418889

**KPMG**

September 6, 2000
Invoice: 40367929

PLEASE REMIT TO:

KPMG
ATTN MR. WILLIAM VAN AERDE:
BOLLEBERGEN 2B
BUS 13
B-9052 GENT

KPMG, LLP
DEPT. 0579
P.O. BOX 120001
DALLAS, TX 75312-0579

TIN: 13-5565207

| Business Unit: | US036 | Client Number: | 60040543 | |
|---|---|---|---|---|

Billing for professional services rendered in connection with the opening balance sheet limited scope review conducted in accordance with the interoffice instructions for Dragon Systems, Inc. as of June 7, 2000, including out-of-pocket expenses          $52,000.00

Billing for review procedures for the period June 7, 2000 acquisition date, through June 30, 2000 (as quarter only consists of 23 days this amount is less than what we would expect to bill for the full quarter).          6,700.00

**Total Due**          $58,700.00

KPMG LLP  KPMG LLP, a U.S. limited liability partnership, is a member of KPMG International, a Swiss association.

Please Pay By Invoice and
Enclose Remittance Copy

Payment Due
Upon Receipt

KPMG                     [stamp 4 October 2000]

       Bedrijfsrevisoren – Reviseurs d'Entreprises

                                    Limited liability company

Lernout & Hauspie Speech Products NV
Att. Mr. Carl Dammekens
Senior vice President and Acting CFO
Flanders Language Valley 50
8900 Ieper

VAT No.: BE 432.834.685          [stamp 29 September 2000]

                    **INVOICE**        [stamp 2001110274]

KPMG Bedrijfsrevisoren fee,
commissioner-auditor, respresented
by Mr.W.Van Aerde, statutory auditor,
billing through of expenses concerning Dragon
(copy of the invoice attached)

58,700 $ of              BEF  2,777,330

VAT 21%                       583,239

                         - - - - - - - - -

       Total              BEF  3,360,569

| Calculation in EUR for information purposes only | | |
| Basis | VAT 21% | Total |
| EUR 68,848.21 | 14,458.12 | 83,306.33 |

| Please pay this invoice to our account: | BBL: 310-0929850-94 |
| Veuillez payer cette facture à notre compte : | CCB :068-2328001-28 |
| Gelieve deze factuur te betalen op onze rekening: | KB: 409-8511731-25 |



04 OCT. 2000

Bedrijfsrevisoren - Reviseurs d'Entreprises

Burgerlijke vennootschap die de rechtsvorm heeft
aangenomen van een coöperatieve vennootschap met
beperkte aansprakelijkheid.
Société civile ayant emprunté la forme d'une société
coopérative à responsabilité limitée.

Lernout & Hauspie Speech Products
Attn. Mr. Carl Dammekens
Senior Vice President and Acting CFO
Flanders Language Valley 50
8900 Ieper

V.A.T. n° : BE 432.834.685 ✓

29 -09- 2000

**INVOICE**           **2 0 0 1 1 1 0 2 7 2**

Fees of Klynveld Peat Marwick Goerdeler Reviseurs d'Entreprises,
statutory auditor represented by Mr. W. Van Aerde, for the review
of the June 30, 2000 10Q report in August and September 2000.
(work done by Laurens Van Nevel, Stefan Huysman, William Van Aerde)

|  | NR | 3u 1 |
| --- | --- | --- |
|  | APD | |
|  | PO | |

(Amount including outlays)          BEF      133.760

                                            28.090

V.A.T. 21 %

                                   ———————

Total                            BEF      161.850
                                   ═══════

640210
0045100

| Conversion in Euro for information purposes only | Base | VAT 21 % | Total |
| --- | --- | --- | --- |
|  | EUR  3.315,82 | 696,33 | 4.012,15 |

| Please pay this invoice to our account : | BBL : 310-0929850-94 |
| --- | --- |
| Veuillez payer cette facture à notre compte : | DEXIA : 068-2328001-28 |
| Gelieve deze factuur te betalen op onze rekening : | KBC : 409-8511731-25 |

Bourgerean -                Botebergen 28 - Bus 13    rue Van Opré 76
Avenue du Bourget 40        9052 Gent                  5100 Jambes
1130 Brussel - Bruxelles    Benge - Belgique          Belgique
Benge - Belgique            Tel . 32 9 241 88 00      Tel . 32 81 32 69 60



16 OCT. 2000

Bedrijfsrevisoren - Reviseurs d'Entreprises

Burgerlijke vennootschap die de rechtsvorm heeft
aangenomen van een coöperatieve vennootschap met
beperkte aansprakelijkheid.
Société civile ayant emprunté la forme d'une société
coopérative à responsabilité limitée.

