# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

SCOTT L. BAENA, Litigation Trustee     :     04-CV-12606-PBS
of the Lernout & Hauspie Speech Products,  :
N.V. Litigation Trust,                  :
                                        :
                  Plaintiff,            :
                                        :
v.                                      :
                                        :
KPMG LLP and KLYNVELD PEAT              :
MARWICK GOERDELER                       :
BEDRIJFSREVISOREN,                      :
                                        :
                  Defendants.           :
_____:

## PLAINTIFF'S OPPOSITION TO KPMG BELGIUM'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND _FORUM NON CONVENIENS_

David W. Trench, FBN 202975              Joel G. Beckman BBO# 553086
Robert E. Turken, FBN 306355            William C. Nystrom BBO#559656
Bilzin Sumberg Baena Price & Axelrod LLP  Nystrom Beckman & Paris LLP
200 South Biscayne Boulevard            10 St. James Avenue, 16th Floor
Suite 2500                              Boston, MA  02116
Miami, Florida 33131-5340               Telephone: (617) 778-9100
                                        Facsimile: (617) 778-9110


Attorneys for SCOTT L. BAENA,
LITIGATION TRUSTEE OF THE LERNOUT
& HAUSPIE SPEECH PRODUCTS N.V.
LITIGATION TRUST

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. I

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT .................................................................................................................... 3

I.  PERSONAL JURISDICTION MUST BE CONSIDERED UNDER A NATIONWIDE
    CONTACTS ANALYSIS .......................................................................................... 3

II. KPMG BELGIUM HAS MORE THAN SUFFICIENT "MINIMUM CONTACTS"
    WITH THE UNITED STATES FOR THE EXERCISE OF JURISDICTION ................ 5

    A.    KPMG Belgium's Contacts With The United States Through its Agent,
    KPMG US ............................................................................................................ 6

    B.    KPMG Belgium's Direct Contacts ................................................................... 17

    C.    Constitutional Analysis ..................................................................................... 18

III. THE COMPLAINT SHOULD NOT BE DISMISSED ON THE GROUND OF
     *FORUM NON CONVENIENS* .............................................................................. 21

    A.    Prosecuting Claims Against KPMG Belgium in Belgium Would Only
    Waste Judicial Resources And Create The Possibility Of Inconsistent
    Results ................................................................................................................ 22

    B.    KPMG Belgium Fails To Address Whether Equivalent Claims May Be
    Asserted In Belgium .......................................................................................... 23

    C.    United States Accounting Standards, Not Belgian Accounting Standards,
    Control This Case .............................................................................................. 24

    D.    Plaintiff Has Been Provided Certain Materials And Information Relevant
    To This Action By The Belgian Prosecutor ...................................................... 25

IV. INTERNATIONAL COMITY PROVIDES NO BASIS TO DEFER TO THE
    BELGIAN BANKRUPTCY PROCEEDING ............................................................ 25

VI. CONCLUSION ...................................................................................................... 27

CERTIFICATE OF SERVICE ....................................................................................... 28

i

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

Adams v. Cumberland Farms, Inc.,
  1996 WL 228567, *3 (1st Cir. 1996) ..................................................................... 3

Burger King Corp. v. Rudzewicz,
  471 U.S. 462 (1985) ............................................................................................... 19

Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,
  290 F.3d 42 (1st Cir. 2002) ................................................... 6, 7, 17, 18, 19

Diamond Mortgage Corporation of Illinois,
  913 F.2d 1233 (7th Cir. 1990) ............................................................................... 4

Ganis Corp. of California v. Jackson,
  635 F.Supp. 311 (D. Mass. 1986) ......................................................................... 8

In re Federal Fountain, Inc.,
  165 F.3d 600 (8th Cir. 1999) ................................................................................. 4

In re Lernout & Hauspie Securities Litigation,
  208 F.Supp.2d 74 (D. Mass 2002) ................................................................. 21, 23

In re Lernout & Hauspie Securities Litigation,
  337 F.Supp.2d 298 (D. Mass. 2004) ...................................... 5, 6, 9, 19, 20

In re Lernout and Hauspie Securities Litigation,
  230 F.Supp.2d 152 (D. Mass. 2002) ..................................................................... 11

In re Lernout and Hauspie,
  301 B.R. 651 (Bankr. D. Del. 2003) ..................................................................... 26

In re Middlesex Power Equipment & Marine, Inc.,
  292 F.3d 61 (1st Cir. 2002) ................................................................................... 3

In re North,
  279 B.R. 845 (Bankr. D. Arizona 2002) ............................................................... 5

In re Paques, Inc,
  277 B.R. 615 (Bankr. E.D. Pa. 2000) ................................................................... 5

In re Santa Clara County Child Care Consortium v. Children's Discovery Centers, Inc.,
  223 B.R. 40 (B.A.P. 1st Cir. 1998) ....................................................................... 4

In re the Celotex Corp.,
  124 F.3d 619 (4th Cir.1997) ................................................................................. 4

Jet Wine & Spirits, Inc.v. Bacardi & Company, Ltd.,
  298 F.3d 7 (1st Cir. 2002) ....................................................... 6, 7, 17, 19

ii

Kim v. Mohn,
  925 F.Supp. 491 (S.D. Texas 1996) ........................................................................ 8

Lacey v. Cessna Aircraft Co.,
  862 F.2d 38 (3d Cir. 1988) ................................................................................... 21

Mercier v. Sheration Int'l, Inc.,
  981 F.2d 1345 (1st Cir. 1992) .............................................................................. 24

Mercier v. Sheraton Int'l, Inc.,
  935 F.2d 419 (1st Cir. 1991) ................................................................................ 24

Noonan v. The Winston Company,
  902 F.Supp. 298 (D. Mass. 1995) ......................................................................... 18

Nowak v. Tak How Investments, Inc.,
  94 F.3d 708 (1st Cir. 1996) ............................................................................ 18, 21

O'Keefe v. Amin,
  1996 WL 463685 (D. Mass. 1996) ..................................................................... 7, 8, 9

Olympic Corp. v. Societe Generale,
  462 F.2d 376 (2d Cir. 1972) ............................................................................ 22, 23

Pharmaceutical Group Services, Inc. v. National Pharmacies, Inc.,
  592 F.Supp.1247 (E.D. Pa. 1984) ........................................................................... 8

Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren,
  361 F.3d 11 (1st Cir. 2004) ................................................................................. 19

Scottish Air Int'l, Inc. v. British Caledonian Group, PLC,
  81 F.3d 1224 (2d Cir. 1996) ................................................................................. 22

United Technologies Corp. v. Liberty Mutual Ins. Co.,
  555 N.E.2d 224 (1990) .................................................................................... 22, 23

Wells Fargo & Company v. Wells Fargo Express Company,
  556 F.2d 406 (9th Cir. 1977) .............................................................................. 6, 8

**Other Authorities**

15 U.S.C. § 78 ............................................................................................... 20

28 U.S.C. §1334 ....................................................................................... 2, 3, 4

Fed. R. Civ. P. 12 ............................................................................................ 1

Federal Rule of Bankruptcy Procedure 7004 ........................................................... 4, 5

**PLAINTIFF'S OPPOSITION TO KPMG BELGIUM'S
MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION
AND *FORUM NON CONVENIENS*[1]**

Plaintiff, Scott L. Baena, Litigation Trustee of the Lernout & Hauspie Speech Products, N.V. Litigation Trust ("Plaintiff"), submits this memorandum in opposition to the motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(2) ("Motion to Dismiss") and the supporting memorandum of law ("Memorandum") filed by Defendant Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren ("KPMG Belgium").

