## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SCOTT L. BAENA, Litigation Trustee :  04-CV-12606-PBS
of the Lernout & Hauspie Speech Products, :
N.V. Litigation Trust, :

    Plaintiff, :

     :

v.      :

     :

KPMG LLP and KLYNVELD PEAT :
MARWICK GOERDELER :
BEDRIJFSREVISOREN, :

    Defendants. :

## DECLARATION OF DAVID W. TRENCH IN SUPPORT
## OF PLAINTIFF'S OPPOSITION TO KPMG US' MOTION
## TO DISMISS THE COMPLAINT

David W. Trench, Esq. deposes and says:

1. I am an attorney admitted to practice in this District *pro hac vice* and am a partner at the law firm of Bilzin Sumberg Baena Price & Axelrod, LLP, counsel for Plaintiff. Based on my knowledge as counsel in this action, I submit this declaration in support of Plaintiff's Opposition to KPMG US' Motion to Dismiss the Complaint.

2. Attached as Exhibit A is true and correct copy of KPMG LLP's Motion to Transfer the Action to the District of Massachusetts.

3. Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

          _____
          DAVID W. TRENCH, ESQ.

Dated: February 11, 2005.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LERNOUT & HAUSPIE SPEECH | ) | Case No. 00-4398 (JHW) |
| PRODUCTS N.V., | ) | (Jointly Administered) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| SCOTT L. BAENA, LITIGATION TRUSTEE | ) | |
| OF THE LERNOUT & HAUSPIE SPEECH | ) | |
| PRODUCTS N.V. LITIGATION TRUST, | ) | |
| | ) | Adv. Pro. No. 04-54842 (JHW) |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| KPMG LLP and KLYNFELD PEAT MARWICK | ) | |
| GOERDELER BEDRIJFREVISOREN, | ) | |
| | ) | |
| Defendants. | ) | |

## OPENING BRIEF IN SUPPORT OF KPMG LLP'S MOTION TO TRANSFER THE ACTION TO THE DISTRICT OF MASSACHUSETTS

Dated: October 4, 2004

Brett D. Fallon (#2480)
Douglas N. Candeub (#4211)
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Post Office Box 2306
Wilmington, Delaware 19899
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: bfallon@morrisjames.com
E-mail: dcandeub@morrisjames.com
Attorneys for KPMG LLP

OF COUNSEL:
Michael P. Carroll
Michael S. Flynn
Suong T. Nguyen
Julian J. Moore
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Facsimile: (212) 450-3800

TMH/103194-0002/1046032/1

## TABLE OF CONTENTS

**Page**

TABLE OF CITATIONS...................................................................................................ii,iii

SUMMARY OF THE ARGUMENT ...................................................................................1

NATURE AND STAGE OF PROCEEDINGS.....................................................................2

STATEMENT OF THE FACTS .........................................................................................3

    A.   The Actions Pending in the Massachusetts District Court ...........................................3

    B.   Discovery and Scheduling in the Massachusetts Actions..............................................5

LEGAL STANDARD........................................................................................................5

ARGUMENT ...................................................................................................................6

CONCLUSION ...............................................................................................................10

TMH/103194-0002/1046034/1

## TABLE OF CITATIONS

### Cases

Page

In re A.R.E. Mfg. Co., 124 B.R. 912 (Bankr. M.D. Fla. 1991) ................................................ 5

In re Centennial Coal, Inc., 282 B.R. 140 (Bankr. D.Del. 2002) ............................................ 5,6,8

In re DVI Inc., No. 03-12656 MFW, Civ. A. 04-170 JJF,
   2004 WL 1498593 (D.Del. June 23, 2004) ............................................................ 6

Davox Corp. v. Digital Sys. Int'l, 846 F. Supp. 144 (D. Mass. 1993) ...................................... 7,9

E.E.O.C. v. University of Pennsylvania, 850 F.2d 969 (3d Cir. 1988) .......................................... 8

In re Emerson Radio Corp., 52 F.3d 50 (3d Cir. 1995) .............................................................. 6

Ferens v. John Deere Co., 494 U.S. 516 (1990) ...................................................................... 7,9

Filler v. Lernout, 2002 WL 227079 (D.Del. Feb. 8, 2002) ...................................................... 3,7,8

HLI Creditor Trust v. Keller Rigging Constr. (In re Hayes
   Lemmerz Int'l.), 2004 WL 1673061 (Bankr. D.Del. July 20, 2004) ............................... 6

Jumara v. State Farm Ins. Co., 55 F.3d 873 (3d Cir. 1995) ....................................................... 6

In re Lernout & Hauspie Securities Litigation, No. 02-10304 (D. Mass. Aug. 19, 2002) ............. 2

In re Lernout & Hauspie Securities Litigation, No. 02-10304 (D. Mass. Nov. 18, 2002) ............. 2

Nisselson v. Lernout, No. 03-10843 (D. Mass. Aug. 9, 2004) ................................................... 2

PSA, Inc. v. Puerto Rico Telephone Company, Inc. (In Re PSA,
   Inc.), Civil Action No. 02-1495-KAJ, Jordan, J. (D. Del. July 8, 2003) ........................... 8

Pursuit Athletic Footwear, Inc. v. Save Power Ltd., No. Civ. A. 96-40-MMS,
   1996 WL 328596 (D.Del. June 7, 1996) ........................................................ 8,9,10

In re Thomson McKinnon Sec. Inc., 126 B.R. 833 (Bankr. S.D.N.Y. 1991) ............................... 5

Van Dusen v. Barrack, 376 U.S. 612 (1964) ............................................................................ 7

TMH/103194-0002/1046033/1

## Statutes & Rules

28 U.S.C. § 1404 .................................................................................................................... 6,7

28 U.S.C. § 1404(a) ............................................................................................................. 1,7

28 U.S.C. § 1412 .................................................................................................................. 1,5

Fed. Bankr. R. 7087 ............................................................................................................. 1,5

TMH/103194-0002/1046033/1

Defendant KPMG LLP ("KPMG US") respectfully submits this memorandum of law in support of its motion to transfer this action from the United States Bankruptcy Court for the District of Delaware to the United States District Court of Massachusetts (the "Massachusetts District Court") pursuant to 28 U.S.C. Sections 1404(a) and 1412 and Federal Rule of Bankruptcy Procedure 7087.[1]

## SUMMARY OF THE ARGUMENT

The Litigation Trustee of Lernout & Hauspie Speech Products N.V. ("L&H") Litigation Trust (the "Plaintiff" or the "L&H Litigation Trust") has commenced this adversary proceeding against Klynfeld Peat Marwick Goerdeler Bedrijfrevisoren ("KPMG Belgium") and KPMG US in this Court under 28 U.S.C. Section 1334(b). (Compl. ¶ 19.)[2] Plaintiff is the post-confirmation successor-in-interest to L&H created by a confirmed plan of reorganization for L&H, a Belgian Company with U.S. offices in Massachusetts. (Compl. ¶ 26.) Plaintiff brings this action standing in the shoes of L&H and alleges various Massachusetts state law claims against KPMG US and KPMG Belgium.

The gravamen of Plaintiff's Complaint is that L&H's management (the so-called "Breaching Managers") falsely inflated the Company's revenues and earnings, with the alleged assistance of KPMG Belgium and KPMG US. Plaintiff alleges that, as a result of the alleged fraud by the Breaching Managers, L&H incurred $340 million in debt that it could not repay in connection with its acquisition of two companies, namely Dragon Systems, Inc. ("Dragon") and

---

[1] Pursuant to the parties' agreement set forth in a letter dated September 30, 2004, KPMG US's time to move to dismiss or otherwise respond to the Complaint has been extended until forty-five (45) days after KPMG Belgium has been served with the Complaint in order to permit a coordinated briefing schedule. This transfer motion is made without waiver of or prejudice to any and all defenses, including those set forth in Fed. R. Civ. P. 12(b). A copy of the September 30, 2004 letter is attached hereto as Exhibit A to the accompanying Declaration of Douglas N. Candeub (the "Candeub Decl." or "Candeub Declaration").

[2] Citations hereto to the Complaint are in the form "Compl. ¶ ___."

Dictaphone Corporation ("Dictaphone").  Plaintiff also alleges that "Massachusetts [is] the 'center of gravity'" of the alleged misconduct at issue.  (Compl. ¶ 97.)

Virtually all of the factual and legal issues surrounding Plaintiff's claims against KPMG US and KPMG Belgium have been the subject of litigation pending for several years in the Massachusetts District Court. (Saris J.)  Judge Saris has presided over six different cases naming KPMG US and KPMG Belgium and has issued numerous written opinions, some extremely lengthy.[3]  These cases concern the exact same issues presented here -- for example, the factual issues surrounding the collapse of L&H, the analysis of alleged misrepresentations related to the Dictaphone and Dragon transactions, the role of, and services performed by, KPMG Belgium and KPMG US, the discovery and jurisdictional issues related to KPMG Belgium, third-party discovery of literally hundreds of persons and entities who have relevant information regarding the collapse of L&H, as well as scores of other factual and legal issues.  Given the Massachusetts District Court's familiarity with matters related to L&H's collapse, numerous cases filed elsewhere have previously been transferred to the Massachusetts District Court, including cases related to L&H's acquisition of Dictaphone and Dragon that were originally filed in the District Court in Delaware.  In addition, the causes of action alleged will each require the application of Massachusetts state law, with which the Massachusetts District Court is well-versed.

For these reasons, and those set forth below, KPMG US respectfully requests that this case be transferred to the Massachusetts District Court.

## NATURE AND STAGE OF PROCEEDINGS

The L&H Litigation Trust filed this action on August 2, 2004, and named two

---

[3] See, e.g., Nisselson v. Lernout, No. 03-10843 (D. Mass. Aug. 9, 2004); In re Lernout & Hauspie Securities Litigation, No. 02-10304 (D. Mass. Nov. 18, 2002); In re Lernout & Hauspie Securities Litigation, No. 02-10304 (D. Mass. Aug. 19, 2002).  In addition to the decisions by Judge Saris, Magistrate Judge Collings has rendered opinions on numerous discovery motions, involving issues that would be duplicative of those that may arise in this case (such as the applicability of the Belgium secrecy laws to KPMG Belgium's documents and the date-cut off applicable to discoverable documents).

2

defendants, KPMG US and KPMG Belgium. KPMG US and KPMG Belgium are scheduled to respond to the Complaint on November 15, 2004. No proceedings with respect to the case have occurred to date.

Plaintiff asserts three claims against KPMG US and KPMG Belgium: (1) Violation of Mass. Gen. L.C. 93A; (2) aiding and abetting breach of fiduciary duties owed by L&H's management; and (3) malpractice.

## STATEMENT OF FACTS

### A.    The Actions Pending in the Massachusetts District Court

Since 2000, a series of cases (including the first-filed case) alleging substantially similar facts and legal theories have been brought against L&H directors and officers, KPMG Belgium, KPMG US and others in the Massachusetts District Court (or have been transferred to Massachusetts) (collectively, the "Massachusetts Actions").[4] Indeed, Plaintiff in this case has taken portions of the complaints in the Massachusetts Actions and re-alleged them here. Plaintiff has also asserted a claim under Massachusetts statutory law, specifically Mass. Gen. L.C. 93A.