Lernout & Hauspie Speech Products
Attn. Mr. Carl Dammekens
Senior Vice President and Acting CFO
Flanders Language Valley 50
8900 Ieper

0 9 -10- 2000

V.A.T. n° : BE 432.834.685

2 0 0 1 1 1 0 3 7 9

## INVOICE

Fees of Klynveld Peat Marwick Goerdeler Reviseurs d'Entreprises,
statutory auditor represented by Mr. W. Van Aerde, for the June 30 audit
(see overview), excluding the fee for KPMG Korea, to be billed locally

Progress bill: 395.000 USD or                     BEF    18.184.198

V.A.T. 21 %                                               3.818.682

Total                                              BEF    22.002.880

| Conversion in Euro for information purposes only | Base | VAT 21 % | Total |
|---|---|---|---|
| | EUR    450.774,50 | 94.662,65 | 545.437,15 |

| Please pay this invoice to our account : Veuillez payer cette facture à notre compte : Gelieve deze factuur te betalen op onze rekening : | BBL : 310-0929850-94 DEXIA : 068-2328001-28 KBC : 409-8511731-25 |
|---|---|

NR

APD

KPMG : 30. _____

AC. 6140.170
00*6000

Bourgetlaan ·
Avenue du Bourget 40
1130 Brussel - Bruxelles
België - Belgique
Tel. + 32 2 708 43 00

Bollebergen 2B - bus 13
9052 Gent
België - Belgique
Tel. + 32 9 241 86 00

rue Van Opre 76
5100 Jambont
Belgique
Tel. + 32 81 32 69 60

03-10-00  13:01    Van KPMG REGIO WEST    +32-0-2410000    T-788  P.02/02  F-105

## Overview Fees form G

| KPMG office | | Full scope upgrade (fees + expenses) | Expenses | US $ | Suggested Fees US $ |
|---|---|---|---|---|---|
| Belgium: | | | | | |
| Audit Moper | BEF | 1.800.000 | 250.000 | 38.414 | 38.000 |
| Audit Transf. Divs. | BEF | 400.000 | | 8.536 | 8.000 |
| Consol, review and reporting | BEF | 3.370.000 | 900.000 | 71.920 | 70.000 |
| Boston | USD | 65.000 | | 65.000 | 65.000 |
| Dusseldorf | DEM | 72.000 | 4.000 | 31.682 | 24.000 |
| Paris | FRF | 54.780 | | 7.190 | 6.000 |
| Toulouse | FRF | 63.200 | | 8.295 | 6.300 |
| Madrid | ESP | 700.000 | | 3.622 | 3.500 |
| Birmingham | GBP | 12.054 | 950 | 17.074 | 10.000 |
| Tokyo | JPY | 1.000.000 | 20 | 9.424 | 9.500 |
| Dublin | IEP | 6.000 | 975 | 6.559 | 4.400 |
| Singapore | Sing $ | 31.000 | 300 | 17.863 | 12.000 |
| Lisbon | PTE | 800.000 | 40 | 3.435 | 3.500 |
| Milan | ITL | 10.450.000 | 500.000 | 4.645 | 4.600 |
| Goteborg | SEK | 25.600 | | 2.627 | 2.500 |
| Helsinki | FIM | 75.000 | 1.100 | 10.859 | 7.000 |
| Kopenhagen | DKK | 55.900 | 775 | 6.451 | 5.200 |
| Oslo | NOK | 41.000 | | 4.399 | 3.500 |
| Seoul | KRW | 159.500.000 | | 144.190 | 145.000 |
| Providence | USD | 20.300 | | 20.300 | 20.000 |
| Stamford | USD | 75.000 | | 75.000 | 70.000 |
| Houston* | USD | 22.000 | | 22.000 | 22.000 |
| | | | | 579.495 | 540.000 |

* Billed separately and directly to LHS; amount excludes hours and costs of Bob McLamb

*20000 5307*



Bedrijfsrevisoren

Lernout & Hauspie Speech Products
Ter attentie van de Heer C. Dammekens
Senior Vice President and Acting CFO
Flanders Language Valley 50
8900 Ieper

NR
APD    *Zie bijlage : Carl*
P:                    1 4 NOV. 2000
CORR
SC     *6140170*
       *00+6000*