**PRELIMINARY STATEMENT**

To avoid personal jurisdiction, KPMG Belgium seeks to rewrite Plaintiff's Complaint, which is based on the conscious mis-certification of financial statements prepared under US GAAP and US GAAS, into a garden-variety Belgian malpractice claim. Specifically, KPMG Belgium would have this Court believe that it only performed services for a Belgian client in Belgium. KPMG Belgium thus argues that its accounting services must be assessed under Belgian accounting rules and can only be determined by a Belgian court. KPMG Belgium further contends that because "there is no federal claim alleged in the Complaint, and no federal statute at issue that provides for the nationwide service of process, . . . Plaintiff's references to [KPMG Belgium's] alleged contacts with 'the United States' are legally meaningless." See Memorandum at p.8.

Each element of KPMG Belgium's jurisdictional syllogism is both legally and factually flawed. First, personal jurisdiction in this case is not dependent on KPMG Belgium's contacts with the Commonwealth of Massachusetts – although these contacts are more than sufficient.

---

[1]     Rather than burden the Court with duplicative briefing, Plaintiff jointly addresses the legal arguments raised by defendants KPMG Belgium and KPMG US as to the purported legal insufficiencies of Plaintiff's claims in a separate, contemporaneously-filed brief. Accordingly, as denoted by the title, this brief addresses only KPMG Belgium's jurisdictional and *forum non conveniens* arguments.

1

Rather, because subject matter jurisdiction in this case is based solely on the bankruptcy "related to" provisions of 28 U.S.C. §1334, personal jurisdiction over KPMG Belgium must be determined by using a nationwide service of process/United States contacts analysis.

Second, KPMG Belgium acted extensively and systematically in the United States, both directly and through its agent, KPMG US.  Indeed, the services performed in the United States by KPMG US that are at issue in this case (i) were performed – according to KPMG US – at the behest, and under the direct control and supervision of, KPMG Belgium, (ii) were billed by KPMG Belgium as if the services had been performed by KPMG Belgium, including the addition of a 21% Belgium value added tax, and (iii) were documented, not by separate work papers maintained by KPMG US in the United States, but by KPMG Belgium's work papers.

Third, although KPMG Belgium performed accounting services for Lernout & Hauspie Speech Products, N.V. ("L&H") on a world wide basis, the services critical to this lawsuit center around the certification by KPMG Belgium of L&H's financial statements as compliant with US GAAP and US GAAS, and the filing of that certification with the Securities and Exchange Commission.  These facts require that KPMG Belgium's services be analyzed in the context of United States accounting rules.

Finally, contrary to KPMG Belgium's assertions, the maintenance of this lawsuit in this Court is consistent with the protocols of the dual bankruptcies pending in the United States and Belgium.  Plaintiff has been accorded the exclusive authority to commence this action under the provisions of the L&H Plan of Liquidation.  In addition, the Belgian prosecutor has provided Plaintiff with documents and testimony--the same documents and testimony that KPMG Belgium claims are only available in Belgium--in order to assist Plaintiff in the prosecution of this action.

Accordingly, KPMG Belgium's motion to dismiss for lack of personal jurisdiction and forum *non conveniens* should be denied in its entirety.

## ARGUMENT

### I.  PERSONAL JURISDICTION MUST BE CONSIDERED UNDER A NATIONWIDE CONTACTS ANALYSIS

KPMG Belgium's jurisdictional analysis is predicated on the contention that "[t]here is no federal claim alleged in the Complaint, and no federal statute at issue that provides for the nationwide service of process, so Plaintiff's references to [KPMG Belgium's] alleged contacts with the 'United States' are legally meaningless."   See Memorandum at p.8.  This contention is wrong.

First, subject matter jurisdiction in this case is based *exclusively* on 28 U.S.C. § 1334(b) which provides, in pertinent part, "the district court shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in *or related to cases under title 11*." (emphasis added).  Plaintiff is the Litigation Trustee of the Lernout & Hauspie Speech Products, NV Litigation Trust and was appointed in the L&H Bankruptcy proceedings pursuant to the L&H Plan of Liquidation.  As Litigation Trustee, Plaintiff is charged with responsibility for, *inter alia,* prosecuting all claims of L&H for the benefit of the L&H bankruptcy estate.

As a result, this case falls squarely within the "related to" bankruptcy jurisdiction of this Court established by 28 U.S.C. § 1334(b). See e.g. In re Middlesex Power Equipment & Marine, Inc., 292 F.3d 61, 68 (1st Cir. 2002)(defining "'related to' proceedings as proceedings which 'potentially have some effect on the bankruptcy estate….'"); Adams v. Cumberland Farms, Inc., 1996 WL 228567, *3, n.2 (1st Cir. 1996) (explaining that "[t]he district court's 'related to' jurisdiction under §1334(b) is expansive" and that "the test for determining whether a civil proceeding is related to [a] bankruptcy is whether the outcome of that proceeding could

conceivably have any effect on the estate being administered in bankruptcy."); In re Santa Clara County Child Care Consortium v. Children's Discovery Centers, Inc., 223 B.R. 40, 43, n.3 (B.A.P. 1st Cir. 1998)(highlighting that "related to" jurisdiction "extends to matters 'concerned only with state law issues that did not arise in the core bankruptcy function of adjudicating debtor-creditor rights'").[2]

Because federal jurisdiction exists under 28 U.S.C. §1334(b), the nationwide service of process provisions of Federal Rule of Bankruptcy Procedure 7004 apply to this case. See e.g. Diamond Mortgage Corporation of Illinois, 913 F.2d 1233, 1242-1244 (7th Cir. 1990); In re Federal Fountain, Inc., 165 F.3d 600, 601 (8th Cir. 1999); In re the Celotex Corp., 124 F.3d 619, 629-630 (4th Cir.1997). This is true, moreover, notwithstanding that only claims for violations of state law are alleged in Plaintiff's complaint. See e.g. Diamond Mortgage, 913 F.2d at 1243-1244 (nationwide service of process provisions applied to "related to" proceedings asserting claims for professional malpractice and breach of fiduciary duty under state law); Federal Fountain, Inc., 165 F.3d at 601 (nationwide service of process provision applied to "related to" proceedings asserting claim for breach of contract under state law); Celotex, 124 F.3d at 630 (nationwide service of process provision applied to "related to" proceeding asserting claim for contribution under state law).