Four cases involving the Dragon and Dictaphone transactions, which are at the heart of the instant action, previously transferred from the District of Delaware to the Massachusetts District Court (collectively, the "Transaction Cases").[5] Many of the witnesses (both parties and

---

[4] KPMG US and KPMG Belgium have been named as defendants in the following L&H-related actions currently pending in Massachusetts (collectively, the "Massachusetts Actions"): (1) a consolidated class action entitled In re Lernout & Hauspie Securities Litigation, No. 00-CV-11589 (PBS); (2) four separate actions brought by former shareholders of Dragon and Dictaphone, see infra.; and (3) an action entitled Nisselson v. Lernout et al., No. Civ. A. 03-10843 (PBS), commenced by the Litigation Trustee of the Litigation Trust of Dictaphone (which had also filed for Chapter 11 bankruptcy in Delaware).

[5] The Transaction Cases transferred from the District of Delaware to the District of Massachusetts are: Filler v. Lernout, et al., Case No. 02-10302 (D. Mass.) (originally Case No. 01-191-SLR); Stonington Partners v. Dammekens, et al., Case No. 02-10303 (D. Mass.) (originally Case No. 01-298-SLR); Paul G. Bamberg Trust v. KPMG LLP, et al., Case No. 02-10304 (D. Mass.) (originally Case No. 01-379-SLR); and Baker v. KPMG LLP, et al., Case No. 02-10305 (D. Mass.). The decision transferring the four actions that were filed in Delaware to Massachusetts is reported at Filler v. Lernout, 2002 WL 227079 (D.Del. Feb. 8, 2002). A copy of the court's opinion is attached hereto as Exhibit B to the Candeub Declaration.

3

non-parties) and document discovery in the Massachusetts Actions and Transaction Cases will be the same in this case. Moreover, the Breaching Managers, whom KPMG US and KPMG Belgium allegedly assisted in allegedly breaching their fiduciary duties to L&H, are defendants in the Massachusetts Actions and depositions of those witnesses (among other witnesses who would overlap with those in this case) have been noticed to take place in Massachusetts.

The Massachusetts District Court has already overseen substantial motion practice both on the merits and on discovery issues of the Massachusetts Actions, which have been consolidated for pre-trial purposes. All of the Massachusetts Actions are pending before one judge, and a federal Magistrate Judge in Massachusetts has been assigned to oversee the discovery process and any disputes that may arise.

The factual allegations and legal theories in the Complaint are virtually identical to those in the Massachusetts Actions.[6] The Massachusetts Actions are based upon the same allegations of improper revenue recognition practices at L&H, pertain to the same 1998 and 1999 L&H financial statements, quote the same documents and make the same allegation that KPMG US and KPMG Belgium actively participated in L&H's improper recognition of revenue.[7]

---

[6] Plaintiff's Complaint, along with the complaints filed in the In re L&H Securities Litigation, Stonington, Filler, Baker and Bamberg actions are attached hereto as Exhibits C-1, C-2, C-3, C-4, C-5 and C-6 respectively to the Candeub Declaration.

[7] Notice, for example, the similarities in Plaintiff's allegations referencing U.S. GAAP (Compare Compl. ¶¶ 18, 46, 70, 97 and 106 with Stonington Compl. ¶¶ 315-28; Filler Compl. ¶¶ 6, 69-73; Bamberg Compl. ¶¶ 84-92; Baker Compl. ¶¶ 3-10, 86-95; Class Compl. ¶¶12, 353-386); Plaintiff's allegations referencing a series of articles published in The Wall Street Journal (Compare Compl. ¶¶ 58, 78, 81, 93, 102, 112 and 120 with Stonington Compl. ¶¶ 6, 179, 222, 226, 310; Filler Compl. ¶¶ 5, 95, 99, 150; Bamberg Compl. ¶¶ 171, 368, 369; Baker Compl. ¶¶ 191, 192, 196, 199, 211, 239, 241, 242, 246-51, 254, 255, 260, 266, 285, 304, 314, 324, 369; Class Compl. ¶¶ 8, 413, 422, 424); Plaintiff's allegations referencing KPMG Belgium's certification of L&H's financial statements at issue (Compare Compl. ¶¶ 46, 60, 69-82, 85, 87, 92, 94, 97, 101, 103, 106, 113 and 121 with Stonington Compl. ¶ 3; Filler Compl. ¶¶ 143, 187; Bamberg Compl. ¶ 8; Baker Compl. ¶¶ 3, 297; Class Compl. 44, 235, 236, 243, 525); and Plaintiff's allegations referencing various purported communications between representatives of L&H and representatives of KPMG US or KPMG Belgium. (Compare Compl. ¶¶ 44, 45, 47, 48, 50, 51, 54, 57, 61, 63-65, and 75 with Stonington Compl. ¶¶ 155, 166, 172, 180, 266; Filler Compl. ¶ 67, 147, 148, 150; Bamberg Compl. ¶¶ 163, 164, 172; Baker Compl. ¶¶ 123-30; Class Compl. ¶¶ 259, 262, 266, 275, 291); and Plaintiff's allegations referencing various purported communications between representatives of L&H and representatives of KPMG US or

4

**B.**    **Discovery and Scheduling in the Massachusetts Actions**

The parties in the Massachusetts Actions have served extensive discovery requests on each other, including document requests, interrogatories and requests for admission. These requests cover information and documents related to the alleged fraud at L&H and L&H's resulting collapse and include all aspects of L&H's acquisition of Dragon and Dictaphone. All of these subjects are expected to be the subject of discovery in this case. In addition, the parties in the Massachusetts Actions have engaged in extensive motion practice before the Massachusetts District Court. As a result, the Massachusetts District Court is already intimately familiar with discovery and other issues that will, to the extent this action proceeds, be germane to the case.

## LEGAL STANDARD

Federal Bankruptcy Rule 7087 provides that this Court "may transfer an adversary proceeding . . . to another district court pursuant to 28 U.S.C. § 1412." Fed. Bankr. R. Pro. 7087. Pursuant to 28 U.S.C. Section 1412, a case may be transferred to a district court for another district, in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412; see, e.g., In re Centennial Coal, Inc., 282 B.R. 140, 144 (Bankr. D.Del. 2002) (bankruptcy court transferred adversary proceeding to District Court for Western District of Kentucky); In re Thomson McKinnon Sec. Inc., 126 B.R. 833, 835 (Bankr. S.D.N.Y. 1991); In re A.R.E. Mfg. Co., Inc., 124 B.R. 912 (Bankr. M.D. Fla. 1991). Similarly, 28 U.S.C. Section 1404 reflects the fact that transfer is appropriate "[f]or the convenience of parties and witnesses, in the interest of justice."[8]

---

KPMG Belgium (Compare Compl. ¶¶ 44, 45, 47, 48, 50, 51, 54, 57, 61, 63-65, and 75 with Stonington Compl. ¶¶ 155. 166, 172, 180, 266; Filler Compl. ¶ 67, 147, 148, 150; Bamberg Compl. ¶¶ 163, 164, 172; Baker Compl. ¶¶ 123-30; Class Compl. ¶¶ 259, 262, 266, 275, 291).
    [8] "In the Third Circuit, the considerations used to determine whether a transfer is appropriate are the same

5

In determining whether transfer is appropriate, courts consider all relevant factors in determining whether transfer of the litigation will proceed more conveniently and will better serve the interests of justice. See, e.g., Jumara v. State Farm Ins. Co., 55 F.3d 873, 878 (3d Cir. 1995). These factors include: (1) plaintiff's choice of forum, (2) defendant's forum preference, (3) whether the claim arose elsewhere, (4) the location of books and records and/or the possibility of viewing premises if applicable, (5) the convenience of the parties as indicated by their relative physical and financial condition, (6) the convenience of the witnesses – especially to the extent that the witnesses may actually be unavailable for trial in one of the fora, (7) the enforceability of the judgment, (8) practical considerations that would make the trial easy, expeditious or inexpensive, (9) the relative administrative difficulty in the two fora resulting from congestion of the court's dockets, (10) the public policies of the fora, (11) the familiarity of the judge with the applicable state law, and (12) the local interest in deciding local controversies at home. See HLI Creditor Trust v. Keller Rigging Constr. (In re Hayes Lemmerz Int'l.), 2004 WL 1673061, at *1 (Bankr. D.Del. July 20, 2004); Centennial Coal, 282 B.R. at 144; see also Jumara, 55 F.3d at 879-80 (describing the first six factors as "private interests" and the latter six factors as "public interests").

## ARGUMENT

### THIS ACTION SHOULD BE TRANSFERRED
### TO THE MASSACHUSETTS DISTRICT COURT

Transfer of this action to the Massachusetts District Court would serve the "interest of justice" and the "convenience of the witnesses and parties" for the following reasons:

    1.     As an initial matter, the factual and legal overlap between the L&H Litigation

---

under either Section 1404(a) or Section 1412, . . . with the exception that Section 1412 does not require that the action could have been brought in the transferee district." In re DVI Inc., No. 03-12656 MFW, Civ. A. 04-170 JJF, 2004 WL 1498593, *2 (D.Del. June 23, 2004), citing In re Emerson Radio Corp., 52 F.3d 50, 55 (3d Cir. 1995).

6

Trust's Complaint and the complaints in the Massachusetts Actions are significant. The same alleged accounting fraud at a now-bankrupt Belgian company (L&H) giving rise to alleged misstatements in the Company's 1998 and 1999 financial statements is central to all of the cases. L&H's demise is alleged to be the proximate cause of the plaintiffs' harm in all of the cases. In addition, plaintiffs in each of these cases allege that KPMG US and KPMG Belgium provided substantial assistance to L&H in connection with such alleged misstatements. Under these circumstances, the documentary evidence, written discovery, fact depositions and other discovery will be largely identical.

2.    Courts have overwhelmingly adopted the view that it is most efficient if cases with substantially similar facts and legal theories are adjudicated in the same forum. See, e.g., Ferens v. John Deere Co., 494 U.S. 516, 531 (1990) ("We have made quite clear that '[t]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent.'" (citation omitted)); Davox Corp. v. Digital Sys. Int'l, 846 F. Supp. 144, 149 (D. Mass 1993). Transfer is favored where, as in this case, judicial resources will be conserved. See Van Dusen v. Barrack, 376 U.S. 612, 616 (1964).

3.    It was for these reasons that a number of cases originally commenced in districts outside of Massachusetts, namely Delaware and Pennsylvania,[9] were transferred to the Massachusetts District Court to promote judicial efficiency and consistency of results. Filler v. Lernout, 2002 WL 227079, at *2 (D.Del. Feb. 8, 2002) (transferring four Transaction Cases to

---

[9] The cases transferred to the Massachusetts District Court from the United States District Court for the Eastern District of Pennsylvania are: Maskaleris v. Lernout & Hauspie, Case No. 00-CV-12548-PBS (D. Mass.) (originally Case No. 00-CV-04019); Piven v. Lernout & Hauspie, Case No. 00-CV-12552-PBS (D. Mass.) (originally Case No. 00-CV-04047); Kofman v. Lernout & Hauspie, Case No. 00-CV-12561-PBS (D. Mass.) (originally Case No. 00-CV-04271); Cammann v. Lernout & Hauspie, Case No. 00-CV-12555-PBS (D. Mass.) (originally Case No. 00-CV-04890); Godfrey v. Lernout & Hauspie, Case No. 00-CV-12561-PBS (D. Mass.) (originally Case No. 00-CV-05009).