B.T.W. nr. : BE 432.834.685 V

31 oktober 2000
**2001110660**

## FACTUUR

Ereloon van Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren,
commissaris-revisor, vertegenwoordigd door de Heer W. Van Aerde,
bedrijfsrevisor, voor diverse prestaties vanaf oktober 2000 m.i.v.
ondermeer doorfacturatie ontvangen kosten KPMG Houston, KPMG
Hong Kong, verplaatsing Korea, advocatenkosten

|  |  |  |
|---|---|---|
|  | BEF | 37.744.580 |
| B.T.W. 21 % |  | 7.926.362 |
| Totaal | BEF | 45.670.942 |

| Omrekening in Euro louter ter informatie | Basis | BTW 21 % | Totaal |
|---|---|---|---|
| EUR | 935.663,70 | 196.489,38 | 1.132.153,08 |

| Please pay this invoice to our account : | BBL : 310-0929850-94 |
|---|---|
| Veuillez payer cette facture à notre compte : | DEXIA : 068-2328001-28 |
| Gelieve deze factuur te betalen op onze rekening : | KBC : 409-8511731-25 |

Bourgetlaan 40        Bollebergen 2 E - bus 13    rue Van Opré 76
1130 Brussel          9052 Gent                  5100 Jambes
België                België                     Belgique



Lernout & Hauspie

# FAX

| TO: Bart Ferrand |
| --- |
| COMPANY: Artesia<br>Fax / 056/23.53.00<br>FROM : Carl Dammekens |
| SUBJECT : overschrijving |
| DATE: 15/11/00 17:25<br>NO. OF PAGES: 1 |

MESSAGE:

Geachte,

Gelieve onderstaande overschrijving dringend uit te voeren via het debet van onze rekening 551-3865100-10 :

- Begunstigde :          KPMG
- Rekening) :            310-0929850-94
- Bedrag:                45.670.942  BEF
- Mededeling :           2001110660

Met vriendelijke groeten,

Carl Dammekens

**COMPOSITE EXHIBIT "G"**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:            )
                             )
LERNOUT & HAUSPIE            )
SPEECH PRODUCTS, N.V.        )    File No. HO-7341


WITNESS:  Robert P. McLamb

PAGES:    1 through 207

PLACE:    Securities and Exchange Commission Headquarters
          450 Fifth Street, NW, Room 9314
          Washington, DC

DATE:     Thursday, January 18, 2001


     The above-entitled matter came on for hearing at 9:31
a.m., pursuant to notice.


APPEARANCES:

On behalf of the Securities and Exchange Commission:

     DEBORAH HEILIZER, ESQ.
     CHARLES DAVIS, ESQ.
     DAVID WITHERSPOON, CERTIFIED PUBLIC ACCOUNTANT
     KAM H. LEE, CERTIFIED PUBLIC ACCOUNTANT
     Securities and Exchange Commission
     450 Fifth Street, NW
     Washington, DC  20549
     (202) 942-4683

On behalf of the Witness:

     MICHAEL P. CARROLL, ESQ.
     WILLIAM J. FENRICH, ESQ.
     Davis, Polk & Wardwell
     450 Lexington Avenue
     New York, NY  10017
     (212) 450-4549

     SUSAN C. COCKFIELD, ESQ.
     WILLIAM J. BARRY, CERTIFIED PUBLIC ACCOUNTANT
     KPMG, LLP
     280 Park Avenue
     New York, NY  10017
     (212) 909-5840

               Diversified Reporting Services, Inc.
                      (202) 296-9626

63

1       formal written sign-off.

2           Q     What about for your -- for LLP's purposes?  Did you

3       make any notation, "This is done," "I've completed this,"

4       "This is okay to file," anything like that?

5           A     No, ma'am, the work papers are the responsibility

6       of the foreign firms and so we didn't -- we kept no separate

7       work papers or separate files other than the actual public

8       registration statement.

9           Q     What about in your time records?  Would you make

10      any notation or other indication that you had completed your

11      review?

12          A     No, ma'am.

13                BY MR. LEE:

14          Q     The documents produced to you for your file review,

15      where do you keep them?

16          A     I would receive drafts of things like the

17      completion memo and once I had finished reviewing and had any

18      comments or concerns responded to, I would discard those as

19      they belonged in the work papers.

20          Q     At what point would you destroy them?

21          A     At the point that I had completed my work on that

22      particular document.