Given that nationwide service of process is authorized under a federal statute, personal jurisdiction over KPMG Belgium must be considered under a ***national*** contacts analysis. See e.g. Diamond Mortgage, 913 F.2d at 1244; Federal Fountain, 165 F.3d at 602; Celotex, 124 F.3d at

---

[2]        In connection with the transfer of this case to this District, KPMG US recognized the existence of federal question bankruptcy jurisdiction in its motion to transfer this case from the United States Bankruptcy Court for the District of Delaware. Specifically, KPMG US cited to 28 U.S.C. § 1412 and Federal Rule of Bankruptcy Procedure 7087, both of which apply only to cases or proceedings under title 11, as support for its motion to transfer. (Opening Brief in Support of KPMG LLP's Motion to Transfer the Action to the District of Massachusetts, p. 1). The transfer of this case to this Court presupposes, of course, that this Court has subject matter jurisdiction to hear the case.

630.  See also In re North, 279 B.R. 845, 851 (Bankr. D. Arizona 2002) (regardless of whether

defendant is from a foreign country, national contacts analysis is the applicable analysis); In re

Paques, Inc, 277 B.R. 615, 632-633 (Bankr. E.D. Pa. 2000)(explaining that national contacts

analysis is always the applicable analysis, even where defendant is foreign company, and

detailing the 1996 amendment to Rule 7004 which further clarified this point).

     The relevant jurisdictional inquiry, therefore, is not whether KPMG Belgium had

sufficient contacts with Massachusetts, but rather whether KPMG Belgium had sufficient

contacts with the United States as a whole.  Indeed, as this Court specifically held, the applicable

jurisdictional test in a nationwide service of process case is "whether the defendant had

'minimum contacts' with the United States and whether exercising jurisdiction over the

defendant comports with due process."  In re Lernout & Hauspie Securities Litigation, 337

F.Supp.2d 298, 311 (D. Mass. 2004).  As demonstrated below, application of this test leads to the

inescapable conclusion that this Court has personal jurisdiction over KPMG Belgium.

## II.  KPMG BELGIUM HAS MORE THAN SUFFICIENT "MINIMUM CONTACTS" WITH THE UNITED STATES FOR THE EXERCISE OF JURISDICTION

     KPMG Belgium had extensive and systematic contacts with the United States and with

Massachusetts, both directly and through its agent, KPMG US.  These contacts were wide-

ranging and included (i) multiple trips to Massachusetts, (ii) constant communications with

KPMG US in Massachusetts and elsewhere in the United States to control and supervise the

extensive work on the L&H account in the United States, (iii) KPMG Belgium's certification of

L&H's financial statements under US GAAP and US GAAS, and (iv) the filing of that

certification with the SEC.  All of these contacts related to KPMG Belgium's L&H engagement

and to the claims Plaintiff has asserted against KPMG Belgium.   Simply put, these contacts

justify the exercise of personal jurisdiction over KPMG Belgium.

A.    **KPMG Belgium's Contacts With The United States Through its Agent, KPMG US.**

   **1.    The Law.**

   The agency theory of personal jurisdiction has been repeatedly recognized by numerous

courts, including the First Circuit and this Court itself.  See Jet Wine & Spirits, Inc.v. Bacardi &

Company, Ltd., 298 F.3d 7, 9-10 (1st Cir. 2002); Daynard v. Ness, Motley , Loadholt,

Richardson & Poole, P.A., 290 F.3d 42, 55 (1st Cir. 2002); Lernout and Hauspie, 337 F. Supp.2d

at 313, 314-315.  Contrary to KPMG Belgium's attempt to equate agency with alter ego, the

agency theory does not require a showing of "veil-piercing" or require this Court to conclude

that KPMG Belgium and KPMG US are not separate legal entities.

   Rather, as the Ninth Circuit's seminal decision on agency jurisdiction explained, there is

"no reason why a completely independent, in-state corporation cannot be held to have acted as an

agent for another, out-of-state corporation in performing activities giving rise to a cause of

action."  Wells Fargo & Company v. Wells Fargo Express Company, 556 F.2d 406, 419 (9th Cir.

1977)(citing a string of cases).

    Both the First Circuit and this Court have recognized this distinction between the agency

theory of jurisdiction and an alter ego/piercing the corporate veil theory of jurisdiction.  See e.g.

Lernout and Hauspie, 337 F. Supp.2d at 313, 314-315; Jet Wine, 298 F.3d at 9 (distinguishing

the agency theory of jurisdiction from an alter ego theory, and describing the agency theory as a

"narrower" argument that does not require the proof necessary to pierce a corporate veil).  The

agency theory of jurisdiction simply requires some showing that the relevant activities of KPMG

US in the United States were performed at the behest of, with the authorization of, and under the

supervision of KPMG Belgium.  See e.g. Jet Wine, 298 F.3d at 7-8 ("[t]he exact type of agency

relationship used to impute contacts [for purposes of personal jurisdiction] is not crucial…, nor are the technical differences between the states' different rules of agency vital." (citing <u>Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.</u>, 290 F.3d 42, 56-57 (1st Cir. 2002)).

In <u>Jet Wine</u>, for instance, the First Circuit determined that a single letter from Bacardi & Company, a Liechtenstein corporation, to Bacardi U.S.A., a separate Delaware corporation, "authorizing" the Delaware corporation to effectuate the sale of certain productions in the United States was enough to establish an agency relationship between the two companies for purposes of jurisdiction. <u>Id.</u> at 10.

Similarly, in <u>O'Keefe v. Amin</u>, 1996 WL 463685 (D. Mass. 1996), the court found that the exercise of personal jurisdiction over a corporation with ***no direct contacts*** with the forum state was warranted under the agency theory of jurisdiction. The court described "an agent, in the jurisdictional context, as one who acts on behalf of and with authorization of another." <u>Id.</u> at *2. It determined that the important consideration is whether the in-forum activities ***were requested by the foreign corporation and benefited the foreign corporation***. <u>Id.</u> (citation omitted). Likewise, the court cited case law which clarified that while control was a factor, agency jurisdiction only requires "a showing of 'some control,' but not more than that is necessary." <u>Id.</u> (citation omitted). Finally, the court focused on the policy considerations behind the agency theory of jurisdiction:

> In the modern economy, corporations do not undertake all their business activities "in-house." . . . Parties are held accountable for the acts of their agents precisely to prevent them from avoiding the legal consequences of their activities simply by out-sourcing these activities to intermediaries. A restrictive definition of "agent" thwarts this purpose.

<u>Id.</u> at *3. Based on these factors, the court concluded that it could properly exercise personal jurisdiction over the defendant foreign corporation, a franchisee of a Days Inns, based only on

the fact that a completely separate and independent corporation distributed brochures on behalf of all the franchisees of Days Inn, including the defendant, and that some of these brochures were distributed in Massachusetts.  Id.