7

the Massachusetts District Court) (Candeub Decl. Ex. C). Additionally, because the first-filed

case related to this litigation was filed in the Massachusetts District Court, the Delaware District

Court concluded that subsequently filed actions involving the same parties and the same issues

should be transferred to the court in which the earlier filed action is pending. Id.; see also

E.E.O.C. v. University of Pennsylvania, 850 F.2d 969, 979 (3d Cir. 1988) (holding first-filed rule

"will usually be the norm, not the exception").

    4.    Although Plaintiff filed this action in bankruptcy court rather than district court,

the same reasons warrant transfer of this action to the Massachusetts District Court. The L&H

bankruptcy plan is now confirmed, and nothing in the Complaint requires resolution of issues

related to that Plan. See, e.g., In re Centennial Coal, Inc., 282 B.R. 140, 144-145 (Bankr. D.Del.

2002); PSA, Inc. v. Puerto Rico Telephone Company, Inc. (In Re PSA, Inc.), Civil Action No.

02-1495-KAJ, Jordan, J. (D. Del. July 8, 2003) ("The Bankruptcy plan in this case is now

confirmed. Therefore, Debtor's argument that the case should remain here because of the

bankruptcy proceedings is non-persuasive.") (Candeub Decl. Ex. E); Pursuit Athletic Footwear,

Inc. v. Save Power Ltd., No. Civ. A. 96-40-MMS, 1996 WL 328596, at *9-*10 (D. Del. June 7,

1996) (transferring venue due to the absence of connections with Delaware) (Candeub Decl. Ex.

F). In Nisselson v. Lernout et al., No. Civ. A. 03-10843 (PBS), the plaintiff, trustee of the

Dictaphone Litigation Trust, similarly alleged improper revenue recognition practices against

KPMG US and KPMG Belgium, among other defendants. However, because the only

connection to the Delaware forum in that case was the underlying bankruptcy action and the state

of incorporation of Dictaphone, plaintiff appropriately filed his action in the Massachusetts

District Court. Here, too, Plaintiff's claim is merely an attempt to liquidate a cause of action

having no connection with Delaware.

    5.    The allegations and claims asserted in the Complaint here underscore the

appropriateness of the resolution of the legal and factual issues by the Massachusetts District Court. The Complaint alleges that Massachusetts is "the center of gravity" of the alleged misconduct at issue here. (Compl. ¶ 97.) Additionally, the Complaint alleges that L&H's U.S. presence was in Massachusetts and that the alleged negligent "auditing functions" occurred in Boston. (Compl. ¶ 97.) Indeed, Plaintiff itself has invoked a Massachusetts consumer protection statute, namely Mass. Gen. L.C. 93A, and other claims requiring the application of Massachusetts state law.

6.    The claims asserted here relate to the same underlying transactions that are the subject of the cases that have been pending in the Massachusetts District Court. Because that court has already delved into, and will continue to delve into, factual and legal issues relating to the present action, judicial economy weighs in favor of transfer. See Ferens, 494 U.S. at 531; Davox Corp., 846 F. Supp. at 149. If these cases were to proceed in separate districts, duplicative discovery and motion practice would ensue, wasting valuable judicial resources by requiring multiple judges to become familiar with the underlying facts here. Moreover, the possibility of inconsistent rulings and results becomes more likely when multiple courts are adjudicating the same issues.

7.    Transfer of this action to the Massachusetts District Court would also be more convenient to the parties and witnesses involved. Because of the ongoing litigation in Massachusetts, discovery has been coordinated in one forum, preventing witnesses from being subjected to multiple depositions in multiple jurisdictions. In Pursuit Athletic Footwear, Inc., the District Court for the District of Delaware gave great weight to the convenience of witnesses in transferring an adversary proceeding to the Northern District of Texas. 1996 WL 328596, at *10. Because the only connection to Delaware was the underlying bankruptcy case, the court found transfer of the action appropriate. Id. at *6-7. Here, too, Plaintiff's choice of forum has

9

no direct relation to the operative, underlying facts of the case. In contrast, virtually all of the

factual and legal issues surrounding Plaintiff's claims against KPMG US and KPMG Belgium

have been the subject of litigation pending for several years in the Massachusetts District Court.

Accordingly, transfer of this action to Massachusetts will prove more convenient to the parties

and witnesses involved and preserve the precious judicial resources at stake.

## CONCLUSION

For all the foregoing reasons KPMG US respectfully requests that this Court enter an

Order transferring this action to the Massachusetts District Court.

Dated: October 4, 2004

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Brett D. Fallon (#2480)
Douglas N. Candeub (#4211)
222 Delaware Avenue, 10th Floor
Post Office Box 2306
Wilmington, Delaware 19899
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: bfallon@morrisjames.com
E-mail: dcandeub@morrisjames.com

Attorneys for KPMG LLP

OF COUNSEL:
Michael P. Carroll
Michael S. Flynn
Suong T. Nguyen
Julian J. Moore
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Facsimile: (212) 450-3800

10

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LERNOUT & HAUSPIE SPEECH | ) | Case No. 00-4398 (JHW) |
| PRODUCTS N.V., | ) | (Jointly Administered) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| SCOTT L. BAENA, LITIGATION TRUSTEE | ) | |
| OF THE LERNOUT & HAUSPIE SPEECH | ) | |
| PRODUCTS N.V. LITIGATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Pro. No. 04-54842 (JHW) |
| v. | ) | |
| | ) | |
| KPMG LLP and KLYNFELD PEAT MARWICK | ) | |
| GOERDELER BEDRIJFREVISOREN, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF DOUGLAS N. CANDEUB IN SUPPORT OF KPMG LLP's MOTION TO TRANSFER ACTION TO THE DISTRICT OF MASSACHUSETTS

Douglas N. Candeub, Esq., deposes and says:

1.    I am an attorney admitted to practice in this District and am an attorney at the law firm of Morris, James, Hitchens & Williams, counsel for KPMG LLP.  Based on my knowledge as counsel in this action, I submit this declaration in support of KPMG LLP's Motion to Transfer Action to the District of Massachusetts, pursuant to 28 U.S.C. Sections 1404(a) and 1412 and Federal Rule of Bankruptcy Procedure 7087 (the "KPMG LLP Motion").

2.    Attached are true and correct copies of the following documents:

TMH/103194-0002/1046035/1

| Document | Exhibit |
|---|---|
| Letter from S. Nguyen to R. Turken, dated September 30, 2004 | A |
| Filler v. Lernout, 2002 WL 227079 (D. Del. Feb. 8, 2002) | B |
| Baena v. KPMG LLP et al., Adv. Pro. No. 04-54842 (JHW), Complaint | C-1 |
| In re Lernout & Hauspie Securities Litigation, No. 00-CV-11589-PBS, Complaint | C-2 |
| Stonington Partners v. Dammekens, et al., No. 02-10303 (D. Mass.), Complaint | C-3 |
| Filler v. Lernout, et al., No. 02-10302 (D. Mass.), Complaint | C-4 |
| Baker v. KPMG LLP, et al., No. 02-10305 (D. Mass.), Complaint | C-5 |
| Paul G. Bamberg Trust v. KPMG LLP, et al., No. 02-10304 (D. Mass.), Complaint | C-6 |
| PSA, Inc. v. Puerto Rico Telephone Company, Inc. (In Re PSA, Inc.), Civil Action No. 02-1495-KAJ, Jordan, J. (D. Del. July 8, 2003) | D |
| Pursuit Athletic Footwear, Inc. v. Save Power Ltd., 1996 WL 328596 (D. Del. June 7, 1996) | E |

3.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true and correct.

By: _____

Douglas N. Candeub (#4211)

Dated:  Wilmington, Delaware
        October 4, 2004

2

**EXHIBIT A**

# DAVIS POLK & WARDWELL

| | | |
|---|---|---|
| 1300 I STREET. N.W.<br>WASHINGTON, D.C. 20005 | 450 LEXINGTON AVENUE<br>NEW YORK, N.Y. 10017<br>212 450 4000<br>FAX 212 450 3800 | MESSETURM<br>60308 FRANKFURT AM MAIN |
| 1800 EL CAMINO REAL<br>MENLO PARK, CA 94025 | | MARQUÉS DE LA ENSENADA, 2<br>28004 MADRID |
| 99 GRESHAM STREET<br>LONDON EC2V 7NG | WRITER'S DIRECT | 1-6-1 ROPPONGI<br>MINATO-KU, TOKYO 106-6033 |
| 15, AVENUE MATIGNON<br>75008 PARIS | 212 450 4309 | 3A CHATER ROAD<br>HONG KONG |

September 30, 2004


Re:  **Baena v. KPMG LLP et al.**

**BY FAX AND U.S. MAIL**
Robert W. Turken, Esq.
Bilzin Sumberg Baena Price & Axelrod LLP
2500 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, FL 33131-2336

Dear Bob:

We write to confirm our discussions today in which it was agreed as follows:

1.    On Monday, October 4, 2004, KPMG LLP ("KPMG US") will file its motion to transfer the above-reference matter to the United States District Court for the District of Massachusetts, where a number of L&H-related matters are currently pending before Judge Saris.

2.    You and the L&H Litigation Trust understand that the filing of the transfer motion by KPMG LLP is not, and should not be construed as, a waiver by KPMG US of any defenses to the claims asserted or any responses to the complaint and that all defenses and responses are expressly preserved, including any and all defenses set forth in Fed. R. Civ. P. 12(b). Accordingly, you agreed that the Litigation Trust will not assert or argue that KPMG US has waived any defenses as a result of the filing of the transfer motion.

3.    KPMG US's time to move to dismiss or otherwise respond to the L&H Litigation Trust Complaint dated August 2, 2004 (the "Complaint") is extended to forty-five (45) days after service of the Complaint on Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren ("KPMG Belgium"). You informed me on the call that KPMG Belgium had been served with the Complaint yesterday.

Robert W. Turken, Esq.                    2                    September 30, 2004

As stated previously, after you have reviewed the transfer motion, you will let us know during that week of October 4 whether or not the L&H Litigation Trust will be opposing transfer.

We would be happy to discuss any of the above with you.