23          Q     After you have completed your review and before you

24      give the approval to the audit engagement team, did you need

25      to gain the approval of the SEC review partner before you

85

```
1      Q    Your inquiry would be in writing?

2      A    No, sir.

3      Q    It would be verbal?  It would be verbal?

4      A    Yes, sir.

5      Q    And have you seen any document provided by KPMG,

6  Belgium that would indicate they have actually made the

7  inquiry to every, single KPMG member firm who participated in

8  the Lernout audit?

9      A    In their instructions that they -- the -- that they

10 would send out for the annual audit, it's my recollection

11 that there was a section in those instructions regarding

12 independent -- SEC independence rules.  I do not know how

13 they required each firm to respond or if a response

14 specifically was required.  I don't know.

15     Q    Do you still have a copy of any of those

16 instructions?

17     A    No, sir.

18     Q    After you have given them your approval, after you

19 finish your file review, is your practice to destroy the

20 files?

21     A    As I've previously stated, as I was doing -- in the

22 course of doing my file review, I would -- there were certain

23 documents that they would send me drafts of that they knew

24 that I needed to review and as I completed my review and got

25 my commentaries, written responses, to those, I would discard
```

Diversified Reporting Services, Inc.
(202) 296-9626

86

1    those documents.

2         Q    Should there be any follow-up question or

3    subsequent question concerning a file review that was

4    performed before, where would you look to refresh your

5    memory?

6         A    If the question is, that if issues came up

7    subsequent, in subsequent file reviews, that related to

8    the -- to a previous set of financial statements for a

9    quarter -- and I am talking in general, I am not talking

10   specifically about Lernout & Hauspie -- I would discuss the

11   issue with the engagement team and may have them send me, if

12   it was referenced in the completion memo, a copy of where

13   that issue was documented and the results of that -- the

14   conclusions on that issue were documented.

15        Q    But since when you make your approval or gave your

16   file review approval, you would not give it in writing or

17   there's no document of your approval, how would you know

18   whether you have given the approval for that particular

19   issue?

20        A    If you're talking about approval for the file

21   review, in total, I -- as I said before, in London, I would

22   have between fifteen and twenty reviews.  So I would make a

23   mental note as to those that I had completed and those that I

24   had not.  If you're talking about a specific issue, then

25   I -- as I said before, I would have the engagement team

87

1    refresh my memory by maybe providing me a copy of the

2    completion memo section that related to the issue or point me

3    to where the issue was talked about in the financial

4    statements.

5        Q    Do you maintain a list of the approval you have

6    given of file reviews anywhere?

7        A    No, sir.

8        Q    So if someone should come back and ask you whether

9    you have approved, on a file review related to a 6-K file in,

10    say, June, 1998, where would you look?

11        A    I don't have a specific file.  The instances

12    that -- where it is not approved are not frequent, in

13    general, and so I would have a mental note of that.

14        Q    You would not mark it down anywhere that you have

15    not completed the review?

16        A    No, sir.

17        Q    Is this a standard KPMG practice?

18        A    I don't know if it is a standard KPMG practice.  It

19    is Bob McLamb's practice.

20        Q    To your knowledge, are there other people in KPMG

21    who follow a similar practice to yours?

22        A    I do not know.

23        Q    Have you talked to other file reviewers?  Have you

24    observed other file reviewers to see whether they maintained

25    documents related to the file review?

152

1    would provide that to them.  If they requested it, I may

2    provide them a copy of the current text of the SASs.  If

3    there were specific PPLs that would come out of the

4    Department of Professional Practice that I thought would be

5    applicable to them or of interest to them, I would provide

6    those to them.

7         Q    PPL stands for what?

8         A    Professional practice letters.

9         Q    Thank you.  Anything else?

10        A    I provided Mr. Huysman with some information about

11   the course, the non-KPMG course, that he attended.  It had

12   come across my desk through mailings.  And I don't recall

13   anything -- anything else.

14        Q    Did you get involved at all in the transmission of

15   the reporting package in connection with the audit of U.S.

16   L&H entities to Belgium?

17        A    I don't understand what you mean -- what you mean

18   by "get involved in the transmission."  Did I physically

19   deliver anything or e-mail something?

20        Q    Well, okay.

21        A    Yeah.

22        Q    Did you have any role to play in transmitting

23   information from other parts of LLP to KPMG, Belgium?

24        A    No, ma'am.

25        Q    In connection with your consultations with DPP

153

1    relating to Lernout, did you make any notes?