In Ganis Corp. of California v. Jackson, 635 F.Supp. 311 (D. Mass. 1986), the court relied on the same agency principals discussed in O'Keefe to find that personal jurisdiction existed over out of forum defendants.  The court summarized the agency theory of jurisdiction by explaining that "activities conducted [at the] behest and under [the] control of [a] party are imputable to it."  Id. at 315 (citing the Ninth Circuit's decision in Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 419 (9th Cir. 1977) discussed above and referring to the Restatement (Second) of Agency).[3]

The August 12, 2004 Report and Recommendation of United Magistrate Judge Collings, issued in the L&H securities litigation and adopted by this Court, is consistent with these authorities.  Not only did the Report and Recommendation rely on the agency theory of jurisdiction to conclude that personal jurisdiction could appropriately be exercised over the Belgian entity, Flanders Language Valley CVA, but it specifically cited to the Restatement (Second) of Agency and case law which defines an agent simply as one who acts on behalf of and with the authorization of another.  Lernout and Hauspie, 337 F.Supp.2d at 315 (citing, *inter*

---

[3] See also Kim v. Mohn, 925 F.Supp. 491, 494-495 (S.D. Texas 1996)(distinguishing alter ego and agency theory of jurisdiction and explaining that domestic company who provided services to foreign defendant at its behest could be considered its agent for purposes of jurisdiction, regardless of whether the foreign defendant exercised control over the internal operations of the domestic company) New York Marine Managers, Inc. v. M. V. Topor-1, 716 F.Supp. 783, 786 (S.D.N.Y. 1989)(where in-state company performed activities in the forum-state on behalf of a foreign corporation and essentially did what foreign corporation would have otherwise had to do itself, the exercise of personal jurisdiction under the agency theory was warranted; explaining that "for jurisdictional purposes, a formal agency relationship is not necessary in order to find that a domestic company is acting as a foreign corporation's agent."); Pharmaceutical Group Services, Inc. v. National Pharmacies, Inc., 592 F.Supp.1247, 1249 (E.D. Pa. 1984) (in-state company servicing account on behalf of foreign company could properly be considered agent of foreign corporation for purposes of personal jurisdiction).

*alia,* O'Keefe v. Amin, 1996 WL 463685 (D. Mass. 1996) and Restatement (Second) of Agency, § 1 (1958)).

As detailed in Plaintiff's proffer below, there is ample evidence of KPMG Belgium's collaboration with KPMG US and its control over KPMG US's activities necessary to establish this Court's agency jurisdiction over KPMG Belgium.

    2.    **The Facts.**

        a.    **KPMG US Admits That KPMG Belgium Directed Its Work For L&H.**

The sworn testimony of KPMG US before the Securities and Exchange Commission and at depositions conducted by the Belgian prosecutor's office demonstrates the agency relationship between KPMG US and KPMG Belgium for purposes of personal jurisdiction.  James Boyer, the partner from the Boston, Massachusetts office of KPMG US in charge of the audit of L&H's U.S. operations, explained that the services KPMG US performed during the years 1998 through 2000 were twofold:

●     KPMG US would perform "reviews" of the L&H financial statements on a quarterly basis, and

●     KPMG US would also perform audit procedures on L&H's U.S. operations.

See October 7, 2003 Deposition of James Boyer by Officials of the Belgian Government attached as Composite Exhibit A to the contemporaneously filed Declaration of David W. Trench ("Trench Declaration"), pp. 16-17.

Mr. Boyer went out of his way to point out—indeed he made the point over and over again—that **all** of KPMG US' work was performed **at the behest of KPMG Belgium, and under the control and supervision of KPMG Belgium**. [4]

Mr. Glen Davison, another KPMG US partner, echoed Mr. Boyer's view that all of the work performed by KPMG US on the L&H account had been at the behest of KPMG Belgium and under its control and supervision:

> My understanding is KPMG Belgium led the Lernout & Hauspie audit engagement at all times . . . . There was a segment of the audit that was done by KPMG, LLP in the U.S. The Boston office was involved. I believe the company's U.S. headquarters were in Burlington, Massachusetts. So the U.S. firm was involved in auditing the U.S. segment . . . They [KPMG Belgium] would have requested that work be done by the various affiliates in the countries where Lernout and Hauspie had significant operations. The foreign affiliates would have performed the procedures and reported the results to KPMG Belgium.

See October 6, 2003 Deposition of Glen Davison by officials of the Belgian government attached as Composite Exhibit B to the Trench Declaration, pp.26-27;  See also Id. at p.151 ("the audit engagement partner [from KPMG Belgium] is the one who is contracted with the client to perform the service. He has participated in the planning. The people who work on the engagement are under his supervision.").

Mr. Robert McLamb, a third KPMG US partner, also testified that the work performed by KPMG US on the L&H account was performed at the behest of KPMG Belgium and under its control and supervision:

---

[4] For example, Mr. Boyer explained that it was KPMG Belgium "who gave instructions" for the work done on the L&H account and that KPMG Belgium was the engagement partner with respect to the L&H account and "requested assistance" from KPMG US. Id. at 18-19, 21. He also testified that "[a]ny problems that we had, we would address through KPMG Belgium. So they weren't so much an intermediary, we were reporting to them." Id. at 30. Further, he stated that he was "reporting [his] conclusions to KPMG Belgium" according to "the instructions that [he] would receive from KPMG Belgium." Id. at 32-33.

Q:  What is your view about the involvement of KPMG LLP in the Lernout audit?

A:  It's my – my understanding that KPMG Belgium requested KPMG LLP, the Boston office, to perform procedures on Lernout & Hauspie's U.S. subsidiary.

Q:  So you – do you consider KPMG LLP to be the auditors?

A:  No, sir.

Q:  Why not?

A:  Because the engagement is with KPMG Belgium and they are the – the firm signing the audit opinion.

Q:  Do you consider KPMG LLP to be participating in the audit?

A:  KPMG performed audit procedures on Lernout & Hauspie's U.S. operations under the direction and at the request of KPMG Belgium.

See January 19, 2001 Testimony of Robert P. McLamb before the United States Securities and

Exchange Committee attached as Composite Exhibit C to the Trench Declaration, pp. 309-310.[5]

The testimony by KPMG US partners was unanimous that the supervision from KPMG

Belgium took the form of multiple in-person meetings, both in Belgium and in Massachusetts,

and constant conference calls, written correspondence and emails. See e.g. October 7, 2003

Deposition of James Boyer,

● explaining that he attended meetings with representatives of KPMG Belgium both in the U.S. and in Belgium in order to plan audit procedures and report back to KPMG Belgium on audit procedures, pp. 11-12;

---

[5] The foregoing testimony establishes the very requirements of an agency relationship which this Court identified in In re Lernout and Hauspie Litigation, 230 F.Supp.2d 152, 157 (D. Mass. 2002)(explaining that plaintiffs had failed to sufficiently allege an agency relationship between KPMG International and certain other KPMG entities  because they had not alleged that "collaborations [on different aspects of the L&H audit] [had] occurred at the behest of, on behalf of, under the direction of, or subject to the control of KPMG International")(citing Restatement (Second) of Agency).

● describing two meetings held in Burlington, Massachusetts between KPMG Belgium and KPMG US for the same reasons, pp. 12-13;

● referring to "periodic meetings" with KPMG Belgium "to talk about technical accounting rules," p. 13;

 ● referring to "numerous conference calls and emails" in which KPMG Belgium was usually involved, p. 14;

● explaining that KPMG US "discussed the issues [revenue recognition issues] at length with the KPMG Belgium team," p. 27;

● referring to a conference call in early December 1999 with KPMG Belgium and certain representatives from L&H to discuss pending audit issues and an in-person meeting in Burlington, Massachusetts in late January 2000 with KPMG Belgium, pp. 39-41;

● referring to "several meetings with Gaston Bastiaens and other members of the L&H management team along with KPMG Belgium" initiated by KPMG Belgium, pp. 61-63.[6]

### b.  __The Involvement of the Boston Office in the Auditing Activities.__

Mr. Boyer also testified regarding the numerous managers from the Boston office who

worked on the L&H account:

> Q: Could you name the people from KPMG U.S. who were on the L&H account?
>
> A.  Yes.  And would you like a specific time period?