Very truly yours,

Suong Nguyen

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d
2002 WL 227079 (D.Del.)
**(Cite as: 2002 WL 227079 (D.Del.))**

Page 1

▷
Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

Gary B. FILLER and Lawrence Perlman, Trustees of
the TRA Rights Trust,
Plaintiffs,
v.
Jo LERNOUT, Pol Hauspie, Gaston Bastiaens, Carl
Dammekens, Nico Willaert,
Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren,
and Paul Behets, Defendants.
STONINGTON PARTNERS, INC., Stonington
Capital Capital Appreciation 1994 Fund
L.P., Stonington Holdings, L.L.C., Plaintiffs,
v.
Carl DAMMEKENS, Klynveld Peat Marwick
Goerdeler Bedrijfsrevisoven, KPMG UK,
Paul Behets, KPMG International, KPMG LLP,
Corporations A-Z, John Does 1-50,
Defendants.
Paul G. BAMBERG, Robert Roth, Paul G. Bamberg
and Donald B. Fletcher, Jr., as
Trustees of the Paul G. Bamberg Trust u/a dated
8/18/89, as amended 10/20/93,
and Cherry F. Bamberg and Donald B. Fletcher, Jr.,
as Trustees of the Cherry F.
Bamberg Trust u/a dated 8/18/89, as amended
10/20/93, Plaintiffs,
v.
Jo LERNOUT, Pol Hauspie, Nico Willaert, Carl
Dammekens, Dirk Cauwelier, Fernand
Cloet, Jan Coene, Marc G.H. De Pauw, Hubert
Detremmerie, Roel Pieper, Rvd
Securities, N.V., Alex Vieux, Gerard Van Acker,
Bernard Vergnes, Francis
Vanderhoydonck, L & H Holding, N .V., L & H
Holding, III, Oldco, N.V., L & H
Investment Company, N.V., Leha, KPMG
International, KPMG LLP, KPMG UK and KPMG
Belgium, Defendants.
Janet BAKER and James Baker, Jkbaker LLC and
Jmbaker LLC, Plaintiffs,
v.
KPMG LLP, KPMG International, KPMG Belgium,
KPMG UK, Paul Behets, SG Cowen

Securities Corporation, Jo Lernout, Pol Hauspie, Carl
Dammekens, Nico Willaert,
Roel Pieper, and Corporations A-Z, and John Does 1-
50, Defendants.

**No. CIV.A.01-191-SLR, CIV.A.01-298-SLR,
CIV.A.01-379-SLR, CIV.A.01-380-SLR.**

Feb. 8, 2002.

MEMORANDUM ORDER

ROBINSON, District J.

I. INTRODUCTION

*1 Presently before the court are defendants' motions
[FN1] to transfer pursuant to 28 U.S.C. § 1404(a).
For the reasons that follow, the motions will be
granted.

> FN1. C.A. 01-379-SLR, D.I. 4; C.A. 01-
> 380-SLR, D.I. 66; C.A. 01-191- SLR, D.I.
> 29. In C.A. 01-298-SLR, defendant
> Klynveld moved to dismiss under the
> common-law doctrine of *forum non
> conveniens* contending that the proper forum
> is Belgium and that the matter should be
> dismissed. (D.I.37)

II. BACKGROUND

The above captioned actions arise from a series of
events related to security transactions involving
Lernout & Hauspie Speech Products N.V. ("L & H").
L & H is a global speech recognition software
company that offers products and services including
automatic speech recognition, text-to-speech, digital
speech and music compression and text-to-text
translation. (C.A.01-191-SLR, D.I.1, ¶ 1)

Plaintiffs Janet Baker and James Baker [FN2] were
majority owners of the shares of Dragon Systems,
Inc. ("Dragon"), then a leading worldwide supplier of
speech and language technology. L & H was a chief
competitor of Dragon. On June 7, 2000, the Bakers
purchased L & H [FN3] stock in an all-stock
transaction whereby Dragon was merged into a U.S.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 227079 (D.Del.)
(Cite as: 2002 WL 227079 (D.Del.))

Page 2

subsidiary of L & H, known as L & H Holdings USA, Inc.. This transaction occurred pursuant to an Agreement and Plan of Merger among the Bakers, L & H, L & H Holdings USA Inc., Dragon Systems, Inc., and certain other principal shareholders of Dragon, dated March 27, 2000.

FN2. Additional plaintiffs in C.A. 01-380-SLR are JK Baker LLC and JMBaker LLC. Plaintiffs claim damages, as a result of their exchange of their 51% interest in Dragon, worth hundreds of millions of dollars, for artificially inflated L & H stock.

FN3. Defendant is a Belgium corporation.

Plaintiffs Gary B. Filler and Lawrence Perlman [FN4] represent Seagate, a world leader in storage technology for Internet, business and consumer applications. Seagate designed, manufactured and marketed products for storage, retrieval and management of data on computer systems, including disc drives, disc drive components, tape drives and software. (C.A. No. 01-191-SLR, D.I.1, ¶ 1) Seagate [FN5] alleges it sold its nearly $170 million interest in Dragon for L & H stock as part of the Agreement outlined above.

FN4. Plaintiffs in C.A. No. 01-191-SLR, and trustees of the TRA Rights Trust.

FN5. Gary B. Filler and Lawrence Perlman, plaintiffs in C.A. 01-191, are the former Co-Chairman of the Board of Seagate and currently the Trustees of the TRA Rights Trust, the sole successor in interest to Seagate for and on behalf of the stockholders of Seagate with respect to any and all claims and causes of action possessed by Seagate arising out of, in connection with, or relating to Seagate's acquisition or ownership of shares of, or holdings in L & H.

Plaintiffs Stonington Partners, Inc, Stonington Capital Appreciation 1994 Fund L.P. and Stonington Holdings, L.L.C. [FN6] purchased L & H stock in a merger of Dictaphone Corporation into a subsidiary of L & H that was consummated in May 2000.

FN6. Plaintiffs in C.A. 01-298.

Plaintiffs Paul F. Bamberg, Donald B. Fletcher, Jr., Donald B. Fletcher, J. and Cherry F. Bamberg and Donald B. Fletcher, Jr. [FN7] were shareholders of Dragon.

FN7. Plaintiffs in C.A. 01-379.

In November, 2000, L & H announced it would have to restate its financial statements for 1998, 1999 and the first half of 2000 because of accounting irregularities. (C.A.01-380-SLR, D.I.1, ¶ 4) Subsequently, L & H filed for bankruptcy protection in the United States and Belgium, the NASDAQ Exchange delisted L & H stock and investigations followed. A wave of securities fraud actions followed brought by shareholders of L & H against, *inter alia*, L & H officers and directors, L & H auditors, and various investment bankers. (C.A.01-380, D.I.66)

Essentially, all of the above captioned plaintiffs assert L & H engaged in fraudulent transactions and accounting practices that enabled L & H to artificially inflate its revenues, earnings and the value of its stock. Similar lawsuits were first instituted in the United States District Court for the District of Massachusetts, *In re Lernout & Hauspie Securities Litigation*, Civil Action No. 00-CV-11589-PBS. [FN8]

FN8. The class action complaint was filed on August 4, 2000. C.A. No. 01-380-SLR (D.I.69, Ex. A). It was subsequently consolidated with other cases in the District of Massachusetts as well as the Eastern District of Pennsylvania. *Id.* at Ex. D.

III. DISCUSSION

*2 More than fifty years ago, the Third Circuit Court of Appeals adopted the "first-filed rule" where "[i]n all cases of federal concurrent jurisdiction the court which first had possession of the subject must decide it." *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3d Cir.1941) (quoting *Smith v. McIver*, 22 U.S. (9 Wheat.) 532 (1824)). Consequently, the second filed action should be stayed or transferred to the

Not Reported in F.Supp.2d
2002 WL 227079 (D.Del.)
**(Cite as: 2002 WL 227079 (D.Del.))**

Page 3

court where the first filed action is pending. *Peregrine Corp. v. Peregrine Indus., Inc.,* 769 F.Supp. 169, 171 (E.D. Pa 1991); *Dippold-Harmon Enterprises, Inc. v. Lowe's Companies, Inc.,* Civil Action No. 01-532-GMS, 2001 WL 1414868 (D.Del.2001). The rule "encourages sound judicial administration and promotes comity among federal courts of equal rank." *E.E.O.C. v. University of Pennsylvania,* 850 F.2d 969, 971 (3d Cir.1988). The decision to transfer or stay the second action is within the discretion of the trial court. *Id.,* at 972, 977. However,

> invocation of the rule will usually be the norm, not the exception. Courts must be presented with exceptional circumstances before exercising their discretion to depart from the first-filed rule.

*Id.* at 979.

The court finds the four cases involve the same set of facts, although not necessarily the same claims as those pending in the United States District Court for the District of Massachusetts. Since the shareholder actions in Massachusetts were filed first, transfer of these subsequently filed Delaware actions will promote judicial administration and consistency of results.

IV. CONCLUSION

For the reasons stated, at Wilmington, this 8th day of February, 2002, IT IS ORDERED that:

1. The motions to transfer [FN9] are granted.

> FN9. C.A. 01-379-SLR, D.I. 4; C.A. 01-380-SLR, D.I. 66; C.A. 01-191- SLR, D.I. 29; 01-298-SLR D.I. 37.

2. The above-captioned actions shall be transferred to the United States District Court for the District of Massachusetts.

2002 WL 227079 (D.Del.)

Motions, Pleadings and Filings (Back to top)

*     1:01CV00379    (Docket)
(Jun. 06, 2001)

*     1:01CV00380    (Docket)
(Jun. 06, 2001)

*     1:01CV00298    (Docket)
(May. 04, 2001)

*     1:01CV00191    (Docket)
(Mar. 26, 2001)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT C-1**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| LERNOUT & HAUSPIE SPEECH PRODUCTS N.V., et al., | Case No. 00-04397 (JHW) Through 00-04399 (JHW) (Jointly Administered) |
| Debtor. | |
| SCOTT L. BAENA, LITIGATION TRUSTEE OF THE LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. LITIGATION TRUST, | |
| Plaintiff, | |
| v. | Ad. Proc. No. ___04___ 1 4 4 2 ( |
| KPMG LLP and KLYNVELD PEAT MARWICK GOERDELER BEDRIJFSREVISOREN, | |
| Defendants. | |

### COMPLAINT

Plaintiff, Scott L. Baena, Litigation Trustee of the Lernout & Hauspie Speech Products, N.V. Litigation Trust, sues Defendants, KPMG LLP ("KPMG US") and KLYNVELD PEAT MARWICK GOERDELER BEDRIJFSREVISOREN ("KPMG Belgium"), and alleges: ·

### INTRODUCTION

1.    This is an action for damages arising from accounting irregularities and misstatements of revenues that, in relative terms, exceed in severity and degree the accounting problems found in much more publicized corporate failures such as Enron and WorldCom.

\75543\21123\ # 681188 v 5

2.    Lernout & Hauspie Speech Products, N.V. ("L&H" or the "Company") was an international software technology enterprise whose business was centered on the burgeoning field of speech recognition systems. Between 1995, when it completed its initial public offering and commenced trading on NASDAQ, through the summer of 2000, L&H projected the appearance of a true market leader with seemingly limitless potential.

3.    L&H's reported revenues showed more than a 100% increase between 1997 and 1998 and another 60% increase between 1998 and 1999. Its operational and financial growth as reflected in its public filings attracted investors on both sides of the Atlantic and included such technology powerhouses as Microsoft, Dell and Intel. By March 2000, L&H's stock price had climbed to more than $70 per share, resulting in a market capitalization in excess of $8 billion.

4.    The reality, however, was that the highly touted technological and financial accomplishments that fueled L&H's explosive growth did not exist; they were the product of a systematic and elaborate program of misstatement and overstatement of Company revenue.