2        A    I may have made notes at the time of the

3    consultations and would pass that information on either

4    through an oral conversation or an e-mail or a fax to the

5    KPMG engagement team and then it was their responsibility to

6    document it as they saw fit in their work papers.

7        Q    Where are the notes?  What happened to them?

8        A    Well, as -- after I had communicated that

9    information to the engagement team, I would -- I would

10   discard it.

11       Q    Is there any guidance or practice at LLP with

12   respect to either keeping or destroying notes on

13   conversations with persons at DPP?

14       A    KPMG, LLP has a policy that your discussions with

15   the Department of Professional Practice are to be documented

16   in the work papers, in a memo fashion in the work papers.

17       Q    Okay.  And how did you make that happen?

18       A    As it relates to Lernout & Hauspie?

19       Q    Yes.

20       A    It was not my responsibility to do that.  I would

21   pass the information on and, in some cases, they

22   participated, the KPMG, Belgium team participated in those

23   conversations and then it was their responsibility to

24   document what they saw fit under their -- under their firm's

25   requirements.

161

1     that correct?

2                    MR. CARROLL:  Right.

3                    MS. HEILIZER:  Now are you folks asserting

4     privilege with respect to the conversation that we were

5     asking about before the break?

6                    MR. CARROLL:  Ask your next question and we'll find

7     out.

8                    MS. HEILIZER:  Well, I think the question was

9     pending, which was, what was discussed during that

10    conversation?

11                    MR. CARROLL:  Then just reput it to the witness and

12    we'll take it one question at a time.

13                    MS. HEILIZER:  Okay.

14                    BY MS. HEILIZER:

15    Q     Sir, what was discussed?

16    A     Can you repeat the question, please?

17    Q     Sure.  We were talking -- now let me set up the

18    context for you, because the question is the same.  We were

19    talking about the conversation in June of 2000, I believe,

20    between Mr. Guinan, Mr. Van Aerde, yourself, and Fran

21    Disarro.

22    A     Yes, ma'am.

23    Q     Is that a man or a woman?

24    A     A man.

25    Q     Okay, Mr. Disarro.

                    Diversified Reporting Services, Inc.
                            (202) 296-9626

162

1        A    Ms. -- I'm sorry, a woman.

2        Q    Okay, Ms. Disarro.  And I think you told me it

3    lasted about fifteen minutes?

4        A    Yes, ma'am.

5        Q    Who said what to whom?

6        A    There were discussions regarding certain audit

7    procedures that, as file reviewer, I felt the engagement team

8    needed to perform.

9        ·Q    So why was DPP involved?

10        A    The engagement team had wanted to talk to somebody

11    besides myself about the necessity of those procedures, and,  ──

12    as I recall, Mr. Davidson was not available.

13        Q    You haven't said this, but I want to find out if

14    I'm correct in understanding, from what you've said, that you

15    had suggested that the audit team do certain procedures and

16    they didn't want to do them, so they wanted to talk to

17    somebody else about whether it was necessary?

18        A    They were questioning the necessity of the

19    procedures, yes, ma'am.

20        Q    And what were the procedures you had suggested for

21    them to do that they didn't want to do?

22        A    The procedures that they were questioning the

23    necessity of were sending out confirmations to investors in

24    certain companies that Lernout & Hauspie had entered into

25    license agreements with.

163

1          Q     Which companies were these?

2          A     I don't know the specific names.  I refer to them

3     as the "language development companies."

4          Q     The LDCs?

5          A     Yes, ma'am.

6          Q     Okay.  Now the -- I'm sorry.  You were going to say

7     something --

8          A     And they're -- they also -- some of them are

9     referred to as cross LDCs, XLDCs.

10         Q     Okay.  Were any of them referred to as IACs?

11         A     Not the ones that I was concerned about at that

12    point in time.

13         Q     When did this issue about confirming the identity

14    of investors or finding out the identity of the investors in

15    the LDCs first come up?

16         A     In the summer/fall of 1999.

17         Q     Why was this still an issue in June of 2000?

18         A     I was under the understanding that the procedures

19    had been performed in the fall of 1999.  In June, I became

20    aware that they had not been performed, the confirms to the

21    investors in those companies, and when I became aware of

22    that, I advised the engagement that those were files

23    in -- those were confirmation procedures that I felt needed

24    to be done in order for me to complete my file review.

25         Q     Do you remember who you talked to on the engagement

1    to that belief that it had been done?