---

[6] See also October 6, 2003 Deposition of Glen Davison:
● referring to a "regular dialogue" with the KPMG Belgium engagement team,  p. 87;

February 28, 2001 Testimony of Glen Davison before the United States Securities and Exchange Commission attached as Composite Exhibit D to the Trench Declaration:

● explaining the full day meeting held in Burlington, Massachusetts with KPMG Belgium in December 1998 to learn about L&H and establish procedures to be followed, pp. 94-95, 134;

March 1, 2001 Testimony of Glen Davison before the United States Securities and Exchange Commission attached as Composite Exhibit E to the Trench Declaration:

 ● referring to emails from KPMG Belgium regarding the L&H file reviews, p. 273
 ● referring to letter memorandum written by KPMG Belgium to KPMG US regarding additional audit procedures, p. 320.

January 19, 2001 Testimony of Robert P. McLamb,
● referring to "daily telephone conversations" with KPMG Belgium regarding revenue recognition issues, pp. 399-400.

Q:  Yeah, 1998, '99 and 2000.

A.  Okay.  The members of the team that I was responsible for in Boston would have included several different managers.  Those people included Katie Warren and Craig Campbell, Mike Maschio, Jason Neelan, Megan Upham.  Those were managers and staff who were involved in the work that I was responsible for.  That's for the period 1998, 1999.  Those were not all the people.  Those were key people who were on the engagement.

See October 7, 2003 Deposition of James Boyer, pp. 10-11, Composite Exhibit A.

Mr. Boyer further testified that:

● "the scope of the work that we were asked to perform by KPMG Belgium had increased" (Id. at p. 8);

● the work became "more intensive" on the L&H account toward the end of 1999 and the beginning of 2000 (Id. at p. 15);

● "L&H had acquired a number of companies in the U.S., so the scope of the work that KPMG Belgium asked us to perform increased because of some of these new entities that were being acquired." (Id. at p. 17); and

●he and his team "spent an enormous amount of time" trying to understand certain L&H licensing contracts entered into in the U.S. and the revenue recognition issues associated with these contracts (Id. at 25).

### c.  KPMG Belgium Billed For KPMG US' Work As If It Were Performed By KPMG Belgium.

Consistent with the manner in which KPMG Belgium supervised and managed the extensive services performed by KPMG US as part of the L&H engagement,  KPMG Belgium also billed L&H for KPMG US' services as if the services had been performed by KPMG Belgium.  For example, KPMG Belgium invoice no. 2001110379 was a bill for services rendered by a number of KPMG offices around the world.  See Composite Exhibit F.  The services provided to L&H in the United States by KPMG US offices in Boston, Massachusetts, Stamford, Connecticut and Providence, Rhode Island represented the bulk of that invoice.

KPMG Belgium also billed L&H and collected on separate invoices that KPMG US submitted to KPMG Belgium. For example, KPMG Belgium invoice no. 9901113236 to L&H was a "recharge" of KPMG US (Houston, Texas office) invoice 40295561 to KPMG Belgium.  Id. Similarly, KPMG Belgium invoice no. 2001110274 to L&H was a recharge of KPMG US invoice no. 40367929 to KPMG Belgium.  Id.

Most importantly, *both sets of invoices reflect that KPMG Belgium charged L&H a 21% Belgian value added tax, not only for services that KPMG Belgium performed in Belgium, but also for the services that were performed on its behalf by KPMG US in the United States*.  In short, KPMG Belgium treated KPMG US' services in every respect as if they were performed by KPMG Belgium.

> **d.    <u>KPMG US Destroyed Its Work Papers Because KPMG Belgium Was in Control.</u>**

Also compelling on the issue of the agency relationship is the fact that KPMG US destroyed many of its work papers relating to L&H.  According to KPMG US, it discarded all work papers with respect to its quarterly reviews of the L&H financials because its services were only an adjunct to KPMG Belgium's services and were documented by KPMG Belgium's work papers.  See <u>e.g.</u> January 18, 2001 Testimony of Robert P. McLamb before the United States Securities and Exchange Commission attached as Composite Exhibit G to the Trench Declaration, p. 63 ("the work papers are the responsibility of the foreign firm and so we didn't – we kept no separate work papers or separate files other than the actual public registration statement.") and pp. 85-87 ("As I've previously stated, as I was doing – in the course of doing my file review, I would – there were certain documents that they would send me drafts of that they knew that I needed to review and as I completed my review and got my commentaries, written responses to those, I would discard these documents….[I]f issues came up

subsequent…that related to the previous set of financial statements for a quarter…I would

discuss the issue with the engagement team and may have them send me…a copy of where the

issue was documented…. I would [also] make a mental note as to those [file reviews] that I had

completed and those that I had not.").

### e.  KPMG US Admits it Relied on KPMG Belgium's Supervision.

Even when significant issues began to arise over the L&H account (the very same issues

that form the basis of Plaintiff's Complaint), KPMG US testified that it continued to turn to and

rely on KPMG Belgium's supervision of the L&H account.  For instance, in the summer of 1999,

a woman employed by L&H in Massachusetts in connection with its United States operations

called KPMG US to raise concerns over what she claimed were revenue recognition issues

involving the Language Development Companies ("LDCs"). See e.g. October 6, 2003

Deposition of Glen Davison, pp. 83-84, Composite Exhibit B.   This information was made

known to Mr. McLamb, who testified that he immediately called KPMG Belgium to relay the

information and to arrange for an in-person meeting with KPMG Belgium. See e.g. January 18,

2001 Testimony of Robert P. McLamb, pp.163, 170, and 182, Composite Exhibit G.

At the conclusion of the in-person meeting with KPMG Belgium held in late August or

early September of 1999 in Belgium, Mr. McLamb testified that he believed that KPMG US and

KPMG Belgium were in agreement that certain additional audit procedures should be performed.

Id. at pp. 187-190.  Specifically, Mr. McLamb testified that he believed KPMG Belgium was

going to request L&H's assistance in obtaining a list of investors in the various LDCs and that

upon obtaining the list KPMG Belgium would send out confirmations directly to those investors.

Id. at 190.

According to Mr. McLamb, he first realized that this procedure had not actually been performed by KPMG Belgium in June of 2000 while he was in the process of performing his file review for the fiscal year 1999 for the 20-F. Id. at pp. 163, 168-169. He testified that a "miscommunication" must have occurred between KPMG US and KPMG Belgium with respect to the issue. Id. at p. 166. Because, according to Mr. McLamb, KPMG Belgium continued to question the necessity of obtaining the LDC investor confirmations, several conference calls occurred between McLamb, representatives of KPMG Belgium, and representatives of KPMG US' Department of Professional Procedures ("DPP") in which the need for the procedure was discussed. Id. at 161-163.