5.    The discovery of these misstatements and overstatements first began in August 2000 and ultimately resulted in (i) the dramatic plunge of the price of L&H's stock to little more than $1 per share, (ii) the restatement of L&H's revenues for 1998, 1999 and the first half of 2000 by more than $360 million (almost 50% of the Company's reported revenue for these periods), and (iii) the commencement by L&H of bankruptcy proceedings in November, 2000 that ended in the Company's liquidation.

6.    The improper recognition and reporting of revenue that helped spawn the Company's growth, and ultimately led to its demise, were implemented by certain members of L&H's management with the assistance, both direct and indirect, of its long-time accountants, KPMG US and KPMG Belgium.

7.    KPMG US and KPMG Belgium's assistance in L&H's improper recognition and reporting of its revenue was critical; it prevented the independent members of L&H's Board of Directors from being able to discover and correct the misstatements and allowed L&H to complete acquisitions that caused the Company to incur hundreds of millions of dollars of debt that the Company could not possibly repay.

8.    This action is brought to hold KPMG US and KPMG Belgium accountable for the hundreds of millions of dollars of damages suffered by the Company as a consequence of their actions.

## PLAINTIFF

9.    Plaintiff, Scott L. Baena, is the Litigation Trustee of the Lernout & Hauspie Speech Products, N.V. Litigation Trust.

10.    Plaintiff's position arose out of L&H's bankruptcy, commenced on November 29, 2000 by its filing of a voluntary petition in the United States Bankruptcy Court for the District of Delaware for relief under chapter 11 of title 11 of the United States Code.

11.    On March 31, 2001, the United States Trustee appointed an official committee of unsecured creditors (the "Committee") and, on May 30, 2003, the Bankruptcy Court entered an order confirming a plan of liquidation (the "Plan").

12.    The Plan vests authority to maintain and prosecute claims after its effective date with a litigation trustee appointed by the Committee.

13.    On April 2, 2004 (the "Effective Date"), the Plan became effective and the Committee appointed Plaintiff Scott L. Baena as the litigation trustee ("Plaintiff" or "Litigation Trustee").

14.     As of the Effective Date and in accordance with the terms of the Plan, Plaintiff as the Litigation Trustee assumed responsibility for the prosecution of all claims of L&H and was vested with all right, title and interest of L&H in those claims.

### DEFENDANTS

15.     Defendant KPMG US is a public accounting firm and a limited liability partnership organized under the laws of the state of Delaware.

16.     Defendant KPMG Belgium is a Belgian public accounting firm that has conducted business in the United States through its agents and affiliates.

17.     KPMG US and KPMG Belgium are both members of KPMG International ("KPMG"), a Swiss "Verein" or association. Each KPMG firm worldwide, including KPMG US and KPMG Belgium, is a member of KPMG, which markets itself and all of its member firms as a single entity.

18.     Since 1991, L&H was a global client of KPMG. As part of that engagement, both KPMG US and KPMG Belgium served as L&H's accountants and, among other things, issued unqualified reports on|L&H financial statements for 1998 and 1999 and ensured they were prepared in compliance with United States Generally Accepted Accounting Principles ("US GAAP") and Generally Accepted Auditing Standards ("US GAAS").

### JURISDICTION

19.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334

20.     This Court has in personam jurisdiction over KPMG Belgium because the claims asserted against it in this complaint arise out of the transaction of business in the United States

*Baena v. KPMG US*

by KPMG Belgium through its agents and affiliates causing injury by acts and omissions in the United States.

21.    Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## IMPROPER REVENUE RECOGNITION PRACTICES

22.    Prior to the L&H bankruptcy, various members of L&H's management (the "Breaching Managers") engaged in activities and practices that falsely and artificially inflated L&H's revenues and earnings. In so doing, they caused the Company to incur over $340 million of debt that L&H could never pay.

23.    The Breaching Managers routinely and improperly recorded revenues derived from, among other things, barter transactions, transactions without contracts, transactions with fictitious parties or parties whose ability perform was in doubt, transactions based on wholly contingent contracts, and loan transactions disguised as sales.

### Barter/Exchange Transaction.

24.    Accounting Principles Board Opinion No. 29 states that "an exchange of a product or property held for sale in the ordinary course of business for a product for property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange" does not culminate an earnings process, and that revenue may not be recognized.

25.    Notwithstanding this rule, the Breaching Managers repeatedly recorded revenue from barter or exchange transactions where no cash changed hands.

26.    The use of barter or exchange transactions was particularly common to L&H's United States operations, headquartered in Burlington Massachusetts. Indeed, a former L&H sales manager said barter/swap transactions were widespread at L&H Burlington and "a standard practice within the whole company."

*Baena v. KPMG US*

### Booking Revenue Without A Contract.

27.    Statement of Position ("SOP") 97-2 of the American Institute of Certified Public Accountants states that there must be persuasive evidence of an existing arrangement in order to recognize revenue and that "if the vendor has a customary business practice of utilizing written contracts, evidence of the arrangement is provided only by a contract signed by both parties."

28.    L&H's internal revenue recognition policy mirrored the requirements of SOP 97 and provided that L&H only recognizes revenue, *inter alia*, "upon the signing of the license agreement . . . when no contractual terms remain unsatisfied . . ."

29.    Again, notwithstanding the applicable accounting principles and Company policy, the Breaching Managers regularly and improperly recognized revenues where no contract was signed or where the terms of the contract were not finalized. In fact, they repeatedly booked sales even though negotiations were still ongoing, and the "customer" was under no binding obligation to purchase the product.

30.    For example, the Breaching Managers recorded $23 million in revenue for the last quarter of 1999 from purported licensing agreements between L&H and its affiliates on the one hand and Digital Sei-Young Ltd, Doshin Electronics, Co. Ltd., Neo Information Telecom Corp. and HI Worldwide, on the other hand. In fact, none of these purported contracts was executed, let alone completed, in 1999, and all of the $23 million of recorded revenue subsequently had to be reversed.

### Booking Revenues When Collectibility was in Doubt.

31.    SOP 97-2 also states that collectibility must be deemed to be probable in order for revenue to be recognized.

*Baena v. KPMG US*

32.    In addition to booking revenue before contract negotiations were finalized, the Breaching Managers repeatedly recorded sales when it was doubtful that the customer could pay for its products or services and, in many instances, even when the customer did not exist.

33.    Indeed, the Breaching Managers became so emboldened in their ability to recognize revenue from sham transactions that they made little effort to disguise fictitious customers. For example, the Breaching Managers recorded millions of dollars of revenue from transactions with numerous purported customers, all of which <u>coincidentally</u> were located at the same address in Singapore. Not surprisingly, all of these customers were later discovered to be fictitious, and all of the revenue recorded from the transactions was required to be reversed.

### Booking Revenues on Contingent Contracts and/or Prior to Delivery.

34.    SOP 97-2 further provides, <u>inter alia</u>, that fees under a software arrangement must be "fixed and determinable" before revenue can be recognized.

35.    Despite this rule, the Breaching Managers routinely recognized revenues from sales where delivery had not been completed or where other contingencies existed, such as the requirement that L&H later perform development work for the customer.

36.    For example, the Breaching Managers booked tens of millions of dollars of immediate revenue from license agreements with various purported language development companies ("LDC") and cross language development companies ("CLDC"), notwithstanding the fact that payments under these agreements were contingent on L&H itself doing all of the development work.

### Loan Transactions Disguised As Revenue.

*Baena v. KPMG US*

37.    Consistent with their practice of "manufacturing" transactions to artificially inflate revenues, the Breaching Managers also transformed loan agreements into purported sales agreements and, in the process, converted what should have been liabilities into revenues.

38.    This practice, which was common with the LDC's and CLDC's, is exemplified by L&H's contract with Capital Union, EC, an investment banker based in Bahrain, United Arab Emirates.

39.    On December 29, 1999, L&H entered into what purported to be an $8 million software license agreement with Capital Union which the Breaching Managers used to recognize the entire $8 million stated in the agreement as revenue in the fourth quarter of 1999.

40.    However, according to the terms of the "license agreement" and the supplements thereto, Capital Union was not intended to be the end-user of the licenses, but instead was to "sell" them to Belgian LDCs that L&H was to create for the purpose of purchasing the licenses.

41.    The newly created LDCs would then take the licenses and repay the $8 million Capital Union had advanced to L&H. In addition, L&H would pay Capital Union $1.25 million of interest as well as a "success fee" of $490,000.

42.    In the event that the sale of the licenses to the not-yet-existent LDCs did not materialize, L&H promised to pay Capital Union $9.25 million (the $8 million license fee and interest of $1.25 million).

43.    Here as well, all of the $8 million of "revenue" recorded from the transaction was later required to be reversed.

## KPMG'S ROLE

44.    At all times material to this complaint, Defendants KPMG US and KPMG Belgium provided substantial assistance to the Breaching Managers in their overstatements and misstatements of Company revenues.

45.    KPMG US and KPMG Belgium served as L&H's auditors and reviewed L&H's financial results at the end of each quarter.

46.    KPMG US was primarily responsible for L&H's compliance with United States Accounting Standards, and in particular US GAAP and US GAAS. Accordingly, whereas KPMG Belgium issued the certification of L&H's year-end financial statements, it only did so after receiving approval and authorization from KPMG US.

47.    As a result of providing audit and other services for L&H, KPMG US and KPMG Belgium personnel had continuous and unfettered access to, and knowledge of, L&H's confidential internal corporate, financial, operating and business information. They also had ample opportunity to observe and review L&H's business and accounting practices, to test L&H's internal and publicly reported financial statements, and to review L&H's internal controls.

48.    In a letter dated April 25, 2001 to the L&H Board of Directors, Jo Lernout, one of the founders of L&H, wrote:

> In the course of the past ten years, we built up a good working relationship with KPMG, and we relied extensively on the advice from numerous KPMG divisions in various countries as well as on the KPMG audit departments, in particular in Belgium and in the United States.
>
> As part of this relationship, all information which we deemed relevant was always communicated to KPMG. Often, they worked side-by-side with the company in the execution of transactions.

49.   In his letter to the L&H Board of Directors dated April 25, 2001, Lernout indicated that, "from the day we were quoted on the stock exchange on 12/1/95, we turned to KPMG for every decision of any significance."

50.   Indeed, according to Carl Dammekens, L&H's Chief Financial Officer, L&H consulted with KPMG US personnel on revenue recognition issues "almost daily, certainly weekly," and provided KPMG US with all US contracts over $100,000 and all contracts worldwide over $1 million. A procedure was put in place "so [KPMG US] would review [the contracts] quickly."