2        A    I believe it was a telephone conversation with one

3    of the engagement team members.  I do not recall which one.

4        Q    Do you think you were given incorrect information

5    or do you think you made a mistake or do you think something

6    else happened that led you to the belief that confirmation of

7    the identity of the investors had been done when it hadn't?

8        A    Can you repeat all --

9        Q    Sure.

10        A    I mean you gave a series of possibilities.

11        Q    And I'm not trying to make the question confusing.

12        A    No.

13        Q    I'm trying to -- as you sit here today, how did it

14    happen or what do you now understand happened that you

15    thought something had been done when, in fact, it wasn't?

16        A    As I sit here today, I believe it was a

17    miscommunication between myself and the KPMG engagement team.

18        Q    Can you be more specific?

19        A    No, ma'am.

20        Q    Were you provided incorrect information by the KPMG

21    engagement team?

22            MR. CARROLL:  Asked and answered.

23            THE WITNESS:  As I said, I believe that the -- that

24    the -- it was the result of a miscommunication between myself

25    and the KPMG engagement team.

168

1           BY MR. DAVIS:

2           Q    What does that mean?  What do you mean?  You

3      misunderstood them?

4           A    I can't sit here today and say that I was provided

5      with -- you're asking me if I was provided with incorrect or

6      inaccurate information and I cannot make that assessment

7      today.  I do -- I believe --

8           Q    Well --

9           A    -- it was a miscommunication or a misunderstanding.

10          Q    On their part or on your part?

11          A    There were two parties to the conversation, so I

12     believe it was on both parts.

13          Q    I mean but I'm only talking one.

14          A    Okay.

15          Q    So was it on your part or their part?

16          A    I can't recall the conversation where I got the

17     impression that procedures had been performed, but it was

18     a --

19          Q    Did you have a incorrect impression or a

20     misimpression?

21               MR. CARROLL:  You have to let him finish.

22               MR. DAVIS:  I'm sorry.

23               THE WITNESS:  I do not recall the conversation

24     where I came to the belief that the procedures had been

25     performed, and in order to conclude whether I was provided

Diversified Reporting Services, Inc.
(202) 296-9626

169

1    incorrect information, I believe I would have to recall that

2    conversation.  They did perform confirmation procedures in

3    the fall of 1999.  I later came to understand what those

4    procedures were and I did not deem those sufficient enough in

5    order for me to complete my file review.

6              BY MS. HEILIZER:

7         Q    This is the file review for the fiscal year '99

8    audit?

9         A    Yes, ma'am.

10        Q    For the 20-F?

11        A    Yes, ma'am.                        ——

12        Q    Okay.  So the 20-F had not yet been filed at the

13   time you had this conversation in June of 2000; is that

14   correct?

15        A    Yes, ma'am.

16        Q    Were there any other instances that you can

17   remember as you sit here today where there were

18   misunderstandings with KPMG, Belgium, with respect to either

19   audit procedures you wanted done or instructions you had

20   given with respect -- or advice you had given with respect to

21   GAAP or GAAS?

22        A    I don't recall any other such instances.

23        Q    Okay.  Can you recall anything else about this

24   telephone conversation that we've been talking about, the DPP

25   conversation, other than what you've already told me?

Diversified Reporting Services, Inc.
(202) 296-9626

170

```
 1        A    No, ma'am.

 2             BY MR. LEE:

 3        Q    In fall of 1999, do you remember what triggered you

 4   to propose the confirmation procedures?

 5        A    I became aware of information that caused me to

 6   have concern about the language development companies --

 7        Q    Do you --

 8        A    -- and their relationship with Lernout & Hauspie.

 9        Q    Do you remember what information you came across?

10        A    I had received a phone call from the Department of

11   Professional Practice and OGC.

12        Q    I'm sorry.  The OGC?

13        A    Office of General Counsel.

14        Q    Okay.

15        A    Whereby they told me that they had been --

16             MS. HEILIZER:  Excuse me one second.  I just want

17   to make sure that -- give your counsel a moment to object if

18   he or she wants to.

19             MR. CARROLL:  He or she does.  If this is a

20   conversation with KPMG, LLP's counsel, he should not relate

21   the substance of it, but I will permit, Deborah, you to

22   inquire into his understanding of what the facts were after

23   the conversation.

24             MS. HEILIZER:  Wait a minute.  Let's first find

25   out --
```

182

1    generated.