Although the evidence of KPMG US' activities at the direction and control of KPMG Belgium is overwhelming, the efforts of KPMG US to shift the blame for the accounting malfeasance to KPMG Belgium are the subject of "significant disagreement" by KPMG Belgium. In the words of the Belgian prosecutor, various Belgian witnesses testified that "KPMG Belgium always blindly followed McLamb's suggestions," "McLamb gave final approval and KPMG Belgium didn't really have anything to say," and "in the hierarchy [McLamb] was above KPMG Belgium." See October 6, 2003 Deposition of Glen Davison, pp. 144-145 (the Belgian prosecutor purporting to summarize the testimony of Mr. Paul Behets, of KPMG Belgium, Mr. Joe Lernout and Mr. Paul Hauspie), Composite Exhibit B.

In addition, as Philippe Longerstaey, President of KPMG Belgium, stated in a February 2, 2001 memorandum:

> I believe that all of this will come out in the open in the litigation. The US firm is up through its ears in this affair, and it is time to raise this issue with them.

(Exhibit H to Trench Declaration).

Regardless of how the responsibility for the malfeasance is shared by Defendants, Plaintiff has certainly proffered evidence sufficient to make a prima facie showing of agency jurisdiction. See e.g. Daynard, 290 F.3d at 45 ("In this case there are many disputed, and as of yet unresolved, facts.  We do not resolve these disputed facts because we 'must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing."); Jet Wine, 298 F.3d at 8 (where a "plausible interpretation" of a particular document had been presented by the plaintiff, it was "sufficient for a prima facie showing of jurisdiction" and the "merits of the interpretation" could be resolved later).

**B.    KPMG Belgium's Direct Contacts**.

As discussed above, from 1998 to 2000, partners of KPMG Belgium made multiple trips to Massachusetts in connection with the L&H engagement.  KPMG Belgium also sent countless facsimiles, letters, e-mails, and written documents into the United States, and specifically, into Massachusetts, with respect to the L&H engagement.  Likewise, constant telephone calls were made by KPMG Belgium to the United States to discuss the L&H account with KPMG US, including what were described as "daily" telephone calls with respect to the revenue recognition issues that form the basis of Plaintiff's claims. See e.g. January 19, 2001 Testimony of Robert P. McLamb, pp. 399-400, Composite Exhibit C.

More critical to Plaintiff's claims, KPMG Belgium itself certified L&H's consolidated balance sheets and consolidated statements of operations for the fiscal years ending December 31, 1998 and December 31, 1999 under US GAAP and US GAAS.  It was this certification that was filed with the SEC and that allowed the acquisitions of Dictaphone and Dragon to be completed.  See Plaintiff's Complaint, ¶ ¶ 60, 69, 71.

C.    <u>**Constitutional Analysis**</u>.

KPMG Belgium's pervasive direct and agency contacts with the United States, including its numerous contacts with Massachusetts, exceed the required minimum national contacts and due process analysis. These contacts relate specifically to KPMG Belgium's L&H engagement and the claims asserted by Plaintiff in this case. They establish that KPMG Belgium itself, and through its agent KPMG US, purposefully availed itself of the privilege of conducting business in the United States, and thus could have reasonably anticipated being haled into court in the United States. <u>See</u> <u>e.g.</u> <u>Daynard,</u> 290 F.3d at 61-62.

KPMG Belgium's direct contacts with the United States alone meet the purposeful availment requirement. <u>Id.</u> (explaining that one of the cornerstones of the analysis is the voluntary nature of the defendant's contacts, and that ***even a single act***, such as one visit to the forum state to negotiate a contract, can constitute purposeful availment, especially when considered together with telephone and fax communications with the forum state; "[t]he transmission of facts or information into Massachusetts via telephone or mail would of course constitute evidence of a jurisdictional contact directed into the forum."); <u>Nowak v. Tak How</u> <u>Investments, Inc.,</u> 94 F.3d 708, 719 (1st Cir. 1996)("a defendant need only have on contact with the forum state, so long as the contact is meaningful."); <u>Noonan v. The Winston Company</u>, 902 F.Supp. 298, 301, n. 5 (D. Mass. 1995)(personal jurisdiction could be exercised over a United Kingdom corporation where its employees or agents had "sent letters, made telephone calls, and traveled to Massachusetts for business purposes.")

When KPMG Belgium's direct contacts are coupled with its contacts through KPMG US – including literally years of accounting services performed physically in the United States – it is even more apparent that KPMG Belgium purposefully availed itself of the privilege of

conducting business in the United States.  See e.g. Daynard, 290 F.3d at 62.  Indeed, the First

Circuit concluded that, not only should KPMG Belgium have reasonably anticipated being haled

into court in the United States, but it should have anticipated the burdens of United States

discovery.  Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren, 361 F.3d 11, 22 (1st

Cir. 2004)(referring to KPMG Belgium's "decision to ply its wares in the lucrative American

marketplace" and explaining that "[h]aving elected to establish a major presence in the United

States, KPMG-B must have anticipated that it would be subject to suit in this country (and, thus,

subject to pretrial discovery rules that are pandemic to the American justice system.)").

        Finally, in considering whether the exercise of jurisdiction over KPMG Belgium is

consistent with due process, this Court also must consider the factors which the First Circuit has

named the "gestalt factors," to wit:  "1) the defendant's burden of appearing, 2) the forum state's

interest in adjudicating the dispute, 3) the plaintiff's interest in obtaining convenient and

effective relief, 4) the judicial system's interest in obtaining the most efficient resolution of

controversy, and 5) the common interests of all sovereigns in promoting substantive social

policies."  Jet Wine, 298 F.3d at 11.  Where a plaintiff has established minimum contacts with

the United States, however, the defendant "'must present a compelling case that the presence of

**some other considerations** would render jurisdiction unreasonable.'"  Burger King Corp. v.

Rudzewicz, 471 U.S. 462, 477 (1985) (emphasis added).  "[I]t usually will not be unfair to

subject [a nonresident defendant] to the burdens of litigating in another forum for disputes

relating to [in-forum economic] activity").  Id. at 474.

        The first factor, the burden on KPMG Belgium, "is only meaningful where a party can

demonstrate some kind of special or unusual burden."  Lernout and Hauspie, 337 F.Supp.2d at

318 (citations omitted).  In this case, KPMG Belgium has not, and cannot, make the requisite

showing of a special or unusual burden which it will suffer if it is required to litigate Plaintiff's claims against it before this Court.  Indeed, KPMG Belgium has been a litigant before this Court for years in connection with several other suits stemming from its L&H engagement.

The second factor, the forum state's interest in adjudicating the dispute, also favors the exercise of jurisdiction over KPMG Belgium.  The United States has a significant interest in ensuring that accountants performing audits in the United States, certifying financial statements under US GAAP and US GAAS, and filing such certifications with the SEC perform these services according to the requisite professional standards.  See Section 10A of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j-1.[7] Likewise, Massachusetts has an interest in ensuring that professionals "plying their wares" here do not violate the legislative proscriptions against unfair and deceptive trade practices as provided under Mass. Gen. L.C. 93A.