### Knowledge of False Revenue Recognition.

51.   KPMG US and KPMG Belgium's knowledge of L&H's misstatement of revenue is undeniable. For example, in an "URGENT" e-mail message dated October 18, 1999 from Oh Bum Kwon, a partner in KPMG's Korea office, to Stephan Huysman and William Van Arde of KPMG Belgium and Carl Dammenkens of L&H just weeks before the issuance of L&H's press release announcing third quarter financial results, Kwon wrote:

> We have just completed our fieldwork for the September closing of Bumil [L&H's Korea]. However, we have a critical revenue recognition issue as follows and, I want you to confirm this in your office as appropriate L&H responsible personnel.
>
> At 30 September 1999, L&H Korea ("Bumil") recognized the software revenue of approximately US$11M, the largest amount Bumil ever recorded. The sales were made to two unknown local software companies, VoiceTek (US$7M) and International Business Computer (U$4M), respectively, and I believe that Frederick's visit to Bumil last time was probably to review or record these transactions. Frederik [Deschodt's assistant controller at L&H] told the accountant of Bumil that this transaction was agree [sic] by KPMG at the Corporate level. I am surprised why he did not discussed [sic] with me when we met last time.
>
> We were not informed of the details of VoiceTek. Same to ICB. We know that VoiceTek was established in July this year in the

*Baena v. KPMG US*

minimum paid-in capital. We are not aware of anything on IBC. There are sales contracts dated 30 September 1999 with these new customers but there are no proper documents on the revenue generation schedule and condition. The contracts say that the sales is [sic] final and no refund is required and the localising expenses to be incurred will be charged to the customers additionally, etc. Furthermore, the receivable was factored with a local bank with a collateral of Bumil's bank deposit and we believe the factoring is "with recourse".

Because of this transaction at 30, September 1999, Bumil showed big profit, about, US$13M, in September while it had loss carryforward of approximately US$0.5M until the end of August.

Based on our understanding, I have several critical questions.

1. Why did Bumil recognized [sic] the whole amount in September? Per their explanation, the ultimate solution in Korean will take about five years to complete even though Bumil is not required to refund the contract amount. Therefore, at least, the revenue should be recognized over five years or more.

2. The revenue recognition basis under USGAAP (SOP91-1 and 97-2) should be carefully complied in this transaction. Because of its sensitive nature of the first consolidation with L&H, I recommend you should consult your SEC partner on this issue. My preliminary interpretation is that this revenue recognition has some problems particularly in terms of "when-and-if" available conditions, delivery of products, and collectibility.

As you know this issue should be cleared promptly to complete the consolidation, please discuss at Corporate level and advise me of the discussions. If it meets the requirements of SOP's, we may conclude the September closing and consolidation package of Bumil. (emphasis added).

Thanks in advance for your immediate action.

52.    Notwithstanding the fact that the transactions referred to in Kwon's e-mail were false, KPMG US and KPMG Belgium permitted L&H to report the transactions as revenue in the Company's financial results for the third quarter of 1999 and for the fiscal year ended December 31, 1999.

53.    Of course, Kwon's "preliminary interpretation" regarding the impropriety of recognizing the revenue was absolutely correct.   In fact, in connection with the subsequent investigation of L&H's revenue recognition practices following the revelation of L&H's misstatements and overstatements, the independent auditors commissioned by the Audit Committee of L&H's Board of Directors determined that the transactions with VoiceTek and ICB had to be reversed.   They also noted specifically that "KPMG was aware of the transaction" at the time it was originally recorded.

54.    KPMG US and KPMG Belgium also knew of serious issues surrounding the recognition of revenue in connection with the LDCs as early as July 1999. In a "private & confidential" letter dated July 29, 1999 from William Van Aerde of KPMG Belgium to Gaston Bastiaens, L&H's president and CEO, in Burlington Massachusetts, Van Aerde confirmed a meeting for September 1, 1999 including, among others, Robert McLamb and James Boyer, both of KPMG US, for the purposes of discussing the "Language Companies."   In particular, Van Aerde:

- wanted an update on the status, review of independence;

- required names of investors to arrange a separate meeting;

- wanted to review collectibility of the LDC receivables.

55.    The July 29, 1999 letter also indicated that Van Aerde wanted an "update on the status of all issues raised in the Report to the Audit Committee," the most important among them being "revenue recognition."

56.    Van Aerde's "questions" regarding the LDCs mirrored concerns that KPMG US also had raised, including whether the LDC investors were parties related to L&H. In fact, the "KPMG USA Professional Practice" group requested a "special review" of this issue in

connection with the review performed by KPMG Belgium on L&H's third quarter 1999 financial statements.

57.    In a series of e-mails dated between January 27 and January 29, 2000, KPMG US further documented the serious doubts they had concerning the validity of revenue transactions recorded by L&H in connection with the LDCs. For example, in a January 29, 2000 e-mail message from McLamb of KPMG US to Dammekens of L&H; and Van Aerde and Stephen Huysman of KPMG Belgium, McLamb wrote:

> It seems that a single payment of $25 million was paid to L&H Korea. The payment was for amounts owed to LHS (the group in total) by a number of LDC's. Who made this payment? We need to see the wire transfer or check and determine what bank account it came from. Why did the payment for several LDC's come from a single bank account? This makes it more important that we find out who the individual investors are for each of the LDC's. It is no longer acceptable for us to rely on an agent acting for a group of investors. When we find out the company or person that the $25 million payment came from we need to get KPMG Korea to find out about the Company or person. If the payment was made by a Company we need to know who the owners of the company are. This is very important.

McLamb correctly identified the source of the payment as "very important," but neither KPMG US nor KPMG Belgium ever determined the source of the payment.  Nevertheless, both KPMG US and KPMG Belgium permitted the revenue to be recognized.

58.    KPMG US and KPMG Belgium also knew of one of the most important facts that ultimately led to the uncovering of the revenue misstatements by The Wall Street Journal: that many of the LDCs had the exact same business address. In fact, further to additional inquiries initiated by KPMG US's McLamb, Huysman of KPMG Belgium wrote to Oh Bum Kwon of KPMG Korea and Phillip Lee of KPMG Singapore (with a copy to McLamb) asking:

> Oh Bum and Philip, in connection with yesterdays mail and urgent request to obtain additional information on the investors in the

LDC's (customers of L&H Singapore) and the Korean customers of Bumil, can you in the meantime report to KPMG Ghent what procedures you have already performed to satisfy yourself that these are all existing (live) organisations? We made this request before in mail and fax instructions. From Korea, we got a mail back of an interview with Mr. Lee from HI world. Have any others been visited or have you checked these companies registrations at an official filing system? Are there financial statements available at a central filing that allow to find out if these companies are in a position to pay the large sums of the contracts to L&H? Is there a way of finding out through their articles of association who the shareholders/directors are behind them? At the request of Jo Demario, with whom you met last week, could someone of your office go the official addresses of these customers to see if they appear proper companies/organisations. It may be worthwhile taking a picture of the location.

Oh Bum, I will also fax the names and phone numbers of 3 Korean individuals to you. We have been informed that these would be investors. Jo has asked that someone confirms [sic] that these people/phones exist. Do the addresses appear to be normal addresses considering the fact that these individuals should be relatively wealthy as investors?

Philip, we obtained through your people registration of four companies (customers) of L&H Asia. Can you send someone down to the address of these companies to see if they are operational and appear proper companies and not just a post office box. Here as well, you may have some pictures taken. Can you please confirm? If any other LDC's are located in Singapore, please perform the same procedures.

The above request is urgent and your prompt cooperation is appreciated. As you know, the client is putting together the investors list. We expect to get this by end of this week. We may need your offices early next week to perform additional work for this (meet with investors, check out companies or individuals etc). We will keep you informed. Meanwhile, please start to update us on the above. We will keep Jo and Bob informed of the progress.

59.    KPMG US and KPMG Belgium's inquiries were warranted. As the Audit Committee of L&H's Board of Directors determined following its later investigation, seventeen of the LDC's and CLDC's with which L&H signed license agreements in 1998 and 1999, shared

the exact same address in Singapore. These license agreements accounted for more than $50 million of the revenue recognized by L&H's during these periods

60.    Yet, despite this fact, and despite the fact that all of this revenue subsequently had to be reversed, KPMG US and KPMG Belgium sanctioned the inclusion of the full amount of LDC and CLDC revenue in L&H's 1998 and 1999 financial statements, and KPMG US authorized the publication of KPMG Belgium's certification of L&H's financial statements in L&H's public securities filings.

61.    In addition to its knowledge of L&H's improper revenue recognition, KPMG US and KPMG Belgium also had knowledge that the L&H accounting department was functionally inadequate.    In an e-mail message from Dammekens to McLamb dated May 3, 2000, Dammekens stated:

> I DO WANT TO BRING UP ANOTHER POINT - AM I CAPABLE OR [SIC] REMAINING CFO IN AN ORGNISATION LIKE THIS? PERSONALLY I DO NOT THINK SO.
>
> I AM CONVINCED THAT IT IS TIME TO BRING IN AN EXPERIENCED GUY, THAT CAN BRING STABILITY AND DISCIPLINE AND KNOWS HOW TO RUN THE FINANCES OF A BIG COMPANY (BECAUSE HE GREW UP IN ONE AND HAS DONE IT BEFORE).
>
> THINGS ARE GETTING OVER MY HEAD - I AM STAFFING UP MY PEOPLE, BUT WITH ALL THE DEALS/ACQUISITIONS THAT GO ON, I DO NOT HAVE TIME ENOUGH TO EVEN THINK ABOUT INTEGRATION OR ORGANISATION. (caps in original).

62.    Thus, KPMG US and KPMG Belgium were well aware that there was no "discipline" in the accounting department at L&H.  It was inexcusable for KPMG US and KPMG Belgium to authorize the issuance of unqualified audit opinions on the financial statements of a

publicly traded company reporting hundreds of millions of dollars of revenues prepared by an individual who admitted to them he was "over [his] head."

### Active Participation in Improper Recognition of Revenue.

63.     KPMG US and KPMG Belgium went far beyond simply turning a blind eye to the improper recognition of revenue; they instructed L&H how to "fix" contracts for inclusion in revenues reported to the public even though the contracts were not binding agreements at the time the revenues were recorded.

64.     In an e-mail dated January 5, 2000, five days <u>after</u> the end of L&H's 1999 fiscal year, KPMG US's McLamb sent Dammekens, the Chief Financial Officer of L&H, an attached memorandum entitled "COMMENTS ON CERTAIN DRAFT AGREEMENTS." The e-mail was copied to Glen Davison, another KPMG US auditor. According to the e-mail, McLamb had reviewed the "draft" agreements with Digital Sei-Young Ltd, Doshin Electronics, Co., Ltd., Neo Information Telecom,Corp. and HI Worldwide. He discussed a number of issues with respect to the contracts, each of which should have precluded, or limited substantially, the $23 million in revenue under these contracts which the Company wanted to recognize in the fourth quarter of 1999.

65.     With regard to the Digital Sei-Young contract, McLamb noted specific problem items including:

1.     The contract should be signed and dated by each party. Having just an effective date is unacceptable.

2.     Need to determine the financial viability of Digital to determine whether they have the financial ability to pay the $10 million.

3.     Need to see clear evidence of the delivery of the deliverables under each part of the contract.

[* * *]

7.    Under each part of the contract Digital is required to obtain L&H's approval for design of packaging and other artwork. *This is continuing involvement of L&H and causes a problem with revenue recognition.*

[* * *]

10.    *ArticleA.8.1 makes it possible for Digital to get its moneyback. . . .*

[* * *]

I have not looked into this further as I think that VSOE [Vendor Specific Objective Evidence] will not be established for each element and the entire $10 million would need to be amortized into income over the term of the agreement.

I also believe that the accounting is affected by the continuing involvement of L&H (see 7 above) and the royalties could be refunded under certain circumstances (see 10 above).

McLamb made similar comments about the Doshin and Neo Information contracts in his January, 2000 memorandum. With regard to the HI Worldwide contract, McLamb wrote that he had "previously reviewed this contract and given my comments to Carl [Dammekens]."