2        Q    Let's go back to your calendar.  I think you were

3    talking about having this call with Mr. Jones and Ms. Disarro

4    when you were transitioning back to Houston.  Does looking at

5    your calendar refresh your recollection, that is, help you to

6    remember when that telephone call took place?

7        A    No, ma'am.

8        Q    You can't place it for me any more specifically

9    than you already have?

10        A    No, ma'am, I can't.

11        Q    So you were telling us about what you did after the

12    phone call, and you said, I think, the next day you called

13    Mr. Van Aerde?

14        A    Yes, ma'am.

15        Q    Can you tell us about that, please?

16        A    I called Mr. Van Aerde and told him that I had been

17    made aware of information that caused me concern about the

18    relationship between the LDCs and Lernout & Hauspie and that

19    I wanted to arrange a meeting with him first, and with

20    management of Lernout & Hauspie following our meeting,

21    with -- with Mr. Van Aerde.

22        Q    Were you upset?

23        A    Yes, ma'am.

24        Q    Did you communicate that to Mr. Van Aerde?

25        A    Yes, ma'am.

187

1    confirmed -- to be performed?

2        A    Not at that -- not in that call, no, sir.

3        Q    Did you meet with Mr. Davidson subsequent to that

4    call, but before your trip to meet with Mr. Van Aerde?

5        A    I don't think so, no.

6        Q    When did you meet with Mr. Van Aerde?

7        A    Again, that's a while back.  I don't remember the

8    specific date, but it was in the August/September timeframe.

9            BY MS. HEILIZER:

10       Q    Could I ask you to look at your calendar, please, .

11   because it might help you to remember?  I don't know if it

12   will, but if you take a look at your calendar, it appears to

13   me to indicate meetings on the 30th, 31st of August and the

14   1st of September, which is within the range of the time

15   period you're talking about.

16       A    Yes, ma'am, that's what the calendar indicates, but

17   oftentimes my trips overseas during that time period may have

18   moved slightly, you know, or had been canceled and may not

19   have been reflected on the calendar, and -- but it was in the

20   August to September timeframe.

21       Q    Does looking at this help you to

22   remember -- refresh your recollection -- by "this," I mean

23   your calendar -- when the meeting took place?

24       A    No, ma'am.

25           BY MR. LEE:

Diversified Reporting Services, Inc.
(202) 296-9626

188

| | | |
|---|---|---|
| 1 | Q | Do you remember where the meeting took place? |
| 2 | A | On that trip there were two meetings held.  One -- |
| 3 | Q | The first one? |
| 4 | A | -- one with Mr. Van Aerde at the Ghent office of |
| 5 | KPMG. | |
| 6 | Q | At the Ghent office? |
| 7 | A | Of KPMG, yes, sir. |
| 8 | Q | Okay.  How long did the meeting last? |
| 9 | A | Approximately an hour. |
| 10 | Q | Who was in that meeting? |
| 11 | A | The only person I remember is Mr. Van Aerde. |
| 12 | Q | What about other members of the engagement team? |
| 13 | A | I don't recall any other members of the engagement |
| 14 | team being at that meeting. | |
| 15 | Q | What was discussed in that meeting? |
| 16 | A | I explained to Mr. Van Aerde the procedures that I |
| 17 | had thought of that would be necessary to perform as a result | |
| 18 | of the information that I had become -- been made aware of, | |
| 19 | and we -- we reached an agreement at that time as to how we | |
| 20 | would present those procedures to the company. | |
| 21 | Q | When you explained to Mr. Van Aerde the procedures |
| 22 | that you would recommend, did you give him any paper listing | |
| 23 | out the procedures or you just did it verbally? | |
| 24 | A | I just did it verbally, but I gave it -- there was |
| 25 | no -- I had no written -- I had not taken any notes or | |

189

1    anything regarding that.

2        Q    You mentioned then, later on, you agreed to

3    procedures that you would propose to the company.  Did those

4    procedures differ from the ones you originally proposed?

5        A    Well, prior to those conversations, we had not

6    proposed -- we had not had any procedures as a result of this

7    information.

8        Q    I understand that.  What I'm trying to understand

9    is, at the beginning of the meeting you proposed to Mr. Van

10   Aerde certain procedures to be performed, and did Mr. Van

11   Aerde agree to all the procedures that you proposed or did he

12   make any recommended changes --

13       A    He made no recommended changes.

14       Q    So he adopted all the procedures that you proposed

15   and those were the ones you were going to propose to the

16   management of Lernout?