The third factor – the plaintiff's interest in obtaining convenient and effective relief – likewise cuts in favor of exercising personal jurisdiction over KPMG Belgium since "a plaintiff's choice of forum must be accorded a degree of deference with respect the issue of its own convenience."  Lernout and Hauspie, 337 F.Supp.2d at 318 (citation omitted).  It goes without saying that it is more convenient for Plaintiff  to litigate this case in the United States than in Belgium.  Moreover, although KPMG Belgium has expressed concern as to whether a judgment by this Court could be enforced against it in Belgium, we are convinced that this Court can afford Plaintiff efficient and effective relief.  The fourth and fifth gestalt factors are essentially inapplicable to this discussion, and do not weigh against exercising jurisdiction over KPMG Belgium.  Id.

---

[7] Plaintiff discusses the importance of this section at length in his opposition brief to Defendants' motions to dismiss for legal insufficiencies.

In sum, KPMG Belgium, both directly and through its agent, KPMG US, had sufficient minimum contacts with the United States, and the exercise of jurisdiction over it thus comports with due process. Accordingly, Plaintiff submits that this Court may properly exercise jurisdiction over KPMG Belgium in this case.

### III.  THE COMPLAINT SHOULD NOT BE DISMISSED ON THE GROUND OF *FORUM NON CONVENIENS*

KPMG Belgium argues this Court should dismiss the claims against it based on the doctrine of forum *non conveniens* because, *inter alia,* the applicability of Belgian accountancy law and the location of relevant evidence make it much more convenient for a Belgian court to determine the claims. There is no merit to these arguments.

It is black letter law that "since there is a strong presumption in favor of the plaintiff's forum choice, the defendant must bear the burden of proving the availability of an adequate forum, and the likelihood of serious unfairness to the parties in the absence of a transfer to the alternative forum." In re Lernout & Hauspie Securities Litigation, 208 F.Supp.2d 74, 91 (D. Mass 2002)(citations omitted). See also Nowak, 94 F.3d at 719 ("We have emphasized that the doctrine of forum *non conveniens* is used to avoid 'serious unfairness' and that plaintiff's choice of forum will be disturbed only rarely.")(citations omitted). As described below, KPMG Belgium has not met its burden of overcoming the strong presumption in favor of plaintiff's forum choice[8] and indeed has not put forward any valid argument as to the "serious unfairness" that would befall it were it forced to litigate the claims against it before this Court.

---

[8]      KPMG Belgium argues that plaintiff's choice of forum is not entitled to any deference because he stands in the shoes of a Belgian entity. Even KPMG Belgium, however, does not dispute it is overwhelmingly more convenient for plaintiff to litigate here rather than in Belgium, and does not explain why this is not the relevant forum *non conveniens* consideration. Moreover, even putting this issue aside and assuming *arguendo* that plaintiff should be considered a "foreign plaintiff," this does not mean that his choice of forum is not entitled to deference. See e.g. Lacey v. Cessna Aircraft Co., 862 F.2d 38, 45-46 (3d Cir. 1988) ("We agree with the Fifth Circuit that Piper's language . . . is not an invitation to accord a foreign plaintiff's selection of an American forum *no* deference since dismissal for forum *non conveniens* is the exception rather than the rule.").

A.      **Prosecuting Claims Against KPMG Belgium in Belgium Would Only Waste Judicial Resources And Create The Possibility Of Inconsistent Results.**

KPMG Belgium begins its forum *non conveniens* discussion by arguing that Belgium should be considered an adequate alternate forum, regardless of whether Belgian courts have jurisdiction over KPMG US.  Since KPMG US has not requested that the claims against it be heard in Belgium—indeed, KPMG US specifically asked to have this case transferred to this Court—KPMG Belgium's proposition would result in this case being split in two.  That is, even though virtually identical claims have been asserted in this case against both KPMG Belgium and KPMG US involving the same documentary evidence and witnesses, KPMG Belgium would have two different courts determine these claims.  In addition to inviting the possibility of inconsistent results, there can be no greater waste of judicial resources and no greater inconvenience to the witnesses who would have to testify in both proceedings.

Indeed, the case cited by KPMG Belgium in support of its novel, split-the-case-into-two-identical-cases argument, Scottish Air Int'l, Inc. v. British Caledonian Group, PLC, 81 F.3d 1224 (2d Cir. 1996), supports Plaintiff's position.  The Scottish Air case involved a claim for contempt of court that ***the court disposed of as a matter of law in favor of defendants***, as well as certain other claims which were dismissed for forum *non conveniens* reasons.  Id.  Scottish Air does not establish the propriety of creating two different cases such that the same facts and legal issues are determined by two different courts in two different forums.  In fact, Scottish Air noted that "deciding related questions in different courts may often be inconvenient and inefficient." Id. at 1235.

Likewise, the two decisions relied on by the Scottish Air court,  Olympic Corp. v. Societe Generale, 462 F.2d 376, 378 (2d Cir. 1972) and United Technologies Corp. v. Liberty Mutual

Ins. Co., 555 N.E.2d 224, 225 (1990), further establish that waste of judicial resources and the possibility of inconsistent results should be guarded against, not encouraged, in ruling on a motion to dismiss for forum *non conveniens*.  See Olympic Corp., 462 F.2d at 378 (affirming the dismissal of a third party complaint on forum *non conveniens* grounds only after determining **that different legal issues** were at stake than those at issue in the complaint such that a separate trial of the complaint and third-party complaint **would not produce inconsistent results**); United Technologies, 555 N.E.2d at 227 (reversing the trial court's grant of a forum *non conveniens* dismissal based, *inter alia,* on the "the strong arguments to support resolution of common questions of law and fact in one proceedings").  Again, neither of these courts suggested that, under the guise of a forum *non conveniens* argument, it would be appropriate to create dual litigation in two different countries to determine the same questions of law and fact.

For this reason alone, the Court should deny KPMG Belgium's motion to dismiss for forum *non conveniens*.  Rather than promote convenience and efficiency, a determination that the claims against KPMG Belgium should be heard in Belgium would only serve to waste judicial resources, inconvenience the relevant witnesses who would need to testify in two proceedings, and create the possibility of inconsistent results.

**B.     KPMG Belgium Fails To Address Whether Equivalent Claims May Be Asserted In Belgium**.

KPMG Belgium further asserts that it considers Belgium to be an adequate alternative forum simply because Belgian law apparently provides some type of cause of action for professional malpractice.  See Memorandum at p. 13.  Revealingly, KPMG Belgium fails to even address whether Belgian law would recognize a cause of action similar to the claim for violation of Mass. Gen. L.C. 93A or the claim for aiding and abetting breach of fiduciary duty asserted in Plaintiff's Complaint.  This failure also is sufficient grounds to deny KPMG Belgium's forum

*non conveniens* motion.  See *e.g.* Lernout & Hauspie, 208 F.Supp.2d at 91 (To prove the availability of an adequate alternative forum "the defendant [must] demonstrate[ ] that the alternative forum addresses the type of claims that the plaintiff has brought.")(citations omitted).[9]

Try as it might, KPMG Belgium cannot transform this case into an ordinary accounting malpractice case.  Plaintiff has alleged far more egregious conduct by KPMG Belgium, and is entitled to have these claims heard and determined by this Court.