66.    Notwithstanding the myriad issues raised by McLamb in his January 5, 2000 email and accompanying memorandum, KPMG US and KPMG Belgium still permitted all the revenue from these contracts to be recognized in the fourth quarter of 1999.

67.    Each of the contracts was determined to be invalid during the subsequent Audit Commitment Investigation, and all of the revenue associated with the contracts was required to be reversed.

## KPMG's Certification of L&H's Financial Statements and the Acquisitions of Dragon and Dictaphone

68.    In March 2000, L&H entered into contracts to acquire Dictaphone Corp. ("Dictaphone") and Dragon Systems, Inc. ("Dragon"), United States corporations with language recognition capability.

*Baena v. KPMG US*

69.     On April 27, 2000, KPMG Belgium issued its certification of L&H's consolidated balance sheets and consolidated statements of operations for the fiscal years ending December 31, 1998 and December 31, 1999. It stated:

> LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. AND
> SUBSIDIARIES INDEPENDENT AUDITOR'S REPORT
>
> The Board of Directors and Shareholders
>
> Lernout & Hauspie Speech Products N.V.:
>
> We have audited the accompanying consolidated balance sheets of Lernout & Hauspie Speech Products N.V. and subsidiaries (the Company as of December 31, 1998 and December 31, 1999, and the related consolidated statements of operations, shareholders' equity, cash flows and comprehensive income (loss) for each of the years in the three year period ended December 31, 1999. These consolidated financial statements are the responsibility of the Company's management.   Our responsibility is to express an opinion on these consolidated financial statements based on our audits.
>
> We conducted our audits in accordance with generally accepted auditing standards in the United States.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.   An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provided a reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries of December 31, 1998 and December 31, 1999, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1999, in conformity with generally accepted accounting principles in the United States.
>
> Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren
> Brussels, Belgium
> April 27, 2000

\75543\21123\ # 681188 v 5                          18

70.    Because the audit was to be conducted in accordance with US GAAP and US GAAS, KPMG US was required to sign off and approve the certification before it could be issued and, in fact, did sign off and approve the certification.

71.    The issuance of the certification of L&H's financial statements was critical; without it L&H would not have been able to complete the acquisitions of Dictaphone and Dragon.

72.    Both of these acquisitions were funded with the currency of L&H's artificially inflated stock value that, in turn, was dependent on L&H's glowing financial statements for 1998 and 1999 – the same financial statements that were approved by KPMG US and certified by KPMG Belgium.

73.    In connection with and as a necessary consequence of the Dictaphone and Dragon acquisitions, L&H incurred more than $340 million in new debt.

74.    KPMG US and KPMG Belgium were well aware of the importance of L&H's operational results to the consummation of the Dictaphone and Dragon acquisitions; they also were well aware that the deals would not close if the overstatements and misstatements of L&H's revenue were revealed.

75.    KPMG US and KPMG Belgium also knew of the "dramatic" changes and risks that the Dictaphone and Dragon acquisitions presented to L&H. In fact, in an e-mail that KPMG US's McLamb wrote to various members of L&H's management on August 31, 2000, he observed:

> Lernout & Hauspie Speech Products N.V. (LHS) has grown rapidly during the five years of my involvement with the Company. Much of this growth has come through acquisitions, with each acquisition being larger than the previous one. With these acquisitions has come change, most of it good, but some bad.

However in the last six months we have seen the most dramatic growth and change. The acquisitions of Dictaphone and Dragon have resulted in a dramatic increase in the amount of revenues and debt of the Company, like it has never experienced in the past. In addition they have resulted in a significant increase in the number of products, employees, market expectations and skeptics. These acquisitions have brought with them opportunities and conflict. The opportunity to expand L&H's presence and penetration into a number of different markets. The conflicts include cultural issues, financial resources, personnel resources and cost reductions.

76.    Unfortunately, the ultimate discovery of L&H's revenue misstatements (representing almost half of L&H's reported revenue) that KPMG US and KPMG Belgium should have known was inevitable, never allowed L&H to realize any of the possible benefits from the Dictaphone and Dragon acquisitions.

77.    Instead, it left the Company saddled with $340 million of new debt incurred in connection with the acquisitions that it could not possibly repay. This debt together with the revelations of L&H's misstatements and overstatements of its revenue forced the Company into bankruptcy and ultimately liquidation.

## DISCOVERY OF THE MISSTATEMENTS OF REVENUE

### The August 8th *Wall Street Journal* Story.

78.    On August 8, 2000, The Wall Street Journal began reporting the results of inquiries it had initiated into L&H and its explosive growth. As would be revealed over the coming months, merely by asking a few questions of purported "customers," the Journal's reporters (based in Boston) were able to uncover the widespread overstatement of revenue that had been concealed by the Breaching Managers with the assistance of KPMG US and KPMG Belgium. The first Journal article on August 8, 2000 focused on L&H's Korean operations and reported that:

\75543\21123\ # 681188 v 5                    20

...[S]ome companies that L&H has identified as Korean customers say they do no business at all with L&H. Others say their purchases have been smaller than L&H says. L&H officials now acknowledge they made some mistaken initial representations about customers. But the company disputes other accounts given by some of the Korean companies, and it insists its Korean revenue figures are accurate.

[* * *]

In Korea, Mr. Bastiaens says L&H sells a range of products, including software licenses and automated phone switchboards that recognize voice commands. In May, while being questioned about the Asian sales by a reporter, he volunteered the names of about a dozen Korean customers. Later, the CEO provided ranges of the dollar amount of business done with those and some other customers. Subsequently, the company disclosed more names. In all, 18 of about 30 companies claimed by L&H as customers were contacted by this newspaper.

Three of the companies say they aren't, in fact, L&H customers. L&H says one of those was a former Bumil customer, and was mistakenly put on its list. Three more companies say their purchases from L&H over the past three quarters were smaller than figures provided by Mr. Bastiaens or Sam Cho, vice president of L&H Korea. One additional company says it is in a joint business with L&H that produces considerably less revenue than L&H claims. Officials from an eighth company initially said it had formed a joint venture with L&H and that the joint venture, not the company itself, had purchased products from L&H. Later, the company retracted this initial version.

[***]

Among the companies that L&H boasts as customers: Korea Securities Computer Corp., or Koscom, a government-regulated clearinghouse for stock trades. Mr. Bastiaens initially says L&H received revenue in the range of $5 million to $10 million (he wouldn't be more specific) from Koscom in the three quarters ended June 30. According to two Koscom officials, whose names were provided by L&H, Koscom and L&H are partners in an automated phone stock quote service. Korea Telecom collects the per call payment, keeps 10% and splits the rest between Koscom and L&H.

One of the Koscom officials estimated L&H and Bumil's share of the revenue at roughly $1.5 million in 1999. Told of the

discrepancy, L&H contradicts Mr. Bastiaens and puts the Koscom revenue in the range of $1 million to $5 million.

In a Dec. 28, 1999, press release, L&H said Samsung Securities, a big Korean brokerage, together with more than 14 other securities firms, had "selected L&H to develop client server solutions for online trading and automated dialogue systems." But two Samsung officials, including spokesman Shin Dong Woo, say their firm never made any purchases from L&H, although they discussed some.

[***]

L&H also claims LG Electronics as a customer. But Yu Won Uk, a senior research engineer at LG Electronics - a contact provided by L&H - says his company never bought products or licenses from L&H. Instead, he says the two firms briefly worked on joint project for applying voice recognition to television, but stopped because there "was no progress." LG Electronics paid L&H only "engineer charges," he says, akin to labor costs for L&H's share of the work on the failed project.

[***]

Another Korean company with which L&H says it has a significant relationship is Hung Chang Co., a maker of communications equipment. Mr. Bastiaens put revenue from Hung Chang in the range of $5 million and $10 million over the past three quarters.

However, Kim Ho Kyun, a Hung Chang official whom L&H identified as its contact, says Hung Chang wasn't using L&H products internally and that L&H's $5 million bill was paid by a joint venture called Spia, "not Hung Chang." Another Hung Chang official, Choi Sang Hyun, who was reached independently of L&H says Spia Co. was founded May 2, with Hung Chang as the largest shareholder, but June 28 L&H Korea became the largest, with Hung Chang holding 27.49%. Mr. Choi says Spia makes products based on L&H's voice recognition technology, and says Hung Chang is only a passive shareholder.

[***]

Mr. Bastiaens also identified Hyundai Securities and Hanvit Bank as providing revenue totaling between $5 million and $10 million. But at Hyundai Securities, two officials, including a contact provided by L&H, say their purchases amounted to just over $1

> million. At Hanvit Bank, Lee Jae Bong, manager of network management, says the only contract signed by its intuition tallied $150,000.

[Emphasis added.]

79.    Despite L&H's assertion that all Korean revenues were accurate, L&H then commissioned a mid-year interim audit of the company by KPMG, even though KPMG Belgium had certified L&H's financial statements less than four months earlier and KPMG US had authorized the inclusion of the certification in L&H's Form 10K less than two months earlier.

80.    On September 21, 2000, L&H issued a press release announcing an SEC investigation into L&H and reporting that its Audit Committee had initiated its own investigation of L&H's prior financial statements at the request of L&H's Board of Directors.

81.    On September 22 and 26, 2000, The Wall Street Journal published new articles that raised significant questions about L&H's Asian revenue. Specifically, the articles focused on the Singapore and Belgian startup LDC's that accounted for nearly all of L&H's Asian revenue reported in 1998 and 1999. The articles also raised concerns about the connection between the startup LDC's and an investment capital fund that was closely related to L&H.

82.    Significantly, the Belgian and Singapore LDC's that were the subject of the articles included the same LDC's that that shared the same address in Singapore that KPMG US and KPMG Belgium had scrutinized only a few months before. These, of course, were the LDC's whose investors and operations neither KPMG US nor KPMG Belgium ever verified, but whose $50 million plus of contract revenue KPMG US and KPMG Belgium nevertheless allowed to be in included in L&H's certified financial results.

**Admission of "Accounting Irregularities".**

*Baena v. KPMG US*

83.    On November 9, 2000, in the course of the L&H Audit Committee's investigation into the misstatements of revenue, L&H issued a press release announcing that as a result of past accounting "errors and irregularities" L&H would need to restate the most recent 2½ years of financial statements. Specifically, L&H announced:

> "[a]s a result of certain errors and irregularities identified in the audit committee inquiry, the Company expects to restate its financial statements for the periods 1998, 1999 and for the first half of 2000. Although the audit committee is working diligently to determine the impact of these discrepancies on L&H's financial statements for these periods, L&H does not expect the audit and necessary restatements to be completed by November 14, 2000. Accordingly, the Company does not believe that its Form 10-Q for the third quarter ended September 30, 2000 will be filed in a timely manner.

84.    In reaction, on November 9, 2000, both NASDAQ and EASDAQ suspended trading of L&H stock. Prior to the suspension, the price of L&H on the NASDAQ market fell as low as $6.2188. After trading finally resumed on December 8, 2000, the stock plummeted to $1.40 per share and continued its free fall to trade below $1 per share from December 12 to December 15, 2000.