17       A    He agreed that it would be necessary for him to

18   perform those procedures and those would be the ones we would

19   present to Lernout & Hauspie.

20       Q    Were those procedures ever documented anywhere?

21       A    Yes, sir.

22       Q    Do you know where?

23       A    Those procedures were ultimately documented in the

24   work papers of the -- I mean of the 1999 audit of Lernout &

25   Hauspie.

190

1    Q    Have you actually seen them documented in the work

2    papers?

3    A    Yes, sir.

4    Q    You have seen them?

5    A    Yes, sir.

6    Q    Were they in agreement with your understanding of

7    what you proposed to be performed?

8    A    The final procedures that he performed were in

9    agreement with the procedures that I had proposed in

10   August/September of 1999.

11   Q    Okay.  And what was the next thing after this    ——

12   meeting?

13         MS. HEILIZER:  Can I stop you?

14         MR. LEE:  Sure.

15         BY MS. HEILIZER:

16   Q    Before we leave the meeting, what were the

17   procedures that you proposed?

18   A    I proposed to Mr. Van Aerde that we should request

19   the client's assistance in obtaining a list of the investors

20   in the various LDCs and XLDCs, that upon obtaining that list

21   that we would -- we would send out confirmations to those

22   investors --

23   Q    Who's "we"?

24   A    That KPMG, Belgium would send out the confirmation.

25   Q    Okay.  Now when you say "confirmations," what was

191

1      it you were recommending be confirmed?

2            A    I don't remember each specific item, but I will

3      give you the ones that I do remember.

4            Q    Please.

5            A    That we would confirm that they're independent of

6      Lernout & Hauspie or Mr. Lernout or Mr. Hauspie or any

7      affiliated sister company; that we confirm that there was no

8      guarantee or obligation of buy-back or refund of the money

9      associated with the license agreements involved; that they

10     confirm that they had, in fact, made the investment or had an

11     investment in the LDCs or XLDCs, and the amount of that

12     investment.

13           Q    Why were you trying to confirm that, both that the

14     investors were contacted that had an investment in the LDC

15     and the amount of the investment?

16           A    Because we were having to obtain assistance from

17     the client in getting the list, because it was not

18     publicly-available information.  I wanted to confirm that the

19     list that they had given to us was an accurate reflection,

20     and, in order to do that, we needed to confirm the amounts.

21           Q    What audit assertion were you trying to confirm

22     with respect to the independence aspect of the confirmation

23     you just described to me and the absence of any guarantees or

24     obligations to buy back?

25           A    Well, as it related to the independence issue,

                    Diversified Reporting Services, Inc.
                              (202) 296-9626

**EXHIBIT "H"**

Theo, Marc,

Here are my thoughts on the meeting with Neil Lerner yesterday afternoon.

1. It is good that the UK and International realise how serious this matter is, and that it is just not confined to Belgium.

2. Neil is as, if not more, concerned than I am that the US may decline to be further involved in the audit, irrespective of the implications in Belgium.

3. Over the years, the US has earned the majority of the fee on the engagement. The role of the US was to advise the Company and the audit team on revenue recognition issues. This is the main area where fraudulent reporting has been identified. During the debriefing meeting held with the audit committee, Brian Cave and Arthur Andersen in early November, the statement was made that, irrespective of the issue of fraud, there were indications that the business with the LDC's should not have been booked as revenue in 1999, because it was reasonable to assume even at that time that the Company would continue to be involved in the development of the technology, thereby prohibiting the recognition of revenue under US GAAP, or alternatively, that the whole deal was a case of research and development funded by others, again precluding the recognition of revenue under US GAAP. The US partner and Arthur Andersen agreed to involve their respective software accounting revenues to further investigate the matter. Nothing has come out of this, although I queried the US partner several times on the outcome of this joint review.

   The 1999 financial statements were concurring partner reviewed by a US partner on secondment to Belgium.

   I believe that all of this will come out in the open in the litigation. The US firm is up through its ears in this affair, and it is time to raise this issue with them.

4. The implications of the affair on our operations and the costs that it will cause to be incurred over the years are most probably massively understated. Belgium bears the brunt of the costs and of the negative implications in terms of loss of existing business and opportunities. Because of the responsibility of the US and International in this affair, Belgium should receive more than just moral support from the Firm. I think we should raise this issue, first with Colin Holland, and then higher up, and do this quickly.

Philippe Longerstaey
February 2, 2001