**C.**     **United States Accounting Standards, Not Belgian Accounting Standards, Control This Case.**

Much of KPMG Belgium's remaining forum *non conveniens* argument centers on the purported applicability of Belgian accounting standards to this case.  Plaintiff does not understand why Belgian accounting standards would be implicated here since Plaintiff's claims center on certifications ***under US GAAP and US GAAS***, not Belgian accounting standards. Indeed, according to the testimony of KPMG US, all of L&H's financial statements were prepared under US GAAP and US GAAS, and there are no Belgian accounting standards equivalent to the revenue recognition standards at issue in Plaintiff's Complaint:

> I would comment that the U.S. GAAP rules on software revenue recognition are very detailed, and I am confident that there is not an equivalent anywhere else in the world in terms of their complexity and their detailed nature.  So to answer your original question, I would doubt that there is present in Belgium GAAP an

---

[9] See also Mercier v. Sheraton Int'l, Inc., 935 F.2d 419, 425-426 (1st Cir. 1991)("Mercier I")(reversing forum *non conveniens* dismissal where, *inter alia*, expert's "affidavit failed to satisfy fully the initial burden which must be shouldered by a defendant seeking a forum *non conveniens* dismissal.  Among the affidavit's most notable defects is its failure to state expressly that Turkish law recognizes claims for breach of contract and tortious interference with contract – or some analogous action.  A general recitation such as [the expert's] that the alternative forum can adjudicate 'commercial claims'…simply fails to provide a sufficient basis upon which to conclude that Turkey will take cognizance of this dispute."); Mercier v. Sheration Int'l, Inc., 981 F.2d 1345, 1351-52, n.5 (1st Cir. 1992)("Mercier II")(affirming forum *non conveniens*  dismissal on remand only after, *inter alia,* expert affidavit detailed that causes of action for breach of contract and tortious interference with contractual relations were recognized under Turkish law).

> equivalent standard, but to my knowledge, Lernout & Hauspie
> applied U.S. rules everywhere in the world.

October 6, 2003 Deposition of Glen Davison, p. 30.

    For purposes of Plaintiff's claims, it is irrelevant that KPMG Belgium is a Belgian partnership because it has been sued for providing United States accounting services.  Certainly this Court, rather than a Belgian court, is more equipped to consider the appropriateness of KPMG Belgium's accounting activities relating to its certifications under US GAAP and US GAAS.

**D.**    **Plaintiff Has Been Provided Certain Materials And Information Relevant To This Action By The Belgian Prosecutor.**

    KPMG Belgium also asserts that since only the Belgian curators have access to certain documents and testimony collected by the Belgian prosecutor's office, and because Belgian secrecy laws prohibit the sharing of this information with Plaintiff, the claims against it should be resolved in Belgium.  KPMG Belgium is wrong again.  In fact, the Belgian prosecutor has provided Plaintiff with the same information and material that was made available to the Belgian curators.  Moreover, these materials were provided to Plaintiff for the specific purpose of assisting Plaintiff's discharge of his fiduciary duties as Litigation Trustee, which includes the prosecution of this lawsuit.  Accordingly, the "ease of access" to evidence does not weigh in favor of a forum *non conveniens* dismissal.

**IV.**  **INTERNATIONAL COMITY PROVIDES NO BASIS TO DEFER TO THE BELGIAN BANKRUPTCY PROCEEDING**

    KPMG Belgium's international comity argument fares no better than its personal jurisdiction and forum *non conveniens* arguments.  Specifically, KPMG Belgium appears to argue that the maintenance of this case before this Court would somehow offend the Belgian courts because of the pendency of the Belgian L&H bankruptcy proceedings.  Curiously, in

making this argument, KPMG Belgium refers to certain provisions of the L&H Plan of Liquidation. In fact, as the disclosure statement which KPMG US filed with this Court makes clear, the Lernout & Hauspie Speech Products NV Litigation Trust was specifically assigned, *inter alia,* claims "against KPMG or any of its foreign or U.S. affiliates" and Plaintiff, the Litigation Trustee, was specifically vested with the authority and responsibility to prosecute these claims. (<u>See</u> Disclosure Statement, p.83).

More importantly, the Bankruptcy Court for the District of Delaware specifically took into account issues of international comity when it approved the L&H Plan of Liquidation:

> Most noteworthy on the issue of international comity and deference to Belgian judicial proceedings is the apparent acquiescence of the Curators to the terms of the plan. As noted above, although the Curators do not affirmatively support the plan, they have not filed an objection to the plain and did not object to the plan at the confirmation hearing. In other matters since their appointment in October 2001, the Curators, through debtor's counsel, have made their positions known. While the initial plan proposed by the Creditors Committee was pending, the Curators filed an emergency motion on March 31, 2003 to receive authorization to disburse $23 million dollars of debtor's assets to pay Belgian administrative claims. The motion was withdrawn when the Creditors Committee agreed to increase the funds to be allocated to the Belgian case by $5 million dollars and agreed to allow Belgian general unsecured creditors to be administered as Class 3 creditors within the Chapter 11 plan. According to counsel for the Committee, the Curators' silence at the confirmation hearings signifies a plan that the curators "can live with, because if they could not live with it…they would have [] objected."…. Committee counsel reflected at oral argument that provisions of the Litigation Trust Agreement, which established the plan to liquidate potential causes of action belonging to the debtor, include cooperative paragraphs between the Curators and the Litigation Trustee, including mutual access to books and records in both jurisdictions, which was (sic) drafted with Curator participation and cooperation.

<u>In re Lernout and Hauspie</u>, 301 B.R. 651, 659-660 (Bankr. D. Del. 2003).

Consistent with the L&H Plan of Liquidation, the Belgian Curators are executing their notice of transfer of all claims that were filed in the Belgian insolvency proceeding and will deliver that notice to Plaintiff, as Plan Administrator of the L&H estate.  In addition, as discussed above, Plaintiff has requested and been provided material by the Belgian prosecutor.  It thus appears that the only entity offended by the maintenance of this case before this Court is KPMG Belgium. Obviously, KPMG Belgium's own displeasure cannot form the basis of a valid international comity argument.

## VI.  CONCLUSION

Based on the foregoing arguments and legal authorities, Plaintiff respectfully requests that this Court reject in their entirety the jurisdictional, forum *non conveniens*, and comity arguments, and deny KPMG Belgium's motion to dismiss.

Respectfully submitted,

SCOTT L. BAENA, LITIGATION TRUSTEE
OF THE LERNOUT & HAUSPIE SPEECH
PRODUCTS N.V. LITIGATION TRUST

By his attorneys,

/s/ David W. Trench
David W. Trench, FBN 202975
Robert E. Turken, FBN 306355
Bilzin Sumberg Baena Price & Axelrod LLP
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131-5340
Telephone: (305) 374-7580
Facsimile:  (305) 374-7593

-AND-

Joel G. Beckman BBO# 553086
William C. Nystrom BBO#559656
Nystrom Beckman & Paris LLP
10 St. James Avenue, 16th Floor
Boston, MA  02116
Telephone: (617) 778-9100
Facsimile: (617) 778-9110

Dated: February 11, 2005.


## <u>CERTIFICATE OF SERVICE</u>

I, Joel G. Beckman, hereby certify that on February 11, 2005, I caused a true copy of the foregoing document to be served upon all counsel of record by First Class postage pre-paid mail.


_____
Joel G. Beckman