85.    On November 15, 2000, KPMG withdrew its audit report of L&H's 1998 and 1999 financial results, stating that its prior audit opinions "should no longer be relied upon." This decision was based on the same information that was available to, and in many instances actually considered by, KPMG US and KPMG Belgium when the certification of L&H's financial statements was issued and then filed with the SEC less than six months earlier.

**The Audit Committee Report.**

86.    On November 20, 2000, the Audit Committee of L&H was presented with the report of the investigation that it had commissioned regarding L&H's revenue recognition practices. The report listed a host of accounting irregularities, related to the Company's 1998 and

1999 revenues, and concluded, in part, that L&H had improperly recorded as much as $277 million in revenue during 1998, 1999 and the first half of 2000.

87.    The initial calculation of L&H's misstatement of revenues in connection with the Audit Committee investigation was subsequently increased to $362,700,000, and was performed without any assistance of KPMG. In fact, notwithstanding that KPMG had served as the Company's auditors for ten years and had certified the Company's financial statements for 1998 and 1999, it refused to cooperate with the Audit Committee investigation and was not even willing to make its work papers available for the investigators to review.

### L&H's Bankruptcy

88.    On November 29, 2000, nine days after the Audit Committee report, L&H was forced to file for Chapter 11 Bankruptcy protection in the United States Bankruptcy Court for the District of Delaware

89.    It soon became evident that L&H could not be reorganized and, as a result, a Plan of Liquidation of the Company was proposed to, and confirmed by, the Bankruptcy Court. Based on projections included in the Plan Disclosure Statement, distributions to unsecured creditors of L&H were estimated to be approximately 4½ cents on the dollar.

### COUNT I

### (Violation of Mss. Gen. L.C. 93A by KPMG US)

90.    The Liquidating Trustee realleges paragraphs 1 through 89, above as it set forth herein at length.

91.    KPMG US undertook to provide L&H accounting services for which KPMG US received compensation.

92.    The conduct of KPMG US that culminated in its approval and authorization of the certification of L&H's financial statements allowed the acquisitions of Dictaphone and Dragon to be completed by enabling the Breaching Managers to conceal their overstatements and misstatements of L&H's revenue from the independent directors on the Audit Committee as well as from Dictaphone and Dragon until well after the closings of these transactions.

93.    As demonstrated by the prompt actions the Audit Committee undertook to investigate and correct the misstatements and overstatements of revenue after they were revealed by The Wall Street Journal reports, the independent directors could, and would, have prevented the dissemination of the false financial information that was necessary to close the Dictaphone and Dragon acquisitions.

94.    If the true financial condition of L&H had been revealed, either by corrected financial statements or by the refusal of KPMG US to approve and authorize KPMG Belgium to certify the false financial statements, neither acquisition would have closed.

95.    The conduct of KPMG US described in this complaint constituted unfair and/or deceptive acts or practices in violation of Mass. Gen L.C. 93A § 2.

96.    As a result of KPMG US's use or employment of the aforementioned unfair and/or deceptive act or practice, L&H has suffered substantial damages, including but not limited to, the incurrence of over $340 million of debts that L&H could not possibly repay.

97.    The facts alleged in this complaint, including specifically the fact that KPMG US authorized KPMG Belgium to certify L&H's financial statements as complying with US GAAP and US GAAS, the fact that L&H's United States headquarters were located in Burlington, Massachusetts, and the fact that KPMG US performed its audit functions primarily out of its

Boston office, establishes Massachusetts as the "center of gravity" of the conduct of KPMG US giving rise to this action.

98.     WHEREFORE, Plaintiff demands judgment against KPMG US for damages in excess of 340 million, plus interest, cost and all other relief that the Court deems just and proper.

## COUNT II

### (Violation of Mss. Gen. L.C. 93A by KPMG Belgium)

99.     The Liquidating Trustee realleges paragraphs 1 through 89, above as it set forth herein at length.

100.     KPMG Belgium undertook to provide L&H accounting services for which KPMG Belgium received compensation.

101.     The conduct of KPMG Belgium, culminating in its certification of L&H's financial statements, allowed the acquisitions of Dictaphone and Dragon to be completed by enabling the Breaching Managers to conceal their overstatements and misstatements of L&H's revenue from the independent directors on the Audit Committee as well as from Dictaphone and Dragon until well after the closings of these transactions.

102.     As demonstrated by the prompt actions that the Audit Committee undertook to investigate and correct the misstatements and overstatements of revenue after they were revealed by The Wall Street Journal reports, the independent directors could, and would, have prevented the dissemination of the false financial information that were integral to the Dictaphone and Dragon acquisitions.

103.     If the true financial condition of L&H had been revealed, either by corrected financial statements or by the refusal of KPMG Belgium to certify the false financial statements, neither acquisition would have closed.

\75543\21123\ # 681188 v 5                              27

104.     The conduct of KPMG Belgium described in this complaint constituted unfair and/or deceptive acts or practices in violation of Mass. Gen L.C. 93A § 2.

105.     As a result of KPMG Belgium's use or employment of the aforementioned unfair and/or deceptive act or practice, L&H has suffered substantial damages, including but not limited to, the incurrence of over $340 million of debts that L&H could not possibly repay.

106.     The combination of the facts alleged above, including specifically the fact that KPMG Belgium certified L&H's financial statements as complying with US GAAP and US GAAS, the fact that L&H's United States headquarters were located in Burlington, Massachusetts, and the fact that KPMG Belgium utilized the services and expertise of KPMG US and its Boston audit team, establishes Massachusetts as the "center of gravity" of the acts and omissions of KPMG Belgium giving rise to this action.

WHEREFORE, Plaintiff demands judgment against KPMG Belgium for damages in excess of $340 million, plus interest, cost and all other relief that the Court deems just and proper.

## COUNT III

### (Aiding and Abetting Breach of Fiduciary Duty against KPMG US)

107.     The Liquidating Trustee realleges paragraphs 1 through 89 as through fully set forth herein.

108.     By virtue of their position with the Company, all of the Breaching Managers owed fiduciary duties to L&H to fairly and faithfully manage the operations and financial affairs of L&H.

109.     The Breaching Managers breached their fiduciary duties to L&H by overstating and misstating the Company's revenue as set forth above.

\75543\21123\ # 681188 v 5                    28

110.    As further set forth above, KPMG US knowingly participated in and gave substantial assistance to the Breaching Manager's aforementioned breaches of their fiduciary duties.

111.    In fact, the aiding and abetting of the Breaching Managers violations of their fiduciary duties by KPMG US allowed the Breaching Managers to conceal their overstatements and misstatements of L&H's revenue from the independent directors on the Audit Committee until well after the acquisitions of Dictaphone and Dragon had been completed.

112.    As demonstrated by the prompt actions that the Audit Committee undertook to investigate and correct the misstatements and overstatements of revenue after they were revealed by The Wall Street Journal reports, the independent directors could, and would, have prevented the dissemination of the false financial information that were integral to the Dictaphone and Dragon acquisitions.

113.    If the true financial condition of L&H had been revealed, either by corrected financial statements or by the refusal of KPMG US to approve and authorize KPMG Belgium to certify the false financial statements, neither acquisition would have closed.

114.    As a result of the above-described conduct of KPMG US, L&H has suffered substantial damages including, but not limited to, the incurrence of over $340 million of debts that L&H could not possibly repay.

WHEREFORE, Plaintiff demands judgment against KPMG US for damages in excess of $340 million, plus interest, cost and all other relief that the Court deems just and proper.

## COUNT IV

**(Aiding and Abetting Breach of Fiduciary Duty against KPMG Belgium)**

115.    The Liquidating Trustee realleges paragraphs 1 through 89 as through fully set forth herein.

116.    By virtue of their position with the Company, all of the Breaching Managers owed fiduciary duties to L&H to fairly and faithfully manage the operations and financial affairs of L&H.

117.    The Breaching Managers breached their fiduciary duties to L&H by overstating and misstating the Company's revenue as set forth above.

118.    As further set forth above, KPMG Belgium knowingly participated in and gave substantial assistance to the Breaching Manager's aforementioned breaches of their fiduciary duties.

119.    In fact, the aiding and abetting of the Breaching Managers violations of their fiduciary duties by KPMG Belgium allowed the Breaching Managers to conceal their overstatements and misstatements of L&H's revenue from the independent directors on the Audit Committee until well after the acquisitions of Dictaphone and Dragon had been completed.

120.    As demonstrated by the prompt actions that the Audit Committee undertook to investigate and correct the misstatements and overstatements of revenue after they were revealed by The Wall Street Journal reports, the independent directors could, and would, have prevented the dissemination of the false financial information that were integral to the Dictaphone and Dragon acquisitions.

121.    If the true financial condition of L&H had been revealed, either by corrected financial statements or by the refusal of KPMG Belgium to certify the false financial statements, neither acquisition would have closed.

122.    As a result of the above-described conduct of KPMG Belgium, L&H has suffered substantial damages including, but not limited to, the incurrence of over $340 million of debts that L&H could not possibly repay.

WHEREFORE, Plaintiff demands judgment against KPMG Belgium for damages in excess of $340 million, plus interest, cost and all other relief that the Court deems just and proper.

## COUNT V

### (Malpractice against KPMG US)

123.    The Liquidating Trustee realleges paragraphs 1 through 89, 111 through 113 as though fully set forth herein.

124.    KPMG US owed L&H a duty to exercise care in the performance of its professional services and a duty to perform those services in accordance with the accepted professional practices and standards.

125.    KPMG US breached those duties for the reasons set forth above.

126.    As a result of KPMG US's breach of its duties to L&H, L&H has suffered damages including, but not limited to, the incurrence of over $340 million of debt that L&H could not possibly repay.

WHEREFORE, Plaintiff demands judgment against KPMG US for damages in excess of 340 million, plus interest, cost and all other relief that the Court deems just and proper.

## COUNT VI

### (Malpractice against KPMG Belgium)

127.    The Liquidating Trustee realleges paragraphs 1 through 89, 119 through 121 as though fully set forth herein.

\75543\21123\ # 681188 v 5                              31

128.    KPMG Belgium owed L&H a duty to exercise care in the performance of its professional services and a duty to perform those services in accordance with the accepted professional practices and standards.

129.    KPMG Belgium breached those duties for the reasons set forth above.

130.    As a result of KPMG Belgium's breach of its duties to L&H, L&H has suffered damages including, but not limited to, the incurrence of over $340 million of debt that L&H could not possibly repay.

WHEREFORE, Plaintiff demands judgment against KPMG Belgium for damages in excess of $340 million, plus interest, cost and all other relief that the Court deems just and proper.

Dated: August 2, 2004

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
David W. Trench, Esq.
2500 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2336
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

Counsel for Scott L. Baena, Litigation Trustee of the Lernout & Hauspie Speech Products, N.V. Litigation Trust

-and-

*Baena v. KPMG US*

**FERRY, JOSEPH & PEARCE, P.A.**

/s/ Theodore J. Tacconelli
Theodore J. Tacconelli (No. 2678)
Lisa L. Coggins (No. 4234)
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899
Telephone: (302) 575-1555

Local Counsel for Scott L. Baena, Litigation
Trustee of the Lernout & Hauspie Speech
Products, N.V. Litigation Trust